**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

Southern District of Florida
District of _____
(State)

Case number (*If known*): _____

Chapter you are filing under:
- ☐ Chapter 7
- ☑ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13

☐ Check if this is an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/22

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.**

| | | |
|---|---|---|
| 1. | **Debtor's name** | TGP COMMUNICATIONS, LLC |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years** <br><br> Include any assumed names, trade names, and *doing business as* names | The Gateway Pundit |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 46-4161586 |

**4. Debtor's address**

**Principal place of business**

1820 NE JENSEN BEACH BLVD
Number     Street

UNIT 1120

Jensen Beach     FL     34957
City     State     ZIP Code

Martin County
County

**Mailing address, if different from principal place of business**

Number     Street

P.O. Box

City     State     ZIP Code

**Location of principal assets, if different from principal place of business**

Number     Street

City     State     ZIP Code

**5. Debtor's website** (URL)     http://www.thegatewaypundit.com

**6. Type of debtor**
- ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding LLP)
- ☐ Other. Specify: _____

4

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* _____ |
|---|---|---|---|
| | Name | | |

**7. Describe debtor's business**

**A.** *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

**B.** *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

**C.** NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.naics.com/search/ .

5178

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check all that apply:*

　☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

　☑ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

　☐ A plan is being filed with this petition.

　☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

　☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

　☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No

☐ Yes. District _____ When _____ Case number _____
　　　　　　　　　　　　　　MM / DD / YYYY

　　　District _____ When _____ Case number _____
　　　　　　　　　　　　　MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____ Relationship _____

　　　District _____ When _____
　　　　　　　　　　　　　　　　　　MM / DD / YYYY

　　　Case number, if known _____

5

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**11. Why is the case filed in *this district*?**

Check all that apply:

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
Number          Street

_____

_____  _____  _____
City                                                    State          ZIP Code

**Is the property insured?**

☐ No
☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

| ■ | **Statistical and administrative information** |
|---|---|

**13. Debtor's estimation of available funds**

Check one:

☑ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☑ 1-49
☐ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

**15. Estimated assets**

☐ $0-$50,000
☐ $50,001-$100,000
☐ $100,001-$500,000
☐ $500,001-$1 million

☐ $1,000,001-$10 million
☐ $10,000,001-$50 million
☐ $50,000,001-$100 million
☐ $100,000,001-$500 million

☐ $500,000,001-$1 billion
☐ $1,000,000,001-$10 billion
☐ $10,000,000,001-$50 billion
☐ More than $50 billion

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) |
|---|---|---|
| | Name | |

**16. Estimated liabilities**

- ☐ $0-$50,000
- ☐ $50,001-$100,000
- ☑ $100,001-$500,000
- ☐ $500,001-$1 million

- ☐ $1,000,001-$10 million
- ☐ $10,000,001-$50 million
- ☐ $50,000,001-$100 million
- ☐ $100,000,001-$500 million

- ☐ $500,000,001-$1 billion
- ☐ $1,000,000,001-$10 billion
- ☐ $10,000,000,001-$50 billion
- ☐ More than $50 billion

## Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  04/24/2024
                    MM  / DD / YYYY

✖ /s/ James Hoft                                    James Hoft
Signature of authorized representative of debtor    Printed name

Title  Manager

**18. Signature of attorney**

✖ /s/ Bart Houston                    Date  04/24/2024
Signature of attorney for debtor            MM   / DD / YYYY

Bart Houston
Printed name
Houston Roderman PLLC
Firm name
633 S. Andrews Avenue Suite 500
Number       Street
Ft. Lauderdale                              FL          33301
City                                        State       ZIP Code
954-900-2615                                bhouston@thehoustonfirm.com
Contact phone                               Email address

0623636                                     FL
Bar number                                  State

7

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                    Chapter 11

TGP COMMUNICATIONS, LLC                    Case No.  24-13938-MAM

     Debtor.

_____/

## CHAPTER 11 CASE MANAGEMENT SUMMARY

In compliance with Local Rule 2081-1(B), the Debtor-in-Possession, TGP Communications, LLC (the "**Debtor**") files this Chapter 11 Case Management Summary and states:

The following data represents approximations for background information only and the information may represent the Debtor's best estimate in response to some of the ensuing questions.

1. Date of Order for Relief under chapter 11 (filing date of petition if voluntary chapter 11 petition):

   **April 24, 2024**

2. Names, case numbers and dates of filing of related debtors:

   **N/A**

3. Description of debtor's business:

   **The Debtor owns and operates a conservative news and opinion website**

4. Locations of debtor's operations and whether the business premises are leased or owned:

   **The Debtor operates from Jensen Beach Florida address**.

5. Reasons for filing chapter 11:

   **Multiple litigations that threaten the Debtor's continued viability and ability to continue operations.**

6. List of officers and directors, if applicable, and their salaries and benefits at the time of filing and during the 1 year prior to filing:

7.     Debtor's fiscal or calendar year to date gross income and the debtor's gross income for the calendar or fiscal year prior to the filing of this petition:

**2024: $   725,128.81**
**2023: $3,097,988.38**

8.     Amounts owed to various creditors:

a.   Obligations owed to priority creditors including priority tax obligations:

**N/A**

b.   With respect to creditors holding secured claims, the name of and amounts owed to such creditors and a description and estimated value of all collateral of the debtor securing their claims, and

**N/A**

c.   Amount of unsecured claims:

**Approximately $108,000 of known liquidated claims.**

9.     General description and approximate value of the debtor's assets:

**Investment Accounts**
**Vehicle**
**Approximately $ 180,313**
**(Good will – unknown)**

10.    List of all insurance policies, the property covered under the policy, the name of the insurer, the policy number, amount of coverage, whether the premium is current, the date the next premium is due and date the policy expires;

**Media Professional Liability policy.**
**Atlantic Specialty Insurance Company**
**MEP-23005-20**
**Coverage amount: $2,000,000**
**Premium is current; Current expiration date is unknown (most current form of policy has been requested).**

**Captive insurance policy**
**Information is forthcoming**

11.    Number of employees and amounts of wages owed as of petition date:

**One Employee – no wages owed on petition date**

12.     Status of debtor's payroll and sales tax obligations, if applicable.   This does not eliminate the obligation of chapter 11 debtors (other than individuals not engaged in business) to provide the more detailed payroll tax information required by Local Rule 2081-1(A):

**Current**

13.     Anticipated emergency relief to be requested within 14 days from the petition date:

**The Debtor anticipates filing a motion for authorization to appoint John Burns. Esq. as service agent for the contract writers.  Due to some of the controversial articles published by the Debtor, the contract writers have requested to remain anonymous in public filings.**

Dated: April 29, 2024

/s  James Hoft
James Hoft

**HOUSTON RODERMAN**
Attorney for Debtor

By:     /s/ Bart A. Houston
        Bart A. Houston
        Florida Bar No. 623636
        633 S. Andrews Ave. Suite 500
        Ft. Lauderdale, Florida 33301
        Telephone: (954) 900-2615
        Facsimile: (954) 839-9068
        Primary Email: bhouston@thehoustonfirm.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### www.flsb.uscourts.gov

In re:                                                    **Chapter 11**

**TGP COMMUNICATIONS, LLC**                    **Case No.  24-13938-MAM**

   Debtor.

_____/

### DEBTOR'S APPLICATION FOR AUTHORIZATION TO
### EMPLOY AND RETAIN HOUSTON RODERMAN, PLLC
### AS BANKRUPTCY COUNSEL FOR DEBTOR-IN-POSSESSION

**TGP COMMUNICATIONS, LLC** ("**Debtor**") requests entry of an order of the Court

authorizing the employment and retention of Bart A. Houston, Esq. and Houston Roderman, PLLC

(collectively, "**HR**") as general bankruptcy counsel to the Debtor in connection with its Chapter 11

case in accordance with the terms and conditions set forth in this Motion.

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157(b) and

1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 327(a) and 330 of

Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2014(a) and 2016 of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Local Rules 2014-1 and

2016-1.

**Background**

4.    On April 24, 2024, the Debtor filed its Voluntary Petition under Chapter 11, Sub chapter V of the U.S. Bankruptcy Code. The Debtor continues to operate as Debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

5.    The Debtor is a Missouri limited liability company that maintains its principal place of business in Palm Beach County.

**HR Qualifications**

6.    The Debtor seeks to retain HR as its bankruptcy counsel because of the firm's experience and knowledge with regard to debtors' and creditors' rights and reorganization under Chapter 11 of the Bankruptcy Code. The Debtor believes that HR is well qualified and able to represent it in this Chapter 11 case in an efficient and timely manner.

**Services to be Provided**

7.    Consistent with the terms of the retainer agreement with the Debtor, the professional services HR shall render may be summarized as follows:

    a.  Advise the Debtor with respect to its powers and duties as debtor-in-possession and generally advise on matters of bankruptcy law in connection with this case;

    b.  Advise the Debtor with respect to its responsibilities in complying with the U.S. Trustee's Operating Guidelines, Reporting Requirements and with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, applicable bankruptcy rules, including local rules, pertaining to the administration of the case;

    c.  To prepare motions, applications answers, orders, reports and any other legal documents necessary in the administration of the case;

    d.  To negotiate with creditors, prepare and seek confirmation of a plan of reorganization and related documents, and assist the Debtor with implementation of any plan;

    e.  Review executory contracts and unexpired leases, if any;

    f.  To negotiate and document any financing matters;

    g.  To advise the Debtor regarding immediate litigation issues;

2

h.  To protect the interest of the Debtor in all matters pending before the Court; and

i.  To undertake the filing and prosecution of any claims or actions against creditors or other third parties.

## **Professional Compensation**

8.    HR will apply for compensation for services rendered and reimbursement of costs incurred on behalf of the Debtor pursuant to sections 330 and 331 of the Bankruptcy Code, and as may be adjusted from time to time in accord with the Bankruptcy Rules, the Local Rules, the guidelines established by the Office of the United States Trustee for the Southern District of Florida (the "**U.S. Trustee**") and other applicable procedures and orders of the Court.

9.    HR will provide services on an hourly basis, at rates comparable to those for comparable matters.  Currently, the partner rate for Bart A. Houston is $595.00 per hour, associates at $450.00 and non-attorney paraprofessionals is $150.00 - $185.00.

10.    On Tuesday, April 16, 2024, HR received a fee retainer of $50,000.00 and cost retainer of $7,500.00 from the Debtor.

11.    Prior to the filing of the Bankruptcy Case, HR applied: $1,738.00 for the Chapter 11 filing fee and $24,800.00 for prepetition services including the gathering and study of the financial information, research (legal and otherwise), preparation of schedules and related documents for the bankruptcy filing and litigation matters pending in other jurisdictions.

12.    HR will not be paid any compensation by the Debtor except upon application by HR and upon approval by the Court after notice and hearing.

13.    To the best of the Debtor's knowledge, neither Bart A. Houston nor Houston Roderman, PLLC has any connection with the creditors or other parties-in-interest or their respective attorneys except as set forth in the Houston Declaration. Neither Bart A. Houston nor Houston Roderman, PLLC represents any interest adverse to the Debtor. Thus, the Debtor believes that Bart

A. Houston and Houston Roderman, PLLC are disinterested as required by section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.

14.     Attached to this application as ***Exhibit "A"***, is the *Declaration of Bart A. Houston, Esq on Behalf of Houston Roderman, PLLC as Proposed Bankruptcy Counsel for Debtor-In-Possession* demonstrating that Bart A. Houston and Houston Roderman, PLLC are "disinterested" as required by 11 U.S.C. § 327(a) and Bankruptcy Rule 2014.

**WHEREFORE,** TGP Communications, LLC, as Debtor in Possession seeks approval of Houston Roderman, PLLC and Bart A. Houston, Esq. as general bankruptcy counsel in accordance with the terms and conditions stated in this application.

**Dated: April 30, 2024**

/s/ James Hoft
TGP Communications, LLC,
Debtor-in-Possession

# Exhibit "A"

**Declaration of Bart A. Houston**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                    **Chapter 11**

**TGP COMMUNICATIONS, LLC**                **Case No.  24-13938-MAM**

      **Debtor.**

_____/

### DECLARATION OF BART A. HOUSTON, ESQ ON BEHALF OF HOUSTON RODERMAN, PLLC AS PROPOSED BANKRUPTCY COUNSEL FOR DEBTOR-IN-POSSESSION

I, Bart A. Houston, declare as follows:

1.     I am an attorney employed by Houston Roderman, PLLC ("**HR**"). HR maintains offices for the practice of law at 633 S. Andrews Avenue, Suite 500, Fort Lauderdale, Florida 33301.

2.     I am familiar with the matters set forth herein and make this Affidavit in support of the *Application of Debtor-In-Possession for Employment of Bart A. Houston and Houston Roderman, PLLC as Proposed Bankruptcy Counsel for Debtor-In-Possession* (the "**Application**").

3.     In support of the Application, I disclose the following:

a.     Unless otherwise stated, this Affidavit is based upon facts of which I have personal knowledge.

b.     In preparing this Affidavit, I have reviewed the list of all creditors and any close relationships of the Debtor. HR maintains a computerized billing and conflict check system. HR has compared the information obtained thereby with the information contained in its client and adverse party conflict check system. The facts stated in this Affidavit as to the relationship between HR and the Debtor, the Debtor's creditors, the United States Trustee, and those persons and entities who are defined as disinterested persons in Section 101(14) of the Bankruptcy Code, are based on the results

6

of my review of HR's conflict check system. Based upon such search, HR does not represent any entity in any matter involving or adverse to the Debtor or which would constitute a conflict of interest or impair the disinterestedness of HR in respect of its representation of the Debtor in this case.

4.     HR's client and adverse party conflicts check system is comprised of records regularly maintained in the course of business by HR, and it is the regular practice of HR to make and maintain these records. The system reflects entries that are noted at the time the information becomes known by persons whose regular duties include recording and maintaining this information.  I am the person who is responsible for the supervision of the system and ensure this system remains up-to-date, and I regularly use and rely upon the information contained in the system in the performance of my duties with HR and in my practice of law.

5.     HR neither holds nor represents any interest adverse to the Debtor and is disinterested person within the scope and meaning of Section 101(14) of the Bankruptcy Code.

6.     Neither I nor HR has or will represent any other entity in connection with this case, and neither I nor HR will accept any fee from any other party or parties in this case, except the Debtor in Possession or otherwise disclosed in this affidavit and application, or otherwise authorized by the Court.

7.     Beginning in or about February 2024, the Debtor consulted HR for advice and information relating to the potential filing of a voluntary petition in the Southern District of Florida. On April 16, 2024, HR received a fee retained of $50,000.00 and cost retainer of $7,500.00.

8.     Prior to the filing of the Bankruptcy Case, HR has studied and researched issues concerning the Debtor's litigation in other jurisdictions and advised the Debtor of its options for the

filing of the bankruptcy case and otherwise gathered and organized the financial and related information necessary to file the Bankruptcy Case.

9.     On April 24, 2024, HR applied: $1,738.00 for the Chapter 11 filing fee from the cost retainer and $24,800.00 from the fee retainer for the prepetition services and preparation of information for the Chapter 11 filing.  As of the date of filing, HR is holding $25,200.00 from the remaining fee retainer and $5,307.00 for costs.

10.     The professionals' fees and costs to be incurred by HR in the course of its representation of the Debtor in this case shall be subject in all respects to the application and notice requirement of 11 U.S.C. §§ 330 and 331 and Fed. R. Bank. P. 2014 and 2016.

11.     The hourly rate for lawyers working on this matter is as follows: Bart A. Houston is $595.00 and Alex Lewitt is $450.00.

12.     The hourly rate for the clerks and para-professionals at HR is $150.00 - $185.00. HR reserves the right to increase its hourly rates in accordance with its normal and customary business practices.

13.     There is no agreement of any nature as to the sharing of any compensation to be paid to HR, except between the employees of HR. No promises have been received by HR, nor any member or associate thereof, as to compensation in connection with this case other than in accordance with the provisions of the Bankruptcy Code and as disclosed in this affidavit.

14.     No attorney at HR has any other interest, direct or indirect, that may be affected by the proposed representation.

15.     Except as set forth herein, no attorney at HR has had or presently has any connection with the above-captioned Debtor or the estate on any matters in which HR is to be engaged.

16.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

**Dated:  April 30, 2024**

**HOUSTON RODERMAN, L.L.C.**
*Proposed Attorney for Debtor-in-Possession*

By:     /s/ Bart A. Houston
          Bart A. Houston
          Florida Bar No. 623636
          633 S. Andrews Ave. Suite 500
          Ft. Lauderdale, Florida 33301
          Telephone: (954) 900-2615
          Facsimile: (954) 839-9068
          Primary Email: bhouston@thehoustonfirm.com
          Secondary Email: dschena@thehoustonfirm.com

9

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                     **Chapter 11**

**TGP COMMUNICATIONS, LLC**                **Case No.  24-13938-MAM**

      **Debtor.**

_____/

**CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)**

    Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the undersigned counsel for **TGP COMMUNICATIONS, LLC,** in the above captioned action, certifies that the following is a (are) corporation(s), other than the debtor or a governmental unit, that directly or indirectly own(s) 10% or more of any class of the corporations's equity interests, or states that there are no entities to report under Fed. R. Bankr. P. 7007.1:

    1.    **None.**

**Dated: May 2, 2024**

                                 **HOUSTON RODERMAN**
                                 *Attorney for Debtor-in-Possession*

           By:    /s/ Bart A. Houston_____
                  Bart A. Houston
                  Florida Bar No. 623636
                  633 S. Andrews Ave. Suite 500
                  Ft. Lauderdale, Florida 33301
                  Telephone: (954) 900-2615
                  Facsimile: (954) 839-9068
                  Primary Email: bhouston@thehoustonfirm.com
                  Secondary Email: dschena@thehoustonfirm.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                    **Chapter 11**

**TGP COMMUNICATIONS, LLC**                **Case No.  24-13938-MAM**
        **Debtor.**

_____/

**NOTICE OF FILING DOCUMENTS**
**FOR SMALL BUSINESS AS REQUIRED BY 11 USC §1116(1)**

      **TGP COMMUNICATIONS, LLC** the debtor and debtor-in-possession (the "**Debtor**"),

through its Manager, James Hoft, as required by 11 U.S.C. §1116(1) files the following documents:

1. The Debtor's Balance Sheet for 1st quarter of 2024.

2. The Debtor's Profit and Loss and Statement of Cash Flows for 1st quarter 2024.

3. The Debtor's 2021 and 2022 Federal Tax Returns are filed under separate docket entry, restricted and only available to the U.S. Trustee's Office.

**Dated: May 2, 2024**

                    **HOUSTON RODERMAN**
                    *Attorney for Debtor-in-Possession*

          By:    /s/ Bart A. Houston
                Bart A. Houston
                Florida Bar No. 623636
                633 S. Andrews Ave. Suite 500
                Ft. Lauderdale, Florida 33301
                Telephone: (954) 900-2615
                Facsimile: (954) 839-9068
                Primary Email: bhouston@thehoustonfirm.com
                Secondary Email: dschena@thehoustonfirm.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served

by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing

System on May 2, 2024.

By:     */s/ Bart A. Houston*
Bart A. Houston, Esq.
Florida Bar No. 623636

1:24 PM

04/17/24

Cash Basis

# TGP Communications, LLC
# Balance Sheet
### As of March 31, 2024

|  | Mar 31, 24 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Checking - US BANK | 84,494.16 |
| PT Checking | 2,114.01 |
| Revolut Business | 329,647.07 |
| TGP Store Account | 5,000.00 |
| TGP Store Account 2 | 100.00 |
| **Total Checking/Savings** | 421,355.24 |
| **Other Current Assets** | |
| Due From Shareholder-Condo | 799,860.00 |
| Due to/From Justice League | 150,000.00 |
| Loan to Joe Hoft | 21,000.00 |
| Schwab Investment Account | 104,422.67 |
| **Total Other Current Assets** | 1,075,282.67 |
| **Total Current Assets** | 1,496,637.91 |
| **Fixed Assets** | |
| **Investments** | |
| Coinbase.com | 10,000.00 |
| Robin Hood Investments | 25,000.00 |
| Uphold HQ Investments | 4,700.00 |
| WeBull Finacial | 100.00 |
| **Total Investments** | 39,800.00 |
| **Vehicles** | |
| 2021 Porsche | 88,055.70 |
| Vehicles - Accum Depr | -51,963.73 |
| **Total Vehicles** | 36,091.97 |
| **Total Fixed Assets** | 75,891.97 |
| **TOTAL ASSETS** | **1,572,529.88** |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Other Current Liabilities** | |
| **Payroll Liabilities** | |
| 401(k) Employee Liability | -10,000.00 |
| Federal Taxes (941/944) | 3,395.71 |
| **Total Payroll Liabilities** | -6,604.29 |
| **Total Other Current Liabilities** | -6,604.29 |
| **Total Current Liabilities** | -6,604.29 |
| **Total Liabilities** | -6,604.29 |
| **Equity** | |
| **Owner's Equity** | |
| Contributions | 8,047.00 |
| Draws | -691,095.50 |
| Estimated Fed Taxes | -205,922.53 |
| Estimated MO Taxes | -33,871.50 |
| **Total Owner's Equity** | -922,842.53 |
| Retained Earnings | 2,253,939.56 |
| Net Income | 248,037.14 |
| **Total Equity** | 1,579,134.17 |
| **TOTAL LIABILITIES & EQUITY** | **1,572,529.88** |

Page 1

23

**1:23 PM**

**04/17/24**

**Cash Basis**

# TGP Communications, LLC
## Profit & Loss
### January through March 2024

|  | Jan - Mar 24 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Gross Receipts** | |
| Christopher D Do | 146,667.47 |
| Donations | 20,101.44 |
| Economic Advisors | 342,304.70 |
| Facebook | 435.47 |
| Leven Labs Inc. | 96,224.26 |
| Liftable Media | 19,603.08 |
| Rumble | 83,363.85 |
| Twitter Income | 3,640.62 |
| Zelenko Labs | 12,787.92 |
| **Total Gross Receipts** | 725,128.81 |
| **Total Income** | 725,128.81 |
| **Gross Profit** | 725,128.81 |
| **Expense** | |
| **Auto Expenses** | |
| Fuel | 54.79 |
| **Total Auto Expenses** | 54.79 |
| **Bank & Credit Card Fees** | 1,090.33 |
| **Contractors** | |
| Advertiser, Poen | 6,000.00 |
| Conference, McCulloch | 29,664.02 |
| Lupo, Brian | 6,342.23 |
| **Writers** | |
| Fairbanks, Cassandra | 16,483.87 |
| Goglanian, Cristina (Laila) | 45,098.02 |
| Lachance, Michael | 11,285.99 |
| McMurray, Patty | 1,089.82 |
| Powe, Alicia | 4,295.46 |
| Taylor, Kristinn | 4,987.84 |
| **Total Writers** | 83,241.00 |
| **Contractors - Other** | 137,466.83 |
| **Total Contractors** | 262,714.08 |
| **Dues & Subscriptions** | 1,242.25 |
| **Information Technology** | |
| IT - Kirk | 3,600.00 |
| Software | 12,699.33 |
| Website | 5,047.69 |
| **Total Information Technology** | 21,347.02 |
| **Insurance** | |
| Insurance - Liability | 3,113.00 |
| **Total Insurance** | 3,113.00 |
| Internet/Telephone | 702.00 |
| Legal Fees | 70,000.00 |
| Meals | 96.97 |
| Memberships | 2,605.00 |
| Miscellaneous | 300.99 |
| Office Expenses | 100.00 |
| **Payroll Expenses** | |
| Wages | 45,000.00 |
| Payroll Expenses - Other | 2,627.70 |
| **Total Payroll Expenses** | 47,627.70 |

## TGP Communications, LLC
# Profit & Loss
### January through March 2024

|  | Jan - Mar 24 |
|---|---:|
| **Payroll Support** | 504.74 |
| **Professional Fees** | 4,890.00 |
| **Travel** | |
| Travel - Lodging | 3,542.12 |
| Travel - Transportation | 1,219.01 |
| Travel - Other | 122.45 |
| **Total Travel** | 4,883.58 |
| **Total Expense** | 421,272.45 |
| **Net Ordinary Income** | 303,856.36 |
| **Other Income/Expense** | |
| **Other Expense** | |
| Ask My Accountant | 55,819.22 |
| **Total Other Expense** | 55,819.22 |
| **Net Other Income** | -55,819.22 |
| **Net Income** | **248,037.14** |

# TGP Communications, LLC
## Statement of Cash Flows
### January through March 2024

|  | Jan - Mar 24 |
|---|---|
| **OPERATING ACTIVITIES** |  |
| **Net Income** | 248,037.14 |
| **Adjustments to reconcile Net Income** |  |
| **to net cash provided by operations:** |  |
| **Payroll Liabilities:Federal Taxes (941/944)** | 3,395.71 |
| **Net cash provided by Operating Activities** | 251,432.85 |
| **FINANCING ACTIVITIES** |  |
| **Owner's Equity:Draws** | -65,984.12 |
| **Net cash provided by Financing Activities** | -65,984.12 |
| **Net cash increase for period** | 185,448.73 |
| **Cash at beginning of period** | 235,906.51 |
| **Cash at end of period** | **421,355.24** |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                              Chapter 11
**TGP COMMUNICATIONS, LLC**                          Case No.  24-13938-MAM
         Debtor.
_____/

**NOTICE OF FILING**

   **TGP COMMUNICATIONS, LLC** (the "**Debtor**"), hereby files the *Retainer Agreement*,

which is attached as Exhibit "A".

Dated: May 2, 2024

                              **HOUSTON RODERMAN**
                              *Attorney for Debtor-in-Possession*

               By:     /s/ Bart A. Houston_____
                       Bart A. Houston
                       Florida Bar No. 623636
                       633 S. Andrews Ave. Suite 500
                       Ft. Lauderdale, Florida 33301
                       Telephone: (954) 900-2615
                       Facsimile: (954) 839-9068
                       Primary Email: bhouston@thehoustonfirm.com
                       Secondary Email: dschena@thehoustonfirm.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing System on May 2, 2024.

By:    */s/ Bart A. Houston*
Bart A. Houston, Esq.
Florida Bar No. 623636

# EXHIBIT "A"
## Retainer Agreement

# HOUSTON RODERMAN

**633 South Andrews Avenue**
**Suite 500**
**Ft. Lauderdale, Fla. 33301**

BART A. HOUSTON
DIRECT: 954.900.2615
CELL: 954.609.1075
EMAIL: bhouston@houstonroderman.com

April 12, 2024

**By Facsimile and U.S. Mail**
TGP Communications, LLC
d/b/a The Gateway Pundit
c/o James Hoft
8750 S Ocean Drive
Apt 534
Jensen Beach, FL 34957

### Re: Engagement Letter for TGP Communications d/b/a The Gateway Pundit Chapter 11 Bankruptcy Case

Dear Mr. Hoft:

We are pleased that TGP Communications, LLC d/b/a The Gateway Pundit (the "Client" or "Company") has decided to engage Houston Roderman, PLLC (the "Firm") to represent it in connection with the filing of a voluntary Chapter 11 bankruptcy petition under Sub-chapter V (small business chapter) in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Proceeding").

Prior to the filing of the bankruptcy petition, we will prepare all of the necessary pleadings to commence the Bankruptcy Case and to otherwise address the various matters related thereto. As discussed with your legal counsel and management, once the Bankruptcy Case is filed, our representation of the Company is subject to the approval of the Bankruptcy Court upon motion and a hearing. During the Bankruptcy Case, we will represent the interest of the Company as a debtor in possession under the Bankruptcy Code and such representation shall include, but shall not be limited to: (i) the preparation, filing, and (if necessary) amendment to the voluntary petition, schedules, statement, lists, applications to employ professionals, a plan of reorganization, and any other customary or appropriate pleadings, motions and notices; (ii) meetings, discussions and negotiations with creditors and if applicable the Office of the United States Trustee, (iii) appearance and representation at the meeting of creditors, any depositions scheduled pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, and at hearings, trials, or other court appearances; (iv) objections to claims and related contested matters; and (v) the institution of appropriate adversary proceedings.

Consistent with the rules of professional responsibility which govern all attorneys, it is our Firm's practice to advise Clients in writing of the terms and conditions under which we undertake a representation. The Firm is also required to inform the Company of any conflicts of interest which may be presented by the representation and give the Company an opportunity to

ask questions, evaluate your options, and (if appropriate) to provide the Company with informed consent to the Firm's representation in the Bankruptcy case irrespective of the potential conflict of interest.

Based upon our discussions to date, we have a good understanding of the goals that the Company wants to achieve. We will continue to work with the Company to develop such strategies consistent with the best interests of the Company, its creditors and members. Consistent with the rules of professional responsibility which govern all attorneys, it is our firm's practice to advise clients in writing of the terms and conditions under which we undertake a representation.

To protect all of us and to comply with our professional obligations, this engagement is subject to clearance of any conflicts of interest with present or former clients of our Law Firm. We have performed a conflict check regarding those parties who we anticipate will be adverse to the Company and have determined that no conflict exists at this time. In order to help us in the future, if you or the Company becomes aware of additional potential adverse parties, then please provide us with the name of any such person or entity as soon as possible. Also, if we become aware of any potential or actual conflict, we will so advise you.

I will have primary responsibility for this engagement and will use other attorneys and legal assistants in our firm in the exercise of my professional judgment. The fees and expenses for our representation will be based on the provisions set forth herein and in our Standard Terms and Conditions, which are annexed to and made a part of this letter agreement. My hourly rate is $595.00. The other lawyers' and paralegals' hourly rates range as follows: from $125.00-$150.00 (paralegal); $425.00 (mid-level associate); and $565.00 -$595.00 (senior partners).

We want to assure you that we will endeavor to serve the Company effectively and strive to represent its interests vigorously and efficiently. To advance these goals, the Company agrees to disclose fully and accurately all pertinent facts and keep us appraised of all developments. The Company further agrees otherwise to cooperate fully with us and to be available to attend such meetings as are appropriate. During the course of our representation, we may express opinions regarding issues for which we are being engaged or various courses of action and the results that might be anticipated. Any such statement made by me or by any partner, associate or employee of our firm, is intended to be an expression of opinion only, based on information available to us at the time, and should not be construed as a promise or guarantee. Needless to say, there can be no assurances that our efforts on your behalf will be successful.

In connection with the preparation and filing of a bankruptcy petition, unless it agreed in writing by us otherwise, I have requested and you have agreed that the Company pay an initial fee retainer of **$50,000.00** (the "Fee Retainer"), receipt of which has been acknowledged by the Firm, part of which shall be allocated towards payment of fees incurred in the Bankruptcy Case and anticipated costs of **$7,500.00** (the "Cost Retainer" and along with the Fee Retainer, the "Retainer"). The Retainer quoted here is for the bankruptcy filing only and upon depletion of the Retainer, the Firm shall be authorized to request and seek additional fees from the Bankruptcy Court. If further litigation becomes necessary for the Company, the Firm will require an additional retainer.

Our fees will be based primarily on the amount of time spent on behalf of the Company. Each lawyer and paraprofessional has an hourly billing rate based generally on experience and special knowledge. The rate, multiplied by the time expended on your behalf will be the initial basis for determining our professional fees. Please keep in mind that, under the applicable provisions of the Bankruptcy Code, we cannot be a creditor of the Company and represent the Company as bankruptcy counsel. As a result, we anticipate that the Firm will incur fees and costs for the "pre-petition" work in connection with, among other things, pre-filing consultation, research, telephone and zoom conferences, preparation of the bankruptcy petition, bankruptcy schedules/statement of financial affairs and "first day motions." This may increase or decrease depending on the number of issues that need to be addressed pre-petition in connection with such preparation and the availability of the necessary information and documentation.

In addition, we can only be paid from (i) funds that are not subject to liens of secured creditors, (ii) funds subject to liens of secured creditors with their consent, or (iii) funds from new loans made to the Company by a DIP lender, subject to such lender's consent. As a result, there is substantial risk in the payment of professional fees after the filing of a bankruptcy. Therefore, the Firm requires the full retainer be paid prior to the filing of the bankruptcy sufficient to cover an initial portion of the fees that we anticipate that we will incur throughout the first several months of the case. Ultimately, all professional fees will need to be paid, or arrangement made for the payment thereof, at the time of confirmation of a bankruptcy plan.

Please review this agreement carefully, and if you have any questions concerning the foregoing terms and conditions, do not hesitate to contact me. If this agreement is acceptable to you, please acknowledge that the appropriate Company representatives have reviewed it, understands it, and desires to retain us on the basis of the terms of this letter and attachment by signing this letter, and initializing each page of the Standard Terms and Conditions of Engagement together with the retainer. We recommend that you keep a copy of this letter and our Standard Terms in your file. Thank you for allowing us to be of service.

Thank you for retaining us and we look forward to working with you in these matters.

Sincerely,

**HOUSTON RODERMAN, PLLC**

Bart A. Houston
For the Firm

**THE ABOVE REPRESENTATION IS ACCEPTED
AND AGREED TO:**

**TGP Communications, LLC d/b/a The Gateway Pundit**

**By:** _____

**Its:** _____

3

## STANDARD TERMS AND CONDITIONS OF ENGAGEMENT

1. **Fees**: We take into account many factors in billing for services rendered. The principal factor is our schedule of hourly rates, and most statements for services are the product of the time worked (in units of tenths of an hour) multiplied by the hourly rates for the attorneys and legal assistants who did the work. The client will be billed for all time spent on its behalf, including without limitation conferences, telephone calls, drafting, research, and travel.

It is impossible to determine in advance how much time will be needed, since that depends on many things beyond our control. Any figures we give you for the cost of all or part of our engagement are merely estimates.

Our schedule of hourly rates for attorneys and other members of the professional staff is based on years of experience, specialization in training and practice, level of professional attainment, and overhead costs. Currently our hourly rates range from $150.00 for legal assistants to $595.00 for our most senior partners. We reconsider our schedule of hourly rates annually, and may revise them at that time. If we change our rates, the new rates will go into effect only upon notice to the client. Upon request, we will provide a client with the rates of those professional staff working on an engagement.

2. **Costs**: It is usually necessary for us to incur, as agent for our clients, expenses for items such as filing fees, travel, lodging, meals, toll telephone calls, photocopying, facsimiles and courier services. Many engagements require substantial amounts of costly ancillary services such as outside duplication services and computerized legal research. The client is responsible for all costs incurred on the client's behalf. In order to allocate these expenses fairly and to keep our hourly rates as low as possible for those matters which do not involve such expenditures, these items are separately itemized on our statements as "costs advanced" or "disbursements". Major out-of-pocket expenses, including outside fees and expenses (such as printing costs, filing fees, etc.), will not be advanced by us unless special arrangements are made in advance. They will be billed directly or forwarded to our client.

3. **Billing**: Fees and expenses will be billed monthly. Payment is due within thirty (30) days of presentation of the statement, unless we agree otherwise in writing. Bankruptcy Cases will be subject to *"information only"* invoices, but may only be paid upon approval of the bankruptcy court

4. **Late Payments**: We are confident that our clients make every effort to pay us promptly. Occasionally, however, a client has difficulty in making timely payment. To avoid burdening those clients who pay their statements promptly with higher fees reflecting the added costs we incur as a result of clients who are delinquent, we reserve the right to impose an interest/service charge of one percent per month for late payments. In no event will the service charge be greater than permitted by applicable law.

5. **Non-Payment of Fees and Costs**: Failure to pay any statement rendered when due will constitute a default. In the event of a default, you agree that in our discretion we may immediately cease all legal services on your behalf or discontinue our representation (subject to our ethical obligations and any other applicable provision of law). In the unlikely event that we are required to institute legal proceedings to collect fees and costs owed by the client, the

4

prevailing party will be entitled to reimbursement of its reasonable attorneys' fees and other costs of collection.

6. **Termination**:  The client has the right to terminate our representation by written notice at any time.  In that case, the client is not relieved of the obligation to pay for all services rendered and costs incurred on its behalf prior to receipt of such notice.  We have the same right to terminate our engagement, subject to an obligation to give the client reasonable notice to arrange alternative representation.

7. **Applicable Law**:  The laws of the State of Florida will govern the interpretation of this agreement, including all rules or codes of ethics which apply to the provision of services by us.

8. **Payment by Others:**  Sometimes another party to a transaction agrees to pay our client's legal fees, or a court may order our client's adversary to pay all or a part of its legal fees and costs.  However, in such case our client remains primarily liable for payment of all fees and costs.  Any amounts received from others will be credited to the client's account.

**HOUSTON RODERMAN, PLLC**
**(Schedule of Professional Rates – Reorganization case)**

The current hourly rates for the Firm's lawyers and paralegal for the Assignment are as follows:

| | |
|---|---|
| **Bart A. Houston, Esq.** | **$595.00 per hour** |
| **Alex Lewitt, Esq.** | **$425.00 per hour** |
| **Deborah Schena, Paralegal, CLA** | **$150.00 per hour** |
| **Marika Tolz, Admin.** | **$100.00 per hour** |

5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                          **Chapter 11**
**TGP COMMUNICATIONS, LLC**          **Case No.  24-13938-MAM**
        **Debtor.**
_____/

**EX-PARTE MOTION FOR EXTENSION OF TIME TO COMPLY**
**WITH NOTICE OF DEADLINE(S) TO CORRECT FILING DEFICIENCY(IES)**
**[DOC 4]**

**TGP COMMUNICATIONS, LLC ("Debtor")** hereby files this Ex-Parte Motion for

Extension of Time to Comply with Notice of Deadlines to Correct Filing Deficiencies [Doc 4],

and in support thereof, states as follows:

1.      On April 24, 2024, the Debtor filed their Voluntary Petition for relief under

Subchapter V, Chapter 11 of the Bankruptcy Code.

2.      Pursuant to directive from the Office of the Clerk of the United States Bankruptcy

Court for the Southern District of Florida, the Debtor is required to file all remaining Schedules of

Assets and Liabilities, Declaration Concerning Debtor's Schedules, Statement of Financial

Affairs, and List of Equity Security Holders on or before May 8, 2024.

3.      The Debtor requires an additional fourteen (14) days to gather the necessary

information to complete the Schedules until May 22, 2024.

**WHEREFORE**, **TGP COMMUNICATIONS, LLC** requests the entry of an Order

extending the time within which to comply with this Court's Notice of Filing Requirements for an

additional fourteen (14) days and for such other and further relief as this Court deems just and

proper.

**Dated: May 8, 2024**

1

**HOUSTON RODERMAN**
Attorney for Debtor

/s/ Bart A. Houston
Bart A. Houston
Florida Bar No. 623636
633 S. Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 900-2615
Facsimile: (954) 839-9068
Primary Email: bhouston@thehoustonfirm.com
Secondary Email: dschena@thehoustonfirm.com

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing System on May 8, 2024.

/s/ Bart A. Houston
Bart A. Houston
Florida Bar No. 623636



**ORDERED in the Southern District of Florida on May 20, 2024.**

**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                  Chapter 11
**TGP COMMUNICATIONS, LLC**                              **Case No.  24-13938-MAM**
    **Debtor.**

_____/

**ORDER GRANTING EX-PARTE MOTION FOR EXTENSION OF TIME TO COMPLY**
**WITH NOTICE OF DEADLINE(S) TO CORRECT FILING DEFICIENCY(IES)**

THIS MATTER came before the Court for consideration of Debtor's Ex-Parte Motion for

Extension of Time to Comply with Notice of Deadlines to Correct Filing Deficiencies [Doc 22]

(the "Motion").  The Court, having reviewed and considered the Motion, and finding good cause

shown, does hereby order:

    1.      The Ex-Parte Motion for Extension of Time to Comply with Notice of Deadlines

to Correct Filing Deficiencies, is **GRANTED**; and

    2.      Debtor shall file all remaining Schedules and Statements with this Court on or

1

before May 22, 2024.

      3.      No further extensions will be granted absent extraordinary circumstances.


###

**Submitted by:**
Bart A. Houston, Esq.
**Houston Roderman, PLLC**
633 South Andrews Ave, Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 900-2615
Facsimile: (954) 839-9068
bhouston@houstonroderman.com

**Copy furnished to:**
Bart A. Houston, Esq.

*(Attorney Houston shall serve a copy of the signed order on all parties listed below and file with the court a certificate of service conforming with Local Rule 2002-1(F).*

Debtor
Attorney for Debtor
U.S. Trustee
Chapter 11 Trustee (if applicable)
Attorney for Chapter 11 Trustee (if applicable)

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| **TGP COMMUNICATIONS, LLC** | Case No.  24-13938-MAM |
| Debtor. | |

_____/

## MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS

The Debtor and Debtor-in-Possession ("**Debtor**"), by and through its proposed undersigned counsel, seek an Order *Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors* (the "**Motion**").

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought herein are sections 105, 107, 342 and 521 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 1007 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida.

### BACKGROUND

4. On April 24, 2024 (the "**Petition Date**") the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

5. The Debtor is operating its business and managing its affairs as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### RELIEF REQUESTED

6.     By this Motion, the Debtor requests entry of an Order, substantially in the form attached hereto as **Exhibit A**, authorizing, but not directing, the Debtor to suppress personal identifiable information for certain individual creditors (the "**Contract Writers**") that perform contract work for the Debtor.

### BASIS FOR RELIEF AND APPLICABLE AUTHORITY

#### Cause Exists to Authorize the Debtor to
#### Suppress Personal Identifiable Information for Certain Individual Creditors

7.     Section 107(c) of the Bankruptcy Code provides that the Court "for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual [:] …. [a]ny means of identification…contained in a paper filed, or to be filed in a case under" the Bankruptcy Code. 11 U.S.C. § 107(c)(1)(A).

8.     The Debtor respectfully submits that it is appropriate to authorize the Debtor to suppress from any paper filed with the Court in this Chapter 11 Cases, the names, residential addresses and email addresses of the Contract Writers. This request has been made from the Contract Writers to the Debtor and the Debtor supports the relief requested.

9.     The Contract Writers investigate and draft articles to be published on the Debtor's website.  Given the conservative nature of the Debtor's publications and opinions, many of the Contract Writers are subject to extreme criticisms from other less conservative groups.  Further, in the past, several of the Contract Writers have received threats of bodily harm from groups and individuals.

10.     Although the Debtor seeks to suppress the names and addresses of the Contract Writers from filings on the public record, including on the creditor matrix and certificates of service of court papers that will be filed by the Debtor, the Debtor and its counsel will maintain a list of the suppressed Contract Writers so that the Debtor can track and confirm service of court paper details, which will also be made available to the Court, the Sub V Trustee and the U.S. Trustee.[1]

11.     The separate maintenance of a list containing the service details for court papers served upon the Contract Writers will protect their personal information, and will also facilitate an efficient manner to document service. Subject to the Court's approval of the relief requested herein, the Debtor proposes that it will certify service to the Contract Writers by referencing the Court's Order on this Motion and, separately, maintaining a list with the relevant service detail should the Court, US Trustee or other authorized party upon reasonable request require confirmation of service.

12.     As an example, the Debtor may document service by including the following or substantially similar statement on a separate certificate of service, as may be appropriate:

> Pursuant to the Court's Order entered on May ____, 2024 at ECF No. ____, the Debtor served the [named] court papers upon [number] individuals and will separately maintain the service details in order to protect against the disclosure of such individuals' personal information on the public record.

13.     Courts in various jurisdictions have approved relief similar orders in the nature of the relief requested herein with respect to the non-disclosure, redaction, restriction of access to, or suppression of personally identifiable information for individuals, whether they are creditors or

---

[1] The Debtor is not adverse to identifying and appointing a special service agent to act as fiduciary to ensure service upon the Contract Writers.

other parties-in interest. *See, e.g., In re Genesis Global Holdco, LLC*, 652 B.R. 618, 637 (Bankr. S.D.N.Y. 2023) (stating that "[t]he publication of names alone has been found to heighten the risk of identity theft and other harm." and noting that home addresses can easily be found on the internet through the use of an individual's name); *In re Bird Global, Inc., et al.*, Case No. 23-20514 (CLC) (Bankr. S.D. Fla. Dec. 22, 2023) (authorizing the debtors to redact email addresses and home addresses of individual creditors and equity holders); *In re Air Methods Corp., et al.*, Case No. 23-90886 (MI) (Bankr. S.D. Tex. Oct. 25, 2023) (authorizing the debtors to redact the names and e-mail addresses of the debtors' individual employees, creditors, and other individual parties in interest); *In re AeroTech Miami, Inc. d/b/a iAero Tech, et al.*, Case No. 23-17503 (RAM) (Bankr. S.D. Fla. Sept. 22, 2023) (authorizing the  debtors to redact the residential and email addresses of the individual creditors); *In re Forever 21, Inc.,* Case No. 19-12122 (KB) (Bankr. D. Del. Dec. 19, 2019) (authorizing the debtors to redact the home addresses of the debtors' employees); *In re Anna Holdings, Inc.,* Case No. 19-12551 (CSS) (Bankr. D. Del. Dec. 3, 2019); (authorizing the debtors to redact personally identifiable information of all individual creditors and interest holders); *In re Loot Crate, Inc.*, No. 19-11791 (BLS) (Bankr. D. Del. Oct. 1, 2019) (authorizing the debtors to file lists of customer creditors under seal); *In re THG Holdings, LLC*, No. 19-11689 (JTD) (Bankr. D. Del. Aug. 22, 2019) (authorizing the debtors to redact personal identification information of the debtors' employees); and *In re Charming Charlie Holdings Inc.*, No. 19-11534 (CSS) (Bankr. D. Del. Jul. 12, 2019) (authorizing the debtors to redact personally identifiable information of their employees and former employees on the creditor matrix).

      **WHEREFORE**, the Debtor respectfully request entry of an Order in the form attached hereto as **Exhibit A** granting this Motion and, thereby authorizing, but not directing, the Debtor to suppress personally identifiable information for the Debtor's Contract Writers and reflect service

upon them as indicated herein; and granting such other and further relief as the Court deems just and proper.

**Dated: May 21, 2024**

                                   **HOUSTON RODERMAN**
                                   Attorney for Debtor

By:     /s Bart A. Houston
                          Bart A. Houston
                          Florida Bar No. 623636
                          633 S. Andrews Ave. Suite 500
                          Ft. Lauderdale, Florida 33301
                          Telephone: (954) 900-2615
                          Facsimile: (954) 839-9068
                          Primary Email: bhouston@thehoustonfirm.com

EXHIBIT "A"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                    **Chapter 11**

**TGP COMMUNICATIONS, LLC**                **Case No. 24-13938-MAM**

     **Debtor.**
_____/

### ORDER GRANTING DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS

**THIS MATTER** came before the Court on _____, 2024, at _____ a.m./p.m., for a hearing ("Hearing"), upon the *Debtor's Motion for Entry of an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors* [ECF No. ____] (the "Motion") filed by the debtor and debtor-in-possession (the "Debtors").

The Court finds that: (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A); (iii) this Court may enter a final order consistent with Article III of the Constitution; (iv) venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; (v) the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties in interest; (vi) notice of the Motion and the Hearing were appropriate under the circumstances and no other notice need be provided; and (vii) upon review of the record before the Court, including the legal and factual bases set forth in the Motion and the statements made by counsel at the Hearing, good and sufficient cause exists to grant the relief requested.

Accordingly, it is **ORDERED** that:

1.     The Motion is **GRANTED**.

2.      The Debtors are authorized, but not directed, to suppress the names, residential addresses and email addresses of certain individual creditors from any paper filed with the Court in this Chapter 11 Case, including the creditor matrix and certificates of service; provided that the Debtor shall maintain a list of the suppressed individual's personal information so that the Debtor can track and confirm service of court paper details, which shall also be made available to the Court, the Sub Chapter V Trustee and the U.S. Trustee.

3.      The Debtor shall document service by the Debtor upon the suppressed individual creditors by including the following or substantially similar statement on a Certificate of Service:

> Pursuant to the Court's Order entered on May ____, 2024 at ECF No. ____, the Debtor has served the [named] court papers upon [number] individuals and will separately maintain the service details in order to protect against the disclosure of such individuals' personal information on the public record.

4.      The Debtor is authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

5.      The Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

# # #

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                   **Chapter 11**

**TGP COMMUNICATIONS, LLC**                **Case No.  24-13938-MAM**

      **Debtor.**

_____/

**DEBTOR'S PRE-STATUS CONFERENCE**
**REPORT PURSUANT TO 11 U.S.C. §1188(C)**

    TGP COMMUNICATIONS, LLC, as Debtor and Debtor in Possession ("**Debtor**")
pursuant to Section 1188(c**)** of Title 11 of the United States Code and the *Order Setting Subchapter*
*V Status Conference, Claims Bar Date, and Deadline for Elections Under 11 U.S.C. §1111(b)*
(ECF No. 8) provides the following report that details the efforts the Debtor has undertaken and
will undertake to attain a consensual plan of reorganization/liquidation.

    1.    On April 24, 2024, the Debtor filed a voluntary petition for relief under Subchapter
V of Chapter 11 of the United States Code.

    2.    The status conference required by Section 1188(a) of the Bankruptcy Code has been
scheduled for June 4, 2024 at 1:30 P.M. (EST).

    3.    The Debtor continues finalizing and filing all required documents and pleadings
and is otherwise be in compliance with all requirements under Subchapter V of Chapter 11 of the
Bankruptcy Code.

    4.    The meeting of creditors under Section 341 of the Bankruptcy Code is scheduled
for May 30, 2024 at 3:30 pm.

    5.    The Debtor anticipates using its disposable income to pay its creditors over a three
(3) year period.

6.      Efforts have been made to discuss the confirmation of a consensual plan with the largest creditor constituents. The largest creditors are represented by no less than 8 lawyers and no substantive conversations have yet occurred with the lawyers for the two (2) groups of claimants. All other creditors have expressed an interest in a consensual plan to allow the Debtor to reorganize.

7.      The Debtor anticipates timely filing its plan of reorganization on or before July 23, 2024.

**Dated: May 21, 2024**

Respectfully submitted,

By:     /s/ Bart A. Houston
        Bart A. Houston
        Florida Bar No. 623636
        **HOUSTON RODERMAN**
        *Proposed Counsel for Debtor*
        633 S. Andrews Ave. Suite 500
        Ft. Lauderdale, Florida 33301
        Telephone: (954) 900-2615
        Facsimile: (954) 839-9068
        Primary Email: bhouston@thehoustonfirm.com
        Secondary Email: dschena@thehoustonfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing System on May 21, 2024.

By:     */s/ Bart A. Houston*
        Bart A. Houston, Esq.
        Florida Bar No. 623636

**Fill in this information to identify the case:**

Debtor name ___TGP COMMUNICATIONS, LLC___

United States Bankruptcy Court for the: ___Southern District of Florida___ District of _____
(State)

Case number (If known): ___24-13938-MAM___

☐ Check if this is an amended filing

## Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals

**12/15**

---

**Part 1:** Summary of Assets

1. *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B* ........................................... $ _____0.00__

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B* ....................................... $ ___1,333,278.70__

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B* ......................................... $ ___1,333,278.70__

---

**Part 2:** Summary of Liabilities

2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D* ................. $ _____0.00__

3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 6a of *Schedule E/F* ....................................... $ _____0.00__

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 6b of *Schedule E/F* .................... +$ ___102,596.61__

4. **Total liabilities** ...........................................................
   Lines 2 + 3a + 3b                                                         $ ___102,596.61__

Case 9:24-bk-13938-MAM Doc 30 Filed 05/23/24 Page 09/09/2024

**Fill in this information to identify the case:**

Debtor name _TGP COMMUNICATIONS, LLC_

United States Bankruptcy Court for the: _Southern District of Florida_

Case number (If known): _24-13938-MAM_

☐ Check if this is an amended filing

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property

**12/15**

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

## Part 1: Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

   | All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
   |---|---|

2. **Cash on hand** — $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

   | | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
   |---|---|---|---|---|
   | 3.1. | MIDFLORIDA Credit union | Checking | 2 6 1 9 | $ 0.00 |
   | 3.2. | See continuation sheet | | | $ 185,757.83 |

4. **Other cash equivalents** *(Identify all)*

   | 4.1. | | $ |
   |---|---|---|
   | 4.2. | | $ |

5. **Total of Part 1**

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80. — $ 185,757.83

## Part 2: Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☑ No. Go to Part 3.
   ☐ Yes. Fill in the information below.

   | | Current value of debtor's interest |
   |---|---|

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

   | 7.1. | | $ |
   |---|---|---|
   | 7.2. | | $ |

Debtor    TGP COMMUNICATIONS, LLC      Case number (*if known*) 24-13938-MAM
       Name

**8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1. _____    $_____

8.2. _____    $_____

**9. Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81.           $_____

---

**Part 3:**   **Accounts receivable**

10. **Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.

☐ Yes. Fill in the information below.

Current value of debtor's interest

11. **Accounts receivable**

11a. 90 days old or less: _____ – _____ = ........➔   $_____
       face amount     doubtful or uncollectible accounts

11b. Over 90 days old: _____ – _____ = ........➔   $_____
       face amount     doubtful or uncollectible accounts

12. **Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.    $_____

---

**Part 4:**   **Investments**

13. **Does the debtor own any investments?**

☐ No. Go to Part 5.

☑ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. Charles Schwab acct #8256       _____   $ 107,617.10

14.2. See continuation sheet       _____   $ 15,704.77

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:        % of ownership:

15.1. _____    _____%    _____   $_____

15.2. _____    _____%    _____   $_____

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1. _____    _____   $_____

16.2. _____    _____   $_____

17. **Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.        $ 123,321.87

---

Debtor  TGP COMMUNICATIONS, LLC
      Name

Case number *(if known)*  24-13938-MAM

## Part 5: Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | ____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **20. Work in progress** | ____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **21. Finished goods, including goods held for resale** | ____ MM / DD / YYYY | $_____ | _____ | $_____ |
| **22. Other inventory or supplies** | ____ MM / DD / YYYY | $_____ | _____ | $_____ |

23. **Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$_____

24. **Is any of the property listed in Part 5 perishable?**
☐ No
☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**
☐ No
☐ Yes. Book value _____ Valuation method_____ Current value_____

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**
☐ No
☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | $_____ | _____ | $_____ |
| **29. Farm animals** *Examples:* Livestock, poultry, farm-raised fish | $_____ | _____ | $_____ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | $_____ | _____ | $_____ |
| **31. Farm and fishing supplies, chemicals, and feed** | $_____ | _____ | $_____ |
| **32. Other farming and fishing-related property not already listed in Part 6** | $_____ | _____ | $_____ |

Official Form 206A/B       **Schedule A/B: Assets — Real and Personal Property**       page 3

Debtor     TGP COMMUNICATIONS, LLC
              Name

Case number (*if known*)    24-13938-MAM

---

33. **Total of Part 6.**

    Add lines 28 through 32. Copy the total to line 85.

    $_____

34. **Is the debtor a member of an agricultural cooperative?**

    ☐ No

    ☐ Yes. Is any of the debtor's property stored at the cooperative?

         ☐ No

         ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

    ☐ No

    ☐ Yes. Book value $_____ Valuation method _____ Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

    ☐ No

    ☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

    ☐ No

    ☐ Yes

---

**Part 7:**    Office furniture, fixtures, and equipment; and collectibles

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

    ☑ No. Go to Part 8.

    ☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | | | |
| | $_____ | _____ | $_____ |
| 40. **Office fixtures** | | | |
| | $_____ | _____ | $_____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | | | |
| | $_____ | _____ | $_____ |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1_____ | $_____ | _____ | $_____ |
| 42.2_____ | $_____ | _____ | $_____ |
| 42.3_____ | $_____ | _____ | · $_____ |

43. **Total of Part 7.**

    Add lines 39 through 42. Copy the total to line 86.

    $_____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

    ☐ No

    ☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

    ☐ No

    ☐ Yes

---

Official Form 206A/B        **Schedule A/B: Assets — Real and Personal Property**        page 4

Debtor  TGP COMMUNICATIONS, LLC
Name

Case number (if known)  24-13938-MAM

---

## Part 8:  Machinery, equipment, and vehicles

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

    ☐ No. Go to Part 9.

    ☑ Yes. Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles** | | | |
| 47.1 2021 Porsche Cayenne | $ | | $ 53,339.00 |
| 47.2 | $ | | $ |
| 47.3 | $ | | $ |
| 47.4 | $ | | $ |
| **48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels | | | |
| 48.1 | $ | | $ |
| 48.2 | $ | | $ |
| **49. Aircraft and accessories** | | | |
| 49.1 | $ | | $ |
| 49.2 | $ | | $ |
| **50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)** | | | |
| | $ | | $ |

51. **Total of Part 8.**
    Add lines 47 through 50. Copy the total to line 87.

    $ 53,339.00

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

    ☑ No

    ☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

    ☑ No

    ☐ Yes

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

## Part 9: Real property

54. **Does the debtor own or lease any real property?**

☑ No. Go to Part 10.

☐ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 | | $_____ | _____ | $_____ |
| 55.2 | | $_____ | _____ | $_____ |
| 55.3 | | $_____ | _____ | $_____ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$_____

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☐ Yes

## Part 10: Intangibles and intellectual property

59. **Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets**<br>Trademark Rights to: The Gateway Pundit (www.thegatewaypundit.c | $_____ | _____ | Unknown<br>$_____ |
| 61. **Internet domain names and websites**<br>www.thegatewaypundit.com | $_____ | _____ | Unknown<br>$_____ |
| 62. **Licenses, franchises, and royalties** | $_____ | _____ | $_____ |
| 63. **Customer lists, mailing lists, or other compilations** | $_____ | _____ | $_____ |
| 64. **Other intangibles, or intellectual property** | $_____ | _____ | $_____ |
| 65. **Goodwill** | $_____ | _____ | $_____ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 0.00

Official Form 206A/B        Schedule A/B: Assets — Real and Personal Property        page 6

55

Debtor    TGP COMMUNICATIONS, LLC
          Name

Case number (*if known*)  24-13938-MAM

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**
- ☑ No
- ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
- ☑ No
- ☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
- ☑ No
- ☐ Yes

## Part 11:   All other assets

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.
- ☐ No. Go to Part 12.
- ☑ Yes. Fill in the information below.

Current value of debtor's interest

71. **Notes receivable**
Description (include name of obligor)
See continuation sheet

| 970,860.00 | − | 0.00 | = ➔ | $ 970,860.00 |
| Total face amount | | doubtful or uncollectible amount | | |

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____     Tax year _____     $_____
_____     Tax year _____     $_____
_____     Tax year _____     $_____

73. **Interests in insurance policies or annuities**

_____     $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____     $_____

Nature of claim        _____
Amount requested     $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____     $_____

Nature of claim        _____
Amount requested     $_____

76. **Trusts, equitable or future interests in property**

_____     $_____

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____     $_____
_____     $_____

78. **Total of Part 11.**
Add lines 71 through 77. Copy the total to line 90.

$ 970,860.00

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
- ☑ No
- ☐ Yes

56

Debtor    TGP COMMUNICATIONS, LLC         Case number *(if known)*   24-13938-MAM

Name

---

| Part 12: | Summary |
|---|---|

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 185,757.83 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 123,321.87 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 53,339.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* . ➜ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 970,860.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ...........................91a. | $ 1,333,278.70 | + 91b. $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92.   1,333,278.70 ...................................................................    $ 1,333,278.70

---

Official Form 206A/B      **Schedule A/B: Assets — Real and Personal Property**      page 8

Case 9:24-bk-13938-MAM   24-13938-MAM

| Debtor 1 | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | |
|---|---|---|---|---|
| | First Name | Middle Name | Last Name | |

### Continuation Sheet for Official Form 206 A/B

**3) Checking, savings, money market, or financial brokerage accounts**

| General description | Type of account | Last 4 digits of account number |
|---|---|---|
| US Bank | Checking | 3057 |
| Balance: 34,404.51 | | |
| Revolut Business | Checking | 1220 |
| Balance: 136,868.62 | | |
| US Bank | Checking | 0574 |
| Balance: 14,484.70 | | |

**14) Mutual funds or publicly traded stocks not included in Part 1**

| General description | Valuation method | Current value |
|---|---|---|
| Robinhood Crypto acct #1382 | | 7,116.53 |
| Robinhood acct #1307 | | 8,588.24 |
| Coinbase acct # | | Unknown |

**71) Notes receivable**

| General description | Total face amount | Doubtful or uncollectible amount | Current value |
|---|---|---|---|
| Loan Receivable – Shareholder | 799,860.00 | 0.00 | 799,860.00 |
| Due from Justice League | 150,000.00 | 0.00 | 150,000.00 |
| Loan Receivable – Joe Hoft | 21,000.00 | 0.00 | 21,000.00 |

Fill in this information to identify the case:

Debtor name __TGP COMMUNICATIONS, LLC__

United States Bankruptcy Court for the: __Southern District of Florida__

Case number (If known): __24-13938-MAM__

☐ Check if this is an amended filing

Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property

**12/15**

Be as complete and accurate as possible.

1. Do any creditors have claims secured by debtor's property?
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☐ Yes. Fill in all of the information below.

| Part 1: | List Creditors Who Have Secured Claims |

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|
| **2.1** Creditor's name | Describe debtor's property that is subject to a lien | $_____ | $_____ |

Creditor's mailing address

Creditor's email address, if known

Describe the lien _____

Is the creditor an insider or related party?
☐ No
☐ Yes

Date debt was incurred _____

Last 4 digits of account number _____

Is anyone else liable on this claim?
☐ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

Do multiple creditors have an interest in the same property?
☐ No
☐ Yes. Specify each creditor, including this creditor,

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

| **2.2** Creditor's name | Describe debtor's property that is subject to a lien | $_____ | $_____ |

Creditor's mailing address

Creditor's email address, if known

Describe the lien _____

Is the creditor an insider or related party?
☐ No
☐ Yes

Date debt was incurred _____

Last 4 digits of account number _____

Is anyone else liable on this claim?
☐ No
☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H).

Do multiple creditors have an interest in the same property?
☐ No
☐ Yes. Have you already specified the relative priority?
   ☐ No. Specify each creditor, including this creditor, and its relative priority.

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

☐ Yes. The relative priority of creditors is specified on lines _____

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.** $_____

Official Form 206D          Schedule D: Creditors Who Have Claims Secured by Property          page 1 of __0__          59

**Fill in this information to identify the case:**

Debtor    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:   Southern District of Florida

Case number   24-13938-MAM
(if known)

☐ Check if this is an amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims    12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

## Part 1:   List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   - ☐ No. Go to Part 2.
   - ☑ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | | Total claim | Priority amount |
|---|---|---|---|---|
| **2.1** | **Priority creditor's name and mailing address**<br>Internal Revenue Service<br>POB 7346<br>Philadelphia, PA, 19101-7346 | **As of the petition filing date, the claim is:** *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $ Unknown | $ |
| | **Date or dates debt was incurred**<br>_____ | **Basis for the claim:**<br>Taxes & Other Government Units | | |
| | **Last 4 digits of account number** _____ | **Is the claim subject to offset?**<br>☑ No<br>☐ Yes | | |
| | **Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) ( 8 ) | | | |
| **2.2** | **Priority creditor's name and mailing address** | **As of the petition filing date, the claim is:** *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $ | $ |
| | **Date or dates debt was incurred**<br>_____ | **Basis for the claim:** | | |
| | **Last 4 digits of account number** _____ | **Is the claim subject to offset?**<br>☐ No<br>☐ Yes | | |
| | **Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____) | | | |
| **2.3** | **Priority creditor's name and mailing address** | **As of the petition filing date, the claim is:** *Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $ | $ |
| | **Date or dates debt was incurred**<br>_____ | **Basis for the claim:** | | |
| | **Last 4 digits of account number** _____ | **Is the claim subject to offset?**<br>☐ No<br>☐ Yes | | |
| | **Specify Code subsection of PRIORITY unsecured claim:** 11 U.S.C. § 507(a) (_____) | | | |

Debtor   TGP COMMUNICATIONS, LLC
         _____
         Name

Case number (if known)_____24-13938-MAM____

| Part 2: | List All Creditors with NONPRIORITY Unsecured Claims |
|---|---|

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

Amount of claim

**3.1** Nonpriority creditor's name and mailing address
Christopher Douglass
199 Clarkson Road

Ballwin, MO, 63011

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Advertising

$ Unknown

Date or dates debt was incurred  _____
Last 4 digits of account number  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.2** Nonpriority creditor's name and mailing address
Eric Coomer
c/o CAIN & SKARNULIS PLLC
P. O. Box 1064
Salida, CO, 81201

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

**Basis for the claim:** Lawsuit

$ Unknown

Date or dates debt was incurred  _____
Last 4 digits of account number  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.3** Nonpriority creditor's name and mailing address
James Kirk
947 CENTURY OAKS DR

Manchester, MO, 63021

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Telephone / Internet services

$ 1,200.00

Date or dates debt was incurred  _____
Last 4 digits of account number  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.4** Nonpriority creditor's name and mailing address
Jane Doe - A
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 1,162.37

Date or dates debt was incurred  _____
Last 4 digits of account number  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.5** Nonpriority creditor's name and mailing address
Jane Doe - B
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ Unknown

Date or dates debt was incurred  _____
Last 4 digits of account number  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.6** Nonpriority creditor's name and mailing address
Jane Doe - C
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 16,546.06

Date or dates debt was incurred  _____
Last 4 digits of account number  _____

Is the claim subject to offset?
☑ No
☐ Yes

Debtor    TGP COMMUNICATIONS, LLC

Name

Case number *(if known)*    24-13936-MAM

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.7**   **Nonpriority creditor's name and mailing address**

Jane Doe - D
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____

Last 4 digits of account number _____

$ 5,202.16

---

**3.8**   **Nonpriority creditor's name and mailing address**

Jane Doe - E
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Suppliers or Vendors

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____

Last 4 digits of account number _____

$ 979.26

---

**3.9**   **Nonpriority creditor's name and mailing address**

Jane Doe - F
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____

Last 4 digits of account number _____

$ 10,041.70

---

**3.10**   **Nonpriority creditor's name and mailing address**

Jane Doe - H
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____

Last 4 digits of account number _____

$ Unknown

---

**3.11**   **Nonpriority creditor's name and mailing address**

Jane Doe - I
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____

Last 4 digits of account number _____

$ 1,376.21

---

Debtor  TGP COMMUNICATIONS, LLC
_____
        Name

Case number *(if known)*  24-13938-MAM

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

**3.12** Nonpriority creditor's name and mailing address

Jane Doe - J
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

$ 972.51

---

**3.13** Nonpriority creditor's name and mailing address

Jane Doe - K
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

$ Unknown

---

**3.14** Nonpriority creditor's name and mailing address

Jez Morano
8750 South Ocean Drive
Unit 534
Jensen Beach, FL, 34957

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Telephone / Internet services

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

$ 11,062.06

---

**3.15** Nonpriority creditor's name and mailing address

John Doe - A
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

$ 1,895.56

---

**3.16** Nonpriority creditor's name and mailing address

John Doe - AA
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

$ 4,492.58

---

Debtor TGP COMMUNICATIONS, LLC

Name

Case number *(if known)* 24-13938-MAM

## Part 2: Additional Page

| | Amount of claim |
|---|---|
| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | |

---

**3.17** **Nonpriority creditor's name and mailing address**

John Doe - B
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

$ Unknown

---

**3.18** **Nonpriority creditor's name and mailing address**

John Doe - BB
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

$ 2,293.59

---

**3.19** **Nonpriority creditor's name and mailing address**

John Doe - C
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

$ 6,001.66

---

**3.20** **Nonpriority creditor's name and mailing address**

John Doe - CC
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

$ 3,104.19

---

**3.21** **Nonpriority creditor's name and mailing address**

John Doe - D
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

$ Unknown

---

Debtor    TGP COMMUNICATIONS, LLC
     Name

Case number *(if known)*   24-13938-MAM

## Part 2:   Additional Page

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.22**   Nonpriority creditor's name and mailing address

John Doe - E
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 80.45

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.23**   Nonpriority creditor's name and mailing address

John Doe - F
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Suppliers or Vendors

$ Unknown

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.24**   Nonpriority creditor's name and mailing address

John Doe - FF
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 1,820.94

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.25**   Nonpriority creditor's name and mailing address

John Doe - G
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ Unknown

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.26**   Nonpriority creditor's name and mailing address

John Doe - GG
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:

$ 50.38

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

Debtor    TGP COMMUNICATIONS, LLC       Case number *(if known)* __24-13938-MAM__

Name

| **Part 2:** | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

---

**3.** 27    **Nonpriority creditor's name and mailing address**

John Doe - H
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 730.58

**Date or dates debt was incurred** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

**Last 4 digits of account number** _____

---

**3.** 28    **Nonpriority creditor's name and mailing address**

John Doe - I
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 837.02

**Date or dates debt was incurred** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

**Last 4 digits of account number** _____

---

**3.** 29    **Nonpriority creditor's name and mailing address**

John Doe - J
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ Unknown

**Date or dates debt was incurred** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

**Last 4 digits of account number** _____

---

**3.** 30    **Nonpriority creditor's name and mailing address**

John Doe - M
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 1,399.83

**Date or dates debt was incurred** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

**Last 4 digits of account number** _____

---

**3.** 31    **Nonpriority creditor's name and mailing address**

John Doe - N
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 417.74

**Date or dates debt was incurred** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

**Last 4 digits of account number** _____

---

Debtor TGP COMMUNICATIONS, LLC
Name

Case number *(if known)* 24-13938-MAM

| **Part 2:** | **Additional Page** |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

**3.32** Nonpriority creditor's name and mailing address

John Doe - O
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Suppliers or Vendors

$ 2,540.50

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☒ No
☐ Yes

**3.33** Nonpriority creditor's name and mailing address

John Doe - Q
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Editor in Chief

$ 3,627.06

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☒ No
☐ Yes

**3.34** Nonpriority creditor's name and mailing address

John Doe - R
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 5,178.55

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☒ No
☐ Yes

**3.35** Nonpriority creditor's name and mailing address

John Doe - S
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 2,191.16

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☒ No
☐ Yes

**3.36** Nonpriority creditor's name and mailing address

John Doe - T
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ Unknown

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☒ No
☐ Yes

Debtor  TGP COMMUNICATIONS, LLC
     Name

Case number (*if known*)  24-13938-MAM

## Part 2:  Additional Page

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

| | |
|---|---|
| 3.**37** Nonpriority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* |
| John Doe - U<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim:** Services |
| | **$ Unknown** |

Date or dates debt was incurred _____

Last 4 digits of account number _____

**Is the claim subject to offset?**
☑ No
☐ Yes

| | |
|---|---|
| 3.**38** Nonpriority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* |
| John Doe - V<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim:** Services |
| | **$ Unknown** |

Date or dates debt was incurred _____

Last 4 digits of account number _____

**Is the claim subject to offset?**
☑ No
☐ Yes

| | |
|---|---|
| 3.**39** Nonpriority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* |
| John Doe - W<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim:** Services |
| | **$ 2,194.82** |

Date or dates debt was incurred _____

Last 4 digits of account number _____

**Is the claim subject to offset?**
☑ No
☐ Yes

| | |
|---|---|
| 3.**40** Nonpriority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* |
| John Doe - Y<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim:** Services |
| | **$ 2,755.40** |

Date or dates debt was incurred _____

Last 4 digits of account number _____

**Is the claim subject to offset?**
☑ No
☐ Yes

| | |
|---|---|
| 3.**41** Nonpriority creditor's name and mailing address | **As of the petition filing date, the claim is:** *Check all that apply.* |
| John Doe - Z<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 | ☐ Contingent<br>☐ Unliquidated<br>☐ Disputed<br><br>**Basis for the claim:** Services |
| | **$ 627.27** |

Date or dates debt was incurred _____

Last 4 digits of account number _____

**Is the claim subject to offset?**
☑ No
☐ Yes

Debtor  TGP COMMUNICATIONS, LLC
_____
Name

Case number *(if known)* 24-15938-MAM

| Part 2: | Additional Page |
|---|---|

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

Amount of claim

**3.42** Nonpriority creditor's name and mailing address

Kellie Poen
344 Fallon Pkwy

Saint Peters, MO, 63376

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Suppliers or Vendors

$ 2,000.00

Date or dates debt was incurred   _____

Last 4 digits of account number   _____

Is the claim subject to offset?
☒ No
☐ Yes

---

**3.43** Nonpriority creditor's name and mailing address

Ruby Freeman
c/o Dowd Bennett LLP
7733 Forsyth Blvd, Suite 1900
Saint Louis, MO, 63105

As of the petition filing date, the claim is:
*Check all that apply.*
☒ Contingent
☒ Unliquidated
☒ Disputed

**Basis for the claim:**

$ Unknown

Date or dates debt was incurred   _____

Last 4 digits of account number   _____

Is the claim subject to offset?
☒ No
☐ Yes

---

**3.44** Nonpriority creditor's name and mailing address

Tammie Gassawsy
19274 Babler Forest Rd

Chesterfield, MO, 63005

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Accountant

$ 815.00

Date or dates debt was incurred   _____

Last 4 digits of account number   _____

Is the claim subject to offset?
☒ No
☐ Yes

---

**3.45** Nonpriority creditor's name and mailing address

Ted Slater
2820 N PINAL AVE
STE 12 PMB 209
CASA GRANDE, AZ, 85122

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Telephone / Internet services

$ 9,000.00

Date or dates debt was incurred   _____

Last 4 digits of account number   _____

Is the claim subject to offset?
☒ No
☐ Yes

---

**3.46** Nonpriority creditor's name and mailing address

Wandrea Moss
c/o Dowd Bennett LLP
7733 Forsyth Blvd, Suite 1900
Saint Louis, MO, 63105

As of the petition filing date, the claim is:
*Check all that apply.*
☒ Contingent
☒ Unliquidated
☒ Disputed

**Basis for the claim:**

$ Unknown

Date or dates debt was incurred   _____

Last 4 digits of account number   _____

Is the claim subject to offset?
☒ No
☐ Yes

---

Official Form 206E/F          Schedule E/F: Creditors Who Have Unsecured Claims

Debtor  TOP COMMUNICATIONS, LLC
Name

Case number (if known) 24-13938-MAM

---

## Part 3:  List Others to Be Notified About Unsecured Claims

4. List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

   **If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.**

| | Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|---|
| 4.1. | Eric Coomer<br>c/o RECHTKORNFELD PC<br>1600 Stout Street, Suite 1400<br>Denver, CO, 80202 | Line 3.2<br>☐ Not listed. Explain: | _____ |
| 4.2. | Ruby Freeman<br>c/o YALE LAW SCHOOL<br>127 Wall Street, P.O. Box 208215<br>New Haven, CT, 06520 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.3. | Ruby Freeman<br>c/o Von A. DuBose, Esq.<br>75 14th Street, NE, Suite 2110<br>Atlanta, GA, 30309 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.4. | Ruby Freeman<br>c/o UNITED TO PROTECT DEMOCRACY<br>15 Main St., Suite 312<br>Watertown, MA, 02472 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 41. | Ruby Freeman<br>c/o UNITED TO PROTECT DEMOCRACY<br>2020 Pennsylvania Ave. NW, Suite 163<br>Washington, DC, 20006 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.5. | Ruby Freeman<br>c/o UNITED TO PROTECT DEMOCRACY<br>82 Nassau Street, #601<br>New York, NY, 10038 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.6. | Ruby Freeman<br>c/o Charles Smith, Esq. and Michael Morrell, Esq.<br>155 N. Wacker Drive<br>Chicago, IL, 60606 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.7. | Ruby Freeman<br>c/o Mary E. Grinman, Esq.<br>500 Boylston Street<br>Boston, MA, 02116 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.8. | Ruby Freeman<br>c/o Aanchal Chugh, Esq.<br>1440 New York Avenue, N.W.<br>Washington, DC, 20005 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.9. | Ruby Freeman<br>c/o Eliza Simons, Esq.<br>One Manhattan West<br>New York, NY, 10001 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.10. | Wandrea Moss<br>c/o UNITED TO PROTECT DEMOCRACY<br>15 Main St., Suite 312<br>Watertown, MA, 02472 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.11. | Wandrea Moss<br>c/o YALE LAW SCHOOL<br>127 Wall Street, P.O. Box 208215<br>New Haven, CT, 06520 | Line 3.46<br>☐ Not listed. Explain | _____ |

Debtor  TGP COMMUNICATIONS, LLC

Name

Case number *(if known)*  24-13938-MAM

## Part 3:  Additional Page for Others to Be Notified About Unsecured Claims

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4._13_ Wandrea Moss<br>c/o Von A. DuBose, Esq.<br>75 14th Street, NE, Suite 2110<br>Atlanta, GA, 30309 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4._14_ Wandrea Moss<br>c/o Mary E. Grinman, Esq.<br>500 Boylston Street<br>Boston, MA, 02116 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4._15_ Wandrea Moss<br>c/o Charles Smith, Esq. and Michael Morrell, Esq.<br>155 N. Wacker Drive<br>Chicago, IL, 60606 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4._16_ Wandrea Moss<br>c/o UNITED TO PROTECT DEMOCRACY<br>2020 Pennsylvania Ave. NW, Suite 163<br>Washington, DC, 20006 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4._17_ Wandrea Moss<br>c/o Aanchal Chugh, Esq.<br>1440 New York Avenue, N.W.<br>Washington, DC, 20005 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4._18_ Wandrea Moss<br>c/o UNITED TO PROTECT DEMOCRACY<br>82 Nassau Street, #601<br>New York, NY, 10038 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4._19_ Wandrea Moss<br>c/o Eliza Simons, Esq.<br>One Manhattan West<br>New York, NY, 10001 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain _____ | _____ |

Debtor **TGR COMMUNICATIONS, LLC**
        Name

Case number *(if known)* **24-18388-MAM**

Case 9:24-bk-18388-MAM Document 23-3 Filed 05/25/24 Page 09/06/2024

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---|---|

5. **Add the amounts of priority and nonpriority unsecured claims.**

| | | | Total of claim amounts |
|---|---|---|---|
| 5a. | **Total claims from Part 1** | 5a. | $ 0.00 |
| 5b. | **Total claims from Part 2** | 5b. + | $ 102,596.61 |
| 5c. | **Total of Parts 1 and 2**<br>Lines 5a + 5b = 5c. | 5c. | $ 102,596.61 |

**Fill in this information to identify the case:**

Debtor name    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:    Southern District of Florida

Case number (If known):    24-13938-MAM     Chapter   11

☐ Check if this is an amended filing

Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases

12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☑ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☐ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|
| **2.1**   State what the contract or lease is for and the nature of the debtor's interest <br><br> State the term remaining <br><br> List the contract number of any government contract | |
| **2.2**   State what the contract or lease is for and the nature of the debtor's interest <br><br> State the term remaining <br><br> List the contract number of any government contract | |
| **2.3**   State what the contract or lease is for and the nature of the debtor's interest <br><br> State the term remaining <br><br> List the contract number of any government contract | |
| **2.4**   State what the contract or lease is for and the nature of the debtor's interest <br><br> State the term remaining <br><br> List the contract number of any government contract | |
| **2.5**   State what the contract or lease is for and the nature of the debtor's interest <br><br> State the term remaining <br><br> List the contract number of any government contract | |

Fill in this information to identify the case:

Debtor name   TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:   Southern District of Florida

Case number (If known):   24-13938-MAM

☐ Check if this is an
amended filing

## Official Form 206H
## Schedule H: Codebtors                                                                 12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

**1. Does the debtor have any codebtors?**

☑ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

☐ Yes

**2. In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G.* Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.**

| *Column 1:* Codebtor | | *Column 2:* Creditor | |
|---|---|---|---|
| Name | Mailing address | Name | Check all schedules that apply: |
| 2.1 | | | ☐ D ☐ E/F ☐ G |
| 2.2 | | | ☐ D ☐ E/F ☐ G |
| 2.3 | | | ☐ D ☐ E/F ☐ G |
| 2.4 | | | ☐ D ☐ E/F ☐ G |
| 2.5 | | | ☐ D ☐ E/F ☐ G |
| 2.6 | | | ☐ D ☐ E/F ☐ G |

**Fill in this information to identify the case:**

Debtor name    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:   Southern District of Florida   District of _____
                                                          (State)

Case number (If known):    24-13938-MAM

☐ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy   04/22

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

| Part 1: | Income |
|---|---|

**1. Gross revenue from business**

☐ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|---|---|---|
| **From the beginning of the fiscal year to filing date:** | From 04/22/2024<br>MM / DD / YYYY | to | Filing date | ☑ Operating a business<br>☐ Other | $ 725,128.81 |
| **For prior year:** | From 01/01/2023<br>MM / DD / YYYY | to | 12/31/2023<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 3,097,988.38 |
| **For the year before that:** | From 01/01/2022<br>MM / DD / YYYY | to | 12/31/2022<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 2,860,691.00 |

**2. Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | | | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|---|---|---|---|
| **From the beginning of the fiscal year to filing date:** | From<br>MM / DD / YYYY | to | Filing date | | $ |
| **For prior year:** | From<br>MM / DD / YYYY | to | MM / DD / YYYY | | $ |
| **For the year before that:** | From<br>MM / DD / YYYY | to | MM / DD / YYYY | | $ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**Part 2:   List Certain Transfers Made Before Filing for Bankruptcy**

**3.   Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/23 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None

| | Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|---|
| 3.1. | John Doe - R<br>Creditor's name<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO 63119 | 3/1/2024<br>4/1/2024 | $ 15,535.66 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☐ Other _____ |
| 3.2. | John Doe - Q<br>Creditor's name<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO 63119 | 3/1/2024<br>4/1/2024 | $ 10,881.17 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☐ Services<br>☑ Other _____Other_____ |

**4.   Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None

| | Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | _____<br>Insider's name<br><br>Relationship to debtor<br>_____ | _____<br>_____<br>_____ | $ _____ | |
| 4.2. | _____<br>Insider's name<br><br>Relationship to debtor<br>_____ | _____<br>_____<br>_____ | $ _____ | |

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|---|
| 5.1. | | | _____ | $_____ |
| | Creditor's name | | | |
| 5.2. | | | _____ | $_____ |
| | Creditor's name | | | |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| | Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|---|
| | | | _____ | $_____ |
| | Creditor's name | | | |

Last 4 digits of account number: XXXX– _____

## Part 3: Legal Actions or Assignments

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | ERIC COOMER V DONALD J. TRUMP FOR PRESIDENT, INC., et al | Defamation and Intentional Infliction of Emotional Distress | Denver District Court | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| | **Case number** | | 1437 Bannock St<br>Denver, CO 80202 | |
| | 2020CV34319 | | | |
| 7.2. | **Case title**<br>RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT. TGP COMMUNICATIONS. LLC | | **Court or agency's name and address**<br>St. Louis Circuit Court | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| | **Case number** | Defamation and Intentional Inflict | 10 N. Tucker Blvd<br>Saint Louis, MO 63101 | |
| | 2122-CC09815-01 | | | |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| | _____ | $_____ |
| Custodian's name | **Case title** | **Court name and address** |
| | _____ | _____ |
| | | Name |
| | **Case number** | |
| | _____ | |
| | **Date of order or assignment** | |
| | _____ | |

---

**Part 4:** **Certain Gifts and Charitable Contributions**

**9.** **List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|
| 9.1. _____ | | _____ | $_____ |
| Recipient's name | | _____ | $_____ |
| | | | |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |
| 9.2. _____ | | _____ | $_____ |
| Recipient's name | | _____ | $_____ |
| | | | |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |

---

**Part 5:** **Certain Losses**

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | | |
| | _____ | _____ | $_____ |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

## Part 6: Certain Payments or Transfers

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☑ None

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | HOUSTON RODERMAN, PLLC | FEE RETAINER FOR BANKRUPTCY [RECEIVED $7,500.00 COST RETAINER] | 04/16/2024 | $ 50,000.00 |

**Address**

633 S. Andrews Avenue
Suite 500
Fort Lauderdale, FL 33301

**Email or website address**

_____

**Who made the payment, if not debtor?**

_____

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.2. | _____ | | _____ | $_____ |

**Address**

**Email or website address**

_____

**Who made the payment, if not debtor?**

_____

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☑ None

| | Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|---|
| | _____ | | _____ | $_____ |

**Trustee**

_____

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | | _____ | $ _____ |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 13.2. | Who received transfer? | | _____ | $ _____ |
| | _____ | | | |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

**Part 7:    Previous Locations**

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| | Address | | Dates of occupancy | |
|---|---|---|---|---|
| 14.1. | 5105 LINDELL BLVD<br>Saint Louis, MO 63108 | From | 4/2019 | To 10/2021 |
| 14.2. | | From | _____ | To _____ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**Part 8:** **Health Care Bankruptcies**

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| | Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|---|
| 15.1. | _____<br>Facility name | | _____ |
| | | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept?<br><br>*Check all that apply:*<br><br>☐ Electronically<br>☐ Paper |
| | **Facility name and address** | **Nature of the business operation, including type of services the debtor provides** | **If debtor provides meals and housing, number of patients in debtor's care** |
| 15.2. | _____<br>Facility name | | _____ |
| | | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept?<br><br>*Check all that apply:*<br><br>☐ Electronically<br>☐ Paper |

**Part 9:** **Personally Identifiable Information**

**16.** Does the debtor collect and retain personally identifiable information of customers?

☑ No.

☐ Yes. State the nature of the information collected and retained. _____

Does the debtor have a privacy policy about that information?

☐ No

☐ Yes

**17.** Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?

☑ No. Go to Part 10.

☐ Yes. Does the debtor serve as plan administrator?

☐ No. Go to Part 10.

☐ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| _____ | EIN: _____ |

Has the plan been terminated?

☐ No

☐ Yes

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|--------|-------------------------|--------------------------|--------------|
| | Name | | |

## Part 10:   Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| | Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | _____<br>Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |
| 18.2. | _____<br>Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name | | | ☐ No<br>☐ Yes |
| Address | | | |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name | | | ☐ No<br>☐ Yes |
| Address | | | |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

**Part 11:** **Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|
| | | | $_____ |
| Name | | | |

---

**Part 12:** **Details About Environmental Information**

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).
- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.
- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|
| | | | ☐ Pending |
| **Case number** | Name | | ☐ On appeal |
| | | | ☐ Concluded |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| _____ Name | _____ Name | | _____ |

---

**Part 13:** **Details About the Debtor's Business or Connections to Any Business**

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

| | Business name and address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
|---|---|---|---|
| 25.1. | _____ Name | | EIN: _____<br><br>**Dates business existed**<br><br>From _____ To _____ |
| 25.2. | _____ Name | | EIN: _____<br><br>**Dates business existed**<br><br>From _____ To _____ |
| 25.3. | _____ Name | | EIN: _____<br><br>**Dates business existed**<br><br>From _____ To _____ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| **Name and address** | | **Dates of service** | |
|---|---|---|---|
| 26a.1. | AP Accounting & Tax | From _____ | |
| | Name | To _____ | |
| | 19274 Babler Forest Rd, Wildwood, MO 63005 | | |

| **Name and address** | | **Dates of service** | |
|---|---|---|---|
| 26a.2. | | From _____ | |
| | Name | To _____ | |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

| **Name and address** | | **Dates of service** | |
|---|---|---|---|
| 26b.1. | | From _____ | |
| | Name | To _____ | |

| **Name and address** | | **Dates of service** | |
|---|---|---|---|
| 26b.2. | | From _____ | |
| | Name | To _____ | |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| **Name and address** | | **If any books of account and records are unavailable, explain why** |
|---|---|---|
| 26c.1. | AP Accounting & Tax | |
| | Name | |
| | 19274 Babler Forest Rd, Wildwood, MO 63005 | |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

| | **Name and address** | **If any books of account and records are unavailable, explain why** |
|---|---|---|
| 26c.2. | _____ | |
| | Name | |

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

| | **Name and address** | |
|---|---|---|
| 26d.1. | _____ | |
| | Name | |

| | **Name and address** | |
|---|---|---|
| 26d.2. | _____ | |
| | Name | |

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No

☐ Yes. Give the details about the two most recent inventories.

| **Name of the person who supervised the taking of the inventory** | **Date of inventory** | **The dollar amount and basis (cost, market, or other basis) of each inventory** |
|---|---|---|
| _____ | _____ | $_____ |

| | **Name and address of the person who has possession of inventory records** |
|---|---|
| 27.1. | _____ |
| | Name |

| | |
|---|---|
| Debtor | TGP COMMUNICATIONS, LLC |
| | Name |

Case number (if known) 24-13938-MAM

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $ _____ |

| Name and address of the person who has possession of inventory records |
|---|
| 27.2. _____ |
| Name |

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| James Hoft | 1820 NE JENSEN BEACH BLVD. UNIT 1120, Jensen Beach, FL 34957 | Manager | 100 |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |

30. **Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|
| 30.1. _____ | _____ | _____ | |
| Name | | | |
| | | _____ | |
| | | _____ | |
| Relationship to debtor | | _____ | |
| _____ | | | |

Official Form 207    **Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**    page **13**

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|--------|--------------------------|------------------------|--------------|
| | Name | | |

**Name and address of recipient**

30.2 _____
Name

**Relationship to debtor**

_____

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

| **Name of the parent corporation** | **Employer Identification number of the parent corporation** |
|------------------------------------|--------------------------------------------------------------|
| _____ | EIN: _____ |

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

| **Name of the pension fund** | **Employer Identification number of the pension fund** |
|------------------------------|---------------------------------------------------------|
| _____ | EIN: _____ |

---

**Part 14:     Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    05/22/2024
             MM / DD / YYYY

✖ /s/ James Hoft                                    Printed name    James Hoft
Signature of individual signing on behalf of the debtor

Position or relationship to debtor    Manager

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☐ No
☑ Yes

| Debtor Name | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|

### Continuation Sheet for Official Form 207

**3) Certain payments or transfers to creditors within 90 days before filing this case**

| | | |
|---|---|---|
| Jez Morano, 8750 South Ocean Drive Unit 534, Jensen Beach, FL 34957 | $33,186.17 | Telephone / internet services |
| John Doe - Y, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $8,784.42 | Services |
| Jane Doe - C, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $49,638.17 | Services |
| John Doe - CC, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $9,812.57 | Services |
| CONRADSON RENTALS LLC, | $17,714.64 | |
| CASSANDRA FAIRBANKS, | $15,606.48 | |
| JIM HOFT, | $17,280.00 | |
| JUSTICE LEAGUE, | $95,000.00 | |
| O'MALLEY McCULLOCH, LLC, | $30,125.09 | |
| ORCHID GROVE MEDIA, | $27,000.00 | |
| SLIGHTLY OFFENSIVE INC, | $13,477.73 | |

**7) Legal Actions**

RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT, TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT

2122-CC09815-01

XXXXXXXXXXXXXXXXXXXXXXXXXXXXX

St. Louis Circuit Court

10 N. Tucker Blvd, Saint Louis, MO 63101

Pending

-------

JAMES HOFT, JOSEPH HOFT AND TGP COMMUNICATIONS LLC d/b/a THE GATEWAY PUNDIT V. GILBERT C. HUMES et al

24CV-004696

Fulton Superior Court Clerk

| Debtor Name | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|

## Continuation Sheet for Official Form 207

**136 Pryor St SW, Atlanta, GA 30303**

**Pending**

**-------**

**Fill in this information to identify the case and this filing:**

Debtor Name ___TGP COMMUNICATIONS, LLC___

United States Bankruptcy Court for the: ___Southern District of Florida___

Case number (*If known*): ___24-13938-MAM___

---

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☑ *Schedule H: Codebtors* (Official Form 206H)

☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* ____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ Other document that requires a declaration_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___05/22/2024___         ✘ /s/ James Hoft
        MM / DD / YYYY          _____
                      Signature of individual signing on behalf of debtor

                     James Hoft
                     _____
                     Printed name

                     Manager
                     _____
                     Position or relationship to debtor

In re:

TGP COMMUNICATIONS, LLC                        Case No. 24-13938-MAM
                                               Chapter 11

      Debtor.

_____/

### DEBTOR'S NOTICE OF COMPLIANCE WITH REQUIREMENTS FOR
### AMENDING CREDITOR INFORMATION

This notice is being filed in accordance with Local Rules 1007-2(B), 1009-1(D), or 1019-1(B) upon the filing of an amendment to the debtor's lists, schedules or statements, pursuant to Bankruptcy Rules 1007, 1009, or 1019. I certify that:

[   ]   The paper filed **adds** creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being added). I have:
    1.   remitted the required fee (unless the paper is a Bankruptcy Rule 1019(5) report);
    2.   provided the court with a supplemental matrix diskette **containing only the added creditors** or electronically uploaded the added creditors in CM/ECF;
    3.   provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)]; and
    4.   filed an amended schedule(s) and summary of schedules.

[   ]   The paper filed **deletes** a creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being deleted**). I have:**
    1.   remitted the required fee;
    2.   provided notice to affected parties and
    3.   filed an amended schedule(s) and summary of schedules.

[   ]   The paper filed **corrects** the name and/or address of a creditor(s) as reflected on the <u>attached list</u>. **I have**:
    1.   provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)] and
    2.   filed an amended schedule(s) or other paper.

[   ]   The paper filed **corrects** schedule D, E or F amount(s) or classification(s). **I have:**
    1.   remitted the required fee;
    2.   provided notice to affected parties and
    3.   filed an amended schedule(s) and summary of schedules.

[ X  ]   None of the above apply. The paper filed does not require an additional fee, a supplemental matrix, or notice to affected parties. It ☐ does X does not require the filing of an amended schedule and summary of schedules.

I also certify that, if required to be filed by the Bankruptcy Rules, the official form "Declaration Concerning Debtor's Schedules" has been signed by each debtor as required by Local Rules 1007-2(B), 1009-1(A)(2) and (D)(1), or 1019-1(B) and, if filed electronically without imaged signatures, a local form "Declaration Under Penalty of Perjury to Accompany Petitions, Schedules and Statements Filed Electronically" accompanied the filing of the document.

Dated:   <u>5/22/2024</u>
Bart A. Houston

_____      _____
Attorney for Debtor (or Debtor, if pro se)      Joint Debtor (if applicable)

 <u>TGP COMMUNICATIONS, LLC</u>      _____
Print Name      Address

 <u>623636</u>      _____
Florida Bar Number      Phone Number

**United States Bankruptcy Court**

IN RE:                                                    Case No. <u>24-13938-MAM</u>

TGP COMMUNICATIONS, LLC
<u>_____</u> Chapter <u>  11  </u>

## LIST OF EQUITY SECURITY HOLDERS

| Registered name and last known address of security holder | Shares (Or Percentage) | Security Class (or kind of interest) |
|---|---|---|
| James Hoft<br>1820 NE JENSEN BEACH BLVD. UNIT 1120, Jensen Beach, FL 34957 | 100 | President |

# United States Bankruptcy Court

Southern District of Florida

**In re** TGP COMMUNICATIONS, LLC

Case No. 24-13938-MAM

**Debtor**

Chapter 11

### DISCLOSURE OF COMPENSATION OF ATTORNEY FOR DEBTOR

1. Pursuant to 11 U .S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

☐ FLAT FEE

For legal services, I have agreed to accept . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

Prior to the filing of this statement I have received. . . . . . . . . . . . . . . . . . . . . . $ _____

Balance Due. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____

☑ RETAINER

For legal services, I have agreed to accept a retainer of . . . . . . . . . . . . . . . . . . . $ 50,000.00

The undersigned shall bill against the retainer at an hourly rate of . . . . . . . . . . $ 595.00

[Or attach firm hourly rate schedule.] Debtor(s) have agreed to pay all Court approved fees and expenses exceeding the amount of the retainer.

**\*\*\*Received $7,500.00 Cost Retainer\*\*\***

2. The source of the compensation paid to me was:

    ☑ Debtor          ☐ Other (specify)

3. The source of compensation to be paid to me is:

    ☑ Debtor          ☐ Other (specify)

4. ☑ I have not agreed to share the above-disclosed compensation with any other person unless they are members and associates of my law firm.

    ☐ I have agreed to share the above-disclosed compensation with a other person or persons who are not members or associates of my law firm. A copy of the Agreement, together with a list of the names of the people sharing the compensation is attached.

5. In return of the above-disclosed fee, I have agreed to render legal service for all aspects of the bankruptcy case, including:

    a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
    b. Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;
    c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof;

B2030 (Form 2030) (12/15)

    d.  [Other provisions as needed]
All aspects of the case.

6.  By agreement with the debtor(s), the above-disclosed fee does not include the following services:

CERTIFICATION

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceeding.

05/22/2024

*Date*

/s/ Bart Houston, 0623636

*Signature of Attorney*

Houston Roderman PLLC

*Name of law firm*

633 S. Andrews Avenue
Suite 500
Ft. Lauderdale, FL 33301

AMENDED

**Fill in this information to identify the case:**

Debtor name ____TGP COMMUNICATIONS, LLC____

United States Bankruptcy Court for the: ___Southern District of Florida___ District of _____
(State)

Case number (If known): ___24-13938-MAM___

☑ Check if this is an amended filing

# Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals          **12/15**

---

### Part 1:   Summary of Assets

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B* ............................................................. $ _____0.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B* ........................................................ $ ___2,323,996.76

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B* ........................................................... $ ___2,323,996.76

---

### Part 2:   Summary of Liabilities

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim,* from line 3 of *Schedule D* ................. $ _____0.00

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 6a of *Schedule E/F* ........................................ $ _____0.00

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 6b of *Schedule E/F* .................... +$ ___102,596.61

4. **Total liabilities** ........................................................................................... $ ___102,596.61
   Lines 2 + 3a + 3b

---

---

**Fill in this information to identify the case:**

Debtor name    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:  Southern District of Florida

Case number (If known):  24-13938-MAM

☑ Check if this is an
amended filing

---

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property                    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

## Part 1: Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

   **All cash or cash equivalents owned or controlled by the debtor**

   **Current value of debtor's interest**

2. **Cash on hand**                                                                   $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

   | | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
   |---|---|---|---|---|
   | 3.1. | MIDFLORIDA Credit union | Checking | 2  6  1  9 | $ 0.00 |
   | 3.2. | See continuation sheet | | | $ 185,757.83 |

4. **Other cash equivalents** *(Identify all)*

   | | | |
   |---|---|---|
   | 4.1. | Coinbase (Cryptocurrency / Digital Asset) | $ 1,637.15 |
   | 4.2. | | $ |

5. **Total of Part 1**                                                                 $ 187,394.98

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

## Part 2: Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☑ No. Go to Part 3.
   ☐ Yes. Fill in the information below.

   **Current value of debtor's interest**

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

   | | | |
   |---|---|---|
   | 7.1. | | $ |
   | 7.2. | | $ |

---

Debtor  TGP COMMUNICATIONS, LLC
Name

Case number *(if known)* 24-13938-MAM

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1._____ $_____

8.2._____ $_____

9. **Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81. $_____

**Part 3:  Accounts receivable**

10. **Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.

☐ Yes. Fill in the information below.

Current value of debtor's interest

11. **Accounts receivable**

11a. 90 days old or less: _____ – _____ = ........➔ $_____
        face amount      doubtful or uncollectible accounts

11b. Over 90 days old: _____ – _____ = ........➔ $_____
        face amount      doubtful or uncollectible accounts

12. **Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82. $_____

**Part 4:  Investments**

13. **Does the debtor own any investments?**

☐ No. Go to Part 5.

☑ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. Robinhood Crypto acct #1382 (currency investment)    _____   $ 7,116.53

14.2. See continuation sheet    _____   $ 1,105,286.25

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:      % of ownership:

15.1._____ _____%   _____   $_____

15.2._____ _____%   _____   $_____

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1._____   _____   $_____

16.2._____   _____   $_____

17. **Total of Part 4**

Add lines 14 through 16. Copy the total to line 83. $ 1,112,402.78

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

## Part 5: Inventory, excluding agriculture assets

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19. **Raw materials** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 20. **Work in progress** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 21. **Finished goods, including goods held for resale** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 22. **Other inventory or supplies** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |

23. **Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$_____

24. **Is any of the property listed in Part 5 perishable?**

☐ No
☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No
☐ Yes. Book value _____ Valuation method_____ Current value_____

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No
☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops—either planted or harvested** | | | |
| _____ | $_____ | _____ | $_____ |
| 29. **Farm animals** *Examples:* Livestock, poultry, farm-raised fish | | | |
| _____ | $_____ | _____ | $_____ |
| 30. **Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| _____ | $_____ | _____ | $_____ |
| 31. **Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $_____ | _____ | $_____ |
| 32. **Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $_____ | _____ | $_____ |

AMENDED

Case 9:24-cv-80969-AMC Document 23-3 Entered 05/30/24 Docket 05/30/2024 Page 98 of 1417
Case 24-13938-MAM Claim 2-3 Filed 05/06/24 Page 99 of 101

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$_____

34. **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

☐ No

☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____  Valuation method _____  Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

**Part 7:  Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | $_____ | _____ | $_____ |
| 40. **Office fixtures** | $_____ | _____ | $_____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | $_____ | _____ | $_____ |

42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles

| | Net book value of debtor's interest | Valuation method | Current value of debtor's interest |
|---|---|---|---|
| 42.1 _____ | $_____ | _____ | $_____ |
| 42.2 _____ | $_____ | _____ | $_____ |
| 42.3 _____ | $_____ | _____ | $_____ |

43. **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$_____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☐ No

☐ Yes

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) 24-13938-MAM |
|---|---|---|
| | Name | |

---

**Part 8:** Machinery, equipment, and vehicles

46. **Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.

☑ Yes. Fill in the information below.

| General description<br><br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br><br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

47. **Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1 2021 Porsche Cayenne VIN#WP1AA2AY4MDA01232 | $_____ | _____ | $ 53,339.00 |
| 47.2 _____ | $_____ | _____ | $_____ |
| 47.3 _____ | $_____ | _____ | $_____ |
| 47.4 _____ | $_____ | _____ | $_____ |

48. **Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 _____ | $_____ | _____ | $_____ |
| 48.2 _____ | $_____ | _____ | $_____ |

49. **Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 _____ | $_____ | _____ | $_____ |
| 49.2 _____ | $_____ | _____ | $_____ |

50. **Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| | $_____ | | $_____ |

51. **Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.

$ 53,339.00

52. **Is a depreciation schedule available for any of the property listed in Part 8?**

☑ No

☐ Yes

53. **Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☑ No

☐ Yes

---

Debtor __TGP COMMUNICATIONS, LLC_____ Case number *(if known)* __24-13938-MAM_____

Name

---

## Part 9: Real property

54. **Does the debtor own or lease any real property?**

☑ No. Go to Part 10.

☐ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 | | $_____ | _____ | $_____ |
| 55.2 | | $_____ | _____ | $_____ |
| 55.3 | | $_____ | _____ | $_____ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$_____

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

## Part 10: Intangibles and intellectual property

59. **Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets**<br>Trademark Rights to: The Gateway Pundit (www.thegatewaypundit.c | $_____ | _____ | Unknown<br>$_____ |
| 61. **Internet domain names and websites**<br>See continuation sheet | 0.00<br>$_____ | _____ | Unknown<br>$_____ |
| 62. **Licenses, franchises, and royalties** | $_____ | _____ | $_____ |
| 63. **Customer lists, mailing lists, or other compilations** | $_____ | _____ | $_____ |
| 64. **Other intangibles, or intellectual property**<br>See continuation sheet | 0.00<br>$_____ | _____ | Unknown<br>$_____ |
| 65. **Goodwill** | $_____ | _____ | $_____ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$__0.00_____

---

Official Form 206A/B                    Schedule A/B: Assets — Real and Personal Property                    page 6

103

Debtor  TGP COMMUNICATIONS, LLC
Name

Case number *(if known)*  24-13938-MAM

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**

☑ No

☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☑ No

☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☑ No

☐ Yes

**Part 11:   All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.

☑ Yes. Fill in the information below.

**Current value of debtor's interest**

71. **Notes receivable**

Description (include name of obligor)

See continuation sheet

970,860.00 ____ 0.00  =➜  $ 970,860.00

Total face amount     doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____  Tax year _____  $_____
_____  Tax year _____  $_____
_____  Tax year _____  $_____

73. **Interests in insurance policies or annuities**

_____  $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____  $_____

Nature of claim       _____

Amount requested    $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____  $_____

Nature of claim       _____

Amount requested    $_____

76. **Trusts, equitable or future interests in property**

_____  $_____

77. **Other property of any kind not already listed**  *Examples:* Season tickets, country club membership

_____  $_____
_____  $_____

78. **Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.

$ 970,860.00

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No

☐ Yes

AMENDED

Debtor TGP COMMUNICATIONS, LLC
Name

Case number (if known) 24-13938-MAM

---

**Part 12:** **Summary**

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 187,394.98 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 1,112,402.78 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 53,339.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* ................................➔ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 970,860.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ...........................91a. | $ 2,323,996.76 | 91b. $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ........................................ 2,323,996.76    $ 2,323,996.76

Debtor 1 ___TGP COMMUNICATIONS, LLC_____     Case number *(if known)*_____

     First Name      Middle Name      Last Name

## <u>Continuation Sheet for Official Form 206 A/B</u>

**3) Checking, savings, money market, or financial brokerage accounts**

| General description | Type of account | Last 4 digits of account number |
|---|---|---|
| US Bank | Checking | 3057 |
| Balance: 34,404.51 | | |
| Revolut Business | Checking | 1220 |
| Balance: 136,868.62 | | |
| US Bank | Checking | 0574 |
| Balance: 14,484.70 | | |

**14) Mutual funds or publicly traded stocks not included in Part 1**

| General description | Valuation method | Current value |
|---|---|---|
| Robinhood acct #1307 | | 8,588.24 |
| Charles Schwab (401k) acct #4627 | | 497,511.37 |
| Charles Schwab acct #8256 | | 107,617.10 |
| Charles Schwab acct #2360 | | 491,569.54 |

**61) Internet domain names and websites**

| General description | Net book value | Valuation method | Current value |
|---|---|---|---|
| www.thegatewaypundit.com | | | Unknown |
| TGPTruth.com | | | Unknown |
| TGPVideos.com | | | Unknown |
| TheGatewayPunditStore.com | | | Unknown |
| RINOWatch.com (in development) | | | Unknown |
| TGPTruth.org | | | Unknown |
| Gateway.Video (in development) | | | Unknown |
| TheGateway.Games (in development) | | | Unknown |

Debtor 1 _____
       TGP COMMUNICATIONS, LLC

First Name      Middle Name      Last Name

Case number *(if known)*_____

### Continuation Sheet for Official Form 206 A/B

**64) Other intangibles, or intellectual property**

| General description | Net book value | Valuation method | Current value |
|---|---|---|---|
| The Gateway Pundit – 140,000 articles on website | | | Unknown |
| The Gateway Pundit – 140,000 articles on Twitter – X, Facebook, Telegram, Instagram, Rumble, YouTube | | | Unknown |

**71) Notes receivable**

| General description | Total face amount | Doubtful or uncollectible amount | Current value |
|---|---|---|---|
| Loan Receivable – Shareholder | 799,860.00 | 0.00 | 799,860.00 |
| Due from Justice League | 150,000.00 | 0.00 | 150,000.00 |
| Loan Receivable – Joe Hoft | 21,000.00 | 0.00 | 21,000.00 |

**Fill in this information to identify the case:**

Debtor name ___TGP COMMUNICATIONS, LLC___

United States Bankruptcy Court for the: ___Southern District of Florida___

Case number (If known): ___24-13938-MAM___   Chapter ___11___

☑ Check if this is an amended filing

Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases     12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|
| **2.1** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | Services - Writer for TGP<br><br>John Doe - GG<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.2** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | Services - Writer for TGP<br><br>John Doe - H<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.3** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | Services - Writer for TGP<br><br>Jane Doe - D<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.4** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | Services - Writer for TGP<br><br>John Doe - N<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.5** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | Services - Writer for TGP<br><br>John Doe - Z<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**Additional Page if Debtor Has More Executory Contracts or Unexpired Leases**

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.

| List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|

**2.6**

| State what the contract or lease is for and the nature of the debtor's interest | Services - Writer for TGP | John Doe - D<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
|---|---|---|
| State the term remaining | | |
| List the contract number o any government contract | | |

**2.7**

| State what the contract or lease is for and the nature of the debtor's interest | Services - Writer for TGP | John Doe - M<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
|---|---|---|
| State the term remaining | | |
| List the contract number of any government contract | | |

**2.8**

| State what the contract or lease is for and the nature of the debtor's interest | Services - Writer for TGP | Jane Doe - C<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
|---|---|---|
| State the term remaining | | |
| List the contract number of any government contract | | |

**2.___**

| State what the contract or lease is for and the nature of the debtor's interest | | |
|---|---|---|
| State the term remaining | | |
| List the contract number of any government contract | | |

**2.___**

| State what the contract or lease is for and the nature of the debtor's interest | | |
|---|---|---|
| State the term remaining | | |
| List the contract number of any government contract | | |

**2.___**

| State what the contract or lease is for and the nature of the debtor's interest | | |
|---|---|---|
| State the term remaining | | |
| List the contract number of any government contract | | |

**2.___**

| State what the contract or lease is for and the nature of the debtor's interest | | |
|---|---|---|
| State the term remaining | | |
| List the contract number of any government contract | | |

**Fill in this information to identify the case:**

Debtor name  TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the: Southern District of Florida  District of _____
                                                                                      (State)

Case number (If known):  24-13938-MAM

☑ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy  04/22

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

| Part 1: | Income |

### 1. Gross revenue from business

☐ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
|---|---|---|---|---|---|
| **From the beginning of the fiscal year to filing date:** | From 04/22/2024<br>MM / DD / YYYY | to | Filing date | ☑ Operating a business<br>☐ Other | $ 725,128.81 |
| **For prior year:** | From 01/01/2023<br>MM / DD / YYYY | to | 12/31/2023<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 3,097,988.38 |
| **For the year before that:** | From 01/01/2022<br>MM / DD / YYYY | to | 12/31/2022<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 2,860,691.00 |

### 2. Non-business revenue

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | | | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
|---|---|---|---|---|---|
| **From the beginning of the fiscal year to filing date:** | From _____<br>MM / DD / YYYY | to | Filing date | _____ | $ _____ |
| **For prior year:** | From _____<br>MM / DD / YYYY | to | _____<br>MM / DD / YYYY | _____ | $ _____ |
| **For the year before that:** | From _____<br>MM / DD / YYYY | to | _____<br>MM / DD / YYYY | _____ | $ _____ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

## Part 2: List Certain Transfers Made Before Filing for Bankruptcy

**3. Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/23 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None

| | Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|---|
| 3.1. | Jane Doe - D<br>Creditor's name<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO 63119 | 2/1/2024<br>3/1/2024<br>4/1/2024 | $ 15,606.48 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☐ Other _____ |
| 3.2. | John Doe - R<br>Creditor's name<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO 63119 | 2/1/2024<br>3/1/2024<br>4/1/2024 | $ 15,535.66 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☐ Other _____ |

**4. Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None

| | Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | _____<br>Insider's name | _____ | $ _____ | |
| | | _____ | | |
| | | _____ | | |
| | Relationship to debtor<br>_____ | | | |
| 4.2. | _____<br>Insider's name | _____ | $ _____ | |
| | | _____ | | |
| | | _____ | | |
| | Relationship to debtor<br>_____ | | | |

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|---|
| 5.1. | _____<br>Creditor's name | | _____ | $_____ |
| 5.2. | _____<br>Creditor's name | | _____ | $_____ |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| | Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|---|
| | _____<br>Creditor's name | | _____ | $_____ |

Last 4 digits of account number: XXXX– _____

**Part 3:    Legal Actions or Assignments**

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | ERIC COOMER V DONALD J. TRUMP FOR PRESIDENT, INC., et al | Defamation and Intentional Infliction of Emotional Distress | Denver District Court | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| | **Case number**<br>2020CV34319 | | 1437 Bannock St<br>Denver, CO 80202 | |
| 7.2. | RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT. TGP COMMUNICATIONS. LLC | | St. Louis Circuit Court | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| | **Case number**<br>2122-CC09815-01 | Defamation and Intentional Inflict | 10 N. Tucker Blvd<br>Saint Louis, MO 63101 | |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| | _____ | $_____ |
| Custodian's name | | |
| | **Case title** | **Court name and address** |
| | _____ | |
| | | Name |
| | **Case number** | |
| | _____ | |
| | **Date of order or assignment** | |
| | _____ | |

---

**Part 4:** | **Certain Gifts and Charitable Contributions**

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|
| 9.1. _____ | | _____ | $_____ |
| Recipient's name | | | |
| | | _____ | $_____ |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |
| 9.2. _____ | | _____ | $_____ |
| Recipient's name | | | |
| | | _____ | $_____ |
| **Recipient's relationship to debtor** | | | |
| _____ | | | |

---

**Part 5:** | **Certain Losses**

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | | |
| | _____ | _____ | $_____ |

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |

---

### Part 6: Certain Payments or Transfers

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | HOUSTON RODERMAN, PLLC | FEE RETAINER FOR BANKRUPTCY [RECEIVED $7,500.00 COST RETAINER] | 04/16/2024 | $ 50,000.00 |
| | **Address** | | | |
| | 633 S. Andrews Avenue Suite 500 Fort Lauderdale, FL 33301 | | | |
| | **Email or website address** | | | |
| | | | | |
| | **Who made the payment, if not debtor?** | | | |
| | | | | |

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.2. | | | | $ |
| | **Address** | | | |
| | | | | |
| | **Email or website address** | | | |
| | | | | |
| | **Who made the payment, if not debtor?** | | | |
| | | | | |

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☑ None

| | Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|---|
| | | | | $ |
| | **Trustee** | | | |
| | | | | |

---

Case 24-13938-MAM Doc 32 Filed 05/30/24 Page 99 of 302

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

### 13. Transfers not already listed on this statement

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | | _____ | $ _____ |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 13.2. | **Who received transfer?** _____ | | _____ | $ _____ |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

### Part 7:  Previous Locations

### 14. Previous addresses

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| | Address | Dates of occupancy | | |
|---|---|---|---|---|
| 14.1. | 5105 LINDELL BLVD<br>Saint Louis, MO 63108 | From | 4/2019 | To | 10/2021 |
| 14.2. | | From | _____ | To | _____ |

Debtor   TGP COMMUNICATIONS, LLC
         _____          Case number (if known) 24-13938-MAM
         Name

---

**Part 8:**   **Health Care Bankruptcies**

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| Facility name and address | Nature of the business operation, including type of services the debtor provides | If debtor provides meals and housing, number of patients in debtor's care |
|---|---|---|
| 15.1. _____ Facility name | | _____ |
| | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept? *Check that all apply:* ☐ Electronically ☐ Paper |
| **Facility name and address** | **Nature of the business operation, including type of services the debtor provides** | **If debtor provides meals and housing, number of patients in debtor's care** |
| 15.2. _____ Facility name | | _____ |
| | Location where patient records are maintained (if different from facility address). If electronic, identify any service provider. | How are records kept? *Check that all apply:* ☐ Electronically ☐ Paper |

---

**Part 9:**   **Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.

☐ Yes. State the nature of the information collected and retained. _____

Does the debtor have a privacy policy about that information?

☐ No

☐ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.

Yes. Does the debtor serve as plan administrator?

☐ No. Go to Part 10.

☐ Yes. Fill in below:

| Name of plan | Employer identification number of the plan |
|---|---|
| _____ | EIN: _____ |

Has the plan been terminated?

☐ No

☐ Yes

---

Debtor **TGP COMMUNICATIONS, LLC**
Name

Case number (*if known*) 24-13938-MAM

---

**Part 10:** Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| 18.1. _____ Name | XXXX–_____ | ☐ Checking ☐ Savings ☐ Money market ☐ Brokerage ☐ Other_____ | _____ | $_____ |
| 18.2. _____ Name | XXXX–_____ | ☐ Checking ☐ Savings ☐ Money market ☐ Brokerage ☐ Other_____ | _____ | $_____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____ Name  Address | | | ☐ No ☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____ Name  Address | | | ☐ No ☐ Yes |

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

**Part 11:**    **Property the Debtor Holds or Controls That the Debtor Does Not Own**

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---|---|---|---|
| | | | $_____ |
| Name | | | |

---

**Part 12:**    **Details About Environmental Information**

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).
- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.
- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|---|---|---|---|
| | | | ☐ Pending |
| **Case number** | Name | | ☐ On appeal |
| | | | ☐ Concluded |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | _____ |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

**24.** **Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| _____ | _____ | | _____ |
| Name | Name | | |

---

| **Part 13:** | **Details About the Debtor's Business or Connections to Any Business** |
|---|---|

**25.** **Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

| | Business name and address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
|---|---|---|---|
| 25.1. | _____<br>Name | | EIN: _____<br><br>**Dates business existed**<br><br>From _____  To _____ |
| 25.2. | _____<br>Name | | EIN: _____<br><br>**Dates business existed**<br><br>From _____  To _____ |
| 25.3. | _____<br>Name | | EIN: _____<br><br>**Dates business existed**<br><br>From _____  To _____ |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|--------|-------------------------|------------------------|--------------|
|        | Name                    |                        |              |

---

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| **Name and address** | **Dates of service** |
|----------------------|----------------------|
| 26a.1. AP Accounting & Tax | From _____ |
| Name | |
| 19274 Babler Forest Rd, Wildwood, MO 63005 | To _____ |

| **Name and address** | **Dates of service** |
|----------------------|----------------------|
| 26a.2. | From _____ |
| Name | |
| | To _____ |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

| **Name and address** | **Dates of service** |
|----------------------|----------------------|
| 26b.1. | From _____ |
| Name | |
| | To _____ |

| **Name and address** | **Dates of service** |
|----------------------|----------------------|
| 26b.2. | From _____ |
| Name | |
| | To _____ |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| **Name and address** | **If any books of account and records are unavailable, explain why** |
|----------------------|----------------------------------------------------------------------|
| 26c.1. AP Accounting & Tax | |
| Name | |
| 19274 Babler Forest Rd, Wildwood, MO 63005 | |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

| | **Name and address** | **If any books of account and records are unavailable, explain why** |
|---|---|---|

26c.2. _____
        Name

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

**Name and address**

26d.1. _____
        Name

**Name and address**

26d.2. _____
        Name

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $_____ |

**Name and address of the person who has possession of inventory records**

27.1. _____
        Name

Debtor    TGP COMMUNICATIONS, LLC
_____
Name

Case number *(if known)*   24-13938-MAM
_____

| | | | |
|---|---|---|---|
| **Name of the person who supervised the taking of the inventory** | | **Date of inventory** | **The dollar amount and basis (cost, market, or other basis) of each inventory** |
| _____ | | _____ | $_____ |

**Name and address of the person who has possession of inventory records**

27.2. _____
     Name

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| James Hoft | 1820 NE JENSEN BEACH BLVD. UNIT 1120, Jensen Beach, FL 34957 | Manager | 100 |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| | | | _____ To ____ |
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |

30. **Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|
| 30.1. _____ <br> Name | _____ | _____ | |
| | | _____ | |
| | | _____ | |
| Relationship to debtor <br> _____ | | _____ | |

AMENDED

| | | | |
|---|---|---|---|
| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) | 24-13938-MAM |
| | Name | | |

**Name and address of recipient**

30.2

Name _____

_____

_____

_____

**Relationship to debtor**

_____

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No

☐ Yes. Identify below.

| **Name of the parent corporation** | **Employer Identification number of the parent corporation** |
|---|---|
| _____ | EIN: _____ |

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No

☐ Yes. Identify below.

| **Name of the pension fund** | **Employer Identification number of the pension fund** |
|---|---|
| _____ | EIN: _____ |

**Part 14:    Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    05/30/2024
                    MM / DD / YYYY

✗ /s/ James Hoft _____          Printed name    James Hoft
Signature of individual signing on behalf of the debtor

Position or relationship to debtor    Manager

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☐ No

☑ Yes

| Debtor Name | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|

## Continuation Sheet for Official Form 207

**3) Certain payments or transfers to creditors within 90 days before filing this case**

| | | |
|---|---|---|
| John Doe – Q, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $10,881.17 | Other |
| Jez Morano, 8750 South Ocean Drive Unit 534, Jensen Beach, FL 34957 | $33,186.17 | Telephone / internet services |
| John Doe – Y, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $8,784.42 | Services |
| Jane Doe – C, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $49,638.17 | Services |
| John Doe – CC, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $9,812.57 | Services |
| James Hoft, 8750 South Ocean Drive Unit 534, Jensen Beach, FL 34957 | $17,280.00 | |
| JUSTICE LEAGUE, POB 191250, Saint Louis, MO 63119 | $95,000.00 | |
| ORCHID GROVE MEDIA, 2820 N PINAL AVE STE 12 PMB 209, CASA GRANDE, AZ 85122 | $27,000.00 | |
| CONRADSON RENTALS LLC, | $17,714.64 | |
| O'MALLEY McCULLOCH LLC, | $30,125.09 | |
| SLIGHTLY OFFENSIVE INC, | $13,477.73 | |

**7) Legal Actions**

RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT, TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT

2122-CC09815-01

Defamation and Intentional Infliction of Emotional Distress

St. Louis Circuit Court

10 N. Tucker Blvd, Saint Louis, MO 63101

| Debtor Name | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|

### Continuation Sheet for Official Form 207

**Pending**

**-------**

**JAMES HOFT, JOSEPH HOFT AND TGP COMMUNICATIONS LLC d/b/a THE GATEWAY PUNDIT V. GILBERT C. HUMES et al**

**24CV-004696**

**Fulton Superior Court Clerk**

**136 Pryor St SW, Atlanta, GA 30303**

**Pending**

**-------**

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case and this filing:</strong></td></tr>
</table>

Debtor Name    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:   Southern District of Florida

Case number (*If known*):    24-13938-MAM

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors   12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐   *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐   *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐   *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐   *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐   *Schedule H: Codebtors* (Official Form 206H)

☐   *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☑   Amended *Schedule* \_\_\_\_   A/B, G

☐   *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐   Other document that requires a declaration_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   05/30/2024     ✘ /s/ James Hoft
       MM / DD / YYYY         Signature of individual signing on behalf of debtor

                                James Hoft
                                Printed name

                                Manager
                                Position or relationship to debtor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:

TGP COMMUNICATIONS, LLC                    Case No. 24-13938-MAM
                                           Chapter 11

     Debtor.

_____/

## DEBTOR'S NOTICE OF COMPLIANCE WITH REQUIREMENTS FOR
## AMENDING CREDITOR INFORMATION

This notice is being filed in accordance with Local Rules 1007-2(B), 1009-1(D), or 1019-1(B) upon the filing of an amendment to the debtor's lists, schedules or statements, pursuant to Bankruptcy Rules 1007, 1009, or 1019.   I certify that:

[  ]    The paper filed **adds** creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being added).   I have:
     1.    remitted the required fee (unless the paper is a Bankruptcy Rule 1019(5) report);
     2.    provided the court with a supplemental matrix diskette **containing only the added creditors** or electronically uploaded the added creditors in CM/ECF;
     3.    provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)]; and
     4.    filed an amended schedule(s) and summary of schedules.

[  ]    The paper filed **deletes** a creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being deleted)**.   I have:**
     1.    remitted the required fee;
     2.    provided notice to affected parties and
     3.    filed an amended schedule(s) and summary of schedules.

[  ]    The paper filed **corrects** the name and/or address of a creditor(s) as reflected on the <u>attached list</u>.   **I have**:
     1.    provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)] and
     2.    filed an amended schedule(s) or other paper.

[  ]    The paper filed **corrects** schedule D, E or F amount(s) or classification(s).   **I have:**
     1.    remitted the required fee;
     2.    provided notice to affected parties and
     3.    filed an amended schedule(s) and summary of schedules.

[ X ]    None of the above apply. The paper filed does not require an additional fee, a supplemental matrix, or notice to affected parties. It **X does** ☐ does not require the filing of an amended schedule and summary of schedules.

I also certify that, if required to be filed by the Bankruptcy Rules, the official form "Declaration Concerning Debtor's Schedules" has been signed by each debtor as required by Local Rules 1007-2(B), 1009-1(A)(2) and (D)(1), or 1019-1(B) and, if filed electronically without imaged signatures, a local form "Declaration Under Penalty of Perjury to Accompany Petitions, Schedules and Statements Filed Electronically" accompanied the filing of the document.

Dated:   _5/30/2024_____
Bart A. Houston
_____         _____
Attorney for Debtor (or Debtor, if pro se)         Joint Debtor (if applicable)

  _TGP COMMUNICATIONS, LLC_____       _____
Print Name                         Address

  _623636_____        _____
Florida Bar Number                     Phone Number

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| TGP COMMUNICATIONS, LLC , | : | CASE NO. 24-13938-MAM |
| | : | |
| DEBTOR. | : | |

**UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS**

Mary Ida Townson, the United States Trustee for Region 21 (the "U.S. Trustee"), through her undersigned counsel, files this objection (the "Objection") to the *Debtor's Motion for an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors* (the "Motion") (Dkt. 26), and respectfully states:

## I.     PRELIMINARY STATEMENT

1.     The bankruptcy process operates, like the rest of the court system, on the bedrock principle of American jurisprudence that the public has a right of access to judicial records. Only under limited circumstances may a federal court restrict or deny that access. Here, the Debtor seeks authority for a wholesale redaction of all personal identifiable information, including the creditors' names, for the contract writers (the "Contract Writers") that perform contract work for the Debtor.

2.     Disclosure is a basic premise of bankruptcy law. Indeed, it is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised. The Bankruptcy Code contains very limited and specific exceptions to the general rule that bankruptcy proceedings should be open and

transparent.  The movant must demonstrate extraordinary circumstances and a compelling need to obtain protection to justify any such request.  This is especially true as to information required to be filed by the Bankruptcy Code, Bankruptcy Rules, and the Local Rules, such as the creditor matrix, schedules, and statements.  Here, with nothing more than vague statements supporting the request, the Debtor seeks extremely broad authority to redact all information relating to the Contract Writers. If the Motion is granted, the ability of interested parties to evaluate the Debtor and its bankruptcy process and to communicate and find each other will be significantly curtailed.

3.      In addition to creating unfavorable precedent in this and other media industry chapter 11 cases, allowing the Debtor to file incomplete creditor lists and schedules and statements is a slippery slope.  Does the Debtor intend to conduct its claim objections under seal?  Will certain creditors' treatment in a plan be redacted?  Will objections to the disclosure statement and confirmation also be sealed?  Will the hearings before the Court in this case have to be repeatedly closed?  It is well settled that, as a matter of promoting the integrity of the judicial system, bankruptcy proceedings must be open and transparent.  Accordingly, the Debtor's request should be denied.

## II.      JURISDICTION, VENUE AND STANDING

4.      This Court has jurisdiction to hear and determine this Objection.

5.      Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

6.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on this Objection.  *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## III.     FACTUAL BACKGROUND

### A.  General Case Background

7.     On April 24, 2024, ("Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") (Dkt. 1).

8.     The Debtor continues to operate its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

9.     On April 25, 2024, the U.S. Trustee appointed Linda Marie Leali as Subchapter V Trustee (Dkt. 6).

10.     The Debtor "owns and operates a conservative news and opinion website" (Dkt. 13, ¶3).

11.     The Debtor claims it operates from 1820 N. Jensen Beach Blvd., Unit 1120, Jensen Beach, FL 34957 (Dkt. 13, ¶4).  Upon information and belief, this address is actually the location of a Mailboxes, Inc.

12.     On May 6, 2024, the U.S. Trustee conducted its initial debtor interview (the "IDI"). At the IDI, Jonathan Burns, the Debtor's in-house counsel appeared on behalf of the Debtor.

13.     James Hoft, the manager and principal of the Debtor and signatory on the Debtor's bankruptcy petition and schedules, did not appear at the IDI.

14.     On May 22, 2024, the Debtor filed its schedules and Statement of Financial Affairs. (Dkt. 30).

15.     On its Schedule F, the Debtor listed the Contract Writers, as Jane Doe or John Doe, followed by a letter. The address listed for each of the Contract Writers was in care of Jonathan Burns, at POB 191250, Saint Louis, MO, 63119 (Dkt. 30).

16.     It is unclear who has access to, or controls that post office box. On May 30, 2024, the U.S. Trustee commenced the meeting of creditors (the "Meeting of Creditors"). At the Meeting of Creditors, Jonathan Burns, the Debtor's in-house counsel appeared on behalf of the Debtor.

17.     James Hoft, the principal of the Debtor and signatory on the Debtor's bankruptcy petition and schedules, did not appear at the Meeting of Creditors so the Meeting of Creditors was continued to June 6, 2024, at 3:30 p.m.

**B.  The Motion**

18.     On May 21, 2024, the Debtor filed the Motion.

19.     The Motion seeks a court order allowing the Debtor to suppress from any paper filed with the Court, the names, residential addresses, mailing addresses, and email addresses of the Contract Writers. (Motion, ¶8).

20.     The Motion provides the rationale for the relief is that the "Contract Writers investigate and draft articles to be published on the Debtor's website" and they are "subject to extreme criticisms from other less conservative groups." The Debtor also claims that ". . .  in the past, several of the "Contract Writers have received threats of bodily harm from groups and individuals". (Motion, ¶9).

21.     The Motion is not supported by a Certification and provides no evidentiary support for the allegations made or relief requested.

## IV.     LEGAL FRAMEWORK

### A.  Debtors in Bankruptcy Are Required to File Certain Information Regarding Their Creditors

22.     The Bankruptcy Code states that the debtor "*shall* . . . file, unless the court orders otherwise - a schedule of assets and liabilities," and "statement of the debtor's financial affairs," among other information.  11 U.S.C. § 521(a)(1)(B)(i)(emphasis added).  Rule 1007-1(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that a debtor, other than one under chapter 9, shall file schedules of assets and liabilities, of current income and expenditures, of executory contracts and unexpired leases, and a statement of financial affairs, among other documents.

23.     Bankruptcy Rule 1007(a)(1) requires that a debtor in a voluntary case "file with the petition a list containing the name and address of each entity included or to be included on Schedules D, E/F, G and H as prescribed by the Official Forms."

24.     Debtors in chapter 11 and chapter 9 cases are also required to file Official Form 201, setting forth a list of creditors with the largest unsecured claims that are not insiders. That form requires the provision of the following information for such creditors:  name, complete mailing address, the name, telephone number and email address of a creditor contact, and the nature and amount of claim.

### B.  The Right of Public Access to Judicial Records

25.     In American jurisprudence, there is a long-standing, common law right of public access to court records.  *See Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589, 591 (1978) ([i]t is clear that the courts of this country recognize a general right to inspect and copy public records

and documents, including judicial records and documents.")  The public's right of access envisions "a pervasive common law right to inspect and copy public records and documents, including judicial records and documents."  *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001) (citations omitted).

26.     The "access to civil proceedings and records promotes public respect for the judicial process."  *Id.* (citations omitted).  Such access is "rooted in the public's First Amendment right to know about the administration of justice."  *Motors Liquidation Co. Avoidance Action Trust v. JP Morgan Chase Bank, N.A. (In re Motors Liquidation Co.)*, 561 B.R. 36, 41 (Bankr S.D.N.Y. 2016).  This right is "firmly entrenched and well supported by policy and practical considerations."  *Orion Pictures Corp. v. Video Software Dealers Assoc.*, 21 F.3d 24, 26 (2d Cir. 1994).

27.     The right of public access has given rise to "a strong presumption and public policy in favor of public access to court records."  *In re Borders Grp., Inc.*, 462 B.R. 42, 46 (Bankr. S.D.N.Y. 2011).  This presumption "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice . . . . [P]ublic monitoring is an essential feature of democratic control."  *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).  The Second Circuit has issued this pointed guidance:

> There must be a strong presumption against sealing any document that is filed with the court.  Our courts do not operate in secrecy.  Except on rare occasions and for compelling reasons, everything that courts do is subject to public scrutiny.  To hide from the public entire proceedings, or even particular documents or testimony forming a basis for judicial action that may directly and significantly affect public interests, would be contrary to the premises underling a free, democratic society.

*City of Hartford v. Chase*, 942 F.2d 130, 137 (2d Cir. 1991).

### C. **The Right to Public Access Is Codified in the Bankruptcy Code**

28.    In our bankruptcy system, it is widely acknowledged that the governmental interest is safeguarding public access to judicial records is "of special importance . . . as unrestricted access to judicial records fosters confidence among creditors regarding fairness in the bankruptcy system." *Motors Liquidation*, 561 B.R. at 41, *quoting Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d. 1, 7 (1st Cir. 2005) (*quoting In re Crawford*, 194 F.3d. 954, 960 (9th Cir. 1999). Described as "fundamental to the operation of the bankruptcy system and . . . the best means of avoiding any suggestion of impropriety that might or could be raised," the policy of open inspection, as applied in this Court, cannot be underestimated. *Motors Liquidation*, 561 B.R. at 41-42, *quoting In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984).

29.    The common law right of public access to judicial records has been codified in section 107(a) of the Bankruptcy Code. *Togut v. Deutsche Bank AG (In re Anthracite Capital Inc.)*, 492 B.R. 162, 170, 173 (Bankr S.D.N.Y. 2013); *see also Gitto Global*, 422 F.3d at 7-8 (section 107 supplants the common law of public access). Pursuant to section 107(a), papers filed in bankruptcy cases and the Court's dockets are "public records, open to examination by an entity at reasonable times without charge." 11 U.S.C. § 107(a); *Anthracite*, 492 B.R. at 170.

### D. **The Limited Exception of Bankruptcy Code § 107(c)**

30.    Despite its deep underpinnings, the right to public access to court records is "not absolute." *Nixon*, 435 U.S. at 598; *Motors Liquidation*, 561 B.R. at 42. "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon*, 435 U.S. at 598; *Orion Pictures*, 21 F.3d at 27 (noting that court may limit access where user's purpose is improper).

134

31.     Section 107(b)(1) of the Code provides that, "[o]n request of a party in interest, the bankruptcy court shall, . . .  protect an entity with respect to a trade secret or confidential research, development or commercial information."  11 U.S.C. § 107(b)(1).  Section 107(b) of the Code provides a "narrow statutory exception" to public access in bankruptcy cases."  *In re Muma Services, Inc.*, 279 B.R. 478, 484 (Bankr. D. Del. 2002).

32.     Section 107(c)(1), added to the Code through the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, "broadened the situations in which the court could protect individuals from disclosure of sensitive information in light of the emerging problem of identity theft."  2 *Collier on Bankruptcy* ¶ 107.LH[2] (16th ed.).

33.     The statute provides:

> (c)(1) The bankruptcy court, for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual or the individual's property:

>> (A) Any means of identification (as defined in section 1028(d) of title 18) contained in a paper filed, or to be filed, in a case under this title.

>> (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c).

34.     Section 1028(d)(7) of title 18 ("Fraud and related activity in connection with identification documents, authentication features, and information") defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including any –

>> (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

>> (B)  unique biometric data (such as finger print, voice print retina or iris image, or other unique physical representation);

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e)).

18 U.S.C. § 1028(d)(7).

35. The specific "purpose of § 107(c) is to set forth a limited exception to the general rule that all records are public." *In re French*, 401 B.R. 295, 305 (Bankr. E.D. Tenn. 2009). Accordingly, under the precise structure and deliberate terms of § 107(c), the Court, in the exercise of its discretion, *may* limit public access of certain identification information only if it determines that (1) *cause exists, and* (2) *to the extent* dissemination of the information would constitute an *undue risk* of identity theft. *Id.* (emphasis added). The Supreme Court has "emphasized that the word 'may' clearly connotes discretion." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 136 S. Ct. 1923, 1931 (2016). "Undue," which appears as a modifier in section 107(c), is not defined in the Bankruptcy Code, and generally means "excessive or unwarranted." *Black's Law Dictionary* (3rd pocket ed. 2006). Regarding the statutory interpretation of modifiers, such as "undue," the Court has the "duty to 'give effect, if possible, to every clause and word of [the] statute.'" *In re Mazzeo*, 131 F.3d 295, 302 (2d Cir. 1997) (interpreting "liquidated" and "noncontingent" as modifiers of "debts" in § 109(e)), *quoting United States v. Menasche*, 348 U.S. 528, 538-39 (1955).

36. Given the express limitations in the statute permitting a bankruptcy court to "protect an individual" solely "to the extent" that "undue" risk is present, section 107(c)(1), like Section 107 in general, "does not mandate sealing – only protection." *Motions Seeking Access to 2019 Statements*, 585 B.R. 733, 753 (D. Del. 2018), *quoting Anthracite*, 492 B.R. at 180. It follows from this principle that the Court's consideration of a request for relief under section 107(c)(1) necessarily entails a consideration of competing interests. *Id.*, 585 B.R. at 755-57.

E.  **The Debtor Has the Burden of Proof Under § 107(c)**

37.     In seeking to apply any exception to the general right of public access to judicial

records, codified by section 107(a) of the Bankruptcy Code, "[t]he burden is on the party who

seeks to overcome the presumption of access to show that the interest in secrecy outweighs the

presumption." *Cendant Corp.*, 260 F.3d at 194.   In *Cendant*, the Third Circuit Court of Appeals

further explained:

> [T]he party seeking the closure of a hearing or the sealing of part of the
> judicial record "bears the burden of showing that the material is the kind of
> information that courts will protect" and that "disclosure will work a *clearly
> defined and serious injury to the party seeking closure*."  In delineating the
> injury to be prevented, *specificity is essential*.  Broad allegations of harm,
> bereft of specific examples or articulated reasoning, are insufficient.

*Id.* (internal citations omitted, emphasis added).

38.     The moving party bears the burden of showing that a request to place documents

under seal falls within the parameters of Bankruptcy Code § 107(b) and Bankruptcy Rule 9018

by demonstrating ". . . that the interest in secrecy outweighs the presumption in favor of access."

*United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.),* 150 B.R. 334, 340

(D. Del. 1993); *accord Food Mgmt. Group,* 359 B.R. at 561 (Bankr. S.D.N.Y. 2007); *In re

Fibermark, Inc.*, 330 B.R. 480 (Bankr. D. Vt. 2005).

39.     The burden of proof to seal or redact filed bankruptcy papers "is not an easy

burden nor should it be . . . The party seeking impoundment must submit 'evidence that filing

under seal outweighs the presumption of public access to court records.'" *In re Creighton*, 490

B.R. 240, 244 (Bankr. N.D. Ohio 2013), *quoting Gitto/Global*, 321 B.R. at 373, *quoting In re

Muma Servs. Inc.*, 279 B.R. 478, 485 (Bankr. D. Del. 2002).  "[S]ealing official documents," as

the Debtor would like, "should not be done without a compelling reason."  *City of Hartford*, 942

F.2d at 135.

## IV.   <u>OBJECTION</u>

40.     The Debtor has not overcome the long-standing presumption of the public's right to access court records.  It is well settled that honesty and full disclosure are paramount in bankruptcy.  The duty of disclosure is important in the chapter 11 context, where the debtor in possession serves as a trustee for the bankruptcy estate.  *In re Scott*, 172 F.3d 959, 967 n.6 (7th Cir. 1999).  In this case, the Debtor has not overcome that presumption.

### A.   **The Debtor Has Not Established Grounds to Redact the Names of the Contract Writers Under Section 107(c) of the Bankruptcy Code**

41.     The Debtor has made no attempt to fulfill its burden of proof under Bankruptcy Code § 107(c).  As that statute is applied in this case, for the Court to exercise its discretion to protect the names, addresses, and other personal identifiable information of the Contract Writers, the Debtor must furnish evidence and make a concrete showing that filing this information, "*would* create" an "*undue* risk" of identity theft or other unlawful injury to the Contract Writers. 11 U.S.C. § 107(c) (emphasis added).

42.     This issue was addressed by the Bankruptcy Court in *In re Celsius Network, LLC*, 644 B.R. 276, 293 (Bankr. S.D.N.Y 2022). There, the court determined that "[i]dentifying the individual account holders by name, without physical and email addresses, is insufficient information to expose customers to risks of identity theft or personal danger."  644 B.R. at 293. The court recognized that sealing such information from public disclosure "risks transforming the open and transparent bankruptcy process into something very different, which the Court is loath to do without a strong showing of real and not speculative risks."  *Id.*

43.     The Debtor has not set forth any facts demonstrating that disclosure of Contract Writers' contact information, including their names, would create any risk, let alone any undue risk, of identity theft or other unlawful injury.

44.     The Debtor's unsubstantiated and unsupported allegations are insufficient to overcome the burden imposed under Section 107(c).

45.     The Debtor cites, as authority, an unpublished order entered in *In re Bird Global, Inc., et al.*, Case No. 23-20514 (CLC) (Bankr. S.D. Fla. Dec. 22, 2023). In that case, however, the Debtors disclosed the creditors' names. Additionally, the Debtors used the services of Epiq Corporate Restructuring, LLC, a third-party noticing agent, to serve the creditors.

46.     Here, the Debtor seeks to suppress disclosure of all information regarding the Contract Writers, including their names. Moreover, the Debtor's schedules indicate that the Debtor intends to provide service at a post office box maintained and controlled by the Debtor.

47.     Consistent with the depth of the public right to access judicial documents, Bankruptcy Code § 107(c) by its express terms requires both proof of undue risk – *i.e.*, not merely a slightly possible, theoretical risk – as well as a certainty of such undue risk.  11 U.S.C. § 107(c).  The modifier "undue" must be proven by a movant under § 107(c)(1), and not read out of the statute.  *In re Mazzeo,* 131 F.3d 295, 302 (2d Cir., 1997).  In the Motion, the Debtor merely hypothesizes, without the evidence required, that there is a possibility of just ordinary risk.  That simply does not suffice to fulfill the Debtor's heavy burden of proof under § 107(c). *Cendant*, 260 F.3d at 194 ("Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient"); *see also Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 144-45 (2d Cir. 2016) ("'Broad and general findings' and 'conclusory assertion[s]' are insufficient to justify deprivation of public access to the record, . . . 'specific, on-the-record findings' are required.") (*quoting United States v. Erie Cty.*, 763 F.3d 235, 243 (2d Cir. 2014) (internal quotations omitted).

48.     Without any additional proof establishing an "undue" risk of identity theft or other unlawful injury to the Contract Writers, the Motion must be denied under § 107(c)(1).

49.     The U.S. Trustee leaves the Debtor to its burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the relief requested by the Motion and grant any such other and further relief that the Court deems just and proper.

MARY IDA TOWNSON

UNITED STATES TRUSTEE
REGION 21

By:_____/s/
Martin P. Ochs*
Georgia Bar No. 091608
United States Department of Justice
Office of the United States Trustee
362 Richard Russell Building
75 Ted Turner Drive SW
Atlanta, Georgia 30303
(404) 331-4509
martin.p.ochs@usdoj.gov

*I hereby certify that I am admitted to the Bars of the States of Georgia and New York and that I am excepted from additional qualifications to practice in this Court pursuant to Local Rule 9011-4 pertaining to attorneys representing the United States government.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS was electronically filed with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system and via U.S. Mail to the following:

Bart Houston:         bhouston@houstonroderman.com
Robert Furr:          ltitus@furrcohen.com
Linda Leali:          trustee@lealilaw.com

DONE this the 30th day of May, 2024.

By: _____/s/
Martin P. Ochs*
Georgia Bar No. 091608
United States Department of Justice
Office of the United States Trustee
362 Richard Russell Building
75 Ted Turner Drive SW
Atlanta, Georgia 30303
(404) 331-4509
martin.p.ochs@usdoj.gov

 *I hereby certify that I am admitted to the Bars of the States of Georgia and New York and that I am excepted from additional qualifications to practice in this Court pursuant to Local Rule 9011-4 pertaining to attorneys representing the United States government.

**WILLKIE FARR & GALLAGHER LLP**
Rachel C. Strickland (*pro hac vice* forthcoming)
Aaron E. Nathan (*pro hac vice* forthcoming)
James H. Burbage (*pro hac vice* forthcoming)
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
rstrickland@willkie.com
anathan@willkie.com
jburbage@willkie.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Michael J. Gottlieb (*pro hac vice* forthcoming)
Meryl C. Governski (*pro hac vice* forthcoming)
1875 K Street NW
Washington, DC 20006
mgottlieb@willkie.com
mgovernski@willkie.com

**DUNN LAW, P.A.**
David A. Blansky
Florida Bar No. 1033002
Michael P. Dunn
Florida Bar No. 100705
66 West Flager Street, Suite 400
Miami, FL 33130
Telephone: (786) 433-3866
Facsimile: (786) 260-0269
dblansky@dunnlawpa.com
michael.dunn@dunnlawpa.com

-and-

**UNITED TO PROTECT DEMOCRACY**
Rachel Goodman (*pro hac vice* forthcoming)
Brittany Williams (*pro hac vice* forthcoming)
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
rachel.goodman@protectdemocracy.org
brittany.williams@protectdemocracy.org

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| TGP Communications, LLC. | Case No. 24-13938 (MAM) |
| Debtor. | |

# MOTION OF
# RUBY FREEMAN AND WANDREA' ARSHAYE
# MOSS FOR AN ORDER DISMISSING THE DEBTOR'S
# CHAPTER 11 CASE UNDER SECTIONS 1112(b) AND 305(a) OF
# THE BANKRUPTCY CODE OR, IN THE ALTERNATIVE, MODIFYING
# THE AUTOMATIC STAY TO CONTINUE PREPETITION LITIGATION

Ruby Freeman and Wandrea' ArShaye "Shaye" Moss (together, the "Freeman Plaintiffs"), as creditors of TGP Communications, LLC (the "Debtor" or "The Gateway Pundit"), by and through their undersigned counsel, file this motion (the "Motion")[1] for an order (a) dismissing the Debtor's chapter 11 case under sections 1112(b) and 305(a) of the Bankruptcy Code, or (b) in the alternative, modifying the automatic stay pursuant to section 362(d) to continue litigation currently pending in (i) the Circuit Court of the City of Saint Louis City, Missouri (the "Missouri Litigation") and (ii) the Superior Court of Fulton County, Georgia.  In support of the Motion, the Freeman Plaintiffs represent as follows:

## PRELIMINARY STATEMENT

1.     On December 4, 2020, in the aftermath of the 2020 presidential election, the Debtor published an article with the title "**BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER [Sic] Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED – IT'S RUBY'S DAUGHTER! (Video)**."[2]  This article identified Georgia election workers Ruby Freeman and Shaye Moss by name and accused them of committing voter fraud in Georgia to help Joseph Biden win the presidential election.  Notwithstanding the complete refutation of false allegations by Georgia election officials less than 24 hours later, for months The Gateway Pundit published dozens of additional defamatory articles accusing the Freeman Plaintiffs of voter fraud.

---

[1]  This Motion has been drafted to comport with the "Rule of 5 and 10" as encouraged by Judge Mora's Chamber Rules.  The Freeman Plaintiffs are prepared to provide additional briefing in connection with any aspect of the Motion to the extent necessary upon the request of the Court.

[2]  *See* Jim Hoft, *BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER!*, The Gateway Pundit (Dec. 4, 2020 7:35 a.m.), https://www.thegatewaypundit.com/2020/12/breaking-crooked-elections-superviser-filmed-pulling-suitcases-ballots-georgia-identified-rubys-daughter-video/.

2.      The Freeman Plaintiffs suffered immediate and devastating effects from the Debtor's accusations and conduct.  Ms. Freeman and Ms. Moss received numerous harassing calls, emails, text messages, and social media messages from strangers, many of which threatened bodily harm and asserted that Ms. Freeman or Ms. Moss deserved to die.  Missouri Litigation Jan. 10, 2023 Second Amended Petition at ¶¶ 172, 180, 186, 189, attached hereto as **Exhibit A**.[3]  Some of those strangers harassed Ms. Freeman at her home and Ms. Moss's grandmother at hers.  (*Id.* ¶¶ 174, 178, 187-188.)  Twice, strangers came to Ms. Moss's grandmother's house asking for Ms. Moss.  (*Id.* at ¶ 188.)  Even Ms. Moss's son—fourteen years old at the time—could not escape the hatred of anonymous strangers.  He was bombarded with phone calls, including from one caller who stated that he "should hang alongside [his] n***** momma." (*Id.* ¶ 185.)  As a result of the harassment she faces, Ms. Freeman is fearful anytime she goes out in public.  (*Id.* ¶ 182.)  She has been forced to shutter her business, deactivate social media, and flee her home.  (*Id.* ¶¶ 178, 180.)  Similarly, Ms. Moss has suffered disrupted sleep and physical symptoms, and is rarely able to feel safe enough to leave her home.  (*Id.* ¶¶ 192-194.)

3.      In December 2021, the Freeman Plaintiffs began to fight back.  They sued the Debtor, the Debtor's owner Jim Hoft, and his twin brother Joe Hoft (collectively, the "Defendants") in Missouri state court for defamation and intentional infliction of emotional distress.  To date, the Defendants' strategy in the Missouri Litigation has had one goal: delay.  This chapter 11 filing is just the newest effort—in a long line of failed tactics—to prevent the Freeman Plaintiffs from proving their claims in a court of law.

---

[3]  Only filings in the Missouri Litigation after July 2023 are publicly available. The Circuit Court of the City of Saint Louis City, Missouri does not assign docket numbers to court filings.  Accordingly, citations to filings in the Missouri Litigation are identified by their date and type of filing. The Freeman Plaintiffs are happy to produce additional pleadings from the Missouri Litigation to the extent helpful to the Court.

4.      The Gateway Pundit's chapter 11 filing has all the hallmarks of a case warranting dismissal. The Debtor is cash-flow positive and easily able to meet its debts in the ordinary course of business. The Debtor has few assets and only one employee. The Debtor is a party to only a few purported executory contracts and zero unexpired leases. Outside of the Missouri Litigation and a separate defamation lawsuit pending in Colorado ("Colorado Litigation")—neither of which is close to trial—there are few creditors, all with *de minimis* claims. The bankruptcy filing's timing seems designed to delay the Hoft brothers' depositions in the Missouri Litigation (which were to take place at the end of May). Prior to the petition date, the Debtor made highly suspicious loans and other payments to the Hoft brothers. Put simply, the red flags here are large and numerous. This case is a pure litigation tactic. For these reasons, and those set forth in detail below, the Freeman Plaintiffs' Motion should be granted.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Southern District of Florida (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.      Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.[4]

7.      The statutory predicates for the relief sought are sections 305(a), 362(d), and 1112(b) of title 11 of the United States Code, 11 U.S.C. § 101-1532 (the "Bankruptcy Code").

---

[4] While venue is proper to hear this Motion, the Freeman Plaintiffs do not concede that venue for the chapter 11 case is proper. As set forth on **Exhibit B,** the Debtor registered with the Florida Secretary of State on April 18, 2024 (i.e., less than one week before the commencement of this case). Thus, it appears the Debtor may be seeking to manufacture venue in the Southern District of Florida notwithstanding the statutory 180-day requirement. *See* 28 U.S.C. § 1408(1). The United States Trustee's recent objection noting that the Debtor's purported address is merely the location of a rented P.O. box only raises more questions about whether venue is proper and is yet another red flag in this case. *See* Docket No. 35 at ¶ 11. The Freeman Plaintiffs reserve all rights, including the right to seek discovery, in connection with a potential motion to transfer venue.

**BACKGROUND**

8.      Beginning on December 3, 2020—approximately one month after election day—the Debtor began publishing articles accusing the Freeman Plaintiffs of voter fraud.  Throughout December 2020 and January 2021, The Gateway Pundit published 28 more articles falsely accusing Ms. Moss and Ms. Freeman of participating in voter fraud.  *See* Exhibit A at ¶¶ 76-78, 82, 84, 89-91, 93-94, 96-97, 99-100, 102, 104-105, 111-112, 114, 116. In the months thereafter, The Gateway Pundit published dozens of additional articles wrongly identifying Ms. Moss and Ms. Freeman of "stealing" the election.

9.      On December 2, 2021, Ms. Freeman and Ms. Moss initiated the Missouri Litigation. To date, the Defendants' strategy has been delay.  The Defendants have launched a series of delay tactics including (a) seeking to remove the Missouri Litigation to Federal Court (denied), (b) seeking a Protective Order that would require attorneys for the Freeman Plaintiffs to fly to Missouri or Georgia anytime they wanted to look at discovery (denied), (c) filing counterclaims for defamation against the Freeman Plaintiffs and their attorneys (all dismissed), (d) moving to dismiss the Missouri Litigation pursuant to Georgia's anti-SLAPP statute (denied), and (e) appealing the dismissal of counterclaims (dismissed) and denial of Defendants' anti-SLAPP motion (denied).[5]

10.     The same desire for delay colored the Defendants' approach to discovery, which commenced nearly two years ago in June 2022.  Between November 11, 2022 and March 5, 2024 the Freeman Plaintiffs were forced to file *five* separate motions to compel the Defendants to produce documents.  A Special Master was eventually appointed to address the numerous

---

[5]  *See generally* Missouri Litigation June 6, 2022 Opinion, Memorandum and Order attached hereto as **Exhibit C** (denying removal); December 20, 2022 Order on Protective Order attached hereto as **Exhibits D** (denying defendant cross motion); July 24, 2023 Order attached hereto as **Exhibit E (**dismissing defendant counterclaims and striking anti-SLAPP Motion); Order Aug. 17, 2023 attached hereto as **Exhibit F** (denying anti-SLAPP appeal); Order Aug. 31, 2023 attached hereto as **Exhibit G** (dismissing counterclaim appeal).

discovery disputes.  *See* Missouri Litigation May 10, 2023 Appointment Order, attached hereto as **Exhibit H**.  Due to the Defendants' obstructionist tactics, the Freeman Plaintiffs filed a motion (which was granted) seeking a protocol that would control the scheduling and administration of depositions. *See* Missouri Litigation Nov. 7, 2023 Order, attached hereto as **Exhibit I**.

11.     On February 26, 2024, the Missouri court adopted the recommendation of the Special Master that fact discovery be completed by May 31, 2024.  That same day, the Defendants again demonstrated their flippant approach to discovery and moved the court to issue letters rogatory for the deposition of *thirty-seven* individuals and entities in Georgia despite (a) a cap limiting the number of depositions to 20; (b) having not sought to depose a single party in the previous two years; and (c) there being only approximately three months left of fact discovery.[6]

12.     On April 10, 2024, Jim Hoft and Joe Hoft finally each agreed to be deposed on May 28 and 29, 2024, respectively.  On April 24, 2024, the Freeman Plaintiffs noticed the depositions of Jim Hoft and Joe Hoft.  That same day, the Debtor filed this chapter 11 bankruptcy case.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

**I.     THE COURT SHOULD DISMISS THE CASE UNDER 11 U.S.C. § 1112(b) AS A BAD FAITH FILING**

13.     Bankruptcy Code section 1112(b)(1) provides: "…[T]he court shall … dismiss a case under this chapter… for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."  *See* 11 U.S.C. § 1112(b).  A court can dismiss a case for cause if the petition was not filed in good faith. *See In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988).  Courts analyzing

---

[6]  On April 12, 2024, the Defendants filed an action in Georgia (the "Georgia Litigation"), seeking the issuance of third-party subpoenas from the Superior Court of Fulton County based on the letters rogatory issued by the Missouri court.

whether a chapter 11 case constitutes a "bad faith filing" look to a number of factors, often referred

to as the "*Piccadilly*" factors: (1) the debtor has only one asset; (2) the debtor has few unsecured

creditors whose claims are small in relation to the claims of the secured creditors; (3) the debtor

has few employees; (4) the property at issue is the subject of a foreclosure action as a result of

arrearages on the debt; (5) the debtor's financial problems involve essentially a dispute between

the debtor and the secured creditors which can be resolved in an existing state court action; (6) the

timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the

debtor's creditors to enforce their rights.  *See id*. at 1394-95.

14.     Here, each of the applicable *Piccadilly* factors strongly cut in favor of dismissing

the Debtor's petition as a bad faith filing:

- ***Piccadilly Factor 1: Number of Assets*.**  The existence of relatively few assets cuts in favor of
  dismissal.  *See In re Canbec Inv. Corp.*, 349 B.R. 915, 918 (Bankr. M.D. Fla. 2006).  Here, the
  Debtor's estate consists of (a) cash and cash equivalents, (b) investment accounts, (c) a 2021
  Porsche Cayenne, (d) trademark/internet domain names, and (e) approximately $970,000 in
  accounts receivable in connection with various loans the Debtor has made to Jim Hoft and Joe
  Hoft.  *See* Docket No. 30, Schedule A/B; *see also* Docket No. 34 (revising value of Debtor's
  assets on Schedule A/B upwards by over $1 million).[7]

- ***Piccadilly Factor 2: Number and Nature of Unsecured Creditors*.**  Beyond the plaintiffs in
  the Missouri Litigation and Colorado Litigation, the Debtors have few unsecured creditors with
  *de minimis* claims.  *See* Docket No. 2 (listing largest unsecured creditor claim of $16,546.05
  and the majority of claims are under $3,200); Docket No. 13 (the "Case Management
  Summary") at ¶ 11 (reporting approximately $108,000 in "known liquidated claims").  The
  second largest unsecured claim listed on the top twenty unsecured creditors list is owed to Jez
  Morano (i.e., the husband of Jim Hoft).  There is no reason to believe the Debtor cannot pay

---

[7]  On May 2, 2024, the Debtor filed a balance sheet pursuant to Bankruptcy Code section 1116(1). *See* Docket No. 17
(the "Q1 2024 Balance Sheet").  The Q1 2024 Balance Sheet discloses the balances of three loans made by the
Debtor to statutory insiders prior to the petition date.  *See also* Docket No. 30, Schedule A/B (addendum to question
70).  The first is a $799,860 loan to Jim Hoft, apparently made in connection with a condominium.  The second is
a $21,000 loan to Joe Hoft.  The third is a $150,000 loan to the "Justice League."  While the Debtor's disclosures
to date are not clear, The Gateway Pundit appears to be affiliated with the "Justice League for America for a Free
Press."  *See* https://www.givesendgo.com/G2HD4 (noting funds will cover expenses of the Debtor's ongoing
litigations and that "Campaign funds will be received by Jim Hoft.").  Courts have found prepetition loans made to
insiders can be indicative of bad faith filings.  *In re Gunnison Ctr. Apartments, LP*, 320 B.R. 391, 400-01 (Bankr.
D. Colo. 2005).  The Q1 2024 Balance Sheet also discloses over $1.5 million in equity value and appears to show
historic dividends from the Company of approximately $930,000.

these creditors in the ordinary course of business. *See, e.g.*, Docket No. 28 (disclosing total cash in excess of $275,000 at the end of April and projecting $62,522.29 in positive net cash flow for May 2024);[8] Q1 2024 Balance Sheet (disclosing current assets in excess of $400,000). On May 30, 2024, the Debtor disclosed it owns Charles Schwab accounts of over $1 million. Moreover, the Debtor could have over $1 million in additional cash on hand if not for the three loans made to statutory insiders and the Debtor's acquisition of a 2021 Porsche (which is valued at approximately $88,000 notwithstanding a $50,000 in value depreciation). *See* Q1 2024 Balance Sheet.[9]

- ***Piccadilly Factor 3: Number of Employees***. This factor cuts in favor of dismissal because the Debtor has only one employee. *See In re Outta Control Sportfishing, Inc.*, 642 B.R. 180, 184 (Bankr. S.D. Fla. 2022). The fact that the Debtor does business with various contract writers in the ordinary course of business does not change this analysis. *See id.*

- ***Piccadilly Factor 5: Nature of the Disputes***. The Debtor disclosed that it filed for bankruptcy to address the Missouri Litigation and the Colorado Litigation. *See* Case Management Summary at ¶ 5 (noting "[m]ultiple litigations that threaten the Debtor's continued viability and ability to continue operations."); *see also* Docket No. 30, Statement of Financial Affairs, Part 3 (noting Debtor is defendant in only two litigations). However, courts favor dismissal when a debtor's financial problems stem from a dispute that can be resolved in state court. *See In re Canbec Inv. Corp.*, 349 B.R. at 918. Moreover, "[c]ourts universally demand more of Chapter 11 petitions than a naked desire to stay pending litigation." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 128 (3d Cir. 2004). Here, dismissing the case would return the Missouri Litigation and the Colorado Litigation to their respective state courts, which makes sense for reasons including that (a) state courts are better positioned than the Bankruptcy Court to adjudicate issues of state tort law, (b) the costs of defending these litigations are presumably being paid by an applicable insurance policy,[10] and (c) neither the Missouri Litigation nor the Colorado Litigation are particularly close to resulting in a judgment that would render the Debtor insolvent.[11]

---

[8] Confusingly, the US Bank statement attached to the Debtor's April monthly operating report redacts the name of the account holders and lists the Debtor's name (TGP Communications LLC) as a "doing business as" name.

[9] Even a cursory review of the payments made in the 90 days prior to the petition date raises a number of additional red flags, including a $17,280 payment to Jim Hoft, a $33,186.17 payment to Jim Hoft's husband, and a $95,000 payment to the "Justice League." *See* Docket No. 34, Amended Statement of Financial Affairs, Part 2 addendum (listed on page 28 of 31). In the same filing, the Debtor inexplicably answers "No" to the following question: "*Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?*" However, the Debtor's own disclosures regarding existing loans and transfers prior to the petition date make it clear that this answer to this question should be "Yes." Jim Hoft (on behalf of The Gateway Pundit) falsely answered that question under penalty of perjury two separate times. *See* Docket Nos. 30, 34.

[10] The Case Management Summary discloses a $2 million media professional insurance liability policy.

[11] As of the petition date, the Colorado Litigation has not even started general discovery.

- ***Piccadilly Factor 6: Intent to Frustrate Legitimate Efforts of Creditors to Reorganize***.  The timing of the chapter 11 filing—a mere 4 weeks before Jim Hoft was scheduled to be deposed, and 5 weeks before the close of fact discovery—further evidences the bad faith nature of this filing.  *BAMC Dev. Holding, LLC v. Wilmington Sav. Fund Soc'y (In re BAMC Dev. Holding, LLC)*, No. 22-bk-01487, 2024 U.S. Dist. LEXIS 17522, at *13 (M.D. Fla. Feb. 1, 2024) (affirming bad faith filing where debtor filed two days after a dispositive motion in a prepetition lawsuit was scheduled for a hearing). The effort to frustrate creditors is particularly inequitable here where the Debtor continues to publish defamatory statements about the Freeman Plaintiffs.[12]

## II.     THE COURT SHOULD DISMISS THE CASE UNDER 11 U.S.C. § 305(a)

15.     Bankruptcy Code section 305(a) provides: "The court . . . may dismiss a case under this title. . . if. . . the interests of creditors and the debtor would be better served by such dismissal. . . ." *See* 11 U.S.C. § 305(a).  Courts in this district analyze the following factors when determining whether relief under section 305(a) is appropriate: (1) whether another forum is available or there is already a pending action in another court;  (2) whether the creditor and debtor are actively engaged in an out of court workout; (3) the purpose for which bankruptcy jurisdiction has been sought; (4) whether the bankruptcy will unnecessarily interfere with state or federal regulatory schemes; (5) the effect of the bankruptcy proceeding on the debtor's business; and (6) whether the bankruptcy action is essentially a two-party dispute.  *In re Forever Propane Sales & Serv., Inc.*, 597 B.R. 696, 697 (Bankr. S.D. Fla. 2019).  No one of these factors is dispositive, and courts use a flexible approach in their analysis.  *Id.*

16.     Dismissal is warranted under section 305(a) for many of the same reasons dismissal is warranted under section 1112(b).  The Missouri and Colorado state courts provide a better forum to adjudicate the state law claims for defamation and intentional infliction of emotional distress

---

[12] These statements have continued on a post-petition basis. *See e.g.,* Jim, Hoft, *This Video Right Here is Why The Gateway Pundit is Under Constant Assault and Lawfare Attacks by the Tyrannical Left…*, The Gateway Pundit, (May 29, 2024, 8:15 AM), https://www.thegatewaypundit.com/2024/05/this-video-right-here-is-why-gateway-pundit/ (claiming TGP has "hard evidence" [of Plaintiffs] "crashing into a counting room after observers were removed and running stacks of ballots through the machines three and four times each").  The Freeman Plaintiffs reserve all rights to file administrative expense claims for these post-petition tortious actions.

made against the Debtor.  There is no imminent need for reorganization as evidenced by (a) neither the Missouri Litigation nor Colorado Litigation being procedurally close to determining liability, (b) the costs of those litigations being covered by insurance, and (c) the existence of minimal operational expenses.[13]  Moreover, there is no reason to believe the chapter 11 filing will negatively impact the Debtor's business—a sentiment Jim Hoft himself has shared publicly.[14]

17.     The final abstention factor also cuts in favor of dismissal because this is "essentially" a two-party dispute.  *See In re Weakley Bayou, Inc.*, No. 22-30583, 2022 WL 17824218, at *4 (Bankr. N.D. Fla. Dec. 20, 2022).  Here, the timing of the Debtor's bankruptcy filing—the same day depositions of the Hoft brothers were noticed—suggests that the filing is just the latest effort to delay the Missouri Litigation.  The existence of the Colorado Litigation should not alter the Court's analysis.  Using a flexible approach, Courts can analyze this factor in context of the cases as a whole (e.g., ability to meet debts as they come due, few unsecured creditors, few assets, one employee, suspicious timing of filing).  The Debtor's effort to improperly prejudice the plaintiffs in both the Missouri Litigation and Colorado Litigation through its chapter 11 filing should not somehow render otherwise unjustifiable tactics kosher.  The law is not beholden to such reductivist logic.  Accordingly, this factor also cuts in favor of dismissal.

## III.     ALTERNATIVELY, THE COURT SHOULD MODIFY THE AUTOMATIC STAY TO ALLOW THE MISSOURI LITIGATION TO PROCEED

18.     Even if the Court determines that dismissal is justified under neither Bankruptcy Code section 1112(b) nor 305(a), the Court should modify the automatic stay to allow the Missouri

---

[13] As of March 31, 2024, the Debtor's balance sheet showed total liabilities of only $6,604.29. *See* Docket No. 17.

[14] *See* Jim Hoft, *Fact Check: No, The Gateway Pundit is Not Losing Its Audience — We Continue to be One of the MOST VISITED News Sites in America Today*, The Gateway Pundit (Apr. 25, 2024), https://www.thegatewaypundit.com/2024/04/fact-check-no-gateway-pundit-is-not-losing/ (published day after the petition date and noting *The Gateway Pundit* is "doing better than ever").

- 9 -

Litigation and Georgia Litigation to proceed. Section 362(d) allows the automatic stay to be modified if "cause" is established. To determine whether cause exists, courts engage in a harm-balancing exercise. *See In re Vital Pharms.*, 655 B.R. 374, 387 (Bankr. S.D. Fla. 2023).

19.     Here, lifting the stay will harm neither the Debtor nor its estate. First, fact discovery in the Missouri Litigation was just over five weeks from completion when the Debtor filed for bankruptcy and will therefore require a minimal amount of the Debtor's time and resources. Second, the costs of defending the Missouri Litigation are covered by insurance, meaning there is no concern of depleting estate assets. *See, e.g. In re Scott Wetzel Servs., Inc.*, 243 B.R. 802, 805 (Bankr. M.D. Fla. 1999) (finding proceeds of insurance policy are not estate property). In fact, lifting the stay will *benefit* the Debtor and its estate, which is a separate factor considered by courts when considering whether to lift the stay. The Missouri Litigation represents one of the Debtor's largest—if not the largest—unsecured claim. And, given the nature of the claim, it is potentially nondischargeable. Accordingly, before any distributions can be made to creditors, the Missouri Litigation claims will need to be liquidated. Fully lifting the stay would allow the court best positioned to liquidate the claim to do so: the Missouri state court. At the very least, partially lifting the stay to allow for the completion of fact discovery would still benefit the estate by setting the table for a fair and efficient estimation proceeding.

20.     In contrast, the Freeman Plaintiffs would be significantly harmed if the stay is not lifted. The interrelated nature of the claims in the Missouri Litigation—which include claims against the non-debtor Hoft brothers—has effectively caused all factual discovery in that case to be stayed. A full or partial modification of the stay would allow for the completion of factual discovery. This result would advance the fair and efficient administration of justice, the fourth and final factor courts look to when assessing whether to grant stay relief.

- 10 -

## **CONCLUSION**

WHEREFORE, Ruby Freeman and Shaye Moss respectfully request that the Court enter

an order granting this Motion and dismissing this chapter 11 case, or in the alternative, granting

them relief from the automatic stay to continue the Missouri Litigation and Georgia Litigation.

> *I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).*

> *I further certify that on May 29, 2024, lawyers for the Freeman Plaintiffs contacted Debtor's counsel to meet and confer and to ask whether Debtor would consent to dismissing the chapter 11 case or lifting the stay with respect to the Missouri Litigation and Georgia Litigation. See Local Rule 9073-1(D). Debtor's counsel confirmed that it was not amenable to granting the relief sought in the Motion without the need for a hearing.*

Dated: May 31, 2024

By: */s/ David A. Blansky*

David A. Blansky
Florida Bar No. 1033002
Michael P. Dunn
Florida Bar No. 100705
DUNN LAW, P.A.
66 West Flager Street, Suite 400
Miami, FL 33130
Telephone: (786) 433-3866
Facsimile: (786) 260-0269
dblansky@dunnlawpa.com
michael.dunn@dunnlawpa.com

-and-

Rachel Goodman (*pro hac vice* forthcoming)
Brittany Williams (*pro hac vice* forthcoming)
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
rachel.goodman@protectdemocracy.org
brittany.williams@protectdemocracy.org

Rachel C. Strickland (*pro hac vice* forthcoming)
Aaron E. Nathan (*pro hac vice* forthcoming)
James H. Burbage (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
rstrickland@willkie.com
anathan@willkie.com
jburbage@willkie.com

-and-

Michael J. Gottlieb (*pro hac vice* forthcoming)
Meryl C. Governski (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
mgottlieb@willkie.com
mgovernski@willkie.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed this Motion to Dismiss or in the alternative

for Relief from the Automatic Stay with the Clerk of the Court using the Court's CM/ECF system

on May 31, 2024, thereby serving all registered ECF users in the case.


By:  *s/ David A. Blansky*
DUNN LAW, P.A.
66 West Flager Street, Suite 400
Miami, FL 33130
Telephone: (786) 433-3866
Facsimile: (786) 260-0269
dblansky@dunnlawpa.com
mdunn@dunnlawpa.com

**EXHIBIT A**

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**IN THE CIRCUIT COURT OF ST. LOUIS CITY, MISSOURI**
**TWENTY-SECOND JUDICIAL CIRCUIT**

| | | |
|---|---|---|
| RUBY FREEMAN and WANDREA MOSS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2122-CC09815-01 |
| JAMES HOFT, JOSEPH HOFT, and TGP COMMUNICATIONS LLC d/b/a *THE GATEWAY PUNDIT*, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## SECOND AMENDED PETITION

Plaintiffs Ruby Freeman and Wandrea Moss, through their attorneys, file this Second Amended Petition against Defendants James Hoft, Joseph Hoft, and TGP Communications LLC d/b/a *The Gateway Pundit* (collectively, "Defendants").

### INTRODUCTION

1.      The intentional dissemination of known falsehoods aimed at sowing doubt about the integrity of our elections threatens our very ability to function as a democracy. These falsehoods also destroy the lives of America's election workers, whose service to our system of government places them in the crosshairs of those who seek to undermine it with their disinformation. Plaintiffs Ruby Freeman and Wandrea "Shaye" Moss have been the targets of such a campaign of lies, accused by Defendants James Hoft, Joseph Hoft, and *The Gateway Pundit* of committing ballot fraud to alter the outcome of the 2020 presidential election in Georgia. The lies about Ms. Freeman and Ms. Moss have not only devastated their personal and professional reputations but instigated a deluge of

1

intimidation, harassment, and threats that has forced them to change their phone numbers, delete their online accounts, and fear for their physical safety.

2.      *The Gateway Pundit* presents itself as an online news source committed to responsible journalism: "All our content should be true. No value is more important than this."[1] But *The Gateway Pundit*'s stock in trade is spreading disinformation, including lies about the integrity of the 2020 election. According to NewsGuard, a company that rates journalistic credibility, during the 2020 presidential election *The Gateway Pundit* regularly featured "false reports, conspiracy theories, and unfounded allegations, with no distinction made between opinions and actual news reports."[2]

3.      In fact, Defendants are among the leading purveyors of false information in the United States, spreading baseless conspiracy theories and disinformation for fame and fortune. *The Gateway Pundit* has been identified as *the* top producer of false content during and after the 2020 presidential election. In the fourth quarter of 2020, *The Gateway Pundit* raked in ad revenue by achieving 7.2 million shares on social media of its bogus election fraud stories—far more than the social media shares for such national news sites such as *The Washington Post*, NBC News and NPR.[3]

4.      This action seeks to hold Defendants accountable for just some of their knowing lies—their false and endlessly repeated accusations that Ms. Freeman and Ms. Moss committed election fraud by, among other things, conspiring to empty the room

---

[1] Gateway Pundit, *About*, https://www.thegatewaypundit.com/about/ (last visited Nov. 30, 2021).

[2] NewsGuard, *Media Analysis of the US Election: August 2020*, Pressrelations – Knowledge Discovery, 36 (Sept. 4, 2020), https://www.pressrelations.com/files/user_upload/US-election_analysis_August_withAppendix_EN.pdf.

[3] Adrienne Goldstein, *Social Media Engagement with Deceptive Sites Reached Record Highs in 2020 | Strengthening Transatlantic Cooperation*, German Marshall Fund of the United States (Jan. 27, 2021), https://www.gmfus.org/news/social-media-engagement-deceptive-sites-reached-record-highs-2020/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

where they were counting ballots of poll watchers, producing secret "suitcases" full of illegal ballots, and running those ballots through vote counting machines multiple times. In making these false accusations, Defendants apparently drew their inspiration from lawyers for the Trump campaign, who contended on December 3, 2020, that grainy security camera footage showed unidentified persons counting illegal ballots. Defendants took these unsupported factual assertions and almost immediately published them to millions of readers, subsequently attributing names and additional accusations of criminal fraud against Ms. Freeman and Ms. Moss.

5.      Within 24 hours, the claims had been publicly and definitively refuted by Georgia elections officials through a detailed explanation of what the misinterpreted video actually showed: no suitcases; no illegal ballots; no voter fraud. Defendants nonetheless repeated and republished the completely fictitious account, month after month, long after it was conclusively shown to be untrue. With no concern for the truth or the consequences of their willful conduct, Defendants baselessly portrayed Plaintiffs as traitors who participated in a carefully planned conspiracy to steal the presidential election in Georgia.

6.      Defendants' reports were both false and consequential. They caused Ms. Freeman and Ms. Moss to be vilified on social media and subjected to an onslaught of violent, racist threats and harassment of all kinds. At the height of Defendants' campaign of disinformation, Ms. Freeman, at the recommendation of the FBI, fled her home and did not return for two months. On January 6, 2021, a crowd on foot and in vehicles surrounded Ms. Freeman's house. Ms. Freeman was forced to shutter her online business when social media became impossible to navigate. Ms. Moss has suffered personal and professional consequences in her work on Fulton County elections. On at least two occasions, strangers

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

showed up at her grandmother's home and attempted to push into the house in order to make a "citizens' arrest." Fulton County elections' general email address would forward incoming emails to Ms. Moss and many of her colleagues, filling her workplace with harassing messages.

7.      As a result of Defendants' ongoing campaign, both women are afraid to live normal lives. Ms. Freeman is fearful when she hears her name called in public; Ms. Moss now fears risking even a visit to the grocery store and must get her groceries delivered instead. Defendants have inflicted and continue to inflict severe and ongoing emotional, and economic damage on both plaintiffs.

8.      Plaintiffs file this lawsuit to vindicate their reputations and to ensure that other patriotic Americans who step forward to help make our election system function do not likewise become victims of abuse.

### PARTIES

9.      Plaintiff Ruby Freeman is a natural person and citizen of Georgia. Ms. Freeman worked as a temporary election worker with the Fulton County Registration and Elections Department during the 2020 general election. Her responsibilities as a temporary election worker included verifying signatures as absentee ballots came in, and then preparing absentee ballots for counting and processing.

10.     Plaintiff Wandrea "Shaye" Moss is a natural person and citizen of Georgia. Ms. Moss has worked for the Fulton County Registration and Elections Department since 2012. Ms. Moss's current position with the County is a Registration Officer, and her responsibilities include processing voter applications and assisting voters in person and

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

over the phone. During the 2020 general election, she supervised Fulton County's absentee ballot operation.

11.     Defendant James "Jim" Hoft is a natural person and citizen of Missouri whose principal place of residence is in St. Louis City, Missouri. Jim Hoft is the owner and the sole organizer of TGP Communications LLC. He is the editor of and frequent contributor to a political website and blog called *The Gateway Pundit* that he created in 2004.

12.     Defendant Joseph "Joe" Hoft is a natural person and citizen of Missouri, where he hosts a daily radio show from a studio in Chesterfield, Missouri. He also maintains a residence in Jensen Beach, Florida. He is Jim Hoft's twin brother. Joe Hoft writes regularly for *The Gateway Pundit*.

13.     Defendant TGP Communications LLC d/b/a The Gateway Pundit ("*The Gateway Pundit*") is a limited liability company organized and existing under the laws of Missouri. At all times, *The Gateway Pundit* was acting by or through its authorized agent(s), employee(s), representative(s) or owner(s). Upon information and belief, *The Gateway Pundit* publishes its articles and related social media posts from James Hoft's principal place of residence in St. Louis City, Missouri.

14.     *The Gateway Pundit* has no registered agent. Gregory J. Hickel, the only agent *the Gateway Pundit* had registered with the Missouri Secretary of State, passed away in 2016, and *The Gateway Pundit* has not registered another agent.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

## JURISDICTION AND VENUE

15.     Plaintiffs filed this case in Missouri state court. Defendants improperly removed the case to federal district court. The case was remanded to this Court on June 6, 2022.

16.     The Courts of the State of Missouri have personal jurisdiction over all Defendants because all Defendants have published defamatory statements in Missouri, and taken other actions in Missouri, such statements and actions being the subject of this Petition, and accordingly this suit arises out of and relates to Defendants' contacts with Missouri.

17.     The Courts of the State of Missouri may exercise personal jurisdiction over Jim Hoft as he is a resident and domiciliary of Missouri and he committed tortious actions giving rise to this cause of action within Missouri.

18.     The Courts of the State of Missouri may exercise personal jurisdiction over Joe Hoft as he is a resident and domiciliary of Missouri, writes for and maintains business contacts with *The Gateway Pundit*, and in the alternative, on information and belief, visited Missouri and/or had contacts with this State in connection with the conduct giving rise to this action.

19.     The Courts of the State of Missouri may exercise personal jurisdiction over *The Gateway Pundit* as it is formed within and exists under the laws of Missouri, and it committed tortious actions giving rise to this cause of action within Missouri.

20.     Venue is proper in St. Louis City, Missouri, because, pursuant to §508.010 R.S. Mo., in this action for defamation, Plaintiffs were first injured in St. Louis City, the

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

jurisdiction in which the defamation was first published. Additionally, individual defendant Jim Hoft's principal place of residence is St. Louis City, Missouri.

## FACTS

**A.    The Role, Reach, and Reputation of *The Gateway Pundit***

21.    *The Gateway Pundit* reaches a large audience. A study by the Berkman Klein Center for Internet & Society at Harvard University of mainstream and social media coverage during the 2016 presidential race showed that the website was one of the most popular media sources on the right. Between May 1, 2015, and November 7, 2016, the website was the fifth-most popular source on Twitter and the third-most popular source on Facebook (notably, Fox News was the fourth most popular source on Facebook for the same period).[4]

22.    The reach of *The Gateway Pundit* grew further in the 2020 election cycle. Research by the German Marshall Fund, a non-partisan policy organization, found the site to have been "particularly dominant" during the election, with a ninefold increase in the sharing of its content on Twitter between the fourth quarter of 2018 and the fourth quarter of 2020.[5] The report also noted that nine of the website's ten most popular articles in the fourth quarter of 2020 presented disinformation about voter fraud.

23.    In September 2021, *The Gateway Pundit* had more than 2.8 million unique visitors, making it the eleventh-most-visited U.S. conservative site, according to one

---

[4] Robert Faris et al., *Partisanship, Propaganda, and Disinformation: Online Media and the 2016 U.S. Presidential Election* at 13, Berkman Klein Ctr. for Internet & Soc'y, 13 (2017), http://nrs.harvard.edu/urn-3:HUL.InstRepos:33759251/.

[5] Goldstein, *supra* note 3.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

assessment.[6] More than 650,000 users "like" its Facebook page, while 630,000 users "follow" the page.[7] Roughly 98,000 people subscribe to its YouTube channel, and its videos regularly garner thousands of views.[8]

24.     According to published reports, *The Gateway Pundit* earned as much as $1.1 million in Google Ad revenue between November 2020 and June 2021.[9] In February 2021, *The Gateway Pundit* began offering a subscription service.[10]

25.     Despite its professed allegiance to the truth, *The Gateway Pundit* regularly publishes false claims. The Berkman Klein Center study identified seven online sources—both left- and right-leaning—that were highly influential on social media, highly partisan, and sometimes explicitly deceptive. Among these, the study stated, "Gateway Pundit is in a class of its own, known for 'publishing falsehoods and spreading hoaxes.'"[11]

26.     Defendant Jim Hoft has responded derisively to the notion that *The Gateway Pundit* should verify information before publishing it. After a *New Yorker* reporter interviewing him in 2017 told Hoft to expect a call from the magazine's fact-checkers, he responded: "Oh yeah, just like at the Gateway Pundit. We've got a huge

---

[6] *US Conservative Websites Ranked by Unique Visitors, September 2021*, The Righting, https://www.therighting.com/september-2021-conservative-website-metrics (last visited Nov. 30, 2021).

[7] *Gateway Pundit*, Facebook, https://www.facebook.com/gatewaypundit (last visited Nov. 30, 2021).

[8] *Gateway Pundit*, YouTube, https://www.youtube.com/c/GatewayPunditVideo/ (last visited Nov. 30, 2021).

[9] *One of the Biggest Publishers of Election Misinfo Earned Up to $1.1 Million in Google Ad Revenue*, Ctr. for Countering Digital Hate (July 29, 2021), https://www.counterhate.com/post/gatewaypundit.

[10] Paul Wagman, *Loud, shrill and unknown: The strange case of the Gateway Pundit*, Gateway Journalism Review (July 6, 2021), https://gatewayjr.org/loud-shrill-and-unknown-the-strange-case-of-the-gateway-pundit/; *Subscribe to The Gateway Pundit!*, The Gateway Pundit, https://www.thegatewaypundit.com/join/ (last visited Nov. 30, 2021).

[11] Faris et al, *supra* note 4, at 15 (quoting Ben Schreckinger, *'Real News' Joins the White House Briefing Room*, Politico Mag. (Feb. 15, 2017), https://www.politico.com/magazine/story/2017/02/fake-news-gateway-pundit-white-house-trump-briefing-room-214781/).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

department of full-time fact-checkers." He then "laughed so hard that he nearly spilled his lemonade."[12]

**B.     The 2020 Election in Fulton County, Georgia**

27.     In the fall of 2020, Americans cast ballots in the nation's 59th presidential election, which pitted the incumbent, Republican Donald J. Trump, against the former Vice President, Democrat Joseph R. Biden. News coverage in the lead-up to Election Day noted that Georgia had "emerged as one of the nation's biggest electoral battlegrounds in the race for the White House."[13]

28.     The voting process in Georgia began on September 15, 2020, when local officials began mailing out absentee ballots. Voters could cast early voting ballots in-person from October 12, 2020, until October 30, 2020, and they could vote by mail until Election Day, on November 3, 2020. All told, more than 4 million Georgians cast ballots during early voting or via absentee ballot in the 2020 election.[14] On Election Day, when another 975,540 people cast votes,[15] Georgia Secretary of State Brad Raffensperger observed, "We are having a successful election in Georgia today."[16]

---

[12] Andrew Marantz, *Is Trump Trolling the White House Press Corps?*, New Yorker (Mar. 13, 2017), https://www.newyorker.com/magazine/2017/03/20/is-trump-trolling-the-white-house-press-corps.

[13] Greg Bluestein, *Election Day Arrives: 5 Factors That Will Decide Georgia's 2020 Race*, Atlanta J.-Const., (Nov. 3, 2020), https://www.ajc.com/politics/election-day-arrives-5-factors-that-will-decide-georgias-2020-race/5K5HAAJJGBHDRLB6KWTHQ7ODRE/; *see also id.* (noting how "tantalizingly close" Democrats came to winning a statewide official in 2018).

[14]     *November      3,      2020      General      Election*,      Ga.      Sec'y      of      State, https://results.enr.clarityelections.com/GA/105369/web.264614/#/detail/5000 (last visited Nov. 30, 2021).

[15] *Id.*

[16] Kate Brumback & Sudhin Thanawala, *Despite A Few Hiccups, Voting in Georgia Goes Smoothly*, Associated Press (Nov. 4, 2020), https://apnews.com/article/election-2020-virus-outbreak-primary-elections-georgia-elections-ce8204935e991f740c94d6bc464481cf.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

29.     In Fulton County, absentee ballots were counted in State Farm Arena. Plaintiffs were employed to assist in the vote tabulation process at the arena.

30.     On November 3, 2020, an overflowing urinal at State Farm Arena led to a brief voluntary evacuation of the affected area.[17] According to a press release at the time:

> At approximately 6:07 a.m., the staff at State Farm Arena notified Fulton County Registration & Elections of a water leak affecting the room where absentee ballots were being tabulated. The State Farm Arena team acted swiftly to remediate the issue. Within 2 hours, repairs were complete. No ballots were damaged, nor was any equipment affected. There was a brief delay in tabulating absentee ballots while the repairs were being conducted.[18]

The *Atlanta Journal-Constitution* reported on November 3 that a pipe break had caused a water leak at the ballot processing site and specifically noted that no ballots were damaged.[19] It was later determined that the water leak had been caused by an overflowing urinal.[20]

31.     On November 13, 2020, NBC and CNN declared Biden the projected winner of Georgia.[21]

---

[17] Decl. of Frances Watson ¶¶ 4, 6, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1, https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[18] *Statement Regarding Absentee Ballot Tabulation at State Farm Arena*, State Farm Arena (Nov. 3, 2020), https://www.statefarmarena.com/news/detail/statement-regarding-absentee-ballot-tabulation-at-state-farm-arena.

[19] Ben Brasch, *Fulton County Election Results Delayed After Pipe Bursts in Room with Ballots*, Atlanta J.-Const. (Nov. 3, 2020), https://www.ajc.com/news/atlanta-news/fulton-election-results-delayed-after-pipe-bursts-in-room-with-ballots/4T3KPQV7PBEX3JVAIGJBNBSVJY/.

[20] Declaration of Frances Watson ¶ 5, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1 (stating that the Secretary of State's Office launched an investigation that "revealed that the incident initially reported as a water leak late in the evening on November 3rd was actually a urinal that had overflowed early in the morning of November 3rd" and confirming that this leak "did not affect the counting of votes by Fulton County later that evening"), https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[21] Adam Edelman, *With final states called, Biden's projected Electoral College victory matches Trump's in 2016*, NBC News (Nov. 13, 2020), https://www.nbcnews.com/politics/2020-election/final-states-called-

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

32.    From November 11 through November 19, 2020, county election officials carried out a risk-limiting audit, which included a full manual tally of all votes cast and confirmed Biden had won Georgia's election.[22] "Audit boards from all 159 Georgia countries examined 41[,]881 batches, hand-sorting and counting each ballot as part of the process, which was the largest hand count of ballots in United States history." According to the audit, "no individual county showed a variation in margin larger than 0.73%." Moreover, "103 of the 159 counties showed a margin variation of less than 0.05%."[23] It concluded that "the correct winner was reported."[24]

33.    On November 20, 2020, Secretary of State Raffensperger certified Biden's victory. That same day, Republican governor Brian Kemp certified Georgia's election results.[25]

34.    President Trump requested a recount, which was conducted using scanners that read and tally the votes.[26] The recount was the third tally of votes in the Georgia presidential race and the third tally to conclude that Joe Biden won the election. On

---

biden-s-projected-electoral-college-victory-matches-n1247766. Gregory Krieg, *Joe Biden becomes first Democrat in 28 years to win Georgia*, CNN (Nov. 13, 2021), https://www.cnn.com/2020/11/13/politics/joe-biden-wins-georgia/index.html.

[22] "Like any risk-limiting audit, this audit does not confirm or correct the exact margin of victory. It only provides sufficient evidence that the correct winner was reported." *Risk-Limiting Audit Report: Georgia Presidential Contest, November 2020*, Georgia Secretary of State (Nov. 19, 2020), https://sos.ga.gov/admin/uploads/11.19_.20_Risk_Limiting_Audit_Report_Memo_1.pdf.

[23] *Id.*

[24] *Id.*

[25] Kate Brumback, *Georgia Officials Certify Election Results Showing Biden Win*, Associated Press (Nov. 20, 2020), https://apnews.com/article/georgia-certify-election-joe-biden-ea8f867d740f3d7d42d0a55c1aef9e69.

[26] Kate Brumback, *Georgia Again Certifies Election Results Showing Biden Won*, Associated Press (Dec. 7, 2021), https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

December 7, 2020, Georgia officials recertified Biden's victory of the state's 16 electoral votes.[27]

**C.      Trump's Legal Team Initiates the Lie That Georgia Election Workers Illegally Instructed Observers to Leave and Counted Thousands of Fraudulent Ballots Unobserved**

35.      On December 3, 2020, Donald Trump's legal team testified before the Georgia State Senate, alleging that fraud and misconduct had occurred during Georgia's November 2020 election.[28]

36.      In an attempt to demonstrate that there had been irregularities in ballot-counting, a lawyer for the Trump campaign named Jacki Pick played cherry-picked snippets of surveillance video of the absentee and military vote count at the State Farm Arena.[29] While the surveillance video of the vote counting on November 3 is 14 hours long, Ms. Pick played only a few brief excerpts during her 17-minute testimony.

37.      While playing the video excerpts for the State Senate, Ms. Pick provided her own interpretation of what was being shown. She claimed that Republican observers had been asked to leave the arena in contravention of Georgia law and that, once they were gone, the election workers produced and counted 18,000 hidden, fraudulent ballots—more than the margin of victory in the presidential race.[30]

---

[27] *Id.*

[28] Beau Evans, *Georgia Senate Panel Hosts Trump Attorney Giuliani As Election Officials Dispute Fraud Claims*, Augusta Chron. (Dec. 3, 2020), https://www.augustachronicle.com/story/news/2020/12/03/georgia-senate-panel-probing-election-hosts-trump-attorney-giuliani/3818365001/.

[29] Angelo Fichera, *Video Doesn't Show 'Suitcases' of Illegal Ballots in Georgia*, FactCheck.org (Dec. 4, 2020), https://www.factcheck.org/2020/12/video-doesnt-show-suitcases-of-illegal-ballots-in-georgia/. For video of the hearing, see also 11Alive, *Second Georgia Senate Election Hearing*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=hRCXUNOwOjw.

[30] 11Alive, *Second Georgia Senate Election Hearing*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=hRCXUNOwOjw (showing Ms. Pick's commentary on the surveillance footage from 33:27 to 50:26).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

38.     Ms. Pick described the surveillance videotape as showing Republican observers and the press leaving the room shortly before 11 p.m. after a "lady who has blonde braids" asked them to leave and told them that election workers were going to stop counting ballots for the day. The surveillance video had no sound to corroborate this claim, but Ms. Pick said she had been provided this information by the observers and noted that the video showed four election workers staying while observers and press departed. She identified the election workers in the room as "the lady in purple," "two women in yellow," and "the lady with the blonde braids also, who told everyone to leave."[31]

39.     Ms. Pick's commentary continued as she played her video excerpt: "Once everyone is gone, coast is clear, they are going to pull ballots out from underneath a table." Ms. Pick said it was not typical to store "suitcases" full of ballots under a table and pointed out a table which she claimed had been placed there earlier in the day by "the lady with the blonde braids." Ms. Pick did not identify the four election workers by name but said "one of them had the name Ruby across her shirt somewhere."[32]

40.     Ms. Pick acknowledged that the Trump legal team had taken only a couple of hours to review the 14 hours of surveillance footage, and no one working for the campaign had watched the entire video, even once.[33]

41.     Both the Georgia Secretary of State and the Georgia Bureau of Investigation immediately investigated Ms. Pick's claims. The Secretary of State is a Republican who had been endorsed during his campaign by Donald Trump. They reviewed the security

---

[31]                                                                                                          *Id.*

[32] *Id.*

[33] *Id.*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

videotape, interviewed all witnesses who were present at the time of the alleged misconduct, and found no evidence whatsoever to substantiate any of Ms. Pick's claims.[34]

42.    Secure the Vote, a website maintained by the office of the Secretary of State, provides a detailed fact check of Ms. Pick's claims about what is depicted in the video.[35] Secure the Vote's timeline documents the events from November 3, 2020, actually shown on the video, including:

| | |
|---|---|
| 5:22 a.m. | Workers arrive at the State Farm Arena and discover a water leak. They immediately move tables and ballots away from the leak to prevent any water damage. |
| 6:30 a.m. | Workers can be seen moving tables, but not tampering with ballots. |
| 7:11 a.m. | Workers are seen vacuuming and drying the floors. |
| 8:22 a.m. | Workers begin rearranging the room to its original layout. They move tables and ballot containers. The table under which a "suitcase" full of ballots was allegedly stashed is moved, revealing nothing hidden there. |
| 9:57 p.m. | Poll workers prepare to stop work for the night and empty ballot containers are brought into the room. Workers then fill the containers with uncounted ballots. |
| 10:06 p.m. | Poll workers store the containers with uncounted ballots under the table for the night while there are still many people in the room. |
| 11:02 p.m. | After the Secretary of State[36] told poll workers they should continue working through the night, they remove the containers with uncounted ballots from underneath the table and resume their counting. |

---

[34] Response of the Georgia Secretary of State to the Court's Order of September 20, 2021, *Favorito v. Wan*, Civ. No. 2020CV343938 (Fulton Cnty. Ga. Super. Ct. Oct. 12, 2021), https://www.gpb.org/news/2021/10/12/election-investigators-havent-found-evidence-of-counterfeit-ballots-in-georgia/.

[35] *State Farm Arena*, Secure the Vote, https://securevotega.com/fact-check/ (last visited Nov. 30, 2021).

[36] Voting Implementation Manager for the State of Georgia, Gabriel Sterling reported that Georgia's Secretary of State Brad Raffensperger ordered election workers to continue counting ballots through the night. Maggie Astor, A Georgia Election Official Debunked Trump's Claims of Voter Fraud, Point by Point, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/2021/01/04/us/politics/trump-georgia-election-fraud.html.

14

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**D.     Defendants Publish and Republish the Lie**

43.     Immediately after Ms. Pick spoke in the Georgia Senate on December 3, 2020, the false accusation of wrongdoing and misleading excerpts from the surveillance video were circulated widely by the Trump campaign and various media outlets. For example, One America News Network rebroadcast the surveillance video shown earlier that day by the Trump lawyers with Ms. Pick's commentary.[37]

44.     The Trump campaign promptly amplified and republished a brief excerpt from the One America News Network's coverage[38] and distributed it repeatedly on Twitter that same day.[39] The excerpt depicted four individuals walking between desks while one individual removes containers from underneath a table in the foreground and brings them back to the desks. The individuals then remove ballots from the containers and process them.[40] (This edited footage from the surveillance video will hereafter be called the "Trump Edited Video.")

45.     That same day, December 3, 2020, *The Gateway Pundit* published its first article disseminating the same Trump Edited Video. The story was promoted under the headline "HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled

---

[37] One America News Network, *Giuliani, TRUMP Legal Team Testify in GA.FULL 12/3/20*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=3wObE1JCQMg/.

[38] Donald J. Trump, *Video from GA Shows Suitcases Filled with Ballots Pulled From Under a Table AFTER Poll Workers Left*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=nVP_60Hm4P8/.

[39]     @TeamTrump, Twitter (Dec. 3, 2020, 10:32 AM), *available at* https://web.archive.org/web/20201205090637mp_/https://twitter.com/TeamTrump/status/13345663012059 25889/ (last visited Dec. 22, 2021); @TeamTrump, Twitter (Dec. 3, 2020, 10:44 AM), *available at* https://web.archive.org/web/20201205122001/https://twitter.com/TeamTrump/status/133456932933408358 6/ (last visited Nov. 30, 2021). The @TeamTrump account is no longer accessible on Twitter.

[40] Donald J. Trump, *Video from GA Shows Suitcases Filled with Ballots Pulled from under a Table after Poll Workers Left*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=nVP_60Hm4P8/.

From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center." Written by Cristina Laila, the article republished two Team Trump tweets about the video and added the following claims:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.
>
> …
>
> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated![41]

46.     The article concludes with a photo captioned, "Close up photo of the suitcases being wheeled out from under tables."[42]

---

[41] Cristina Laila, *HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center*, Gateway Pundit (Dec. 3, 2020, 1:11 PM), https://www.thegatewaypundit.com/2020/12/video-footage-georgia-shows-suitcases-filled-ballots-pulled-table-supervisor-told-gop-poll-workers-leave-tabulation-center/. A true and correct copy of this article is attached as Exhibit 1. (Due to changes in the formatting of Defendants' website since Plaintiffs filed the original Petition and First Amended Complaint, there are some differences in the formatting of the PDFs Plaintiffs have attached as exhibits, particularly with respect to the comments section on various articles.)

[42] *Id.*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



47.     Defendant Jim Hoft amplified this story and its defamatory claims using his Twitter account.[43]

48.     A little while later, Hoft again amplified the story and added additional defamatory remarks, calling Ms. Freeman and Ms. Moss "dirty Crooks" and insinuating that they were political operatives:[44]

---

[43]     Jim     Hoft     (@gatewaypundit),     Twitter     (Dec.     3,     2020),     *available     at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit/status/1334577520478392 320 (last visited Nov. 30, 2021). The @gatewaypundit account is no longer accessible on Twitter.

[44]     Jim     Hoft     (@gatewaypundit),     Twitter     (Dec.     3,     2020),     *available     at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



49.     In the afternoon on December 3, *The Gateway Pundit* published another article, titled, "WHERE'S BILL BARR? — We Got Your Voter Fraud AG Barr — It's On Video and They Attempted to Steal Georgia with It! — HOW ABOUT A FEW ARRESTS?"[45] It accused those in the video of "stay[ing] behind to count illegal ballots for Joe Biden" and "cheating":

> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!
>
> They were caught cheating!

---

[45] Jim Hoft, *WHERE'S BILL BARR? — We Got Your Voter Fraud AG Barr — It's On Video and They Attempted to Steal Georgia with It! — HOW ABOUT A FEW ARRESTS?*, Gateway Pundit (Dec. 3, 2020, 2:29 PM), https://www.thegatewaypundit.com/2020/12/bill-barr-got-voter-fraud-ag-barr-video-attempted-steal-georgia-arrests/. A true and correct copy of this article is attached as Exhibit 2.

18

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

50.     Jim Hoft amplified this story on Twitter.[46]

51.     Later on December 3, *The Gateway Pundit* published another article repeating the false report, headlined "What's Up, Ruby?... BREAKING: Crooked Operative Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED." Written by Defendant Jim Hoft, this article reasserted the false claims about "crooked Democrats" engaging in "voter fraud."[47]

52.     This article was the first to identify by name Plaintiff Ruby Freeman as one of the workers in the video, naming Ms. Freeman and her business and falsely accusing her of voter fraud. It stated:

> One woman in the video is wearing a purple top.

> …

> Her name is Ruby Freeman.

> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.

> Her T-shirt says "Lady Ruby" and her purse says, "LaRuby" which is her company.

> This was not a very smart move.

> Her company is called "LaRuby's Unique Treasures."

> It's on her LinkedIn page!

> …

---

[46]     Jim     Hoft     (@gatewaypundit),     Twitter     (Dec.     3,     2020),     *available     at* https://web.archive.org/web/20201205214839/https://twitter.com/gatewaypundit/status/1334595742594428 930 (last visited Aug. 23, 2022).

[47] Jim Hoft, *What's Up, Ruby?... BREAKING: Crooked Operative Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED*, Gateway Pundit (Dec. 3, 2020, 8:49 PM), https://www.thegatewaypundit.com/2020/12/ruby-breaking-crooked-democrat-filmed-pulling-suitcases-ballots-georgia-identified/. A true and correct copy of this article is attached as Exhibit 3.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Maybe the Georgia police or Bill Barr's DOJ may want to
> pay Ruby Freeman a visit.[48]

53.     The article concluded with the following images of Ms. Freeman, over a

banner saying "CROOK GETS CAUGHT."



54.     Defendants Jim and Joe Hoft amplified this story on Twitter, too.[49]

**E.      Despite Prompt and Authoritative Refutation of the False Report by Multiple
          Sources, Defendants Republish and Magnify the Lies for Months**

55.     The Trump legal team's claim of voter fraud in the State Farm Arena was

flatly, fully, and publicly repudiated by Georgia election officials within 24 hours after it

was made. At 6:41 a.m. on December 4, 2020, the Voting Implementation Manager for the

State of Georgia, Gabriel Sterling, shot down the fanciful claim on Twitter: "The 90 second

---

[48] *Id.*

[49]     Jim     Hoft     (@gatewaypundit),     Twitter     (Dec.     3,     2020),     *available     at*
https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30,
2021);     Joe     Hoft     (@joehoft),     Twitter     (Dec.     4,     2020),     *available     at*
https://web.archive.org/web/20201207070649/https://twitter.com/joehoft (last visited Nov. 30, 2021). Note
that for many of Jim and Joe Hoft's tweets, web.archive.org does not appear to have captured the preview
image.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

video of election workers at State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators. Shows normal ballot processing. Here is the fact check on it."[50]

56.    Mr. Sterling's tweet shared a link to a fact check published by Lead Stories, a fact-checking website that identifies false or misleading stories. It demonstrated that the Trump Edited Video did not show suitcases full of ballots being pulled from under a table, and that poll watchers were not told to leave.[51] The fact check quotes Georgia election officials explaining that the containers in the video contained ballots that were processed for counting earlier in the night, that the vote count data and voter verifications negated the claim that thousands of fraudulent ballots had been introduced into the count, and that it was not illegal for election workers to count ballots in the observers' absence.[52]

57.    Several days earlier, after reports of harassment and death threats against election officials, Mr. Sterling had made clear what he believed were the likely consequences of the continued attacks on Georgia's election system. "Someone's going to get hurt, someone's going to get shot, someone's going to get killed," he had stated in a news conference.[53]

---

[50]    Gabriel    Sterling    (@GabrielSterling),    Twitter    (Dec.    4,    2020,    6:41    AM), https://twitter.com/GabrielSterling/status/1334825233610633217.

[51] Alan Duke & Hallie Golden, *Fact Check: Video From Georgia Does NOT Show Suitcases Filled With Ballots Suspiciously Pulled From Under A Table; Poll Watchers Were NOT Told To Leave*, Lead Stories (Dec.    3,    2020),    https://leadstories.com/hoax-alert/2020/12/fact-check-video-from-ga-does-not-show-suitcases-filled-with-ballots-pulled-from-under-a-table-after-poll-workers-dismissed.html.

[52] *Id.*; *see* Angelo Fichera, *Video Doesn't Show 'Suitcases' of Illegal Ballots in Georgia*, FactCheck.org (Dec.    4,    2020),    https://www.factcheck.org/2020/12/video-doesnt-show-suitcases-of-illegal-ballots-in-georgia/.

[53] Stephen Fowler, *'Someone's Going To Get Killed': Ga. Official Blasts GOP Silence On Election Threats*, NPR    (Dec.    1,    2020,    8:58    PM    ET),    https://www.npr.org/sections/biden-transition-updates/2020/12/01/940961602/someones-going-to-get-killed-ga-official-blasts-gop-silence-on-election-threats.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

58.     Nonetheless, Jim Hoft authored another article published on *The Gateway Pundit* later that morning under the title "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER [sic] Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)." The article repeated the now-debunked allegations from the night before and introduced new false claims:

> Earlier on Thursday Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!

…

> We identified one of the operatives last night who was caught on video counting illegal ballots from a suitcase stashed under a table!
>
> As you can see from the video one woman in a purple top was filmed helping pull out the ballots and then sitting down to count the ballots.
>
> That woman has now been identified.
>
> Local 11 News covered the story from the State Farm Arena that a pipe had burst.
>
> (This later was proven to be complete fraud and an excuse to kick out the GOP election observers!)

…

> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.

22

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

…

Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.

They then commented on her LinkedIn page.

Ruby Freeman still has an active Facebook page (as of 11 PM on Thursday night).

On her page Ruby Freeman brags about her "Shaye" being her supervisor.

It is clear from a video that was released that Shaye and Ruby are very close.

Here are a few entries from Ruby's Facebook page.

…

Ruby made a post on Facebook on Nov 3, "Look at my Baby giving that look to the employees. Mommie is so proud of you. Supervisor of registration."

And here is a closeup of the woman in question via a Getty image.

Her official name is "Wandrea Moss."

…

You can clearly see "Shaye" the woman in blonde pigtails removing suitcases of ballots from under a table after GOP observers were evacuated from the room and told to go home.[54]

59.    Less than two hours after Voting Implementation Manager Sterling tweeted that what the video of Ms. Freeman and Ms. Moss showed was "normal ballot processing," Defendant Joe Hoft published an article titled, "CLOWN SHOW: Georgia Election Insider

---

[54] Jim Hoft, *BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)*, Gateway Pundit (Dec. 4, 2020, 7:35 AM), https://www.thegatewaypundit.com/2020/12/breaking-crooked-elections-superviser-filmed-pulling-suitcases-ballots-georgia-identified-rubys-daughter-video/. A true and correct copy of this article is attached as Exhibit 4.

23

Gabriel Sterling Freaks Out and Labels Election Fraud Caught on Camera 'Normal Ballot Processing.'" Rather than acknowledge the falsity of *The Gateway Pundit*'s earlier stories—or even neutrally reporting on the fact checks—that article lobbed a series of ad hominem attacks against Mr. Sterling and doubled down on Defendants' false claims, including the statement:

> Unfortunately for Sterling, we can't even keep up with the amount of corruption in Georgia related to this year's election. Yesterday for example, a video was unearthed by the Trump team showing Democrat counters in Atlanta pulling out suitcases full of ballots and counting them after sending Republicans home due to a falsely reported water main break (um, this is against the law Mr. Sterling).
>
> But Sterling still wants to call it all a lie. He claims there was no corruption in this year's election and he shares another totally bogus 'fact check' from Lead Stories as in his Facebook page as support that this is all normal. . . .[55]

60.     Joe Hoft amplified this story on Twitter by retweeting another user.[56]

61.     The same morning, Georgia Public Broadcasting published its own article fact-checking the election fraud claims made during the George State Senate hearing on the previous day. The article directly refuted the Trump legal team's claims concerning the contents of the Trump Edited Video. It reported that the video showed a normal tabulation process, which both state and county officials had verified. It also reported that no observers had been asked to leave, but Republican monitors and the press did leave when

---

[55] Joe Hoft, *CLOWN SHOW: Georgia Election Insider Gabriel Sterling Freaks Out and Labels Election Fraud Caught on Camera 'Normal Ballot Processing'*, Gateway Pundit (Dec. 4, 2020, 8:15 AM), https://www.thegatewaypundit.com/2020/12/clown-show-georgia-election-insider-gabriel-sterling-freaks-labels-election-fraud-caught-camera-normal-ballot-processing/.

[56] Joe Hoft (@joehoft), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

some election employees stopped their work for the night. And it clarified that Georgia law does not require poll monitors to be present for the ballot counting process.[57]

62.     Defendants learned of the ongoing fact checks almost immediately after they were published.

63.     Even after acknowledging the first fact check, and after the second fact check was published and available online, Jim and Joe Hoft      published several additional articles on *The Gateway Pundit* on December 4, 2020, repeating and realleging the false claims that Ms. Freeman and Ms. Moss secretly brought illicit ballots into the arena to be counted and had committed massive voter fraud. Jim Hoft's next article was titled "NEW VIDEO Shows Anti-Trump Georgia Ballot Counter Ruby Freeman with Piles of Ballots, Walking Past Boxes of Ballots, Working Alone in Cubes WITH NO GOP OBSERVERS IN SIGHT!" and made new false and defamatory claims about Ms. Freeman:

> Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.
>
> Ruby walks by several boxes of ballots just sitting around in the room.
>
> The elections workers were each given their own secret cube.
>
> Then Ruby goes to her desk and pulls out a tray of ballots on her desk.
>
> There is NO supervisor or GOP observer anywhere in sight.
>
> And then Ruby leaves the ballots on her desk as she goes to take a break.

---

[57] Stephen Fowler, *Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim*, Georgia Public Broadcasting (Dec. 4, 2020, 8:27 AM), https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim, archived at https://web.archive.org/web/20201204170112/https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim.

Electronically Filed · City of St. Louis · January 10, 2023 · 04:52 PM

This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.[58]

64.    Jim and Joe Hoft amplified this story using their Twitter accounts.[59]

65.    At approximately 10:08 a.m. ET, Voting Implementation Manager Gabe Sterling joined Newsmax for a roughly 17-minute segment.[60] After playing a clip of the Trump Campaign's footage and soliciting comments from another guest, the host asked Sterling to weigh in on the video. Sterling straightforwardly debunked any claim that the video showed anything nefarious:

> Unlike watching 90 seconds of it like we saw in the Senate hearing yesterday, we've had our investigators watch all many several hours of it yesterday. And what essentially happened is—and we knew about this, part of this, on election night itself—around 10:15/10:20, there's two groups of people in this room that are working. There are cutters—the people who are opening the envelopes—and then there's the people who are scanning, which is the ones we see on the video.
>
> And let's keep a few things in mind. I've been in this room. It's really obvious there's video cameras everywhere, so they know they're being watched on that front.
>
> So what happened was, when the cutters were—they were done, so they were, so they was like, "Okay, we're done, time to go home," and the media started packing up. And then the monitors kept packing up.

---

[58] Jim Hoft, *NEW VIDEO Shows Anti-Trump Georgia Ballot Counter Ruby Freeman with Piles of Ballots, Walking Past Boxes of Ballots, Working Alone in Cubes WITH NO GOP OBSERVERS IN SIGHT!*, Gateway Pundit (Dec. 4, 2020, 8:53 AM), https://www.thegatewaypundit.com/2020/12/new-video-shows-anti-trump-georgia-ballot-counter-ruby-freeman-piles-ballots-walking-past-boxes-ballots-no-gop-observers-sight/.    A true and correct copy of this article is attached as Exhibit 5.

[59]    Jim    Hoft    (@gatewaypundit),    Twitter    (Dec.    4,    2020),    *available    at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021);    Joe    Hoft    (@joehoft),    Twitter    (Dec.    4,    2020),    *available    at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Nov. 30, 2021).

[60] Monkey Savant, *Gabriel Sterling and Chad Robichaux On Newsmax Discuss The GA Ballot Fraud Situation 12/04/20*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=o6k2zRRPx4I.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Now the one thing we have is a he said she said, where the officials there said, "we didn't tell anybody that they had to leave." The people who left—the Republican monitor said, "we were told we had to leave." And we have no audio from those videotapes to ascertain the absolute truth. That's what is he said she said on that front.

But when you watch the video, the process—those aren't suitcases. Those are regular absentee carriers used in dozens of counties across the state. That's how they bring those in. Nothing was brought in without the monitors there, so everything was there. There was nothing new brought in. We didn't see somebody wheeling stuff into the room; we saw stuff that was already in the room that the monitors already saw brought in.

And then you saw the processes they're doing. Essentially what happened, the elections director called the absentee coordinator that's saying we're not shutting down. Tell them they gotta go get back to work because the counting people thought they were also getting to go home. So they were kind of disappointed. So you see him on his phone. He walks over to them, they kind of shrug their shoulders like, "crap, we got to go back to work again." So, so they started doing that, and then we found out that the monitors weren't there anymore. So, we called their elections directors, and we called our state elections board monitor, who we have placed in Fulton County under a consent decree that we had ordered because of their screw-ups in the June election, and yes, there was 82 minutes where there wasn't a person there. But we have all the videotape that we are literally looking at right now.

We have to ask ourselves in that period of time, I think it was about three to five thousand votes that were scanned, and did this elections crew of, you know, medium-paid, tired elections workers suddenly become the Ocean's Eleven crew as part of a theft of an election? Or is it more likely they were tired and irritated?

You see when the SEB monitor gets there, and when the investigator gets there, the armed investigator, they keep doing the exact same thing they were doing. They don't even pay any mind because it's just—they're doing their regular processes.

27

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

And the problem we have is people don't understand this, and when people whip people's emotions up, it goes back to the issue I was talking about before of threats being against these thousands of workers across the country.

66.     On information and belief, Jim Hoft watched this segment, as he immediately criticized Newsmax for airing the segment and reiterated his false claims:[61]



**Jim Hoft** ✔
@gatewaypundit

VERY DISAPPOINTING to Go on @Newsmax and Allow @GabrielSterling to LASH OUT AT REPUBLICANS after EXPLOSIVE SUITCASE FRAUD EXPOSED! That Segment was a TRAINWRECK! @Newsmax better get their sh*t together. This was an OUTRAGEOUS Segment!

7:26 AM · Dec 4, 2020 · Twitter Web App

67.     Seeking to magnify the false claims and gain still more shares on social media, Jim Hoft published a fourth article on *The Gateway Pundit* on December 4, repeating the false and disproven claims from his earlier articles. This article was titled, "UPDATE: More on the Suitcase Vote Scam, the Elections Supervisor and that Strange 'Pass' Between Mother and Daughter That Was Also Caught on Video." It discussed the relationship between Ms. Freeman and Ms. Moss and introduced a new baseless allegation of still more illicit activity supposedly shown on the Trump Edited Video:

> On her [Facebook] page Ruby Freeman brags about her "Shaye" being her supervisor.
>
> …
>
> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.

---

[61]     Jim      Hoft      (@gatewaypundit),      Twitter      (Dec.      4,      2020),      *available      at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit/status/1334881814670938 113 (last visited Nov. 30, 2021). Plaintiffs believe the timestamp available through web.archive.org is in Pacific Time.

> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other.
>
> It sure looks like they were trying to hide this transaction.[62]

68.     This article made clear Defendants' ill-will toward Ms. Freeman in repeating the false claims against her over and over again. In it, Jim Hoft noted the consequences of *The Gateway Pundit*'s publicity on Ms. Freeman and implicitly urged readers to harass her:

> Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.
>
> They then commented on her LinkedIn page.
>
> Note: Please do not confuse this with a similar business in Snellville!
>
> Ruby Freeman had an active Facebook page last night.
>
> It was shut down early on Friday morning.[63]

69.     Jim Hoft amplified this story on social media.[64]

70.     Not satisfied with the harm done, Defendants published two more articles about Ms. Freeman on *The Gateway Pundit* later on December 4. The first, titled "Timing of Large Georgia Ballot Dump for Biden Appears to Coincide with Timing of Mother-Daughter Duo's Election Fraud Scam," was written by Joe Hoft and described Plaintiffs'

---

[62] Jim Hoft, *UPDATE: More on the Suitcase Vote Scam, the Elections Supervisor and that Strange "Pass" Between Mother and Daughter That Was Also Caught on Video*, Gateway Pundit (Dec. 4, 2020, 1:51 PM), https://www.thegatewaypundit.com/2020/12/update-ruby-freeman-elections-supervisor-shaye-ross-strange-pass-also-caught-video/. A true and correct copy of this article is attached as Exhibit 6.

[63] *Id.*

[64] Jim Hoft (@gatewaypundit), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

29

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

processing of ballots as "the mother-daughter duo in Atlanta . . . messing with ballots in secret." The article stated:

> This is when a major portion of the steal took place in Georgia — which is about the same time that the mother daughter team of Trump haters kicked all Republicans out of the ballot counting room in Atlanta and started tabulating votes on their own after grabbing ballots out from underneath the table.[65]

71. The next article, also written by Joe Hoft, summarized the false and already debunked claims in the previous articles from *The Gateway Pundit*, and it advanced the new false and defamatory smear that Ms. Freeman supposedly counted the same votes for Biden three times. Titled "UNBELIEVABLE: Anti-Trump Democrat In Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)," the article stated:

> The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.
>
> We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]
>
> Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.
>
> The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to

---

[65] Joe Hoft, *Timing of Large Georgia Ballot Dump for Biden Appears to Coincide with Timing of Mother-Daughter Duo's Election Fraud Scam*, Gateway Pundit (Dec. 4, 2020, 3:25 PM), https://www.thegatewaypundit.com/2020/12/timing-large-georgia-ballot-dump-biden-appears-coincide-timing-mother-daughter-duos-election-fraud-scam/. A true and correct copy of this article is attached as Exhibit 7.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.[66]

72.     Defendants also posted the video embedded in this article to *The Gateway Pundit*'s YouTube channel with the caption, "Poll Worker Ruby Freeman Loads Up The Same Stack Of Ballots To Be Counted 3X," which has been viewed more than 51,638 times at the time of filing.[67]

73.     Jim and Joe Hoft also amplified the story using their Twitter accounts.[68]

74.     Defendants later boasted that they originated the false and defamatory claim that Ms. Freeman tabulated the same votes three times.[69]

75.     On December 4, PolitiFact—a non-profit website that checks the accuracy of claims made by elected officials and others—published another fact check of the claim repeatedly made by *The Gateway Pundit* that video footage from Georgia showed suitcases filled with ballots being illegally counted after election monitors were told to leave. The PolitiFact article confirmed the conclusions of Lead Stories and Georgia Public Broadcasting that the claim was plainly false. It featured a statement from Richard Barron,

---

[66] Joe Hoft, *UNBELIEVABLE: Anti-Trump Democrat In Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)*, Gateway Pundit (Dec. 4, 2020, 5:45 PM), https://www.thegatewaypundit.com/2020/12/unbelievable-mother-along-daughter-handled-counted-ballots-alone-hours-georgia-ruby-freeman-caught-running-batch-ballots-tabulator-three-times/. A true and correct copy of this article is attached as Exhibit 8.

[67] Gateway Pundit, *Corrupt Georgia Election Worker Seen Loading Same Ballots 3 Times into Machine*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=RiREC3Zy20E (last visited Aug. 24, 2022).

[68] Jim Hoft (@gatewaypundit), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335017338396176384 (last visited Aug. 23, 2022); Joe Hoft (@joehoft), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Aug. 23, 2022).

[69] Joe Hoft, *Fulton County 2020 Election Case's Request is Granted - Election Workers Ruby Freeman, Wandrea Moss, and Happy Faces Personnel Group Are Added to the Case*, Gateway Pundit (Aug. 14, 2021, 9:15 AM), https://www.thegatewaypundit.com/2021/08/fulton-county-2020-election-cases-request-add-ruby-freeman-wandrea-moss-happy-faces-personnel-group-case-granted/. A true and correct copy of this article is attached as Exhibit 9.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

the elections director in Fulton County, who confirmed that no announcement was made telling people to leave. Rather, certain staff members left as their work was finished. Mr. Barron himself told the workers scanning the ballots to keep working. Mr. Barron also confirmed that it was normal to keep containers under the tables near the scanners.[70]

76.     Two days later, on December 6, 2020, after the Defendants' statements had been thoroughly refuted by multiple state and county officials, Defendants published three more articles in *The Gateway Pundit*. The first repeated earlier lies that Plaintiffs had engaged in fraud:

> [T]he secret suitcase ballots were pulled out from their hiding place under the tables.
>
> They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.[71]

77.     Jim Hoft tweeted a link to the article.[72]

78.     The second two articles purported to disclose "exclusive" new information about the "man in red" shown in the security video, and each repeated the false claims that Ms. Freeman and Ms. Moss were involved in "voter corruption":

> [I]t was uncovered that a mother and daughter team, Ruby Freeman and her daughter "Shaye" Moss as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were

---

[70] Bill McCarthy, *No, Georgia Election Workers Didn't Kick Out Observers and Illegally Count 'Suitcases' of Ballots*, PolitiFact (Dec. 4, 2020), https://www.politifact.com/factchecks/2020/dec/04/facebook-posts/no-georgia-election-workers-didnt-kick-out-observe/.

[71] Joe Hoft, *The Same Organized Fraud That Took Place in Michigan Took Place in Georgia on Election Night — Republicans Were Removed from the Counting Area and the Massive Spike in Biden Only Votes Is Recorded*, Gateway Pundit (Dec. 6, 2020, 8:15 AM), https://www.thegatewaypundit.com/2020/12/thing-happened-michigan-happened-georgia-election-night-republicans-removed-counting-area-massive-ballot-drop-biden-votes/. A true and correct copy of this article is attached as Exhibit 10.

[72] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201206191516/https://twitter.com/gatewaypundit/status/1335631252217532421 (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

pulled out from under a table that were previously covered up and processed with no Republican observers.

The mother - daughter team have become infamous in the annals of voter corruption[.][73]

79.      Jim Hoft amplified these stories on Twitter.[74]

80.      Also on December 6, Georgia Governor Brian Kemp filed in federal court a sworn affidavit from Frances Watson, chief investigator for the Georgia Secretary of State, further refuting these lies. Gov. Kemp filed this affidavit in *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga), in response to claims by a group of Presidential Electors for Trump of widespread election-related misconduct. The affidavit detailed the results of an investigation by Ms. Watson into the alleged events at the State Farm Arena. Ms. Watson attested that her investigative team interviewed witnesses and reviewed the entire security footage. Her investigation found that (a) observers and members of the press were *not* told to leave, but exited the room after seeing a group of workers responsible for opening envelopes leave; and (b) no ballots were brought in from an unknown location and hidden under a table. She also stated that the video showed opened but uncounted ballots

---

[73] Joe Hoft, *EXCLUSIVE: Review of Late-Night Ballot Counting in Atlanta's State Farm Arena Shows Mysterious 'Man In Red' Receiving Numerous Calls During the Ballot Heist But from Whom?*, Gateway Pundit (Dec. 6, 2020, 6:35 PM), https://www.thegatewaypundit.com/2020/12/review-late-night-ballot-counting-atlantas-state-farm-arena-shows-mysterious-man-red-making-numerous-calls/; Jim Hoft, *BREAKING EXCLUSIVE: Third Suspect from State Farm Center 'Suitcase Scandal' Identified as Ralph Jones, Sr. – Who Was in the News for Shady Deal with ATL Mayor Keisha Bottoms*, Gateway Pundit (Dec. 6, 2020, 9:23 PM), https://www.thegatewaypundit.com/2020/12/breaking-exclusive-third-suspect-state-farm-center-suitcase-scandal-identified-ralph-jones-sr-news-shady-deal-atl-mayor-keisha-bottoms/ (republishing same paragraph). True and correct copies of these articles are attached as Exhibits 11 and 12, respectively.

[74] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335757633836421121 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335787833760559111 (last visited Aug. 23, 2022).

being placed in boxes and stored under the table, and later showed the boxes being opened so the workers could scan the ballots when the counting resumed later that night.[75]

81.     The Watson affidavit's submission and its content were widely reported in the press on December 6 and 7, 2020.[76]

82.     Nonetheless, Jim Hoft published two more articles early on December 7 containing additional false and defamatory statements about Plaintiffs. The first labeled Ms. Freeman and Ms. Moss "suspects in the suitcase ballot fraud at the State Farm Center" and said they were captured on the "most explosive video of the entire campaign season" pulling "hidden ballots in the suitcases" out and counting them "after all of the GOP observers and media was sent home for a 'water main' break." It then mocked Ms. Freeman for supposedly saying she "needed a lawyer" and declining an interview request by "Carolyn Ryan TV."[77]

83.     Jim Hoft amplified this article on Twitter.[78]

---

[75] Declaration of Frances Watson, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1, *available at* https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[76] *See, e.g.*, Daniel Chaitin, *Chief Georgia Investigator: No 'Mystery Ballots' Seen in Security Video,* Wash. Examiner (Dec. 6, 2020, 11:56 PM), https://www.washingtonexaminer.com/news/chief-georgia-investigator-no-mystery-ballots-seen-in-security-video; Ronn Blitzer, *No 'Mystery Ballots' Hidden Under Table in Fulton County, Georgia Investigator Swears in Affidavit*, Fox News (Dec. 7, 2020), https://www.foxnews.com/politics/fulton-county-georgia-no-mystery-ballots-under-table-investigator-affidavit; Peter Weber, *Georgia's Top Election Investigator Debunks A Vote Fraud Conspiracy Involving 'Suitcases' of Ballots, A Urinal*, Yahoo News (Dec. 7, 2020), https://news.yahoo.com/georgias-top-election-investigator-debunks-115236191.html.

[77] Jim Hoft, *"I Won't Be Able to Be Interviewed – I Need an Attorney" — Georgia's Ruby Freeman Lawyers Up, Cancels Interview*, Gateway Pundit (Dec. 7, 2020, 7:15 AM), https://www.thegatewaypundit.com/2020/12/wont-able-interviewed-need-attorney-georgias-ruby-freeman-lawyers-cancels-interview/. A true and correct copy of this article is attached as Exhibit 13.

[78] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

84.     In a second article on December 7, 2020, Jim Hoft blasted out the "HUGE"
news that the third "suspect" in the "suitcase scandal" was the same man who told reporters
there had been a "water main break." The article depicted the claim of a water problem as
clever ruse to facilitate election fraud by Plaintiffs:

> We know this was a lie because there was NEVER a work
> order filed and the water department never received a call.
> It never happened!
>
> But it gave Ralph and Ruby and Shaye cover to complete
> their scam on Georgia and America![79]

85.     Jim Hoft amplified this story on Twitter.[80]

86.     In a news conference on December 7, Gabriel Sterling, Georgia's Voting
Implementation Manager, once more refuted the lies about the Trump Edited Video that
*The Gateway Pundit* was continuing to spread. He yet again confirmed that the surveillance
video showed that the containers taken from under a table held valid, uncounted ballots
that had been stored by workers who thought they were leaving for the night. After realizing
that they were staying, the workers unpacked the ballots from the containers and resumed
scanning them. Mr. Sterling specifically refuted the claim that election workers had
illegally scanned the same ballots multiple times, explaining that any such action would
have been revealed by the hand count undertaken by Georgia election officials and

---

[79] Jim Hoft, *HUGE! WE CAUGHT THEM! Conspiracy Revealed — 3rd Suspect in GA 'Suitcase Scandal' is Also the Same Man Who Spoke to Reporters on Water Main Break*, Gateway Pundit (Dec. 7, 2020, 8:29 AM), https://www.thegatewaypundit.com/2020/12/huge-caught-criminal-conspiracy-revealed-3rd-suspect-ga-suitcase-scandal-also-man-spread-lies-water-main-broke-state-farm-center/. A true and correct copy of this article is attached as Exhibit 14.

[80] Jim    Hoft    (@gatewaypundit),    Twitter    (Dec.    7,    2020),    *available    at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

machine-based recount requested by the Trump campaign. Neither recount showed a meaningful change in results originally reported.[81]

87.    In the evening on December 7, Jim Hoft further evidenced Defendants' awareness of the fact checks, sharing a link to an article in *The Federalist* discussing the various fact-checks:[82]



88.    Nonetheless, with full awareness that his statements about Ms. Freeman and Ms. Moss had been flatly and fully refuted by multiple officials and multiple fact-checking organizations, Jim Hoft continued to publish false statements on *The Gateway Pundit*.

89.    On December 8, 2020, Jim Hoft published three new articles repeating and doubling down on the false and defamatory claims. The first article was titled "CONFIRMED: Supervisor Shaye Moss - Who "Yelled Out" for Georgia GOP Observers to GO Home - Is Same Woman Who Pulled the Suitcase Ballots Out from Underneath the

---

[81] Nick Corasaniti, *Top Georgia Election Official Debunks 'Ridiculous' Claims About Election Fraud*, The New York Times (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/technology/suitcases-ballots-georgia-election.html.

[82] Jim Hoft (@gatewaypundit), Twitter (Dec. 7, 2020, 6:38 PM), https://twitter.com/gatewaypundit/status/1336137974875033602, *available at* https://web.archive.org/web/20201208024013/https://twitter.com/gatewaypundit/status/1336137974875033602 (including link to Mollie Hemingway, *No, The Georgia Vote-Counting Video Was Not 'Debunked.' Not Even Close*, Federalist (Dec. 7, 2020), https://thefederalist.com/2020/12/07/no-the-georgia-vote-counting-video-was-not-debunked-not-even-close/).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Table When they Left." In addition to repeating previously made false claims about Ms.

Freeman and Ms. Moss, it stated:

> Mollie Hemingway at The Federalist reported earlier today that poll watchers in sworn affidavits claim it was "a woman with blonde braids" who appeared to be a supervisor "yelled out" to those present in the room that they would stop working for the night and would resume in the morning.
>
> Shaye told everyone to go home.
>
> Then Shaye, her mother and a couple others including Ralph Jones, Sr. were filmed taking "suitcases" of ballots hidden under a table out to be tabulated. This was right before Joe Biden got his surprise spike in ballots.
>
> And now the liberal media and their fake "fact-checkers" are lying about the incredible incident caught on video![83]

90.     Jim Hoft's second article on December 8 was titled, "NOW WITH AUDIO:

Georgia Election Official Ralph Jones, Sr. Announced on Nov. 3rd Evening that Counting

would Stop at 11 PM — Then Led Team to Count Stashed 'Suitcase' Ballots." This article

noted both the *Pearson v. Kemp* affidavit, which stated that the count was never intended

to stop at 10:00 p.m., and Mr. Sterling's statement that counting was resumed at 11:00 p.m.

It stated:

> Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.

---

[83] Jim Hoft, *CONFIRMED: Supervisor Shaye Moss – Who "Yelled Out" for Georgia GOP Observers to Go Home – Is Same Woman Who Pulled the Suitcase Ballots Out from Underneath the Table When they Left*, Gateway Pundit (Dec. 8, 2020, 7:20 AM), https://www.thegatewaypundit.com/2020/12/confirmed-supervisor-shaye-moss-yelled-georgia-gop-observers-go-home-woman-pulled-suitcase-ballots-underneath-table-left/. A true and correct copy of this article is attached as Exhibit 15.

…

For the record — Georgia anti-Trump elections official Gabe Sterling later said that the local officials called for the counting to resume at 11 PM but this is just not true.

…

The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.

Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.

It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.

It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud.

…

The lying fake news media wants you to believe this entire incident was debunked.

Nothing could be further from the truth — something that is lacking in the mainstream media and their "fact-checkers" today.

We now have actual audio of Ralph Jones — the elections official at the heart of the "suitcase scandal" telling government officials the State Farm Center will shut down at 10 or 11 PM on Election night!

Georgia Secretary of State officials released an affidavit insisting there never was an intent to stop the count at 10:00 PM, but only the cutters were going to stop.[84]

---

[84] Jim Hoft, *NOW WITH AUDIO: Georgia Election Official Ralph Jones, Sr. Announced on Nov. 3rd Evening that Counting would Stop at 11 PM — Then Led Team to Count Stashed 'Suitcase' Ballots*, Gateway Pundit (Dec. 8, 2020, 8:59 AM), https://www.thegatewaypundit.com/2020/12/now-audio-georgia-election-official-ralph-jones-sr-announced-nov-3rd-evening-counting-stop-11-pm-led-team-count-stashed-suitcase-ballots/. A true and correct copy of this article is attached as Exhibit 16.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

91.     Jim Hoft authored a third article that same day to discredit the fact check organization Lead Stories, one of the several outside groups that had found the "suitcase scandal" to be no scandal at all. He sought to undermine their credibility by writing: "Lead Stories we now know is funded by Facebook and a Chinese company. So it makes sense that they would target any conservative outlet that reported on this explosive video."[85] He used the occasion to repeat yet again the false claim that Plaintiffs had "stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room," in a pre-planned conspiracy to commit election fraud.

92.     Jim Hoft amplified each of these stories on Twitter.[86]

93.     Defendants' false and defamatory tirade targeting Ms. Freeman and Ms. Moss continued later that month. On December 15, 2020, Jim Hoft published an article insinuating that Ms. Freeman and Ms. Moss engaged in fraudulent activity and should be questioned by law enforcement:

> As we have reported numerous times now the election numbers in Georgia are suspect, fraudulent, and impossible.
>
> We even HAVE VIDEO of Democrats at work stealing votes from the people of Georgia.
> . . .

---

[85] Jim Hoft, *China-Funded 'Fact-Checker' Lead Stories Pushes Bullsh\*t That Fulton County 'Suitcase' Scandal Was Debunked — Will They EVER Tell the Truth?*, Gateway Pundit (Dec. 8, 2020, 1:11 PM), https://www.thegatewaypundit.com/2020/12/china-funded-facebook-fact-checker-lead-stories-pushes-bullsht-fulton-county-suitcase-scandal-debunked-will-ever-tell-truth/. A true and correct copy of this article is attached as Exhibit 17.

[86] Jim Hoft (@gatewaypundit), Twitter (Dec. 8, 2020), *available at* https://web.archive.org/web/20201208224901/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Has anyone questioned Ruby Freeman or her daughter?[87]

94.    On December 23, 2020, Jim Hoft published another article on this theme, repeating a tweet posted by Team Trump the day before. This article was titled "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?" It repeated prior false and defamatory claims about Ms. Freeman and Ms. Moss published on *The Gateway Pundit*, boasting of the publication's leading role in spreading the misinformation:

> On Tuesday night President Trump tweeted out an OANN report on a Gateway Pundit investigation of the Atlanta suitcase voter fraud scandal.
>
> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].
>
> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
>
> On Tuesday night President Trump tweeted this OANN and Gateway Pundit video.

---

[87] Jim Hoft, *PRESIDENT TRUMP Retweets Attorney Lin Wood: Kemp and Raffensperger "Will Soon be Going to Jail"*, Gateway Pundit (Dec. 15, 2020, 9:19 AM), https://www.thegatewaypundit.com/2020/12/president-trump-retweets-attorney-lin-wood-kemp-raffensperger-will-soon-going-jail/. A true and correct copy of this article is attached as Exhibit 18.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist [sic].

Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist [sic]!

It was a carefully planned event!

They had NO IDEA they would get caught!

At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.

They were able to flip Georgia for Beijing Biden by their actions.

Why is the FBI or DOJ not involved?

41

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

This tells you everything you need to know about your federal government.[88]

95. Jim Hoft amplified this story on Twitter.[89]

96. *The Gateway Pundit* published two additional articles about Plaintiffs on December 23 repeating the false and defamatory smear that Ms. Freeman "grabbed the ballots and started jamming the ballots into the Dominion tabulators three times" and that "Democrats using people like these poll workers stole the election for Joe Biden." Joe Hoft published the first article, titled "President Trump Tweets Gateway Pundit Video Showing Poll Workers Stuffing Ballots Into Tabulators Numerous Times on Election Night."[90] Jim Hoft published the second article on this theme, with substantially similar allegations.[91]

97. On December 26, 2020, *The Gateway Pundit* published an article reiterating previously debunked claims about Ms. Freeman and Ms. Moss. It stated:

> Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.

---

[88] Jim Hoft, *Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?*, Gateway Pundit (Dec. 23, 2020, 8:40 AM), https://www.thegatewaypundit.com/2020/12/fbi-spoken-ruby-freeman-ralph-jones-yet-not-fbi/. A true and correct copy of this article is attached as Exhibit 19.

[89] Jim Hoft (@gatewaypundit), Twitter (Dec. 23, 2020), *available at* https://web.archive.org/web/20201226003813/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

[90] Joe Hoft, *President Trump Tweets Gateway Pundit Video Showing Poll Workers Stuffing Ballots Into Tabulators Numerous Times on Election Night*, Gateway Pundit (Dec. 23, 2020, 8:10 AM), https://www.thegatewaypundit.com/2020/12/president-trump-retweets-gateway-pundit-video-showing-poll-workers-stuffing-ballots-tabulators-numerous-times-election-night/. A true and correct copy of this article is attached as Exhibit 20.

[91] Jim Hoft, *WTH? Twitter Says OANN Report of Gateway Pundit Investigation is Disputed – How Could This Be When We Are the Only Ones Who Wrote About It?*, Gateway Pundit (Dec. 23, 2020, 11:05 AM), https://www.thegatewaypundit.com/2020/12/wth-twitter-says-oann-report-gateway-pundit-investigation-disputed-ones-wrote/. A true and correct copy of this article is attached as Exhibit 21.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.
>
> …
>
> Ruby and her daughter pulled out more than 11,779 ballots and can be seen entering those ballots multiple times into the Dominion machine.[92]

98.    Jim Hoft amplified this story on Twitter by retweeting another user.[93]

99.    Defendants' targeting of Ms. Freeman and Ms. Moss continued into the new year. On January 1, 2021, Joe Hoft again published an article which repeated the false and defamatory claim that Plaintiffs were the "individuals dragging ballots out from under the tables in Georgia on election night on video," insinuating that they engaged in criminal activity, and complaining that "none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of."[94]

100.    The next morning, Jim Hoft published an article titled "BREAKING: ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!" The article repeated the defamatory claim that Ms. Freeman jammed ballots through the machines three times and committed fraud.[95]

---

[92] Larry Johnson, *Bill Barr Did Not See Fraud Because He Refused To Look*, Gateway Pundit (Dec. 26, 2020, 7:34 PM), https://www.thegatewaypundit.com/2020/12/bill-barr-not-see-fraud-refused-look/. A true and correct copy of this article is attached as Exhibit 22.

[93] Jim Hoft (@gatewaypundit), Twitter (Dec. 27, 2020), *available at* https://web.archive.org/web/20201228210249/https://twitter.com/gatewaypundit (last visited Aug. 23, 2022).

[94] Joe Hoft, *What Are Americans To Do When the Justice Department Is Unjust, the Courts Won't Adjudicate and the Media Covers It All Up?*, Gateway Pundit (Jan. 1, 2021, 9:58 AM), https://www.thegatewaypundit.com/2021/01/americans-justice-department-unjust-courts-wont-adjudicate-media-covers/. A true and correct copy of this article is attached as Exhibit 23.

[95] Jim Hoft, *BREAKING: ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!*, Gateway Pundit (Jan. 2, 2021, 7:30 AM),

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

101.    Later on January 2, 2021, Donald Trump placed a telephone call to Georgia's Secretary of State Brad Raffensperger, during which Mr. Trump pressured Mr. Raffensperger to change the outcome of the Georgia presidential election by finding more votes for him. To justify his request, Mr. Trump repeated some of the many false allegations about Ms. Freeman that Defendants had been publishing throughout December. These include statements calling her "a vote scammer, a professional vote scammer and hustler," and asserting, "we're so far ahead of these numbers, even the phony ballots of Ruby Freeman — known scammer."[96]

102.    Over the next couple of days, Jim Hoft published a number of articles on *The Gateway Pundit* about this phone call. Several of these noted that the call was about how the election in Georgia was "wrought with fraud," and observing that "[i]t's not clear if Ruby Freeman . . . w[as] on the call."[97] These articles imply she had a role in the alleged fraud.

---

https://www.thegatewaypundit.com/2021/01/breaking-another-video-corrupt-election-workers-feeding-ballots-machines-numerous-times/. A true and correct copy of this article is attached as Exhibit 24.

[96] WSJ Staff, *Trump's Georgia Call: Listen to the Audio and Read a Full Transcript*, Wall St. J. (Jan. 3, 2021, 9:47 PM), https://www.wsj.com/articles/listen-to-the-full-trump-ga-call-11609713527.

[97] Jim Hoft, *Raffensperger's Team Leaks President Trump's Saturday Call to Fake News WaPo — Tells You Everything About the Dirty Georgia Leadership* (Jan. 3, 2021, 1:08 PM), https://www.thegatewaypundit.com/2021/01/raffenspergers-team-leaks-president-trumps-saturday-call-fake-news-wapo-tells-everything-dirty-georgia-leadership/; Jim Hoft, *Corrupt Georgia Secretary of State Raffensperger Insists Georgia's Fraudulent Election Was Legitimate, Then Accuses President Trump of Lying* (Jan. 3, 2021, 4:21 PM), https://www.thegatewaypundit.com/2021/01/corrupt-georgia-secretary-state-raffensperger-lies-georgias-2020-election-results-legitimate-calls-president-trump-liar/; Jim Hoft, *President Trump Files Two Lawsuits Against Dirty Georgia Secretary of State Raffensperger for Leaking Confidential Litigation Call* (Jan. 3, 2021, 8:09 PM), https://www.thegatewaypundit.com/2021/01/president-trump-files-two-lawsuits-dirty-georgia-secretary-state-raffensperger-leaking-confidential-litigation-call/; Jim Hoft, *Report: White House Planning to Refer Brad Raffensperger to Secret Service for Investigation Under the Espionage Act* (Jan. 4, 2021, 7:15 AM), https://www.thegatewaypundit.com/2021/01/raeport-white-house-planning-refer-brad-raffensperger-secret-service-investigation-espionage-act/; Jim Hoft, *Dirtbag Georgia Secretary of State to Hold Press Conference at 3 PM* (Jan. 4, 2021, 11:37 AM), https://www.thegatewaypundit.com/2021/01/dirtbag-georgia-secretary-state-hold-press-conference-3-pm/. A true and correct copy of the article published January 3, 2021, at 4:21 p.m., is attached as Exhibit 25.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

103.    Jim Hoft amplified several of these stories using his Twitter account.[98]

104.    In a January 3, 2021, article by Jim Hoft about the call, the headline announced, "HUGE: TRUMP DROPS A BOMB DURING PHONE CALL! Tells Raffensperger 'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal! (VIDEO)." The article republished the portion of the call's transcript when Mr. Trump made the accusation of election fraud that Defendants had been publishing repeatedly since December 3, and it inserted Ms. Freeman's name where it had been omitted by *The Washington Post*, which had broken the story about the call. It stated:

> President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to [sic] with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break. Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.[99]

---

[98]    Jim    Hoft    (@gatewaypundit),    Twitter    (Jan.    3,    2021),    *available    at* https://web.archive.org/web/20210103191234/https:/twitter.com/gatewaypundit/status/1345810207587397 633 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 3, 2021), *available at* https://web.archive.org/web/20210104213119/https:/twitter.com/gatewaypundit/status/1345915506423951 360 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 4, 2021), *available at* https://web.archive.org/web/20210104132453/https:/twitter.com/gatewaypundit/status/1346085100224716 801 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 4, 2021), *available at* https://web.archive.org/web/20210104181156/https:/twitter.com/gatewaypundit/status/1346156819052441 600 (last visited Aug. 23, 2022).

[99]    Jim Hoft, *HUGE: TRUMP DROPS A BOMB DURING PHONE CALL! Tells Raffensperger 'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal!    (VIDEO)*,    Gateway    Pundit    (Jan.    3,    2021,    6:20    PM), https://www.thegatewaypundit.com/2021/01/huge-trump-drops-bomb-phone-call-tells-raffensperger-vote-scammer-hustler-ruby-freeman-behind-18000-fraudulent-votes-suitcase-scandal-video/. A true and correct copy of this article is attached as Exhibit 26.

45

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

105.    The article then reminded readers of *The Gateway Pundit* that it "was first to identify Ruby Freeman, her daughter Shaye Moss and supervisor Ralph Jones, Sr. in the suitcase fraud scandal that was caught on tape and went viral online."[100]

106.    Jim Hoft amplified this story on Twitter.[101]

107.    On January 4, 2021, Georgia election officials held yet another press conference to refute the already-debunked election fraud allegations that Mr. Trump had raised in his call with Mr. Raffensperger.[102] Gabriel Sterling once again described the events that occurred on election day at State Farm Arena, explained how they represented entirely normal ballot processing, and directed listeners to the Georgia's Secretary of State's website for a detailed timeline matched to the surveillance footage.[103] Sterling reiterated for the assembled reporters the actual series of events:

> Late in the evening, after the water main break had been fixed, election workers prepared to go home for the night and followed standard procedures to store ballots securely: placing them in containers and affixing numbered seals. But when Mr. Raffensperger found out that they were closing up shop, he ordered them to continue counting through the night — so the workers retrieved the containers and resumed counting ballots.[104]

---

[100] *Id.*

[101]    Jim    Hoft    (@gatewaypundit),    Twitter    (Jan.    3,    2021),    *available    at* https://web.archive.org/web/20210105040422/https://twitter.com/gatewaypundit/status/1345888162455953 410 (last visited Aug. 23, 2022).

[102] 11Alive, *Georgia Senate Runoffs | Secretary of State's Office Addresses Election Day, Claims*, YouTube (Jan. 4, 2021), https://www.youtube.com/watch?v=K7lDlqJ66fU&t=740s.

[103] *Fact Check*, Secure the Vote, https://securevotega.com/fact-check/ (last accessed Nov. 7, 2021).

[104] Maggie Astor, *A Georgia Election Official Debunked Trump's Claims of Voter Fraud, Point by Point*, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/2021/01/04/us/politics/trump-georgia-election-fraud.html.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Sterling expressed his great frustration that the Trump legal team "had the entire tape" revealing these facts, and nevertheless "intentionally misled the State Senate, the voters and the people of the United States about this."[105]

108.    Defendants were well aware of the Georgia Secretary of State's website and additional fact check, as evidenced by Jim Hoft's tweet on January 4, 2021:[106]



109.    PolitiFact published a fact-check article about the Raffensperger call that same day, finding that the events described by Mr. Sterling lined up with previous reports from PolitiFact and other fact-checkers. This article repeated PolitiFact's earlier assessment that the arena surveillance video showed no wrongdoing and provided no evidence of election fraud. It rated Mr. Trump's claim that Georgia election workers pulled 18,000 ballots from suitcases and counted them for Biden as "Pants on Fire!" false.[107]

---

[105] *Id.*

[106]    Jim   Hoft   (@gatewaypundit),   Twitter   (Jan.   4,   2021),   *available   at* https://web.archive.org/web/20210105040422/https://twitter.com/gatewaypundit/status/1346240056055517185 (last visited Nov. 30, 2021).

[107] Bill McCarthy, *Trump Rehashes Debunked Claim About 'Suitcases' of Ballots in Georgia Phone Call*, PolitiFact (Jan. 4, 2021), https://www.politifact.com/factchecks/2021/jan/04/donald-trump/trump-rehashes-debunked-claim-about-suitcases-ball/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

F.    *The Gateway Pundit's* **Continuing Publication of False and Defamatory Claims**

110.    Nonetheless, Defendants returned to their false statements about Ms. Freeman and Ms. Moss shortly afterward and continued long after Inauguration Day.

111.    On January 5, 2021, Jim Hoft published an article criticizing Gabriel Sterling's press conference with the false and defamatory claim that Ms. Freeman had engaged in criminal conduct that Sterling was covering up:

> Gabe Sterling misled his audience, defended the corrupt and likely criminal conduct at the State Farm Center on election night, defended Ruby Freeman for passing hundreds of ballots through a ballot counting machines [sic] at least three times.[108]

112.    Later that day, Joe Hoft published an article repeating substantially the same defamatory statements.[109]

113.    Jim Hoft amplified both of these stories on Twitter.[110]

---

[108] Jim Hoft, *CAUGHT ON VIDEO: Georgia Hack Gabe Sterling Called Out by Dominion Executive Eric Coomer*, Gateway Pundit (Jan. 5, 2021, 9:20 AM), https://www.thegatewaypundit.com/2021/01/confirmed-dirty-hack-gabe-sterling-called-dominion-executive-eric-coomer-video/. A true and correct copy of this article is attached as Exhibit 27.

[109] Joe Hoft, *Georgia Election Official Gabe Sterling Claims Processing was "Normal" At the State Farm Arena Election Night – Nothing Could Be Further from the Truth*, Gateway Pundit (Jan. 5, 2021, 1:02 PM), https://www.thegatewaypundit.com/2021/01/georgia-election-official-gabe-sterling-claims-processing-normal-state-farm-arena-election-night-nothing-truth/. A true and correct copy of this article is attached as Exhibit 28.

[110] Jim Hoft (@gatewaypundit), Twitter (Jan. 5, 2021), *available at* https://web.archive.org/web/20210105152726/https://twitter.com/gatewaypundit/status/1346477248367366147 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 5, 2021), *available at* https://web.archive.org/web/20210105213817/https://twitter.com/gatewaypundit/status/1346571658593787908 (last visited Aug. 23, 2022).

48

114.    On January 7, 2021, Joe Hoft published an article reiterating the false claim that Plaintiffs are operatives who carried out massive voter fraud and that the FBI should question Ms. Freeman regarding the "infamous ballot hoist [sic]."[111]

115.    Jim Hoft amplified this story on Twitter, as well.[112]

116.    On January 17, 2021, Jim Hoft published an article on *The Gateway Pundit* titled "HERE THEY ARE: The Five Most Obvious Acts of Fraud in the 2020 Election that You Are No Longer Allowed to Discuss." In this article, he listed "[t]he Georgia Late Night Hidden Suitcase Heist" as the first "MOST SIGNIFICANT ACT[] OF FRAUD IN THE 2020 ELECTION," republished the boast about the publication's role in spreading disinformation about Plaintiffs, falsely characterized their conduct as a criminal conspiracy in which "[t]hey had NO IDEA they would get caught," and baselessly insinuated that they should be subject to federal investigation.[113]

117.    On March 25, 2021, Joe Hoft published an article that republished earlier defamatory statements describing Plaintiffs as a "mother-daughter team of ballot counters in Atlanta [who] really overdid their fraud" and Ms. Freeman as a "Crooked Operative."[114]

---

[111] Joe Hoft, *Project Veritas Identifies the Exact Moment Ralph Jones is Ordered by a judge to Stop Preventing Poll Watchers Access to Activities Going on in Atlanta*, Gateway Pundit (Jan. 7, 2021, 3:14 PM), https://www.thegatewaypundit.com/2021/01/project-veritas-identifies-exact-moment-ralph-jones-ordered-judge-stop-preventing-poll-watchers-access-activities-going-atlanta/. A true and correct copy of this article is attached as Exhibit 29.

[112] Jim Hoft (@gatewaypundit), Twitter (Jan. 7, 2021), *available at* https://web.archive.org/web/20210107214951/https://twitter.com/gatewaypundit/status/1347298953105178 625 (last visited Aug. 23, 2022).

[113] Jim Hoft, *HERE THEY ARE: The Five Most Obvious Acts of Fraud in the 2020 Election that You Are No Longer Allowed to Discuss*, Gateway Pundit (Jan. 17, 2021, 6:33 PM), https://www.thegatewaypundit.com/2021/01/five-obvious-acts-fraud-2020-election/. A true and correct copy of this article is attached as Exhibit 30.

[114] Joe Hoft, *TOO LITTLE TOO LATE — After Certifying Sham 2020 Election Results — Georgia Gov. Kemp Signs New Election Legislation*, Gateway Pundit (Mar. 25, 2021, 7:25 PM), https://www.thegatewaypundit.com/2021/03/little-late-certifying-sham-2020-election-results-georgia-gov-kemp-signs-new-election-legislation/. A true and correct copy of this article is attached as Exhibit 31.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

118.     On May 21, 2021, in response to a court order in *Favorito v. Wan*, No. 2020CV343938 (Fulton Cnty. Ga. Super. Ct. May 21, 2021), to unseal absentee ballots in Fulton County, Joe Hoft published another article falsely alleging voter fraud by Plaintiffs. After republishing the same defamatory statements as the March article, Joe Hoft again touted *The Gateway Pundit*'s role in spreading the debunked narrative of Plaintiffs' fraud:

> We nailed it in Georgia. We identified in the video below that the same ballots were pushed through voting machines two and three times.



> President Trump retweeted this story (but this was taken down by Twitter.) [sic][115]

119.     The next day, Jim Hoft published another article identifying Ms. Freeman and Ms. Moss by name and image and republishing false allegations that they engaged in

---

[115] Joe Hoft, *UPDATE: Georgia Judge Orders 145,000 Absentee Ballots from Fulton County to Be Scanned to Determine Legitimacy – Case Revolves Around Explosive Dec. Report from Gateway Pundit*, Gateway Pundit (May 21, 2021, 12:34 PM), https://www.thegatewaypundit.com/2021/05/update-georgia-judge-orders-145000-absentee-ballots-fulton-county-scanned-determine-legitimacy-case-revolves-around-disturbing-tgp-findings/. A true and correct copy of this article is attached as Exhibit 32.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

fraud and counted ballots in secret after kicking Republicans out of the State Farm Center.[116]



120.     On June 6, 2021, based on reports that Ms. Moss had been subpoenaed, Joe Hoft published an article on *The Gateway Pundit* republishing prior defamatory statements about Plaintiffs:

---

[116] Jim Hoft, *Sidney Powell Weighs in on Georgia Audit: 145,000 Absentee Ballots, 106,000 Adjudicated Ballots, Video of Multiple Scannings of Same Ballots and Nine witnesses of Suspected Fake Ballots!*, Gateway Pundit (May 22, 2021, 9:05 AM), https://www.thegatewaypundit.com/2021/05/sidney-powell-weighs-georgia-audit-145000-absentee-ballots-106000-adjudicated-ballots-video-multiple-scannings-ballots-nine-witnesses-suspected-fake-ballots/. A true and correct copy of this article is attached as Exhibit 33.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



It's getting hot in Georgia! One of the individuals caught on tape late on election night in Fulton County, Georgia, Wandrea Shaye Moss, has been subpoenaed for a deposition in a civil trial in Fulton County.

Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?

After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving *stacks of ballots* through the machines two and three times each.

In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on election night[.]

. . .

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.
>
> . . .
>
> We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.[117]

121. The following day, he published a similar article about Ms. Freeman, titled "BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night Is Subpoenaed," in which he repeated prior defamatory statements:

> Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. Ruby Freeman was caught on tape running the same stack of suspect ballots through the machines multiple times.[118]

122. Jim Hoft republished defamatory statements from this article a week later in a new posting on *The Gateway Pundit*.[119]

---

[117] Joe Hoft, *BREAKING: Ruby Freeman's Daughter Election Supervisor Wandrea Shaye Moss Is Subpoenaed for Deposition in Fulton County GA*, Gateway Pundit (June 6, 2021, 7:53 AM), https://www.thegatewaypundit.com/2021/06/breaking-ruby-freemans-daughter-election-supervisor-wandrea-shaye-moss-subpoenaed-deposition-fulton-county-ga/. A true and correct copy of this article is attached as Exhibit 34.

[118] Joe Hoft, *BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night is Subpoenaed*, Gateway Pundit (June 7, 2021, 9:43 PM), https://www.thegatewaypundit.com/2021/06/breaking-georgia-update-ruby-freeman-jammed-suspect-ballots-voting-machines-multiple-times-election-night-subpoenaed/. A true and correct copy of this article is attached as Exhibit 35.

[119] Jim Hoft, *CONFIRMED: Judge Delays Depositions from Georgia Election Workers Ruby Freeman and Her Daughter Shae Moss*, Gateway Pundit (June 14, 2021, 10:33 AM), https://www.thegatewaypundit.com/2021/06/confirmed-judge-delays-depositions-georgia-election-workers-ruby-freeman-daughter-shae-moss/. A true and correct copy of this article is attached as Exhibit 36.

123.    On June 8, 2021, Jim Hoft published an article that republished earlier defamatory statements that Ms. Freeman was an "Anti-Trump Democrat" who was part of a "'Suitcase Scandal'" in which she was "[c]aught" counting ballots multiple times.[120]

124.    On June 11, 2021, Joe Hoft authored an article republishing these same defamatory claims.[121]

125.    Then, on June 17, 2021, Jim Hoft published an article featuring a video of Secretary of State Raffensperger describing election safeguards, and averring that Georgia "had safe, secure, and honest elections." Despite this, Jim Hoft included an image from election night identifying Ms. Freeman by name and again falsely alleging that Plaintiffs engaged in voter fraud:

> Of course, NOTHING could be further of [sic] the truth.
>
> The Gateway Pundit wrote several reports on the likely fraud and corruption in the November 2020 Georgia election.
>
> . . .
>
> [A] Gateway Pundit report exposed Georgia election officials repeatedly feeding hundreds and possibly thousands of ballots through the voting machines late at night in Atlanta, Georgia after the election observers were sent home.[122]

---

[120] Jim Hoft, *Georgia Update: Attorneys back in Court on June 21 After Fulton County Officials Block Audit of Ballots — Attorney Requests Video Footage from Unsecured Building*, Gateway Pundit (June 8, 2021, 11:57 AM), https://www.thegatewaypundit.com/2021/06/georgia-update-attorneys-back-court-june-21-fulton-county-officials-block-audit-ballots-attorney-requests-video-footage-unsecured-building/. A true and correct copy of this article is attached as Exhibit 37.

[121] Joe Hoft, *BREAKING: AG Merrick Garland Announces that His DOJ Will Scrutinize Any Post-Election Audits for Evidence of Voting Law Violations!*, Gateway Pundit (June 11, 2021, 3:03 PM), https://www.thegatewaypundit.com/2021/06/breaking-ag-merrick-garland-announces-doj-will-scrutinize-post-election-audits-evidence-voting-law-violations/. A true and correct copy of this article is attached as Exhibit 38.

[122] Jim Hoft, *Raffensperger's Own Team Was Saying "Bad, Bad Things" Were Happening in Fulton County Elections – He Ignored Them and Attacked Trump Instead (VIDEO)*, Gateway Pundit (June 17, 2021, 11:04 AM), https://www.thegatewaypundit.com/2021/06/raffenspergers-team-saying-bad-bad-things-happening-fulton-county-elections-ignored-attacked-trump-instead-video/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

126.    The next day, in response to a report from independent election monitor Carter Jones on election integrity in Fulton County, Jim Hoft published three more articles on *The Gateway Pundit* that republished prior defamatory statements about Plaintiffs being "leftist operatives" who were part of a "crew" that scanned fraudulent ballots. In the first, he wrote:

> A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night.
>
> . . .
>
> Ralph Jones was the person who sent home all of the election observers.
> Then his crew, including Ruby and daughter Shaye, went to work on election night!
>
> . . .
>
> The Gateway Pundit was first to report that Ruby Freeman was seen scanning stacks of ballots up to three times at the State Farm Center in Atlanta, Georgia after observers were sent home on election night.
>
> Our source caught Ruby Freeman in the purple shirt scanning the same stack of ballots multiple times on election night.[123]

127.    Defendants' characterizations of Carter Jones' report were in direct contradiction with Mr. Jones' own takeaways from the election, as evidenced by his interview with The Associated Press. In the AP interview, Mr. Jones challenged rumors of "suitcases filled with ballots" by noting that the ballot containers in the widely circulated

---

[123] Jim Hoft, *EXPLOSIVE DEVELOPMENT: Election Worker Ralph Jones Is Now Caught Double-Counting Ballots at the State Farm Center on Election Night!*, Gateway Pundit (June 18, 2021, 8:00 AM), https://www.thegatewaypundit.com/2021/06/explosive-new-report-confirms-least-two-elections-officials-ruby-freeman-ralph-jones-caught-double-counting-ballots-state-farm-center-election-night/. A true and correct copy of this article is attached as Exhibit 39.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

videos from the State Farm Arena are standard ballot bins used all over the state, "So they're not mysteries, they're not suitcases, they're ballots."[124]

128.    Three hours after Defendants' first article on the Carter Jones report, *The Gateway Pundit* published another article titled "Author of Fulton County Elections Report Tries Desperately to Walk Back Explosive Accusations – BUT IT'S TOO LATE," to try to discredit Mr. Jones' debunking the false narrative of fraud and suitcases of ballots that *The Gateway Pundit* was peddling:

> The lying fake news media is trying desperately to downplay the damning elections report from Fulton County Georgia today.
>
> . . .
>
> In the 29-page report Carter Jones tells of two more instances where the election officials were double-scanning votes late at night after the election observers and news media was sent home!
>
> The Gateway Pundit was first to report that Ruby Freeman was also seen double scanning stacks of ballots at the State Farm Center in Atlanta, Georgia after observers were sent home on election night.[125]

After quoting extensively from Mr. Jones' comments debunking the fraud allegations, Jim Hoft dismissed the comments as false.

129.    Minutes later, Jim Hoft published a third article on *The Gateway Pundit* that republished his claim that "Ruby Freeman . . . was filmed feeding the same stacks of ballots

---

[124] Kate Brumback, *Observer: Georgia county's elections messy, not fraudulent*, Associated Press (June 16, 2021), https://apnews.com/article/donald-trump-ga-state-wire-georgia-elections-government-and-politics-87bb23d4d9b2ec80a1db715e6bf1c633.

[125] Jim Hoft, *Author of Fulton County Elections Report Tries Desperately to Walk Back Explosive Accusations – BUT IT'S TOO LATE*, Gateway Pundit (June 18, 2021, 11:06 AM), https://www.thegatewaypundit.com/2021/06/author-fulton-county-elections-report-tries-desperately-walk-back-explosive-accusations-late/. A true and correct copy of this article is attached as Exhibit 40.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

through voting machines late at night at the center – after observes [sic] were sent home," by which he intended to, and did, falsely convey that she was fraudulently inflating the Biden-Harris vote count.[126]

130.    The next day, on June 19, 2021, Joe Hoft published an article titled "Multiple Individuals Pushed Stacks of Ballots through Tabulators Multiple Times in Georgia. This is Illegal. Law Enforcement Did Nothing" that reiterated false claims that Ms. Freeman had engaged in criminal conduct. It noted *The Gateway Pundit*'s earlier reporting on "Fulton County Georgia poll worker Ruby Freeman pushing multiple ballots through the vote tabulators multiple times. This was illegal."[127]

131.    The same day, prompted by an online report that batches of absentee ballots were missing in Fulton County, Jim Hoft published another article replete with baseless and disproven allegations of voter fraud by plaintiffs:

> This follows news first reported by The Gateway Pundit that election operative Ruby Freeman was also caught tripe [sic] counting stacks of votes late at night at the counting center after GOP observers were sent home.

…

> On December 4th TGP reported with video on anti-Trump ballot counter Ruby Freeman working in a private cube with trays of ballots, walking past open boxes of ballots, working alone with NO ELECTION OBSERVERS IN SIGHT!

> This is the DEFINITION OF CHEATING!

---

[126] Jim Hoft, *Twitter Subpoenaed in Georgia Lawsuit Involving Fulton County Elections Supervisor Wandrea Shaye Moss*, Gateway Pundit (June 18, 2021, 11:29 AM), https://www.thegatewaypundit.com/2021/06/twitter-subpoenaed-georgia-lawsuit-involving-fulton-county-elections-supervisor-wandrea-arshaye-moss/. A true and correct copy of this article is attached as Exhibit 41.

[127] Joe Hoft, *Multiple Individuals Pushed Stacks of Ballots through Tabulators Multiple Times in Georgia. This Is Illegal. Law Enforcement Did Nothing.*, Gateway Pundit (June 19, 2021, 10:20 AM), https://www.thegatewaypundit.com/2021/06/multiple-individuals-push-multiple-ballots-multiple-tabulators-multiple-times-georgia-illegal-law-enforcement-nothing/. A true and correct copy of this article is attached as Exhibit 42.

The video and tweet was removed from Twitter but we found the video on YouTube and we are saving a copy. [Embedded is a copy of an Instagram video taken by Ms. Freeman in October 2020 that she had removed.]

…

Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.

Ruby walks by several boxes of ballots just sitting around in the room.

The elections workers were each given their own secret cube.

Then Ruby goes to her desk and pulls out a tray of ballots on her desk.

There is NO supervisor or GOP observer anywhere in sight.

And then Ruby leaves the ballots on her desk as she goes to take a break.

This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.

The Democrat operatives were running a voter fraud factory inside the State Farm Center on Election Day and into Election Week![128]

132. On June 20, 2021, Joe Hoft published an article in *The Gateway Pundit* that repeated the false claim that the publication had "exposed Georgia election officials repeatedly feeding thousands of ballots through the voting machines late at night in Atlanta,

---

[128] Jim Hoft, *IT WAS A VOTER FRAUD FACTORY: 2nd Carter Jones Report Describes Complete Breakdown of GA Election Systems — BALLOTS EVERYWHERE, NO CHAIN OF CUSTODY, COMPLETE DISARRAY and WE HAVE THE VIDEO*, Gateway Pundit (June 19, 2021, 8:31 PM), https://www.thegatewaypundit.com/2021/06/voter-fraud-factory-2nd-carter-jones-report-describes-complete-breakdown-election-systems-ballots-everywhere-no-chain-custody-complete-disarray-video/.   A true and correct copy of this article is attached as Exhibit 43.

58

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Georgia after the election observers were sent home," and identifying Ms. Freeman by name and image.[129]

133.    Later that day, Joe Hoft published a second article that again falsely stated, with reference to Ms. Freeman, that "ballots [were] being pulled from under the table and then jammed through voting machines," that this happened "late at night after election observers were kicked out of the [State Farm] Arena," and that these were "criminal acts."[130]

134.    On June 24, 2021, *The Gateway Pundit* published an article titled "Fulton County Hires CRIMINAL Attorneys to Stop Election Audit," which baselessly insinuated that Plaintiffs had engaged in criminal conduct, contrary to the reports of state and county officials and numerous fact checkers, as Defendants were aware:

> On Thursday, we received news that Fulton County officials have hired two new CRIMINAL attorneys to stop the court-ordered Georgia audit.
>
> . . .
>
> Fulton County is home to the infamous Ruby Freeman and her daughter Shaye Moss who were caught pulling ballot boxes from under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.
> . . .

---

[129]  Joe Hoft, *OUTRAGEOUS: Georgia Secretary of State Raffensperger Received Report Showing Egregious Election Issues Yet He Concealed Report and Claimed State had "Safe, Secure, and Honest Elections"*, Gateway Pundit (June 20, 2021, 7:15 AM), https://www.thegatewaypundit.com/2021/06/outrageous-georgia-secretary-state-raffensperger-received-report-showing-egregious-election-issues-yet-concealed-report-claimed-state-safe-secure-honest-elections/. A true and correct copy of this article is attached as Exhibit 44.

[130]  Joe Hoft, *WE CAUGHT THEM: President Trump Warned Raffensperger and His Attorney Ryan Germany About Election Fraud — New Evidence Shows Germany Was Made Aware of Election Fraud on Election Night And Hid This from President Trump*, Gateway Pundit (June 20, 2021, 10:30 AM), https://www.thegatewaypundit.com/2021/06/caught-president-trump-warned-raffensperger-attorney-ryan-germany-election-fraud-new-evidence-shows-germany-made-aware-election-fraud-election-night-hid-fro/. A true and correct copy of this article is attached as Exhibit 45.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?
>
> This is not how innocent people act. They are hiding something in Fulton County, Georgia.[131]

135.    On July 10, 2021, *The Gateway Pundit* published an article taking credit for its role in accusing Plaintiffs of voter fraud: "For the record—The Gateway Pundit broke the story last year that Ruby Freeman and Georgia officials were triple counting stack of ballots at the TCF Center [sic] late on election night after the GOP observers were sent home."[132]

136.    On July 14, 2021, Jim Hoft published another article on *The Gateway Pundit* republishing prior false statements that Plaintiffs "really overdid their fraud" and that Ms. Freeman is a "Crooked Operative":

> As we have previously reported Fulton County election officials cleared out election observers and the media from the State Farm Arena on election night, but a handful of people stayed behind and continued to count ballots in private from around 10:30 pm until 1:00 am.
>
> As The Gateway Pundit first reported in December 2020 – This included scanning the same sets of ballots multiple times.[133]

---

[131] Jordan Conradson, *Fulton County Hires CRIMINAL Attorneys to Stop Election Audit*, Gateway Pundit (June 24, 2021, 8:35 PM), https://www.thegatewaypundit.com/2021/06/fulton-county-hires-criminal-attorneys-stop-election-audit/. A true and correct copy of this article is attached as Exhibit 46.

[132] Jordan Conradson, *Arizona State Senator: Georgia Has Proof of Somebody Admitting to Running Ballots Through Numerous Times – "Americans Don't Like Cheating" (VIDEO)*, Gateway Pundit (July 10, 2021, 8:20 AM), https://www.thegatewaypundit.com/2021/07/arizona-state-senator-georgia-proof-somebody-admitting-running-ballots-numerous-times-americans-dont-like-cheating-video/. A true and correct copy of this article is attached as Exhibit 47.

[133] Jim Hoft, *Hard Evidence Presented: Duplicate Ballots were Counted in Fulton County Georgia in 2020 Election*, Gateway Pundit (July 14, 2021, 7:30 AM), https://www.thegatewaypundit.com/2021/07/hard-evidence-presented-duplicate-ballots-counted-fulton-county-georgia-2020-election/. A true and correct copy of this article is attached as Exhibit 48.

137.     Later that day, he published an article on *The Gateway Pundit* again claiming credit for identifying Ms. Freeman as the Fulton County election official "feeding stacks of ballots through the voting machines at least three times each on November 4th in the early morning after the GOP election observers were told to go home."[134]

138.     On August 14, 2021, Joe Hoft published another article on *The Gateway Pundit* falsely describing how Ms. Freeman, Ms. Moss, and other election workers had been added to a lawsuit against Fulton County alleging election fraud.[135] The article republished *The Gateway Pundit*'s prior defamatory statements about Ms. Freeman and boasted about its role in promulgating and amplifying the false claims:

> We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.
>
> This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.
>
> We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.

…

> This is not good for Ruby and her daughter.

---

[134] Jim Hoft, *FANTASTIC! Tucker Carlson Covers the Election Fraud in Fulton County Georgia 8 Months After Election – Here Are the Background Reports (VIDEO)*, Gateway Pundit (July 14, 2021, 9:19 PM), https://www.thegatewaypundit.com/2021/07/fantastic-tucker-carlson-covers-election-fraud-fulton-county-georgia-8-months-election-background-reports-video/. A true and correct copy of this article is attached as Exhibit 49.

[135] This lawsuit has since been dismissed. *See* Associated Press, *Judge Dismisses Fulton County Ballot Review Case in Georgia*, U.S. News (Oct. 13, 2021), https://www.usnews.com/news/best-states/georgia/articles/2021-10-13/judge-dismisses-fulton-county-ballot-review-case-in-georgia.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> It's also pathetic that these two are not in jail already. Their crimes were videotaped![136]

139.    On September 20, 2021, Joe Hoft published an article republishing *The Gateway Pundit*'s prior defamatory statements describing Ms. Moss as a "Crooked Georgia Elections Superviser [sic]" and Plaintiffs' actions on election night as being part of a "Voter Fraud Factory."[137]

140.    On September 25, 2021, in response to an internal financial review of Fulton County's Registration and Elections Department, Joe Hoft published yet another article on *The Gateway Pundit* falsely insinuating that Plaintiffs' actions on election night nearly a year before were corrupt:

> Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.
>
> . . .
>
> Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.[138]

---

[136] Ex. 9.

[137] Joe Hoft, *Wake Up Georgia: ACLU Is Currently Recruiting Leftist Poll Workers to Run the Next Election Like the Last*, Gateway Pundit (Sept. 20, 2021, 3:30 PM), https://www.thegatewaypundit.com/2021/09/wake-georgia-aclu-currently-recruiting-poll-workers-run-next-election-like-last/. A true and correct copy of this article is attached as Exhibit 50.

[138] Joe Hoft, *BREAKING EXCLUSIVE: Report Shows Fulton County, GA 2020 Election Had $2 million in Unsupported OT, 15 Missing Routers, an Agreement with the SPLC to Put in Place Drop Boxes, and More*, Gateway Pundit (Sept. 25, 2021, 7:10 AM), https://www.thegatewaypundit.com/2021/09/breaking-exclusive-report-shows-fulton-county-ga-2020-election-2-million-ot-without-support-15-missing-routers-agreement-splc-put-place-drop-boxes/. A true and correct copy of this article is attached as Exhibit 51.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**G.**     **Defendants Published the Statements With Knowledge of Their Falsity or Serious Doubts About Their Truth**

141.     Defendants knew that their statements about Ms. Freeman and Ms. Moss were not true or had serious doubts about their truth.  Indeed, the story that two poll workers could secretly inject tens of thousands of fraudulent ballots into the vote count and process the fraudulent ballots for counting multiple times without detection, despite several machine and hand recounts, is not credible on its face. Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

142.     Defendants were aware of the numerous statements by Georgia officials disproving the portrayal of misconduct that had been advanced by the Trump lawyers, and they also knew that multiple fact-checking organizations had confirmed the facts as presented by the Georgia officials. Defendants baselessly disregarded the reliable sources refuting their claims and had no credible basis for the false allegations they continued to make.

143.     At no point in publishing their many stories about Ms. Freeman and Ms. Moss did Defendants ever attempt to contact Plaintiffs to obtain their account of the events being reported. Nor did Defendants contact for corroboration other obvious available sources, and they specifically avoided contacting sources who had evidence to disprove their lies.

144.     Defendants ignored the truth because they had a predetermined story in mind that would continue to attract readers—that widespread voter fraud would taint the 2020 presidential election. Even before the vote counting began, Defendants cultivated this

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

narrative.[139] In November 2020, Defendants published multiple articles focusing on baseless claims of election fraud in several states.[140]

146.    Defendants advanced this predetermined fictitious storyline in the face of the facts because it was financially advantageous to do so. They were motivated to publish lies about Plaintiffs because lying about the election was more profitable than telling the truth.

146.    Defendants consciously avoided the truth in order to profit from the repeated publication of scandalous material. *The Gateway Pundit*'s articles about voter fraud throughout the 2020 election cycle increased its readership, reach, and engagement. Its articles about voter fraud, in particular, performed well, and it earned increased advertising revenue by publishing and republishing such well-performing falsehoods about Plaintiffs.

---

[139] *See, e.g.*, Jim Hoft, *BREAKING: US Mail Found in Ditch in Rural Wisconsin – Included Absentee Ballots*, Gateway Pundit (Sept. 23, 2020, 11:18 AM), https://www.thegatewaypundit.com/2020/09/breaking-us-mail-found-ditch-greenville-wisconsin-included-absentee-ballots/.

[140] *E.g.,* Cristina Laila, As Many as 6,000 Illegal Votes Identified in Nevada – Thousands of People Referred to DOJ For Potential Criminal Violation of Election Laws, Gateway Pundit (Nov. 5, 2020, 7:45 PM), https://www.thegatewaypundit.com/2020/11/many-6000-illegal-votes-identified-nevada-thousands-people-referred-doj-potential-criminal-violation-election-laws/; Jim Hoft, *HUGE! Corrupted Software Used in Michigan County that Stole 6,000 Votes from Trump – Is Also Used in ALL SWING STATES – PA, GA, NV, MI, WI, AZ, MN!*, Gateway Pundit (Nov. 6, 2020, 8:35 PM), https://www.thegatewaypundit.com/2020/11/huge-corrupted-software-used-michigan-county-stole-6000-votes-trump-also-used-swing-states-pa-ga-nv-mi-wi-az-mn/; Joe Hoft, *BREAKING EXCLUSIVE: Analysis of Election Night Data from All States Shows MILLIONS OF VOTES Either Switched from President Trump to Biden or Were Lost*, Gateway Pundit (Nov. 10, 2020, 6:32 PM), https://www.thegatewaypundit.com/2020/11/breaking-exclusive-analysis-election-night-data-states-shows-millions-votes-either-switched-president-trump-biden-lost/); Joe Hoft, *SHOCKING EXCLUSIVE: WE CAUGHT THEM! Pennsylvania Results Show a Statistically Impossible Pattern Behind Biden's Steal! WE CAUGHT THEM!*, Gateway Pundit (Nov. 13, 2020, 6:47 PM), https://www.thegatewaypundit.com/2020/11/shocking-exclusive-caught-pennsylvania-results-show-statistically-impossible-pattern-behind-bidens-steal-caught/; Jim Hoft, *WE CAUGHT THEM! Part 2: Email Inventor Dr. Shiva Finds SAME IMPOSSIBLE BALLOT RATIO Feature in Michigan Results – WE CAUGHT THEM!*, Gateway Pundit (Nov. 14, 2020, 5:49 PM), https://www.thegatewaypundit.com/2020/11/caught-part-2-email-inventor-dr-shiva-finds-impossible-ballot-ratio-feature-michigan-results-caught/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

147.    Defendants additionally hoped that repeating their preconceived narrative would affect the outcome of the presidential election.

**H.    Defendants' Failure to Retract, Despite Plaintiffs' Cease and Desist Letters and The Filing of This Lawsuit**

148.    In an effort to attempt to mitigate the harm caused by the publication of the false statements in Defendants' stories, Ms. Freeman and Ms. Moss engaged legal counsel, Dowd Bennett, LLC, and DuBose Miller, LLC to seek retraction from Defendants.

149.    On November 22, 2021, counsel sent Defendants a letter demanding that they correct and retract the numerous defamatory statements they have published and continue to publish about Ms. Freeman and Ms. Moss.[141]

150.    As of the date of this filing, Defendants have not responded to that letter nor taken any action to correct and retract their statements. Moreover, even after the initial filing of this lawsuit specifying Defendants' willfully false and malicious statements and the consequent harm to Plaintiffs, Defendants have kept up their defamatory campaign, coupled with requests for financial contributions to support their legal defense.

151.    On December 2, 2021, hours after this lawsuit was filed, Jim Hoft published an article on *The Gateway Pundit* titled "Ruby Freeman and Daughter Sue Gateway Pundit for Posting Video of Her Shoving Ballots Through Voting Machines Numerous Times – PLEASE HELP UP Fight This Latest Lawsuit," in which he again boasted about the publication's role in first identifying Plaintiffs by name:

> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.

---

[141] A true and correct copy of this letter is attached as Exhibit 52.

> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.[142]

The article concluded with a request for donations to help protect against "this latest assault."

152. The following day, Jim Hoft published an article on *The Gateway Pundit* titled "Interesting. FBI Investigated Alleged Threats to Ruby Freeman but There Is No Record of FBI Investigating the Illicit Late Night Actions at State Farm Center." He falsely accused Plaintiffs of illegal conduct and then attempted to discredit an ABC News article from the day before about the lawsuit which noted that "[t]he allegation that 'suitcases' of ballots were pulled from under tables away from the eyes of observers was almost immediately debunked."[143] In response, Mr. Hoft wrote:

> ABC News, a lapdog outlet for the Democrat regime, reported on the lawsuit on Thursday.
>
> ABC News said the suitcase scandal was "debunked." It wasn't. And 9 of 10 people who view the video and hears the entire story KNOWS this was suspicious activist [sic] – to be kind.[144]

He again concluded with an appeal for funds to defend against Plaintiffs' "assault" on *The Gateway Pundit*.

---

[142] Jim Hoft, *Ruby Freeman and Daughter Sue Gateway Pundit for Posting Video of Her Shoving Ballots Through Voting Machines Numerous Times – PLEASE HELP US Fight This Latest Lawsuit*, Gateway Pundit (Dec. 2, 2021, 12:42 PM), https://www.thegatewaypundit.com/2021/12/ruby-freeman-daughter-sue-gateway-pundit-posting-video-shoving-ballots-voting-machines-numerous-times-please-help-us-fight-latest-lawsuit/. A true and correct copy of this article is attached as Exhibit 53.

[143] Kate Brumback, *Election workers sue conservative site over fraud claims*, ABC News (Dec. 2, 2021), https://abcnews.go.com/Politics/wireStory/election-workers-sue-conservative-site-fraud-claims-81520609.

[144] Jim Hoft, *Interesting. FBI Investigated Alleged Threats to Ruby Freeman but There Is No Record of FBI Investigating the Illicit Late Night Actions at State Farm Center* (Dec. 3, 2021, 12:02 PM), https://www.thegatewaypundit.com/2021/12/interesting-fbi-investigated-alleged-threats-ruby-freeman-no-record-fbi-investigating-illicit-late-night-actions-state-farm-center/. A true and correct copy of this article is attached as Exhibit 54.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

153.    On December 8, 2021, Jim Hoft published another article on *The Gateway Pundit* taking credit for identifying Plaintiffs and republishing prior false statements that Ms. Freeman was "caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home." He went on to falsely suggest that Plaintiffs' lawful processing of ballots was actually election theft on behalf of President Biden:

> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race.
>
> We disagree.
>
> Today Georgia Secretary of State Brad Raffensperger went on the popular John Fredericks Radio Show. Raffensperger argued that the "suitcase scandal" was an urban myth.
> . . .
>
> Raffensperger allows this obvious stealing of votes in Georgia elections.[145]

154.    Later that day, Joe Hoft published another article with an embedded audio clip of an episode of the Joe Hoft Show on RealTalk 93.3. In the audio clip, Joe Hoft defamed Plaintiffs again by falsely accusing them of corrupt activity:

> So these people stuck around, and they decided to pull ballots out from underneath the tables . . . in suitcases, and then they opened them up, and they started shoving them through the tabulators.
>
> . . .

---

[145] Jim Hoft, *Brad Raffensperger Argues the State Farm Suitcase Video Was "Urban Myth"—Kicking Out Obversers* [sic]*, Rolling Out Suitcases and Shoving Ballots Thru Machines 3 Times in Middle of Night is Completely Acceptable (VIDEO)*, Gateway Pundit (Dec. 8, 2021, 7:41 PM), https://www.thegatewaypundit.com/2021/12/brad-raffensperger-argues-state-farm-suitcase-video-urban-myth-kicking-obversers-rolling-suitcases-shoving-ballots-thru-machines-3-times-middle-night-completely-acc/. A true and correct copy of this article is attached as Exhibit 55.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?[146]

155.    The following week, Jim Hoft published an article on *The Gateway Pundit* attempting to discredit a news report from the *St. Louis Post-Dispatch* about the lawsuit, which had observed that the Georgia Secretary of State had "quickly and forcefully debunked the allegations" of suitcases of fake ballots being processed unsupervised.[147] In response, Mr. Hoft objected that *The Gateway Pundit* was not spreading conspiracy theories and republished its initial reporting, again accusing Plaintiffs of corrupt conduct, allegations disproven by state and county officials and third-party fact-checkers many times over.[148]

156.    On December 24, 2021, counsel sent Defendants a second letter demanding that they correct and retract their additional defamatory statements, including those described above, some of which post-dated Plaintiff's first retraction letter.[149]

157.    As of the date of this filing, Defendants have not responded to that letter, either, nor taken any action to correct or retract their false stories. Instead, they published new stories defaming Plaintiffs.

---

[146] Joe Hoft, *You're Really About to Destroy Yourselves . . . You Just Don't Know the Grave You're Digging for Yourselves" – Jessica Laurent on Georgia Suitcase Sandal and Lawsuit Against Gateway Pundit*, Gateway Pundit (Dec. 8, 2021, 8:50 PM), https://www.thegatewaypundit.com/2021/12/really-destroy-just-dont-know-grave-digging-jessica-laurent-ruby-shaye-lawsuit-gateway-pundit/. A true and correct copy of this article is attached as Exhibit 56.

[147] Peter Eisler & Joel Currier, *Two Georgia election workers sue St. Louis-based Gateway Pundit website over false fraud claims* (Dec. 2, 2021), https://www.stltoday.com/news/local/crime-and-courts/two-georgia-election-workers-sue-st-louis-based-gateway-pundit-website-over-false-fraud-claims/article_2619f7b7-575f-58fe-965e-ee3f4d118dc1.html.

[148] Jim Hoft, *The St. Louis Post-Dispatch Refused to Publish Gateway Pundit's Response to Their Numerous Hit Pieces and Lies – So We Are Posting It Here Where It Will Get More Traffic*, Gateway Pundit (Dec. 15, 2021, 8:00 AM), https://www.thegatewaypundit.com/2021/12/response-st-louis-post-dispatch-recent-attempts-dilute-jury-pool-based-lies-far-left-opinion/.

[149] A true and correct copy of this letter is attached as Exhibit 57.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

158.    On December 25, 2021, Jim Hoft published another article on *The Gateway Pundit* republishing Defendants' earlier defamatory statements about Plaintiffs, describing them as "election operatives" and stating that Ms. Freeman was "caught on video shoving stack of ballots through the voting machines numerous times late at night after all of the election observers were sent home." Mr. Hoft went on to describe Plaintiffs as "lawless individuals" engaged in unethical conduct and to question whether they had actually been defamed:

> But were they?
>
> There is absolutely no way to explain away these actions.
>
> If this behavior is accepted then it will be the end of our free, fair, and trusted elections.
>
> If this behavior becomes the norm in future elections then we will be reduced to banana-republic status.
>
> . . .
>
> So where are all of the GOP lawmakers speaking out against the shady actions CAUGHT ON VIDEO from inside the State Farm Center on election night?
>
> . . .
>
> You can't be considered a viable opposition when you submit to lawless individuals. You just can't.[150]

159.    On January 14, 2022, Plaintiffs filed their First Amended Complaint, which added 19 defamatory articles listed in their second retraction letter.

---

[150] Jim Hoft, *If Republican Leaders Will Not Speak out Against Election Officials Removing GOP Observers from Room, Pulling Out Hidden Suitcases of Votes and Shoving Stacks of Ballots Thru Machines 3 Times, Then the Grand Old Party's Days Are Over*, Gateway Pundit (Dec. 25, 2021, 12:25 PM), https://www.thegatewaypundit.com/2021/12/republican-leaders-will-not-speak-election-officials-removing-gop-observers-room-pulling-hidden-suitcases-votes-shoving-stacks-ballots-thru-machines-3-times-th/. A true and correct copy of this article is attached as Exhibit 58.

69

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

160. Even after two retraction letters and the First Amended Complaint, Defendants continued to publish defamatory statements about Plaintiffs.

161. On April 22, 2022, *The Gateway Pundit* published an article titled "WTH? John F. Kennedy Library Foundation Lumps President Zelensky In With Pack of Election Crooks, Cowards and Liars In Latest 'Profile in Courage' Awards." The article falsely charges Ms. Moss with one of these epithets and questions whether accusations against her of processing fake ballots were actually false, despite numerous fact-checks making this clear. The article states:

> . . . Gateway Pundit claims Ruby Freeman and her daughter Wandrea "Shaye" Moss are repeatedly jamming the same stacks of ballots through the tabulators: . . . .
>
> The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video . . . .
>
> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.
>
> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.[151]

The article again included an appeal for funds to fund Defendants' costs in litigating this suit, which they characterized as an "assault."

162. On May 4, 2022, *The Gateway Pundit* published an article titled "Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award." In

---

[151] Patty McMurray, *WTH? John F. Kennedy Library Foundation Lumps President Zelensky In With Pack of Election Crooks, Cowards and Liars In Latest "Profile in Courage" Awards*, Gateway Pundit (Apr. 22, 2022, 11:05 AM), https://www.thegatewaypundit.com/2022/04/wth-john-f-kennedy-library-foundation-lumps-president-zelensky-pack-election-crooks-cowards-liars-latest-profile-courage-awards/. A true and correct copy of this article is attached as Exhibit 59.

70

addition to the false and defamatory claim that Ms. Moss engaged in voter fraud as a "ballot harvester," the article expressed incredulity that the JFK Foundation would present this award to Plaintiff Moss for "'protecting democracy.'" Further, the article twisted the ramifications of *The Gateway Pundit*'s falsely accusing Ms. Moss of voter fraud as instead just being "backlash from being caught on camera ballot harvesting."[152]

163.    On June 16, 2022, counsel sent Defendants a third letter demanding that they correct and retract their additional defamatory statements, including those described above, some of which post-dated Plaintiff's second retraction letter.[153]

164.    As of the date of this filing, Defendants have not responded to that letter, either, or taken any action to correct or retract their false stories.

I.    **Defendants Caused Substantial Reputational Harm With Their False Statements About Ms. Freeman and Ms. Moss That Constitute Defamation *Per Se***

165.    Defendants falsely stated or implied that (a) Ms. Freeman and Ms. Moss planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden; (b) Ms. Freeman and Ms. Moss helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center; (c) Ms. Freeman and Ms. Moss engaged in a criminal conspiracy to exclude observers during the counting of ballots so that they could engage in election fraud; (d) Ms. Freeman and Ms. Moss criminally introduced "suitcases" of illegal ballots into the ballot counting process when no observers were present; (e) Ms. Freeman fraudulently triple-counted the

---

[152] Alicia Powe, *Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award*, Gateway Pundit (May 4, 2022, 1:03 PM), https://www.thegatewaypundit.com/2022/05/stunning-ballot-havester-shaye-moss-receives-john-f-kennedy-profile-courage-award/. A true and correct copy of this article is attached as Exhibit 60.

[153] A true and correct copy of this letter is attached as Exhibit 61.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

same ballots by running them through a tabulator three times; and (f) Ms. Freeman and Ms. Moss committed election fraud and other crimes for which they are subject to arrest and imprisonment. These claims are false and constitute defamation *per se*.

166.  Given the nature of Plaintiffs' employment with the Registration and Elections Department of Fulton County, Defendants' claims that Ms. Freeman and Ms. Moss participated in a conspiracy to fraudulently overturn a democratic election would tend to injure them in their trade, office, or profession: a reputation for integrity is a requirement for workers in a profession whose responsibility is to accurately and legitimately tabulate and report elections results while maintaining public confidence in elections.

167.  Defendants also stated that Ms. Freeman and Ms. Moss participated in criminal activity punishable by law. Defendants labeled both Ms. Freeman and Ms. Moss as "crook[s]" and claimed that "nobody did more to steal the election for Joe Biden than this mother-daughter combo."[154] Defendants asserted that the actions of Ms. Freeman and Ms. Moss were "illegal" and that "the Georgia police or Bill Barr's DOJ may want to pay Ruby Freeman a visit."[155]

168.  Published on a website with nearly three million unique visitors per month, Defendants' stories did cause and continue to cause substantial reputational harm to Ms. Freeman and Ms. Moss.

169.  Defendants are directly responsible for the reputational harm that Ms. Freeman and Ms. Moss experienced. Though the initial claims by the Trump legal team

---

[154] Ex. 8.

[155] Ex. 3.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

were based only on short selections of security footage and did not name any individual Fulton County election workers, "[t]he Gateway Pundit was first to identify Ruby Freeman [and] her daughter Wandrea "Shaye" Moss . . . in the infamous suitcase ballot hoist [sic]," as the Defendants themselves boast.[156]

## J.   Impact of Defendants' Campaign Against Ms. Freeman and Ms. Moss

170.   Defendants repeatedly published the full names of Ms. Freeman and Ms. Moss, in addition to numerous images of Ms. Freeman and Ms. Moss, the name of Ms. Freeman's business, and Ms. Freeman's social media account information. In so doing, Defendants were fully aware that their readers would target Ms. Freeman and Ms. Moss in response to their stories. Defendants even urged their readers not to "confuse [Ms. Freeman's business] with a similar business in Snellville!"[157]

171.   As a direct result of Defendants' campaign of lies, Ms. Freeman and Ms. Moss began receiving—almost immediately—an onslaught of extremely violent and graphic threats and dangerous harassment.

Ms. Freeman

172.   As Defendants' false accusations began to spread across the internet, Ms. Freeman received at least 420 emails and seventy-five text messages, including one that read, "We know where you live, we coming to get you."

173.   Ms. Freeman sought intervention from the local police; a local officer answered more than twenty harassing calls on Ms. Freeman's cell phone. Despite these efforts, Ms. Freeman was ultimately forced to change her phone number and email address.

---

[156] Ex. 19.

[157] Ex. 6.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

174. On multiple occasions, strangers camped out at Ms. Freeman's home and/or knocked on her door. When Ms. Freeman was not home or would not answer the door, these strangers would sometimes also harass her neighbors. Strangers were coming to her home so frequently that the local police agreed to add her address to their patrols of the area.

175. During this time, numerous pizza deliveries showed up at her home that she and her family had never ordered. This is an often-chronicled result of being "doxxed"— the term for when strangers post and share a target's personal information as a means to organize a coordinated harassment campaign.

176. Christmas cards were mailed to Ms. Freeman's address with messages like, "Ruby please report to the FBI and tell them you committed voter fraud. If not you will be sorry," and "You deserve to go to jail, you worthless piece of shit whore."

177. The level of harassment Ms. Freeman received at her home led the FBI to conclude that she would not be safe in her home on beginning on January 6, 2021, the date of former President Trump's infamous rally and the subsequent insurrection at the U.S. Capitol, and continuing at least through Inauguration Day, January 20, 2021.

178. On January 6, 2021, a crowd surrounded Ms. Freeman's house, some on foot, some in vehicles, others equipped with a bullhorn. Fortunately, Ms. Freeman had followed the FBI's advice and had temporarily relocated from her home. She was not able to return for two months.

179. Since returning home, Ms. Freeman has had to purchase eleven cameras and three motion sensors in an effort to safeguard her own home.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

180.    Ms. Freeman was also forced to deactivate the social media pages for herself and her business, Lady Ruby's Unique Treasures, a pop-up clothing boutique. Though she has long been a local entrepreneur, she was forced to shutter her business when she was unable to attend public events or conduct online marketing through social media.

181.    The reputational impacts of Defendants' lies continue to be felt across Ms. Freeman's social and professional networks. After being publicly accused of crimes, she has lost friendships.

182.    When people recognize her in public and call out her name, Ms. Freeman is fearful. Her experiences over the months since *The Gateway Pundit*'s defamation campaign began have taught Ms. Freeman to be distrustful of strangers and concerned for her safety.

183.    The stress of this period also took a toll on Ms. Freeman's body, including manifesting through stress-related dental injuries.

184.    To this day, Ms. Freeman continues to receive threatening communications referencing Defendants' defamation. On November 13, 2021, she received an email accusing her of treason, insinuating she would soon be serving jail time, and including a link to an article about election fraud in Georgia from *The Gateway Pundit.*

Ms. Moss

185.    The day after *The Gateway Pundit*'s campaign of falsehoods began, Ms. Moss's then fourteen-year-old son informed her that numerous calls were coming into Ms. Moss's old phone, which he was using at the time. When he answered the calls, he was bombarded with racial slurs and threats of violence. One caller stated that her son "should hang alongside [his] nigger momma." Her son fielded these harassing calls for months.

75

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

186.    Defendants' defamation also caused Ms. Moss to suffer an onslaught of online harassment. She received dozens of messages through Facebook, LinkedIn, and Pinterest, many of which threatened violence. These messages did not merely suggest Ms. Moss lose her job but insisted that she deserved to die and would be killed in retribution for her "treason." She has since deleted her Pinterest and LinkedIn accounts.

187.    Because Ms. Moss had previously lived with her grandmother, it was her grandmother's address that harassers found and exploited. As they did with Ms. Freeman, these harassers repeatedly sent unwanted pizzas to Ms. Moss's grandmother's house.

188.    On at least two occasions, strangers showed up at her grandmother's home and attempted to push into the house in order to make a "citizens' arrest." On these occasions, Ms. Moss's grandmother, who is in her mid-seventies, called her in a panic, confused and scared for her safety.

189.    The impacts of Defendants' lies also followed Ms. Moss at work. The general email addresses used by the public to contact the Fulton County elections offices would forward incoming emails to Ms. Moss and many of her colleagues. As a result, Ms. Moss and her colleagues received, directly in their work inboxes, harassing emails sent to those public email addresses.

190.    Inspired by the demonstrably false conspiracy theory pushed by Defendants, people also protested about Ms. Moss outside of her Fulton County workplace, demanding she be fired from her job.

191.    This whirlwind of negative attention around Ms. Moss left her feeling fearful and ashamed in an office where she has worked since 2012. Before the 2020 general election, she generally enjoyed the parts of her job that allowed her to work with and assist

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

the public. Since then, even when she was assisting constituents over the phone, she would sweat and feel anxious if they asked her name. She was afraid that when people heard her name, they would think she is a fraud and a cheater.

192.    Ms. Moss left her position working at Fulton County elections in April 2022.

193.    Like her mother, Ms. Moss is now fearful whenever people recognize her in public. As a result, Ms. Moss has largely retreated from social and public life. She has gone as far as to avoid the grocery store, opting to have groceries delivered in order to avoid it. She feels trapped by the unshakable fear that there are unknown people after her who want her dead.

194.    Over the last year, Ms. Moss has suffered from disrupted sleep and has gained fifty pounds as a result of the stress caused by Defendants' campaign of lies.

195.    The onslaught of threats that Plaintiffs have experienced and the necessary measures they have been forced to take to protect themselves are the direct result of Defendants' defamatory conduct. Plaintiffs have and will continue to experience serious and severe emotional distress as a result. The harm Defendants have caused to Plaintiffs' reputations, privacy, safety, and earnings and other pecuniary loss is immense.

## **FIRST CLAIM**
### **(Defamation of Ms. Freeman)**

196.    Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

197.    Beginning on December 3, 2020, Defendants published a series of false and defamatory statements of fact about Ms. Freeman, including by and through *The Gateway*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

*Pundit*'s own agents making the statements themselves; and by republishing the statements on *The Gateway Pundit*'s website and social media accounts, and the social media accounts of its agents, as detailed extensively above. Those statements include, but are not limited to, the following non-exhaustive list:

a) In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statements, which they republished verbatim on December 3, 2020, at 2:29 p.m.:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.
>
> …
>
> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.

b) In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statement, which they republished verbatim or nearly verbatim nine (9) times on December 3, 2020 at 2:29 p.m. and 8:49 p.m.; December 4, 2020 at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; December 7, 2020 at 7:15 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m; and May 4, 2022 at 1:03 p.m.[158]:

> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!

---

[158] The December 3, 2020, 2:29 p.m. article added the additional defamatory statement: "They were caught cheating!" The December 8, 2020, 1:11 p.m. article added the additional defamatory statement: "A few liberal election 'workers' stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room!" The May 4, 2022, 1:03 p.m. article omitted the opening phrase "A few 'workers' stayed behind and were seen."

c) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim eighteen (18) times on December 4, 2020 at 7:35 a.m., 8:53 a.m., 1:51 p.m., and 5:45 p.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 7:15 a.m. and 8:29 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; June 7, 2021 at 9:43 p.m.; June 14, 2021 at 10:33 a.m.; August 14, 2021 at 9:15 a.m.; September 20, 2021 at 3:30 p.m.; and May 4, 2022 at 1:03 p.m.[159]:

> Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.

d) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim five (5) times on December 4, 2020, at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; December 7, 2020, at 7:15 a.m.; and December 8, 2020, at 7:20 a.m.:

> We identified one of the operatives [last/Thursday] night who was caught on video counting illegal ballots from a suitcase stashed under a table!

e) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim four (4)

---

[159] The December 3, 2020, 8:49 p.m.; December 4, 2020, 5:45 p.m.; and May 4, 2022, 1:03 p.m., articles added the additional defamatory statement "What's Up, Ruby? . . . BREAKING: CROOKED OPERATIVE Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED."

79

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

times on December 4, 2020, at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; and

December 8, 2020, at 7:20 a.m.:

> As you can see from the video one woman in a purple top was filmed helping pull out the ballots and then sitting down to count the ballots.

f) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statements, which they republished four (4) times on December 4, 2020, at 7:35 a.m., 8:53 a.m.,[160] and 1:51 p.m.[161]; and December 8, 2020, at 7:20 a.m.:

> One woman in the video is wearing a purple top. She later appeared in the suitcase video!
>
> The woman in the purple made a mistake and left her purse on her desk advertising her business.
>
> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.
>
> Her T-shirt says "Lady Ruby" and her purse says, "LaRuby" which is her company.
>
> This was not a very smart move.
>
> Her company is called "LaRuby's Unique Treasures." It's on her LinkedIn page!
>
> Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.

---

[160] The December 4, 2020, 8:53 a.m. article's republication deletes the following sentences: "The woman in the purple made a mistake and left her purse on her desk advertising her business," and "It's on her LinkedIn page!"

[161] The December 4, 2020, 1:51 p.m. article's republication deletes the following sentences: "Her T-shirt says 'Lady Ruby' and her purse says, 'LaRuby' which is her company. This was not a very smart move. Her company is called 'LaRuby's Unique Treasures.' It's on her LinkedIn page!"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

They then commented on her LinkedIn page.[162]

g) Defendants end their December 3, 2020, article published at 8:49 p.m. with the following false statements:

> Maybe the Georgia police or Bill Barr's DOJ may want to pay Ruby Freeman a visit.
>
> …
>
> CROOK GETS CAUGHT

h) In their December 4, 2020, article published at 8:53 a.m., Defendants made the following false statements, which they republished verbatim on June 19, 2021, at 8:31 p.m.:

> Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.
>
> Ruby walks by several boxes of ballots just sitting around in the room.
>
> The elections workers were each given their own secret cube.
>
> Then Ruby goes to her desk and pulls out a tray of ballots on her desk.
>
> There is NO supervisor or GOP observer anywhere in sight. And then Ruby leaves the ballots on her desk as she goes to take a break.
>
> This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.

i) In their December 4, 2020, article published at 1:51 p.m., Defendants made the following false statements:

---

[162] The original publication of this article added that "Ruby Freeman still has an active Facebook page (as of 11 PM on Thursday night)," while republications noted that Freeman's Facebook account was no longer active.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.
>
> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other. It sure looks like they were trying to hide this transaction.

j) In their December 4, 2020, article published at 3:25 p.m., Defendants made the following false statements:

> Mother-Daughter Duo's Election Fraud Scam . . .
>
> [T]he mother-daughter duo in Atlanta began messing with ballots in secret.

k) In their December 4, 2020, article published at 5:45 p.m., Defendants made the following false statements, which they substantially republished twenty (20) times on December 6, 2020 at 8:15 a.m.; December 23, 2020 at 8:10 a.m. and 11:05 a.m.; January 2, 2021 at 7:30 a.m.; March 25, 2021 at 7:25 p.m.; May 21, 2021 at 12:34 p.m.; May 22, 2021 at 9:05 a.m.; June 6, 2021 at 7:53 a.m.; June 8, 2021 at 11:57 a.m.; June 11, 2021 at 3:03 p.m.; June 18, 2021 at 8:00 a.m.; June 19, 2021 at 10:20 a.m.; June 20, 2021 at 7:15 a.m.; July 10, 2021 at 8:20 a.m.; July 14, 2021 at 7:30 a.m.; December 2, 2021 at 12:42 p.m.; December 3, 2021 at 12:02 p.m.; December 8, 2021 at 7:41 p.m.; December 25, 2021 at 12:25 p.m.; and April 22, 2022 at 11:05 a.m.[163]:

> UNBELIEVABLE: Anti-Trump Democrat in Georgia 'Suitcase Scandal' Caught running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)

---

[163] The republications each added the additional defamatory statement "What's Up, Ruby? . . . BREAKING: CROOKED OPERATIVE Filmed Pulling Out Suitcases of Ballots in Georgia." Further, three other articles republished only the first defamatory statement about Ms. Freeman being "[c]aught" in the "'[s]uitcase [s]candal'": June 8, 2021, at 11:57 a.m.; June 19, 2021, at 10:20 a.m.; and June 20, 2021, at 7:15 a.m.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.

l)   In their December 4, 2020, article published at 5:45 p.m., Defendants also made the following false statements:

> We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]

> Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.

> The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.

m) In their December 6, 2020, article published at 8:15 a.m., Defendants also made the following false statements:

> [T]he secret suitcase ballots were pulled out from their hiding place under the tables.

> They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.

n)  In their December 6, 2020, article published at 6:35 p.m., Defendants made the following false statements, which they republished on December 6, 2020, at 9:23 p.m. and December 7, 2020, at 8:29 a.m.:

> Next it was uncovered that a mother and daughter team [, Ruby Freeman and her daughter "Shaye" Moss] as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were pulled out from under a table that were previously covered up and processed with no Republican observers.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The mother – daughter team have become infamous in the annals of voter corruption[.]

o) In their December 7, 2020, article published at 8:29 a.m., Defendants made the following false statements, which they republished verbatim on December 8, 2020, at 8:59 a.m. and republished in part on December 23, 2020, at 8:40 a.m.[164]:

> Ralph Jones, Sr. was identified as the third suspect in the Fulton County Georgia suitcase scandal.
>
> ** Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> ** Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.
>
> ...
>
> They sent everyone home!
>
> ...
>
> ** The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.
>
> ** Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.
>
> ** It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.

---

[164] The December 8, 2020, 8:59 a.m. article shortens the final sentence to read, "It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud." The December 23, 2020, 8:40 a.m. article includes the first two sentences and ends with "** Ralph and his team plotted to remove ALL elections observers."

** It appears this was a conspiracy to lie to the public including local news, to remove observers from the center and then to commit their hidden suitcase ballot fraud.

p) Defendants end their December 7, 2020, article published at 8:29 a.m. with

the following false statements:

We know [the alleged pipe burst at State Farm Arena] was a lie because there was NEVER a work order filed and the water department never received a call.

It never happened!

But it gave Ralph and Ruby and Shaye cover to complete their scam on Georgia and America!

q) In their December 8, 2020, article published at 7:20 a.m., Defendants made

the following false statements:

Shaye told everyone to go home.

Then Shaye, her mother and a couple others including Ralph Jones, Sr. were filmed taking "suitcases" of ballots hidden under a table out to be tabulated. This was right before Joe Biden got his surprise spike in ballots.

And now the liberal media and their fake "fact-checkers" are lying about the incredible incident caught on video!

r) In their December 15, 2020, article published at 9:19 a.m., Defendants made

the following false statements:

We even HAVE VIDEO of Democrats at work stealing votes from the people of Georgia. . . .

Has anyone questioned Ruby Freeman or her daughter?

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

s) In their December 23, 2020, article published at 8:10 a.m., Defendants made the following false statements, which they republished on December 23, 2020, at 11:05 a.m. and January 2, 2021, at 7:30 a.m.[165]:

> President Trump tweeted a Gateway Pundit video where we identified Georgia ballot workers jamming ballots into tabulators multiple times [late on election night].
>
> . . .
>
> We shared this video on December 4, when we pointed out that one of the participants in the [ballots under the desk scandal / suitcase ballot hoist] grabbed the ballots and started jamming the ballots into the Dominion tabulators three times.
>
> Georgia's results are a total fraud. The Democrats using people like these poll workers stole the election for Joe Biden.

t) In their December 23, 2020, article published at 8:40 a.m., Defendants made the following false statement, which they republished on January 3, 2021, at 6:20 p.m.; January 7, 2021, at 3:14 p.m.; January 17, 2021, at 6:33 p.m.; and June 6, 2021, at 7:53 a.m.[166]:

> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].

---

[165] The article on December 23, 2020, at 11:05 a.m. omits the last paragraph and the article on January 2, 2021, includes only the line "Georgia's results are a total fraud" from the last paragraph.

[166] The articles on December 23, 2020, at 8:40 a.m. and June 6, 2021, at 7:53 a.m. added the additional defamatory statement "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

u)  In their December 23, 2020, article published at 8:40 a.m., Defendants also made the following false statements, which they largely republished on January 17, 2021, at 6:33 p.m.[167]:

> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
>
> ...
>
> Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist [sic]. Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist [sic]!
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.
>
> They were able to flip Georgia for Beijing Biden by their actions.
>
> Why is the FBI or DOJ not involved?
>
> This tells you everything you need to know about your federal government.

v)  In their December 26, 2020, article published at 7:34 p.m., Defendants made the following false statements:

> [T]he documentary and video evidence show that thousands of votes were illegally counted in Fulton County, Georgia. Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation

---

[167] The January 17, 2021, 6:33 p.m. article included all but the last three sentences of these defamatory statements.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.

The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.

w) In their January 1, 2021, article published at 9:58 a.m., Defendants made the following false statements:

We have individuals dragging ballots out from under the tables in Georgia on election night on video and yet none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of.

x) In their January 2, 2021, article published at 7:30 a.m., Defendants made the following false statement, which they republished on May 21, 2021, at 12:34 p.m. and June 19, 2021, at 10:20 a.m.:

ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!

y) In their January 3, 2021, article published at 6:20 p.m., Defendants made the following false statements, which they republished in part on June 6, 2021, at 7:53 a.m. and June 20, 2021, at 10:30 a.m.[168]:

President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break.

---

[168] The republished portion in the two subsequent articles quotes the headline that "'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal!"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.

z) In their January 5, 2021, article published at 9:20 a.m., Defendants made

the following false statement, which they republished verbatim on January

5, 2021, at 1:02 p.m.:

> Sterling misled his audience, defended the corrupt and likely criminal conduct at the State Farm Center on election night [and] defended [elections worker] Ruby Freeman for passing hundreds of ballots through a ballot counting machines at least three times.

aa) In their January 17, 2021, article, published at 6:33 p.m., Defendants made

the following false statements:

> FIVE MOST SIGNIFICANT ACTS OF FRAUD IN THE 2020 ELECTION:
>
> 1.) The Georgia Late Night Hidden Suitcase Heist:

bb) In their June 6, 2021, article published at 7:53 a.m., Defendants made the

following statements:

> Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?
>
> After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving stacks of ballots through the machines two and three times each.
>
> In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on Election night:

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

. . .

The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.

. . .

We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.

. . .

cc) In their June 7, 2021, article published at 9:43 p.m., Defendants made the following false statements, which they republished on June 14, 2021, at 10:33 a.m. and June 18, 2021, at 8:00 a.m.[169]:

Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. [Our source caught Ruby Freeman in the purple shirts scanning / Ruby Freeman was caught on tape running] the same stack of suspect ballots through the machines multiple times

dd) In their June 18, 2021, article published at 8:00 a.m., Defendants made the following false statements, which they substantially republished on June 18, 2021, at 11:06 a.m. and June 19, 2021, at 10:20 a.m.[170]:

A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night. Top Atlanta election official Ralph Jones was also double scanning ballots late at night at the State Farm Center in Atlanta, Georgia on election night.

. . .

---

[169] The June 7, 2021, 9:43 p.m. article added the additional defamatory statement "BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night is Subpoenaed."

[170] The second two articles republish only the first of these two paragraphs.

90

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Ralph Jones was the person who sent home all of the election observers. Then his crew, including Ruby and daughter Shaye, went to work on election night!

. . .

ee) In their June 18, 2021, article published at 8:00 a.m., Defendants made the following additional false statement, which they republished seven (7) times, on June 18, 2021, at 11:06 a.m., December 2, 2021, at 12:42 p.m., December 3, 2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., December 25, 2021, at 12:25 p.m., April 22, 2022, at 11:05 a.m., and May 4, 2022, at 1:03 p.m.:

> The Gateway Pundit was [also] first to [report / reveal] that Ruby Freeman was [also] [caught on video shoving / seen scanning / seen double scanning] stacks of ballots [up to three / through the voting machines numerous] times [at the State Farm Center in Atlanta, Georgia / late at night] after [all of the election] observers were sent home [on election night].

ff) In their June 18, 2021, article published at 11:29 a.m., Defendants made the following false statement:

> Shaye is the daughter of Ruby Freeman who was filmed feeding the same stacks of ballots through voting machines late at night at the center – after observes [sic] were sent home.

gg) In their June 19, 2021, article published at 10:20 a.m., Defendants made the following false statement:

> [W]e reported on Fulton County Georgia poll worker Ruby Freeman pushing multiple ballots through the vote tabulators multiple times. This was illegal.

91

hh) In their June 19, 2021, article published at 8:31 p.m., Defendants made the

following false statements:

> This follows news first reported by The Gateway Pundit that election operative Ruby Freeman was also caught tripe [sic] counting stacks of votes late at night at the counting center after GOP observers were sent home.

> It was a carefully planned event!

> They had NO IDEA they would get caught!

> On December 4th TGP reported with video on anti-Trump ballot counter Ruby Freeman working in a private cube with trays of ballots, walking past open boxes of ballots, working alone with NO ELECTION OBSERVERS IN SIGHT! This is the DEFINITION OF CHEATING!

> …

> The Democrat operatives were running a voter fraud factory inside the State Farm Center on Election Day and into Election Week!

ii) In their June 24, 2021, article published at 8:35 p.m., Defendants made the

following false statements:

> Fulton County is home to the infamous Ruby Freeman and her daughter Shaye Moss who were caught pulling ballot boxes from under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.

> . . .

> If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?

> This is not how innocent people act. They are hiding something in Fulton County, Georgia.

92

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

jj) In their July 14, 2021, article published at 9:19 p.m., Defendants made the following false statements:

> That a Fulton County election official – identified by The Gateway Pundit as Ruby Freeman – was feeding stacks of ballots through the voting machines at least three times each on November 4th in the early morning after GOP election observers were told to go home.
>
> . . .
>
> ** Dec. 4, 2020- Anti-Trump Democrat in Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator       THREE TIMES! (VIDEO)

kk) In their August 14, 2021, article published at 9:15 a.m., Defendants made the following false statements:

> We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.
>
> This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.
>
> We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.
>
> …
>
> This is not good for Ruby and her daughter.
>
> It's also pathetic that these two are not in jail already. Their crimes were videotaped!

ll) In their September 25, 2021, article published at 7:10 a.m., Defendants made the following false statements:

Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.

. . .

Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.

mm)     In their December 2, 2021, article published at 12:42 p.m., Defendants made the following false statements, which they republished on December 3, 2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., and April 22, 2022, at 11:05 a.m.[171]:

The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video at the State Farm Arena in Atlanta Georgia on November 3rd and the morning of November 4th.

The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.

The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.

nn) In their December 8, 2021, article published at 8:50 p.m. with embedded audio, Defendants made the following false statements:

Joe Hoft:        That night . . . I don't know if you remember the news first came out that night, and was saying there was a water main break and they needed to stop counting in Georgia. Remember that? . . . And then we were

---

[171] The December 8, 2021, 7:41 p.m. article elaborated on typical election procedures with an additional defamatory statement: "The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race. We disagree."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

told later that was a lie and it never happened. And then they said it happened in the morning. And then apparently they just kind of tried to say it never happened.

. . .

There was no water main break. . . . So, that was a lie.

So what happened then was they shut down for the night at 10:30. Now everybody else is thinking, wait a minute, I thought we counted until the election was done. I didn't think we were going to take shifts here, you know, go to bed. . . . So they decide to shut down. And there's evidence that they were doing that.

And then what happened is five people stuck around. Now, I know at least three of them are Black. And it doesn't matter.  To me, it doesn't matter. I don't care if they were . . .

So these people stuck around, and they decided to pull ballots out from underneath the tables. Do you remember this story? Did you see that video? . . . Everybody saw it. The video came out, they pulled these ballots out from underneath the tables, and in suitcases, and then they opened them up, and they started shoving them through the tabulators.

. . .

Now later they're trying to say this is normal.

. . .

I mean, do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?

198.    The defamatory meanings of Defendants' false statements are apparent from the face of the publications, refer to Ms. Freeman by name, are accompanied by images of Ms. Freeman, and/or are understood to be about her.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

199.    The statements authored and published by Defendants about Ms. Freeman are reasonably understood to state or imply that she:

   a)   Planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden;

   b)   Helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center;

   c)   Engaged in a criminal conspiracy to exclude observers during the counting of ballots so that election fraud could be committed;

   d)   Criminally introduced illegal ballots taken from the hidden suitcases into the ballot counting process when no observers were present;

   e)   Fraudulently triple-counted ballots by running them through a tabulator three times; and

   f)   Committed election fraud and other crimes for which she is subject to arrest and imprisonment.

200.    Each of these statements and implications is false and defamatory.

201.    Each of these statements was read by millions of visitors to *The Gateway Pundit* website, as well as social media users who read social media posts shared by Defendants.

202.    Each of these false statements was published with actual malice, *i.e.*, with knowledge of its falsity or with reckless disregard as to its truth.

203.    Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible basis for the false allegations made; and published their allegations in a manner to create false inferences.

204.    Defendants had both political and financial motives for promulgating lies about Plaintiffs.

96

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

205.    Defendants did not neutrally report the allegations about Ms. Freeman that were advanced by Trump lawyers and promptly disproven by Georgia election officials. Rather, they endorsed and adopted the allegations as their own, publishing and republishing them for months with full knowledge of their falsity or reckless disregard for their truth.

206.    Defendants had no applicable privilege or legal authorization to make these false and defamatory statements, or if they did, they abused it.

207.    Defendants repeated and embellished the false accusations without ever attempting to verify them and invented and published defamatory lies about Ms. Freeman without once seeking comment from her.

208.    Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

209.    Defendants have never corrected or retracted their defamatory statements, and those statements remain published on *The Gateway Pundit* to this day. Even after Plaintiffs specifically requested that Defendants correct and retract their defamatory statements, Defendants took no action to correct or retract and only published additional defamatory statements, further evidencing their actual malice.

210.    Defendants' statements and implications about Ms. Freeman constitute defamation *per se* in that they damaged her in her trade, office, or profession and claimed that she participated in criminal activity punishable by law and labeled her a "crook."

211.    Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Freeman harm.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

212.    Defendants' statements damaged Ms. Freeman's reputation in the general public, in her profession, in her neighborhood, and with friends, relatives, and neighbors.

213.    As a direct and proximate result of Defendants' conduct, Ms. Freeman has suffered significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss. Among other things, Ms. Freeman lost income when she was forced to shutter her online business.

## SECOND CLAIM

### (Defamation of Ms. Moss)

214.    Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

215.    Beginning on December 3, 2020, Defendants published a series of false and defamatory statements of fact about Ms. Moss, including by and through *The Gateway Pundit*'s own agents making the statements themselves; and by republishing the statements on *The Gateway Pundit*'s website and social media accounts, and the social media accounts of its agents, as detailed extensively above. Those statements include, but are not limited to, the following non-exhaustive list:

    a)  In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statements, which they republished verbatim on December 3, 2020, at 2:29 p.m.:

> Poll watchers were kicked out of the State Farm Arena
> tabulation center on election night after a burst pipe caused
> flooding.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

…

> We now know that a pipe never burst. It was all a lie in order
> to kick out poll watchers while a few crooks stayed behind
> to count illegal ballots for Joe Biden.

b) In a December 3, 2020, article published at 1:11 p.m., Defendants made the following false statement, which they republished verbatim or nearly verbatim nine (9) times on December 3, 2020, at 2:29 p.m. and 8:49 p.m.; December 4, 2020, at 7:35 a.m., 8:53 a.m., 1:51 p.m.; December 7, 2020, at 7:15 a.m.; and December 8, 2020, at 7:20 a.m. and 1:11 p.m.; and May 4, 2022, at 1:03 p.m. [172]:

> A few "workers" stayed behind and were seen pulling
> suitcases full of ballots out from under tables to be tabulated!

c) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim eighteen (18) times on December 4, 2020 at 7:35 a.m., 8:53 a.m., 1:51 p.m., and 5:45 p.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 7:15 a.m. and 8:29 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; June 7, 2021 at 9:43 p.m.; June 14, 2021 at 10:33 a.m.; August

---

[172] The December 3, 2020, 2:29 p.m. article added the additional defamatory statement: "They were caught cheating!" The December 8, 2020, 1:11 p.m. article added the additional defamatory statement: "A few liberal election 'workers' stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room!" The May 4, 2022, 1:03 p.m. article omitted the opening phrase "A few 'workers' stayed behind and were seen."

99

14, 2021 at 9:15 a.m.; September 20, 2021 at 3:30 p.m.; and May 4, 2022 at 1:03 p.m.[173]:

> Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.

d) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim on December 4, 2020, at 7:35 a.m.:

> Local 11 News covered the story from the State Farm Arena that a pipe had burst. (This later was proven to be complete fraud and an excuse to kick out the GOP election observers!)

e) In their December 4, 2020, article published at 7:35 a.m., Defendants made the following false statement, which they republished verbatim on December 8, 2020, at 7:20 a.m.:

> "Shaye" [was] the woman in blonde [pigtails/braids] [who was filmed] removing suitcases of ballots from under a table after GOP observers were evacuated from the room and told to go home.

f) In their December 4, 2020, article published at 1:51 p.m., Defendants made the following false statements:

> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.

> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other.

---

[173] The articles on December 4, 2020 at 7:35 a.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 8:29 a.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; August 14, 2021 at 9:15 a.m.; and September 20, 2021 at 3:30 p.m. add the additional defamatory statement: "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED – IT'S RUBY'S DAUGHTER! (Video)."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

It sure looks like they were trying to hide this transaction.

g)   In their December 4, 2020, article published at 3:25 p.m., Defendants made

the following false statements:

> Mother-Daughter Duo's Election Fraud Scam . . .
>
> [T]he mother-daughter duo in Atlanta began messing with ballots in secret.

h)   In their December 4, 2020, article published at 5:45 p.m., Defendants made

the following false statements, which they republished verbatim eighteen

(18) times on December 6, 2020 at 8:15 a.m.; December 23, 2020 at 8:10

a.m. and 11:05 a.m.; January 2, 2021 at 7:30 a.m.; March 25, 2021 at 7:25

p.m.; May 21, 2021 at 12:34 p.m.; May 22, 2021 at 9:05 a.m.; June 6, 2021

at 7:53 a.m.; June 11, 2021 at 3:03 p.m.; June 18, 2021 at 8:00 a.m.; June

19, 2021 at 10:20 a.m.; July 10, 2021 at 8:20 a.m.; July 14, 2021 at 7:30

a.m.; December 2, 2021 at 12:42 p.m.; December 3, 2021 at 12:02 p.m.;

December 8, 2021 at 7:41 p.m.; December 25, 2021 at 12:25 p.m.; and April

22, 2022 at 11:05 a.m.:

> The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.

i)   In their December 4, 2020, article published at 5:45 p.m., Defendants also

made the following false statements:

> We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]

101

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.

The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.

j)  In their December 6, 2020, article published at 8:15 a.m., Defendants also made the following false statements:

[T]he secret suitcase ballots were pulled out from their hiding place under the tables.

They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.

k)  In their December 6, 2020, article published at 6:35 p.m., Defendants made the following false statements, which they republished on December 6, 2020, at 9:23 p.m. and December 7, 2020, at 8:29 a.m.:

Next it was uncovered that a mother and daughter team [, Ruby Freeman and her daughter "Shaye" Moss] as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were pulled out from under a table that were previously covered up and processed with no Republican observers.

The mother – daughter team have become infamous in the annals of voter corruption[.]

l)  In their December 7, 2020, article published at 7:15 a.m., Defendants made the following false statements:

And [Ruby's] daughter Wandrea "Shaye" Moss was later identified as her supervisor who was helping cart out the hidden ballots in the suitcases to be counted after all of the GOP observers and media was sent home for a "water main" break.

102

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

It was all a fraud.

m) In their December 7, 2020, article published at 8:29 a.m., Defendants made the following false statements, which they republished verbatim on December 8, 2020, at 8:59 a.m. and republished in part on December 23, 2020, at 8:40 a.m.[174]:

> Ralph Jones, Sr. was identified as the third suspect in the Fulton County Georgia suitcase scandal.
>
> ** Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> ** Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.
>
> ...
>
> They sent everyone home!
>
> ...
>
> ** The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.
>
> ** Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.
>
> ** It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.
>
> ** It appears this was a conspiracy to lie to the public including local news, to remove observers from the center and then to commit their hidden suitcase ballot fraud.

---

[174] The December 8, 2020, 8:59 a.m. article shortens the final sentence to read, "It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud." The December 23, 2020, 8:40 a.m. article includes the first two sentences and ends with "** Ralph and his team plotted to remove ALL elections observers."

n)  Defendants end their December 7, 2020, article published at 8:29 a.m. with

the following false statements:

> We know [the alleged pipe burst at State Farm Arena] was a
> lie because there was NEVER a work order filed and the
> water department never received a call.
>
> It never happened!
>
> But it gave Ralph and Ruby and Shaye cover to complete
> their scam on Georgia and America!

o)  In their December 8, 2020, article published at 7:20 a.m., Defendants made

the following false statements:

> Shaye told everyone to go home.
>
> Then Shaye, her mother and a couple others including Ralph
> Jones, Sr. were filmed taking "suitcases" of ballots hidden
> under a table out to be tabulated. This was right before Joe
> Biden got his surprise spike in ballots.
>
> And now the liberal media and their fake "fact-checkers" are
> lying about the incredible incident caught on video!

p)  In their December 15, 2020, article published at 9:19 a.m., Defendants made

the following false statements:

> We even HAVE VIDEO of Democrats at work stealing
> votes from the people of Georgia.
>
> . . .
>
> Has anyone questioned <u>Ruby Freeman or her daughter</u>?

q)  In their December 23, 2020, article published at 8:40 a.m., Defendants made

the following false statements, which they republished on January 3, 2021,

104

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

at 6:20 p.m.; January 7, 2021, at 3:14 p.m.; January 17, 2021, at 6:33 p.m.;

and June 6, 2021, at 7:53 a.m.[175]:

> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].

r)   In their December 23, 2020, article published at 8:40 a.m., Defendants also made the following false statements, which they largely republished on January 17, 2021, at 6:33 p.m.[176]:

> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
> ...
> Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist.
>
> Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist[sic]!
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.
>
> They were able to flip Georgia for Beijing Biden by their actions.
>
> Why is the FBI or DOJ not involved?

---

[175] The articles on December 23, 2020, at 8:40 a.m. and June 6, 2021, at 7:53 a.m. added the additional defamatory statement "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?"

[176] The January 17, 2021, 6:33 p.m. article included all but the last three sentences of these defamatory statements.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

This tells you everything you need to know about your federal government.

s) In their December 26, 2020, article published at 7:34 p.m., Defendants made the following false statements:

> [T]he documentary and video evidence show that thousands of votes were illegally counted in Fulton County, Georgia. Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.
>
> The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.

t) In their January 1, 2021, article published at 9:58 a.m., Defendants made the following false statements:

> We have individuals dragging ballots out from under the tables in Georgia on election night on video and yet none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of.

u) In their January 3, 2021, article published at 6:20 p.m., Defendants made the following false statements:

> President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break. Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

v)  In their January 17, 2021, article, published at 6:33 p.m., Defendants made

the following false statements:

> FIVE MOST SIGNIFICANT ACTS OF FRAUD IN THE
> 2020 ELECTION:
>
> 2.)  The Georgia Late Night Hidden Suitcase Heist:

w)  In their June 6, 2021, article published at 7:53 a.m., Defendants made the

following statements:

> Who can forget Ruby, Ralph, and Ruby's daughter Wandrea
> Shaye?
>
> After removing everyone from the State Farm Arena on
> 2020 Election night and sending them home, these three
> individuals and a couple of others pulled out ballots hidden
> under the table and began jamming them into the vote
> tabulation machines. The election workers were filmed
> shoving stacks of ballots through the machines two and three
> times each.
>
> In early December The Gateway Pundit was first to identify
> the culprits. Ruby Freeman and her daughter Wandrea were
> two of the individuals who pulled the hidden ballots out from
> under the table on Election night:
>
> . . .
>
> The Gateway Pundit also discovered that these piles of
> ballots were run through the tabulators multiple times.
>
> . . .
>
> We asked in December why the FBI had not spoken with the
> culprits and arrested them for election-related crimes.
>
> . . .

x)  In their June 7, 2021, article published at 9:43 p.m., Defendants made the

following false statements, which they republished on June 14, 2021, at

10:33 a.m. and June 18, 2021, at 8:00 a.m.:

Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. [Our source caught Ruby Freeman in the purple shirts scanning / Ruby Freeman was caught on tape running] the same stack of suspect ballots through the machines multiple times.

y) In their June 18, 2021, article published at 8:00 a.m., Defendants made the following false statements, which they substantially republished on June 18, 2021, at 11:06 a.m. and June 19, 2021, at 10:20 a.m.[177]:

A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night. Top Atlanta election official Ralph Jones was also double scanning ballots late at night at the State Farm Center in Atlanta, Georgia on election night.

. . .

Ralph Jones was the person who sent home all of the election observers. Then his crew, including Ruby and daughter Shaye, went to work on election night!

. . .

z) In their June 19, 2021, article published at 8:31 p.m., Defendants made the following false statement:

The Democrat operatives were running a voter fraud factory inside the State Farm Center on Election Day and into Election Week!

aa) In their June 24, 2021, article published at 8:35 p.m., Defendants made the following false statements:

Fulton County is home to the infamous Ruby Freeman and her daughter Shaye Moss who were caught pulling ballot boxes from

---

[177] The second two articles republish only the first of these two paragraphs.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.

. . .

If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?

This is not how innocent people act. They are hiding something in Fulton County, Georgia.

bb) In their August 14, 2021, article published at 9:15 a.m., Defendants made the following false statements:

We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.

This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.

We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.

…

This is not good for Ruby and her daughter.

It's also pathetic that these two are not in jail already. Their crimes were videotaped!

cc) In their September 25, 2021, article published at 7:10 a.m., Defendants made the following false statements:

Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.

. . .

109

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.

dd) In their December 2, 2021, article published at 12:42 p.m., Defendants made

the following false statements, which they republished on December 3,

2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., and April 22, 2022, at

11:05 a.m.[178]:

> The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video at the State Farm Arena in Atlanta Georgia on November 3rd and the morning of the [sic] November 4th.
>
> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.
>
> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.

ee) In their December 8, 2021, article published at 8:50 p.m. with embedded

audio, Defendants made the following false statements:

Joe Hoft:        That night . . . I don't know if you remember the news first came out that night, and was saying there was a water main break and they needed to stop counting in Georgia. Remember that? . . . And then we were told later that was a lie and it never happened. And then they said it happened in the morning. And then

---

[178] The December 8, 2021, 7:41 p.m. article elaborated on typical election procedures with an additional defamatory statement: "The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race. We disagree."

apparently they just kind of tried to say it never happened.

. . .

There was no water main break. . . . So, that was a lie.

So what happened then was they shut down for the night at 10:30. Now everybody else is thinking, wait a minute, I thought we counted until the election was done. I didn't think we were going to take shifts here, you know, go to bed. . . . So they decide to shut down. And there's evidence that they were doing that.

And then what happened is five people stuck around. Now, I know at least three of them are Black. And it doesn't matter. To me, it doesn't matter. I don't care if they were . . .

So these people stuck around, and they decided to pull ballots out from underneath the tables. Do you remember this story? Did you see that video? . . . Everybody saw it. The video came out, they pulled these ballots out from underneath the tables, and in suitcases, and then they opened them up, and they started shoving them through the tabulators.

. . .

Now later they're trying to say this is normal.

. . .

I mean, do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?

ff) In their May 4, 2022, article published at 1:03 p.m., Defendants made the

following false statements:

Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award

. . .

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The John F. Kennedy Library Foundation issued a statement on April 21 praising Moss for continuing to work as an election processor despite backlash from being caught on camera ballot harvesting during the 2020 presidential race.
>
> . . .
>
> . . . TGP's reporting, which showcases the two women's engagement of election fraud . . .

216.    The defamatory meanings of Defendants' false statements are apparent from the face of the publications, refer to Ms. Moss by name, are accompanied by images of Ms. Moss, and/or are understood to be about her.

217.    The statements authored and published by Defendants about Ms. Moss are reasonably understood to state or imply that she:

a)  Planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden;

b)  Helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center;

c)  Engaged in a criminal conspiracy to exclude observers during the counting of ballots so that election fraud could be committed;

d)  Criminally introduced illegal ballots taken from the hidden suitcases into the ballot counting process when no observers were present;

e)  Committed election fraud and other crimes for which she is subject to arrest and imprisonment.

218.    Each of these statements and implications is false and defamatory.

219.    Each of these statements were read by millions of visitors to *The Gateway Pundit* website, as well as social media users who read social media posts shared by Defendants.

220.    Each of these false statements was published with actual malice, *i.e.* with knowledge of its falsity or with reckless disregard as to its truth.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

221.    Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible basis for the false allegations made; and published their allegations in a manner to create false inferences.

222.    Defendants had both political and financial motives for promulgating lies about Plaintiffs.

223.    Defendants did not neutrally report the allegations about Ms. Moss that were advanced by Trump lawyers and promptly disproven by Georgia election officials. Rather, they endorsed and adopted the allegations as their own, publishing and republishing them for months with full knowledge of their falsity or reckless disregard for their truth.

224.    Defendants had no applicable privilege or legal authorization to make these false and defamatory statements, or if they did, they abused it.

225.    Defendants repeated and embellished the false accusations without ever attempting to verify them, and they invented and published defamatory lies about Ms. Moss without once seeking comment from her.

226.    Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

227.    Defendants have never corrected or retracted their defamatory statements, and those statements remain published on *The Gateway Pundit* to this day. Even after Plaintiffs specifically requested that Defendants retract their defamatory statements, Defendants took no action to correct or retract and only published additional defamatory statements, further evidencing their actual malice.

113

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

228.    Defendants' statements and implications about Ms. Moss constitute defamation *per se* in that they claim Ms. Moss participated in criminal activity punishable by law and labeled her a "crook."

229.    Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Moss harm.

230.    Defendants' statements damaged Ms. Moss's reputation in the general public, in her profession, in her neighborhood, and with friends, relatives, and neighbors.

231.    As a direct and proximate result of Defendants' conduct, Ms. Moss has suffered significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.

### THIRD CLAIM

### (Intentional Infliction of Emotional Distress)

232.    Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

233.    Defendants' months-long campaign of false and defamatory accusations directed specifically at Ms. Freeman and Ms. Moss was malicious, wanton, and intentional.

234.    Defendants carried out their campaign with actual malice as they either knew that their accusations were false or published them with reckless disregard for their truth.

114

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

235.    Defendants wrongful conduct was extreme and outrageous, and it was
calculated to cause harm to Ms. Freeman and Ms. Moss. Defendants accused plaintiffs of
stealing an election through a pre-conceived plan that would make them "infamous in the
annals of voter corruption." They exploited public fear and taunted the "good people of
Georgia" to stand up to the corrupt "mother-daughter combo" who stole the election for
Joe Biden. Defendants encouraged readers to retaliate and harass plaintiffs, publicizing that
Ms. Freeman could be contacted through the LinkedIn page of her business and coyly
warning not to confuse her business with another in Georgia with a similar name.

236.    Defendants' wrongful conduct is so outrageous in character and so extreme
in degree that it is beyond all possible bounds of decency and is to be regarded as atrocious
and utterly intolerable in a civilized community.

237.    Defendants acted with willful misconduct, malice, fraud, wantonness,
oppression, and/or entire want of care which would raise the presumption of conscious
indifference to consequences, and they specifically intended to cause Ms. Freeman and Ms.
Moss harm.

238.    Defendants' wrongful conduct had its intended effect. All aspects of
Plaintiffs' lives have been altered as a result of Defendants' actions, including such simple
things as where to live, how to go out in public, and when to see family and friends. This
result was entirely foreseeable. Defendants' conduct is so outrageous in character and
extreme in degree as to be beyond all bounds of decency. It should be regarded as atrocious
and determined intolerable in a civilized community.

239.    Defendants' wrongful conduct has inflicted severe emotional distress on
Plaintiffs. They have suffered mental reactions including fright and fear for their safety,

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

horror and helplessness in the face of the intense hatred directed at them by Defendants and by their readers, anger, anxiety, sleeplessness, shame and humiliation. The emotional distress Defendants caused to be inflicted on Ms. Freeman and Ms. Moss was so severe that no reasonable person could be expected to endure it.

240.    Defendants' wrongful conduct caused physical manifestations of harm to Plaintiffs, including dental injuries, weight gain, disrupted sleep, and anxiety attacks, as well as mental anguish, requiring them to seek treatment for the mental anguish resulting directly from the severe emotional trauma inflicted by Defendants.

241.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered significant general, actual, incidental, and special damages including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants for each of the causes of action raised herein. Plaintiffs respectfully request a judgment in their favor and against Defendants for:

A.  Nominal damages;

B.  Compensatory damages, including general, actual, consequential, and special damages, in an amount to be determined at trial;

C.  Punitive damages;

D.  Reasonable and necessary attorneys' fees;

E.  Reasonable and necessary costs of the suit;

F.  Prejudgment and post-judgment interest at the highest lawful rates;

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

G.  Declarative relief stating that the statements authored and published by Defendants identified within this Petition, individually and collectively, were and are false;

H.  Injunctive relief enjoining Defendants to remove their false and defamatory statements about plaintiffs from any website and/or social media accounts under their control;

I.  Such other and further relief as this Court deems just and appropriate.

Dated:  January 10, 2023

Respectfully submitted,

*By: /s/ James F. Bennett*

James F. Bennett, No. 46826
John C. Danforth, No. 18438
Matt D. Ampleman, No. 69938
Dowd Bennett LLP
7733 Forsyth Blvd, Suite 1900
St. Louis, MO 63105
Phone: (314) 889-7373
Fax: (314) 863-2111
jbennett@dowdbennett.com
jdanforth@dowdbennett.com
mampleman@dowdbennett.com

Von A. DuBose*
75 14th Street, NE
Suite 2110
Atlanta, Georgia 30309
Telephone: (404) 720-8111
dubose@dubosemiller.com

Kurt G. Kastorf**
Kastorf Law LLC
1387 Iverson Street NE
Suite #100
Atlanta, GA 30307
(404) 900-0330
kurt@kastorflaw.com

117

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Brittany Williams*
UNITED TO PROTECT DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
(202) 579-4582
brittany.williams@protectdemocracy.org

Shalini Goel Agarwal*
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
(202) 579-4582
shalini.agarwal@protectdemocracy.org

John Langford*
Rachel Goodman*
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

David A. Schulz*
Kelsey R. Eberly*
MEDIA FREEDOM & INFORMATION
        ACCESS CLINIC
FLOYD ABRAMS INSTITUTE FOR
        FREEDOM OF EXPRESSION
YALE LAW SCHOOL
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(203) 436-5827
david.schulz@yale.edu
kelsey.eberly@yale.edu

*Admitted *Pro hac vice*

***Pro hac vice* forthcoming

*Attorneys for Plaintiffs*

118

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon all parties electronically through the Court's electronic filing system on this 10th day of January, 2023.

*/s/ James F. Bennett*

119

# **EXHIBIT B**

M24000005025

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP  ☐ WAIT  ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____  Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



500426297535

RECEIVED
2024 APR 18 PM 4: 19
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

2024 APR 18 AM 11: 11
FILED

APR 19 2024

K. Brumbley

**FLORIDA CAPITAL COURIER SERVICES, INC**

(850) 491-9625 Brandon

2330 CLARE DR

(850) 524-5437 Teresa

TALLAHASSEE, FL 32309

(850) 524-6243 Rich

**Please use funds from account: I20210000160: $160.00**

**Authorization Signature:** _James Fulk_

**Business Name:** **TGP Communications, LLC**

**Document #**

**_X__Certified Copy**

**_X__Certificate of Status**

| **NEW FILINGS** | **&** | **AMENDMENTS** |
|---|---|---|
| ___Profit Corp | | ___Amendment |
| ___Not for Profit | | ___Resignation / Withdrawal |
| **_X__Limited Liability** | | ___Change of Registered Agent |
| ___Domestication | | ___Revocation of Dissolution |
| ___LLLP | | ___Merger |
| ___Corp | | ___Articles of Conversion |
| ___Inc | | ___Amended & Restated Articles of Incorporation |
| ___Other | | ___Statement of Authority |

| **APOSTILLE(s)** | **&** | **OTHER FILINGS** |
|---|---|---|
| ___Apostille(s) | | ___Foreign Filing |
| | | ___Reinstatement |
| | | ___Qualification |
| ___Country(s) | | ___Fictitious Name |
| | | ___Annual Report |

**EXAMINER'S INITIALS:____**

# COVER LETTER

**TO:**     **Registration Section**
        **Division of Corporations**

**SUBJECT:**   TGP Communications, LLC
_____
                        Name of Limited Liability Company

The enclosed "Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida," Certificate of Existence, and check are submitted to register the above referenced foreign limited liability company to transact business in Florida.

Please return all correspondence concerning this matter to the following:

    John C. Burns
    _____
                        Name of Person

    The Burns Law Firm
    _____
                        Firm/Company

    PO Box 191250
    _____
                        Address

    Saint Louis, Missouri 63119
    _____
                        City/State and Zip Code

    john@burns-law-firm.com
    _____
            E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

    John C. Burns                              314        329-5040
    _____          at (_____)  _____
        Name of Contact Person                Area Code    Daytime Telephone Number

**Mailing Address:**                    **Street Address:**
Registration Section                    Registration Section
Division of Corporations                Division of Corporations
P.O. Box 6327                           The Centre of Tallahassee
Tallahassee, FL 32314                   2415 N. Monroe Street, Suite 810
                                        Tallahassee, FL 32303

Enclosed is a check for the following amount:
Please make check payable to: **FLORIDA DEPARTMENT OF STATE**
☐ $125.00 Filing Fee    ☐ $130.00 Filing Fee &    ☐ $155.00 Filing Fee &    ■ $160.00 Filing Fee, Certificate
                        Certificate of Status        Certified Copy            of Status & Certified Copy

## APPLICATION BY FOREIGN LIMITED LIABILITY COMPANY FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 605.0902, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN LIMITED LIABILITY COMPANY TO TRANSACT BUSINESS IN THE STATE OF FLORIDA:*

1. **TGP Communications, LLC**
   _(Name of Foreign Limited Liability Company; must include "Limited Liability Company," "L.L.C." or "LLC.")_

**The Gateway Pundit, LLC**
_(If name unavailable, enter alternate name adopted for the purpose of transacting business in Florida. The alternate name must include "Limited Liability Company," "L.L.C." or "LLC.")_

2. **Missouri**
   _(Jurisdiction under the law of which foreign limited liability company is organized)_

3. **46-4161586**
   _(FEI number, if applicable)_

4. **November 1, 2021**
   _(Date first transacted business in Florida, if prior to registration.)_
   _(See sections 605.0904 & 605.0905, F.S. to determine penalty liability.)_

5. **1820 NE Jensen Beach Blvd Unit 1120**
   _(Street Address of Principal Office)_

   **Jensen Beach Florida 34957**

6. **1820 NE Jensen Beach Blvd Unit 1120**
   _(Mailing Address)_

   **Jensen Beach Florida 34957**

7. Name and street address of Florida registered agent: (P.O. Box NOT acceptable)

   Name: **Northwest Registered Agent LLC**

   Office Address: **7901 4th St N STE 300**

   **St. Petersburg** , Florida **33702**
   _(City)_ _(Zip code)_

**Registered agent's acceptance:**
*Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

_(Registered agent's signature)_

280

8. For initial indexing purposes, list names, title or capacity and addresses of the primary members/managers or persons authorized to manage [up to six (6) total]:

| Title or Capacity: | Name and Address: | Title or Capacity: | Name and Address: |
|---|---|---|---|
| ☐ Manager | Name: Jim Hoft | ☐ Manager | Name: _____ |
| ☒ Member | Address: 1820 NE Jensen Beach Blvd | ☐ Member | Address: _____ |
| ☐ Authorized | Unit 1120 | ☐ Authorized | _____ |
| Person | Jensen Beach, FL 34957 | Person | _____ |
| ☐ Other _____ | ☐ Other _____ | ☐ Other _____ | ☐ Other _____ |

| | | | |
|---|---|---|---|
| ☐ Manager | Name: John C. Burns | ☐ Manager | Name: _____ |
| ☐ Member | Address: PO Box 191250 | ☐ Member | Address: _____ |
| ☒ Authorized | Saint Louis, MO 63119 | ☐ Authorized | _____ |
| Person | _____ | Person | _____ |
| ☐ Other _____ | ☐ Other _____ | ☐ Other _____ | ☐ Other _____ |

| | | | |
|---|---|---|---|
| ☐ Manager | Name: _____ | ☐ Manager | Name: _____ |
| ☐ Member | Address: _____ | ☐ Member | Address: _____ |
| ☐ Authorized | _____ | ☐ Authorized | _____ |
| Person | _____ | Person | _____ |
| ☐ Other _____ | ☐ Other _____ | ☐ Other _____ | ☐ Other _____ |

Important Notice: Use an attachment to report more than six (6). The attachment will be imaged for reporting purposes only. Non-indexed individuals may be added to the index when filing your Florida Department of State Annual Report form.

9. Attached is a certificate of existence, no more than 90 days old, duly authenticated by the official having custody of records in the jurisdiction under the law of which it is organized. (If the certificate is in a foreign language, a translation of the certificate under oath of the translator must be submitted)

10. This document is executed in accordance with section 605.0203 (1) (b), Florida Statutes. I am aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

_John C. Burns_
Signature of an authorized person

John C. Burns
Typed or printed name of signee



# STATE OF MISSOURI



**John R. Ashcroft**
**Secretary of State**

CORPORATION DIVISION
CERTIFICATE OF GOOD STANDING

I, JOHN R. ASHCROFT, Secretary of State of the STATE OF MISSOURI, do hereby certify that the records in my office and in my care and custody reveal that

*TGP Communications LLC*
*LC1358217*

was created under the laws of this State on the 21st day of November, 2013, and is active, having fully complied with all requirements of this office.

IN TESTIMONY WHEREOF, I hereunto set my hand and cause to be affixed the GREAT SEAL of the State of Missouri. Done at the City of Jefferson, this 1st day of April, 2024.



Secretary of State

Certification Number: CERT-04012024-0119

282

**EXHIBIT C**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **RUBY FREEMAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:21CV1424 HEA** |
| | ) | |
| **JAMES HOFT, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion to Remand, [Doc. No. 13]. The matter is fully briefed and ready for disposition. For the reasons set forth below, Plaintiffs' Motion to Remand will be granted.

### Facts and Background

On Thursday, December 2, 2021, Plaintiffs Ruby Freeman and Wandrea Moss filed this defamation (Counts I and II) and intentional infliction of emotional distress (Count III) action in the Circuit Court of the City of St. Louis, Missouri, against individual defendants James Hoft and Joseph Hoft, and corporate defendant TGP Communications LLC, d/b/a, The Gateway Pundit (TGP), alleging Defendants made false statements about their activities as election workers during the 2020 Presidential election, which has damaged their professional and personal reputations. Plaintiffs are seeking damages and other relief as compensation.

On Sunday, December 5, 2021, Defendant Joseph Hoft removed the cause of action to this Court, invoking jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332(a), noting the forum defendant rule does not bar removal of the action where the forum defendant has not yet been served. According to the notice of removal, Defendant Joseph Hoft is a citizen of the state of Florida and Defendants James Hoft and TGP are citizens of the State of Missouri. Plaintiffs are both citizens of the State of Georgia. Defendants James Hoft and TGP were served the day after the notice of removal was filed, December 6, 2021. Defendant Joseph Hoft was served on December 14, 2021.

In the instant motion, Plaintiffs argues that because (i) no defendant had been served at the time the notice of removal was filed, "snap removal" was not available and removal is improper; and (ii) Joseph Hoft is a citizen of the state of Missouri, not Florida, so as a forum defendant, he is not entitled to snap removal, and the case should be remanded pursuant to the forum defendant rule, 28 U.S.C. § 1441(b)(2). Defendant opposes remand, arguing that under the doctrine of "snap removal," the Court has diversity jurisdiction under 28 U.S.C. § 1441(b)(2) because the forum defendants (James Hoft and TGP) had not been served at the time of removal. Defendant also maintains Joseph Hoft is a resident of Florida and

2

is not a forum defendant.[1] The parties do not dispute that none of the defendants were served at the time of removal.

## Legal Standard

"[A]ny civil action brought in State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court" in which the action is pending. 28 U.S.C. § 1441(a). A claim may be removed to federal court only if it could have been brought in federal court originally; thus, the diversity and amount in controversy requirements of 28 U.S.C. § 1332 must be met, or the claim must be based upon a federal question pursuant to 28 U.S.C. § 1331. *Peters v. Union Pac. R.R. Co.,* 80 F.3d 257, 260 (8th Cir. 1996). The removing defendant bears the burden of establishing federal jurisdiction by a preponderance of the evidence. *Green v. Ameritide, Inc.,* 279 F.3d 590, 595 (8th Cir. 2002); *Altimore v. Mount Mercy Coll.,* 420 F.3d 763, 768 (8th Cir. 2005). Removal statutes must be strictly construed because they impede upon states' rights to resolve controversies in their own courts. *Nichols v. Harbor Venture, Inc.,* 284 F.3d 857, 861 (8th Cir. 2002). A district court is required to resolve all doubts about federal jurisdiction in favor of remand. *Bates v. Mo. & N. Ark. R.R. Co.,* 548 F.3d 634, 638 (8th Cir.2008); *In re*

---

[1] The Court will not address the issue regarding Defendant Joseph Hoft's residency since the Plaintiff's Motion to Remand will be granted for the reasons explained below. Therefore, the issue is moot.

*Prempro Prods. Liab. Litig.*, 591 F.3d 613, 619 (8th Cir. 2010) (citing *Wilkinson v. Shackelford*, 478 F.3d 957, 963 (8th Cir. 2007)).

For diversity jurisdiction to exist under 28 U.S.C. § 1332(a)(1) there must be complete diversity of citizenship between plaintiffs and defendants. *Buckley v. Control Data Corp.*, 923 F.2d 96, 97, n.6 (8th Cir. 1991). "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007). "It is settled, of course, that absent complete diversity a case is not removable because the district court would lack original jurisdiction." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 564 (2005) (cited case omitted). Where complete diversity of citizenship does not exist, 28 U.S.C. § 1447(c) requires a district court to remand the case to state court for lack of subject matter jurisdiction.

The "forum defendant rule" imposes an additional restriction on the removal of diversity cases. 28 U.S.C. § 1441(b)(2). Specifically, the statute provides that:

A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought. *Id.*

A case must be remanded if, at anytime, it appears that the district court lacks subject-matter jurisdiction. 28 U.S.C. § 1447(c); Fed. R. Civ. P. 12(h)(3).

4

## Discussion

While the statute plainly does not allow removal once a forum defendant has been properly served, there is "much disagreement on whether to invoke the forum defendant rule in cases of pre-service removal." *Boschert v. Wright Med. Grp., Inc.,* No. 4:15-CV-00211 (AGF), 2015 WL 1006482, at *2 (E.D. Mo. Mar. 6, 2015). Although the Eighth Circuit recently joined other circuits holding a violation of the forum defendant rule is a non-jurisdictional defect that must be raised within 30 days of removal, it has not addressed the propriety of "snap removal." *Holbein v. TAW Enters., Inc.,* 983 F.3d 1049, 1053 (8th Cir. 2020) (en banc). This district has taken three different approaches. In large part, the different views expressed by the courts arise from tension between the plain text of 28 U.S.C. § 1441(b)(2) and its presumed purpose.

The first approach is permitting snap removals based on the plain language of the statute, which does not explicitly state a defendant must be served before filing a notice of removal. *See, e.g., Tillman v. BNSF Ry. Co.,* No. 1:20-CV-00178 SNLJ, 2021 WL 842600, at *2 (E.D. Mo. Mar. 5, 2021). Among the reasons provided for these decisions, is the Eighth Circuit's prescription that "[w]hen the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances the sole function of the courts is to enforce [the statute] according to its terms." *United States v. Union Elec. Co.,* 64 F.3d 1152, 1165 (8th Cir. 1995) (internal quotation marks and citations omitted).

The second approach is remanding snap removals because they are inconsistent with the legislative intent behind the forum defendant rule, which is to protect the defendant from the improper joinder of a forum defendant that plaintiff has no intention of serving, and the purposes of removal. *See, e.g., Laster v. Monsanto Co.,* No. 4:18-CV-00397 CAS, 2018 WL 1566846, at *2 (E.D. Mo. Mar. 30, 2018). In accordance with this premise, district courts, including this one, have carved out exceptions to the "joined and served," language, deeming their analysis the "congressional intent" approach when Defendant is engaging in procedural gamesmanship to keep the case out of state court. *See, e.g., Gray v. Monsanto Co.,* No. 4:17-CV-02882 HEA, 2018 WL 488935, at *2 (E.D. Mo. Jan. 19, 2018) (granting remand and finding that although the statute's plain text is ordinarily decisive, it is notable that policy purposes underlying the "joined and served" language to prevent procedural gamesmanship are well-served).

The final approach is allowing snap removals only when at least one defendant has been served, based on a construction of the word "any" in section 1441(b)(2). *See, e.g., M & B Oil, Inc. v. Federated Mut. Ins. Co.,* No. 4:21-CV-00250 (NCC), 2021 WL 3472629, at *2 (E.D. Mo. Aug. 6, 2021), motion to certify appeal granted, No. 4:21-CV-00250 (NCC), 2021 WL 4963524 (E.D. Mo. Oct. 26, 2021); *Czapla v. Republic Servs., Inc.,* 372 F. Supp. 3d 878, 881 (E.D. Mo. 2019) (the Court narrowed its application of § 1441(b) by requiring service on at least one defendant before the case may be removed); *Rogers v. Boeing Aerospace*

6

*Operations*, Inc., 13 F.Supp.3d 972, 978 (E.D. Mo. 2014) (interpreting the text to mean that "an out-of-state defendant may remove a diversity case if at least one defendant–and no forum defendant–has been served"); *Perez v. Forest Labs., Inc.,* 902 F. Supp. 2d 1238, 1244–45 (E.D. Mo. 2012) (ordering remand where the *out-of-state* defendant removed the case only six days after plaintiffs filed the complaint and before *any* defendant was served) (emphasis added).

Acknowledging the recent cases that narrow the application of § 1441(b), this Court finds that the word "any" requires at least one party to have been joined and served before a defendant can snap remove. *Rogers*, 13 F.Supp.3d 972 at 977-78; 28 U.S.C. 1441 § (b)(2). Plaintiffs filed the action in state court on Thursday, December 2, 2021, and Defendant Joseph Hoft removed a mere three days later on Sunday, December 5, 2021 before *any* defendant had been served. Therefore, under this Court's interpretation of the forum defendant rule, the Court cannot maintain jurisdiction over this suit based on diversity, and Plaintiff's Motion to Remand will be granted.

## Conclusion

The Court concludes that diversity jurisdiction is not properly present in this case because Defendant Joseph Hoft removed it before any defendant was served. Further, a district court is required to resolve all doubts about federal jurisdiction in favor of remand. *Bates v. Mo.,* 548 F.3d 634 at 638; *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613 at 619 (citing *Wilkinson*, 478 F.3d 957 at 963)).

7

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Remand, [Doc. No. 13], is **GRANTED.**

**IT IS FURTHER ORDERED** that this matter is remanded to the Circuit Court of the City of St. Louis, Missouri.

Dated this 6th day of June, 2022.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

**EXHIBIT D**

STATE OF MISSOURI   )
                         ) SS
CITY OF ST. LOUIS     )

**FILED**

DEC 20 2022

22ⁿᵈ JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY ___MD___ DEPUTY

## MISSOURI CIRCUIT COURT
## TWENTY-SECOND JUDICIAL CIRCUIT
### (City of St. Louis)

RUBY FREEMAN and WANDREA   )
MOSS,                            )
                                )
        Plaintiffs,        )
                                )    Cause No. 2122-CC09815-01
vs.                             )
                                )    Division No. 18
JAMES HOFT, JOSEPH HOFT, and   )
TGP COMMUNICATIONS LLC d/b/a   )
*THE GATEWAY PUNDIT*,        )
                                )
        Defendants.      )

## ORDER

The Court has before it Plaintiffs' Second Motion to Compel Discovery and for a Protective Order and Defendants' Cross Motion for Protective Order. The Court now rules as follows.

On December 2, 2021, Plaintiffs filed this lawsuit alleging that Defendants knowingly and repeatedly published false accusations that Plaintiffs committed election fraud during the 2020 presidential election. In their Second Amended Petition, Plaintiffs bring claims for defamation (Counts I and II) and intentional infliction of emotional distress (Count III).

Plaintiffs seek the Order of this Court compelling Defendants to produce documents responsive to Plaintiffs' Second Requests for Production, and for entry of a Protective Order. Defendants agree that a protective order should issue but ask that this Court enter the Protective Order proffered by Defendants.

The general rule of discovery found in Rule 56.01(b)(1) is that the parties may obtain information regarding any matter, not privileged, that is relevant to the subject matter involved in

the pending action. State ex rel. Ford Motor Co. v. Westbrooke, 151 S.W.3d 364, 366 (Mo. banc 2004). Information is relevant if it is "reasonably calculated to lead to the discovery of admissible evidence." Rule 56.01; State ex rel. Stecher v. Dowd, 912 S.W.2d 462, 464 (Mo. banc 1995). "The party seeking discovery shall bear the burden of establishing relevance." Rule 56.01(b)(1); State ex rel. Ford Motor Co., 151 S.W.3d at 366.

Plaintiffs seek the Order of this Court overruling Defendants' objections to Plaintiffs' Second Requests for Production 1-7 and requiring Defendants to answer said requests. The Court has reviewed the discovery requests at issue and finds that Defendants' objections should be overruled as to requests 3-7 and that Defendants should be ordered to answer. Regarding request for production 1, which seeks all documents related to Google Analytics, the Court finds that Defendants' objections that the request is overbroad and unduly burdensome should be sustained at this time. Plaintiffs have proposed narrowing the scope of request for production 2 by requesting five sets of Google Analytics reports for each month from January 1, 2020 through the present: landing page reports, all page reports, filtered all pages reports, traffic acquisition reports and monthly topline reports. The Court finds that Defendants' objections should be overruled as to request 2 and that Defendants should be ordered to answer only as limited by Plaintiffs' proposal.

Next, both parties seek a Protective Order in order to protect the confidential information of the parties.

Rule 56.01(c), which authorizes protective orders, states:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

2

(1) that the discovery not be had;

(2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place;

(3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

(4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters; ...

"A protective order should issue if annoyance, oppression, and undue burden and expense outweigh the need for discovery." State ex rel. Ford Motor Co. v. Messina, 71 S.W.3d 602, 607 (Mo. banc 2002); See also Edwards v. State Bd. of Chiropractic Examiners, 85 S.W.3d 10, 22 (Mo. App. W.D. 2002).

In this case, the parties agree that a protective order should be entered but cannot agree as to its terms. Following a review of the record the Court finds that both parties have shown good cause for the entry of a protective order herein. Following a review of the proposed orders proffered by each party, the Court finds that Plaintiffs' proposed order best protects the parties' confidential information without imposing undue burden. Accordingly, the Court will enter Plaintiffs' proposed Protective Order.

Finally, both Plaintiffs and Defendants seek attorneys' fees and costs related to the instant motion. The Court finds that it should not exercise its discretion here to order the sanctions sought because they are in excess of what is necessary to accomplish the purposes of discovery. See Fairbanks v. Weitzman, 13 S.W.3d 313, 327 (Mo. App. E.D. 2000).

THEREFORE, it is Ordered and Decreed that Plaintiffs' Second Motion to Compel Discovery and for a Protective Order is hereby GRANTED.

3

Defendants' objections to Plaintiffs' Second Requests for Production 3-7 are hereby overruled.

Defendants' objection to request for production 1 is sustained.

Defendants' objections to Plaintiffs' Second Requests for Production 2 are overruled as limited to five sets of reports for each month from January 1, 2020 through the present: landing page reports, all page reports, filtered all pages reports, traffic acquisition reports and monthly topline reports.

Defendants are Ordered to answer the subject discovery within twenty days of the date of this Order.

This Court will enter Plaintiffs' proposed Protective Order.

In all other respects, Plaintiffs' motion is denied.

Defendants' Cross Motion for Protective Order is granted in part to the extent that this Court is entering a Protective Order in order to protect the confidential information of the parties. Defendants' Cross Motion for Protective Order is denied in all other respects.

SO ORDERED:

Jason Sengheiser, Judge

Dated: December 20, 2022

4

**EXHIBIT E**

MISSOURI CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)



FILED
JUL 2 4 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

RUBY FREEMAN, et al.,          )
                              )
        Plaintiffs,            )
                              )   Case No. 2122-CC09815
v.                            )
                              )   Division 6
JAMES HOFT, et al.,            )
                              )
        Defendants.            )

## ORDER AND JUDGMENT

The Court has the following before it: Plaintiffs' Motion to Dismiss Defendants' Improper Counterclaim Pursuant to Rule 55.27(a)(11) and Rule 55.27(a)(6); and Plaintiffs' Motion to Strike Defendants' Anti-SLAPP Motion made under GA Code §9-11-11.1. The Motions were heard on July 13, 2023, where the parties appeared by counsel. The Court has reviewed the submissions of the parties, the relevant authorities, and the arguments of counsel, and now rules as follows.

Plaintiffs Ruby Freeman and Wandrea Moss brought this case alleging that Defendants James Hoft, Joseph Hoft, and TGP Communications, LLC, d/b/a the Gateway Pundit are liable for defamation and intentional infliction of emotional distress for "knowingly and repeatedly published false accusations that Plaintiffs committed election fraud during the 2020 presidential election."

ENTERED
JUL 24 2023
MAM
298

Defendants filed a counterclaim alleging that Plaintiffs, their counsel, and the entities for which Plaintiffs' counsel work[1], are liable for defamation *per se* for statements made by Plaintiffs' counsel outside of court proceedings regarding Defendants' alleged defamatory statements that gave rise to this case.

Defendants also filed a motion entitled "Defendants' Motion to Strike Under GA §9-11-11.1," which states the following:

> Defendants [...] hereby move for summary judgment under Missouri R. Civ. P. 74.04(b), invoking Georgia's Anti-SLAPP statute, GA Code § 9-11-11.1 (2020) because Plaintiffs' claims asserted in their Second Amended Petition are based entirely on Defendants' exercise of their right to free speech in connection with an issue of public interest or concern, and Plaintiffs cannot establish that there is a probability of prevailing on their claims.

### MOTION TO DISMISS COUNTERCLAIM

Defendants' Counterclaim asserts that Plaintiffs' counsel, the entities for which Plaintiffs' counsel work, and Plaintiffs themselves defamed Defendants when Plaintiffs' counsel uttered the following seven statements outside of the pleadings:

1. "The Gateway Pundit, along with its founding editor Jim Hoft, and contributor Joe Hoft, knowingly fabricated and

---

[1] Despite being named as counterclaim-defendants, Plaintiffs' counsel, and the entities for which Plaintiffs' counsel work, have not been joined as parties to this case, nor is there a motion before the Court asking that they be joined, nor has their conduct in this case indicated consent to the Court's jurisdiction over them.

2

disseminated blatantly false stories claiming that Ms. Freeman and Ms. Moss were involved in a conspiracy to commit election fraud, and continued to publish these untruths long after they were proven to be false." A statement by Protect Democracy on the website law4truth.org.

2. "The Hofts' defamations, aimed at undermining confidence in the 2020 election in an effort to overturn the will of the voters, targeted two Black women for doing their jobs as election workers. In significant measure because of the lies told by The Gateway Pundit, our clients were and continue to be targeted with threats of violence and racial intimidation." A statement by Protect Democracy on the website protectdemocracy.org.

3. "Lies like those that The Gateway Pundit knowingly told about Ruby Freeman and Shaye Moss cannot be divorced from the devastation they leave behind—both for the targeted individuals and for our democracy itself." A statement by Plaintiffs' attorney Brittany Williams on protectdemocracy.org.

4. "But that didn't stop some of the former president's top allies in the media – The Gateway Pundit, One America News Network – from continuing to spread that lie about our clients." A statement by Plaintiffs' attorney John Langford in an NPR interview.

5. "The defendants repeatedly published unverified and uncorroborated information claiming that Ms. Freeman and Ms. Moss were involved in a conspiracy to commit election fraud. They continue to publish these untruths long after they were proven to be false. Further, by identifying Ms. Freeman and Ms. Moss by name and publishing pictures of them online, Gateway Pundit caused, and was directly responsible for, the abuse and harassment Ms. Freeman and Ms. Moss suffered." A statement by Protect Democracy on the website protectdemocracy.org.

6. "Last year the Gateway Pundit knowingly published lies about two Georgia election workers." A Twitter post by Yale University's Media Freedom & Information Access (MFIA) Clinic.

7. "the type of disinformation campaign waged by the Gateway Pundit is undermining the very ability of our democracy to function." A statement by Plaintiffs' attorney David Schulz

3

on the MFIA Clinic website.

Plaintiffs move to dismiss Defendants' Counterclaim for two reasons. First, under Rule 55.27(a)(11), Plaintiffs assert that the Counterclaim is an improper, premature counterclaim in the nature of malicious prosecution. In the alternative, under Rule 55.27(a)(6), Plaintiffs assert that the Counterclaim fails to state a claim upon which relief can be granted because it (1) alleges defamation based on statements that are privileged and (2) fails to plead all elements of a defamation claim including that Plaintiffs had knowledge of falsity or serious doubts as the truth of their attorneys' statements, and that Defendants have suffered any damages as a result of the statements.

A motion to dismiss under Missouri Rule 55.27(a)(11) asserts a defense that "the counterclaim or cross-claim is one which cannot be properly interposed in this action." Plaintiffs argue that the Counterclaim seeks to hold them liable for statements made by their attorneys that simply echo their pleadings. Plaintiffs thus argue that the Counterclaim essentially alleges malicious prosecution, a claim that "is not cognizable until the original underlying suit has been prosecuted to a conclusion favorable to the party raising the malicious prosecution claim." See State ex rel. O'Basuyi v. Vincent, 434 S.W.3d 517 (Mo. banc 2014).

Plaintiffs further assert that their attorneys' statements comply with Rule of Professional Conduct 4-3.6. While the Rule

4

generally prohibits lawyers involved in litigation from making certain extrajudicial statements, it permits lawyers to state the claim, offense, or defense involved, and, unless prohibited by law, the identity of the persons involved. Rule 4-3.6(a)-(b).

The Court finds that while the Counterclaim purports to allege defamation, it is nonetheless in the nature of a claim for malicious prosecution. As such, the Court will dismiss the Counterclaim. Because the Court's ruling on Plaintiff's first argument is dispositive, it need not address Plaintiffs' arguments in the alternative.

## MOTION TO STRIKE

Plaintiffs assert two reasons that the Court should strike Defendants' Anti-SLAPP Motion made under Georgia Code Section 9-11-11.1. First, Plaintiffs argue that it seeks to apply a Georgia procedural rule in a Missouri state court case, and in the alternative, it does not meet the terms of the Georgia rule. Further, Plaintiffs argue that they should be awarded reasonable expenses associated with responding to the instant Motion because it is meritless and dilatory.

Under Missouri Rule 55.27(e), a party may request that "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" be stricken from any pleading. Missouri follows the rule that a forum state applies its own procedural law but chooses the applicable substantive law according to its conflict-

of-law doctrines. <u>Harter v. Ozark-Kenworth, Inc.</u>, 904 S.W.2d 317, 320 (Mo. App. W.D. 1995).

Missouri has its own anti-SLAPP statute which provides a procedural mechanism for the early disposition of a SLAPP action. Section 537.528.1 RSMo. However, application of this statute is restricted to conduct or speech undertaken or made in connection with a public hearing or public meeting. <u>Id.</u> A public meeting includes any meeting held by a state of local government entity, including meetings of or presentations before state, county, city, town, or village councils, planning commissions, or review boards. <u>Id.</u> Because the statements at issue in this case were not uttered in connection with a public hearing or public meeting, Defendants acknowledge that Missouri's statute does not apply. Instead, Defendants seek to apply Georgia's anti-SLAPP statute whose more expansive scope encompasses, among other things, "[a]ny written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern." Ga. Section 9-11-11.1(c)(3).

Defendants assert that Georgia's statute provides substantive protection from this suit. The Court disagrees. Like its Missouri counterpart, the Georgia anti-SLAPP statute provides "procedural protection" against SLAPP actions. <u>See</u> <u>Rogers v. Dupree</u>, 824 S.E.2d 823, 830 (Ga. Ct. App. 2019) quoting <u>Denton v. Browns Mill Dev. Co.</u>, 561 S.E.2d 431, 434 (Ga. 2002); <u>see also</u> <u>Carbone v. CNN, Inc.</u>,

6

910 F.3d 1345, 1348 ("The anti-SLAPP statute 'creates no substantive rights; it merely provides a procedural mechanism for vindicating existing rights.'").

Because Defendants' anti-SLAPP Motion is predicated on the Court's application of a foreign procedural law, the Court must grant Plaintiffs' Motion to Strike it. Because the Court's ruling on Plaintiff's first argument is dispositive, it need not address Plaintiffs' arguments in the alternative. The Court declines Plaintiffs' request for reasonable expenses associated with responding to this Motion.


THEREFORE, it is Ordered and Decreed as follows:

- Plaintiffs' Motion to Dismiss Defendants' Counterclaim is GRANTED. Defendants' Counterclaim is hereby dismissed.
- Plaintiffs' Motion to Strike Defendants' Anti-SLAPP Motion made under GA Code Section 9-11-11.1 is GRANTED. Defendants' Motion to Strike Under GA Code Section 9-11-11.1 is hereby stricken from the record.

SO ORDERED:

MICHAEL STELZER, Judge

Dated: _July 24, 2023_

7

**EXHIBIT F**



# In the Missouri Court of Appeals
# Eastern District

| | | |
|---|---|---|
| JAMES HOFT, JOSEPH HOFT, AND TGP COMMUNICATIONS LLC D/B/A THE GATEWAY PUNDIT, RELATORS, | ) ) ) ) | No. ED111920 |
| | ) | Writ of Prohibition and/or Mandamus |
| | ) ) | |
| vs. | ) ) ) | Cause No. 2122-CC09815 |
| THE HONORABLE MICHAEL F. STELZER CIRCUIT JUDGE CIRCUIT COURT OF ST. LOUIS COUNTY, RESPONDENT. | ) ) ) ) | |

## ORDER

Relators have filed a Petition for Writ of Prohibition along with Suggestions in Support and Exhibits.

Being duly advised in the premises, the Court hereby DENIES Relator's Petition for Writ of Prohibition.

SO ORDERED.

DATED: August 17, 2023

John P. Torbitzky, Presiding Judge
Writ Division IV
Missouri Court of Appeals, Eastern District

cc:  Hon. Michael F. Stelzer
     Matthew Ampleman
     John Danforth
     James Bennett
     Jonathon Burns



**EXHIBIT G**



# In the Missouri Court of Appeals
# Eastern District

RUBY FREEMAN, and WANDREA
MOSS,

          Respondents,

vs.

JAMES HOFT, JOSEPH HOFT, TGP
COMMUNICATIONS LLC d/b/a
THE GATEWAY PUNDIT,

          Appellants.

)
)
)
)
)
)
)
)
)
)
)
)

No. ED111906

## ORDER

     Respondents have filed a motion to dismiss, contending that there is no final, appealable judgment under Rule 74.01(b). Appellants have not filed a response to the motion to dismiss.

     Respondents filed a three-count petition alleging defamation and intentional infliction of emotional distress against Appellants, and Appellants filed a counterclaim alleging malicious prosecution. On July 24, 2023, the trial court entered an order and judgment dismissing Appellants' counterclaim upon finding that a malicious prosecution counterclaim could only be brought after the termination of the current litigation. Appellants have filed a notice of appeal from the July 24, 2023 order and judgment dismissing the counterclaim.

     An appellate court has jurisdiction only over final judgments that dispose of all parties and claims in the case and leave nothing for future determination. O'Neill v. O'Neill, 864 S.W.2d 7, 8 (Mo. App. E.D. 1993). If the trial court does not either resolve all the issues as to all parties or expressly designate "there is no just reason for delay," the appeal must be dismissed. Rule 74.01(b); Fleahman v. Fleahman, 25 S.W.3d 162, 164 (Mo. App. E.D. 1999).

     Here, the trial court granted Respondents' motion to dismiss Appellants' counterclaim, but it did not certify the judgment for immediate appeal under Rule 74.01(b). Further, the three

claims asserted in Respondents' petition remain pending before the trial court. Therefore, there is no final and appealable judgment under Rule 74.01(b). Respondents' motion to dismiss the appeal is hereby granted.

SO ORDERED.

DATED: ___8·31·23___

Kelly C. Broniec, Chief Judge

ecc:    Jonathon C. Burns
        James F. Bennett
        John C. Danforth
        Matthew Ampleman



**EXHIBIT H**

STATE OF MISSOURI )
                  ) SS
CITY OF ST. LOUIS )



MAY 10 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

### MISSOURI CIRCUIT COURT
### TWENTY-SECOND JUDICIAL CIRCUIT
### (City of St. Louis)

| | |
|---|---|
| Ruby Freeman et al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 2122-CC09815 |
| vs. | ) |
| | ) Division No. 6 |
| TGP Communications LLC | ) |
| Et al | ) |
| Defendants, | ) |
| | ) |
| | ) |

### ORDER APPOINTING MASTER

COMES NOW this Court under Rule 68.01 and hereby appoints

Peter Dunne 100 South 4th St, Suite 400, St. Louis, MO 63102, to

be Special Master in this matter. Within seven (7) days of

receipt of this order, the Master shall appear before the

Honorable Michael F. Stelzer, Division 6 of the Twenty-Second

Judicial Circuit to have his oath administered pursuant to Rule

68.01(d).

The Master shall have all of the powers set out in Rule

68.01(e), including but not limited to:

The power to regulate all proceedings in every hearing

before the master and to do all acts and take all measures

**ENTERED**

**MAY 10 2023**

**M S**

necessary or proper for the efficient performance of the duties under the order.

The power to require the production of evidence upon all matters related to discovery matters herein.

The master may rule upon the admissibility of evidence and has the authority to put witnesses on oath and may examine them and may call the parties to the action and examine them upon oath.

The master may preside over depositions and all discovery disputes as provided for in Rule 68.01(h). The master shall be compensated at $ 450.00 per hour.

The parties shall proceed before the master as provided in Rule 68.01(e)and(f).

SO ORDERED:

MICHAEL F. STELZER, Judge

Dated: 5/10/23 , 2023

2

**EXHIBIT I**

# MISSOURI CIRCUIT COURT
# TWENTY-SECOND JUDICIAL CIRCUIT
## (St. Louis City)

Ruby Freeman et al, Plaintiffs

**vs**

TGP Communications LLC et al, Defendants

CASE NO. 2122-cc09815        DIVISION  6                November 7, 2023

# COURT ORDER

The Special Master having filed his Third Report and Recommendation on November 3, 2023 and given the short time frames regarding the discovery the Court hereby adopts the Third Report and Recommendation of the Special Master in its entirety.

**FILED**

NOV 0 7 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

**SO ORDERED:**

_Michael F. Stelzer #40716_

cc: All parties of record

ENTERED
NOV -7 2023
MAM

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | § | Chapter 11 (Subchapter V) |
| | § | |
| TGP COMMUNICATIONS, LLC | § | Case No. 24-13938 (MAM) |
| | § | |
| Debtor. | § | |

**JOINDER TO THE UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS**

Dr. Eric Coomer ("Coomer"), as a creditor and party-in-interest of TGP Communications, LLC (the "Debtor" or "The Gateway Pundit"), by and through his undersigned counsel, respectfully joins and adopts the United States Trustee's Objection to the Debtor's Motion for an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors (the "UST's Objection") [Dkt. 35]. Coomer further reserves the right to raise any arguments in connection with the Debtor's Motion for Entry of an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors [Dkt. 26] at the hearing scheduled for June 4, 2024, at 1:30 p.m.

In addition to the arguments raised by the UST, Coomer, who is the former Director of Product Strategy and Security for Dominion Voting Systems, notes that many of the undisclosed Contract Writers are likely to be some of the very same writers that either created or have knowledge of the defamatory articles published by The Gateway Pundit about Coomer's alleged role in rigging the 2020 presidential election. Thus, any argument by the Debtor that publication of personally identifying information of the Contract Writers constitutes an unlawful injury under 11 U.S.C. § 107(c) is wholly

1

inconsistent with the Debtor's prior conduct in the publication of defamatory material concerning Coomer on its website.

Coomer would further note that the Debtor *currently* lists the following writers in the byline on articles published on its website[1] today, to wit:  Cullen Linebarger, Jim Hoft, Anthony Scott, Cristina Laila, Margaret Flavin, Ben Kew, Jordan Conradson, Alicia Powe, Paul Serran, Antonio Graceffo, Sharika Soa, and Mike LaChance.  These articles contain links to biographical information concerning the referenced writers.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Dr. Eric Coomer joins the UST's Objection and respectfully requests that the Court deny the relief requested in the Debtor's Motion for Entry of an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors [Dkt. 26] and grant any such other and further relief that the Court deems just and proper.

Dated: May 31, 2024                    Respectfully submitted,

*/s/ Vincent F. Alexander*
Vincent F. Alexander
Florida Bar No. 68114
**Shutts & Bowen LLP**
201 East Las Olas Blvd., Suite 2200
Fort Lauderdale, FL 33301
(954) 524-5505-main
(954) 524-5506-facsimile
VAlexander@shutts.com

                    and

*/s/ Ryan E. Chapple*
Charles J. Cain - *Pro Hac Vice Forthcoming*
ccain@cstrial.com
Ryan E. Chapple - *Pro Hac Vice Forthcoming*
rchapple@cstrial.com

---

[1] https://www.thegatewaypundit.com/

FTLDOCS 9171854 1

Bradley A. Kloewer - *Pro Hac Vice*
*Forthcoming*
bkloewer@cstrial.com
**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

**ATTORNEYS FOR DR. ERIC COOMER**

**CERTIFICATE OF SERVICE**

**I CERTIFY** that on May 31, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or *pro se* parties who are authorized to receive electronically Notice of Electronic Filing in these bankruptcy cases.

*/s/ Vincent F. Alexander*
Vincent F. Alexander

FTLDOCS 9171854 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| TGP Communications, LLC. | Case No. 24-13938 (MAM) |
| Debtor. | |

**JOINDER TO THE UNITED**
**STATES TRUSTEE'S OBJECTION TO THE DEBTOR'S MOTION FOR**
**AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY**
**IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS**

Ruby Freeman and Wandrea' ArShaye "Shaye" Moss (together, the "Freeman Plaintiffs"), as creditors of TGP Communications, LLC (the "Debtor" or "The Gateway Pundit"), by and through their undersigned counsel, respectfully join and adopt *The United States Trustee's Objection to the Debtor's Motion for an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors* [Dkt. 35]. The Freeman Plaintiffs further reserve the right to raise any arguments in connection with the *Debtor's Motion for Entry of an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors* [Dkt. 26] at the hearing scheduled for June 4, 2024, at 1:30 p.m.

*[remainder of page left intentionally blank]*

318

Dated: June 3, 2024

By: _/s/ David A. Blansky_____

David A. Blansky
Florida Bar No. 1033002
Michael P. Dunn
Florida Bar No. 100705
DUNN LAW, P.A.
66 West Flager Street, Suite 400
Miami, FL 33130
Telephone: (786) 433-3866
Facsimile: (786) 260-0269
dblansky@dunnlawpa.com
michael.dunn@dunnlawpa.com

-and-

Rachel Goodman (*pro hac vice* forthcoming)
Brittany Williams (*pro hac vice* forthcoming)
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
rachel.goodman@protectdemocracy.org
brittany.williams@protectdemocracy.org

Rachel C. Strickland (*pro hac vice* pending)
Aaron E. Nathan (*pro hac vice* pending)
James H. Burbage (*pro hac vice* pending)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
rstrickland@willkie.com
anathan@willkie.com
jburbage@willkie.com

-and-

Michael J. Gottlieb (*pro hac vice* pending)
Meryl C. Governski (*pro hac vice* forthcoming)
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
mgottlieb@willkie.com
mgovernski@willkie.com

## **CERTIFICATE OF SERVICE**

    **I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF), on this 3rd day of June, 2024 upon counsel for Debtors and registered users in this case.

By: _/s/David A. Blansky_____
    David A. Blansky, Esq.
    Florida Bar No. 1033002

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| TGP Communications, LLC. | Case No. 24-13938 (MAM) |
| Debtor. | |

**NOTICE OF FILING ELECTRONICALLY BOOKEDMARKED COPY OF**
**THE EXHIBITS TO THE MOTION OF RUBY FREEMAN AND WANDREA'**
**ARSHAYE MOSS FOR AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11**
**CASE UNDER SECTIONS 1112(b) AND 305(a) OF THE BANKRUPTCY CODE OR,**
**IN THE ALTERNATIVE, MODIFYING THE AUTOMATIC STAY**
**TO CONTINUE PREPETITION LITIGATION**

Ruby Freeman and Wandrea' ArShaye "Shaye" Moss (together, the "Freeman Plaintiffs"), as creditors of TGP Communications, LLC (the "Debtor" or "The Gateway Pundit"), by and through their undersigned counsel, give notice of filing of an electronically bookmarked copy of the Exhibits to the Freeman Plaintiff's *Motion for an Order Dismissing the Debtor's Chapter 11 Case under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation* [D.E. 39], which were previously filed on May 31, 2024.

*[remainder of page left intentionally blank]*

Dated: June 3, 2024

By: /s/ David A. Blansky

| | |
|---|---|
| David A. Blansky | Rachel C. Strickland (*pro hac vice* pending) |
| Florida Bar No. 1033002 | Aaron E. Nathan (*pro hac vice* pending) |
| Michael P. Dunn | James H. Burbage (*pro hac vice* pending) |
| Florida Bar No. 100705 | WILLKIE FARR & GALLAGHER LLP |
| DUNN LAW, P.A. | 787 Seventh Avenue |
| 66 West Flagler Street, Suite 400 | New York, NY 10019 |
| Miami, FL 33130 | Telephone: (212) 728-8000 |
| Telephone: (786) 433-3866 | Facsimile: (212) 728-8111 |
| Facsimile: (786) 260-0269 | rstrickland@willkie.com |
| dblansky@dunnlawpa.com | anathan@willkie.com |
| michael.dunn@dunnlawpa.com | jburbage@willkie.com |
| | |
| -and- | -and- |
| | |
| Rachel Goodman (*pro hac vice* forthcoming) | Michael J. Gottlieb (*pro hac vice* pending) |
| Brittany Williams (*pro hac vice* forthcoming) | Meryl C. Governski (*pro hac vice* forthcoming) |
| UNITED TO PROTECT DEMOCRACY | WILLKIE FARR & GALLAGHER LLP |
| 82 Nassau Street, #601 | 1875 K Street NW |
| New York, NY 10038 | Washington, DC 20006 |
| Telephone: (202) 579-4582 | mgottlieb@willkie.com |
| rachel.goodman@protectdemocracy.org | mgovernski@willkie.com |
| brittany.williams@protectdemocracy.org | |

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF), on this 3rd day of June, 2024 upon counsel for Debtor and registered users in this case.

By: /s/ David A. Blansky
David A. Blansky, Esq.
Florida Bar No. 1033002

# EXHIBIT A

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**IN THE CIRCUIT COURT OF ST. LOUIS CITY, MISSOURI**
**TWENTY-SECOND JUDICIAL CIRCUIT**

| | | |
|---|---|---|
| RUBY FREEMAN and WANDREA MOSS, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 2122-CC09815-01 |
| JAMES HOFT, JOSEPH HOFT, and TGP COMMUNICATIONS LLC d/b/a *THE GATEWAY PUNDIT*, | ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## SECOND AMENDED PETITION

Plaintiffs Ruby Freeman and Wandrea Moss, through their attorneys, file this Second Amended Petition against Defendants James Hoft, Joseph Hoft, and TGP Communications LLC d/b/a *The Gateway Pundit* (collectively, "Defendants").

### INTRODUCTION

1.       The intentional dissemination of known falsehoods aimed at sowing doubt about the integrity of our elections threatens our very ability to function as a democracy. These falsehoods also destroy the lives of America's election workers, whose service to our system of government places them in the crosshairs of those who seek to undermine it with their disinformation. Plaintiffs Ruby Freeman and Wandrea "Shaye" Moss have been the targets of such a campaign of lies, accused by Defendants James Hoft, Joseph Hoft, and *The Gateway Pundit* of committing ballot fraud to alter the outcome of the 2020 presidential election in Georgia. The lies about Ms. Freeman and Ms. Moss have not only devastated their personal and professional reputations but instigated a deluge of

intimidation, harassment, and threats that has forced them to change their phone numbers, delete their online accounts, and fear for their physical safety.

2.      *The Gateway Pundit* presents itself as an online news source committed to responsible journalism: "All our content should be true. No value is more important than this."[1] But *The Gateway Pundit*'s stock in trade is spreading disinformation, including lies about the integrity of the 2020 election. According to NewsGuard, a company that rates journalistic credibility, during the 2020 presidential election *The Gateway Pundit* regularly featured "false reports, conspiracy theories, and unfounded allegations, with no distinction made between opinions and actual news reports."[2]

3.      In fact, Defendants are among the leading purveyors of false information in the United States, spreading baseless conspiracy theories and disinformation for fame and fortune. *The Gateway Pundit* has been identified as *the* top producer of false content during and after the 2020 presidential election. In the fourth quarter of 2020, *The Gateway Pundit* raked in ad revenue by achieving 7.2 million shares on social media of its bogus election fraud stories—far more than the social media shares for such national news sites such as *The Washington Post*, NBC News and NPR.[3]

4.      This action seeks to hold Defendants accountable for just some of their knowing lies—their false and endlessly repeated accusations that Ms. Freeman and Ms. Moss committed election fraud by, among other things, conspiring to empty the room

---

[1] Gateway Pundit, *About*, https://www.thegatewaypundit.com/about/ (last visited Nov. 30, 2021).

[2] NewsGuard, *Media Analysis of the US Election: August 2020*, Pressrelations – Knowledge Discovery, 36 (Sept. 4, 2020), https://www.pressrelations.com/files/user_upload/US-election_analysis_August_withAppendix_EN.pdf.

[3] Adrienne Goldstein, *Social Media Engagement with Deceptive Sites Reached Record Highs in 2020 | Strengthening Transatlantic Cooperation*, German Marshall Fund of the United States (Jan. 27, 2021), https://www.gmfus.org/news/social-media-engagement-deceptive-sites-reached-record-highs-2020/.

2

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

where they were counting ballots of poll watchers, producing secret "suitcases" full of illegal ballots, and running those ballots through vote counting machines multiple times. In making these false accusations, Defendants apparently drew their inspiration from lawyers for the Trump campaign, who contended on December 3, 2020, that grainy security camera footage showed unidentified persons counting illegal ballots. Defendants took these unsupported factual assertions and almost immediately published them to millions of readers, subsequently attributing names and additional accusations of criminal fraud against Ms. Freeman and Ms. Moss.

5.      Within 24 hours, the claims had been publicly and definitively refuted by Georgia elections officials through a detailed explanation of what the misinterpreted video actually showed: no suitcases; no illegal ballots; no voter fraud. Defendants nonetheless repeated and republished the completely fictitious account, month after month, long after it was conclusively shown to be untrue. With no concern for the truth or the consequences of their willful conduct, Defendants baselessly portrayed Plaintiffs as traitors who participated in a carefully planned conspiracy to steal the presidential election in Georgia.

6.      Defendants' reports were both false and consequential. They caused Ms. Freeman and Ms. Moss to be vilified on social media and subjected to an onslaught of violent, racist threats and harassment of all kinds. At the height of Defendants' campaign of disinformation, Ms. Freeman, at the recommendation of the FBI, fled her home and did not return for two months. On January 6, 2021, a crowd on foot and in vehicles surrounded Ms. Freeman's house. Ms. Freeman was forced to shutter her online business when social media became impossible to navigate. Ms. Moss has suffered personal and professional consequences in her work on Fulton County elections. On at least two occasions, strangers

3

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

showed up at her grandmother's home and attempted to push into the house in order to make a "citizens' arrest." Fulton County elections' general email address would forward incoming emails to Ms. Moss and many of her colleagues, filling her workplace with harassing messages.

7.      As a result of Defendants' ongoing campaign, both women are afraid to live normal lives. Ms. Freeman is fearful when she hears her name called in public; Ms. Moss now fears risking even a visit to the grocery store and must get her groceries delivered instead. Defendants have inflicted and continue to inflict severe and ongoing emotional, and economic damage on both plaintiffs.

8.      Plaintiffs file this lawsuit to vindicate their reputations and to ensure that other patriotic Americans who step forward to help make our election system function do not likewise become victims of abuse.

**PARTIES**

9.      Plaintiff Ruby Freeman is a natural person and citizen of Georgia. Ms. Freeman worked as a temporary election worker with the Fulton County Registration and Elections Department during the 2020 general election. Her responsibilities as a temporary election worker included verifying signatures as absentee ballots came in, and then preparing absentee ballots for counting and processing.

10.     Plaintiff Wandrea "Shaye" Moss is a natural person and citizen of Georgia. Ms. Moss has worked for the Fulton County Registration and Elections Department since 2012. Ms. Moss's current position with the County is a Registration Officer, and her responsibilities include processing voter applications and assisting voters in person and

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

over the phone. During the 2020 general election, she supervised Fulton County's absentee ballot operation.

11.     Defendant James "Jim" Hoft is a natural person and citizen of Missouri whose principal place of residence is in St. Louis City, Missouri. Jim Hoft is the owner and the sole organizer of TGP Communications LLC. He is the editor of and frequent contributor to a political website and blog called *The Gateway Pundit* that he created in 2004.

12.     Defendant Joseph "Joe" Hoft is a natural person and citizen of Missouri, where he hosts a daily radio show from a studio in Chesterfield, Missouri. He also maintains a residence in Jensen Beach, Florida. He is Jim Hoft's twin brother. Joe Hoft writes regularly for *The Gateway Pundit*.

13.     Defendant TGP Communications LLC d/b/a The Gateway Pundit ("*The Gateway Pundit*") is a limited liability company organized and existing under the laws of Missouri. At all times, *The Gateway Pundit* was acting by or through its authorized agent(s), employee(s), representative(s) or owner(s). Upon information and belief, *The Gateway Pundit* publishes its articles and related social media posts from James Hoft's principal place of residence in St. Louis City, Missouri.

14.     *The Gateway Pundit* has no registered agent. Gregory J. Hickel, the only agent *the Gateway Pundit* had registered with the Missouri Secretary of State, passed away in 2016, and *The Gateway Pundit* has not registered another agent.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**JURISDICTION AND VENUE**

15.    Plaintiffs filed this case in Missouri state court. Defendants improperly removed the case to federal district court. The case was remanded to this Court on June 6, 2022.

16.    The Courts of the State of Missouri have personal jurisdiction over all Defendants because all Defendants have published defamatory statements in Missouri, and taken other actions in Missouri, such statements and actions being the subject of this Petition, and accordingly this suit arises out of and relates to Defendants' contacts with Missouri.

17.    The Courts of the State of Missouri may exercise personal jurisdiction over Jim Hoft as he is a resident and domiciliary of Missouri and he committed tortious actions giving rise to this cause of action within Missouri.

18.    The Courts of the State of Missouri may exercise personal jurisdiction over Joe Hoft as he is a resident and domiciliary of Missouri, writes for and maintains business contacts with *The Gateway Pundit*, and in the alternative, on information and belief, visited Missouri and/or had contacts with this State in connection with the conduct giving rise to this action.

19.    The Courts of the State of Missouri may exercise personal jurisdiction over *The Gateway Pundit* as it is formed within and exists under the laws of Missouri, and it committed tortious actions giving rise to this cause of action within Missouri.

20.    Venue is proper in St. Louis City, Missouri, because, pursuant to §508.010 R.S. Mo., in this action for defamation, Plaintiffs were first injured in St. Louis City, the

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

jurisdiction in which the defamation was first published. Additionally, individual defendant Jim Hoft's principal place of residence is St. Louis City, Missouri.

**FACTS**

**A.      The Role, Reach, and Reputation of *The Gateway Pundit***

21.      *The Gateway Pundit* reaches a large audience. A study by the Berkman Klein Center for Internet & Society at Harvard University of mainstream and social media coverage during the 2016 presidential race showed that the website was one of the most popular media sources on the right. Between May 1, 2015, and November 7, 2016, the website was the fifth-most popular source on Twitter and the third-most popular source on Facebook (notably, Fox News was the fourth most popular source on Facebook for the same period).[4]

22.      The reach of *The Gateway Pundit* grew further in the 2020 election cycle. Research by the German Marshall Fund, a non-partisan policy organization, found the site to have been "particularly dominant" during the election, with a ninefold increase in the sharing of its content on Twitter between the fourth quarter of 2018 and the fourth quarter of 2020.[5] The report also noted that nine of the website's ten most popular articles in the fourth quarter of 2020 presented disinformation about voter fraud.

23.      In September 2021, *The Gateway Pundit* had more than 2.8 million unique visitors, making it the eleventh-most-visited U.S. conservative site, according to one

---

[4] Robert Faris et al., *Partisanship, Propaganda, and Disinformation: Online Media and the 2016 U.S. Presidential Election* at 13, Berkman Klein Ctr. for Internet & Soc'y, 13 (2017), http://nrs.harvard.edu/urn-3:HUL.InstRepos:33759251/.

[5] Goldstein, *supra* note 3.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

assessment.[6] More than 650,000 users "like" its Facebook page, while 630,000 users "follow" the page.[7] Roughly 98,000 people subscribe to its YouTube channel, and its videos regularly garner thousands of views.[8]

24.     According to published reports, *The Gateway Pundit* earned as much as $1.1 million in Google Ad revenue between November 2020 and June 2021.[9] In February 2021, *The Gateway Pundit* began offering a subscription service.[10]

25.     Despite its professed allegiance to the truth, *The Gateway Pundit* regularly publishes false claims. The Berkman Klein Center study identified seven online sources— both left- and right-leaning—that were highly influential on social media, highly partisan, and sometimes explicitly deceptive. Among these, the study stated, "Gateway Pundit is in a class of its own, known for 'publishing falsehoods and spreading hoaxes.'"[11]

26.     Defendant Jim Hoft has responded derisively to the notion that *The Gateway Pundit* should verify information before publishing it. After a *New Yorker* reporter interviewing him in 2017 told Hoft to expect a call from the magazine's fact-checkers, he responded: "Oh yeah, just like at the Gateway Pundit. We've got a huge

---

[6] *US Conservative Websites Ranked by Unique Visitors, September 2021*, The Righting, https://www.therighting.com/september-2021-conservative-website-metrics (last visited Nov. 30, 2021).

[7] *Gateway Pundit*, Facebook, https://www.facebook.com/gatewaypundit (last visited Nov. 30, 2021).

[8] *Gateway Pundit*, YouTube, https://www.youtube.com/c/GatewayPunditVideo/ (last visited Nov. 30, 2021).

[9] *One of the Biggest Publishers of Election Misinfo Earned Up to $1.1 Million in Google Ad Revenue*, Ctr. for Countering Digital Hate (July 29, 2021), https://www.counterhate.com/post/gatewaypundit.

[10] Paul Wagman, *Loud, shrill and unknown: The strange case of the Gateway Pundit*, Gateway Journalism Review (July 6, 2021), https://gatewayjr.org/loud-shrill-and-unknown-the-strange-case-of-the-gateway-pundit/; *Subscribe to The Gateway Pundit!*, The Gateway Pundit, https://www.thegatewaypundit.com/join/ (last visited Nov. 30, 2021).

[11] Faris et al, *supra* note 4, at 15 (quoting Ben Schreckinger, *'Real News' Joins the White House Briefing Room*, Politico Mag. (Feb. 15, 2017), https://www.politico.com/magazine/story/2017/02/fake-news-gateway-pundit-white-house-trump-briefing-room-214781/).

department of full-time fact-checkers." He then "laughed so hard that he nearly spilled his lemonade."[12]

**B.** **The 2020 Election in Fulton County, Georgia**

27.     In the fall of 2020, Americans cast ballots in the nation's 59th presidential election, which pitted the incumbent, Republican Donald J. Trump, against the former Vice President, Democrat Joseph R. Biden. News coverage in the lead-up to Election Day noted that Georgia had "emerged as one of the nation's biggest electoral battlegrounds in the race for the White House."[13]

28.     The voting process in Georgia began on September 15, 2020, when local officials began mailing out absentee ballots. Voters could cast early voting ballots in-person from October 12, 2020, until October 30, 2020, and they could vote by mail until Election Day, on November 3, 2020. All told, more than 4 million Georgians cast ballots during early voting or via absentee ballot in the 2020 election.[14] On Election Day, when another 975,540 people cast votes,[15] Georgia Secretary of State Brad Raffensperger observed, "We are having a successful election in Georgia today."[16]

---

[12] Andrew Marantz, *Is Trump Trolling the White House Press Corps?*, New Yorker (Mar. 13, 2017), https://www.newyorker.com/magazine/2017/03/20/is-trump-trolling-the-white-house-press-corps.

[13] Greg Bluestein, *Election Day Arrives: 5 Factors That Will Decide Georgia's 2020 Race*, Atlanta J.-Const., (Nov. 3, 2020), https://www.ajc.com/politics/election-day-arrives-5-factors-that-will-decide-georgias-2020-race/5K5HAAJJGBHDRLB6KWTHQ7ODRE/; *see also id.* (noting how "tantalizingly close" Democrats came to winning a statewide official in 2018).

[14] *November 3, 2020 General Election*, Ga. Sec'y of State, https://results.enr.clarityelections.com/GA/105369/web.264614/#/detail/5000 (last visited Nov. 30, 2021).

[15] *Id.*

[16] Kate Brumback & Sudhin Thanawala, *Despite A Few Hiccups, Voting in Georgia Goes Smoothly*, Associated Press (Nov. 4, 2020), https://apnews.com/article/election-2020-virus-outbreak-primary-elections-georgia-elections-ce8204935e991f740c94d6bc464481cf.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

29.     In Fulton County, absentee ballots were counted in State Farm Arena. Plaintiffs were employed to assist in the vote tabulation process at the arena.

30.     On November 3, 2020, an overflowing urinal at State Farm Arena led to a brief voluntary evacuation of the affected area.[17] According to a press release at the time:

> At approximately 6:07 a.m., the staff at State Farm Arena notified Fulton County Registration & Elections of a water leak affecting the room where absentee ballots were being tabulated. The State Farm Arena team acted swiftly to remediate the issue. Within 2 hours, repairs were complete. No ballots were damaged, nor was any equipment affected. There was a brief delay in tabulating absentee ballots while the repairs were being conducted.[18]

The *Atlanta Journal-Constitution* reported on November 3 that a pipe break had caused a water leak at the ballot processing site and specifically noted that no ballots were damaged.[19] It was later determined that the water leak had been caused by an overflowing urinal.[20]

31.     On November 13, 2020, NBC and CNN declared Biden the projected winner of Georgia.[21]

---

[17] Decl. of Frances Watson ¶¶ 4, 6, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1, https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[18] *Statement Regarding Absentee Ballot Tabulation at State Farm Arena*, State Farm Arena (Nov. 3, 2020), https://www.statefarmarena.com/news/detail/statement-regarding-absentee-ballot-tabulation-at-state-farm-arena.

[19] Ben Brasch, *Fulton County Election Results Delayed After Pipe Bursts in Room with Ballots*, Atlanta J.-Const. (Nov. 3, 2020), https://www.ajc.com/news/atlanta-news/fulton-election-results-delayed-after-pipe-bursts-in-room-with-ballots/4T3KPQV7PBEX3JVAIGJBNBSVJY/.

[20] Declaration of Frances Watson ¶ 5, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1 (stating that the Secretary of State's Office launched an investigation that "revealed that the incident initially reported as a water leak late in the evening on November 3rd was actually a urinal that had overflowed early in the morning of November 3rd" and confirming that this leak "did not affect the counting of votes by Fulton County later that evening"), https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[21] Adam Edelman, *With final states called, Biden's projected Electoral College victory matches Trump's in 2016*, NBC News (Nov. 13, 2020), https://www.nbcnews.com/politics/2020-election/final-states-called-

32.     From November 11 through November 19, 2020, county election officials carried out a risk-limiting audit, which included a full manual tally of all votes cast and confirmed Biden had won Georgia's election.[22] "Audit boards from all 159 Georgia countries examined 41[,]881 batches, hand-sorting and counting each ballot as part of the process, which was the largest hand count of ballots in United States history." According to the audit, "no individual county showed a variation in margin larger than 0.73%." Moreover, "103 of the 159 counties showed a margin variation of less than 0.05%."[23] It concluded that "the correct winner was reported."[24]

33.     On November 20, 2020, Secretary of State Raffensperger certified Biden's victory. That same day, Republican governor Brian Kemp certified Georgia's election results.[25]

34.     President Trump requested a recount, which was conducted using scanners that read and tally the votes.[26] The recount was the third tally of votes in the Georgia presidential race and the third tally to conclude that Joe Biden won the election. On

---

biden-s-projected-electoral-college-victory-matches-n1247766. Gregory Krieg, *Joe Biden becomes first Democrat in 28 years to win Georgia*, CNN (Nov. 13, 2021), https://www.cnn.com/2020/11/13/politics/joe-biden-wins-georgia/index.html.

[22] "Like any risk-limiting audit, this audit does not confirm or correct the exact margin of victory. It only provides sufficient evidence that the correct winner was reported." *Risk-Limiting Audit Report: Georgia Presidential Contest, November 2020*, Georgia Secretary of State (Nov. 19, 2020), https://sos.ga.gov/admin/uploads/11.19_.20_Risk_Limiting_Audit_Report_Memo_1.pdf.

[23] *Id.*

[24] *Id.*

[25] Kate Brumback, *Georgia Officials Certify Election Results Showing Biden Win*, Associated Press (Nov. 20, 2020), https://apnews.com/article/georgia-certify-election-joe-biden-ea8f867d740f3d7d42d0a55c1aef9e69.

[26] Kate Brumback, *Georgia Again Certifies Election Results Showing Biden Won*, Associated Press (Dec. 7, 2021), https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a.

11

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

December 7, 2020, Georgia officials recertified Biden's victory of the state's 16 electoral votes.[27]

**C.     Trump's Legal Team Initiates the Lie That Georgia Election Workers Illegally Instructed Observers to Leave and Counted Thousands of Fraudulent Ballots Unobserved**

35.     On December 3, 2020, Donald Trump's legal team testified before the Georgia State Senate, alleging that fraud and misconduct had occurred during Georgia's November 2020 election.[28]

36.     In an attempt to demonstrate that there had been irregularities in ballot-counting, a lawyer for the Trump campaign named Jacki Pick played cherry-picked snippets of surveillance video of the absentee and military vote count at the State Farm Arena.[29] While the surveillance video of the vote counting on November 3 is 14 hours long, Ms. Pick played only a few brief excerpts during her 17-minute testimony.

37.     While playing the video excerpts for the State Senate, Ms. Pick provided her own interpretation of what was being shown. She claimed that Republican observers had been asked to leave the arena in contravention of Georgia law and that, once they were gone, the election workers produced and counted 18,000 hidden, fraudulent ballots—more than the margin of victory in the presidential race.[30]

---

[27] *Id.*

[28] Beau Evans, *Georgia Senate Panel Hosts Trump Attorney Giuliani As Election Officials Dispute Fraud Claims*, Augusta Chron. (Dec. 3, 2020), https://www.augustachronicle.com/story/news/2020/12/03/georgia-senate-panel-probing-election-hosts-trump-attorney-giuliani/3818365001/.

[29] Angelo Fichera, *Video Doesn't Show 'Suitcases' of Illegal Ballots in Georgia*, FactCheck.org (Dec. 4, 2020), https://www.factcheck.org/2020/12/video-doesnt-show-suitcases-of-illegal-ballots-in-georgia/. For video of the hearing, see also 11Alive, *Second Georgia Senate Election Hearing*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=hRCXUNOwOjw.

[30] 11Alive, *Second Georgia Senate Election Hearing*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=hRCXUNOwOjw (showing Ms. Pick's commentary on the surveillance footage from 33:27 to 50:26).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

38.     Ms. Pick described the surveillance videotape as showing Republican observers and the press leaving the room shortly before 11 p.m. after a "lady who has blonde braids" asked them to leave and told them that election workers were going to stop counting ballots for the day. The surveillance video had no sound to corroborate this claim, but Ms. Pick said she had been provided this information by the observers and noted that the video showed four election workers staying while observers and press departed. She identified the election workers in the room as "the lady in purple," "two women in yellow," and "the lady with the blonde braids also, who told everyone to leave."[31]

39.     Ms. Pick's commentary continued as she played her video excerpt: "Once everyone is gone, coast is clear, they are going to pull ballots out from underneath a table." Ms. Pick said it was not typical to store "suitcases" full of ballots under a table and pointed out a table which she claimed had been placed there earlier in the day by "the lady with the blonde braids." Ms. Pick did not identify the four election workers by name but said "one of them had the name Ruby across her shirt somewhere."[32]

40.     Ms. Pick acknowledged that the Trump legal team had taken only a couple of hours to review the 14 hours of surveillance footage, and no one working for the campaign had watched the entire video, even once.[33]

41.     Both the Georgia Secretary of State and the Georgia Bureau of Investigation immediately investigated Ms. Pick's claims. The Secretary of State is a Republican who had been endorsed during his campaign by Donald Trump. They reviewed the security

---

[31]                                                                                                           *Id.*

[32] *Id.*

[33] *Id.*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

videotape, interviewed all witnesses who were present at the time of the alleged misconduct, and found no evidence whatsoever to substantiate any of Ms. Pick's claims.[34]

42.     Secure the Vote, a website maintained by the office of the Secretary of State, provides a detailed fact check of Ms. Pick's claims about what is depicted in the video.[35] Secure the Vote's timeline documents the events from November 3, 2020, actually shown on the video, including:

| | |
|---|---|
| 5:22 a.m. | Workers arrive at the State Farm Arena and discover a water leak. They immediately move tables and ballots away from the leak to prevent any water damage. |
| 6:30 a.m. | Workers can be seen moving tables, but not tampering with ballots. |
| 7:11 a.m. | Workers are seen vacuuming and drying the floors. |
| 8:22 a.m. | Workers begin rearranging the room to its original layout. They move tables and ballot containers. The table under which a "suitcase" full of ballots was allegedly stashed is moved, revealing nothing hidden there. |
| 9:57 p.m. | Poll workers prepare to stop work for the night and empty ballot containers are brought into the room. Workers then fill the containers with uncounted ballots. |
| 10:06 p.m. | Poll workers store the containers with uncounted ballots under the table for the night while there are still many people in the room. |
| 11:02 p.m. | After the Secretary of State[36] told poll workers they should continue working through the night, they remove the containers with uncounted ballots from underneath the table and resume their counting. |

---

[34] Response of the Georgia Secretary of State to the Court's Order of September 20, 2021, *Favorito v. Wan*, Civ. No. 2020CV343938 (Fulton Cnty. Ga. Super. Ct. Oct. 12, 2021), https://www.gpb.org/news/2021/10/12/election-investigators-havent-found-evidence-of-counterfeit-ballots-in-georgia/.

[35] *State Farm Arena*, Secure the Vote, https://securevotega.com/fact-check/ (last visited Nov. 30, 2021).

[36] Voting Implementation Manager for the State of Georgia, Gabriel Sterling reported that Georgia's Secretary of State Brad Raffensperger ordered election workers to continue counting ballots through the night. Maggie Astor, A Georgia Election Official Debunked Trump's Claims of Voter Fraud, Point by Point, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/2021/01/04/us/politics/trump-georgia-election-fraud.html.

**D. Defendants Publish and Republish the Lie**

43. Immediately after Ms. Pick spoke in the Georgia Senate on December 3, 2020, the false accusation of wrongdoing and misleading excerpts from the surveillance video were circulated widely by the Trump campaign and various media outlets. For example, One America News Network rebroadcast the surveillance video shown earlier that day by the Trump lawyers with Ms. Pick's commentary.[37]

44. The Trump campaign promptly amplified and republished a brief excerpt from the One America News Network's coverage[38] and distributed it repeatedly on Twitter that same day.[39] The excerpt depicted four individuals walking between desks while one individual removes containers from underneath a table in the foreground and brings them back to the desks. The individuals then remove ballots from the containers and process them.[40] (This edited footage from the surveillance video will hereafter be called the "Trump Edited Video.")

45. That same day, December 3, 2020, *The Gateway Pundit* published its first article disseminating the same Trump Edited Video. The story was promoted under the headline "HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled

---

[37] One America News Network, *Giuliani, TRUMP Legal Team Testify in GA.FULL 12/3/20*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=3wObE1JCQMg/.

[38] Donald J. Trump, *Video from GA Shows Suitcases Filled with Ballots Pulled From Under a Table AFTER Poll Workers Left*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=nVP_60Hm4P8/.

[39] @TeamTrump, Twitter (Dec. 3, 2020, 10:32 AM), *available at* https://web.archive.org/web/20201205090637mp_/https://twitter.com/TeamTrump/status/13345663012059 25889/ (last visited Dec. 22, 2021); @TeamTrump, Twitter (Dec. 3, 2020, 10:44 AM), *available at* https://web.archive.org/web/20201205122001/https://twitter.com/TeamTrump/status/133456932933408358 6/ (last visited Nov. 30, 2021). The @TeamTrump account is no longer accessible on Twitter.

[40] Donald J. Trump, *Video from GA Shows Suitcases Filled with Ballots Pulled from under a Table after Poll Workers Left*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=nVP_60Hm4P8/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center." Written by Cristina Laila, the article republished two Team Trump tweets about the video and added the following claims:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.
>
> …
>
> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated![41]

46.     The article concludes with a photo captioned, "Close up photo of the suitcases being wheeled out from under tables."[42]

---

[41] Cristina Laila, *HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center*, Gateway Pundit (Dec. 3, 2020, 1:11 PM), https://www.thegatewaypundit.com/2020/12/video-footage-georgia-shows-suitcases-filled-ballots-pulled-table-supervisor-told-gop-poll-workers-leave-tabulation-center/. A true and correct copy of this article is attached as Exhibit 1. (Due to changes in the formatting of Defendants' website since Plaintiffs filed the original Petition and First Amended Complaint, there are some differences in the formatting of the PDFs Plaintiffs have attached as exhibits, particularly with respect to the comments section on various articles.)

[42] *Id.*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



47.     Defendant Jim Hoft amplified this story and its defamatory claims using his Twitter account.[43]

48.     A little while later, Hoft again amplified the story and added additional defamatory remarks, calling Ms. Freeman and Ms. Moss "dirty Crooks" and insinuating that they were political operatives:[44]

---

[43]     Jim    Hoft    (@gatewaypundit),    Twitter    (Dec.    3,    2020),    *available    at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit/status/1334577520478392 320 (last visited Nov. 30, 2021). The @gatewaypundit account is no longer accessible on Twitter.

[44]     Jim    Hoft    (@gatewaypundit),    Twitter    (Dec.    3,    2020),    *available    at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

17

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



49.    In the afternoon on December 3, *The Gateway Pundit* published another article, titled, "WHERE'S BILL BARR? — We Got Your Voter Fraud AG Barr — It's On Video and They Attempted to Steal Georgia with It! — HOW ABOUT A FEW ARRESTS?"[45] It accused those in the video of "stay[ing] behind to count illegal ballots for Joe Biden" and "cheating":

> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!
>
> They were caught cheating!

---

[45] Jim Hoft, *WHERE'S BILL BARR? — We Got Your Voter Fraud AG Barr — It's On Video and They Attempted to Steal Georgia with It! — HOW ABOUT A FEW ARRESTS?*, Gateway Pundit (Dec. 3, 2020, 2:29 PM), https://www.thegatewaypundit.com/2020/12/bill-barr-got-voter-fraud-ag-barr-video-attempted-steal-georgia-arrests/. A true and correct copy of this article is attached as Exhibit 2.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

50. Jim Hoft amplified this story on Twitter.[46]

51. Later on December 3, *The Gateway Pundit* published another article repeating the false report, headlined "What's Up, Ruby?… BREAKING: Crooked Operative Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED." Written by Defendant Jim Hoft, this article reasserted the false claims about "crooked Democrats" engaging in "voter fraud."[47]

52. This article was the first to identify by name Plaintiff Ruby Freeman as one of the workers in the video, naming Ms. Freeman and her business and falsely accusing her of voter fraud. It stated:

> One woman in the video is wearing a purple top.
>
> …
>
> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.
>
> Her T-shirt says "Lady Ruby" and her purse says, "LaRuby" which is her company.
>
> This was not a very smart move.
>
> Her company is called "LaRuby's Unique Treasures."
>
> It's on her LinkedIn page!
>
> …

---

[46] Jim Hoft (@gatewaypundit), Twitter (Dec. 3, 2020), *available at* https://web.archive.org/web/20201205214839/https://twitter.com/gatewaypundit/status/1334595742594428930 (last visited Aug. 23, 2022).

[47] Jim Hoft, *What's Up, Ruby?… BREAKING: Crooked Operative Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED*, Gateway Pundit (Dec. 3, 2020, 8:49 PM), https://www.thegatewaypundit.com/2020/12/ruby-breaking-crooked-democrat-filmed-pulling-suitcases-ballots-georgia-identified/. A true and correct copy of this article is attached as Exhibit 3.

Maybe the Georgia police or Bill Barr's DOJ may want to
pay Ruby Freeman a visit.[48]

53.    The article concluded with the following images of Ms. Freeman, over a

banner saying "CROOK GETS CAUGHT."



54.    Defendants Jim and Joe Hoft amplified this story on Twitter, too.[49]

**E.     Despite Prompt and Authoritative Refutation of the False Report by Multiple
Sources, Defendants Republish and Magnify the Lies for Months**

55.    The Trump legal team's claim of voter fraud in the State Farm Arena was

flatly, fully, and publicly repudiated by Georgia election officials within 24 hours after it

was made. At 6:41 a.m. on December 4, 2020, the Voting Implementation Manager for the

State of Georgia, Gabriel Sterling, shot down the fanciful claim on Twitter: "The 90 second

---

[48] *Id.*

[49]    Jim    Hoft    (@gatewaypundit),    Twitter    (Dec.    3,    2020),    *available    at*
https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30,
2021);    Joe    Hoft    (@joehoft),    Twitter    (Dec.    4,    2020),    *available    at*
https://web.archive.org/web/20201207070649/https://twitter.com/joehoft (last visited Nov. 30, 2021). Note
that for many of Jim and Joe Hoft's tweets, web.archive.org does not appear to have captured the preview
image.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

video of election workers at State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators. Shows normal ballot processing. Here is the fact check on it."[50]

56.     Mr. Sterling's tweet shared a link to a fact check published by Lead Stories, a fact-checking website that identifies false or misleading stories. It demonstrated that the Trump Edited Video did not show suitcases full of ballots being pulled from under a table, and that poll watchers were not told to leave.[51] The fact check quotes Georgia election officials explaining that the containers in the video contained ballots that were processed for counting earlier in the night, that the vote count data and voter verifications negated the claim that thousands of fraudulent ballots had been introduced into the count, and that it was not illegal for election workers to count ballots in the observers' absence.[52]

57.     Several days earlier, after reports of harassment and death threats against election officials, Mr. Sterling had made clear what he believed were the likely consequences of the continued attacks on Georgia's election system. "Someone's going to get hurt, someone's going to get shot, someone's going to get killed," he had stated in a news conference.[53]

---

[50]     Gabriel     Sterling     (@GabrielSterling),     Twitter     (Dec.     4,     2020,     6:41     AM), https://twitter.com/GabrielSterling/status/1334825233610633217.

[51] Alan Duke & Hallie Golden, *Fact Check: Video From Georgia Does NOT Show Suitcases Filled With Ballots Suspiciously Pulled From Under A Table; Poll Watchers Were NOT Told To Leave*, Lead Stories (Dec.     3,     2020),     https://leadstories.com/hoax-alert/2020/12/fact-check-video-from-ga-does-not-show-suitcases-filled-with-ballots-pulled-from-under-a-table-after-poll-workers-dismissed.html.

[52] *Id.*; *see* Angelo Fichera, *Video Doesn't Show 'Suitcases' of Illegal Ballots in Georgia*, FactCheck.org (Dec.     4,     2020),     https://www.factcheck.org/2020/12/video-doesnt-show-suitcases-of-illegal-ballots-in-georgia/.

[53] Stephen Fowler, *'Someone's Going To Get Killed': Ga. Official Blasts GOP Silence On Election Threats*, NPR     (Dec.     1,     2020,     8:58     PM     ET),     https://www.npr.org/sections/biden-transition-updates/2020/12/01/940961602/someones-going-to-get-killed-ga-official-blasts-gop-silence-on-election-threats.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

58.     Nonetheless, Jim Hoft authored another article published on *The Gateway Pundit* later that morning under the title "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER [sic] Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)." The article repeated the now-debunked allegations from the night before and introduced new false claims:

> Earlier on Thursday Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!
>
> …
>
> We identified one of the operatives last night who was caught on video counting illegal ballots from a suitcase stashed under a table!
>
> As you can see from the video one woman in a purple top was filmed helping pull out the ballots and then sitting down to count the ballots.
>
> That woman has now been identified.
>
> Local 11 News covered the story from the State Farm Arena that a pipe had burst.
>
> (This later was proven to be complete fraud and an excuse to kick out the GOP election observers!)
>
> …
>
> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.

...

Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.

They then commented on her LinkedIn page.

Ruby Freeman still has an active Facebook page (as of 11 PM on Thursday night).

On her page Ruby Freeman brags about her "Shaye" being her supervisor.

It is clear from a video that was released that Shaye and Ruby are very close.

Here are a few entries from Ruby's Facebook page.

...

Ruby made a post on Facebook on Nov 3, "Look at my Baby giving that look to the employees. Mommie is so proud of you. Supervisor of registration."

And here is a closeup of the woman in question via a Getty image.

Her official name is "Wandrea Moss."

...

You can clearly see "Shaye" the woman in blonde pigtails removing suitcases of ballots from under a table after GOP observers were evacuated from the room and told to go home.[54]

59.    Less than two hours after Voting Implementation Manager Sterling tweeted that what the video of Ms. Freeman and Ms. Moss showed was "normal ballot processing," Defendant Joe Hoft published an article titled, "CLOWN SHOW: Georgia Election Insider

---

[54] Jim Hoft, *BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)*, Gateway Pundit (Dec. 4, 2020, 7:35 AM), https://www.thegatewaypundit.com/2020/12/breaking-crooked-elections-superviser-filmed-pulling-suitcases-ballots-georgia-identified-rubys-daughter-video/. A true and correct copy of this article is attached as Exhibit 4.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Gabriel Sterling Freaks Out and Labels Election Fraud Caught on Camera 'Normal Ballot Processing.'" Rather than acknowledge the falsity of *The Gateway Pundit*'s earlier stories—or even neutrally reporting on the fact checks—that article lobbed a series of ad hominem attacks against Mr. Sterling and doubled down on Defendants' false claims, including the statement:

> Unfortunately for Sterling, we can't even keep up with the amount of corruption in Georgia related to this year's election. Yesterday for example, a video was unearthed by the Trump team showing Democrat counters in Atlanta pulling out suitcases full of ballots and counting them after sending Republicans home due to a falsely reported water main break (um, this is against the law Mr. Sterling).
>
> But Sterling still wants to call it all a lie. He claims there was no corruption in this year's election and he shares another totally bogus 'fact check' from Lead Stories as in his Facebook page as support that this is all normal. . . .[55]

60.    Joe Hoft amplified this story on Twitter by retweeting another user.[56]

61.    The same morning, Georgia Public Broadcasting published its own article fact-checking the election fraud claims made during the George State Senate hearing on the previous day. The article directly refuted the Trump legal team's claims concerning the contents of the Trump Edited Video. It reported that the video showed a normal tabulation process, which both state and county officials had verified. It also reported that no observers had been asked to leave, but Republican monitors and the press did leave when

---

[55] Joe Hoft, *CLOWN SHOW: Georgia Election Insider Gabriel Sterling Freaks Out and Labels Election Fraud Caught on Camera 'Normal Ballot Processing'*, Gateway Pundit (Dec. 4, 2020, 8:15 AM), https://www.thegatewaypundit.com/2020/12/clown-show-georgia-election-insider-gabriel-sterling-freaks-labels-election-fraud-caught-camera-normal-ballot-processing/.

[56] Joe Hoft (@joehoft), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

some election employees stopped their work for the night. And it clarified that Georgia law does not require poll monitors to be present for the ballot counting process.[57]

62.    Defendants learned of the ongoing fact checks almost immediately after they were published.

63.    Even after acknowledging the first fact check, and after the second fact check was published and available online, Jim and Joe Hoft     published several additional articles on *The Gateway Pundit* on December 4, 2020, repeating and realleging the false claims that Ms. Freeman and Ms. Moss secretly brought illicit ballots into the arena to be counted and had committed massive voter fraud. Jim Hoft's next article was titled "NEW VIDEO Shows Anti-Trump Georgia Ballot Counter Ruby Freeman with Piles of Ballots, Walking Past Boxes of Ballots, Working Alone in Cubes WITH NO GOP OBSERVERS IN SIGHT!" and made new false and defamatory claims about Ms. Freeman:

> Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.
>
> Ruby walks by several boxes of ballots just sitting around in the room.
>
> The elections workers were each given their own secret cube.
>
> Then Ruby goes to her desk and pulls out a tray of ballots on her desk.
>
> There is NO supervisor or GOP observer anywhere in sight.
>
> And then Ruby leaves the ballots on her desk as she goes to take a break.

---

[57] Stephen Fowler, *Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim*, Georgia Public Broadcasting (Dec. 4, 2020, 8:27 AM), https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim,                    archived                    at https://web.archive.org/web/20201204170112/https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.[58]

64.     Jim and Joe Hoft amplified this story using their Twitter accounts.[59]

65.     At approximately 10:08 a.m. ET, Voting Implementation Manager Gabe Sterling joined Newsmax for a roughly 17-minute segment.[60] After playing a clip of the Trump Campaign's footage and soliciting comments from another guest, the host asked Sterling to weigh in on the video. Sterling straightforwardly debunked any claim that the video showed anything nefarious:

> Unlike watching 90 seconds of it like we saw in the Senate hearing yesterday, we've had our investigators watch all many several hours of it yesterday. And what essentially happened is—and we knew about this, part of this, on election night itself—around 10:15/10:20, there's two groups of people in this room that are working. There are cutters—the people who are opening the envelopes—and then there's the people who are scanning, which is the ones we see on the video.

> And let's keep a few things in mind. I've been in this room. It's really obvious there's video cameras everywhere, so they know they're being watched on that front.

> So what happened was, when the cutters were—they were done, so they were, so they was like, "Okay, we're done, time to go home," and the media started packing up. And then the monitors kept packing up.

---

[58] Jim Hoft, *NEW VIDEO Shows Anti-Trump Georgia Ballot Counter Ruby Freeman with Piles of Ballots, Walking Past Boxes of Ballots, Working Alone in Cubes WITH NO GOP OBSERVERS IN SIGHT!*, Gateway Pundit (Dec. 4, 2020, 8:53 AM), https://www.thegatewaypundit.com/2020/12/new-video-shows-anti-trump-georgia-ballot-counter-ruby-freeman-piles-ballots-walking-past-boxes-ballots-no-gop-observers-sight/.   A true and correct copy of this article is attached as Exhibit 5.

[59]     Jim     Hoft     (@gatewaypundit),     Twitter     (Dec.     4,     2020),     *available     at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit     (last     visited     Nov.     30, 2021);     Joe     Hoft     (@joehoft),     Twitter     (Dec.     4,     2020),     *available     at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Nov. 30, 2021).

[60]  Monkey Savant, *Gabriel Sterling and Chad Robichaux On Newsmax Discuss The GA Ballot Fraud Situation 12/04/20*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=o6k2zRRPx4I.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Now the one thing we have is a he said she said, where the officials there said, "we didn't tell anybody that they had to leave." The people who left—the Republican monitor said, "we were told we had to leave." And we have no audio from those videotapes to ascertain the absolute truth. That's what is he said she said on that front.

But when you watch the video, the process—those aren't suitcases. Those are regular absentee carriers used in dozens of counties across the state. That's how they bring those in. Nothing was brought in without the monitors there, so everything was there. There was nothing new brought in. We didn't see somebody wheeling stuff into the room; we saw stuff that was already in the room that the monitors already saw brought in.

And then you saw the processes they're doing. Essentially what happened, the elections director called the absentee coordinator that's saying we're not shutting down. Tell them they gotta go get back to work because the counting people thought they were also getting to go home. So they were kind of disappointed. So you see him on his phone. He walks over to them, they kind of shrug their shoulders like, "crap, we got to go back to work again." So, so they started doing that, and then we found out that the monitors weren't there anymore. So, we called their elections directors, and we called our state elections board monitor, who we have placed in Fulton County under a consent decree that we had ordered because of their screw-ups in the June election, and yes, there was 82 minutes where there wasn't a person there. But we have all the videotape that we are literally looking at right now.

We have to ask ourselves in that period of time, I think it was about three to five thousand votes that were scanned, and did this elections crew of, you know, medium-paid, tired elections workers suddenly become the Ocean's Eleven crew as part of a theft of an election? Or is it more likely they were tired and irritated?

You see when the SEB monitor gets there, and when the investigator gets there, the armed investigator, they keep doing the exact same thing they were doing. They don't even pay any mind because it's just—they're doing their regular processes.

27

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

And the problem we have is people don't understand this, and when people whip people's emotions up, it goes back to the issue I was talking about before of threats being against these thousands of workers across the country.

66.     On information and belief, Jim Hoft watched this segment, as he immediately criticized Newsmax for airing the segment and reiterated his false claims:[61]



**Jim Hoft** ✔
@gatewaypundit

VERY DISAPPOINTING to Go on @Newsmax and Allow @GabrielSterling to LASH OUT AT REPUBLICANS after EXPLOSIVE SUITCASE FRAUD EXPOSED!  That Segment was a TRAINWRECK! @Newsmax better get their sh*t together.  This was an OUTRAGEOUS Segment!

7:26 AM · Dec 4, 2020 · Twitter Web App

67.     Seeking to magnify the false claims and gain still more shares on social media, Jim Hoft published a fourth article on *The Gateway Pundit* on December 4, repeating the false and disproven claims from his earlier articles. This article was titled, "UPDATE: More on the Suitcase Vote Scam, the Elections Supervisor and that Strange 'Pass' Between Mother and Daughter That Was Also Caught on Video." It discussed the relationship between Ms. Freeman and Ms. Moss and introduced a new baseless allegation of still more illicit activity supposedly shown on the Trump Edited Video:

> On her [Facebook] page Ruby Freeman brags about her "Shaye" being her supervisor.
>
> …
>
> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.

---

[61]     Jim Hoft (@gatewaypundit), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit/status/1334881814670938 113 (last visited Nov. 30, 2021). Plaintiffs believe the timestamp available through web.archive.org is in Pacific Time.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other.
>
> It sure looks like they were trying to hide this transaction.[62]

68.     This article made clear Defendants' ill-will toward Ms. Freeman in repeating the false claims against her over and over again. In it, Jim Hoft noted the consequences of *The Gateway Pundit*'s publicity on Ms. Freeman and implicitly urged readers to harass her:

> Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.
>
> They then commented on her LinkedIn page.
>
> Note: Please do not confuse this with a similar business in Snellville!
>
> Ruby Freeman had an active Facebook page last night.
>
> It was shut down early on Friday morning.[63]

69.     Jim Hoft amplified this story on social media.[64]

70.     Not satisfied with the harm done, Defendants published two more articles about Ms. Freeman on *The Gateway Pundit* later on December 4. The first, titled "Timing of Large Georgia Ballot Dump for Biden Appears to Coincide with Timing of Mother-Daughter Duo's Election Fraud Scam," was written by Joe Hoft and described Plaintiffs'

---

[62] Jim Hoft, *UPDATE: More on the Suitcase Vote Scam, the Elections Supervisor and that Strange "Pass" Between Mother and Daughter That Was Also Caught on Video*, Gateway Pundit (Dec. 4, 2020, 1:51 PM), https://www.thegatewaypundit.com/2020/12/update-ruby-freeman-elections-supervisor-shaye-ross-strange-pass-also-caught-video/. A true and correct copy of this article is attached as Exhibit 6.

[63] *Id.*

[64] Jim Hoft (@gatewaypundit), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

29

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

processing of ballots as "the mother-daughter duo in Atlanta . . . messing with ballots in secret." The article stated:

> This is when a major portion of the steal took place in Georgia — which is about the same time that the mother daughter team of Trump haters kicked all Republicans out of the ballot counting room in Atlanta and started tabulating votes on their own after grabbing ballots out from underneath the table.[65]

71.     The next article, also written by Joe Hoft, summarized the false and already debunked claims in the previous articles from *The Gateway Pundit*, and it advanced the new false and defamatory smear that Ms. Freeman supposedly counted the same votes for Biden three times. Titled "UNBELIEVABLE: Anti-Trump Democrat In Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)," the article stated:

> The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.
>
> We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]
>
> Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.
>
> The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to

---

[65] Joe Hoft, *Timing of Large Georgia Ballot Dump for Biden Appears to Coincide with Timing of Mother-Daughter Duo's Election Fraud Scam*, Gateway Pundit (Dec. 4, 2020, 3:25 PM), https://www.thegatewaypundit.com/2020/12/timing-large-georgia-ballot-dump-biden-appears-coincide-timing-mother-daughter-duos-election-fraud-scam/. A true and correct copy of this article is attached as Exhibit 7.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.[66]

72.     Defendants also posted the video embedded in this article to *The Gateway Pundit*'s YouTube channel with the caption, "Poll Worker Ruby Freeman Loads Up The Same Stack Of Ballots To Be Counted 3X," which has been viewed more than 51,638 times at the time of filing.[67]

73.     Jim and Joe Hoft also amplified the story using their Twitter accounts.[68]

74.     Defendants later boasted that they originated the false and defamatory claim that Ms. Freeman tabulated the same votes three times.[69]

75.     On December 4, PolitiFact—a non-profit website that checks the accuracy of claims made by elected officials and others—published another fact check of the claim repeatedly made by *The Gateway Pundit* that video footage from Georgia showed suitcases filled with ballots being illegally counted after election monitors were told to leave. The PolitiFact article confirmed the conclusions of Lead Stories and Georgia Public Broadcasting that the claim was plainly false. It featured a statement from Richard Barron,

---

[66] Joe Hoft, *UNBELIEVABLE: Anti-Trump Democrat In Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)*, Gateway Pundit (Dec. 4, 2020, 5:45 PM), https://www.thegatewaypundit.com/2020/12/unbelievable-mother-along-daughter-handled-counted-ballots-alone-hours-georgia-ruby-freeman-caught-running-batch-ballots-tabulator-three-times/. A true and correct copy of this article is attached as Exhibit 8.

[67] Gateway Pundit, *Corrupt Georgia Election Worker Seen Loading Same Ballots 3 Times into Machine*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=RiREC3Zy20E (last visited Aug. 24, 2022).

[68] Jim Hoft (@gatewaypundit), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335017338396176 384 (last visited Aug. 23, 2022); Joe Hoft (@joehoft), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Aug. 23, 2022).

[69] Joe Hoft, *Fulton County 2020 Election Case's Request is Granted - Election Workers Ruby Freeman, Wandrea Moss, and Happy Faces Personnel Group Are Added to the Case*, Gateway Pundit (Aug. 14, 2021, 9:15 AM), https://www.thegatewaypundit.com/2021/08/fulton-county-2020-election-cases-request-add-ruby-freeman-wandrea-moss-happy-faces-personnel-group-case-granted/. A true and correct copy of this article is attached as Exhibit 9.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

the elections director in Fulton County, who confirmed that no announcement was made telling people to leave. Rather, certain staff members left as their work was finished. Mr. Barron himself told the workers scanning the ballots to keep working. Mr. Barron also confirmed that it was normal to keep containers under the tables near the scanners.[70]

76.     Two days later, on December 6, 2020, after the Defendants' statements had been thoroughly refuted by multiple state and county officials, Defendants published three more articles in *The Gateway Pundit.* The first repeated earlier lies that Plaintiffs had engaged in fraud:

> [T]he secret suitcase ballots were pulled out from their hiding place under the tables.
>
> They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.[71]

77.     Jim Hoft tweeted a link to the article.[72]

78.     The second two articles purported to disclose "exclusive" new information about the "man in red" shown in the security video, and each repeated the false claims that Ms. Freeman and Ms. Moss were involved in "voter corruption":

> [I]t was uncovered that a mother and daughter team, Ruby Freeman and her daughter "Shaye" Moss as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were

---

[70] Bill McCarthy, *No, Georgia Election Workers Didn't Kick Out Observers and Illegally Count 'Suitcases' of Ballots*, PolitiFact (Dec. 4, 2020), https://www.politifact.com/factchecks/2020/dec/04/facebook-posts/no-georgia-election-workers-didnt-kick-out-observe/.

[71] Joe Hoft, *The Same Organized Fraud That Took Place in Michigan Took Place in Georgia on Election Night — Republicans Were Removed from the Counting Area and the Massive Spike in Biden Only Votes Is Recorded*, Gateway Pundit (Dec. 6, 2020, 8:15 AM), https://www.thegatewaypundit.com/2020/12/thing-happened-michigan-happened-georgia-election-night-republicans-removed-counting-area-massive-ballot-drop-biden-votes/. A true and correct copy of this article is attached as Exhibit 10.

[72] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201206191516/https://twitter.com/gatewaypundit/status/1335631252217532 421 (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

pulled out from under a table that were previously covered up and processed with no Republican observers.

The mother - daughter team have become infamous in the annals of voter corruption[.][73]

79.     Jim Hoft amplified these stories on Twitter.[74]

80.     Also on December 6, Georgia Governor Brian Kemp filed in federal court a sworn affidavit from Frances Watson, chief investigator for the Georgia Secretary of State, further refuting these lies. Gov. Kemp filed this affidavit in *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga), in response to claims by a group of Presidential Electors for Trump of widespread election-related misconduct. The affidavit detailed the results of an investigation by Ms. Watson into the alleged events at the State Farm Arena. Ms. Watson attested that her investigative team interviewed witnesses and reviewed the entire security footage. Her investigation found that (a) observers and members of the press were *not* told to leave, but exited the room after seeing a group of workers responsible for opening envelopes leave; and (b) no ballots were brought in from an unknown location and hidden under a table. She also stated that the video showed opened but uncounted ballots

---

[73] Joe Hoft, *EXCLUSIVE: Review of Late-Night Ballot Counting in Atlanta's State Farm Arena Shows Mysterious 'Man In Red' Receiving Numerous Calls During the Ballot Heist But from Whom?*, Gateway Pundit (Dec. 6, 2020, 6:35 PM), https://www.thegatewaypundit.com/2020/12/review-late-night-ballot-counting-atlantas-state-farm-arena-shows-mysterious-man-red-making-numerous-calls/; Jim Hoft, *BREAKING EXCLUSIVE: Third Suspect from State Farm Center 'Suitcase Scandal' Identified as Ralph Jones, Sr. – Who Was in the News for Shady Deal with ATL Mayor Keisha Bottoms*, Gateway Pundit (Dec. 6, 2020, 9:23 PM), https://www.thegatewaypundit.com/2020/12/breaking-exclusive-third-suspect-state-farm-center-suitcase-scandal-identified-ralph-jones-sr-news-shady-deal-atl-mayor-keisha-bottoms/ (republishing same paragraph). True and correct copies of these articles are attached as Exhibits 11 and 12, respectively.

[74] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335757633836421 121 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335787833760559 111 (last visited Aug. 23, 2022).

being placed in boxes and stored under the table, and later showed the boxes being opened so the workers could scan the ballots when the counting resumed later that night.[75]

81.     The Watson affidavit's submission and its content were widely reported in the press on December 6 and 7, 2020.[76]

82.     Nonetheless, Jim Hoft published two more articles early on December 7 containing additional false and defamatory statements about Plaintiffs. The first labeled Ms. Freeman and Ms. Moss "suspects in the suitcase ballot fraud at the State Farm Center" and said they were captured on the "most explosive video of the entire campaign season" pulling "hidden ballots in the suitcases" out and counting them "after all of the GOP observers and media was sent home for a 'water main' break." It then mocked Ms. Freeman for supposedly saying she "needed a lawyer" and declining an interview request by "Carolyn Ryan TV."[77]

83.     Jim Hoft amplified this article on Twitter.[78]

---

[75] Declaration of Frances Watson, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1, *available at* https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[76] *See, e.g.*, Daniel Chaitin, *Chief Georgia Investigator: No 'Mystery Ballots' Seen in Security Video,* Wash. Examiner (Dec. 6, 2020, 11:56 PM), https://www.washingtonexaminer.com/news/chief-georgia-investigator-no-mystery-ballots-seen-in-security-video; Ronn Blitzer, *No 'Mystery Ballots' Hidden Under Table in Fulton County, Georgia Investigator Swears in Affidavit*, Fox News (Dec. 7, 2020), https://www.foxnews.com/politics/fulton-county-georgia-no-mystery-ballots-under-table-investigator-affidavit; Peter Weber, *Georgia's Top Election Investigator Debunks A Vote Fraud Conspiracy Involving 'Suitcases' of Ballots, A Urinal*, Yahoo News (Dec. 7, 2020), https://news.yahoo.com/georgias-top-election-investigator-debunks-115236191.html.

[77] Jim Hoft, *"I Won't Be Able to Be Interviewed – I Need an Attorney" — Georgia's Ruby Freeman Lawyers Up, Cancels Interview*, Gateway Pundit (Dec. 7, 2020, 7:15 AM), https://www.thegatewaypundit.com/2020/12/wont-able-interviewed-need-attorney-georgias-ruby-freeman-lawyers-cancels-interview/. A true and correct copy of this article is attached as Exhibit 13.

[78] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

84.     In a second article on December 7, 2020, Jim Hoft blasted out the "HUGE" news that the third "suspect" in the "suitcase scandal" was the same man who told reporters there had been a "water main break." The article depicted the claim of a water problem as clever ruse to facilitate election fraud by Plaintiffs:

> We know this was a lie because there was NEVER a work order filed and the water department never received a call. It never happened!
>
> But it gave Ralph and Ruby and Shaye cover to complete their scam on Georgia and America![79]

85.     Jim Hoft amplified this story on Twitter.[80]

86.     In a news conference on December 7, Gabriel Sterling, Georgia's Voting Implementation Manager, once more refuted the lies about the Trump Edited Video that *The Gateway Pundit* was continuing to spread. He yet again confirmed that the surveillance video showed that the containers taken from under a table held valid, uncounted ballots that had been stored by workers who thought they were leaving for the night. After realizing that they were staying, the workers unpacked the ballots from the containers and resumed scanning them. Mr. Sterling specifically refuted the claim that election workers had illegally scanned the same ballots multiple times, explaining that any such action would have been revealed by the hand count undertaken by Georgia election officials and

---

[79] Jim Hoft, *HUGE! WE CAUGHT THEM! Conspiracy Revealed — 3rd Suspect in GA 'Suitcase Scandal' is Also the Same Man Who Spoke to Reporters on Water Main Break*, Gateway Pundit (Dec. 7, 2020, 8:29 AM), https://www.thegatewaypundit.com/2020/12/huge-caught-criminal-conspiracy-revealed-3rd-suspect-ga-suitcase-scandal-also-man-spread-lies-water-main-broke-state-farm-center/. A true and correct copy of this article is attached as Exhibit 14.

[80] Jim Hoft (@gatewaypundit), Twitter (Dec. 7, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

machine-based recount requested by the Trump campaign. Neither recount showed a meaningful change in results originally reported.[81]

87.     In the evening on December 7, Jim Hoft further evidenced Defendants' awareness of the fact checks, sharing a link to an article in *The Federalist* discussing the various fact-checks:[82]



88.     Nonetheless, with full awareness that his statements about Ms. Freeman and Ms. Moss had been flatly and fully refuted by multiple officials and multiple fact-checking organizations, Jim Hoft continued to publish false statements on *The Gateway Pundit*.

89.     On December 8, 2020, Jim Hoft published three new articles repeating and doubling down on the false and defamatory claims. The first article was titled "CONFIRMED: Supervisor Shaye Moss - Who "Yelled Out" for Georgia GOP Observers to GO Home - Is Same Woman Who Pulled the Suitcase Ballots Out from Underneath the

---

[81] Nick Corasaniti, *Top Georgia Election Official Debunks 'Ridiculous' Claims About Election Fraud*, The New York Times (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/technology/suitcases-ballots-georgia-election.html.

[82] Jim      Hoft      (@gatewaypundit),     Twitter     (Dec.     7,     2020,     6:38     PM), https://twitter.com/gatewaypundit/status/1336137974875033602,           *available           at* https://web.archive.org/web/20201208024013/https://twitter.com/gatewaypundit/status/1336137974875033 602 (including link to Mollie Hemingway, *No, The Georgia Vote-Counting Video Was Not 'Debunked.' Not Even Close*, Federalist (Dec. 7, 2020), https://thefederalist.com/2020/12/07/no-the-georgia-vote-counting-video-was-not-debunked-not-even-close/).

36

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Table When they Left." In addition to repeating previously made false claims about Ms.

Freeman and Ms. Moss, it stated:

> Mollie Hemingway at The Federalist reported earlier today that poll watchers in sworn affidavits claim it was "a woman with blonde braids" who appeared to be a supervisor "yelled out" to those present in the room that they would stop working for the night and would resume in the morning.
>
> Shaye told everyone to go home.
>
> Then Shaye, her mother and a couple others including Ralph Jones, Sr. were filmed taking "suitcases" of ballots hidden under a table out to be tabulated. This was right before Joe Biden got his surprise spike in ballots.
>
> And now the liberal media and their fake "fact-checkers" are lying about the incredible incident caught on video![83]

90.     Jim Hoft's second article on December 8 was titled, "NOW WITH AUDIO:

Georgia Election Official Ralph Jones, Sr. Announced on Nov. 3rd Evening that Counting

would Stop at 11 PM — Then Led Team to Count Stashed 'Suitcase' Ballots." This article

noted both the *Pearson v. Kemp* affidavit, which stated that the count was never intended

to stop at 10:00 p.m., and Mr. Sterling's statement that counting was resumed at 11:00 p.m.

It stated:

> Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.

---

[83] Jim Hoft, *CONFIRMED: Supervisor Shaye Moss – Who "Yelled Out" for Georgia GOP Observers to Go Home – Is Same Woman Who Pulled the Suitcase Ballots Out from Underneath the Table When they Left,* Gateway Pundit (Dec. 8, 2020, 7:20 AM), https://www.thegatewaypundit.com/2020/12/confirmed-supervisor-shaye-moss-yelled-georgia-gop-observers-go-home-woman-pulled-suitcase-ballots-underneath-table-left/. A true and correct copy of this article is attached as Exhibit 15.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

…

> For the record — Georgia anti-Trump elections official Gabe Sterling later said that the local officials called for the counting to resume at 11 PM but this is just not true.

…

> The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.

> Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.

> It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.

> It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud.

…

> The lying fake news media wants you to believe this entire incident was debunked.

> Nothing could be further from the truth — something that is lacking in the mainstream media and their "fact-checkers" today.

> We now have actual audio of Ralph Jones — the elections official at the heart of the "suitcase scandal" telling government officials the State Farm Center will shut down at 10 or 11 PM on Election night!

> Georgia Secretary of State officials released an affidavit insisting there never was an intent to stop the count at 10:00 PM, but only the cutters were going to stop.[84]

---

[84] Jim Hoft, *NOW WITH AUDIO: Georgia Election Official Ralph Jones, Sr. Announced on Nov. 3rd Evening that Counting would Stop at 11 PM — Then Led Team to Count Stashed 'Suitcase" Ballots*, Gateway Pundit (Dec. 8, 2020, 8:59 AM), https://www.thegatewaypundit.com/2020/12/now-audio-georgia-election-official-ralph-jones-sr-announced-nov-3rd-evening-counting-stop-11-pm-led-team-count-stashed-suitcase-ballots/. A true and correct copy of this article is attached as Exhibit 16.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

91.     Jim Hoft authored a third article that same day to discredit the fact check organization Lead Stories, one of the several outside groups that had found the "suitcase scandal" to be no scandal at all. He sought to undermine their credibility by writing: "Lead Stories we now know is funded by Facebook and a Chinese company. So it makes sense that they would target any conservative outlet that reported on this explosive video."[85] He used the occasion to repeat yet again the false claim that Plaintiffs had "stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room," in a pre-planned conspiracy to commit election fraud.

92.     Jim Hoft amplified each of these stories on Twitter.[86]

93.     Defendants' false and defamatory tirade targeting Ms. Freeman and Ms. Moss continued later that month. On December 15, 2020, Jim Hoft published an article insinuating that Ms. Freeman and Ms. Moss engaged in fraudulent activity and should be questioned by law enforcement:

> As we have reported numerous times now the election numbers in Georgia are suspect, fraudulent, and impossible.
>
> We even HAVE VIDEO of Democrats at work stealing votes from the people of Georgia.
> . . .

---

[85] Jim Hoft, *China-Funded 'Fact-Checker' Lead Stories Pushes Bullsh\*t That Fulton County 'Suitcase' Scandal Was Debunked — Will They EVER Tell the Truth?*, Gateway Pundit (Dec. 8, 2020, 1:11 PM), https://www.thegatewaypundit.com/2020/12/china-funded-facebook-fact-checker-lead-stories-pushes-bullsht-fulton-county-suitcase-scandal-debunked-will-ever-tell-truth/. A true and correct copy of this article is attached as Exhibit 17.

[86] Jim Hoft (@gatewaypundit), Twitter (Dec. 8, 2020), *available at* https://web.archive.org/web/20201208224901/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Has anyone questioned Ruby Freeman or her daughter?[87]

94.     On December 23, 2020, Jim Hoft published another     article on this theme, repeating a tweet posted by Team Trump the day before. This article was titled "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?" It repeated prior false and defamatory claims about Ms. Freeman and Ms. Moss published on *The Gateway Pundit*, boasting of the publication's leading role in spreading the misinformation:

> On Tuesday night President Trump tweeted out an OANN report on a Gateway Pundit investigation of the Atlanta suitcase voter fraud scandal.
>
> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].
>
> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
>
> On Tuesday night President Trump tweeted this OANN and Gateway Pundit video.

---

[87] Jim Hoft, *PRESIDENT TRUMP Retweets Attorney Lin Wood: Kemp and Raffensperger "Will Soon be Going to Jail"*, Gateway Pundit (Dec. 15, 2020, 9:19 AM), https://www.thegatewaypundit.com/2020/12/president-trump-retweets-attorney-lin-wood-kemp-raffensperger-will-soon-going-jail/. A true and correct copy of this article is attached as Exhibit 18.



Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist [sic].

Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist [sic]!

It was a carefully planned event!

They had NO IDEA they would get caught!

At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.

They were able to flip Georgia for Beijing Biden by their actions.

Why is the FBI or DOJ not involved?

41

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

This tells you everything you need to know about your federal government.[88]

95.     Jim Hoft amplified this story on Twitter.[89]

96.     *The Gateway Pundit* published two additional articles about Plaintiffs on December 23 repeating the false and defamatory smear that Ms. Freeman "grabbed the ballots and started jamming the ballots into the Dominion tabulators three times" and that "Democrats using people like these poll workers stole the election for Joe Biden." Joe Hoft published the first article, titled "President Trump Tweets Gateway Pundit Video Showing Poll Workers Stuffing Ballots Into Tabulators Numerous Times on Election Night."[90] Jim Hoft published the second article on this theme, with substantially similar allegations.[91]

97.     On December 26, 2020, *The Gateway Pundit* published an article reiterating previously debunked claims about Ms. Freeman and Ms. Moss. It stated:

> Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.

---

[88] Jim Hoft, *Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?*, Gateway Pundit (Dec. 23, 2020, 8:40 AM), https://www.thegatewaypundit.com/2020/12/fbi-spoken-ruby-freeman-ralph-jones-yet-not-fbi/. A true and correct copy of this article is attached as Exhibit 19.

[89] Jim Hoft (@gatewaypundit), Twitter (Dec. 23, 2020), *available at* https://web.archive.org/web/20201226003813/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

[90] Joe Hoft, *President Trump Tweets Gateway Pundit Video Showing Poll Workers Stuffing Ballots Into Tabulators Numerous Times on Election Night*, Gateway Pundit (Dec. 23, 2020, 8:10 AM), https://www.thegatewaypundit.com/2020/12/president-trump-retweets-gateway-pundit-video-showing-poll-workers-stuffing-ballots-tabulators-numerous-times-election-night/. A true and correct copy of this article is attached as Exhibit 20.

[91] Jim Hoft, *WTH? Twitter Says OANN Report of Gateway Pundit Investigation is Disputed – How Could This Be When We Are the Only Ones Who Wrote About It?*, Gateway Pundit (Dec. 23, 2020, 11:05 AM), https://www.thegatewaypundit.com/2020/12/wth-twitter-says-oann-report-gateway-pundit-investigation-disputed-ones-wrote/. A true and correct copy of this article is attached as Exhibit 21.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.

…

Ruby and her daughter pulled out more than 11,779 ballots and can be seen entering those ballots multiple times into the Dominion machine.[92]

98.    Jim Hoft amplified this story on Twitter by retweeting another user.[93]

99.    Defendants' targeting of Ms. Freeman and Ms. Moss continued into the new year. On January 1, 2021, Joe Hoft again published an article which repeated the false and defamatory claim that Plaintiffs were the "individuals dragging ballots out from under the tables in Georgia on election night on video," insinuating that they engaged in criminal activity, and complaining that "none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of."[94]

100.    The next morning, Jim Hoft published an article titled "BREAKING: ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!" The article repeated the defamatory claim that Ms. Freeman jammed ballots through the machines three times and committed fraud.[95]

---

[92] Larry Johnson, *Bill Barr Did Not See Fraud Because He Refused To Look*, Gateway Pundit (Dec. 26, 2020, 7:34 PM), https://www.thegatewaypundit.com/2020/12/bill-barr-not-see-fraud-refused-look/. A true and correct copy of this article is attached as Exhibit 22.

[93] Jim Hoft (@gatewaypundit), Twitter (Dec. 27, 2020), *available at* https://web.archive.org/web/20201228210249/https://twitter.com/gatewaypundit (last visited Aug. 23, 2022).

[94] Joe Hoft, *What Are Americans To Do When the Justice Department Is Unjust, the Courts Won't Adjudicate and the Media Covers It All Up?*, Gateway Pundit (Jan. 1, 2021, 9:58 AM), https://www.thegatewaypundit.com/2021/01/americans-justice-department-unjust-courts-wont-adjudicate-media-covers/. A true and correct copy of this article is attached as Exhibit 23.

[95] Jim Hoft, *BREAKING: ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!*, Gateway Pundit (Jan. 2, 2021, 7:30 AM),

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

101.     Later on January 2, 2021, Donald Trump placed a telephone call to Georgia's Secretary of State Brad Raffensperger, during which Mr. Trump pressured Mr. Raffensperger to change the outcome of the Georgia presidential election by finding more votes for him. To justify his request, Mr. Trump repeated some of the many false allegations about Ms. Freeman that Defendants had been publishing throughout December. These include statements calling her "a vote scammer, a professional vote scammer and hustler," and asserting, "we're so far ahead of these numbers, even the phony ballots of Ruby Freeman — known scammer."[96]

102.     Over the next couple of days, Jim Hoft published a number of articles on *The Gateway Pundit* about this phone call. Several of these noted that the call was about how the election in Georgia was "wrought with fraud," and observing that "[i]t's not clear if Ruby Freeman . . . w[as] on the call."[97] These articles imply she had a role in the alleged fraud.

---

https://www.thegatewaypundit.com/2021/01/breaking-another-video-corrupt-election-workers-feeding-ballots-machines-numerous-times/. A true and correct copy of this article is attached as Exhibit 24.

[96] WSJ Staff, *Trump's Georgia Call: Listen to the Audio and Read a Full Transcript*, Wall St. J. (Jan. 3, 2021, 9:47 PM), https://www.wsj.com/articles/listen-to-the-full-trump-ga-call-11609713527.

[97] Jim Hoft, *Raffensperger's Team Leaks President Trump's Saturday Call to Fake News WaPo — Tells You Everything About the Dirty Georgia Leadership* (Jan. 3, 2021, 1:08 PM), https://www.thegatewaypundit.com/2021/01/raffenspergers-team-leaks-president-trumps-saturday-call-fake-news-wapo-tells-everything-dirty-georgia-leadership/; Jim Hoft, *Corrupt Georgia Secretary of State Raffensperger Insists Georgia's Fraudulent Election Was Legitimate, Then Accuses President Trump of Lying* (Jan. 3, 2021, 4:21 PM), https://www.thegatewaypundit.com/2021/01/corrupt-georgia-secretary-state-raffensperger-lies-georgias-2020-election-results-legitimate-calls-president-trump-liar/; Jim Hoft, *President Trump Files Two Lawsuits Against Dirty Georgia Secretary of State Raffensperger for Leaking Confidential Litigation Call* (Jan. 3, 2021, 8:09 PM), https://www.thegatewaypundit.com/2021/01/president-trump-files-two-lawsuits-dirty-georgia-secretary-state-raffensperger-leaking-confidential-litigation-call/; Jim Hoft, *Report: White House Planning to Refer Brad Raffensperger to Secret Service for Investigation Under the Espionage Act* (Jan. 4, 2021, 7:15 AM), https://www.thegatewaypundit.com/2021/01/raeport-white-house-planning-refer-brad-raffensperger-secret-service-investigation-espionage-act/; Jim Hoft, *Dirtbag Georgia Secretary of State to Hold Press Conference at 3 PM* (Jan. 4, 2021, 11:37 AM), https://www.thegatewaypundit.com/2021/01/dirtbag-georgia-secretary-state-hold-press-conference-3-pm/. A true and correct copy of the article published January 3, 2021, at 4:21 p.m., is attached as Exhibit 25.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

103.    Jim Hoft amplified several of these stories using his Twitter account.[98]

104.    In a January 3, 2021, article by Jim Hoft about the call, the headline announced, "HUGE: TRUMP DROPS A BOMB DURING PHONE CALL! Tells Raffensperger 'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal! (VIDEO)." The article republished the portion of the call's transcript when Mr. Trump made the accusation of election fraud that Defendants had been publishing repeatedly since December 3, and it inserted Ms. Freeman's name where it had been omitted by *The Washington Post*, which had broken the story about the call. It stated:

> President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to [sic] with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break. Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.[99]

---

[98]    Jim       Hoft      (@gatewaypundit),     Twitter     (Jan.    3,    2021),    *available    at* https://web.archive.org/web/20210103191234/https:/twitter.com/gatewaypundit/status/1345810207587397 633 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 3, 2021), *available at* https://web.archive.org/web/20210104213119/https:/twitter.com/gatewaypundit/status/1345915506423951 360 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 4, 2021), *available at* https://web.archive.org/web/20210104132453/https:/twitter.com/gatewaypundit/status/1346085100224716 801 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 4, 2021), *available at* https://web.archive.org/web/20210104181156/https:/twitter.com/gatewaypundit/status/1346156819052441 600 (last visited Aug. 23, 2022).

[99]    Jim Hoft, *HUGE: TRUMP DROPS A BOMB DURING PHONE CALL! Tells Raffensperger 'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal! (VIDEO)*, Gateway Pundit (Jan. 3, 2021, 6:20 PM), https://www.thegatewaypundit.com/2021/01/huge-trump-drops-bomb-phone-call-tells-raffensperger-vote-scammer-hustler-ruby-freeman-behind-18000-fraudulent-votes-suitcase-scandal-video/. A true and correct copy of this article is attached as Exhibit 26.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

105.    The article then reminded readers of *The Gateway Pundit* that it "was first to identify Ruby Freeman, her daughter Shaye Moss and supervisor Ralph Jones, Sr. in the suitcase fraud scandal that was caught on tape and went viral online."[100]

106.    Jim Hoft amplified this story on Twitter.[101]

107.    On January 4, 2021, Georgia election officials held yet another press conference to refute the already-debunked election fraud allegations that Mr. Trump had raised in his call with Mr. Raffensperger.[102] Gabriel Sterling once again described the events that occurred on election day at State Farm Arena, explained how they represented entirely normal ballot processing, and directed listeners to the Georgia's Secretary of State's website for a detailed timeline matched to the surveillance footage.[103] Sterling reiterated for the assembled reporters the actual series of events:

> Late in the evening, after the water main break had been fixed, election workers prepared to go home for the night and followed standard procedures to store ballots securely: placing them in containers and affixing numbered seals. But when Mr. Raffensperger found out that they were closing up shop, he ordered them to continue counting through the night — so the workers retrieved the containers and resumed counting ballots.[104]

---

[100] *Id.*

[101]    Jim Hoft (@gatewaypundit), Twitter (Jan. 3, 2021), *available at* https://web.archive.org/web/20210105040422/https://twitter.com/gatewaypundit/status/1345888162455953 410 (last visited Aug. 23, 2022).

[102] 11Alive, *Georgia Senate Runoffs | Secretary of State's Office Addresses Election Day, Claims*, YouTube (Jan. 4, 2021), https://www.youtube.com/watch?v=K7lDlqJ66fU&t=740s.

[103] *Fact Check*, Secure the Vote, https://securevotega.com/fact-check/ (last accessed Nov. 7, 2021).

[104] Maggie Astor, *A Georgia Election Official Debunked Trump's Claims of Voter Fraud, Point by Point*, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/2021/01/04/us/politics/trump-georgia-election-fraud.html.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Sterling expressed his great frustration that the Trump legal team "had the entire tape" revealing these facts, and nevertheless "intentionally misled the State Senate, the voters and the people of the United States about this."[105]

108.    Defendants were well aware of the Georgia Secretary of State's website and additional fact check, as evidenced by Jim Hoft's tweet on January 4, 2021:[106]



109.    PolitiFact published a fact-check article about the Raffensperger call that same day, finding that the events described by Mr. Sterling lined up with previous reports from PolitiFact and other fact-checkers. This article repeated PolitiFact's earlier assessment that the arena surveillance video showed no wrongdoing and provided no evidence of election fraud. It rated Mr. Trump's claim that Georgia election workers pulled 18,000 ballots from suitcases and counted them for Biden as "Pants on Fire!" false.[107]

---

[105] *Id.*

[106]    Jim    Hoft    (@gatewaypundit),    Twitter    (Jan.    4,    2021),    *available    at* https://web.archive.org/web/20210105040422/https://twitter.com/gatewaypundit/status/1346240056055517185 (last visited Nov. 30, 2021).

[107] Bill McCarthy, *Trump Rehashes Debunked Claim About 'Suitcases' of Ballots in Georgia Phone Call*, PolitiFact (Jan. 4, 2021), https://www.politifact.com/factchecks/2021/jan/04/donald-trump/trump-rehashes-debunked-claim-about-suitcases-ball/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

F.    *The Gateway Pundit's* **Continuing Publication of False and Defamatory Claims**

110.    Nonetheless, Defendants returned to their false statements about Ms. Freeman and Ms. Moss shortly afterward and continued long after Inauguration Day.

111.    On January 5, 2021, Jim Hoft published an article criticizing Gabriel Sterling's press conference with the false and defamatory claim that Ms. Freeman had engaged in criminal conduct that Sterling was covering up:

> Gabe Sterling misled his audience, defended the corrupt and likely criminal conduct at the State Farm Center on election night, defended Ruby Freeman for passing hundreds of ballots through a ballot counting machines [sic] at least three times.[108]

112.    Later that day, Joe Hoft published an article repeating substantially the same defamatory statements.[109]

113.    Jim Hoft amplified both of these stories on Twitter.[110]

---

[108] Jim Hoft, *CAUGHT ON VIDEO: Georgia Hack Gabe Sterling Called Out by Dominion Executive Eric Coomer*, Gateway Pundit (Jan. 5, 2021, 9:20 AM), https://www.thegatewaypundit.com/2021/01/confirmed-dirty-hack-gabe-sterling-called-dominion-executive-eric-coomer-video/. A true and correct copy of this article is attached as Exhibit 27.

[109] Joe Hoft, *Georgia Election Official Gabe Sterling Claims Processing was "Normal" At the State Farm Arena Election Night – Nothing Could Be Further from the Truth*, Gateway Pundit (Jan. 5, 2021, 1:02 PM), https://www.thegatewaypundit.com/2021/01/georgia-election-official-gabe-sterling-claims-processing-normal-state-farm-arena-election-night-nothing-truth/. A true and correct copy of this article is attached as Exhibit 28.

[110]    Jim    Hoft    (@gatewaypundit),    Twitter    (Jan.    5,    2021),    *available    at* https://web.archive.org/web/20210105152726/https://twitter.com/gatewaypundit/status/1346477248367366 147 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 5, 2021), *available at* https://web.archive.org/web/20210105213817/https://twitter.com/gatewaypundit/status/1346571658593787 908 (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

114. On January 7, 2021, Joe Hoft published an article reiterating the false claim that Plaintiffs are operatives who carried out massive voter fraud and that the FBI should question Ms. Freeman regarding the "infamous ballot hoist [sic]."[111]

115. Jim Hoft amplified this story on Twitter, as well.[112]

116. On January 17, 2021, Jim Hoft published an article on *The Gateway Pundit* titled "HERE THEY ARE: The Five Most Obvious Acts of Fraud in the 2020 Election that You Are No Longer Allowed to Discuss." In this article, he listed "[t]he Georgia Late Night Hidden Suitcase Heist" as the first "MOST SIGNIFICANT ACT[] OF FRAUD IN THE 2020 ELECTION," republished the boast about the publication's role in spreading disinformation about Plaintiffs, falsely characterized their conduct as a criminal conspiracy in which "[t]hey had NO IDEA they would get caught," and baselessly insinuated that they should be subject to federal investigation.[113]

117. On March 25, 2021, Joe Hoft published an article that republished earlier defamatory statements describing Plaintiffs as a "mother-daughter team of ballot counters in Atlanta [who] really overdid their fraud" and Ms. Freeman as a "Crooked Operative."[114]

---

[111] Joe Hoft, *Project Veritas Identifies the Exact Moment Ralph Jones is Ordered by a judge to Stop Preventing Poll Watchers Access to Activities Going on in Atlanta*, Gateway Pundit (Jan. 7, 2021, 3:14 PM), https://www.thegatewaypundit.com/2021/01/project-veritas-identifies-exact-moment-ralph-jones-ordered-judge-stop-preventing-poll-watchers-access-activities-going-atlanta/. A true and correct copy of this article is attached as Exhibit 29.

[112] Jim Hoft (@gatewaypundit), Twitter (Jan. 7, 2021), *available at* https://web.archive.org/web/20210107214951/https://twitter.com/gatewaypundit/status/1347298953105178625 (last visited Aug. 23, 2022).

[113] Jim Hoft, *HERE THEY ARE: The Five Most Obvious Acts of Fraud in the 2020 Election that You Are No Longer Allowed to Discuss*, Gateway Pundit (Jan. 17, 2021, 6:33 PM), https://www.thegatewaypundit.com/2021/01/five-obvious-acts-fraud-2020-election/. A true and correct copy of this article is attached as Exhibit 30.

[114] Joe Hoft, *TOO LITTLE TOO LATE — After Certifying Sham 2020 Election Results — Georgia Gov. Kemp Signs New Election Legislation*, Gateway Pundit (Mar. 25, 2021, 7:25 PM), https://www.thegatewaypundit.com/2021/03/little-late-certifying-sham-2020-election-results-georgia-gov-kemp-signs-new-election-legislation/. A true and correct copy of this article is attached as Exhibit 31.

118. On May 21, 2021, in response to a court order in *Favorito v. Wan*, No. 2020CV343938 (Fulton Cnty. Ga. Super. Ct. May 21, 2021), to unseal absentee ballots in Fulton County, Joe Hoft published another article falsely alleging voter fraud by Plaintiffs. After republishing the same defamatory statements as the March article, Joe Hoft again touted *The Gateway Pundit*'s role in spreading the debunked narrative of Plaintiffs' fraud:

> We nailed it in Georgia. We identified in the video below that the same ballots were pushed through voting machines two and three times.



> President Trump retweeted this story (but this was taken down by Twitter.) [sic][115]

119. The next day, Jim Hoft published another article identifying Ms. Freeman and Ms. Moss by name and image and republishing false allegations that they engaged in

---

[115] Joe Hoft, *UPDATE: Georgia Judge Orders 145,000 Absentee Ballots from Fulton County to Be Scanned to Determine Legitimacy – Case Revolves Around Explosive Dec. Report from Gateway Pundit*, Gateway Pundit (May 21, 2021, 12:34 PM), https://www.thegatewaypundit.com/2021/05/update-georgia-judge-orders-145000-absentee-ballots-fulton-county-scanned-determine-legitimacy-case-revolves-around-disturbing-tgp-findings/. A true and correct copy of this article is attached as Exhibit 32.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

fraud and counted ballots in secret after kicking Republicans out of the State Farm Center.[116]



120.     On June 6, 2021, based on reports that Ms. Moss had been subpoenaed, Joe Hoft published an article on *The Gateway Pundit* republishing prior defamatory statements about Plaintiffs:

---

[116] Jim Hoft, *Sidney Powell Weighs in on Georgia Audit: 145,000 Absentee Ballots, 106,000 Adjudicated Ballots, Video of Multiple Scannings of Same Ballots and Nine witnesses of Suspected Fake Ballots!*, Gateway Pundit (May 22, 2021, 9:05 AM), https://www.thegatewaypundit.com/2021/05/sidney-powell-weighs-georgia-audit-145000-absentee-ballots-106000-adjudicated-ballots-video-multiple-scannings-ballots-nine-witnesses-suspected-fake-ballots/. A true and correct copy of this article is attached as Exhibit 33.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



Ralph Jones, the Registration Chief at Fulton County Government and the floor supervisor during the ballot count consulting with his crack team

It's getting hot in Georgia! One of the individuals caught on tape late on election night in Fulton County, Georgia, Wandrea Shaye Moss, has been subpoenaed for a deposition in a civil trial in Fulton County.

Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?

After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving *stacks of ballots* through the machines two and three times each.

In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on election night[.]

. . .

52

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.

. . .

We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.[117]

121.    The following day, he published a similar article about Ms. Freeman, titled "BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night Is Subpoenaed," in which he repeated prior defamatory statements:

Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. Ruby Freeman was caught on tape running the same stack of suspect ballots through the machines multiple times.[118]

122.    Jim Hoft republished defamatory statements from this article a week later in a new posting on *The Gateway Pundit*.[119]

---

[117] Joe Hoft, *BREAKING: Ruby Freeman's Daughter Election Supervisor Wandrea Shaye Moss Is Subpoenaed for Deposition in Fulton County GA*, Gateway Pundit (June 6, 2021, 7:53 AM), https://www.thegatewaypundit.com/2021/06/breaking-ruby-freemans-daughter-election-supervisor-wandrea-shaye-moss-subpoenaed-deposition-fulton-county-ga/. A true and correct copy of this article is attached as Exhibit 34.

[118] Joe Hoft, *BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night is Subpoenaed*, Gateway Pundit (June 7, 2021, 9:43 PM), https://www.thegatewaypundit.com/2021/06/breaking-georgia-update-ruby-freeman-jammed-suspect-ballots-voting-machines-multiple-times-election-night-subpoenaed/. A true and correct copy of this article is attached as Exhibit 35.

[119] Jim Hoft, *CONFIRMED: Judge Delays Depositions from Georgia Election Workers Ruby Freeman and Her Daughter Shae Moss*, Gateway Pundit (June 14, 2021, 10:33 AM), https://www.thegatewaypundit.com/2021/06/confirmed-judge-delays-depositions-georgia-election-workers-ruby-freeman-daughter-shae-moss/. A true and correct copy of this article is attached as Exhibit 36.

123.     On June 8, 2021, Jim Hoft published an article that republished earlier defamatory statements that Ms. Freeman was an "Anti-Trump Democrat" who was part of a "'Suitcase Scandal'" in which she was "[c]aught" counting ballots multiple times.[120]

124.     On June 11, 2021, Joe Hoft authored an article republishing these same defamatory claims.[121]

125.     Then, on June 17, 2021, Jim Hoft published an article featuring a video of Secretary of State Raffensperger describing election safeguards, and averring that Georgia "had safe, secure, and honest elections." Despite this, Jim Hoft included an image from election night identifying Ms. Freeman by name and again falsely alleging that Plaintiffs engaged in voter fraud:

> Of course, NOTHING could be further of [sic] the truth.
>
> The Gateway Pundit wrote several reports on the likely fraud and corruption in the November 2020 Georgia election.
>
> . . .
>
> [A] Gateway Pundit report exposed Georgia election officials repeatedly feeding hundreds and possibly thousands of ballots through the voting machines late at night in Atlanta, Georgia after the election observers were sent home.[122]

---

[120] Jim Hoft, *Georgia Update: Attorneys back in Court on June 21 After Fulton County Officials Block Audit of Ballots — Attorney Requests Video Footage from Unsecured Building*, Gateway Pundit (June 8, 2021, 11:57 AM), https://www.thegatewaypundit.com/2021/06/georgia-update-attorneys-back-court-june-21-fulton-county-officials-block-audit-ballots-attorney-requests-video-footage-unsecured-building/. A true and correct copy of this article is attached as Exhibit 37.

[121] Joe Hoft, *BREAKING: AG Merrick Garland Announces that His DOJ Will Scrutinize Any Post-Election Audits for Evidence of Voting Law Violations!*, Gateway Pundit (June 11, 2021, 3:03 PM), https://www.thegatewaypundit.com/2021/06/breaking-ag-merrick-garland-announces-doj-will-scrutinize-post-election-audits-evidence-voting-law-violations/. A true and correct copy of this article is attached as Exhibit 38.

[122] Jim Hoft, *Raffensperger's Own Team Was Saying "Bad, Bad Things" Were Happening in Fulton County Elections – He Ignored Them and Attacked Trump Instead (VIDEO)*, Gateway Pundit (June 17, 2021, 11:04 AM), https://www.thegatewaypundit.com/2021/06/raffenspergers-team-saying-bad-bad-things-happening-fulton-county-elections-ignored-attacked-trump-instead-video/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

126.    The next day, in response to a report from independent election monitor Carter Jones on election integrity in Fulton County, Jim Hoft published three more articles on *The Gateway Pundit* that republished prior defamatory statements about Plaintiffs being "leftist operatives" who were part of a "crew" that scanned fraudulent ballots. In the first, he wrote:

> A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night.
>
> . . .
>
> Ralph Jones was the person who sent home all of the election observers.
> Then his crew, including Ruby and daughter Shaye, went to work on election night!
>
> . . .
>
> The Gateway Pundit was first to report that Ruby Freeman was seen scanning stacks of ballots up to three times at the State Farm Center in Atlanta, Georgia after observers were sent home on election night.
>
> Our source caught Ruby Freeman in the purple shirt scanning the same stack of ballots multiple times on election night.[123]

127.    Defendants' characterizations of Carter Jones' report were in direct contradiction with Mr. Jones' own takeaways from the election, as evidenced by his interview with The Associated Press. In the AP interview, Mr. Jones challenged rumors of "suitcases filled with ballots" by noting that the ballot containers in the widely circulated

---

[123] Jim Hoft, *EXPLOSIVE DEVELOPMENT: Election Worker Ralph Jones Is Now Caught Double-Counting Ballots at the State Farm Center on Election Night!*, Gateway Pundit (June 18, 2021, 8:00 AM), https://www.thegatewaypundit.com/2021/06/explosive-new-report-confirms-least-two-elections-officials-ruby-freeman-ralph-jones-caught-double-counting-ballots-state-farm-center-election-night/. A true and correct copy of this article is attached as Exhibit 39.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

videos from the State Farm Arena are standard ballot bins used all over the state, "So they're not mysteries, they're not suitcases, they're ballots."[124]

128.    Three hours after Defendants' first article on the Carter Jones report, *The Gateway Pundit* published another article titled "Author of Fulton County Elections Report Tries Desperately to Walk Back Explosive Accusations – BUT IT'S TOO LATE," to try to discredit Mr. Jones' debunking the false narrative of fraud and suitcases of ballots that *The Gateway Pundit* was peddling:

> The lying fake news media is trying desperately to downplay the damning elections report from Fulton County Georgia today.
>
> . . .
>
> In the 29-page report Carter Jones tells of two more instances where the election officials were double-scanning votes late at night after the election observers and news media was sent home!
>
> The Gateway Pundit was first to report that Ruby Freeman was also seen double scanning stacks of ballots at the State Farm Center in Atlanta, Georgia after observers were sent home on election night.[125]

After quoting extensively from Mr. Jones' comments debunking the fraud allegations, Jim Hoft dismissed the comments as false.

129.    Minutes later, Jim Hoft published a third article on *The Gateway Pundit* that republished his claim that "Ruby Freeman . . . was filmed feeding the same stacks of ballots

---

[124] Kate Brumback, *Observer: Georgia county's elections messy, not fraudulent*, Associated Press (June 16, 2021), https://apnews.com/article/donald-trump-ga-state-wire-georgia-elections-government-and-politics-87bb23d4d9b2ec80a1db715e6bf1c633.

[125] Jim Hoft, *Author of Fulton County Elections Report Tries Desperately to Walk Back Explosive Accusations – BUT IT'S TOO LATE*, Gateway Pundit (June 18, 2021, 11:06 AM), https://www.thegatewaypundit.com/2021/06/author-fulton-county-elections-report-tries-desperately-walk-back-explosive-accusations-late/. A true and correct copy of this article is attached as Exhibit 40.

through voting machines late at night at the center – after observes [sic] were sent home," by which he intended to, and did, falsely convey that she was fraudulently inflating the Biden-Harris vote count.[126]

130.    The next day, on June 19, 2021, Joe Hoft published an article titled "Multiple Individuals Pushed Stacks of Ballots through Tabulators Multiple Times in Georgia. This is Illegal. Law Enforcement Did Nothing" that reiterated false claims that Ms. Freeman had engaged in criminal conduct. It noted *The Gateway Pundit*'s earlier reporting on "Fulton County Georgia poll worker Ruby Freeman pushing multiple ballots through the vote tabulators multiple times. This was illegal."[127]

131.    The same day, prompted by an online report that batches of absentee ballots were missing in Fulton County, Jim Hoft published another article replete with baseless and disproven allegations of voter fraud by plaintiffs:

> This follows news first reported by The Gateway Pundit that election operative Ruby Freeman was also caught tripe [sic] counting stacks of votes late at night at the counting center after GOP observers were sent home.

…

> On December 4th TGP reported with video on anti-Trump ballot counter Ruby Freeman working in a private cube with trays of ballots, walking past open boxes of ballots, working alone with NO ELECTION OBSERVERS IN SIGHT!

> This is the DEFINITION OF CHEATING!

---

[126] Jim Hoft, *Twitter Subpoenaed in Georgia Lawsuit Involving Fulton County Elections Supervisor Wandrea Shaye Moss*, Gateway Pundit (June 18, 2021, 11:29 AM), https://www.thegatewaypundit.com/2021/06/twitter-subpoenaed-georgia-lawsuit-involving-fulton-county-elections-supervisor-wandrea-arshaye-moss/. A true and correct copy of this article is attached as Exhibit 41.

[127] Joe Hoft, *Multiple Individuals Pushed Stacks of Ballots through Tabulators Multiple Times in Georgia. This Is Illegal. Law Enforcement Did Nothing.*, Gateway Pundit (June 19, 2021, 10:20 AM), https://www.thegatewaypundit.com/2021/06/multiple-individuals-push-multiple-ballots-multiple-tabulators-multiple-times-georgia-illegal-law-enforcement-nothing/. A true and correct copy of this article is attached as Exhibit 42.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

The video and tweet was removed from Twitter but we found the video on YouTube and we are saving a copy. [Embedded is a copy of an Instagram video taken by Ms. Freeman in October 2020 that she had removed.]

…

Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.

Ruby walks by several boxes of ballots just sitting around in the room.

The elections workers were each given their own secret cube.

Then Ruby goes to her desk and pulls out a tray of ballots on her desk.

There is NO supervisor or GOP observer anywhere in sight.

And then Ruby leaves the ballots on her desk as she goes to take a break.

This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.

The Democrat operatives were running a voter fraud factory inside the State Farm Center on Election Day and into Election Week![128]

132.    On June 20, 2021, Joe Hoft published an article in *The Gateway Pundit* that repeated the false claim that the publication had "exposed Georgia election officials repeatedly feeding thousands of ballots through the voting machines late at night in Atlanta,

---

[128] Jim Hoft, *IT WAS A VOTER FRAUD FACTORY: 2nd Carter Jones Report Describes Complete Breakdown of GA Election Systems — BALLOTS EVERYWHERE, NO CHAIN OF CUSTODY, COMPLETE DISARRAY and WE HAVE THE VIDEO*, Gateway Pundit (June 19, 2021, 8:31 PM), https://www.thegatewaypundit.com/2021/06/voter-fraud-factory-2nd-carter-jones-report-describes-complete-breakdown-election-systems-ballots-everywhere-no-chain-custody-complete-disarray-video/.    A true and correct copy of this article is attached as Exhibit 43.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Georgia after the election observers were sent home," and identifying Ms. Freeman by name and image.[129]

133.    Later that day, Joe Hoft published a second article that again falsely stated, with reference to Ms. Freeman, that "ballots [were] being pulled from under the table and then jammed through voting machines," that this happened "late at night after election observers were kicked out of the [State Farm] Arena," and that these were "criminal acts."[130]

134.    On June 24, 2021, *The Gateway Pundit* published an article titled "Fulton County Hires CRIMINAL Attorneys to Stop Election Audit," which baselessly insinuated that Plaintiffs had engaged in criminal conduct, contrary to the reports of state and county officials and numerous fact checkers, as Defendants were aware:

> On Thursday, we received news that Fulton County officials have hired two new CRIMINAL attorneys to stop the court-ordered Georgia audit.
>
> . . .
>
> Fulton County is home to the infamous Ruby Freeman and her daughter Shaye Moss who were caught pulling ballot boxes from under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.
> . . .

---

[129]  Joe Hoft, *OUTRAGEOUS: Georgia Secretary of State Raffensperger Received Report Showing Egregious Election Issues Yet He Concealed Report and Claimed State had "Safe, Secure, and Honest Elections"*, Gateway Pundit (June 20, 2021, 7:15 AM), https://www.thegatewaypundit.com/2021/06/outrageous-georgia-secretary-state-raffensperger-received-report-showing-egregious-election-issues-yet-concealed-report-claimed-state-safe-secure-honest-elections/. A true and correct copy of this article is attached as Exhibit 44.

[130]  Joe Hoft, *WE CAUGHT THEM: President Trump Warned Raffensperger and His Attorney Ryan Germany About Election Fraud — New Evidence Shows Germany Was Made Aware of Election Fraud on Election Night And Hid This from President Trump*, Gateway Pundit (June 20, 2021, 10:30 AM), https://www.thegatewaypundit.com/2021/06/caught-president-trump-warned-raffensperger-attorney-ryan-germany-election-fraud-new-evidence-shows-germany-made-aware-election-fraud-election-night-hid-fro/. A true and correct copy of this article is attached as Exhibit 45.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?
>
> This is not how innocent people act. They are hiding something in Fulton County, Georgia.[131]

135.     On July 10, 2021, *The Gateway Pundit* published an article taking credit for its role in accusing Plaintiffs of voter fraud: "For the record—The Gateway Pundit broke the story last year that Ruby Freeman and Georgia officials were triple counting stack of ballots at the TCF Center [sic] late on election night after the GOP observers were sent home."[132]

136.     On July 14, 2021, Jim Hoft published another article on *The Gateway Pundit* republishing prior false statements that Plaintiffs "really overdid their fraud" and that Ms. Freeman is a "Crooked Operative":

> As we have previously reported Fulton County election officials cleared out election observers and the media from the State Farm Arena on election night, but a handful of people stayed behind and continued to count ballots in private from around 10:30 pm until 1:00 am.
>
> As The Gateway Pundit first reported in December 2020 – This included scanning the same sets of ballots multiple times.[133]

---

[131] Jordan Conradson, *Fulton County Hires CRIMINAL Attorneys to Stop Election Audit*, Gateway Pundit (June 24, 2021, 8:35 PM), https://www.thegatewaypundit.com/2021/06/fulton-county-hires-criminal-attorneys-stop-election-audit/. A true and correct copy of this article is attached as Exhibit 46.

[132] Jordan Conradson, *Arizona State Senator: Georgia Has Proof of Somebody Admitting to Running Ballots Through Numerous Times – "Americans Don't Like Cheating" (VIDEO)*, Gateway Pundit (July 10, 2021, 8:20 AM), https://www.thegatewaypundit.com/2021/07/arizona-state-senator-georgia-proof-somebody-admitting-running-ballots-numerous-times-americans-dont-like-cheating-video/. A true and correct copy of this article is attached as Exhibit 47.

[133] Jim Hoft, *Hard Evidence Presented: Duplicate Ballots were Counted in Fulton County Georgia in 2020 Election*, Gateway Pundit (July 14, 2021, 7:30 AM), https://www.thegatewaypundit.com/2021/07/hard-evidence-presented-duplicate-ballots-counted-fulton-county-georgia-2020-election/. A true and correct copy of this article is attached as Exhibit 48.

137.    Later that day, he published an article on *The Gateway Pundit* again claiming credit for identifying Ms. Freeman as the Fulton County election official "feeding stacks of ballots through the voting machines at least three times each on November 4th in the early morning after the GOP election observers were told to go home."[134]

138.    On August 14, 2021, Joe Hoft published another article on *The Gateway Pundit* falsely describing how Ms. Freeman, Ms. Moss, and other election workers had been added to a lawsuit against Fulton County alleging election fraud.[135] The article republished *The Gateway Pundit*'s prior defamatory statements about Ms. Freeman and boasted about its role in promulgating and amplifying the false claims:

> We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.
>
> This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.
>
> We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.
>
> …
>
> This is not good for Ruby and her daughter.

---

[134] Jim Hoft, *FANTASTIC! Tucker Carlson Covers the Election Fraud in Fulton County Georgia 8 Months After Election – Here Are the Background Reports (VIDEO)*, Gateway Pundit (July 14, 2021, 9:19 PM), https://www.thegatewaypundit.com/2021/07/fantastic-tucker-carlson-covers-election-fraud-fulton-county-georgia-8-months-election-background-reports-video/. A true and correct copy of this article is attached as Exhibit 49.

[135] This lawsuit has since been dismissed. *See* Associated Press, *Judge Dismisses Fulton County Ballot Review Case in Georgia*, U.S. News (Oct. 13, 2021), https://www.usnews.com/news/best-states/georgia/articles/2021-10-13/judge-dismisses-fulton-county-ballot-review-case-in-georgia.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

It's also pathetic that these two are not in jail already. Their crimes were videotaped![136]

139.    On September 20, 2021, Joe Hoft published an article republishing *The Gateway Pundit*'s prior defamatory statements describing Ms. Moss as a "Crooked Georgia Elections Superviser [sic]" and Plaintiffs' actions on election night as being part of a "Voter Fraud Factory."[137]

140.    On September 25, 2021, in response to an internal financial review of Fulton County's Registration and Elections Department, Joe Hoft published yet another article on *The Gateway Pundit* falsely insinuating that Plaintiffs' actions on election night nearly a year before were corrupt:

> Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.
>
> . . .
>
> Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.[138]

---

[136] Ex. 9.

[137] Joe Hoft, *Wake Up Georgia: ACLU Is Currently Recruiting Leftist Poll Workers to Run the Next Election Like the Last*, Gateway Pundit (Sept. 20, 2021, 3:30 PM), https://www.thegatewaypundit.com/2021/09/wake-georgia-aclu-currently-recruiting-poll-workers-run-next-election-like-last/. A true and correct copy of this article is attached as Exhibit 50.

[138] Joe Hoft, *BREAKING EXCLUSIVE: Report Shows Fulton County, GA 2020 Election Had $2 million in Unsupported OT, 15 Missing Routers, an Agreement with the SPLC to Put in Place Drop Boxes, and More*, Gateway Pundit (Sept. 25, 2021, 7:10 AM), https://www.thegatewaypundit.com/2021/09/breaking-exclusive-report-shows-fulton-county-ga-2020-election-2-million-ot-without-support-15-missing-routers-agreement-splc-put-place-drop-boxes/. A true and correct copy of this article is attached as Exhibit 51.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**G.    Defendants Published the Statements With Knowledge of Their Falsity or Serious Doubts About Their Truth**

141.    Defendants knew that their statements about Ms. Freeman and Ms. Moss were not true or had serious doubts about their truth.  Indeed, the story that two poll workers could secretly inject tens of thousands of fraudulent ballots into the vote count and process the fraudulent ballots for counting multiple times without detection, despite several machine and hand recounts, is not credible on its face. Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

142.    Defendants were aware of the numerous statements by Georgia officials disproving the portrayal of misconduct that had been advanced by the Trump lawyers, and they also knew that multiple fact-checking organizations had confirmed the facts as presented by the Georgia officials. Defendants baselessly disregarded the reliable sources refuting their claims and had no credible basis for the false allegations they continued to make.

143.    At no point in publishing their many stories about Ms. Freeman and Ms. Moss did Defendants ever attempt to contact Plaintiffs to obtain their account of the events being reported. Nor did Defendants contact for corroboration other obvious available sources, and they specifically avoided contacting sources who had evidence to disprove their lies.

144.    Defendants ignored the truth because they had a predetermined story in mind that would continue to attract readers—that widespread voter fraud would taint the 2020 presidential election. Even before the vote counting began, Defendants cultivated this

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

narrative.[139] In November 2020, Defendants published multiple articles focusing on baseless claims of election fraud in several states.[140]

145. Defendants advanced this predetermined fictitious storyline in the face of the facts because it was financially advantageous to do so. They were motivated to publish lies about Plaintiffs because lying about the election was more profitable than telling the truth.

146. Defendants consciously avoided the truth in order to profit from the repeated publication of scandalous material. *The Gateway Pundit*'s articles about voter fraud throughout the 2020 election cycle increased its readership, reach, and engagement. Its articles about voter fraud, in particular, performed well, and it earned increased advertising revenue by publishing and republishing such well-performing falsehoods about Plaintiffs.

---

[139] *See, e.g.*, Jim Hoft, *BREAKING: US Mail Found in Ditch in Rural Wisconsin – Included Absentee Ballots*, Gateway Pundit (Sept. 23, 2020, 11:18 AM), https://www.thegatewaypundit.com/2020/09/breaking-us-mail-found-ditch-greenville-wisconsin-included-absentee-ballots/.

[140] *E.g.,* Cristina Laila, As Many as 6,000 Illegal Votes Identified in Nevada – Thousands of People Referred to DOJ For Potential Criminal Violation of Election Laws, Gateway Pundit (Nov. 5, 2020, 7:45 PM), https://www.thegatewaypundit.com/2020/11/many-6000-illegal-votes-identified-nevada-thousands-people-referred-doj-potential-criminal-violation-election-laws/; Jim Hoft, *HUGE! Corrupted Software Used in Michigan County that Stole 6,000 Votes from Trump – Is Also Used in ALL SWING STATES – PA, GA, NV, MI, WI, AZ, MN!*, Gateway Pundit (Nov. 6, 2020, 8:35 PM), https://www.thegatewaypundit.com/2020/11/huge-corrupted-software-used-michigan-county-stole-6000-votes-trump-also-used-swing-states-pa-ga-nv-mi-wi-az-mn/; Joe Hoft, *BREAKING EXCLUSIVE: Analysis of Election Night Data from All States Shows MILLIONS OF VOTES Either Switched from President Trump to Biden or Were Lost*, Gateway Pundit (Nov. 10, 2020, 6:32 PM), https://www.thegatewaypundit.com/2020/11/breaking-exclusive-analysis-election-night-data-states-shows-millions-votes-either-switched-president-trump-biden-lost/); Joe Hoft, *SHOCKING EXCLUSIVE: WE CAUGHT THEM! Pennsylvania Results Show a Statistically Impossible Pattern Behind Biden's Steal! WE CAUGHT THEM!*, Gateway Pundit (Nov. 13, 2020, 6:47 PM), https://www.thegatewaypundit.com/2020/11/shocking-exclusive-caught-pennsylvania-results-show-statistically-impossible-pattern-behind-bidens-steal-caught/; Jim Hoft, *WE CAUGHT THEM! Part 2: Email Inventor Dr. Shiva Finds SAME IMPOSSIBLE BALLOT RATIO Feature in Michigan Results – WE CAUGHT THEM!*, Gateway Pundit (Nov. 14, 2020, 5:49 PM), https://www.thegatewaypundit.com/2020/11/caught-part-2-email-inventor-dr-shiva-finds-impossible-ballot-ratio-feature-michigan-results-caught/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

147.    Defendants additionally hoped that repeating their preconceived narrative would affect the outcome of the presidential election.

**H.    Defendants' Failure to Retract, Despite Plaintiffs' Cease and Desist Letters and The Filing of This Lawsuit**

148.    In an effort to attempt to mitigate the harm caused by the publication of the false statements in Defendants' stories, Ms. Freeman and Ms. Moss engaged legal counsel, Dowd Bennett, LLC, and DuBose Miller, LLC to seek retraction from Defendants.

149.    On November 22, 2021, counsel sent Defendants a letter demanding that they correct and retract the numerous defamatory statements they have published and continue to publish about Ms. Freeman and Ms. Moss.[141]

150.    As of the date of this filing, Defendants have not responded to that letter nor taken any action to correct and retract their statements. Moreover, even after the initial filing of this lawsuit specifying Defendants' willfully false and malicious statements and the consequent harm to Plaintiffs, Defendants have kept up their defamatory campaign, coupled with requests for financial contributions to support their legal defense.

151.    On December 2, 2021, hours after this lawsuit was filed, Jim Hoft published an article on *The Gateway Pundit* titled "Ruby Freeman and Daughter Sue Gateway Pundit for Posting Video of Her Shoving Ballots Through Voting Machines Numerous Times – PLEASE HELP UP Fight This Latest Lawsuit," in which he again boasted about the publication's role in first identifying Plaintiffs by name:

> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.

---

[141] A true and correct copy of this letter is attached as Exhibit 52.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.[142]

The article concluded with a request for donations to help protect against "this latest assault."

152. The following day, Jim Hoft published an article on *The Gateway Pundit* titled "Interesting. FBI Investigated Alleged Threats to Ruby Freeman but There Is No Record of FBI Investigating the Illicit Late Night Actions at State Farm Center." He falsely accused Plaintiffs of illegal conduct and then attempted to discredit an ABC News article from the day before about the lawsuit which noted that "[t]he allegation that 'suitcases' of ballots were pulled from under tables away from the eyes of observers was almost immediately debunked."[143] In response, Mr. Hoft wrote:

> ABC News, a lapdog outlet for the Democrat regime, reported on the lawsuit on Thursday.
>
> ABC News said the suitcase scandal was "debunked." It wasn't. And 9 of 10 people who view the video and hears the entire story KNOWS this was suspicious activist [sic] – to be kind.[144]

He again concluded with an appeal for funds to defend against Plaintiffs' "assault" on *The Gateway Pundit.*

---

[142] Jim Hoft, *Ruby Freeman and Daughter Sue Gateway Pundit for Posting Video of Her Shoving Ballots Through Voting Machines Numerous Times – PLEASE HELP US Fight This Latest Lawsuit*, Gateway Pundit (Dec. 2, 2021, 12:42 PM), https://www.thegatewaypundit.com/2021/12/ruby-freeman-daughter-sue-gateway-pundit-posting-video-shoving-ballots-voting-machines-numerous-times-please-help-us-fight-latest-lawsuit/. A true and correct copy of this article is attached as Exhibit 53.

[143] Kate Brumback, *Election workers sue conservative site over fraud claims*, ABC News (Dec. 2, 2021), https://abcnews.go.com/Politics/wireStory/election-workers-sue-conservative-site-fraud-claims-81520609.

[144] Jim Hoft, *Interesting. FBI Investigated Alleged Threats to Ruby Freeman but There Is No Record of FBI Investigating the Illicit Late Night Actions at State Farm Center* (Dec. 3, 2021, 12:02 PM), https://www.thegatewaypundit.com/2021/12/interesting-fbi-investigated-alleged-threats-ruby-freeman-no-record-fbi-investigating-illicit-late-night-actions-state-farm-center/. A true and correct copy of this article is attached as Exhibit 54.

153.    On December 8, 2021, Jim Hoft published another article on *The Gateway Pundit* taking credit for identifying Plaintiffs and republishing prior false statements that Ms. Freeman was "caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home." He went on to falsely suggest that Plaintiffs' lawful processing of ballots was actually election theft on behalf of President Biden:

> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race.
>
> We disagree.
>
> Today Georgia Secretary of State Brad Raffensperger went on the popular John Fredericks Radio Show. Raffensperger argued that the "suitcase scandal" was an urban myth.
> . . .
>
> Raffensperger allows this obvious stealing of votes in Georgia elections.[145]

154.    Later that day, Joe Hoft published another article with an embedded audio clip of an episode of the Joe Hoft Show on RealTalk 93.3. In the audio clip, Joe Hoft defamed Plaintiffs again by falsely accusing them of corrupt activity:

> So these people stuck around, and they decided to pull ballots out from underneath the tables . . . in suitcases, and then they opened them up, and they started shoving them through the tabulators.
>
> . . .

---

[145] Jim Hoft, *Brad Raffensperger Argues the State Farm Suitcase Video Was "Urban Myth"—Kicking Out Obversers* [sic]*, Rolling Out Suitcases and Shoving Ballots Thru Machines 3 Times in Middle of Night is Completely Acceptable (VIDEO)*, Gateway Pundit (Dec. 8, 2021, 7:41 PM), https://www.thegatewaypundit.com/2021/12/brad-raffensperger-argues-state-farm-suitcase-video-urban-myth-kicking-obversers-rolling-suitcases-shoving-ballots-thru-machines-3-times-middle-night-completely-acc/. A true and correct copy of this article is attached as Exhibit 55.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?[146]

155. The following week, Jim Hoft published an article on *The Gateway Pundit* attempting to discredit a news report from the *St. Louis Post-Dispatch* about the lawsuit, which had observed that the Georgia Secretary of State had "quickly and forcefully debunked the allegations" of suitcases of fake ballots being processed unsupervised.[147] In response, Mr. Hoft objected that *The Gateway Pundit* was not spreading conspiracy theories and republished its initial reporting, again accusing Plaintiffs of corrupt conduct, allegations disproven by state and county officials and third-party fact-checkers many times over.[148]

156. On December 24, 2021, counsel sent Defendants a second letter demanding that they correct and retract their additional defamatory statements, including those described above, some of which post-dated Plaintiff's first retraction letter.[149]

157. As of the date of this filing, Defendants have not responded to that letter, either, nor taken any action to correct or retract their false stories. Instead, they published new stories defaming Plaintiffs.

---

[146] Joe Hoft, *You're Really About to Destroy Yourselves . . . You Just Don't Know the Grave You're Digging for Yourselves" – Jessica Laurent on Georgia Suitcase Sandal and Lawsuit Against Gateway Pundit*, Gateway Pundit (Dec. 8, 2021, 8:50 PM), https://www.thegatewaypundit.com/2021/12/really-destroy-just-dont-know-grave-digging-jessica-laurent-ruby-shaye-lawsuit-gateway-pundit/. A true and correct copy of this article is attached as Exhibit 56.

[147] Peter Eisler & Joel Currier, *Two Georgia election workers sue St. Louis-based Gateway Pundit website over false fraud claims* (Dec. 2, 2021), https://www.stltoday.com/news/local/crime-and-courts/two-georgia-election-workers-sue-st-louis-based-gateway-pundit-website-over-false-fraud-claims/article_2619f7b7-575f-58fe-965e-ee3f4d118dc1.html.

[148] Jim Hoft, *The St. Louis Post-Dispatch Refused to Publish Gateway Pundit's Response to Their Numerous Hit Pieces and Lies – So We Are Posting It Here Where It Will Get More Traffic*, Gateway Pundit (Dec. 15, 2021, 8:00 AM), https://www.thegatewaypundit.com/2021/12/response-st-louis-post-dispatch-recent-attempts-dilute-jury-pool-based-lies-far-left-opinion/.

[149] A true and correct copy of this letter is attached as Exhibit 57.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

158.     On December 25, 2021, Jim Hoft published another article on *The Gateway Pundit* republishing Defendants' earlier defamatory statements about Plaintiffs, describing them as "election operatives" and stating that Ms. Freeman was "caught on video shoving stack of ballots through the voting machines numerous times late at night after all of the election observers were sent home." Mr. Hoft went on to describe Plaintiffs as "lawless individuals" engaged in unethical conduct and to question whether they had actually been defamed:

> But were they?
>
> There is absolutely no way to explain away these actions.
>
> If this behavior is accepted then it will be the end of our free, fair, and trusted elections.
>
> If this behavior becomes the norm in future elections then we will be reduced to banana-republic status.
>
> . . .
>
> So where are all of the GOP lawmakers speaking out against the shady actions CAUGHT ON VIDEO from inside the State Farm Center on election night?
>
> . . .
>
> You can't be considered a viable opposition when you submit to lawless individuals. You just can't.[150]

159.     On January 14, 2022, Plaintiffs filed their First Amended Complaint, which added 19 defamatory articles listed in their second retraction letter.

---

[150] Jim Hoft, *If Republican Leaders Will Not Speak out Against Election Officials Removing GOP Observers from Room, Pulling Out Hidden Suitcases of Votes and Shoving Stacks of Ballots Thru Machines 3 Times, Then the Grand Old Party's Days Are Over*, Gateway Pundit (Dec. 25, 2021, 12:25 PM), https://www.thegatewaypundit.com/2021/12/republican-leaders-will-not-speak-election-officials-removing-gop-observers-room-pulling-hidden-suitcases-votes-shoving-stacks-ballots-thru-machines-3-times-th/. A true and correct copy of this article is attached as Exhibit 58.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

160. Even after two retraction letters and the First Amended Complaint, Defendants continued to publish defamatory statements about Plaintiffs.

161. On April 22, 2022, *The Gateway Pundit* published an article titled "WTH? John F. Kennedy Library Foundation Lumps President Zelensky In With Pack of Election Crooks, Cowards and Liars In Latest 'Profile in Courage' Awards." The article falsely charges Ms. Moss with one of these epithets and questions whether accusations against her of processing fake ballots were actually false, despite numerous fact-checks making this clear. The article states:

> . . . Gateway Pundit claims Ruby Freeman and her daughter Wandrea "Shaye" Moss are repeatedly jamming the same stacks of ballots through the tabulators: . . . .
>
> The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video . . . .
>
> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.
>
> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.[151]

The article again included an appeal for funds to fund Defendants' costs in litigating this suit, which they characterized as an "assault."

162. On May 4, 2022, *The Gateway Pundit* published an article titled "Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award." In

---

[151] Patty McMurray, *WTH? John F. Kennedy Library Foundation Lumps President Zelensky In With Pack of Election Crooks, Cowards and Liars In Latest "Profile in Courage" Awards*, Gateway Pundit (Apr. 22, 2022, 11:05 AM), https://www.thegatewaypundit.com/2022/04/wth-john-f-kennedy-library-foundation-lumps-president-zelensky-pack-election-crooks-cowards-liars-latest-profile-courage-awards/. A true and correct copy of this article is attached as Exhibit 59.

addition to the false and defamatory claim that Ms. Moss engaged in voter fraud as a "ballot harvester," the article expressed incredulity that the JFK Foundation would present this award to Plaintiff Moss for "'protecting democracy.'" Further, the article twisted the ramifications of *The Gateway Pundit*'s falsely accusing Ms. Moss of voter fraud as instead just being "backlash from being caught on camera ballot harvesting."[152]

163.    On June 16, 2022, counsel sent Defendants a third letter demanding that they correct and retract their additional defamatory statements, including those described above, some of which post-dated Plaintiff's second retraction letter.[153]

164.    As of the date of this filing, Defendants have not responded to that letter, either, or taken any action to correct or retract their false stories.

## I.    Defendants Caused Substantial Reputational Harm With Their False Statements About Ms. Freeman and Ms. Moss That Constitute Defamation *Per Se*

165.    Defendants falsely stated or implied that (a) Ms. Freeman and Ms. Moss planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden; (b) Ms. Freeman and Ms. Moss helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center; (c) Ms. Freeman and Ms. Moss engaged in a criminal conspiracy to exclude observers during the counting of ballots so that they could engage in election fraud; (d) Ms. Freeman and Ms. Moss criminally introduced "suitcases" of illegal ballots into the ballot counting process when no observers were present; (e) Ms. Freeman fraudulently triple-counted the

---

[152] Alicia Powe, *Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award*, Gateway Pundit (May 4, 2022, 1:03 PM), https://www.thegatewaypundit.com/2022/05/stunning-ballot-havester-shaye-moss-receives-john-f-kennedy-profile-courage-award/. A true and correct copy of this article is attached as Exhibit 60.

[153] A true and correct copy of this letter is attached as Exhibit 61.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

same ballots by running them through a tabulator three times; and (f) Ms. Freeman and Ms. Moss committed election fraud and other crimes for which they are subject to arrest and imprisonment. These claims are false and constitute defamation *per se*.

166.    Given the nature of Plaintiffs' employment with the Registration and Elections Department of Fulton County, Defendants' claims that Ms. Freeman and Ms. Moss participated in a conspiracy to fraudulently overturn a democratic election would tend to injure them in their trade, office, or profession: a reputation for integrity is a requirement for workers in a profession whose responsibility is to accurately and legitimately tabulate and report elections results while maintaining public confidence in elections.

167.    Defendants also stated that Ms. Freeman and Ms. Moss participated in criminal activity punishable by law. Defendants labeled both Ms. Freeman and Ms. Moss as "crook[s]" and claimed that "nobody did more to steal the election for Joe Biden than this mother-daughter combo."[154] Defendants asserted that the actions of Ms. Freeman and Ms. Moss were "illegal" and that "the Georgia police or Bill Barr's DOJ may want to pay Ruby Freeman a visit."[155]

168.    Published on a website with nearly three million unique visitors per month, Defendants' stories did cause and continue to cause substantial reputational harm to Ms. Freeman and Ms. Moss.

169.    Defendants are directly responsible for the reputational harm that Ms. Freeman and Ms. Moss experienced. Though the initial claims by the Trump legal team

---

[154] Ex. 8.

[155] Ex. 3.

were based only on short selections of security footage and did not name any individual Fulton County election workers, "[t]he Gateway Pundit was first to identify Ruby Freeman [and] her daughter Wandrea "Shaye" Moss . . . in the infamous suitcase ballot hoist [sic]," as the Defendants themselves boast.[156]

**J.      Impact of Defendants' Campaign Against Ms. Freeman and Ms. Moss**

170.    Defendants repeatedly published the full names of Ms. Freeman and Ms. Moss, in addition to numerous images of Ms. Freeman and Ms. Moss, the name of Ms. Freeman's business, and Ms. Freeman's social media account information. In so doing, Defendants were fully aware that their readers would target Ms. Freeman and Ms. Moss in response to their stories. Defendants even urged their readers not to "confuse [Ms. Freeman's business] with a similar business in Snellville!"[157]

171.    As a direct result of Defendants' campaign of lies, Ms. Freeman and Ms. Moss began receiving—almost immediately—an onslaught of extremely violent and graphic threats and dangerous harassment.

Ms. Freeman

172.    As Defendants' false accusations began to spread across the internet, Ms. Freeman received at least 420 emails and seventy-five text messages, including one that read, "We know where you live, we coming to get you."

173.    Ms. Freeman sought intervention from the local police; a local officer answered more than twenty harassing calls on Ms. Freeman's cell phone. Despite these efforts, Ms. Freeman was ultimately forced to change her phone number and email address.

---

[156] Ex. 19.

[157] Ex. 6.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

174.     On multiple occasions, strangers camped out at Ms. Freeman's home and/or knocked on her door. When Ms. Freeman was not home or would not answer the door, these strangers would sometimes also harass her neighbors. Strangers were coming to her home so frequently that the local police agreed to add her address to their patrols of the area.

175.     During this time, numerous pizza deliveries showed up at her home that she and her family had never ordered. This is an often-chronicled result of being "doxxed"—the term for when strangers post and share a target's personal information as a means to organize a coordinated harassment campaign.

176.     Christmas cards were mailed to Ms. Freeman's address with messages like, "Ruby please report to the FBI and tell them you committed voter fraud. If not you will be sorry," and "You deserve to go to jail, you worthless piece of shit whore."

177.     The level of harassment Ms. Freeman received at her home led the FBI to conclude that she would not be safe in her home on beginning on January 6, 2021, the date of former President Trump's infamous rally and the subsequent insurrection at the U.S. Capitol, and continuing at least through Inauguration Day, January 20, 2021.

178.     On January 6, 2021, a crowd surrounded Ms. Freeman's house, some on foot, some in vehicles, others equipped with a bullhorn. Fortunately, Ms. Freeman had followed the FBI's advice and had temporarily relocated from her home. She was not able to return for two months.

179.     Since returning home, Ms. Freeman has had to purchase eleven cameras and three motion sensors in an effort to safeguard her own home.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

180.     Ms. Freeman was also forced to deactivate the social media pages for herself and her business, Lady Ruby's Unique Treasures, a pop-up clothing boutique. Though she has long been a local entrepreneur, she was forced to shutter her business when she was unable to attend public events or conduct online marketing through social media.

181.     The reputational impacts of Defendants' lies continue to be felt across Ms. Freeman's social and professional networks. After being publicly accused of crimes, she has lost friendships.

182.     When people recognize her in public and call out her name, Ms. Freeman is fearful. Her experiences over the months since *The Gateway Pundit*'s defamation campaign began have taught Ms. Freeman to be distrustful of strangers and concerned for her safety.

183.     The stress of this period also took a toll on Ms. Freeman's body, including manifesting through stress-related dental injuries.

184.     To this day, Ms. Freeman continues to receive threatening communications referencing Defendants' defamation. On November 13, 2021, she received an email accusing her of treason, insinuating she would soon be serving jail time, and including a link to an article about election fraud in Georgia from *The Gateway Pundit.*

Ms. Moss

185.     The day after *The Gateway Pundit*'s campaign of falsehoods began, Ms. Moss's then fourteen-year-old son informed her that numerous calls were coming into Ms. Moss's old phone, which he was using at the time. When he answered the calls, he was bombarded with racial slurs and threats of violence. One caller stated that her son "should hang alongside [his] nigger momma." Her son fielded these harassing calls for months.

75

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

186.    Defendants' defamation also caused Ms. Moss to suffer an onslaught of online harassment. She received dozens of messages through Facebook, LinkedIn, and Pinterest, many of which threatened violence. These messages did not merely suggest Ms. Moss lose her job but insisted that she deserved to die and would be killed in retribution for her "treason." She has since deleted her Pinterest and LinkedIn accounts.

187.    Because Ms. Moss had previously lived with her grandmother, it was her grandmother's address that harassers found and exploited. As they did with Ms. Freeman, these harassers repeatedly sent unwanted pizzas to Ms. Moss's grandmother's house.

188.    On at least two occasions, strangers showed up at her grandmother's home and attempted to push into the house in order to make a "citizens' arrest." On these occasions, Ms. Moss's grandmother, who is in her mid-seventies, called her in a panic, confused and scared for her safety.

189.    The impacts of Defendants' lies also followed Ms. Moss at work. The general email addresses used by the public to contact the Fulton County elections offices would forward incoming emails to Ms. Moss and many of her colleagues. As a result, Ms. Moss and her colleagues received, directly in their work inboxes, harassing emails sent to those public email addresses.

190.    Inspired by the demonstrably false conspiracy theory pushed by Defendants, people also protested about Ms. Moss outside of her Fulton County workplace, demanding she be fired from her job.

191.    This whirlwind of negative attention around Ms. Moss left her feeling fearful and ashamed in an office where she has worked since 2012. Before the 2020 general election, she generally enjoyed the parts of her job that allowed her to work with and assist

76

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

the public. Since then, even when she was assisting constituents over the phone, she would sweat and feel anxious if they asked her name. She was afraid that when people heard her name, they would think she is a fraud and a cheater.

192.    Ms. Moss left her position working at Fulton County elections in April 2022.

193.    Like her mother, Ms. Moss is now fearful whenever people recognize her in public. As a result, Ms. Moss has largely retreated from social and public life. She has gone as far as to avoid the grocery store, opting to have groceries delivered in order to avoid it. She feels trapped by the unshakable fear that there are unknown people after her who want her dead.

194.    Over the last year, Ms. Moss has suffered from disrupted sleep and has gained fifty pounds as a result of the stress caused by Defendants' campaign of lies.

195.    The onslaught of threats that Plaintiffs have experienced and the necessary measures they have been forced to take to protect themselves are the direct result of Defendants' defamatory conduct. Plaintiffs have and will continue to experience serious and severe emotional distress as a result. The harm Defendants have caused to Plaintiffs' reputations, privacy, safety, and earnings and other pecuniary loss is immense.

## **FIRST CLAIM**
### **(Defamation of Ms. Freeman)**

196.    Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

197.    Beginning on December 3, 2020, Defendants published a series of false and defamatory statements of fact about Ms. Freeman, including by and through *The Gateway*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

*Pundit*'s own agents making the statements themselves; and by republishing the statements on *The Gateway Pundit*'s website and social media accounts, and the social media accounts of its agents, as detailed extensively above. Those statements include, but are not limited to, the following non-exhaustive list:

a)   In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statements, which they republished verbatim on December 3, 2020, at 2:29 p.m.:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.
>
> …
>
> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.

b)   In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statement, which they republished verbatim or nearly verbatim nine (9) times on December 3, 2020 at 2:29 p.m. and 8:49 p.m.; December 4, 2020 at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; December 7, 2020 at 7:15 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m; and May 4, 2022 at 1:03 p.m.[158]:

> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!

---

[158] The December 3, 2020, 2:29 p.m. article added the additional defamatory statement: "They were caught cheating!" The December 8, 2020, 1:11 p.m. article added the additional defamatory statement: "A few liberal election 'workers' stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room!" The May 4, 2022, 1:03 p.m. article omitted the opening phrase "A few 'workers' stayed behind and were seen."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

c) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim eighteen (18) times on December 4, 2020 at 7:35 a.m., 8:53 a.m., 1:51 p.m., and 5:45 p.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 7:15 a.m. and 8:29 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; June 7, 2021 at 9:43 p.m.; June 14, 2021 at 10:33 a.m.; August 14, 2021 at 9:15 a.m.; September 20, 2021 at 3:30 p.m.; and May 4, 2022 at 1:03 p.m.[159]:

> Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.

d) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim five (5) times on December 4, 2020, at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; December 7, 2020, at 7:15 a.m.; and December 8, 2020, at 7:20 a.m.:

> We identified one of the operatives [last/Thursday] night who was caught on video counting illegal ballots from a suitcase stashed under a table!

e) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim four (4)

---

[159] The December 3, 2020, 8:49 p.m.; December 4, 2020, 5:45 p.m.; and May 4, 2022, 1:03 p.m., articles added the additional defamatory statement "What's Up, Ruby? . . . BREAKING: CROOKED OPERATIVE Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

times on December 4, 2020, at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; and

December 8, 2020, at 7:20 a.m.:

> As you can see from the video one woman in a purple top was filmed helping pull out the ballots and then sitting down to count the ballots.

f) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statements, which they republished four (4) times on December 4, 2020, at 7:35 a.m., 8:53 a.m.,[160] and 1:51 p.m.[161]; and December 8, 2020, at 7:20 a.m.:

> One woman in the video is wearing a purple top. She later appeared in the suitcase video!
>
> The woman in the purple made a mistake and left her purse on her desk advertising her business.
>
> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.
>
> Her T-shirt says "Lady Ruby" and her purse says, "LaRuby" which is her company.
>
> This was not a very smart move.
>
> Her company is called "LaRuby's Unique Treasures." It's on her LinkedIn page!
>
> Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.

---

[160] The December 4, 2020, 8:53 a.m. article's republication deletes the following sentences: "The woman in the purple made a mistake and left her purse on her desk advertising her business," and "It's on her LinkedIn page!"

[161] The December 4, 2020, 1:51 p.m. article's republication deletes the following sentences: "Her T-shirt says 'Lady Ruby' and her purse says, 'LaRuby' which is her company. This was not a very smart move. Her company is called 'LaRuby's Unique Treasures.' It's on her LinkedIn page!"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

They then commented on her LinkedIn page.[162]

g) Defendants end their December 3, 2020, article published at 8:49 p.m. with the following false statements:

> Maybe the Georgia police or Bill Barr's DOJ may want to pay Ruby Freeman a visit.
>
> …
>
> CROOK GETS CAUGHT

h) In their December 4, 2020, article published at 8:53 a.m., Defendants made the following false statements, which they republished verbatim on June 19, 2021, at 8:31 p.m.:

> Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.
>
> Ruby walks by several boxes of ballots just sitting around in the room.
>
> The elections workers were each given their own secret cube.
>
> Then Ruby goes to her desk and pulls out a tray of ballots on her desk.
>
> There is NO supervisor or GOP observer anywhere in sight. And then Ruby leaves the ballots on her desk as she goes to take a break.
>
> This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.

i) In their December 4, 2020, article published at 1:51 p.m., Defendants made the following false statements:

---

[162] The original publication of this article added that "Ruby Freeman still has an active Facebook page (as of 11 PM on Thursday night)," while republications noted that Freeman's Facebook account was no longer active.

81

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.
>
> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other. It sure looks like they were trying to hide this transaction.

j) In their December 4, 2020, article published at 3:25 p.m., Defendants made the following false statements:

> Mother-Daughter Duo's Election Fraud Scam . . .
>
> [T]he mother-daughter duo in Atlanta began messing with ballots in secret.

k) In their December 4, 2020, article published at 5:45 p.m., Defendants made the following false statements, which they substantially republished twenty (20) times on December 6, 2020 at 8:15 a.m.; December 23, 2020 at 8:10 a.m. and 11:05 a.m.; January 2, 2021 at 7:30 a.m.; March 25, 2021 at 7:25 p.m.; May 21, 2021 at 12:34 p.m.; May 22, 2021 at 9:05 a.m.; June 6, 2021 at 7:53 a.m.; June 8, 2021 at 11:57 a.m.; June 11, 2021 at 3:03 p.m.; June 18, 2021 at 8:00 a.m.; June 19, 2021 at 10:20 a.m.; June 20, 2021 at 7:15 a.m.; July 10, 2021 at 8:20 a.m.; July 14, 2021 at 7:30 a.m.; December 2, 2021 at 12:42 p.m.; December 3, 2021 at 12:02 p.m.; December 8, 2021 at 7:41 p.m.; December 25, 2021 at 12:25 p.m.; and April 22, 2022 at 11:05 a.m.[163]:

> UNBELIEVABLE: Anti-Trump Democrat in Georgia 'Suitcase Scandal' Caught running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)

---

[163] The republications each added the additional defamatory statement "What's Up, Ruby? . . . BREAKING: CROOKED OPERATIVE Filmed Pulling Out Suitcases of Ballots in Georgia." Further, three other articles republished only the first defamatory statement about Ms. Freeman being "[c]aught" in the "'[s]uitcase [s]candal'": June 8, 2021, at 11:57 a.m.; June 19, 2021, at 10:20 a.m.; and June 20, 2021, at 7:15 a.m.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.

l)  In their December 4, 2020, article published at 5:45 p.m., Defendants also made the following false statements:

We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]

Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.

The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.

m) In their December 6, 2020, article published at 8:15 a.m., Defendants also made the following false statements:

[T]he secret suitcase ballots were pulled out from their hiding place under the tables.

They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.

n)  In their December 6, 2020, article published at 6:35 p.m., Defendants made the following false statements, which they republished on December 6, 2020, at 9:23 p.m. and December 7, 2020, at 8:29 a.m.:

Next it was uncovered that a mother and daughter team [, Ruby Freeman and her daughter "Shaye" Moss] as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were pulled out from under a table that were previously covered up and processed with no Republican observers.

83

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The mother – daughter team have become infamous in the annals of voter corruption[.]

o) In their December 7, 2020, article published at 8:29 a.m., Defendants made the following false statements, which they republished verbatim on December 8, 2020, at 8:59 a.m. and republished in part on December 23, 2020, at 8:40 a.m.[164]:

> Ralph Jones, Sr. was identified as the third suspect in the Fulton County Georgia suitcase scandal.
>
> ** Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> ** Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.
>
> ...
>
> They sent everyone home!
>
> ...
>
> ** The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.
>
> ** Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.
>
> ** It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.

---

[164] The December 8, 2020, 8:59 a.m. article shortens the final sentence to read, "It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud." The December 23, 2020, 8:40 a.m. article includes the first two sentences and ends with "** Ralph and his team plotted to remove ALL elections observers."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

      \*\* It appears this was a conspiracy to lie to the public including local news, to remove observers from the center and then to commit their hidden suitcase ballot fraud.

p) Defendants end their December 7, 2020, article published at 8:29 a.m. with the following false statements:

      We know [the alleged pipe burst at State Farm Arena] was a lie because there was NEVER a work order filed and the water department never received a call.

      It never happened!

      But it gave Ralph and Ruby and Shaye cover to complete their scam on Georgia and America!

q) In their December 8, 2020, article published at 7:20 a.m., Defendants made the following false statements:

      Shaye told everyone to go home.

      Then Shaye, her mother and a couple others including Ralph Jones, Sr. were filmed taking "suitcases" of ballots hidden under a table out to be tabulated. This was right before Joe Biden got his surprise spike in ballots.

      And now the liberal media and their fake "fact-checkers" are lying about the incredible incident caught on video!

r) In their December 15, 2020, article published at 9:19 a.m., Defendants made the following false statements:

      We even HAVE VIDEO of Democrats at work stealing votes from the people of Georgia. . . .

      Has anyone questioned <u>Ruby Freeman or her daughter</u>?

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

s)  In their December 23, 2020, article published at 8:10 a.m., Defendants made the following false statements, which they republished on December 23, 2020, at 11:05 a.m. and January 2, 2021, at 7:30 a.m.[165]:

> President Trump tweeted a Gateway Pundit video where we identified Georgia ballot workers jamming ballots into tabulators multiple times [late on election night].
>
> . . .
>
> We shared this video on December 4, when we pointed out that one of the participants in the [ballots under the desk scandal / suitcase ballot hoist] grabbed the ballots and started jamming the ballots into the Dominion tabulators three times.
>
> Georgia's results are a total fraud. The Democrats using people like these poll workers stole the election for Joe Biden.

t)  In their December 23, 2020, article published at 8:40 a.m., Defendants made the following false statement, which they republished on January 3, 2021, at 6:20 p.m.; January 7, 2021, at 3:14 p.m.; January 17, 2021, at 6:33 p.m.; and June 6, 2021, at 7:53 a.m.[166]:

> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].

---

[165] The article on December 23, 2020, at 11:05 a.m. omits the last paragraph and the article on January 2, 2021, includes only the line "Georgia's results are a total fraud" from the last paragraph.

[166] The articles on December 23, 2020, at 8:40 a.m. and June 6, 2021, at 7:53 a.m. added the additional defamatory statement "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

u)  In their December 23, 2020, article published at 8:40 a.m., Defendants also made the following false statements, which they largely republished on January 17, 2021, at 6:33 p.m.[167]:

> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
>
> ...
>
> Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist [sic]. Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist [sic]!
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.
>
> They were able to flip Georgia for Beijing Biden by their actions.
>
> Why is the FBI or DOJ not involved?
>
> This tells you everything you need to know about your federal government.

v)  In their December 26, 2020, article published at 7:34 p.m., Defendants made the following false statements:

> [T]he documentary and video evidence show that thousands of votes were illegally counted in Fulton County, Georgia. Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation

---

[167] The January 17, 2021, 6:33 p.m. article included all but the last three sentences of these defamatory statements.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.

The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.

w) In their January 1, 2021, article published at 9:58 a.m., Defendants made

the following false statements:

We have individuals dragging ballots out from under the tables in Georgia on election night on video and yet none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of.

x) In their January 2, 2021, article published at 7:30 a.m., Defendants made

the following false statement, which they republished on May 21, 2021, at

12:34 p.m. and June 19, 2021, at 10:20 a.m.:

ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!

y) In their January 3, 2021, article published at 6:20 p.m., Defendants made

the following false statements, which they republished in part on June 6,

2021, at 7:53 a.m. and June 20, 2021, at 10:30 a.m.[168]:

President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break.

---

[168] The republished portion in the two subsequent articles quotes the headline that "'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal!"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.

z) In their January 5, 2021, article published at 9:20 a.m., Defendants made

the following false statement, which they republished verbatim on January

5, 2021, at 1:02 p.m.:

> Sterling misled his audience, defended the corrupt and likely criminal conduct at the State Farm Center on election night [and] defended [elections worker] Ruby Freeman for passing hundreds of ballots through a ballot counting machines at least three times.

aa) In their January 17, 2021, article, published at 6:33 p.m., Defendants made

the following false statements:

> FIVE MOST SIGNIFICANT ACTS OF FRAUD IN THE 2020 ELECTION:
>
> 1.) The Georgia Late Night Hidden Suitcase Heist:

bb) In their June 6, 2021, article published at 7:53 a.m., Defendants made the

following statements:

> Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?
>
> After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving stacks of ballots through the machines two and three times each.
>
> In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on Election night:

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

. . .

The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.

. . .

We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.

. . .

cc) In their June 7, 2021, article published at 9:43 p.m., Defendants made the following false statements, which they republished on June 14, 2021, at 10:33 a.m. and June 18, 2021, at 8:00 a.m.[169]:

Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. [Our source caught Ruby Freeman in the purple shirts scanning / Ruby Freeman was caught on tape running] the same stack of suspect ballots through the machines multiple times

dd) In their June 18, 2021, article published at 8:00 a.m., Defendants made the following false statements, which they substantially republished on June 18, 2021, at 11:06 a.m. and June 19, 2021, at 10:20 a.m.[170]:

A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night. Top Atlanta election official Ralph Jones was also double scanning ballots late at night at the State Farm Center in Atlanta, Georgia on election night.

. . .

---

[169] The June 7, 2021, 9:43 p.m. article added the additional defamatory statement "BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night is Subpoenaed."

[170] The second two articles republish only the first of these two paragraphs.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Ralph Jones was the person who sent home all of the election observers. Then his crew, including Ruby and daughter Shaye, went to work on election night!
>
> . . .

ee) In their June 18, 2021, article published at 8:00 a.m., Defendants made the following additional false statement, which they republished seven (7) times, on June 18, 2021, at 11:06 a.m., December 2, 2021, at 12:42 p.m., December 3, 2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., December 25, 2021, at 12:25 p.m., April 22, 2022, at 11:05 a.m., and May 4, 2022, at 1:03 p.m.:

> The Gateway Pundit was [also] first to [report / reveal] that Ruby Freeman was [also] [caught on video shoving / seen scanning / seen double scanning] stacks of ballots [up to three / through the voting machines numerous] times [at the State Farm Center in Atlanta, Georgia / late at night] after [all of the election] observers were sent home [on election night].

ff) In their June 18, 2021, article published at 11:29 a.m., Defendants made the following false statement:

> Shaye is the daughter of Ruby Freeman who was filmed feeding the same stacks of ballots through voting machines late at night at the center – after observes [sic] were sent home.

gg) In their June 19, 2021, article published at 10:20 a.m., Defendants made the following false statement:

> [W]e reported on Fulton County Georgia poll worker Ruby Freeman pushing multiple ballots through the vote tabulators multiple times.  This was illegal.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

hh) In their June 19, 2021, article published at 8:31 p.m., Defendants made the

following false statements:

> This follows news first reported by The Gateway Pundit that
> election operative Ruby Freeman was also caught tripe [sic]
> counting stacks of votes late at night at the counting center
> after GOP observers were sent home.
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> On December 4th TGP reported with video on anti-Trump
> ballot counter Ruby Freeman working in a private cube with
> trays of ballots, walking past open boxes of ballots, working
> alone with NO ELECTION OBSERVERS IN SIGHT!
> This is the DEFINITION OF CHEATING!
>
> …
>
> The Democrat operatives were running a voter fraud factory
> inside the State Farm Center on Election Day and into
> Election Week!

ii) In their June 24, 2021, article published at 8:35 p.m., Defendants made the

following false statements:

> Fulton County is home to the infamous Ruby Freeman and
> her daughter Shaye Moss who were caught pulling ballot
> boxes from under tables and scanning the same ballots
> multiple times after GOP elections observers were sent home
> on election night.
>
> . . .
>
> If Fulton County officials are SO confident in the security of
> Georgia's election, why are they hiring CRIMINAL
> DEFENSE attorneys?
>
> This is not how innocent people act. They are hiding
> something in Fulton County, Georgia.

92

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

jj) In their July 14, 2021, article published at 9:19 p.m., Defendants made the following false statements:

> That a Fulton County election official – identified by The Gateway Pundit as Ruby Freeman – was feeding stacks of ballots through the voting machines at least three times each on November 4th in the early morning after GOP election observers were told to go home.
>
> . . .
>
> ** Dec. 4, 2020- Anti-Trump Democrat in Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator    THREE TIMES! (VIDEO)

kk) In their August 14, 2021, article published at 9:15 a.m., Defendants made the following false statements:

> We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.
>
> This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.
>
> We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.
>
> …
>
> This is not good for Ruby and her daughter.
>
> It's also pathetic that these two are not in jail already. Their crimes were videotaped!

ll) In their September 25, 2021, article published at 7:10 a.m., Defendants made the following false statements:

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.

. . .

Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.

mm)    In their December 2, 2021, article published at 12:42 p.m., Defendants made the following false statements, which they republished on December 3, 2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., and April 22, 2022, at 11:05 a.m.[171]:

The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video at the State Farm Arena in Atlanta Georgia on November 3rd and the morning of November 4th.

The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.

The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.

nn) In their December 8, 2021, article published at 8:50 p.m. with embedded audio, Defendants made the following false statements:

Joe Hoft:      That night . . . I don't know if you remember the news first came out that night, and was saying there was a water main break and they needed to stop counting in Georgia. Remember that? . . . And then we were

---

[171] The December 8, 2021, 7:41 p.m. article elaborated on typical election procedures with an additional defamatory statement: "The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race. We disagree."

told later that was a lie and it never happened. And then they said it happened in the morning. And then apparently they just kind of tried to say it never happened.

. . .

There was no water main break. . . . So, that was a lie.

So what happened then was they shut down for the night at 10:30. Now everybody else is thinking, wait a minute, I thought we counted until the election was done. I didn't think we were going to take shifts here, you know, go to bed. . . . So they decide to shut down. And there's evidence that they were doing that.

And then what happened is five people stuck around. Now, I know at least three of them are Black. And it doesn't matter. To me, it doesn't matter. I don't care if they were . . .

So these people stuck around, and they decided to pull ballots out from underneath the tables. Do you remember this story? Did you see that video? . . . Everybody saw it. The video came out, they pulled these ballots out from underneath the tables, and in suitcases, and then they opened them up, and they started shoving them through the tabulators.

. . .

Now later they're trying to say this is normal.

. . .

I mean, do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?

198. The defamatory meanings of Defendants' false statements are apparent from the face of the publications, refer to Ms. Freeman by name, are accompanied by images of Ms. Freeman, and/or are understood to be about her.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

199.    The statements authored and published by Defendants about Ms. Freeman are reasonably understood to state or imply that she:

   a) Planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden;

   b) Helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center;

   c) Engaged in a criminal conspiracy to exclude observers during the counting of ballots so that election fraud could be committed;

   d) Criminally introduced illegal ballots taken from the hidden suitcases into the ballot counting process when no observers were present;

   e) Fraudulently triple-counted ballots by running them through a tabulator three times; and

   f) Committed election fraud and other crimes for which she is subject to arrest and imprisonment.

200.    Each of these statements and implications is false and defamatory.

201.    Each of these statements was read by millions of visitors to *The Gateway Pundit* website, as well as social media users who read social media posts shared by Defendants.

202.    Each of these false statements was published with actual malice, *i.e.*, with knowledge of its falsity or with reckless disregard as to its truth.

203.    Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible basis for the false allegations made; and published their allegations in a manner to create false inferences.

204.    Defendants had both political and financial motives for promulgating lies about Plaintiffs.

96

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

205.    Defendants did not neutrally report the allegations about Ms. Freeman that were advanced by Trump lawyers and promptly disproven by Georgia election officials. Rather, they endorsed and adopted the allegations as their own, publishing and republishing them for months with full knowledge of their falsity or reckless disregard for their truth.

206.    Defendants had no applicable privilege or legal authorization to make these false and defamatory statements, or if they did, they abused it.

207.    Defendants repeated and embellished the false accusations without ever attempting to verify them and invented and published defamatory lies about Ms. Freeman without once seeking comment from her.

208.    Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

209.    Defendants have never corrected or retracted their defamatory statements, and those statements remain published on *The Gateway Pundit* to this day. Even after Plaintiffs specifically requested that Defendants correct and retract their defamatory statements, Defendants took no action to correct or retract and only published additional defamatory statements, further evidencing their actual malice.

210.    Defendants' statements and implications about Ms. Freeman constitute defamation *per se* in that they damaged her in her trade, office, or profession and claimed that she participated in criminal activity punishable by law and labeled her a "crook."

211.    Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Freeman harm.

212.     Defendants' statements damaged Ms. Freeman's reputation in the general public, in her profession, in her neighborhood, and with friends, relatives, and neighbors.

213.     As a direct and proximate result of Defendants' conduct, Ms. Freeman has suffered significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss. Among other things, Ms. Freeman lost income when she was forced to shutter her online business.

**SECOND CLAIM**

**(Defamation of Ms. Moss)**

214.     Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

215.     Beginning on December 3, 2020, Defendants published a series of false and defamatory statements of fact about Ms. Moss, including by and through *The Gateway Pundit*'s own agents making the statements themselves; and by republishing the statements on *The Gateway Pundit*'s website and social media accounts, and the social media accounts of its agents, as detailed extensively above. Those statements include, but are not limited to, the following non-exhaustive list:

a)   In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statements, which they republished verbatim on December 3, 2020, at 2:29 p.m.:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.

98

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

…

We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.

b)  In a December 3, 2020, article published at 1:11 p.m., Defendants made the following false statement, which they republished verbatim or nearly verbatim nine (9) times on December 3, 2020, at 2:29 p.m. and 8:49 p.m.; December 4, 2020, at 7:35 a.m., 8:53 a.m., 1:51 p.m.; December 7, 2020, at 7:15 a.m.; and December 8, 2020, at 7:20 a.m. and 1:11 p.m.; and May 4, 2022, at 1:03 p.m. [172]:

A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!

c)  In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim eighteen (18) times on December 4, 2020 at 7:35 a.m., 8:53 a.m., 1:51 p.m., and 5:45 p.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 7:15 a.m. and 8:29 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; June 7, 2021 at 9:43 p.m.; June 14, 2021 at 10:33 a.m.; August

---

[172] The December 3, 2020, 2:29 p.m. article added the additional defamatory statement: "They were caught cheating!" The December 8, 2020, 1:11 p.m. article added the additional defamatory statement: "A few liberal election 'workers' stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room!" The May 4, 2022, 1:03 p.m. article omitted the opening phrase "A few 'workers' stayed behind and were seen."

14, 2021 at 9:15 a.m.; September 20, 2021 at 3:30 p.m.; and May 4, 2022 at

1:03 p.m.[173]:

> Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.

d)  In their December 3, 2020, article published at 8:49 p.m., Defendants made

the following false statement, which they republished verbatim on

December 4, 2020, at 7:35 a.m.:

> Local 11 News covered the story from the State Farm Arena that a pipe had burst. (This later was proven to be complete fraud and an excuse to kick out the GOP election observers!)

e)  In their December 4, 2020, article published at 7:35 a.m., Defendants made

the following false statement, which they republished verbatim on

December 8, 2020, at 7:20 a.m.:

> "Shaye" [was] the woman in blonde [pigtails/braids] [who was filmed] removing suitcases of ballots from under a table after GOP observers were evacuated from the room and told to go home.

f)  In their December 4, 2020, article published at 1:51 p.m., Defendants made

the following false statements:

> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.
>
> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other.

---

[173] The articles on December 4, 2020 at 7:35 a.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 8:29 a.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; August 14, 2021 at 9:15 a.m.; and September 20, 2021 at 3:30 p.m. add the additional defamatory statement: "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED – IT'S RUBY'S DAUGHTER! (Video)."

100

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

It sure looks like they were trying to hide this transaction.

g)   In their December 4, 2020, article published at 3:25 p.m., Defendants made

the following false statements:

> Mother-Daughter Duo's Election Fraud Scam . . .
>
> [T]he mother-daughter duo in Atlanta began messing with
> ballots in secret.

h)   In their December 4, 2020, article published at 5:45 p.m., Defendants made

the following false statements, which they republished verbatim eighteen

(18) times on December 6, 2020 at 8:15 a.m.; December 23, 2020 at 8:10

a.m. and 11:05 a.m.; January 2, 2021 at 7:30 a.m.; March 25, 2021 at 7:25

p.m.; May 21, 2021 at 12:34 p.m.; May 22, 2021 at 9:05 a.m.; June 6, 2021

at 7:53 a.m.; June 11, 2021 at 3:03 p.m.; June 18, 2021 at 8:00 a.m.; June

19, 2021 at 10:20 a.m.; July 10, 2021 at 8:20 a.m.; July 14, 2021 at 7:30

a.m.; December 2, 2021 at 12:42 p.m.; December 3, 2021 at 12:02 p.m.;

December 8, 2021 at 7:41 p.m.; December 25, 2021 at 12:25 p.m.; and April

22, 2022 at 11:05 a.m.:

> The mother – daughter team of ballot counters in Atlanta
> really overdid their fraud. We saw last night how they stuck
> around and counted ballots after kicking Republicans out of
> the State Farm Center on a fake water main break hoax.

i)   In their December 4, 2020, article published at 5:45 p.m., Defendants also

made the following false statements:

> We also saw the mother and daughter pass an object the size
> of a thumb drive between each other in a suspicious
> manner[.]

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.
>
> The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.

j)  In their December 6, 2020, article published at 8:15 a.m., Defendants also made the following false statements:

> [T]he secret suitcase ballots were pulled out from their hiding place under the tables.
>
> They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.

k)  In their December 6, 2020, article published at 6:35 p.m., Defendants made the following false statements, which they republished on December 6, 2020, at 9:23 p.m. and December 7, 2020, at 8:29 a.m.:

> Next it was uncovered that a mother and daughter team [, Ruby Freeman and her daughter "Shaye" Moss] as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were pulled out from under a table that were previously covered up and processed with no Republican observers.
>
> The mother – daughter team have become infamous in the annals of voter corruption[.]

l)  In their December 7, 2020, article published at 7:15 a.m., Defendants made the following false statements:

> And [Ruby's] daughter Wandrea "Shaye" Moss was later identified as her supervisor who was helping cart out the hidden ballots in the suitcases to be counted after all of the GOP observers and media was sent home for a "water main" break.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

It was all a fraud.

m) In their December 7, 2020, article published at 8:29 a.m., Defendants made the following false statements, which they republished verbatim on December 8, 2020, at 8:59 a.m. and republished in part on December 23, 2020, at 8:40 a.m.[174]:

> Ralph Jones, Sr. was identified as the third suspect in the Fulton County Georgia suitcase scandal.
>
> ** Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> ** Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.
>
> ...
>
> They sent everyone home!
>
> ...
>
> ** The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.
>
> ** Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.
>
> ** It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.
>
> ** It appears this was a conspiracy to lie to the public including local news, to remove observers from the center and then to commit their hidden suitcase ballot fraud.

---

[174] The December 8, 2020, 8:59 a.m. article shortens the final sentence to read, "It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud." The December 23, 2020, 8:40 a.m. article includes the first two sentences and ends with "** Ralph and his team plotted to remove ALL elections observers."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

n) Defendants end their December 7, 2020, article published at 8:29 a.m. with

the following false statements:

> We know [the alleged pipe burst at State Farm Arena] was a lie because there was NEVER a work order filed and the water department never received a call.
>
> It never happened!
>
> But it gave Ralph and Ruby and Shaye cover to complete their scam on Georgia and America!

o) In their December 8, 2020, article published at 7:20 a.m., Defendants made

the following false statements:

> Shaye told everyone to go home.
>
> Then Shaye, her mother and a couple others including Ralph Jones, Sr. were filmed taking "suitcases" of ballots hidden under a table out to be tabulated. This was right before Joe Biden got his surprise spike in ballots.
>
> And now the liberal media and their fake "fact-checkers" are lying about the incredible incident caught on video!

p) In their December 15, 2020, article published at 9:19 a.m., Defendants made

the following false statements:

> We even HAVE VIDEO of Democrats at work stealing votes from the people of Georgia.
>
> . . .
>
> Has anyone questioned <u>Ruby Freeman or her daughter</u>?

q) In their December 23, 2020, article published at 8:40 a.m., Defendants made

the following false statements, which they republished on January 3, 2021,

104

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

at 6:20 p.m.; January 7, 2021, at 3:14 p.m.; January 17, 2021, at 6:33 p.m.; and June 6, 2021, at 7:53 a.m.[175]:

> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].

r) In their December 23, 2020, article published at 8:40 a.m., Defendants also made the following false statements, which they largely republished on January 17, 2021, at 6:33 p.m.[176]:

> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
> ...
> Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist.
>
> Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist[sic]!
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.
>
> They were able to flip Georgia for Beijing Biden by their actions.
>
> Why is the FBI or DOJ not involved?

---

[175] The articles on December 23, 2020, at 8:40 a.m. and June 6, 2021, at 7:53 a.m. added the additional defamatory statement "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?"

[176] The January 17, 2021, 6:33 p.m. article included all but the last three sentences of these defamatory statements.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

This tells you everything you need to know about your federal government.

s)   In their December 26, 2020, article published at 7:34 p.m., Defendants made the following false statements:

> [T]he documentary and video evidence show that thousands of votes were illegally counted in Fulton County, Georgia. Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.
>
> The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.

t)   In their January 1, 2021, article published at 9:58 a.m., Defendants made the following false statements:

> We have individuals dragging ballots out from under the tables in Georgia on election night on video and yet none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of.

u)   In their January 3, 2021, article published at 6:20 p.m., Defendants made the following false statements:

> President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break. Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.

106

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

v)  In their January 17, 2021, article, published at 6:33 p.m., Defendants made the following false statements:

> FIVE MOST SIGNIFICANT ACTS OF FRAUD IN THE 2020 ELECTION:
>
> 2.)  The Georgia Late Night Hidden Suitcase Heist:

w)  In their June 6, 2021, article published at 7:53 a.m., Defendants made the following statements:

> Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?
>
> After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving stacks of ballots through the machines two and three times each.
>
> In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on Election night:
>
> . . .
>
> The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.
>
> . . .
>
> We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.
>
> . . .

x)  In their June 7, 2021, article published at 9:43 p.m., Defendants made the following false statements, which they republished on June 14, 2021, at 10:33 a.m. and June 18, 2021, at 8:00 a.m.:

Shaye Moss was famous for kicking everyone out of the room where
votes were counted in Fulton County and telling observers to go
home. Then Shaye and others including Ralph Jones and her mother
Ruby dragged hidden boxes of ballots out from underneath tables
and started running them through the machines. [Our source caught
Ruby Freeman in the purple shirts scanning / Ruby Freeman was
caught on tape running] the same stack of suspect ballots through
the machines multiple times.

y)  In their June 18, 2021, article published at 8:00 a.m., Defendants made the

following false statements, which they substantially republished on June 18,

2021, at 11:06 a.m. and June 19, 2021, at 10:20 a.m.[177]:

A new report confirms Fulton County election worker Ruby
Freeman was not the only leftist operative double counting stacks of
ballots in Atlanta on election night. Top Atlanta election official
Ralph Jones was also double scanning ballots late at night at the
State Farm Center in Atlanta, Georgia on election night.

. . .

Ralph Jones was the person who sent home all of the election
observers. Then his crew, including Ruby and daughter Shaye, went
to work on election night!

. . .

z)  In their June 19, 2021, article published at 8:31 p.m., Defendants made the

following false statement:

The Democrat operatives were running a voter fraud factory inside
the State Farm Center on Election Day and into Election Week!

aa) In their June 24, 2021, article published at 8:35 p.m., Defendants made the

following false statements:

Fulton County is home to the infamous Ruby Freeman and her
daughter Shaye Moss who were caught pulling ballot boxes from

---

[177] The second two articles republish only the first of these two paragraphs.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.

. . .

If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?

This is not how innocent people act. They are hiding something in Fulton County, Georgia.

bb) In their August 14, 2021, article published at 9:15 a.m., Defendants made the following false statements:

We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.

This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.

We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.

…

This is not good for Ruby and her daughter.

It's also pathetic that these two are not in jail already. Their crimes were videotaped!

cc) In their September 25, 2021, article published at 7:10 a.m., Defendants made the following false statements:

Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.

. . .

109

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.

dd) In their December 2, 2021, article published at 12:42 p.m., Defendants made the following false statements, which they republished on December 3, 2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., and April 22, 2022, at 11:05 a.m.[178]:

> The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video at the State Farm Arena in Atlanta Georgia on November 3rd and the morning of the [sic] November 4th.
>
> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.
>
> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.

ee) In their December 8, 2021, article published at 8:50 p.m. with embedded audio, Defendants made the following false statements:

Joe Hoft: That night . . . I don't know if you remember the news first came out that night, and was saying there was a water main break and they needed to stop counting in Georgia. Remember that? . . . And then we were told later that was a lie and it never happened. And then they said it happened in the morning. And then

---

[178] The December 8, 2021, 7:41 p.m. article elaborated on typical election procedures with an additional defamatory statement: "The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race. We disagree."

apparently they just kind of tried to say it never happened.

. . .

There was no water main break. . . . So, that was a lie.

So what happened then was they shut down for the night at 10:30. Now everybody else is thinking, wait a minute, I thought we counted until the election was done. I didn't think we were going to take shifts here, you know, go to bed. . . . So they decide to shut down. And there's evidence that they were doing that.

And then what happened is five people stuck around. Now, I know at least three of them are Black. And it doesn't matter. To me, it doesn't matter. I don't care if they were . . .

So these people stuck around, and they decided to pull ballots out from underneath the tables. Do you remember this story? Did you see that video? . . . Everybody saw it. The video came out, they pulled these ballots out from underneath the tables, and in suitcases, and then they opened them up, and they started shoving them through the tabulators.

. . .

Now later they're trying to say this is normal.

. . .

I mean, do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?

ff) In their May 4, 2022, article published at 1:03 p.m., Defendants made the

following false statements:

Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award

. . .

111

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The John F. Kennedy Library Foundation issued a statement on April 21 praising Moss for continuing to work as an election processor despite backlash from being caught on camera ballot harvesting during the 2020 presidential race.
>
> . . .
>
> . . . TGP's reporting, which showcases the two women's engagement of election fraud . . .

216. The defamatory meanings of Defendants' false statements are apparent from the face of the publications, refer to Ms. Moss by name, are accompanied by images of Ms. Moss, and/or are understood to be about her.

217. The statements authored and published by Defendants about Ms. Moss are reasonably understood to state or imply that she:

a) Planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden;

b) Helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center;

c) Engaged in a criminal conspiracy to exclude observers during the counting of ballots so that election fraud could be committed;

d) Criminally introduced illegal ballots taken from the hidden suitcases into the ballot counting process when no observers were present;

e) Committed election fraud and other crimes for which she is subject to arrest and imprisonment.

218. Each of these statements and implications is false and defamatory.

219. Each of these statements were read by millions of visitors to *The Gateway Pundit* website, as well as social media users who read social media posts shared by Defendants.

220. Each of these false statements was published with actual malice, *i.e.* with knowledge of its falsity or with reckless disregard as to its truth.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

221.    Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible basis for the false allegations made; and published their allegations in a manner to create false inferences.

222.    Defendants had both political and financial motives for promulgating lies about Plaintiffs.

223.    Defendants did not neutrally report the allegations about Ms. Moss that were advanced by Trump lawyers and promptly disproven by Georgia election officials. Rather, they endorsed and adopted the allegations as their own, publishing and republishing them for months with full knowledge of their falsity or reckless disregard for their truth.

224.    Defendants had no applicable privilege or legal authorization to make these false and defamatory statements, or if they did, they abused it.

225.    Defendants repeated and embellished the false accusations without ever attempting to verify them, and they invented and published defamatory lies about Ms. Moss without once seeking comment from her.

226.    Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

227.    Defendants have never corrected or retracted their defamatory statements, and those statements remain published on *The Gateway Pundit* to this day. Even after Plaintiffs specifically requested that Defendants retract their defamatory statements, Defendants took no action to correct or retract and only published additional defamatory statements, further evidencing their actual malice.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

228.    Defendants' statements and implications about Ms. Moss constitute defamation *per se* in that they claim Ms. Moss participated in criminal activity punishable by law and labeled her a "crook."

229.    Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Moss harm.

230.    Defendants' statements damaged Ms. Moss's reputation in the general public, in her profession, in her neighborhood, and with friends, relatives, and neighbors.

231.    As a direct and proximate result of Defendants' conduct, Ms. Moss has suffered significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.

## THIRD CLAIM

### (Intentional Infliction of Emotional Distress)

232.    Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

233.    Defendants' months-long campaign of false and defamatory accusations directed specifically at Ms. Freeman and Ms. Moss was malicious, wanton, and intentional.

234.    Defendants carried out their campaign with actual malice as they either knew that their accusations were false or published them with reckless disregard for their truth.

114

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

235.    Defendants wrongful conduct was extreme and outrageous, and it was calculated to cause harm to Ms. Freeman and Ms. Moss. Defendants accused plaintiffs of stealing an election through a pre-conceived plan that would make them "infamous in the annals of voter corruption." They exploited public fear and taunted the "good people of Georgia" to stand up to the corrupt "mother-daughter combo" who stole the election for Joe Biden. Defendants encouraged readers to retaliate and harass plaintiffs, publicizing that Ms. Freeman could be contacted through the LinkedIn page of her business and coyly warning not to confuse her business with another in Georgia with a similar name.

236.    Defendants' wrongful conduct is so outrageous in character and so extreme in degree that it is beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community.

237.    Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Freeman and Ms. Moss harm.

238.    Defendants' wrongful conduct had its intended effect. All aspects of Plaintiffs' lives have been altered as a result of Defendants' actions, including such simple things as where to live, how to go out in public, and when to see family and friends. This result was entirely foreseeable. Defendants' conduct is so outrageous in character and extreme in degree as to be beyond all bounds of decency. It should be regarded as atrocious and determined intolerable in a civilized community.

239.    Defendants' wrongful conduct has inflicted severe emotional distress on Plaintiffs. They have suffered mental reactions including fright and fear for their safety,

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

horror and helplessness in the face of the intense hatred directed at them by Defendants and by their readers, anger, anxiety, sleeplessness, shame and humiliation. The emotional distress Defendants caused to be inflicted on Ms. Freeman and Ms. Moss was so severe that no reasonable person could be expected to endure it.

240.    Defendants' wrongful conduct caused physical manifestations of harm to Plaintiffs, including dental injuries, weight gain, disrupted sleep, and anxiety attacks, as well as mental anguish, requiring them to seek treatment for the mental anguish resulting directly from the severe emotional trauma inflicted by Defendants.

241.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered significant general, actual, incidental, and special damages including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants for each of the causes of action raised herein. Plaintiffs respectfully request a judgment in their favor and against Defendants for:

A.  Nominal damages;

B.  Compensatory damages, including general, actual, consequential, and special damages, in an amount to be determined at trial;

C.  Punitive damages;

D.  Reasonable and necessary attorneys' fees;

E.  Reasonable and necessary costs of the suit;

F.  Prejudgment and post-judgment interest at the highest lawful rates;

116

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

G.  Declarative relief stating that the statements authored and published by Defendants identified within this Petition, individually and collectively, were and are false;

H.  Injunctive relief enjoining Defendants to remove their false and defamatory statements about plaintiffs from any website and/or social media accounts under their control;

I.  Such other and further relief as this Court deems just and appropriate.

Dated:  January 10, 2023

Respectfully submitted,

*By: /s/ James F. Bennett*

James F. Bennett, No. 46826
John C. Danforth, No. 18438
Matt D. Ampleman, No. 69938
Dowd Bennett LLP
7733 Forsyth Blvd, Suite 1900
St. Louis, MO 63105
Phone: (314) 889-7373
Fax: (314) 863-2111
jbennett@dowdbennett.com
jdanforth@dowdbennett.com
mampleman@dowdbennett.com

Von A. DuBose*
75 14th Street, NE
Suite 2110
Atlanta, Georgia 30309
Telephone: (404) 720-8111
dubose@dubosemiller.com

Kurt G. Kastorf**
Kastorf Law LLC
1387 Iverson Street NE
Suite #100
Atlanta, GA 30307
(404) 900-0330
kurt@kastorflaw.com

117

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Brittany Williams*
UNITED TO PROTECT DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
(202) 579-4582
brittany.williams@protectdemocracy.org

Shalini Goel Agarwal*
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
(202) 579-4582
shalini.agarwal@protectdemocracy.org

John Langford*
Rachel Goodman*
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

David A. Schulz*
Kelsey R. Eberly*
MEDIA FREEDOM & INFORMATION
        ACCESS CLINIC
FLOYD ABRAMS INSTITUTE FOR
        FREEDOM OF EXPRESSION
YALE LAW SCHOOL
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(203) 436-5827
david.schulz@yale.edu
kelsey.eberly@yale.edu

*Admitted *Pro hac vice*

**\*\*Pro hac vice* forthcoming

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon all parties electronically through the Court's electronic filing system on this 10th day of January, 2023.

*/s/ James F. Bennett*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**EXHIBIT B**

# M24000005025

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



500426297535

RECEIVED
2024 APR 18 PM 4: 19
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

2024 APR 18 AM 11: 11

APR 19 2024

K. Brumbley

# FLORIDA CAPITAL COURIER SERVICES, INC

2330 CLARE DR
TALLAHASSEE, FL 32309

(850) 491-9625 Brandon
(850) 524-5437 Teresa
(850) 524-6243 Rich

**Please use funds from account: I20210000160: $160.00**

**Authorization Signature:** _famstulh_

**Business Name:** **TGP Communications, LLC**

**Document #**

**_X_ Certified Copy**

**_X_ Certificate of Status**

| **NEW FILINGS** | **&** | **AMENDMENTS** |
|---|---|---|

___Profit Corp

___Not for Profit

**_X_ Limited Liability**

___Domestication

___LLLP

___Corp

___Inc

___Other

___Amendment

___Resignation / Withdrawal

___Change of Registered Agent

___Revocation of Dissolution

___Merger

___Articles of Conversion

___Amended & Restated Articles of Incorporation

___Statement of Authority

| **APOSTILLE(s)** | **&** | **OTHER FILINGS** |
|---|---|---|

___Apostille(s)

___Country(s)

___Foreign Filing

___Reinstatement

___Qualification

___Fictitious Name

___Annual Report

EXAMINER'S INITIALS:____

444

# COVER LETTER

**TO:** **Registration Section**
**Division of Corporations**

TGP Communications, LLC
**SUBJECT:** _____
Name of Limited Liability Company

The enclosed "Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida," Certificate of Existence, and check are submitted to register the above referenced foreign limited liability company to transact business in Florida.

Please return all correspondence concerning this matter to the following:

John C. Burns
_____
Name of Person

The Burns Law Firm
_____
Firm/Company

PO Box 191250
_____
Address

Saint Louis, Missouri 63119
_____
City/State and Zip Code

john@burns-law-firm.com
_____
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

John C. Burns                     314        329-5040
_____ at (_____) _____
Name of Contact Person         Area Code    Daytime Telephone Number

**Mailing Address:**                    **Street Address:**
Registration Section                Registration Section
Division of Corporations            Division of Corporations
P.O. Box 6327                       The Centre of Tallahassee
Tallahassee, FL 32314               2415 N. Monroe Street, Suite 810
                                    Tallahassee, FL 32303

Enclosed is a check for the following amount:
Please make check payable to: **FLORIDA DEPARTMENT OF STATE**
☐ $125.00 Filing Fee    ☐ $130.00 Filing Fee &    ☐ $155.00 Filing Fee &    ☑ $160.00 Filing Fee, Certificate
                          Certificate of Status      Certified Copy              of Status & Certified Copy

## APPLICATION BY FOREIGN LIMITED LIABILITY COMPANY FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 605.0902, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN LIMITED LIABILITY COMPANY TO TRANSACT BUSINESS IN THE STATE OF FLORIDA:*

1. TGP Communications, LLC
   (Name of Foreign Limited Liability Company; must include "Limited Liability Company," "L.L.C.," or "LLC.")

The Gateway Pundit, LLC
(If name unavailable, enter alternate name adopted for the purpose of transacting business in Florida. The alternate name must include "Limited Liability Company," "L.L.C.," or "LLC.")

2. Missouri
   (Jurisdiction under the law of which foreign limited liability company is organized)

3. 46-4161586
   (FEI number, if applicable)

4. November 1, 2021
   (Date first transacted business in Florida, if prior to registration.)
   (See sections 605.0904 & 605.0905, F.S. to determine penalty liability)

5. 1820 NE Jensen Beach Blvd Unit 1120
   (Street Address of Principal Office)

   Jensen Beach Florida 34957

6. 1820 NE Jensen Beach Blvd Unit 1120
   (Mailing Address)

   Jensen Beach Florida 34957

7. Name and street address of Florida registered agent: (P.O. Box NOT acceptable)

   Name: Northwest Registered Agent LLC

   Office Address: 7901 4th St N STE 300

   St. Petersburg, Florida 33702
   (City)                    (Zip code)

**Registered agent's acceptance:**
*Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

(Registered agent's signature)

8. For initial indexing purposes, list names. title or capacity and addresses of the primary members/managers or persons authorized to manage [up to six (6) total]:

| Title or Capacity: | Name and Address: | Title or Capacity: | Name and Address: |
|---|---|---|---|
| ☐Manager | Name: Jim Hoft | ☐Manager | Name: |
| ■Member | Address: 1820 NE Jensen Beach Blvd | ☐Member | Address: |
| ☐Authorized | Unit 1120 | ☐Authorized | |
| Person | Jensen Beach, FL 34957 | Person | |
| ☐Other_____ | ☐Other_____ | ☐Other_____ | ☐Other_____ |
| | | | |
| ☐Manager | Name: John C. Burns | ☐Manager | Name: |
| ☐Member | Address: PO Box 191250 | ☐Member | Address: |
| ■Authorized | Saint Louis, MO 63119 | ☐Authorized | |
| Person | | Person | |
| ☐Other_____ | ☐Other_____ | ☐Other_____ | ☐Other_____ |
| | | | |
| ☐Manager | Name: | ☐Manager | Name: |
| ☐Member | Address: | ☐Member | Address: |
| ☐Authorized | | ☐Authorized | |
| Person | | Person | |
| ☐Other_____ | ☐Other_____ | ☐Other_____ | ☐Other_____ |

**Important Notice:** Use an attachment to report more than six (6). The attachment will be imaged for reporting purposes only. Non-indexed individuals may be added to the index when filing your Florida Department of State Annual Report form.

9. Attached is a certificate of existence, no more than 90 days old. duly authenticated by the official having custody of records in the jurisdiction under the law of which it is organized. (If the certificate is in a foreign language, a translation of the certificate under oath of the translator must be submitted)

10. This document is executed in accordance with section 605.0203 (1) (b), Florida Statutes. I am aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

*John C. Burns*
_____
Signature of an authorized person

John C. Burns
_____
Typed or printed name of signee





## John R. Ashcroft
## Secretary of State

CORPORATION DIVISION
CERTIFICATE OF GOOD STANDING

I, JOHN R. ASHCROFT, Secretary of State of the STATE OF MISSOURI, do hereby certify that the records in my office and in my care and custody reveal that

*TGP Communications LLC*
*LC1358217*

was created under the laws of this State on the 21st day of November, 2013, and is active, having fully complied with all requirements of this office.

IN TESTIMONY WHEREOF, I hereunto set my hand and cause to be affixed the GREAT SEAL of the State of Missouri. Done at the City of Jefferson, this 1st day of April, 2024.



Secretary of State



Certification Number: CERT-04012024-0119

## EXHIBIT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RUBY FREEMAN, et al.

HEARING

DEFENDANTS.

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion to Remand, [Doc. No. 13]. The matter is fully briefed and ready for disposition. For the reasons set forth below, Plaintiffs' Motion to Remand will be granted.

### B

On Thursday, December 2, 2021, Plaintiffs Ruby Freeman and Wandrea Moss filed this defamation (Counts I and II) and intentional infliction of emotional distress (Count III) action in the Circuit Court of the City of St. Louis, Missouri, against individual defendants James Hoft and Joseph Hoft, and corporate defendant TGP Communications LLC, d/b/a, The Gateway Pundit (TGP), alleging Defendants made false statements about their activities as election workers during the 2020 Presidential election, which has damaged their professional and personal reputations. Plaintiffs are seeking damages and other relief as compensation.

On Sunday, December 5, 2021, Defendant Joseph Hoft removed the cause of action to this Court, invoking jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332(a), noting the forum defendant rule does not bar removal of the action where the forum defendant has not yet been served. According to the notice of removal, Defendant Joseph Hoft is a citizen of the state of Florida and Defendants James Hoft and TGP are citizens of the State of Missouri. Plaintiffs are both citizens of the State of Georgia. Defendants James Hoft and TGP were served the day after the notice of removal was filed, December 6, 2021. Defendant Joseph Hoft was served on December 14, 2021.

In the instant motion, Plaintiffs argues that because (i) no defendant had been served at the time the notice of removal was filed, "snap removal" was not available and removal is improper; and (ii) Joseph Hoft is a citizen of the state of Missouri, not Florida, so as a forum defendant, he is not entitled to snap removal, and the case should be remanded pursuant to the forum defendant rule, 28 U.S.C. § 1441(b)(2). Defendant opposes remand, arguing that under the doctrine of "snap removal," the Court has diversity jurisdiction under 28 U.S.C. § 1441(b)(2) because the forum defendants (James Hoft and TGP) had not been served at the time of removal. Defendant also maintains Joseph Hoft is a resident of Florida and

is not a forum defendant. The parties do not dispute that none of the defendants were served at the time of removal.

"[A]ny civil action brought in State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court" in which the action is pending. 28 U.S.C. § 1441(a). A claim may be removed to federal court only if it could have been brought in federal court originally; thus, the diversity and amount in controversy requirements of 28 U.S.C. § 1332 must be met, or the claim must be based upon a federal question pursuant to 28 U.S.C. § 1331. *Peters v. Union Pac. R.R. Co.,* 80 F.3d 257, 260 (8th Cir. 1996). The removing defendant bears the burden of establishing federal jurisdiction by a preponderance of the evidence. *Green v. Ameritide, Inc.,* 279 F.3d 590, 595 (8th Cir. 2002); *Altimore v. Mount Mercy Coll.*, 420 F.3d 763, 768 (8th Cir. 2005). Removal statutes must be strictly construed because they impede upon states' rights to resolve controversies in their own courts. *Nichols v. Harbor Venture, Inc.,* 284 F.3d 857, 861 (8th Cir. 2002). A district court is required to resolve all doubts about federal jurisdiction in favor of remand. *Bates v. Mo. & N. Ark. R.R. Co.,* 548 F.3d 634, 638 (8th Cir.2008); *In re*

---

The Court will not address the issue regarding Defendant Joseph Hoft's residency since the Plaintiff's Motion to Remand will be granted for the reasons explained below. Therefore, the issue is moot.

3

*Prempro Prods. Liab. Litig.*, 591 F.3d 613, 619 (8th Cir. 2010) (citing *Wilkinson v. Shackelford*, 478 F.3d 957, 963 (8th Cir. 2007)).

For diversity jurisdiction to exist under 28 U.S.C. § 1332(a)(1) there must be complete diversity of citizenship between plaintiffs and defendants. *Buckley v. Control Data Corp*., 923 F.2d 96, 97, n.6 (8th Cir. 1991). "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007). "It is settled, of course, that absent complete diversity a case is not removable because the district court would lack original jurisdiction." *Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 564 (2005) (cited case omitted). Where complete diversity of citizenship does not exist, 28 U.S.C. § 1447(c) requires a district court to remand the case to state court for lack of subject matter jurisdiction.

The "forum defendant rule" imposes an additional restriction on the removal of diversity cases. 28 U.S.C. § 1441(b)(2). Specifically, the statute provides that:

> A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought. *Id.*

A case must be remanded if, at anytime, it appears that the district court lacks subject-matter jurisdiction. 28 U.S.C. § 1447(c); Fed. R. Civ. P. 12(h)(3).

4

While the statute plainly does not allow removal once a forum defendant has been properly served, there is "much disagreement on whether to invoke the forum defendant rule in cases of pre-service removal." *Boschert v. Wright Med. Grp., Inc.,* No. 4:15-CV-00211 (AGF), 2015 WL 1006482, at *2 (E.D. Mo. Mar. 6, 2015). Although the Eighth Circuit recently joined other circuits holding a violation of the forum defendant rule is a non-jurisdictional defect that must be raised within 30 days of removal, it has not addressed the propriety of "snap removal." *Holbein v. TAW Enters., Inc.,* 983 F.3d 1049, 1053 (8th Cir. 2020) (en banc). This district has taken three different approaches. In large part, the different views expressed by the courts arise from tension between the plain text of 28 U.S.C. § 1441(b)(2) and its presumed purpose.

The first approach is permitting snap removals based on the plain language of the statute, which does not explicitly state a defendant must be served before filing a notice of removal. *See, e.g., Tillman v. BNSF Ry. Co.,* No. 1:20-CV-00178 SNLJ, 2021 WL 842600, at *2 (E.D. Mo. Mar. 5, 2021). Among the reasons provided for these decisions, is the Eighth Circuit's prescription that "[w]hen the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances the sole function of the courts is to enforce [the statute] according to its terms." *United States v. Union Elec. Co.,* 64 F.3d 1152, 1165 (8th Cir. 1995) (internal quotation marks and citations omitted).

The second approach is remanding snap removals because they are inconsistent with the legislative intent behind the forum defendant rule, which is to protect the defendant from the improper joinder of a forum defendant that plaintiff has no intention of serving, and the purposes of removal. *See, e.g., Laster v. Monsanto Co.,* No. 4:18-CV-00397 CAS, 2018 WL 1566846, at *2 (E.D. Mo. Mar. 30, 2018). In accordance with this premise, district courts, including this one, have carved out exceptions to the "joined and served," language, deeming their analysis the "congressional intent" approach when Defendant is engaging in procedural gamesmanship to keep the case out of state court. *See, e.g., Gray v. Monsanto Co.,* No. 4:17-CV-02882 HEA, 2018 WL 488935, at *2 (E.D. Mo. Jan. 19, 2018) (granting remand and finding that although the statute's plain text is ordinarily decisive, it is notable that policy purposes underlying the "joined and served" language to prevent procedural gamesmanship are well-served).

The final approach is allowing snap removals only when at least one defendant has been served, based on a construction of the word "any" in section 1441(b)(2). *See, e.g., M & B Oil, Inc. v. Federated Mut. Ins. Co.,* No. 4:21-CV-00250 (NCC), 2021 WL 3472629, at *2 (E.D. Mo. Aug. 6, 2021), motion to certify appeal granted, No. 4:21-CV-00250 (NCC), 2021 WL 4963524 (E.D. Mo. Oct. 26, 2021); *Czapla v. Republic Servs., Inc.,* 372 F. Supp. 3d 878, 881 (E.D. Mo. 2019) (the Court narrowed its application of § 1441(b) by requiring service on at least one defendant before the case may be removed); *Rogers v. Boeing Aerospace*

6

*Operations*, Inc., 13 F.Supp.3d 972, 978 (E.D. Mo. 2014) (interpreting the text to mean that "an out-of-state defendant may remove a diversity case if at least one defendant–and no forum defendant–has been served"); *Perez v. Forest Labs., Inc.,* 902 F. Supp. 2d 1238, 1244–45 (E.D. Mo. 2012) (ordering remand where the *out-of-state* defendant removed the case only six days after plaintiffs filed the complaint and before *any* defendant was served) (emphasis added).

Acknowledging the recent cases that narrow the application of § 1441(b), this Court finds that the word "any" requires at least one party to have been joined and served before a defendant can snap remove. *Rogers*, 13 F.Supp.3d 972 at 977-78; 28 U.S.C. 1441 § (b)(2). Plaintiffs filed the action in state court on Thursday, December 2, 2021, and Defendant Joseph Hoft removed a mere three days later on Sunday, December 5, 2021 before *any* defendant had been served. Therefore, under this Court's interpretation of the forum defendant rule, the Court cannot maintain jurisdiction over this suit based on diversity, and Plaintiff's Motion to Remand will be granted.

The Court concludes that diversity jurisdiction is not properly present in this case because Defendant Joseph Hoft removed it before any defendant was served. Further, a district court is required to resolve all doubts about federal jurisdiction in favor of remand. *Bates v. Mo.,* 548 F.3d 634 at 638; *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613 at 619 (citing *Wilkinson*, 478 F.3d 957 at 963)).

7

Accordingly,

**IT I  HE  EB        E  E**   that Plaintiffs' Motion to Remand, [Doc. No. 13], is    **A  TE**

**IT I        THE        E  E**   that this matter is remanded to the Circuit Court of the City of St. Louis, Missouri.

Dated this  6th  day of June, 2022.

_____
     HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

8

## EXHIBIT

STATE OF MISSOURI )
) SS
CITY OF ST. LOUIS )

**F I L E D**

DEC 2 0 2022

22ᴺᴰ JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY **MD**_____ DEPUTY

### MISSOURI CIRCUIT COURT
### TWENTY-SECOND JUDICIAL CIRCUIT
### (City of St. Louis)

RUBY FREEMAN and WANDREA )
MOSS, )
)
      Plaintiffs, )
)   Cause No. 2122-CC09815-01
vs. )
)   Division No. 18
JAMES HOFT, JOSEPH HOFT, and )
TGP COMMUNICATIONS LLC d/b/a )
*THE GATEWAY PUNDIT*, )
)
      Defendants. )

### ORDER

     The Court has before it Plaintiffs' Second Motion to Compel Discovery and for a Protective

Order and Defendants' Cross Motion for Protective Order. The Court now rules as follows.

     On December 2, 2021, Plaintiffs filed this lawsuit alleging that Defendants knowingly and

repeatedly published false accusations that Plaintiffs committed election fraud during the 2020

presidential election. In their Second Amended Petition, Plaintiffs bring claims for defamation

(Counts I and II) and intentional infliction of emotional distress (Count III).

     Plaintiffs seek the Order of this Court compelling Defendants to produce documents

responsive to Plaintiffs' Second Requests for Production, and for entry of a Protective Order.

Defendants agree that a protective order should issue but ask that this Court enter the Protective

Order proffered by Defendants.

     The general rule of discovery found in Rule 56.01(b)(1) is that the parties may obtain

information regarding any matter, not privileged, that is relevant to the subject matter involved in

the pending action. State ex rel. Ford Motor Co. v. Westbrooke, 151 S.W.3d 364, 366 (Mo. banc 2004). Information is relevant if it is "reasonably calculated to lead to the discovery of admissible evidence." Rule 56.01; State ex rel. Stecher v. Dowd, 912 S.W.2d 462, 464 (Mo. banc 1995). "The party seeking discovery shall bear the burden of establishing relevance." Rule 56.01(b)(1); State ex rel. Ford Motor Co., 151 S.W.3d at 366.

Plaintiffs seek the Order of this Court overruling Defendants' objections to Plaintiffs' Second Requests for Production 1-7 and requiring Defendants to answer said requests. The Court has reviewed the discovery requests at issue and finds that Defendants' objections should be overruled as to requests 3-7 and that Defendants should be ordered to answer. Regarding request for production 1, which seeks all documents related to Google Analytics, the Court finds that Defendants' objections that the request is overbroad and unduly burdensome should be sustained at this time. Plaintiffs have proposed narrowing the scope of request for production 2 by requesting five sets of Google Analytics reports for each month from January 1, 2020 through the present: landing page reports, all page reports, filtered all pages reports, traffic acquisition reports and monthly topline reports. The Court finds that Defendants' objections should be overruled as to request 2 and that Defendants should be ordered to answer only as limited by Plaintiffs' proposal.

Next, both parties seek a Protective Order in order to protect the confidential information of the parties.

Rule 56.01(c), which authorizes protective orders, states:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

2

(1) that the discovery not be had;

(2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place;

(3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

(4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters; …

"A protective order should issue if annoyance, oppression, and undue burden and expense outweigh the need for discovery." State ex rel. Ford Motor Co. v. Messina, 71 S.W.3d 602, 607 (Mo. banc 2002); See also Edwards v. State Bd. of Chiropractic Examiners, 85 S.W.3d 10, 22 (Mo. App. W.D. 2002).

In this case, the parties agree that a protective order should be entered but cannot agree as to its terms. Following a review of the record the Court finds that both parties have shown good cause for the entry of a protective order herein. Following a review of the proposed orders proffered by each party, the Court finds that Plaintiffs' proposed order best protects the parties' confidential information without imposing undue burden. Accordingly, the Court will enter Plaintiffs' proposed Protective Order.

Finally, both Plaintiffs and Defendants seek attorneys' fees and costs related to the instant motion. The Court finds that it should not exercise its discretion here to order the sanctions sought because they are in excess of what is necessary to accomplish the purposes of discovery. See Fairbanks v. Weitzman, 13 S.W.3d 313, 327 (Mo. App. E.D. 2000).

THEREFORE, it is Ordered and Decreed that Plaintiffs' Second Motion to Compel Discovery and for a Protective Order is hereby GRANTED.

3

Defendants' objections to Plaintiffs' Second Requests for Production 3-7 are hereby overruled.

Defendants' objection to request for production 1 is sustained.

Defendants' objections to Plaintiffs' Second Requests for Production 2 are overruled as limited to five sets of reports for each month from January 1, 2020 through the present: landing page reports, all page reports, filtered all pages reports, traffic acquisition reports and monthly topline reports.

Defendants are Ordered to answer the subject discovery within twenty days of the date of this Order.

This Court will enter Plaintiffs' proposed Protective Order.

In all other respects, Plaintiffs' motion is denied.

Defendants' Cross Motion for Protective Order is granted in part to the extent that this Court is entering a Protective Order in order to protect the confidential information of the parties. Defendants' Cross Motion for Protective Order is denied in all other respects.

SO ORDERED:

Jason Sengheiser, Judge

Dated: December 20, 2022

4

# **EXHIBIT E**

MISSOURI CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)



**FILED**

JUL 2 4 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY_____DEPUTY

RUBY FREEMAN, et al.,       )
                           )
     Plaintiffs,            )
                           ) Case No. 2122-CC09815
v.                          )
                           ) Division 6
JAMES HOFT, et al.,         )
                           )
     Defendants.            )

<u>**ORDER AND JUDGMENT**</u>

The Court has the following before it: Plaintiffs' Motion to Dismiss Defendants' Improper Counterclaim Pursuant to Rule 55.27(a)(11) and Rule 55.27(a)(6); and Plaintiffs' Motion to Strike Defendants' Anti-SLAPP Motion made under GA Code §9-11-11.1. The Motions were heard on July 13, 2023, where the parties appeared by counsel. The Court has reviewed the submissions of the parties, the relevant authorities, and the arguments of counsel, and now rules as follows.

Plaintiffs Ruby Freeman and Wandrea Moss brought this case alleging that Defendants James Hoft, Joseph Hoft, and TGP Communications, LLC, d/b/a the Gateway Pundit are liable for defamation and intentional infliction of emotional distress for "knowingly and repeatedly published false accusations that Plaintiffs committed election fraud during the 2020 presidential election."

**ENTERED**

JUL 24 2023

**MAM**

464

Defendants filed a counterclaim alleging that Plaintiffs, their counsel, and the entities for which Plaintiffs' counsel work[1], are liable for defamation *per se* for statements made by Plaintiffs' counsel outside of court proceedings regarding Defendants' alleged defamatory statements that gave rise to this case.

Defendants also filed a motion entitled "Defendants' Motion to Strike Under GA §9-11-11.1," which states the following:

> Defendants [...] hereby move for summary judgment under Missouri R. Civ. P. 74.04(b), invoking Georgia's Anti-SLAPP statute, GA Code § 9-11-11.1 (2020) because Plaintiffs' claims asserted in their Second Amended Petition are based entirely on Defendants' exercise of their right to free speech in connection with an issue of public interest or concern, and Plaintiffs cannot establish that there is a probability of prevailing on their claims.

### MOTION TO DISMISS COUNTERCLAIM

Defendants' Counterclaim asserts that Plaintiffs' counsel, the entities for which Plaintiffs' counsel work, and Plaintiffs themselves defamed Defendants when Plaintiffs' counsel uttered the following seven statements outside of the pleadings:

1. "The Gateway Pundit, along with its founding editor Jim Hoft, and contributor Joe Hoft, knowingly fabricated and

---

[1] Despite being named as counterclaim-defendants, Plaintiffs' counsel, and the entities for which Plaintiffs' counsel work, have not been joined as parties to this case, nor is there a motion before the Court asking that they be joined, nor has their conduct in this case indicated consent to the Court's jurisdiction over them.

disseminated blatantly false stories claiming that Ms. Freeman and Ms. Moss were involved in a conspiracy to commit election fraud, and continued to publish these untruths long after they were proven to be false." A statement by Protect Democracy on the website law4truth.org.

2. "The Hofts' defamations, aimed at undermining confidence in the 2020 election in an effort to overturn the will of the voters, targeted two Black women for doing their jobs as election workers. In significant measure because of the lies told by The Gateway Pundit, our clients were and continue to be targeted with threats of violence and racial intimidation." A statement by Protect Democracy on the website protectdemocracy.org.

3. "Lies like those that The Gateway Pundit knowingly told about Ruby Freeman and Shaye Moss cannot be divorced from the devastation they leave behind—both for the targeted individuals and for our democracy itself." A statement by Plaintiffs' attorney Brittany Williams on protectdemocracy.org.

4. "But that didn't stop some of the former president's top allies in the media – The Gateway Pundit, One America News Network – from continuing to spread that lie about our clients." A statement by Plaintiffs' attorney John Langford in an NPR interview.

5. "The defendants repeatedly published unverified and uncorroborated information claiming that Ms. Freeman and Ms. Moss were involved in a conspiracy to commit election fraud. They continue to publish these untruths long after they were proven to be false. Further, by identifying Ms. Freeman and Ms. Moss by name and publishing pictures of them online, Gateway Pundit caused, and was directly responsible for, the abuse and harassment Ms. Freeman and Ms. Moss suffered." A statement by Protect Democracy on the website protectdemocracy.org.

6. "Last year the Gateway Pundit knowingly published lies about two Georgia election workers." A Twitter post by Yale University's Media Freedom & Information Access (MFIA) Clinic.

7. "the type of disinformation campaign waged by the Gateway Pundit is undermining the very ability of our democracy to function." A statement by Plaintiffs' attorney David Schulz

3

on the MFIA Clinic website.

Plaintiffs move to dismiss Defendants' Counterclaim for two reasons. First, under Rule 55.27(a)(11), Plaintiffs assert that the Counterclaim is an improper, premature counterclaim in the nature of malicious prosecution. In the alternative, under Rule 55.27(a)(6), Plaintiffs assert that the Counterclaim fails to state a claim upon which relief can be granted because it (1) alleges defamation based on statements that are privileged and (2) fails to plead all elements of a defamation claim including that Plaintiffs had knowledge of falsity or serious doubts as the truth of their attorneys' statements, and that Defendants have suffered any damages as a result of the statements.

A motion to dismiss under Missouri Rule 55.27(a)(11) asserts a defense that "the counterclaim or cross-claim is one which cannot be properly interposed in this action." Plaintiffs argue that the Counterclaim seeks to hold them liable for statements made by their attorneys that simply echo their pleadings. Plaintiffs thus argue that the Counterclaim essentially alleges malicious prosecution, a claim that "is not cognizable until the original underlying suit has been prosecuted to a conclusion favorable to the party raising the malicious prosecution claim." See State ex rel. O'Basuyi v. Vincent, 434 S.W.3d 517 (Mo. banc 2014).

Plaintiffs further assert that their attorneys' statements comply with Rule of Professional Conduct 4-3.6. While the Rule

4

generally prohibits lawyers involved in litigation from making certain extrajudicial statements, it permits lawyers to state the claim, offense, or defense involved, and, unless prohibited by law, the identity of the persons involved. Rule 4-3.6(a)-(b).

The Court finds that while the Counterclaim purports to allege defamation, it is nonetheless in the nature of a claim for malicious prosecution. As such, the Court will dismiss the Counterclaim. Because the Court's ruling on Plaintiff's first argument is dispositive, it need not address Plaintiffs' arguments in the alternative.

## MOTION TO STRIKE

Plaintiffs assert two reasons that the Court should strike Defendants' Anti-SLAPP Motion made under Georgia Code Section 9-11-11.1. First, Plaintiffs argue that it seeks to apply a Georgia procedural rule in a Missouri state court case, and in the alternative, it does not meet the terms of the Georgia rule. Further, Plaintiffs argue that they should be awarded reasonable expenses associated with responding to the instant Motion because it is meritless and dilatory.

Under Missouri Rule 55.27(e), a party may request that "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" be stricken from any pleading. Missouri follows the rule that a forum state applies its own procedural law but chooses the applicable substantive law according to its conflict-

5

468

of-law doctrines. Harter v. Ozark-Kenworth, Inc., 904 S.W.2d 317, 320 (Mo. App. W.D. 1995).

Missouri has its own anti-SLAPP statute which provides a procedural mechanism for the early disposition of a SLAPP action. Section 537.528.1 RSMo. However, application of this statute is restricted to conduct or speech undertaken or made in connection with a public hearing or public meeting. Id. A public meeting includes any meeting held by a state of local government entity, including meetings of or presentations before state, county, city, town, or village councils, planning commissions, or review boards. Id. Because the statements at issue in this case were not uttered in connection with a public hearing or public meeting, Defendants acknowledge that Missouri's statute does not apply. Instead, Defendants seek to apply Georgia's anti-SLAPP statute whose more expansive scope encompasses, among other things, "[a]ny written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern." Ga. Section 9-11-11.1(c)(3).

Defendants assert that Georgia's statute provides substantive protection from this suit. The Court disagrees. Like its Missouri counterpart, the Georgia anti-SLAPP statute provides "procedural protection" against SLAPP actions. See Rogers v. Dupree, 824 S.E.2d 823, 830 (Ga. Ct. App. 2019) quoting Denton v. Browns Mill Dev. Co., 561 S.E.2d 431, 434 (Ga. 2002); see also Carbone v. CNN, Inc.,

6

910 F.3d 1345, 1348 ("The anti-SLAPP statute 'creates no substantive rights; it merely provides a procedural mechanism for vindicating existing rights.'").

Because Defendants' anti-SLAPP Motion is predicated on the Court's application of a foreign procedural law, the Court must grant Plaintiffs' Motion to Strike it. Because the Court's ruling on Plaintiff's first argument is dispositive, it need not address Plaintiffs' arguments in the alternative. The Court declines Plaintiffs' request for reasonable expenses associated with responding to this Motion.

THEREFORE, it is Ordered and Decreed as follows:

- Plaintiffs' Motion to Dismiss Defendants' Counterclaim is GRANTED. Defendants' Counterclaim is hereby dismissed.
- Plaintiffs' Motion to Strike Defendants' Anti-SLAPP Motion made under GA Code Section 9-11-11.1 is GRANTED. Defendants' Motion to Strike Under GA Code Section 9-11-11.1 is hereby stricken from the record.

SO ORDERED:

MICHAEL STELZER, Judge

Dated: _July 24, 2023_

7

# EXHIBIT



# In the Missouri Court of Appeals
# Eastern District

JAMES HOFT, JOSEPH HOFT, AND TGP )
COMMUNICATIONS LLC D/B/A THE )
GATEWAY PUNDIT, RELATORS, )
)
)
)
)
vs. )
)
)
THE HONORABLE MICHAEL F. )
STELZER CIRCUIT JUDGE CIRCUIT )
COURT OF ST. LOUIS COUNTY, )
RESPONDENT.

No. ED111920

Writ of Prohibition and/or
Mandamus

Cause No. 2122-CC09815

## ORDER

Relators have filed a Petition for Writ of Prohibition along with Suggestions in Support and Exhibits.

Being duly advised in the premises, the Court hereby DENIES Relator's Petition for Writ of Prohibition.

SO ORDERED.

DATED: August 17, 2023

John P. Torbitzky, Presiding Judge
Writ Division IV
Missouri Court of Appeals, Eastern District

cc: Hon. Michael F. Stelzer
Matthew Ampleman
John Danforth
James Bennett
Jonathon Burns



**EXHIBIT**



# In the Missouri Court of Appeals
# Eastern District

RUBY FREEMAN, and WANDREA )    No. ED111906
MOSS, )
                                )
         Respondents, )
                                )
vs. )
                                )
JAMES HOFT, JOSEPH HOFT, TGP )
COMMUNICATIONS LLC d/b/a )
THE GATEWAY PUNDIT, )
                                )
         Appellants. )

## ORDER

Respondents have filed a motion to dismiss, contending that there is no final, appealable judgment under Rule 74.01(b). Appellants have not filed a response to the motion to dismiss.

Respondents filed a three-count petition alleging defamation and intentional infliction of emotional distress against Appellants, and Appellants filed a counterclaim alleging malicious prosecution. On July 24, 2023, the trial court entered an order and judgment dismissing Appellants' counterclaim upon finding that a malicious prosecution counterclaim could only be brought after the termination of the current litigation. Appellants have filed a notice of appeal from the July 24, 2023 order and judgment dismissing the counterclaim.

An appellate court has jurisdiction only over final judgments that dispose of all parties and claims in the case and leave nothing for future determination. O'Neill v. O'Neill, 864 S.W.2d 7, 8 (Mo. App. E.D. 1993). If the trial court does not either resolve all the issues as to all parties or expressly designate "there is no just reason for delay," the appeal must be dismissed. Rule 74.01(b); Fleahman v. Fleahman, 25 S.W.3d 162, 164 (Mo. App. E.D. 1999).

Here, the trial court granted Respondents' motion to dismiss Appellants' counterclaim, but it did not certify the judgment for immediate appeal under Rule 74.01(b). Further, the three

claims asserted in Respondents' petition remain pending before the trial court.  Therefore, there is no final and appealable judgment under Rule 74.01(b).  Respondents' motion to dismiss the appeal is hereby granted.

SO ORDERED.

DATED:  _8-31-23_____



Kelly C. Broniec, Chief Judge

ecc:    Jonathon C. Burns
        James F. Bennett
        John C. Danforth
        Matthew Ampleman

**EXHIBIT H**

STATE OF MISSOURI    )
                     ) SS
CITY OF ST. LOUIS    )



**MISSOURI CIRCUIT COURT**
**TWENTY-SECOND JUDICIAL CIRCUIT**
**(City of St. Louis)**

Ruby Freeman et al,              )
                                 )
          Plaintiffs,            )
                                 )    No. 2122-CC09815
vs.                              )
                                 )    Division No. 6
TGP Communications LLC           )
Et al                            )
          Defendants,            )
                                 )
                                 )

<u>ORDER APPOINTING MASTER</u>

 COMES NOW this Court under Rule 68.01 and hereby appoints Peter Dunne 100 South 4th St, Suite 400, St. Louis, MO 63102, to be Special Master in this matter. Within seven (7) days of receipt of this order, the Master shall appear before the Honorable Michael F. Stelzer, Division 6 of the Twenty-Second Judicial Circuit to have his oath administered pursuant to Rule 68.01(d).

 The Master shall have all of the powers set out in Rule 68.01(e), including but not limited to:

 The power to regulate all proceedings in every hearing before the master and to do all acts and take all measures

ENTERED

MAY 1 0 2023

M S

necessary or proper for the efficient performance of the duties under the order.

The power to require the production of evidence upon all matters related to discovery matters herein.

The master may rule upon the admissibility of evidence and has the authority to put witnesses on oath and may examine them and may call the parties to the action and examine them upon oath.

The master may preside over depositions and all discovery disputes as provided for in Rule 68.01(h). The master shall be compensated at $ 450.00 per hour.

The parties shall proceed before the master as provided in Rule 68.01(e)and(f).

SO ORDERED:

MICHAEL F. STELZER, Judge

Dated: ___5/10/23___, 2023

2

**EXHIBIT I**

# MISSOURI CIRCUIT COURT
# TWENTY-SECOND JUDICIAL CIRCUIT
## (St. Louis City)

Ruby Freeman et al, Plaintiffs

**vs**

TGP Communications LLC et al, Defendants

CASE NO. 2122-cc09815          DIVISION 6          November 7, 2023

# COURT ORDER

The Special Master having filed his Third Report and Recommendation on November 3, 2023 and given the short time frames regarding the discovery the Court hereby adopts the Third Report and Recommendation of the Special Master in its entirety.

FILED

NOV 0 7 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

**SO ORDERED:**

Michael F. Stelzer #40716

cc: All parties of record

ENTERED
NOV -7 2023
MAM

480

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                    **Chapter 11**

**TGP COMMUNICATIONS, LLC**                  **Case No.  24-13938-MAM**

_____Debtor._____/

### ADDITIONAL CERTIFICATION OF INFORMATION CONTAINED
### WITHIN SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS

**TGP COMMUNICATIONS, LLC** files this Certification of Information Contained

Within the Schedules and Statement of Financial Affairs.

### I.    Introduction

On April 24, 2024, the Debtor filed its Voluntary Petition under Chapter 11, Subchapter V.

(ECF No. 1).  On May 22, 2024, the Debtor filed its Schedules and Statement of Financial Affairs.

(ECF No. 30).  On May 30, 3034, the Debtor filed its Amended Schedules and Statement of Financial

Affairs. (ECF No. 34).

James Hoft is the President and sole shareholder of the Debtor; however, Mr. Hoft relied upon

others to manage and gather information necessary to complete the Schedules and Statement of

Financial Affairs.  Specifically, Jonathon Burns, General Counsel and EVP was tasked with the

responsibility to gather necessary information from different sources and communicate with Bart

Houston, as Debtor's counsel.  Mr. Burns was the sole communicator of information with counsel

and confirmed any questions or requests for additional information needed by counsel for the

bankruptcy case. Mr. Burns has also appeared at the Initial Debtor Interview and the Section 341

Meeting as he is the Debtor's representative with the most comprehensive information concerning

the content of the Schedules and daily activities of the Debtor.  As such, Mr. Burns offers the

following additional certification

## II.  Certification

I have examined the information in the Schedules and the Statement of Financial Affairs and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 06/05/2024

s/  Jonathan Burns
Signature of individual signing on behalf of the debtor
Position or relationship to debtor: General Counsel and Executive Vice President

**Dated: June 6, 2024**

**HOUSTON RODERMAN**
*Attorney for Debtor-in-Possession*

By:     /s/ Bart A. Houston
Bart A. Houston
Florida Bar No. 623636
633 S. Andrews Ave. Suite 500
Ft. Lauderdale, Florida 33301
Telephone: (954) 900-2615
Facsimile: (954) 839-9068
Primary Email: bhouston@thehoustonfirm.com
Secondary Email: dschena@thehoustonfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing System on June 6, 2024.

By:     */s/ Bart A. Houston*
Bart A. Houston, Esq.
Florida Bar No. 623636

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | § | Chapter 11 (Subchapter V) |
| | § | |
| TGP COMMUNICATIONS, LLC | § | Case No. 24-13938 (MAM) |
| | § | |
| Debtor. | § | |

**JOINDER TO THE MOTION OF RUBY FREEMAN AND WANDREA'**
**ARSHAYE MOSS FOR AN ORDER DISMISSING THE DEBTOR'S CHAPTER**
**11 CASE UNDER SECTIONS 1112(b) AND 305(a) OF THE BANKRUPTCY**
**CODE, OR, IN THE ALTERNATIVE, MODIFYING THE AUTOMATIC STAY**
**TO CONTINUE PREPETITION LITIGATION**

Dr. Eric Coomer ("Dr. Coomer"), as a creditor and party-in-interest of TGP Communications, LLC (the "Debtor" or "The Gateway Pundit"), by and through his undersigned counsel, respectfully joins and adopts the Motion of Ruby Freeman and Wandrea' Arshaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the alternative, Modifying the Automatic Stay to Continue Prepetition Litigation [Dkt. 39] (the "Motion"), and files this Joinder, adopting the arguments in the Motion, adding additional relevant facts, and seeking an order (a) dismissing the Debtor's chapter 11 case under sections 1112(b) and 305(a) of the Bankruptcy Code, or (b) in the alternative, modifying the automatic stay pursuant to section 362(d) to continue litigation currently pending in the District Court of Denver, Colorado (the "Colorado Litigation"). Dr. Coomer further reserves the right to raise any arguments in connection with the Motion at the hearing scheduled for June 27, 2024, at 1:00 p.m.

1

## ADDITIONAL FACTS RELEVANT TO DR. COOMER

1.      In addition to the Background provided in the Motion, Dr. Coomer provides the following facts relevant to the Colorado Litigation.  Dr. Coomer is the former Director of Product Strategy and Security for Dominion Voting Systems.  He served in that role during the 2020 presidential election.

2.      In the wake of 2020 presidential election, Debtor published successive articles about Dr. Coomer containing patent falsehoods.  Headlines of these articles include:

>   on November 13, 2020: "Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote;"[1]

>   on November 14, 2020: "Report: Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online;"[2]

>   on November 16, 2020: "Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile Is Being Deleted and Erased (AUDIO);"[3]

>   on December 28, 2020: "WAKE UP AMERICA! Bold Billionaire Offers $1 Million Bounty for Dominion, Eric Coomer's Comeuppance."[4]

3.      Debtor's articles garnered national attention and Dr. Coomer was forced to flee his home in response to credible threats he received.  Colorado Litigation 1st Am. Pet. at ¶ 74, attached hereto as **Exhibit A**.  Dr. Coomer had to sever ties with friends and family members to stay in seclusion during the onslaught of threats and efforts across social media to locate him.  (*Id.* at ¶¶ 72, 74-77).  Dr. Coomer has suffered damage to his

---

[1] Jim Hoft, THE GATEWAY PUNDIT, Nov. 13, 2020.
[2] Jim Hoft, THE GATEWAY PUNDIT, Nov. 14, 2020.
[3] Jim Hoft, THE GATEWAY PUNDIT, Nov. 16, 2020.  Eric Trump subsequently linked this article in a tweet to cast doubt on the integrity of the election.
[4] Jim Hoft, THE GATEWAY PUNDIT, Dec. 28, 2020.

9178717.2

reputation, privacy, safety, earnings, among other pecuniary loss and emotional and physical distress. (*Id.* at ¶ 81).

4.  On December 22, 2020, Dr. Coomer filed Case No. 2020CV34319, styled *Coomer v. Donald J Trump for President Inc., et al,* in the District Court, Denver County, Colorado. The Colorado Litigation includes claims against Debtor and Debtor's owner, Jim Hoft ("Mr. Hoft"), among others, related to defamatory statements concerning Dr. Coomer and his alleged role in rigging the 2020 presidential election. Debtor's strategy in the Colorado Litigation has been the same as in the Missouri Litigation: delay.

5.  On April 30, 2021, Debtor and Mr. Hoft filed a special motion to dismiss Dr. Coomer's claims under Colorado's anti-SLAPP statute. On May 13, 2022, the district court denied all anti-SLAPP motions, including those filed by Debtor and Mr. Hoft (the "anti-SLAPP Order").

6.  On May 24, 2022, Debtor and Mr. Hoft filed a notice of appeal of the anti-SLAPP Order.

7.  On April 11, 2024, the Colorado Court of Appeals affirmed the majority of the district court's findings in the anti-SLAPP Order, including those against Debtor and Mr. Hoft.

8.  Two weeks later, on April 25, 2024, Debtor filed a Suggestion of Bankruptcy in the Colorado Litigation.

9.  On May 10, 2024, Debtor filed a joint motion seeking an extension of time to file petitions for writ of certiorari before the Supreme Court of Colorado, despite the pendency of this bankruptcy.

10.  The Colorado Litigation is currently on appeal before the Supreme Court of Colorado.

11. Assuming the Colorado Litigation is ultimately remanded to the district court, Dr. Coomer will begin conducting fact and expert discovery. This discovery will likely last through 2025. There is no current trial setting.

12. In the alternative, if the Court finds dismissal is not justified, Dr. Coomer seeks an order modifying the automatic stay to allow the Colorado Litigation to proceed pursuant to 11 U.S.C § 362(d)(1). The same considerations outlined in the Motion supporting a modification of the automatic stay to allow the Missouri Litigation to proceed are applicable here and Dr. Coomer joins in and adopts such arguments.

### CONCLUSION

**WHEREFORE**, for the foregoing reasons, Dr. Eric Coomer joins the Motion and respectfully requests that the Court enter an order granting the Motion and dismissing this chapter 11 case. In the alternative, Dr. Eric Coomer requests an order granting him relief from the automatic stay to continue the Colorado Litigation to judgment.

Dated: June 8, 2024

Respectfully submitted,

/s/ Vincent F. Alexander
Vincent F. Alexander
valexander@shutts.com
Florida Bar No. 68114
**SHUTTS & BOWEN LLP**
201 East Las Olas Blvd., Suite 2200
Fort Lauderdale, Florida 33301
954-524-5505
954-524-5506—Facsimile

and

/s/ Ryan E. Chapple
Charles J. Cain - *Pro Hac Vice Pending*
ccain@cstrial.com
Ryan E. Chapple - *Pro Hac Vice Pending*
rchapple@cstrial.com
Bradley A. Kloewer - *Pro Hac Vice Pending*
bkloewer@cstrial.com

9178717.2

**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

**ATTORNEYS FOR DR. ERIC COOMER**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 8, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or *pro se* parties who are authorized to receive electronically Notice of Electronic Filing in these bankruptcy cases.

*/s/ Vincent F. Alexander*
Vincent F. Alexander

9178717.2

# EXHIBIT A

DATE FILED: February 4, 2021 4:07 PM
FILING ID: 5D2B3A08F794E
CASE NUMBER: 2020CV34319

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC., et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff**<br>Charles J. Cain, No. 51020<br>ccain@cstrial.com<br>Steve Skarnulis, No. 21PHV6401<br>skarnulis@cstrial.com<br>**CAIN & SKARNULIS PLLC**<br>P. O. Box 1064<br>Salida, Colorado 81201<br>719-530-3011          Telephone<br>512-477-5011          Facsimile<br><br>Thomas J. Rogers III, No. 28809<br>trey@rklawpc.com<br>Mark Grueskin, No. 14621<br>mark@rklawpc.com<br>Andrew E. Ho, No. 40381<br>andrew@rklawpc.com<br>RechtKornfeld PC<br>1600 Stout Street, Suite 1400<br>Denver, Colorado 80202<br>303-573-1900          Telephone<br>303-446-9400          Facsimile | Case Number:          2020cv034319<br><br>Division Courtroom:          409 |
| **PLAINTIFF'S FIRST AMENDED COMPLAINT** | |

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), by and through undersigned counsel, brings this action against Defendants Donald J. Trump for President, Inc., Sidney Powell, Sidney Powell, P.C., Defending the Republic, Inc., Rudolph Giuliani, Joseph Oltmann, FEC United, Shuffling Madness Media, Inc. dba Conservative Daily, James Hoft, TGP Communications LLC dba The Gateway Pundit, Michelle Malkin, Eric Metaxas, Chanel Rion, Herring Networks, Inc. dba One America News Network, and Newsmax Media, Inc. (collectively, Defendants herein) in response to relentless defamation and ongoing threats.

## I.     INTRODUCTION

1.      Spreading false conspiracy theories about the American election and its workers can have devastating consequences.  This is such a case.  Specifically, this case is based on Defendants' false and baseless assertions that Dr. Coomer, an employee of Dominion Voting Systems, Inc. (Dominion), sits at the center of a national conspiracy to fraudulently elect the President of the United States.  Defendants, by their actions, have elevated Dr. Coomer into the national spotlight, invaded his privacy, threatened his security, and fundamentally defamed his reputation across this country.

2.      On November 3, 2020, the presidential election was held across the United States.  Votes were counted throughout the week, and on Saturday, November 7, 2020, the Associated Press formally called the election for former Vice President Joseph Biden.  President Biden decisively won the election with a total of 306 electoral votes, winning the popular vote by more than seven million votes.  State election officials have verified

and certified the election results.  Electors have cast their ballots.  Electoral votes have been counted.  Joseph Biden is now President.

3.      But as the vote count proceeded and it became apparent that President Trump was likely to lose the election, the former President, his campaign, his agents, and many of his supporters began alleging widespread voter fraud and perpetuating baseless conspiracies about why President Trump lost.

4.      Defendants were integral to this effort.  To support their unsubstantiated allegations, they manufactured and spread a false narrative that Dominion—a business that had partnered with more than 1,300 jurisdictions in the United States to provide various election support services—conspired to rig its equipment and the election in favor of President Biden.[1]  Defendants made Dr. Coomer, the Director of Product Strategy and Security for Dominion, the face of their false claims.

5.      Defendants relied heavily upon false allegations made by Joseph Oltmann, a politically-motivated individual, business owner, and podcast host, to support their conspiracy theory.

6.      Oltmann has founded a nonprofit and media business for the alleged purpose of building a political movement to preserve freedoms he perceives as threatened in the United States.  This allegedly included efforts to uncover and reveal Antifa activists conspiring against Oltmann.  Oltmann claimed to have infiltrated a conference call with

---

[1] Apparently, this conspiracy only affected the presidential votes, as Democrats in the same election lost ground in down-ballot races.  *See* Trip Gabriel, *How Democrats Suffered Crushing Down-Ballot Losses Across America*, N.Y. TIMES, Nov. 28, 2020, https://www.nytimes.com/2020/11/28/us/politics/democrats-republicans-state-legislatures.html   (last visited Feb. 4, 2021).

such Antifa activists.  Oltmann claimed on this call he purportedly heard someone identified as "Eric from Dominion," and that this "Eric" stated he would ensure the election went to President Biden.  Oltmann provided no explanation for how he learned of this purported call or gained access to it.  Oltmann acknowledged he has no recording of it and indicated he had no knowledge of the participants he referenced within it. Rather, Oltmann's dubious claims are premised on one unverified speaker referring to another.  With no legitimate attempt to confirm the identity of these alleged speakers, Oltmann attributed their alleged statements to Dr. Coomer.  With no additional evidence, Oltmann then used these statements to falsely assert that Dr. Coomer subverted the results of the election.  Defendants seized on and perpetuated these false allegations to further their own interests.

7.  To be clear, Dr. Coomer has no knowledge of an alleged "Antifa Conference Call;" Dr. Coomer did not participate in such an alleged call; Dr. Coomer did not make the comments Defendants falsely attribute to him; and Dr. Coomer did not take actions to subvert the presidential election as Defendants falsely allege.

8.  Despite the inherent unreliability of these claims, Defendants widely disseminated this false narrative.  As intended, Defendants' fabrication quickly spread throughout various media sources.  Within days, the hashtags #EricCoomer, #ExposeEricCoomer, and #ArrestEricCoomer were trending on social media.  President Trump began publishing numerous false statements to his millions of followers alleging Dominion interfered with the election; President Trump's son and campaign surrogate, Eric Trump, tweeted a photo of Dr. Coomer alongside this false claim; and the Trump

Campaign lawyers identified Dr. Coomer in a nationally televised press conference where they described him as a "vicious, vicious man" who "is close to Antifa" and falsely claimed that Dr. Coomer "specifically says that they're going to fix this election" and that he "had the election rigged for Mr. Biden."  With such attention, Defendants have escalated denigrations of Dr. Coomer, furthered dissemination of these false statements, and encouraged threats and violence against Dr. Coomer.

9.      Defendants knowingly circulated and amplified a baseless conspiracy theory to challenge the integrity of the presidential election.  While this theory has been thoroughly rejected, its immediate and life-threatening effects remain very real.  The deluge of misinformation has caused immense injury to Dr. Coomer's reputation, professional standing, safety, and privacy.  Once an esteemed private election technology expert, Dr. Coomer has been vilified and subjected to an onslaught of offensive messages and harassment.  In response to multiple credible death threats, Dr. Coomer has been forced to leave his home in fear for his safety.  Without concern for the truth or the consequences of their reckless conduct, Defendants branded Dr. Coomer a traitor to the United States, a terrorist, and a criminal of the highest order.

## II.     PARTIES

10.      Plaintiff Eric Coomer, Ph.D. is an individual and resident of Colorado who may be contacted c/o Cain & Skarnulis PLLC, P. O. Box 1064, Salida, Colorado 81201.  Dr. Coomer is the Director of Product Strategy and Security for Dominion.

11.     Defendant Donald J. Trump for President Inc. (the Trump Campaign)[2] is a corporation organized and existing under the laws of Virginia, and may be served through its registered agent for service CT Corporation System at 4701 Cox Road, Suite 284, Glen Allen, Virginia 23060-6808.

12.     Defendant Sidney Powell (Powell) is an individual and resident of Texas. Powell is a practicing attorney that has brought several lawsuits seeking to overturn the results of the election.  On November 14, 2020, President Trump identified Powell as part of the legal team representing his campaign and its efforts to overturn the results of the election.  On November 22, 2020, the campaign subsequently removed Powell from its legal team.  Powell may be served at 3831 Turtle Creek Boulevard, Unit 5B, Dallas, Texas 75219.

13.     Defendant Sidney Powell, P.C. (Powell, P.C.)[3] is a professional corporation organized and existing under the laws of Texas, and may be served with process through its registered agent Sidney Powell at 3831 Turtle Creek Boulevard, Unit 5B, Dallas, Texas 75219.

---

[2] As of this filing, Rudolph Giuliani is a representative of the Trump Campaign.  His actions relevant to this case were as a representative of the Trump Campaign and within the scope and furtherance of his work for the Trump Campaign.  He had actual or apparent authority as an agent of the Trump Campaign.  The Trump Campaign is vicariously liable for Giuliani's tortious conduct described herein.  Sidney Powell was a representative of the Trump Campaign.  For a period of time relevant to this case, Powell's actions were as a representative of the Trump Campaign and within the scope and furtherance of her work for the Trump Campaign.  She had actual or apparent authority as an agent of the Trump Campaign during that period of time.  The Trump Campaign is vicariously liable for Powell's tortious conduct during the period of time described herein.

[3] Powell is a representative of Powell, P.C.  Her actions relevant to this case were as a representative of Powell, P.C. and within the scope and furtherance of her work for Powell, P.C.  She had actual or apparent authority as an agent of Powell, P.C.  Powell, P.C. is vicariously liable for Powell's tortious conduct described herein.

14.     Defendant Defending the Republic, Inc.[4] (Defending the Republic) is a nonprofit corporation organized and existing under the laws of Texas, and may be served with process through its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

15.     Defendant Rudolph Giuliani (Giuliani) is an individual and resident of New York.  Giuliani is a practicing attorney that serves as President Trump's personal counsel, as well as counsel for President Trump's campaign, Donald J. Trump for President Inc.  Giuliani may be served with process at 445 Park Avenue, Floor 18, New York, New York 10022.

16.     Defendant Joseph Oltmann (Oltmann) is an individual and resident of Colorado.  Oltmann is an activist; a supporter of President Trump; an owner of Shuffling Madness Media, Inc. dba Conservative Daily; a co-host of the Conservative Daily podcast; and founder of the nonprofit FEC United.  Oltmann may be served with process at 8245 Keith Court, Castle Rock, Colorado 80108.

17.     Defendant FEC United[5] is a nonprofit corporation organized and existing under the laws of Colorado with its principal place of business located in Denver, Colorado, and may be served with process through its registered agent Pacific Registered Agents, Inc. at 44 Cook Street, Suite 100, Denver, Colorado 80206.

---

[4] Powell is a director and representative of Defending the Republic.  Her actions relevant to this case were as a representative of Defending the Republic and within the scope and furtherance of her work for Defending the Republic.  She had actual or apparent authority as an agent of Defending the Republic.  Defending the Republic is vicariously liable for Powell's tortious conduct described herein.

[5] Oltmann is a representative of FEC United.  His actions relevant to this case were as a representative of FEC United and within the scope and furtherance of his work for FEC United.  He had actual or apparent authority as an agent of FEC United.  FEC United is vicariously liable for Oltmann's tortious conduct described herein.

18.     Defendant Shuffling Madness Media, Inc. with registered trade name Conservative Daily (Conservative Daily)[6] is a corporation organized and existing under the laws of Delaware with its principal place of business located in Colorado, and may be served with process through its registered agent Joe Oltmann at 10750 S. Pine Drive, Parker, Colorado 80138.

19.     Defendant James Hoft (Hoft) is an individual and resident of Missouri. Hoft is the owner of TGP Communications LLC and author and editor of the political website and blog, The Gateway Pundit. Hoft may be served with process at 12 Godwin Lane, St. Louis, Missouri 63124.

20.     Defendant TGP Communications LLC dba The Gateway Pundit (Gateway Pundit)[7] is a limited liability company organized and existing under the laws of Missouri, and may be served with process through its registered agent Gregory J. Hickel at 12300 Old Tesson Road, Suite 400-G, St. Louis, Missouri 63128.

21.     Defendant Michelle Malkin (Malkin) is an individual and resident of Colorado. Malkin is a political blogger, commentator, and author. Malkin may be served with process at 171 Larkspur Lane, Avon, Colorado 81620.

22.     Defendant Eric Metaxas (Metaxas) is an individual and resident of New York. Metaxas is an author, speaker, and host of The Eric Metaxas Radio Show.

---

[6] Oltmann is also a representative of Conservative Daily. His actions relevant to this case were as a representative of Conservative Daily and within the scope and furtherance of his work for Conservative Daily. He had actual or apparent authority as an agent of Conservative Daily. Conservative Daily is vicariously liable for Oltmann's tortious conduct described herein.

[7] Hoft is a representative of Gateway Pundit. His actions relevant to this case were as a representative of Gateway Pundit and within the scope and furtherance of his work for Gateway Pundit. He had actual or apparent authority as an agent of Gateway Pundit. Gateway Pundit is vicariously liable for Hoft's tortious conduct described herein.

Metaxas may be served with process at 35 East 84th Street, Apt. 5A, New York, New York 10028.

23.     Defendant Chanel Rion (Rion) is an individual and resident of New York. Rion is the Chief White House Correspondent for One America News Network (OANN). Rion may be served with process at 622 Acorn Hill Road, Olivesbridge, New York 12461.

24.     Defendant Herring Networks, Inc.,[8] is a corporation organized and existing under the laws of California, which owns and operates One America News Network (OANN).   OANN may be served through its agent for service Seth B. Bobroff at 6256 Greenwich Drive, Suite 500, San Diego, California 92117.

25.     Defendant Newsmax Media, Inc. (Newsmax) is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Florida. Newsmax may be served through its registered agent Cogency Global Inc. at 115 North Calhoun Street, Suite 4, Tallahassee, Florida 32301.

### III.    JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to Article VI, section 9 of the Colorado Constitution and C.R.S. section 13-1-124.

27.     This Court may exercise personal jurisdiction over the Trump Campaign as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  The Trump Campaign had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and

---

[8] Rion is a representative of Herring Networks, Inc. (referred to herein as OANN).  Rion's actions relevant to this case were as a representative of OANN and within the scope and furtherance of her work for OANN. She had actual or apparent authority as an agent of OANN.  OANN is vicariously liable for Rion's tortious conduct described herein.

that its defamatory messages would be directed at Colorado. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776-81 (1984). The Trump Campaign derived its defamatory statements from Coloradan sources.[9] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[10] *See Calder v. Jones*, 465 U.S. 783, 788-89 (1984); *see also Keeton,* 465 U.S. at 780 (recognizing a plaintiff's residence may be relevant to the jurisdictional inquiry as it "may be the focus of the activities of the defendant out of which the suit arises."). The Trump Campaign purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[11] *See Keeton,* 465 U.S. at 776-81 (finding "libel is generally held to occur wherever the offending material is circulated" and a defendant continuously and deliberately exploiting a market "must reasonably anticipate being haled into court there in a libel action"). Colorado has a substantial interest in this cause of action.

28.     This Court may exercise personal jurisdiction over Powell as she committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Powell had the knowledge and intent that: the effects of her actions would be felt

---

[9] The Trump Campaign knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 61–68, 71.

[10] The Trump Campaign knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 52–68, 71.

[11] The Trump Campaign knowingly published its statements using national platforms and broadcasts that purposefully direct their statements into the state of Colorado and to Coloradan audiences. The Trump Campaign intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 61–68, 71.

in the state of Colorado; the injury would occur in Colorado; and that her defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Powell derived her defamatory statements from Coloradan sources.[12] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for her defamatory statements.[13] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Powell purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make her statements.[14] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

29.    This Court may exercise personal jurisdiction over Powell, P.C. as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Powell, P.C. had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Powell, P.C. derived its defamatory statements from Coloradan sources.[15] The subject of

---

[12] Powell knowingly relied on Oltmann as her source for her false statements; specifically identified Oltmann as a Denver, Colorado businessman within her statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 64–71.

[13] Powell knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of her false statements. *See infra* ¶¶ 64–71.

[14] Powell knowingly published her statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences. Powell intended to reach every citizen in the United States, purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 64–71.

[15] Powell P.C. knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 64–71.

those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[16] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Powell, P.C. purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[17] *See Keeton,* 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

30.  This Court may exercise personal jurisdiction over Defending the Republic as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  Defending the Republic had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 77681.  Defending the Republic derived its defamatory statements from Coloradan sources.[18]  The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[19]  *See Calder*, 465 U.S. at 788-89;

---

[16] Powell P.C. knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements.  *See infra* ¶¶ 64–71.

[17] Powell P.C. knowingly published its statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences.  Powell P.C. intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans.  *See infra* ¶¶ 64–71.

[18] Defending the Republic knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 64–71.

[19] Defending the Republic knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements.  *See infra* ¶¶ 64–71.

*see also Keeton,* 465 U.S. at 780.  Defending the Republic purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[20]  *See Keeton,* 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

31.     This Court may exercise personal jurisdiction over Giuliani as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  Giuliani had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Giuliani derived his defamatory statements from Coloradan sources.[21]  The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for his defamatory statements.[22]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Giuliani purposefully utilized national broadcasts and media platforms with regular circulation in

---

[20] Defending the Republic knowingly published its statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences.  Defending the Republic intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans.  *See infra* ¶¶ 64–71.

[21] Giuliani knowingly relied on Oltmann, a Colorado businessman, as his source for his false statements and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 64–65, 71.

[22] Giuliani knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements.  *See infra* ¶¶ 64–65, 71.

Colorado and to Coloradan audiences to make his statements.[23] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

32.    This Court may exercise personal jurisdiction over Oltmann as he is a resident and domiciliary of Colorado and he committed tortious actions giving rise to this cause of action within Colorado.

33.    This Court may exercise personal jurisdiction over FEC United as it is formed within and existing under the laws of Colorado and it committed tortious actions giving rise to this cause of action within Colorado.

34.    This Court may exercise personal jurisdiction over Conservative Daily as it has its principal place of business within Colorado and it committed tortious actions giving rise to this cause of action within Colorado.

35.    This Court may exercise personal jurisdiction over Hoft as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Hoft had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Hoft derived his defamatory statements from Coloradan sources.[24] The subject of those statements concerned a Colorado resident and that resident's work and employment within a

---

[23] Giuliani knowingly published his statements using national platforms and broadcasts that purposefully direct their statements into the state of Colorado and to Coloradan audiences. Giuliani intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 64–65, 71.

[24] Hoft knowingly relied on Oltmann as his source for his false statements, specifically identified Oltmann as a Denver, Colorado businessman within his statements, and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 57, 60, 71.

business based in Colorado, making Colorado an integral focal point for his defamatory statements.[25] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Further, Hoft has purposefully sought a national audience and regularly directs his publications to Colorado and Coloradan audiences for circulation.[26]  *See Keeton,* 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

36.    This Court may exercise personal jurisdiction over Gateway Pundit as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  Gateway Pundit had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Gateway Pundit derived its defamatory statements from Coloradan sources.[27] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[28]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Further, Gateway Pundit has purposefully sought a national audience and regularly directs its publications to Colorado and Coloradan audiences for

---

[25] Hoft knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements.  *See infra* ¶¶ 57, 60, 71.

[26] Hoft, as founder, editor, and author of Gateway Pundit, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets, with articles naming Colorado, identifying events in Colorado, and referencing Coloradans.  *See infra* ¶¶ 57, 60, 71, n.29.

[27] Gateway Pundit knowingly relied on Oltmann as its source for false statements it published, specifically identified Oltmann as a Denver, Colorado businessman within its statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 57, 60, 71.

[28] Gateway Pundit knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 57, 60, 71.

circulation.[29]  *See Keeton,* 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

37.    This Court may exercise personal jurisdiction over Malkin as she is a resident and domiciliary of Colorado and she committed tortious actions giving rise to this cause of action within Colorado.

38.    This Court may exercise personal jurisdiction over Metaxas as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As the host of a nationally syndicated radio show and podcast, Metaxas had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado.  *See Keeton*, 465 U.S. at 776-81.  Metaxas also derived his defamatory statements from Coloradan sources.[30]  The subject of those statements concerned a Colorado resident and that resident's work and employment within a business based in Colorado, making Colorado an integral focal point for his defamatory

---

[29] Gateway Pundit regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets, with articles naming Colorado, identifying events in Colorado, and referencing Coloradans.  *See e.g.*, Cristina Laila, *BREAKING! SHOCK VIDEO: Colorado Democrat Executive Says "2020 is a Political Revolution"; "Guillotines Motherf*cker, Killing Random Nazis in the Street"*, THE GATEWAY PUNDIT, Oct. 13, 2020; Joe Hoft, *WEIRD: Early Reports Claimed Killer of Trump Supporter in Denver Is a Security Guard But He's Not Registered In Colorado's Security Guard Database*, THE GATEWAY PUNDIT, Oct. 11, 2020; Cristina Laila, *Democrat Colorado Secretary of State Mails Postcards to Illegals and Dead People Urging Them to Vote*, THE GATEWAY PUNDIT, Sept. 27, 2020; Jim Hoft, *Let's Make Her Famous! Violent, Foul-Mouthed Leftist Caught on Video Ripping Down Trump Sign in Castle Rock, Colorado*, THE GATEWAY PUNDIT, Sept. 22, 2020; Cristina Laila, *Colorado Woman Repeatedly Punches 12-Year-Old Boy in the Back of the Head Over Trump Yard Sign*, THE GATEWAY PUNDIT, Sept. 2, 2020.

[30] Metaxas knowingly relied on Oltmann as his source for his false statements, specifically identified Oltmann as a Denver, Colorado businessman within his statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 59, 71.

statements.[31]  *See Calder*, 465 U.S. at 788-89; *see also Keeton*, 465 U.S. at 780.  Further, Metaxas has purposefully sought a national audience and regularly directs his publications to Colorado and Coloradan audiences for circulation.[32]  *See Keeton*, 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

39.     This Court may exercise personal jurisdiction over Rion as she committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As a correspondent for a national news network that specifically broadcasts to Colorado and Coloradan audiences, Rion had the knowledge and intent that: the effects of her actions would be felt in the state of Colorado; the injury would occur in Colorado; and that her defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Rion also derived her defamatory statements from Coloradan sources.[33]  The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for her defamatory statements.[34]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Through OANN, Rion has purposefully sought a national audience and

---

[31] Metaxas knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements.  *See infra* ¶¶ 59, 71.

[32] Metaxas, as the host of a nationally syndicated radio show and podcast, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets.  *See infra* ¶¶ 59, 71.

[33] Rion knowingly relied on Oltmann as her source for her false statements, specifically identified Oltmann as a Denver, Colorado businessman within her statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 61, 71.

[34] Rion knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of her false statements.  *See infra* ¶¶ 61, 71.

regularly directs her reporting to Colorado and Coloradan audiences for circulation.[35] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

40. This Court may exercise personal jurisdiction over OANN as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. As a national news network that specifically broadcasts to Colorado and Coloradan audiences, OANN had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. OANN also derived its defamatory statements from Coloradan sources.[36] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[37] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. OANN has purposefully sought a national audience and regularly directs its reporting to Colorado and Coloradan audiences for circulation.[38] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

---

[35] Rion, as a correspondent for OANN, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets. *See infra* ¶¶ 61, 71, n.38.

[36] OANN knowingly relied on Oltmann as its source for false statements it published, specifically identified Oltmann as a Denver, Colorado businessman within its statements, and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 61, 71.

[37] OANN knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 61, 71.

[38] On its website, OANN identifies: (1) national cable providers, including AT&T U-verse, CenturyLink PRISM, DirecTV, GCI, and Verizon FiOS; (2) local providers in all 50 states; and (3) for Colorado, OANN specifically states "You can find OAN in Colorado on one of the many national cable providers above. Need another option? Stream OAN and many other TV channels LIVE on KlowdTV without a contract, offering flexibility and affordability. Sign up for a free-trial!" *See OANN, Where to Watch,* https://www.oann.com/wheretowatch/ (last visited Feb. 4, 2021).

41.    This Court may exercise personal jurisdiction over Newsmax as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As a national news network that specifically broadcasts to Colorado and Coloradan audiences, Newsmax had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Newsmax further derived its defamatory statements from Coloradan sources.[39] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[40]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Newsmax has purposefully sought a national audience and regularly directs its reporting to Colorado and Coloradan audiences for circulation.[41]  *See Keeton,* 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

42.    Jurisdiction in Colorado provides for the efficient resolution of the claims herein.  Venue is proper in this Court pursuant to Colorado Rule of Civil Procedure 98

---

[39] Newsmax knowingly relied on Oltmann, a Colorado based businessman, as the source of the false statements that it published and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 66, 71.

[40] Newsmax knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements.  *See infra* ¶¶ 66, 71.

[41] Newsmax purposefully directs its broadcasts into the state of Colorado and to Coloradan audiences.  On its website, Newsmax identifies broadcast areas for Coloradan zip codes and identifies national cable providers and channels specifically for Colorado.  For example, in the zip code of this Court, Newsmax identifies "Newsmax TV is available in your local area in the following services" including: CenturyLink HD Ch. 1209 (SD Ch. 209); DIRECTV HD Ch. 349; DISH Network HD Ch. 216; fuboTV; Sling TV; and Xfinity/Comcast HD Ch. 1115.  *See* Newsmax TV, *You Can Watch Newsmax TV!*", https://www.newsmaxtv.com/findus (last visited Feb. 4, 2021).

because a substantial part of the events and omissions giving rise to the claims occurred in Denver County, Colorado and Defendant FEC United's principal place of business is in Denver County, Colorado.

## IV. FACTS

43.　Plaintiff Dr. Eric Coomer is the Director of Product Strategy and Security for Dominion.

44.　Dominion is based in Denver, Colorado, and provides election support services across the United States, including from initial project implementation through election set-up, ballot layout, multiple language audio, machine set-up and system testing.

45.　Dominion provided election related services to at least thirty different states during the 2020 presidential election.

### A. *The 2020 presidential election was a free and fair election.*

46.　The 2020 presidential election results have been verified by numerous independent entities, including government officials and agencies.　State elections officials tasked with verifying the election and vote counts certified the election results across all 50 states and the District of Columbia.[42]　Electors met and formerly cast their ballots with President Joe Biden securing 306 electoral votes and winning the popular vote by more than seven million votes.[43]　Despite incited violence, Congress formally

---

[42] *See* Maggie Astor, et al., *Biden Secures Enough Electors to Be President*, N.Y. TIMES, Dec. 9, 2020, https://www.nytimes.com/interactive/2020/11/20/us/politics/2020-election-certification-tracker.html (last visited Feb. 4, 2021).　("Election results have now been certified in all 50 states and Washington, D.C.").

[43] *See* Nick Corasaniti, et. al., *Electoral College Vote Officially Affirms Biden's Victory*, N.Y. TIMES, Dec. 14, 2020, https://www.nytimes.com/2020/12/14/us/politics/biden-electoral-college.html (last visited Feb. 4, 2021).

counted the electoral votes, and Vice President Mike Pence declared Joe Biden the winner of the presidential election.[44]

47.     The Cybersecurity & Infrastructure Security Agency (CISA), a standalone United States federal agency under the Department of Homeland Security, issued a Joint Statement from the Elections Infrastructure Government Coordinating Council and the Elections Infrastructure Sector Coordinating Executive Committees stating:

> The November 3rd election was the most secure in American history. Right now, across the country, election officials are reviewing and double checking the entire election process prior to finalizing the result.
>
> When states have close elections, many will recount ballots. All of the states with close results in the 2020 presidential race have paper records of each vote, allowing the ability to go back and count each ballot if necessary. This is an added benefit for security and resilience. This process allows for the identification and correction of any mistakes or errors. **There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.**
>
> Other security measures like pre-election testing, state certification of voting equipment, and the U.S. Election Assistance Commission's (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020.
>
> While we know there are many unfounded claims and opportunities for misinformation about the process of our elections, we can assure you we have the utmost confidence in the security and integrity of our elections, and you should too. When you have questions, turn to elections officials as trusted voices as they administer elections."[45]

---

[44] *See* John Wagner, et al., *Pence declares Biden winner of presidential election after Congress finally counts electoral votes*, WASH. POST, Jan. 07, 2021, https://www.washingtonpost.com/politics/2021/01/0 6/congress-electoral-college-vote-live-updates/ (last visited Feb. 4, 2021).

[45] CISA, *Joint Statement from Elections Infrastructure Gov't Coordinating Council & the Election Infrastructure Sector Coordinating Exec. Comms.*, Nov. 12, 2020, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (last visited Feb. 4, 2021) (emphasis in original).

48.     Former Director of CISA, Chris Krebs, after his dismissal by President Trump, acknowledged that states had transitioned to auditable voting systems with paper-based ballots that could be recounted, independent of any allegedly hacked software or hardware.[46]  Krebs explained that these paper ballots, when paired with state post-election checks, ensured the accuracy of the voting counts.  Such post-election checks were utilized with recounts in Georgia and Wisconsin, which affirmed the election results.[47]

49.     Then U.S. Attorney General William Barr confirmed "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."[48]

50.     Over 60 separate lawsuits brought by President Trump's campaign and its supporters across the country attempting to challenge the legitimacy of the election results have failed.[49]  With these, courts have rejected baseless allegations of widespread

---

[46] Chris Krebs, *Trump fired me for saying this, but I'll say it again: The Election wasn't rigged*, WASH. POST, Dec. 1, 2020, https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html (last visited Feb. 4, 2021).

[47] Scott Bauer, *Wisconsin certifies Joe Biden as winner following recount*, AP, Nov. 30, 2020, https://apnews.com/article/election-2020-joe-biden-donald-trump-wisconsin-lawsuits-2e9cf60550f519537d31b6b71aa32c3c (last visited Feb. 4, 2021); Kate Brumback, *Georgia again certifies election results showing Biden won*, AP, Dec. 7, 2020, https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a (last visited Feb. 4, 2021).

[48] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, AP, Dec. 1, 2020, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (last visited Feb. 4, 2021).  As of this filing, U.S. Attorney General Barr has tendered his resignation.

[49] Rosalind S. Helderman, et al., *'The last wall': How dozens of judges across the political spectrum rejected Trump's efforts to overturn the election*, WASH. POST, Dec. 12, 2020, https://www.washingtonpost.com/politics/judges-trump-election-lawsuits/2020/12/12/e3a57224-3a72-11eb-98c4-25dc9f4987e8_story.html (last visited Feb. 4, 2021); William Cummings, et al., By the numbers: President Donald Trump's failed efforts to overturn the election, USA TODAY, Jan. 6, 2021, https://www.usatoday.com/in-depth/news/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/ (last visited Feb. 4, 2021) ("Out of the 62 lawsuits filed challenging the presidential election, 61 have failed").

voter fraud raised to overcome the election results.[50]  Notably in one case, Judge Brann
in the United States District Court for the Middle District of Pennsylvania rendered an
opinion stating:

> One might expect that when seeking [to disenfranchise almost seven million
> voters], a plaintiff would come formidably armed with compelling legal
> arguments and factual proof of rampant corruption, such that this Court
> would have no option but to regrettably grant the proposed injunctive relief
> despite the impact it would have on such a large group of citizens.
>
> That has not happened.  Instead, this Court has been presented with
> strained legal arguments without merit and speculative accusations, unpled
> in the operative complaint and unsupported by evidence.

*Donald J. Trump for President, Inc., et al. v. Boockvar, et al.*, No. 4:20-cv-02078-
MWB, at Dkt. No. 202, p.2 (M.D. PA. Nov. 21, 2020).  In review of this opinion, Judge
Bibas, writing the Third Circuit's unanimous opinion on November 27, 2020,
summarized the Court's ruling as follows:

> Free, fair elections are the lifeblood of our democracy.  Charges of
> unfairness are serious.  But calling an election unfair does not make it so.
> Charges require specific allegations and then proof.  We have neither here.

*Donald J. Trump for President, Inc., et. al. v. Sec'y Commonwealth of Pennsylvania, et.
al.*, No. 20-3371, * 2 (3rd Cir. Nov. 27, 2020).

---

[50] *See e.g.*, *Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 84, p.28
(concluding "[n]ot only have Plaintiffs failed to provide the Court with factual support for their
extraordinary claims, but they have wholly failed to establish that they have standing for the Court to
consider them.  Allegations that find favor in the public sphere of gossip and innuendo cannot be a
substitute for earnest pleadings and procedure in federal court.").

**B.**     *Oltmann fabricated a conspiracy.*

51.     Joseph Oltmann is a political activist and supporter of President Trump with ambitions of creating a political movement.[51]  Oltmann formed a nonprofit organization, FEC United, allegedly to restore and secure constitutional protections he perceived as under attack, which includes a paramilitary civilian defense group.[52] FEC United has hosted rallies for armed civilians to gather, as well as political events on behalf of the Colorado Republican Party and the Trump Campaign.[53]  By way of example, FEC United reportedly solicited its members to sign up for the "Army for Trump" poll watcher program before the election, claiming that "Democrats have been actively stacking the poll-watching positions with their own people, and this will only contribute to the fraud . . . Join Our Election Day Team!"[54]  Upon information and belief, Oltmann also owns a business, Shuffling Madness Media, Inc., which registered the trade name

---

[51] *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 2, 2020) (In response to lawsuits brought by President Trump, "[w]e do this without the wlae ass Republican traitors."); (Dec. 4, 2020) ("It's time we turn out the corrupt government and weaponized media and tech companies.  This is our country . . . #reckoning #ericcoomerisatraitor #dominionvotingsystems); (Dec. 6, 2020) ("I will love my neighbors after I beat their ass and stop this evil indoctrination and cancer on our community . . . I punched one of these asshats in the face and defended our country"); (Dec. 7, 2020) ("I am angry we are where we are and we allowed the loony left to even get their claws of deceit and despair into the fiber of our country. I am disappointed we let the evil left remove God from our schools and communities without a bigger fight . . . Pray for our country.  Pray for our President.  Pray for our leaders that they can have courage.  Pray for the warriors of our nation that will stand up for you.  God bless you all.  We will not surrender and we will never retreat."); (Dec. 10, 2020) ("Pray for our country and that our Supreme Court has the courage to reject the evil we face."); (Dec. 12, 2020) ("Now we got to war as the people . . . the deep state runs deep. Evil at work . . .").

[52] *See* FEC United, *Defend the American Way of Life,* https://fecunited.com (last visited Feb. 4, 2021); United American Defense Fund, *Defend and Protect What Is Ours*, https://fecunited.com/uadf/ (last visited Feb. 4, 2021).

[53] *See* Erik Maulbetsch, *Conservative Group Behind the Deadly "Patriot Muster" Rally Working Closely With Colorado GOP*, COLO. TIMES RECORDER, Oct. 12, 2020, https://coloradotimesrecorder.com/2020/10/conservative-group-behind-deadly-patriot-muster-rally-working-closely-with-colorado-gop/31445/ (last visited Feb. 4, 2021).

[54] *See id.*

and upon information and belief operates under the Conservative Daily.  Oltmann serves

as a co-host of the Conservative Daily Podcast under the name Joe Otto with videos also

posted on Conservative Daily's YouTube channel.

    52.    After the results of the election were called for President Joe Biden,

Oltmann co-hosted a Conservative Daily Podcast.[55]  On that podcast, he alleged to have

learned almost two months earlier of a conspiracy to elect the president of the United

States.  Oltmann claimed he gained this information after infiltrating Antifa.  Despite his

interest in the election and prolific podcasting schedule, Oltmann apparently took no

action at that time to report this alleged threat to democracy.[56]  Waiting until November 9,

2020, Oltmann began this podcast, saying:

> Let's not sugar coat this, we're going to expose someone inside of Dominion
> Voting Systems specifically related to Antifa and related to someone that is
> so far left and is controlling the elections, and his fingerprints are in every
> state.  So I want you guys to understand that what we're about to show you,
> you have to share . . . The conversation will be about a man named Eric
> Coomer.  C-O-O-M-E-R.

Oltmann then posted a photo of Dr. Coomer's face.  Oltmann explained he had allegedly

"infiltrated an Antifa conference call" sometime in late September with unknown and

unverified participants.  Oltmann claimed while on this purported call one of these

unknown participants was referred to as "Eric" and another allegedly explained "Eric is

the Dominion guy."  Oltmann claimed when another unknown participant asked, "What

---

[55] Joseph Oltmann, et al., *Ep. 196—Dominion Voting Systems*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020).

[56] The Conservative Daily Podcast posted fifty podcasts from September 1, 2020 to November 9, 2020. *See id.*; *see also* Joseph Oltmann, et al., *Ep. 146—Someone Stole My Trump Sign (And I'm Pissed)*, CONSERVATIVE DAILY PODCAST (Sept. 1, 2020).

are we gonna do if f-ing Trump wins?" the unknown "Eric" responded, which Oltmann paraphrased as, "Don't worry about the election, Trump is not gonna win.  I made f-ing sure of that.  Hahahaha."  Afterwards, Oltmann's alleged efforts to identify the unknown speakers of this purported call were limited to googling "Eric," "Dominion," and "Denver, Colorado."[57]  With this, Oltmann claimed he identified Dr. Coomer and Dominion Voting Systems, Inc.[58]  At no point has Oltmann contacted Dr. Coomer to confirm his involvement in this purported call.

53.  Only after President Trump had lost the presidential election did Oltmann allegedly remember Dr. Coomer and take steps to target him.  Oltmann had conceived a storyline about the election—that its results were fraudulent—and consciously set out to establish that Dr. Coomer perpetuated this fraud.[59]  This included accessing Dr. Coomer's

---

[57] In a subsequent interview, Oltmann explained, "So it was really simple.  This is what I did, right.  I put in 'Eric,' into google search, 'Eric,' 'Dominion,' 'Denver, Colorado.' Not very clever, right?"  *See* Michelle Malkin, *#MalkinLive: U.S. Elections*, YOUTUBE (Nov. 13, 2020).

[58] Oltmann provides no explanation for how he understood "Dominion" to mean "Dominion Voting Systems, Inc." and not any of the number of other Dominion-named businesses and locations in Colorado, including, but not limited to: Old Dominion Freight Line; Dominion Life Church; Dominion Realty Group; Dominion Water & Sanitation District; either of the two Dominion Towers constituting Dominion Plaza; Dominion Mortgage; and Dominion Carpet Cleaning Inc.

[59] Oltmann has a history of advancing varying allegations of voter fraud to support his political beliefs and his preferred candidates as well as to promote himself and his businesses interests.  *See e.g.*, Erik Maulbetsch, *Conservative Group Behind the Deadly "Patriot Muster Rally Working Closely With Colorado GOP*, COLO. TIMES RECORDER, Oct. 12, 2020 (FEC United alleging election fraud); Joseph Oltmann, et al., *Ep. 151–Voter Fraud is Real*, CONSERVATIVE DAILY PODCAST (Sept. 9, 2020) (separate allegations of election fraud); *Ep. 126–GOP Caving to Pelosi's Cheat-By-Mail Demands,* CONSERVATIVE DAILY PODCAST (Aug. 5, 2020) (separate allegations of election fraud).  Shortly after the election, Oltmann's baseless allegations of fraud continued to evolve across various theories until coalescing into his false statements against Dr. Coomer.  *Compare* Joseph Oltmann, et al., *Ep. 193–Democrats Just Got Caught*, CONSERVATIVE DAILY PODCAST (Nov. 5, 2020) (separate allegations of election fraud), *Ep. 194–How Democrats Stole It* CONSERVATIVE DAILY PODCAST (Nov. 6, 2020) (separate allegations of election fraud), and *Ep. 194–How Democrats Stole It (Part 2)*, CONSERVATIVE DAILY PODCAST (Nov. 6, 2020) (separate allegations of election fraud), *with Ep.196–Dominion Voting Systems*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) ("we're doing a deep dive on Dominion Voting Systems, all the stuff we're seeing with Scorecard, with Hammer, big tech as a whole.").  Oltmann ultimately utilized these false allegations for personal gain.  On November 5, 2020, the Conservative Daily podcast informed its viewers it was the "#119 most popular political podcast in

private Facebook profile. Finding no credible evidence of Dr. Coomer's involvement in the purported "Antifa Conference Call," Oltmann, instead, used posts on Dr. Coomer's Facebook profile that were critical of President Trump to allege he was the anonymous "Eric." Having no credible evidence of voter fraud, Oltmann used Dr. Coomer's position and employment with Dominion to allege Dr. Coomer was a key figure in a high-level conspiracy to rig the election against President Trump.[60] These statements are baseless and unequivocally false. Dr. Coomer has no knowledge of this alleged "Antifa Conference Call;" Dr. Coomer did not participate in such an alleged call; Dr. Coomer did not make the comments Oltmann alleged were made; and Dr. Coomer did not take steps to subvert the results of the presidential election.

54.     In reality, Dr. Coomer, like many, had a private Facebook page that he shared with approximately 300 friends. He shared political views and was critical of President Trump. He shared satire, that Oltmann intentionally disregarded and held out as true. None of it was public. It is unclear how Oltmann came into possession of it.

_____

America," on November 6, 2020 it informed them it was then the "#108 most popular political podcast," on November 9, 2020 it was "#66," on November 10, 2020 it was "#62," November 14, 2020 it was "#53," on November 19, 2020 it was "#28," on December 2, 2020 it was "#8."

[60] *See* Joseph Oltmann, et al., *Ep. 196—Dominion Voting Systems*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) ("It's not admitting it's vulnerable, it's actually creating the vulnerability so that it can actually be manipulated, and that's what's happened here, Max. That's what's happened here. You have a guy that literally is a fanatic. He's on calls, he's taking time in the middle of an election season to get on a call. Three weeks before an election. Three weeks before the election! He's getting on the phone and he's saying very clearly that 'I have it handled.' And he runs product strategy and security. We're not talking about someone that is at a low level, that has an opportunity to just - He's in everywhere you look!"); Wake Up with Randy Corporon, Nov. 14, 2020, 710 KNUS (Corporon: "Joe, what you have done and exposed may save the republic, or at least save the possibility of having an honest outcome to this election. People's heads roll up and they say, okay, maybe there were a few machines that made a mistake or whatever. You have exposed the Antifa basis to the man who has the knowledge and the influence on this company that has these machines and this software in battleground states around the country." Oltmann, in agreement: "Everywhere across the country, Eric Coomer is in every state. He is the one actually presenting that. He is the cog to the wheel."); *see also infra* § IV(C).

55.     More importantly, Dr. Coomer's professional life was separate from his personal political opinion.  Dr. Coomer did not participate in political groups and did not donate to campaigns.   Dr. Coomer worked with elections officials—Republican, Democratic, and independent—across the country to make sure the process was safe, secure, and fair.  The ability to have a political opinion in this country is a protected right. It remains a protected right, even if critical of a sitting president.  That criticism does not denote conspiracy or fraud.

## C.     *Defendants spread the conspiracy.*

56.     Oltmann began spreading his baseless allegations.[61]  Defendants seized on Oltmann's statements to promote a conspiracy of election fraud.   At the same time Defendants began to use Oltmann as a source for their reporting, Twitter suspended his account.  This suspension was related to Oltmann's attempts to spread false allegations and threats about Dr. Coomer.[62]

57.     On November 13, 2020, Gateway Pundit published an article by James "Jim" Hoft to its website with the headline: "Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote."[63]   In this article, Hoft and Gateway Pundit developed Oltmann's story by adding photo and video, additional context, and links to ostensibly

---

[61] On December 6, 2020 alone, Oltmann claimed he had "been busy doing 15 interviews in the last 2 days." *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020).

[62] Oltmann explained after sharing an alleged photograph of Dr. Coomer's house, "I have been kicked off of Twitter for exposing Eric Coomer."  *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020).

[63] Jim Hoft, THE GATEWAY PUNDIT, Nov. 13, 2020.

related content.  They rely on Oltmann as a source of information to report on Dr. Coomer and Dominion, asserting:

> Joe Oltmann did a deep dive on Dr. Eric Coomer who is responsible for the strategy and Security of Dominion Voting Systems.  Oltmann posted a Facebook post by Coomer from June.  Dr. Coomer retweeted the "Antifa" manifesto letter to President Trump.  Needless to say Dr. Coomer is NOT a Trump supporter!

58.    Also on November 13, 2020, Michelle Malkin[64] hosted an interview with Oltmann, who was identified as a representative of FEC United, on her personal YouTube channel, #MalkinLive, which has approximately 100,000 subscribers.[65]   During the MalkinLive interview, Oltmann again falsely alleged that Dr. Coomer was an anonymous Antifa activist on a purported call Oltmann claimed to have infiltrated well before the election.[66]  Yet only after the presidential election did Oltmann allegedly determine from this call that Dr. Coomer subverted the election to elect Joe Biden.[67]   Malkin published these false statements despite their inherent improbability, the unreliability of her source, and the lack of credible evidence in support of these allegations.  Malkin had no credible evidence that an "Antifa conference call" actually happened; that Dr. Coomer was present

---

[64] Notably, Malkin joined Newsmax in May 2020 as a political contributor and host of a Newsmax television show, Michelle Malkin Sovereign Nation.  *See* Bill Hoffmann, *Acclaimed Journalist Michelle Malkin Joins Newsmax TV*, May 21, 2020; *see also* Newsmax TV, Hosts, https://www.newsmaxtv.com/host-bios (last visited Feb. 4, 2021).

[65] Michelle Malkin, *#MalkinLive: U.S. Elections*, YOUTUBE (Nov. 13, 2020).  In this interview, Malkin identified Oltmann as Colorado businessman and founder of FEC United.  Oltmann explained why he formed FEC United, spoke on behalf of FEC United during the interview, and promoted FEC United with a large banner across the screen reading, "For more info: FECUnited.com."

[66] Oltmann admitted in this interview his efforts to infiltrate Antifa stemmed from his belief they were conspiring against him, saying "So these journalists started attacking me. . . I wanted to know why . . . So I set out to uncover Antifa within the journalist community.  *See id.*

[67] Oltmann explained to Malkin that his investigation of this purported call was premised on a Google search and premised on unknown and unverified speakers, stating "somebody named Eric came on . . . someone says who's Eric . . . and someone answers."  *Id.*

on the call; that the comments attributed to Dr. Coomer were actually spoken; and that the alleged election fraud actually occurred. Malkin took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary.[68] At one point in the interview, Oltmann rhetorically directed his commentary to Dr. Coomer, and said:

> You're either the one who is responsible for it, which is what it looks like, or you have other people that need to take the fall with you, and that might lessen the opportunity for you to get the death penalty, because frankly, I think the treason is punishable by death.

Following this interview, Malkin began publishing additional false statements in tweets, promoting her interview of Oltmann and the allegations of fraud to her followers[69] as well as additional broadcasts with Oltmann.[70] Like Oltmann, Malkin conceived a story that

---

[68] Malkin also has a history of advancing varying allegations of voter fraud to support her political beliefs and her preferred candidates as well as to promote herself and her businesses interests. *See e.g.*, Michelle Malkin, *Who's Funding Shady Ballot Harvesting Schemes,* RASMUSSEN REPORTS, Sept. 30, 2020 (separate allegations of voter fraud); *Out of the Shadows . . . and Into the Voting Booth*, RASMUSSEN REPORTS, Dec. 18, 2019 (separate allegations of voter fraud). Malkin is also an admitted supporter of President Trump. *See, e.g.*, Michelle Malkin, *No Time for Phony Healing*, RASMUSSEN REPORTS, Nov. 11, 2020 ("We, the 71 million Americans who voted to reelect Donald J. Trump, do not surrender.").

[69] Michelle Malkin (@michellemalkin), TWITTER (Nov. 13, 2020, 12:43 PM) ("Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop hatred-inciting rants of #EricCoomer, VP of strategy/security of Dominion Voting Systems. 'What if I told you he is a major shareholder' in Dominion & 'owns patents associated with other voting systems?' #MalkinLive."); (Nov. 13, 2020, 12:46 PM) ("Full interview with #joeoltmann on #ericcoomer #dominion here ==>"); (Nov. 13, 2020, 2:31 PM), ("What are they trying to hide? #DominionVotingSystems."); (Nov. 15, 2020, 12:09 PM) ("ICYMI – Dominion, Antifa & #EricCoomer exposed by Joe Oltmann on #MalkinLive last week. Joe was suspended by Twitter but you can find him on @parler."); (Nov. 16, 2020, 12:29 PM) ("ICYMI: #ExposeDominion #WhoIsEricCoomer #JoeOltmann Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath -- His Internet Profile is Being Deleted and Erased (AUDIO)."); (Nov. 16, 2020, 12:29 PM) (commenting with the hashtags "#ExposeDominion" and "#WhoIsEricCoomer."); (Nov. 19, 2020, 12:19 PM) ("In case you missed it: My interview with #JoeOltmann from six days ago exposing #EricCoomer #Antifa #ExposeDominion.").

[70] In a broadcast of Sovereign Nation on Newsmax, Malkin conducted another interview with Oltmann on November 28, 2020. Malkin's broadcast compared allegations of voter fraud in the Philippines allegedly using Smartmatic with allegations of voter fraud in the United States allegedly with Dr. Coomer and Dominion:

the results of the election were fraudulent and consciously set out to establish that Dr. Coomer did in fact subvert the election and perpetuate this fraud.

59. Similarly, Eric Metaxas hosted an interview with Oltmann, who was again identified as a representative of FEC United, on his radio talk show and podcast on November 24, 2020.[71] This interview was also published on Metaxas's YouTube channel,

---

Malkin: Well, evading scrutiny seems to be part of the vote hacking playbook. Last week, Dominion officials bailed out of a state legislative hearing in battleground Pennsylvania . . . Who has control over our elections? Who has *dominion* over our votes? Is it we the people, or is it the electronic voting oligarchs? Without full election transparency, there can be no election peace. Next up, Denver businessman Joe Oltmann joins me to discuss his shocking discoveries about Dominion Vice President of Strategy and Security Eric Coomer, plus much more. Stay tuned . . . I want you to tell our audience at Sovereign Nation who exactly Eric Coomer is, and why it matters in these ongoing battles against election fraud across the country . . .

Oltmann: Eric Coomer is the Director of Strategy and Security for Dominion Voting Systems. He is also affiliated with or a part of the Antifa movement. Frankly, he has the ability, he has a doctorate in nuclear physics, and has the ability to put his finger on the scale and has, I believe, put his finger on the scale of our election across the country . . .

Malkin: In the course of the work you do, political activism and research, back in October, you happened to be on a phone call of local Denver area Antifa organizers, and that's where you heard the name Eric Coomer. Tell us what you heard on that phone call.

After Oltmann alleged to have heard an unidentified third party refer to another unidentified third party only as "Eric" and from this falsely allege that Dr. Coomer was part of an Antifa conspiracy to fraudulently elect the President of the United States:

Malkin: The reason why this is so alarming, and it's obvious, but it should be spelled out, is that this is one of the highest-ranking officials at Dominion Voting Systems, which has penetrated our election system across the country and of course, around the world . . .

Oltmann: He truly is the mastermind . . .

Malkin: As a reward for the whistleblowing and the recording that you've done, you were banned on Twitter, or suspended. Tell us about that . . .

Oltmann: I decided I was going to come forward, put all of the information forward, call out Eric Coomer specifically. As soon as I did that, you caught wind of the story, you posted it, people started following me on Twitter, I started releasing even more information that I had, and Twitter came back and said that I had multiple Twitter accounts that I was using to harm others.

*See* Sovereign Nation with Michelle Malkin, *Hacking the Vote*, NEWSMAX, Nov. 28, 2020.

[71] Eric Metaxas, *Joe Oltmann*, THE ERIC METAXAS SHOW PODCAST (Nov. 24, 2020).

The Eric Metaxas Radio Show, which has approximately 185,000 subscribers.[72]  During

the Metaxas interview, Oltmann again falsely alleged that Dr. Coomer was an anonymous

Antifa activist on a purported call Oltmann claimed to have infiltrated well before the

election.[73]  And again allegedly determined from this call that Dr. Coomer subverted the

presidential election.[74]  Metaxas also published these false statements despite their

---

[72] The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020).  In this interview, Oltmann was identified as a Colorado businessman and founder of FEC United.  Oltmann explained why he formed FEC United and spoke on behalf of FEC United during the interview.

[73] Oltmann admitted in this interview his efforts to infiltrate Antifa stemmed from his belief that Antifa journalists were conspiring against both him and FEC United following his efforts to reopen small businesses in Colorado last September.

[74] Oltmann explained to Metaxas in this interview that his investigation of this purported call was premised on a google search and premised on unknown and unverified speakers in the purported call, stating "This guy named Eric started talking, and then somebody asked who Eric was.  And they said, 'Eric's a Dominion guy.'"  Despite this, Metaxas took no actions or efforts to corroborate or verify the baseless allegations before publishing them.  Instead, Metaxas perpetuated these false allegations of voter fraud:

> Metaxas: He's a PhD in nuclear physics, so this is a super brilliant guy, Director of Strategy and Security.  Now, when you're talking about Dominion Voting Systems, there is no higher level of security necessary, it's like the guy who we had on this program recently who created the anti-fraud system for eBay.  I mean, this is top, top, top level coding and that stuff.  So this guy, Eric Coomer, this genius, you discover was the guy who said on this Antifa call "don't worry about Trump, there's no way he's going to win."

> Oltmann: Yeah.  And I've also tied him to Our Revolution, the movement . . .  We were dealing with a person that could put his finger firmly on the American voice, and tip scale of the election very easily, and frankly that he was doing it.

> Metaxas: When you're smart enough to get a Ph.D. in nuclear physics, it reminds me of the Unabomber.  There are some people that uh, their learning, or rather their brains will flirt with insanity and violence.  It sounds like you're dealing with somebody who at least begins to fall into that category.  We know that Antifa is evil, that they are anti-American, that they are effectively Marxist shock troops at this point.  But to have a man with this kind of power, the Director of Strategy and Security at Dominion, *huge*, powerful, international company.  This is big news . . . I mean, this is globalist stuff.  This is everybody's worst nightmare of deep state, George Soros.  The idea that a man of this level, at a place like Dominion, which is operating all around the globe in elections, which got started in Venezuela, that somebody like that who despises America.  You know, if you despise America, by definition, you become allied with these globalist forces, which are effectively fascist, Marxist, you know.  That this guy has this kind of power, I mean, it's scary, even just having this conversation with you and thinking about this . . . The idea, the *idea*, that anyone would *dare* to try to mess with our elections, many patriots have died, suffered and died, so that we can have what we have.  I cannot think of anything more despicable and more worthy

inherent improbability, the unreliability of his source, and the lack of credible evidence in support of these allegations. Metaxas also had no credible evidence that an "Antifa conference call" actually happened; that Dr. Coomer was present on the call; that the comments attributed to Dr. Coomer were actually spoken; or that the alleged election fraud actually occurred. Metaxas also took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary. Following this interview, Metaxas, like Malkin, published additional false statements in tweets, promoting his interview of Oltmann[75] and additional interviews perpetuating these allegations of fraud to his followers.[76] Like

---

of our doing everything we can, including give our lives if necessary, to fight for this, and so that's why I'm so glad to be speaking with you and getting this information out. . . Eric Coomer, has he gone into hiding? What is he thinking? Does he know that he's going to go to prison for the rest of his life?

Oltmann: This isn't all made up, this isn't hyperbole that we're just throwing out there. This is absolute fact.

Metaxas responded: Well there's levels of stupidity and evil, and we know that not everybody is on the same level. There are some people that just hate Trump, but then there are other nefarious actors, like Mr. Coomer and others. It's hard to know what to say other than there's wickedness, there's evil here. Because nothing that they're doing, even if you hate Trump, I have many friends who hate Trump, but they would never do what we're talking about. What we're talking about is evil. In fact, Let's just say this, it's extremely criminal, and these folks know they're going to go to jail for the rest of their lives. It doesn't matter how rich or smart they are. They are in the process of being caught, thanks to God, because you just stumbled across this, God chose you to stumble across this to get this information out. I'm very encouraged by your mere existence, Joe Oltmann.

*See* The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020).

[75] Eric Metaxas (@ericmetaxas), TWITTER (Nov. 24, 2020, 5:26 PM) ("Today Joe Oltmann explained how after infiltrating Antifa he bumped into someone working w/them named Eric Koomer [sic] – who was the head of Security and Safety at #Dominion – and who PROMISED the Antifa folks that 'effing' Trump WOULD NOT WIN! Please RT.").

[76] Eric Metaxas (@ericmetaxas), INSTAGRAM (Nov. 16, 2020) ("Sidney Powell talks to Lou Dobbs about the Dominion Voting Systems on Fox. Release the Kraken!"); The Eric Metaxas Radio Show, *John Zmirak Shares His Personal Knowledge of the "Authenticity" of Sidney Powell's Investigation*, YOUTUBE (Nov. 20, 2020); The Eric Metaxas Radio Show, *Eric Examines Sidney Powell Investigation*, YOUTUBE (Nov. 23, 2020); Eric Metaxas, *Joe Oltmann*, THE ERIC METAXAS SHOW PODCAST (Nov. 24, 2020); Eric Metaxas, *Joe*

Oltmann, Metaxas conceived of a story that the results of the election were fraudulent and consciously set out to establish that Dr. Coomer perpetuated this fraud.[77]

60.     On November 14, 2020, Gateway Pundit began publishing successive articles written or edited by Hoft based and built upon Oltmann's false allegations. Gateway Pundit and Hoft asserted, "Oltmann said that as the conversation continued, someone asked, 'What are we gonna do if F*cking Trump wins?' Oltmann paraphrased how Eric (the Dominion guy) responded, 'Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!'"[78]     Gateway Pundit repeatedly identified

---

*Oltmann*, THE ERIC METAXAS SHOW PODCAST (Nov. 25, 2020); The Eric Metaxas Radio Show, *Kevin McCullough Has Late-breaking News About the Ownership Of Dominion Voting Machines (It's China)*, YOUTUBE (Dec. 3, 2020); The Eric Metaxas Radio Show, *Charlie Kirk Asks Eric Where We Stand As a Nation Right Now & Eric Shares A Christmas Miracle Story*, YOUTUBE (Dec. 9, 2020); The Eric Metaxas Radio Show, *Eric Presents Steve Bannon From Sunday Night's "Prayer Call" | Steve Shares Trump's Path to Victory*, YOUTUBE (Dec. 21, 2020); Eric Metaxas (@ericmetaxas), TWITTER (Jan. 4, 2021, 2:22 PM) ("WATCH! Here's @SidneyPowell1 talking about the election fraud from last night's prayer meeting . . ."); Eric Metaxas, *Mike Lindell*, THE ERIC METAXAS SHOW PODCAST (Jan. 18, 2021).

[77] Metaxas has advanced varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote his businesses interests. *See e.g.*, The Eric Metaxas Radio Show, *Attorney Jenna Ellis—On Democrats Changing Election Laws for the 2020 Election*, YOUTUBE (May 11, 2020); Eric Metaxas (@ericmetaxas), TWITTER (Nov. 7, 2020, 4:35 PM) (in response to President Trump's allegations of voter fraud to observers and mail-in-ballots, "If an election bears signs of fraud—so that the will of the people was thwarted—it is not an official election.  STAY TUNED.  And pray.  This is absolutely not over, despite what some seem to think.  The American people will not roll over.").

[78] *See* Jim Hoft, *Report: Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online*, THE GATEWAY PUNDIT, Nov. 14, 2020; *Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile Is Being Deleted and Erased (AUDIO)*, THE GATEWAY PUNDIT, Nov. 16, 2020 ("Oltmann told The Gateway Pundit he believes Eric Coomer is mentally ill and a sociopath."); Jim Hoft, *WAKE UP AMERICA! Bold Billionaire Offers $1 Million Bounty for Dominion, Eric Coomer's Comeuppance*, THE GATEWAY PUNDIT, Dec. 28, 2020 (After referencing a reward posted on another website by Greek billionaire Alki David for proof that Dominion and Dr. Coomer produced fraudulent votes in the 2020 election, stating "We know that Dominion is one of the companies accused of massive fraud in numerous lawsuits around the country stemming from the 2020 election. But who is Eric Coomer? . . . Eric Coomer is an alleged PhD who allegedly worked for Dominion . . . As an employee of Dominion, he seemed to be fairly integral.  In fact, he seems to have designed several voting machine patents beginning in 2011, at least some of which belonged to dominion but now belong to China's HSBC as of last year . . . An affidavit from Trump Lawsuit highlighting Coomer's Dominion Patent, now alleged to belong to China . . . He also can be seen in training videos explaining to users 'adjudication' functions on the vote machine that could allegedly be used to alter votes, singularly or in bulk, if a nefarious user chose to do so.  It is also alleged that he or Dominion performed

Oltmann, a "Denver business owner" and "founder of FEC (Faith Education Commerce) United," as the source of its articles about Dr. Coomer and Dominion, stating:

> The Gateway Pundit's Jim Hoft interviewed Denver business owner Joe Oltmann on Sunday. Oltmann, the founder of FEC (Faith Education Commerce) United, revealed how he infiltrated Antifa and how during a conversation with Antifa members, he discovered "Eric from Dominion" was allegedly part of a chat during the week of September 27, 2020.

After indelibly linking Dr. Coomer and Dominion to false allegations of voter fraud, Gateway Pundit and Hoft proceeded to release additional articles alleging the means with which such fraud occurred.[79] Similarly, Gateway Pundit and Hoft took no efforts to verify or corroborate these false allegations. Gateway Pundit and Hoft equally had no credible evidence of any "Antifa conference call;" that Dr. Coomer was part of this purported call; or that Dr. Coomer committed election fraud. Gateway Pundit and Hoft also took no actions or efforts to corroborate or verify the baseless allegations before publishing them

---

illegal un-certified updates to possibly 1000s of Georgia election machines just days before the election . . . Coomer and Dominion Voting Systems are also allegedly threatening hefty lawsuits against all websites and news agencies who dare to speak out against their alleged massive national (and possibly international) scheme to allegedly rig our alleged elections. That is why we all must be very careful about what we say about Dominion and The Great and Powerful Eric Coomer.").

[79] *See* Jim Hoft, IT WAS SYSTEMIC-PURPOSEFUL FRAUD: *Clark County Nevada Dominion Machines ALSO Kicked out "About 70% of Ballots" – It Was in the Settings!*, THE GATEWAY PUNDIT, Dec. 15, 2020 ("The Dominion machines were set up to dispute 68.05 percent of all ballots. These ballots were then sent off to 'another location' where people in other locations could change the votes. This election is a fraud."); Jim Hoft, *New Video Shows Dominion's Eric Coomer Admitting Their Voting Machine Systems Are Wireless and Support All Networks*, THE GATEWAY PUNDIT, Jan. 3, 2021; Joe Hoft, *Report: Georgia Secretary of State Brad Raffensperger Neglected to Protect Georgians By Allowing Dominion Voting Machines in Elections – He Didn't Prevent Fraud – He Provided for It*, THE GATEWAY PUNDIT, Jan. 4, 2021; Joe Hoft, *New Detailed Inventory on Election Fraud in the 2020 Election by Deroy Murdock Provides Strong Evidence on President Trump's Performance in All the Swing States and Overall Race*, THE GATEWAY PUNDIT, Jan. 9, 2021 ("Everyone knows the results of the 2020 election are invalid. Even the corrupt politicians who ignored the fraud."); Joe Hoft, *Accurate List of 2020 Election Fraud Cases Shows 81 Cases Total, 30 Still Active – And NOT ONE SINGLE COURT Has Allowed Evidence to be Argued*, THE GATEWAY PUNDIT, Jan. 24, 2021 ("The 2020 election will go down as arguably the greatest fraud in world history. The tremendously popular incumbent candidate, President Trump, was easily winning the race on election night *in a landslide* and then suddenly multiple states took a break, quit counting, and by the end of the week the election was flipped to Joe Biden.").

and disregarded reliable sources establishing the contrary. Oltmann has admitted there is no recording of this call.[80] Gateway Pundit and Hoft knowingly and recklessly published these false statements despite their inherent improbability, the unreliability of the source, and the lack of credible evidence. Gateway Pundit and Hoft made these false statements to support their preconceived conspiracy that the election was fraudulent.[81]

61. On November 17, 2020, OANN Chief White House Correspondent Chanel Rion published false statements regarding Dr. Coomer, tweeting "Dominion Director of Strategy and Security, #EricCoomer: 'Trump won't win. I made F***ing sure of that.'"[82] As a representative of OANN and national broadcast reporter, Rion has a Twitter following of roughly 588,000 people with followers across the United States, including those in Colorado. Rion's November 17 tweet referencing Dr. Coomer garnered more than 40,000 likes. OANN and Rion went on to broadcast false allegations of the statements and actions Oltmann attributed to Dr. Coomer of election fraud, including a three-part report focusing on Dominion and Dr. Coomer, which President Trump

---

[80] *See* Joseph Oltmann, et al., *Ep. 196–Dominion Voting Machines*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) (In response to the statement "but we don't have a recording," Oltmann stated "[i]t doesn't matter if I don't have it recorded.").

[81] Gateway Pundit and Hoft have a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests. *See* Joe Hoft, *ROGER STONE EXCLUSIVE: How the Democrats Plan to Steal the 2020 Election*, THE GATEWAY PUNDIT, October 31, 2020; Joe Hoft, *2020 Election Prediction: Despite Massive Headwinds and Democrat Attempts to Steal Election, President Trump Will Win in Larger Landslide than 2016*, THE GATEWAY PUNDIT, October 23, 2020; Cassandra Fairbanks, *4Chan Users Claim To Have Found Way To Easily Change People's Voter Registration and Cancel Ballots Online in Washington and Oregon*, THE GATEWAY PUNDIT, October 18, 2020; Joe Hoft, *ELECTION FRAUD: Pennsylvania Rejects 334,000 Duplicate Ballots Already; Kentucky Reports Bins of Ballots Discarded*, THE GATEWAY PUNDIT, October 17, 2020.

[82] Chanel Rion OAN (@ChanelRion), TWITTER (Nov. 17, 2020, 8:35 AM).

retweeted to his followers.[83]  Given OANN and Rion's coverage of President Trump and the Trump Campaign, the President had increasingly promoted their reporting.[84] President Trump at that time had a national audience of over 88,000,000 followers on Twitter, including upon information and belief a substantial number of Colorado residents.  After linking Dr. Coomer and Dominion to false allegations of voter fraud, OANN continued to perpetuate allegations of systemic voter fraud.[85]  Similarly, OANN and Rion took no efforts to verify or corroborate these false allegations before publishing them and disregarded reliable sources establishing the contrary.  They had no credible evidence of any "Antifa conference call;" that Dr. Coomer was part of this purported call;

---

[83] *See* Chanel Rion, *Dominion-izing the Vote*, YOUTUBE (Nov. 21, 2021) (saying "In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters.  What does he mean when he says 'Trump won't win.  I made f-ing sure of that.'  Nothing?"); *Top Dominion Exec: Trump Is Not Going to Win.  I Made F\*\*ing Sure of That*, Nov. 29, 2020, YOUTUBE (publishing Oltmann saying "Eric Coomer was this, you know, he's not just Antifa, he was responsible for putting his finger on the scales of our election" and adding "If Coomer is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason.  Unfortunately, the question is, will the FBI step up to investigate?"); *see also* Donald J. Trump (@realDonaldTrump), TWITTER (NOV. 18, 2020, 11:41 PM), (Nov. 21, 2020, 10:30 PM), (Nov. 21, 2020, 10:31 PM), and (Nov. 21, 2020, 10:32 PM).

[84] Margaret Sullivan, *When Fox News disappoints, Trump has a backup: the conspiracy theory-peddling OANN*, WASH. POST, June 10, 2020, https://www.washingtonpost.com/lifestyle/media/when-fox-news-disappoints-trump-has-a-backup-the-conspiracy-peddling-oann/2020/06/10/c2a6ec8e-ab1f-11ea-9063-e69bd6520940_story.html (last visited Feb. 4, 2021); Jason Wilson, *OANN: what is the alternative far-right media outlet Trump is pushing?*, GUARDIAN, Nov. 16, 2020, https://www.theguardian.com/us-news/2020/nov/16/oann-what-is-tv-network-trump-is-pushing (last visited Feb. 4, 2021).

[85] Upon information and belief, OANN published several false statements of voter fraud relating to Dominion, which OANN had directly linked to Dr. Coomer, across various segments, including but not limited to: In Focus, *Former U.S. Attorney, Joe DiGenova, On the Growing Evidence of Voter Fraud*, OANN, Nov. 20, 2020 (Identifying Joe DiGenova as counsel for the Trump Campaign, publishing false allegations of voter fraud involving Dominion, including bulletins stating "Trump Campaign Building on 9 Key Points All Pointing to Election Fraud"); OAN News 8 AM, *Voting Fraud: Trump Legal Team Presents 'Clear and Viable' Path to Victory*, OANN, Nov. 20, 2020 (publishing false allegations that Sidney Powell was "making the case" for voter fraud, that Dominion and Smartmatic software was linked, and that real time data showed irregularities with Dominion voting machines); *Syndey* [sic] *Powell Launches Election Lawsuits in Michigan, Georgia*, OANN, Nov. 28, 2020 (publishing false allegations of voter fraud using Dominion's software programs); *President Trump's Path to Re-Election*, OANN, Dec. 21, 2020 (publishing allegations in support of false statements regarding voter fraud); *George Soros-Linked Election Software Company Denies Ties with Dominion*, Dec. 21, 2020 (publishing allegations in support of false statements regarding voter fraud so as to link Dominion, Smartmatic, and George Soros).

37

or that Dr. Coomer committed election fraud. Instead, like other Defendants, OANN and Rion knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[86]

62. Newsmax also began publishing false statements regarding Dr. Coomer. On November 17, 2020, Newsmax aired an episode of "American Agenda" that identified Dr. Coomer by name in relation to allegations of voter fraud with election equipment for Dominion and Smartmatic, a competitor of Dominion, alongside alleged conspiratoral connections with the 90-year-old Hungarian philanthropist George Soros.[87] Newsmax suggested nefarious intent when noting that Dominion had "scrubbed [Dr. Coomer] from their website." In reality, Dr. Coomer had not been on Dominion's website for years and Dominion employees' identities were removed from third party marketing sites as an essential safety precaution given the numerous death threats already targeting them. On

---

[86] OANN has a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests. *See* OANN Newsroom, *Several States Investigating Accounts of Mail-In Voter Fraud*, OANN, Sept. 27, 2020; OANN Newsroom, *President Trump Slams Mail-In Voting As A 'Scam,' Says It Will Be 'A Disaster,'* OANN, Sep. 19, 2020; OANN Newsroom, *AG Barr: Mail-In Ballots Enable Fraud, Voter Coercion*, OANN, Sept. 3, 2020.

[87] American Agenda, *Who is behind Dominion Voting System*, NEWSMAX, Nov. 17, 2020 (Childers: ". . . we're talking about Dominion Voting, everyone has heard of it by now. It is one of the major systems used to case election ballots all across the nation. It is used in fact in 28 states. It has come under fire as allegations of voter fraud . . . in which votes for the President were switched to Joe Biden . . .and joining us now to talk a little more about it, what was in fact uncovered, is national security and foreign policy advisory board Trump for President 2016 Kenneth Timmerman . . . you are also the author of Election Heist." Timmerman: "Dominion is certainly backpedaling very quickly . . . their relationship with Smartmatic . . . chairman of the board of Smartmatic until recently . . . was an investment partner of George Soros . . . Smartmatic changed their website and scrubbed him from the website and Dominion scrubbed about half of their employees . . . their profiles . . . including a gentleman named Eric Coomer, who is best known for having reposted the Antifa manifesto and sent it to President Trump." With the bulletin "Is the President Right About Faulty Dominion Machines," Sellers: "It seems Ken like they've never heard of each other . . . as you know, they have. They've worked together in some cases." Timmerman stating that not all systems have paper backups, following with allegations the certification of Dominion software was faulty: "You don't certify the software four days before the election, it could very well be hacked . . . the hacking doesn't have to come by Dominion by the way, it can come from someone impersonating Dominion.").

November 20, 2020, Newsmax host Howie Carr invited Powell onto "The Howie Carr Show" to elaborate on her baseless allegations of voter fraud. Carr sought confirmation from Powell regarding the false allegations she had made against Dr. Coomer, asking her if it was true that Dr. Coomer was on a conference call with Antifa and had allegedly claimed he rigged the election.[88] Carr did not ask for any proof when Powell affirmed those allegations, when she stated that she had a recording of the call (she does not), or when she went on to make further baseless allegations of connections between George Soros and Dominion. Just a week later Newsmax aired an episode of Michelle Malkin's "Sovereign Nation" wherein she focused an entire segment on Dr. Coomer.[89] Malkin invited Oltmann on the show for a lengthy interview where Oltmann again promoted his false allegations against Dr. Coomer. Malkin falsely claimed that Oltmann "heard the name Eric Coomer" on the call (he did not), and Oltmann noted that she was an early vector for facilitating the spread of the story.[90] On December 5, 2020, Newsmax host Greg Kelly invited Ken Timmerman on his show, Greg Kelly Reports, to discuss his book "The Election Heist."[91] Timmerman concluded the segment by repeating the question that had driven Dr. Coomer into hiding and that had resulted in countless death threats:

---

[88] See Howie Carr, THE HOWIE CARR RADIO NETWORK PODCAST, (Nov. 20, 2020) (Carr asking, "Let me ask you about this guy Eric Coomer. He's—I think—he works for Dominion. He's [a] Berkley, California—University of California grad. He's the one who was allegedly . . . on a conference call or something—a Zoom—with Antifa. And he said supposedly, 'Don't worry about Trump. I've already made sure he's going to lose the election.' Is that true, for starters?" Powell responded, "Yes . . . We have an affidavit to that effect and we have the—I think we have a copy of the call." Carr continued, "Where is Eric Coomer now?" Powell responded, "He's disappeared. And also Dominion has shuttered up both of their offices in Canada where they shared an office floor with George Soros entities and they have moved their office in Denver and of course, I'm sure there was a lot of document shredding and thing quote lost end quote in that process.").

[89] See Sovereign Nation with Michelle Malkin, *Hacking the Vote*, NEWSMAX, Nov. 28, 2020.

[90] See supra at n.70.

[91] Greg Kelly Reports, NEWSMAX, Dec. 5, 2020.

"Where is Eric Coomer?  Where is Eric Coomer, the Dominion guy who is behind all of this?" Kelly responded, "Good question.  Good question indeed.  We'll see you later, okay? Eric Coomer, yeah, that's certainly not a household name yet.  Could be soon.  We'll be right back."[92]  After linking Dr. Coomer and Dominion to allegations of voter fraud, on December 15, 2020, Newsmax aired another episode of "American Agenda" linking Dominion with Smartmatic, alleging Smartmatic was Venezuelan-owned, and falsely alleging there was systemic fraud.[93]   Newsmax repeatedly promoted these false allegations of voter fraud.[94]  Newsmax took no efforts to verify or corroborate the false allegations against Dr. Coomer and Dominion before publishing them and disregarded reliable sources establishing the contrary.[95]  It had no credible evidence of any "Antifa

---

[92] Upon information and belief, a similar segment was aired by Newsmax on December 4, 2020 and December 5, 2020, on its daytime program "Spicer and Co," which also asked "Where is Eric Coomer? . . . the guy who's behind it all . . . that's certainly not a household name yet but could be soon."

[93] American Agenda, NEWSMAX, Dec. 15, 2020 ( Morris: "Dominion software was licensed from Smartmatic, which is a Venezuelan owned and controlled company.  So, we're dealing with here the most incredible, systemic fraud.  This is the exact same system they're using in Georgia on January 5th."  Childers: "Regardless of whether it was caused by human error rate of 68 percent versus what the FEC says is acceptable of .0008 percent.  Dramatically different").

[94] Upon information and belief, Newsmax published several false statements of voter fraud relating Dominion, which Newsmax had directly linked to Dr. Coomer, across various segments, including but not limited to: Stinchfield, NEWSMAX, Nov. 17, 2020 (publishing statements that election fraud may well have originated in the Dominion software); John Bachman Now, NEWSMAX, Nov. 19, 2020 (publishing statements of a wide-ranging conspiracy involving George Soros, deceased Venezuelan president Hugo Chavez, and Dr. Coomer); American Agenda, NEWSMAX, Dec. 15, 2020 (publishing statements that Dominion software is licensed from Smartmatic); Greg Kelly Reports, NEWSMAX, Dec. 17, 2020 (publishing statements that Smartmatic election software was used by various foreign governments to destroy the election system); American Agenda, *Who is behind Dominion Voting System*, NEWSMAX, Dec. 18, 2020 (publishing statements that actual intervention in the vote count with Dominion software has been "proven"); The Chris Salcedo Show, NEWSMAX, Dec. 18, 2020 (publishing statements that Smartmatic election software only used to easily change votes).

[95] Since then, Newsmax has issued a sweeping retraction for such statements, stating:

> Since election day, various guests, attorneys and elected officials have appeared on Newsmax and offered opinions and claims about Smartmatic and Dominion Systems, both companies that offer voting software in the U.S. Newsmax would like to clarify its news

conference call;" that Dr. Coomer was part of this purported call; or that Dr. Coomer committed election fraud or subverted the results of the election. Instead, like other

_____

> coverage and note that it has not reported as true certain claims made about these companies. There are several facts our viewers and readers should be aware of.
>
> Newsmax has found no evidence that either Dominion or Smartmatic owns the other, or has any business association with each other. We have no evidence that Dominion uses Smartmatic software, or vice versa. No evidence has been offered that Dominion or Smartmatic used software or reprogrammed software that manipulated votes in the 2020 election. Smartmatic has stated that its software was only used in the 2020 election in Los Angeles. It was not used in any battleground state contested by the Trump Campaign. Newsmax has no evidence to the contrary.
>
> Dominion has stated the company has no ownership relationship with the Pelosi family, the Feinstein family, the Clinton family, Hugo Chavez, or the government of Venezuela. Neither Dominion nor Smartmatic has any relationship with George Soros. Smartmatic is a U.S. company, and not owned by the Venezuelan government, Hugo Chavez, or any foreign official or entity. Smartmatic states that it has no operations in Venezuela. While the company did election projects in Venezuela from 2004-2017, it states that it was never founded by Hugo Chavez, nor did it have a corrupt relationship with him, or the Venezuelan government.

*See Jeremy Barr, Newsmax issues sweeping 'clarification' debunking its own coverage of election information,* WASH. POST, Dec 21, 2020, *https://www.washingtonpost.com/media/2020/12/21/newsmax-clarification-smartmatic/* (last visited Feb. 4, 2021). Other entities have similarly issued retractions, including the American Thinker Magazine:

> American Thinker and contributors Andrea Widburg, R.D. Wedge, Brian Tomlinson, and Peggy Ryan have published pieces on www.AmericanThinker.com that falsely accuse US Dominion Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively "Dominion") of conspiring to steal the November 2020 election from Donald Trump. These pieces rely on discredited sources who have peddled debunked theories about Dominion's supposed ties to Venezuela, fraud on Dominion's machines that resulted in massive vote switching or weighted votes, and other claims falsely stating that there is credible evidence that Dominion acted fraudulently.
>
> These statements are completely false and have no basis in fact. Industry experts and public officials alike have confirmed that Dominion conducted itself appropriately and that there is simply no evidence to support these claims.
>
> It was wrong for us to publish these false statements. We apologize to Dominion for all of the harm this caused them and their employees. We also apologize to our readers for abandoning journalistic principles and misrepresenting Dominion's track record and its limited role in tabulating votes for the November 2020 election. We regret this grave error.

Thomas Lifson, *Statement*, AM. THINKER, Jan. 15, 2021, https://www.americanthinker.com/blog/2021/01/statement.html (last visited Feb. 4, 2021).

Defendants, Newsmax knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[96]

63.　The Trump Campaign fomented these conspiracies of election fraud. Beginning as early as 2016, President Trump and the Trump Campaign began to promote baseless allegations of voter fraud as a justification for then losing the popular vote.[97]　In the months leading to the 2020 election, the Trump Campaign revived these allegations in the event of a loss and repeatedly refused to agree to accept the results of the election.[98] After election night, as President Trump's early lead dwindled, the Trump Campaign refused to accept the results and instead turned to allegations of fraud.[99]　This included

---

[96] Newsmax has a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests. *See* John Gizzi, *Pennsylvania Conservatives Echo Trump on Possible Voter Fraud*, NEWSMAX, Sept. 28, 2020 (separate allegations of voter fraud); Michael Dorstewitz, *On Elections Trump Is Right: Protect Integrity, Beware of Fraud*, NEWSMAX, Sept. 30, 2020 (separate allegations of voter fraud).

[97] *See* Jim Rutenberg, et al., *77 Days: Trump's Campaign to Subvert the Election*, N.Y. TIMES, Jan. 31, 2021, https://www.nytimes.com/2021/01/31/us/trump-election-lie.html (last visited Feb. 4, 2021).

[98] As the Trial Memorandum of the U.S. House of Representatives stated:

> Before a single voter cast a ballot in the 2020 presidential election President Trump made it clear that he had no intention of abiding by the verdict of the American people. In a July 2020 interview, he pointedly refused to agree that he would accept the election results. Pressed in September 2020 on whether he would "commit to making sure that there is a peaceful transferal [sic] of power after the election," he responded: "We're going to have to see what happens." Throughout this period, he insisted at rallies and through social media that if he appeared to lose the election, the only possible explanation was a conspiracy to defraud him and those who supported him. On August 17, for instance, he asserted that "the only way we're going to lose this election is if this election is rigged." One week later, he declared that "[t]he only way they can take this election away from us is if this is a rigged election." He echoed these points at every opportunity, laying the groundwork for a refusal to accept any outcome other than his own continued grip on power.

*See In re Impeachment of Donald J. Trump*, Tr. Memo., In the Senate of the United States Sitting as a Court of Impeachment, Feb. 2, 2021 (internal citations omitted).

[99] *See* Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 4, 2020, 12:49 A.M.) ("We are up BIG, but they are trying to STEAL the Election. We will never let them do it."); Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 8, 2020, 9:17 A.M.) ("this was a stolen election").

Oltmann's baseless allegations against Dr. Coomer.[100]   On November 17, 2020, Eric Trump, a representative and surrogate of President Trump's campaign, tweeted the following:[101]



With his relationship to the President and the Trump Campaign, Eric Trump has a Twitter following of roughly 4.5 million people, including a significant number of Colorado

---

[100] *See* Wake Up with Randy Corporon, 710 KNUS, Nov. 14, 2020 (Corporon assisted Oltmann in preparing an affidavit for the Trump Campaign regarding Oltmann's false statements of voter fraud, stating "Joe is part of that evidence now, because yesterday we polished up an affidavit and sent it directly to Jenna Ellis, Donald Trump's, actually she sent it to me, because she put it together after conversations with him, and I reviewed it and cleaned it up . . . When I say we, I am a minor wheel in the cog of the Trump team lawyers, just doing whatever I can, whenever I am told, any time I am told it, to try to move this thing along.").

[101] Eric Trump (@EricTrump), TWITTER (Nov. 17, 2020, 2:49 PM).

residents.[102]  Eric Trump's November 17 tweet falsely attributed the quote "Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that!" to Dr. Coomer and linked a Gateway Pundit article identifying "Denver Business Owner" Oltmann as its source for allegations against Dr. Coomer and Dominion.  This false statement garnered more than 38,000 likes.  While Eric Trump's published tweet was intended to reach a national audience to cast doubt on the integrity of an election for the benefit of the Trump Campaign, it directly identified and targeted Colorado and Coloradan audiences.  As intended, followers in Colorado received Eric Trump's message and responded.[103]  Despite the lack of evidence, unreliability of the source, and improbability of the allegations, Eric Trump, as a representative of the Trump Campaign, promoted a preconceived conspiracy of election fraud in support of the Trump campaign.[104]

---

[102] Eric Trump has campaigned on behalf of the Trump Campaign in Colorado and specifically in relation to FEC United.  *See* Erik Maulbetsch, *FEC United Founder Threatens Journalists at GOP Campaign Event*, COLO. TIMES RECORDER, Oct. 16, 2020, https://coloradotimesrecorder.com/2020/10/fec-united-founder-threatens-journalists-at-gop-candidate-event/31689/ (last visited Feb. 4, 2021) (reporting a political event held by FEC United and Oltmann in Colorado featured video message from Eric Trump before the presidential election).

[103] *See e.g.*, Liesl Bryan (@LieslBryan), TWITTER (Nov. 17, 2020, 3:43 PM) ("We need a revote in Colorado then!"); Optimistforever – blacklisted by commies (@99Cornelia6), TWITTER (Nov. 17, 2020, 2:53 PM) ("Maybe Colorado is blue for the same reason!!"); Bink's MamaBear (@Binks_MamaBear), TWITTER (Nov. 17, 2020, 3:09 PM) ("Yet, no one is investigating Colorado's results. Why?!?! @JenaGriswold insisted our elections were perfect.  I'm certain if they were audited Gardner & House would've won.  There's an active campaign to recall polis.  @pnjaban @SidneyPowell1 @RonColeman @LLinWood."); D W Jenkins(@DWJenkins1), TWITTER (Nov. 17, 2020, 2:51 PM) ("Denver and all the front range need to be scrutinized").

[104] Eric Trump and the Trump Campaign have a history of advancing varying allegations of voter fraud to support and promote their political advancement.  *See* Donald J. Trump (@realDonaldTrump), TWITTER (Jun. 22, 2020, 6:10 AM) (separate allegations of fraud); *see also* Tiffany Hsu, *Conservative News Sites Fuel Voter Fraud Misinformation*, N.Y. TIMES, Oct.25, 2020, https://www.nytimes.com/2020/10/25/business/media/voter-fraud-misinformation.html (last visited Feb. 4, 2021); Pat Beall et. al., *We analyzed a conservative foundation's catalog of absentee ballot fraud: It's not a 2020 election threat*, USA TODAY, Oct. 20, 2020, https://www.usatoday.com/in-depth/news/investigations/2020/10/20/trumps-absentee-ballot-fraud-claims-not-supported-evidence/5969447002/ (last visited Feb. 4, 2021); Arielle Mitropoulos, *Trump's ballot fraud allegations*

Similarly, Eric Trump took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary.

64.     Furthering the false allegations, on November 19, 2020, the Trump Campaign provided an update on its legal challenges to the election from the Republican National Committee in Washington D.C.[105]  Among those who spoke at the press conference were personal attorneys for President Trump, as well as the Trump Campaign, including (at that time) Sidney Powell, Rudolph Giuliani, and Jenna Ellis.[106]  During the press conference, Powell falsely stated:

> Speaking of Smartmatic's leadership, one of the Smartmatic patent holders, Eric Coomer I believe his name is, is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden, nothing to worry about here, and he was going to, they were going to f— Trump.  His social media is filled with hatred for the President, and for the United States of America as a whole, as are the social media accounts of many other Smartmatic people.

Giuliani furthered these unfounded attacks on Dr. Coomer, stating:

> By the way, the Coomer character, who is close to Antifa, took off all of his social media, haha, but we kept it.  We've got it.  The man is a vicious, vicious man.  He wrote horrible things about the president.  He is completely – he is completely biased.  He is completely warped.  And, he specifically says, that they are going to fix this election.  I don't know what you need to wake

---

*embellished and not widespread: Experts*, ABC, Oct. 20, 2020, https://abcnews.go.com/Politics/trumps-ballot-fraud-allegations-embellished-widespread-experts/story?id=73701060 (last visited Feb. 4, 2021).

[105] This event was broadcast on C-SPAN.  It has also been substantially reported across various media outlets, including CNN, Fox, The New York Times as well as Defendants OANN and Newsmax.  President Trump also tweeted this news conference. *See* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 19, 2020, 6:59 AM) ("Important News Conference today by lawyers on a very clear and viable path to victory. Pieces are very nicely falling into place.  RNC at 12:00 P.M.")

[106] *See* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 14, 2020, 9:11 PM) ("Rudy, Giuliani, Joseph diGenova, Victoria Toensing, Sidney Powell, and Jenna Ellis, a truly great team, added to our wonderful lawyers and representatives!").

up, to do your job, and inform the American people, whether you like it or not, of the things they need to know.

This is real. It is not made up. It is not - there is nobody here that engages in fantasies. I've tried a hundred cases. I've prosecuted some of the most dangerous criminals in the world. I know crimes. I can smell them. You don't have to smell this one. I can prove it to you eighteen different ways. I can prove to you that he won Pennsylvania by 300,000 votes. I can prove to you that he won Michigan by probably 50,000 votes.

When I went to bed on election night, he was ahead in all of those states, every single one of those states. How is it they all turned around? Every single one of them turned around. Or is it more consistent that there was a plan to turn them around? And since there are witnesses who say there was a plan to turn them around, and it kind of begs credulity to say that it all happened in every single state, my goodness this is how you win cases in a courtroom.

Giuliani's statement echoed several previous statements he made about Dr. Coomer.[107] These statements are false. Dr. Coomer is not part of Smartmatic. He never had a conversation with anyone claiming to be Antifa, he never uttered words suggesting he would rig the election, and he never took actions to rig the election. As noted above, Dr. Coomer's social media was private and, of course, under the First Amendment to the Constitution, he is entitled to his political opinion. Notably, Ronna McDaniel, the chairwoman of the Republic National Committee, has since expressed regret over letting

---

[107] On November 12, 2020, in a nationally televised interview on Lou Dobbs Tonight, Giuliani falsely claimed that Dominion was owned by Smartmatic and that Smartmatic was formed to "fix the elections" by Venezuelans and that Smartmatic was being run by individuals in George Soros's organization. *Lou Dobbs Tonight*, FOX BUSINESS, Nov. 12, 2020. On November 13, 2020, Giuliani again said that "Dominion software . . . really is Venezuelan . . . it's called Smartmatic." *Chat with the Mayor: Major Challenges*, 77WABC, Nov. 13, 2020. On November 14, 2020, Giuliani tweeted that Dominion "was a front for Smartmatic." Rudy W. Giuliani (@RudyGiuliani), TWITTER (Nov. 14, 2020). On November 15, 2020, during his radio show and a televised interview on Fox News, Giuliani claimed that Dominion uses Venezuelans software "that's been used to steal elections in other countries" and that Dominion "notifies" election officials as to when they can add fake ballots. *Uncovering the Truth with Rudy Giuliani & Dr. Maria Ryan: Voter Fraud*, 77WABC, Nov. 15, 2020; *Giuliani: Trump is contesting the election 'vigorously' in the courts*, FOX NEWS., Nov. 15, 2020.

Powell and Giuliani hold this press conference, stating "When I saw some of the things
Sidney was saying, without proof, I certainly was concerned it was happening in my
building."[108]

65.    The Trump Campaign and its representatives knowingly and recklessly
made these statements despite the lack of credible evidence, the unreliability of their
sources, and the improbability of the allegations.[109]  They similarly took no actions or
efforts to corroborate or verify the baseless allegations before publishing them and
disregarded reliable sources establishing the contrary.[110]  They continued to promote a

---

[108] *See* Annie Karni, et al., *An Emboldened Extremist Wing Flexes Its Power in a Leaderless
G.O.P.*, N.Y. TIMES, Feb. 1, 2021, https://www.nytimes.com/2021/02/01/us/politics/republicans-trump-
ronna-mcdaniel.html (last visited Feb. 4, 2021).

[109] Counsel for the Trump Campaign had declined to make allegations of systemic voter fraud in court under
penalty of perjury.  One attorney for the campaign recently filed a motion for leave to withdraw as counsel
for the Trump Campaign, stating it had used his "services to perpetuate a crime" and "insist[ed] upon taking
action that the lawyer considers repugnant and with which the lawyer has a fundamental disagreement."
*See Trump for President, Inc. v. Phila. Cnty. Bd. of Elections*, No. 2:20-cv-05533-PD (E.D. Pa.) at Dkt.
No. 9.  There are reports indicating President Trump and the Trump Campaign were advised these
allegations were baseless.  *See* Jonathan Swan, et al.*, Bonus Episode, Inside the craziest meeting of the
Trump presidency*, Axios, Feb. 2, 2021, https://www.axios.com/trump-oval-office-meeting-sidney-powell-
a8e1e466-2e42-42d0-9cf1-26eb267f8723.html.

[110] Several Trump Campaign attorneys are now being investigated for failures of professional obligations for
peddling such claims.  Michigan's Attorney General, Secretary of State, and Governor filed complaints with
the State Bar of Texas requesting that Powell be disbarred for violating her ethical and professional
obligations by "fil[ing] a complaint based on falsehoods, us[ing] her law license in an attempt to
disenfranchise Michigan voters and undermine the faith of the public in the legitimacy of the recent
presidential election, and len[ding] credence to untruths that led to violence and unrest." *See* Press Release,
State of Michigan, AG Nessel, Gov. Whitmer, Secretary Benson Seek Disbarment of Attorneys for Pushing
Election Fraud Narrative, Feb. 1, 2021, https://www.michigan.gov/som/0,4669,7-192-26847-551080--
,00.html (last visited Feb. 4, 2021).  The New York State Bar Association (NYSBA) received hundreds of
similar complaints about Giuliani and "his baseless efforts on behalf of President Trump to cast doubt on
the veracity of the 2020 presidential election and after the votes were cast, to overturn its legitimate results"
and announced its formal investigation into Giuliani and his efforts, which "included the commencement
and prosecution of court actions in multiple states without any evidentiary basis whatsoever."  *See* Susan
DeSantis, *New York State Bar Association Launches Historic Inquiry into Removing Trump Attorney
Rudy Giuliani From Its Membership*, N.Y. STATE BAR ASSOC., Jan. 11, 2021, https://nysba.org/new-york-
state-bar-association-launches-historic-inquiry-into-removing-trump-attorney-rudy-giuliani-from-its-
membership/ (last visited Feb. 4, 2021).

preconceived conspiracy of election fraud in support of their political ends.[111]  In response to inquiries from members of the press in attendance at the news conference, Jenna Ellis, baldly informed them, "Your question is fundamentally flawed when you're asking, 'Where is the evidence?'"  Following the press conference, various news publications ran headlines questioning the reliability of the Trump Campaign's allegations.[112]  Despite concerns raised by news outlets, a significant portion of the public trusts President Trump, his campaign, and his campaign representatives and took these false allegations against Dr. Coomer seriously.[113]  This led to an anticipated violent conclusion.

66.    In November 2020, Sidney Powell, the Trump Campaign's then-attorney, began making appearances on nationally broadcasted platforms to further disseminate false statements about election fraud and Dr. Coomer.  On November 20, 2020, Newsmax host Howie Carr interviewed Powell on "The Howie Carr Show" and asked her to confirm that there was alleged evidence of widespread voter fraud, that votes cast had been changed through voting machines, that millions of votes had been removed from

---

[111] Notably, the legal challenges raised by the Trump Campaign after the election failed to allege or support the false allegations raised to the public.  *See* Alanna Durkin Richer, et. al., *EXPLAINER: A look at Trump's long-shot legal challenges,* AP, Nov. 18, 2020, https://apnews.com/article/donald-trump-legal-challenges-explained-075b2ef6f75e9dd3026d54fc38b81920 (last visited Feb. 4, 2021).

[112] *See e.g.*, Jane C. Timm, *Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference*, NBC, Nov. 19, 2020, https://www.nbcnews.com/politics/donald-trump/rudy-giuliani-baselessly-alleges-centralized-voter-fraud-free-wheeling-news-n1248273 (last visited Feb. 4, 2021); Tara Subramaniam, et al., *Fact checking Giuliani and the Trump legal team's wild, fact-free press conference,* CNN, Nov. 20, 2020, https://www.cnn.com/2020/11/19/politics/giuliani-trump-legal-team-press-briefing-fact-check/index.html (last visited Feb. 4, 2021); Andrew Solender, *More Republicans Break with Trump On Election After Giuliani Press Conference*, FORBES, Nov. 20, 2020, https://www.forbes.com/sites/andrewsolender/2020/11/20/more-republicans-break-with-trump-on-election-after-giuliani-press-conference/?sh=6d9007cb6013 (last visited Feb. 4, 2021).

[113] *See* Anthony Salvanto et. al., *CBS News Poll: Most feel election is "settled" but Trump voters disagree*, CBS, Dec. 13, 2020.; *see also infra* § IV(D).

President Trump and given to President Joe Biden, and that Dr. Coomer through Dominion was part of this conspiracy to subvert the presidential election. Carr then asked Powell whether Dr. Coomer actually stated "Don't worry about President Trump, I already made sure that he's going to lose the election." Powell falsely attributed these statements to Dr. Coomer, stating "Yes, it's true. We have an affidavit to that effect and I think we have a copy of the call."[114] She further alleged Dr. Coomer had disappeared, and Dominion had closed its offices in Denver and Toronto. Powell had no "copy of the call" or recording.[115] Dr. Coomer had not "disappeared." And Dominion had not closed its offices. These allegations were capable of verification. Yet, neither Newsmax nor Powell made any legitimate effort to verify them before publishing. They had no credible evidence or reliable source. They again disregarded reliable sources establishing the contrary. Like other Defendants, Newsmax and Powell knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[116]

---

[114] Howie Carr, *The Howie Carr Show*, NEWSMAX, Nov. 20, 2020. The affidavit Powell referenced was made by Oltmann. *See e.g.*, *Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 1, ¶¶ 94-101. Oltmann, in an interview on the Peter Boyles Show on November 17, 2020 also confirmed he had been "in constant contact with the Trump lawyers."

[115] Oltmann has admitted he has no recording of the alleged "Antifa Conference Call" he infiltrated. *See* Joseph Oltmann, et al., *Ep. 196–Dominion Voting Machines,* CONSERVATIVE DAILY PODCAST (Nov. 9, 2020).

[116] Powell also has a history of advancing unsupported theories and allegations of fraud to support specific political beliefs and specific political candidates as well as to promote her businesses interests. *See, e.g.*, Lou Dobbs, *Sidney Powell: Trump has to fight for election integrity,* FOX BUSINESS, Nov. 7, 2020 (alleging that an Obama-era supercomputer known as The Hammer had flipped thousands of votes from Trump to Biden); Sidney Powell, *Licensed to Lie* (2nd ed. 2018) (alleging deep state corruption in the Justice Department); Jeremy W. Peters, et al., *What We Know About Sidney Powell, the Lawyer Behind Wild Voting Conspiracy Theories,* Dec. 8, 2020, https://www.nytimes.com/article/who-is-sidney-powell.html (last visited Feb. 4, 2021). For example, in her November 7, 2020 interview on The Lou Dobbs Show, Powell

67.     On this same day, Powell appeared in another interview with Maria Bartiromo and again alleged she had a tape of Dr. Coomer saying he was going to rig the election for Biden.[117]  Again, she had no tape.  However, Powell apparently did not have time to appear on Fox News that same day with Tucker Carlson.  That evening, Carlson published an opinion piece wherein he stated, "We asked the Trump campaign attorney for proof of her bombshell claims.  She gave us nothing."[118]  Carlson went on to explain that:

> [W]e invited Sidney Powell on the show.  We would have given her the whole hour.  We would have given her the entire week, actually, and listened quietly the whole time at rapt attention.
>
> But she never sent us any evidence, despite a lot of polite requests.  When we kept pressing, she got angry and told us to stop contacting her.  When we checked with others around the Trump Campaign, people in positions of

_____

turned to far-right conspiracy theories circulated prior to the election regarding programs called The Hammer and Scorecard stating:

> I think there are a number of things [the Department of Justice] need[s] to investigate, including the likelihood that 3% of the vote total was changed in the pre-election voting ballots that were collected digitally by using the Hammer program and the software program called Scorecard.  That would have amounted to a massive change in the vote that would have gone across the country and explains a lot of what we're seeing.  In addition, they ran an algorithm to calculate votes they might need to come up with for Mr. Biden in specific areas . . . I think they were very broadly used, but not by the vote counters.  They were used by the forces in the Democratic operatives that had access to these programs through the government access points that they have and used it illegally to change votes in this country.  It's got to be investigated probably by the president's most trusted military intelligence officials who can get into the system and see what was done, but we do have some evidence that was exactly what happened.  And they've used it against other entities in other countries, it's just been turned recently against our own citizens here to change election results.

Lou Dobbs Tonight, *Sidney Powell: Trump has to fight for election integrity*, Fox Business, Nov. 7, 2020.  These conspiracies were created well before the 2020 election.

[117] *See* Maria Bartiromo, *Mornings with Maria*, Fox, Nov. 20, 2020 (Powell falsely stating "We've got Eric Coomer admitting on tape that he rigged the election for Biden and hated Trump . . . We have pictures of him in other countries helping people rig elections.  So he's got a long history of accomplishing the result that they want accomplished, and I'm sure that it's for money.").

[118] Tucker Carlson, *Tucker Carlson: Time for Sidney Powell to show us her evidence*, Fox, Nov. 19, 2020.

authority, they also told us Powell had never given them evidence to prove anything she claimed at the press conference.

68.     On November 22, 2020, the Trump Campaign purportedly removed Powell from its legal team.  "Sidney Powell is practicing law on her own," Trump's personal and campaign lawyers said in the statement.[119]  "She is not a member of the Trump Legal Team.  She is also not a lawyer for the President in his personal capacity."  That did not stop Powell's false statements against Dr. Coomer.

69.     Throughout Powell's various media appearances, she solicited millions of dollars in donations on behalf of her legal defense fund, Defending the Republic.  Powell and Defending the Republic then used the donations to fund her attacks on the election and Dr. Coomer.

70.     Using these donations, Powell filed highly publicized lawsuits in Arizona, Georgia, Wisconsin, and Michigan, in which Dr. Coomer is a central figure.  Powell promised the press she would "release the Kraken" with extensive evidence, but the lawsuits that followed were filled with conspiracy theories, speculation, and typographical errors.  Without evidence, she alleged a massive criminal conspiracy under Dr. Coomer's direction and accused Dr. Coomer of anti-American and criminal conduct:

- In the United States District Court for the Northern District of Georgia, Powell quotes Oltmann's interview with Michelle Malkin and recounts Oltmann's story about "Eric from Dominion" saying he fixed the election on an Antifa call.[120]  Judge Timothy Batten dismissed the suit less than two weeks after it was filed.[121]  After

---

[119] *See* Kyle Cheney, *Trump Campaign cuts Sidney Powell from president's legal team*, POLITICO, Nov. 22, 2020, https://www.politico.com/news/2020/11/22/trump-campaign-sidney-powell-legal-439357 (last visited Feb. 4, 2021).

[120] *Pearson, et al., v. Kemp, et al.*, No. 1:20-cv-04809-TCB (N.D. Ga.) at Dkt. No. 1, ¶ 120.

[121] *Id.* at Dkt. No. 74.

appealing to the U.S. Supreme Court, Powell voluntarily dismissed the lawsuit on January 19, 2021.[122]

- In the United States District Court for the Eastern District of Michigan, Powell again references the Malkin interview with Oltmann.[123] In a scathing order, Judge Linda V. Parker dismissed the case, noting "Plaintiffs are far from likely to succeed in this matter."[124]

- In the United States District Court of Arizona, Powell alleged Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA, a domestic terrorist organization where he recorded Eric Coomer representing, "Don't worry about the election. Trump is not going to win . . ."[125] Judge Diane J. Humetewa dismissed this matter, stating "Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court."[126]

  In the United States District Court for the Eastern District of Wisconsin, Powell again relies on Oltmann to falsely allege that Dr. Coomer was present at an Antifa meeting, made allegations to subvert the election, and suggests he did in fact subvert the election.[127] Judge Pamela Pepper dismissed this matter, stating "Federal judges do not appoint the president in this country. One wonders why plaintiffs came to federal court and asked a federal judge to do so."[128]

71.    All of the Defendants relied on false statements made by one another to advance a narrative that had no basis in fact. Together, Defendants conceived of a story

---

[122] *Pearson, et al., v. Kemp, et al.*, No. 20-816 (U.S.) at Joint Stipulation to Dismiss Appeal.

[123] *King, et al., v. Whitmer, et al.*, No. 2:20-cv-13134-LVP-RSW (E. Mich.) at Dkt. No. 1, ¶ 153.

[124] *Id.* at Dkt. No. 62, p. 35 (the Court goes on to say, "In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government.").

[125] *Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 1, ¶ 100.

[126] *Id.* at Dkt. No. 84, p. 28–29.

[127] *Feehan, et al., v. Wis. Elections Comm'n, et al.*, No. 2:20-cv-01771-PP (E.D. Wisc.) at Dkt. No. 1, ¶¶ 99-100.

[128] *Id.* at Dkt. No. 83, p. 2, 45.

that the results of the election were fraudulent and consciously set out to establish that Dr. Coomer perpetuated this fraud so as to further their own ends. To do this, Defendants disregarded credible evidence and relied on inherently unreliable sources all to form their inherently improbable accusations. Defendants' conduct has resulted in direct harm to Dr. Coomer through their encouragement of violence and threats. This harm is not hypothetical. A direct manifestation of the harm caused by Defendants' conduct is the armed insurrection on the U.S. Capitol on January 6, 2021. Lies about election fraud, including lies about Dr. Coomer, incited the insurrection. The open use of force by the militants further confirms the seriousness of the threats being made against Dr. Coomer.

**D.** ***The harm Defendants caused Dr. Coomer.***

72. Social media exploded with threats and attacks as the lies spread. For example, on November 21, 2020, anonymous Reddit user "Pher001" posted an article to the subreddit /r/donaldtrump titled "Eric Coomer needs to be arrested before he tries to run/or fly away." The post contained the following image:



Some of the responses among the hundreds written to this one post include:

"Fking maggot";

"Most wanted, live, to testify.  Report if you know his were abouts. Report
any sight-seeing of him.  But I think he is going to hide in Venezuela!";

"If this man disenfranchised people of their votes he deserves worse than
life in prison";

"He disenfranchised millions of people's voting rights.  Wars are fought over
that. He deserves everything he gets";

"His fucken face makes me so fucken mad.  FUCK HIM!! TRUMP WON!";

"A good mug for USA's Top 10 Terrorist list.  Wanted DEAD or ALIVE";

"This man will be dead within 2 weeks."

73.     Given the flood of negative publicity, including death threats, Dominion was
forced to alter its website and attempted to correct the numerous falsehoods Defendants
and others had spread about it and its employees.[129]  Dominion posted on its website that
"Dominion is not shuttering its offices.   Employees have been encouraged to work
remotely and protect their social media profiles due to persistent harassment and threats
against their personal safety.  Dominion employees are being forced to retreat from their
lives due to personal safety concerns, not only for our employees themselves, but also for
their extended families."[130]

---

[129] Dominion Voting Systems, *Election 2020: Disinformation is Dangerous and Threatens Democracy*,
https://www.dominionvoting.com ("Get the Facts About Dominion and Its Voting Systems") (last visited
Feb. 4, 2021); John Poulos, *Fake Claims About Dominion Voting System Do Real Damage*, WSJ, Nov. 30,
2020,        https://www.wsj.com/articles/fake-claims-about-dominion-voting-systems-do-real-damage-
11606755399 (last visited Feb. 4, 2021).

[130] *See* Dominion Voting Systems, *Setting the Record Straight: Facts & Rumors*,
https://www.dominionvoting.com (previous webpage on Nov. 30, 2020).

74.     Dr. Coomer is the Dominion employee who has taken the brunt of these attacks.[131]  He was forced to flee his home in response to the credible threats he has been receiving and continues to receive.[132]  He has had to sever ties with friends and family members in order to stay in seclusion.[133]

75.     Calls for Dr. Coomer's capture and arrest have spread rapidly across the internet and on social media.  For example,



76.     Threats grew more intense and specific.  For example, on November 25, 2020, Twitter user @AngLindva stated the following:

---

[131] Oltmann has published statements across media platforms referring to Dr. Coomer as mentally ill, an unhinged sociopath, a creep, a fraud, a cheat, a scumbag, a lynchman, a terrorist, a traitor, evil, and even suggesting it is unsafe to receive medical treatment for fear of Antifa activists and Dr. Coomer compromising his care.

[132] Oltmann has threatened Dr. Coomer.  *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020) ("Blow this shit up.  Share, put his name everywhere.  No rest for this shitbag.  Eric Coomer, Eric Coomer, Eric Coomer . . . Eric we are watching you . . .").

[133] Oltmann has allegedly revealed personally identifying information about Dr. Coomer.  *See* Joseph Oltmann, et al., *Ep. 217–Shameful Dems Attacking Election Witnesses*, CONSERVATIVE DAILY PODCAST (Dec. 3, 2020), (Oltmann stating "I want everybody to put out on their social media account, 'Where is Eric Coomer?' I found him.  Just want you to know I found him . . . I have pictures of him coming out of hiding . . . I know he drives a truck.  I know his truck is parked at his house.").  These actions are especially dangerous given Oltmann's involvement with an armed paramilitary civilian group with ties to FEC United.  *See* United American Defense Fund, *Defend and Protect What Is Ours*, https://fecunited.com/uadf/ (last visited Feb. 4, 2021).



77.     Dr. Coomer began to receive threatening text messages from unknown out-of-state numbers sent directly to his cell phone in Colorado.  Some of these messages included:

> "[W]e are already watching you.  Come clean and you will live."

> "What is the penalty for TREASON?"

> "FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA.  Does that chant sound familiar. PB have you and there is nowhere you can run."

> "RUN."

78.     Oltmann's efforts to incite violence against Dr. Coomer are escalating with Oltmann posting:

> They certify this election and we go to war . . . Now it's time we fight.  And when I mean fight I don't mean yelling it's not fair.  I mean we fight these communist, marxist lying shitbags.  That means Eric Coomer never has peace and we smash each and every voting machine in every state that uses them.  We will not be silenced by a bunch of BLM and Antifa communist asshats.  It's time we take back our America by any and all means necessary . . .

> . . . Eric Coomer, you are a traitor.  We are coming for you and your shitbag company.  We are coming for Antifa and we are coming for your politician

friends. Share this . . . share Eric's name . . . If they certify the electors today after this audit, we have an obligation to forcibly remove them all. This is not a drill, our country is not their evil playground. God is at the wheel, but we are the warriors that must do the work of men to repel evil. These people are evil, and they are liars, cheats and thieves out to take what they did not earn or deserve. Where will you stand?[134]

79. Upon information and belief, in early January, Defendant Oltmann traveled to Washington D.C. to spread his unfounded theories about Dr. Coomer and to partake in various other efforts to undermine the legitimacy of the presidential election. On January 5, 2021, Oltmann was apparently the keynote speaker at the #StopTheSteal rally on Freedom Plaza.[135] The day before crowds would go on to breach the Capitol and assault more than 130 police officer, Oltmann was introduced as "The guy who found and fingered Eric Coomer." After the applause died down, Oltmann stated, "By the way, Eric Coomer is suing me. It's really fun. I'm going to crush him in discovery." Oltmann then went on to perpetuate his baseless theories of voter fraud, alleging Dominion machines had manipulated the vote counts to subvert results of the presidential election.

80. On January 26, 2021, Oltmann posted from his Facebook account:

. . . Eric Coomer. I'm never going to stop. You have no idea what information I have or how your loose lips and arrogance is your ultimate weakness. By the time I am done … and I will never talk about the "krakken" that is stupid. What I will talk about is truth. See you later, and your unhinged lawyers . . . see those shitbags too. Good night.. God is at the wheel and blood is in the water.[136]

---

[134] Joseph Oltmann (@Joeoltmann), PARLER (Dec. 14, 2020).

[135] *See* RSBN Network (@RSBNetwork*)* TWITTER, (Jan. 5, 2021, 1:45 p.m.), Other speakers included InfoWars host Alex Jones, Roger Stone, and rally organizer, Ali Alexander.

[136] *See* Joe Oltmann, FACEBOOK (Jan. 26, 2021).

81.     The onslaught of threats Dr. Coomer has experienced and the necessary measures he has been forced to take to protect himself are the direct result of Defendants' defamatory conduct.  Dr. Coomer has and will continue to experience serious and severe emotional and physical distress as a result.  The harm Defendants have caused to Dr. Coomer's reputation,[137] privacy, safety, and earnings, and other pecuniary loss is immense.

## V.     CAUSES OF ACTION

### A.     *Defamation Against All Defendants*

82.     Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

83.     Dr. Coomer is neither a public official nor a public figure.  He is a private individual that Defendants, by their own conduct and for their own ends, targeted and elevated into the public sphere.  Defendants intentionally caused the publication of false and unprivileged oral and written statements about Dr. Coomer.  Their false statements have been seen, read, or heard by millions of individuals across the United States, across Colorado, and specifically within Denver County, Colorado.

84.     The defamatory meaning of Defendants' false statements is apparent from the face of their publication, refer to Dr. Coomer, and are understood to be about him.

---

[137] These false statements have damaged Dr. Coomer's professional reputation, which depended on working relationships with state and county officials, and compromised his continued involvement and employment in relation to  and support of elections.  *See* Saja Hindi, *GOP demand for probe of Colorado's Dominion voting system part of "debunked conspiracy theories." House speaker says*, DENVER POST, Dec. 7, 2020, https://www.denverpost.com/2020/12/07/colorado-republicans-dominion-investigation/  (last visited Feb. 4, 2021).

These statements are defamatory per se as they inherently injure Dr. Coomer's reputation; impute a crime; and disparage his business practices. On their face, they falsely assert Dr. Coomer has perpetrated a conspiracy that undermined the integrity of the election; disenfranchised millions of voters; and fraudulently elected the president of the United States. Defendants falsely allege Dr. Coomer accomplished this through fraudulent business practices as an employee of Dominion. Defendants falsely allege Dr. Coomer is a traitor. Defendants' false statements have subjected Dr. Coomer to scorn, outrage, and threats from his community. Their false statements have harmed Dr. Coomer's reputation by lowering him in the estimation of at least a substantial and respectable minority of the community.

85. Defendants published their false statements negligently. Defendants published these statements with actual malice. Defendants knew or had reason to know that these statements were false and published their statements with knowledge or reckless disregard of their falsity. Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible bases for the false allegations made; fabricated specific allegations; treated speculation and innuendo as evidence; and published their allegations in a manner calculated to create a false inference. Their allegations were inherently improbable, derived from unreliable sources, and unsupported by evidence. Defendants preconceived a conspiracy and then set out to establish that conspiracy to further their own ends.

86.    As a direct and proximate result of Defendants' conduct, Dr. Coomer has suffered significant actual and special damages including, without limitation, harm to his reputation, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.

**B.    *Intentional Infliction of Emotional Distress Against All Defendants***

87.    Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

88.    Defendants engaged in extreme and outrageous conduct. Their conduct was calculated to cause Dr. Coomer severe emotional distress. Defendants falsely alleged Dr. Coomer perpetrated a criminal conspiracy against every American citizen to overturn the results of the presidential election. They branded Dr. Coomer a traitor and made him a pariah. They encouraged the dissemination of these false claims. They exploited public fear and directed vitriol and threats against Dr. Coomer. Oltmann has directly made terroristic threats against Dr. Coomer, calling on people to harm Dr. Coomer and placing Dr. Coomer in fear of imminent injury and death. Defendants have knowingly elevated Oltmann's statements and adopted his false allegations and threats. These actions have had their intended effect. Dr. Coomer has had an onslaught of harassment and credible death threats issued against him; he is at risk in his home or in going to work; his presence puts his family, friends, colleagues, and his community in danger. All aspects of his life have been altered in response to Defendants' conduct, including things as basic as where to live, how to go out in public, and when to see family and friends. The results of Defendants' ongoing conduct are foreseeable and obscene. This conduct is so outrageous

in character and extreme in degree as to go beyond all possible bounds of decency.  It
should be regarded as atrocious and determined intolerable in a civilized community.

89.    As a direct and proximate result of Defendants' conduct, Dr. Coomer has
suffered significant actual and special damages including, without limitation, emotional
distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

### C.    *Civil Conspiracy Against All Defendants*

90.    Plaintiff fully incorporates the foregoing paragraphs, as well as the
Introduction of this Complaint.

91.    Defendants engaged in a conspiracy to defame and inflict emotional distress
upon Plaintiff.

92.    Defendants' collective objective was to promote the reelection bid of
President Trump for their own financial and political gain.  To do that, Defendants agreed,
both expressly and implicitly, to create a false narrative that in the event President Trump
lost his reelection bid it could have only occurred because of fraudulent election activities.
Defendants began spreading this false narrative before the election began.

93.    After the election, Defendants fed their narrative by falsely accusing
Plaintiff of both having the ability and intent to rig the presidential election and actually
subverting the election results so as to disenfranchise millions of voters.  Defendants
fabricated their false narrative by using Plaintiff's alleged (and false) affiliation with
"Antifa," speculation as to his access to election hardware and software, and his personal
political beliefs.  In order to further their objective, Defendants agreed, by their words and

conduct, to publish and republish defamatory statements about Plaintiff and threats towards Plaintiff.

94.     As a result of Defendants' coordinated conduct, Plaintiff has become the target of death threats and harassment and suffered significant actual and special damages proximately caused by their conduct, including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

**D.     *Preliminary and Permanent Injunction***

95.     Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

96.     Defendant Oltmann's escalating violent threats directed at Dr. Coomer demonstrate the need for the Court to enjoin such conduct. The Court should order that Oltmann, FEC United, Conservative Daily, and their officers, agents, servants, employees, and attorneys be enjoined from threatening or encouraging acts of violence, intimidation, or coercion against Dr. Coomer, including but not limited to encouraging others to confront, threaten, or endanger Dr. Coomer's physical safety, and further order these Defendants to remove any publication of threats, intimidation, personal information, or coercion made against Dr. Coomer. Such an order is essential to avoid impending danger and preserve the status quo at the time the controversy arose. Plaintiff is prepared to post the necessary bond.

97.     From the facts in this Complaint, Plaintiff has demonstrated the existence of a wrongful act, a clear likelihood of success on the merits, the existence of imminent, irreparable harm for which no adequate remedy at law exists, and that the damage to

Plaintiff if the injunction does not issue will exceed the damage to Defendants Oltmann, FEC United, and Conservative Daily if the injunction does issue.

98.     Plaintiff further seeks permanent injunctive relief to remove all Defendants' defamatory statements upon final adjudication of the claims at issue.

## VI.     DEMAND FOR RETRACTION

99.     Plaintiff demands Defendants immediately and publicly retract all defamatory statements regarding Plaintiff and threats Defendants made to Plaintiff.

## VII.     RIGHT TO AMEND

100.     Plaintiff reserves the right to amend his pleadings in accordance with the Colorado Rules of Civil Procedure.  Plaintiff anticipates amending his pleadings as more information becomes available, including the full scope of defamatory statements Defendants have made.

## VIII.   JURY DEMAND

101.     Pursuant to Colorado Rule of Civil Procedure 38, Plaintiff requests a jury to decide all issues of fact.

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer, and that the Court enter judgment against Defendants, including, but not limited to:

- • Preliminary and permanent injunctive relief enjoining Defendants Oltmann, FEC United, Conservative Daily, and their officers, agents, servants, employees, and attorneys from threatening or encouraging acts of violence, intimidation, or coercion against Dr. Coomer and further ordering these Defendants to remove any publication of threats, intimidation, or coercion made against Dr. Coomer;

- Permanent injunctive relief requiring Defendants and their officers, agents, servants, employees, and attorneys to remove any and all defamatory publications made about Dr. Coomer;

- Actual and special damages against Defendants in an amount to be proven at trial;

- Leave to amend this Complaint and allege exemplary damages in an amount to be proven at trial after the exchange of initial disclosures pursuant to Colorado Rules of Civil Procedure and Plaintiff establishes prima facie proof of triable issues pursuant to C.R.S. § 13-21-102.

- Attorney's fees and costs;

- Prejudgment and post-judgment interest; and

- Such other and further relief, both general and special, to which Plaintiff may be justly entitled to receive.

Respectfully submitted this 4th day of February 2021.[138]

Respectfully submitted,

_____/s/ Charles J. Cain_____
Charles J. Cain, No. 51020
Steve Skarnulis, No. 21PHV6401
Thomas J. Rogers III, No. 28809
Mark Grueskin, No. 14621
Andrew Ho, No. 40381

---

[138] Spacing pursuant to C.R.C.P. 10(d)(3)(II) due to the complexity and technical nature of this matter.

**CERTIFICATE OF SERVICE**

I certify that on February 4, 2021, a true and accurate copy of the foregoing Plaintiff's First Amended Complaint has been e-served via ICCES on all counsel of record.

_____/s/ Charles J. Cain_____
Charles J. Cain, No. 51020

**Subject:** FW: Coomer Amended Complaint

**Date:** Friday, February 5, 2021 at 3:50:21 PM Central Standard Time

**From:** Summer Knox on behalf of Notifications

**Attachments:** P 1st Amd Complaint (20210204).pdf

---

**From:** CO E-Filing Courtesy Notices <DoNotReply@judicial.state.co.us>
**Date:** Friday, February 5, 2021 at 3:25 PM
**To:** Scotti Beam <sbeam@cstrial.com>
**Subject:** Accepted Filing: 2020CV034319 - Coomer, Eric v. Donald J Trump For President Inc et al

Court: Denver County - District
Case Caption: Coomer, Eric v. Donald J Trump For President Inc et al
Case Number: 2020CV034319
Division: Division 409
Filing ID: 5D2B3A08F794E
Date Filed: February 4, 2021
Date Accepted: February 5, 2021

Document ID: F3406FAEB0234 Plaintiff's First Amended Complaint has been accepted by the court.
Clerk Name: Corrin O

View details online at
https://www.jbits.courts.state.co.us/efiling/web/filingInformation/filingInfo.htm#/filingInfo?
fid=5D2B3A08F794E.

For questions about this case, please contact the court.

If you need additional assistance, you may contact us at efilingsupport@judicial.state.co.us or 1-855-264-2237.

*This e-mail was sent from an automated service. Please do not reply to this e-mail directly.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re:                                                 **Chapter 11**

**TGP COMMUNICATIONS, LLC**                  **Case No.  24-13938-MAM**

    **Debtor.**

_____/

**DEBTOR'S RESPONSE IN OPPOSITION TO**
**MOTION OF RUBY FREEMAN AND WANDREA' ARSHAYE MOSS FOR AN ORDER**
**DISMISSING THE DEBTOR'S CHAPTER 11 CASE UNDER SECTIONS 1112(B)**
**AND 305(A) OF THE BANKRUPTCY CODE OR, IN THE ALTERNATIVE,**
**MODIFYING THE AUTOMATIC STAY TO CONTINUE PREPETITION LITIGATION**

    **TGP COMMUNICATIONS, LLC** (the "**Debtor**") responds in opposition to the Motion of Ruby Freeman and Wandrea' Arshaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation [ECF No. 39] (the "**Dismissal Motion**"), as joined by Eric Coomer (ECF No. 57).

### INTRODUCTION

    The Litigation Creditors[1] seek dismissal of the Debtor's Chapter 11 Case based upon the assertion that the filing was made in bad faith (or lack of good faith). Although not expressly mentioned in Section 1112(b), *bad faith* has been recognized as a basis for dismissal of bankruptcy cases.

    The finding of good faith in the bankruptcy filing is guided by a judicial determination that the petition was filed with a valid bankruptcy purpose. The valid bankruptcy purpose is guided by

---

[1] The Litigation Creditors includes Ruby Freeman and Wandrea' Arshaye Moss as Plaintiff in the Georgia Litigation and Eric Coomer as Plaintiff in the Colorado Litigation.

an intent (i) of "preserving going concerns"; and (ii) of "maximizing property available to satisfy creditors".[2]  In this instance, the legitimate motivation by the Debtor to serve a valid bankruptcy function is demonstrably existent in this bankruptcy filing. That is, the Debtor has the availability to make substantial payments to all creditors over a defined time period and the timing of the filing was intended to maximize funds available to satisfy those creditors. Additionally, absent an opportunity to present a feasible plan that complies with the Bankruptcy Code, the outstanding state court litigation will certainly result in the total destruction of the Debtor and any going concern value that may be the source of payment to all creditors.

## BACKGROUND

1.      The Debtor is a limited liability corporation incorporated in Missouri in 2013. At that time, its principal and sole shareholder, James Hoft ("**Mr. Hoft**") was a resident of St. Louis, Missouri. Mr. Hoft is the principal publisher, editor and philosophical leader for the Debtor's operations and publication on its opinion website known as The Gateway Pundit.

2.      The Gateway Pundit is a blog/website devoted to the publication of conservative opinion and other newsworthy information at www.thegatewaypundit.com.

3.       Shortly after the 2020 national election, the Debtor published and proclaimed opinion and information concerning voter fraud and other acts of election interference arising from the election of Joe Biden as the 46th President.

4.      Among the information published in opinion and editorial content, was the allegations concerning Ruby Freeman and Wandrea Arshaye Moss (the "**Freeman Plaintiffs**"). These allegations were independently echoed throughout many right-wing conservative outlets

---

[2] *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 437, 119 S. Ct. 1411, 1414, 143 L. Ed. 2d 607 (1999); accord *Toibb v. Radloff*, 501 U.S. 157, 163, 115 L. Ed. 2d 145, 111 S. Ct. 2197 (1991).

and were derived from and restated by former President, Donald Trump and former New York
Mayor, Rudy Giuliani.

5.      On December 2, 2021, the Freeman Plaintiffs initiated litigation (the "**Missouri
Litigation**") against the Debtor in the St. Louis Missouri Circuit Court. The Missouri Litigation
seeks damages against the Debtor and others for defamation and intentional infliction of emotional
distress.

6.      On December 22, 2020, Eric Coomer ("**Mr. Coomer**") filed his lawsuit against the
Debtor in the Second Judicial District in Denver County, Colorado. (the "**Colorado Litigation**")
Mr. Coomer is a resident of Colorado and was the Director of Security for Dominion Voting
Systems. The Colorado Litigation also asserts claims against the Debtor for defamation intentional
infliction of emotional distress and civil conspiracy.

## ARGUMENT

### Dismissal: The Phoenix Piccadilly Factors

The Dismissal Motion cites *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11ᵗʰ Cir. 1988)
as the primary source for its analysis of the Debtors *bad faith* filing. Of course, *Phoenix Piccadilly*
presents a specific factual situation that customarily arises on the eve of a foreclosure proceeding
on developed or undeveloped real estate as the sole asset of the Debtor. Generally, the cast of
characters includes the Debtor/developer on one hand and the secured creditor(s) on the other hand.
This line of cases are generally two-party disputes (debtor v. secured creditor), involves very few
unsecured creditors and is filed solely to stall or delay the foreclosure proceedings in the
speculation that an angel investor will appear to save the day.  Many of the circumstantial factors
which are identified by the *Phoenix Piccadilly* Court in support of a finding of bad faith are

specifically tailored to single asset real estate cases.[3] Thus, the factors identified in the Dismissal Motion do not truly fit within the framework of this case. Further, Courts in this district have rejected the formulaic application of a checklist to the determination of bad faith.[4] Especially when the rights of an unpaid **secured creditor** is not at issue.[5]

### A.    Piccadilly Factor 1: Number of Assets

As indicated, this element is more aptly suited for single asset real estate cases. The Litigation Creditors cite to *In re Cambec Investment Corp* 349 B.R. 915 (Bankr. M. D. Fla 2006) The *Cambec* case is another single asset real estate bankruptcy that arose from the filing of a foreclosure action by the secured creditor. The Litigation Creditors argue that the "number of assets" owned by the Debtor is a circumstance that should contribute to a conclusion of bad faith.

However, this Debtor is not a real estate company, and its business purpose is not driven by an asset portfolio. Rather, this Debtor is an operating business deriving advertising revenue from legitimate sources. The Debtor's business operation is virtual in nature. That is, the Debtor has no need for a physical office to house multiple employees in order to operate its website. The "number of assets" factor is truly geared to the single asset real estate cases given the very nature of that type of business.   Especially since the *Phoenix Piccadilly* analysis is tailored for the

---

[3] *State St. Houses, Inc. v. N.Y. State Urban Dev. Corp.* (In re State St. Houses, Inc.), 356 F.3d 1345, 1347 (11th Cir. 2004)(the *Phoenix Piccadilly* factors are appropriate guidelines for consideration when evaluating whether a Chapter 11 petition in a single asset real estate case was filed in bad faith); *In re Clinton Fields, Inc.*, 168 B.R. 265, 268 (Bankr. M.D. Ga. 1994)(In the context of a single asset real estate Chapter 11 case, the Eleventh Circuit has enunciated the following [phoenix-piccadilly factors] as evidence of a debtor's bad faith); *In re Victoria Ltd. P'ship*, 187 B.R. 54, 59 (Bankr. D. Mass. 1995)(Stripped of much of its window dressing, *Phoenix Piccadilly* stands for the startling proposition that it is an act of bad faith for a debtor to file under chapter 11 in order to prevent foreclosure upon its only asset)

[4] See, *In re Balboa St. Beach Club, Inc*., 319 B.R. 736 (Bankr. S.D. Fla. 2005)

[5] 319 B.R. at 742

<u>SINGLE ASSET</u> real estate case.[6]  Thus, Piccadilly Factor 1 is not an adequate metric of good/bad faith for purposes of this case and otherwise fails to demonstrate bad faith.

### B.      Piccadilly Factor 2: Number and Nature of Unsecured Creditors

In *Phoenix Piccadilly,* as well as other single asset real estate cases, there are very few low-dollar unsecured creditors, and one or more secured creditor(s) holding high-dollar claims. Thus, the analysis of *quantity* of unsecured creditors is significant in the real estate cases.  That is, in developer cases, the unsecured creditors are traditionally smaller in number and amount in comparison to the secured creditor holding multi-million dollar secured debt.    In this case, however, both the Freeman Creditors and Mr. Coomer are unsecured creditors themselves. The Litigation Creditors seem to metamorphose unsecured creditors *in litigation* with the position of the secured creditor in real estate cases. There are no secured creditors in this case. Either the Piccadilly Factor 2 is inapplicable to this situation; or, the existence of the Freeman Creditors and Mr. Coomer militates against dismissal as they are themselves unsecured creditors.

### C.      Piccadilly Factor 3: Number of Employees

In support of this Factor, the Litigation Creditors rely upon a Southern District of Florida bankruptcy case that was filed by an owner of a fishing boat that was subject to foreclosure.[7] The Bankruptcy Court determined that the case was a bad faith filing, and stated: [8]

> [W]hen a debtor files a bankruptcy petition as a result of a two-party dispute for the sole purpose of gaining an advantage in a foreclosure action by avoiding the posting of a bond in order to regain possession of an arrested vessel, the debtor has filed in bad faith.

---

[6] See, fn. 3, *infra*

[7]  In re Outta Control Sportfishing, 642 B.R. 180 (Bankr. S.D. Fla. 2022)

[8]  642 B.R. at 181.

The Bankruptcy Court did not rely upon the "number of employees" factor for its determination

of bad faith.  Media entities frequently utilize freelance writers on an independent contractor basis.

Based upon the nature of its business, the Debtor has chosen to utilize this model of labor for its

operation. That is, 30+ writers committed to the opinion website and are paid on a contract basis

based upon the content and the popularity of the writing submitted by the writer. This less-common

form of business and compensation justifies and explains the reasons for "few employees", though

the writers are committed and serve the analytical purpose of Factor 3, albeit as independent

contractors.

### D.      Piccadilly Factor 5: Nature of the Disputes

Both the Colorado Litigation and the Missouri Litigation may be characterized as *destroy-*

*the-company* litigation. That is, the two lawsuits appear to be intended to run the Debtor out of

business rather than to obtain compensation.  The Missouri creditors have already received

hundreds of thousands of dollars in a settlement with One America News Network and were

awarded nearly $150 million against Rudolph Giuliani for the same damages they claim Debtor

caused.  The Debtor is presently insured by a media liability policy (the "**Policy**") with

approximately $1.3 million dollars remaining as the available Policy proceeds.[9] The two existing

litigations will consume the entirety of the Policy prior to trial of either of the two cases. In that

event, the Debtor will end up in a default position making it vulnerable to liquidation. The

Litigation Creditors seem to have unlimited resources to pursue the litigations, receiving

politically-driven donations for the cause. The Debtor does not. This kind of litigation is not

---

[9] The media liability Policy is  a wasting policy. A "wasting policy" is one in which the limits of liability
for a settlement or judgment are reduced by the amount of legal costs and expenses incurred during the
course of the defense.

unusual in lower trial courts. However, this Court is concerned with factors other than settling vendettas or political dominance. This Court is intended to balance the survival of an operating business with and against payment to creditors. The Debtor is prepared to address the Litigation Creditors' claims through a confirmed plan which should result in a larger repayment than a dissolved and asset-less company. The bankruptcy statutes are designed and executed in such a manner as to allow a going concern to share its prospects of future productivity to allow for payment to creditors that exceed fire sale liquidation. If the Litigation Creditors truly seek compensatory payments, the confirmation of a reorganization plan in this Court is their best course.

### E. Piccadilly Factor 6: Intent to Frustrate Legitimate Efforts of Creditors to Reorganize

This factor is cited by the Creditors to criticize the *timing* of the filing of the Bankruptcy Case. According to the Dismissal Motion, an intense period of discovery was commencing which would utilize substantial resources from the Debtor's insurance Policy. It's the Debtor's belief that the remaining $1.3 million dollar value of the Policy is better deployed in a settlement/plan context rather than being used up by insurance-paid lawyers leaving the Debtor destitute upon depletion. Thus, the Debtor has acted responsibly and in good faith to preserve any additional resource to be brought to bear upon a plan of reorganization. No other impending event or discovery was contemplated in the timing of the bankruptcy. Had the Debtor waited an additional 3 to 6 months for a potential filing, the Policy proceeds would have been nil and there would be no additional contribution to a potential settlement or reorganization.

### Abstention/Stay Relief

For the same reasons argued above, this Court should deny the additional relief of abstention and/or relief from stay to allow the matters to return to State Court. "[I]n determining

whether cause exists to lift the stay, courts look to the totality of the circumstances."[10]  That is, the prospects of reorganization and contribution of additional funds from the insurance Policy are better suited to be deployed in a bankruptcy case where all parties remain in the same forum and will receive equal treatment. Certainly, two separate litigations in two separate forums all funded by a single insurance policy will result in full depletion of defense funds, dissolution of the company and little to no payment to creditors. Abstention would have a detrimental effect on the administration of the estate. [11]

Relief from stay would be similarly detrimental.  One of the laudable benefits of bankruptcy is to consolidate disparate claims into a single forum for equality of treatment and distribution. In this case, whichever one of the two pending litigations that reaches trial first will likely have depleted the Policy and will get first shot at the remaining assets of the Debtor. The second place litigation will be left with nothing but a pyrrhic victory.   If the Litigation Creditors are dead set on depletion of the insurance policy, destruction of the Debtors business operations and zero payment on account of their claims, then such a result will certainly occur in a dismissal or stay relief.

In light of the foregoing, the Dismissal Motion should be denied in its entirety.

---

[10] *State Farm Fla. Ins. Co. v. Carapella (In re Gaime)*, 17 F.4th  1349, 1355 (11th Cir. 2021).

[11] *Compare  Tidewater Lodging Grp., Ltd. Liab. Co. v. Kolter Cmtys. Mgmt., Ltd. Liab. Co*. (*In re Tidewater Lodging Grp., Ltd. Liab. Co*.), Nos. 08-25694-BKC-RBR, 09-01053, 2009 Bankr. LEXIS 926, at *7 (Bankr. S.D. Fla. Apr. 3, 2009).

**Dated: June 20, 2024**

Respectfully submitted,

By:     /s/ Bart A. Houston
        Bart A. Houston
        Florida Bar No. 623636
        **HOUSTON RODERMAN**
        *Counsel for Debtor*
        633 S. Andrews Ave. Suite 500
        Ft. Lauderdale, Florida 33301
        Telephone: (954) 900-2615
        Facsimile: (954) 839-9068
        Primary Email: bhouston@houstonroderman.com
        Secondary Email: dschena@houstonroderman.com

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are registered on the CM/ECF Noticing System on June 20, 2024.

By:     /s/ Bart A. Houston
        Bart A. Houston
        Florida Bar No. 623636

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

In re:                                        **Chapter 11**

**TGP COMMUNICATIONS, LLC**               **Case No.  24-13938-MAM**

   **Debtor.**
_____/

## NOTICE OF FILING REDACTED DECLARATIONS [1]

   **TGP COMMUNICATIONS, LLC** (the "**Debtor**") files the attached redacted declarations in further support of the *Debtor's Motion for Entry of an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors.* [ECF No. 26] (the "Motion").

**Dated: June 20, 2024**

                              Respectfully submitted,

                    By:    /s/ Bart A. Houston
                           Bart A. Houston
                           Florida Bar No. 623636
                           **HOUSTON RODERMAN**
                           *Counsel for Debtor*
                           633 S. Andrews Ave. Suite 500
                           Ft. Lauderdale, Florida 33301
                           Telephone: (954) 900-2615
                           Facsimile: (954) 839-9068
                           Primary Email: bhouston@houstonroderman.com
                           Secondary Email: dschena@houstonroderman.com

---

[1] The unredacted declarations shall be provided only to the Court, the U.S. Trustee and the Subchapter V Trustee pending the Court's ruling on the Motion.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing System on June 20, 2024.

By:    /s/ Bart A. Houston
Bart A. Houston
Florida Bar No. 623636

**UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

**TGP COMMUNICATIONS, LLC**                    Case No. 24-13938-MAM

**Debtor.**
_____/

**DECLARATION OF**

1.      I,                    , am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor for Debtor.  I have been writing for Debtor since 2018_____.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

5.      Because of the harassing and threatening electronic communications I have received, I have written and currently write articles under a pseudonym.

6.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because my first and last name, as well as the name of the publication at which my work is featured, alongside profanities, has been written by a group that calls themselves "sedition hunters" and "Antifa" on the ground outside of the federal courthouse in Washington DC. Antifa has also sought to publish my home address on social media in the past.  In 2021, my name was listed beside my phone number on a Tweet by NBC. I subsequently received harassing phone calls and messages for the following few days.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

2

I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  June 16, 2024          *Signature:* 

NAME:

**UNITED STATES BANKRUPTCY**
**COURT SOUTHERN DISTRICT OF**
**FLORIDA**
www.flsb.uscourts.gov

In re:                                              **Chapter 11**

**TGP COMMUNICATIONS, LLC**                          **Case No.  24-13938-MAM**

**Debtor.**
_____/

## <u>DECLARATION OF</u>

1.      I,                              , am over the age of 18 and make this Declaration in
support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to
Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor for Debtor.  I have been writing for Debtor since
2022.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have
received concerning negative emails from members of the public.

5.      Because of the hateful emails I have received, I have written and currently write
articles under a pseudonym.

6.      Although I am a creditor, I **do not** want my personally identifiable information,
including, but not limited to my legal name, email address, phone number, and home address
released to the public in Debtor's bankruptcy.

1

7.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger and so would my wife.

8.      I have reason to believe this because several of my colleagues have received life-threatening communications.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

2

Executed On:  June  17, 2024          *Signature:* _____

                                      NAME:

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA
### www.flsb.uscourts.gov

In re:                                                    Chapter 11

**TGP COMMUNICATIONS, LLC**                        Case No. 24-13938-MAM

**Debtor.**

_____/

## DECLARATION OF

1.      I,                          am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor or Debtor. I have been writing for Debtor since 2024. I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

1

5.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

6.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

7.      I have reason to believe this because I have received various threats over the course of my career, many violent in nature.

8.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.   At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 14, 2024                    Signature:

                                               NAME:

ITE   TATE  BA        T
T       THE     I T I T
I A

_____

I

T              I ATI                                                          A

_____

E   A  ATI

1.      I,                        , and I am over the age of 18 and make this Declaration
in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion
to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer and contractor for Debtor.  I have been writing for Debtor
since 2019.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have
received threats of physical harm and violence from members of the public, and I periodically
receive or have received harassing electronic communications from members of the public who
profess to      me and my writing,

.

5.      Because of the harassing and threatening electronic communications I have
received, I have written and currently write articles under a pseudonym as well as under my own
name.

1

6.      Although I am a creditor, I            want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, **I**                                   : I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because:

a.  I have been terminated from salaried positions because of my writing at TGP.

b.  I have been warned by colleagues and social contacts not to write for TGP otherwise it will come at great personal expense.

c.  I have received repeated negative comments from hostile members of the public that often lightly hint at creating personal repercussions for reporting facts about topics that they dislike.

d.  I have been on the receiving end of hostile members of the public who have confronted me about truthful things they dislike in the reporting at the Gateway Pundit.

e.  Colleagues have warned that significant political figures have "blackballed" or made me permanently unemployable in certain political-sensitive jobs, as a result of my reporting at the Gateway Pundit.

f.  The Detroit City Clerk threatened to "sick her dogs on" one of the reporters I was directing simply for asking her a question. Later, this individual, Janice Winfrey, perjured herself about this incident claiming that she was the victim. The Michigan Legislature then passed a law, based on Winfrey's perjury, to criminalize the 'harassment' of election officials such as her. I believe that these powerful government officials and legislators are trying to find a way to punish and penalize individuals who are reporting facts that they find

2

unhelpful to their agenda.

g.  I have repeatedly reported on the misdeeds of a family who owns a private military contractor, and who has been tied to war crimes including assault and murder.

h.  I have reported on issues of international concern that involve groups engaged in war crimes and violence against vulnerable populations.

i.  Powerful and prominent individuals regularly approach Publisher Jim Hoft asking for my termination from TGP, and I believe that those people are seeking to inflict harm upon me in other ways.

j.  Individuals have tried in the past to use smear campaigns and coordinated defamation campaigns to inflict economic warfare on me, including threatening business, filing complaints at my place of work, in order to stop and negative affect my reporting.

k.  I regularly receive some kind of veiled threat from individuals and organizations for my reporting.

9.  Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number,  and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

3

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June ___17___, 2024          *Signature:* _____          _____

NAME:

_____          _____

4

5

UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA
www.flsb.uscourts.gov

In re:                                          Chapter 11

TGP COMMUNICATIONS, LLC                         Case No. 24-13938-MAM

Debtor.
_____/

### DECLARATION OF _____

1.    I,       am over the age of 18 and make this Declaration in support of Debtor
and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally
Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.    I make this Declaration based on personal knowledge.

3.    I am currently a writer/contractor for Debtor. I have been writing for Debtor since
2022. I am also an individual creditor for Debtor in the instant bankruptcy.

4.    Because of my writing for Debtor and/or other similar online publications, I am
aware of physical harm and violence from members of the public made against my colleagues, and
I periodically receive or have received harassing electronic communications from members of the
public who profess to hate me and my writing, **and who have stated they wish to inflict physical
harm upon my person.**

5.    Although I am a creditor, I do not want my personally identifiable information,
including, but not limited to my legal name, email address, phone number, and home address
released to the public in Debtor's bankruptcy.

1

6.  Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

7.  I have reason to believe this because of attacks labeling the publication as "far-right" and "conspiracy theorists" has placed a target on myself for reporting credible stories based on known facts regarding US elections and January 6th defendants and cases, among other stories. Rhetoric and criticisms from political officials and other media outlets on certain ideas and topics in the minds of some radicalized followers of these entities has created hostile sentiments for differing political and social opinions.

8.  Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: June 17, 2024

Signature:

NAME:

**UNITED STATES BANKRUPTCY**
**COURT SOUTHERN DISTRICT OF**
**FLORIDA**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

**TGP COMMUNICATIONS, LLC**                **Case No. 24-13938-MAM**

Debtor.
_____

## DECLARATION OF

1.     I, _____, am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.     I make this Declaration based on personal knowledge.

3.     I am currently a writer/contractor for Debtor. I have been writing for Debtor since 2017. I am also an individual creditor for Debtor in the instant bankruptcy.

4.     Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person.**

5.     Because of the harassing and threatening electronic communications I have received, I have gone to extreme lengths to keep my address from being made public.

6.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, I **am in fear for my life and safety:** I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because I moved from Washington, DC, to West Virginia after my address was published online and fireworks were shot at my home in the middle of the night while I was alone with my then-nine-year-old daughter. My main employer, Timcast, has also been the target of over a dozen swatting incidents where fake police reports were made to send a heavy police presence to his home and studio to harass him. I am currently 25 weeks into a high-risk pregnancy with twins and this would cause me extreme stress.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

2

I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  June 16, 2024

NAME:

# UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA

www.flsb.uscourts.gov

In re:

TGP COMMUNICATIONS, LLC

Debtor.

Chapter 11

Case No. 24-13938-MAM

## DECLARATION OF

1.    I, ████████████ , am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.    I make this Declaration based on personal knowledge.

3.    I am currently a writer/contractor for Debtor. I have been writing for Debtor since 2021. I am also an individual creditor for Debtor in the instant bankruptcy.

4.    Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to hate me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

5.    Because of the harassing and threatening electronic communications I have received, I have written and currently write articles under a pseudonym.

6.      Although I am a creditor, I do not want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, I am in fear for my life and safety and that of my family: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because multiple threats that have already occurred over the years. One of the threats was made directly to both me and my children and required the involvement of the local police department. The harassment included threatening phone calls with explicit threats of physical harm against me and my children, as well as threatening communication via email and regular email. Those threats were a factor in me and my family moving almost 1000 miles from that town.

Additionally, I have a vulnerable sibling who will be spending time in my home who suffers from a severe mental disorder. Having my personal details exposed publicly, thus revealing my legal name and personal details and contact information which would open me back up to the continued harassment, would place that sibling in grave danger and could have serious, harmful repercussions for his mental health and safety.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable

information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: June 14, 2024

Signature:

NAME:

**UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA**
www.flsb.uscourts.gov

In re:                                                     Chapter 11

**TGP COMMUNICATIONS, LLC**                 Case No.  24-13938-MAM

**Debtor.**

_____/


## DECLARATION OF

1.      I,                            , am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor for Debtor.  I have been writing for Debtor since 2019.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

5.      Because of the harassing and threatening electronic communications I have received, I have written and currently write articles under a pseudonym.

6.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

1

7.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because I have been personally doxxed (had my personal information revealed against by wishes) numerous times by radical activists seeking to maximize negative effects on me, including left-wing journalists with wide reach Matthias Meisner and Lars Wienand, and a group of online stalkers known as "AchbesserCrew". I am continuously stalked by left-wing websites frequented by the German street guerilla known as "Anti"-Fascists. Many colleagues and acquaintances have been attacked as a result of such doxxing by so-called "Anti"-Fascists.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

2

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 15, 2024                    Signature:

NAME:

**UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

**TGP COMMUNICATIONS, LLC**                               **Case No. 24-13938-MAM**

Debtor.

_____/

## DECLARATION OF

    1.    I, .            am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

    2.    I make this Declaration based on personal knowledge.

    3.    I am currently a writer for Debtor. I have been writing for Debtor since 2021. I am also an individual creditor for Debtor in the instant bankruptcy.

    4.    Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing **physical and electronic** communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

    5.    Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

1

6. Specifically, **I am in fear for my life and safety as well as my loved ones' lives and safety**: I strongly believe that were my personally identifiable information made readily available to the public, we would be placed in great physical danger.

7. I have reason to believe this because of harassing mail and phone calls, as well as violent social media messages and mentions that I have received. Given the fact that I have already received mail at my home and others have spoken publicly about my home address, I reasonably believe and fear that continuing to publicize my home address and making my personal information more available would further dox me, further empower individuals who seek to harm me and lead to increased risk to my life and the lives of my family members.

8. Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 17, 2024          *Signature:*

                                     NAME: .

## APPENDIX TO DECLARATION OF JORDAN CONRADSON

1:  A Twitter user offers to share my home address with others online for the purposes of harassment. This post was deleted after I filed a complaint with Twitter.





2: The same Twitter user publicizes photos of my family members and their social media pages, potentially urging others to find them and harm them.

Page URL:
https://x.com/arthurzork/status/1507765959376838657?s=46&t=ZzgrZiYNNvG9nN8Khg7lJQ

Archived page URL: https://archive.ph/5KBi4



Arthur Zork 🪱 {they/them}
@ArthurZork
[Follow]

**You also might be exposing family members on social media even if you don't make family details public.**
m.facebook.com/photo.php?fbid...

mobile.twitter.com/jimconradson



1:06 PM · 3/26/22 From Earth

**1 Like**

3: Another Twitter user asks other users to send my home address to them for the purpose of harassing me.

Page URLs:
(https://x.com/bystander85234/status/1677509321557684224?s=46&t=ZzqrZiYNNvG9nN8Khg7IJQ)
(https://x.com/bystander85234/status/1677515226646978563?s=46&t=ZzqrZiYNNvG9nN8Khg7IJQ)

Archived page URLs: (https://archive.ph/7octG)(https://archive.ph/4RFAj)



4: A harassing letter sent to my home dated 11/30/2023 with the envelope dated 12/1/2023:



5: I am mentioned in a social media post, threatening to "stick that gun so far up your [asshole]."

Page URL:
https://x.com/robertb31340553/status/1668671991585419288?s=46&t=ZzqrZiYNNvG9nN8Khg7lJQ

—

Archived page URL: https://archive.ph/RmBnu

 **Robert Beck @RobertB31340553 · 6/13/23** · · ·
**Replying to @ConradsonJordan @KariLake and 2 others**

As a Republican but not a conservative because vaginas don't terrify me bring it on you old hag... We'll stick that gun so far up your axshole you'll enjoy it... You're a historic loser

     ⟲     ♡ 1     �_ıl 23     ⊓     ⬆

ITE   TATE BA        T
T     THE    I T I T
I A

I
T              I ATI                                                      A

E   A ATI

1.     I,                    , am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.     I make this Declaration based on personal knowledge.

3.     I am currently a writer/contractor for Debtor.  I have been writing for Debtor since 2016.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.     Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to      me and my writing,

.

5.     Because of the harassing and threatening electronic communications I have received, I have written and currently write articles under a pseudonym.

6.     Although I am a creditor, I          want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, **I**                                      : I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because I have received very serious threats against my life. I have had several male stalkers who have tried to find my address. I have had to move twice and lived at three different residences since 2016 because of the stalking and threats directly related to my conservative political beliefs and work as a blogger . One man sent me a picture of a firearm on his lap and told me he found my address. I have received various threats on the social media platform X (formerly Twitter). Twitter users have told me that I should be lit on fire. One Twitter user threatened to rape me if he ever found me. I have called the police countless times to report threats and cyberstalking. One of my stalkers is a former police officer who sent me hundreds of harassing messages. He even called into a radio show I was on to scream at me and harass me. Another man has stalked me on and off since 2016. I recently began receiving harassing emails and I believe it may be him. I also received a correspondence from the Pakistani government informing me that they had sentenced me to death and or life in prison for violating Sharia law related to one of my Twitter posts. Twitter legal delivered the death sentence from the Paksistani government to me via email. I live in fear that the Pakistani government may have operatives in the US who may try to find me. I have a weapon on me at all times because I live in fear that one of my stalkers will find me and try to harm me or kill me. I have family and elderly parents who live near me and I believe they would also be in danger since we all share the same last name.  As a woman who lives alone it would be dangerous for my   name and email address to be made public.

... the supervising Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: June _14___, 2024          *Signature:*

                                        NAME:

3

UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA
www.flsb.uscourts.gov

In re:                                      Chapter 11

TGP COMMUNICATIONS, LLC                     Case No. 24-13938-MAM

Debtor.

_____/

### DECLARATION OF

1.      I, _____ am over the age of 18 and make this Declaration in

support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to

Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor for Debtor. I have been writing for Debtor since

November 2022. I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have

received threats of physical harm and violence from members of the public, and I periodically

receive or have received harassing electronic communications from members of the public who

profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm

upon my person**.

5.      Although I am a creditor, I **do not** want my personally identifiable information,

including, but not limited to my legal name, email address, phone number, and home address

released to the public in Debtor's bankruptcy.

1

6.    Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

7.    I have reason to believe this because:

    a.  I have personally received numerous hate emails.

    b.  Other writers have received threats to themselves and their families, including but not limited to death threats and actions against their personal property. I fear that if my personal information was disclosed, not only would I be threatened, but also the members of my family who reside with me would be in imminent danger.

8.    Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 15, 2024

Signature:

NAME:

3

## UNITED STATES BANKRUPTCY
## COURT SOUTHERN DISTRICT OF
## FLORIDA
### www.flsb.uscourts.gov

In re:                                              Chapter 11

**TGP COMMUNICATIONS, LLC**                          Case No.  24-13938-MAM

**Debtor.**

_____/

## <u>DECLARATION OF</u>

1.      I,                      , am over the age of 18 and make this Declaration in support

of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to

Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No.

26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor for Debtor.  I have been writing for Debtor since

2022.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing and reporting for Debtor and/or other similar online

publications, I have been brutally harassed in public. <u>I have been physically assaulted on

various occasions</u>. I have been threatened of harm and violence, and I periodically

receive or have received harassing communications from members of the public after

they read articles I have written.

1

5.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

6.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

7.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.   At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy. Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 18th, 2024

Signature: /

NAME:

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:                                                              Chapter 11

**TGP COMMUNICATIONS, LLC**                      Case No.  24-13938-MAM

**Debtor.**

_____/

## DECLARATION OF

1.   I,                    , am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor for Debtor.  I have been a contractor for Debtor since 2023 and  a writer published there for several years before then.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have received intimidating comments and posts implying threats of physical harm from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have implied they wish to inflict physical harm upon my person**.

5.      I write under my own name, as I have since writing online since 1998. However, I do not publish my address, phone number or email addresses or specific locale beyond "east central Ohio" because of the harassing and threatening electronic communications I have received.

1

6.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I am a journalist with The Gateway Pundit and contribute to multiple reputable publications – previous contributions include Fox News, New York Times, Blaze TV, Daily Wire and more. I am a federally credentialed reporter with verified ID directly from the House of Arms in the Senate Building, having been cleared by the FBI and other federal agencies in background checks. My work has been used in the 2nd impeachment hearing of former President Donald Trump, prosecution of Kyle Rittenhouse from the Kenosha, WI shooting, and featured at CNN, MSNBC, and recent documentaries from HBO amongst other notable networks. According to my contacts at The Gateway Pundit it has come to my attention that court proceedings are requesting my personal information to be released on merit of legal inquiry. As a journalist, field reporter, and writer – my work has been and continues to remain an essential source for the general American public. However, in the majority of cases I have prided myself behind the scenes as being an undercover reporter that imbeds himself in extremist groups from the right wing to left-wing – even being involved in exposing crimes of far right groups (unnamed) in federal probes. It has come to my attention that TGP is being asked to release personal information from their contractors (myself) and many others – while I understand the foundation of this request, any further request for address and info from reporters like myself puts our lives in danger. I have received countless credible death threats, even in recent months, confirming that a future legal doxing of my personal

2

details would result in severe harm to myself, my 15 month old son, and 6 month pregnant wife who is NOT a public figure among many other family members who are not publicly involved. I have been physically assaulted (near death) due to the nature of my work in several well documented public occasions, one of which was at gun point and resulted in permanent damage to my face. Additionally, I have had guns drawn to my head by perps while documenting my work, had federal investigators meddle with my sources against statutory law, and had multiple people directly threaten family members with use of force.

In the name of journalistic integrity, I ask that you keep my personal information private and do not release any info of our journalists in court docs for the sake of free press. This is a security issue, both for the team, and a precedent for the nation as whole.

9. Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 17, 2024

Signature _____

NAME:

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA**
ww.-.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| **TGP COMMUNICATIONS, LLC** | Case No. 24-13938-MAM |
| Debtor. | |

_____/

**DECLARATION OF** _____

1.    I, _____, am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.    I make this Declaration based on personal knowledge.

3.    I am currently a writer/contributor/contractor for Debtor. I have been writing for Debtor since 2023. I am also an individual creditor for Debtor in the instant bankruptcy.

4.    Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public and hostile groups, and I periodically receive or have received harassing electronic communications from members of the public and hostile groups who profess to hate me and my writing, and who have stated they wish to inflict physical harm upon my person. Because of my past work for the U.S. Government, I have in the past been informed that I am a person of interest of terrorist groups and foreign governments. I have recently been informed that different groups are attempting to access my home network and information to obtain more information about me.

5.      Because of the harassing and threatening electronic communications I have received; I am concerned about the release of any of my personally identifiable infom1ation.

6.      Although I am a creditor, I do not want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, I am in fear for the safety of my family and myself: I strongly beLieve that were my personally identifiable information made readily available to the public, my family and I would be placed in great physical danger.

8.      I have reason to believe this because I have been informed when in Federal Government Service to take precautions in and around my home due to hostile groups and I have also received specific threats on social media such as Twitter, GETTR, Gab, and Truth.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS fNTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: June 17, 2024                    *Signature*

                                              NAME:

ITE   TATE  BA     T
T      THE      I T I T
I  A

I

T                 I ATI                                                                    A

_____

E   A ATI

1.  I,                    , am over the age of 18 and make this Declaration in support of Debtor and

Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally

Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.    I make this Declaration based on personal knowledge.

3.    I am currently a writer/contractor for Debtor.  I have been a contractor for Debtor

since 2014 and  a writer published there for several years before then.  I am also an individual

creditor for Debtor in the instant bankruptcy.

4.    Because of my writing for Debtor and/or other similar online publications, I have

received intimidating comments and posts implying threats of physical harm from members of the

public, and I periodically receive or have received harassing electronic communications from

members of the public who profess to       me and my writing,

.

5.    I write under my own name, as I have since writing online since 1998. However, I

do not publish my address, phone number or email addresses or specific locale beyond "east central

Ohio" because of the harassing and threatening electronic communications I have received.

1

6.      Although I am a creditor, I          want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, **I**                                  : I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because I have been doxed by critics who wanted me to be aware they knew details of my private life, including real world work and home locations; a private investigator associated with the Clintons let me know he was investigating me; the current political climate is such that liberals show up at the homes of conservatives, apostate liberals and Supreme Court justices at all hours of the day and night to harass and intimidate, sometimes vandalizing their homes and property—as well as the attempt to assassinate Justice Brett Kavanaugh and the hammer attack on the husband of former Speaker Nancy Pelosi at their respective homes.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

2

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 15, 2024          *Signature:* _____          _____

                                    NAME:

I declare under penalty of perjury that the foregoing is true and correct.


Executed On: June 15, 2024          *Signature:* Kristinn S. Taylor

                                    NAME:

                                    Kristinn S. Taylor

UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| TGP COMMUNICATIONS, LLC | Case No. 24-13938-MAM |
| Debtor. | |
| _____/ | |

## DECLARATION OF

1.     I, ____ ____, am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.     I make this Declaration based on personal knowledge.

3.     I am currently a writer/contractor for Debtor. I have been writing for Debtor since 20 2 5. I am also an individual creditor for Debtor in the instant bankruptcy.

4.     Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to hate me and my writing, **and who have stated they wish to inflict physical harm upon my person.**

5.     Because of the harassing and threatening electronic communications I have received, I have written and currently write articles under a pseudonym.

1

6. Although I am a creditor, **I do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7. Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8. I have reason to believe this because [INSERT NEGATIVE EXPERIENCES AND CONCERNS HERE]. ODD PHONE CALLS TO ME + FAMILY. THREATS TOO.

9. Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: June 17, 2024      Signature:

NAME:

3

**UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA**
www.flsb.uscourts.gov

In re:                                                                    Chapter 11

**TGP COMMUNICATIONS, LLC**                          Case No.  24-13938-MAM

**Debtor.**

_____/

<u>**DECLARATION OF**</u>

1.       I,                          , am over the age of 18 and make this Declaration in support of

Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to

Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No.

26).

2.       I make this Declaration based on personal knowledge.

3.       I am currently a writer/contractor for Debtor.  I have been writing for Debtor since

2022.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.       Because of my writing for Debtor and/or other similar online publications, I have

received concerning negative emails from members of the public.

▮         ████████████████████████████████████

████████████████

1

6.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7.      Specifically, **I am in fear for my life and safety** and am asking that my personal identifiable information not be exposed in any way by lawyers or representatives of the DOJ. I am an independent contractor who contributes to The Gateway Pundit when I choose. There is no reason to make my home address or any other identifiable information available to the public other than for the purposes of inviting retribution for articles that I've written that may have triggered or angered individuals or groups like Antifa, who hold opposing views. My obvious concern would be the use of violence or the threat of violence against me, my husband or my young adult daughter who lives at home while working at a local university.

I've seen the unruly mobs outside of Justice Thomas' home when he was doxxed. I've watched news reports about death threats against Justice Kavanaugh, and other conservatives with whom the Left disagrees. I've received at least one violent death threat against me and my children that I reported to Facebook. I've also reported a threat to the Secret Service that was shared with me against President Trump. I've received multiple threats via email and on Facebook during the time I was a co-owner of my own popular website and Facebook pages, which is why I was careful to NEVER expose my last name to the public. Additionally, I have ALWAYS been careful to never tell anyone I don't know personally where I live. I would hope that my personal

private information, for the sake of myself, and especially for the safety of my family that lives

with me, would be respected by the recipient of this email as well.

8. Because of this, I ask the Bankruptcy Court to keep and preserve my personally

identifiable information, including but not limited to my name, email address, phone

number, and home address sealed and unavailable to the public. At the same time, I

understand that parties in interest to these bankruptcy proceedings have a right to contact

me, and I do not object to the parties in interest (or the Court) having knowledge of and

access to my personally identifiable information as stated above so that they may contact

me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

3

Executed On:  June  17, 2024            *Signature:*

NAME:

**UNITED STATES BANKRUPTCY**
**COURT SOUTHERN DISTRICT OF**
**FLORIDA**
www.flsb.uscourts.gov

In re:                                                    **Chapter 11**

**TGP COMMUNICATIONS, LLC**                    **Case No.  24-13938-MAM**

**Debtor.**

_____/


**DECLARATION OF**          _____


1.       I, ___          _____, am over the age of 18

and make this Declaration in support of Debtor and Debtor in Possession TGP Communications,

LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual

Creditors (ECF No. 26).

2.       I make this Declaration based on personal knowledge.

3.       I am currently a contractor for Debtor.  I have been writing for Debtor since 2024.

I am also an individual creditor for Debtor in the instant bankruptcy.

4.       Because of my writing for Debtor and/or other similar online publications, I have

received threats of physical harm and violence from members of the public, and I periodically

receive or have received harassing electronic communications from members of the public who

profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm**

**upon my person**.

5.       Although I am a creditor, I **do not** want my personally identifiable information,

including, but not limited to my legal name, email address, phone number, and home address

released to the public in Debtor's bankruptcy.

6.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

7.      I have reason to believe this because of vicious and in some cases, threats of violence and doxing attempts I have received on social media and other places.

8.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

2

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June  17_____, 2024          _Signature:_____          _____

                                            NAME:

                                            ____          _____

**UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA**
www.flsb.uscourts.gov

**In re:**                                                      **Chapter 11**

**TGP COMMUNICATIONS, LLC**                    **Case No. 24-13938-MAM**

**Debtor.**

_____/

## DECLARATION OF

1.    I,                                am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.    I make this Declaration based on personal knowledge.

3.    I am currently a writer/contractor for Debtor. I have been writing for Debtor since 2023. I am also an individual creditor for Debtor in the instant bankruptcy.

4.    Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

5.    I have written and currently write articles under a 'pen-name'.

6.    Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

1



7.      Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8.      I have reason to believe this because of the nature of the threats both me and my colleagues have received.

9.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.


THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK


2

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  June 16, 2024

Signature: _____

NAME:

## UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                   Chapter 11

**TGP COMMUNICATIONS, LLC**               **Case No. 24-13938-MAM**

Debtor.

_____/

## DECLARATION OF ,

1.      I, .          am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently an independent contractor for Debtor. I have been writing for Debtor since February 2024. I am also an individual creditor for Debtor in the instant bankruptcy.

4.      As a freelance reporter, I have written and currently write articles under the pseudonym J.M. Phelps out of concern for safety, having written hundreds of articles related to national security, terrorist threats, the highly controversial COVID-19 vaccine mandate and more. Additionally, at my request for all of the abovementioned reasons, none of the outlets I write for use a writer bio photograph or any personally identifiable information, such as my home address or my business address. In order to effectively investigate issues, I have to maintain some level of anonymity as a journalist, just as I have to protect my sources.

5.      Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

6.      Specifically, **I do have concern for my safety and that of my family's safety.** I strongly believe that were my personally identifiable information made readily available to the public, I risk attacks to my personal character, my reputation as a writer, and greater risk of potential physical danger.

7.      I have reason to believe this because others who have written articles similar to myself currently have fatwas against them, and others have found themselves unjustly investigated and imprisoned. As people get more radicalized with specific targets, there is legitimate concern for media personnel and media outlets to be harassed or attacked.

8.      Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  June 17, 2024

NAME:

**UNITED STATES BANKRUPTCY**
**COURT SOUTHERN DISTRICT OF**
**FLORIDA**
www.flsb.uscourts.gov

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **TGP COMMUNICATIONS, LLC** | **Case No.  24-13938-MAM** |
| **Debtor.** | |
| _____/ | |

**DECLARATION OF**                    **|_____**

1.      I,                                      am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.      I make this Declaration based on personal knowledge.

3.      I am currently a writer/contractor for Debtor.  I have been writing for Debtor since 2024____.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.      Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

5.      Because of the harassing and threatening electronic communications I have received, I have written and currently write articles under a pseudonym.

1

6. Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

7. Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

8. I have reason to believe this because [I have received threatening emails from readers, through my Gateway Pundit email. I have been attacked and criticized for my pro Israel stance and I am concerned that if my address were made public, my family could be harmed].

9. Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.


Executed On:  June _16____, 2024          *Signature:*_____   .            _____

                                          NAME:

**UNITED STATES BANKRUPTCY**
**COURT SOUTHERN DISTRICT OF**
**FLORIDA**
www.flsb.uscourts.gov

In re:                                                    Chapter 11

**TGP COMMUNICATIONS, LLC**               **Case No. 24-13938-MAM**

**Debtor.**
_____/

### DECLARATION OF

- I, ___ _____, am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

- I make this Declaration based on personal knowledge.

- I am currently a writer/contractor for Debtor. I have been writing for Debtor since 2024. I am also an individual creditor for Debtor in the instant bankruptcy.

- Because of my writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

- Because of the harassing and threatening electronic communications I have received, I have written and currently write articles under a pseudonym.

- Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

- Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I would be placed in great physical danger.

- Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public. At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK

I declare under penalty of perjury that the foregoing is true and correct.

| | |
|---|---|
| Executed On: June 15, 2024 | *Signature:* |
| | NAME: |
| | |

**UNITED STATES BANKRUPTCY
COURT SOUTHERN DISTRICT OF
FLORIDA**
www.flsb.uscourts.gov

In re:                                                  Chapter 11

**TGP COMMUNICATIONS, LLC**                    Case No.  24-13938-MAM

**Debtor.**

_____/


## DECLARATION OF


1.       I,                      , am over the age of 18 and make this Declaration in support of Debtor and Debtor in Possession TGP Communications, LLC's ("Debtor") Motion to Suppress Personally Identifiable Information for Certain Individual Creditors (ECF No. 26).

2.       I make this Declaration based on personal knowledge.

3.       I am currently a video contributor and writer for Debtor.  I have been creating video content and writing for Debtor since 2023.  I am also an individual creditor for Debtor in the instant bankruptcy.

4.       Because of my video content and writing for Debtor and/or other similar online publications, I have received threats of physical harm and violence from members of the public, and I periodically receive or have received harassing electronic communications from members of the public who profess to **hate** me and my writing, **and who have stated they wish to inflict physical harm upon my person**.

5.       Although I am a creditor, I **do not** want my personally identifiable information, including, but not limited to my legal name, email address, phone number, and home address released to the public in Debtor's bankruptcy.

1

6.     Specifically, **I am in fear for my life and safety**: I strongly believe that were my personally identifiable information made readily available to the public, I and my family would be placed in great physical danger.

7.     I have reason to believe this because I regularly receive messages on my public social media account that threaten my life and safety. This social media account is the account I post videos I have created for Debtor before uploading to Debtor's website with the link to my account. Attached as Exhibit A are messages I have received just in the last three months. Individuals have made threats towards me. Multiple threats have encouraged me to commit suicide. One even was a wish that the person could meet me and "break every bone in my face." Exhibit A. As a result of the continued hatred and threats directed toward myself, I have been forced to take action to protect myself and my family from the dangers of my personal information going public and compromising our safety.

8.     Because of this, I ask the Bankruptcy Court to keep and preserve my personally identifiable information, including but not limited to my name, email address, phone number, and home address sealed and unavailable to the public.  At the same time, I understand that parties in interest to these bankruptcy proceedings have a right to contact me, and I do not object to the parties in interest (or the Court) having knowledge of and access to my personally identifiable information as stated above so that they may contact me to the extent they have a right to do so as part of TGP's bankruptcy.

Further, affiant sayeth not.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed On: June 16, 2024          Signature :s//          _____

                                    NAME:

8:47

 **mana**



## mana

@_mana_____

0 following · 0 followers

**Follow**

May 20, 10:05 AM

kill yourself you worthless fuck. I'd love to meet you and break every bone in your face



If you receive a message that you find inappropriate or concerning, tap Report so we can review it.

May 20, 8:03 PM

❤️❤️  😂😂  👍👍   Stickers  ▶️ Sh

Send a message...

8:47

<  **Karson** 🚩 ⋯



# Karson

@karson.ingram13
32 following · 35 followers

**Follow**

May 20, 11:21 AM

have you tried killing yourself

 yet



May 20, 1:41 PM

Message request accepted. You can start chatting.

❤️❤️    😂😂    👍👍     Stickers    ▶️ Sh

Send a message...

8:49



‹ **jesserox29** ⚑ •••



# jesserox29

jesserox29

Mar 22, 12:42 AM

 Cut ur dICk off and killyourself

Mar 22, 12:59 AM

Message request accepted. You can start chatting.

❤️❤️   😂😂   👍👍    Stickers   

Send a message…

EXHIBIT A

8:49

# DanDidAThing



# DanDidAThing

danblay

Mar 21, 7:52 AM

I hope you live in fear at any moment someone you don't know hates you fucking sucker punches you.



Mar 22, 1:03 AM

Message request acce... You can start chatting.

❤️❤️     😂😂     👍👍     Stickers

Send a message...

EXHIBIT A

8:49

< **User** 

Only friends can send messages to each other



@(null)
0 following · 0 followers

Mar 23, 1:21 AM

kill

your

self

Mar 23, 2:01 AM

Message request accepted. You can start chatting.

❤️❤️❤️  😂😂😂  👍👍👍  Stickers

Send a message...

**8:48**

 **girgis J** 

211 following · 19 followers

**Follow**

Mar 22, 8:33 AM

 i hope you have people around you who love you and look out for you,
hold tight onto them,

Mar 22, 9:36 AM

Message request accepted. You can start chatting.

Lol thanks?

May 3, 10:01 AM

 and now it's when you'll need people who love you around you, say hello to a life of suffering you little piece of shit

 ❤️❤️  😂😂  👍👍  Stickers 

Send a message...  



ORDERED in the Southern District of Florida on June 20, 2024.

Mindy A. Mora, Judge
United States Bankruptcy Court

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                          Case No.: 24-13938-MAM

TGP Communications, LLC,                        Chapter 11

     Debtors.
_____/

AGREED ORDER SETTING EVIDENTIARY HEARING
AND ESTABLISHING RELATED DEADLINES

    **THIS MATTER** came before the Court upon the Motion of Ruby Freeman and Wandrea' ArShaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation (ECF No. 39) (the "Motion"). Counsel for Ruby Freeman and Wandrea' ArShaye Moss ("Movants") and counsel for the Debtor ("Respondent") have advised the Court that all parties are prepared to proceed with an evidentiary hearing. Accordingly, the Court ORDERS as follows:

1. **HEARING; SERVICE**. The Court will conduct an evidentiary hearing on **June 27, 2024 at 1:00 p.m. (ET).** The hearing will take place at the United States Bankruptcy Court located at 1515 N. Flagler Drive, Courtroom A, Room 801, West Palm Beach, Florida 33401. Movants shall serve a copy of this Order

on all appropriate parties and file a certificate of service thereof as required by this Court's local rules.

2.  **VIDEO CONFERENCE PROCEDURES.**  The parties are DIRECTED to comply with the *General Procedures for Hearings by Video Conference* found on Judge Mora's webpage at www.flsb.uscourts.gov.  To the extent that the procedures on Judge Mora's web page conflict with the instructions in this Order, this Order shall govern.

3.  **PUBLIC ACCESS.**  Any person wishing to listen to the hearing by telephone must contact Maria Romaguera, Courtroom Deputy, solely by email at **Maria_Romaguera@flsb.uscourts.gov** to obtain dial-in instructions by no later than 3:00 p.m. at least two (2) business days prior to the date of the hearing.  The Court cannot process untimely requests.

4.  **EXCHANGE OF EXHIBITS AND WITNESS LISTS, IF ANY**.

    In accordance with Local Rule 9070-1, a complete set of exhibits, if any, shall be exchanged with opposing counsel and filed with the Court according to the schedule and specifications set forth below.  The number of days specified below is the minimum number of business days prior to the hearing by which the documents must be exchanged or submitted, as applicable.  All submissions must occur **by 4:00 p.m.** on the specified date unless stated otherwise.

| Event | Number of Business Days Prior to Hearing |
|---|---|
| Exhibits exchanged and filed pursuant to Local Rule 9070-1 | **4** |
| Witness Lists | **4** |
| Objections to Exhibits | **2** |
| Joint Stipulation of Facts exchanged with counsel for Respondent | **4** |
| Joint Stipulation of Facts filed with the Court by Movants | **2** |
| Supporting Declarations filed with the Court | **2 (by 9:00 a.m. (ET))** |
| Objections to Supporting Declarations filed with the Court | **0 (by 9:00 a.m. (ET))** |

A.  Exhibits:

(1)  Parties must exchange set of pre-marked exhibits (including summaries) intended to be offered as evidence at the evidentiary hearing, if any.  All exhibits must include the party's role in the

matter or adversary proceeding (i.e., "plaintiff" or "movants") and be sequentially numbered. When exhibits are exchanged electronically, Movants and Respondent shall also include a short descriptive name of each exhibit, e.g., "mortgage", "note", or "letter dated xx/xx/xxxx" in the file name of each exhibit.

(2)    Presentation and exchange of exhibits shall conform to Local Rule 9070-1. As noted in Local Rule 9070-1, counsel representing any party shall submit the exhibits and exhibit register via CM/ECF. The exhibits so filed shall constitute the official exhibits in this matter.

(3)    With regard to any summary the party will offer in evidence at the hearing, the submitting party must provide a notice of the location(s) of the books, records, and the like, from which each summary has been made, and the reasonable times when they may be inspected and copied by adverse parties.

(4)    Each party must prepare a separate exhibit register based upon the Local Form Exhibit Register.

B. Witness Lists:

Each party presenting witnesses must provide all other parties with a list showing the name and, if not previously provided, the address and telephone number of each witness that the party may call at the hearing other than solely for impeachment.

C. Objections to Exhibits:

Any objection to the admissibility of any proposed exhibit, including any deposition transcript or recording (audio or video) or any summary must be submitted pursuant to the deadlines set forth above. The objection must (i) identify the exhibit, (ii) briefly state the grounds for the objection, and (iii) provide citations to case law and other authority in support of the objection. <u>An objection not so made—except for one under Federal Rule of Evidence 402 or 403—is waived unless excused by the Court for good cause.</u>

D. Joint Stipulation:

The respective parties shall file a joint stipulation of uncontested facts on or before the deadline set forth above. **Counsel for Movants shall prepare the first draft of the joint stipulation of uncontested**

facts and exchange the draft with counsel for Respondent on or before the deadline set forth above. Counsel for all parties shall sign the final stipulation of uncontested facts. The failure of counsel to prepare and submit the joint stipulation may result in sanctions.

E. Supporting Declarations:

Any party who expects to use in person witness testimony in support or opposition to the Motion or Response shall present the direct testimony of the witness by written declaration. The written declaration, if any, shall be filed and served on or before **9:00 a.m. (ET) on June 25, 2024**. Objections to such declarations must be filed by **9:00 a.m. (ET) on June 27, 2024**. The witnesses presenting direct testimony by written declaration shall be required to appear in person in the courtroom and will affirm under oath the statements in their written declaration and shall be subject to cross-examination.

5. **FINAL ARGUMENT**. At the conclusion of the hearing, in lieu of final argument, the Court may request that each party file a proposed order with findings of fact and conclusions of law.

6. **SETTLEMENT**. If the contested matter is settled, the parties shall submit to the Court a stipulation approved by all parties and a motion for approval of the same prior to the date of the hearing. If a stipulation and motion are not submitted to the Court, all parties shall be prepared to proceed with the hearing. If the contested matter is removed from the calendar based upon the announcement of a settlement, the contested matter will not be reset for hearing if the parties fail to consummate the settlement. In such event, the Court will consider only a motion to enforce the settlement, unless the sole reason the settlement is not consummated is that the Court did not approve the settlement, in which case the matter will be reset for hearing at a later date.

7. **SANCTIONS**. Failure to appear at the hearing or to comply with any provision of this order may result in appropriate sanctions, including the award of attorney's fees, striking of papers, or the exclusion of exhibits or witnesses.

8. **CONTINUANCES**. Continuances of the hearing or any deadlines set forth in this order must be requested by written motion. Any request for continuance or amendment to this order shall set forth the status of discovery and shall state the reasons why the party or parties seek a continuance.

9. **BRIEFING SCHEDULE**.

**a.** The Respondent may file a response (the "<u>Response</u>") to the Motion on or before **June 18, 2024 at 4:00 p.m.** If Respondent elects to file a Response the title of the Response shall reference the ECF number of the Motion. The Response must not exceed ten (10) pages in length, including any accompanying memoranda of law. If Respondent(s) choose(s) to submit supplemental documentation, each document must be filed as an individual exhibit to the Response. Failure to timely file a Response may result in the Court granting the Motion.

**b.** Movants and any other party in interest may file a reply (each, a "<u>Reply</u>") to the Response on or before **June 25, 2024 at 4:00 p.m.** If Movants or any other party in interest elects to file a Reply, each Reply shall not exceed five (5) pages in length. If Movants or any other party in interest chooses to submit supplemental documentation, each document must be filed as an individual exhibit to the Reply.

**c.** The Response and any Reply must provide pinpoint citations identifying (i) contested allegations by paragraph and (ii) describing the purported legal basis for dismissal (or lack thereof). Failure to provide the Court with clear, accurate, and precise citations may result in the Court striking the relevant factual or legal assertion(s).

**d.** The Response and any Reply shall be formatted with 12-point font (preferably Times New Roman or Century Schoolbook) and double-spacing of paragraphs. Failure to adhere to page limitations may result in the Court striking the portion of the submission that exceeds the stated limitations.

###

<u>**Submitted by:**</u>

David A. Blansky
DUNN LAW, P.A.
66 West Flager Street, Suite 400
Miami, FL 33130
Telephone: (786) 433-3866
Facsimile: (786) 260-0269
dblansky@dunnlawpa.com

**Copy furnished to:**

*Attorney David A, Blansky shall immediately serve this Order upon all parties listed below and file a certificate of service with the Court that conforms with Local Rule 2002-1(F).*

Debtor
United States Trustee's Office
Linda Leali, Esq.
Dr. Eric Coomer
All apparences

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

TGP COMMUNICATIONS, LLC,                          Case No. 24-13938-MAM
                                                   Chapter 11

    Debtor.
_____/

## **EXHIBIT REGISTER**

Exhibits submitted on behalf of: Ruby Freeman and Wandrea' ArShaye Moss (Movants) and Dr. Eric Coomer (Joining Party)

Matter set for hearing/trial: *Motion of Ruby Freeman and Wandrea' ArShaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation* (ECF No. 39).

Date of hearing/trial: June 27, 2024

By: */s/ David A. Blansky*                   By: */s/ Vincent F. Alexander*

    David A. Blansky                       Vincent F. Alexander
    Florida Bar No. 1033002              Florida Bar No. 68114
    Michael P. Dunn                     SHUTTS & BOWEN LLP
    Florida Bar No. 100705              201 East Las Olas Blvd., Suite 2200
    DUNN LAW, P.A.                    Fort Lauderdale, Florida 33301
    66 West Flager Street, Suite 400      Telephone: 954-524-5505
    Miami, FL 33130                  Facsimile: 954-524-5506
    Telephone: (786) 433-3866         valexander@shutts.com
    Facsimile: (786) 260-0269          *Attorneys for Joining Party*
    dblansky@dunnlawpa.com         *Dr. Eric Coomer*
    michael.dunn@dunnlawpa.com
    *Attorneys for Movants Ruby Freeman*
    *and Wandrea' ArShaye Moss*

| Exhibit Number | Description | Admitted | Refused | Not Offered Into Evidence |
|---|---|---|---|---|
| 1. | Missouri Litigation: Second Amended Petition (Case No. 2122-CC09815-01) | | | |
| 2. | Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida | | | |
| 3. | Missouri Litigation: Opinion, Memorandum and Order Remanding Case | | | |
| 4. | Missouri Litigation: Order on Defendants' Protective Order | | | |
| 5. | Missouri Litigation: Order and Judgment Dismissing Defendants' Counterclaim and Striking Defendants' anti-SLAPP Motion | | | |
| 6. | Missouri Litigation: Order – Petition for Writ of Prohibition | | | |
| 7. | Missouri Litigation: Order Granting Motion to Dismiss | | | |
| 8. | Missouri Litigation: Order Appointing Special Master | | | |
| 9. | Missouri Litigation: Court Order Adopting Third Report and Recommendation of the Special Master in its Entirety | | | |
| 10. | Voluntary Petition for Non-Individuals Filing for Bankruptcy [ECF No. 1] | | | |
| 11. | Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders [ECF No. 2] | | | |
| 12. | Chapter 11 Case Management Summary [ECF No. 13] | | | |
| 13. | Notice of Filing Documents for Small Business as Required by 11 USC § 1116(1) [ECF No. 17] | | | |
| 14. | Debtor's Pre-Status Conference Report Pursuant to 11 U.S.C. § 1188(c) [ECF No. 27] | | | |
| 15. | Summary of Assets and Liability for Non-Individuals and Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy [ECF No. 30] | | | |

| 16. | Amended Summary of Assets and Liability for Non-Individuals and Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy [ECF No. 34] | | | |
| 17. | Amended Monthly Operating Report for Small Business Under Chapter 11 [ECF No. 51] | | | |
| 18. | Additional Certification of Information Contained Within Schedules and Statement of Financial Affairs [ECF No. 52] | | | |
| 19. | 341 Meeting of Creditors Transcript [June 6, 2024] | | | |
| 20. | 341 Meeting of Creditors Transcript [June 18, 2024] | | | |
| 21. | Colorado Litigation: Plaintiff's Original Complaint (Case No. 2020-cv-034319) | | | |
| 22. | Colorado Litigation: Plaintiff's First Amended Complaint | | | |
| 23. | Colorado Litigation: Court of Appeals' Anti-SLAPP Opinion | | | |
| 24. | Colorado Litigation: Order of Court Granting Motion for Extension of Time to File Opposition Brief to Petitions for Writ of Certiorari | | | |
| 25. | Title of 2021 Porsche Cayenne | | | |

# Exhibit 1

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**IN THE CIRCUIT COURT OF ST. LOUIS CITY, MISSOURI
TWENTY-SECOND JUDICIAL CIRCUIT**

| | | |
|---|---|---|
| RUBY FREEMAN and WANDREA MOSS, | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2122-CC09815-01 |
| | ) | |
| JAMES HOFT, JOSEPH HOFT, and TGP COMMUNICATIONS LLC d/b/a *THE GATEWAY PUNDIT*, | ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED PETITION**

Plaintiffs Ruby Freeman and Wandrea Moss, through their attorneys, file this Second Amended Petition against Defendants James Hoft, Joseph Hoft, and TGP Communications LLC d/b/a *The Gateway Pundit* (collectively, "Defendants").

**INTRODUCTION**

1. The intentional dissemination of known falsehoods aimed at sowing doubt about the integrity of our elections threatens our very ability to function as a democracy. These falsehoods also destroy the lives of America's election workers, whose service to our system of government places them in the crosshairs of those who seek to undermine it with their disinformation. Plaintiffs Ruby Freeman and Wandrea "Shaye" Moss have been the targets of such a campaign of lies, accused by Defendants James Hoft, Joseph Hoft, and *The Gateway Pundit* of committing ballot fraud to alter the outcome of the 2020 presidential election in Georgia. The lies about Ms. Freeman and Ms. Moss have not only devastated their personal and professional reputations but instigated a deluge of

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

intimidation, harassment, and threats that has forced them to change their phone numbers, delete their online accounts, and fear for their physical safety.

2.      *The Gateway Pundit* presents itself as an online news source committed to responsible journalism: "All our content should be true. No value is more important than this."[1] But *The Gateway Pundit*'s stock in trade is spreading disinformation, including lies about the integrity of the 2020 election. According to NewsGuard, a company that rates journalistic credibility, during the 2020 presidential election *The Gateway Pundit* regularly featured "false reports, conspiracy theories, and unfounded allegations, with no distinction made between opinions and actual news reports."[2]

3.      In fact, Defendants are among the leading purveyors of false information in the United States, spreading baseless conspiracy theories and disinformation for fame and fortune. *The Gateway Pundit* has been identified as ***the*** top producer of false content during and after the 2020 presidential election. In the fourth quarter of 2020, *The Gateway Pundit* raked in ad revenue by achieving 7.2 million shares on social media of its bogus election fraud stories—far more than the social media shares for such national news sites such as *The Washington Post*, NBC News and NPR.[3]

4.      This action seeks to hold Defendants accountable for just some of their knowing lies—their false and endlessly repeated accusations that Ms. Freeman and Ms. Moss committed election fraud by, among other things, conspiring to empty the room

---

[1] Gateway Pundit, *About*, https://www.thegatewaypundit.com/about/ (last visited Nov. 30, 2021).

[2] NewsGuard, *Media Analysis of the US Election: August 2020*, Pressrelations – Knowledge Discovery, 36 (Sept. 4, 2020), https://www.pressrelations.com/files/user_upload/US-election_analysis_August_withAppendix_EN.pdf.

[3] Adrienne Goldstein, *Social Media Engagement with Deceptive Sites Reached Record Highs in 2020 | Strengthening Transatlantic Cooperation*, German Marshall Fund of the United States (Jan. 27, 2021), https://www.gmfus.org/news/social-media-engagement-deceptive-sites-reached-record-highs-2020/.

2

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

where they were counting ballots of poll watchers, producing secret "suitcases" full of illegal ballots, and running those ballots through vote counting machines multiple times. In making these false accusations, Defendants apparently drew their inspiration from lawyers for the Trump campaign, who contended on December 3, 2020, that grainy security camera footage showed unidentified persons counting illegal ballots. Defendants took these unsupported factual assertions and almost immediately published them to millions of readers, subsequently attributing names and additional accusations of criminal fraud against Ms. Freeman and Ms. Moss.

5.        Within 24 hours, the claims had been publicly and definitively refuted by Georgia elections officials through a detailed explanation of what the misinterpreted video actually showed: no suitcases; no illegal ballots; no voter fraud. Defendants nonetheless repeated and republished the completely fictitious account, month after month, long after it was conclusively shown to be untrue. With no concern for the truth or the consequences of their willful conduct, Defendants baselessly portrayed Plaintiffs as traitors who participated in a carefully planned conspiracy to steal the presidential election in Georgia.

6.        Defendants' reports were both false and consequential. They caused Ms. Freeman and Ms. Moss to be vilified on social media and subjected to an onslaught of violent, racist threats and harassment of all kinds. At the height of Defendants' campaign of disinformation, Ms. Freeman, at the recommendation of the FBI, fled her home and did not return for two months. On January 6, 2021, a crowd on foot and in vehicles surrounded Ms. Freeman's house. Ms. Freeman was forced to shutter her online business when social media became impossible to navigate. Ms. Moss has suffered personal and professional consequences in her work on Fulton County elections. On at least two occasions, strangers

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

showed up at her grandmother's home and attempted to push into the house in order to make a "citizens' arrest." Fulton County elections' general email address would forward incoming emails to Ms. Moss and many of her colleagues, filling her workplace with harassing messages.

7.      As a result of Defendants' ongoing campaign, both women are afraid to live normal lives. Ms. Freeman is fearful when she hears her name called in public; Ms. Moss now fears risking even a visit to the grocery store and must get her groceries delivered instead. Defendants have inflicted and continue to inflict severe and ongoing emotional, and economic damage on both plaintiffs.

8.      Plaintiffs file this lawsuit to vindicate their reputations and to ensure that other patriotic Americans who step forward to help make our election system function do not likewise become victims of abuse.

**PARTIES**

9.      Plaintiff Ruby Freeman is a natural person and citizen of Georgia. Ms. Freeman worked as a temporary election worker with the Fulton County Registration and Elections Department during the 2020 general election. Her responsibilities as a temporary election worker included verifying signatures as absentee ballots came in, and then preparing absentee ballots for counting and processing.

10.     Plaintiff Wandrea "Shaye" Moss is a natural person and citizen of Georgia. Ms. Moss has worked for the Fulton County Registration and Elections Department since 2012. Ms. Moss's current position with the County is a Registration Officer, and her responsibilities include processing voter applications and assisting voters in person and

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

over the phone. During the 2020 general election, she supervised Fulton County's absentee ballot operation.

      11.     Defendant James "Jim" Hoft is a natural person and citizen of Missouri whose principal place of residence is in St. Louis City, Missouri. Jim Hoft is the owner and the sole organizer of TGP Communications LLC. He is the editor of and frequent contributor to a political website and blog called *The Gateway Pundit* that he created in 2004.

      12.     Defendant Joseph "Joe" Hoft is a natural person and citizen of Missouri, where he hosts a daily radio show from a studio in Chesterfield, Missouri. He also maintains a residence in Jensen Beach, Florida. He is Jim Hoft's twin brother. Joe Hoft writes regularly for *The Gateway Pundit*.

      13.     Defendant TGP Communications LLC d/b/a The Gateway Pundit ("*The Gateway Pundit*") is a limited liability company organized and existing under the laws of Missouri. At all times, *The Gateway Pundit* was acting by or through its authorized agent(s), employee(s), representative(s) or owner(s). Upon information and belief, *The Gateway Pundit* publishes its articles and related social media posts from James Hoft's principal place of residence in St. Louis City, Missouri.

      14.     *The Gateway Pundit* has no registered agent. Gregory J. Hickel, the only agent *the Gateway Pundit* had registered with the Missouri Secretary of State, passed away in 2016, and *The Gateway Pundit* has not registered another agent.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**JURISDICTION AND VENUE**

15.     Plaintiffs filed this case in Missouri state court. Defendants improperly removed the case to federal district court. The case was remanded to this Court on June 6, 2022.

16.     The Courts of the State of Missouri have personal jurisdiction over all Defendants because all Defendants have published defamatory statements in Missouri, and taken other actions in Missouri, such statements and actions being the subject of this Petition, and accordingly this suit arises out of and relates to Defendants' contacts with Missouri.

17.     The Courts of the State of Missouri may exercise personal jurisdiction over Jim Hoft as he is a resident and domiciliary of Missouri and he committed tortious actions giving rise to this cause of action within Missouri.

18.     The Courts of the State of Missouri may exercise personal jurisdiction over Joe Hoft as he is a resident and domiciliary of Missouri, writes for and maintains business contacts with *The Gateway Pundit*, and in the alternative, on information and belief, visited Missouri and/or had contacts with this State in connection with the conduct giving rise to this action.

19.     The Courts of the State of Missouri may exercise personal jurisdiction over *The Gateway Pundit* as it is formed within and exists under the laws of Missouri, and it committed tortious actions giving rise to this cause of action within Missouri.

20.     Venue is proper in St. Louis City, Missouri, because, pursuant to §508.010 R.S. Mo., in this action for defamation, Plaintiffs were first injured in St. Louis City, the

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

jurisdiction in which the defamation was first published. Additionally, individual defendant Jim Hoft's principal place of residence is St. Louis City, Missouri.

## FACTS

### A.    The Role, Reach, and Reputation of *The Gateway Pundit*

21.    *The Gateway Pundit* reaches a large audience. A study by the Berkman Klein Center for Internet & Society at Harvard University of mainstream and social media coverage during the 2016 presidential race showed that the website was one of the most popular media sources on the right. Between May 1, 2015, and November 7, 2016, the website was the fifth-most popular source on Twitter and the third-most popular source on Facebook (notably, Fox News was the fourth most popular source on Facebook for the same period).[4]

22.    The reach of *The Gateway Pundit* grew further in the 2020 election cycle. Research by the German Marshall Fund, a non-partisan policy organization, found the site to have been "particularly dominant" during the election, with a ninefold increase in the sharing of its content on Twitter between the fourth quarter of 2018 and the fourth quarter of 2020.[5] The report also noted that nine of the website's ten most popular articles in the fourth quarter of 2020 presented disinformation about voter fraud.

23.    In September 2021, *The Gateway Pundit* had more than 2.8 million unique visitors, making it the eleventh-most-visited U.S. conservative site, according to one

---

[4] Robert Faris et al., *Partisanship, Propaganda, and Disinformation: Online Media and the 2016 U.S. Presidential Election* at 13, Berkman Klein Ctr. for Internet & Soc'y, 13 (2017), http://nrs.harvard.edu/urn-3:HUL.InstRepos:33759251/.

[5] Goldstein, *supra* note 3.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

assessment.[6] More than 650,000 users "like" its Facebook page, while 630,000 users "follow" the page.[7] Roughly 98,000 people subscribe to its YouTube channel, and its videos regularly garner thousands of views.[8]

24.     According to published reports, *The Gateway Pundit* earned as much as $1.1 million in Google Ad revenue between November 2020 and June 2021.[9] In February 2021, *The Gateway Pundit* began offering a subscription service.[10]

25.     Despite its professed allegiance to the truth, *The Gateway Pundit* regularly publishes false claims. The Berkman Klein Center study identified seven online sources— both left- and right-leaning—that were highly influential on social media, highly partisan, and sometimes explicitly deceptive. Among these, the study stated, "Gateway Pundit is in a class of its own, known for 'publishing falsehoods and spreading hoaxes.'"[11]

26.     Defendant Jim Hoft has responded derisively to the notion that *The Gateway Pundit* should verify information before publishing it. After a *New Yorker* reporter interviewing him in 2017 told Hoft to expect a call from the magazine's fact-checkers, he responded: "Oh yeah, just like at the Gateway Pundit. We've got a huge

---

[6] *US Conservative Websites Ranked by Unique Visitors, September 2021*, The Righting, https://www.therighting.com/september-2021-conservative-website-metrics (last visited Nov. 30, 2021).

[7] *Gateway Pundit*, Facebook, https://www.facebook.com/gatewaypundit (last visited Nov. 30, 2021).

[8] *Gateway Pundit*, YouTube, https://www.youtube.com/c/GatewayPunditVideo/ (last visited Nov. 30, 2021).

[9] *One of the Biggest Publishers of Election Misinfo Earned Up to $1.1 Million in Google Ad Revenue*, Ctr. for Countering Digital Hate (July 29, 2021), https://www.counterhate.com/post/gatewaypundit.

[10] Paul Wagman, *Loud, shrill and unknown: The strange case of the Gateway Pundit*, Gateway Journalism Review (July 6, 2021), https://gatewayjr.org/loud-shrill-and-unknown-the-strange-case-of-the-gateway-pundit/; *Subscribe to The Gateway Pundit!*, The Gateway Pundit, https://www.thegatewaypundit.com/join/ (last visited Nov. 30, 2021).

[11] Faris et al, *supra* note 4, at 15 (quoting Ben Schreckinger, *'Real News' Joins the White House Briefing Room*, Politico Mag. (Feb. 15, 2017), https://www.politico.com/magazine/story/2017/02/fake-news-gateway-pundit-white-house-trump-briefing-room-214781/).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

department of full-time fact-checkers." He then "laughed so hard that he nearly spilled his lemonade."[12]

**B.      The 2020 Election in Fulton County, Georgia**

27.      In the fall of 2020, Americans cast ballots in the nation's 59th presidential election, which pitted the incumbent, Republican Donald J. Trump, against the former Vice President, Democrat Joseph R. Biden. News coverage in the lead-up to Election Day noted that Georgia had "emerged as one of the nation's biggest electoral battlegrounds in the race for the White House."[13]

28.      The voting process in Georgia began on September 15, 2020, when local officials began mailing out absentee ballots. Voters could cast early voting ballots in-person from October 12, 2020, until October 30, 2020, and they could vote by mail until Election Day, on November 3, 2020. All told, more than 4 million Georgians cast ballots during early voting or via absentee ballot in the 2020 election.[14] On Election Day, when another 975,540 people cast votes,[15] Georgia Secretary of State Brad Raffensperger observed, "We are having a successful election in Georgia today."[16]

---

[12] Andrew Marantz, *Is Trump Trolling the White House Press Corps?*, New Yorker (Mar. 13, 2017), https://www.newyorker.com/magazine/2017/03/20/is-trump-trolling-the-white-house-press-corps.

[13] Greg Bluestein, *Election Day Arrives: 5 Factors That Will Decide Georgia's 2020 Race*, Atlanta J.-Const., (Nov. 3, 2020), https://www.ajc.com/politics/election-day-arrives-5-factors-that-will-decide-georgias-2020-race/5K5HAAJJGBHDRLB6KWTHQ7ODRE/; *see also id.* (noting how "tantalizingly close" Democrats came to winning a statewide official in 2018).

[14]      *November      3,      2020      General      Election*,      Ga.      Sec'y      of      State, https://results.enr.clarityelections.com/GA/105369/web.264614/#/detail/5000 (last visited Nov. 30, 2021).

[15] *Id.*

[16] Kate Brumback & Sudhin Thanawala, *Despite A Few Hiccups, Voting in Georgia Goes Smoothly*, Associated Press (Nov. 4, 2020), https://apnews.com/article/election-2020-virus-outbreak-primary-elections-georgia-elections-ce8204935e991f740c94d6bc464481cf.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

29.     In Fulton County, absentee ballots were counted in State Farm Arena. Plaintiffs were employed to assist in the vote tabulation process at the arena.

30.     On November 3, 2020, an overflowing urinal at State Farm Arena led to a brief voluntary evacuation of the affected area.[17] According to a press release at the time:

> At approximately 6:07 a.m., the staff at State Farm Arena notified Fulton County Registration & Elections of a water leak affecting the room where absentee ballots were being tabulated. The State Farm Arena team acted swiftly to remediate the issue. Within 2 hours, repairs were complete. No ballots were damaged, nor was any equipment affected. There was a brief delay in tabulating absentee ballots while the repairs were being conducted.[18]

The *Atlanta Journal-Constitution* reported on November 3 that a pipe break had caused a water leak at the ballot processing site and specifically noted that no ballots were damaged.[19] It was later determined that the water leak had been caused by an overflowing urinal.[20]

31.     On November 13, 2020, NBC and CNN declared Biden the projected winner of Georgia.[21]

---

[17] Decl. of Frances Watson ¶¶ 4, 6, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1, https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[18] *Statement Regarding Absentee Ballot Tabulation at State Farm Arena*, State Farm Arena (Nov. 3, 2020), https://www.statefarmarena.com/news/detail/statement-regarding-absentee-ballot-tabulation-at-state-farm-arena.

[19] Ben Brasch, *Fulton County Election Results Delayed After Pipe Bursts in Room with Ballots*, Atlanta J.-Const. (Nov. 3, 2020), https://www.ajc.com/news/atlanta-news/fulton-election-results-delayed-after-pipe-bursts-in-room-with-ballots/4T3KPQV7PBEX3JVAIGJBNBSVJY/.

[20] Declaration of Frances Watson ¶ 5, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1 (stating that the Secretary of State's Office launched an investigation that "revealed that the incident initially reported as a water leak late in the evening on November 3rd was actually a urinal that had overflowed early in the morning of November 3rd" and confirming that this leak "did not affect the counting of votes by Fulton County later that evening"), https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[21] Adam Edelman, *With final states called, Biden's projected Electoral College victory matches Trump's in 2016*, NBC News (Nov. 13, 2020), https://www.nbcnews.com/politics/2020-election/final-states-called-

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

32.     From November 11 through November 19, 2020, county election officials carried out a risk-limiting audit, which included a full manual tally of all votes cast and confirmed Biden had won Georgia's election.[22] "Audit boards from all 159 Georgia countries examined 41[,]881 batches, hand-sorting and counting each ballot as part of the process, which was the largest hand count of ballots in United States history." According to the audit, "no individual county showed a variation in margin larger than 0.73%." Moreover, "103 of the 159 counties showed a margin variation of less than 0.05%."[23] It concluded that "the correct winner was reported."[24]

33.     On November 20, 2020, Secretary of State Raffensperger certified Biden's victory. That same day, Republican governor Brian Kemp certified Georgia's election results.[25]

34.     President Trump requested a recount, which was conducted using scanners that read and tally the votes.[26] The recount was the third tally of votes in the Georgia presidential race and the third tally to conclude that Joe Biden won the election. On

---

biden-s-projected-electoral-college-victory-matches-n1247766. Gregory Krieg, *Joe Biden becomes first Democrat in 28 years to win Georgia*, CNN (Nov. 13, 2021), https://www.cnn.com/2020/11/13/politics/joe-biden-wins-georgia/index.html.

[22] "Like any risk-limiting audit, this audit does not confirm or correct the exact margin of victory. It only provides sufficient evidence that the correct winner was reported." *Risk-Limiting Audit Report: Georgia Presidential Contest, November 2020*, Georgia Secretary of State (Nov. 19, 2020), https://sos.ga.gov/admin/uploads/11.19_.20_Risk_Limiting_Audit_Report_Memo_1.pdf.

[23] *Id.*

[24] *Id.*

[25] Kate Brumback, *Georgia Officials Certify Election Results Showing Biden Win*, Associated Press (Nov. 20, 2020), https://apnews.com/article/georgia-certify-election-joe-biden-ea8f867d740f3d7d42d0a55c1aef9e69.

[26] Kate Brumback, *Georgia Again Certifies Election Results Showing Biden Won*, Associated Press (Dec. 7, 2021), https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

December 7, 2020, Georgia officials recertified Biden's victory of the state's 16 electoral votes.[27]

**C.  Trump's Legal Team Initiates the Lie That Georgia Election Workers Illegally Instructed Observers to Leave and Counted Thousands of Fraudulent Ballots Unobserved**

35.  On December 3, 2020, Donald Trump's legal team testified before the Georgia State Senate, alleging that fraud and misconduct had occurred during Georgia's November 2020 election.[28]

36.  In an attempt to demonstrate that there had been irregularities in ballot-counting, a lawyer for the Trump campaign named Jacki Pick played cherry-picked snippets of surveillance video of the absentee and military vote count at the State Farm Arena.[29] While the surveillance video of the vote counting on November 3 is 14 hours long, Ms. Pick played only a few brief excerpts during her 17-minute testimony.

37.  While playing the video excerpts for the State Senate, Ms. Pick provided her own interpretation of what was being shown. She claimed that Republican observers had been asked to leave the arena in contravention of Georgia law and that, once they were gone, the election workers produced and counted 18,000 hidden, fraudulent ballots—more than the margin of victory in the presidential race.[30]

---

[27] *Id.*

[28] Beau Evans, *Georgia Senate Panel Hosts Trump Attorney Giuliani As Election Officials Dispute Fraud Claims*, Augusta Chron. (Dec. 3, 2020), https://www.augustachronicle.com/story/news/2020/12/03/georgia-senate-panel-probing-election-hosts-trump-attorney-giuliani/3818365001/.

[29] Angelo Fichera, *Video Doesn't Show 'Suitcases' of Illegal Ballots in Georgia*, FactCheck.org (Dec. 4, 2020), https://www.factcheck.org/2020/12/video-doesnt-show-suitcases-of-illegal-ballots-in-georgia/.  For video of the hearing, see also 11Alive, *Second Georgia Senate Election Hearing*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=hRCXUNOwOjw.

[30] 11Alive, *Second Georgia Senate Election Hearing*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=hRCXUNOwOjw (showing Ms. Pick's commentary on the surveillance footage from 33:27 to 50:26).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

38.     Ms. Pick described the surveillance videotape as showing Republican observers and the press leaving the room shortly before 11 p.m. after a "lady who has blonde braids" asked them to leave and told them that election workers were going to stop counting ballots for the day. The surveillance video had no sound to corroborate this claim, but Ms. Pick said she had been provided this information by the observers and noted that the video showed four election workers staying while observers and press departed. She identified the election workers in the room as "the lady in purple," "two women in yellow," and "the lady with the blonde braids also, who told everyone to leave."[31]

39.     Ms. Pick's commentary continued as she played her video excerpt: "Once everyone is gone, coast is clear, they are going to pull ballots out from underneath a table." Ms. Pick said it was not typical to store "suitcases" full of ballots under a table and pointed out a table which she claimed had been placed there earlier in the day by "the lady with the blonde braids." Ms. Pick did not identify the four election workers by name but said "one of them had the name Ruby across her shirt somewhere."[32]

40.     Ms. Pick acknowledged that the Trump legal team had taken only a couple of hours to review the 14 hours of surveillance footage, and no one working for the campaign had watched the entire video, even once.[33]

41.     Both the Georgia Secretary of State and the Georgia Bureau of Investigation immediately investigated Ms. Pick's claims. The Secretary of State is a Republican who had been endorsed during his campaign by Donald Trump. They reviewed the security

---

[31]                                                                                                       *Id.*

[32] *Id.*

[33] *Id.*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

videotape, interviewed all witnesses who were present at the time of the alleged misconduct, and found no evidence whatsoever to substantiate any of Ms. Pick's claims.[34]

42.    Secure the Vote, a website maintained by the office of the Secretary of State, provides a detailed fact check of Ms. Pick's claims about what is depicted in the video.[35] Secure the Vote's timeline documents the events from November 3, 2020, actually shown on the video, including:

| 5:22 a.m. | Workers arrive at the State Farm Arena and discover a water leak. They immediately move tables and ballots away from the leak to prevent any water damage. |
|---|---|
| 6:30 a.m. | Workers can be seen moving tables, but not tampering with ballots. |
| 7:11 a.m. | Workers are seen vacuuming and drying the floors. |
| 8:22 a.m. | Workers begin rearranging the room to its original layout. They move tables and ballot containers. The table under which a "suitcase" full of ballots was allegedly stashed is moved, revealing nothing hidden there. |
| 9:57 p.m. | Poll workers prepare to stop work for the night and empty ballot containers are brought into the room. Workers then fill the containers with uncounted ballots. |
| 10:06 p.m. | Poll workers store the containers with uncounted ballots under the table for the night while there are still many people in the room. |
| 11:02 p.m. | After the Secretary of State[36] told poll workers they should continue working through the night, they remove the containers with uncounted ballots from underneath the table and resume their counting. |

---

[34] Response of the Georgia Secretary of State to the Court's Order of September 20, 2021, *Favorito v. Wan*, Civ. No. 2020CV343938 (Fulton Cnty. Ga. Super. Ct. Oct. 12, 2021), https://www.gpb.org/news/2021/10/12/election-investigators-havent-found-evidence-of-counterfeit-ballots-in-georgia/.

[35] *State Farm Arena*, Secure the Vote, https://securevotega.com/fact-check/ (last visited Nov. 30, 2021).

[36] Voting Implementation Manager for the State of Georgia, Gabriel Sterling reported that Georgia's Secretary of State Brad Raffensperger ordered election workers to continue counting ballots through the night. Maggie Astor, A Georgia Election Official Debunked Trump's Claims of Voter Fraud, Point by Point, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/2021/01/04/us/politics/trump-georgia-election-fraud.html.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**D.      Defendants Publish and Republish the Lie**

43.      Immediately after Ms. Pick spoke in the Georgia Senate on December 3, 2020, the false accusation of wrongdoing and misleading excerpts from the surveillance video were circulated widely by the Trump campaign and various media outlets. For example, One America News Network rebroadcast the surveillance video shown earlier that day by the Trump lawyers with Ms. Pick's commentary.[37]

44.      The Trump campaign promptly amplified and republished a brief excerpt from the One America News Network's coverage[38] and distributed it repeatedly on Twitter that same day.[39] The excerpt depicted four individuals walking between desks while one individual removes containers from underneath a table in the foreground and brings them back to the desks. The individuals then remove ballots from the containers and process them.[40] (This edited footage from the surveillance video will hereafter be called the "Trump Edited Video.")

45.      That same day, December 3, 2020, *The Gateway Pundit* published its first article disseminating the same Trump Edited Video. The story was promoted under the headline "HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled

---

[37] One America News Network, *Giuliani, TRUMP Legal Team Testify in GA.FULL 12/3/20*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=3wObE1JCQMg/.

[38] Donald J. Trump, *Video from GA Shows Suitcases Filled with Ballots Pulled From Under a Table AFTER Poll Workers Left*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=nVP_60Hm4P8/.

[39] @TeamTrump, Twitter (Dec. 3, 2020, 10:32 AM), *available at* https://web.archive.org/web/20201205090637mp_/https://twitter.com/TeamTrump/status/13345663012059 25889/ (last visited Dec. 22, 2021); @TeamTrump, Twitter (Dec. 3, 2020, 10:44 AM), *available at* https://web.archive.org/web/20201205122001/https://twitter.com/TeamTrump/status/133456932933408358 6/ (last visited Nov. 30, 2021). The @TeamTrump account is no longer accessible on Twitter.

[40] Donald J. Trump, *Video from GA Shows Suitcases Filled with Ballots Pulled from under a Table after Poll Workers Left*, YouTube (Dec. 3, 2020), https://www.youtube.com/watch?v=nVP_60Hm4P8/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center." Written by Cristina Laila, the article republished two Team Trump tweets about the video and added the following claims:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.
>
> …
>
> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated![41]

46.     The article concludes with a photo captioned, "Close up photo of the suitcases being wheeled out from under tables."[42]

---

[41] Cristina Laila, *HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center*, Gateway Pundit (Dec. 3, 2020, 1:11 PM), https://www.thegatewaypundit.com/2020/12/video-footage-georgia-shows-suitcases-filled-ballots-pulled-table-supervisor-told-gop-poll-workers-leave-tabulation-center/. A true and correct copy of this article is attached as Exhibit 1. (Due to changes in the formatting of Defendants' website since Plaintiffs filed the original Petition and First Amended Complaint, there are some differences in the formatting of the PDFs Plaintiffs have attached as exhibits, particularly with respect to the comments section on various articles.)

[42] *Id.*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



47. Defendant Jim Hoft amplified this story and its defamatory claims using his Twitter account.[43]

48. A little while later, Hoft again amplified the story and added additional defamatory remarks, calling Ms. Freeman and Ms. Moss "dirty Crooks" and insinuating that they were political operatives:[44]

---

[43] Jim Hoft (@gatewaypundit), Twitter (Dec. 3, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit/status/1334577520478392 320 (last visited Nov. 30, 2021). The @gatewaypundit account is no longer accessible on Twitter.

[44] Jim Hoft (@gatewaypundit), Twitter (Dec. 3, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



49.     In the afternoon on December 3, *The Gateway Pundit* published another article, titled, "WHERE'S BILL BARR? — We Got Your Voter Fraud AG Barr — It's On Video and They Attempted to Steal Georgia with It! — HOW ABOUT A FEW ARRESTS?"[45] It accused those in the video of "stay[ing] behind to count illegal ballots for Joe Biden" and "cheating":

> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!
>
> They were caught cheating!

---

[45] Jim Hoft, *WHERE'S BILL BARR? — We Got Your Voter Fraud AG Barr — It's On Video and They Attempted to Steal Georgia with It! — HOW ABOUT A FEW ARRESTS?*, Gateway Pundit (Dec. 3, 2020, 2:29 PM), https://www.thegatewaypundit.com/2020/12/bill-barr-got-voter-fraud-ag-barr-video-attempted-steal-georgia-arrests/. A true and correct copy of this article is attached as Exhibit 2.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

50.     Jim Hoft amplified this story on Twitter.[46]

51.     Later on December 3, *The Gateway Pundit* published another article repeating the false report, headlined "What's Up, Ruby?… BREAKING: Crooked Operative Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED." Written by Defendant Jim Hoft, this article reasserted the false claims about "crooked Democrats" engaging in "voter fraud."[47]

52.     This article was the first to identify by name Plaintiff Ruby Freeman as one of the workers in the video, naming Ms. Freeman and her business and falsely accusing her of voter fraud. It stated:

> One woman in the video is wearing a purple top.
>
> …
>
> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.
>
> Her T-shirt says "Lady Ruby" and her purse says, "LaRuby" which is her company.
>
> This was not a very smart move.
>
> Her company is called "LaRuby's Unique Treasures."
>
> It's on her LinkedIn page!
>
> …

---

[46]     Jim     Hoft     (@gatewaypundit),     Twitter     (Dec.     3,     2020),     *available     at* https://web.archive.org/web/20201205214839/https://twitter.com/gatewaypundit/status/1334595742594428 930 (last visited Aug. 23, 2022).

[47] Jim Hoft, *What's Up, Ruby?… BREAKING: Crooked Operative Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED*, Gateway Pundit (Dec. 3, 2020, 8:49 PM), https://www.thegatewaypundit.com/2020/12/ruby-breaking-crooked-democrat-filmed-pulling-suitcases-ballots-georgia-identified/. A true and correct copy of this article is attached as Exhibit 3.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Maybe the Georgia police or Bill Barr's DOJ may want to
> pay Ruby Freeman a visit.[48]

53.    The article concluded with the following images of Ms. Freeman, over a

banner saying "CROOK GETS CAUGHT."



54.    Defendants Jim and Joe Hoft amplified this story on Twitter, too.[49]

**E.    Despite Prompt and Authoritative Refutation of the False Report by Multiple
Sources, Defendants Republish and Magnify the Lies for Months**

55.    The Trump legal team's claim of voter fraud in the State Farm Arena was

flatly, fully, and publicly repudiated by Georgia election officials within 24 hours after it

was made. At 6:41 a.m. on December 4, 2020, the Voting Implementation Manager for the

State of Georgia, Gabriel Sterling, shot down the fanciful claim on Twitter: "The 90 second

---

[48] *Id.*

[49]    Jim    Hoft    (@gatewaypundit),    Twitter    (Dec.    3,    2020),    *available    at*
https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30,
2021);    Joe    Hoft    (@joehoft),    Twitter    (Dec.    4,    2020),    *available    at*
https://web.archive.org/web/20201207070649/https://twitter.com/joehoft (last visited Nov. 30, 2021). Note
that for many of Jim and Joe Hoft's tweets, web.archive.org does not appear to have captured the preview
image.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

video of election workers at State Farm arena, purporting to show fraud was watched in its entirety (hours) by @GaSecofState investigators. Shows normal ballot processing. Here is the fact check on it."[50]

56.     Mr. Sterling's tweet shared a link to a fact check published by Lead Stories, a fact-checking website that identifies false or misleading stories. It demonstrated that the Trump Edited Video did not show suitcases full of ballots being pulled from under a table, and that poll watchers were not told to leave.[51] The fact check quotes Georgia election officials explaining that the containers in the video contained ballots that were processed for counting earlier in the night, that the vote count data and voter verifications negated the claim that thousands of fraudulent ballots had been introduced into the count, and that it was not illegal for election workers to count ballots in the observers' absence.[52]

57.     Several days earlier, after reports of harassment and death threats against election officials, Mr. Sterling had made clear what he believed were the likely consequences of the continued attacks on Georgia's election system. "Someone's going to get hurt, someone's going to get shot, someone's going to get killed," he had stated in a news conference.[53]

---

[50]     Gabriel     Sterling     (@GabrielSterling),     Twitter     (Dec.     4,     2020,     6:41     AM), https://twitter.com/GabrielSterling/status/1334825233610633217.

[51] Alan Duke & Hallie Golden, *Fact Check: Video From Georgia Does NOT Show Suitcases Filled With Ballots Suspiciously Pulled From Under A Table; Poll Watchers Were NOT Told To Leave*, Lead Stories (Dec. 3, 2020), https://leadstories.com/hoax-alert/2020/12/fact-check-video-from-ga-does-not-show-suitcases-filled-with-ballots-pulled-from-under-a-table-after-poll-workers-dismissed.html.

[52] *Id.*; *see* Angelo Fichera, *Video Doesn't Show 'Suitcases' of Illegal Ballots in Georgia*, FactCheck.org (Dec. 4, 2020), https://www.factcheck.org/2020/12/video-doesnt-show-suitcases-of-illegal-ballots-in-georgia/.

[53] Stephen Fowler, *'Someone's Going To Get Killed': Ga. Official Blasts GOP Silence On Election Threats*, NPR (Dec. 1, 2020, 8:58 PM ET), https://www.npr.org/sections/biden-transition-updates/2020/12/01/940961602/someones-going-to-get-killed-ga-official-blasts-gop-silence-on-election-threats.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

58.     Nonetheless, Jim Hoft authored another article published on *The Gateway Pundit* later that morning under the title "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER [sic] Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)." The article repeated the now-debunked allegations from the night before and introduced new false claims:

> Earlier on Thursday Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.
>
> Trump's legal team showed a video from the State Farm Arena tabulation center when poll workers were told to leave at 10:25 PM.
>
> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!

…

> We identified one of the operatives last night who was caught on video counting illegal ballots from a suitcase stashed under a table!
>
> As you can see from the video one woman in a purple top was filmed helping pull out the ballots and then sitting down to count the ballots.
>
> That woman has now been identified.
>
> Local 11 News covered the story from the State Farm Arena that a pipe had burst.
>
> (This later was proven to be complete fraud and an excuse to kick out the GOP election observers!)

…

> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

…

> Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.
>
> They then commented on her LinkedIn page.
>
> Ruby Freeman still has an active Facebook page (as of 11 PM on Thursday night).
>
> On her page Ruby Freeman brags about her "Shaye" being her supervisor.
>
> It is clear from a video that was released that Shaye and Ruby are very close.
>
> Here are a few entries from Ruby's Facebook page.

…

> Ruby made a post on Facebook on Nov 3, "Look at my Baby giving that look to the employees. Mommie is so proud of you. Supervisor of registration."
>
> And here is a closeup of the woman in question via a Getty image.
>
> Her official name is "Wandrea Moss."

…

> You can clearly see "Shaye" the woman in blonde pigtails removing suitcases of ballots from under a table after GOP observers were evacuated from the room and told to go home.[54]

59.     Less than two hours after Voting Implementation Manager Sterling tweeted that what the video of Ms. Freeman and Ms. Moss showed was "normal ballot processing," Defendant Joe Hoft published an article titled, "CLOWN SHOW: Georgia Election Insider

---

[54] Jim Hoft, *BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)*, Gateway Pundit (Dec. 4, 2020, 7:35 AM), https://www.thegatewaypundit.com/2020/12/breaking-crooked-elections-superviser-filmed-pulling-suitcases-ballots-georgia-identified-rubys-daughter-video/. A true and correct copy of this article is attached as Exhibit 4.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Gabriel Sterling Freaks Out and Labels Election Fraud Caught on Camera 'Normal Ballot Processing.'" Rather than acknowledge the falsity of *The Gateway Pundit*'s earlier stories—or even neutrally reporting on the fact checks—that article lobbed a series of ad hominem attacks against Mr. Sterling and doubled down on Defendants' false claims, including the statement:

> Unfortunately for Sterling, we can't even keep up with the amount of corruption in Georgia related to this year's election. Yesterday for example, a video was unearthed by the Trump team showing Democrat counters in Atlanta pulling out suitcases full of ballots and counting them after sending Republicans home due to a falsely reported water main break (um, this is against the law Mr. Sterling).

> But Sterling still wants to call it all a lie. He claims there was no corruption in this year's election and he shares another totally bogus 'fact check' from Lead Stories as in his Facebook page as support that this is all normal. . . .[55]

60.     Joe Hoft amplified this story on Twitter by retweeting another user.[56]

61.     The same morning, Georgia Public Broadcasting published its own article fact-checking the election fraud claims made during the George State Senate hearing on the previous day. The article directly refuted the Trump legal team's claims concerning the contents of the Trump Edited Video. It reported that the video showed a normal tabulation process, which both state and county officials had verified. It also reported that no observers had been asked to leave, but Republican monitors and the press did leave when

---

[55] Joe Hoft, *CLOWN SHOW: Georgia Election Insider Gabriel Sterling Freaks Out and Labels Election Fraud Caught on Camera 'Normal Ballot Processing'*, Gateway Pundit (Dec. 4, 2020, 8:15 AM), https://www.thegatewaypundit.com/2020/12/clown-show-georgia-election-insider-gabriel-sterling-freaks-labels-election-fraud-caught-camera-normal-ballot-processing/.

[56] Joe      Hoft      (@joehoft),      Twitter      (Dec.      4,      2020),      *available      at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

some election employees stopped their work for the night. And it clarified that Georgia law does not require poll monitors to be present for the ballot counting process.[57]

62.     Defendants learned of the ongoing fact checks almost immediately after they were published.

63.     Even after acknowledging the first fact check, and after the second fact check was published and available online, Jim and Joe Hoft    published several additional articles on *The Gateway Pundit* on December 4, 2020, repeating and realleging the false claims that Ms. Freeman and Ms. Moss secretly brought illicit ballots into the arena to be counted and had committed massive voter fraud. Jim Hoft's next article was titled "NEW VIDEO Shows Anti-Trump Georgia Ballot Counter Ruby Freeman with Piles of Ballots, Walking Past Boxes of Ballots, Working Alone in Cubes WITH NO GOP OBSERVERS IN SIGHT!" and made new false and defamatory claims about Ms. Freeman:

> Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.
>
> Ruby walks by several boxes of ballots just sitting around in the room.
>
> The elections workers were each given their own secret cube.
>
> Then Ruby goes to her desk and pulls out a tray of ballots on her desk.
>
> There is NO supervisor or GOP observer anywhere in sight.
>
> And then Ruby leaves the ballots on her desk as she goes to take a break.

---

[57] Stephen Fowler, *Fact Checking Rudy Giuliani's Grandiose Georgia Election Fraud Claim*, Georgia Public Broadcasting (Dec. 4, 2020, 8:27 AM), https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim, archived at https://web.archive.org/web/20201204170112/https://www.gpb.org/news/2020/12/04/fact-checking-rudy-giulianis-grandiose-georgia-election-fraud-claim.

This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.[58]

64.     Jim and Joe Hoft amplified this story using their Twitter accounts.[59]

65.     At approximately 10:08 a.m. ET, Voting Implementation Manager Gabe Sterling joined Newsmax for a roughly 17-minute segment.[60] After playing a clip of the Trump Campaign's footage and soliciting comments from another guest, the host asked Sterling to weigh in on the video. Sterling straightforwardly debunked any claim that the video showed anything nefarious:

> Unlike watching 90 seconds of it like we saw in the Senate hearing yesterday, we've had our investigators watch all many several hours of it yesterday. And what essentially happened is—and we knew about this, part of this, on election night itself—around 10:15/10:20, there's two groups of people in this room that are working. There are cutters—the people who are opening the envelopes—and then there's the people who are scanning, which is the ones we see on the video.

> And let's keep a few things in mind. I've been in this room. It's really obvious there's video cameras everywhere, so they know they're being watched on that front.

> So what happened was, when the cutters were—they were done, so they were, so they was like, "Okay, we're done, time to go home," and the media started packing up. And then the monitors kept packing up.

---

[58] Jim Hoft, *NEW VIDEO Shows Anti-Trump Georgia Ballot Counter Ruby Freeman with Piles of Ballots, Walking Past Boxes of Ballots, Working Alone in Cubes WITH NO GOP OBSERVERS IN SIGHT!*, Gateway Pundit (Dec. 4, 2020, 8:53 AM), https://www.thegatewaypundit.com/2020/12/new-video-shows-anti-trump-georgia-ballot-counter-ruby-freeman-piles-ballots-walking-past-boxes-ballots-no-gop-observers-sight/.   A true and correct copy of this article is attached as Exhibit 5.

[59]    Jim    Hoft    (@gatewaypundit),    Twitter    (Dec.    4,    2020),    *available    at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit  (last  visited  Nov.  30, 2021);    Joe    Hoft    (@joehoft),    Twitter    (Dec.    4,    2020),    *available    at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Nov. 30, 2021).

[60]  Monkey Savant,  *Gabriel Sterling and Chad Robichaux On Newsmax Discuss The GA Ballot Fraud Situation 12/04/20*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=o6k2zRRPx4I.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Now the one thing we have is a he said she said, where the officials there said, "we didn't tell anybody that they had to leave." The people who left—the Republican monitor said, "we were told we had to leave." And we have no audio from those videotapes to ascertain the absolute truth. That's what is he said she said on that front.

But when you watch the video, the process—those aren't suitcases. Those are regular absentee carriers used in dozens of counties across the state. That's how they bring those in. Nothing was brought in without the monitors there, so everything was there. There was nothing new brought in. We didn't see somebody wheeling stuff into the room; we saw stuff that was already in the room that the monitors already saw brought in.

And then you saw the processes they're doing. Essentially what happened, the elections director called the absentee coordinator that's saying we're not shutting down. Tell them they gotta go get back to work because the counting people thought they were also getting to go home. So they were kind of disappointed. So you see him on his phone. He walks over to them, they kind of shrug their shoulders like, "crap, we got to go back to work again." So, so they started doing that, and then we found out that the monitors weren't there anymore. So, we called their elections directors, and we called our state elections board monitor, who we have placed in Fulton County under a consent decree that we had ordered because of their screw-ups in the June election, and yes, there was 82 minutes where there wasn't a person there. But we have all the videotape that we are literally looking at right now.

We have to ask ourselves in that period of time, I think it was about three to five thousand votes that were scanned, and did this elections crew of, you know, medium-paid, tired elections workers suddenly become the Ocean's Eleven crew as part of a theft of an election? Or is it more likely they were tired and irritated?

You see when the SEB monitor gets there, and when the investigator gets there, the armed investigator, they keep doing the exact same thing they were doing. They don't even pay any mind because it's just—they're doing their regular processes.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

And the problem we have is people don't understand this, and when people whip people's emotions up, it goes back to the issue I was talking about before of threats being against these thousands of workers across the country.

66.     On information and belief, Jim Hoft watched this segment, as he immediately criticized Newsmax for airing the segment and reiterated his false claims:[61]



**Jim Hoft** ✔
@gatewaypundit

VERY DISAPPOINTING to Go on @Newsmax and Allow @GabrielSterling to LASH OUT AT REPUBLICANS after EXPLOSIVE SUITCASE FRAUD EXPOSED! That Segment was a TRAINWRECK! @Newsmax better get their sh*t together. This was an OUTRAGEOUS Segment!

7:26 AM · Dec 4, 2020 · Twitter Web App

67.     Seeking to magnify the false claims and gain still more shares on social media, Jim Hoft published a fourth article on *The Gateway Pundit* on December 4, repeating the false and disproven claims from his earlier articles. This article was titled, "UPDATE: More on the Suitcase Vote Scam, the Elections Supervisor and that Strange 'Pass' Between Mother and Daughter That Was Also Caught on Video." It discussed the relationship between Ms. Freeman and Ms. Moss and introduced a new baseless allegation of still more illicit activity supposedly shown on the Trump Edited Video:

On her [Facebook] page Ruby Freeman brags about her "Shaye" being her supervisor.

…

And now there is video of Ruby secretly passing something to her daughter during the ballot counting.

---

[61]     Jim Hoft (@gatewaypundit), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit/status/1334881814670938 113 (last visited Nov. 30, 2021). Plaintiffs believe the timestamp available through web.archive.org is in Pacific Time.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other.
>
> It sure looks like they were trying to hide this transaction.[62]

68.     This article made clear Defendants' ill-will toward Ms. Freeman in repeating the false claims against her over and over again. In it, Jim Hoft noted the consequences of *The Gateway Pundit*'s publicity on Ms. Freeman and implicitly urged readers to harass her:

> Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.
>
> They then commented on her LinkedIn page.
>
> Note: Please do not confuse this with a similar business in Snellville!
>
> Ruby Freeman had an active Facebook page last night.
>
> It was shut down early on Friday morning.[63]

69.     Jim Hoft amplified this story on social media.[64]

70.     Not satisfied with the harm done, Defendants published two more articles about Ms. Freeman on *The Gateway Pundit* later on December 4. The first, titled "Timing of Large Georgia Ballot Dump for Biden Appears to Coincide with Timing of Mother-Daughter Duo's Election Fraud Scam," was written by Joe Hoft and described Plaintiffs'

---

[62] Jim Hoft, *UPDATE: More on the Suitcase Vote Scam, the Elections Supervisor and that Strange "Pass" Between Mother and Daughter That Was Also Caught on Video*, Gateway Pundit (Dec. 4, 2020, 1:51 PM), https://www.thegatewaypundit.com/2020/12/update-ruby-freeman-elections-supervisor-shaye-ross-strange-pass-also-caught-video/. A true and correct copy of this article is attached as Exhibit 6.

[63] *Id.*

[64] Jim     Hoft     (@gatewaypundit),     Twitter     (Dec.     4,     2020),     *available     at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

processing of ballots as "the mother-daughter duo in Atlanta . . . messing with ballots in secret." The article stated:

> This is when a major portion of the steal took place in Georgia — which is about the same time that the mother daughter team of Trump haters kicked all Republicans out of the ballot counting room in Atlanta and started tabulating votes on their own after grabbing ballots out from underneath the table.[65]

71.     The next article, also written by Joe Hoft, summarized the false and already debunked claims in the previous articles from *The Gateway Pundit*, and it advanced the new false and defamatory smear that Ms. Freeman supposedly counted the same votes for Biden three times. Titled "UNBELIEVABLE: Anti-Trump Democrat In Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)," the article stated:

> The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.
>
> We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]
>
> Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.
>
> The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to

---

[65]  Joe Hoft, *Timing of Large Georgia Ballot Dump for Biden Appears to Coincide with Timing of Mother-Daughter Duo's Election Fraud Scam*, Gateway Pundit (Dec. 4, 2020, 3:25 PM), https://www.thegatewaypundit.com/2020/12/timing-large-georgia-ballot-dump-biden-appears-coincide-timing-mother-daughter-duos-election-fraud-scam/. A true and correct copy of this article is attached as Exhibit 7.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

steal the election for Joe Biden than this mother – daughter
combo. The good people in Georgia need to stand up.[66]

72.    Defendants also posted the video embedded in this article to *The Gateway
Pundit*'s YouTube channel with the caption, "Poll Worker Ruby Freeman Loads Up The
Same Stack Of Ballots To Be Counted 3X," which has been viewed more than 51,638
times at the time of filing.[67]

73.    Jim and Joe Hoft also amplified the story using their Twitter accounts.[68]

74.    Defendants later boasted that they originated the false and defamatory claim
that Ms. Freeman tabulated the same votes three times.[69]

75.    On December 4, PolitiFact—a non-profit website that checks the accuracy
of claims made by elected officials and others—published another fact check of the claim
repeatedly made by *The Gateway Pundit* that video footage from Georgia showed suitcases
filled with ballots being illegally counted after election monitors were told to leave. The
PolitiFact article confirmed the conclusions of Lead Stories and Georgia Public
Broadcasting that the claim was plainly false. It featured a statement from Richard Barron,

---

[66] Joe Hoft, *UNBELIEVABLE: Anti-Trump Democrat In Georgia 'Suitcase Scandal' Caught Running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)*, Gateway Pundit (Dec. 4, 2020, 5:45 PM), https://www.thegatewaypundit.com/2020/12/unbelievable-mother-along-daughter-handled-counted-ballots-alone-hours-georgia-ruby-freeman-caught-running-batch-ballots-tabulator-three-times/. A true and correct copy of this article is attached as Exhibit 8.

[67] Gateway Pundit, *Corrupt Georgia Election Worker Seen Loading Same Ballots 3 Times into Machine*, YouTube (Dec. 4, 2020), https://www.youtube.com/watch?v=RiREC3Zy20E (last visited Aug. 24, 2022).

[68] Jim Hoft (@gatewaypundit), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335017338396176 384 (last visited Aug. 23, 2022); Joe Hoft (@joehoft), Twitter (Dec. 4, 2020), *available at* https://web.archive.org/web/20201208010821/https://twitter.com/joehoft (last visited Aug. 23, 2022).

[69] Joe Hoft, *Fulton County 2020 Election Case's Request is Granted - Election Workers Ruby Freeman, Wandrea Moss, and Happy Faces Personnel Group Are Added to the Case*, Gateway Pundit (Aug. 14, 2021, 9:15 AM), https://www.thegatewaypundit.com/2021/08/fulton-county-2020-election-cases-request-add-ruby-freeman-wandrea-moss-happy-faces-personnel-group-case-granted/. A true and correct copy of this article is attached as Exhibit 9.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

the elections director in Fulton County, who confirmed that no announcement was made telling people to leave. Rather, certain staff members left as their work was finished. Mr. Barron himself told the workers scanning the ballots to keep working. Mr. Barron also confirmed that it was normal to keep containers under the tables near the scanners.[70]

76.     Two days later, on December 6, 2020, after the Defendants' statements had been thoroughly refuted by multiple state and county officials, Defendants published three more articles in *The Gateway Pundit.* The first repeated earlier lies that Plaintiffs had engaged in fraud:

> [T]he secret suitcase ballots were pulled out from their hiding place under the tables.
>
> They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.[71]

77.     Jim Hoft tweeted a link to the article.[72]

78.     The second two articles purported to disclose "exclusive" new information about the "man in red" shown in the security video, and each repeated the false claims that Ms. Freeman and Ms. Moss were involved in "voter corruption":

> [I]t was uncovered that a mother and daughter team, Ruby Freeman and her daughter "Shaye" Moss as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were

---

[70] Bill McCarthy, *No, Georgia Election Workers Didn't Kick Out Observers and Illegally Count 'Suitcases' of Ballots*, PolitiFact (Dec. 4, 2020), https://www.politifact.com/factchecks/2020/dec/04/facebook-posts/no-georgia-election-workers-didnt-kick-out-observe/.

[71] Joe Hoft, *The Same Organized Fraud That Took Place in Michigan Took Place in Georgia on Election Night — Republicans Were Removed from the Counting Area and the Massive Spike in Biden Only Votes Is Recorded*, Gateway Pundit (Dec. 6, 2020, 8:15 AM), https://www.thegatewaypundit.com/2020/12/thing-happened-michigan-happened-georgia-election-night-republicans-removed-counting-area-massive-ballot-drop-biden-votes/. A true and correct copy of this article is attached as Exhibit 10.

[72] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201206191516/https://twitter.com/gatewaypundit/status/1335631252217532421 (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

pulled out from under a table that were previously covered up and processed with no Republican observers.

The mother - daughter team have become infamous in the annals of voter corruption[.][73]

79.     Jim Hoft amplified these stories on Twitter.[74]

80.     Also on December 6, Georgia Governor Brian Kemp filed in federal court a sworn affidavit from Frances Watson, chief investigator for the Georgia Secretary of State, further refuting these lies. Gov. Kemp filed this affidavit in *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga), in response to claims by a group of Presidential Electors for Trump of widespread election-related misconduct. The affidavit detailed the results of an investigation by Ms. Watson into the alleged events at the State Farm Arena. Ms. Watson attested that her investigative team interviewed witnesses and reviewed the entire security footage. Her investigation found that (a) observers and members of the press were *not* told to leave, but exited the room after seeing a group of workers responsible for opening envelopes leave; and (b) no ballots were brought in from an unknown location and hidden under a table. She also stated that the video showed opened but uncounted ballots

---

[73] Joe Hoft, *EXCLUSIVE: Review of Late-Night Ballot Counting in Atlanta's State Farm Arena Shows Mysterious 'Man In Red' Receiving Numerous Calls During the Ballot Heist But from Whom?*, Gateway Pundit (Dec. 6, 2020, 6:35 PM), https://www.thegatewaypundit.com/2020/12/review-late-night-ballot-counting-atlantas-state-farm-arena-shows-mysterious-man-red-making-numerous-calls/; Jim Hoft, *BREAKING EXCLUSIVE: Third Suspect from State Farm Center 'Suitcase Scandal' Identified as Ralph Jones, Sr. – Who Was in the News for Shady Deal with ATL Mayor Keisha Bottoms*, Gateway Pundit (Dec. 6, 2020, 9:23 PM), https://www.thegatewaypundit.com/2020/12/breaking-exclusive-third-suspect-state-farm-center-suitcase-scandal-identified-ralph-jones-sr-news-shady-deal-atl-mayor-keisha-bottoms/ (republishing same paragraph). True and correct copies of these articles are attached as Exhibits 11 and 12, respectively.

[74] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335757633836421121 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit/status/1335787833760559111 (last visited Aug. 23, 2022).

being placed in boxes and stored under the table, and later showed the boxes being opened

so the workers could scan the ballots when the counting resumed later that night.[75]

81.     The Watson affidavit's submission and its content were widely reported in

the press on December 6 and 7, 2020.[76]

82.     Nonetheless, Jim Hoft published two more articles early on December 7

containing additional false and defamatory statements about Plaintiffs. The first labeled

Ms. Freeman and Ms. Moss "suspects in the suitcase ballot fraud at the State Farm Center"

and said they were captured on the "most explosive video of the entire campaign season"

pulling "hidden ballots in the suitcases" out and counting them "after all of the GOP

observers and media was sent home for a 'water main' break." It then mocked Ms. Freeman

for supposedly saying she "needed a lawyer" and declining an interview request by

"Carolyn Ryan TV."[77]

83.     Jim Hoft amplified this article on Twitter.[78]

---

[75] Declaration of Frances Watson, *Pearson v. Kemp*, Civ. No. 1:20-cv-04809-TCB (N.D. Ga. Dec. 6, 2020), ECF No. 72-1, *available at* https://s3.documentcloud.org/documents/20420664/frances-watson-affidavit.pdf.

[76] *See, e.g.*, Daniel Chaitin, *Chief Georgia Investigator: No 'Mystery Ballots' Seen in Security Video,* Wash. Examiner (Dec. 6, 2020, 11:56 PM), https://www.washingtonexaminer.com/news/chief-georgia-investigator-no-mystery-ballots-seen-in-security-video; Ronn Blitzer, *No 'Mystery Ballots' Hidden Under Table in Fulton County, Georgia Investigator Swears in Affidavit*, Fox News (Dec. 7, 2020), https://www.foxnews.com/politics/fulton-county-georgia-no-mystery-ballots-under-table-investigator-affidavit; Peter Weber, *Georgia's Top Election Investigator Debunks A Vote Fraud Conspiracy Involving 'Suitcases' of Ballots, A Urinal*, Yahoo News (Dec. 7, 2020), https://news.yahoo.com/georgias-top-election-investigator-debunks-115236191.html.

[77] Jim Hoft, *"I Won't Be Able to Be Interviewed – I Need an Attorney" — Georgia's Ruby Freeman Lawyers Up, Cancels Interview*, Gateway Pundit (Dec. 7, 2020, 7:15 AM), https://www.thegatewaypundit.com/2020/12/wont-able-interviewed-need-attorney-georgias-ruby-freeman-lawyers-cancels-interview/. A true and correct copy of this article is attached as Exhibit 13.

[78] Jim Hoft (@gatewaypundit), Twitter (Dec. 6, 2020), *available at* https://web.archive.org/web/20201207070649/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

84.     In a second article on December 7, 2020, Jim Hoft blasted out the "HUGE" news that the third "suspect" in the "suitcase scandal" was the same man who told reporters there had been a "water main break." The article depicted the claim of a water problem as clever ruse to facilitate election fraud by Plaintiffs:

> We know this was a lie because there was NEVER a work order filed and the water department never received a call. It never happened!
>
> But it gave Ralph and Ruby and Shaye cover to complete their scam on Georgia and America![79]

85.     Jim Hoft amplified this story on Twitter.[80]

86.     In a news conference on December 7, Gabriel Sterling, Georgia's Voting Implementation Manager, once more refuted the lies about the Trump Edited Video that *The Gateway Pundit* was continuing to spread. He yet again confirmed that the surveillance video showed that the containers taken from under a table held valid, uncounted ballots that had been stored by workers who thought they were leaving for the night. After realizing that they were staying, the workers unpacked the ballots from the containers and resumed scanning them. Mr. Sterling specifically refuted the claim that election workers had illegally scanned the same ballots multiple times, explaining that any such action would have been revealed by the hand count undertaken by Georgia election officials and

---

[79] Jim Hoft, *HUGE! WE CAUGHT THEM! Conspiracy Revealed — 3rd Suspect in GA 'Suitcase Scandal' is Also the Same Man Who Spoke to Reporters on Water Main Break*, Gateway Pundit (Dec. 7, 2020, 8:29 AM), https://www.thegatewaypundit.com/2020/12/huge-caught-criminal-conspiracy-revealed-3rd-suspect-ga-suitcase-scandal-also-man-spread-lies-water-main-broke-state-farm-center/. A true and correct copy of this article is attached as Exhibit 14.

[80] Jim Hoft (@gatewaypundit), Twitter (Dec. 7, 2020), *available at* https://web.archive.org/web/20201208081456/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

machine-based recount requested by the Trump campaign. Neither recount showed a meaningful change in results originally reported.[81]

87. In the evening on December 7, Jim Hoft further evidenced Defendants' awareness of the fact checks, sharing a link to an article in *The Federalist* discussing the various fact-checks:[82]



88. Nonetheless, with full awareness that his statements about Ms. Freeman and Ms. Moss had been flatly and fully refuted by multiple officials and multiple fact-checking organizations, Jim Hoft continued to publish false statements on *The Gateway Pundit*.

89. On December 8, 2020, Jim Hoft published three new articles repeating and doubling down on the false and defamatory claims. The first article was titled "CONFIRMED: Supervisor Shaye Moss - Who "Yelled Out" for Georgia GOP Observers to GO Home - Is Same Woman Who Pulled the Suitcase Ballots Out from Underneath the

---

[81] Nick Corasaniti, *Top Georgia Election Official Debunks 'Ridiculous' Claims About Election Fraud*, The New York Times (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/technology/suitcases-ballots-georgia-election.html.

[82] Jim Hoft (@gatewaypundit), Twitter (Dec. 7, 2020, 6:38 PM), https://twitter.com/gatewaypundit/status/1336137974875033602, *available at* https://web.archive.org/web/20201208024013/https://twitter.com/gatewaypundit/status/1336137974875033 602 (including link to Mollie Hemingway, *No, The Georgia Vote-Counting Video Was Not 'Debunked.' Not Even Close*, Federalist (Dec. 7, 2020), https://thefederalist.com/2020/12/07/no-the-georgia-vote-counting-video-was-not-debunked-not-even-close/).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Table When they Left." In addition to repeating previously made false claims about Ms.

Freeman and Ms. Moss, it stated:

> Mollie Hemingway at The Federalist reported earlier today that poll watchers in sworn affidavits claim it was "a woman with blonde braids" who appeared to be a supervisor "yelled out" to those present in the room that they would stop working for the night and would resume in the morning.
>
> Shaye told everyone to go home.
>
> Then Shaye, her mother and a couple others including Ralph Jones, Sr. were filmed taking "suitcases" of ballots hidden under a table out to be tabulated. This was right before Joe Biden got his surprise spike in ballots.
>
> And now the liberal media and their fake "fact-checkers" are lying about the incredible incident caught on video![83]

90.     Jim Hoft's second article on December 8 was titled, "NOW WITH AUDIO:

Georgia Election Official Ralph Jones, Sr. Announced on Nov. 3rd Evening that Counting

would Stop at 11 PM — Then Led Team to Count Stashed 'Suitcase' Ballots." This article

noted both the *Pearson v. Kemp* affidavit, which stated that the count was never intended

to stop at 10:00 p.m., and Mr. Sterling's statement that counting was resumed at 11:00 p.m.

It stated:

> Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.

---

[83] Jim Hoft, *CONFIRMED: Supervisor Shaye Moss – Who "Yelled Out" for Georgia GOP Observers to Go Home – Is Same Woman Who Pulled the Suitcase Ballots Out from Underneath the Table When they Left*, Gateway Pundit (Dec. 8, 2020, 7:20 AM), https://www.thegatewaypundit.com/2020/12/confirmed-supervisor-shaye-moss-yelled-georgia-gop-observers-go-home-woman-pulled-suitcase-ballots-underneath-table-left/. A true and correct copy of this article is attached as Exhibit 15.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

…

> For the record — Georgia anti-Trump elections official Gabe Sterling later said that the local officials called for the counting to resume at 11 PM but this is just not true.

…

> The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.

> Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.

> It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.

> It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud.

…

> The lying fake news media wants you to believe this entire incident was debunked.

> Nothing could be further from the truth — something that is lacking in the mainstream media and their "fact-checkers" today.

> We now have actual audio of Ralph Jones — the elections official at the heart of the "suitcase scandal" telling government officials the State Farm Center will shut down at 10 or 11 PM on Election night!

> Georgia Secretary of State officials released an affidavit insisting there never was an intent to stop the count at 10:00 PM, but only the cutters were going to stop.[84]

---

[84] Jim Hoft, *NOW WITH AUDIO: Georgia Election Official Ralph Jones, Sr. Announced on Nov. 3rd Evening that Counting would Stop at 11 PM — Then Led Team to Count Stashed 'Suitcase" Ballots*, Gateway Pundit (Dec. 8, 2020, 8:59 AM), https://www.thegatewaypundit.com/2020/12/now-audio-georgia-election-official-ralph-jones-sr-announced-nov-3rd-evening-counting-stop-11-pm-led-team-count-stashed-suitcase-ballots/. A true and correct copy of this article is attached as Exhibit 16.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

91.     Jim Hoft authored a third article that same day to discredit the fact check organization Lead Stories, one of the several outside groups that had found the "suitcase scandal" to be no scandal at all. He sought to undermine their credibility by writing: "Lead Stories we now know is funded by Facebook and a Chinese company. So it makes sense that they would target any conservative outlet that reported on this explosive video."[85] He used the occasion to repeat yet again the false claim that Plaintiffs had "stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room," in a pre-planned conspiracy to commit election fraud.

92.     Jim Hoft amplified each of these stories on Twitter.[86]

93.     Defendants' false and defamatory tirade targeting Ms. Freeman and Ms. Moss continued later that month. On December 15, 2020, Jim Hoft published an article insinuating that Ms. Freeman and Ms. Moss engaged in fraudulent activity and should be questioned by law enforcement:

> As we have reported numerous times now the election numbers in Georgia are suspect, fraudulent, and impossible.
>
> We even HAVE VIDEO of Democrats at work stealing votes from the people of Georgia.
>
> . . .

---

[85] Jim Hoft, *China-Funded 'Fact-Checker' Lead Stories Pushes Bullsh\*t That Fulton County 'Suitcase' Scandal Was Debunked — Will They EVER Tell the Truth?*, Gateway Pundit (Dec. 8, 2020, 1:11 PM), https://www.thegatewaypundit.com/2020/12/china-funded-facebook-fact-checker-lead-stories-pushes-bullsht-fulton-county-suitcase-scandal-debunked-will-ever-tell-truth/. A true and correct copy of this article is attached as Exhibit 17.

[86] Jim Hoft (@gatewaypundit), Twitter (Dec. 8, 2020), *available at* https://web.archive.org/web/20201208224901/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

Has anyone questioned Ruby Freeman or her daughter?[87]

94.    On December 23, 2020, Jim Hoft published another     article on this theme, repeating a tweet posted by Team Trump the day before. This article was titled "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?" It repeated prior false and defamatory claims about Ms. Freeman and Ms. Moss published on *The Gateway Pundit*, boasting of the publication's leading role in spreading the misinformation:

> On Tuesday night President Trump tweeted out an OANN report on a Gateway Pundit investigation of the Atlanta suitcase voter fraud scandal.
>
> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].
>
> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
>
> On Tuesday night President Trump tweeted this OANN and Gateway Pundit video.

---

[87] Jim Hoft, *PRESIDENT TRUMP Retweets Attorney Lin Wood: Kemp and Raffensperger "Will Soon be Going to Jail"*, Gateway Pundit (Dec. 15, 2020, 9:19 AM), https://www.thegatewaypundit.com/2020/12/president-trump-retweets-attorney-lin-wood-kemp-raffensperger-will-soon-going-jail/. A true and correct copy of this article is attached as Exhibit 18.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist [sic].

Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist [sic]!

It was a carefully planned event!

They had NO IDEA they would get caught!

At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.

They were able to flip Georgia for Beijing Biden by their actions.

Why is the FBI or DOJ not involved?

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> This tells you everything you need to know about your federal government.[88]

95.     Jim Hoft amplified this story on Twitter.[89]

96.     *The Gateway Pundit* published two additional articles about Plaintiffs on December 23 repeating the false and defamatory smear that Ms. Freeman "grabbed the ballots and started jamming the ballots into the Dominion tabulators three times" and that "Democrats using people like these poll workers stole the election for Joe Biden." Joe Hoft published the first article, titled "President Trump Tweets Gateway Pundit Video Showing Poll Workers Stuffing Ballots Into Tabulators Numerous Times on Election Night."[90] Jim Hoft published the second article on this theme, with substantially similar allegations.[91]

97.     On December 26, 2020, *The Gateway Pundit* published an article reiterating previously debunked claims about Ms. Freeman and Ms. Moss. It stated:

> Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.

---

[88] Jim Hoft, *Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?*, Gateway Pundit (Dec. 23, 2020, 8:40 AM), https://www.thegatewaypundit.com/2020/12/fbi-spoken-ruby-freeman-ralph-jones-yet-not-fbi/. A true and correct copy of this article is attached as Exhibit 19.

[89] Jim Hoft (@gatewaypundit), Twitter (Dec. 23, 2020), *available at* https://web.archive.org/web/20201226003813/https://twitter.com/gatewaypundit (last visited Nov. 30, 2021).

[90] Joe Hoft, *President Trump Tweets Gateway Pundit Video Showing Poll Workers Stuffing Ballots Into Tabulators Numerous Times on Election Night*, Gateway Pundit (Dec. 23, 2020, 8:10 AM), https://www.thegatewaypundit.com/2020/12/president-trump-retweets-gateway-pundit-video-showing-poll-workers-stuffing-ballots-tabulators-numerous-times-election-night/. A true and correct copy of this article is attached as Exhibit 20.

[91] Jim Hoft, *WTH? Twitter Says OANN Report of Gateway Pundit Investigation is Disputed – How Could This Be When We Are the Only Ones Who Wrote About It?*, Gateway Pundit (Dec. 23, 2020, 11:05 AM), https://www.thegatewaypundit.com/2020/12/wth-twitter-says-oann-report-gateway-pundit-investigation-disputed-ones-wrote/. A true and correct copy of this article is attached as Exhibit 21.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.
>
> …
>
> Ruby and her daughter pulled out more than 11,779 ballots and can be seen entering those ballots multiple times into the Dominion machine.[92]

98.     Jim Hoft amplified this story on Twitter by retweeting another user.[93]

99.     Defendants' targeting of Ms. Freeman and Ms. Moss continued into the new year. On January 1, 2021, Joe Hoft again published an article which repeated the false and defamatory claim that Plaintiffs were the "individuals dragging ballots out from under the tables in Georgia on election night on video," insinuating that they engaged in criminal activity, and complaining that "none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of."[94]

100.     The next morning, Jim Hoft published an article titled "BREAKING: ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!" The article repeated the defamatory claim that Ms. Freeman jammed ballots through the machines three times and committed fraud.[95]

---

[92] Larry Johnson, *Bill Barr Did Not See Fraud Because He Refused To Look*, Gateway Pundit (Dec. 26, 2020, 7:34 PM), https://www.thegatewaypundit.com/2020/12/bill-barr-not-see-fraud-refused-look/. A true and correct copy of this article is attached as Exhibit 22.

[93] Jim Hoft (@gatewaypundit), Twitter (Dec. 27, 2020), *available at* https://web.archive.org/web/20201228210249/https://twitter.com/gatewaypundit (last visited Aug. 23, 2022).

[94] Joe Hoft, *What Are Americans To Do When the Justice Department Is Unjust, the Courts Won't Adjudicate and the Media Covers It All Up?*, Gateway Pundit (Jan. 1, 2021, 9:58 AM), https://www.thegatewaypundit.com/2021/01/americans-justice-department-unjust-courts-wont-adjudicate-media-covers/. A true and correct copy of this article is attached as Exhibit 23.

[95] Jim Hoft, *BREAKING: ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!*, Gateway Pundit (Jan. 2, 2021, 7:30 AM),

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

101.    Later on January 2, 2021, Donald Trump placed a telephone call to
Georgia's Secretary of State Brad Raffensperger, during which Mr. Trump pressured Mr.
Raffensperger to change the outcome of the Georgia presidential election by finding more
votes for him. To justify his request, Mr. Trump repeated some of the many false
allegations about Ms. Freeman that Defendants had been publishing throughout December.
These include statements calling her "a vote scammer, a professional vote scammer and
hustler," and asserting, "we're so far ahead of these numbers, even the phony ballots of
Ruby Freeman — known scammer."[96]

102.    Over the next couple of days, Jim Hoft published a number of articles on
*The Gateway Pundit* about this phone call. Several of these noted that the call was about
how the election in Georgia was "wrought with fraud," and observing that "[i]t's not clear
if Ruby Freeman . . . w[as] on the call."[97] These articles imply she had a role in the alleged
fraud.

---

https://www.thegatewaypundit.com/2021/01/breaking-another-video-corrupt-election-workers-feeding-
ballots-machines-numerous-times/. A true and correct copy of this article is attached as Exhibit 24.

[96] WSJ Staff, *Trump's Georgia Call: Listen to the Audio and Read a Full Transcript*, Wall St. J. (Jan. 3,
2021, 9:47 PM), https://www.wsj.com/articles/listen-to-the-full-trump-ga-call-11609713527.

[97] Jim Hoft, *Raffensperger's Team Leaks President Trump's Saturday Call to Fake News WaPo — Tells You
Everything About the Dirty Georgia Leadership* (Jan. 3, 2021, 1:08 PM),
https://www.thegatewaypundit.com/2021/01/raffenspergers-team-leaks-president-trumps-saturday-call-
fake-news-wapo-tells-everything-dirty-georgia-leadership/; Jim Hoft, *Corrupt Georgia Secretary of State
Raffensperger Insists Georgia's Fraudulent Election Was Legitimate, Then Accuses President Trump of
Lying* (Jan. 3, 2021, 4:21 PM), https://www.thegatewaypundit.com/2021/01/corrupt-georgia-secretary-state-
raffensperger-lies-georgias-2020-election-results-legitimate-calls-president-trump-liar/; Jim Hoft, *President
Trump Files Two Lawsuits Against Dirty Georgia Secretary of State Raffensperger for Leaking Confidential
Litigation Call* (Jan. 3, 2021, 8:09 PM), https://www.thegatewaypundit.com/2021/01/president-trump-files-
two-lawsuits-dirty-georgia-secretary-state-raffensperger-leaking-confidential-litigation-call/; Jim Hoft,
*Report: White House Planning to Refer Brad Raffensperger to Secret Service for Investigation Under the
Espionage Act* (Jan. 4, 2021, 7:15 AM), https://www.thegatewaypundit.com/2021/01/raeport-white-house-
planning-refer-brad-raffensperger-secret-service-investigation-espionage-act/; Jim Hoft, *Dirtbag Georgia
Secretary of State to Hold Press Conference at 3 PM* (Jan. 4, 2021, 11:37 AM),
https://www.thegatewaypundit.com/2021/01/dirtbag-georgia-secretary-state-hold-press-conference-3-pm/.
A true and correct copy of the article published January 3, 2021, at 4:21 p.m., is attached as Exhibit 25.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

103.   Jim Hoft amplified several of these stories using his Twitter account.[98]

104.   In a January 3, 2021, article by Jim Hoft about the call, the headline announced, "HUGE: TRUMP DROPS A BOMB DURING PHONE CALL! Tells Raffensperger 'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal! (VIDEO)." The article republished the portion of the call's transcript when Mr. Trump made the accusation of election fraud that Defendants had been publishing repeatedly since December 3, and it inserted Ms. Freeman's name where it had been omitted by *The Washington Post*, which had broken the story about the call. It stated:

> President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to [sic] with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break. Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.[99]

---

[98]    Jim Hoft (@gatewaypundit), Twitter (Jan. 3, 2021), *available at* https://web.archive.org/web/20210103191234/https://twitter.com/gatewaypundit/status/1345810207587397 633 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 3, 2021), *available at* https://web.archive.org/web/20210104213119/https://twitter.com/gatewaypundit/status/1345915506423951 360 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 4, 2021), *available at* https://web.archive.org/web/20210104132453/https://twitter.com/gatewaypundit/status/1346085100224716 801 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 4, 2021), *available at* https://web.archive.org/web/20210104181156/https://twitter.com/gatewaypundit/status/1346156819052441 600 (last visited Aug. 23, 2022).

[99]   Jim Hoft, *HUGE: TRUMP DROPS A BOMB DURING PHONE CALL! Tells Raffensperger 'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal! (VIDEO)*, Gateway Pundit (Jan. 3, 2021, 6:20 PM), https://www.thegatewaypundit.com/2021/01/huge-trump-drops-bomb-phone-call-tells-raffensperger-vote-scammer-hustler-ruby-freeman-behind-18000-fraudulent-votes-suitcase-scandal-video/. A true and correct copy of this article is attached as Exhibit 26.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

105.    The article then reminded readers of *The Gateway Pundit* that it "was first to identify Ruby Freeman, her daughter Shaye Moss and supervisor Ralph Jones, Sr. in the suitcase fraud scandal that was caught on tape and went viral online."[100]

106.    Jim Hoft amplified this story on Twitter.[101]

107.    On January 4, 2021, Georgia election officials held yet another press conference to refute the already-debunked election fraud allegations that Mr. Trump had raised in his call with Mr. Raffensperger.[102] Gabriel Sterling once again described the events that occurred on election day at State Farm Arena, explained how they represented entirely normal ballot processing, and directed listeners to the Georgia's Secretary of State's website for a detailed timeline matched to the surveillance footage.[103] Sterling reiterated for the assembled reporters the actual series of events:

> Late in the evening, after the water main break had been fixed, election workers prepared to go home for the night and followed standard procedures to store ballots securely: placing them in containers and affixing numbered seals. But when Mr. Raffensperger found out that they were closing up shop, he ordered them to continue counting through the night — so the workers retrieved the containers and resumed counting ballots.[104]

---

[100] *Id.*

[101]    Jim    Hoft    (@gatewaypundit),    Twitter    (Jan.    3,    2021),    *available    at* https://web.archive.org/web/20210105040422/https://twitter.com/gatewaypundit/status/1345888162455953 410 (last visited Aug. 23, 2022).

[102] 11Alive, *Georgia Senate Runoffs | Secretary of State's Office Addresses Election Day, Claims*, YouTube (Jan. 4, 2021), https://www.youtube.com/watch?v=K7lDlqJ66fU&t=740s.

[103] *Fact Check*, Secure the Vote, https://securevotega.com/fact-check/ (last accessed Nov. 7, 2021).

[104] Maggie Astor, *A Georgia Election Official Debunked Trump's Claims of Voter Fraud, Point by Point*, N.Y. Times (Jan. 4, 2021), https://www.nytimes.com/2021/01/04/us/politics/trump-georgia-election-fraud.html.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Sterling expressed his great frustration that the Trump legal team "had the entire tape" revealing these facts, and nevertheless "intentionally misled the State Senate, the voters and the people of the United States about this."[105]

108.    Defendants were well aware of the Georgia Secretary of State's website and additional fact check, as evidenced by Jim Hoft's tweet on January 4, 2021:[106]



109.    PolitiFact published a fact-check article about the Raffensperger call that same day, finding that the events described by Mr. Sterling lined up with previous reports from PolitiFact and other fact-checkers. This article repeated PolitiFact's earlier assessment that the arena surveillance video showed no wrongdoing and provided no evidence of election fraud. It rated Mr. Trump's claim that Georgia election workers pulled 18,000 ballots from suitcases and counted them for Biden as "Pants on Fire!" false.[107]

---

[105] *Id.*

[106]    Jim Hoft (@gatewaypundit), Twitter (Jan. 4, 2021), *available at* https://web.archive.org/web/20210105040422/https://twitter.com/gatewaypundit/status/1346240056055517185 (last visited Nov. 30, 2021).

[107] Bill McCarthy, *Trump Rehashes Debunked Claim About 'Suitcases' of Ballots in Georgia Phone Call*, PolitiFact (Jan. 4, 2021), https://www.politifact.com/factchecks/2021/jan/04/donald-trump/trump-rehashes-debunked-claim-about-suitcases-ball/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**F.** ***The Gateway Pundit's*** **Continuing Publication of False and Defamatory Claims**

110. Nonetheless, Defendants returned to their false statements about Ms. Freeman and Ms. Moss shortly afterward and continued long after Inauguration Day.

111. On January 5, 2021, Jim Hoft published an article criticizing Gabriel Sterling's press conference with the false and defamatory claim that Ms. Freeman had engaged in criminal conduct that Sterling was covering up:

> Gabe Sterling misled his audience, defended the corrupt and likely criminal conduct at the State Farm Center on election night, defended Ruby Freeman for passing hundreds of ballots through a ballot counting machines [sic] at least three times.[108]

112. Later that day, Joe Hoft published an article repeating substantially the same defamatory statements.[109]

113. Jim Hoft amplified both of these stories on Twitter.[110]

---

[108] Jim Hoft, *CAUGHT ON VIDEO: Georgia Hack Gabe Sterling Called Out by Dominion Executive Eric Coomer*, Gateway Pundit (Jan. 5, 2021, 9:20 AM), https://www.thegatewaypundit.com/2021/01/confirmed-dirty-hack-gabe-sterling-called-dominion-executive-eric-coomer-video/. A true and correct copy of this article is attached as Exhibit 27.

[109] Joe Hoft, *Georgia Election Official Gabe Sterling Claims Processing was "Normal" At the State Farm Arena Election Night – Nothing Could Be Further from the Truth*, Gateway Pundit (Jan. 5, 2021, 1:02 PM), https://www.thegatewaypundit.com/2021/01/georgia-election-official-gabe-sterling-claims-processing-normal-state-farm-arena-election-night-nothing-truth/. A true and correct copy of this article is attached as Exhibit 28.

[110] Jim Hoft (@gatewaypundit), Twitter (Jan. 5, 2021), *available at* https://web.archive.org/web/20210105152726/https://twitter.com/gatewaypundit/status/1346477248367366 147 (last visited Aug. 23, 2022); Jim Hoft (@gatewaypundit), Twitter (Jan. 5, 2021), *available at* https://web.archive.org/web/20210105213817/https://twitter.com/gatewaypundit/status/1346571658593787 908 (last visited Aug. 23, 2022).

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

114.    On January 7, 2021, Joe Hoft published an article reiterating the false claim that Plaintiffs are operatives who carried out massive voter fraud and that the FBI should question Ms. Freeman regarding the "infamous ballot hoist [sic]."[111]

115.    Jim Hoft amplified this story on Twitter, as well.[112]

116.    On January 17, 2021, Jim Hoft published an article on *The Gateway Pundit* titled "HERE THEY ARE: The Five Most Obvious Acts of Fraud in the 2020 Election that You Are No Longer Allowed to Discuss." In this article, he listed "[t]he Georgia Late Night Hidden Suitcase Heist" as the first "MOST SIGNIFICANT ACT[] OF FRAUD IN THE 2020 ELECTION," republished the boast about the publication's role in spreading disinformation about Plaintiffs, falsely characterized their conduct as a criminal conspiracy in which "[t]hey had NO IDEA they would get caught," and baselessly insinuated that they should be subject to federal investigation.[113]

117.    On March 25, 2021, Joe Hoft published an article that republished earlier defamatory statements describing Plaintiffs as a "mother-daughter team of ballot counters in Atlanta [who] really overdid their fraud" and Ms. Freeman as a "Crooked Operative."[114]

---

[111] Joe Hoft, *Project Veritas Identifies the Exact Moment Ralph Jones is Ordered by a judge to Stop Preventing Poll Watchers Access to Activities Going on in Atlanta*, Gateway Pundit (Jan. 7, 2021, 3:14 PM), https://www.thegatewaypundit.com/2021/01/project-veritas-identifies-exact-moment-ralph-jones-ordered-judge-stop-preventing-poll-watchers-access-activities-going-atlanta/. A true and correct copy of this article is attached as Exhibit 29.

[112] Jim Hoft (@gatewaypundit), Twitter (Jan. 7, 2021), *available at* https://web.archive.org/web/20210107214951/https://twitter.com/gatewaypundit/status/1347298953105178 625 (last visited Aug. 23, 2022).

[113] Jim Hoft, *HERE THEY ARE: The Five Most Obvious Acts of Fraud in the 2020 Election that You Are No Longer Allowed to Discuss*, Gateway Pundit (Jan. 17, 2021, 6:33 PM), https://www.thegatewaypundit.com/2021/01/five-obvious-acts-fraud-2020-election/. A true and correct copy of this article is attached as Exhibit 30.

[114] Joe Hoft, *TOO LITTLE TOO LATE — After Certifying Sham 2020 Election Results — Georgia Gov. Kemp Signs New Election Legislation*, Gateway Pundit (Mar. 25, 2021, 7:25 PM), https://www.thegatewaypundit.com/2021/03/little-late-certifying-sham-2020-election-results-georgia-gov-kemp-signs-new-election-legislation/. A true and correct copy of this article is attached as Exhibit 31.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

118.    On May 21, 2021, in response to a court order in *Favorito v. Wan*, No. 2020CV343938 (Fulton Cnty. Ga. Super. Ct. May 21, 2021), to unseal absentee ballots in Fulton County, Joe Hoft published another article falsely alleging voter fraud by Plaintiffs. After republishing the same defamatory statements as the March article, Joe Hoft again touted *The Gateway Pundit*'s role in spreading the debunked narrative of Plaintiffs' fraud:

> We nailed it in Georgia. We identified in the video below that the same ballots were pushed through voting machines two and three times.



> President Trump retweeted this story (but this was taken down by Twitter.) [sic][115]

119.    The next day, Jim Hoft published another article identifying Ms. Freeman and Ms. Moss by name and image and republishing false allegations that they engaged in

---

[115] Joe Hoft, *UPDATE: Georgia Judge Orders 145,000 Absentee Ballots from Fulton County to Be Scanned to Determine Legitimacy – Case Revolves Around Explosive Dec. Report from Gateway Pundit*, Gateway Pundit (May 21, 2021, 12:34 PM), https://www.thegatewaypundit.com/2021/05/update-georgia-judge-orders-145000-absentee-ballots-fulton-county-scanned-determine-legitimacy-case-revolves-around-disturbing-tgp-findings/. A true and correct copy of this article is attached as Exhibit 32.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

fraud and counted ballots in secret after kicking Republicans out of the State Farm Center.[116]



120.    On June 6, 2021, based on reports that Ms. Moss had been subpoenaed, Joe Hoft published an article on *The Gateway Pundit* republishing prior defamatory statements about Plaintiffs:

---

[116] Jim Hoft, *Sidney Powell Weighs in on Georgia Audit: 145,000 Absentee Ballots, 106,000 Adjudicated Ballots, Video of Multiple Scannings of Same Ballots and Nine witnesses of Suspected Fake Ballots!*, Gateway Pundit (May 22, 2021, 9:05 AM), https://www.thegatewaypundit.com/2021/05/sidney-powell-weighs-georgia-audit-145000-absentee-ballots-106000-adjudicated-ballots-video-multiple-scannings-ballots-nine-witnesses-suspected-fake-ballots/. A true and correct copy of this article is attached as Exhibit 33.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM



It's getting hot in Georgia! One of the individuals caught on tape late on election night in Fulton County, Georgia, Wandrea Shaye Moss, has been subpoenaed for a deposition in a civil trial in Fulton County.

Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?

After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving *stacks of ballots* through the machines two and three times each.

In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on election night[.]

. . .

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.
>
> . . .
>
> We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.[117]

121.   The following day, he published a similar article about Ms. Freeman, titled "BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night Is Subpoenaed," in which he repeated prior defamatory statements:

> Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. Ruby Freeman was caught on tape running the same stack of suspect ballots through the machines multiple times.[118]

122.   Jim Hoft republished defamatory statements from this article a week later in a new posting on *The Gateway Pundit*.[119]

---

[117] Joe Hoft, *BREAKING: Ruby Freeman's Daughter Election Supervisor Wandrea Shaye Moss Is Subpoenaed for Deposition in Fulton County GA*, Gateway Pundit (June 6, 2021, 7:53 AM), https://www.thegatewaypundit.com/2021/06/breaking-ruby-freemans-daughter-election-supervisor-wandrea-shaye-moss-subpoenaed-deposition-fulton-county-ga/. A true and correct copy of this article is attached as Exhibit 34.

[118] Joe Hoft, *BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night is Subpoenaed*, Gateway Pundit (June 7, 2021, 9:43 PM), https://www.thegatewaypundit.com/2021/06/breaking-georgia-update-ruby-freeman-jammed-suspect-ballots-voting-machines-multiple-times-election-night-subpoenaed/. A true and correct copy of this article is attached as Exhibit 35.

[119] Jim Hoft, *CONFIRMED: Judge Delays Depositions from Georgia Election Workers Ruby Freeman and Her Daughter Shae Moss*, Gateway Pundit (June 14, 2021, 10:33 AM), https://www.thegatewaypundit.com/2021/06/confirmed-judge-delays-depositions-georgia-election-workers-ruby-freeman-daughter-shae-moss/. A true and correct copy of this article is attached as Exhibit 36.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

123.     On June 8, 2021, Jim Hoft published an article that republished earlier defamatory statements that Ms. Freeman was an "Anti-Trump Democrat" who was part of a "'Suitcase Scandal'" in which she was "[c]aught" counting ballots multiple times.[120]

124.     On June 11, 2021, Joe Hoft authored an article republishing these same defamatory claims.[121]

125.     Then, on June 17, 2021, Jim Hoft published an article featuring a video of Secretary of State Raffensperger describing election safeguards, and averring that Georgia "had safe, secure, and honest elections." Despite this, Jim Hoft included an image from election night identifying Ms. Freeman by name and again falsely alleging that Plaintiffs engaged in voter fraud:

> Of course, NOTHING could be further of [sic] the truth.
>
> The Gateway Pundit wrote several reports on the likely fraud and corruption in the November 2020 Georgia election.
>
> . . .
>
> [A] Gateway Pundit report exposed Georgia election officials repeatedly feeding hundreds and possibly thousands of ballots through the voting machines late at night in Atlanta, Georgia after the election observers were sent home.[122]

---

[120] Jim Hoft, *Georgia Update: Attorneys back in Court on June 21 After Fulton County Officials Block Audit of Ballots — Attorney Requests Video Footage from Unsecured Building*, Gateway Pundit (June 8, 2021, 11:57 AM), https://www.thegatewaypundit.com/2021/06/georgia-update-attorneys-back-court-june-21-fulton-county-officials-block-audit-ballots-attorney-requests-video-footage-unsecured-building/. A true and correct copy of this article is attached as Exhibit 37.

[121] Joe Hoft, *BREAKING: AG Merrick Garland Announces that His DOJ Will Scrutinize Any Post-Election Audits for Evidence of Voting Law Violations!*, Gateway Pundit (June 11, 2021, 3:03 PM), https://www.thegatewaypundit.com/2021/06/breaking-ag-merrick-garland-announces-doj-will-scrutinize-post-election-audits-evidence-voting-law-violations/. A true and correct copy of this article is attached as Exhibit 38.

[122] Jim Hoft, *Raffensperger's Own Team Was Saying "Bad, Bad Things" Were Happening in Fulton County Elections – He Ignored Them and Attacked Trump Instead (VIDEO)*, Gateway Pundit (June 17, 2021, 11:04 AM), https://www.thegatewaypundit.com/2021/06/raffenspergers-team-saying-bad-bad-things-happening-fulton-county-elections-ignored-attacked-trump-instead-video/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

126.    The next day, in response to a report from independent election monitor Carter Jones on election integrity in Fulton County, Jim Hoft published three more articles on *The Gateway Pundit* that republished prior defamatory statements about Plaintiffs being "leftist operatives" who were part of a "crew" that scanned fraudulent ballots. In the first, he wrote:

> A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night.
>
> . . .
>
> Ralph Jones was the person who sent home all of the election observers.
> Then his crew, including Ruby and daughter Shaye, went to work on election night!
>
> . . .
>
> The Gateway Pundit was first to report that Ruby Freeman was seen scanning stacks of ballots up to three times at the State Farm Center in Atlanta, Georgia after observers were sent home on election night.
>
> Our source caught Ruby Freeman in the purple shirt scanning the same stack of ballots multiple times on election night.[123]

127.    Defendants' characterizations of Carter Jones' report were in direct contradiction with Mr. Jones' own takeaways from the election, as evidenced by his interview with The Associated Press. In the AP interview, Mr. Jones challenged rumors of "suitcases filled with ballots" by noting that the ballot containers in the widely circulated

---

[123] Jim Hoft, *EXPLOSIVE DEVELOPMENT: Election Worker Ralph Jones Is Now Caught Double-Counting Ballots at the State Farm Center on Election Night!*, Gateway Pundit (June 18, 2021, 8:00 AM), https://www.thegatewaypundit.com/2021/06/explosive-new-report-confirms-least-two-elections-officials-ruby-freeman-ralph-jones-caught-double-counting-ballots-state-farm-center-election-night/. A true and correct copy of this article is attached as Exhibit 39.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

videos from the State Farm Arena are standard ballot bins used all over the state, "So they're not mysteries, they're not suitcases, they're ballots."[124]

128.    Three hours after Defendants' first article on the Carter Jones report, *The Gateway Pundit* published another article titled "Author of Fulton County Elections Report Tries Desperately to Walk Back Explosive Accusations – BUT IT'S TOO LATE," to try to discredit Mr. Jones' debunking the false narrative of fraud and suitcases of ballots that *The Gateway Pundit* was peddling:

> The lying fake news media is trying desperately to downplay the damning elections report from Fulton County Georgia today.
>
> . . .
>
> In the 29-page report Carter Jones tells of two more instances where the election officials were double-scanning votes late at night after the election observers and news media was sent home!
>
> The Gateway Pundit was first to report that Ruby Freeman was also seen double scanning stacks of ballots at the State Farm Center in Atlanta, Georgia after observers were sent home on election night.[125]

After quoting extensively from Mr. Jones' comments debunking the fraud allegations, Jim Hoft dismissed the comments as false.

129.    Minutes later, Jim Hoft published a third article on *The Gateway Pundit* that republished his claim that "Ruby Freeman . . . was filmed feeding the same stacks of ballots

---

[124] Kate Brumback, *Observer: Georgia county's elections messy, not fraudulent*, Associated Press (June 16, 2021), https://apnews.com/article/donald-trump-ga-state-wire-georgia-elections-government-and-politics-87bb23d4d9b2ec80a1db715e6bf1c633.

[125] Jim Hoft, *Author of Fulton County Elections Report Tries Desperately to Walk Back Explosive Accusations – BUT IT'S TOO LATE*, Gateway Pundit (June 18, 2021, 11:06 AM), https://www.thegatewaypundit.com/2021/06/author-fulton-county-elections-report-tries-desperately-walk-back-explosive-accusations-late/. A true and correct copy of this article is attached as Exhibit 40.

through voting machines late at night at the center – after observes [sic] were sent home," by which he intended to, and did, falsely convey that she was fraudulently inflating the Biden-Harris vote count.[126]

130.    The next day, on June 19, 2021, Joe Hoft published an article titled "Multiple Individuals Pushed Stacks of Ballots through Tabulators Multiple Times in Georgia. This is Illegal. Law Enforcement Did Nothing" that reiterated false claims that Ms. Freeman had engaged in criminal conduct. It noted *The Gateway Pundit*'s earlier reporting on "Fulton County Georgia poll worker Ruby Freeman pushing multiple ballots through the vote tabulators multiple times. This was illegal."[127]

131.    The same day, prompted by an online report that batches of absentee ballots were missing in Fulton County, Jim Hoft published another article replete with baseless and disproven allegations of voter fraud by plaintiffs:

> This follows news first reported by The Gateway Pundit that election operative Ruby Freeman was also caught tripe [sic] counting stacks of votes late at night at the counting center after GOP observers were sent home.

…

> On December 4th TGP reported with video on anti-Trump ballot counter Ruby Freeman working in a private cube with trays of ballots, walking past open boxes of ballots, working alone with NO ELECTION OBSERVERS IN SIGHT!

> This is the DEFINITION OF CHEATING!

---

[126] Jim Hoft, *Twitter Subpoenaed in Georgia Lawsuit Involving Fulton County Elections Supervisor Wandrea Shaye Moss*, Gateway Pundit (June 18, 2021, 11:29 AM), https://www.thegatewaypundit.com/2021/06/twitter-subpoenaed-georgia-lawsuit-involving-fulton-county-elections-supervisor-wandrea-arshaye-moss/. A true and correct copy of this article is attached as Exhibit 41.

[127] Joe Hoft, *Multiple Individuals Pushed Stacks of Ballots through Tabulators Multiple Times in Georgia. This Is Illegal. Law Enforcement Did Nothing.*, Gateway Pundit (June 19, 2021, 10:20 AM), https://www.thegatewaypundit.com/2021/06/multiple-individuals-push-multiple-ballots-multiple-tabulators-multiple-times-georgia-illegal-law-enforcement-nothing/. A true and correct copy of this article is attached as Exhibit 42.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

The video and tweet was removed from Twitter but we found the video on YouTube and we are saving a copy. [Embedded is a copy of an Instagram video taken by Ms. Freeman in October 2020 that she had removed.]

…

Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.

Ruby walks by several boxes of ballots just sitting around in the room.

The elections workers were each given their own secret cube.

Then Ruby goes to her desk and pulls out a tray of ballots on her desk.

There is NO supervisor or GOP observer anywhere in sight.

And then Ruby leaves the ballots on her desk as she goes to take a break.

This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.

The Democrat operatives were running a voter fraud factory inside the State Farm Center on Election Day and into Election Week![128]

132. On June 20, 2021, Joe Hoft published an article in *The Gateway Pundit* that repeated the false claim that the publication had "exposed Georgia election officials repeatedly feeding thousands of ballots through the voting machines late at night in Atlanta,

---

[128] Jim Hoft, *IT WAS A VOTER FRAUD FACTORY: 2nd Carter Jones Report Describes Complete Breakdown of GA Election Systems — BALLOTS EVERYWHERE, NO CHAIN OF CUSTODY, COMPLETE DISARRAY and WE HAVE THE VIDEO*, Gateway Pundit (June 19, 2021, 8:31 PM), https://www.thegatewaypundit.com/2021/06/voter-fraud-factory-2nd-carter-jones-report-describes-complete-breakdown-election-systems-ballots-everywhere-no-chain-custody-complete-disarray-video/. A true and correct copy of this article is attached as Exhibit 43.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Georgia after the election observers were sent home," and identifying Ms. Freeman by name and image.[129]

133. Later that day, Joe Hoft published a second article that again falsely stated, with reference to Ms. Freeman, that "ballots [were] being pulled from under the table and then jammed through voting machines," that this happened "late at night after election observers were kicked out of the [State Farm] Arena," and that these were "criminal acts."[130]

134. On June 24, 2021, *The Gateway Pundit* published an article titled "Fulton County Hires CRIMINAL Attorneys to Stop Election Audit," which baselessly insinuated that Plaintiffs had engaged in criminal conduct, contrary to the reports of state and county officials and numerous fact checkers, as Defendants were aware:

> On Thursday, we received news that Fulton County officials have hired two new CRIMINAL attorneys to stop the court-ordered Georgia audit.
>
> . . .
>
> Fulton County is home to the infamous Ruby Freeman and her daughter Shaye Moss who were caught pulling ballot boxes from under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.
>
> . . .

---

[129] Joe Hoft, *OUTRAGEOUS: Georgia Secretary of State Raffensperger Received Report Showing Egregious Election Issues Yet He Concealed Report and Claimed State had "Safe, Secure, and Honest Elections"*, Gateway Pundit (June 20, 2021, 7:15 AM), https://www.thegatewaypundit.com/2021/06/outrageous-georgia-secretary-state-raffensperger-received-report-showing-egregious-election-issues-yet-concealed-report-claimed-state-safe-secure-honest-elections/. A true and correct copy of this article is attached as Exhibit 44.

[130] Joe Hoft, *WE CAUGHT THEM: President Trump Warned Raffensperger and His Attorney Ryan Germany About Election Fraud — New Evidence Shows Germany Was Made Aware of Election Fraud on Election Night And Hid This from President Trump*, Gateway Pundit (June 20, 2021, 10:30 AM), https://www.thegatewaypundit.com/2021/06/caught-president-trump-warned-raffensperger-attorney-ryan-germany-election-fraud-new-evidence-shows-germany-made-aware-election-fraud-election-night-hid-fro/. A true and correct copy of this article is attached as Exhibit 45.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?
>
> This is not how innocent people act. They are hiding something in Fulton County, Georgia.[131]

135. On July 10, 2021, *The Gateway Pundit* published an article taking credit for its role in accusing Plaintiffs of voter fraud: "For the record—The Gateway Pundit broke the story last year that Ruby Freeman and Georgia officials were triple counting stack of ballots at the TCF Center [sic] late on election night after the GOP observers were sent home."[132]

136. On July 14, 2021, Jim Hoft published another article on *The Gateway Pundit* republishing prior false statements that Plaintiffs "really overdid their fraud" and that Ms. Freeman is a "Crooked Operative":

> As we have previously reported Fulton County election officials cleared out election observers and the media from the State Farm Arena on election night, but a handful of people stayed behind and continued to count ballots in private from around 10:30 pm until 1:00 am.
>
> As The Gateway Pundit first reported in December 2020 – This included scanning the same sets of ballots multiple times.[133]

---

[131] Jordan Conradson, *Fulton County Hires CRIMINAL Attorneys to Stop Election Audit*, Gateway Pundit (June 24, 2021, 8:35 PM), https://www.thegatewaypundit.com/2021/06/fulton-county-hires-criminal-attorneys-stop-election-audit/. A true and correct copy of this article is attached as Exhibit 46.

[132] Jordan Conradson, *Arizona State Senator: Georgia Has Proof of Somebody Admitting to Running Ballots Through Numerous Times – "Americans Don't Like Cheating" (VIDEO)*, Gateway Pundit (July 10, 2021, 8:20 AM), https://www.thegatewaypundit.com/2021/07/arizona-state-senator-georgia-proof-somebody-admitting-running-ballots-numerous-times-americans-dont-like-cheating-video/. A true and correct copy of this article is attached as Exhibit 47.

[133] Jim Hoft, *Hard Evidence Presented: Duplicate Ballots were Counted in Fulton County Georgia in 2020 Election*, Gateway Pundit (July 14, 2021, 7:30 AM), https://www.thegatewaypundit.com/2021/07/hard-evidence-presented-duplicate-ballots-counted-fulton-county-georgia-2020-election/. A true and correct copy of this article is attached as Exhibit 48.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

137.   Later that day, he published an article on *The Gateway Pundit* again claiming credit for identifying Ms. Freeman as the Fulton County election official "feeding stacks of ballots through the voting machines at least three times each on November 4th in the early morning after the GOP election observers were told to go home."[134]

138.   On August 14, 2021, Joe Hoft published another article on *The Gateway Pundit* falsely describing how Ms. Freeman, Ms. Moss, and other election workers had been added to a lawsuit against Fulton County alleging election fraud.[135] The article republished *The Gateway Pundit*'s prior defamatory statements about Ms. Freeman and boasted about its role in promulgating and amplifying the false claims:

> We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.
>
> This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.
>
> We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.
>
> …
>
> This is not good for Ruby and her daughter.

---

[134] Jim Hoft, *FANTASTIC! Tucker Carlson Covers the Election Fraud in Fulton County Georgia 8 Months After Election – Here Are the Background Reports (VIDEO)*, Gateway Pundit (July 14, 2021, 9:19 PM), https://www.thegatewaypundit.com/2021/07/fantastic-tucker-carlson-covers-election-fraud-fulton-county-georgia-8-months-election-background-reports-video/. A true and correct copy of this article is attached as Exhibit 49.

[135] This lawsuit has since been dismissed. *See* Associated Press, *Judge Dismisses Fulton County Ballot Review Case in Georgia*, U.S. News (Oct. 13, 2021), https://www.usnews.com/news/best-states/georgia/articles/2021-10-13/judge-dismisses-fulton-county-ballot-review-case-in-georgia.

It's also pathetic that these two are not in jail already. Their
crimes were videotaped![136]

139.    On September 20, 2021, Joe Hoft published an article republishing *The
Gateway Pundit*'s prior defamatory statements describing Ms. Moss as a "Crooked Georgia
Elections Superviser [sic]" and Plaintiffs' actions on election night as being part of a "Voter
Fraud Factory."[137]

140.    On September 25, 2021, in response to an internal financial review of Fulton
County's Registration and Elections Department, Joe Hoft published yet another article on
*The Gateway Pundit* falsely insinuating that Plaintiffs' actions on election night nearly a
year before were corrupt:

> Fulton County Georgia is a mess. The election results there
> are in question ever since election night when Ruby and her
> daughter jammed the same (Biden) ballots through
> tabulators continuously for more than an hour.
>
> . . .
>
> Fulton County was a mess and the activities of its employees
> surrounding the 2020 Election were corrupt. To certify the
> results from this county in the 2020 Election, a man would
> have to have no integrity. A man would have to be corrupt.[138]

---

[136] Ex. 9.

[137] Joe Hoft, *Wake Up Georgia: ACLU Is Currently Recruiting Leftist Poll Workers to Run the Next Election
Like the Last*, Gateway Pundit (Sept. 20, 2021, 3:30 PM), https://www.thegatewaypundit.com/2021/09/wake-
georgia-aclu-currently-recruiting-poll-workers-run-next-election-like-last/. A true and correct copy of this
article is attached as Exhibit 50.

[138] Joe Hoft, *BREAKING EXCLUSIVE: Report Shows Fulton County, GA 2020 Election Had $2 million in
Unsupported OT, 15 Missing Routers, an Agreement with the SPLC to Put in Place Drop Boxes, and More*,
Gateway Pundit (Sept. 25, 2021, 7:10 AM), https://www.thegatewaypundit.com/2021/09/breaking-
exclusive-report-shows-fulton-county-ga-2020-election-2-million-ot-without-support-15-missing-routers-
agreement-splc-put-place-drop-boxes/. A true and correct copy of this article is attached as Exhibit 51.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

**G.  Defendants Published the Statements With Knowledge of Their Falsity or Serious Doubts About Their Truth**

141.  Defendants knew that their statements about Ms. Freeman and Ms. Moss were not true or had serious doubts about their truth.  Indeed, the story that two poll workers could secretly inject tens of thousands of fraudulent ballots into the vote count and process the fraudulent ballots for counting multiple times without detection, despite several machine and hand recounts, is not credible on its face. Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

142.  Defendants were aware of the numerous statements by Georgia officials disproving the portrayal of misconduct that had been advanced by the Trump lawyers, and they also knew that multiple fact-checking organizations had confirmed the facts as presented by the Georgia officials. Defendants baselessly disregarded the reliable sources refuting their claims and had no credible basis for the false allegations they continued to make.

143.  At no point in publishing their many stories about Ms. Freeman and Ms. Moss did Defendants ever attempt to contact Plaintiffs to obtain their account of the events being reported. Nor did Defendants contact for corroboration other obvious available sources, and they specifically avoided contacting sources who had evidence to disprove their lies.

144.  Defendants ignored the truth because they had a predetermined story in mind that would continue to attract readers—that widespread voter fraud would taint the 2020 presidential election. Even before the vote counting began, Defendants cultivated this

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

narrative.[139] In November 2020, Defendants published multiple articles focusing on baseless claims of election fraud in several states.[140]

145.     Defendants advanced this predetermined fictitious storyline in the face of the facts because it was financially advantageous to do so. They were motivated to publish lies about Plaintiffs because lying about the election was more profitable than telling the truth.

146.     Defendants consciously avoided the truth in order to profit from the repeated publication of scandalous material. *The Gateway Pundit*'s articles about voter fraud throughout the 2020 election cycle increased its readership, reach, and engagement. Its articles about voter fraud, in particular, performed well, and it earned increased advertising revenue by publishing and republishing such well-performing falsehoods about Plaintiffs.

---

[139] *See, e.g.*, Jim Hoft, *BREAKING: US Mail Found in Ditch in Rural Wisconsin – Included Absentee Ballots*, Gateway Pundit (Sept. 23, 2020, 11:18 AM), https://www.thegatewaypundit.com/2020/09/breaking-us-mail-found-ditch-greenville-wisconsin-included-absentee-ballots/.

[140] *E.g.,* Cristina Laila, As Many as 6,000 Illegal Votes Identified in Nevada – Thousands of People Referred to DOJ For Potential Criminal Violation of Election Laws, Gateway Pundit (Nov. 5, 2020, 7:45 PM), https://www.thegatewaypundit.com/2020/11/many-6000-illegal-votes-identified-nevada-thousands-people-referred-doj-potential-criminal-violation-election-laws/; Jim Hoft, *HUGE! Corrupted Software Used in Michigan County that Stole 6,000 Votes from Trump – Is Also Used in ALL SWING STATES – PA, GA, NV, MI, WI, AZ, MN!*, Gateway Pundit (Nov. 6, 2020, 8:35 PM), https://www.thegatewaypundit.com/2020/11/huge-corrupted-software-used-michigan-county-stole-6000-votes-trump-also-used-swing-states-pa-ga-nv-mi-wi-az-mn/; Joe Hoft, *BREAKING EXCLUSIVE: Analysis of Election Night Data from All States Shows MILLIONS OF VOTES Either Switched from President Trump to Biden or Were Lost*, Gateway Pundit (Nov. 10, 2020, 6:32 PM), https://www.thegatewaypundit.com/2020/11/breaking-exclusive-analysis-election-night-data-states-shows-millions-votes-either-switched-president-trump-biden-lost/); Joe Hoft, *SHOCKING EXCLUSIVE: WE CAUGHT THEM! Pennsylvania Results Show a Statistically Impossible Pattern Behind Biden's Steal! WE CAUGHT THEM!*, Gateway Pundit (Nov. 13, 2020, 6:47 PM), https://www.thegatewaypundit.com/2020/11/shocking-exclusive-caught-pennsylvania-results-show-statistically-impossible-pattern-behind-bidens-steal-caught/; Jim Hoft, *WE CAUGHT THEM! Part 2: Email Inventor Dr. Shiva Finds SAME IMPOSSIBLE BALLOT RATIO Feature in Michigan Results – WE CAUGHT THEM!*, Gateway Pundit (Nov. 14, 2020, 5:49 PM), https://www.thegatewaypundit.com/2020/11/caught-part-2-email-inventor-dr-shiva-finds-impossible-ballot-ratio-feature-michigan-results-caught/.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

147.     Defendants additionally hoped that repeating their preconceived narrative would affect the outcome of the presidential election.

## H.     Defendants' Failure to Retract, Despite Plaintiffs' Cease and Desist Letters and The Filing of This Lawsuit

148.     In an effort to attempt to mitigate the harm caused by the publication of the false statements in Defendants' stories, Ms. Freeman and Ms. Moss engaged legal counsel, Dowd Bennett, LLC, and DuBose Miller, LLC to seek retraction from Defendants.

149.     On November 22, 2021, counsel sent Defendants a letter demanding that they correct and retract the numerous defamatory statements they have published and continue to publish about Ms. Freeman and Ms. Moss.[141]

150.     As of the date of this filing, Defendants have not responded to that letter nor taken any action to correct and retract their statements. Moreover, even after the initial filing of this lawsuit specifying Defendants' willfully false and malicious statements and the consequent harm to Plaintiffs, Defendants have kept up their defamatory campaign, coupled with requests for financial contributions to support their legal defense.

151.     On December 2, 2021, hours after this lawsuit was filed, Jim Hoft published an article on *The Gateway Pundit* titled "Ruby Freeman and Daughter Sue Gateway Pundit for Posting Video of Her Shoving Ballots Through Voting Machines Numerous Times – PLEASE HELP UP Fight This Latest Lawsuit," in which he again boasted about the publication's role in first identifying Plaintiffs by name:

> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.

---

[141] A true and correct copy of this letter is attached as Exhibit 52.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.[142]

The article concluded with a request for donations to help protect against "this latest assault."

152.    The following day, Jim Hoft published an article on *The Gateway Pundit* titled "Interesting. FBI Investigated Alleged Threats to Ruby Freeman but There Is No Record of FBI Investigating the Illicit Late Night Actions at State Farm Center." He falsely accused Plaintiffs of illegal conduct and then attempted to discredit an ABC News article from the day before about the lawsuit which noted that "[t]he allegation that 'suitcases' of ballots were pulled from under tables away from the eyes of observers was almost immediately debunked."[143] In response, Mr. Hoft wrote:

> ABC News, a lapdog outlet for the Democrat regime, reported on the lawsuit on Thursday.
>
> ABC News said the suitcase scandal was "debunked." It wasn't. And 9 of 10 people who view the video and hears the entire story KNOWS this was suspicious activist [sic] – to be kind.[144]

He again concluded with an appeal for funds to defend against Plaintiffs' "assault" on *The Gateway Pundit.*

---

[142] Jim Hoft, *Ruby Freeman and Daughter Sue Gateway Pundit for Posting Video of Her Shoving Ballots Through Voting Machines Numerous Times – PLEASE HELP US Fight This Latest Lawsuit*, Gateway Pundit (Dec. 2, 2021, 12:42 PM), https://www.thegatewaypundit.com/2021/12/ruby-freeman-daughter-sue-gateway-pundit-posting-video-shoving-ballots-voting-machines-numerous-times-please-help-us-fight-latest-lawsuit/. A true and correct copy of this article is attached as Exhibit 53.

[143] Kate Brumback, *Election workers sue conservative site over fraud claims*, ABC News (Dec. 2, 2021), https://abcnews.go.com/Politics/wireStory/election-workers-sue-conservative-site-fraud-claims-81520609.

[144] Jim Hoft, *Interesting. FBI Investigated Alleged Threats to Ruby Freeman but There Is No Record of FBI Investigating the Illicit Late Night Actions at State Farm Center* (Dec. 3, 2021, 12:02 PM), https://www.thegatewaypundit.com/2021/12/interesting-fbi-investigated-alleged-threats-ruby-freeman-no-record-fbi-investigating-illicit-late-night-actions-state-farm-center/. A true and correct copy of this article is attached as Exhibit 54.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

153.     On December 8, 2021, Jim Hoft published another article on *The Gateway Pundit* taking credit for identifying Plaintiffs and republishing prior false statements that Ms. Freeman was "caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home." He went on to falsely suggest that Plaintiffs' lawful processing of ballots was actually election theft on behalf of President Biden:

> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race.
>
> We disagree.
>
> Today Georgia Secretary of State Brad Raffensperger went on the popular John Fredericks Radio Show. Raffensperger argued that the "suitcase scandal" was an urban myth.
> . . .
>
> Raffensperger allows this obvious stealing of votes in Georgia elections.[145]

154.     Later that day, Joe Hoft published another article with an embedded audio clip of an episode of the Joe Hoft Show on RealTalk 93.3. In the audio clip, Joe Hoft defamed Plaintiffs again by falsely accusing them of corrupt activity:

> So these people stuck around, and they decided to pull ballots out from underneath the tables . . . in suitcases, and then they opened them up, and they started shoving them through the tabulators.
>
> . . .

---

[145] Jim Hoft, *Brad Raffensperger Argues the State Farm Suitcase Video Was "Urban Myth"—Kicking Out Obversers* [sic]*, Rolling Out Suitcases and Shoving Ballots Thru Machines 3 Times in Middle of Night is Completely Acceptable (VIDEO)*, Gateway Pundit (Dec. 8, 2021, 7:41 PM), https://www.thegatewaypundit.com/2021/12/brad-raffensperger-argues-state-farm-suitcase-video-urban-myth-kicking-obversers-rolling-suitcases-shoving-ballots-thru-machines-3-times-middle-night-completely-acc/. A true and correct copy of this article is attached as Exhibit 55.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?[146]

155.     The following week, Jim Hoft published an article on *The Gateway Pundit* attempting to discredit a news report from the *St. Louis Post-Dispatch* about the lawsuit, which had observed that the Georgia Secretary of State had "quickly and forcefully debunked the allegations" of suitcases of fake ballots being processed unsupervised.[147] In response, Mr. Hoft objected that *The Gateway Pundit* was not spreading conspiracy theories and republished its initial reporting, again accusing Plaintiffs of corrupt conduct, allegations disproven by state and county officials and third-party fact-checkers many times over.[148]

156.     On December 24, 2021, counsel sent Defendants a second letter demanding that they correct and retract their additional defamatory statements, including those described above, some of which post-dated Plaintiff's first retraction letter.[149]

157.     As of the date of this filing, Defendants have not responded to that letter, either, nor taken any action to correct or retract their false stories. Instead, they published new stories defaming Plaintiffs.

---

[146] Joe Hoft, *You're Really About to Destroy Yourselves . . . You Just Don't Know the Grave You're Digging for Yourselves" – Jessica Laurent on Georgia Suitcase Sandal and Lawsuit Against Gateway Pundit*, Gateway Pundit (Dec. 8, 2021, 8:50 PM), https://www.thegatewaypundit.com/2021/12/really-destroy-just-dont-know-grave-digging-jessica-laurent-ruby-shaye-lawsuit-gateway-pundit/. A true and correct copy of this article is attached as Exhibit 56.

[147] Peter Eisler & Joel Currier, *Two Georgia election workers sue St. Louis-based Gateway Pundit website over false fraud claims* (Dec. 2, 2021), https://www.stltoday.com/news/local/crime-and-courts/two-georgia-election-workers-sue-st-louis-based-gateway-pundit-website-over-false-fraud-claims/article_2619f7b7-575f-58fe-965e-ee3f4d118dc1.html.

[148] Jim Hoft, *The St. Louis Post-Dispatch Refused to Publish Gateway Pundit's Response to Their Numerous Hit Pieces and Lies – So We Are Posting It Here Where It Will Get More Traffic*, Gateway Pundit (Dec. 15, 2021, 8:00 AM), https://www.thegatewaypundit.com/2021/12/response-st-louis-post-dispatch-recent-attempts-dilute-jury-pool-based-lies-far-left-opinion/.

[149] A true and correct copy of this letter is attached as Exhibit 57.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

158.     On December 25, 2021, Jim Hoft published another article on *The Gateway Pundit* republishing Defendants' earlier defamatory statements about Plaintiffs, describing them as "election operatives" and stating that Ms. Freeman was "caught on video shoving stack of ballots through the voting machines numerous times late at night after all of the election observers were sent home." Mr. Hoft went on to describe Plaintiffs as "lawless individuals" engaged in unethical conduct and to question whether they had actually been defamed:

> But were they?
>
> There is absolutely no way to explain away these actions.
>
> If this behavior is accepted then it will be the end of our free, fair, and trusted elections.
>
> If this behavior becomes the norm in future elections then we will be reduced to banana-republic status.
>
> . . .
>
> So where are all of the GOP lawmakers speaking out against the shady actions CAUGHT ON VIDEO from inside the State Farm Center on election night?
>
> . . .
>
> You can't be considered a viable opposition when you submit to lawless individuals. You just can't.[150]

159.     On January 14, 2022, Plaintiffs filed their First Amended Complaint, which added 19 defamatory articles listed in their second retraction letter.

---

[150] Jim Hoft, *If Republican Leaders Will Not Speak out Against Election Officials Removing GOP Observers from Room, Pulling Out Hidden Suitcases of Votes and Shoving Stacks of Ballots Thru Machines 3 Times, Then the Grand Old Party's Days Are Over*, Gateway Pundit (Dec. 25, 2021, 12:25 PM), https://www.thegatewaypundit.com/2021/12/republican-leaders-will-not-speak-election-officials-removing-gop-observers-room-pulling-hidden-suitcases-votes-shoving-stacks-ballots-thru-machines-3-times-th/. A true and correct copy of this article is attached as Exhibit 58.

160.    Even after two retraction letters and the First Amended Complaint, Defendants continued to publish defamatory statements about Plaintiffs.

161.    On April 22, 2022, *The Gateway Pundit* published an article titled "WTH? John F. Kennedy Library Foundation Lumps President Zelensky In With Pack of Election Crooks, Cowards and Liars In Latest 'Profile in Courage' Awards." The article falsely charges Ms. Moss with one of these epithets and questions whether accusations against her of processing fake ballots were actually false, despite numerous fact-checks making this clear. The article states:

> . . . Gateway Pundit claims Ruby Freeman and her daughter Wandrea "Shaye" Moss are repeatedly jamming the same stacks of ballots through the tabulators: . . . .
>
> The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video . . . .
>
> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.
>
> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.[151]

The article again included an appeal for funds to fund Defendants' costs in litigating this suit, which they characterized as an "assault."

162.    On May 4, 2022, *The Gateway Pundit* published an article titled "Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award." In

---

[151] Patty McMurray, *WTH? John F. Kennedy Library Foundation Lumps President Zelensky In With Pack of Election Crooks, Cowards and Liars In Latest "Profile in Courage" Awards*, Gateway Pundit (Apr. 22, 2022, 11:05 AM), https://www.thegatewaypundit.com/2022/04/wth-john-f-kennedy-library-foundation-lumps-president-zelensky-pack-election-crooks-cowards-liars-latest-profile-courage-awards/. A true and correct copy of this article is attached as Exhibit 59.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

addition to the false and defamatory claim that Ms. Moss engaged in voter fraud as a "ballot harvester," the article expressed incredulity that the JFK Foundation would present this award to Plaintiff Moss for "'protecting democracy.'" Further, the article twisted the ramifications of *The Gateway Pundit*'s falsely accusing Ms. Moss of voter fraud as instead just being "backlash from being caught on camera ballot harvesting."[152]

163.    On June 16, 2022, counsel sent Defendants a third letter demanding that they correct and retract their additional defamatory statements, including those described above, some of which post-dated Plaintiff's second retraction letter.[153]

164.    As of the date of this filing, Defendants have not responded to that letter, either, or taken any action to correct or retract their false stories.

## I.    Defendants Caused Substantial Reputational Harm With Their False Statements About Ms. Freeman and Ms. Moss That Constitute Defamation *Per Se*

165.    Defendants falsely stated or implied that (a) Ms. Freeman and Ms. Moss planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden; (b) Ms. Freeman and Ms. Moss helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center; (c) Ms. Freeman and Ms. Moss engaged in a criminal conspiracy to exclude observers during the counting of ballots so that they could engage in election fraud; (d) Ms. Freeman and Ms. Moss criminally introduced "suitcases" of illegal ballots into the ballot counting process when no observers were present; (e) Ms. Freeman fraudulently triple-counted the

---

[152] Alicia Powe, *Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award*, Gateway Pundit (May 4, 2022, 1:03 PM), https://www.thegatewaypundit.com/2022/05/stunning-ballot-havester-shaye-moss-receives-john-f-kennedy-profile-courage-award/. A true and correct copy of this article is attached as Exhibit 60.

[153] A true and correct copy of this letter is attached as Exhibit 61.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

same ballots by running them through a tabulator three times; and (f) Ms. Freeman and Ms. Moss committed election fraud and other crimes for which they are subject to arrest and imprisonment. These claims are false and constitute defamation *per se*.

166.    Given the nature of Plaintiffs' employment with the Registration and Elections Department of Fulton County, Defendants' claims that Ms. Freeman and Ms. Moss participated in a conspiracy to fraudulently overturn a democratic election would tend to injure them in their trade, office, or profession: a reputation for integrity is a requirement for workers in a profession whose responsibility is to accurately and legitimately tabulate and report elections results while maintaining public confidence in elections.

167.    Defendants also stated that Ms. Freeman and Ms. Moss participated in criminal activity punishable by law. Defendants labeled both Ms. Freeman and Ms. Moss as "crook[s]" and claimed that "nobody did more to steal the election for Joe Biden than this mother-daughter combo."[154] Defendants asserted that the actions of Ms. Freeman and Ms. Moss were "illegal" and that "the Georgia police or Bill Barr's DOJ may want to pay Ruby Freeman a visit."[155]

168.    Published on a website with nearly three million unique visitors per month, Defendants' stories did cause and continue to cause substantial reputational harm to Ms. Freeman and Ms. Moss.

169.    Defendants are directly responsible for the reputational harm that Ms. Freeman and Ms. Moss experienced. Though the initial claims by the Trump legal team

---

[154] Ex. 8.

[155] Ex. 3.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

were based only on short selections of security footage and did not name any individual Fulton County election workers, "[t]he Gateway Pundit was first to identify Ruby Freeman [and] her daughter Wandrea "Shaye" Moss . . . in the infamous suitcase ballot hoist [sic]," as the Defendants themselves boast.[156]

**J.      Impact of Defendants' Campaign Against Ms. Freeman and Ms. Moss**

170.    Defendants repeatedly published the full names of Ms. Freeman and Ms. Moss, in addition to numerous images of Ms. Freeman and Ms. Moss, the name of Ms. Freeman's business, and Ms. Freeman's social media account information. In so doing, Defendants were fully aware that their readers would target Ms. Freeman and Ms. Moss in response to their stories. Defendants even urged their readers not to "confuse [Ms. Freeman's business] with a similar business in Snellville!"[157]

171.    As a direct result of Defendants' campaign of lies, Ms. Freeman and Ms. Moss began receiving—almost immediately—an onslaught of extremely violent and graphic threats and dangerous harassment.

<u>Ms. Freeman</u>

172.    As Defendants' false accusations began to spread across the internet, Ms. Freeman received at least 420 emails and seventy-five text messages, including one that read, "We know where you live, we coming to get you."

173.    Ms. Freeman sought intervention from the local police; a local officer answered more than twenty harassing calls on Ms. Freeman's cell phone. Despite these efforts, Ms. Freeman was ultimately forced to change her phone number and email address.

---

[156] Ex. 19.

[157] Ex. 6.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

174.    On multiple occasions, strangers camped out at Ms. Freeman's home and/or knocked on her door. When Ms. Freeman was not home or would not answer the door, these strangers would sometimes also harass her neighbors. Strangers were coming to her home so frequently that the local police agreed to add her address to their patrols of the area.

175.    During this time, numerous pizza deliveries showed up at her home that she and her family had never ordered. This is an often-chronicled result of being "doxxed"— the term for when strangers post and share a target's personal information as a means to organize a coordinated harassment campaign.

176.    Christmas cards were mailed to Ms. Freeman's address with messages like, "Ruby please report to the FBI and tell them you committed voter fraud. If not you will be sorry," and "You deserve to go to jail, you worthless piece of shit whore."

177.    The level of harassment Ms. Freeman received at her home led the FBI to conclude that she would not be safe in her home on beginning on January 6, 2021, the date of former President Trump's infamous rally and the subsequent insurrection at the U.S. Capitol, and continuing at least through Inauguration Day, January 20, 2021.

178.    On January 6, 2021, a crowd surrounded Ms. Freeman's house, some on foot, some in vehicles, others equipped with a bullhorn. Fortunately, Ms. Freeman had followed the FBI's advice and had temporarily relocated from her home. She was not able to return for two months.

179.    Since returning home, Ms. Freeman has had to purchase eleven cameras and three motion sensors in an effort to safeguard her own home.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

180.     Ms. Freeman was also forced to deactivate the social media pages for herself and her business, Lady Ruby's Unique Treasures, a pop-up clothing boutique. Though she has long been a local entrepreneur, she was forced to shutter her business when she was unable to attend public events or conduct online marketing through social media.

181.     The reputational impacts of Defendants' lies continue to be felt across Ms. Freeman's social and professional networks. After being publicly accused of crimes, she has lost friendships.

182.     When people recognize her in public and call out her name, Ms. Freeman is fearful. Her experiences over the months since *The Gateway Pundit*'s defamation campaign began have taught Ms. Freeman to be distrustful of strangers and concerned for her safety.

183.     The stress of this period also took a toll on Ms. Freeman's body, including manifesting through stress-related dental injuries.

184.     To this day, Ms. Freeman continues to receive threatening communications referencing Defendants' defamation. On November 13, 2021, she received an email accusing her of treason, insinuating she would soon be serving jail time, and including a link to an article about election fraud in Georgia from *The Gateway Pundit.*

Ms. Moss

185.     The day after *The Gateway Pundit*'s campaign of falsehoods began, Ms. Moss's then fourteen-year-old son informed her that numerous calls were coming into Ms. Moss's old phone, which he was using at the time. When he answered the calls, he was bombarded with racial slurs and threats of violence. One caller stated that her son "should hang alongside [his] nigger momma." Her son fielded these harassing calls for months.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

186.    Defendants' defamation also caused Ms. Moss to suffer an onslaught of online harassment. She received dozens of messages through Facebook, LinkedIn, and Pinterest, many of which threatened violence. These messages did not merely suggest Ms. Moss lose her job but insisted that she deserved to die and would be killed in retribution for her "treason." She has since deleted her Pinterest and LinkedIn accounts.

187.    Because Ms. Moss had previously lived with her grandmother, it was her grandmother's address that harassers found and exploited. As they did with Ms. Freeman, these harassers repeatedly sent unwanted pizzas to Ms. Moss's grandmother's house.

188.    On at least two occasions, strangers showed up at her grandmother's home and attempted to push into the house in order to make a "citizens' arrest." On these occasions, Ms. Moss's grandmother, who is in her mid-seventies, called her in a panic, confused and scared for her safety.

189.    The impacts of Defendants' lies also followed Ms. Moss at work. The general email addresses used by the public to contact the Fulton County elections offices would forward incoming emails to Ms. Moss and many of her colleagues. As a result, Ms. Moss and her colleagues received, directly in their work inboxes, harassing emails sent to those public email addresses.

190.    Inspired by the demonstrably false conspiracy theory pushed by Defendants, people also protested about Ms. Moss outside of her Fulton County workplace, demanding she be fired from her job.

191.    This whirlwind of negative attention around Ms. Moss left her feeling fearful and ashamed in an office where she has worked since 2012. Before the 2020 general election, she generally enjoyed the parts of her job that allowed her to work with and assist

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

the public. Since then, even when she was assisting constituents over the phone, she would sweat and feel anxious if they asked her name. She was afraid that when people heard her name, they would think she is a fraud and a cheater.

192.    Ms. Moss left her position working at Fulton County elections in April 2022.

193.    Like her mother, Ms. Moss is now fearful whenever people recognize her in public. As a result, Ms. Moss has largely retreated from social and public life. She has gone as far as to avoid the grocery store, opting to have groceries delivered in order to avoid it. She feels trapped by the unshakable fear that there are unknown people after her who want her dead.

194.    Over the last year, Ms. Moss has suffered from disrupted sleep and has gained fifty pounds as a result of the stress caused by Defendants' campaign of lies.

195.    The onslaught of threats that Plaintiffs have experienced and the necessary measures they have been forced to take to protect themselves are the direct result of Defendants' defamatory conduct. Plaintiffs have and will continue to experience serious and severe emotional distress as a result. The harm Defendants have caused to Plaintiffs' reputations, privacy, safety, and earnings and other pecuniary loss is immense.

## **FIRST CLAIM**
### **(Defamation of Ms. Freeman)**

196.    Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

197.    Beginning on December 3, 2020, Defendants published a series of false and defamatory statements of fact about Ms. Freeman, including by and through *The Gateway*

*Pundit*'s own agents making the statements themselves; and by republishing the statements on *The Gateway Pundit*'s website and social media accounts, and the social media accounts of its agents, as detailed extensively above. Those statements include, but are not limited to, the following non-exhaustive list:

a) In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statements, which they republished verbatim on December 3, 2020, at 2:29 p.m.:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.
>
> …
>
> We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.

b) In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statement, which they republished verbatim or nearly verbatim nine (9) times on December 3, 2020 at 2:29 p.m. and 8:49 p.m.; December 4, 2020 at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; December 7, 2020 at 7:15 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m; and May 4, 2022 at 1:03 p.m.[158]:

> A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!

---

[158] The December 3, 2020, 2:29 p.m. article added the additional defamatory statement: "They were caught cheating!" The December 8, 2020, 1:11 p.m. article added the additional defamatory statement: "A few liberal election 'workers' stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room!" The May 4, 2022, 1:03 p.m. article omitted the opening phrase "A few 'workers' stayed behind and were seen."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

c) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim eighteen (18) times on December 4, 2020 at 7:35 a.m., 8:53 a.m., 1:51 p.m., and 5:45 p.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 7:15 a.m. and 8:29 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; June 7, 2021 at 9:43 p.m.; June 14, 2021 at 10:33 a.m.; August 14, 2021 at 9:15 a.m.; September 20, 2021 at 3:30 p.m.; and May 4, 2022 at 1:03 p.m.[159]:

> Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.

d) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim five (5) times on December 4, 2020, at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; December 7, 2020, at 7:15 a.m.; and December 8, 2020, at 7:20 a.m.:

> We identified one of the operatives [last/Thursday] night who was caught on video counting illegal ballots from a suitcase stashed under a table!

e) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim four (4)

---

[159] The December 3, 2020, 8:49 p.m.; December 4, 2020, 5:45 p.m.; and May 4, 2022, 1:03 p.m., articles added the additional defamatory statement "What's Up, Ruby? . . . BREAKING: CROOKED OPERATIVE Filmed Pulling Out Suitcases of Ballots in Georgia IS IDENTIFIED."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

times on December 4, 2020, at 7:35 a.m., 8:53 a.m., and 1:51 p.m.; and

December 8, 2020, at 7:20 a.m.:

> As you can see from the video one woman in a purple top was filmed helping pull out the ballots and then sitting down to count the ballots.

f)  In their December 3, 2020, article published at 8:49 p.m., Defendants made

the following false statements, which they republished four (4) times on

December 4, 2020, at 7:35 a.m., 8:53 a.m.,[160] and 1:51 p.m.[161]; and

December 8, 2020, at 7:20 a.m.:

> One woman in the video is wearing a purple top.
> She later appeared in the suitcase video!
>
> The woman in the purple made a mistake and left her purse on her desk advertising her business.
>
> Her name is Ruby Freeman.
>
> And she made the mistake of advertising her purse on her desk the same night she was involved in voter fraud on a MASSIVE SCALE.
>
> Her T-shirt says "Lady Ruby" and her purse says, "LaRuby" which is her company.
>
> This was not a very smart move.
>
> Her company is called "LaRuby's Unique Treasures."
> It's on her LinkedIn page!
>
> Ruby's purse was a hit and several fans wrote her on her LinkedIn page after they saw her and her purse on TV.

---

[160] The December 4, 2020, 8:53 a.m. article's republication deletes the following sentences: "The woman in the purple made a mistake and left her purse on her desk advertising her business," and "It's on her LinkedIn page!"

[161] The December 4, 2020, 1:51 p.m. article's republication deletes the following sentences: "Her T-shirt says 'Lady Ruby' and her purse says, 'LaRuby' which is her company. This was not a very smart move. Her company is called 'LaRuby's Unique Treasures.' It's on her LinkedIn page!"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

They then commented on her LinkedIn page.[162]

g)  Defendants end their December 3, 2020, article published at 8:49 p.m. with

the following false statements:

> Maybe the Georgia police or Bill Barr's DOJ may want to pay Ruby Freeman a visit.
>
> …
>
> CROOK GETS CAUGHT

h)  In their December 4, 2020, article published at 8:53 a.m., Defendants made

the following false statements, which they republished verbatim on June 19,

2021, at 8:31 p.m.:

> Now there is video of Ruby Freeman filming herself entering the building to count Georgia ballots.
>
> Ruby walks by several boxes of ballots just sitting around in the room.
>
> The elections workers were each given their own secret cube.
>
> Then Ruby goes to her desk and pulls out a tray of ballots on her desk.
>
> There is NO supervisor or GOP observer anywhere in sight. And then Ruby leaves the ballots on her desk as she goes to take a break.
>
> This is suspicious activity. The State Farm Center was full of unsecured ballots and illegal conduct.

i)  In their December 4, 2020, article published at 1:51 p.m., Defendants made

the following false statements:

---

[162] The original publication of this article added that "Ruby Freeman still has an active Facebook page (as of 11 PM on Thursday night)," while republications noted that Freeman's Facebook account was no longer active.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.
>
> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other. It sure looks like they were trying to hide this transaction.

j) In their December 4, 2020, article published at 3:25 p.m., Defendants made the following false statements:

> Mother-Daughter Duo's Election Fraud Scam . . .
>
> [T]he mother-daughter duo in Atlanta began messing with ballots in secret.

k) In their December 4, 2020, article published at 5:45 p.m., Defendants made the following false statements, which they substantially republished twenty (20) times on December 6, 2020 at 8:15 a.m.; December 23, 2020 at 8:10 a.m. and 11:05 a.m.; January 2, 2021 at 7:30 a.m.; March 25, 2021 at 7:25 p.m.; May 21, 2021 at 12:34 p.m.; May 22, 2021 at 9:05 a.m.; June 6, 2021 at 7:53 a.m.; June 8, 2021 at 11:57 a.m.; June 11, 2021 at 3:03 p.m.; June 18, 2021 at 8:00 a.m.; June 19, 2021 at 10:20 a.m.; June 20, 2021 at 7:15 a.m.; July 10, 2021 at 8:20 a.m.; July 14, 2021 at 7:30 a.m.; December 2, 2021 at 12:42 p.m.; December 3, 2021 at 12:02 p.m.; December 8, 2021 at 7:41 p.m.; December 25, 2021 at 12:25 p.m.; and April 22, 2022 at 11:05 a.m.[163]:

> UNBELIEVABLE: Anti-Trump Democrat in Georgia 'Suitcase Scandal' Caught running Same Batch of Ballots Through Tabulator THREE TIMES! (VIDEO)

---

[163] The republications each added the additional defamatory statement "What's Up, Ruby? . . . BREAKING: CROOKED OPERATIVE Filmed Pulling Out Suitcases of Ballots in Georgia." Further, three other articles republished only the first defamatory statement about Ms. Freeman being "[c]aught" in the "'[s]uitcase [s]candal'": June 8, 2021, at 11:57 a.m.; June 19, 2021, at 10:20 a.m.; and June 20, 2021, at 7:15 a.m.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.

l)  In their December 4, 2020, article published at 5:45 p.m., Defendants also

made the following false statements:

We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]

Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.

The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.

m)  In their December 6, 2020, article published at 8:15 a.m., Defendants also

made the following false statements:

[T]he secret suitcase ballots were pulled out from their hiding place under the tables.

They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.

n)  In their December 6, 2020, article published at 6:35 p.m., Defendants made

the following false statements, which they republished on December 6,

2020, at 9:23 p.m. and December 7, 2020, at 8:29 a.m.:

Next it was uncovered that a mother and daughter team [, Ruby Freeman and her daughter "Shaye" Moss] as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were pulled out from under a table that were previously covered up and processed with no Republican observers.

83

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

The mother – daughter team have become infamous in the annals of voter corruption[.]

o)  In their December 7, 2020, article published at 8:29 a.m., Defendants made the following false statements, which they republished verbatim on December 8, 2020, at 8:59 a.m. and republished in part on December 23, 2020, at 8:40 a.m.[164]:

Ralph Jones, Sr. was identified as the third suspect in the Fulton County Georgia suitcase scandal.

** Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.

** Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.

...

They sent everyone home!

...

** The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.

** Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.

** It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.

---

[164] The December 8, 2020, 8:59 a.m. article shortens the final sentence to read, "It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud." The December 23, 2020, 8:40 a.m. article includes the first two sentences and ends with "** Ralph and his team plotted to remove ALL elections observers."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> \*\* It appears this was a conspiracy to lie to the public including local news, to remove observers from the center and then to commit their hidden suitcase ballot fraud.

p) Defendants end their December 7, 2020, article published at 8:29 a.m. with

the following false statements:

> We know [the alleged pipe burst at State Farm Arena] was a lie because there was NEVER a work order filed and the water department never received a call.

> It never happened!

> But it gave Ralph and Ruby and Shaye cover to complete their scam on Georgia and America!

q) In their December 8, 2020, article published at 7:20 a.m., Defendants made

the following false statements:

> Shaye told everyone to go home.

> Then Shaye, her mother and a couple others including Ralph Jones, Sr. were filmed taking "suitcases" of ballots hidden under a table out to be tabulated. This was right before Joe Biden got his surprise spike in ballots.

> And now the liberal media and their fake "fact-checkers" are lying about the incredible incident caught on video!

r) In their December 15, 2020, article published at 9:19 a.m., Defendants made

the following false statements:

> We even HAVE VIDEO of Democrats at work stealing votes from the people of Georgia. . . .

> Has anyone questioned Ruby Freeman or her daughter?

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

s)   In their December 23, 2020, article published at 8:10 a.m., Defendants made

the following false statements, which they republished on December 23,

2020, at 11:05 a.m. and January 2, 2021, at 7:30 a.m.[165]:

> President Trump tweeted a Gateway Pundit video where we
> identified Georgia ballot workers jamming ballots into
> tabulators multiple times [late on election night].
>
> . . .
> We shared this video on December 4, when we pointed out
> that one of the participants in the [ballots under the desk
> scandal / suitcase ballot hoist] grabbed the ballots and started
> jamming the ballots into the Dominion tabulators three
> times.
>
> Georgia's results are a total fraud. The Democrats using
> people like these poll workers stole the election for Joe
> Biden.

t)   In their December 23, 2020, article published at 8:40 a.m., Defendants made

the following false statement, which they republished on January 3, 2021,

at 6:20 p.m.; January 7, 2021, at 3:14 p.m.; January 17, 2021, at 6:33 p.m.;

and June 6, 2021, at 7:53 a.m.[166]:

> The Gateway Pundit was first to identify Ruby Freeman, her
> daughter Wandrea "Shaye" Moss, and their boss Ralph
> Jones, Sr. in the infamous suitcase ballot hoist [sic].

---

[165] The article on December 23, 2020, at 11:05 a.m. omits the last paragraph and the article on January 2, 2021, includes only the line "Georgia's results are a total fraud" from the last paragraph.

[166] The articles on December 23, 2020, at 8:40 a.m. and June 6, 2021, at 7:53 a.m. added the additional defamatory statement "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?"

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

u)  In their December 23, 2020, article published at 8:40 a.m., Defendants also made the following false statements, which they largely republished on January 17, 2021, at 6:33 p.m.[167]:

> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
>
> ...
>
> Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist [sic]. Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist [sic]!
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.
>
> They were able to flip Georgia for Beijing Biden by their actions.
>
> Why is the FBI or DOJ not involved?
>
> This tells you everything you need to know about your federal government.

v)  In their December 26, 2020, article published at 7:34 p.m., Defendants made the following false statements:

> [T]he documentary and video evidence show that thousands of votes were illegally counted in Fulton County, Georgia. Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation

---

[167] The January 17, 2021, 6:33 p.m. article included all but the last three sentences of these defamatory statements.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.

The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.

w) In their January 1, 2021, article published at 9:58 a.m., Defendants made

the following false statements:

We have individuals dragging ballots out from under the tables in Georgia on election night on video and yet none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of.

x) In their January 2, 2021, article published at 7:30 a.m., Defendants made

the following false statement, which they republished on May 21, 2021, at

12:34 p.m. and June 19, 2021, at 10:20 a.m.:

ANOTHER VIDEO of Corrupt GA Election Workers Feeding SAME BALLOTS Through Machines Numerous Times!

y) In their January 3, 2021, article published at 6:20 p.m., Defendants made

the following false statements, which they republished in part on June 6,

2021, at 7:53 a.m. and June 20, 2021, at 10:30 a.m.[168]:

President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break.

---

[168] The republished portion in the two subsequent articles quotes the headline that "'Vote Scammer and Hustler' Ruby Freeman Was Behind Alleged 18,000 FRAUDULENT VOTES in Suitcase Scandal!"

> Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.

z) In their January 5, 2021, article published at 9:20 a.m., Defendants made

the following false statement, which they republished verbatim on January

5, 2021, at 1:02 p.m.:

> Sterling misled his audience, defended the corrupt and likely criminal conduct at the State Farm Center on election night [and] defended [elections worker] Ruby Freeman for passing hundreds of ballots through a ballot counting machines at least three times.

aa) In their January 17, 2021, article, published at 6:33 p.m., Defendants made

the following false statements:

> FIVE MOST SIGNIFICANT ACTS OF FRAUD IN THE 2020 ELECTION:
>
> 1.) The Georgia Late Night Hidden Suitcase Heist:

bb) In their June 6, 2021, article published at 7:53 a.m., Defendants made the

following statements:

> Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?
>
> After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving stacks of ballots through the machines two and three times each.
>
> In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on Election night:

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

. . .

The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.

. . .

We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.

. . .

cc) In their June 7, 2021, article published at 9:43 p.m., Defendants made the following false statements, which they republished on June 14, 2021, at 10:33 a.m. and June 18, 2021, at 8:00 a.m.[169]:

> Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. [Our source caught Ruby Freeman in the purple shirts scanning / Ruby Freeman was caught on tape running] the same stack of suspect ballots through the machines multiple times

dd) In their June 18, 2021, article published at 8:00 a.m., Defendants made the following false statements, which they substantially republished on June 18, 2021, at 11:06 a.m. and June 19, 2021, at 10:20 a.m.[170]:

> A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night. Top Atlanta election official Ralph Jones was also double scanning ballots late at night at the State Farm Center in Atlanta, Georgia on election night.

. . .

---

[169] The June 7, 2021, 9:43 p.m. article added the additional defamatory statement "BREAKING GEORGIA UPDATE: Ruby Freeman who Jammed Suspect Ballots Into Voting Machines Multiple Times on Election Night is Subpoenaed."

[170] The second two articles republish only the first of these two paragraphs.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Ralph Jones was the person who sent home all of the election observers. Then his crew, including Ruby and daughter Shaye, went to work on election night!
>
> . . .

ee) In their June 18, 2021, article published at 8:00 a.m., Defendants made the following additional false statement, which they republished seven (7) times, on June 18, 2021, at 11:06 a.m., December 2, 2021, at 12:42 p.m., December 3, 2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., December 25, 2021, at 12:25 p.m., April 22, 2022, at 11:05 a.m., and May 4, 2022, at 1:03 p.m.:

> The Gateway Pundit was [also] first to [report / reveal] that Ruby Freeman was [also] [caught on video shoving / seen scanning / seen double scanning] stacks of ballots [up to three / through the voting machines numerous] times [at the State Farm Center in Atlanta, Georgia / late at night] after [all of the election] observers were sent home [on election night].

ff) In their June 18, 2021, article published at 11:29 a.m., Defendants made the following false statement:

> Shaye is the daughter of Ruby Freeman who was filmed feeding the same stacks of ballots through voting machines late at night at the center – after observes [sic] were sent home.

gg) In their June 19, 2021, article published at 10:20 a.m., Defendants made the following false statement:

> [W]e reported on Fulton County Georgia poll worker Ruby Freeman pushing multiple ballots through the vote tabulators multiple times. This was illegal.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

hh) In their June 19, 2021, article published at 8:31 p.m., Defendants made the

following false statements:

> This follows news first reported by The Gateway Pundit that election operative Ruby Freeman was also caught tripe [sic] counting stacks of votes late at night at the counting center after GOP observers were sent home.
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> On December 4th TGP reported with video on anti-Trump ballot counter Ruby Freeman working in a private cube with trays of ballots, walking past open boxes of ballots, working alone with NO ELECTION OBSERVERS IN SIGHT! This is the DEFINITION OF CHEATING!
>
> …
>
> The Democrat operatives were running a voter fraud factory inside the State Farm Center on Election Day and into Election Week!

ii) In their June 24, 2021, article published at 8:35 p.m., Defendants made the

following false statements:

> Fulton County is home to the infamous Ruby Freeman and her daughter Shaye Moss who were caught pulling ballot boxes from under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.
>
> . . .
>
> If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?
>
> This is not how innocent people act. They are hiding something in Fulton County, Georgia.

jj)  In their July 14, 2021, article published at 9:19 p.m., Defendants made the

following false statements:

> That a Fulton County election official – identified by The
> Gateway Pundit as Ruby Freeman – was feeding stacks of
> ballots through the voting machines at least three times each
> on November 4th in the early morning after GOP election
> observers were told to go home.
>
> . . .
>
> ** Dec. 4, 2020- Anti-Trump Democrat in Georgia 'Suitcase
> Scandal' Caught Running Same Batch of Ballots Through
> Tabulator      THREE TIMES! (VIDEO)

kk) In their August 14, 2021, article published at 9:15 a.m., Defendants made

the following false statements:

> We first discovered Ruby Freeman and her daughter Shaye
> Moss in December when The Gateway Pundit first reported
> that these two election workers took ballots out from under
> a table on Election night and jammed thousands of ballots
> into the tabulators numerous times.
>
> This was after all of the election observers were sent home
> for the night. This was also after Trump had accumulated
> what experts said was an insurmountable lead in the state.
>
> We revealed first that the ballots taken out from under tables
> on Election night were pushed into tabulators up to three
> times each.
>
> …
>
> This is not good for Ruby and her daughter.
>
> It's also pathetic that these two are not in jail already. Their
> crimes were videotaped!

ll)  In their September 25, 2021, article published at 7:10 a.m., Defendants

made the following false statements:

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.

. . .

Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.

mm)     In their December 2, 2021, article published at 12:42 p.m., Defendants made the following false statements, which they republished on December 3, 2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., and April 22, 2022, at 11:05 a.m.[171]:

The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video at the State Farm Arena in Atlanta Georgia on November 3rd and the morning of November 4th.

The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.

The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.

nn) In their December 8, 2021, article published at 8:50 p.m. with embedded audio, Defendants made the following false statements:

Joe Hoft:     That night . . . I don't know if you remember the news first came out that night, and was saying there was a water main break and they needed to stop counting in Georgia. Remember that? . . . And then we were

---

[171] The December 8, 2021, 7:41 p.m. article elaborated on typical election procedures with an additional defamatory statement: "The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race. We disagree."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

told later that was a lie and it never happened. And then they said it happened in the morning. And then apparently they just kind of tried to say it never happened.

. . .

There was no water main break. . . . So, that was a lie.

So what happened then was they shut down for the night at 10:30. Now everybody else is thinking, wait a minute, I thought we counted until the election was done. I didn't think we were going to take shifts here, you know, go to bed. . . . So they decide to shut down. And there's evidence that they were doing that.

And then what happened is five people stuck around. Now, I know at least three of them are Black. And it doesn't matter.  To me, it doesn't matter. I don't care if they were . . .

So these people stuck around, and they decided to pull ballots out from underneath the tables. Do you remember this story? Did you see that video? . . . Everybody saw it. The video came out, they pulled these ballots out from underneath the tables, and in suitcases, and then they opened them up, and they started shoving them through the tabulators.

. . .

Now later they're trying to say this is normal.

. . .

I mean, do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?

198.    The defamatory meanings of Defendants' false statements are apparent

from the face of the publications, refer to Ms. Freeman by name, are accompanied by

images of Ms. Freeman, and/or are understood to be about her.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

199.    The statements authored and published by Defendants about Ms. Freeman are reasonably understood to state or imply that she:

   a)  Planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden;

   b)  Helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center;

   c)  Engaged in a criminal conspiracy to exclude observers during the counting of ballots so that election fraud could be committed;

   d)  Criminally introduced illegal ballots taken from the hidden suitcases into the ballot counting process when no observers were present;

   e)  Fraudulently triple-counted ballots by running them through a tabulator three times; and

   f)  Committed election fraud and other crimes for which she is subject to arrest and imprisonment.

200.    Each of these statements and implications is false and defamatory.

201.    Each of these statements was read by millions of visitors to *The Gateway Pundit* website, as well as social media users who read social media posts shared by Defendants.

202.    Each of these false statements was published with actual malice, *i.e.*, with knowledge of its falsity or with reckless disregard as to its truth.

203.    Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible basis for the false allegations made; and published their allegations in a manner to create false inferences.

204.    Defendants had both political and financial motives for promulgating lies about Plaintiffs.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

205.     Defendants did not neutrally report the allegations about Ms. Freeman that were advanced by Trump lawyers and promptly disproven by Georgia election officials. Rather, they endorsed and adopted the allegations as their own, publishing and republishing them for months with full knowledge of their falsity or reckless disregard for their truth.

206.     Defendants had no applicable privilege or legal authorization to make these false and defamatory statements, or if they did, they abused it.

207.     Defendants repeated and embellished the false accusations without ever attempting to verify them and invented and published defamatory lies about Ms. Freeman without once seeking comment from her.

208.     Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

209.     Defendants have never corrected or retracted their defamatory statements, and those statements remain published on *The Gateway Pundit* to this day. Even after Plaintiffs specifically requested that Defendants correct and retract their defamatory statements, Defendants took no action to correct or retract and only published additional defamatory statements, further evidencing their actual malice.

210.     Defendants' statements and implications about Ms. Freeman constitute defamation *per se* in that they damaged her in her trade, office, or profession and claimed that she participated in criminal activity punishable by law and labeled her a "crook."

211.     Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Freeman harm.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

212.    Defendants' statements damaged Ms. Freeman's reputation in the general public, in her profession, in her neighborhood, and with friends, relatives, and neighbors.

213.    As a direct and proximate result of Defendants' conduct, Ms. Freeman has suffered significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss. Among other things, Ms. Freeman lost income when she was forced to shutter her online business.

## SECOND CLAIM

### (Defamation of Ms. Moss)

214.    Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

215.    Beginning on December 3, 2020, Defendants published a series of false and defamatory statements of fact about Ms. Moss, including by and through *The Gateway Pundit*'s own agents making the statements themselves; and by republishing the statements on *The Gateway Pundit*'s website and social media accounts, and the social media accounts of its agents, as detailed extensively above. Those statements include, but are not limited to, the following non-exhaustive list:

    a)    In their December 3, 2020, article published at 1:11 p.m., Defendants made the following false statements, which they republished verbatim on December 3, 2020, at 2:29 p.m.:

> Poll watchers were kicked out of the State Farm Arena tabulation center on election night after a burst pipe caused flooding.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

…

We now know that a pipe never burst. It was all a lie in order to kick out poll watchers while a few crooks stayed behind to count illegal ballots for Joe Biden.

b) In a December 3, 2020, article published at 1:11 p.m., Defendants made the following false statement, which they republished verbatim or nearly verbatim nine (9) times on December 3, 2020, at 2:29 p.m. and 8:49 p.m.; December 4, 2020, at 7:35 a.m., 8:53 a.m., 1:51 p.m.; December 7, 2020, at 7:15 a.m.; and December 8, 2020, at 7:20 a.m. and 1:11 p.m.; and May 4, 2022, at 1:03 p.m. [172]:

A few "workers" stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated!

c) In their December 3, 2020, article published at 8:49 p.m., Defendants made the following false statement, which they republished verbatim eighteen (18) times on December 4, 2020 at 7:35 a.m., 8:53 a.m., 1:51 p.m., and 5:45 p.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 7:15 a.m. and 8:29 a.m.; December 8, 2020 at 7:20 a.m. and 1:11 p.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; June 7, 2021 at 9:43 p.m.; June 14, 2021 at 10:33 a.m.; August

---

[172] The December 3, 2020, 2:29 p.m. article added the additional defamatory statement: "They were caught cheating!" The December 8, 2020, 1:11 p.m. article added the additional defamatory statement: "A few liberal election 'workers' stayed behind and were seen pulling suitcases full of ballots out from under tables to be tabulated after the GOP inspectors and media left the room!" The May 4, 2022, 1:03 p.m. article omitted the opening phrase "A few 'workers' stayed behind and were seen."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

14, 2021 at 9:15 a.m.; September 20, 2021 at 3:30 p.m.; and May 4, 2022 at

1:03 p.m.[173]:

> Cristina Laila reported on the explosive video that was revealed during the Georgia ballot counting at the State Farm Arena where crooked Democrats pulled out suitcases full of ballots and began counting those ballots without election monitors in the room.

d) In their December 3, 2020, article published at 8:49 p.m., Defendants made

the following false statement, which they republished verbatim on

December 4, 2020, at 7:35 a.m.:

> Local 11 News covered the story from the State Farm Arena that a pipe had burst. (This later was proven to be complete fraud and an excuse to kick out the GOP election observers!)

e) In their December 4, 2020, article published at 7:35 a.m., Defendants made

the following false statement, which they republished verbatim on

December 8, 2020, at 7:20 a.m.:

> "Shaye" [was] the woman in blonde [pigtails/braids] [who was filmed] removing suitcases of ballots from under a table after GOP observers were evacuated from the room and told to go home.

f) In their December 4, 2020, article published at 1:51 p.m., Defendants made

the following false statements:

> And now there is video of Ruby secretly passing something to her daughter during the ballot counting.

> It is not clear what was passed. Some readers say it was a USB stick but it is not clear what they passed to each other.

---

[173] The articles on December 4, 2020 at 7:35 a.m.; December 6, 2020 at 6:35 p.m. and 9:23 p.m.; December 7, 2020 at 8:29 a.m.; January 1, 2021 at 9:58 a.m.; January 3, 2021 at 4:21 p.m.; June 6, 2021 at 7:53 a.m.; August 14, 2021 at 9:15 a.m.; and September 20, 2021 at 3:30 p.m. add the additional defamatory statement: "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISER Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED – IT'S RUBY'S DAUGHTER! (Video)."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

It sure looks like they were trying to hide this transaction.

g) In their December 4, 2020, article published at 3:25 p.m., Defendants made the following false statements:

> Mother-Daughter Duo's Election Fraud Scam . . .
>
> [T]he mother-daughter duo in Atlanta began messing with ballots in secret.

h) In their December 4, 2020, article published at 5:45 p.m., Defendants made the following false statements, which they republished verbatim eighteen (18) times on December 6, 2020 at 8:15 a.m.; December 23, 2020 at 8:10 a.m. and 11:05 a.m.; January 2, 2021 at 7:30 a.m.; March 25, 2021 at 7:25 p.m.; May 21, 2021 at 12:34 p.m.; May 22, 2021 at 9:05 a.m.; June 6, 2021 at 7:53 a.m.; June 11, 2021 at 3:03 p.m.; June 18, 2021 at 8:00 a.m.; June 19, 2021 at 10:20 a.m.; July 10, 2021 at 8:20 a.m.; July 14, 2021 at 7:30 a.m.; December 2, 2021 at 12:42 p.m.; December 3, 2021 at 12:02 p.m.; December 8, 2021 at 7:41 p.m.; December 25, 2021 at 12:25 p.m.; and April 22, 2022 at 11:05 a.m.:

> The mother – daughter team of ballot counters in Atlanta really overdid their fraud. We saw last night how they stuck around and counted ballots after kicking Republicans out of the State Farm Center on a fake water main break hoax.

i) In their December 4, 2020, article published at 5:45 p.m., Defendants also made the following false statements:

> We also saw the mother and daughter pass an object the size of a thumb drive between each other in a suspicious manner[.]

101

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Now we have evidence mother Ruby sent the same stack of votes through a tabulator in the State Farm Center three times. This is illegal.
>
> The corrupt Republican politicians in Georgia are giving the election to Joe Biden. Besides them, nobody did more to steal the election for Joe Biden than this mother – daughter combo. The good people in Georgia need to stand up.

j) In their December 6, 2020, article published at 8:15 a.m., Defendants also

made the following false statements:

> [T]he secret suitcase ballots were pulled out from their hiding place under the tables.
>
> They then ran the Biden only ballots through the tabulators multiple times. These votes were all for Biden and fraudulently gave Biden the lead in the race.

k) In their December 6, 2020, article published at 6:35 p.m., Defendants made

the following false statements, which they republished on December 6,

2020, at 9:23 p.m. and December 7, 2020, at 8:29 a.m.:

> Next it was uncovered that a mother and daughter team [, Ruby Freeman and her daughter "Shaye" Moss] as well as a couple others, stuck around after sending everyone home and started running ballots through tabulators. Ballots were pulled out from under a table that were previously covered up and processed with no Republican observers.
>
> The mother – daughter team have become infamous in the annals of voter corruption[.]

l) In their December 7, 2020, article published at 7:15 a.m., Defendants made

the following false statements:

> And [Ruby's] daughter Wandrea "Shaye" Moss was later identified as her supervisor who was helping cart out the hidden ballots in the suitcases to be counted after all of the GOP observers and media was sent home for a "water main" break.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

It was all a fraud.

m) In their December 7, 2020, article published at 8:29 a.m., Defendants made the following false statements, which they republished verbatim on December 8, 2020, at 8:59 a.m. and republished in part on December 23, 2020, at 8:40 a.m.[174]:

> Ralph Jones, Sr. was identified as the third suspect in the Fulton County Georgia suitcase scandal.
>
> ** Ralph led a team of operatives in carrying out a massive voter fraud scandal on election night at the State Farm Center in Atlanta, Georgia.
>
> ** Ralph and his team plotted to remove ALL elections observers (Republicans) from the counting room so they could roll out their suitcases full of Joe Biden ballots and run them through the machine.
>
> ...
>
> They sent everyone home!
>
> ...
>
> ** The elections officials used the "water main break" to say there was a delay in counting and they used that to send people home — except for the suitcase gang.
>
> ** Then Ralph Jones, Sr., Ruby Freeman and her daughter Shaye Ross went to work rolling out the hidden suitcases of ballots stashed under the table and hidden from view.
>
> ** It was their actions that gave Joe Biden the spike in unexplained votes in Georgia on Wednesday morning.
>
> ** It appears this was a conspiracy to lie to the public including local news, to remove observers from the center and then to commit their hidden suitcase ballot fraud.

---

[174] The December 8, 2020, 8:59 a.m. article shortens the final sentence to read, "It appears that this was a conspiracy to remove observers from the center and then to commit their hidden suitcase ballot fraud." The December 23, 2020, 8:40 a.m. article includes the first two sentences and ends with "** Ralph and his team plotted to remove ALL elections observers."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

n)  Defendants end their December 7, 2020, article published at 8:29 a.m. with

the following false statements:

> We know [the alleged pipe burst at State Farm Arena] was a
> lie because there was NEVER a work order filed and the
> water department never received a call.
>
> It never happened!
>
> But it gave Ralph and Ruby and Shaye cover to complete
> their scam on Georgia and America!

o)  In their December 8, 2020, article published at 7:20 a.m., Defendants made

the following false statements:

> Shaye told everyone to go home.
>
> Then Shaye, her mother and a couple others including Ralph
> Jones, Sr. were filmed taking "suitcases" of ballots hidden
> under a table out to be tabulated. This was right before Joe
> Biden got his surprise spike in ballots.
>
> And now the liberal media and their fake "fact-checkers" are
> lying about the incredible incident caught on video!

p)  In their December 15, 2020, article published at 9:19 a.m., Defendants made

the following false statements:

> We even HAVE VIDEO of Democrats at work stealing
> votes from the people of Georgia.
>
> . . .
>
> Has anyone questioned <u>Ruby Freeman or her daughter</u>?

q)  In their December 23, 2020, article published at 8:40 a.m., Defendants made

the following false statements, which they republished on January 3, 2021,

at 6:20 p.m.; January 7, 2021, at 3:14 p.m.; January 17, 2021, at 6:33 p.m.;

and June 6, 2021, at 7:53 a.m.[175]:

> The Gateway Pundit was first to identify Ruby Freeman, her daughter Wandrea "Shaye" Moss, and their boss Ralph Jones, Sr. in the infamous suitcase ballot hoist [sic].

r) In their December 23, 2020, article published at 8:40 a.m., Defendants also made the following false statements, which they largely republished on January 17, 2021, at 6:33 p.m.[176]:

> We later reported on Ruby Freeman running the same batch of ballots through the counting machines at least three times after these Democrat operatives cleared the room of observers!
> ...
> Shaye Moss is the same person who called out for observers to go home late on election night before the ballot hoist.
>
> Ralph Jones, Sr. is ON AUDIO telling reporters he was going to shut down the State Farm Center early and send observers home. This was BEFORE the suitcase ballot hoist[sic]!
>
> It was a carefully planned event!
>
> They had NO IDEA they would get caught!
>
> At this time there is no evidence that FBI or the Georgia Bureau of Investigations have interviewed or arrested Ruby Freeman, Shaye Ross, or Ralph Jones, Sr.
>
> They were able to flip Georgia for Beijing Biden by their actions.
>
> Why is the FBI or DOJ not involved?

---

[175] The articles on December 23, 2020, at 8:40 a.m. and June 6, 2021, at 7:53 a.m. added the additional defamatory statement "Has the FBI Spoken with Ruby Freeman or Ralph Jones Yet? And If Not, Why in the Hell Do we Have an FBI?"

[176] The January 17, 2021, 6:33 p.m. article included all but the last three sentences of these defamatory statements.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

This tells you everything you need to know about your federal government.

s) In their December 26, 2020, article published at 7:34 p.m., Defendants made

the following false statements:

[T]he documentary and video evidence show that thousands of votes were illegally counted in Fulton County, Georgia. Fulton County Georgia elections officials told the media and GOP observers that they were shutting down the tabulation center at State Farm Arena at 10:30 p.m. on election night because of an alleged water main rupture. But there was no break in the water line.

The Democrat workers continued counting ballots in secret until 1:00 a.m. Ruby Freeman and her daughter–elections supervisor Wandrea "Shaye" Moss–are clearly visible on video pulling out suitcases full of ballots and began counting those ballots without election monitors in the room.

t) In their January 1, 2021, article published at 9:58 a.m., Defendants made

the following false statements:

We have individuals dragging ballots out from under the tables in Georgia on election night on video and yet none of these individuals have been interviewed, let alone prosecuted for their crimes that we are aware of.

u) In their January 3, 2021, article published at 6:20 p.m., Defendants made

the following false statements:

President Trump: We have at least 18,000, that's on tape. We had them counted very painstakingly. 18,000 voters having to with BEEP [in red] (Ruby Freeman). She's a vote scammer, a professional vote scammer and hustler. BEEP [in red] (Ruby Freeman) that is the tape that is shown all over the world. It makes everybody look bad, you, me and everybody else. Number one, they said very clearly, and it's been reported that they said that there's a water main break. Everybody fled the area. And then they came back. BEEP [in red] (Ruby Freeman) and her daughter and a few people.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

v) In their January 17, 2021, article, published at 6:33 p.m., Defendants made

the following false statements:

> FIVE MOST SIGNIFICANT ACTS OF FRAUD IN THE 2020 ELECTION:
>
> 2.) The Georgia Late Night Hidden Suitcase Heist:

w) In their June 6, 2021, article published at 7:53 a.m., Defendants made the

following statements:

> Who can forget Ruby, Ralph, and Ruby's daughter Wandrea Shaye?
>
> After removing everyone from the State Farm Arena on 2020 Election night and sending them home, these three individuals and a couple of others pulled out ballots hidden under the table and began jamming them into the vote tabulation machines. The election workers were filmed shoving stacks of ballots through the machines two and three times each.
>
> In early December The Gateway Pundit was first to identify the culprits. Ruby Freeman and her daughter Wandrea were two of the individuals who pulled the hidden ballots out from under the table on Election night:
>
> . . .
>
> The Gateway Pundit also discovered that these piles of ballots were run through the tabulators multiple times.
>
> . . .
>
> We asked in December why the FBI had not spoken with the culprits and arrested them for election-related crimes.
>
> . . .

x) In their June 7, 2021, article published at 9:43 p.m., Defendants made the

following false statements, which they republished on June 14, 2021, at

10:33 a.m. and June 18, 2021, at 8:00 a.m.:

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Shaye Moss was famous for kicking everyone out of the room where votes were counted in Fulton County and telling observers to go home. Then Shaye and others including Ralph Jones and her mother Ruby dragged hidden boxes of ballots out from underneath tables and started running them through the machines. [Our source caught Ruby Freeman in the purple shirts scanning / Ruby Freeman was caught on tape running] the same stack of suspect ballots through the machines multiple times.

y)  In their June 18, 2021, article published at 8:00 a.m., Defendants made the

following false statements, which they substantially republished on June 18,

2021, at 11:06 a.m. and June 19, 2021, at 10:20 a.m.[177]:

> A new report confirms Fulton County election worker Ruby Freeman was not the only leftist operative double counting stacks of ballots in Atlanta on election night. Top Atlanta election official Ralph Jones was also double scanning ballots late at night at the State Farm Center in Atlanta, Georgia on election night.
>
> . . .
>
> Ralph Jones was the person who sent home all of the election observers. Then his crew, including Ruby and daughter Shaye, went to work on election night!
>
> . . .

z)  In their June 19, 2021, article published at 8:31 p.m., Defendants made the

following false statement:

> The Democrat operatives were running a voter fraud factory inside the State Farm Center on Election Day and into Election Week!

aa) In their June 24, 2021, article published at 8:35 p.m., Defendants made the

following false statements:

> Fulton County is home to the infamous Ruby Freeman and her daughter Shaye Moss who were caught pulling ballot boxes from

---

[177] The second two articles republish only the first of these two paragraphs.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

under tables and scanning the same ballots multiple times after GOP elections observers were sent home on election night.

. . .

If Fulton County officials are SO confident in the security of Georgia's election, why are they hiring CRIMINAL DEFENSE attorneys?

This is not how innocent people act. They are hiding something in Fulton County, Georgia.

bb) In their August 14, 2021, article published at 9:15 a.m., Defendants made the following false statements:

We first discovered Ruby Freeman and her daughter Shaye Moss in December when The Gateway Pundit first reported that these two election workers took ballots out from under a table on Election night and jammed thousands of ballots into the tabulators numerous times.

This was after all of the election observers were sent home for the night. This was also after Trump had accumulated what experts said was an insurmountable lead in the state.

We revealed first that the ballots taken out from under tables on Election night were pushed into tabulators up to three times each.

…

This is not good for Ruby and her daughter.

It's also pathetic that these two are not in jail already. Their crimes were videotaped!

cc) In their September 25, 2021, article published at 7:10 a.m., Defendants made the following false statements:

Fulton County Georgia is a mess. The election results there are in question ever since election night when Ruby and her daughter jammed the same (Biden) ballots through tabulators continuously for more than an hour.

. . .

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> Fulton County was a mess and the activities of its employees surrounding the 2020 Election were corrupt. To certify the results from this county in the 2020 Election, a man would have to have no integrity. A man would have to be corrupt.

dd) In their December 2, 2021, article published at 12:42 p.m., Defendants made

the following false statements, which they republished on December 3,

2021, at 12:02 p.m., December 8, 2021, at 7:41 p.m., and April 22, 2022, at

11:05 a.m.[178]:

> The two women and their far-left funders targeted The Gateway Pundit after we were the first to identify the women in the late-night ballot-counting video at the State Farm Arena in Atlanta Georgia on November 3rd and the morning of the [sic] November 4th.

> The Gateway Pundit was also first to report that Ruby Freeman was caught on video shoving stacks of ballots through the voting machines numerous times late at night after all of the election observers were sent home.

> The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia. We disagree.

ee) In their December 8, 2021, article published at 8:50 p.m. with embedded

audio, Defendants made the following false statements:

Joe Hoft:    That night . . . I don't know if you remember the news first came out that night, and was saying there was a water main break and they needed to stop counting in Georgia. Remember that? . . . And then we were told later that was a lie and it never happened. And then they said it happened in the morning. And then

---

[178] The December 8, 2021, 7:41 p.m. article elaborated on typical election procedures with an additional defamatory statement: "The anti-Trump officials in Georgia insisted that this was normal procedure in the state of Georgia to kick out observers pull out hidden suitcases of ballots and feed them through the machines in an empty room numerous times when your candidate is losing the race. We disagree."

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

apparently they just kind of tried to say it never happened.

. . .

There was no water main break. . . . So, that was a lie.

So what happened then was they shut down for the night at 10:30. Now everybody else is thinking, wait a minute, I thought we counted until the election was done. I didn't think we were going to take shifts here, you know, go to bed. . . . So they decide to shut down. And there's evidence that they were doing that.

And then what happened is five people stuck around. Now, I know at least three of them are Black. And it doesn't matter. To me, it doesn't matter. I don't care if they were . . .

So these people stuck around, and they decided to pull ballots out from underneath the tables. Do you remember this story? Did you see that video? . . . Everybody saw it. The video came out, they pulled these ballots out from underneath the tables, and in suitcases, and then they opened them up, and they started shoving them through the tabulators.

. . .

Now later they're trying to say this is normal.

. . .

I mean, do we want an election where anybody can just grab suitcases of ballots and start shoving them through machines when nobody is watching?

ff) In their May 4, 2022, article published at 1:03 p.m., Defendants made the

following false statements:

Stunning: Ballot Harvester Shaye Moss Receives John F. Kennedy Profile In Courage Award

. . .

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

> The John F. Kennedy Library Foundation issued a statement on April 21 praising Moss for continuing to work as an election processor despite backlash from being caught on camera ballot harvesting during the 2020 presidential race.
>
> . . .
>
> . . . TGP's reporting, which showcases the two women's engagement of election fraud . . .

216. The defamatory meanings of Defendants' false statements are apparent from the face of the publications, refer to Ms. Moss by name, are accompanied by images of Ms. Moss, and/or are understood to be about her.

217. The statements authored and published by Defendants about Ms. Moss are reasonably understood to state or imply that she:

    a) Planned and carried out with others a plot to "steal the election" and "flip Georgia" for Joe Biden;

    b) Helped to fake a water main break that was used as a cover to bring suitcases stuffed with fraudulent ballots into the vote tabulation center;

    c) Engaged in a criminal conspiracy to exclude observers during the counting of ballots so that election fraud could be committed;

    d) Criminally introduced illegal ballots taken from the hidden suitcases into the ballot counting process when no observers were present;

    e) Committed election fraud and other crimes for which she is subject to arrest and imprisonment.

218. Each of these statements and implications is false and defamatory.

219. Each of these statements were read by millions of visitors to *The Gateway Pundit* website, as well as social media users who read social media posts shared by Defendants.

220. Each of these false statements was published with actual malice, *i.e.* with knowledge of its falsity or with reckless disregard as to its truth.

221.    Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible basis for the false allegations made; and published their allegations in a manner to create false inferences.

222.    Defendants had both political and financial motives for promulgating lies about Plaintiffs.

223.    Defendants did not neutrally report the allegations about Ms. Moss that were advanced by Trump lawyers and promptly disproven by Georgia election officials. Rather, they endorsed and adopted the allegations as their own, publishing and republishing them for months with full knowledge of their falsity or reckless disregard for their truth.

224.    Defendants had no applicable privilege or legal authorization to make these false and defamatory statements, or if they did, they abused it.

225.    Defendants repeated and embellished the false accusations without ever attempting to verify them, and they invented and published defamatory lies about Ms. Moss without once seeking comment from her.

226.    Defendants' defamatory statements were inherently improbable to begin with and have only become more improbable over time.

227.    Defendants have never corrected or retracted their defamatory statements, and those statements remain published on *The Gateway Pundit* to this day. Even after Plaintiffs specifically requested that Defendants retract their defamatory statements, Defendants took no action to correct or retract and only published additional defamatory statements, further evidencing their actual malice.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

228. Defendants' statements and implications about Ms. Moss constitute defamation *per se* in that they claim Ms. Moss participated in criminal activity punishable by law and labeled her a "crook."

229. Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Moss harm.

230. Defendants' statements damaged Ms. Moss's reputation in the general public, in her profession, in her neighborhood, and with friends, relatives, and neighbors.

231. As a direct and proximate result of Defendants' conduct, Ms. Moss has suffered significant general, actual, consequential, and special damages including, without limitation, impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.

### THIRD CLAIM

### (Intentional Infliction of Emotional Distress)

232. Plaintiffs incorporate and re-allege all paragraphs preceding and following as if fully set forth herein.

233. Defendants' months-long campaign of false and defamatory accusations directed specifically at Ms. Freeman and Ms. Moss was malicious, wanton, and intentional.

234. Defendants carried out their campaign with actual malice as they either knew that their accusations were false or published them with reckless disregard for their truth.

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

235. Defendants wrongful conduct was extreme and outrageous, and it was calculated to cause harm to Ms. Freeman and Ms. Moss. Defendants accused plaintiffs of stealing an election through a pre-conceived plan that would make them "infamous in the annals of voter corruption." They exploited public fear and taunted the "good people of Georgia" to stand up to the corrupt "mother-daughter combo" who stole the election for Joe Biden. Defendants encouraged readers to retaliate and harass plaintiffs, publicizing that Ms. Freeman could be contacted through the LinkedIn page of her business and coyly warning not to confuse her business with another in Georgia with a similar name.

236. Defendants' wrongful conduct is so outrageous in character and so extreme in degree that it is beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community.

237. Defendants acted with willful misconduct, malice, fraud, wantonness, oppression, and/or entire want of care which would raise the presumption of conscious indifference to consequences, and they specifically intended to cause Ms. Freeman and Ms. Moss harm.

238. Defendants' wrongful conduct had its intended effect. All aspects of Plaintiffs' lives have been altered as a result of Defendants' actions, including such simple things as where to live, how to go out in public, and when to see family and friends. This result was entirely foreseeable. Defendants' conduct is so outrageous in character and extreme in degree as to be beyond all bounds of decency. It should be regarded as atrocious and determined intolerable in a civilized community.

239. Defendants' wrongful conduct has inflicted severe emotional distress on Plaintiffs. They have suffered mental reactions including fright and fear for their safety,

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

horror and helplessness in the face of the intense hatred directed at them by Defendants and by their readers, anger, anxiety, sleeplessness, shame and humiliation. The emotional distress Defendants caused to be inflicted on Ms. Freeman and Ms. Moss was so severe that no reasonable person could be expected to endure it.

240. Defendants' wrongful conduct caused physical manifestations of harm to Plaintiffs, including dental injuries, weight gain, disrupted sleep, and anxiety attacks, as well as mental anguish, requiring them to seek treatment for the mental anguish resulting directly from the severe emotional trauma inflicted by Defendants.

241. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered significant general, actual, incidental, and special damages including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants for each of the causes of action raised herein. Plaintiffs respectfully request a judgment in their favor and against Defendants for:

A. Nominal damages;

B. Compensatory damages, including general, actual, consequential, and special damages, in an amount to be determined at trial;

C. Punitive damages;

D. Reasonable and necessary attorneys' fees;

E. Reasonable and necessary costs of the suit;

F. Prejudgment and post-judgment interest at the highest lawful rates;

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

G.  Declarative relief stating that the statements authored and published by
    Defendants identified within this Petition, individually and
    collectively, were and are false;

H.  Injunctive relief enjoining Defendants to remove their false and
    defamatory statements about plaintiffs from any website and/or social
    media accounts under their control;

I.  Such other and further relief as this Court deems just and appropriate.

Dated:  January 10, 2023                    Respectfully submitted,

                                            *By: /s/ James F. Bennett*

                                            James F. Bennett, No. 46826
                                            John C. Danforth, No. 18438
                                            Matt D. Ampleman, No. 69938
                                            Dowd Bennett LLP
                                            7733 Forsyth Blvd, Suite 1900
                                            St. Louis, MO 63105
                                            Phone: (314) 889-7373
                                            Fax: (314) 863-2111
                                            jbennett@dowdbennett.com
                                            jdanforth@dowdbennett.com
                                            mampleman@dowdbennett.com

                                            Von A. DuBose*
                                            75 14th Street, NE
                                            Suite 2110
                                            Atlanta, Georgia 30309
                                            Telephone: (404) 720-8111
                                            dubose@dubosemiller.com

                                            Kurt G. Kastorf**
                                            Kastorf Law LLC
                                            1387 Iverson Street NE
                                            Suite #100
                                            Atlanta, GA 30307
                                            (404) 900-0330
                                            kurt@kastorflaw.com

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

Brittany Williams*
UNITED TO PROTECT DEMOCRACY
15 Main St., Suite 312
Watertown, MA 02472
(202) 579-4582
brittany.williams@protectdemocracy.org

Shalini Goel Agarwal*
UNITED TO PROTECT DEMOCRACY
2020 Pennsylvania Ave. NW, Suite 163
Washington, DC 20006
(202) 579-4582
shalini.agarwal@protectdemocracy.org

John Langford*
Rachel Goodman*
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
(202) 579-4582
john.langford@protectdemocracy.org
rachel.goodman@protectdemocracy.org

David A. Schulz*
Kelsey R. Eberly*
MEDIA FREEDOM & INFORMATION
        ACCESS CLINIC
FLOYD ABRAMS INSTITUTE FOR
        FREEDOM OF EXPRESSION
YALE LAW SCHOOL
127 Wall Street
P.O. Box 208215
New Haven, CT 06520
(203) 436-5827
david.schulz@yale.edu
kelsey.eberly@yale.edu

*Admitted *Pro hac vice*

**\**Pro hac vice* forthcoming

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon all parties electronically through the Court's electronic filing system on this 10th day of January, 2023.

*/s/ James F. Bennett*

Electronically Filed - City of St. Louis - January 10, 2023 - 04:52 PM

# Exhibit 2

M240000005025

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



500426297535

RECEIVED
2024 APR 18 PM 4: 19
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

2024 APR 18 AM 11: 11

APR 19 2024
K. Brumbley

**FLORIDA CAPITAL COURIER SERVICES, INC**       (850) 491-9625 Brandon

2330 CLARE DR                               (850) 524-5437 Teresa

TALLAHASSEE, FL 32309                   (850) 524-6243 Rich

**Please use funds from account:  I20210000160: $160.00**

**Authorization Signature:** _fauxField_

**Business Name**:   **TGP Communications, LLC**

**Document #**

**_X__Certified Copy**

**_X__Certificate of Status**

| NEW FILINGS | & | AMENDMENTS |
|---|---|---|

**NEW FILINGS**     **&**     **AMENDMENTS**

___Profit Corp                 ___Amendment

___Not for Profit             ___Resignation / Withdrawal

**_X__Limited Liability**         ___Change of Registered Agent

___Domestication            ___Revocation of Dissolution

___LLLP                     ___Merger

___Corp                     ___Articles of Conversion

___Inc                       ___Amended & Restated Articles of Incorporation

___Other                   ___Statement of Authority

**APOSTILLE(s)**     **&**     **OTHER FILINGS**

___Apostille(s)             ___Foreign Filing

                               ___Reinstatement

                               ___Qualification

___Country(s)             ___Fictitious Name

                               ___Annual Report

EXAMINER'S INITIALS:____

**COVER LETTER**

**TO:**     Registration Section
            Division of Corporations

            TGP Communications, LLC
**SUBJECT:** _____
                        Name of Limited Liability Company

The enclosed "Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida," Certificate of Existence, and check are submitted to register the above referenced foreign limited liability company to transact business in Florida.

Please return all correspondence concerning this matter to the following:

John C. Burns
_____
                    Name of Person

The Burns Law Firm
_____
                    Firm/Company

PO Box 191250
_____
                    Address

Saint Louis, Missouri 63119
_____
                City/State and Zip Code

john@burns-law-firm.com
_____
        E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

John C. Burns                        314        329-5040
_____   at ( _____ ) _____
    Name of Contact Person              Area Code    Daytime Telephone Number

**Mailing Address:**                    **Street Address:**
Registration Section                    Registration Section
Division of Corporations                Division of Corporations
P.O. Box 6327                           The Centre of Tallahassee
Tallahassee, FL 32314                   2415 N. Monroe Street, Suite 810
                                        Tallahassee, FL 32303

Enclosed is a check for the following amount:
Please make check payable to: **FLORIDA DEPARTMENT OF STATE**
☐ $125.00 Filing Fee    ☐ $130.00 Filing Fee &    ☐ $155.00 Filing Fee &    ■ $160.00 Filing Fee, Certificate
                            Certificate of Status       Certified Copy           of Status & Certified Copy

**APPLICATION BY FOREIGN LIMITED LIABILITY COMPANY FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA**

*IN COMPLIANCE WITH SECTION 605.0902, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN LIMITED LIABILITY COMPANY TO TRANSACT BUSINESS IN THE STATE OF FLORIDA:*

1. TGP Communications, LLC
_____
(Name of Foreign Limited Liability Company; must include "Limited Liability Company," "L.L.C.," or "LLC.")

The Gateway Pundit, LLC
_____
(If name unavailable, enter alternate name adopted for the purpose of transacting business in Florida. The alternate name must include "Limited Liability Company," "L.L.C." or "LLC.")

2. Missouri
_____
(Jurisdiction under the law of which foreign limited liability company is organized)

3. 46-4161586
_____
(FEI number, if applicable)

4. **November 1, 2021**
_____
(Date first transacted business in Florida, if prior to registration.)
(See sections 605.0904 & 605.0905, F.S. to determine penalty liability)

5. 1820 NE Jensen Beach Blvd Unit 1120
_____
(Street Address of Principal Office)

Jensen Beach Florida 34957

6. 1820 NE Jensen Beach Blvd Unit 1120
_____
(Mailing Address)

Jensen Beach Florida 34957

7. Name and street address of Florida registered agent: (P.O. Box NOT acceptable)

Name:  Northwest Registered Agent LLC
_____

Office Address:  7901 4th St N STE 300
_____

St. Petersburg                              , Florida  33702
_____
(City)                                              (Zip code)

**Registered agent's acceptance:**
*Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

_____
(Registered agent's signature)

8. For initial indexing purposes, list names, title or capacity and addresses of the primary members/managers or persons authorized to manage [up to six (6) total]:

| Title or Capacity: | Name and Address: | Title or Capacity: | Name and Address: |
|---|---|---|---|
| ☐Manager | Name: Jim Hoft | ☐Manager | Name: _____ |
| ☑Member | Address: 1820 NE Jensen Beach Blvd | ☐Member | Address: _____ |
| ☐Authorized | Unit 1120 | ☐Authorized | _____ |
| Person | Jensen Beach, FL 34957 | Person | _____ |
| ☐Other_____ | ☐Other_____ | ☐Other_____ | ☐Other_____ |

| | | | |
|---|---|---|---|
| ☐Manager | Name: John C. Burns | ☐Manager | Name: _____ |
| ☐Member | Address: PO Box 191250 | ☐Member | Address: _____ |
| ☑Authorized | Saint Louis, MO 63119 | ☐Authorized | _____ |
| Person | _____ | Person | _____ |
| ☐Other_____ | ☐Other_____ | ☐Other_____ | ☐Other_____ |

| | | | |
|---|---|---|---|
| ☐Manager | Name: _____ | ☐Manager | Name: _____ |
| ☐Member | Address: _____ | ☐Member | Address: _____ |
| ☐Authorized | _____ | ☐Authorized | _____ |
| Person | _____ | Person | _____ |
| ☐Other_____ | ☐Other_____ | ☐Other_____ | ☐Other_____ |

Important Notice: Use an attachment to report more than six (6). The attachment will be imaged for reporting purposes only. Non-indexed individuals may be added to the index when filing your Florida Department of State Annual Report form.

9. Attached is a certificate of existence, no more than 90 days old, duly authenticated by the official having custody of records in the jurisdiction under the law of which it is organized. (If the certificate is in a foreign language, a translation of the certificate under oath of the translator must be submitted)

10. This document is executed in accordance with section 605.0203 (1) (b), Florida Statutes. I am aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

_John C. Burns_
Signature of an authorized person

John C. Burns
Typed or printed name of signee



# STATE OF MISSOURI



## John R. Ashcroft
## Secretary of State

### CORPORATION DIVISION
### CERTIFICATE OF GOOD STANDING

I, JOHN R. ASHCROFT, Secretary of State of the STATE OF MISSOURI, do hereby certify that the records in my office and in my care and custody reveal that

*TGP Communications LLC*
*LC1358217*

was created under the laws of this State on the 21st day of November, 2013, and is active, having fully complied with all requirements of this office.

IN TESTIMONY WHEREOF, I hereunto set my hand and cause to be affixed the GREAT SEAL of the State of Missouri. Done at the City of Jefferson, this 1st day of April, 2024.



Secretary of State



Certification Number: CERT-04012024-0119

# Exhibit 3

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

RUBY FREEMAN, et al.,      )
                                )
     Plaintiffs,        )
                                )
       v.            )      Case No. 4:21CV1424 HEA
                                )
JAMES HOFT, et al.,        )
                                )
     Defendants.       )

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion to Remand, [Doc. No. 13]. The matter is fully briefed and ready for disposition. For the reasons set forth below, Plaintiffs' Motion to Remand will be granted.

### Facts and Background

On Thursday, December 2, 2021, Plaintiffs Ruby Freeman and Wandrea Moss filed this defamation (Counts I and II) and intentional infliction of emotional distress (Count III) action in the Circuit Court of the City of St. Louis, Missouri, against individual defendants James Hoft and Joseph Hoft, and corporate defendant TGP Communications LLC, d/b/a, The Gateway Pundit (TGP), alleging Defendants made false statements about their activities as election workers during the 2020 Presidential election, which has damaged their professional and personal reputations. Plaintiffs are seeking damages and other relief as compensation.

On Sunday, December 5, 2021, Defendant Joseph Hoft removed the cause of action to this Court, invoking jurisdiction based on diversity of citizenship, 28 U.S.C. § 1332(a), noting the forum defendant rule does not bar removal of the action where the forum defendant has not yet been served. According to the notice of removal, Defendant Joseph Hoft is a citizen of the state of Florida and Defendants James Hoft and TGP are citizens of the State of Missouri. Plaintiffs are both citizens of the State of Georgia. Defendants James Hoft and TGP were served the day after the notice of removal was filed, December 6, 2021. Defendant Joseph Hoft was served on December 14, 2021.

In the instant motion, Plaintiffs argues that because (i) no defendant had been served at the time the notice of removal was filed, "snap removal" was not available and removal is improper; and (ii) Joseph Hoft is a citizen of the state of Missouri, not Florida, so as a forum defendant, he is not entitled to snap removal, and the case should be remanded pursuant to the forum defendant rule, 28 U.S.C. § 1441(b)(2). Defendant opposes remand, arguing that under the doctrine of "snap removal," the Court has diversity jurisdiction under 28 U.S.C. § 1441(b)(2) because the forum defendants (James Hoft and TGP) had not been served at the time of removal. Defendant also maintains Joseph Hoft is a resident of Florida and

is not a forum defendant.[1] The parties do not dispute that none of the defendants were served at the time of removal.

## Legal Standard

"[A]ny civil action brought in State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court" in which the action is pending. 28 U.S.C. § 1441(a). A claim may be removed to federal court only if it could have been brought in federal court originally; thus, the diversity and amount in controversy requirements of 28 U.S.C. § 1332 must be met, or the claim must be based upon a federal question pursuant to 28 U.S.C. § 1331. *Peters v. Union Pac. R.R. Co.,* 80 F.3d 257, 260 (8th Cir. 1996). The removing defendant bears the burden of establishing federal jurisdiction by a preponderance of the evidence. *Green v. Ameritide, Inc.,* 279 F.3d 590, 595 (8th Cir. 2002); *Altimore v. Mount Mercy Coll.*, 420 F.3d 763, 768 (8th Cir. 2005). Removal statutes must be strictly construed because they impede upon states' rights to resolve controversies in their own courts. *Nichols v. Harbor Venture, Inc.,* 284 F.3d 857, 861 (8th Cir. 2002). A district court is required to resolve all doubts about federal jurisdiction in favor of remand. *Bates v. Mo. & N. Ark. R.R. Co.,* 548 F.3d 634, 638 (8th Cir.2008); *In re*

---

[1] The Court will not address the issue regarding Defendant Joseph Hoft's residency since the Plaintiff's Motion to Remand will be granted for the reasons explained below. Therefore, the issue is moot.

*Prempro Prods. Liab. Litig.*, 591 F.3d 613, 619 (8th Cir. 2010) (citing *Wilkinson v. Shackelford*, 478 F.3d 957, 963 (8th Cir. 2007)).

For diversity jurisdiction to exist under 28 U.S.C. § 1332(a)(1) there must be complete diversity of citizenship between plaintiffs and defendants. *Buckley v. Control Data Corp.*, 923 F.2d 96, 97, n.6 (8th Cir. 1991). "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007). "It is settled, of course, that absent complete diversity a case is not removable because the district court would lack original jurisdiction." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 564 (2005) (cited case omitted). Where complete diversity of citizenship does not exist, 28 U.S.C. § 1447(c) requires a district court to remand the case to state court for lack of subject matter jurisdiction.

The "forum defendant rule" imposes an additional restriction on the removal of diversity cases. 28 U.S.C. § 1441(b)(2). Specifically, the statute provides that:

A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought. *Id.*

A case must be remanded if, at anytime, it appears that the district court lacks subject-matter jurisdiction. 28 U.S.C. § 1447(c); Fed. R. Civ. P. 12(h)(3).

## Discussion

While the statute plainly does not allow removal once a forum defendant has been properly served, there is "much disagreement on whether to invoke the forum defendant rule in cases of pre-service removal." *Boschert v. Wright Med. Grp., Inc.,* No. 4:15-CV-00211 (AGF), 2015 WL 1006482, at *2 (E.D. Mo. Mar. 6, 2015). Although the Eighth Circuit recently joined other circuits holding a violation of the forum defendant rule is a non-jurisdictional defect that must be raised within 30 days of removal, it has not addressed the propriety of "snap removal." *Holbein v. TAW Enters., Inc.,* 983 F.3d 1049, 1053 (8th Cir. 2020) (en banc). This district has taken three different approaches. In large part, the different views expressed by the courts arise from tension between the plain text of 28 U.S.C. § 1441(b)(2) and its presumed purpose.

The first approach is permitting snap removals based on the plain language of the statute, which does not explicitly state a defendant must be served before filing a notice of removal. *See, e.g., Tillman v. BNSF Ry. Co.,* No. 1:20-CV-00178 SNLJ, 2021 WL 842600, at *2 (E.D. Mo. Mar. 5, 2021). Among the reasons provided for these decisions, is the Eighth Circuit's prescription that "[w]hen the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances the sole function of the courts is to enforce [the statute] according to its terms." *United States v. Union Elec. Co.,* 64 F.3d 1152, 1165 (8th Cir. 1995) (internal quotation marks and citations omitted).

The second approach is remanding snap removals because they are inconsistent with the legislative intent behind the forum defendant rule, which is to protect the defendant from the improper joinder of a forum defendant that plaintiff has no intention of serving, and the purposes of removal. *See, e.g., Laster v. Monsanto Co.,* No. 4:18-CV-00397 CAS, 2018 WL 1566846, at *2 (E.D. Mo. Mar. 30, 2018). In accordance with this premise, district courts, including this one, have carved out exceptions to the "joined and served," language, deeming their analysis the "congressional intent" approach when Defendant is engaging in procedural gamesmanship to keep the case out of state court. *See, e.g., Gray v. Monsanto Co.,* No. 4:17-CV-02882 HEA, 2018 WL 488935, at *2 (E.D. Mo. Jan. 19, 2018) (granting remand and finding that although the statute's plain text is ordinarily decisive, it is notable that policy purposes underlying the "joined and served" language to prevent procedural gamesmanship are well-served).

The final approach is allowing snap removals only when at least one defendant has been served, based on a construction of the word "any" in section 1441(b)(2). *See, e.g., M & B Oil, Inc. v. Federated Mut. Ins. Co.,* No. 4:21-CV-00250 (NCC), 2021 WL 3472629, at *2 (E.D. Mo. Aug. 6, 2021), motion to certify appeal granted, No. 4:21-CV-00250 (NCC), 2021 WL 4963524 (E.D. Mo. Oct. 26, 2021); *Czapla v. Republic Servs., Inc.,* 372 F. Supp. 3d 878, 881 (E.D. Mo. 2019) (the Court narrowed its application of § 1441(b) by requiring service on at least one defendant before the case may be removed); *Rogers v. Boeing Aerospace*

6

*Operations*, Inc., 13 F.Supp.3d 972, 978 (E.D. Mo. 2014) (interpreting the text to

mean that "an out-of-state defendant may remove a diversity case if at least one

defendant–and no forum defendant–has been served"); *Perez v. Forest Labs., Inc.,*

902 F. Supp. 2d 1238, 1244–45 (E.D. Mo. 2012) (ordering remand where the *out-*

*of-state* defendant removed the case only six days after plaintiffs filed the

complaint and before *any* defendant was served) (emphasis added).

Acknowledging the recent cases that narrow the application of § 1441(b),

this Court finds that the word "any" requires at least one party to have been joined

and served before a defendant can snap remove. *Rogers*, 13 F.Supp.3d 972 at 977-

78; 28 U.S.C. 1441 § (b)(2). Plaintiffs filed the action in state court on Thursday,

December 2, 2021, and Defendant Joseph Hoft removed a mere three days later on

Sunday, December 5, 2021 before *any* defendant had been served. Therefore,

under this Court's interpretation of the forum defendant rule, the Court cannot

maintain jurisdiction over this suit based on diversity, and Plaintiff's Motion to

Remand will be granted.

## Conclusion

The Court concludes that diversity jurisdiction is not properly present in this

case because Defendant Joseph Hoft removed it before any defendant was served.

Further, a district court is required to resolve all doubts about federal jurisdiction in

favor of remand. *Bates v. Mo.,* 548 F.3d 634 at 638; *In re Prempro Prods. Liab.*

*Litig.*, 591 F.3d 613 at 619 (citing *Wilkinson*, 478 F.3d 957 at 963)).

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Remand, [Doc. No. 13], is **GRANTED.**

**IT IS FURTHER ORDERED** that this matter is remanded to the Circuit Court of the City of St. Louis, Missouri.

Dated this 6th day of June, 2022.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

# Exhibit 4

STATE OF MISSOURI        )
                         ) SS
CITY OF ST. LOUIS        )

**MISSOURI CIRCUIT COURT**
**TWENTY-SECOND JUDICIAL CIRCUIT**
**(City of St. Louis)**

FILED
DEC 2 0 2022
22ⁿᵈ JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY  MD            DEPUTY

RUBY FREEMAN and WANDREA        )
MOSS,                           )
                                )
           Plaintiffs,          )
                                )      Cause No. 2122-CC09815-01
vs.                             )
                                )      Division No.  18
JAMES HOFT, JOSEPH HOFT, and    )
TGP COMMUNICATIONS LLC d/b/a     )
*THE GATEWAY PUNDIT*,           )
                                )
           Defendants.          )

**<u>ORDER</u>**

The Court has before it Plaintiffs' Second Motion to Compel Discovery and for a Protective

Order and Defendants' Cross Motion for Protective Order. The Court now rules as follows.

On December 2, 2021, Plaintiffs filed this lawsuit alleging that Defendants knowingly and

repeatedly published false accusations that Plaintiffs committed election fraud during the 2020

presidential election. In their Second Amended Petition, Plaintiffs bring claims for defamation

(Counts I and II) and intentional infliction of emotional distress (Count III).

Plaintiffs seek the Order of this Court compelling Defendants to produce documents

responsive to Plaintiffs' Second Requests for Production, and for entry of a Protective Order.

Defendants agree that a protective order should issue but ask that this Court enter the Protective

Order proffered by Defendants.

The general rule of discovery found in Rule 56.01(b)(1) is that the parties may obtain

information regarding any matter, not privileged, that is relevant to the subject matter involved in

the pending action. State ex rel. Ford Motor Co. v. Westbrooke, 151 S.W.3d 364, 366 (Mo. banc 2004). Information is relevant if it is "reasonably calculated to lead to the discovery of admissible evidence." Rule 56.01; State ex rel. Stecher v. Dowd, 912 S.W.2d 462, 464 (Mo. banc 1995). "The party seeking discovery shall bear the burden of establishing relevance." Rule 56.01(b)(1); State ex rel. Ford Motor Co., 151 S.W.3d at 366.

Plaintiffs seek the Order of this Court overruling Defendants' objections to Plaintiffs' Second Requests for Production 1-7 and requiring Defendants to answer said requests. The Court has reviewed the discovery requests at issue and finds that Defendants' objections should be overruled as to requests 3-7 and that Defendants should be ordered to answer. Regarding request for production 1, which seeks all documents related to Google Analytics, the Court finds that Defendants' objections that the request is overbroad and unduly burdensome should be sustained at this time. Plaintiffs have proposed narrowing the scope of request for production 2 by requesting five sets of Google Analytics reports for each month from January 1, 2020 through the present: landing page reports, all page reports, filtered all pages reports, traffic acquisition reports and monthly topline reports. The Court finds that Defendants' objections should be overruled as to request 2 and that Defendants should be ordered to answer only as limited by Plaintiffs' proposal.

Next, both parties seek a Protective Order in order to protect the confidential information of the parties.

Rule 56.01(c), which authorizes protective orders, states:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

2

(1) that the discovery not be had;

(2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place;

(3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

(4) that certain matters not be inquired into, or that the scope of discovery be limited to certain matters; …

"A protective order should issue if annoyance, oppression, and undue burden and expense outweigh the need for discovery." State ex rel. Ford Motor Co. v. Messina, 71 S.W.3d 602, 607 (Mo. banc 2002); See also Edwards v. State Bd. of Chiropractic Examiners, 85 S.W.3d 10, 22 (Mo. App. W.D. 2002).

In this case, the parties agree that a protective order should be entered but cannot agree as to its terms. Following a review of the record the Court finds that both parties have shown good cause for the entry of a protective order herein. Following a review of the proposed orders proffered by each party, the Court finds that Plaintiffs' proposed order best protects the parties' confidential information without imposing undue burden. Accordingly, the Court will enter Plaintiffs' proposed Protective Order.

Finally, both Plaintiffs and Defendants seek attorneys' fees and costs related to the instant motion. The Court finds that it should not exercise its discretion here to order the sanctions sought because they are in excess of what is necessary to accomplish the purposes of discovery. See Fairbanks v. Weitzman, 13 S.W.3d 313, 327 (Mo. App. E.D. 2000).

THEREFORE, it is Ordered and Decreed that Plaintiffs' Second Motion to Compel Discovery and for a Protective Order is hereby GRANTED.

3

Defendants' objections to Plaintiffs' Second Requests for Production 3-7 are hereby overruled.

Defendants' objection to request for production 1 is sustained.

Defendants' objections to Plaintiffs' Second Requests for Production 2 are overruled as limited to five sets of reports for each month from January 1, 2020 through the present: landing page reports, all page reports, filtered all pages reports, traffic acquisition reports and monthly topline reports.

Defendants are Ordered to answer the subject discovery within twenty days of the date of this Order.

This Court will enter Plaintiffs' proposed Protective Order.

In all other respects, Plaintiffs' motion is denied.

Defendants' Cross Motion for Protective Order is granted in part to the extent that this Court is entering a Protective Order in order to protect the confidential information of the parties. Defendants' Cross Motion for Protective Order is denied in all other respects.

SO ORDERED:

Jason Sengheiser, Judge

Dated: December 20, 2022

4

# Exhibit 5

MISSOURI CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)



JUL 2 4 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

RUBY FREEMAN, et al.,                    )
                                         )
        Plaintiffs,                      )
                                         )   Case No. 2122-CC09815
v.                                       )
                                         )   Division 6
JAMES HOFT, et al.,                      )
                                         )
        Defendants.                      )

### ORDER AND JUDGMENT

The Court has the following before it: Plaintiffs' Motion to
Dismiss Defendants' Improper Counterclaim Pursuant to Rule
55.27(a)(11) and Rule 55.27(a)(6); and Plaintiffs' Motion to
Strike Defendants' Anti-SLAPP Motion made under GA Code §9-11-
11.1. The Motions were heard on July 13, 2023, where the parties
appeared by counsel. The Court has reviewed the submissions of the
parties, the relevant authorities, and the arguments of counsel,
and now rules as follows.

Plaintiffs Ruby Freeman and Wandrea Moss brought this case
alleging that Defendants James Hoft, Joseph Hoft, and TGP
Communications, LLC, d/b/a the Gateway Pundit are liable for
defamation and intentional infliction of emotional distress for
"knowingly and repeatedly published false accusations that
Plaintiffs committed election fraud during the 2020 presidential
election."



Defendants filed a counterclaim alleging that Plaintiffs, their counsel, and the entities for which Plaintiffs' counsel work[1], are liable for defamation *per se* for statements made by Plaintiffs' counsel outside of court proceedings regarding Defendants' alleged defamatory statements that gave rise to this case.

Defendants also filed a motion entitled "Defendants' Motion to Strike Under GA §9-11-11.1," which states the following:

> Defendants [...] hereby move for summary judgment under Missouri R. Civ. P. 74.04(b), invoking Georgia's Anti-SLAPP statute, GA Code § 9-11-11.1 (2020) because Plaintiffs' claims asserted in their Second Amended Petition are based entirely on Defendants' exercise of their right to free speech in connection with an issue of public interest or concern, and Plaintiffs cannot establish that there is a probability of prevailing on their claims.

## MOTION TO DISMISS COUNTERCLAIM

Defendants' Counterclaim asserts that Plaintiffs' counsel, the entities for which Plaintiffs' counsel work, and Plaintiffs themselves defamed Defendants when Plaintiffs' counsel uttered the following seven statements outside of the pleadings:

1. "The Gateway Pundit, along with its founding editor Jim Hoft, and contributor Joe Hoft, knowingly fabricated and

---

[1] Despite being named as counterclaim-defendants, Plaintiffs' counsel, and the entities for which Plaintiffs' counsel work, have not been joined as parties to this case, nor is there a motion before the Court asking that they be joined, nor has their conduct in this case indicated consent to the Court's jurisdiction over them.

disseminated blatantly false stories claiming that Ms. Freeman and Ms. Moss were involved in a conspiracy to commit election fraud, and continued to publish these untruths long after they were proven to be false." A statement by Protect Democracy on the website law4truth.org.

2. "The Hofts' defamations, aimed at undermining confidence in the 2020 election in an effort to overturn the will of the voters, targeted two Black women for doing their jobs as election workers. In significant measure because of the lies told by The Gateway Pundit, our clients were and continue to be targeted with threats of violence and racial intimidation." A statement by Protect Democracy on the website protectdemocracy.org.

3. "Lies like those that The Gateway Pundit knowingly told about Ruby Freeman and Shaye Moss cannot be divorced from the devastation they leave behind—both for the targeted individuals and for our democracy itself." A statement by Plaintiffs' attorney Brittany Williams on protectdemocracy.org.

4. "But that didn't stop some of the former president's top allies in the media – The Gateway Pundit, One America News Network – from continuing to spread that lie about our clients." A statement by Plaintiffs' attorney John Langford in an NPR interview.

5. "The defendants repeatedly published unverified and uncorroborated information claiming that Ms. Freeman and Ms. Moss were involved in a conspiracy to commit election fraud. They continue to publish these untruths long after they were proven to be false. Further, by identifying Ms. Freeman and Ms. Moss by name and publishing pictures of them online, Gateway Pundit caused, and was directly responsible for, the abuse and harassment Ms. Freeman and Ms. Moss suffered." A statement by Protect Democracy on the website protectdemocracy.org.

6. "Last year the Gateway Pundit knowingly published lies about two Georgia election workers." A Twitter post by Yale University's Media Freedom & Information Access (MFIA) Clinic.

7. "the type of disinformation campaign waged by the Gateway Pundit is undermining the very ability of our democracy to function." A statement by Plaintiffs' attorney David Schulz

3

on the MFIA Clinic website.

Plaintiffs move to dismiss Defendants' Counterclaim for two reasons. First, under Rule 55.27(a)(11), Plaintiffs assert that the Counterclaim is an improper, premature counterclaim in the nature of malicious prosecution. In the alternative, under Rule 55.27(a)(6), Plaintiffs assert that the Counterclaim fails to state a claim upon which relief can be granted because it (1) alleges defamation based on statements that are privileged and (2) fails to plead all elements of a defamation claim including that Plaintiffs had knowledge of falsity or serious doubts as the truth of their attorneys' statements, and that Defendants have suffered any damages as a result of the statements.

A motion to dismiss under Missouri Rule 55.27(a)(11) asserts a defense that "the counterclaim or cross-claim is one which cannot be properly interposed in this action." Plaintiffs argue that the Counterclaim seeks to hold them liable for statements made by their attorneys that simply echo their pleadings. Plaintiffs thus argue that the Counterclaim essentially alleges malicious prosecution, a claim that "is not cognizable until the original underlying suit has been prosecuted to a conclusion favorable to the party raising the malicious prosecution claim." See State ex rel. O'Basuyi v. Vincent, 434 S.W.3d 517 (Mo. banc 2014).

Plaintiffs further assert that their attorneys' statements comply with Rule of Professional Conduct 4-3.6. While the Rule

4

generally prohibits lawyers involved in litigation from making certain extrajudicial statements, it permits lawyers to state the claim, offense, or defense involved, and, unless prohibited by law, the identity of the persons involved. Rule 4-3.6(a)-(b).

The Court finds that while the Counterclaim purports to allege defamation, it is nonetheless in the nature of a claim for malicious prosecution. As such, the Court will dismiss the Counterclaim. Because the Court's ruling on Plaintiff's first argument is dispositive, it need not address Plaintiffs' arguments in the alternative.

## MOTION TO STRIKE

Plaintiffs assert two reasons that the Court should strike Defendants' Anti-SLAPP Motion made under Georgia Code Section 9-11-11.1. First, Plaintiffs argue that it seeks to apply a Georgia procedural rule in a Missouri state court case, and in the alternative, it does not meet the terms of the Georgia rule. Further, Plaintiffs argue that they should be awarded reasonable expenses associated with responding to the instant Motion because it is meritless and dilatory.

Under Missouri Rule 55.27(e), a party may request that "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" be stricken from any pleading. Missouri follows the rule that a forum state applies its own procedural law but chooses the applicable substantive law according to its conflict-

5

of-law doctrines. Harter v. Ozark-Kenworth, Inc., 904 S.W.2d 317, 320 (Mo. App. W.D. 1995).

Missouri has its own anti-SLAPP statute which provides a procedural mechanism for the early disposition of a SLAPP action. Section 537.528.1 RSMo. However, application of this statute is restricted to conduct or speech undertaken or made in connection with a public hearing or public meeting. Id. A public meeting includes any meeting held by a state of local government entity, including meetings of or presentations before state, county, city, town, or village councils, planning commissions, or review boards. Id. Because the statements at issue in this case were not uttered in connection with a public hearing or public meeting, Defendants acknowledge that Missouri's statute does not apply. Instead, Defendants seek to apply Georgia's anti-SLAPP statute whose more expansive scope encompasses, among other things, "[a]ny written or oral statement or writing or petition made in a place open to the public or a public forum in connection with an issue of public interest or concern." Ga. Section 9-11-11.1(c)(3).

Defendants assert that Georgia's statute provides substantive protection from this suit. The Court disagrees. Like its Missouri counterpart, the Georgia anti-SLAPP statute provides "procedural protection" against SLAPP actions. See Rogers v. Dupree, 824 S.E.2d 823, 830 (Ga. Ct. App. 2019) quoting Denton v. Browns Mill Dev. Co., 561 S.E.2d 431, 434 (Ga. 2002); see also Carbone v. CNN, Inc.,

6

910 F.3d 1345, 1348 ("The anti-SLAPP statute 'creates no substantive rights; it merely provides a procedural mechanism for vindicating existing rights.'").

Because Defendants' anti-SLAPP Motion is predicated on the Court's application of a foreign procedural law, the Court must grant Plaintiffs' Motion to Strike it. Because the Court's ruling on Plaintiff's first argument is dispositive, it need not address Plaintiffs' arguments in the alternative. The Court declines Plaintiffs' request for reasonable expenses associated with responding to this Motion.

THEREFORE, it is Ordered and Decreed as follows:

- Plaintiffs' Motion to Dismiss Defendants' Counterclaim is GRANTED. Defendants' Counterclaim is hereby dismissed.
- Plaintiffs' Motion to Strike Defendants' Anti-SLAPP Motion made under GA Code Section 9-11-11.1 is GRANTED. Defendants' Motion to Strike Under GA Code Section 9-11-11.1 is hereby stricken from the record.

SO ORDERED:

MICHAEL STELZER, Judge

Dated: _July 24, 2023_

7

# Exhibit 6



# In the Missouri Court of Appeals
# Eastern District

| | |
|---|---|
| JAMES HOFT, JOSEPH HOFT, AND TGP COMMUNICATIONS LLC D/B/A THE GATEWAY PUNDIT, RELATORS, | No. ED111920 |
| | Writ of Prohibition and/or Mandamus |
| | Cause No. 2122-CC09815 |
| vs. | |
| THE HONORABLE MICHAEL F. STELZER CIRCUIT JUDGE CIRCUIT COURT OF ST. LOUIS COUNTY, RESPONDENT. | |

## ORDER

Relators have filed a Petition for Writ of Prohibition along with Suggestions in Support and Exhibits.

Being duly advised in the premises, the Court hereby DENIES Relator's Petition for Writ of Prohibition.

SO ORDERED.

DATED: August 17, 2023

John P. Torbitzky, Presiding Judge
Writ Division IV
Missouri Court of Appeals, Eastern District

cc:  Hon. Michael F. Stelzer
Matthew Ampleman
John Danforth
James Bennett
Jonathon Burns



# Exhibit 7



# In the Missouri Court of Appeals
# Eastern District

| | | |
|---|---|---|
| RUBY FREEMAN, and WANDREA MOSS, | ) | No. ED111906 |
| | ) | |
| Respondents, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JAMES HOFT, JOSEPH HOFT, TGP COMMUNICATIONS LLC d/b/a THE GATEWAY PUNDIT, | ) | |
| | ) | |
| Appellants. | ) | |

<u>ORDER</u>

Respondents have filed a motion to dismiss, contending that there is no final, appealable judgment under Rule 74.01(b).  Appellants have not filed a response to the motion to dismiss.

Respondents filed a three-count petition alleging defamation and intentional infliction of emotional distress against Appellants, and Appellants filed a counterclaim alleging malicious prosecution.  On July 24, 2023, the trial court entered an order and judgment dismissing Appellants' counterclaim upon finding that a malicious prosecution counterclaim could only be brought after the termination of the current litigation.  Appellants have filed a notice of appeal from the July 24, 2023 order and judgment dismissing the counterclaim.

An appellate court has jurisdiction only over final judgments that dispose of all parties and claims in the case and leave nothing for future determination.  <u>O'Neill v. O'Neill</u>, 864 S.W.2d 7, 8 (Mo. App. E.D. 1993).  If the trial court does not either resolve all the issues as to all parties or expressly designate "there is no just reason for delay," the appeal must be dismissed. Rule 74.01(b); <u>Fleahman v. Fleahman</u>, 25 S.W.3d 162, 164 (Mo. App. E.D. 1999).

Here, the trial court granted Respondents' motion to dismiss Appellants' counterclaim, but it did not certify the judgment for immediate appeal under Rule 74.01(b).  Further, the three

claims asserted in Respondents' petition remain pending before the trial court. Therefore, there is no final and appealable judgment under Rule 74.01(b). Respondents' motion to dismiss the appeal is hereby granted.

SO ORDERED.

DATED: ___8·31·23___

Kelly C. Broniec, Chief Judge

ecc:    Jonathon C. Burns
         James F. Bennett
         John C. Danforth
         Matthew Ampleman



# Exhibit 8

STATE OF MISSOURI   )
                    ) SS
CITY OF ST. LOUIS   )



FILED

MAY 1 0 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY_____ DEPUTY

**MISSOURI CIRCUIT COURT**
**TWENTY-SECOND JUDICIAL CIRCUIT**
**(City of St. Louis)**

Ruby Freeman et al,              )
                                 )
          Plaintiffs,            )
                                 )   No. 2122-CC09815
vs.                              )
                                 )   Division No. 6
TGP Communications LLC           )
Et al                            )
          Defendants,            )
                                 )
                                 )

ORDER APPOINTING MASTER

COMES NOW this Court under Rule 68.01 and hereby appoints Peter Dunne 100 South 4th St, Suite 400, St. Louis, MO 63102, to be Special Master in this matter. Within seven (7) days of receipt of this order, the Master shall appear before the Honorable Michael F. Stelzer, Division 6 of the Twenty-Second Judicial Circuit to have his oath administered pursuant to Rule 68.01(d).

The Master shall have all of the powers set out in Rule 68.01(e), including but not limited to:

The power to regulate all proceedings in every hearing before the master and to do all acts and take all measures

**ENTERED**

**MAY 1 0 2023**

**M S**

necessary or proper for the efficient performance of the duties under the order.

The power to require the production of evidence upon all matters related to discovery matters herein.

The master may rule upon the admissibility of evidence and has the authority to put witnesses on oath and may examine them and may call the parties to the action and examine them upon oath.

The master may preside over depositions and all discovery disputes as provided for in Rule 68.01(h). The master shall be compensated at $ 450.00 per hour.

The parties shall proceed before the master as provided in Rule 68.01(e)and(f).

SO ORDERED:

MICHAEL F. STELZER, Judge

Dated: _____5/10/23_____, 2023

2

# Exhibit 9

# MISSOURI CIRCUIT COURT
# TWENTY-SECOND JUDICIAL CIRCUIT
## (St. Louis City)

Ruby Freeman et al, Plaintiffs

**vs**

TGP Communications LLC et al, Defendants

| CASE NO. 2122-cc09815 | DIVISION 6 | November 7, 2023 |
|---|---|---|

# COURT ORDER

The Special Master having filed his Third Report and Recommendation on November 3, 2023 and given the short time frames regarding the discovery the Court hereby adopts the Third Report and Recommendation of the Special Master in its entirety.

**FILED**

NOV 07 2023

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

**SO ORDERED:**

Michael F. Stelzer #40716

cc: All parties of record

ENTERED
NOV -7 2023
MAM

# Exhibit 10

Fill in this information to identify your case:

United States Bankruptcy Court for the:

Southern District of Florida
_____ District of _____
                              (State)

Case number (*If known*): _____

Chapter you are filing under:
- ☐ Chapter 7
- ☑ Chapter 11
- ☐ Chapter 12
- ☐ Chapter 13

☐ Check if this is an amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy          06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals*, is available.

| | |
|---|---|
| **1. Debtor's name** | TGP COMMUNICATIONS, LLC |
| **2. All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | The Gateway Pundit |
| **3. Debtor's federal Employer Identification Number** (EIN) | 46-4161586 |

**4. Debtor's address**

**Principal place of business**

1820 NE JENSEN BEACH BLVD
Number        Street

UNIT 1120

Jensen Beach          FL     34957
City                      State      ZIP Code

Martin County
County

**Mailing address, if different from principal place of business**

Number        Street

P.O. Box

City                      State      ZIP Code

**Location of principal assets, if different from principal place of business**

Number        Street

City                      State      ZIP Code

| | |
|---|---|
| **5. Debtor's website** (URL) | http://www.thegatewaypundit.com |
| **6. Type of debtor** | ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br>☐ Partnership (excluding  LLP)<br>☐ Other. Specify: _____ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) _____ |
|---|---|---|
| | Name | |

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

☑ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.naics.com/search/ .

5178

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

☑ Chapter 11. *Check all that apply:*

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☑ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☑ No

☐ Yes. District _____ When _____ / _____ / _____ Case number _____
                                        MM / DD / YYYY

        District _____ When _____ / _____ / _____ Case number _____
                                          MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☑ No

☐ Yes. Debtor _____ Relationship _____

        District _____ When _____ / _____ / _____
                                              MM / DD / YYYY

        Case number, if known _____

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) _____ |
|---|---|---|
| | Name | |

**11. Why is the case filed in *this district*?**

Check all that apply:

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No
☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (Check all that apply.)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
Number            Street

_____

_____
City                                      State        ZIP Code

**Is the property insured?**

☐ No
☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

## Statistical and administrative information

**13. Debtor's estimation of available funds**

Check one:

☑ Funds will be available for distribution to unsecured creditors.
☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☑ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

**16. Estimated liabilities**

☐ $0-$50,000  ☐ $1,000,001-$10 million  ☐ $500,000,001-$1 billion
☐ $50,001-$100,000  ☐ $10,000,001-$50 million  ☐ $1,000,000,001-$10 billion
☑ $100,001-$500,000  ☐ $50,000,001-$100 million  ☐ $10,000,000,001-$50 billion
☐ $500,001-$1 million  ☐ $100,000,001-$500 million  ☐ More than $50 billion

---

## Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  04/24/2024
_____
MM / DD / YYYY

✖ /s/ James Hoft
_____
Signature of authorized representative of debtor

James Hoft
_____
Printed name

Title  Manager
_____

**18. Signature of attorney**

✖ /s/ Bart Houston
_____
Signature of attorney for debtor

Date  04/24/2024
_____
MM / DD / YYYY

Bart Houston
_____
Printed name

Houston Roderman PLLC
_____
Firm name

633 S. Andrews Avenue Suite 500
_____
Number        Street

Ft. Lauderdale          FL    33301
_____
City                State  ZIP Code

954-900-2615          bhouston@thehoustonfirm.com
_____
Contact phone          Email address

0623636              FL
_____
Bar number            State

---

# Exhibit 11

**Fill in this information to identify the case:**

Debtor name _____ TGP COMMUNICATIONS, LLC _____

United States Bankruptcy Court for the: ___ Southern District of Florida ___

Case number (If known): _____

☐ Check if this is an amended filing

Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider*, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
|---|---|---|---|---|---|---|---|
| 1 | Jane Doe - C c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 16,546.06 |
| 2 | Jez Morano 8750 South Ocean Drive Unit 534 Jensen Beach, FL, 34957 | | Telephone / Internet services | | | | 11,062.06 |
| 3 | Jane Doe - F c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 10,041.70 |
| 4 | Ted Slater 2820 N PINAL AVE STE 12 PMB 209 CASA GRANDE, AZ, 85122 | | Telephone / Internet services | | | | 9,000.00 |
| 5 | John Doe - C c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 6,001.66 |
| 6 | Jane Doe - D c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 5,202.16 |
| 7 | John Doe - R c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 5,178.55 |
| 8 | John Doe - AA c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 4,492.58 |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) |
|---|---|---|
| | Name | |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 9 | John Doe - CC c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 3,104.19 |
| 10 | John Doe - Y c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 2,755.40 |
| 11 | John Doe - O c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Suppliers or Vendors | | | | 2,540.50 |
| 12 | John Doe - BB c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 2,293.59 |
| 13 | John Doe - W c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 2,194.82 |
| 14 | John Doe - S c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 2,191.16 |
| 15 | Kellie Poen 344 Fallon Pkwy Saint Peters, MO, 63376 | | Suppliers or Vendors | | | | 2,000.00 |
| 16 | John Doe - A c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 1,895.56 |
| 17 | John Doe - FF c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 1,820.94 |
| 18 | John Doe - M c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 1,399.83 |
| 19 | Jane Doe - I c/o Jonathan Burns POB 191250 Saint Louis, MO, 63119 | | Services | | | | 1,376.21 |
| 20 | James Kirk 947 CENTURY OAKS DR Manchester, MO, 63021 | | Telephone / Internet services | | | | 1,200.00 |

# Exhibit 12

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### www.flsb.uscourts.gov

In re:                                                        **Chapter 11**

**TGP COMMUNICATIONS, LLC**                    **Case No.  24-13938-MAM**

      **Debtor.**

_____/

## CHAPTER 11 CASE MANAGEMENT SUMMARY

In compliance with Local Rule 2081-1(B), the Debtor-in-Possession, TGP Communications, LLC (the "**Debtor**") files this Chapter 11 Case Management Summary and states:

The following data represents approximations for background information only and the information may represent the Debtor's best estimate in response to some of the ensuing questions.

1. Date of Order for Relief under chapter 11 (filing date of petition if voluntary chapter 11 petition):

    **April 24, 2024**

2. Names, case numbers and dates of filing of related debtors:

    **N/A**

3. Description of debtor's business:

    **The Debtor owns and operates a conservative news and opinion website**

4. Locations of debtor's operations and whether the business premises are leased or owned:

    **The Debtor operates from Jensen Beach Florida address**.

5. Reasons for filing chapter 11:

    **Multiple litigations that threaten the Debtor's continued viability and ability to continue operations.**

6. List of officers and directors, if applicable, and their salaries and benefits at the time of filing and during the 1 year prior to filing:

7.    Debtor's fiscal or calendar year to date gross income and the debtor's gross income for the calendar or fiscal year prior to the filing of this petition:

**2024: $  725,128.81**
**2023: $3,097,988.38**

8.    Amounts owed to various creditors:

   a.   Obligations owed to priority creditors including priority tax obligations:

   **N/A**

   b.   With respect to creditors holding secured claims, the name of and amounts owed to such creditors and a description and estimated value of all collateral of the debtor securing their claims, and

   **N/A**

   c.   Amount of unsecured claims:

   **Approximately $108,000 of known liquidated claims.**

9.    General description and approximate value of the debtor's assets:

   **Investment Accounts**
   **Vehicle**
   **Approximately $ 180,313**
   **(Good will – unknown)**

10.   List of all insurance policies, the property covered under the policy, the name of the insurer, the policy number, amount of coverage, whether the premium is current, the date the next premium is due and date the policy expires;

   **Media Professional Liability policy.**
   **Atlantic Specialty Insurance Company**
   **MEP-23005-20**
   **Coverage amount: $2,000,000**
   **Premium is current; Current expiration date is unknown (most current form of policy has been requested).**

   **Captive insurance policy**
   **Information is forthcoming**

11.   Number of employees and amounts of wages owed as of petition date:

   **One Employee – no wages owed on petition date**

12.     Status of debtor's payroll and sales tax obligations, if applicable.   This does not
eliminate the obligation of chapter 11 debtors (other than individuals not engaged in
business) to provide the more detailed payroll tax information required by Local
Rule 2081-1(A):

**Current**

13.     Anticipated emergency relief to be requested within 14 days from the petition date:

**The Debtor anticipates filing a motion for authorization to appoint John Burns. Esq. as service
agent for the contract writers.  Due to some of the controversial articles published by the
Debtor, the contract writers have requested to remain anonymous in public filings.**

Dated: April 29, 2024

/s  James Hoft
James Hoft

**HOUSTON RODERMAN**
Attorney for Debtor

By:     /s/ Bart A. Houston
Bart A. Houston
Florida Bar No. 623636
633 S. Andrews Ave. Suite 500
Ft. Lauderdale, Florida 33301
Telephone: (954) 900-2615
Facsimile: (954) 839-9068
Primary Email: bhouston@thehoustonfirm.com

Exhibit 13

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:                                               **Chapter 11**

**TGP COMMUNICATIONS, LLC**                           **Case No.  24-13938-MAM**
         **Debtor.**

_____/

### NOTICE OF FILING DOCUMENTS
### FOR SMALL BUSINESS AS REQUIRED BY 11 USC §1116(1)

**TGP COMMUNICATIONS, LLC** the debtor and debtor-in-possession (the "**Debtor**"),

through its Manager, James Hoft, as required by 11 U.S.C. §1116(1) files the following documents:

1. The Debtor's Balance Sheet for 1st quarter of 2024.

2. The Debtor's Profit and Loss and Statement of Cash Flows for 1st quarter 2024.

3. The Debtor's 2021 and 2022 Federal Tax Returns are filed under separate docket entry, restricted and only available to the U.S. Trustee's Office.

**Dated: May 2, 2024**

                         **HOUSTON RODERMAN**
                         *Attorney for Debtor-in-Possession*

              By:    /s/ Bart A. Houston
                     Bart A. Houston
                     Florida Bar No. 623636
                     633 S. Andrews Ave. Suite 500
                     Ft. Lauderdale, Florida 33301
                     Telephone: (954) 900-2615
                     Facsimile: (954) 839-9068
                     Primary Email: bhouston@thehoustonfirm.com
                     Secondary Email: dschena@thehoustonfirm.com

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served

by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing

System on May 2, 2024.

By:     _/s/ Bart A. Houston_
        Bart A. Houston, Esq.
        Florida Bar No. 623636

1:24 PM

04/17/24

Cash Basis

# TGP Communications, LLC
## Balance Sheet
### As of March 31, 2024

|  | Mar 31, 24 |
|---|---|
| **ASSETS** |  |
| **Current Assets** |  |
| **Checking/Savings** |  |
| Checking - US BANK | 84,494.16 |
| PT Checking | 2,114.01 |
| Revolut Business | 329,647.07 |
| TGP Store Account | 5,000.00 |
| TGP Store Account 2 | 100.00 |
| **Total Checking/Savings** | 421,355.24 |
| **Other Current Assets** |  |
| Due From Shareholder-Condo | 799,860.00 |
| Due to/From Justice League | 150,000.00 |
| Loan to Joe Hoft | 21,000.00 |
| Schwab Investment Account | 104,422.67 |
| **Total Other Current Assets** | 1,075,282.67 |
| **Total Current Assets** | 1,496,637.91 |
| **Fixed Assets** |  |
| **Investments** |  |
| Coinbase.com | 10,000.00 |
| Robin Hood Investments | 25,000.00 |
| Uphold HQ Investments | 4,700.00 |
| WeBull Finacial | 100.00 |
| **Total Investments** | 39,800.00 |
| **Vehicles** |  |
| 2021 Porsche | 88,055.70 |
| Vehicles - Accum Depr | -51,963.73 |
| **Total Vehicles** | 36,091.97 |
| **Total Fixed Assets** | 75,891.97 |
| **TOTAL ASSETS** | **1,572,529.88** |
| **LIABILITIES & EQUITY** |  |
| **Liabilities** |  |
| **Current Liabilities** |  |
| **Other Current Liabilities** |  |
| **Payroll Liabilities** |  |
| 401(k) Employee Liability | -10,000.00 |
| Federal Taxes (941/944) | 3,395.71 |
| **Total Payroll Liabilities** | -6,604.29 |
| **Total Other Current Liabilities** | -6,604.29 |
| **Total Current Liabilities** | -6,604.29 |
| **Total Liabilities** | -6,604.29 |
| **Equity** |  |
| **Owner's Equity** |  |
| Contributions | 8,047.00 |
| Draws | -691,095.50 |
| Estimated Fed Taxes | -205,922.53 |
| Estimated MO Taxes | -33,871.50 |
| **Total Owner's Equity** | -922,842.53 |
| Retained Earnings | 2,253,939.56 |
| Net Income | 248,037.14 |
| **Total Equity** | 1,579,134.17 |
| **TOTAL LIABILITIES & EQUITY** | **1,572,529.88** |

1:23 PM

04/17/24

Cash Basis

# TGP Communications, LLC
## Profit & Loss
### January through March 2024

| | Jan - Mar 24 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Gross Receipts** | |
| Christopher D Do | 146,667.47 |
| Donations | 20,101.44 |
| Economic Advisors | 342,304.70 |
| Facebook | 435.47 |
| Leven Labs Inc. | 96,224.26 |
| Liftable Media | 19,603.08 |
| Rumble | 83,363.85 |
| Twitter Income | 3,640.62 |
| Zelenko Labs | 12,787.92 |
| **Total Gross Receipts** | 725,128.81 |
| **Total Income** | 725,128.81 |
| **Gross Profit** | 725,128.81 |
| **Expense** | |
| **Auto Expenses** | |
| Fuel | 54.79 |
| **Total Auto Expenses** | 54.79 |
| **Bank & Credit Card Fees** | 1,090.33 |
| **Contractors** | |
| Advertiser, Poen | 6,000.00 |
| Conference, McCulloch | 29,664.02 |
| Lupo, Brian | 6,342.23 |
| **Writers** | |
| Fairbanks, Cassandra | 16,483.87 |
| Goglanian, Cristina (Laila) | 45,098.02 |
| Lachance, Michael | 11,285.99 |
| McMurray, Patty | 1,089.82 |
| Powe, Alicia | 4,295.46 |
| Taylor, Kristinn | 4,987.84 |
| **Total Writers** | 83,241.00 |
| **Contractors - Other** | 137,466.83 |
| **Total Contractors** | 262,714.08 |
| **Dues & Subscriptions** | 1,242.25 |
| **Information Technology** | |
| IT - Kirk | 3,600.00 |
| Software | 12,699.33 |
| Website | 5,047.69 |
| **Total Information Technology** | 21,347.02 |
| **Insurance** | |
| Insurance - Liability | 3,113.00 |
| **Total Insurance** | 3,113.00 |
| Internet/Telephone | 702.00 |
| Legal Fees | 70,000.00 |
| Meals | 96.97 |
| Memberships | 2,605.00 |
| Miscellaneous | 300.99 |
| Office Expenses | 100.00 |
| **Payroll Expenses** | |
| Wages | 45,000.00 |
| Payroll Expenses - Other | 2,627.70 |
| **Total Payroll Expenses** | 47,627.70 |

**TGP Communications, LLC**
# Profit & Loss
**January through March 2024**

1:23 PM

04/17/24

Cash Basis

|  | Jan - Mar 24 |
|---|---|
| **Payroll Support** | 504.74 |
| **Professional Fees** | 4,890.00 |
| **Travel** | |
| Travel - Lodging | 3,542.12 |
| Travel - Transportation | 1,219.01 |
| Travel - Other | 122.45 |
| **Total Travel** | 4,883.58 |
| **Total Expense** | 421,272.45 |
| **Net Ordinary Income** | 303,856.36 |
| **Other Income/Expense** | |
| **Other Expense** | |
| Ask My Accountant | 55,819.22 |
| **Total Other Expense** | 55,819.22 |
| **Net Other Income** | -55,819.22 |
| **Net Income** | **248,037.14** |

1:25 PM

04/17/24

# TGP Communications, LLC
## Statement of Cash Flows
### January through March 2024

|  | Jan - Mar 24 |
| --- | --- |
| **OPERATING ACTIVITIES** |  |
| **Net Income** | 248,037.14 |
| **Adjustments to reconcile Net Income** |  |
| **to net cash provided by operations:** |  |
| **Payroll Liabilities:Federal Taxes (941/944)** | 3,395.71 |
| **Net cash provided by Operating Activities** | 251,432.85 |
| **FINANCING ACTIVITIES** |  |
| **Owner's Equity:Draws** | -65,984.12 |
| **Net cash provided by Financing Activities** | -65,984.12 |
| **Net cash increase for period** | 185,448.73 |
| **Cash at beginning of period** | 235,906.51 |
| **Cash at end of period** | **421,355.24** |

# Exhibit 14

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
www.flsb.uscourts.gov

In re:                                                    **Chapter 11**

**TGP COMMUNICATIONS, LLC**                  **Case No.  24-13938-MAM**

           **Debtor.**

_____/

**DEBTOR'S PRE-STATUS CONFERENCE**
**REPORT PURSUANT TO 11 U.S.C. §1188(C)**

TGP COMMUNICATIONS, LLC, as Debtor and Debtor in Possession ("**Debtor**")

pursuant to Section 1188(c**)** of Title 11 of the United States Code and the *Order Setting Subchapter*

*V Status Conference, Claims Bar Date, and Deadline for Elections Under 11 U.S.C. §1111(b)*

(ECF No. 8) provides the following report that details the efforts the Debtor has undertaken and

will undertake to attain a consensual plan of reorganization/liquidation.

1.      On April 24, 2024, the Debtor filed a voluntary petition for relief under Subchapter

V of Chapter 11 of the United States Code.

2.      The status conference required by Section 1188(a) of the Bankruptcy Code has been

scheduled for June 4, 2024 at 1:30 P.M. (EST).

3.      The Debtor continues finalizing and filing all required documents and pleadings

and is otherwise be in compliance with all requirements under Subchapter V of Chapter 11 of the

Bankruptcy Code.

4.      The meeting of creditors under Section 341 of the Bankruptcy Code is scheduled

for May 30, 2024 at 3:30 pm.

5.      The Debtor anticipates using its disposable income to pay its creditors over a three

(3) year period.

6.      Efforts have been made to discuss the confirmation of a consensual plan with the largest creditor constituents. The largest creditors are represented by no less than 8 lawyers and no substantive conversations have yet occurred with the lawyers for the two (2) groups of claimants. All other creditors have expressed an interest in a consensual plan to allow the Debtor to reorganize.

7.      The Debtor anticipates timely filing its plan of reorganization on or before July 23, 2024.

**Dated: May 21, 2024**

Respectfully submitted,

By:      /s/ Bart A. Houston
Bart A. Houston
Florida Bar No. 623636
**HOUSTON RODERMAN**
*Proposed Counsel for Debtor*
633 S. Andrews Ave. Suite 500
Ft. Lauderdale, Florida 33301
Telephone: (954) 900-2615
Facsimile: (954) 839-9068
Primary Email: bhouston@thehoustonfirm.com
Secondary Email: dschena@thehoustonfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing System on May 21, 2024.

By:      */s/ Bart A. Houston*
Bart A. Houston, Esq.
Florida Bar No. 623636

# Exhibit 15

**Fill in this information to identify the case:**

Debtor name _____ TGP COMMUNICATIONS, LLC _____

United States Bankruptcy Court for the: _____ Southern District of Florida _____ District of _____
(State)

Case number (If known): _____ 24-13938-MAM _____

☐ Check if this is an amended filing

## Official Form 206Sum

# Summary of Assets and Liabilities for Non-Individuals

**12/15**

| Part 1: | Summary of Assets |
|---|---|

1. **Schedule A/B: Assets–Real and Personal Property** (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B*.......................................................................... $ _____ 0.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B*...................................................................... $ _____ 1,333,278.70

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B*........................................................................ $ _____ 1,333,278.70

| Part 2: | Summary of Liabilities |
|---|---|

2. **Schedule D: Creditors Who Have Claims Secured by Property** (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D* .................. $ _____ 0.00

3. **Schedule E/F: Creditors Who Have Unsecured Claims** (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 6a of *Schedule E/F*........................................ $ _____ 0.00

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 6b of *Schedule E/F* ...................... +$ _____ 102,596.61

4. **Total liabilities** ...........................................................................................
   Lines 2 + 3a + 3b     $ _____ 102,596.61

**Fill in this information to identify the case:**

Debtor name    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:  Southern District of Florida

Case number (if known):  24-13938-MAM

☐ Check if this is an amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property    12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

### Part 1:    Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

   **All cash or cash equivalents owned or controlled by the debtor**    **Current value of debtor's interest**

2. **Cash on hand**    $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

   | | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
   |---|---|---|---|---|
   | 3.1. | MIDFLORIDA Credit union | Checking | 2  6  1  9 | $ 0.00 |
   | 3.2. | See continuation sheet | | | $ 185,757.83 |

4. **Other cash equivalents** *(Identify all)*

   | 4.1. | _____ | $_____ |
   |---|---|---|
   | 4.2. | _____ | $_____ |

5. **Total of Part 1**    $ 185,757.83

   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

### Part 2:    Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

   ☑ No. Go to Part 3.
   ☐ Yes. Fill in the information below.

   **Current value of debtor's interest**

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

   | 7.1. | _____ | $_____ |
   |---|---|---|
   | 7.2. | _____ | $_____ |

Debtor    TGP COMMUNICATIONS, LLC
          Name                                                    Case number (if known)  24-13938-MAM

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

   Description, including name of holder of prepayment

   8.1. _____ $ _____

   8.2. _____ $ _____

9. **Total of Part 2.**

   Add lines 7 through 8. Copy the total to line 81.                            $ _____

---

| Part 3: | Accounts receivable |
|---|---|

10. **Does the debtor have any accounts receivable?**

    ☑ No. Go to Part 4.

    ☐ Yes. Fill in the information below.

                                                                    Current value of debtor's
                                                                    interest

11. **Accounts receivable**

    11a. 90 days old or less:  _____ – _____ = ........➔  $ _____
                                face amount         doubtful or uncollectible accounts

    11b. Over 90 days old:     _____ – _____ = ........➔  $ _____
                                face amount         doubtful or uncollectible accounts

12. **Total of Part 3**

    Current value on lines 11a + 11b = line 12. Copy the total to line 82.     $ _____

---

| Part 4: | Investments |
|---|---|

13. **Does the debtor own any investments?**

    ☐ No. Go to Part 5.

    ☑ Yes. Fill in the information below.

                                               Valuation method         Current value of debtor's
                                               used for current value   interest

14. **Mutual funds or publicly traded stocks not included in Part 1**

    Name of fund or stock:

    14.1. Charles Schwab acct #8256            _____   $ 107,617.10

    14.2. See continuation sheet               _____   $ 15,704.77

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

    Name of entity:                            % of ownership:

    15.1. _____    _____%   _____   $ _____

    15.2. _____    _____%   _____   $ _____

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

    Describe:

    16.1. _____    _____   $ _____

    16.2. _____    _____   $ _____

17. **Total of Part 4**

    Add lines 14 through 16. Copy the total to line 83.          $ 123,321.87

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**Part 5:  Inventory, excluding agriculture assets**

18. **Does the debtor own any inventory (excluding agriculture assets)?**

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19. **Raw materials** | MM / DD / YYYY | $ | | $ |
| 20. **Work in progress** | MM / DD / YYYY | $ | | $ |
| 21. **Finished goods, including goods held for resale** | MM / DD / YYYY | $ | | $ |
| 22. **Other inventory or supplies** | MM / DD / YYYY | $ | | $ |

23. **Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$ _____

24. **Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

25. **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value _____ Valuation method _____ Current value _____

26. **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

**Part 6:  Farming and fishing-related assets (other than titled motor vehicles and land)**

27. **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28. **Crops—either planted or harvested** | $ | | $ |
| 29. **Farm animals** Examples: Livestock, poultry, farm-raised fish | $ | | $ |
| 30. **Farm machinery and equipment** (Other than titled motor vehicles) | $ | | $ |
| 31. **Farm and fishing supplies, chemicals, and feed** | $ | | $ |
| 32. **Other farming and fishing-related property not already listed in Part 6** | $ | | $ |

Debtor    TGP COMMUNICATIONS, LLC
Name

Case number (*if known*)  24-13938-MAM

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$_____

34. **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

☐ No

☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

**Part 7:    Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | $_____ | _____ | $_____ |
| 40. **Office fixtures** | $_____ | _____ | $_____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | $_____ | _____ | $_____ |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1_____ | $_____ | _____ | $_____ |
| 42.2_____ | $_____ | _____ | $_____ |
| 42.3_____ | $_____ | _____ | · $_____ |

43. **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$_____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

| Part 8: | Machinery, equipment, and vehicles |
|---|---|

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | (Where available) | | |

**47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1  2021 Porsche Cayenne | $_____ | _____ | $ 53,339.00 |
| 47.2 _____ | $_____ | _____ | $_____ |
| 47.3 _____ | $_____ | _____ | $_____ |
| 47.4 _____ | $_____ | _____ | $_____ |

**48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 _____ | $_____ | _____ | $_____ |
| 48.2 _____ | $_____ | _____ | $_____ |

**49. Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 _____ | $_____ | _____ | $_____ |
| 49.2 _____ | $_____ | _____ | $_____ |

**50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| | $_____ | _____ | $_____ |

**51. Total of Part 8.**
Add lines 47 through 50. Copy the total to line 87.

$ 53,339.00

**52. Is a depreciation schedule available for any of the property listed in Part 8?**

☑ No

☐ Yes

**53. Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☑ No

☐ Yes

Debtor _____  Case number (if known)_____
TGP COMMUNICATIONS, LLC                       24-13938-MAM

Name

---

## Part 9:   Real property

54. **Does the debtor own or lease any real property?**

☑ No. Go to Part 10.

☐ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 | | $_____ | _____ | $_____ |
| 55.2 | | $_____ | _____ | $_____ |
| 55.3 | | $_____ | _____ | $_____ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$_____

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

## Part 10:   Intangibles and intellectual property

59. **Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets**<br>Trademark Rights to: The Gateway Pundit (www.thegatewaypundit.c | $_____ | _____ | Unknown<br>$_____ |
| 61. **Internet domain names and websites**<br>www.thegatewaypundit.com | $_____ | _____ | Unknown<br>$_____ |
| 62. **Licenses, franchises, and royalties** | $_____ | _____ | $_____ |
| 63. **Customer lists, mailing lists, or other compilations** | $_____ | _____ | $_____ |
| 64. **Other intangibles, or intellectual property** | $_____ | _____ | $_____ |
| 65. **Goodwill** | $_____ | _____ | $_____ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 0.00

---

Debtor  TGP COMMUNICATIONS, LLC
      Name

Case number *(if known)* 24-13938-MAM

---

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**

  ☑ No

  ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

  ☑ No

  ☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

  ☑ No

  ☐ Yes

---

## Part 11: All other assets

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

  ☐ No. Go to Part 12.

  ☑ Yes. Fill in the information below.

 

                                    **Current value of debtor's interest**

71. **Notes receivable**

Description (include name of obligor)

See continuation sheet      970,860.00  –  0.00  = ➡   $ 970,860.00

                          Total face amount      doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

                                  Tax year _____   $_____

                                  Tax year _____   $_____

                                  Tax year _____   $_____

73. **Interests in insurance policies or annuities**

                                         $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

**Nature of claim**       _____

**Amount requested**   $_____             $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

**Nature of claim**       _____

**Amount requested**   $_____             $_____

76. **Trusts, equitable or future interests in property**

                                           $_____

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

                                           $_____

                                           $_____

78. **Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.      $ 970,860.00

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

  ☑ No

  ☐ Yes

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) 24-13938-MAM |
|---|---|---|
| | Name | |

### Part 12: Summary

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 185,757.83 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 123,321.87 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 53,339.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* . ................................................➔ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 970,860.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ...........................91a. | $ 1,333,278.70 | + 91b. $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ................................................. $ 1,333,278.70     $ 1,333,278.70

| Debtor 1 | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | First Name    Middle Name    Last Name | | | |

## Continuation Sheet for Official Form 206 A/B

**3) Checking, savings, money market, or financial brokerage accounts**

| General description | Type of account | Last 4 digits of account number |
|---|---|---|
| US Bank | Checking | 3057 |
| Balance: 34,404.51 | | |
| Revolut Business | Checking | 1220 |
| Balance: 136,868.62 | | |
| US Bank | Checking | 0574 |
| Balance: 14,484.70 | | |

**14) Mutual funds or publicly traded stocks not included in Part 1**

| General description | Valuation method | Current value |
|---|---|---|
| Robinhood Crypto acct #1382 | | 7,116.53 |
| Robinhood acct #1307 | | 8,588.24 |
| Coinbase acct # | | Unknown |

**71) Notes receivable**

| General description | Total face amount | Doubtful or uncollectible amount | Current value |
|---|---|---|---|
| Loan Receivable – Shareholder | 799,860.00 | 0.00 | 799,860.00 |
| Due from Justice League | 150,000.00 | 0.00 | 150,000.00 |
| Loan Receivable – Joe Hoft | 21,000.00 | 0.00 | 21,000.00 |

**Fill in this information to identify the case:**

Debtor name: TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the: Southern District of Florida

Case number (If known): 24-13938-MAM

☐ Check if this is an amended filing

## Official Form 206D

# Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

1. **Do any creditors have claims secured by debtor's property?**
   ☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.
   ☐ Yes. Fill in all of the information below.

**Part 1:** List Creditors Who Have Secured Claims

2. **List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

|  | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|

**2.1** Creditor's name _____

Describe debtor's property that is subject to a lien

$_____    $_____

Creditor's mailing address _____

_____

Creditor's email address, if known _____

Describe the lien _____

Date debt was incurred _____

Is the creditor an insider or related party?
☐ No
☐ Yes

Last 4 digits of account number _____

Is anyone else liable on this claim?
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

Do multiple creditors have an interest in the same property?
☐ No
☐ Yes. Specify each creditor, including this creditor,

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

**2.2** Creditor's name _____

Describe debtor's property that is subject to a lien

$_____    $_____

Creditor's mailing address _____

_____

Creditor's email address, if known _____

Describe the lien _____

Date debt was incurred _____

Last 4 digits of account number _____

Is the creditor an insider or related party?
☐ No
☐ Yes

Is anyone else liable on this claim?
☐ No
☐ Yes. Fill out Schedule H: Codebtors (Official Form 206H).

Do multiple creditors have an interest in the same property?
☐ No
☐ Yes. Have you already specified the relative priority?
   ☐ No. Specify each creditor, including this creditor, and its relative priority.

☐ Yes. The relative priority of creditors is specified on lines _____

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

3. **Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.**   $_____

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | TGP COMMUNICATIONS, LLC |
| United States Bankruptcy Court for the: | Southern District of Florida |
| Case number (if known) | 24-13938-MAM |

☐ Check if this is an amended filing

Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims

12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

**Part 1:** List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   ☐ No. Go to Part 2.
   ☑ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

| | | Total claim | Priority amount |
|---|---|---|---|

**2.1** Priority creditor's name and mailing address
Internal Revenue Service
POB 7346
Philadelphia, PA, 19101-7346

As of the petition filing date, the claim is: $ Unknown    $
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
_____

Basis for the claim:
Taxes & Other Government Units

Last 4 digits of account number  _____

Is the claim subject to offset?
☑ No
☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( 8 )

**2.2** Priority creditor's name and mailing address

As of the petition filing date, the claim is: $_____    $_____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
_____

Basis for the claim:

Last 4 digits of account number  _____

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (_____)

**2.3** Priority creditor's name and mailing address

As of the petition filing date, the claim is: $_____    $_____
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Date or dates debt was incurred
_____

Basis for the claim:

Last 4 digits of account number  _____

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) (_____)

Debtor  TGP COMMUNICATIONS, LLC
Name

Case number (if known) 24-T3938-MAM

Case 9:24-cv-80992-MAM

| Part 2: | List All Creditors with **NONPRIORITY** Unsecured Claims |
|---|---|

3. **List in alphabetical order all of the creditors with nonpriority unsecured claims.** If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

Amount of claim

**3.1  Nonpriority creditor's name and mailing address**
Christopher Douglass
199 Clarkson Road

Ballwin, MO, 63011

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  Advertising

$ Unknown

**Date or dates debt was incurred**  _____

**Last 4 digits of account number**  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.2  Nonpriority creditor's name and mailing address**
Eric Coomer
c/o CAIN & SKARNULIS PLLC
P. O. Box 1064
Salida, CO, 81201

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

**Basis for the claim:**  Lawsuit

$ Unknown

**Date or dates debt was incurred**  _____

**Last 4 digits of account number**  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.3  Nonpriority creditor's name and mailing address**
James Kirk
947 CENTURY OAKS DR

Manchester, MO, 63021

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  Telephone / Internet services

$ 1,200.00

**Date or dates debt was incurred**  _____

**Last 4 digits of account number**  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.4  Nonpriority creditor's name and mailing address**
Jane Doe - A
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  Services

$ 1,162.37

**Date or dates debt was incurred**  _____

**Last 4 digits of account number**  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.5  Nonpriority creditor's name and mailing address**
Jane Doe - B
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  Services

$ Unknown

**Date or dates debt was incurred**  _____

**Last 4 digits of account number**  _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.6  Nonpriority creditor's name and mailing address**
Jane Doe - C
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:**  Services

$ 16,546.06

**Date or dates debt was incurred**  _____

**Last 4 digits of account number**  _____

Is the claim subject to offset?
☑ No
☐ Yes

Debtor  TOP COMMUNICATIONS, LLC

Name

Case number (*if known*) 9:24-13938-MAM

## Part 2:  Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.** 7  **Nonpriority creditor's name and mailing address**

Jane Doe - D
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 5,202.16

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**3.** 8  **Nonpriority creditor's name and mailing address**

Jane Doe - E
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Suppliers or Vendors

$ 979.26

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**3.** 9  **Nonpriority creditor's name and mailing address**

Jane Doe - F
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 10,041.70

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**3.** 10  **Nonpriority creditor's name and mailing address**

Jane Doe - H
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ Unknown

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

---

**3.** 11  **Nonpriority creditor's name and mailing address**

Jane Doe - I
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

**As of the petition filing date, the claim is:**
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 1,376.21

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

**Is the claim subject to offset?**
☑ No
☐ Yes

---

Debtor    TGP COMMUNICATIONS, LLC                                          Case number (if known)    9:24-13956-MAM

    Name

| **Part 2:** | **Additional Page** |

**Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.**

**Amount of claim**

**3.** **12** Nonpriority creditor's name and mailing address

Jane Doe - J
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

$ 972.51

**Is the claim subject to offset?**
☒ No
☐ Yes

---

**3.** **13** Nonpriority creditor's name and mailing address

Jane Doe - K
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

$ Unknown

**Is the claim subject to offset?**
☒ No
☐ Yes

---

**3.** **14** Nonpriority creditor's name and mailing address

Jez Morano
8750 South Ocean Drive
Unit 534
Jensen Beach, FL, 34957

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Telephone / Internet services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

$ 11,062.06

**Is the claim subject to offset?**
☒ No
☐ Yes

---

**3.** **15** Nonpriority creditor's name and mailing address

John Doe - A
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

$ 1,895.56

**Is the claim subject to offset?**
☒ No
☐ Yes

---

**3.** **16** Nonpriority creditor's name and mailing address

John Doe - AA
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

**Date or dates debt was incurred** _____

**Last 4 digits of account number** _____

$ 4,492.58

**Is the claim subject to offset?**
☒ No
☐ Yes

---

Debtor  GP COMMUNICATIONS, LLC
    Name

Case number *(if known)*  24-13958 MAM

## Part 2:    Additional Page

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

**3. 17**    Nonpriority creditor's name and mailing address

John Doe - B
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ Unknown

Date or dates debt was incurred    _____

Last 4 digits of account number    _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3. 18**    Nonpriority creditor's name and mailing address

John Doe - BB
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 2,293.59

Date or dates debt was incurred    _____

Last 4 digits of account number    _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3. 19**    Nonpriority creditor's name and mailing address

John Doe - C
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 6,001.66

Date or dates debt was incurred    _____

Last 4 digits of account number    _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3. 20**    Nonpriority creditor's name and mailing address

John Doe - CC
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 3,104.19

Date or dates debt was incurred    _____

Last 4 digits of account number    _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3. 21**    Nonpriority creditor's name and mailing address

John Doe - D
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ Unknown

Date or dates debt was incurred    _____

Last 4 digits of account number    _____

Is the claim subject to offset?
☑ No
☐ Yes

---

Debtor __GP COMMUNICATIONS, LLC__  Case number (if known) __9:24-73938 MAM__
    Name

| Part 2: | Additional Page |
|---|---|

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

Amount of claim

**3.22**   Nonpriority creditor's name and mailing address

John Doe - E
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____
Last 4 digits of account number _____

$ 80.45

**3.23**   Nonpriority creditor's name and mailing address

John Doe - F
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Suppliers or Vendors

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____
Last 4 digits of account number _____

$ Unknown

**3.24**   Nonpriority creditor's name and mailing address

John Doe - FF
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____
Last 4 digits of account number _____

$ 1,820.94

**3.25**   Nonpriority creditor's name and mailing address

John Doe - G
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____
Last 4 digits of account number _____

$ Unknown

**3.26**   Nonpriority creditor's name and mailing address

John Doe - GG
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
Check all that apply.
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim:

Is the claim subject to offset?
☑ No
☐ Yes

Date or dates debt was incurred _____
Last 4 digits of account number _____

$ 50.38

Debtor GP COMMUNICATIONS, LLC
Name

| Part 2: | Additional Page |

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page.

**Amount of claim**

**3.27** Nonpriority creditor's name and mailing address

John Doe - H
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 730.58

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.28** Nonpriority creditor's name and mailing address

John Doe - I
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 837.02

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.29** Nonpriority creditor's name and mailing address

John Doe - J
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ Unknown

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.30** Nonpriority creditor's name and mailing address

John Doe - M
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 1,399.83

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

**3.31** Nonpriority creditor's name and mailing address

John Doe - N
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

$ 417.74

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

Debtor TGP COMMUNICATIONS, LLC
     Name

Case number *(if known)*

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.32** Nonpriority creditor's name and mailing address

John Doe - O
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Suppliers or Vendors

$ 2,540.50

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.33** Nonpriority creditor's name and mailing address

John Doe - Q
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Editor in Chief

$ 3,627.06

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.34** Nonpriority creditor's name and mailing address

John Doe - R
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 5,178.55

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.35** Nonpriority creditor's name and mailing address

John Doe - S
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ 2,191.16

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.36** Nonpriority creditor's name and mailing address

John Doe - T
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Services

$ Unknown

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

Debtor **GIP COMMUNICATIONS, LLC**
Name

Case number *(if known)* **9:24-79558 MAM**

## Part 2: Additional Page

| | Amount of claim |
|---|---|
| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | |

**3.37** Nonpriority creditor's name and mailing address

John Doe - U
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

**$ Unknown**

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.38** Nonpriority creditor's name and mailing address

John Doe - V
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

**$ Unknown**

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.39** Nonpriority creditor's name and mailing address

John Doe - W
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

**$ 2,194.82**

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.40** Nonpriority creditor's name and mailing address

John Doe - Y
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

**$ 2,755.40**

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

**3.41** Nonpriority creditor's name and mailing address

John Doe - Z
c/o Jonathan Burns
POB 191250
Saint Louis, MO, 63119

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

Basis for the claim: Services

**$ 627.27**

Date or dates debt was incurred _____

Last 4 digits of account number _____

Is the claim subject to offset?
☑ No
☐ Yes

---

Debtor TGP COMMUNICATIONS, LLC
Name

Case number (if known) 9:24-cv-80853-MAM

## Part 2: Additional Page

| Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional NONPRIORITY creditors exist, do not fill out or submit this page. | Amount of claim |
|---|---|

**3.42** Nonpriority creditor's name and mailing address

Kellie Poen
344 Fallon Pkwy

Saint Peters, MO, 63376

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Suppliers or Vendors

**Is the claim subject to offset?**
☑ No
☐ Yes

$ 2,000.00

Date or dates debt was incurred _____

Last 4 digits of account number _____

**3.43** Nonpriority creditor's name and mailing address

Ruby Freeman
c/o Dowd Bennett LLP
7733 Forsyth Blvd, Suite 1900
Saint Louis, MO, 63105

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**
☑ No
☐ Yes

$ Unknown

Date or dates debt was incurred _____

Last 4 digits of account number _____

**3.44** Nonpriority creditor's name and mailing address

Tammie Gassawsy
19274 Babler Forest Rd

Chesterfield, MO, 63005

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Accountant

**Is the claim subject to offset?**
☑ No
☐ Yes

$ 815.00

Date or dates debt was incurred _____

Last 4 digits of account number _____

**3.45** Nonpriority creditor's name and mailing address

Ted Slater
2820 N PINAL AVE
STE 12 PMB 209
CASA GRANDE, AZ, 85122

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

**Basis for the claim:** Telephone / Internet services

**Is the claim subject to offset?**
☑ No
☐ Yes

$ 9,000.00

Date or dates debt was incurred _____

Last 4 digits of account number _____

**3.46** Nonpriority creditor's name and mailing address

Wandrea Moss
c/o Dowd Bennett LLP
7733 Forsyth Blvd, Suite 1900
Saint Louis, MO, 63105

As of the petition filing date, the claim is:
*Check all that apply.*
☑ Contingent
☑ Unliquidated
☑ Disputed

**Basis for the claim:**

**Is the claim subject to offset?**
☑ No
☐ Yes

$ Unknown

Date or dates debt was incurred _____

Last 4 digits of account number _____

Debtor  For COMMUNICATIONS, LLC

Name

Case number *(if known)*

| Part 3: | List Others to Be Notified About Unsecured Claims |
|---|---|

4.  **List in alphabetical order any others who must be notified for claims listed in Parts 1 and 2.** Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for unsecured creditors.

   **If no others need to be notified for the debts listed in Parts 1 and 2, do not fill out or submit this page. If additional pages are needed, copy the next page.**

| | Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|---|
| 4.1. | Eric Coomer<br>c/o RECHTKORNFELD PC<br>1600 Stout Street, Suite 1400<br>Denver, CO, 80202 | Line 3.2<br>☐ Not listed. Explain: | _____ |
| 4.2. | Ruby Freeman<br>c/o YALE LAW SCHOOL<br>127 Wall Street, P.O. Box 208215<br>New Haven, CT, 06520 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.3. | Ruby Freeman<br>c/o Von A. DuBose, Esq.<br>75 14th Street, NE, Suite 2110<br>Atlanta, GA, 30309 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.4. | Ruby Freeman<br>c/o UNITED TO PROTECT DEMOCRACY<br>15 Main St., Suite 312<br>Watertown, MA, 02472 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 41. | Ruby Freeman<br>c/o UNITED TO PROTECT DEMOCRACY<br>2020 Pennsylvania Ave. NW, Suite 163<br>Washington, DC, 20006 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.5. | Ruby Freeman<br>c/o UNITED TO PROTECT DEMOCRACY<br>82 Nassau Street, #601<br>New York, NY, 10038 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.6. | Ruby Freeman<br>c/o Charles Smith, Esq. and Michael Morrell, Esq.<br>155 N. Wacker Drive<br>Chicago, IL, 60606 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.7. | Ruby Freeman<br>c/o Mary E. Grinman, Esq.<br>500 Boylston Street<br>Boston, MA, 02116 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.8. | Ruby Freeman<br>c/o Aanchal Chugh, Esq.<br>1440 New York Avenue, N.W.<br>Washington, DC, 20005 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.9. | Ruby Freeman<br>c/o Eliza Simons, Esq.<br>One Manhattan West<br>New York, NY, 10001 | Line 3.43<br>☐ Not listed. Explain | _____ |
| 4.10. | Wandrea Moss<br>c/o UNITED TO PROTECT DEMOCRACY<br>15 Main St., Suite 312<br>Watertown, MA, 02472 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.11. | Wandrea Moss<br>c/o YALE LAW SCHOOL<br>127 Wall Street, P.O. Box 208215<br>New Haven, CT, 06520 | Line 3.46<br>☐ Not listed. Explain | _____ |

Debtor    TGP COMMUNICATIONS, LLC                                    Case number (if known)  9:24-13938-MAM
          Name

| Part 3: | Additional Page for Others to Be Notified About Unsecured Claims |
|---------|------------------------------------------------------------------|

| Name and mailing address | On which line in Part 1 or Part 2 is the related creditor (if any) listed? | Last 4 digits of account number, if any |
|---|---|---|
| 4.__13 Wandrea Moss<br>c/o Von A. DuBose, Esq.<br>75 14th Street, NE, Suite 2110<br>Atlanta, GA, 30309 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__14 Wandrea Moss<br>c/o Mary E. Grinman, Esq.<br>500 Boylston Street<br>Boston, MA, 02116 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__15 Wandrea Moss<br>c/o Charles Smith, Esq. and Michael Morrell, Esq.<br>155 N. Wacker Drive<br>Chicago, IL, 60606 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__16 Wandrea Moss<br>c/o UNITED TO PROTECT DEMOCRACY<br>2020 Pennsylvania Ave. NW, Suite 163<br>Washington, DC, 20006 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__17 Wandrea Moss<br>c/o Aanchal Chugh, Esq.<br>1440 New York Avenue, N.W.<br>Washington, DC, 20005 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__18 Wandrea Moss<br>c/o UNITED TO PROTECT DEMOCRACY<br>82 Nassau Street, #601<br>New York, NY, 10038 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__19 Wandrea Moss<br>c/o Eliza Simons, Esq.<br>One Manhattan West<br>New York, NY, 10001 | Line 3.46<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain | _____ |
| 4.__ | Line ____<br>☐ Not listed. Explain _____ | _____ |

Name

## Part 4:    Total Amounts of the Priority and Nonpriority Unsecured Claims

**5.** **Add the amounts of priority and nonpriority unsecured claims.**

|  |  | Total of claim amounts |
|---|---|---|
| 5a. **Total claims from Part 1** | 5a. | $ 0.00 |
| 5b. **Total claims from Part 2** | 5b. **+** | $ 102,596.61 |
| 5c. **Total of Parts 1 and 2** <br> Lines 5a + 5b = 5c. | 5c. | $ 102,596.61 |

**Fill in this information to identify the case:**

Debtor name TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the: Southern District of Florida

Case number (If known): 24-13938-MAM     Chapter 11

☐ Check if this is an amended filing

## Official Form 206G

# Schedule G: Executory Contracts and Unexpired Leases     12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

■ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☐ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|
| **2.1** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.2** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.3** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.4** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |
| **2.5** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br><br>List the contract number of any government contract | |

**Fill in this information to identify the case:**

Debtor name ___TGP COMMUNICATIONS, LLC___

United States Bankruptcy Court for the: ___Southern District of Florida___

Case number (If known): ___24-13938-MAM___

☐ Check if this is an amended filing

## Official Form 206H

## Schedule H: Codebtors                                                             12/15

Be as complete and accurate as possible. If more space is needed, copy the Additional Page, numbering the entries consecutively. Attach the Additional Page to this page.

---

1. **Does the debtor have any codebtors?**

   ☑ No. Check this box and submit this form to the court with the debtor's other schedules. Nothing else needs to be reported on this form.

   ☐ Yes

2. **In Column 1, list as codebtors all of the people or entities who are also liable for any debts listed by the debtor in the schedules of creditors, *Schedules D-G*.** Include all guarantors and co-obligors. In Column 2, identify the creditor to whom the debt is owed and each schedule on which the creditor is listed. If the codebtor is liable on a debt to more than one creditor, list each creditor separately in Column 2.

| *Column 1:* **Codebtor** | | *Column 2:* **Creditor** | |
|---|---|---|---|
| Name | Mailing address | Name | Check all schedules that apply: |
| 2.1 | | | ☐ D ☐ E/F ☐ G |
| 2.2 | | | ☐ D ☐ E/F ☐ G |
| 2.3 | | | ☐ D ☐ E/F ☐ G |
| 2.4 | | | ☐ D ☐ E/F ☐ G |
| 2.5 | | | ☐ D ☐ E/F ☐ G |
| 2.6 | | | ☐ D ☐ E/F ☐ G |

**Fill in this information to identify the case:**

Debtor name ___TGP COMMUNICATIONS, LLC___

United States Bankruptcy Court for the: ___Southern District of Florida___ District of _____
(State)

Case number (If known): ___24-13938-MAM___

☐ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy 04/22

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

| **Part 1:** | **Income** |
| --- | --- |

**1. Gross revenue from business**

☐ None

| Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | | | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
| --- | --- | --- | --- | --- | --- |
| **From the beginning of the fiscal year to filing date:** | From 04/22/2024<br>MM / DD / YYYY | to | Filing date | ☑ Operating a business<br>☐ Other | $ 725,128.81 |
| **For prior year:** | From 01/01/2023<br>MM / DD / YYYY | to | 12/31/2023<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 3,097,988.38 |
| **For the year before that:** | From 01/01/2022<br>MM / DD / YYYY | to | 12/31/2022<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 2,860,691.00 |

**2. Non-business revenue**

Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

☑ None

| | | | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
| --- | --- | --- | --- | --- | --- |
| **From the beginning of the fiscal year to filing date:** | From _____<br>MM / DD / YYYY | to | Filing date | _____ | $ _____ |
| **For prior year:** | From _____<br>MM / DD / YYYY | to | _____<br>MM / DD / YYYY | _____ | $ _____ |
| **For the year before that:** | From _____<br>MM / DD / YYYY | to | _____<br>MM / DD / YYYY | _____ | $ _____ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

**Part 2:** **List Certain Transfers Made Before Filing for Bankruptcy**

3. **Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/23 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None

| | Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer *Check all that apply* |
|---|---|---|---|---|
| 3.1. | John Doe - R | 3/1/2024 | $ 15,535.66 | ☐ Secured debt |
| | Creditor's name | 4/1/2024 | | ☐ Unsecured loan repayments |
| | c/o Jonathan Burns | | | ☐ Suppliers or vendors |
| | POB 191250 | | | ☑ Services |
| | Saint Louis, MO 63119 | | | ☐ Other _____ |
| 3.2. | John Doe - Q | 3/1/2024 | $ 10,881.17 | ☐ Secured debt |
| | Creditor's name | 4/1/2024 | | ☐ Unsecured loan repayments |
| | c/o Jonathan Burns | | | ☐ Suppliers or vendors |
| | POB 191250 | | | ☐ Services |
| | Saint Louis, MO 63119 | | | ☑ Other Other |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None

| | Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | _____ | _____ | $ _____ | |
| | Insider's name | _____ | | |
| | | _____ | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 4.2. | _____ | _____ | $ _____ | |
| | Insider's name | _____ | | |
| | | _____ | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

---

| Debtor | TGP COMMUNICATIONS, LLC | | Case number (if known) | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|---|
| 5.1. | _____<br>Creditor's name | | _____ | $_____ |
| 5.2. | _____<br>Creditor's name | | _____ | $_____ |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| | Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|---|
| | _____<br>Creditor's name | | _____ | $_____ |
| | | Last 4 digits of account number: XXXX– _____ | | |

---

**Part 3:  Legal Actions or Assignments**

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | ERIC COOMER V DONALD J. TRUMP FOR PRESIDENT, INC., et al<br><br>**Case number**<br>2020CV34319 | Defamation and Intentional Infliction of Emotional Distress | Denver District Court<br><br>1437 Bannock St<br>Denver, CO 80202 | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| 7.2. | RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT. TGP COMMUNICATIONS. LLC<br><br>**Case number**<br>2122-CC09815-01 | Defamation and Intentional Inflict | St. Louis Circuit Court<br><br>10 N. Tucker Blvd<br>Saint Louis, MO 63101 | ☑ Pending<br>☐ On appeal<br>☐ Concluded |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| Custodian's name and address | Description of the property | Value |
|---|---|---|
| | | $_____ |
| Custodian's name | **Case title** | **Court name and address** |
| | _____ | _____ |
| | | Name |
| | **Case number** | |
| | _____ | |
| | **Date of order or assignment** | |
| | _____ | |

## Part 4: Certain Gifts and Charitable Contributions

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|---|---|---|---|
| 9.1. Recipient's name | | _____ | $_____ |
| | | _____ | $_____ |
| Recipient's relationship to debtor | | | |
| _____ | | | |
| 9.2. Recipient's name | | _____ | $_____ |
| | | _____ | $_____ |
| Recipient's relationship to debtor | | | |
| _____ | | | |

## Part 5: Certain Losses

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|---|---|---|---|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | | |
| | _____ | _____ | $_____ |

Debtor   TGP COMMUNICATIONS, LLC
         _____
         Name

Case number (*if known*)  24-13938-MAM

---

**Part 6:    Certain Payments or Transfers**

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☐ None

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.1. | HOUSTON RODERMAN, PLLC | FEE RETAINER FOR BANKRUPTCY [RECEIVED $7,500.00 COST RETAINER] | 04/16/2024 | $ 50,000.00 |

**Address**

633 S. Andrews Avenue
Suite 500
Fort Lauderdale, FL 33301

**Email or website address**

_____

**Who made the payment, if not debtor?**

_____

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|---|---|---|---|---|
| 11.2. | _____ | | _____ | $_____ |

**Address**

_____

**Email or website address**

_____

**Who made the payment, if not debtor?**

_____

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.
Do not include transfers already listed on this statement.

☑ None

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|---|---|---|---|
| _____ | _____ | _____ | $_____ |

**Trustee**

_____

---

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | | _____ | $ _____ |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 13.2. | Who received transfer? | | _____ | $ _____ |
| | _____ | | | |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

| **Part 7:** | **Previous Locations** |
|---|---|

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| | Address | | Dates of occupancy | |
|---|---|---|---|---|
| 14.1. | 5105 LINDELL BLVD<br>Saint Louis, MO 63108 | From | 4/2019 | To | 10/2021 |
| 14.2. | | From | _____ | To | _____ |

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |

---

**Part 8:**    **Health Care Bankruptcies**

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| | **Facility name and address** | **Nature of the business operation, including type of services the debtor provides** | **If debtor provides meals and housing, number of patients in debtor's care** |
|---|---|---|---|
| 15.1. | _____<br>Facility name | | _____ |
| | | **Location where patient records are maintained** (if different from facility address). If electronic, identify any service provider. | **How are records kept?**<br><br>*Check all that apply:*<br><br>☐ Electronically<br>☐ Paper |

| | **Facility name and address** | **Nature of the business operation, including type of services the debtor provides** | **If debtor provides meals and housing, number of patients in debtor's care** |
|---|---|---|---|
| 15.2. | _____<br>Facility name | | _____ |
| | | **Location where patient records are maintained** (if different from facility address). If electronic, identify any service provider. | **How are records kept?**<br><br>*Check all that apply:*<br><br>☐ Electronically<br>☐ Paper |

---

**Part 9:**    **Personally Identifiable Information**

**16.** Does the debtor collect and retain personally identifiable information of customers?

☑ No.

☐ Yes. State the nature of the information collected and retained. _____

     Does the debtor have a privacy policy about that information?

     ☐ No

     ☐ Yes

**17.** Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?

☑ No. Go to Part 10.

     Yes. Does the debtor serve as plan administrator?

     ☐ No. Go to Part 10.

     ☐ Yes. Fill in below:

| **Name of plan** | **Employer identification number of the plan** |
|---|---|
| _____ | EIN: _____ |

     Has the plan been terminated?

     ☐ No

     ☐ Yes

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) 24-13938-MAM |
|---|---|---|
| | Name | |

**Part 10:** Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| | Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | _____<br>Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |
| 18.2. | _____<br>Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name<br><br><br>Address | | | ☐ No<br>☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____<br>Name<br><br><br>Address | | | ☐ No<br>☐ Yes |

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* 24-13938-MAM |
|--------|--------------------------|----------------------------------------|
| | Name | |

## Part 11: Property the Debtor Holds or Controls That the Debtor Does Not Own

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|---------------------------|--------------------------|-----------------------------|-------|
| _____ | | | $_____ |
| Name | | | |

## Part 12: Details About Environmental Information

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).
- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.
- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|------------|----------------------------------|---------------------|----------------|
| _____ | _____ | | ☐ Pending |
| **Case number** | Name | | ☐ On appeal |
| _____ | | | ☐ Concluded |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|------------------------|-------------------------------------|------------------------------|----------------|
| _____ | _____ | | _____ |
| Name | Name | | |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| Name | Name | | |

---

**Part 13:     Details About the Debtor's Business or Connections to Any Business**

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

| | Business name and address | Describe the nature of the business | Employer Identification number Do not include Social Security number or ITIN. |
|---|---|---|---|
| 25.1. | Name | | EIN: _____ Dates business existed From _____  To _____ |
| 25.2. | Name | | EIN: _____ Dates business existed From _____  To _____ |
| 25.3. | Name | | EIN: _____ Dates business existed From _____  To _____ |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

### 26. Books, records, and financial statements

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| | **Name and address** | **Dates of service** |
|---|---|---|
| 26a.1. | AP Accounting & Tax | From _____ |
| | Name | To _____ |
| | 19274 Babler Forest Rd, Wildwood, MO 63005 | |

| | **Name and address** | **Dates of service** |
|---|---|---|
| 26a.2. | | From _____ |
| | Name | To _____ |

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

| | **Name and address** | **Dates of service** |
|---|---|---|
| 26b.1. | | From _____ |
| | Name | To _____ |

| | **Name and address** | **Dates of service** |
|---|---|---|
| 26b.2. | | From _____ |
| | Name | To _____ |

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| | **Name and address** | **If any books of account and records are unavailable, explain why** |
|---|---|---|
| 26c.1. | AP Accounting & Tax | |
| | Name | |
| | 19274 Babler Forest Rd, Wildwood, MO 63005 | |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) 24-13938-MAM |
|---|---|---|
| | Name | |

**Name and address** | **If any books of account and records are unavailable, explain why**

26c.2. _____
Name

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

**Name and address**

26d.1. _____
Name

**Name and address**

26d.2. _____
Name

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No

☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $ _____ |

**Name and address of the person who has possession of inventory records**

27.1. _____
Name

Official Form 207      **Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**      page **12**

| Debtor | TGP COMMUNICATIONS, LLC | | Case number (if known) | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| | | $ |

Name and address of the person who has possession of inventory records

27.2. _____
Name

28. **List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.**

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| James Hoft | 1820 NE JENSEN BEACH BLVD. UNIT 1120, Jensen Beach, FL 34957 | Manager | 100 |

29. **Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?**

☑ No
☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |

30. **Payments, distributions, or withdrawals credited or given to insiders**

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|
| 30.1. _____<br>Name | _____ | _____ | |
| | | _____ | |
| | | _____ | |
| Relationship to debtor | | _____ | |

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|--------|-------------------------|-------------------------|--------------|
| | Name | | |

**Name and address of recipient**

30.2  _____   _____

Name _____   _____

_____   _____

_____

**Relationship to debtor**   _____

_____

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No

☐ Yes. Identify below.

**Name of the parent corporation**    **Employer Identification number of the parent corporation**

_____   EIN: _____

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No

☐ Yes. Identify below.

**Name of the pension fund**    **Employer Identification number of the pension fund**

_____   EIN: _____

**Part 14:    Signature and Declaration**

   **WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

   I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

   I declare under penalty of perjury that the foregoing is true and correct.

   Executed on   05/22/2024
          MM / DD / YYYY

   ✖  /s/ James Hoft _____    Printed name   James Hoft
   Signature of individual signing on behalf of the debtor

   Position or relationship to debtor   Manager

   **Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

   ☐ No
   ☑ Yes

| Debtor Name | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |

### Continuation Sheet for Official Form 207

**3) Certain payments or transfers to creditors within 90 days before filing this case**

| | | |
|---|---|---|
| Jez Morano, 8750 South Ocean Drive Unit 534, Jensen Beach, FL 34957 | $33,186.17 | Telephone / internet services |
| John Doe – Y, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $8,784.42 | Services |
| Jane Doe – C, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $49,638.17 | Services |
| John Doe – CC, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $9,812.57 | Services |
| CONRADSON RENTALS LLC, | $17,714.64 | |
| CASSANDRA FAIRBANKS, | $15,606.48 | |
| JIM HOFT, | $17,280.00 | |
| JUSTICE LEAGUE, | $95,000.00 | |
| O'MALLEY McCULLOCH, LLC, | $30,125.09 | |
| ORCHID GROVE MEDIA, | $27,000.00 | |
| SLIGHTLY OFFENSIVE INC, | $13,477.73 | |

**7) Legal Actions**

RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT, TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT

2122–CC09815–01

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

St. Louis Circuit Court

10 N. Tucker Blvd, Saint Louis, MO 63101

Pending

–––––––

JAMES HOFT, JOSEPH HOFT AND TGP COMMUNICATIONS LLC d/b/a THE GATEWAY PUNDIT V. GILBERT C. HUMES et al

24CV–004696

Fulton Superior Court Clerk

Debtor Name  TGP COMMUNICATIONS, LLC                                    Case number *(if known)*  24-13938-MAM

## Continuation Sheet for Official Form 207

**136 Pryor St SW, Atlanta, GA 30303**

**Pending**

-------

**Fill in this information to identify the case and this filing:**

Debtor Name ___TGP COMMUNICATIONS, LLC___

United States Bankruptcy Court for the: ___Southern District of Florida___

Case number (*If known*): ___24-13938-MAM___

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☑ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☑ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☑ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☑ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☑ *Schedule H: Codebtors* (Official Form 206H)

☑ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐ Amended *Schedule* _____

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ *Other document that requires a declaration* _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___05/22/2024___          ✘ /s/ James Hoft
                MM / DD / YYYY          _____
                                        Signature of individual signing on behalf of debtor

                                        James Hoft
                                        _____
                                        Printed name

                                        Manager
                                        _____
                                        Position or relationship to debtor

SOUTHERN DISTRICT OF FLORIDA

In re:

TGP COMMUNICATIONS, LLC                          Case No. 24-13938-MAM
                                                 Chapter 11

          Debtor.
_____/

**DEBTOR'S NOTICE OF COMPLIANCE WITH REQUIREMENTS FOR
AMENDING CREDITOR INFORMATION**

This notice is being filed in accordance with Local Rules 1007-2(B), 1009-1(D), or 1019-1(B) upon the filing of an amendment to the debtor's lists, schedules or statements, pursuant to Bankruptcy Rules 1007, 1009, or 1019.   I certify that:

[  ]   The paper filed **adds** creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being added).   I have:
       1.   remitted the required fee (unless the paper is a Bankruptcy Rule 1019(5) report);
       2.   provided the court with a supplemental matrix diskette **containing only the added creditors** or electronically uploaded the added creditors in CM/ECF;
       3.   provided notice to affected parties, including service of a copy of this notice and
             a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)]; and
       4.   filed an amended schedule(s) and summary of schedules.

[  ]   The paper filed **deletes** a creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being deleted)**.   I have:**
       1.   remitted the required fee;
       2.   provided notice to affected parties and
       3.   filed an amended schedule(s) and summary of schedules.

[  ]   The paper filed **corrects** the name and/or address of a creditor(s) as reflected on the <u>attached list</u>.   **I have**:
       1.   provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)] and
       2.   filed an amended schedule(s) or other paper.

[  ]   The paper filed **corrects** schedule D, E or F amount(s) or classification(s).   **I have:**
       1.   remitted the required fee;
       2.   provided notice to affected parties and
       3.   filed an amended schedule(s) and summary of schedules.

[ X  ]   None of the above apply. The paper filed does not require an additional fee, a supplemental matrix, or notice to affected parties. It ☐ does X does not require the filing of an amended schedule and summary of schedules.

I also certify that, if required to be filed by the Bankruptcy Rules, the official form "Declaration Concerning Debtor's Schedules" has been signed by each debtor as required by Local Rules 1007-2(B), 1009-1(A)(2) and (D)(1), or 1019-1(B) and, if filed electronically without imaged signatures, a local form "Declaration Under Penalty of Perjury to Accompany Petitions, Schedules and Statements Filed Electronically" accompanied the filing of the document.

Dated:   5/22/2024
Bart A. Houston
_____                    _____
Attorney for Debtor (or Debtor, if pro se)          Joint Debtor (if applicable)

  TGP COMMUNICATIONS, LLC
_____                    _____
Print Name                                          Address

  623636
_____                    _____
Florida Bar Number                                  Phone Number

# Exhibit 16

AMENDED

**Fill in this information to identify the case:**

Debtor name    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:    Southern District of Florida    District of _____
                                                                                    (State)

Case number (If known):    24-13938-MAM

☑ Check if this is an amended filing

# Official Form 206Sum

## Summary of Assets and Liabilities for Non-Individuals                    **12/15**

---

### Part 1:    Summary of Assets

1. *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

   1a. **Real property:**
   Copy line 88 from *Schedule A/B* ....................................................................    $ _____ 0.00

   1b. **Total personal property:**
   Copy line 91A from *Schedule A/B* ...................................................................    $ _____ 2,323,996.76

   1c. **Total of all property:**
   Copy line 92 from *Schedule A/B* .....................................................................    $ _____ 2,323,996.76

---

### Part 2:    Summary of Liabilities

2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
   Copy the total dollar amount listed in Column A, *Amount of claim*, from line 3 of *Schedule D* ...............................    $ _____ 0.00

3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

   3a. **Total claim amounts of priority unsecured claims:**
   Copy the total claims from Part 1 from line 6a of *Schedule E/F* ...........................................    $ _____ 0.00

   3b. **Total amount of claims of nonpriority amount of unsecured claims:**
   Copy the total of the amount of claims from Part 2 from line 6b of *Schedule E/F* ...............................    +$ _____ 102,596.61

4. **Total liabilities** .....................................................................................................................................    $ _____ 102,596.61
   Lines 2 + 3a + 3b

**Fill in this information to identify the case:**

Debtor name    TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the:  Southern District of Florida

Case number (if known):  24-13938-MAM

☐ Check if this is an amended filing

Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property

**12/15**

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

## Part 1: Cash and cash equivalents

1. **Does the debtor have any cash or cash equivalents?**

☐ No. Go to Part 2.
☑ Yes. Fill in the information below.

| All cash or cash equivalents owned or controlled by the debtor | Current value of debtor's interest |
|---|---|

2. **Cash on hand** — $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

| | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
|---|---|---|---|---|
| 3.1. | MIDFLORIDA Credit union | Checking | 2 6 1 9 | $ 0.00 |
| 3.2. | See continuation sheet | | | $ 185,757.83 |

4. **Other cash equivalents** *(Identify all)*

| 4.1. | Coinbase (Cryptocurrency / Digital Asset) | $ 1,637.15 |
| 4.2. | | $ |

5. **Total of Part 1**

Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.    $ 187,394.98

## Part 2: Deposits and prepayments

6. **Does the debtor have any deposits or prepayments?**

☑ No. Go to Part 3.
☐ Yes. Fill in the information below.

| | Current value of debtor's interest |
|---|---|

7. **Deposits, including security deposits and utility deposits**

Description, including name of holder of deposit

| 7.1. | | $ |
| 7.2. | | $ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) 24-13938-MAM |
|---|---|---|
| | Name | |

**8. Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1._____ $_____

8.2._____ $_____

**9. Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81.                                    $_____

---

### Part 3: Accounts receivable

**10. Does the debtor have any accounts receivable?**

☑ No. Go to Part 4.

☐ Yes. Fill in the information below.

Current value of debtor's interest

**11. Accounts receivable**

11a. 90 days old or less: _____ – _____ = ........➔     $_____
                            face amount          doubtful or uncollectible accounts

11b. Over 90 days old: _____ – _____ = ........➔     $_____
                            face amount          doubtful or uncollectible accounts

**12. Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.          $_____

---

### Part 4: Investments

**13. Does the debtor own any investments?**

☐ No. Go to Part 5.

☑ Yes. Fill in the information below.

| | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|

**14. Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. Robinhood Crypto acct #1382 (currency investment)   _____   $ 7,116.53

14.2. See continuation sheet                               _____   $ 1,105,286.25

**15. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:                                    % of ownership:

15.1._____   _____%   _____   $_____

15.2._____   _____%   _____   $_____

**16. Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1._____   _____   $_____

16.2._____   _____   $_____

**17. Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.                        $ 1,112,402.78

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

## Part 5: Inventory, excluding agriculture assets

18. Does the debtor own any inventory (excluding agriculture assets)?

☑ No. Go to Part 6.

☐ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| **19. Raw materials** | | | | |
| _____ | ___/___/___  MM / DD / YYYY | $_____ | _____ | $_____ |
| **20. Work in progress** | | | | |
| _____ | ___/___/___  MM / DD / YYYY | $_____ | _____ | $_____ |
| **21. Finished goods, including goods held for resale** | | | | |
| _____ | ___/___/___  MM / DD / YYYY | $_____ | _____ | $_____ |
| **22. Other inventory or supplies** | | | | |
| _____ | ___/___/___  MM / DD / YYYY | $_____ | _____ | $_____ |

**23. Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

$_____

**24. Is any of the property listed in Part 5 perishable?**

☐ No

☐ Yes

**25. Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value _____ Valuation method _____ Current value _____

**26. Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☐ No

☐ Yes

## Part 6: Farming and fishing-related assets (other than titled motor vehicles and land)

27. Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **28. Crops—either planted or harvested** | | | |
| _____ | $_____ | _____ | $_____ |
| **29. Farm animals** Examples: Livestock, poultry, farm-raised fish | | | |
| _____ | $_____ | _____ | $_____ |
| **30. Farm machinery and equipment** (Other than titled motor vehicles) | | | |
| _____ | $_____ | _____ | $_____ |
| **31. Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $_____ | _____ | $_____ |
| **32. Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $_____ | _____ | $_____ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$_____

34. **Is the debtor a member of an agricultural cooperative?**

☐ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

    ☐ No

    ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____ Valuation method _____ Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

**Part 7:** Office furniture, fixtures, and equipment; and collectibles

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☑ No. Go to Part 8.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** | $_____ | _____ | $_____ |
| 40. **Office fixtures** | $_____ | _____ | $_____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** | $_____ | _____ | $_____ |
| 42. **Collectibles** Examples: Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 _____ | $_____ | _____ | $_____ |
| 42.2 _____ | $_____ | _____ | $_____ |
| 42.3 _____ | $_____ | · $_____ |

43. **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$_____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☐ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☐ No

☐ Yes

Debtor  TGP COMMUNICATIONS, LLC
     Name

Case number *(if known)*  24-13938-MAM

---

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.

☑ Yes. Fill in the information below.

| **General description** Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | **Net book value of debtor's interest** (Where available) | **Valuation method used for current value** | **Current value of debtor's interest** |
|---|---|---|---|

**47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1   2021 Porsche Cayenne VIN#WP1AA2AY4MDA01232 | $_____ | _____ | $ 53,339.00 |
| 47.2 _____ | $_____ | _____ | $_____ |
| 47.3 _____ | $_____ | _____ | $_____ |
| 47.4 _____ | $_____ | _____ | $_____ |

**48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 _____ | $_____ | _____ | $_____ |
| 48.2 _____ | $_____ | _____ | $_____ |

**49. Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 _____ | $_____ | _____ | $_____ |
| 49.2 _____ | $_____ | _____ | $_____ |

**50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| | $_____ | _____ | $_____ |

**51. Total of Part 8.**
Add lines 47 through 50. Copy the total to line 87.

$ 53,339.00

**52. Is a depreciation schedule available for any of the property listed in Part 8?**
☑ No
☐ Yes

**53. Has any of the property listed in Part 8 been appraised by a professional within the last year?**
☑ No
☐ Yes

Debtor  TGP COMMUNICATIONS, LLC
_____
Name

Case number *(if known)* _24-13938-MAM_

---

**Part 9:** **Real property**

54. **Does the debtor own or lease any real property?**

☑ No. Go to Part 10.

☐ Yes. Fill in the information below.

55. **Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 | | $_____ | _____ | $_____ |
| 55.2 | | $_____ | _____ | $_____ |
| 55.3 | | $_____ | _____ | $_____ |

56. **Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$_____

57. **Is a depreciation schedule available for any of the property listed in Part 9?**

☐ No

☐ Yes

58. **Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☐ No

☐ Yes

---

**Part 10:** **Intangibles and intellectual property**

59. **Does the debtor have any interests in intangibles or intellectual property?**

☐ No. Go to Part 11.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 60. **Patents, copyrights, trademarks, and trade secrets**<br>Trademark Rights to: The Gateway Pundit (www.thegatewaypundit.c | $_____ | _____ | Unknown<br>$_____ |
| 61. **Internet domain names and websites**<br>See continuation sheet | 0.00<br>$_____ | _____ | Unknown<br>$_____ |
| 62. **Licenses, franchises, and royalties** | $_____ | _____ | $_____ |
| 63. **Customer lists, mailing lists, or other compilations** | $_____ | _____ | $_____ |
| 64. **Other intangibles, or intellectual property**<br>See continuation sheet | 0.00<br>$_____ | _____ | Unknown<br>$_____ |
| 65. **Goodwill** | $_____ | _____ | $_____ |

66. **Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$ 0.00

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|--------|--------------------------|------------------------|---------------|
| | Name | | |

67. **Do your lists or records include personally identifiable information of customers** (as defined in 11 U.S.C. §§ 101(41A) and 107)**?**

☑ No
☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**

☑ No
☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**

☑ No
☐ Yes

**Part 11:    All other assets**

70. **Does the debtor own any other assets that have not yet been reported on this form?**

Include all interests in executory contracts and unexpired leases not previously reported on this form.

☐ No. Go to Part 12.
☑ Yes. Fill in the information below.

**Current value of debtor's interest**

71. **Notes receivable**

Description (include name of obligor)

See continuation sheet

970,860.00 _ 0.00 = ➔ $ 970,860.00
Total face amount    doubtful or uncollectible amount

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)

_____ Tax year _____ $_____
_____ Tax year _____ $_____
_____ Tax year _____ $_____

73. **Interests in insurance policies or annuities**

_____ $_____

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**

_____ $_____

Nature of claim    _____
Amount requested    $_____

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**

_____ $_____

Nature of claim    _____
Amount requested    $_____

76. **Trusts, equitable or future interests in property**

_____ $_____

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership

_____ $_____
_____ $_____

78. **Total of Part 11.**

Add lines 71 through 77. Copy the total to line 90.

$ 970,860.00

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**

☑ No
☐ Yes

Debtor      TGP COMMUNICATIONS, LLC
            _____        Case number (if known)  24-13938-MAM
            Name                                             _____

<table>
<tr><td><strong>Part 12:</strong></td><td><strong>Summary</strong></td></tr>
</table>

**In Part 12 copy all of the totals from the earlier parts of the form.**

| Type of property | Current value of personal property | Current value of real property |
|---|---|---|
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 187,394.98 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 0.00 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 0.00 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 1,112,402.78 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 0.00 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 53,339.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* .......................................... ➔ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ 970,860.00 | |
| 91. **Total.** Add lines 80 through 90 for each column. ...........................91a. | $ 2,323,996.76 | 91b.  + $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. ...........................................   2,323,996.76 ...................................   $ 2,323,996.76

| Debtor 1 | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | First Name | Middle Name | Last Name | |

## Continuation Sheet for Official Form 206 A/B

**3) Checking, savings, money market, or financial brokerage accounts**

| General description | Type of account | Last 4 digits of account number |
|---|---|---|
| US Bank | Checking | 3057 |
| Balance: 34,404.51 | | |
| Revolut Business | Checking | 1220 |
| Balance: 136,868.62 | | |
| US Bank | Checking | 0574 |
| Balance: 14,484.70 | | |

**14) Mutual funds or publicly traded stocks not included in Part 1**

| General description | Valuation method | Current value |
|---|---|---|
| Robinhood acct #1307 | | 8,588.24 |
| Charles Schwab (401k) acct #4627 | | 497,511.37 |
| Charles Schwab acct #8256 | | 107,617.10 |
| Charles Schwab acct #2360 | | 491,569.54 |

**61) Internet domain names and websites**

| General description | Net book value | Valuation method | Current value |
|---|---|---|---|
| www.thegatewaypundit.com | | | Unknown |
| TGPTruth.com | | | Unknown |
| TGPVideos.com | | | Unknown |
| TheGatewayPunditStore.com | | | Unknown |
| RINOWatch.com (in development) | | | Unknown |
| TGPTruth.org | | | Unknown |
| Gateway.Video (in development) | | | Unknown |
| TheGateway.Games (in development) | | | Unknown |

| Debtor 1 | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | First Name | Middle Name | Last Name | |

## Continuation Sheet for Official Form 206 A/B

**64) Other intangibles, or intellectual property**

| General description | Net book value | Valuation method | Current value |
|---|---|---|---|
| The Gateway Pundit – 140,000 articles on website | | | Unknown |
| The Gateway Pundit – 140,000 articles on Twitter – X, Facebook, Telegram, Instagram, Rumble, YouTube | | | Unknown |

**71) Notes receivable**

| General description | Total face amount | Doubtful or uncollectible amount | Current value |
|---|---|---|---|
| Loan Receivable – Shareholder | 799,860.00 | 0.00 | 799,860.00 |
| Due from Justice League | 150,000.00 | 0.00 | 150,000.00 |
| Loan Receivable – Joe Hoft | 21,000.00 | 0.00 | 21,000.00 |

**Fill in this information to identify the case:**

Debtor name ___TGP COMMUNICATIONS, LLC___

United States Bankruptcy Court for the: ___Southern District of Florida___

Case number (If known): ___24-13938-MAM___   Chapter ___11___

☑ Check if this is an amended filing

Official Form 206G

## Schedule G: Executory Contracts and Unexpired Leases      12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, numbering the entries consecutively.

**1. Does the debtor have any executory contracts or unexpired leases?**

☐ No. Check this box and file this form with the court with the debtor's other schedules. There is nothing else to report on this form.

☑ Yes. Fill in all of the information below even if the contracts or leases are listed on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B).

| 2. List all contracts and unexpired leases | | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|---|
| **2.1** | Services - Writer for TGP<br><br>**State what the contract or lease is for and the nature of the debtor's interest**<br><br>**State the term remaining**<br>**List the contract number of any government contract** | John Doe - GG<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.2** | Services - Writer for TGP<br><br>**State what the contract or lease is for and the nature of the debtor's interest**<br><br>**State the term remaining**<br>**List the contract number of any government contract** | John Doe - H<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.3** | Services - Writer for TGP<br><br>**State what the contract or lease is for and the nature of the debtor's interest**<br><br>**State the term remaining**<br>**List the contract number of any government contract** | Jane Doe - D<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.4** | Services - Writer for TGP<br><br>**State what the contract or lease is for and the nature of the debtor's interest**<br><br>**State the term remaining**<br>**List the contract number of any government contract** | John Doe - N<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.5** | Services - Writer for TGP<br><br>**State what the contract or lease is for and the nature of the debtor's interest**<br><br>**State the term remaining**<br>**List the contract number of any government contract** | John Doe - Z<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |

AMENDED

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |



### Additional Page if Debtor Has More Executory Contracts or Unexpired Leases

Copy this page only if more space is needed. Continue numbering the lines sequentially from the previous page.

| List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|
| **2.6** State what the contract or lease is for and the nature of the debtor's interest — Services - Writer for TGP<br><br>State the term remaining<br>List the contract number o any government contract | John Doe - D<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.7** State what the contract or lease is for and the nature of the debtor's interest — Services - Writer for TGP<br><br>State the term remaining<br>List the contract number of any government contract | John Doe - M<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.8** State what the contract or lease is for and the nature of the debtor's interest — Services - Writer for TGP<br><br>State the term remaining<br>List the contract number of any government contract | Jane Doe - C<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO, 63119 |
| **2.___** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br>List the contract number of any government contract | |
| **2.___** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br>List the contract number of any government contract | |
| **2.___** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br>List the contract number of any government contract | |
| **2.___** State what the contract or lease is for and the nature of the debtor's interest<br><br>State the term remaining<br>List the contract number of any government contract | |

**Fill in this information to identify the case:**

Debtor name TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the: Southern District of Florida District of _____
(State)

Case number (If known): 24-13938-MAM

☑ Check if this is an amended filing

## Official Form 207

# Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy   04/22

The debtor must answer every question. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).

## Part 1:   Income

1. **Gross revenue from business**

   ☐ None

   | Identify the beginning and ending dates of the debtor's fiscal year, which may be a calendar year | | Sources of revenue<br>Check all that apply | Gross revenue<br>(before deductions and exclusions) |
   |---|---|---|---|
   | **From the beginning of the fiscal year to filing date:** | From 04/22/2024 to Filing date<br>MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 725,128.81 |
   | **For prior year:** | From 01/01/2023 to 12/31/2023<br>MM / DD / YYYY   MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 3,097,988.38 |
   | **For the year before that:** | From 01/01/2022 to 12/31/2022<br>MM / DD / YYYY   MM / DD / YYYY | ☑ Operating a business<br>☐ Other | $ 2,860,691.00 |

2. **Non-business revenue**

   Include revenue regardless of whether that revenue is taxable. *Non-business income* may include interest, dividends, money collected from lawsuits, and royalties. List each source and the gross revenue for each separately. Do not include revenue listed in line 1.

   ☑ None

   | | | Description of sources of revenue | Gross revenue from each source<br>(before deductions and exclusions) |
   |---|---|---|---|
   | **From the beginning of the fiscal year to filing date:** | From _____ to Filing date<br>MM / DD / YYYY | _____ | $ _____ |
   | **For prior year:** | From _____ to _____<br>MM / DD / YYYY   MM / DD / YYYY | _____ | $ _____ |
   | **For the year before that:** | From _____ to _____<br>MM / DD / YYYY   MM / DD / YYYY | _____ | $ _____ |

| Debtor | TGP COMMUNICATIONS, LLC | | Case number (if known) | 24-13938-MAM |
|---|---|---|---|---|
| | Name | | | |

---

**Part 2:** **List Certain Transfers Made Before Filing for Bankruptcy**

3. **Certain payments or transfers to creditors within 90 days before filing this case**

List payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,575. (This amount may be adjusted on 4/01/23 and every 3 years after that with respect to cases filed on or after the date of adjustment.)

☐ None

| | Creditor's name and address | Dates | Total amount or value | Reasons for payment or transfer<br>*Check all that apply* |
|---|---|---|---|---|
| 3.1. | Jane Doe - D | 2/1/2024<br>3/1/2024<br>4/1/2024 | $ 15,606.48 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☐ Other _____ |
| | Creditor's name<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO 63119 | | | |
| 3.2. | John Doe - R | 2/1/2024<br>3/1/2024<br>4/1/2024 | $ 15,535.66 | ☐ Secured debt<br>☐ Unsecured loan repayments<br>☐ Suppliers or vendors<br>☑ Services<br>☐ Other _____ |
| | Creditor's name<br>c/o Jonathan Burns<br>POB 191250<br>Saint Louis, MO 63119 | | | |

4. **Payments or other transfers of property made within 1 year before filing this case that benefited any insider**

List payments or transfers, including expense reimbursements, made within 1 year before filing this case on debts owed to an insider or guaranteed or cosigned by an insider unless the aggregate value of all property transferred to or for the benefit of the insider is less than $7,575. (This amount may be adjusted on 4/01/25 and every 3 years after that with respect to cases filed on or after the date of adjustment.) Do not include any payments listed in line 3. *Insiders* include officers, directors, and anyone in control of a corporate debtor and their relatives; general partners of a partnership debtor and their relatives; affiliates of the debtor and insiders of such affiliates; and any managing agent of the debtor. 11 U.S.C. § 101(31).

☑ None

| | Insider's name and address | Dates | Total amount or value | Reasons for payment or transfer |
|---|---|---|---|---|
| 4.1. | Insider's name | | $ | |
| | Relationship to debtor | | | |
| 4.2. | Insider's name | | $ | |
| | Relationship to debtor | | | |

AMENDED

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**5. Repossessions, foreclosures, and returns**

List all property of the debtor that was obtained by a creditor within 1 year before filing this case, including property repossessed by a creditor, sold at a foreclosure sale, transferred by a deed in lieu of foreclosure, or returned to the seller. Do not include property listed in line 6.

☑ None

| | Creditor's name and address | Description of the property | Date | Value of property |
|---|---|---|---|---|
| 5.1. | _____ Creditor's name | | _____ | $_____ |
| 5.2. | _____ Creditor's name | | _____ | $_____ |

**6. Setoffs**

List any creditor, including a bank or financial institution, that within 90 days before filing this case set off or otherwise took anything from an account of the debtor without permission or refused to make a payment at the debtor's direction from an account of the debtor because the debtor owed a debt.

☑ None

| | Creditor's name and address | Description of the action creditor took | Date action was taken | Amount |
|---|---|---|---|---|
| | _____ Creditor's name | | _____ | $_____ |
| | | Last 4 digits of account number: XXXX– _____ | | |

---

**Part 3: Legal Actions or Assignments**

**7. Legal actions, administrative proceedings, court actions, executions, attachments, or governmental audits**

List the legal actions, proceedings, investigations, arbitrations, mediations, and audits by federal or state agencies in which the debtor was involved in any capacity—within 1 year before filing this case.

☐ None

| | Case title | Nature of case | Court or agency's name and address | Status of case |
|---|---|---|---|---|
| 7.1. | ERIC COOMER V DONALD J. TRUMP FOR PRESIDENT, INC., et al | Defamation and Intentional Infliction of Emotional Distress | Denver District Court | ☑ Pending ☐ On appeal ☐ Concluded |
| | **Case number** 2020CV34319 | | 1437 Bannock St Denver, CO 80202 | |
| 7.2. | RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT. TGP COMMUNICATIONS. LLC | | St. Louis Circuit Court | ☑ Pending ☐ On appeal ☐ Concluded |
| | **Case number** 2122-CC09815-01 | Defamation and Intentional Inflict | 10 N. Tucker Blvd Saint Louis, MO 63101 | |

| Debtor | TGP COMMUNICATIONS, LLC | | Case number (if known) | 24-13938-MAM |
|--------|--------------------------|---|-----|-----|
| | Name | | | |

**8. Assignments and receivership**

List any property in the hands of an assignee for the benefit of creditors during the 120 days before filing this case and any property in the hands of a receiver, custodian, or other court-appointed officer within 1 year before filing this case.

☑ None

| Custodian's name and address | Description of the property | Value |
|------------------------------|----------------------------|-------|
| _____ | _____ | $_____ |
| Custodian's name | | |
| | Case title | Court name and address |
| | _____ | _____ |
| | | Name |
| | Case number | |
| | _____ | |
| | Date of order or assignment | |
| | _____ | |

---

**Part 4:** **Certain Gifts and Charitable Contributions**

**9. List all gifts or charitable contributions the debtor gave to a recipient within 2 years before filing this case unless the aggregate value of the gifts to that recipient is less than $1,000**

☑ None

| | Recipient's name and address | Description of the gifts or contributions | Dates given | Value |
|--|------------------------------|-------------------------------------------|-------------|-------|
| 9.1. | _____ | | _____ | $_____ |
| | Recipient's name | | | |
| | | | _____ | $_____ |
| | Recipient's relationship to debtor | | | |
| | _____ | | | |
| 9.2. | _____ | | _____ | $_____ |
| | Recipient's name | | | |
| | | | _____ | $_____ |
| | Recipient's relationship to debtor | | | |
| | _____ | | | |

---

**Part 5:** **Certain Losses**

**10. All losses from fire, theft, or other casualty within 1 year before filing this case.**

☑ None

| Description of the property lost and how the loss occurred | Amount of payments received for the loss | Date of loss | Value of property lost |
|-----------------------------------------------------------|------------------------------------------|--------------|------------------------|
| | If you have received payments to cover the loss, for example, from insurance, government compensation, or tort liability, list the total received. | | |
| | List unpaid claims on Official Form 106A/B (*Schedule A/B: Assets – Real and Personal Property*). | | |
| | _____ | _____ | $_____ |

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|--------|-------------------------|--|--------------------------|--------------|
| | Name | | | |

## Part 6: Certain Payments or Transfers

**11. Payments related to bankruptcy**

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

☑ None

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|--|--------------------------------------------|------------------------------------------------|-------|----------------------|
| 11.1. | HOUSTON RODERMAN, PLLC | FEE RETAINER FOR BANKRUPTCY [RECEIVED $7,500.00 COST RETAINER] | 04/16/2024 | $ 50,000.00 |
| | **Address** | | | |
| | 633 S. Andrews Avenue Suite 500 Fort Lauderdale, FL 33301 | | | |
| | **Email or website address** | | | |
| | | | | |
| | **Who made the payment, if not debtor?** | | | |
| | | | | |

| | Who was paid or who received the transfer? | If not money, describe any property transferred | Dates | Total amount or value |
|--|--------------------------------------------|------------------------------------------------|-------|----------------------|
| 11.2. | | | | $ |
| | **Address** | | | |
| | | | | |
| | **Email or website address** | | | |
| | | | | |
| | **Who made the payment, if not debtor?** | | | |
| | | | | |

**12. Self-settled trusts of which the debtor is a beneficiary**

List any payments or transfers of property made by the debtor or a person acting on behalf of the debtor within 10 years before the filing of this case to a self-settled trust or similar device.

Do not include transfers already listed on this statement.

☑ None

| Name of trust or device | Describe any property transferred | Dates transfers were made | Total amount or value |
|-------------------------|-----------------------------------|---------------------------|----------------------|
| | | | $ |
| **Trustee** | | | |
| | | | |

AMENDED

Debtor    TGP COMMUNICATIONS, LLC
          _____          Case number *(if known)* __24-13938-MAM__
          Name

---

**13. Transfers not already listed on this statement**

List any transfers of money or other property—by sale, trade, or any other means—made by the debtor or a person acting on behalf of the debtor within 2 years before the filing of this case to another person, other than property transferred in the ordinary course of business or financial affairs. Include both outright transfers and transfers made as security. Do not include gifts or transfers previously listed on this statement.

☑ None

| | Who received transfer? | Description of property transferred or payments received or debts paid in exchange | Date transfer was made | Total amount or value |
|---|---|---|---|---|
| 13.1. | _____ | | _____ | $ _____ |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |
| 13.2. | Who received transfer? | | _____ | $ _____ |
| | _____ | | | |
| | **Address** | | | |
| | | | | |
| | **Relationship to debtor** | | | |
| | _____ | | | |

---

| Part 7: | **Previous Locations** |
|---|---|

**14. Previous addresses**

List all previous addresses used by the debtor within 3 years before filing this case and the dates the addresses were used.

☐ Does not apply

| | Address | | Dates of occupancy | |
|---|---|---|---|---|
| 14.1. | 5105 LINDELL BLVD Saint Louis, MO 63108 | From | 4/2019 | To 10/2021 |
| 14.2. | | From | _____ | To _____ |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (*if known*) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

**Part 8:**   **Health Care Bankruptcies**

**15. Health Care bankruptcies**

Is the debtor primarily engaged in offering services and facilities for:

— diagnosing or treating injury, deformity, or disease, or

— providing any surgical, psychiatric, drug treatment, or obstetric care?

☑ No. Go to Part 9.

☐ Yes. Fill in the information below.

| | **Facility name and address** | **Nature of the business operation, including type of services the debtor provides** | **If debtor provides meals and housing, number of patients in debtor's care** |
|---|---|---|---|
| 15.1. | _____ Facility name | | _____ |
| | | **Location where patient records are maintained** (if different from facility address). If electronic, identify any service provider. | **How are records kept?** *Check all that apply:* ☐ Electronically ☐ Paper |
| | **Facility name and address** | **Nature of the business operation, including type of services the debtor provides** | **If debtor provides meals and housing, number of patients in debtor's care** |
| 15.2. | _____ Facility name | | _____ |
| | | **Location where patient records are maintained** (if different from facility address). If electronic, identify any service provider. | **How are records kept?** *Check all that apply:* ☐ Electronically ☐ Paper |

---

**Part 9:**   **Personally Identifiable Information**

**16. Does the debtor collect and retain personally identifiable information of customers?**

☑ No.

☐ Yes. State the nature of the information collected and retained. _____

Does the debtor have a privacy policy about that information?

☐ No

☐ Yes

**17. Within 6 years before filing this case, have any employees of the debtor been participants in any ERISA, 401(k), 403(b), or other pension or profit-sharing plan made available by the debtor as an employee benefit?**

☑ No. Go to Part 10.

Yes. Does the debtor serve as plan administrator?

☐ No. Go to Part 10.

☐ Yes. Fill in below:

| **Name of plan** | **Employer identification number of the plan** |
|---|---|
| _____ | EIN: _____ |

Has the plan been terminated?

☐ No

☐ Yes

| Debtor | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |
|--------|-------------------------|--------------------------|--------------|
| | Name | | |

## Part 10: Certain Financial Accounts, Safe Deposit Boxes, and Storage Units

**18. Closed financial accounts**

Within 1 year before filing this case, were any financial accounts or instruments held in the debtor's name, or for the debtor's benefit, closed, sold, moved, or transferred?

Include checking, savings, money market, or other financial accounts; certificates of deposit; and shares in banks, credit unions, brokerage houses, cooperatives, associations, and other financial institutions.

☑ None

| | Financial institution name and address | Last 4 digits of account number | Type of account | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|---|
| 18.1. | _____ Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |
| 18.2. | _____ Name | XXXX–_____ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |

**19. Safe deposit boxes**

List any safe deposit box or other depository for securities, cash, or other valuables the debtor now has or did have within 1 year before filing this case.

☑ None

| Depository institution name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____ Name<br><br><br>Address | | | ☐ No<br>☐ Yes |

**20. Off-premises storage**

List any property kept in storage units or warehouses within 1 year before filing this case. Do not include facilities that are in a part of a building in which the debtor does business.

☑ None

| Facility name and address | Names of anyone with access to it | Description of the contents | Does debtor still have it? |
|---|---|---|---|
| _____ Name<br><br><br>Address | | | ☐ No<br>☐ Yes |

| Debtor | TGP COMMUNICATIONS, LLC | | Case number *(if known)* | 24-13938-MAM |
|--------|--------------------------|---|--------------------------|--------------|
|        | Name | | | |

## Part 11:   Property the Debtor Holds or Controls That the Debtor Does Not Own

**21. Property held for another**

List any property that the debtor holds or controls that another entity owns. Include any property borrowed from, being stored for, or held in trust. Do not list leased or rented property.

☑ None

| Owner's name and address | Location of the property | Description of the property | Value |
|--------------------------|--------------------------|----------------------------|-------|
| _____ | | | $_____ |
| Name | | | |

## Part 12:   Details About Environmental Information

For the purpose of Part 12, the following definitions apply:

- *Environmental law* means any statute or governmental regulation that concerns pollution, contamination, or hazardous material, regardless of the medium affected (air, land, water, or any other medium).
- *Site* means any location, facility, or property, including disposal sites, that the debtor now owns, operates, or utilizes or that the debtor formerly owned, operated, or utilized.
- *Hazardous material* means anything that an environmental law defines as hazardous or toxic, or describes as a pollutant, contaminant, or a similarly harmful substance.

**Report all notices, releases, and proceedings known, regardless of when they occurred.**

**22. Has the debtor been a party in any judicial or administrative proceeding under any environmental law?** Include settlements and orders.

☑ No
☐ Yes. Provide details below.

| Case title | Court or agency name and address | Nature of the case | Status of case |
|------------|----------------------------------|--------------------|----------------|
| _____ | _____ | | ☐ Pending |
| **Case number** | Name | | ☐ On appeal |
| _____ | | | ☐ Concluded |

**23. Has any governmental unit otherwise notified the debtor that the debtor may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|-----------------------|-------------------------------------|------------------------------|----------------|
| _____ | _____ | | _____ |
| Name | Name | | |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**24. Has the debtor notified any governmental unit of any release of hazardous material?**

☑ No

☐ Yes. Provide details below.

| Site name and address | Governmental unit name and address | Environmental law, if known | Date of notice |
|---|---|---|---|
| _____ | _____ | | _____ |
| Name | Name | | |

---

**Part 13:      Details About the Debtor's Business or Connections to Any Business**

**25. Other businesses in which the debtor has or has had an interest**

List any business for which the debtor was an owner, partner, member, or otherwise a person in control within 6 years before filing this case. Include this information even if already listed in the Schedules.

☑ None

| | Business name and address | Describe the nature of the business | Employer Identification number<br>Do not include Social Security number or ITIN. |
|---|---|---|---|
| 25.1. | _____<br>Name | | EIN: _____<br>**Dates business existed**<br>From _____   To _____ |
| 25.2. | _____<br>Name | | EIN: _____<br>**Dates business existed**<br>From _____   To _____ |
| 25.3. | _____<br>Name | | EIN: _____<br>**Dates business existed**<br>From _____   To _____ |

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
| --- | --- | --- | --- |
| | Name | | |

**26. Books, records, and financial statements**

26a. List all accountants and bookkeepers who maintained the debtor's books and records within 2 years before filing this case.

☐ None

| Name and address | | Dates of service |
| --- | --- | --- |

26a.1.  AP Accounting & Tax
Name

19274 Babler Forest Rd, Wildwood, MO 63005

From _____
To _____

| Name and address | | Dates of service |
| --- | --- | --- |

26a.2.  _____
Name

From _____
To _____

26b. List all firms or individuals who have audited, compiled, or reviewed debtor's books of account and records or prepared a financial statement within 2 years before filing this case.

☑ None

| Name and address | | Dates of service |
| --- | --- | --- |

26b.1.  _____
Name

From _____
To _____

| Name and address | | Dates of service |
| --- | --- | --- |

26b.2.  _____
Name

From _____
To _____

26c. List all firms or individuals who were in possession of the debtor's books of account and records when this case is filed.

☐ None

| Name and address | If any books of account and records are unavailable, explain why |
| --- | --- |

26c.1.  AP Accounting & Tax
Name

19274 Babler Forest Rd, Wildwood, MO 63005

AMENDED

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|--------|-------------------------|------------------------|--------------|
| | Name | | |

| | **Name and address** | **If any books of account and records are unavailable, explain why** |
|---|----------------------|---|

26c.2. _____
       Name

26d. List all financial institutions, creditors, and other parties, including mercantile and trade agencies, to whom the debtor issued a financial statement within 2 years before filing this case.

☑ None

**Name and address**

26d.1. _____
       Name

**Name and address**

26d.2. _____
       Name

27. **Inventories**

Have any inventories of the debtor's property been taken within 2 years before filing this case?

☑ No
☐ Yes. Give the details about the two most recent inventories.

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $_____ |

**Name and address of the person who has possession of inventory records**

27.1. _____
      Name

AMENDED

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

---

| Name of the person who supervised the taking of the inventory | Date of inventory | The dollar amount and basis (cost, market, or other basis) of each inventory |
|---|---|---|
| _____ | _____ | $ _____ |

Name and address of the person who has possession of inventory records

27.2. _____
Name

**28.** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position and nature of any interest | % of interest, if any |
|---|---|---|---|
| James Hoft | 1820 NE JENSEN BEACH BLVD. UNIT 1120, Jensen Beach, FL 34957 | Manager | 100 |

**29.** Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

☑ No
☐ Yes. Identify below.

| Name | Address | Position and nature of any interest | Period during which position or interest was held |
|---|---|---|---|
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |
| | | | _____ To _____ |

**30.** Payments, distributions, or withdrawals credited or given to insiders

Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits on loans, stock redemptions, and options exercised?

☑ No
☐ Yes. Identify below.

| Name and address of recipient | Amount of money or description and value of property | Dates | Reason for providing the value |
|---|---|---|---|
| 30.1. _____ | _____ | _____ | |
| Name | | | |
| | | _____ | |
| | | _____ | |
| Relationship to debtor | | _____ | |

---

| Debtor | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|
| | Name | | |

**Name and address of recipient**

30.2 _____
Name

**Relationship to debtor**

_____

31. **Within 6 years before filing this case, has the debtor been a member of any consolidated group for tax purposes?**

☑ No
☐ Yes. Identify below.

| **Name of the parent corporation** | **Employer Identification number of the parent corporation** |
|---|---|
| _____ | EIN: _____ |

32. **Within 6 years before filing this case, has the debtor as an employer been responsible for contributing to a pension fund?**

☑ No
☐ Yes. Identify below.

| **Name of the pension fund** | **Employer Identification number of the pension fund** |
|---|---|
| _____ | EIN: _____ |

---

**Part 14:   Signature and Declaration**

**WARNING** -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.
18 U.S.C. §§ 152, 1341, 1519, and 3571.

I have examined the information in this *Statement of Financial Affairs* and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   05/30/2024
             MM / DD / YYYY

✖ /s/ James Hoft                                   Printed name   James Hoft
Signature of individual signing on behalf of the debtor

Position or relationship to debtor   Manager

**Are additional pages to *Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* (Official Form 207) attached?**

☐ No
☑ Yes

| Debtor Name | TGP COMMUNICATIONS, LLC | Case number (if known) | 24-13938-MAM |
|---|---|---|---|

### Continuation Sheet for Official Form 207

**3) Certain payments or transfers to creditors within 90 days before filing this case**

| | | |
|---|---|---|
| John Doe – Q, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $10,881.17 | Other |
| Jez Morano, 8750 South Ocean Drive Unit 534, Jensen Beach, FL 34957 | $33,186.17 | Telephone / internet services |
| John Doe – Y, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $8,784.42 | Services |
| Jane Doe – C, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $49,638.17 | Services |
| John Doe – CC, c/o Jonathan Burns POB 191250, Saint Louis, MO 63119 | $9,812.57 | Services |
| James Hoft, 8750 South Ocean Drive Unit 534, Jensen Beach, FL 34957 | $17,280.00 | |
| JUSTICE LEAGUE, POB 191250, Saint Louis, MO 63119 | $95,000.00 | |
| ORCHID GROVE MEDIA, 2820 N PINAL AVE STE 12 PMB 209, CASA GRANDE, AZ 85122 | $27,000.00 | |
| CONRADSON RENTALS LLC, | $17,714.64 | |
| O'MALLEY McCULLOCH LLC, | $30,125.09 | |
| SLIGHTLY OFFENSIVE INC, | $13,477.73 | |

**7) Legal Actions**

RUBY FREEMAN AND WANDREA MOSS V. JAMES HOFT, JOSEPH HOFT, TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT

2122-CC09815-01

Defamation and Intentional Infliction of Emotional Distress

St. Louis Circuit Court

10 N. Tucker Blvd, Saint Louis, MO 63101

AMENDED

| Debtor Name | TGP COMMUNICATIONS, LLC | Case number *(if known)* | 24-13938-MAM |

## Continuation Sheet for Official Form 207

**Pending**

**-------**

**JAMES HOFT, JOSEPH HOFT AND TGP COMMUNICATIONS LLC d/b/a THE GATEWAY PUNDIT V. GILBERT C. HUMES et al**

**24CV-004696**

**Fulton Superior Court Clerk**

**136 Pryor St SW, Atlanta, GA 30303**

**Pending**

**-------**

<table>
<tr><td colspan="2"><b>Fill in this information to identify the case and this filing:</b></td></tr>
<tr><td>Debtor Name</td><td>TGP COMMUNICATIONS, LLC</td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>Southern District of Florida</td></tr>
<tr><td>Case number (If known):</td><td>24-13938-MAM</td></tr>
</table>

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors          12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐  *Schedule H: Codebtors* (Official Form 206H)

☐  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☑  Amended *Schedule* ____ A/B, G

☐  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐  *Other document that requires a declaration* _____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  05/30/2024          ✗ /s/ James Hoft
　　　　　　　MM / DD / YYYY          _____
　　　　　　　　　　　　　　　　　　　Signature of individual signing on behalf of debtor

　　　　　　　　　　　　　　　　　　　James Hoft
　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　Printed name

　　　　　　　　　　　　　　　　　　　Manager
　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　Position or relationship to debtor

SOUTHERN DISTRICT OF FLORIDA

In re:

TGP COMMUNICATIONS, LLC

Case No. 24-13938-MAM
Chapter 11

    Debtor.

_____/

### DEBTOR'S NOTICE OF COMPLIANCE WITH REQUIREMENTS FOR
### AMENDING CREDITOR INFORMATION

This notice is being filed in accordance with Local Rules 1007-2(B), 1009-1(D), or 1019-1(B) upon the filing of an amendment to the debtor's lists, schedules or statements, pursuant to Bankruptcy Rules 1007, 1009, or 1019.   I certify that:

[  ]   The paper filed **adds** creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being added).   I have:
  1.   remitted the required fee (unless the paper is a Bankruptcy Rule 1019(5) report);
  2.   provided the court with a supplemental matrix diskette **containing only the added creditors** or electronically uploaded the added creditors in CM/ECF;
  3.   provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)]; and
  4.   filed an amended schedule(s) and summary of schedules.

[  ]   The paper filed **deletes** a creditor(s) as reflected on the <u>attached list</u> (include name and address of each creditor being deleted**).   I have:**
  1.   remitted the required fee;
  2.   provided notice to affected parties and
  3.   filed an amended schedule(s) and summary of schedules.

[  ]   The paper filed **corrects** the name and/or address of a creditor(s) as reflected on the <u>attached list</u>. **I have**:
  1.   provided notice to affected parties, including service of a copy of this notice and a copy of the §341 or post conversion meeting notice [Local Rule 1009-1(D)(2)] and
  2.   filed an amended schedule(s) or other paper.

[  ]   The paper filed **corrects** schedule D, E or F amount(s) or classification(s).   **I have:**
  1.   remitted the required fee;
  2.   provided notice to affected parties and
  3.   filed an amended schedule(s) and summary of schedules.

[ X  ]   None of the above apply. The paper filed does not require an additional fee, a supplemental matrix, or notice to affected parties. It **X does** ☐ does not require the filing of an amended schedule and summary of schedules.

I also certify that, if required to be filed by the Bankruptcy Rules, the official form "Declaration Concerning Debtor's Schedules" has been signed by each debtor as required by Local Rules 1007-2(B), 1009-1(A)(2) and (D)(1), or 1019-1(B) and, if filed electronically without imaged signatures, a local form "Declaration Under Penalty of Perjury to Accompany Petitions, Schedules and Statements Filed Electronically" accompanied the filing of the document.

Dated:   5/30/2024
Bart A. Houston

_____        _____
Attorney for Debtor (or Debtor, if pro se)                                        Joint Debtor (if applicable)

  TGP COMMUNICATIONS, LLC
_____        _____
Print Name                                                                      Address

  623636
_____        _____
Florida Bar Number                                                              Phone Number

# Exhibit 17

**Fill in this information to identify the case:**

Debtor Name  TGP COMMUNICATIONS, LLC

United States Bankruptcy Court for the: Southern District of Florida

Case number: 24-13938-MAM

☐ Check if this is an amended filing

Official Form 425C

# Monthly Operating Report for Small Business Under Chapter 11     12/17

Month: 4/24/2024 - 4/30/2024

Line of business: OPINION WEBSITE

Date report filed: 04/21/2024
MM / DD / YYYY

NAISC code: 5178

In accordance with title 28, section 1746, of the United States Code, I declare under penalty of perjury that I have examined the following small business monthly operating report and the accompanying attachments and, to the best of my knowledge, these documents are true, correct, and complete.

Responsible party:  Bart A. Houston, Esq.

Original signature of responsible party  /s/Bart A. Houston, Esq.

Printed name of responsible party  Bart A. Houston, Esq.

## 1. Questionnaire

Answer all questions on behalf of the debtor for the period covered by this report, unless otherwise indicated.

**If you answer No to any of the questions in lines 1-9, attach an explanation and label it Exhibit A.**

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 1. | Did the business operate during the entire reporting period? | ☐ | ☑ | ☐ |
| 2. | Do you plan to continue to operate the business next month? | ☑ | ☐ | ☐ |
| 3. | Have you paid all of your bills on time? | ☑ | ☐ | ☐ |
| 4. | Did you pay your employees on time? | ☑ | ☐ | ☐ |
| 5. | Have you deposited all the receipts for your business into debtor in possession (DIP) accounts? | ☐ | ☑ | ☐ |
| 6. | Have you timely filed your tax returns and paid all of your taxes? | ☑ | ☐ | ☐ |
| 7. | Have you timely filed all other required government filings? | ☑ | ☐ | ☐ |
| 8. | Are you current on your quarterly fee payments to the U.S. Trustee or Bankruptcy Administrator? | ☐ | ☐ | ☑ |
| 9. | Have you timely paid all of your insurance premiums? | ☑ | ☐ | ☐ |

**If you answer Yes to any of the questions in lines 10-18, attach an explanation and label it Exhibit B.**

| | | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 10. | Do you have any bank accounts open other than the DIP accounts? | ☑ | ☐ | ☐ |
| 11. | Have you sold any assets other than inventory? | ☐ | ☑ | ☐ |
| 12. | Have you sold or transferred any assets or provided services to anyone related to the DIP in any way? | ☐ | ☑ | ☐ |
| 13. | Did any insurance company cancel your policy? | ☐ | ☑ | ☐ |
| 14. | Did you have any unusual or significant unanticipated expenses? | ☐ | ☑ | ☐ |
| 15. | Have you borrowed money from anyone or has anyone made any payments on your behalf? | ☐ | ☑ | ☐ |
| 16. | Has anyone made an investment in your business? | ☐ | ☑ | ☐ |

Debtor Name  TGP COMMUNICATIONS, LLC

Case number  24-13938-MAM

17. Have you paid any bills you owed before you filed bankruptcy?  ☑ ☐ ☐

18. Have you allowed any checks to clear the bank that were issued before you filed bankruptcy?  ☑ ☐ ☐

## **2.** Summary of Cash Activity for All Accounts

19. **Total opening balance of all accounts**

This amount must equal what you reported as the cash on hand at the end of the month in the previous month. If this is your first report, report the total cash on hand as of the date of the filing of this case.

$ 171273.13

20. **Total cash receipts**

Attach a listing of all cash received for the month and label it *Exhibit C*. Include all cash received even if you have not deposited it at the bank, collections on receivables, credit card deposits, cash received from other parties, or loans, gifts, or payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit C*.

Report the total from *Exhibit C* here.

$ 124390.93

21. **Total cash disbursements**

Attach a listing of all payments you made in the month and label it *Exhibit D*. List the date paid, payee, purpose, and amount. Include all cash payments, debit card transactions, checks issued even if they have not cleared the bank, outstanding checks issued before the bankruptcy was filed that were allowed to clear this month, and payments made by other parties on your behalf. Do not attach bank statements in lieu of *Exhibit D*.

Report the total from *Exhibit D* here.

– $ 17447.5

22. **Net cash flow**

Subtract line 21 from line 20 and report the result here.
This amount may be different from what you may have calculated as *net profit*.

+ $ 106943.43

23. **Cash on hand at the end of the month**

Add line 22 + line 19. Report the result here.

Report this figure as the *cash on hand at the beginning of the month* on your next operating report.

This amount may not match your bank account balance because you may have outstanding checks that have not cleared the bank or deposits in transit.

= $ 278216.56

## 3. Unpaid Bills

Attach a list of all debts (including taxes) which you have incurred since the date you filed bankruptcy but have not paid. Label it *Exhibit E*. Include the date the debt was incurred, who is owed the money, the purpose of the debt, and when the debt is due. Report the total from *Exhibit E* here.

24. **Total payables**

$ 0

*(Exhibit E)*

| Debtor Name | TGP COMMUNICATIONS, LLC | Case number | 24-13938-MAM |
|---|---|---|---|

---

### 4. Money Owed to You

Attach a list of all amounts owed to you by your customers for work you have done or merchandise you have sold. Include amounts owed to you both before, and after you filed bankruptcy.  Label it *Exhibit F*. Identify who owes you money, how much is owed, and when payment is due. Report the total from *Exhibit F* here.

25. **Total receivables**                                                                                                                  $ _____0

   *(Exhibit F)*

---

### 5. Employees

26. What was the number of employees when the case was filed?                                                          _____1

27. What is the number of employees as of the date of this monthly report?                                      _____1

---

### 6. Professional Fees

28. How much have you paid this month in professional fees related to this bankruptcy case?           $ _____0

29. How much have you paid in professional fees related to this bankruptcy case since the case was filed?   $ _____0

30. How much have you paid this month in other professional fees?                                                        $ _____0

31. How much have you paid in total other professional fees since filing the case?                               $ _____0

---

### 7. Projections

Compare your actual cash receipts and disbursements to what you projected in the previous month. Projected figures in the first month should match those provided at the initial debtor interview, if any.

|  | Column A | − | Column B | = | Column C |
|---|---|---|---|---|---|
|  | **Projected** | | **Actual** | | **Difference** |
|  | Copy lines 35-37 from the previous month's report. | | Copy lines 20-22 of this report. | | Subtract Column B from Column A. |
| 32. **Cash receipts** | $ _____0 | − | $ 124390.93 | = | $ _____ |
| 33. **Cash disbursements** | $ _____0 | − | $ 17447.5 | = | $ _____ |
| 34. **Net cash flow** | $ _____0 | − | $ 106943.43 | = | $ _____ |

35. Total projected cash receipts for the next month:                                                          $ 283245.73

36. Total projected cash disbursements for the next month:                                            − $ 220723.44

37. Total projected net cash flow for the next month:                                                        = $ 62522.29

---

Debtor Name  TGP COMMUNICATIONS, LLC

Case number  24-13938-MAM

## 8. Additional Information

If available, check the box to the left and attach copies of the following documents.

☑ 38. Bank statements for each open account (redact all but the last 4 digits of account numbers).

☐ 39. Bank reconciliation reports for each account.

☐ 40. Financial reports such as an income statement (profit & loss) and/or balance sheet.

☑ 41. Budget, projection, or forecast reports.

☐ 42. Project, job costing, or work-in-progress reports.

**US bank.**

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

8414        IMG                S            Y        ST01

106481025447113 S

ılılılılılılılılılılılılılılılılılılılılılılılılılı

DBA TGP COMMUNICATIONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

**Business Statement**

Account Number:

████ 3057

Statement Period:

Apr 1, 2024
through
Apr 30, 2024

Page 1 of 7

☎                        *To Contact U.S. Bank*

*24-Hour Business Solutions:*            800-673-3555

*U.S. Bank accepts Relay Calls*

*Internet:*                usbank.com

---

## INFORMATION YOU SHOULD KNOW

Effective May 13, 2024, we would like to inform you of the upcoming changes to the *Business Pricing Information* and the *U.S. Bank Business Essentials® Pricing Information* documents that may impact your account. To obtain a current copy of the *Business Pricing Information* and *U.S. Bank Business Essentials® Pricing Information* disclosures, visit your local branch.

**Primary updates in your revised *Business Pricing Information* disclosure**

- Effective January 2024, the following fees are no longer being charged. The references to these fees were removed or changed to "no charge" throughout the document:
  - ο  Mini and Full Statement Fee at a U.S. Bank ATM
  - ο  Safe Deposit Box Paper Invoice
  - ο  Tracer Fee
  - ο  Foreign Draft Purchases
- Checks on Select Countries/Banks (non-collection) name is changed to Foreign Currency Check Deposit - Select Countries
- Domestic Internal Wire Transfer Fee clarification is being added for the following:
  - ο  Internal Wire - outgoing - $11.00
- The footnote for Business Overdraft Protection was updated to refer to the *Your Deposit Account Agreement* document in the section titled "Overdraft Protection Plans," under "Business Banking Overdraft Protection" for additional information.

Beginning May 13, 2024, a copy of the *Business Pricing Information* and the *U.S. Bank Business Essentials® Pricing Information* documents will be available by calling 800-673-3555 or by visiting your local branch.

If you have any questions, you can call us at 800-673-3555. Our business bankers are here to help 8 a.m. to 8 p.m. CT Monday through Friday and 8 a.m. to 6:30 p.m. CT on Saturday. We accept relay calls. Our bankers are also available to help at your local branch via appointment.

---

Effective May 13, 2024, please review updates made to the *Your Deposit Account Agreement* document which may affect your rights.

Beginning April 8, 2024, you can review the full revised document at **usbank.com/YDAA-upcoming-version**, by calling 24-Hour Banking at 800-USBANKS (872-2657) or by visiting your local U.S. Bank branch. We accept relay calls.

**Here's what you should know:**

- Under the **Overdraft Protection Plans** section, **Business Banking Overdraft Protection** sub-section, updated the language to state that when a checking account has a linked Business Reserve Line of Credit, the system will automatically draw from that account first, which may incur a fee. If a checking account has a deposit product and credit product linked as overdraft protection, the order of eligible accounts is updated to always draw from the deposit product first, which will not incur a fee, unless the checking account has a linked Business Reserve Line of Credit. If the deposit product has insufficient funds available to transfer, funds will draw from the credit product.

- Under the **Closing Your Account** section, added a paragraph for **How the account closure works** that says, for consumer checking, savings and money market accounts, when you request an account closure, your account will be placed in a 'pending closure' status for a period of 10 business days. During this 10 business day 'pending closure' period, we will allow pending deposits to be cleared and/or post to your account and we will allow pending debit card

---

Products and services available in U.S. only. Eligibility requirements and restrictions apply. For additional information, contact a U.S. Bank branch or call 800-872-2657.

**U.S. bank.**

To keep track of your transactions, you should balance your account every month. Please examine this statement immediately. We will assume that the balance and transactions shown are correct unless you notify us of an error.

Outstanding Deposits

| DATE | AMOUNT |
|------|--------|
|  |  |
|  |  |
|  |  |
| TOTAL | $ |

Outstanding Withdrawals

| DATE | AMOUNT |
|------|--------|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
| TOTAL | $ |

1. List any deposits that do not appear on your statement in the Outstanding Deposits section at the left. Record the total.

2. Check off in your checkbook register all checks, withdrawals (including Debit Card and ATM) and automatic payments that appear on your statement. Withdrawals that are NOT checked off should be recorded in the Outstanding Withdrawals section at the left. Record the total.

3. Enter the ending balance shown on this statement. $_____

4. Enter the total deposits recorded in the Outstanding Deposits section. $_____

5. Total lines 3 and 4. $_____

6. Enter the total withdrawals recorded in the Outstanding Withdrawals section. $_____

7. Subtract line 6 from line 5. This is your balance. $_____

8. Enter in your register and subtract from your register balance any checks, withdrawals or other debits (including fees, if any) that appear on your statement but have not been recorded in your register.

9. Enter in your register and add to your register balance any deposits or other credits (including interest, if any) that appear in your statement but have not been recorded in your register.

10. The balance in your register should be the same as the balance shown in #7. If it does not match, review and check all figures used, and check the addition and subtraction in your register. If necessary, review and balance your statement from the previous month.

**IMPORTANT DISCLOSURES TO OUR CONSUMER CUSTOMERS**
**In Case of Errors or Questions About Your Checking, Savings, ATM, Debit Card, ACH, Bill Pay and Other Electronic Transfers**
If you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt, we must hear from you no later than 60 days* after we sent you the FIRST statement on which the error or problem appeared. Telephone us at the number listed on the front of this statement or write to us at U.S. Bank, EP-MN-WS5D, 60 Livingston Ave., St. Paul, MN 55107.
- Tell us your name and account number.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.
We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, we may take up to 45 days to investigate your complaint. For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.
  *Please note: Paper draft and paper check claims must be disputed within 30 days per Your Deposit Account Agreement.

**IMPORTANT DISCLOSURES TO OUR BUSINESS CUSTOMERS**
Errors related to any transaction on a business account will be governed by any agreement between us and/or all applicable rules and regulations governing such transactions, including the rules of the National Automated Clearing House Association (NACHA Rules) as may be amended from time to time. If you think this statement is wrong, please telephone us at the number listed on the front of this statement immediately.

**CONSUMER BILLING RIGHTS SUMMARY REGARDING YOUR RESERVE LINE**
*What To Do If You Think You Find A Mistake on Your Statement*
If you think there is an error on your statement, write to us at:
U.S. Bank, P.O. Box 3528, Oshkosh, WI 54903-3528.
In your letter, give us the following information:
- *Account information:* Your name and account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.
You must contact us within 60 days after the error appeared on your statement.
You must notify us of any potential errors *in writing*. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question. While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.
**Reserve Line Balance Computation Method:** To determine your **Balance Subject to Interest Rate**, use the dates and balances provided in the Reserve Line Balance Summary section. The date next to the first Balance Subject to Interest is day one for that balance and is applicable up to (but not including) the date of the next balance (if there is one). We multiply the Balance Subject to Interest by the number of days it is applicable and add them up to get the same number of days in the billing cycle. We then divide the result by the number of billing days in the cycle. This is your **Balance Subject to Interest Rate**. Any unpaid interest charges and unpaid fees are not included in the Balance Subject to Interest. The ***INTEREST CHARGE*** begins from the date of each advance.

**REPORTS TO AND FROM CREDIT BUREAUS FOR RESERVE LINES**
We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

**CONSUMER REPORT DISPUTES**
We may report information about account activity on consumer and small business deposit accounts and consumer reserve lines to Consumer Reporting Agencies (CRA). As a result, this may prevent you from obtaining services at other financial institutions. If you believe we have inaccurately reported information to a CRA, you may submit a dispute by calling 844.624.8230 or by writing to: U.S. Bank Attn: Consumer Bureau Dispute Handling (CBDH), P.O. Box 3447, Oshkosh, WI 54903-3447. In order for us to assist you with your dispute, you must provide: your name, address and phone number; the account number; the specific information you are disputing; the explanation of why it is incorrect; and any supporting documentation (e.g., affidavit of identity theft), if applicable.



Member FDIC

**U.S. bank.**

DBA TGP COMMUNICATIONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

Account Number:
■■■■ 3057
Statement Period:
Apr 1, 2024
through
Apr 30, 2024

Page 2 of 7

## INFORMATION YOU SHOULD KNOW                    (CONTINUED)

transactions that you authorized prior to initiating closure to be cleared and/or post to your account. Your debit card will be declined and transactions will no longer be approved when the account is in 'pending closure' status. Once your account is fully closed, transactions will not be allowed to post to the account except under limited circumstances. For example, transactions may be processed after closure if necessary for fraud investigations, transaction dispute claims, merchant credits, or deposit adjustments due to errors.

If you have questions, please call us at 800-673-3555. Our business bankers are here to help 8 a.m. to 8 p.m. CT Monday through Friday and 8 a.m. to 6:30 p.m. CT on Saturday. You can also schedule an appointment at **usbank.com/book** to speak with a banker in person, by phone or virtually.

## SILVER BUSINESS CHECKING                                    *Member FDIC*

U.S. Bank National Association                              **Account Number** ■■■■ **-3057**
**Account Summary**

|                                        | # Items |    |            |
|----------------------------------------|---------|----|------------|
| Beginning Balance on Apr 1             |         | $  | 77,494.16  |
| Other Deposits                         | 47      |    | 185,929.17 |
| Card Withdrawals                       | 21      |    | 16,233.14- |
| Other Withdrawals                      | 15      |    | 132,791.35-|
| Checks Paid                            | 2       |    | 3,615.00-  |
| **Ending Balance on  Apr 30, 2024**    |         | $  | 110,783.84 |

### Other Deposits

| Date | Description of Transaction | Ref Number | Amount |
|------|----------------------------|------------|--------|
|      |                            |            |        |

**U.S. bank.**

DBA TGP COMMUNICATIONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

Account Number:
███████ 3057
Statement Period:
Apr 1, 2024
through
Apr 30, 2024

Page 3 of 7

## SILVER BUSINESS CHECKING

U.S. Bank National Association

**(CONTINUED)**

Account Number ███████ -3057

### Other Deposits (continued)

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|---|------------|--------|
| Apr 25 | Electronic Deposit<br>REF=241150174790890N00 | From MERCHANTE<br>1943346153AMEX DEP 000941000136491 | | 50.00 |
| Apr 25 | Electronic Deposit<br>REF=241150174791140N00 | From MERCHANTE<br>1943346153MERCH DEP 000941000136491 | | 100.00 |
| Apr 26 | Electronic Deposit<br>REF=241160197622850N00 | From MERCHANTE<br>1943346153AMEX DEP 000941000136491 | | 45.00 |
| Apr 26 | Electronic Deposit<br>REF=241160197623020N00 | From MERCHANTE<br>1943346153MERCH DEP 000941000136491 | | 1,542.00 |
| Apr 26 | Wire Credit REF003931<br>ORG=RUMBLE USA INC 444 | TD BANK NA OF WILM 240426B015GC<br>GULF OF MEXICO DR | | 79,166.48 |
| Apr 29 | Electronic Deposit<br>REF=241200148069750N00SD | From MERCHANTE<br>1943346153AMEX DEP 000941000136491 | | 10.00 |
| Apr 29 | Electronic Deposit<br>REF=241200148069780N00SD | From MERCHANTE<br>1943346153MERCH DEP 000941000136491 | | 25.00 |
| Apr 29 | Electronic Deposit<br>REF=241200148069770N00SD | From MERCHANTE<br>1943346153MERCH DEP 000941000136491 | | 290.00 |
| Apr 29 | Electronic Deposit<br>REF=241170128590470N00 | From MERCHANTE<br>1943346153AMEX DEP 000941000136491 | | 510.00 |
| Apr 29 | Electronic Deposit<br>REF=241170128590200N00 | From MERCHANTE<br>1943346153MERCH DEP 000941000136491 | | 1,883.00 |
| Apr 29 | Electronic Deposit<br>REF=241200061782980N00 | From TWITTER PAID FEA<br>4270465600TRANSFER ST-F4Z4J1P5Q0K7 | | 2,048.90 |
| Apr 30 | Electronic Deposit<br>REF=241200234488210N00 | From MERCHANTE<br>1943346153MERCH DEP 000941000136491 | | 15.00 |
| Apr 30 | Electronic Deposit<br>REF=241210116665630N00SD | From LIFTABLE MED8111<br>1471453282CASH C&D | | 3,636.40 |

**US bank.**

DBA TGP COMMUNICATIONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

**Business Statement**

Account Number:
█████ 3057
Statement Period:
Apr 1, 2024
through
Apr 30, 2024

Page 4 of 7

**SILVER BUSINESS CHECKING**     **(CONTINUED)**

U.S. Bank National Association     **Account Number** ████ **-3057**

**Other Deposits (continued)**

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|--|-----------|--------|
| Apr 30 | Wire Credit REF025132 | BK AMER NYC   240430B07L94 | | 4,005.05 |
| | ORG=RUMBLE CANADA INC | 218 ADELAIDE ST W SUITE 4 | | |
| | | **Total Other Deposits** | **$** | **185,929.17** |

**Card Withdrawals**

Card Number: xxxx-xxxx-xxxx-8511

| Date | Description of Transaction | | Ref Number | | Amount |
|------|---------------------------|--|-----------|--|--------|



**U.S. bank.** DBA TGP COMMUNICATIONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

**Business Statement**

Account Number:
██████ 3057
Statement Period:
Apr 1, 2024
through
Apr 30, 2024

Page 5 of 7

## SILVER BUSINESS CHECKING (CONTINUED)

U.S. Bank National Association · · · · · · · · · · · · · · · · · · · **Account Number** ██████ **-3057**

### Card Withdrawals (continued)
Card Number: xxxx-xxxx-xxxx-8511

| Date | Description of Transaction | Ref Number | Amount |
|------|---------------------------|------------|--------|
| | ██████ | ██████ | ██████ |
| | ██████ | ██████ | ██████ |
| | ██████ | ██████ | ██████ |
| | ██████ | ██████ | ██████ |

| | | |
|---|---|---|
| **Card 8511 Withdrawals Subtotal** | **$** | **16,233.14-** |
| **Total Card Withdrawals** | **$** | **16,233.14-** |

### Other Withdrawals

| Date | Description of Transaction | Ref Number | Amount |
|------|---------------------------|------------|--------|
| | ██████ | ██████ | ██████ |
| | ██████ | | |
| | ██████ | | |
| | ██████ | | |
| | ██████ | | |
| | ██████ | | |
| | ██████ | | |
| Apr 26 | Electronic Withdrawal REF=241160130300070N00 To ACCOUNTANTSWORLD 1790977000PAYROLLDBT464161586 | | 9,604.29- |
| Apr 30 | Electronic Withdrawal REF=241200136078160N00 To PAYROLLTAX 1790977000TAX DEBIT 464161586 | | 4,543.21- |

| | | |
|---|---|---|
| **Total Other Withdrawals** | **$** | **132,791.35-** |

### Checks Presented Conventionally

| Check | Date | Ref Number | Amount | Check | Date | Ref Number | Amount |
|-------|------|-----------|--------|-------|------|-----------|--------|
| 2480 | Apr 26 | 9212623445 | 2,800.00 | 5600* | Apr 23 | 8314094543 | 815.00 |

* Gap in check sequence

| | | |
|---|---|---|
| **Conventional Checks Paid (2)** | **$** | **3,615.00-** |

**US bank.**

DBA TGP COMMUNICATIONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

**Business Statement**

Account Number:
3057

Statement Period:
Apr 1, 2024
through
Apr 30, 2024

Page 6 of 7

## SILVER BUSINESS CHECKING                                      (CONTINUED)

**Account Number** ▆▆▆▆▆-3057

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|------|---------------|------|---------------|------|---------------|
| Apr 1 | 71,686.60 | Apr 10 | 38,435.44 | Apr 19 | 99,769.56 |
| Apr 2 | 40,249.23 | Apr 11 | 38,460.44 | Apr 22 | 37,597.51 |
| Apr 3 | 40,379.23 | Apr 12 | 38,158.49 | Apr 23 | 34,404.51 |
| Apr 4 | 43,965.76 | Apr 15 | 19,742.50 | Apr 25 | 34,554.51 |
| Apr 5 | 43,319.91 | Apr 16 | 99,742.50 | Apr 26 | 102,903.70 |
| Apr 8 | 38,416.33 | Apr 17 | 99,762.50 | Apr 29 | 107,670.60 |
| Apr 9 | 38,400.44 | Apr 18 | 99,777.50 | Apr 30 | 110,783.84 |

Balances only appear for days reflecting change.

## ANALYSIS SERVICE CHARGE DETAIL

Account Analysis Activity for: March 2024

| | | | |
|---|---|---|---|
| Account Number: | ▆▆▆▆-3057 | $ | 71.95 |
| Analysis Service Charge assessed to | ▆▆▆▆-3057 | $ | 71.95 |

[1] Financial institutions are required by the State of Iowa to charge sales taxes on certain service charges related to checking accounts. Any assessed tax has been itemized on your statement.

### Service Activity Detail for Account Number ▆▆▆▆-3057

| Service | Volume | Avg Unit Price | Total Charge |
|---------|--------|---------------|--------------|
| **Depository Services** | | | |
| Combined Transactions/Items | 105 | | No Charge |
| Subtotal: Depository Services | | | 0.00 |
| **SinglePoint** | | | |
| SPE Pday Det & Sum Mo Maint | 1 | 17.95000 | 17.95 |
| SPE Previous Day per Item Det | 95 | | No Charge |
| Subtotal: SinglePoint | | | 17.95 |
| **Wire Transfers** | | | |
| Incoming Fedwire | 1 | 14.00000 | 14.00 |
| Incoming Fedwire Ctp | 1 | 16.00000 | 16.00 |
| Wire Advice Mail | 2 | 12.00000 | 24.00 |
| Subtotal: Wire Transfers | | | 54.00 |
| **ACH Services** | | | |
| ACH Received Addenda Item | 2 | | No Charge |
| Subtotal: ACH Services | | | 0.00 |
| Fee Based Service Charges for Account Number ▆▆▆-3057 | | $ | 71.95 |

U.S. Bank National Association

**Business Statement**

Account Number:
3057
Statement Period:
Apr 1, 2024
through
Apr 30, 2024

Page 7 of 7

**us bank.**

DBA TGP COMMUNICATIONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

## IMAGES FOR YOUR SILVER BUSINESS CHECKING ACCOUNT

*Member FDIC*

**Account Number** -3057





| 2480 | Apr 26 | 2,800.00 |
|------|--------|----------|

| 5600* | Apr 23 | 815.00 |
|-------|--------|---------|

\* Gap in check sequence

# u.s. bank

P.O. Box 1800
Saint Paul, Minnesota 55101-0800

2842      TRN          S          X      ST01

106481034738040 ER

JAMES H HOFT
5105 LINDELL BLVD
SAINT LOUIS MO  63108-1221

**U.S. Statement**

Account Number:
██████ 0574

Statement Period:
Apr 11, 2024
through
May 10, 2024

Page 1 of 3

☎  _____  ***To Contact U.S. Bank***

***By Phone:***            *800-US BANKS*
                           *(800-872-2657)*

***St. Louis***
***Metro Area:***              *314-425-2000*

***U.S. Bank accepts Relay Calls***

***Internet:***                  *usbank.com*

## NEWS FOR YOU

**Meet Paze**[SM] **- a new way to check out online.**

We'll be including eligible debit and credit cardmembers in a new checkout option to be used at participating online merchants. Learn more at usbank.com/paze

*Paze and the Paze related marks are wholly owned by Early Warning Services, LLC and are used herein under license.*

## INFORMATION YOU SHOULD KNOW

Effective May 13, 2024, please review updates made to the *Consumer Pricing Information* disclosure which may affect your rights.

Beginning April 8, 2024, you can review the full revised disclosure at **usbank.com/CPI-upcoming-version**, by calling 24-Hour Banking at 800-USBANKS (872-2657) or by visiting your local U.S. Bank branch. We accept relay calls.

Here's what you should know:
- Effective January 2024, the following fees are no longer being charged. The references to these fees were removed or changed to "no charge" throughout the document:
  - o   Paper Statement Fee with or without Check Images
  - o   Photocopy requests for a check, statement or other item
  - o   Mini and Full Statement Fee at a U.S. Bank ATM
  - o   Safe Deposit Box Paper Invoice Fee
- Wire Transfer Fee clarification is being added for the following:
  - o   Domestic internal - incoming - $15.00
  - o   Domestic internal - outgoing - $25.00

If you have questions, please call us at 800-USBANKS (872-2657) - we're available to help! You can also schedule an appointment at **usbank.com/book** to speak with a banker in person, by phone or virtually.

Effective May 13, 2024, please review updates made to the *Your Deposit Account Agreement* document which may affect your rights.

Beginning April 8, 2024, you can review the full revised document at **usbank.com/YDAA-upcoming-version**, by calling 24-Hour Banking at 800-USBANKS (872-2657) or by visiting your local U.S. Bank branch. We accept relay calls.

**Here's what you should know:**

- Under the **Overdraft Protection Plans** section, **Business Banking Overdraft Protection** sub-section, updated the language to state that when a checking account has a linked Business Reserve Line of Credit, the system will automatically draw from that account first, which may incur a fee. If a checking account has a deposit product and credit product linked as overdraft protection, the order of eligible accounts is updated to always draw from the deposit product first, which will not incur a fee, unless the checking account has a linked Business Reserve Line of Credit. If the deposit product has insufficient funds available to transfer, funds will draw from the credit product.

- Under the **Closing Your Account** section, added a paragraph for **How the account closure works** that says, for consumer checking, savings and money market accounts, when you request an account closure, your account will be placed in a 'pending closure' status for a period of 10 business days. During this 10 business day 'pending closure'

Products and services available in U.S. only. Eligibility requirements and restrictions apply. For additional information, contact a U.S. Bank branch or call 800-872-2657.



To keep track of your transactions, you should balance your account every month.  Please examine this statement immediately.  We will assume that the balance and transactions shown are correct unless you notify us of an error.

**Outstanding Deposits**

| DATE | AMOUNT |
|------|--------|
|      |        |
|      |        |
|      |        |
| TOTAL | $     |

**Outstanding Withdrawals**

| DATE | AMOUNT |
|------|--------|
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
|      |        |
| TOTAL | $     |

1.  List any deposits that do not appear on your statement in the Outstanding Deposits section at the left. Record the total.

2.  Check off in your checkbook register all checks, withdrawals (including Debit Card and ATM) and automatic payments that appear on your statement.  Withdrawals that are NOT checked  off should be recorded in the Outstanding Withdrawals section at the left.  Record the total.

3.  Enter the ending balance shown on this statement.                                      $_____

4.  Enter the total deposits recorded in the Outstanding Deposits section.       $_____

5.  Total lines 3 and 4.                                                                                        $_____

6.  Enter the total withdrawals recorded in the Outstanding Withdrawals section.  $_____

7.  Subtract line 6 from line 5.  This is your balance.                                       $_____

8.  Enter in your register and subtract from your register balance any checks, withdrawals or other debits (including fees, if any)  that appear on your statement but have not been recorded in your register.

9.  Enter in your register and add to your register balance any deposits or other credits (including interest, if any) that appear on your statement but have not been recorded in your register.

10. The balance in your register should be the same as the balance shown in #7.  If it does not match, review and check all figures used, and check the addition and subtraction in your register. If necessary, review and balance your statement from the previous month.

## IMPORTANT DISCLOSURES TO OUR CONSUMER CUSTOMERS
### In Case of Errors or Questions About Your Checking, Savings, ATM, Debit Card, ACH, Bill Pay and Other Electronic Transfers
If you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt, we must hear from you no later than 60 days* after we sent you the FIRST statement on which the error or problem appeared. Telephone us at the number listed on the front of this statement or write to us at U.S. Bank, EP-MN-WS5D, 60 Livingston Ave., St. Paul, MN 55107.
- Tell us your name and account number.
- Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
- Tell us the dollar amount of the suspected error.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, we may take up to 45 days to investigate your complaint. For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint. If we decide to do this, we will credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.
     *Please note: Paper draft and paper check claims must be disputed within 30 days per Your Deposit Account Agreement.

## IMPORTANT DISCLOSURES TO OUR BUSINESS CUSTOMERS
Errors related to any transaction on a business account will be governed by any agreement between us and/or all applicable rules and regulations governing such transactions, including the rules of the National Automated Clearing House Association (NACHA Rules) as may be amended from time to time.  If you think this statement is wrong, please telephone us at the number listed on the front of this statement immediately.

## CONSUMER BILLING RIGHTS SUMMARY REGARDING YOUR RESERVE LINE
### *What To Do If You Think You Find A Mistake on Your Statement*
If you think there is an error on your statement, write to us at:
U.S. Bank, P.O. Box 3528, Oshkosh, WI 54903-3528.
In your letter, give us the following information:
- *Account information:* Your name and account number.
- *Dollar Amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.
You must notify us of any potential errors *in writing*. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.
While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Reserve Line Balance Computation Method:**  To determine your **Balance Subject to Interest Rate**, use the dates and balances provided in the Reserve Line Balance Summary section. The date next to the first Balance Subject to Interest is day one for that balance and is applicable up to (but not including) the date of the next balance (if there is one). We multiply the Balance Subject to Interest by the number of days it is applicable and add them up to get the same number of days in the billing cycle. We then divide the result by the number of billing days in the cycle. This is your **Balance Subject to Interest Rate**.  Any unpaid interest charges and unpaid fees are not included in the Balance Subject to Interest.  The ***INTEREST CHARGE*** begins from the date of each advance.

## REPORTS TO AND FROM CREDIT BUREAUS FOR RESERVE LINES
We may report information about your account to credit bureaus. Late payments, missed payments or other defaults on your account may be reflected in your credit report.

## CONSUMER REPORT DISPUTES
We may report information about account activity on consumer and small business deposit accounts and consumer reserve lines to Consumer Reporting Agencies (CRA). As a result, this may prevent you from obtaining services at other financial institutions. If you believe we have inaccurately reported information to a CRA, you may submit a dispute by calling 844.624.8230 or by writing to: U.S. Bank Attn: Consumer Bureau Dispute Handling (CBDH), P.O. Box 3447, Oshkosh, WI 54903-3447. In order for us to assist you with your dispute, you must provide: your name, address and phone number; the account number; the specific information you are disputing; the explanation of why it is incorrect; and any supporting documentation (e.g., affidavit of identity theft), if applicable.



Member FDIC

**U.S. bank**
JAMES THOFF
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

**U.S. Statement**
Account Number:
████ 0574
Statement Period:
Apr 11, 2024
through
May 10, 2024

Page 2 of 3

## INFORMATION YOU SHOULD KNOW                          (CONTINUED)

period, we will allow pending deposits to be cleared and/or post to your account and we will allow pending debit card transactions that you authorized prior to initiating closure to be cleared and/or post to your account. Your debit card will be declined and transactions will no longer be approved when the account is in 'pending closure' status. Once your account is fully closed, transactions will not be allowed to post to the account except under limited circumstances. For example, transactions may be processed after closure if necessary for fraud investigations, transaction dispute claims, merchant credits, or deposit adjustments due to errors.

If you have questions, please call us at 800-USBANKS (872-2657) - we're available to help! You can also schedule an appointment at **usbank.com/book** to speak with a banker in person, by phone or virtually.

## U.S. BANK SMARTLY CHECKING                          *Member FDIC*

U.S. Bank National Association                          **Account Number** ████ -0574

### Account Summary

| | | | | | |
|---|---|---|---|---|---|
| Beginning Balance on Apr 11 | $ | 14,349.64 | Annual Percentage Yield Earned | | 0.00083% |
| Deposits / Credits | | 1,040.77 | Interest Earned this Period | $ | 0.01 |
| Card Withdrawals | | 606.55- | Interest Paid this Year | $ | 0.04 |
| | | | Number of Days in Statement Period | | 30 |
| **Ending Balance on May 10, 2024** | $ | **14,783.86** | | | |

### Deposits / Credits

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Apr 25 | Electronic Deposit<br>REF=241150136431590N00 | From Shopify<br>TRANSFER 1800948598 | | 150.67 |
| Apr 26 | Electronic Deposit<br>REF=241160160584660N00 | From Shopify<br>TRANSFER 1800948598 | | 58.04 |
| Apr 29 | Electronic Deposit<br>REF=241200054837300N00 | From Shopify<br>TRANSFER 1800948598 | | 97.23 |
| Apr 30 | Electronic Deposit<br>REF=241200176786700N00 | From Shopify<br>TRANSFER 1800948598 | | 95.36 |
| | **Total Deposits / Credits** | | $ | **1,040.77** |

### Card Withdrawals

Card Number: xxxx-xxxx-xxxx-6422

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|

**U.S. bank.**

JAMES THIOF
5105 LINDELL BLVD
SAINT LOUIS MO 63108-1221

**U.S. Bank Statement**

Account Number: 0574

Statement Period:
Apr 11, 2024
through
May 10, 2024

Page 3 of 3

## U.S. BANK SMARTLY CHECKING (CONTINUED)

U.S. Bank National Association

Account Number ████ -0574

### Card Withdrawals (continued)

Card Number: xxxx-xxxx-xxxx-6422

| Date | Description of Transaction | | Ref Number | Amount |
|------|---------------------------|---|-----------|--------|
| Apr 24 | Debit Purchase - VISA PRINTIFY.COM | On 042324 HTTPSPRINTIF DE REF # 24011344115000001008995 | 5000001008 | 60.57- |
| Apr 25 | Debit Purchase - VISA PRINTIFY.COM | On 042424 HTTPSPRINTIF DE REF # 24011344115000063891999 | 5000063891 | 15.97- |
| Apr 25 | Debit Purchase - VISA PRINTIFY.COM | On 042424 HTTPSPRINTIF DE REF # 24011344116000001856111 | 6000001856 | 26.14- |
| Apr 25 | Recurring Debit Purchase MODALYST | On 042424 917-376-2265 NY REF # 24116414115067836852 US1 | 5067836852 | 90.00- |
| Apr 26 | Debit Purchase - VISA PRINTIFY.COM | On 042524 HTTPSPRINTIF DE REF # 24011344116000070078910 | 6000070078 | 19.10- |
| Apr 29 | Debit Purchase - VISA PRINTIFY.COM | On 042724 HTTPSPRINTIF DE REF # 24011344118000071467789 | 8000071467 | 12.49- |
| Apr 29 | Debit Purchase - VISA PRINTIFY.COM | On 042724 HTTPSPRINTIF DE REF # 24011344118000071448060 | 8000071448 | 15.66- |
| Apr 29 | Debit Purchase - VISA PRINTIFY.COM | On 042624 HTTPSPRINTIF DE REF # 24011344118000000831675 | 8000000831 | 16.24- |

| | | |
|---|---|---|
| **Card 6422 Withdrawals Subtotal** | $ | 606.55- |
| **Total Card Withdrawals** | $ | 606.55- |

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|------|---------------|------|---------------|------|---------------|
| Apr 11 | 14,304.40 | Apr 19 | 14,425.58 | Apr 29 | 14,595.04 |
| Apr 12 | 14,320.97 | Apr 22 | 14,408.72 | Apr 30 | 14,690.40 |
| Apr 15 | 14,212.92 | Apr 23 | 14,545.27 | May 6 | 14,615.43 |
| Apr 16 | 14,386.71 | Apr 24 | 14,484.70 | May 7 | 14,769.65 |
| Apr 17 | 14,417.25 | Apr 25 | 14,503.26 | May 10 | 14,783.86 |
| Apr 18 | 14,389.28 | Apr 26 | 14,542.20 | | |

Balances only appear for days reflecting change.

# **Revolut** Business

# **Monthly statement**

Generated on the 20 May 2024

## TGP Communications LLC

**5105 Lindell Blvd**
**Saint Louis**
**63108-1221**
**MO**
**United States**

| | |
|---|---|
| Account name | United States Dollar |
| Currency | USD |
| **Type** | Local |
| **Account number** | ████1220 |
| **Routing number** | 026013356 |
| **Wire routing number** | 026013356 |
| **Type** | International |
| **Account number** | ████220 |
| **SWIFT / BIC** | REVOUS31 |
| **Intermediary BIC** | CHASGB2L |

## Balance summary

| | |
|---|---|
| Opening balance | $264 843.95 |
| Money in | $140 912.27 |
| Money out | - $238 323.50 |
| Closing balance | $167 432.72 |

Your funds are held and protected by a licensed bank.

## Transactions from 01 April 2024 to 30 April 2024

| Date (UTC) | | Description | Money out | Money in | Balance |
|---|---|---|---|---|---|
| 30 Apr 2024 | MOS | To Paulo De Paiva Serran • April 2024 Invoice Advance | $500.00 | | $167 432.72 |
| 29 Apr 2024 | MOA | Money added from ECONOMIC ADVISOR | | $29 315.00 | $167 932.72 |
| 25 Apr 2024 | MOA | Money added from ECONOMIC ADVISOR | | $1 749.10 | $138 617.72 |
| 22 Apr 2024 | MOA | Money added from ECONOMIC ADVISOR | | $12 455.80 | $136 868.62 |
| ████ | ██ | ████████ | | ████ | ████ |
| ████ | ██ | ████████ | | ████ | ████ |
| ████ | ██ | ████████ | ████ | | ████ |
| | | ████ | | | |
| ████ | ██ | ████████ | ████ | | ████ |

Report lost or stolen card
+1 844 744 3512
Get help directly In app
Scan the QR code

Revolut Technologies Inc. is a Delaware Software Company with its registered address at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. Banking services are provided by Metropolitan Commercial Bank, Member FDIC. The Revolut USA Mastercard is issued by Metropolitan Commercial Bank pursuant to a license from Mastercard International and may be used everywhere Mastercard is accepted in the U.S. "Metropolitan Commercial Bank" and "Metropolitan" are registered trademarks of Metropolitan Commercial Bank. Mastercard is a registered trademark, and the circles design is a trademark of Mastercard International Incorporated.

© 2024 Revolut Technologies Inc.



Report lost or stolen card
+1 844 744 3512
Get help directly In app
Scan the QR code

Revolut Technologies Inc. is a Delaware Software Company with its registered address at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. Banking services are provided by Metropolitan Commercial Bank, Member FDIC. The Revolut USA Mastercard is issued by Metropolitan Commercial Bank pursuant to a license from Mastercard International and may be used everywhere Mastercard is accepted in the U.S. "Metropolitan Commercial Bank" and "Metropolitan" are registered trademarks of Metropolitan Commercial Bank. Mastercard is a registered trademark, and the circles design is a trademark of Mastercard International Incorporated.

© 2024 Revolut Technologies Inc.



## Transaction types

| | | | |
|---|---|---|---|
| Card payments (CAR) | Money sent (MOS) | Money received (MOR) | Money added (MOA) |
| $0.00 | - $238 283.51 | $0.00 | + $140 912.27 |
| ATM Withdrawals (ATM) | Exchange Out (EXO) | Exchange In (EXI) | Revolut Fees (FEE) |
| $0.00 | $0.00 | $0.00 | - $49.99 |

Report lost or stolen card
+1 844 744 3512
Get help directly In app
Scan the QR code

Revolut Technologies Inc. is a Delaware Software Company with its registered address at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. Banking services are provided by Metropolitan Commercial Bank, Member FDIC. The Revolut USA Mastercard is issued by Metropolitan Commercial Bank pursuant to a license from Mastercard International and may be used everywhere Mastercard is accepted in the U.S. "Metropolitan Commercial Bank" and "Metropolitan" are registered trademarks of Metropolitan Commercial Bank. Mastercard is a registered trademark, and the circles design is a trademark of Mastercard International Incorporated.

© 2024 Revolut Technologies Inc.

# Exhibit 18

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                           **Chapter 11**

**TGP COMMUNICATIONS, LLC**                    **Case No.  24-13938-MAM**

     **Debtor.**

_____ /

**ADDITIONAL CERTIFICATION OF INFORMATION CONTAINED**
**WITHIN SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS**

    **TGP COMMUNICATIONS, LLC** files this Certification of Information Contained

Within the Schedules and Statement of Financial Affairs.

### I.      Introduction

    On April 24, 2024, the Debtor filed its Voluntary Petition under Chapter 11, Subchapter V.

(ECF No. 1).  On May 22, 2024, the Debtor filed its Schedules and Statement of Financial Affairs.

(ECF No. 30)  On May 30, 3034, the Debtor filed its Amended Schedules and Statement of Financial

Affairs. (ECF No. 34).

    James Hoft is the President and sole shareholder of the Debtor; however, Mr. Hoft relied upon

others to manage and gather information necessary to complete the Schedules and Statement of

Financial Affairs.  Specifically, Jonathon Burns, General Counsel and EVP was tasked with the

responsibility to gather necessary information from different sources and communicate with Bart

Houston, as Debtor's counsel.  Mr. Burns was the sole communicator of information with counsel

and confirmed any questions or requests for additional information needed by counsel for the

bankruptcy case. Mr. Burns has also appeared at the Initial Debtor Interview and the Section 341

Meeting as he is the Debtor's representative with the most comprehensive information concerning

the content of the Schedules and daily activities of the Debtor.  As such, Mr. Burns offers the

following additional certification

## II. Certification

I have examined the information in the Schedules and the Statement of Financial Affairs and any attachments and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 06/05/2024

s/  Jonathan Burns
Signature of individual signing on behalf of the debtor
Position or relationship to debtor: General Counsel and Executive Vice President

**Dated: June 6, 2024**

**HOUSTON RODERMAN**
*Attorney for Debtor-in-Possession*

By:   /s/ Bart A. Houston
Bart A. Houston
Florida Bar No. 623636
633 S. Andrews Ave. Suite 500
Ft. Lauderdale, Florida 33301
Telephone: (954) 900-2615
Facsimile: (954) 839-9068
Primary Email: bhouston@thehoustonfirm.com
Secondary Email: dschena@thehoustonfirm.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was served by the CM/ECF Noticing System on all counsel or parties of record who are on the CM/ECF Noticing System on June 6, 2024.

By:   */s/ Bart A. Houston*
Bart A. Houston, Esq.
Florida Bar No. 623636

Exhibit 19

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF FLORIDA

3    Case No. 24-13938-MAM

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    TGP COMMUNICATIONS, LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   Office of the United States Trustee

13                   Southern District of Florida

14                   51 S.W. 1st Ave.

15                   Miami, FL 33130

16

17                   June 6, 2024

18

19

20   341 Meeting of Creditors

21

22

23   B E F O R E :

24   MARTIN P. OCHS

25   TRUSTEE

Page 2

1 A P P E A R A N C E S :

2

3 UNITED STATES DEPARTMENT OF JUSTICE

4    Attorney for the U.S. Trustee

5    51 S.W. 1st Ave.

6    Miami, FL 33130

7

8 BY:  MARTIN P. OCHS (TELEPHONICALLY)

9

10 HOUSTON RODERMAN, LLC

11    Attorneys for Debtor

12    633 South Andrews Avenue

13    Fort Lauderdale, FL 33301

14

15 BY:  BART HOUSTON (TELEPHONICALLY)

16

17 WILLKIE FARR & GALLAGHER LLP

18    Attorneys for Ruby Freeman and Shaye Moss

19    787 Seventh Avenue

20    New York, NY 10019

21

22 BY:  JAMES BURBAGE (TELEPHONICALLY)

23

24

25

Page 3

1 CAIN & SKARNULIS PLLC

2    Attorneys for Dr. Eric Coomer

3    303 Colorado Street

4    Austin, Texas 78701

5

6 BY:  RYAN CHAPPLE (TELEPHONICALLY)

7

8 FURR COHEN

9    Attorneys for Jim Hoft

10    1155 Glades Road

11    Boca Raton, FL 33421

12

13 BY:  ROBERT FURR (TELEPHONICALLY)

14

15 ALSO APPEARING TELEPHONICALLY:

16    JIM HOFT, TGP Communications

17    JOHN BURNS, TGP Communications

18

19

20

21

22

23

24

25 Transcribed by:  Sonya Ledanski Hyde

Page 4

1        P R O C E E D I N G S

2    MR. OCHS:  From this point forward, I will be

3 recording this meeting of creditors.  Good afternoon.  My

4 name is Martin Ochs.  I'm a trial attorney with the United

5 States Trustee in Miami, Florida.  Today is Thursday, June

6 6, 2024.  We are here to conduct a continued 341 meeting in

7 the case of TGP Communications, LLC, Case Number 24-13938.

8 I ask that all parties mute their lines at this point in

9 time until they're speaking.  There's a lot of background

10 noise.  Please mute your phones.

11    This meeting is required pursuant to Section

12 341(a) of the United States Bankruptcy Code.  The purpose of

13 this meeting is to allow for an examination of the debtor

14 under oath concerning the administration of this case.

15 Questions may include but are not limited to why the case

16 was filed, the operation of the debtor's business, and the

17 prospects for reorganization.

18    As a reminder, this meeting is being digitally

19 recorded.  Remember that the recorder cannot see who you are

20 or see if you're nodding your head or waving your hands.  So

21 please be certain to give verbal responses, which you should

22 precede by saying your name and then giving your response.

23    If I'm speaking, please don't speak over me.  If

24 anyone would like to obtain a duplicate copy of today's

25 proceeding or a transcript, arrangements can be made through

Page 5

1 my office, which is the Office of the United States Trustee

2 in Miami, Florida.  First thing, debtor's counsel, I would

3 like you to note your appearance.

4    MR. HOUSTON:  Bart Houston on behalf of the

5 debtor-in-possession.

6    MR. OCHS:  Thank you.  Is a principal of the

7 debtor present today?

8    MR. HOFT:  Yes.  This is Jim Hoft with TGP

9 Communications.

10    MR. OCHS:  Okay.  Is there anybody else here on

11 behalf of the debtor?

12    MR. BURNS:  Yes, John Burns.

13    MR. OCHS:  Okay.  Thank you.  Now I'd like to take

14 attendance of the creditors.  It's hard to do this on the

15 phone, so one at a time please identify yourself and who you

16 represent.  I know you may step on each other a little bit,

17 but one person at a time please.  Thank you.

18    MR. BURBAGE:  Good afternoon.  Jim Burbage of

19 Willkie Farr and Gallagher on behalf of Ruby Freeman and

20 Shaye Moss.

21    MR. OCHS:  Thank you.  Next?

22    MR. CHAPPLE:  Good afternoon.  Ryan Chapple of

23 Cain and Skarnulis, PLLC on behalf of Dr. Eric Coomer.

24    MR. OCHS:  Okay.  Is there anybody else on the

25 line? Is anybody else on the line?  Okay.  Let the record

2 (Pages 2 - 5)

Page 6

1 reflect that there are none.

2     MR. FURR: Yeah, so sorry, Marty. Robert Furr on

3 behalf of Jim Hoft. First time I've phoned in. Sorry.

4     MR. OCHS: Okay. Thank you. All right. Is

5 anybody else on the line? All right. Nobody should be

6 recording this meeting. This meeting may only be recorded

7 by the United States Trustee. If you are recording this

8 meeting, you are directed to stop doing so at this point in

9 time. My recording is the only recording to be made. And

10 as I indicated earlier, a copy of this recording can be

11 obtained through my office or by contacting me.

12     Okay. Mr. Hoft, would you raise your right hand

13 please? Do you swear or affirm the statements you're about

14 to give are true and correct to the best of your knowledge,

15 information, and belief?

16     MR. HOFT: Yes, I do.

17     MR. OCHS: Okay. Are you familiar with the

18 bankruptcy petition that was filed in connection with this

19 case?

20     MR. HOFT: Yes, I am.

21     MR. OCHS: Okay. How did you become familiar with

22 the bankruptcy petition?

23     MR. HOFT: I filed it with -- working with my

24 attorneys.

25     MR. OCHS: Okay. And did you sign the bankruptcy

Page 7

1 petition?

2     MR. HOFT: Yes, I did.

3     MR. OCHS: And for the -- for clarity of the

4 record, this was the bankruptcy petition that was filed on

5 April 24, 2024 at Docket Number 1 on the Bankruptcy Court

6 Docket. You read that document, correct?

7     MR. HOFT: Yes, I did.

8     MR. OCHS: And the statements given there are true

9 and correct to the best of your knowledge, information, and

10 belief?

11     MR. HOFT: Yes, they are.

12     MR. OCHS: Okay. And did you read Document Number

13 2 also filed on April 24, 2024, which is the list of the 20

14 largest creditors?

15     MR. HOFT: Yes, I did.

16     MR. OCHS: And is that document truthful and

17 accurate?

18     MR. HOFT: Yes, I believe it is.

19     MR. OCHS: Okay. And subsequently on May 22,

20 2024, at Docket Number 30, the debtor's amended schedules

21 were filed. Did you read that document?

22     MR. HOFT: I am not familiar with that document.

23 I'm sorry.

24     MR. OCHS: Mr. Houston, have you shown your client

25 a copy of Docket Number 30, which is the schedules in this

Page 8

1 -- the amended schedules in this case?

2     MR. HOUSTON: They were provided through John

3 Burns to Mr. Hoft. As I have indicated previously, Mr.

4 Burns has been my point of contact for all the information

5 that he gathered to go into the schedules.

6     MR. OCHS: Okay. So Mr. --

7     MR. HOUSTON: So -- I'm sorry.

8     MR. OCHS: Mr. Hoft, have you seen this document

9 ever?

10     MR. HOFT: Is that to Jim Hoft?

11     MR. OCHS: Yes.

12     MR. HOFT: Is that the question to me?

13     MR. OCHS: Yes. I was posing it to Mr. Hoft.

14     MR. HOFT: I'm not familiar with it at this point.

15     MR. OCHS: So you don't have an ability to testify

16 about that document?

17     MR. HOFT: I need to see a copy of it, sir.

18     MR. OCHS: Okay. Mr. Houston, do you want to send

19 a copy of it to your client?

20     MR. HOUSTON: Yeah. I can email it to him. He's

21 in a different location than Mr. Burns, and everything I've

22 communicated to him has been to Mr. Burns. So I can email

23 it to him right now.

24     MR. HOFT: Great.

25     MR. OCHS: Mr. Hoft, let me know when you have it

Page 9

1 in your possession or your sight. Just so the record is

2 clear, we're waiting for Mr. Hoft to receive a copy of

3 Docket Number 30 and to confirm his having reviewed and

4 signed that document. I'll wait while Mr. Hoft receives it.

5     MR. HOUSTON: And so I've -- yeah, now I've

6 emailed it.

7     MR. OCHS: Okay. Thank you.

8     MR. HOFT: Okay. I've received the email, Bart.

9     MR. OCHS: All righty. Mr. Hoft, does that

10 document look familiar to you?

11     MR. HOFT: Yes. Yes, it does.

12     MR. OCHS: Okay. Can you describe the document to

13 me so that we're certain you're looking at the right

14 document?

15     MR. HOFT: Yes. It's a Summary of Assets and

16 Liabilities for Non-Individuals. It's Official Form 206Sum.

17     MR. OCHS: All right. Did you ever sign this

18 document? Sir, did you hear my question?

19     MR. HOFT: I'm -- I heard your question, yes. My

20 name is -- signature is on this document.

21     MR. OCHS: Is it -- do -- is -- did you ever sign

22 it with a pen?

23     MR. HOFT: There's a printed -- a signature on

24 this document.

25     MR. OCHS: No, I'm aware of that. I'm asking a

3 (Pages 6 - 9)

Page 10

1  different question.  Did you ever sign this document?
2      MR. HOFT:  Did I sign this document with a pen?
3  No.
4      MR. OCHS:  Did you ever sign this document at all
5  with a crayon or a marker or anything?
6      MR. HOFT:  No.
7      MR. OCHS:  So you have not signed the schedules in
8  this case.  Is that correct?
9      MR. HOFT:  It --
10     MR. OCHS:  It's really a simple --
11     MR. HOFT:  Unless they --
12     MR. HOFT:  It's really simple --
13     MR. HOFT:  -- sent a -- unless I signed
14  electronically, but I did not sign an actual signature.
15     MR. OCHS:  Do you have any recollection of having
16  signed this electronically?
17     MR. HOFT:  I have signed numerous documents, sir,
18  so this is --
19     MR. OCHS:  That's not my --
20     MR. HOFT:  -- (indiscernible) --
21     MR. OCHS:  That's not my -- Mr. Hoft, that's not
22  my question.
23     MR. HOFT:  Yeah.  No.
24     MR. OCHS:  My question is have you ever signed
25  this --

Page 11

1      MR. HOFT:  Yes.
2      MR. OCHS:  -- document.  I'm breaking this into
3  pieces.  Have you ever signed it?
4      MR. HOFT:  Yeah, yeah.  I -- it -- again, it does
5  not look familiar, but I may have signed it, so that's my
6  answer.
7      MR. OCHS:  May have signed it is your answer?
8      MR. HOFT:  That's my honest answer.  I may have
9  signed it.
10     MR. OCHS:  No, I only want you to answer honestly.
11  That's for sure, okay?  You're under oath.  So I only want
12  your honest answers.
13     MR. HOFT:  Okay.
14     MR. OCHS:  Did you ever sign this document?
15     MR. HOFT:  I'm going to say no I did not.
16     MR. OCHS:  Okay.  All right.  We cannot conduct
17  this 341 meeting yet again today.  Mr. Houston, this
18  requires some serious --
19     MR. HOUSTON:  I --
20     MR. OCHS:  Let me finish.  This requires some
21  serious and immediate attention.  This case has significant
22  gravity to it, okay?  This is a basic document.  It should
23  have been signed by Mr. Hoft.  He's now saying he did not
24  sign it, but his signature appears on what was filed with
25  the bankruptcy court.  There are local rules that govern

Page 12

1  this sort of thing and it appears that you have not complied
2  with the local rules, and that's troubling and concerning.
3  Do you understand that?
4      MR. HOUSTON:  Well, before you get troubled and
5  concerned, Mr. Ochs, I have a wet signature.  Mr. Burns
6  obtained the signature.  The fact that he doesn't recognize
7  the document doesn't establish that I've violated any local
8  rules.
9      MR. OCHS:  Okay.  He just testified --
10     MR. HOUSTON:  I'm going to file the wet signature
11  if you'd like.
12     MR. OCHS:  He -- I'd be happy to have it.  He just
13  testified to me that he does not -- that he did not sign
14  this document.  I heard it, you heard it, the recording has
15  it.  So how do you have --
16     MR. HOUSTON:  And --
17     MR. OCHS:  Stop.  How do you have a --
18     MR. HOUSTON:  He --
19     MR. OCHS:  Stop.  How do you have a written or a
20  wet-signed document that this witness says that he did not
21  sign?
22     MR. HOUSTON:  He's mistaken.  He's confused.  That
23  happens.  There's these schedules and then there's Court
24  Paper 34 Amended Schedules.  I have wet signatures on both
25  of them.  I'm glad to send them to you.

Page 13

1      MR. OCHS:  All right.  I'll wait.  Please send
2  them to me.
3      MR. HOUSTON:  Okay.  We're scanning it now.
4      MR. FURR:  Hey, Bart.  Send a copy of that to Jim
5  and to me too.
6      MR. HOUSTON:  Yeah, (indiscernible).
7      MR. FURR:  Robert Furr.
8      MR. HOUSTON:  Yep.
9      MR. OCHS:  Mr. Furr, I take it you don't have a
10  copy of it already?
11     MR. FURR:  No, I don't.  I wouldn't have any
12  reason to necessarily.  I was going on the court file.
13     MR. HOUSTON:  Just emailed.
14     MR. BURNS:  You said you emailed them to me, Bart?
15     MR. HOUSTON:  Yeah, I emailed to you and to Bob
16  Furr, Robert Furr, and to Mr. Hoft.
17     MR. FURR:  I got it.
18     MR. OCHS:  The Subchapter V Trustee says that she
19  is trying to get into the call, so I'm going to pause for a
20  moment.  I'm going to leave the recording running, but I'm
21  going to pause for a moment while, A, I'm waiting for the
22  email, and B, waiting for the Subchapter V Trustee to join.
23     WOMAN:  Marty, I apologize.  I'm actually -- I am
24  on the line.  And I know we talked about it the other day,
25  but I called on the other line, but there seems to be that

4 (Pages 10 - 13)

Page 14

1 there's people waiting on the other line as well.

2 MR. OCHS: I can't control --

3 WOMAN: (Indiscernible).

4 MR. OCHS: I -- unfortunately --

5 WOMAN: Yeah, I know.

6 MR. OCHS: -- I can't control that line because I

7 have -- you know, I have this line engaged.

8 WOMAN: Okay.

9 MR. OCHS: Could you hear the other people?

10 Because I didn't open the other --

11 WOMAN: No, but it shows how many people are on

12 the line holding.

13 MR. OCHS: Okay.

14 WOMAN: It was just a few.

15 MR. OCHS: Because I did not open that -- I did

16 not open the other line, but I'd like to get them. Give me

17 just a moment. I'm just trying to think about a solution

18 for this. All right. I'm going to pause the recording --

19 WOMAN: Well, let me (indiscernible) --

20 MR. OCHS: I'm sorry. Go ahead.

21 WOMAN: Go ahead. I'm sorry.

22 MR. OCHS: No, go ahead.

23 WOMAN: I was going to say (indiscernible) for

24 quite a bit so I could call back and just double confirm

25 that they're still holding.

Page 15

1 MR. OCHS: Okay. If you would, please. I'm going

2 to pause the recording here for a moment. The time is now

3 3:49 p.m. and I'm pausing the recording.

4 (Recording paused)

5 MR. OCHS: It is now 3:51 p.m. on June 6, 2024,

6 and we are resuming the 341 meeting in the TGP case. The

7 reason why we paused was because we were trying to get the

8 documents in front of myself and the debtors -- the debtor,

9 the principal of the debtor so that we could confirm his

10 signatures. So Mr. Hoft, tell me what documents you have in

11 front of you now please.

12 MR. HOFT: I have a document, it looks like

13 206Sum.

14 MR. HOUSTON: He's got the voluntary petition.

15 MR. OCHS: Okay. What about the schedules? Do we

16 have signed copies of the schedules?

17 MR. HOUSTON: The -- what I sent to you, the

18 voluntary petition, should've been the scanned document that

19 he signed for the petition, the schedules, and the amended

20 schedules. I have my secretary now, my paralegal looking

21 for the signed copies that are just like that where it has

22 an electronic signature and then his off in the side.

23 MR. OCHS: Okay.

24 MR. HOUSTON: So --

25 MR. OCHS: The --

Page 16

1 MR. HOUSTON: -- she should find that.

2 MR. OCHS: The only document that I have in front

3 of me with Mr. -- which is what you're telling me is Mr.

4 Hoft's signature is dated April 24, 2024. These other

5 documents were filed and presumably dated at a later date.

6 So this document, you know, is not -- it should not be

7 everything that I'm expecting to receive because there's a

8 document dated May 22, 2004. There is a document dated --

9 MR. HOUSTON: May 30th.

10 MR. OCHS: Yes. And I don't have those --

11 MR. HOUSTON: Understood.

12 MR. OCHS: -- yet signed by Mr. Hoft. So should I

13 pause the recording again, Mr. Houston? Are you sending

14 them too?

15 MR. HOUSTON: I don't have them in my hands yet.

16 I'm waiting for my secretary to come back with them.

17 MR. OCHS: Okay.

18 MR. HOUSTON: So yes, you can pause the recording.

19 MR. OCHS: Okay. Thank you. I'm going to be

20 pausing the recording. It is now 3:54 p.m. on June 6th.

21 (Recording paused)

22 MR. OCHS: Okay. It is now 4:02 p.m. on June 6,

23 2024, and we're continuing the 341 meeting of TGP

24 Communications, Case Number 24-13938. Again, this case was

25 assigned to Bankruptcy Judge Mora. So now I've been

Page 17

1 supplied with Document Number 34 on the docket, which is a

2 30-page document, and it was filed on May 30, 2024. Mr.

3 Hoft, have you seen this document?

4 MR. HOFT: Yes.

5 MR. OCHS: When did you first see this document?

6 MR. HOFT: I would say I saw the first document

7 when it was sent to me by my attorney and I was told to look

8 over it.

9 MR. OCHS: Do you remember when that was?

10 MR. HOFT: That was sometime after -- it would've

11 been sometime in May.

12 MR. OCHS: But you don't remember more precisely

13 than that?

14 MR. HOFT: I don't have the exact date on that,

15 sir.

16 MR. OCHS: Okay. And did you sign that today?

17 MR. HOFT: I just went through our pile of

18 documents, and of course I'm not familiar with these

19 numbers, sir. This is very foreign material to me. I'm not

20 an attorney as you know. And so I go through this stack of

21 documents and I found the documents that were signed and I

22 believe were sent off, but maybe they weren't. And so I

23 sent them off today to my attorneys.

24 MR. OCHS: Today being before this meeting began

25 at 3:30 p.m. or after 3:30 p.m.?

5 (Pages 14 - 17)

Page 18

1     MR. HOFT:  Since the questioning began.

2     MR. OCHS:  Okay.  So --

3     MR. HOFT:  I looked through my pile of documents

4  and sent the signed documents to my attorneys.

5     MR. OCHS:  Okay.  But they were previously signed

6  is what you're saying?

7     MR. HOFT:  Yes.  I had a couple of dates on these

8  documents.  One was -- they were both towards the end of

9  May.

10     MR. OCHS:  Okay.  Now, there was a document filed

11  this afternoon at 3:25 p.m. Eastern Time, which was just

12  five minutes before this proceeding began.  And that

13  document says that the petition -- it confirms the petition

14  was filed on April 24th, and then there were schedules filed

15  on May 22nd and May 30th, okay?  It says that James Hoft,

16  that's you, is the president and sole shareholder of the

17  debtor.  However, you replied on others to manage and gather

18  information necessary to complete the schedules and

19  Statement of Financial Affairs.

20     Who were -- and then it says specifically Jonathan

21  Burns, general counsel and EVP was asked with the -- was

22  tasked, pardon me, with the responsibility to gather the

23  necessary information from different sources and communicate

24  with Bart Houston as general -- as debtor's general counsel.

25  So are you saying -- a couple of questions I have from this.

Page 19

1  Is Mr. Burns the general counsel for the debtor?

2     MR. HOFT:  Mr. Burns is general counsel and

3  executive vice president at TGP Communications.

4     MR. OCHS:  Okay.  And when did Mr. Burns become

5  general counsel?

6     MR. HOFT:  John has worked for me for a number of

7  years.  I would have to look up when John first started

8  working for me.

9     MR. OCHS:  Did he work for you or for TGP?

10     MR. HOFT:  Well, for TGP, sir.  Excuse me.

11     MR. OCHS:  Okay.  Well, it's just precision

12  matters here and that's why I'm asking, okay?  So it says,

13  "Mr. Burns was the sole communicator of information with

14  counsel and confirmed any questions or requests for

15  additional information needed by counsel for the bankruptcy

16  case.  Mr. Burns also appeared at the initial debtor

17  interview and the Section 341 meeting as he is the debtor's

18  representative with the most comprehensive information

19  concerning the content of the schedules."  So is that to

20  suggest that you're not familiar with the finances and the

21  financial affairs of the debtor?

22     MR. HOFT:  I'm certainly familiar with the

23  situation I'm in.

24     MR. OCHS:  Okay.  When you say the situation

25  you're in, tell me what that situation is please.

Page 20

1     MR. HOFT:  Well, I run a business.  I pay my

2  bills.  I have challenges like every business.  And I'm

3  scrutinized consistently.  I have a lawyer because we have

4  lawsuits.  We currently have a lawsuit that is in front of

5  the supreme court that should be decided within the next

6  couple of weeks on free speech where we are the lead

7  plaintiff.

8     We also have other cases in front of us, including

9  the one with Mr. Coomer.  His representatives are on the

10  line I believe.  And also Ruby and Shaye, the two women from

11  Georgia, and their representatives are on the line.  So

12  we're very busy with lawsuits.

13     MR. OCHS:  Okay.  Is TGP a party or a participant

14  in the supreme court litigation that you just talked about?

15     MR. HOFT:  The supreme court litigation is under

16  Jim Hoft, and I am the owner of TGP Communications.

17     MR. OCHS:  But you're saying TGP is not a direct

18  participant in that litigation.  Is that correct?

19     MR. HOFT:  That would be correct.

20     MR. OCHS:  All right.  So what -- you know, the

21  Reader's Digest version of that litigation is what?

22     MR. HOFT:  With the supreme court?

23     MR. OCHS:  Yes.

24     MR. HOFT:  The federal government has decided that

25  they had the right to censor Americans.  We challenged that.

Page 21

1  It made its way to the supreme court.  The supreme court

2  heard the case in March.  They're going to decide this month

3  if the government has the right to censor, ban, silence

4  Americans.  And we are one of the -- again, one of the

5  plaintiffs in this very important case on free speech.

6     MR. OCHS:  Who were the other plaintiffs in that

7  case?

8     MR. HOFT:  There are three doctors.  Dr. Jay

9  Bhattacharya from Stanford, Dr. Kulldorff from Harvard, Dr.

10  Kheriaty who was with the University of California in

11  Irvine.  He was since fired for speaking out against -- I

12  believe it was the fact that they closed down society for

13  COVID.  He spoke up against that and was fired.  And then

14  Jill Hines who is also a writer who is in Louisiana.

15     MR. OCHS:  Who is funding that litigation?

16     MR. HOFT:  That is being represented by the States

17  of Missouri and Louisiana.

18     MR. OCHS:  Who -- but the question is who is

19  funding it.  Who is paying for that litigation?

20     MR. HOFT:  The State of Missouri had asked us to

21  join in on this case.  So I assume it's the State of

22  Missouri who is paying our bills for that case.

23     MR. OCHS:  Okay.  So TGP is not paying towards

24  that litigation?  Is that correct?

25     MR. HOFT:  That's correct at this time.

6 (Pages 18 - 21)

Page 22

1    MR. OCHS: Okay. Has TGP ever paid towards that
2 litigation?
3    MR. HOFT: No, just the work and the hours we put
4 on it in ourselves.
5    MR. OCHS: Okay. And you said, "at this time".
6 Do you think that the payment arrangements for that
7 litigation might change? I'm asking only because you --
8    MR. HOFT: I have no idea.
9    MR. OCHS: I'm only asking because you said it
10 "not at this time".
11    MR. HOFT: I have no idea. That's why I would say
12 that.
13    MR. OCHS: Okay. Tell me what TGP does. What's
14 its business?
15    MR. HOFT: TGP represents The Gateway Pundit,
16 which is one of the leading (indiscernible) opinion websites
17 in the country, independent media. And so TGP is the LLC
18 that we're -- we -- that includes The Gateway Pundit.
19    MR. OCHS: And why did TGP file bankruptcy?
20    MR. HOFT: We filed bankruptcy because of the
21 pressures that are on our business that are (indiscernible)
22 from these I would say leftist groups that are attacking us
23 and wanting -- and taking us to court. And it's costing us
24 a lot of money, and we only have so much money. And so it
25 doesn't look very much like we're in a very positive

Page 23

1 position at this point.
2    MR. OCHS: Did TGP ever operate at a profit?
3    MR. HOFT: Certainly.
4    MR. OCHS: And when was that?
5    MR. HOFT: TGP has -- we pay our bills. We're not
6 a very -- there's lots of different projects we would like
7 to do and perform and different things, but we don't have
8 excess money to do things like that. We don't have money to
9 send reporters all over the country. We do have reporters
10 that are based in different parts of the country and the
11 world, but -- so there's -- so we pay at the minimum. We
12 break even. We make a little money, and that's been our
13 business model.
14    MR. OCHS: When was TGP formed?
15    MR. HOFT: The website was formed in 2013.
16    MR. OCHS: Okay. And --
17    MR. HOFT: TGP was. TGP was.
18    MR. OCHS: By whom was --
19    MR. HOFT: The website was founded in 2004.
20    MR. OCHS: And by whom was it formed?
21    MR. HOFT: I signed the papers on that in 2013.
22    MR. OCHS: And were you the -- but you said it was
23 formed in 2004 and then you said 2013.
24    MR. HOFT: It was a hobby website until 2013 when
25 we filed it with the State of Missouri.

Page 24

1    MR. OCHS: Okay. Where do you live?
2    MR. HOFT: My full-time address is in Florida. My
3 -- I also have a home in Saint Louis, Missouri.
4    MR. OCHS: And where does the business operate
5 from?
6    MR. HOFT: Currently the business operates out of
7 Florida, or if I'm in Saint Louis it operates out of Saint
8 Louis. It's -- our office is wherever we operate from.
9    MR. OCHS: When did TGP start operating in
10 Florida?
11    MR. HOFT: We -- the -- we became citizens of
12 Florida with driver's license and insurance policies and
13 home, that was in 2022.
14    MR. OCHS: Who -- when you say "we", who is the
15 "we"?
16    MR. HOFT: The "we" is my partner Jezreel Morano.
17    MR. OCHS: And you moved from Missouri to Florida?
18    MR. HOFT: We bought a home in Florida.
19    MR. OCHS: Okay. And when did you buy that home?
20    MR. HOFT: That was in -- I believe it was 2021 in
21 October.
22    MR. OCHS: Okay. And when -- and where does -- if
23 I wanted to send a letter to TGP right now, send them
24 whatever, a letter about its work and business, where would
25 I send that letter?

Page 25

1    MR. HOFT: You would send a letter to TGP
2 Communications in Jensen Beach.
3    MR. OCHS: At what address?
4    MR. HOFT: That'd be 1820 NE Jensen Beach
5 Boulevard, Unit 1120.
6    MR. OCHS: And that's just a mailbox drop, isn't
7 that?
8    MR. HOFT: It's a mailbox drop in Florida just
9 like it's a mailbox drop here in Saint Louis.
10    MR. OCHS: So if I went to that address, what
11 would be there at that address? What would I see?
12    MR. HOFT: Just like in Saint Louis it would be a
13 mailbox here in West Saint Louis or it would be a mailbox in
14 Jensen Beach.
15    MR. OCHS: Does TGP keep any sort of physical
16 presence in Florida?
17    MR. HOFT: Well, certainly I have my office there
18 in my home.
19    MR. OCHS: Okay. Where is your office?
20    MR. HOFT: In Jensen Beach.
21    MR. OCHS: Is it at a specific address?
22    MR. HOFT: It's in my home.
23    MR. OCHS: And when is -- since when has that
24 been?
25    MR. HOFT: Since I bought the home in October of

7 (Pages 22 - 25)

Page 26

1  2021.

2      MR. OCHS:  Okay.  And why are you using a mailbox

3  what is, you know, I would refer to as a Mail Boxes Etc.

4  address in Jensen Beach?  Why are you using that address?

5      MR. HOFT:  I don't use my home address and I

6  haven't for years because of obviously different threats

7  that writers get at this point.

8      MR. OCHS:  Are --

9      MR. HOFT:  Certainly we've received threats.

10     MR. OCHS:  Are you a writer?

11     MR. HOFT:  Yes, I write.

12     MR. OCHS:  Okay.  For whom do you write?

13     MR. HOFT:  The Gateway Pundit website.

14     MR. OCHS:  Do you write for anybody else?

15     MR. HOFT:  Maybe a guest post, but nothing -- no,

16 I only write for Gateway Pundit.

17     MR. OCHS:  Okay.  The -- there is a list of

18 creditors that was filed in connection with the bankruptcy

19 case.  And I'm sure you know this because you and I met

20 virtually over a Zoom hearing the other day.  But this list

21 of creditors was filed on April 24th as part of the initial

22 bankruptcy filing, and it lists a number of people but as

23 John or Jane Doe.  Who -- how come the John or Jane Does

24 were used as opposed to their real names?  I assume that not

25 all these people are named Jane Doe or John Doe.

Page 27

1      MR. HOFT:  I think my attorney could answer that

2  better than I could.

3      MR. OCHS:  Well, you run the business so I want to

4  know what --

5      MR. HOFT:  Okay.

6      MR. OCHS:  -- your testimony is.  I can't ask your

7  attorney.

8      MR. HOFT:  We have single women -- okay.  We have

9  single women who live alone and who have been threatened in

10 the past and they don't want the whole world to know where

11 they live.

12     MR. OCHS:  And why are they being threatened?

13     MR. HOFT:  You'd have to ask people who are

14 threatening them.

15     MR. OCHS:  Well, why do you suspect they are being

16 threatened?

17     MR. HOFT:  Because they are conservative Christian

18 women who write articles that some people disagree with.

19     MR. OCHS:  All right.  So they're being threatened

20 because of the publication that TGP does?

21     MR. HOFT:  They're being threatened for the

22 articles that they write.

23     MR. OCHS:  Okay.  And the care-of addresses that

24 are used on this list are Jonathan Burns.  Is that correct?

25     MR. HOFT:  Jonathan is our general counsel.

Page 28

1  That's --

2      MR. OCHS:  All right.

3      MR. HOFT:  -- Jonathan Burns.

4      MR. OCHS:  Did the creditors of the debtor ask

5  Jonathan Burns to represent them?

6      MR. HOFT:  John could answer that.  I believe so.

7      MR. OCHS:  No, he can't.  You have to answer that.

8      MR. HOFT:  Okay.  I would say yes they are -- had

9  required John to represent them.

10     MR. OCHS:  Required or is there another word

11 maybe?

12     MR. HOFT:  Maybe requested.

13     MR. OCHS:  All right, but Jonathan Burns

14 represents -- you said represents the debtor TGP, correct?

15     MR. HOFT:  That's true.

16     MR. OCHS:  Okay.  Who is Jez Morano?

17     MR. HOFT:  That's my husband.

18     MR. OCHS:  Okay.  And -- but his address appears

19 on the bankruptcy petition, correct?

20     MR. HOFT:  If you tell me that's -- I -- you'd

21 have to show me where that is.

22     MR. OCHS:  All right.  I'm --

23     MR. HOFT:  I suppose.

24     MR. OCHS:  I mean, I'm looking at Document Number

25 2 on the Bankruptcy Docket, and he is Item Number 2 on that

Page 29

1  document.

2      MR. HOFT:  Okay.

3      MR. OCHS:  So why is his address not -- you know,

4  under the same theory, why is his address not somehow, you

5  know, redacted or concealed in the way the other creditors'

6  addresses are concealed or names and addresses are

7  concealed?

8      MR. HOUSTON:  Mr. Ochs, I have no idea why this is

9  relevant at all to this bankruptcy case, but that was a

10 mistake made by my law firm because we didn't recognize that

11 that gentleman was Mr. Hoft's husband if that answers your

12 question.

13     MR. OCHS:  Well, it --

14     MR. HOUSTON:  It's our mistake or we would've

15 redacted his too.

16     MR. OCHS:  It does in part, but you know, a

17 somewhat unique motion was made in this case, which I'm sure

18 you're aware because we were all in court about this earlier

19 this week, relative to, you know, in some way veiling the

20 names and addresses of the creditors here.  And the United

21 States Trustee opposed that motion, voiced a concern about

22 it, and the judge has set a hearing, a further hearing on

23 that as you're aware.  And so this is relevant to that.

24 Does that clarify it for you?

25     MR. HOUSTON:  I don't -- well, number one, if

8 (Pages 26 - 29)

Page 30

1 that's what it's relevant to, I don't appreciate doing
2 discovery on a motion that's a contested matter in a 341
3 meeting. And you and I had this discussion before that you
4 don't subscribe to the theory that objections can be made
5 during a 341. So now you're asking questions on a contested
6 matter that you take the position I can't object and I don't
7 think that's appropriate. Respectfully.
8     MR. OCHS: Well, if you want to object, object,
9 but I'm looking at a document that was filed on the
10 Bankruptcy Docket. It is normal for this to be examined
11 about -- at a 341 meeting, and that's what I'm doing.
12     MR. HOUSTON: Got it.
13     MR. OCHS: Okay? So --
14     MR. HOUSTON: Yes, sir.
15     MR. OCHS: -- is there a written --
16     MR. HOUSTON: So the answer to your question is
17 that was a mistake of my office that we included Mr. Hoft's
18 address. And thank you for pointing that out so now
19 everyone knows. But that was my mistake.
20     MR. OCHS: I didn't know who --
21     MR. HOUSTON: I blew that.
22     MR. OCHS: I didn't know who Jez Morano was. So I
23 appreciate the sarcasm, you know, but it had nothing to do
24 with the line of questions. Moving forward, so is there a
25 written agreement between Mr. Burns and the people which I

Page 31

1 understand are authors on this list? Are -- is there a
2 written agreement between Mr. Burns and those people? That
3 question is for Mr. Hoft.
4     MR. HOFT: Well, to take a step back, the reason
5 -- Jezreel just does social media work. He doesn't -- he's
6 not a writer. I don't know why he'd be threatened. He has
7 been threatened in the past, but -- so there's that. I
8 didn't realize that our address was put down on these
9 documents and that you had just mentioned that. So there's
10 also that.
11     And then your question is does -- do these -- John
12 is very open and honest with the writers at Gateway Pundit,
13 and I'm sure he had a discussion with them. But you'd have
14 to ask John.
15     MR. OCHS: Are -- let me try the question a
16 different way. Are you aware of there being a written
17 agreement between Mr. Burns, who you're referring to as
18 John, and the parties that are listed on this Document
19 Number 2?
20     MR. HOFT: Well, I assume John has something. I
21 assume that because John does everything by the book. And
22 so that would -- I had just assumed that he has that
23 agreement with the writers.
24     MR. OCHS: But you don't know one way or the
25 other?

Page 32

1     MR. HOFT: It's not something that I -- that John
2 and I discussed.
3     MR. OCHS: Okay. You have -- again, TGP has
4 listed Ted Slater. Who is Ted Slater?
5     MR. HOFT: Ted is an IT expert who works with us.
6     MR. OCHS: Okay. The PO box listed for Jonathan
7 Burns is in Saint Louis, Missouri. Why is the PO box
8 maintained in Saint Louis?
9     MR. HOFT: For John Burns?
10     MR. OCHS: Yes.
11     MR. HOFT: I guess you'd have to ask John.
12     MR. OCHS: Are you familiar with PO Box 191250?
13     MR. HOFT: At what location?
14     MR. OCHS: Saint Louis, Missouri 63119.
15     MR. HOFT: I don't -- I mean, you'll have to let
16 me look up my box number. Yeah, I'm not familiar with that
17 box.
18     MR. OCHS: You're not -- so you don't know who or
19 what maintains that particular post office box?
20     MR. HOFT: It sounds like you said it was John
21 Burns' box, so I assume John could answer that question.
22     MR. OCHS: No, I'm asking you whether you know who
23 maintains that box.
24     MR. HOFT: I don't know who maintains that box.
25 It's not our box here in Saint Louis.

Page 33

1     MR. OCHS: Have you personally spoken to any of
2 the authors that are concerned that they're going to be
3 threatened or are being threatened?
4     MR. HOFT: I speak to my writers all the time who
5 are being threatened.
6     MR. OCHS: Okay.
7     MR. HOFT: Which isn't anything new.
8     MR. OCHS: Okay. And what have they told you?
9     MR. HOFT: They don't want their address out there
10 and they don't want their names.
11     MR. OCHS: Okay.
12     MR. HOFT: Several of them.
13     MR. OCHS: Because they don't want to be
14 threatened?
15     MR. HOFT: They've been threatened.
16     MR. OCHS: By whom?
17     MR. HOFT: Some have police reports.
18     MR. OCHS: Okay.
19     MR. HOFT: You'll have to ask the writers.
20     MR. OCHS: Do you have copies of those police
21 reports?
22     MR. HOFT: I don't offhand. John Burns may have
23 copies, and some -- I believe some of their threats came
24 before they even were working with me.
25     MR. OCHS: Okay. And then you said to me -- just

9 (Pages 30 - 33)

Page 34

1 a few moments ago you said I would have to ask the writers.
2 How would I go about asking the writers that question?
3     MR. HOFT: How would you do that?
4     MR. OCHS: Yes.
5     MR. HOFT: I suppose because they're John Doe
6 you'd have to go through me and I could set up an interview
7 for you.
8     MR. OCHS: So you know who these John and Jane
9 Does are yourself, correct?
10     MR. HOFT: Sure.
11     MR. OCHS: And obviously people have found out who
12 these John and Jane Does are already, correct?
13     MR. HOFT: I don't know that.
14     MR. OCHS: Well, you said they were being
15 threatened.
16     MR. HOUSTON: Mr. Ochs, I'm going to object to
17 this line of questioning. You're taking discovery on a
18 matter that's a contested matter before the court. This is
19 not a 2004. I would like you to contain your questions to
20 the schedules and the statements and not really get into a
21 matter that's going to be heard by the court on an
22 evidentiary basis.
23     MR. OCHS: I -- with all due respect, okay, I am
24 asking questions about a schedule that was filed by your
25 firm on the docket in this case. I haven't strayed from

Page 35

1 that document or things relative to that document or
2 relative to my getting an understanding of how the document
3 was prepared and why it was prepared.
4     MR. HOUSTON: It's respectfully gone well beyond
5 what the schedules say. You read my motion. You heard our
6 arguments. You made arguments against me. You filed an
7 opposition and it's going to be heard by the court. So I'm
8 just -- I don't know why this is the subject of a 341 when
9 it's already queued up as a contested matter.
10     MR. OCHS: Because it's part and parcel of the 341
11 meeting for the United States Trustee to gain an
12 understanding as to who these parties are on this list.
13 It's part and parcel of that.
14     MR. HOUSTON: Got it. Okay. Obviously I'm not
15 going to win this argument without -- on the phone, so
16 please proceed.
17     MR. OCHS: Who is Kelly Poen, P-O-E-N?
18     MR. HOFT: Kelly helps with some accounting, and
19 she also helps with speaking with advertisers.
20     MR. OCHS: Is she -- she's an employee of TGP?
21     MR. HOFT: Yes.
22     MR. OCHS: Is she a W-2 employee or a 1099
23 employee?
24     MR. HOFT: She's a 1099.
25     MR. OCHS: Do you compensate or does -- withdrawn.

Page 36

1 Does TGP compensation Jonathan Burns?
2     MR. HOFT: Yes. We pay him through -- Justice
3 League. We pay him -- that's how we pay him.
4     MR. OCHS: Okay. Why is Jonathan Burns paid
5 through Justice League?
6     MR. HOFT: That's the way we set it up.
7     MR. OCHS: Who's "we"?
8     MR. HOFT: Myself and John and I'm sure I spoke
9 with our accountant.
10     MR. OCHS: Okay. And when was it set up that way?
11     MR. HOFT: When John -- when we formed Justice
12 League.
13     MR. OCHS: When was Justice League formed?
14     MR. HOFT: I don't have that information in front
15 of me.
16     MR. OCHS: Do you have a rough --
17     MR. HOFT: I could look it up.
18     MR. OCHS: Do you have a rough idea of when it was
19 formed?
20     MR. HOFT: Hmm. Could've been 20 -- I don't know.
21 You can ask John.
22     MR. OCHS: Do -- John won't know whether you know.
23 I'm asking you do you know roughly when it was formed?
24     MR. HOFT: Within the past four years. Say 2020.
25     MR. OCHS: What does Justice League do?

Page 37

1     MR. HOFT: Justice League represented us in
2 several court cases we had and several other legal matters.
3     MR. OCHS: When you say "us", who do you mean by
4 "us"?
5     MR. HOFT: I mean TGP Communications.
6     MR. OCHS: Okay. Is there anybody else included
7 in that umbrella of "us"?
8     MR. HOFT: Not that I can think of. You have the
9 information.
10     MR. OCHS: What do you mean I have the
11 information?
12     MR. HOFT: Well, I've sent you everything I have.
13 We did. We sent you everything we have.
14     MR. OCHS: You keep saying "we". Tell me who you
15 mean by "we".
16     MR. HOFT: Well, that would be me and John and the
17 attorneys that we hired in Florida who helped me fill out
18 paperwork and turned in the many pages of information that
19 you received.
20     MR. OCHS: All right. When you say you sent it to
21 me, you mean the United States Trustee or who do you mean
22 that it was sent to?
23     MR. HOFT: Again, you could ask John Burns that
24 question. They took care of mailing out the information.
25     MR. OCHS: Okay. Who is James Kirk?

10 (Pages 34 - 37)

Page 38

1    MR. HOFT: James is a long-time friend who is an
2 employee, a 1099 employee who helps with cleaning up the
3 comments at the website Gateway Pundit.
4    MR. OCHS: You mean comments from the public?
5    MR. HOFT: Yes.
6    MR. OCHS: Is he paid by the debtor, by TGP?
7    MR. HOFT: Yes.
8    MR. OCHS: And how much --
9    MR. HOFT: Yes.
10    MR. OCHS: How much is he paid?
11    MR. HOFT: I believe we pay James $1,200 a month.
12    MR. OCHS: Okay. And how was the decision made
13 not to, you know, cloak or veil Mr. Kirk's information that
14 is listed on the bankruptcy documents?
15    MR. HOFT: I think you could ask Mr. Burns that
16 question.
17    MR. OCHS: You don't know?
18    MR. HOFT: I'm not familiar why we would leave
19 that open. John would have a better idea.
20    MR. OCHS: Okay. Do you know does -- has TGP
21 closed its pre-bankruptcy bank accounts?
22    MR. HOFT: We've closed several and we're working
23 on the U.S. Bank account currently.
24    MR. OCHS: When you say U.S. Bank account, does
25 this entity keep assets outside of the United States?

Page 39

1    MR. HOFT: No.
2    MR. OCHS: So when you say U.S. Bank, do you mean
3 U.S. Bank the bank name?
4    MR. HOFT: Yes, sir.
5    MR. OCHS: Okay. What steps have been taken to
6 open up a post-bankruptcy account, what we refer to as a
7 debtor-in-possession account?
8    MR. HOFT: We opened up an account with City
9 National Bank.
10    MR. OCHS: Okay. Do you know how your firm got to
11 Mr. Houston to retain -- your company, TGP, how did it get
12 to Mr. Houston to hire Mr. Houston for this bankruptcy case?
13    MR. HOFT: We asked around.
14    MR. OCHS: Okay. So you were referred to him?
15    MR. HOFT: Yes.
16    MR. OCHS: Okay. On the bankruptcy petition and
17 schedules, there was a document filed that's called List of
18 Equity Security Holders. That is Document Number 31, and it
19 was filed on May 22, 2024 and it lists your name James Hoft.
20 And then again it uses the same mailbox address as the
21 debtor's, TGP's, address. Is that correct?
22    MR. HOFT: I'll have (indiscernible) document.
23    MR. OCHS: I'm sorry. Say that one more time
24 please? You broke up.
25    MR. HOFT: I would have to look at the document.

Page 40

1    MR. OCHS: Okay. And do you know why that address
2 is used for you?
3    MR. HOFT: Again, I'd like to see the document
4 you're talking about. I'd have to dig that up through the
5 several documents I have sitting here.
6    MR. OCHS: Okay. It's Document --
7    MR. HOFT: You said the number of that is what?
8    MR. OCHS: Document Number 31, sir. It was Page 1
9 of 1, List of Equity Security Holders.
10    MR. HOFT: Page 1 of 1? Okay. I see our address
11 in Jensen Beach, Florida on this document.
12    MR. OCHS: Why was that address used for you? And
13 you know, beyond the corporation it was used for you
14 individually.
15    MR. HOFT: I don't know why they -- I don't know
16 why that would be there, but that's our -- my home address
17 in Florida.
18    MR. OCHS: Do you receive your mail there at that
19 mailbox?
20    MR. HOFT: Yes. That's a mailbox, yes.
21    MR. OCHS: Okay. So the debtor -- if I understood
22 it correctly from your testimony earlier, the debtor filed
23 bankruptcy because people were suing the Debtor TGP?
24    MR. HOFT: We filed bankruptcy because of the
25 pressures on the business.

Page 41

1    MR. OCHS: Can you --
2    MR. HOFT: And the cost of this litigation and the
3 fact that we have -- don't have the assets.
4    MR. OCHS: So you say the pressures on the
5 company. What were those pressures specifically?
6    MR. HOFT: Well, we have certainly business
7 pressures, advertising pressures that are constant. We have
8 frequent -- frequently there are groups that push
9 advertisers to take their ads off our site. Some leftist
10 groups that do that. So we have pressures with our --
11 maintaining an income, and then we also have now the new
12 pressures with the different lawsuits that we're currently
13 dealing with.
14    MR. OCHS: What is your understanding of why these
15 people are suing TGP?
16    MR. HOFT: Is that something I need to answer
17 here? Are we going to go into those cases today?
18    MR. OCHS: Yes.
19    MR. HOFT: Okay. Well, we caught two women in
20 Georgia who were working in the State Farm Center on
21 election night of 2020. And after the observers were
22 removed from the room, I -- the one woman named Shaye, the
23 five individuals went back into the counting room without
24 any supervision -- without any observers and began to count
25 ballots late at night after it was announced that they were

11 (Pages 38 - 41)

Page 42

1 going to quit counting in Georgia for the evening.

2 We were the ones who were able to report with

3 video evidence that these women were then shoving stacks of

4 ballots through machines three times, turning them over to

5 another individual who would shove them through another

6 machine another time. And this was happening while there

7 was no observers. So we reported this with video evidence.

8 And so now we're being sued because we reported the truth on

9 an incident that we have video evidence for.

10 MR. OCHS: Okay. The debtor maintained a bank

11 account or maintains a bank account at MIDFLORIDA Credit

12 Union. Do you know anything about that bank account?

13 MR. HOFT: Sure. We moved all of our bank

14 accounts over to that one account.

15 MR. OCHS: When did you do that?

16 MR. HOFT: Well, we've done that in the past

17 several weeks.

18 MR. OCHS: This was listed on the bankruptcy

19 petition that was filed -- or the schedules that were filed

20 with the bankruptcy court. So when would you say that

21 account was opened? Or those accounts.

22 MR. HOFT: I could look it up.

23 MR. OCHS: You don't know off the top of your

24 head? You think it was more than a year ago?

25 MR. HOFT: Well, I could find you the date.

Page 43

1 MR. OCHS: Okay.

2 MR. HOFT: I'll find you the date.

3 MR. OCHS: Okay. Do you want me to wait while you

4 do that, or do you want to let me know?

5 MR. HOFT: Sure. You can wait a sec. Okay. City

6 National Bank. When did we open that? (Indiscernible)

7 moved all the money over to City National Bank of Florida.

8 We opened the bank account on May 10th.

9 MR. OCHS: Okay. And how many accounts are there

10 at that bank?

11 MR. HOFT: We have one account at City National

12 Bank.

13 MR. OCHS: Okay. And then you -- and how much

14 money is in that account right now?

15 MR. HOFT: We currently have $148,785.38.

16 MR. OCHS: Who has access to that bank account?

17 MR. HOFT: I have access to that account and I

18 believe Kelly Poen.

19 MR. OCHS: Okay. And then you list mutual funds

20 or publicly traded stocks at Charles Schwab Bank. Who has

21 access to the Charles Schwab account?

22 MR. HOFT: That would be myself.

23 MR. OCHS: And how much money or what's the value

24 of that account at Charles Schwab?

25 MR. HOFT: I don't have that information in front

Page 44

1 of me.

2 MR. OCHS: Do you have an estimate as to what

3 might be in that account?

4 MR. HOFT: I think maybe 1.2 million.

5 MR. OCHS: Okay. Who has access to that account?

6 And what is that account used for?

7 MR. HOFT: So that is not an account with TGP

8 Communications. That's an account with Jim Hoft. That's my

9 personal account.

10 MR. OCHS: But --

11 MR. HOFT: I believe.

12 MR. OCHS: Well, it ends in -- it's account number

13 --

14 MR. HOFT: I gave you -- I stand corrected. I do

15 use business funds to fund that account. I have.

16 MR. OCHS: But do you -- you keep your personal

17 money on that Schwab account as well? It's -- just to be

18 crystal clear before you answer that --

19 MR. HOFT: You know, I would say that it's a

20 business account because I do use business funds. That's

21 what I've done.

22 MR. OCHS: It's a -- so we're clear, it's account

23 ending in 8 number -- in 8256. So you know the account I'm

24 referring to?

25 MR. HOFT: I believe I only have one Schwab

Page 45

1 account. So if that's the number you're saying, I'm going

2 to agree with it. I don't have that information in front of

3 me.

4 MR. OCHS: Okay. Do you access that account for

5 personal funds or personal use?

6 MR. HOFT: I've never taken any money out of that

7 account.

8 MR. OCHS: Okay. And where are the records for

9 that account? Do you have those records?

10 MR. HOFT: I have access to those records.

11 MR. OCHS: Okay. So if I ask you for those

12 records, it would not be a big deal to get those records.

13 Is that correct?

14 MR. HOFT: What was your question again?

15 MR. OCHS: If I asked you to produce those

16 records, you could produce them to me.

17 MR. HOFT: Absolutely.

18 MR. OCHS: Okay. On the bankruptcy schedules,

19 there's listed a 2021 Porsche Cayenne. That's owned by the

20 debtor?

21 MR. HOFT: Yes.

22 MR. OCHS: Is the title to that vehicle in the

23 debtor TGP's name?

24 MR. HOFT: It may be in a trust. It may be in a

25 trust.

12 (Pages 42 - 45)

Page 46

1    MR. OCHS: What trust would that be?

2    MR. HOFT: I'd have to look. I have to look.

3    MR. OCHS: All right. I'm calling for the
4 production of that title to that vehicle. Mr. Houston, are
5 you going to have a problem with me requesting that sort of
6 document here at the 341 meeting?

7    MR. HOUSTON: Zero problem. We'll provide it to
8 you.

9    MR. OCHS: All right.

10    MR. HOUSTON: We already provided the proof of the
11 insurance that's on it.

12    MR. OCHS: Yes. Mr. Hoft, provide the copy of the
13 title to that vehicle to Mr. Houston who's going to provide
14 it to the United States Trustee, okay?

15    MR. HOFT: Okay.

16    MR. OCHS: The debtor also maintains bank accounts
17 at U.S. Bank. Is that correct?

18    MR. HOFT: We are closing that account. We've
19 closed it. We have to -- they told us it would take ten
20 days to close it, so it's currently open but we closed the
21 account.

22    MR. OCHS: All right. And where are the proceeds
23 from the U.S. Bank accounts going to go?

24    MR. HOFT: All of the proceeds went to the City
25 National Bank account.

Page 47

1    MR. OCHS: Okay. And what about the Revolut Bank?

2    MR. HOFT: We closed that account.

3    MR. OCHS: And where did the money from that bank
4 account go?

5    MR. HOFT: It all went to City National Bank.

6    MR. OCHS: Does TGP keep any assets outside of the
7 United States?

8    MR. HOFT: No.

9    MR. OCHS: TGP had Robinhood Crypto accounts,
10 correct?

11    MR. HOFT: Yes.

12    MR. OCHS: And where did those accounts -- are
13 those accounts still open?

14    MR. HOFT: Yes.

15    MR. OCHS: They've not been closed at the time of
16 the bankruptcy?

17    MR. HOFT: No.

18    MR. OCHS: Okay. Why not?

19    MR. HOFT: We just bought the crypto and left them
20 open.

21    MR. OCHS: Okay. Mr. --

22    MR. HOFT: We can close them if that's the
23 request.

24    MR. OCHS: Mr. --

25    MR. HOFT: We can do that. I didn't know that was

Page 48

1 a request.

2    MR. OCHS: Mr. Houston, you and I should have a
3 conversation about the maintenance of those bank accounts.
4 We can do that after this 341 meeting. We don't have to do
5 it today, but --

6    MR. HOUSTON: So it's clear, I inquired on that.
7 It's not a bank account, it's a securities account. But if
8 there's some way to address that it's not being addressed,
9 I'm glad to have that communication with you.

10    MR. OCHS: Okay. I just -- I have concerns about
11 whether it's properly collateralized under 345 for a debtor-
12 in-possession to maintain. So we should discuss that.

13    MR. HOUSTON: Understood.

14    MR. OCHS: I admit the hour's growing late and so
15 I don't want to bog down on that now. So there is listed on
16 the bankruptcy petition notes receivables, and there's a
17 loan receivable from shareholder. Is that you, Mr. Hoft?

18    MR. HOFT: Can you repeat that?

19    MR. OCHS: There is -- at Item 71, Notes
20 Receivable. This is on the bankruptcy petition at Page 10
21 of 44. It says Loan Receivable Shareholder. You're the
22 shareholder, correct?

23    MR. HOFT: Yes.

24    MR. OCHS: And it says that you owe the Debtor TGP
25 $799,860. Is that correct?

Page 49

1    MR. HOFT: Yes.

2    MR. OCHS: Okay. And so you owe TGP that amount
3 of money as of today?

4    MR. HOFT: Correct.

5    MR. OCHS: How did you come to owe TGP $799,860?

6    MR. HOFT: That's for the home in Florida.

7    MR. OCHS: What does that mean exactly?

8    MR. HOFT: I purchased a home in Florida.

9    MR. OCHS: Is the -- was the home in Florida
10 purchased in your individual name or in the name of TGP?

11    MR. HOFT: It was bought in -- by a business loan,
12 and it was for the condominium that we live in there in
13 Florida. And it was, I believe, a trust, through a trust.

14    MR. OCHS: Do you have a copy of the deed to the
15 condominium in Florida?

16    MR. HOFT: Yes.

17    MR. OCHS: Do you have any of the closing
18 documents to the condominium in Florida?

19    MR. HOFT: I could find those.

20    MR. OCHS: I'm calling for the production of those
21 as well. Again, same process. Give them to Mr. Houston who
22 will give them to the United States Trustee. So it says
23 loan receivable. That -- to me, I read that to mean that
24 you owe TGP $799,860. Am I understanding that correctly?

25    MR. HOFT: That looks correct.

13 (Pages 46 - 49)

| Page 50 | Page 52 |
|---|---|
| 1  MR. OCHS: All right. Have you filed personal | 1  to look into that. |
| 2  bankruptcy? | 2  MR. OCHS: Okay. When will you be able to do |
| 3  MR. HOFT: No. | 3  that? |
| 4  MR. OCHS: Do you intend to? | 4  MR. HOFT: I can find that in the next 24 hours |
| 5  MR. HOFT: It's certainly something I've thought | 5  I'm sure. |
| 6  about. I haven't moved forward on that. | 6  MR. OCHS: Okay. Please produce that to Mr. |
| 7  MR. OCHS: Do you have the ability to pay TGP the | 7  Houston who will produce it to me, okay? Is that okay? |
| 8  $799,860, which the schedules say that you owe to TGP? | 8  MR. HOFT: (Indiscernible). |
| 9  MR. HOFT: I could make payments. | 9  MR. OCHS: Okay. Are there any other amounts owed |
| 10  MR. OCHS: Are there documents that surround that | 10  to TGP that we have not yet discussed? |
| 11  loan beyond the condominium purchase? | 11  MR. HOFT: No. |
| 12  MR. HOFT: I'd have to look for any documents. I | 12  MR. OCHS: Okay. Mr. Houston, this next question |
| 13  -- as far as a loan schedule you mean? | 13  is for you, and it's probably one you've been waiting for. |
| 14  MR. OCHS: Well, a note, a promissory note, any | 14  But this meeting has gone long, but I want to give creditors |
| 15  documentation that exists relative to this loan receivable. | 15  an opportunity to ask questions as well. So do you want to |
| 16  MR. HOFT: I'm not sure. | 16  continue today, or should we reschedule? I'm happy to do |
| 17  MR. OCHS: What would make you sure? | 17  either, but I'd be happy to reschedule because this has gone |
| 18  MR. HOFT: I'll have to hunt around for documents. | 18  longer than I would've expected. |
| 19  MR. OCHS: The United States Trustee is calling | 19  MR. HOUSTON: So I would only ask the other |
| 20  for you to hunt around for those documents and to produce | 20  gentlemen on the phone whether they expect to have |
| 21  them to Mr. Houston who will produce them to the United | 21  substantial questioning. And you know, it's, you know, some |
| 22  States Trustee. It's a very precise amount, $799,860. | 22  perfunctory things or they don't have it, then I'd just as |
| 23  Where did that number come from? | 23  soon get it done with. |
| 24  MR. HOFT: That was the purchase price I believe. | 24  MR. OCHS: Okay. What do the parties -- |
| 25  MR. OCHS: For the condominium? | 25  MR. HOUSTON: (Indiscernible) -- |

| Page 51 | Page 53 |
|---|---|
| 1  MR. HOFT: Yes. | 1  MR. OCHS: What do the parties on the line want to |
| 2  MR. OCHS: Okay. Do you recall getting a closing | 2  do? Please let me know. |
| 3  document or closing papers, you know, a closing binder, any | 3  MR. CHAPPLE: Good afternoon. This is Ryan |
| 4  sorts of papers for that condominium? | 4  Chapple for Dr. Eric Coomer. I estimate 15 minutes of |
| 5  MR. HOFT: Yes, we have closing documents. | 5  questions. |
| 6  MR. OCHS: Okay. So produce those to Mr. Houston | 6  MR. OCHS: All right. I think with that in mind, |
| 7  who will produce them to the United States Trustee. Thank | 7  Bart, we should probably reschedule. Let's talk about a |
| 8  you. Okay. There's another loan receivable for $21,000 for | 8  date that we could do that because that's only one creditor, |
| 9  Joe Hoft. That's your brother, isn't it? | 9  and I'm sure there's others that have questions as well. So |
| 10  MR. HOFT: Yes. | 10  I'm looking at my calendar, and I'll suggest some dates. |
| 11  MR. OCHS: Are there any documents relative to | 11  And then the parties on the line can let me know whether |
| 12  that loan? | 12  that works. I would -- well, that's a federal holiday. |
| 13  MR. HOFT: I'm not certain. | 13  Hang on one moment, please. I could be available in the |
| 14  MR. OCHS: Are there any documents at all relative | 14  morning on June 17th. That is -- I could do it at 9 a.m. |
| 15  to that loan? | 15  Eastern Time or start earlier if parties want to. I'd be |
| 16  MR. HOFT: I'm not certain. | 16  happy to start as early as 8:30 that day if the parties |
| 17  MR. OCHS: Why -- what would make you certain? | 17  would like. |
| 18  MR. HOFT: I'd have to look around and ask Joe if | 18  MR. CHAPPLE: I'm sorry, Mr. Ochs. Did you say -- |
| 19  he has a document. | 19  MR. HOUSTON: From the -- |
| 20  MR. OCHS: Well, but he owes the money to Joe Hoft | 20  MR. CHAPPLE: -- that date and time again, please? |
| 21  -- I mean, Joe Hoft, pardon me, owes the money to TGP, | 21  MR. OCHS: June 17th I could start as early as |
| 22  correct? | 22  8:30 a.m. |
| 23  MR. HOFT: I need to look into that. | 23  MR. BURNS: Mr. Ochs, this is John Burns. I am |
| 24  MR. OCHS: What does that mean? | 24  not available in the morning of the 17th. |
| 25  MR. HOFT: I'm not certain about that. I'll have | 25  MR. OCHS: How about the 18th on the same -- |

14 (Pages 50 - 53)

Page 54

1    MR. HOUSTON:  Neither am I.

2    MR. OCHS:  How about the 18th on the same

3 timeframe?

4    MR. BURNS:  One moment.  I can be available --

5 this is John Burns.  I can be available in the morning, yes.

6    MR. OCHS:  Let's try it this way.  Is there

7 anybody on the line who cannot be available on Tuesday, June

8 18th?  Okay.  What time -- Mr. Houston and Mr. Hoft, what

9 time would you like to start on that day?  You know, I'm

10 happy to start at 8:30 or 9.  Whichever you'd prefer.

11 Please let me know.

12    MR. HOFT:  I don't care.

13    MR. HOUSTON:  Either works for me.

14    MR. OCHS:  Okay.  Mr. Hoft?

15    MR. HOUSTON:  9:00.

16    MR. OCHS:  Mr. Hoft, if you're in Missouri or

17 Florida, there's an hour time difference.  Which do you want

18 to do, Mr. Hoft?

19    MR. HOFT:  9:00 is fine.

20    MR. OCHS:  Okay.  Very well.  So we'll do this at

21 9:00 on Tuesday, June 18, 2024.  And I will post on the

22 docket again like I did for today the dial-in information.

23 Please be certain to check the docket.  I need to see

24 whether the same dial-in information is available or it may

25 change, but I have to check with my staff before I do that.

Page 55

1 So with that said, I will continue this meeting June 18th, 9

2 a.m. Eastern Time.  And it is now 5:02 p.m. on June 6, 2024.

3 We are off the record.  Thank you.

4    MR. BURNS:  Thank you.

5    (Whereupon these proceedings were concluded at

6 5:02 PM)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 56

1    C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certified that the foregoing

4 transcript is a true and accurate record of the proceedings.

5

6    _Sonya Ledanski Hyde_  Signature

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20 Veritext Legal Solutions

21 330 Old Country Road

22 Suite 300

23 Mineola, NY 11501

24

25 Date:  June 13, 2024

15 (Pages 54 - 56)

[& - accounts]                                                          Page 1

## &

**&** 2:17 3:1

## 1

**1** 7:5 40:8,9,10
  40:10
**1,200** 38:11
**1.2** 44:4
**10** 48:20
**10019** 2:20
**1099** 35:22,24
  38:2
**10th** 43:8
**1120** 25:5
**11501** 56:23
**1155** 3:10
**12151** 56:6
**13** 56:25
**148,785.38.**
  43:15
**15** 53:4
**17th** 53:14,21
  53:24
**18** 54:21
**1820** 25:4
**18th** 53:25
  54:2,8 55:1
**191250** 32:12
**1st** 1:14 2:5

## 2

**2** 7:13 28:25,25
  31:19 35:22
**20** 7:13 36:20
**2004** 16:8
  23:19,23 34:19
**2013** 23:15,21
  23:23,24

**2020** 36:24
  41:21
**2021** 24:20
  26:1 45:19
**2022** 24:13
**2024** 1:17 4:6
  7:5,13,20 15:5
  16:4,23 17:2
  39:19 54:21
  55:2 56:25
**206sum** 9:16
  15:13
**21,000** 51:8
**22** 7:19 16:8
  39:19
**22nd** 18:15
**24** 7:5,13 16:4
  52:4
**24-13938** 1:3
  4:7 16:24
**24th** 18:14
  26:21

## 3

**30** 7:20,25 9:3
  17:2,2
**300** 56:22
**303** 3:3
**30th** 16:9
  18:15
**31** 39:18 40:8
**330** 56:21
**33130** 1:15 2:6
**33301** 2:13
**33421** 3:11
**34** 12:24 17:1
**341** 1:20 4:6,12
  11:17 15:6

16:23 19:17
  30:2,5,11 35:8
  35:10 46:6
  48:4
**345** 48:11
**3:25** 18:11
**3:30** 17:25,25
**3:49** 15:3
**3:51** 15:5
**3:54** 16:20

## 4

**44** 48:21
**4:02** 16:22

## 5

**51** 1:14 2:5
**5:02** 55:2,6

## 6

**6** 1:17 4:6 15:5
  16:22 55:2
**63119** 32:14
**633** 2:12
**6th** 16:20

## 7

**71** 48:19
**787** 2:19
**78701** 3:4
**799,860** 48:25
  49:5,24 50:8
  50:22

## 8

**8** 44:23
**8256** 44:23
**8:30** 53:16,22
  54:10

## 9

**9** 53:14 54:10
  55:1
**9:00** 54:15,19
  54:21

## a

**a.m.** 53:14,22
  55:2
**ability** 8:15
  50:7
**able** 42:2 52:2
**absolutely**
  45:17
**access** 43:16,17
  43:21 44:5
  45:4,10
**account** 38:23
  38:24 39:6,7,8
  42:11,11,12,14
  42:21 43:8,11
  43:14,16,17,21
  43:24 44:3,5,6
  44:7,8,9,12,15
  44:17,20,22,23
  45:1,4,7,9
  46:18,21,25
  47:2,4 48:7,7
**accountant**
  36:9
**accounting**
  35:18
**accounts** 38:21
  42:14,21 43:9
  46:16,23 47:9
  47:12,13 48:3

**accurate** 7:17
56:4
**actual** 10:14
**actually** 13:23
**additional**
19:15
**address** 24:2
25:3,10,11,21
26:4,4,5 28:18
29:3,4 30:18
31:8 33:9
39:20,21 40:1
40:10,12,16
48:8
**addressed** 48:8
**addresses**
27:23 29:6,6
29:20
**administration**
4:14
**admit** 48:14
**ads** 41:9
**advertisers**
35:19 41:9
**advertising**
41:7
**affairs** 18:19
19:21
**affirm** 6:13
**afternoon** 4:3
5:18,22 18:11
53:3
**ago** 34:1 42:24
**agree** 45:2
**agreement**
30:25 31:2,17
31:23

**ahead** 14:20,21
14:22
**allow** 4:13
**amended** 7:20
8:1 12:24
15:19
**americans**
20:25 21:4
**amount** 49:2
50:22
**amounts** 52:9
**andrews** 2:12
**announced**
41:25
**answer** 11:6,7
11:8,10 27:1
28:6,7 30:16
32:21 41:16
44:18
**answers** 11:12
29:11
**anybody** 5:10
5:24,25 6:5
26:14 37:6
54:7
**apologize**
13:23
**appearance**
5:3
**appeared**
19:16
**appearing** 3:15
**appears** 11:24
12:1 28:18
**appreciate**
30:1,23

**appropriate**
30:7
**april** 7:5,13
16:4 18:14
26:21
**argument**
35:15
**arguments**
35:6,6
**arrangements**
4:25 22:6
**articles** 27:18
27:22
**asked** 18:21
21:20 39:13
45:15
**asking** 9:25
19:12 22:7,9
30:5 32:22
34:2,24 36:23
**assets** 9:15
38:25 41:3
47:6
**assigned** 16:25
**assume** 21:21
26:24 31:20,21
32:21
**assumed** 31:22
**attacking**
22:22
**attendance**
5:14
**attention** 11:21
**attorney** 2:4
4:4 17:7,20
27:1,7

**attorneys** 2:11
2:18 3:2,9 6:24
17:23 18:4
37:17
**austin** 3:4
**authors** 31:1
33:2
**available** 53:13
53:24 54:4,5,7
54:24
**ave** 1:14 2:5
**avenue** 2:12,19
**aware** 9:25
29:18,23 31:16

**b**

**b** 1:23 13:22
**back** 14:24
16:16 31:4
41:23
**background**
4:9
**ballots** 41:25
42:4
**ban** 21:3
**bank** 38:21,23
38:24 39:2,3,3
39:9 42:10,11
42:12,13 43:6
43:7,8,10,12
43:16,20 46:16
46:17,23,25
47:1,3,5 48:3,7
**bankruptcy**
1:1 4:12 6:18
6:22,25 7:4,5
11:25 16:25
19:15 22:19,20

26:18,22 28:19
28:25 29:9
30:10 38:14,21
39:6,12,16
40:23,24 42:18
42:20 45:18
47:16 48:16,20
50:2
**bart** 2:15 5:4
9:8 13:4,14
18:24 53:7
**based** 23:10
**basic** 11:22
**basis** 34:22
**beach** 25:2,4
25:14,20 26:4
40:11
**began** 17:24
18:1,12 41:24
**behalf** 5:4,11
5:19,23 6:3
**belief** 6:15 7:10
**believe** 7:18
17:22 20:10
21:12 24:20
28:6 33:23
38:11 43:18
44:11,25 49:13
50:24
**best** 6:14 7:9
**better** 27:2
38:19
**beyond** 35:4
40:13 50:11
**bhattacharya**
21:9

**big** 45:12
**bills** 20:2 21:22
23:5
**binder** 51:3
**bit** 5:16 14:24
**blew** 30:21
**bob** 13:15
**boca** 3:11
**bog** 48:15
**book** 31:21
**bought** 24:18
25:25 47:19
49:11
**boulevard** 25:5
**box** 32:6,7,12
32:16,17,19,21
32:23,24,25
**boxes** 26:3
**break** 23:12
**breaking** 11:2
**broke** 39:24
**brother** 51:9
**burbage** 2:22
5:18,18
**burns** 3:17
5:12,12 8:3,4
8:21,22 12:5
13:14 18:21
19:1,2,4,13,16
27:24 28:3,5
28:13 30:25
31:2,17 32:7,9
32:21 33:22
36:1,4 37:23
38:15 53:23,23
54:4,5 55:4

**business** 4:16
20:1,2 22:14
22:21 23:13
24:4,6,24 27:3
40:25 41:6
44:15,20,20
49:11
**busy** 20:12
**buy** 24:19

**c**

**c** 2:1 4:1 56:1,1
**cain** 3:1 5:23
**calendar** 53:10
**california**
21:10
**call** 13:19
14:24
**called** 13:25
39:17
**calling** 46:3
49:20 50:19
**care** 27:23
37:24 54:12
**case** 1:3 4:7,7
4:14,15 6:19
8:1 10:8 11:21
15:6 16:24,24
19:16 21:2,5,7
21:21,22 26:19
29:9,17 34:25
39:12
**cases** 20:8 37:2
41:17
**caught** 41:19
**cayenne** 45:19
**censor** 20:25
21:3

**center** 41:20
**certain** 4:21
9:13 51:13,16
51:17,25 54:23
**certainly** 19:22
23:3 25:17
26:9 41:6 50:5
**certified** 56:3
**challenged**
20:25
**challenges**
20:2
**change** 22:7
54:25
**chapple** 3:6
5:22,22 53:3,4
53:18,20
**charles** 43:20
43:21,24
**check** 54:23,25
**christian** 27:17
**citizens** 24:11
**city** 39:8 43:5,7
43:11 46:24
47:5
**clarify** 29:24
**clarity** 7:3
**cleaning** 38:2
**clear** 9:2 44:18
44:22 48:6
**client** 7:24 8:19
**cloak** 38:13
**close** 46:20
47:22
**closed** 21:12
38:21,22 46:19
46:20 47:2,15

| | | | |
|---|---|---|---|
| **closing** 46:18 49:17 51:2,3,3 51:5 | **concealed** 29:5 29:6,7 | **continue** 52:16 55:1 | 27:25 |
| **code** 4:12 | **concern** 29:21 | **continued** 4:6 | **count** 41:24 |
| **cohen** 3:8 | **concerned** 12:5 33:2 | **continuing** 16:23 | **counting** 41:23 42:1 |
| **collateralized** 48:11 | **concerning** 4:14 12:2 19:19 | **control** 14:2,6 | **country** 22:17 23:9,10 56:21 |
| **colorado** 3:3 | **concerns** 48:10 | **conversation** 48:3 | **couple** 18:7,25 20:6 |
| **come** 16:16 26:23 49:5 50:23 | **concluded** 55:5 | **coomer** 3:2 5:23 20:9 53:4 | **course** 17:18 |
| **comments** 38:3 38:4 | **condominium** 49:12,15,18 50:11,25 51:4 | **copies** 15:16,21 33:20,23 | **court** 1:1 7:5 11:25 12:23 13:12 20:5,14 20:15,22 21:1 21:1 22:23 29:18 34:18,21 35:7 37:2 42:20 |
| **communicate** 18:23 | **conduct** 4:6 11:16 | **copy** 4:24 6:10 7:25 8:17,19 9:2 13:4,10 46:12 49:14 | |
| **communicated** 8:22 | **confirm** 9:3 14:24 15:9 | **corporation** 40:13 | |
| **communicati...** 48:9 | **confirmed** 19:14 | **correct** 6:14 7:6,9 10:8 20:18,19 21:24 21:25 27:24 28:14,19 34:9 34:12 39:21 45:13 46:17 47:10 48:22,25 49:4,25 51:22 | **covid** 21:13 |
| **communicati...** 1:7 3:16,17 4:7 5:9 16:24 19:3 20:16 25:2 37:5 44:8 | **confirms** 18:13 | | **crayon** 10:5 |
| | **confused** 12:22 | | **credit** 42:11 |
| | **connection** 6:18 26:18 | | **creditor** 53:8 |
| | **conservative** 27:17 | | **creditors** 1:20 4:3 5:14 7:14 26:18,21 28:4 29:5,20 52:14 |
| **communicator** 19:13 | **consistently** 20:3 | | **crypto** 47:9,19 |
| **company** 39:11 41:5 | **constant** 41:7 | **corrected** 44:14 | **crystal** 44:18 |
| **compensate** 35:25 | **contact** 8:4 | **correctly** 40:22 49:24 | **currently** 20:4 24:6 38:23 41:12 43:15 46:20 |
| **compensation** 36:1 | **contacting** 6:11 | **cost** 41:2 | |
| **complete** 18:18 | **contain** 34:19 | **costing** 22:23 | **d** |
| **complied** 12:1 | **content** 19:19 | **could've** 36:20 | **d** 4:1 |
| **comprehensive** 19:18 | **contested** 30:2 30:5 34:18 35:9 | **counsel** 5:2 18:21,24 19:1 19:2,5,14,15 | **date** 16:5 17:14 42:25 43:2 53:8,20 56:25 |

**dated** 16:4,5,8
16:8
**dates** 18:7
53:10
**day** 13:24
26:20 53:16
54:9
**days** 46:20
**deal** 45:12
**dealing** 41:13
**debtor** 1:9 2:11
4:13 5:5,7,11
15:8,9 18:17
19:1,16,21
28:4,14 38:6
39:7 40:21,22
40:23 42:10
45:20,23 46:16
48:11,24
**debtor's** 4:16
5:2 7:20 18:24
19:17 39:21
**debtors** 15:8
**decide** 21:2
**decided** 20:5
20:24
**decision** 38:12
**deed** 49:14
**department**
2:3
**describe** 9:12
**dial** 54:22,24
**difference**
54:17
**different** 8:21
10:1 18:23
23:6,7,10 26:6

**31:16 41:12**
**dig** 40:4
**digest** 20:21
**digitally** 4:18
**direct** 20:17
**directed** 6:8
**disagree** 27:18
**discovery** 30:2
34:17
**discuss** 48:12
**discussed** 32:2
52:10
**discussion** 30:3
31:13
**district** 1:2,13
**docket** 7:5,6,20
7:25 9:3 17:1
28:25 30:10
34:25 54:22,23
**doctors** 21:8
**document** 7:6
7:12,16,21,22
8:8,16 9:4,10
9:12,14,18,20
9:24 10:1,2,4
11:2,14,22
12:7,14,20
15:12,18 16:2
16:6,8,8 17:1,2
17:3,5,6 18:10
18:13 28:24
29:1 30:9
31:18 35:1,1,2
39:17,18,22,25
40:3,6,8,11
46:6 51:3,19

**documentation**
50:15
**documents**
10:17 15:8,10
16:5 17:18,21
17:21 18:3,4,8
31:9 38:14
40:5 49:18
50:10,12,18,20
51:5,11,14
**doe** 26:23,25
26:25 34:5
**doing** 6:8 30:1
30:11
**double** 14:24
**dr** 3:2 5:23
21:8,9,9 53:4
**driver's** 24:12
**drop** 25:6,8,9
**due** 34:23
**duplicate** 4:24

**e**

**e** 1:23,23 2:1,1
4:1,1 35:17
56:1
**earlier** 6:10
29:18 40:22
53:15
**early** 53:16,21
**eastern** 18:11
53:15 55:2
**either** 52:17
54:13
**election** 41:21
**electronic**
15:22

**electronically**
10:14,16
**email** 8:20,22
9:8 13:22
**emailed** 9:6
13:13,14,15
**employee**
35:20,22,23
38:2,2
**ends** 44:12
**engaged** 14:7
**entity** 38:25
**equity** 39:18
40:9
**eric** 3:2 5:23
53:4
**establish** 12:7
**estimate** 44:2
53:4
**evening** 42:1
**evidence** 42:3
42:7,9
**evidentiary**
34:22
**evp** 18:21
**exact** 17:14
**exactly** 49:7
**examination**
4:13
**examined**
30:10
**excess** 23:8
**excuse** 19:10
**executive** 19:3
**exists** 50:15
**expect** 52:20

**expected** 52:18
**expecting** 16:7
**expert** 32:5

**f**

**f** 1:23 56:1
**fact** 12:6 21:12
    41:3
**familiar** 6:17
    6:21 7:22 8:14
    9:10 11:5
    17:18 19:20,22
    32:12,16 38:18
**far** 50:13
**farm** 41:20
**farr** 2:17 5:19
**federal** 20:24
    53:12
**file** 12:10 13:12
    22:19
**filed** 4:16 6:18
    6:23 7:4,13,21
    11:24 16:5
    17:2 18:10,14
    18:14 22:20
    23:25 26:18,21
    30:9 34:24
    35:6 39:17,19
    40:22,24 42:19
    42:19 50:1
**filing** 26:22
**fill** 37:17
**finances** 19:20
**financial** 18:19
    19:21
**find** 16:1 42:25
    43:2 49:19
    52:4

**fine** 54:19
**finish** 11:20
**fired** 21:11,13
**firm** 29:10
    34:25 39:10
**first** 5:2 6:3
    17:5,6 19:7
**five** 18:12
    41:23
**fl** 1:15 2:6,13
    3:11
**florida** 1:2,13
    4:5 5:2 24:2,7
    24:10,12,17,18
    25:8,16 37:17
    40:11,17 43:7
    49:6,8,9,13,15
    49:18 54:17
**foregoing** 56:3
**foreign** 17:19
**form** 9:16
**formed** 23:14
    23:15,20,23
    36:11,13,19,23
**fort** 2:13
**forward** 4:2
    30:24 50:6
**found** 17:21
    34:11
**founded** 23:19
**four** 36:24
**free** 20:6 21:5
**freeman** 2:18
    5:19
**frequent** 41:8
**frequently**
    41:8

**friend** 38:1
**front** 15:8,11
    16:2 20:4,8
    36:14 43:25
    45:2
**full** 24:2
**fund** 44:15
**funding** 21:15
    21:19
**funds** 43:19
    44:15,20 45:5
**furr** 3:8,13 6:2
    6:2 13:4,7,7,9
    13:11,16,16,17
**further** 29:22

**g**

**g** 4:1
**gain** 35:11
**gallagher** 2:17
    5:19
**gateway** 22:15
    22:18 26:13,16
    31:12 38:3
**gather** 18:17
    18:22
**gathered** 8:5
**general** 18:21
    18:24,24 19:1
    19:2,5 27:25
**gentleman**
    29:11
**gentlemen**
    52:20
**georgia** 20:11
    41:20 42:1
**getting** 35:2
    51:2

**give** 4:21 6:14
    14:16 49:21,22
    52:14
**given** 7:8
**giving** 4:22
**glad** 12:25 48:9
**glades** 3:10
**go** 8:5 14:20,21
    14:22 17:20
    34:2,6 41:17
    46:23 47:4
**going** 11:15
    12:10 13:12,19
    13:20,21 14:18
    14:23 15:1
    16:19 21:2
    33:2 34:16,21
    35:7,15 41:17
    42:1 45:1 46:5
    46:13,23
**good** 4:3 5:18
    5:22 53:3
**govern** 11:25
**government**
    20:24 21:3
**gravity** 11:22
**great** 8:24
**groups** 22:22
    41:8,10
**growing** 48:14
**guess** 32:11
**guest** 26:15

**h**

**hand** 6:12
**hands** 4:20
    16:15

| | | | |
|---|---|---|---|
| **hang** 53:13 | 11:23 13:16 | 41:2,6,16,19 | **hour** 54:17 |
| **happening** | 15:10,12 16:12 | 42:13,16,22,25 | **hour's** 48:14 |
| 42:6 | 17:3,4,6,10,14 | 43:2,5,11,15 | **hours** 22:3 |
| **happens** 12:23 | 17:17 18:1,3,7 | 43:17,22,25 | 52:4 |
| **happy** 12:12 | 18:15 19:2,6 | 44:4,7,8,11,14 | **houston** 2:10 |
| 52:16,17 53:16 | 19:10,22 20:1 | 44:19,25 45:6 | 2:15 5:4,4 7:24 |
| 54:10 | 20:15,16,19,22 | 45:10,14,17,21 | 8:2,7,18,20 9:5 |
| **hard** 5:14 | 20:24 21:8,16 | 45:24 46:2,12 | 11:17,19 12:4 |
| **harvard** 21:9 | 21:20,25 22:3 | 46:15,18,24 | 12:10,16,18,22 |
| **head** 4:20 | 22:8,11,15,20 | 47:2,5,8,11,14 | 13:3,6,8,13,15 |
| 42:24 | 23:3,5,15,17 | 47:17,19,22,25 | 15:14,17,24 |
| **hear** 9:18 14:9 | 23:19,21,24 | 48:17,18,23 | 16:1,9,11,13 |
| **heard** 9:19 | 24:2,6,11,16 | 49:1,4,6,8,11 | 16:15,18 18:24 |
| 12:14,14 21:2 | 24:18,20 25:1 | 49:16,19,25 | 29:8,14,25 |
| 34:21 35:5,7 | 25:4,8,12,17 | 50:3,5,9,12,16 | 30:12,14,16,21 |
| **hearing** 26:20 | 25:20,22,25 | 50:18,24 51:1 | 34:16 35:4,14 |
| 29:22,22 | 26:5,9,11,13 | 51:5,9,10,13 | 39:11,12,12 |
| **helped** 37:17 | 26:15 27:1,5,8 | 51:16,18,20,21 | 46:4,7,10,13 |
| **helps** 35:18,19 | 27:13,17,21,25 | 51:23,25 52:4 | 48:2,6,13 |
| 38:2 | 28:3,6,8,12,15 | 52:8,11 54:8 | 49:21 50:21 |
| **hey** 13:4 | 28:17,20,23 | 54:12,14,16,18 | 51:6 52:7,12 |
| **hines** 21:14 | 29:2 31:3,4,20 | 54:19 | 52:19,25 53:19 |
| **hire** 39:12 | 32:1,5,9,11,13 | **hoft's** 16:4 | 54:1,8,13,15 |
| **hired** 37:17 | 32:15,20,24 | 29:11 30:17 | **hunt** 50:18,20 |
| **hmm** 36:20 | 33:4,7,9,12,15 | **holders** 39:18 | **husband** 28:17 |
| **hobby** 23:24 | 33:17,19,22 | 40:9 | 29:11 |
| **hoft** 3:9,16 5:8 | 34:3,5,10,13 | **holding** 14:12 | **hyde** 3:25 56:3 |
| 5:8 6:3,12,16 | 35:18,21,24 | 14:25 | 56:8 |
| 6:20,23 7:2,7 | 36:2,6,8,11,14 | **holiday** 53:12 | |
| 7:11,15,18,22 | 36:17,20,24 | **home** 24:3,13 | **i** |
| 8:3,8,10,10,12 | 37:1,5,8,12,16 | 24:18,19 25:18 | **idea** 22:8,11 |
| 8:13,14,17,24 | 37:23 38:1,5,7 | 25:22,25 26:5 | 29:8 36:18 |
| 8:25 9:2,4,8,9 | 38:9,11,15,18 | 40:16 49:6,8,9 | 38:19 |
| 9:11,15,19,23 | 38:22 39:1,4,8 | **honest** 11:8,12 | **identify** 5:15 |
| 10:2,6,9,11,13 | 39:13,15,19,22 | 31:12 | **immediate** |
| 10:17,20,21,23 | 39:25 40:3,7 | **honestly** 11:10 | 11:21 |
| 11:1,4,8,13,15 | 40:10,15,20,24 | | **important** 21:5 |

**incident** 42:9
**include** 4:15
**included** 30:17
  37:6
**includes** 22:18
**including** 20:8
**income** 41:11
**independent**
  22:17
**indicated** 6:10
  8:3
**indiscernible**
  10:20 13:6
  14:3,19,23
  22:16,21 39:22
  43:6 52:8,25
**individual** 42:5
  49:10
**individually**
  40:14
**individuals**
  9:16 41:23
**information**
  6:15 7:9 8:4
  18:18,23 19:13
  19:15,18 36:14
  37:9,11,18,24
  38:13 43:25
  45:2 54:22,24
**initial** 19:16
  26:21
**inquired** 48:6
**insurance**
  24:12 46:11
**intend** 50:4
**interview**
  19:17 34:6

**irvine** 21:11
**item** 28:25
  48:19

**j**

**james** 2:22
  18:15 37:25
  38:1,11 39:19
**jane** 26:23,23
  26:25 34:8,12
**jay** 21:8
**jensen** 25:2,4
  25:14,20 26:4
  40:11
**jez** 28:16 30:22
**jezreel** 24:16
  31:5
**jill** 21:14
**jim** 3:9,16 5:8
  5:18 6:3 8:10
  13:4 20:16
  44:8
**joe** 51:9,18,20
  51:21
**john** 3:17 5:12
  8:2 19:6,7
  26:23,23,25
  28:6,9 31:11
  31:14,18,20,21
  32:1,9,11,20
  32:21 33:22
  34:5,8,12 36:8
  36:11,21,22
  37:16,23 38:19
  53:23 54:5
**join** 13:22
  21:21

**jonathan** 18:20
  27:24,25 28:3
  28:5,13 32:6
  36:1,4
**judge** 16:25
  29:22
**june** 1:17 4:5
  15:5 16:20,22
  53:14,21 54:7
  54:21 55:1,2
  56:25
**justice** 2:3 36:2
  36:5,11,13,25
  37:1

**k**

**keep** 25:15
  37:14 38:25
  44:16 47:6
**kelly** 35:17,18
  43:18
**kheriaty** 21:10
**kirk** 37:25
**kirk's** 38:13
**know** 5:16 8:25
  13:24 14:5,7
  16:6 17:20
  20:20 26:3,19
  27:4,10 29:3,5
  29:16,19 30:20
  30:22,23 31:6
  31:24 32:18,22
  32:24 34:8,13
  35:8 36:20,22
  36:22,23 38:13
  38:17,20 39:10
  40:1,13,15,15
  42:12,23 43:4

44:19,23 47:25
51:3 52:21,21
53:2,11 54:9
54:11
**knowledge**
  6:14 7:9
**knows** 30:19
**kulldorff** 21:9

**l**

**largest** 7:14
**late** 41:25
  48:14
**lauderdale**
  2:13
**law** 29:10
**lawsuit** 20:4
**lawsuits** 20:4
  20:12 41:12
**lawyer** 20:3
**lead** 20:6
**leading** 22:16
**league** 36:3,5
  36:12,13,25
  37:1
**leave** 13:20
  38:18
**ledanski** 3:25
  56:3,8
**left** 47:19
**leftist** 22:22
  41:9
**legal** 37:2
  56:20
**letter** 24:23,24
  24:25 25:1
**liabilities** 9:16

**license** 24:12
**limited** 4:15
**line** 5:25,25 6:5
13:24,25 14:1
14:6,7,12,16
20:10,11 30:24
34:17 53:1,11
54:7
**lines** 4:8
**list** 7:13 26:17
26:20 27:24
31:1 35:12
39:17 40:9
43:19
**listed** 31:18
32:4,6 38:14
42:18 45:19
48:15
**lists** 26:22
39:19
**litigation** 20:14
20:15,18,21
21:15,19,24
22:2,7 41:2
**little** 5:16
23:12
**live** 24:1 27:9
27:11 49:12
**llc** 1:7 2:10 4:7
22:17
**llp** 2:17
**loan** 48:17,21
49:11,23 50:11
50:13,15 51:8
51:12,15
**local** 11:25
12:2,7

**location** 8:21
32:13
**long** 38:1 52:14
**longer** 52:18
**look** 9:10 11:5
17:7 19:7
22:25 32:16
36:17 39:25
42:22 46:2,2
50:12 51:18,23
52:1
**looked** 18:3
**looking** 9:13
15:20 28:24
30:9 53:10
**looks** 15:12
49:25
**lot** 4:9 22:24
**lots** 23:6
**louis** 24:3,7,8
25:9,12,13
32:7,8,14,25
**louisiana** 21:14
21:17

**m**

**machine** 42:6
**machines** 42:4
**made** 4:25 6:9
21:1 29:10,17
30:4 35:6
38:12
**mail** 26:3
40:18
**mailbox** 25:6,8
25:9,13,13
26:2 39:20
40:19,20

**mailing** 37:24
**maintain** 48:12
**maintained**
32:8 42:10
**maintaining**
41:11
**maintains**
32:19,23,24
42:11 46:16
**maintenance**
48:3
**make** 23:12
50:9,17 51:17
**mam** 1:3
**manage** 18:17
**march** 21:2
**marker** 10:5
**martin** 1:24
2:8 4:4
**marty** 6:2
13:23
**material** 17:19
**matter** 1:5
30:2,6 34:18
34:18,21 35:9
**matters** 19:12
37:2
**mean** 28:24
32:15 37:3,5
37:10,15,21,21
38:4 39:2 49:7
49:23 50:13
51:21,24
**media** 22:17
31:5
**meeting** 1:20
4:3,6,11,13,18

6:6,6,8 11:17
15:6 16:23
17:24 19:17
30:3,11 35:11
46:6 48:4
52:14 55:1
**mentioned**
31:9
**met** 26:19
**miami** 1:15 2:6
4:5 5:2
**midflorida**
42:11
**million** 44:4
**mind** 53:6
**mineola** 56:23
**minimum**
23:11
**minutes** 18:12
53:4
**missouri** 21:17
21:20,22 23:25
24:3,17 32:7
32:14 54:16
**mistake** 29:10
29:14 30:17,19
**mistaken** 12:22
**model** 23:13
**moment** 13:20
13:21 14:17
15:2 53:13
54:4
**moments** 34:1
**money** 22:24
22:24 23:8,8
23:12 43:7,14
43:23 44:17

45:6 47:3 49:3
51:20,21
**month** 21:2
38:11
**mora** 16:25
**morano** 24:16
28:16 30:22
**morning** 53:14
53:24 54:5
**moss** 2:18 5:20
**motion** 29:17
29:21 30:2
35:5
**moved** 24:17
42:13 43:7
50:6
**moving** 30:24
**mute** 4:8,10
**mutual** 43:19

**n**

**n** 2:1 4:1 35:17
56:1
**name** 4:4,22
9:20 39:3,19
45:23 49:10,10
**named** 26:25
41:22
**names** 26:24
29:6,20 33:10
**national** 39:9
43:6,7,11
46:25 47:5
**ne** 25:4
**necessarily**
13:12
**necessary**
18:18,23

**need** 8:17
41:16 51:23
54:23
**needed** 19:15
**neither** 54:1
**never** 45:6
**new** 2:20 33:7
41:11
**night** 41:21,25
**nodding** 4:20
**noise** 4:10
**non** 9:16
**normal** 30:10
**note** 5:3 50:14
50:14
**notes** 48:16,19
**number** 4:7
7:5,12,20,25
9:3 16:24 17:1
19:6 26:22
28:24,25 29:25
31:19 32:16
39:18 40:7,8
44:12,23 45:1
50:23
**numbers** 17:19
**numerous**
10:17
**ny** 2:20 56:23

**o**

**o** 1:23 4:1
35:17 56:1
**oath** 4:14
11:11
**object** 30:6,8,8
34:16

**objections** 30:4
**observers**
41:21,24 42:7
**obtain** 4:24
**obtained** 6:11
12:6
**obviously** 26:6
34:11 35:14
**ochs** 1:24 2:8
4:2,4 5:6,10,13
5:21,24 6:4,17
6:21,25 7:3,8
7:12,16,19,24
8:6,8,11,13,15
8:18,25 9:7,9
9:12,17,21,25
10:4,7,10,12
10:15,19,21,24
11:2,7,10,14
11:16,20 12:5
12:9,12,17,19
13:1,9,18 14:2
14:4,6,9,13,15
14:20,22 15:1
15:5,15,23,25
16:2,10,12,17
16:19,22 17:5
17:9,12,16,24
18:2,5,10 19:4
19:9,11,24
20:13,17,20,23
21:6,15,18,23
22:1,5,9,13,19
23:2,4,14,16
23:18,20,22
24:1,4,9,14,17
24:19,22 25:3

25:6,10,15,19
25:21,23 26:2
26:8,10,12,14
26:17 27:3,6
27:12,15,19,23
28:2,4,7,10,13
28:16,18,22,24
29:3,8,13,16
30:8,13,15,20
30:22 31:15,24
32:3,6,10,12
32:14,18,22
33:1,6,8,11,13
33:16,18,20,25
34:4,8,11,14
34:16,23 35:10
35:17,20,22,25
36:4,7,10,13
36:16,18,22,25
37:3,6,10,14
37:20,25 38:4
38:6,8,10,12
38:17,20,24
39:2,5,10,14
39:16,23 40:1
40:6,8,12,18
40:21 41:1,4
41:14,18 42:10
42:15,18,23
43:1,3,9,13,16
43:19,23 44:2
44:5,10,12,16
44:22 45:4,8
45:11,15,18,22
46:1,3,9,12,16
46:22 47:1,3,6
47:9,12,15,18

47:21,24 48:2
48:10,14,19,24
49:2,5,7,9,14
49:17,20 50:1
50:4,7,10,14
50:17,19,25
51:2,6,11,14
51:17,20,24
52:2,6,9,12,24
53:1,6,18,21
53:23,25 54:2
54:6,14,16,20
**october** 24:21
25:25
**offhand** 33:22
**office** 1:12 5:1
5:1 6:11 24:8
25:17,19 30:17
32:19
**official** 9:16
**okay** 5:10,13
5:24,25 6:4,12
6:17,21,25
7:12,19 8:6,18
9:7,8,12 11:11
11:13,16,22
12:9 13:3 14:8
14:13 15:1,15
15:23 16:17,19
16:22 17:16
18:2,5,10,15
19:4,11,12,24
20:13 21:23
22:1,5,13
23:16 24:1,19
24:22 25:19
26:2,12,17

27:5,8,23 28:8
28:16,18 29:2
30:13 32:3,6
33:6,8,11,18
33:25 34:23
35:14 36:4,10
37:6,25 38:12
38:20 39:5,10
39:14,16 40:1
40:6,10,21
41:19 42:10
43:1,3,5,9,13
43:19 44:5
45:4,8,11,18
46:14,15 47:1
47:18,21 48:10
49:2 51:2,6,8
52:2,6,7,7,9,12
52:24 54:8,14
54:20
**old** 56:21
**ones** 42:2
**open** 14:10,15
14:16 31:12
38:19 39:6
43:6 46:20
47:13,20
**opened** 39:8
42:21 43:8
**operate** 23:2
24:4,8
**operates** 24:6,7
**operating** 24:9
**operation** 4:16
**opinion** 22:16
**opportunity**
52:15

**opposed** 26:24
29:21
**opposition**
35:7
**outside** 38:25
47:6
**owe** 48:24 49:2
49:5,24 50:8
**owed** 52:9
**owes** 51:20,21
**owned** 45:19
**owner** 20:16

**p**

**p** 1:24 2:1,1,8
4:1 35:17
**p.m.** 15:3,5
16:20,22 17:25
17:25 18:11
55:2
**page** 17:2 40:8
40:10 48:20
**pages** 37:18
**paid** 22:1 36:4
38:6,10
**paper** 12:24
**papers** 23:21
51:3,4
**paperwork**
37:18
**paralegal**
15:20
**parcel** 35:10
35:13
**pardon** 18:22
51:21
**part** 26:21
29:16 35:10,13

**participant**
20:13,18
**particular**
32:19
**parties** 4:8
31:18 35:12
52:24 53:1,11
53:15,16
**partner** 24:16
**parts** 23:10
**party** 20:13
**past** 27:10 31:7
36:24 42:16
**pause** 13:19,21
14:18 15:2
16:13,18
**paused** 15:4,7
16:21
**pausing** 15:3
16:20
**pay** 20:1 23:5
23:11 36:2,3,3
38:11 50:7
**paying** 21:19
21:22,23
**payment** 22:6
**payments** 50:9
**pen** 9:22 10:2
**people** 14:1,9
14:11 26:22,25
27:13,18 30:25
31:2 34:11
40:23 41:15
**perform** 23:7
**perfunctory**
52:22

person  5:17
personal  44:9
  44:16 45:5,5
  50:1
personally
  33:1
petition  6:18
  6:22 7:1,4
  15:14,18,19
  18:13,13 28:19
  39:16 42:19
  48:16,20
phone  5:15
  35:15 52:20
phoned  6:3
phones  4:10
physical  25:15
pieces  11:3
pile  17:17 18:3
plaintiff  20:7
plaintiffs  21:5
  21:6
please  4:10,21
  4:23 5:15,17
  6:13 13:1 15:1
  15:11 19:25
  35:16 39:24
  52:6 53:2,13
  53:20 54:11,23
pllc  3:1 5:23
pm  55:6
po  32:6,7,12
poen  35:17
  43:18
point  4:2,8 6:8
  8:4,14 23:1
  26:7

pointing  30:18
police  33:17,20
policies  24:12
porsche  45:19
posing  8:13
position  23:1
  30:6
positive  22:25
possession  5:5
  9:1 39:7 48:12
post  26:15
  32:19 39:6
  54:21
pre  38:21
precede  4:22
precise  50:22
precisely  17:12
precision
  19:11
prefer  54:10
prepared  35:3
  35:3
presence  25:16
present  5:7
president
  18:16 19:3
pressures
  22:21 40:25
  41:4,5,7,7,10
  41:12
presumably
  16:5
previously  8:3
  18:5
price  50:24
principal  5:6
  15:9

printed  9:23
probably
  52:13 53:7
problem  46:5,7
proceed  35:16
proceeding
  4:25 18:12
proceedings
  55:5 56:4
proceeds  46:22
  46:24
process  49:21
produce  45:15
  45:16 50:20,21
  51:6,7 52:6,7
production
  46:4 49:20
profit  23:2
projects  23:6
promissory
  50:14
proof  46:10
properly  48:11
prospects  4:17
provide  46:7
  46:12,13
provided  8:2
  46:10
public  38:4
publication
  27:20
publicly  43:20
pundit  22:15
  22:18 26:13,16
  31:12 38:3
purchase
  50:11,24

purchased
  49:8,10
purpose  4:12
pursuant  4:11
push  41:8
put  22:3 31:8

**q**

question  8:12
  9:18,19 10:1
  10:22,24 21:18
  29:12 30:16
  31:3,11,15
  32:21 34:2
  37:24 38:16
  45:14 52:12
questioning
  18:1 34:17
  52:21
questions  4:15
  18:25 19:14
  30:5,24 34:19
  34:24 52:15
  53:5,9
queued  35:9
quit  42:1
quite  14:24

**r**

r  1:23 2:1 4:1
  56:1
raise  6:12
raton  3:11
read  7:6,12,21
  35:5 49:23
reader's  20:21
real  26:24

**realize** 31:8
**really** 10:10,12
 34:20
**reason** 13:12
 15:7 31:4
**recall** 51:2
**receivable**
 48:17,20,21
 49:23 50:15
 51:8
**receivables**
 48:16
**receive** 9:2
 16:7 40:18
**received** 9:8
 26:9 37:19
**receives** 9:4
**recognize** 12:6
 29:10
**recollection**
 10:15
**record** 5:25 7:4
 9:1 55:3 56:4
**recorded** 4:19
 6:6
**recorder** 4:19
**recording** 4:3
 6:6,7,9,9,10
 12:14 13:20
 14:18 15:2,3,4
 16:13,18,20,21
**records** 45:8,9
 45:10,12,12,16
**redacted** 29:5
 29:15
**refer** 26:3 39:6

**referred** 39:14
**referring** 31:17
 44:24
**reflect** 6:1
**relative** 29:19
 35:1,2 50:15
 51:11,14
**relevant** 29:9
 29:23 30:1
**remember** 4:19
 17:9,12
**reminder** 4:18
**removed** 41:22
**reorganization**
 4:17
**repeat** 48:18
**replied** 18:17
**report** 42:2
**reported** 42:7
 42:8
**reporters** 23:9
 23:9
**reports** 33:17
 33:21
**represent** 5:16
 28:5,9
**representative**
 19:18
**representatives**
 20:9,11
**represented**
 21:16 37:1
**represents**
 22:15 28:14,14
**request** 47:23
 48:1

**requested**
 28:12
**requesting**
 46:5
**requests** 19:14
**required** 4:11
 28:9,10
**requires** 11:18
 11:20
**reschedule**
 52:16,17 53:7
**respect** 34:23
**respectfully**
 30:7 35:4
**response** 4:22
**responses** 4:21
**responsibility**
 18:22
**resuming** 15:6
**retain** 39:11
**reviewed** 9:3
**revolut** 47:1
**right** 6:4,5,12
 8:23 9:13,17
 11:16 13:1
 14:18 20:20,25
 21:3 24:23
 27:19 28:2,13
 28:22 37:20
 43:14 46:3,9
 46:22 50:1
 53:6
**righty** 9:9
**road** 3:10
 56:21
**robert** 3:13 6:2
 13:7,16

**robinhood**
 47:9
**roderman** 2:10
**room** 41:22,23
**rough** 36:16,18
**roughly** 36:23
**ruby** 2:18 5:19
 20:10
**rules** 11:25
 12:2,8
**run** 20:1 27:3
**running** 13:20
**ryan** 3:6 5:22
 53:3

**s**

**s** 2:1 4:1
**s.w.** 1:14 2:5
**saint** 24:3,7,7
 25:9,12,13
 32:7,8,14,25
**sarcasm** 30:23
**saw** 17:6
**saying** 4:22
 11:23 18:6,25
 20:17 37:14
 45:1
**says** 12:20
 13:18 18:13,15
 18:20 19:12
 48:21,24 49:22
**scanned** 15:18
**scanning** 13:3
**schedule** 34:24
 50:13
**schedules** 7:20
 7:25 8:1,5 10:7
 12:23,24 15:15

15:16,19,20
18:14,18 19:19
34:20 35:5
39:17 42:19
45:18 50:8
**schwab** 43:20
43:21,24 44:17
44:25
**scrutinized**
20:3
**sec** 43:5
**secretary**
15:20 16:16
**section** 4:11
19:17
**securities** 48:7
**security** 39:18
40:9
**see** 4:19,20
8:17 17:5
25:11 40:3,10
54:23
**seems** 13:25
**seen** 8:8 17:3
**send** 8:18
12:25 13:1,4
23:9 24:23,23
24:25 25:1
**sending** 16:13
**sent** 10:13
15:17 17:7,22
17:23 18:4
37:12,13,20,22
**serious** 11:18
11:21
**set** 29:22 34:6
36:6,10

**seventh** 2:19
**several** 33:12
37:2,2 38:22
40:5 42:17
**shareholder**
18:16 48:17,21
48:22
**shaye** 2:18
5:20 20:10
41:22
**should've**
15:18
**shove** 42:5
**shoving** 42:3
**show** 28:21
**shown** 7:24
**shows** 14:11
**side** 15:22
**sight** 9:1
**sign** 6:25 9:17
9:21 10:1,2,4
10:14 11:14,24
12:13,21 17:16
**signature** 9:20
9:23 10:14
11:24 12:5,6
12:10 15:22
16:4 56:6
**signatures**
12:24 15:10
**signed** 9:4 10:7
10:13,16,17,24
11:3,5,7,9,23
12:20 15:16,19
15:21 16:12
17:21 18:4,5
23:21

**significant**
11:21
**silence** 21:3
**simple** 10:10
10:12
**single** 27:8,9
**sir** 8:17 9:18
10:17 17:15,19
19:10 30:14
39:4 40:8
**site** 41:9
**sitting** 40:5
**situation** 19:23
19:24,25
**skarnulis** 3:1
5:23
**slater** 32:4,4
**social** 31:5
**society** 21:12
**sole** 18:16
19:13
**solution** 14:17
**solutions** 56:20
**somewhat**
29:17
**sonya** 3:25
56:3,8
**soon** 52:23
**sorry** 6:2,3
7:23 8:7 14:20
14:21 39:23
53:18
**sort** 12:1 25:15
46:5
**sorts** 51:4
**sounds** 32:20

**sources** 18:23
**south** 2:12
**southern** 1:2
1:13
**speak** 4:23
33:4
**speaking** 4:9
4:23 21:11
35:19
**specific** 25:21
**specifically**
18:20 41:5
**speech** 20:6
21:5
**spoke** 21:13
36:8
**spoken** 33:1
**stack** 17:20
**stacks** 42:3
**staff** 54:25
**stand** 44:14
**stanford** 21:9
**start** 24:9
53:15,16,21
54:9,10
**started** 19:7
**state** 21:20,21
23:25 41:20
**statement**
18:19
**statements**
6:13 7:8 34:20
**states** 1:1,12
2:3 4:5,12 5:1
6:7 21:16
29:21 35:11
37:21 38:25

46:14 47:7
49:22 50:19,22
51:7
**step** 5:16 31:4
**steps** 39:5
**stocks** 43:20
**stop** 6:8 12:17
12:19
**strayed** 34:25
**street** 3:3
**subchapter**
13:18,22
**subject** 35:8
**subscribe** 30:4
**subsequently**
7:19
**substantial**
52:21
**sued** 42:8
**suggest** 19:20
53:10
**suing** 40:23
41:15
**suite** 56:22
**summary** 9:15
**supervision**
41:24
**supplied** 17:1
**suppose** 28:23
34:5
**supreme** 20:5
20:14,15,22
21:1,1
**sure** 11:11
26:19 29:17
31:13 34:10
36:8 42:13

43:5 50:16,17
52:5 53:9
**surround**
50:10
**suspect** 27:15
**swear** 6:13

**t**

**t** 56:1,1
**take** 5:13 13:9
30:6 31:4 41:9
46:19
**taken** 39:5
45:6
**talk** 53:7
**talked** 13:24
20:14
**talking** 40:4
**tasked** 18:22
**ted** 32:4,4,5
**telephonically**
2:8,15,22 3:6
3:13,15
**tell** 15:10 19:25
22:13 28:20
37:14
**telling** 16:3
**ten** 46:19
**testified** 12:9
12:13
**testify** 8:15
**testimony** 27:6
40:22
**texas** 3:4
**tgp** 1:7 3:16,17
4:7 5:8 15:6
16:23 19:3,9
19:10 20:13,16

20:17 21:23
22:1,13,15,17
22:19 23:2,5
23:14,17,17
24:9,23 25:1
25:15 27:20
28:14 32:3
35:20 36:1
37:5 38:6,20
39:11 40:23
41:15 44:7
47:6,9 48:24
49:2,5,10,24
50:7,8 51:21
52:10
**tgp's** 39:21
45:23
**thank** 5:6,13
5:17,21 6:4 9:7
16:19 30:18
51:7 55:3,4
**that'd** 25:4
**theory** 29:4
30:4
**thing** 5:2 12:1
**things** 23:7,8
35:1 52:22
**think** 14:17
22:6 27:1 30:7
37:8 38:15
42:24 44:4
53:6
**thought** 50:5
**threatened**
27:9,12,16,19
27:21 31:6,7
33:3,3,5,14,15

34:15
**threatening**
27:14
**threats** 26:6,9
33:23
**three** 21:8 42:4
**thursday** 4:5
**time** 4:9 5:15
5:17 6:3,9 15:2
18:11 21:25
22:5,10 24:2
33:4 38:1
39:23 42:6
47:15 53:15,20
54:8,9,17 55:2
**timeframe**
54:3
**times** 42:4
**title** 45:22 46:4
46:13
**today** 4:5 5:7
11:17 17:16,23
17:24 41:17
48:5 49:3
52:16 54:22
**today's** 4:24
**told** 17:7 33:8
46:19
**took** 37:24
**top** 42:23
**towards** 18:8
21:23 22:1
**traded** 43:20
**transcribed**
3:25
**transcript** 4:25
56:4

| | | | |
|---|---|---|---|
| **trial** 4:4 | **understood** | **violated** 12:7 | **went** 17:17 |
| **troubled** 12:4 | 16:11 40:21 | **virtually** 26:20 | 25:10 41:23 |
| **troubling** 12:2 | 48:13 | **voiced** 29:21 | 46:24 47:5 |
| **true** 6:14 7:8 | **unfortunately** | **voluntary** | **west** 25:13 |
| 28:15 56:4 | 14:4 | 15:14,18 | **wet** 12:5,10,20 |
| **trust** 45:24,25 | **union** 42:12 | | 12:24 |
| 46:1 49:13,13 | **unique** 29:17 | **w** | **whichever** |
| **trustee** 1:12,25 | **unit** 25:5 | **w** 35:22 | 54:10 |
| 2:4 4:5 5:1 6:7 | **united** 1:1,12 | **wait** 9:4 13:1 | **willkie** 2:17 |
| 13:18,22 29:21 | 2:3 4:4,12 5:1 | 43:3,5 | 5:19 |
| 35:11 37:21 | 6:7 29:20 | **waiting** 9:2 | **win** 35:15 |
| 46:14 49:22 | 35:11 37:21 | 13:21,22 14:1 | **withdrawn** |
| 50:19,22 51:7 | 38:25 46:14 | 16:16 52:13 | 35:25 |
| **truth** 42:8 | 47:7 49:22 | **want** 8:18 | **witness** 12:20 |
| **truthful** 7:16 | 50:19,21 51:7 | 11:10,11 27:3 | **woman** 13:23 |
| **try** 31:15 54:6 | **university** | 27:10 30:8 | 14:3,5,8,11,14 |
| **trying** 13:19 | 21:10 | 33:9,10,13 | 14:19,21,23 |
| 14:17 15:7 | **use** 26:5 44:15 | 43:3,4 48:15 | 41:22 |
| **tuesday** 54:7 | 44:20 45:5 | 52:14,15 53:1 | **women** 20:10 |
| 54:21 | **used** 26:24 | 53:15 54:17 | 27:8,9,18 |
| **turned** 37:18 | 27:24 40:2,12 | **wanted** 24:23 | 41:19 42:3 |
| **turning** 42:4 | 40:13 44:6 | **wanting** 22:23 | **word** 28:10 |
| **two** 20:10 | **uses** 39:20 | **waving** 4:20 | **work** 19:9 22:3 |
| 41:19 | **using** 26:2,4 | **way** 21:1 29:5 | 24:24 31:5 |
| | | 29:19 31:16,24 | **worked** 19:6 |
| **u** | **v** | 36:6,10 48:8 | **working** 6:23 |
| **u.s.** 2:4 38:23 | **v** 13:18,22 | 54:6 | 19:8 33:24 |
| 38:24 39:2,3 | **value** 43:23 | **we've** 26:9 | 38:22 41:20 |
| 46:17,23 | **vehicle** 45:22 | 38:22 42:16 | **works** 32:5 |
| **umbrella** 37:7 | 46:4,13 | 46:18 | 53:12 54:13 |
| **under** 4:14 | **veil** 38:13 | **website** 23:15 | **world** 23:11 |
| 11:11 20:15 | **veiling** 29:19 | 23:19,24 26:13 | 27:10 |
| 29:4 48:11 | **verbal** 4:21 | 38:3 | **would've** 17:10 |
| **understand** | **veritext** 56:20 | **websites** 22:16 | 29:14 52:18 |
| 12:3 31:1 | **version** 20:21 | **week** 29:19 | **write** 26:11,12 |
| **understanding** | **vice** 19:3 | **weeks** 20:6 | 26:14,16 27:18 |
| 35:2,12 41:14 | **video** 42:3,7,9 | 42:17 | 27:22 |
| 49:24 | | | |

**writer**  21:14
    26:10 31:6
**writers**  26:7
    31:12,23 33:4
    33:19 34:1,2
**written**  12:19
    30:15,25 31:2
    31:16

**x**

**x**  1:4,10

**y**

**yeah**  6:2 8:20
    9:5 10:23 11:4
    11:4 13:6,15
    14:5 32:16
**year**  42:24
**years**  19:7 26:6
    36:24
**yep**  13:8
**york**  2:20

**z**

**zero**  46:7
**zoom**  26:20

Exhibit 20

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF FLORIDA, WEST PALM BEACH

3    Case No. 24-13938-MAM

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    TGP COMMUNICATIONS, LLC,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  Flagler Waterview Building

14                  1515 North Flagler Drive, Suite 801

15                  West Palm Beach, FL 33401

16

17                  June 18, 2024

18                  9:02 AM

19

20   341 Meeting of Creditors

21

22

23   B E F O R E :

24   MARTIN P. OCHS

25   TRUSTEE

Page 2

```
 1    A P P E A R A N C E S :

 2

 3    OFFICE OF THE U.S. TRUSTEE

 4         75 Ted Turner Drive, Suite 362

 5         Atlanta, GA 30303

 6

 7    BY:  MARTIN P. OCHS

 8

 9    HOUSTON RODERMAN, PLLC

10         633 S. Andrews Avenue, Suite 500

11         Ft. Lauderdale, FL 33301

12

13    BY:  BART A. HOUSTON

14

15    LINDA LEALI, P.A.

16         Trustee

17         2525 Ponce De Leon Blvd., Suite 300

18         Coral Gables, FL 33134

19

20    BY:  LINDA MARIE LEALI

21

22

23

24

25
```

Page 3

```
 1   FURR COHEN
 2         Attorneys for Jim Hoft
 3         2255 Glades Road, #419A
 4         Boca Raton, FL 33431
 5
 6   BY:  ROBERT C. FURR
 7
 8   SHUTTS & BOWEN LLP
 9         Attorneys for Dr. Eric Coomers
10         201 East Las Olas Blvd., Suite 2200
11         Fort Lauderdale, FL 33301
12
13   BY:  RYAN E. CHAPPLE
14
15   CAIN & SKARNULIS PLLC
16         Attorneys for Dr. Eric Coomers
17         P.O. Box 1064
18         Salida, CO 81201
19
20   BY:  BRADLEY A. KLOEWER
21
22
23
24
25
```

Page 4

```
 1   DUNN LAW, P.A.

 2        Attorneys for Ruby Freeman & Wandrea' ArShaye Moss

 3        66 West Flagler Street, Suite 400

 4        Miami, FL 33130

 5

 6   BY:  DAVID A. BLANSKY

 7

 8   WILLKIE FARR & GALLAGHER LLP

 9        Attorneys for Ruby Freeman & Wandrea' ArShaye Moss

10        787 Seventh Avenue

11        New York, NY 10019

12

13   BY:  JAMES H. BURBAGE

14

15   ALSO PRESENT:

16

17   JIM HOFT

18   JONATHAN BURNS

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S

 2            MR. OCHS:  From this point forward, we will be

 3     recording.  Good morning.  My name is Martin Ochs.  I'm a

 4     trial attorney with the United States Trustee's Office in

 5     Miami, Florida.  Today is Tuesday, June 18th, 2024.  It is

 6     now 9:02 a.m.  If you're not currently speaking, please mute

 7     your microphone because the background noise interferes with

 8     the recording.  Thank you.

 9            This is a continued 341 meeting in the case of TGP

10     Communications, LLC, Case No. 24-13938.  This bankruptcy

11     case has been assigned to bankruptcy Judge Mora.  Whoever

12     has her microphone open and is shuffling papers around,

13     please mute your microphone.  Thank you.

14            This case was filed by the Debtor on May -- I'm

15     sorry, April 24th, 2024.  Is the Debtor's counsel present

16     today?

17            MR. HOUSTON:  Bart Houston on behalf of the

18     Debtor.

19            MR. OCHS:  Okay.  Is Mr. James Hoft, the

20     representative of the Debtor present today?

21            MR. HOFT:  Yes, this is James Hoft.

22            MR. OCHS:  Mr. Hoft, raise your right hand,

23     please.  Do you swear firm the statements you're about to

24     give are true and correct to the best of your knowledge,

25     information, and belief?
```

```
 1            MR. HOFT:  Yes, I do.

 2            MR. OCHS:  And you understand your obligations

 3     when you're under oath; is that correct?

 4            MR. HOFT:  Yes, I do.

 5            MR. OCHS:  All right.  And Mr. Houston, I

 6     understand there's another representative of the Debtor on

 7     the line?  Who is that person?

 8            MR. HOUSTON:  Jonathan Burns.

 9            MR. OCHS:  Okay.  Mr. Burns, please note your

10     appearance.

11            MR. BURNS:  Jon Burns as a representative of the

12     Debtor in Possession.

13            MR. OCHS:  All right.  Would the Sub V Trustee

14     please note her appearance.

15            MS. LEALI:  Hi, this is Linda Leali.  I'm

16     Subchapter V Trustee.

17            MR. OCHS:  Okay.  And now, one at a time, would

18     the other parties that are on the phone please note their

19     names and their appearances.

20            MR. CHAPPLE:  Good morning.  Ryan Chapple.  I

21     represent Dr. Eric Coomer.

22            MR. OCHS:  Thank you.

23            MR. BURBAGE:  Good morning --

24            MR. KLOEWER:  Good morning.  This is Brad Kloewer

25     --
```

Page 7

```
 1              MR. OCHS:  All right, one at a time, please.

 2              MR. BURBAGE:  Okay, I'll go.  Jim Burbage of

 3     Willkie Farr & Gallagher on behalf of Ruby Freeman and Shaye

 4     Moss.

 5              MR. OCHS:  Thank you.  And you're joined by David

 6     Blansky; is that correct?

 7              MR. BURBAGE:  That's correct.

 8              MR. OCHS:  Mr. Blansky, please note your

 9     appearance.

10              MR. BLANSKY:  Good morning, Mr. Ochs.  David

11     Blansky, also appearing for Ms. Freeman and Ms. Moss.

12              MR. OCHS:  All right, and there was another party

13     that was trying to note their appearance but got stepped on,

14     so go ahead, sir, and note your appearance.

15              MR. KLOEWER:  This is Brad Kloewer, also counsel

16     for Dr. Eric Coomer.

17              MR. OCHS:  Okay, thank you.  Is there anybody else

18     who is on the call who has not yet noted their appearance?

19              MR. FURR:  Yes, Robert Furr for Jim Hoft

20     individually.

21              MR. OCHS:  Okay.  Anybody else on the line who has

22     not noted their appearance?  All right.  Please note that

23     this record -- this meeting is being recorded

24     electronically.  The recording cannot see who you are, so

25     when you speak, please note your name and then proceed with
```

1    your -- with the statements that you're making.  It's

2    important that you speak clearly and into the microphone,

3    keeping in mind head nods and hand waves do not get picked

4    up by the recording.

5              This meeting will -- this recording will be kept

6    for a period of two years after the closure of the case.  If

7    somebody would like to obtain a copy of the recording or a

8    transcript of the recording, arrangements can be made

9    through my office in Miami, Florida, or you can email me and

10   I will send you to the proper party to get the recording.

11             When we were at the last 341 meeting, Mr. Houston,

12   the United States Trustee had requested a number of

13   documents and those have not yet been produced.  What is the

14   status on the production of those documents?

15             MR. HOUSTON:  I know that my paralegal made a

16   list.  She is compiling them.  I can report to you after the

17   341 what the status of that is.

18             MR. OCHS:  Okay.  Do you know how much longer it

19   will take?  Many of the things that were requested Mr. Hoft

20   said would be available within 24 hours and that was, you

21   know, that was essentially almost two weeks ago at this

22   point.

23             MR. HOUSTON:  I understand.  I would expect them

24   to be ready for you by tomorrow.

25             MR. OCHS:  Okay.  Because it's impeding my ability

1  to administer this case on a quick basis.  This is a

2  Subchapter V case, which is typically administered in a

3  quicker fashion, and so delays in getting documents is

4  impeding that process.  So, I would ask that I have those

5  documents -- today is Tuesday, January -- I'm sorry,

6  Tuesday, June 18th, 2024.  And I would ask that I have the

7  documents by no later than noon on Thursday, June 20th.

8           MR. HOUSTON:  Understood.

9           MR. OCHS:  Thank you.  All right.  Mr. Hoft, I

10  want to make reference to a document that was filed on the

11  docket at Docket No. 51.  This is a Monthly Operating Report

12  for Small Business under Chapter 11.  Are you familiar with

13  that document?

14           MR. HOFT:  I don't have that in front of me.  I'll

15  have to look it up.

16           MR. OCHS:  Are you being provided the documents as

17  they're being filed in the bankruptcy case or no?

18           MR. HOFT:  I've been provided with documents.

19           MR. OCHS:  Okay.  Do you think that there -- do

20  you think you're not getting all the documents that are

21  being -- that are being filed?

22           MR. HOFT:  No, I don't know that, sir.  I believe

23  I'm getting all the documents that are being filed.

24           MR. OCHS:  You said you would have to look it up.

25  Can you look up the monthly operating report?  It's Docket

```
1    No. 51 on the docket.  I'd like you to have that in front of

2    you.

3              MR. HOFT:  Okay.  Document 51.

4              MR. OCHS:  Let me know when you have it, okay?

5              MR. HOFT:  Okay.

6              MR. OCHS:  Are you able to find that, Mr. Hoft?

7              MR. HOFT:  I'm looking through some documents

8    right now.

9              MR. OCHS:  Mr. Houston, do you want to send it to

10   your client?

11             MR. HOUSTON:  I'm pretty sure that we sent it to

12   Mr. Burns.  He's been our appointed (indiscernible).  I'll

13   email to Mr. Hoft right now.

14             Okay, he got it.

15             MR. OCHS:  Okay.  Are you familiar with that

16   document, sir?

17             MR. HOFT:  It looks familiar.

18             MR. OCHS:  All right.  What makes you familiar

19   with the document?

20             MR. HOFT:  It looks like something I've seen

21   before.

22             MR. OCHS:  Did you assist in its preparation?

23             MR. HOFT:  Sure.

24             MR. OCHS:  What's --

25             MR. HOFT:  I've been asked a lot of questions,
```

1    sir.

2            MR. OCHS:  What level of participation did you

3    provide to the -- in connection with the preparation of this

4    document?

5            MR. HOFT:  Can you rephrase that question, please?

6            MR. OCHS:  How did you participate in the

7    preparation of this document?  What was your role?

8            MR. HOFT:  Well, I -- they asked me some questions

9    and I helped fill it out.

10           MR. OCHS:  Who is "they"?

11           MR. HOFT:  That would have been Jon.

12           MR. OCHS:  Jon who?

13           MR. HOFT:  Jon Burns who is another attorney.

14           MR. OCHS:  And is there another "they"?  Is there

15   another person in the "they"?

16           MR. HOFT:  Well, I do have a documents I -- for my

17   U.S. Bank account, and so I certainly was providing that.

18           MR. OCHS:  All right.  This document was filed

19   with the Bankruptcy Court and it is unsigned and unfinished.

20   Do you know why it was unsigned and unfinished?

21           MR. HOFT:  I don't know that reason.  I just --

22           MR. OCHS:  Mr. Houston, do you know why the

23   document was unsigned and unfinished when it was filed?

24           MR. HOUSTON:  Tell me what you mean -- first of

25   all, I told you this before and I'll say it again, Mr. Burns

```
 1    is our point of contact for these matters.  He's the one

 2    that gathers the information, not Mr. Hoft, and that's why

 3    I've had him on the phone.  I don't know -- where are you

 4    suggesting it's not signed?

 5             MR. OCHS:  All right, Mr. Burns, do you -- will

 6    you testify today, Mr. Burns --

 7             MR. BURNS:  Yes.

 8             MR. OCHS:  Okay.  Please raise your right hand.

 9    Do you swear or affirm the statement you're about to give

10    are true and correct to the best of your knowledge,

11    information, and belief?

12             MR. BURNS:  I do.

13             MR. OCHS:  And are you familiar with Document No.

14    54 that I've been referencing during this meeting?  Fifty-

15    one.

16             MR. HOUSTON:  Fifty-one is what he's talking

17    about.

18             MR. OCHS:  Fifty-one, pardon me, 51.  Pardon me.

19             MR. BURNS:  Yes.

20             MR. OCHS:  Did you --

21             MR. BURNS:  -- familiar with it, yes.

22             MR. OCHS:  Did you assist in the preparation of

23    this document?

24             MR. BURNS:  Yes.

25             MR. OCHS:  Did you sign it?
```

```
 1              MR. BURNS:  No.

 2              MR. OCHS:  All right.  Do you know if anybody on

 3     behalf of the Debtor signed it?

 4              MR. BURNS:  I believe our counsel signed it.

 5              MR. OCHS:  Okay.  Mr. Houston, they're pointing to

 6     you to have signed it.  Can you show me where it was signed?

 7              MR. HOUSTON:  Are you asking me that?  It's on the

 8     first page.

 9              MR. OCHS:  I'm looking at what's filed on the

10     docket.  It was signed on the first page?  You're saying

11     Page 1 of 19.

12              MR. HOUSTON:  The original signature of

13     responsible party.  That's the one that -- went through it

14     with Mr. Burns on the boom, got information, reviewed it,

15     and so I was the one that compiled the report.

16              MR. OCHS:  Can you show me where on the document a

17     signature, any signature appears?

18              MR. HOUSTON:  It's on Page 1, Mr. Ochs.

19              MR. OCHS:  I'm looking at Page 1 right now and

20     it's not on -- and there's no signature on the document on

21     what's on the docket.  I'd urge you to pull it up on the

22     docket and look at it, so you'll look at what --

23              MR. HOUSTON:  I have it in front of me.  Where it

24     says, original signature of responsible party.  And it has

25     my name there and electronic signature.
```

Case 9:24-cv-80642-AHS Document 28-36 Entered on FLSD Docket 09/09/2025 Page 986 of 1417

```
 1              MR. BURNS:  Mr. Ochs, or I just want to make sure
 2      that we're talking about the same document.  We are talking
 3      about Document 51; is that correct?
 4              MR. OCHS:  We are, and I don't see a signature on
 5      it.  I'm looking at it now.  I mean, I'm not saying that I'm
 6      not missing it, but I'm looking at the document scrolling
 7      back and forth through the entirety of Page 1 and I see no
 8      document.  I see no signature on that document.  And --
 9              MR. BURNS:  So, are you looking under the -- where
10      it says, responsible party then it has my name, and then it
11      says, original signature of responsible party?
12              MR. OCHS:  I don't see that at all on the
13      document.
14              MR. BURNS:  Are you -- I'm looking right at it,
15      Page 1 of 19, Doc 51.
16              MR. OCHS:  Let me reload the --
17              MR. BURNS:  Filed on 6/5/24.
18              MR. OCHS:  Let me reload the document.  I -- the
19      docket, rather.  I don't see it.  Give me a moment.  I'm
20      going to -- the docket -- so we're clear, Mr. Houston, the
21      document that I'm looking at is an incomplete document
22      because it still remains open and PDF fillable, what I'm
23      looking at.
24              MR. HOUSTON:  You're looking at a different
25      document than me.
```

```
 1                MR. OCHS:  All right.  I'm --

 2                MR. HOUSTON:  Presumably (audio glitch) everybody

 3       else.  Mine has a stamp on it for the case number and the

 4       doc number --

 5                MR. OCHS:  Mine --

 6                MR. HOUSTON:  -- the docket.

 7                MR. OCHS:  Mine is (indiscernible) as well, but

 8       when I'm looking at it, I can change the data on that

 9       document on my end, which obviously shouldn't be, and

10       there's no bar coding --

11                MR. HOUSTON:  (indiscernible).

12                MR. OCHS:  And there's no bar coding at the end of

13       the document.  Are you familiar with the bar coding that I'm

14       referring to?

15                MR. HOUSTON:  I am.  I'm looking.

16                MS. LEALI:  Marty, I'm looking at it as well.  I

17       see where there's an electronic signature but it is

18       editable.  That's strange.

19                MR. OCHS:  Yeah, I mean that --

20                MR. HOUSTON:  (indiscernible).

21                MR. OCHS:  Bear with me.  I'm on the CourtLink

22       website which is -- it's an alternate to Pacer and it's

23       showing up as un -- with no signature at all and it's

24       showing up as, you know, so it's unsigned and it remains to

25       be PDF fillable, which means that the document was not
```

1   closed out.  I'm now going to ECF Docket and I'm going to

2   pull the document up from there.  Bear with --

3          MR. FURR:  This is Robert Furr.  I'm --

4          MR. OCHS:  All right, we can't --

5          MR. FURR:  This is Robert Furr.  I'm on the ECF

6   document.  It is there and it can be changed.  I didn't even

7   know that you can even do that.  I've never seen this

8   before.

9          MR. OCHS:  Yeah -- because it -- because the

10  document wasn't properly completed, it -- and the one I'm

11  looking at on the docket is likewise not signed and it's

12  still -- it's still alterable and there's no, -- now, just

13  so we're clear, I've looked at now two versions of this

14  document, one on the ECF website maintained by the

15  Bankruptcy Court and one on CourtLink maintained by Lexis.

16  I use CourtLink link very frequently because it's a lesser

17  charge to the government and I try to be a good steward of

18  the government's funds.

19          With that said the, the document itself even on

20  the Bankruptcy Court docket, so at ecf.flsb.uscourts.gov,

21  that document has not been sealed.  It does not have bar

22  coding at the end and it's not signed on what I'm looking

23  at.  I mean, I'm not trying to be crazy here, but it is not

24  signed on what's on the docket.  I'm on Docket No. 51 right

25  now.

1          MR. HOUSTON:  Well, I mean, I -- Mr. Ochs, I --

2     first of all, the last time we were here, you completed your

3     hour-and-a-half of questioning and we were turning it over

4     to the creditors and it seems like we're getting ready to go

5     on another marathon questioning over -- arguing over

6     signatures.  I don't -- so, Ms. Leali, do you see my

7     signature or Mr. Furr, do you see my signature on the first

8     page?

9          MR. FURR:  Yes, I do.

10          MS. LEALI:  Yea --

11          MR. HOUSTON:  -- do.

12          MS. LEALI:  I think, Marty, maybe it has to do

13     with, for some reason, this document is still editable.  I

14     don't know, but --

15          MR. HOUSTON:  And that's way over my pay grade.  I

16     don't understand what that even means.

17          MR. OCHS:  It shouldn't --

18          MR. HOUSTON:  -- certainly find out.

19          MR. OCHS:  I under --

20          MR. HOUSTON:  -- not anything done purposely.  It

21     would have been done by a paralegal in my office.

22          MR. OCHS:  But it was done wrong because -- it was

23     done wrong because it was -- in the piece, in the MOR

24     software, you have to complete the form, then it flattens or

25     seals the document and then the data can't be altered.  And

1    also there is a barcode that appears the end.

2            None of that is on the document that I'm looking

3    at and I'm on the official docket right now.  I'll admit

4    that I was not on the official docket at the beginning, but

5    now I'm on the official docket and it's the same document

6    that is not -- it's not signed, it's not sealed, it's not

7    barcoded.  And that's a problem.

8            And I understand, Mr. Houston, that you're in a

9    rush to get through this 341 meeting.  If I was in your

10   seat, I'd be uncomfortable as well, but this was your

11   choosing to be in that seat.

12           MR. HOUSTON:  That was uncalled for.  That was

13   really uncalled for.

14           MR. OCHS:  All right.

15           MR. HOUSTON:  You turned it over to the creditors

16   at the last one after an hour-and-a-half and now it looks

17   like you're arguing over signatures that everyone else sees.

18           MR. OCHS:  Well, I'd like somebody to send -- you

19   can PDF it and send it to me.  How's that?

20           MR. HOUSTON:  I will.  I'm (indiscernible) right

21   now.

22           MR. OCHS:  I'll move on.  In addition to that, on

23   this monthly operating report -- and the monthly operating

24   report was not available at the last 341 meeting, so you

25   think I don't have an opportunity to examine the Debtor on

Case 9:24-cv-80677-AHS Document 28-36 Entered on FLSD Docket 09/09/2024 Page 991 of 1417

1    the operating report?  I think you're mistaken.  Let's move

2    on with the operating report.

3             There is a tremendous amount of redaction on the

4    operating report.  Why is the operating report almost

5    completely redacted -- the bank statements on the operating

6    report almost completely redacted?

7             MR. BURNS:  I think those were prepetition

8    transactions and this is a post-petition report.

9             MR. OCHS:  You think, but we don't know because

10   it's entirely you --

11            MR. BURNS:  -- through 4/30.

12            MR. OCHS:  You think but you don't know because

13   it's entirely redacted.  And why --

14            MR. BURNS:  I'm looking at the dates, so I think

15   (indiscernible).

16            MR. OCHS:  Why is -- why would you redact the

17   prepetition entries?  Why does that matter?  And why is that

18   subject to redaction?

19            MR. BURNS:  It's a post-petition -- the date of

20   this report is 4/24 through 4/30.  So, the transaction that

21   occurred on 4/24 is -- I mean, 4/22 is not relevant to this

22   report.

23            MR. OCHS:  Let's try it this way.  Will you

24   produce the unredacted bank statements to the United States

25   Trustee?

1           MR. BURNS:  I would be glad to send it to you.

2           MR. OCHS:  Okay.

3           MR. BURNS:  Yes.  I have it.

4           MR. OCHS:  I have a question for -- I have a

5    question for, again, who should I ask about the U.S. Bank

6    statements?  I believe Mr. Hoft testified that he was

7    familiar with those bank statements.  At the top of the --

8    at the top of that bank statement, it says it's redacted and

9    then it says DBA TGP Communications, LLC.  Okay?  What is

10   redacted from the -- from that, from the -- what is the --

11   who is the blank there that is the DBA for TGP

12   Communications?

13          MR. HOFT:  I assume that's my name.

14          MR. OCHS:  So, is TGP Communications, LLC a DBA

15   for yourself?

16          MAN:  Jesus Christ.

17          MR. HOFT:  I didn't hear your question.

18          MR. OCHS:  No, I know.  Somebody was saying Jesus

19   Christ across the record.  Said, the bank statement. Do you

20   have that bank statement, the April 1st --

21          MR. BURNS:  -- Mr. Ochs, I do.  I'll send it to

22   you.

23          MR. OCHS:  Okay.  On that bank statement, is your

24   -- is it your name that appears under the redaction line and

25   then DBA TGP Communications?

```
 1              MR. HOFT:  I see -- is it my name under that

 2    barcode on the top?  Is that what you're saying --

 3              MR. OCHS:  Under the --

 4              MR. HOFT:  -- bank statement?

 5              MR. OCHS:  Under the redaction bar.  It is under

 6    the barcode as well, but it's then redacted and then says

 7    DBA TGP Communications, LLC.

 8              MR. HOFT:  Okay, let me see.  It says -- yes, it's

 9    my name.

10              MR. OCHS:  So, are you operating TGP

11    Communications as an LLC for -- TGP Communications, LLC as a

12    DBA for you personally?

13              MR. HOFT:  Jon, do you want to answer that?

14              MR. OCHS:  No, I want you to answer it, Mr. Hoft.

15              MR. HOFT:  Okay.  I'm not sure.  I'm not

16    (indiscernible) LLC.  I'm not exactly sure what you're

17    asking.

18              MR. OCHS:  Are you operating TGP Communications

19    LLC as a DBA for yourself?

20              MR. BURNS:  Mr. Ochs, it's an LLC.

21              MR. OCHS:  Why does his name appear on the bank

22    statement --

23              MR. BURNS:  -- Communications is an LLC.

24              MR. OCHS:  Why does it -- why does his name appear

25    on the bank statement with the DBA of the LLC?  It's really
```

1    a simple question.

2            MR. BURNS:  Well, it's different.  Well, your -- I

3    think that your question is a little bit confusing because

4    there -- it could be -- the connotation could be, you know,

5    multifaceted there.  You know, are -- you have the -- the

6    business is being operated as a limited liability company,

7    okay, so whether or not the bank account is and how the bank

8    account is styled is somewhat irrelevant.

9            MR. OCHS:  It may be irrelevant to you, Mr. Burns,

10   but it is not irrelevant to the United States Trustee or

11   creditors or parties in interest in this case.  It's not

12   irrelevant at all.  I mean, you're a lawyer.  You know that

13   this is not irrelevant.  Who did the redaction --

14           MR. BURNS:  So, Mr. Ochs, are you saying -- are

15   you saying that you -- when you open a bank account, you

16   have to have the government approved name on your bank

17   account?

18           MR. OCHS:  Are you saying that you don't?

19           MR. BURNS:  It looks like it's -- yes.  Well, for

20   the record, the account is being closed, but that's the name

21   of our business, TGP Communications, LLC.

22           MR. OCHS:  Do you know what -- do you know what

23   Social Security number or tax ID number was affiliated with

24   this bank account, sir?  And that's directed at Mr. Hoft.

25           MR. HOFT:  Are you talking about the EIN number?

1          MR. OCHS:  Yes.

2          MR. HOFT:  Yeah, I can get that for you.

3          MR. OCHS:  All right.  When can you supply that?

4          MR. HOFT:  In about 15 seconds.

5          MR. OCHS:  Okay.  Send it to your attorney.

6          MR. HOFT:  -- number is --

7          MR. OCHS:  Hang on, stop.

8          MR. HOFT:  (indiscernible).

9          MR. OCHS:  Stop, stop, stop --

10         MR. HOFT:  -- 1526 --

11         MR. OCHS:  -- stop.  Stop.  I don't want you to

12   spread that on the record.  What I'm asking you to do is

13   supply that to your attorney who can supply it to me.  Do

14   you understand that?

15         MR. HOFT:  Okay.  Well, you asked me for the

16   number, sir.

17         MR. OCHS:  No, I asked you if you knew the number.

18         MR. HOFT:  Oh, okay.

19         MR. OCHS:  And Mr. Houston, you're going to supply

20   me with the unredacted bank statements?

21         MR. HOUSTON:  For the second time, yes.

22         MR. OCHS:  Sometimes it bears repeating things so

23   there's no confusion.  For the first time at the last 341

24   meeting, you said you would supply documents within 24 hours

25   and that didn't happen.  So, sometimes it does bear

```
 1    repeating.

 2            MR. HOUSTON:  I think Mr. Hoft said that to you.

 3            MR. OCHS:  All right.  Mr. Hoft, looking again at

 4    the same operating report, there are two checks that are

 5    attached to this bank statement.  One is made payable to

 6    Maria, I can't read her last name, something Mancuso or

 7    something to that effect.  Who is that party?

 8            MR. HOFT:  Maria Mancuso is an assistant of mine.

 9            MR. OCHS:  Does she work for you or does she work

10    for TGP?

11            MR. HOFT:  She works for me and she works for TGP.

12            MR. OCHS:  Who pays her --

13            MR. HOFT:  -- two checks each month.

14            MR. OCHS:  So you cut a check from her -- to her

15    individually as well, from your own money?

16            MR. HOFT:  Some of the tasks that she performs is

17    for me personally and some of the tasks she performs are

18    related to the business, so I cut her two checks each month.

19            MR. OCHS:  What tasks does she perform for you

20    individually?

21            MR. HOFT:  She assists with taking -- doing --

22    delivering things, picking up packages.  That would, I

23    guess, be for the business.  She goes, does shopping

24    sometimes.  She does whatever I need.  I ask her around the

25    house to -- the tasks that I don't really have time for.
```

1    She organizes different things around my home.

2            MR. OCHS:  Okay.

3            MR. HOFT:  And, yeah, she's just a helper.

4            MR. OCHS:   There is a second check attached to

5    that bank statement that appears to have your name on it.

6    It says, if I'm understanding it, it says it -- it's a bit

7    hard to read.  It begins with J-A, I believe, and ends in

8    Hoft.  Is that your check?

9            MR. HOFT:  Let me see.

10            MR. OCHS:  Just to assist you, it's at Page 12 of

11    19 on that document.

12            MR. HOFT:  Thank you.  Let me pull that up.  Okay.

13    $815.  So yeah, this was a -- I -- offhand, I'd have to --

14    I'd have to look and see what that payment was for.

15            MR. OCHS:  Is this --

16            MR. HOFT:  -- it's $815.

17            MR. OCHS:  Is this a TGP check?

18            MR. HOFT:  Oh, I know.  This -- yeah, yes.  Yes,

19    sir.  This is to the -- my account.  This is an automatic

20    payment each month.

21            MR. OCHS:  When you say to your accountant, do you

22    mean your accountant individually or the corporation's

23    accountant?

24            MR. HOFT:  This would be the corporation's

25    accountant.  She also works on my individual taxes, too.  I

Page 26

1    have her do business and personal taxes for myself.

2              MR. OCHS:  Okay.  Have you retained an accountant

3    in this bankruptcy case yet?

4              MR. BURNS:  (indiscernible) application.

5              MR. OCHS:  Wait --

6              MR. BURNS:  -- already provided the application

7    for it -- for her.

8              MR. HOFT:  Thank you.

9              MR. OCHS:  So, an account has not yet been

10   retained, correct?

11             MR. HOUSTON:  Correct.

12             MR. OCHS:  Are you planning on --

13             MR. HOUSTON:  I just spoke to -- Bart Houston

14   speaking.  I just spoke to her for the first time last week.

15             MR. OCHS:  Is the plan to retain this company AP

16   Accounting and Tax for the Debtor?

17             MR. HOUSTON:  Bart Houston speaking.  Yes.

18             MR. OCHS:  Okay.

19             MR. HOUSTON:  Because she will be doing some

20   financial work for the plan.

21             MR. OCHS:  How will you get past the conflict of

22   her representing Mr. Hoft individually as well as the

23   corporation?

24             MR. HOUSTON:  She does taxes for Mr. Hoft and she

25   won't have to do those during the period of time that we'll

1    be preparing the financials for the plan.  That's all I

2    really need her for.

3              MR. OCHS:  But do you think that that -- do you

4    think she's disinterested?

5              MR. HOUSTON:  I think that I would file an

6    application.  If someone wants to object to it, they can.  I

7    don't know any other way to get the financial information

8    for the plan.

9              MR. OCHS:  All right.  I think it's likely that

10   the United States Trustee is going to object to that

11   application, unless you can make a showing that she's

12   somehow disinterested, and based upon Mr. Hoft's most recent

13   testimony today, I think it's going to be hard to get past

14   that threshold.

15             Mr. Hoft, I'm now looking at Page 13 of 19 of the

16   of Document No. 51, and your personal name and -- appears at

17   the top of that bank statement.  Can you tell me why that

18   is?

19             MR. HOFT:  Okay, so this was a different account.

20   This is for the company store that we have.

21             MR. OCHS:  Okay, why -- if it's for a company

22   store, why is your individual name on the bank account?

23             MR. HOFT:  That was how we set it up, and I didn't

24   know that there were rules to put a government approved name

25   on a bank account.

```
 1          MR. OCHS:  When you say "we," who is --
 2          MR. HOFT:  This was -- I didn't know that -- did
 3   not know there was rules with our company when we set up a
 4   bank account that we're going to be regulated by the
 5   government as far as the name that we put up on the account.
 6   This is for selling T-shirts and whatever and it's a
 7   separate account, so we kept the transactions separate.  And
 8   so, that's what we did.  We set this account up, which is
 9   also being closed, and so, yeah, that's why it would have my
10   name on it.
11          MR. OCHS:  You said "we."  Who is involved in the
12   we?  Who's included, rather, in the we?
13          MR. HOFT:  That would be myself.
14          MR. OCHS:  Why did you use the word we then?
15          MR. HOFT:  Sir, I'm a twin.  I use the word we a
16   lot.  It's just something I've always done.  So, that would
17   be myself.  I'll be more conscious of that.
18          MR. OCHS:  All right.  Looking at page -- looking
19   at Page 15 of 19, we heard your attorney say that
20   transactions prior to the filing of the petition were the
21   ones that were redacted, but if you look at th3e middle of
22   that page, after the April 30th transaction, there is
23   redaction of two items on that.  What are those relating to?
24          MR. HOFT:  Well, I see some Shopify transactions.
25   Is that what you're talking about?
```

1          MR. OCHS:  I can't tell because I can't -- I can't

2     see it because it's been redacted.  Is it your --

3          MR. HOFT:  Okay.

4          MR. OCHS:  -- testimony that you will produce to

5     me the unredacted versions without the need of a Court

6     order?

7          MR. HOUSTON:  Mr. Ochs --

8          MR. HOFT:  I don't have --

9          MR. HOUSTON:  -- speaking and I will send you the

10    entirety of this.

11         MR. OCHS:  Okay.

12         MR. HOUSTON:  Unredacted.

13         MR. OCHS:  All right.  Looking now to Page 17 of

14    19, Revolut business monthly statement.  Again, it appears

15    that there's a redaction of a name before the TGP

16    Communications, LLC.  What is redacted there?

17         MR. HOFT:  That Revolut count has been closed.  I

18    believe that's the -- I think that's -- I'll have to find

19    the original.  It's -- I assume it's my name, but I'm going

20    to have to look that up.

21         MR. OCHS:  All right.  Mr. Houston, will you

22    produce the Revolut statements as well, unredacted?

23         MR. HOUSTON:  So we're clear on the record, this

24    report is page -- 19 pages.  I'm going to produce everything

25    in here that's been redacted.  It'll be unredacted to you.

```
 1            MR. OCHS:  Very well.  Thank you very much.  I
 2   appreciate that.
 3            MR. HOUSTON:  (indiscernible).
 4            MR. OCHS:  I -- Mr. Hoft, has the Debtor opened up
 5   post-petition Debtor in Possession accounts at this point in
 6   time?
 7            MR. HOFT:  Yes.
 8            MR. OCHS:  Okay, and where are those bank
 9   accounts, please?
10            MR. HOFT:  So, we have a bank account at City
11   National.
12            MR. OCHS:  Anywhere else?
13            MR. HOFT:  We just have the one set up currently.
14            MR. OCHS:  Okay.  And has the Debtor begun using
15   that account on a post-bankruptcy basis?
16            MR. HOFT:  Absolutely.
17            MR. OCHS:  Okay.  When we were here last time, we
18   talked about Charles Schwab accounts.  Do you have the
19   account statements for the Charles Schwab account?
20            MR. HOFT:  I can get those.
21            MR. OCHS:  Okay.
22            MR. HOFT:  I could get those within an hour.
23            MR. OCHS:  Okay.  Very good.  I'm asking you to
24   produce -- and Mr. Houston, you can tell me whether you will
25   do this for Mr. Furr.  If you need, I'll get a Court order.
```

```
 1    I want the Charles Schwab account statements for the one-

 2    year period from today backwards for one year.  Will you

 3    produce those voluntarily?

 4             MR. HOUSTON:  Bart Houston.  Yes.

 5             MR. OCHS:  Okay.  And Mr. Hoft, I had asked for

 6    the documents relating to payments made by the Debtor to Joe

 7    Hoft, which I believe is your twin brother, correct?

 8             MR. HOFT:  That's correct.

 9             MR. OCHS:  I have not gotten those documents.

10    When may I expect to get those documents?

11             MR. HOFT:  Which payments were those?

12             MR. OCHS:  There were payments made that were

13    reflected on the bankruptcy petition that were made from the

14    Debtor to your brother Joe Hoft.

15             MR. HOFT:  I'll look at that and I can get you

16    that.

17             MR. OCHS:  Okay.  How long will it take to get

18    that, do you think?

19             MR. HOFT:  I'll have to look and see where -- what

20    that -- what that was.

21             MR. OCHS:  Okay.  Do you recall during --

22             MR. HOFT:  I think we can get that to you --

23             MR. OCHS:  Do you --

24             MR. HOFT:  -- sometime --

25             MR. OCHS:  Do you recall during --
```

Case 9:24-cv-80068-AHS-Document 26-376 Entered on FLSD Docket 05/09/2025 Page 1004 of
1417

```
 1              MR. HOFT:  -- the next day.
 2              MR. OCHS:  Do you recall during the last 341
 3    meeting that I had asked for the documents relative to a
 4    loan that was made by the corporation to you and then you
 5    then used it to purchase your home in Florida?  Do you
 6    recall that conversation?
 7              MR. HOFT:  Yes.
 8              MR. OCHS:  Okay.  I have not received those
 9    documents.  When will I receive those documents?
10    Specifically, I wanted the loan documents and the closing
11    documents on your home.
12              MR. HOFT:  Okay.  Yeah, I already turned over the
13    closing documents and there's no loan on the home.  So, it's
14    just -- I just returned -- I turned over the closing
15    documents, so we should be able to get those to you very
16    soon.
17              MR. OCHS:  Turned them over to whom, sir?
18              MR. HOFT:  I had sent those to Jon, Mr. Burns.
19              MR. OCHS:  Okay.  Has Mr. Burns turned them over
20    to Mr. Houston so that they can be turned over to the United
21    States Trustee?
22              MR. HOUSTON:  Bart Houston speaking.  I received
23    the closing statement.  Mr. Burns was researching the Joe
24    Hoft loan and wasn't able to find anything.  I've dealt with
25    Mr. Burns almost exclusively, so, you know, I don't think
```

Case 9:24-cv-80629-AHS-BER Document 26-37 Entered on FLSD Docket 06/04/2025 Page 1005 of 1417

1    Mr. Hoft would really know what investigation we've been

2    doing on that.

3              MR. OCHS:  Right.  Well, I'd ask you to turn those

4    documents over to me.  I do want, because the bankruptcy

5    petition suggests that a loan was made by the Debtor to Mr.

6    Hoft, okay, and --

7              MR. HOUSTON:  Well, you need to say Joe or Jim.

8              MR. OCHS:  Jim Hoft.  There's -- well, there's two

9    loans.

10              MR. HOUSTON:  (indiscernible).

11              MR. OCHS:  I want the -- I'll make it easier.

12              MR. HOUSTON:  Understood.

13              MR. OCHS:  I want the loans relative to both of

14    the Misters Hoft.  Okay?  I want the documents relative to

15    both.  I -- the United States Trustee is entitled to them.

16    They are referenced in the bankruptcy petition and they are

17    important to the United States Trustee's investigation in

18    this case.  So, I'm asking for all of those loan documents.

19    Does that make it clear?

20              MR. HOUSTON:  Crystal.

21              MR. OCHS:  Okay.  And then also, the United States

22    Trustee had asked for the title to a Porsche automobile that

23    it was unclear, it was listed on the bankruptcy petition,

24    but it was unclear as to whose name the title is in.  Do you

25    have that title, Mr. Houston?

Case 9:24-cv-80872-AHS Document 26-7 Entered on FLSD Docket 09/09/2025 Page 1006 of 1417

```
 1              MR. HOUSTON:  I don't.

 2              MR. OCHS:  Do or don't?  I'm sorry?  You --

 3              MR. HOUSTON:  If you didn't hear me, I said I do

 4    not.

 5              MR. OCHS:  Okay.  Mr. Hoft, where is the title to

 6    the Porsche, please?

 7              MR. BURNS:  This is Jon -- this is Jon Burns.  Mr.

 8    Hoft turned it over to me and I thought I had -- I thought I

 9    had turned it over to Mr. Houston.  Apparently, maybe I did

10    not, but I will make sure that Mr. Houston has a copy of it

11    shortly.

12              MR. OCHS:  Okay, very good.  So, I would ask that

13    those documents be turned over to the United States Trustee

14    by Thursday, June 20th, at noon.  Okay?  It should hopefully

15    not be an easy thing.  I'll be happy to receive them

16    electronically.  All right, with that said, I'm going to

17    pass the microphone to creditors.  Mr. Brunage, would you

18    please proceed?

19              MR. BURBAGE:  Yes, good morning, Jim Burbage of --

20              MR. OCHS:  Burbage, sorry.

21              MR. BURBAGE:  -- Willkie, Farr & Gallagher.

22              MR. OCHS:  Sorry about that.  I apologize.

23              MR. BURBAGE:  Can you hear me?

24              MR. OCHS:  Yes.  I apologize for mispronouncing

25    your name.
```

```
 1              MR. BURBAGE:  No worries.  So, we can stay talking

 2    about the loans that the Debtor had made, and this is a

 3    question for Mr. Hoft with respect to the loan receivable

 4    which is on Docket No. 34, Page 11 of 30.  It's referred to

 5    as loan receivable shareholder.  Do you recall when the

 6    Debtor provided this loan to you?

 7              MR. HOFT:  What document is that, sir?

 8              MR. BURBAGE:  This is Docket No. 34.

 9              MR. HOFT:  Okay.  I have to look that up.

10              MR. BURBAGE:  On Page 11 of 30, once you have the

11    document.

12              MR. HOFT:  Page 11.  Okay, I'm on Page 11.

13              MR. BURBAGE:  Okay.  And --

14              MR. HOFT:  -- the question?

15              MR. BURBAGE:  Do you see where it says loan

16    receivable shareholder and then it's a --

17              MR. HOFT:  Yeah.

18              MR. BURBAGE:  -- total face amount $799,860?  When

19    did the Debtor provide that loan to you?

20              MR. HOFT:  That would have been in 2021, I

21    believe.  August, October.

22              MR. BURBAGE:  Okay.  And what was the loan for?

23              MR. HOFT:  That was a loan to Main Street, I

24    believe, for the property in Florida.

25              MR. BURBAGE:  Okay.  And this is the property that
```

1    you currently live in?

2             MR. HOFT:  Correct.

3             MR. BURBAGE:  Okay.  And your testimony was a

4    little unclear, so I just want to make sure that I have it.

5    Was this loan reflected in a loan agreement?

6             MR. HOFT:  Well, yes, it was a loan, so.

7             MR. BURBAGE:  Right but that's not my question.

8    Was it memorialized in sort of a formal agreement between

9    you, Jim Hoft, the individual and the Debtor, TGP

10   Communications, LLC?

11            MR. HOFT:  Well, I don't think there was a formal

12   agreement, a formal document.

13            MR. BURBAGE:  Okay.  Was there any interest rate

14   on the loan?

15            MR. HOFT:  No.

16            MR. BURBAGE:  How frequently did you make payments

17   back to the Debtor on account of the loan?

18            MR. HOFT:  Well, I'm actually not sure about that.

19            MR. BURBAGE:  Okay, I can ask it a slightly

20   different way.  Have you made any payments on account of the

21   loan since it was provided?

22            MR. HOFT:  I don't know.

23            MR. BURBAGE:  Have you made any payments in the

24   past 12 months on it?

25            MR. HOFT:  No.  I don't know about that.

Page 37

```
 1              MR. BURBAGE:  Okay.  The outstanding loan balance
 2    is $799,860, a very specific amount.  Did that amount
 3    correspond to the purchase price of the condo?
 4              MR. HOFT:  The purchase price was a bit less than
 5    that.
 6              MR. BURBAGE:  Okay.  And so what would be the
 7    difference between what was borrowed and the purchase price?
 8              MR. HOFT:  There was several thousand between the
 9    purchase price and the amount of the loan.
10              MR. BURBAGE:  Okay.  So, I take it you don't
11    recall if you've made any payments on this loan.  Let me ask
12    you this.  Is there a maturity date on the loan?
13              MR. HOFT:  I can't say.  I don't believe so.
14              MR. BURBAGE:  Okay.  Let's move on to the next
15    notes receivable line item on that same document, which is
16    due from the Justice League.  Do you recall when the Debtor
17    provided this loan?
18              MR. HOFT:  So, this is due from the Justice
19    League, correct?  Is that what you're looking at?
20              MR. BURBAGE:  Yes.
21              MR. HOFT:  Okay.  Yeah, so this has been money
22    that we have invested into the Justice League.
23              MR. BURBAGE:  Okay, but these are notes
24    receivables, correct?  To say it differently, this is a loan
25    that the Debtor would have extended to the Justice League?
```

```
 1              MR. HOFT:  Yes.

 2              MR. BURBAGE:  And when have those loans

 3    historically been extended?

 4              MR. HOFT:  I don't have that information.

 5              MR. BURBAGE:  Would it have been within the past

 6    year?

 7              MR. HOFT:  I don't have that.  I don't have that

 8    information.

 9              MR. BURBAGE:  Okay.  Who would have that

10    information?

11              MR. HOFT:  I'll have to look it up.

12              MR. BURBAGE:  And what was this loan for, the loan

13    from TGP to the Justice League?

14              MR. HOFT:  It would be for expenses, attorney

15    expenses (indiscernible).

16              MR. BURBAGE:  Okay.  And can you just explain a

17    little bit what the Justice League does, to give some

18    context to that answer?

19              MR. HOFT:  Yeah, we set up the Justice League to

20    helped with our law (indiscernible) suits and to help with

21    legal matters, legal documents.  We also run the American

22    Gulag out of the Justice League, which is a separate

23    website.  And so, it's become quite expensive, as you know.

24    That's why we're here today and so that's why I set up the

25    Justice League originally.
```

1    And it's also to promote the First Amendment.  We

2    have some cases, as you know, one that's going to be decided

3    in the Supreme Court any day, on free speech.  We're one of

4    the -- we're one of the top plaintiffs on that case.  And

5    so, it helps with our legal expenses.

6    MR. BURBAGE:  So, is the Justice League paying any

7    legal expenses for that Supreme Court case?

8    MR. HOFT:  No, but quite a bit of time.

9    MR. BURBAGE:  Okay.  Does the Justice League have

10   any business operations where it could pay back the Debtor

11   this amount of money?

12   MR. HOFT:  That's the plan.  That's the plan.

13   MR. BURBAGE:   Right, so you --

14   MR. HOFT:  We were able to -- we won one case, as

15   you know, in Arizona, a free speech case where they were --

16   the Maricopa County was preventing us from attending the

17   public gathering, public meetings with state officials or

18   Maricopa County officials and we had filed a claim and they

19   ended up paying us for damages.  And that was -- so that was

20   a case and that was some money that came back to help pay

21   for some of those expenses.

22   MR. BURBAGE:  Okay.  So is the extension of funds

23   by the Debtor to the Justice League, was that reflected in a

24   loan agreement?

25   MR. HOFT:  I know our accountant has that worked

1    out, and so I think that that would be something she would

2    be able to answer.

3              MR. BURBAGE:  So, my question's slightly -- it's

4    not an accounting question.  It's more of, was this

5    agreement ever formally documented?

6              MR. HOFT:  I don't think there's a formal

7    agreement.

8              MR. BURBAGE:  Okay.  Was there any interest rate

9    on the loan?

10             MR. HOFT:  No, I don't believe so.

11             MR. BURBAGE:  Okay.  Are you aware of any payments

12   that the Justice League has made back to TGP Communications

13   on account of the loan?

14             MR. HOFT:  I'd have to look.

15             MR. BURBAGE:  Would that be a question that Jon

16   Burns would know the answer to?

17             MR. HOFT:  I think Jon Burns would know the answer

18   to that.

19             MR. BURBAGE:  Jon Burns, do you know the answer to

20   that question?

21             MR. BURNS:  I don't believe any payments -- well,

22   there may have been some payments that were made back on the

23   loan.  I'm not entirely sure.  There could have been a few,

24   but I'm not -- I don't -- as I sit here right now, I'm not -

25   - I can't say for sure.  I don't believe so.

```
 1              MR. BURBAGE:  Okay.  So, it sounds like there's
 2     not a regular course of paying this loan back; is that fair?
 3              MR. BURNS:  I mean, regular course?  I mean, I
 4     would say that there's probably -- it probably has not been
 5     paid back.
 6              MR. BURBAGE:  Right, but is there a regular
 7     schedule of payments to pay the loan back?
 8              MR. BURNS:  A schedule of payments?  No.
 9              MR. BURBAGE:  And does the loan have a maturity
10     date?
11              MR. BURNS:  No, not that I'm aware of.
12              MR. BURBAGE:  Okay.  And were -- would the parties
13     have been represented by separate counsel when this loan was
14     negotiated?
15              MR. BURNS:  No.
16              MR. BURBAGE:  Okay.  Moving to the loan receivable
17     about Joe Hoft, which is the third line item on the docket,
18     the document that I originally referenced, Docket 34.  Do
19     you recall when the Debtor provided this loan to Joe Hoft?
20              MR. HOFT:  I don't --
21              MR. BURNS:  Actually, if I could -- if I could
22     interject something real quick.  I just recalled something.
23     This is Jon Burns.  I just recalled something.  I believe
24     that the money that was recouped in the suit that we had
25     with -- that Justice League had with Maricopa County, I
```

1   believe that those funds were ultimately remitted to TGP.

2   So, I think that there was a substantial payment made on the

3   loan.  I believe that that -- I believe that to be the case.

4   Sorry, I forgot about that.

5           MR. BURBAGE:  So, when would that payment have

6   been made?

7           MR. BURNS:  That would have been -- that would

8   have been sometime in the summer of 2023.

9           MR. BURBAGE:  Summer of 2023.  Okay.  But he would

10  -- I mean, as of the petition date, there was still an

11  outstanding loan to the Justice League for $150,000

12  according to Document No. 34.

13          MR. HOFT:  Yeah, that's right.

14          MR. BURBAGE:  Okay.

15          MR. HOFT:  Yeah.

16          MR. BURBAGE:  Okay.  Yeah, I'm just trying to

17  figure out what's owed to the Debtor as of the petition

18  date.

19          MR. HOFT:  Thank you.

20          MR. BURBAGE:  So, going back to the Joe Hoft loan,

21  when did the Debtor provide this loan to Joe Hoft?

22          MR. HOFT:  I'm going to have to look that up.  I

23  don't have that information in front of me.  I can get that

24  to you, to the Court.

25          MR. BURBAGE:  Yeah, if you could provide a copy of

 1    that document that would be -- that would be helpful.  Do

 2    you recall what this loan was for?

 3              MR. HOFT:  I don't have that information in front

 4    of me.  I don't recall.

 5              MR. BURBAGE:  Was the loan reflected in a loan

 6    agreement?

 7              MR. HOFT:  I don't have that information.  I don't

 8    know if I had a formal document.  I'm going to have to

 9    search for that.

10              MR. BURBAGE:  So, do you know if there was an

11    interest rate on the loan?

12              MR. HOFT:  He's my twin brother and so I don't --

13    I wouldn't put an interest rate on a loan to my brother.

14              MR. BURBAGE:  Right, but this is a loan that TGP

15    Communications is making, not you personally.

16              MR. HOFT:  Correct.

17              MR. BURBAGE:  Is that right?

18              MR. HOFT:  Yeah.

19              MR. BURBAGE:  Okay.  And do you know if there was

20    a maturity date on this loan?

21              MR. HOFT:  I don't have that in front of me, that

22    information.  I don't -- I'd have to look that up.

23              MR. BURBAGE:  Okay.  And when you say look it up,

24    what -- if there's no document that is reflecting this, what

25    would you sort of do to ascertain the answer to those

Case 9:24-cv-80972-AHS Document 26-376 Entered on FLSD Docket 06/09/2025 Page 1016 of 1417

1    questions?

2            MR. HOFT:  I'm going to have to look back through

3    emails and documents I saved and see what I have on this.

4            MR. BURBAGE:  Okay.  So, I want to stay on

5    Document No. 34 and actually go one page before Page 11, so

6    Page 10 of 30 which lists the mutual funds, which there's a

7    Robin Hood account and then there are three Charles Schwab

8    accounts.  Do you see those?

9            MR. HOFT:  Sure.

10           MR. BURBAGE:  So, we'll just go through them one

11   by one.  With the Robin Hood account, is there -- are there

12   any other beneficiaries besides the Debtor to the assets in

13   that account?

14           MR. HOFT:  No.  That would just be TGP.

15           MR. BURBAGE:  Okay.  And for the Charles Schwab

16   account, account number 4627 which is -- it says 401(k), are

17   there any beneficiaries besides TGP?

18           MR. HOFT:  I'll have to pull those documents up

19   and see.

20           MR. BURBAGE:  Who is the beneficiary of the 401(k)

21   account?  Is that for an employee --

22           MR. HOFT:  Well --

23           MR. BURBAGE:  -- TGP?

24           MR. HOFT:  I believe it's a personal 401(k).

25           MR. BURBAGE:  Is it your personal 401(k)?

1      MR. HOFT:  I believe so.

2      MR. BURBAGE:  Okay.  And is that because you're an

3  employee of TGP?

4      MR. HOFT:  It's -- yes.  I set that up.  I started

5  that a number of years ago, I believe.

6      MR. BURBAGE:  Okay.  It just -- it was unclear

7  from the last 341 meeting, but how many employees does TGP

8  have?

9      MR. HOFT:  So, I'm currently the only employee.

10     MR. BURBAGE:  Okay.  Okay, got it.  Shifting back

11  to the Charles Schwab account, Charles Schwab account 82 --

12  ending in 8256, are you aware of any other beneficiaries

13  besides the Debtor for this account?

14     MR. HOFT:  No, that would be this -- that would be

15  TGP and myself, being the only employee.

16     MR. BURBAGE:  Okay.  And then Charles Schwab

17  account ending in 2360.  Are there any other beneficiaries

18  to that account besides TGP?

19     MR. HOFT:  No, that would have been myself.  I

20  believe I set these up back in 2016, '17, started these.

21  And I was certainly the only employee I didn't have too many

22  contractors working for me at the time.  So, that's when I

23  set these up.

24     MR. BURBAGE:  Okay.  And are there any limitations

25  on your ability to sell the stocks or mutual funds or

 1   whatever is in these accounts?

 2          MR. HOFT:  I'm not sure.

 3          MR. BURBAGE:  Would you expect there to be any?

 4          MR. HOFT:  I'm not sure.

 5          MR. BURBAGE:  Okay.  Have -- has the Debtor made

 6   any contributions to these accounts within the past year?

 7          MR. HOFT:  I believe I -- that Schwab still takes

 8   money out of our account and so that goes into these

 9   accounts every year.

10          MR. BURBAGE:  I'm sorry, I wasn't quite following

11   that.  So, is the answer yes, you think there has been

12   contributions that have been made in the past 12 months?

13          MR. HOFT:  Yes.

14          MR. BURBAGE:  Okay.  To the extent that there are

15   any documents governing the limitations on liquidating these

16   investments, can we receive a copy of those?

17          MR. HOFT:  I think that's fine.  I think we can

18   provide that.

19          MR. HOUSTON:  Hey, Jim, it's Bart Houston.

20          MR. BURBAGE:  Yeah.

21          MR. HOUSTON:  If you would just give me a short

22   email or a letter on what documents you want, I'll be glad

23   to do it absent a formal request.

24          MR. OCHS:  Please copy the United -- this is

25   Martin Ochs.  This is Martin Ochs.  Please copy the United

Case 9:24-cv-80772-AHS Document 26-376 Entered on FLSD Docket 09/09/2025 Page 1019 of 1417

```
 1    States Trustee with those, with the request and the

 2    documents.  Thank you.

 3              MR. HOUSTON:  Will do.

 4              MR. BURBAGE:  Yeah, will do.  So, staying on

 5    Document No. 34, just a few questions about the 2021 Porsche

 6    Cayenne, which is referenced on Page 6 of that document.  Do

 7    you recall when the Debtor acquired the Porsche?

 8              MR. HOFT:  It's been a few years ago.  I can look

 9    that up.  I don't know the exact date.

10              MR. BURBAGE:  Okay.  Do you recall from where you

11    acquired the Porsche?

12              MR. HOFT:  That would have been a Porsche

13    dealership in St. Louis.

14              MR. BURBAGE:  Okay.  Ballpark, do you recall the

15    purchase price of the Porsche?

16              MR. HOFT:  I'd have -- I'll have to look that up.

17    I believe it was around maybe 70,000.

18              MR. BURBAGE:  Okay.  And what is the -- is there a

19    corporate purpose for the Porsche?

20              MR. HOFT:  It's the car that I've used when I'm in

21    St. Louis for business and --

22              MR. BURBAGE:  So it's a company car.  Okay, so

23    it's not in Florida?

24              MR. HOFT:  No.  I have a separate car in Florida.

25              MR. BURBAGE:  Okay.  And is the Porsche owned
```

```
 1    outright?

 2            MR. HOFT:  It was -- yeah, it was paid for in

 3    cash.

 4            MR. BURBAGE:  Okay.  So, there's no outstanding

 5    lease payments that are due on the Porsche?

 6            MR. HOFT:  No.

 7            MR. BURBAGE:  Okay.  So, staying on Document 34,

 8    could you go to Page 28 of that document?  And on Page 28,

 9    I'm looking at -- there's a list that says certain payments

10    or transfers to creditors within 90 days before the filing

11    of the case.  Let me know when you see that.

12            MR. HOFT:  Okay.

13            MAN:  I'm not there.

14            MR. BURBAGE:  Are you there?

15            MR. HOFT:  Yes, I am.

16            MR. BURBAGE:  Okay.  So, the second line item, it

17    says (indiscernible) and then there's a transfer of a little

18    over $33,000.  Do you see that?

19            MR. HOFT:  Yes.

20            MR. BURBAGE:  Is this -- this is a payment to your

21    partner, correct.

22            MR. HOFT:  Correct.

23            MR. BURBAGE:  Okay.  And it says the payment was

24    for telephone/internet services.  Can you explain exactly

25    what services the -- was being provided to the Debtors?
```

```
 1              MR. HOFT:  So, Jezreel runs the social media and

 2    he has -- there's obviously Twitter, Facebook, True Social,

 3    Telegram, Instagram, and a few others, Getter.  So he runs

 4    those accounts.

 5              MR. BURBAGE:  Okay.  And about how much of his

 6    time was this in compensation for?

 7              MR. HOFT:  It depends on the month, how much he

 8    earns.

 9              MR. BURBAGE:  Okay.  So, $33,000 would that be

10    about one month's worth of work?

11              MR. HOFT:  That's three months.

12              MR. BURBAGE:  Okay.  This would have been three

13    months.  And do you have any -- do you have any sense of

14    whether the amount that the Debtor is paying Jez each month

15    for these services, whether that is reflective of similar

16    services that the Debtor could acquire in the market?

17              MR. HOFT:  Oh, Jez is -- yeah, I -- definitely.

18              MR. BURBAGE:  Okay.  A few lines further down

19    there is there's a payment to Jim Hoft for a little over --

20              MR. HOFT:  Yes.

21              MR. BURBAGE:  -- $17,000.  Was this a payment in

22    connection with your regular salary?

23              MR. HOFT:  I believe that -- and I -- I believe

24    that is a monthly payment that that's -- so it would be a

25    monthly salary that goes to my personal account.
```

1          MR. BURBAGE:  Okay.  This is --

2          MR. HOFT:  (indiscernible).

3          MR. BURBAGE:  -- like one of the -- one of the

4    months is missing because it's around $9,000.

5          MR. HOFT:  It looks like one of the months might

6    be missing, but that's how -- that's the, yeah, personal

7    amount that I make.

8          MR. BURBAGE:  Okay.  And then there is also a

9    $95,000 payment to the Justice League?

10          MR. HOFT:  Okay.

11          MR. BURBAGE:  Underneath that.

12          MR. HOFT:  Correct.

13          MR. BURBAGE:  Do you recall what this payment was

14    for?

15          MR. HOFT:  Well, this is money that goes to

16    Justice League for, as we explained, legal causes and other

17    tasks that they perform.

18          MR. BURBAGE:  Okay.  So, this is -- this is

19    different than the loan that's outstanding that the Justice

20    League owes TGP, though?

21          MR. HOFT:  I'm not sure about that.  I'd have to

22    look into that.

23          MR. BURBAGE:  Okay.  Would Jon Burns know the

24    answer to that?

25          MR. HOFT:  Yeah --

1          MR. BURNS:  This is Jon.  Yeah.  That money is not

2     -- that' snot a loan.

3          MR. BURBAGE:  Okay.  Is the way to think about

4     that payment, it's basically legal services that Justice

5     League would have charged TGP?

6          MR. BURNS:  Yes.

7          MR. BURBAGE:  Okay.

8          MR. BURNS:  I mean -- well, I mean for the most

9     part, yes.  I mean, that is a component to it.  As Mr. Hoft

10    mentioned a few minutes ago, there are other things that

11    Justice League does as well.

12         MR. BURBAGE:  Okay.  Got it.  So, I'd like to talk

13    a little bit about the Debtor's insurance policies, and

14    there are two that are referenced on Docket No. 13.  The

15    first is media liability insurance policy.  Are you familiar

16    with that policy?

17         MR. HOFT:  I believe that's the same policy we

18    have -- and Jon correct me -- that we're using on this, the

19    lawsuits with Ruby and Shaye and Coomer.  Is that correct,

20    Jon?  Isn't that the same policy?

21         MR. BURNS:  I believe so.  What document number

22    was this?  I'm sorry, I -- you cut out.

23         MR. BURBAGE:  This is Document No. 13.

24         MR. BURNS:  One moment.  One moment.  Okay, I'm

25    there.

1           MR. BURBAGE:  Yeah, the reference to the media

2     liability insurance policy.

3           MR. BURNS:  I'm sorry, what line was this?  What

4     bullet or, you know, what number?

5           MR. BURBAGE:  Hold on one second.  I'm just

6     pulling up the document.

7           MR. BURNS:  I think it's number 10; is that right?

8           MR. BURBAGE:  Yeah, that's right, the list of all

9     the insurance policies.

10          MR. BURNS:  Yes.  That, I believe that that's the

11    -- yes, that's got to be the one.

12          MR. BURBAGE:  Okay.  And this is the insurance

13    policy that's covering the litigation costs of the lawsuits

14    initiated by Dr. Coomer and also Ruby and Shaye?

15          MR. BURNS:  Ruby and Shaye and more recently Dr.

16    Coomer.  There was a question as to whether or not the

17    policy applied to Dr. Coomer's case, but it's -- but, so

18    relative -- so that -- so the coverage for Dr. Coomer's case

19    has been more recent, but yes, for -- certainly for the case

20    of Ms. Freeman and Ms. Moss.

21          MR. BURBAGE:  Okay.  So, about how much of the $2

22    million policy has been spent, defending those two lawsuits?

23          MR. BURNS:  So they -- I'm going to have to give

24    you a ballpark figure, because I don't have the precise

25    amount, but I --

```
 1              MR. BURBAGE:  Okay.

 2              MR. BURNS:  I believe it's approximately 1.2 or

 3    1.3 million remaining.  I might be -- however, I apologize,

 4    but I could be off by approximately $50,000 or $100,000.

 5              MR. BURBAGE:  Okay.  Got it.  There's also a

 6    reference to a captive insurance policy.  Can you explain

 7    what that is?

 8              MR. BURNS:  Yes, I mean, it's a captive -- it's a

 9    captive insurance policy, so it's a self-insurance policy,

10    essentially.

11              MR. BURBAGE:  Okay.  That's not a policy that's

12    paying any of the expense costs for the two litigations we

13    were just talking about?

14              MR. BURNS:  That's correct.

15              MR. BURBAGE:  Okay.  Excuse me, I'm just looking

16    at my notes.  I'd like to go to a different document which

17    is Docket No. 17.  Actually, excuse me.  Before we just

18    leave the topic of the insurance policies, it sounds like

19    that insurance policy, the media professionals liability

20    policy, is covering the cost of Dr. Coomer's litigation.  I

21    just want to make sure that -- it sounds like there was a

22    dispute, but that dispute got resolved and that the

23    insurance policy is covering those costs; is that right?

24              MR. BURNS:  That is correct.

25              MR. BURBAGE:  Okay.  So, could you pull up Docket
```

```
 1    No. 17?

 2              MR. BURNS:  Yes, I'm there.

 3              MR. BURBAGE:  Okay.  If you go to Page 3 of 6,

 4    this is the balance sheet of TGP Communications as of March

 5    31st.

 6              MR. BURNS:  Yes, sir, I'm there.

 7              MR. BURBAGE:  Towards the bottom of the page,

 8    there is a number of line items about equity, and there is a

 9    line that says owner's equity, and underneath that there are

10    four lines that says contributions, draws, estimated

11    (indiscernible) taxes, estimated MO taxes.  Do you see

12    those?

13              MR. BURNS:  Yes, I do.

14              MR. BURBAGE:  Can you explain what the $691,000

15    figure for draws, what that represents?

16              MR. BURNS:  I wish I could.  I'm not,

17    unfortunately, I'm not an accountant.  It -- I'm sure it was

18    explained to me at one point, but I can't -- I -- as I sit

19    here, I can't recall how that is structured.  So, I don't

20    have that -- I don't know how to answer the question because

21    I don't know.

22              MR. BURBAGE:  Okay.  Mr. Hoft, do you know the

23    answer to that question?

24              MR. HOFT:  No.  I would defer to our accountant.

25              MR. BURBAGE:  Okay.  Let me ask it this way.  Have
```

Page 55

1    you taken any equity withdrawals from TGP Communications?

2           MR. HOFT:  I don't believe so.

3           MR. BURNS:  That's -- and that's if you know the -

4    - if you know the answer to the question.

5           MR. HOFT:  Yeah, I -- okay.  I don't know the

6    answer to the question.  I don't believe so.

7           MR. BURBAGE:  Okay.  Has TGP ever paid any taxes

8    on your behalf as an individual?

9           MR. HOFT:  No.

10          MR. BURBAGE:  Okay.  So, do you know what those

11   two line items are referring to, the estimated federal taxes

12   and estimated MO taxes?

13          MR. HOFT:  What page is that again?

14          MR. BURBAGE:   It's on Page 3 of 6.

15          MR. HOFT:  Okay.  Let's see.  Okay, I'm on the

16   page.  I don't see a tax line here.  Where is that at?  Page

17   3 of 6?

18          MR. BURBAGE:  Yeah, page 3 of 6 towards the

19   bottom.  It says equity, and then underneath that ---

20          MR. HOFT:  Okay.

21          MR. BURBAGE:  Owner's equity contributions, then

22   draws --

23          MR. HOFT:  Okay.

24          MR. BURBAGE:  (indiscernible).  Are you aware of

25   the Debtor having made tax payments on account of you as the

Page 56

```
 1    individual equity owner?
 2              MR. HOFT:  I don't believe so.  Yeah, because we -
 3    - yeah, I would say -- I would say I pay my own taxes
 4    individually and then we, of course, we have to pay these
 5    other taxes that I'm, you know, that I'm paying each year
 6    for the business.
 7              MR. BURBAGE:  Okay.  And are you aware of any
 8    dividends that you've taken from the company?
 9              MR. HOFT:  I'm not aware of that, but my
10    accountant would know.
11              MR. BURBAGE:  Okay, so you don't know what the --
12    what this figure, this $691,000 figure with respect to draws
13    is referring to?
14              MR. HOFT:  I'm -- that's not something, that I
15    know offhand.  I'd have to talk to Tammy, our accountant.
16              MR. BURBAGE:  Okay.  And -- okay, and just one
17    last set of questions.  In what state is TGP Communications,
18    LLC incorporated?
19              MR. HOFT:  It's incorporated in Missouri in 2013,
20    and then in Florida in the past year with.
21              MR. BURBAGE:  We've got the -- we notices in April
22    2024, there was -- the Debtor filed an application by the
23    foreign limited liability company for authorization to
24    transact business in Florida.  Is that the filing you're
25    referring to?
```

1          MR. HOFT:  The foreign registration form, I

2    believe?

3          MR. BURBAGE:  Yeah.

4          MR. HOFT:  That would have been something, yes,

5    that we filed.

6          MR. BURBAGE:  Okay.  And was that filed in April

7    of April of 2024?

8          MR. HOFT:  Yes.

9          MR. BURBAGE:  Okay.  And did the Debtor move to

10   Florida in April of 2024?

11         MR. HOFT:  I've been a resident of Florida for a

12   couple of years.

13         MR. BURBAGE:  Okay.  Is there a reason why the

14   Debtor didn't file this application to transact business in

15   Florida prior to April of 2024?

16         MR. HOFT:  I would say I -- it wasn't something

17   that came up on my radar immediately and -- but we -- I've

18   been a resident down there in Florida for a couple of years

19   now.

20         MR. BURBAGE:  Okay.  So, when did you ultimately

21   decide to file TGP Communications for bankruptcy?

22         MR. HOFT:  Within the past couple of months?

23         MR. BURBAGE:  Okay.  That had been something

24   you've been contemplating for several months?

25         MR. HOFT:  Yeah, certainly.

```
 1              MR. BURBAGE:  Okay.  And ultimately, what were the

 2      factors that led you to the conclusion that TGP should file

 3      for bankruptcy?

 4              MR. HOFT:  I would say the lawsuits we're

 5      currently facing and the expenses of the lawsuits.

 6              MR. BURBAGE:  Are there any expenses to those

 7      lawsuits that aren't being covered by the insurance policy?

 8              MR. HOFT:  The insurance policies, as you know,

 9      are dwindling down and so that was a serious reason that I

10      looked at the situation I was in and decided that bankruptcy

11      would be a good option.

12              MR. BURBAGE:  I guess, say more, how did you reach

13      the conclusion that after you spent, call it $700,000 of the

14      insurance policy, that now that was the time to file for

15      bankruptcy?

16              MR. HOFT:  Well, because we spent -- I believe

17      around 300,000 of it in the first couple of years, and now

18      we're spending an enormous amount each month as the activity

19      picks up.  And which -- it's chopping into the insurance

20      policy much, much quicker than it was before.  And certainly

21      we don't -- we see that increasing, and so we thought it was

22      a -- it was the best option for us would be to declare the

23      bankruptcy.

24              MR. BURBAGE:  Okay.  And putting aside the

25      lawsuits for a moment, is the company profitable based on
```

Page 59

1      its operations?

2              MR. HOFT:  Well, we are spending so much on these

3      policies, the Coomer policies picking back up now because we

4      lost this appeal after a couple of years, so those -- that'

5      smore money that we're spending there.  Are we profitable?

6      I don't -- we've never been, you know, enormously

7      profitable.

8              MR. BURBAGE:  But -- hold on.  Is TGP

9      Communications paying money each month outside of the

10     insurance policy for these lawsuits?

11             MR. HOFT:  I -- well, I think Jon would be better

12     able to answer that.  I think there's some expenses Jon has

13     that I'm actually paying from TGP that we're not declaring.

14     Is that correct, Jon?

15             MR. BURNS:  No, that's not true.

16             MR. HOFT:  Okay.

17             MR. BURBAGE:  Okay, so just so I -- just so I've

18     got it clear.  Is it fair that -- is it fair to say that the

19     costs of the litigation are being covered by the insurance?

20     And by litigation, I'll be specific of both the Eric Coomer

21     litigation and litigation from Ruby and Shaye, the cost of

22     those litigations are being paid for by the $2 million

23     insurance policy?

24             MR. BURNS:  So, yes, that is the case presently.

25     That was not always the case.  And so, there have been some

Page 60

```
 1    -- there were some that, as I mentioned, the policy, there
 2    was some question as to whether or not the policy, you know,
 3    covered the Coomer matter.  And so, that -- so, the policy
 4    didn't always cover the Coomer matter.  It does show.
 5              MR. BURBAGE:  Okay.
 6              MR. BURNS:  All right.  Well, it to be -- I mean,
 7    it does now, subject to, you know, the bankruptcy and given
 8    that the, you know -- I guess technically it doesn't cover
 9    it right now because that's -- it's tied -- you know, the
10    bankruptcy (audio glitch) tied up.
11              MR. BURBAGE:  Okay.
12              MR. BURNS:  Pending approval of the bankruptcy --
13              MR. BURBAGE:  Right.  So, if these litigations
14    didn't exist, would there be any reason for TGP to file for
15    bankruptcy?
16              MR. HOFT:  Is that to Jon?
17              MR. BURNS:  No.  I mean, the reason for the
18    bankruptcy are the lawsuits.
19              MR. BURBAGE:  Okay.  So the Debtor, certainly
20    based on the monthly operating reports that we've seen and
21    the financial disclosures that have been made, it seems that
22    the creditors and the debts that the company is incurring in
23    the ordinary course of business, that the debtor is
24    generating enough money to pay those creditors; is that
25    right?
```

```
 1              MR. BURNS:  So, I think the concern -- the concern
 2    here is the rapidity of the -- or the burn rate, I guess, on
 3    the different lawsuits, so --
 4              MR. BURBAGE:  No, I appreciate that point.  I
 5    guess my point is slightly different, which is just putting
 6    aside the lawsuits, if you were just to look at the Debtor's
 7    operations and the creditors that the Debtor has, are like
 8    the writers and those folks --
 9              MR. BURNS:  Correct.
10              MR. BURBAGE:  It seems like the Debtors have the
11    ability to pay those folks in the ordinary course of
12    business based on the revenue it makes.  Is that fair?
13              MR. BURNS:  Yes.
14              MR. BURBAGE:  Okay.  Let me just check my notes,
15    but I think that's everything I've got.  Hold on one second.
16              Okay, just two more clarifying questions.  Just
17    going back to actually where we started, which was the loan
18    that the Debtor made to you, Jim, in order to acquire the
19    condo.  You said that the purchase price from the condo was
20    actually a little bit less than the loan that was extended.
21    Was the difference, was that to cover the closing costs?
22              MR. HOFT:  Certainly, it did pay for the closing
23    cost, but there was some extra money, too, that we spent on
24    some necessities and purchases for the condominium.
25              MR. BURBAGE:  So, and then who did you require the
```

Case 9:24-cv-80022-AHS-BER Document 126-376 Entered on FLSD Docket 06/09/2025 Page 1034 of 1417

```
 1   condo from?

 2           MR. HOFT:  I don't have that document in front of

 3   me.  We bought it from a -- it's -- I don't have that

 4   information in front of me.  I could -- I think you have a

 5   copy of that.  Bought and worked through a realtor down

 6   there.

 7           MR. BURBAGE:  Okay.  And do you know who the legal

 8   entity is that currently owns the condo?

 9           MR. HOFT:  I believe it's main -- is it Main

10   Street, Jon?

11           MR. BURNS:  Yes.

12           MR. BURBAGE:  And who is Main Street?

13           MR. BURNS:  It's an LLC.

14           MR. BURBAGE:  it's an LLC.  Is that wholly owned

15   by Jim?

16           MR. BURNS:  Yes.

17           MR. BURBAGE:  Okay.  What -- where is the LLC

18   incorporated?

19           MR. BURNS:  I'd have to double check on that.  It

20   may be -- it may be incorporated in Florida.  I don't recall

21   offhand.

22           MR. BURBAGE:  Okay.  And do you recall the full

23   name of the LLC?

24           MR. BURNS:  Yes.  Right, well, I think so.  I

25   believe it's 2021 Main Street, LLC.  I believe.
```

```
 1              MR. BURBAGE:  Okay.  Okay.  I think that is --
 2      that's all the questions that we've got.  Thank you.
 3              MR. OCHS:  Okay.  Thank you.  Okay.  If Dr.
 4      Coomer's attorney wants to go ahead, please do so.
 5              MR. CHAPPLE:  Thank you very much.  Good morning.
 6      My name is Ryan Chapple.  I'm one of the attorneys for Dr.
 7      Eric Coomer.  Mr. Hoft and Mr. Burns, can you all hear me
 8      okay?
 9              MR. BURNS:  Yes, sir.
10              MR. HOFT:  Yes.
11              MR. CHAPPLE:  Okay.  And first of all, just for
12      the record and for clarity's sake, after this 341 meeting I
13      will get with Mr. Burbage and Debtor' counsel -- I
14      apologize.  I don't have your name in my head right now, but
15      I'll join in the document request via email.  We will copy
16      the United States Trustee, but I just wanted everyone to
17      have a heads up that I would be part of that document
18      request.
19              And from my perspective, the documents will likely
20      focus on the three loans listed, the condo loan, the loan to
21      Mr. Hoft's brother, and the loan to Justice League.  And
22      then also focus on some of the insurance issues that Mr.
23      Burbage was just discussed.  So, --
24              MAN:  Got it.
25              MR. CHAPPLE:  With that, Mr. Hoft, if you can hear
```

```
 1    me, were you the one who made the decision to -- for the

 2    Debtor to loan money to you, for the purchase of the

 3    condominium?

 4            MR. HOFT:  That would have been through advice of

 5    my attorneys and my accountants.

 6            MR. CHAPPLE:  Which attorneys were those?

 7            MR. HOFT:  That would have been Mr. Burns.

 8            MR. CHAPPLE:  Okay.  Was that loan, the initial

 9    loan that we've been discussing today, was that loan made to

10    you individually or was it made to this new entity that we

11    just discussed this 2021 Main Street, LLC?  Do you have any

12    idea?

13            MR. HOFT:  I don't.  I don't know that offhand.

14            MR. CHAPPLE:  And what was the business position

15    of the Debtor to make that loan to you for the purchase of

16    the condominium?

17            MR. HOFT:  Can you repeat that?

18            MR. CHAPPLE:  Why did you on behalf of the Debtor,

19    make the decision to loan the money to you either

20    individually or to this entity that you own and control,

21    2021 Main Street, LLC, to purchase the condominium in

22    Florida?

23            MR. HOFT:  Right.  well, I use it as a place of

24    business because I work out of my home.

25            MR. CHAPPLE:  Okay.  Is that it?
```

Page 65

```
 1              MR. HOFT:  And the location was selected because

 2     my twin brother lives in the area and Joe was a --

 3              MR. CHAPPLE:  Okay.

 4              MR. HOFT:  He was a contract employee at the time.

 5              MR. CHAPPLE:  And you're currently the only

 6     employee of the Debtor, correct?

 7              MR. HOFT:  Correct.

 8              MR. CHAPPLE:  I've got a few questions about the

 9     insurance structure relating to the Debtor, and Mr. Burns,

10     you may have more information on these issues.  Was it your

11     testimony earlier that coverage didn't begin for the Coomer

12     litigation until more recently?  And if that was your

13     testimony, can you provide us with any sort of -- any sort

14     of date of when that started?

15              MR. BURNS:  Yes, that was my testimony, and the

16     date, it would have been sometime in between quarter one and

17     quarter two.  I want to say March or -- I would say

18     approximately March.  Maybe February.  I don't --

19              MR. CHAPPLE:  What year are we talking about?

20              MR. BURNS:  Sorry, sorry.  This year, 2024.

21              MR. CHAPPLE:  When did the Debtor tender to the --

22              MR. BURNS:  There was -- yeah, so there was a

23     question about that.  Initially -- there was a question

24     about that and originally, we didn't believe that there was

25     coverage, quite frankly, but after a further review which
```

Page 66

```
 1    was conducted, it took a while, actually, but, you know, we
 2    were -- we had pressed for a review back in -- towards the
 3    end of 2023, but it took --
 4             MR. CHAPPLE:  (indiscernible).  Excuse me. I'm
 5    sorry to talk over you.  Were you done?
 6             MR. BURNS:  Yeah, yeah.  That -- I'm done.
 7             MR. CHAPPLE:  When you said you press -- we
 8    pressed in 2023, help me understand who the we is, and who
 9    you were pressing and what the issue --
10             MR. BURNS:  Sorry.  I guess the royal we.  Me, on
11    behalf of TGP, working with the insurance company.
12             MR. CHAPPLE:  So, I believe Dr. Coomer initially
13    filed suit in December of 2020?
14             MR. BURNS:  --- understand.
15             MR. CHAPPLE:  Was there communication between the
16    Debtor and the carrier -- well, strike that.  When did
17    communication between the Debtor and the carrier with regard
18    to the criminal litigation (indiscernible)?
19             MR. BURNS:  I don't recall.  I don't remember the
20    original.
21             MR. CHAPPLE:  Well, would it have been -- can you
22    narrow it down to a year it was initiate -- the litigation
23    was filed in December of 2020, so it's been going on for a
24    while.
25             MR. BURNS:  Correct.  I don't -- I wish I could be
```

1    more specific.  I can't state -- I can't state it with any

2    amount of certainty.  I couldn't.  I don't want to mistake

3    something.

4              MR. CHAPPLE:  Okay.  Other than -- when I say the

5    Coomer litigation, we're clear on what I'm referring to,

6    correct, the litigation that -- initiated by my client, Dr.

7    Coomer?

8              MR. BURNS:  Yes, that's pending in Denver District

9    Court.

10             MR. CHAPPLE:  Correct, and then there's the

11   Freeman litigation, correct?

12             MR. BURNS:  Yes, sir.

13             MR. CHAPPLE:  Other than those two pieces of

14   litigation, the Freeman litigation and the Coomer

15   litigation, are you aware of any other claims or claimants

16   against the Debtor during the policy period of the coverage

17   that we're discussing today?

18             MR. BURNS:  No.

19             MR. CHAPPLE:  Other than the media professional

20   liability policy that's listed in Docket No. 13, which you

21   discussed with Mr. Burbage earlier on Page 2, Section 10,

22   are you aware of any other potentially applicable policies

23   on which the Debtor is a named insured, whether it's a

24   primary, an excess, or an umbrella policy?

25             MR. BURNS:  No, sir.

```
 1              MR. CHAPPLE:  On the policy that we're talking
 2      about here, the media professional liability policy that's
 3      listed as (indiscernible), is Mr. Hoft or Jim Hoft an
 4      additional insured?
 5              MR. BURNS:  Yes.
 6              MR. CHAPPLE:  Is Justice League --
 7              MR. BURNS:  Well -- well, I mean, yes, he is.  He
 8      falls -- according to -- the short answer is I'm not
 9      entirely sure.  I don't have the dec page in front of me,
10      but the insurance company certainly has covered him at least
11      in the Freeman case and in the Coomer case.  He has been --
12      he is covered under the policy.  And in the Freeman case,
13      Joe Hoft is covered as well.
14              MR. CHAPPLE:  Other than the Debtor, Joe Hoft, Jim
15      Hoft, are there any other either named insureds or
16      additional insureds under this policy?
17              MR. BURNS:  I mean, I believe that as it has been
18      explained to me by the insurance company, I believe that the
19      insurance, you know, inures to the benefit of the
20      contractors as well in terms of the coverage.  So, had there
21      been other -- if there were other contractors who had been
22      named in the suit in either of the suits, I believe that
23      they would have been covered as well.  That's my
24      understanding.
25              MR. CHAPPLE:  And when you say contractors, you're
```

```
 1    talking about the contract riders that have been discussed

 2    in the various hearings in this case?

 3              MR. BURNS:  Yes, sir.

 4              MR. CHAPPLE:  Okay.  Circling back to the Justice

 5    League, I know the amended schedules and statement that have

 6    been discussed today, there's a loan listed in the amount of

 7    $150,000.  And I know there were some payments made to the

 8    Justice League in the 90 days prior to the bankruptcy.  Do

 9    you know, is the $150,000 loan that has been discussed

10    today, was that a one-time payment?  Were those payments

11    made over a period of time?  Do you have any idea?

12              MR. BURNS:  I -- as I sit here, I do not.  I don't

13    recall that information.  It may have been, but I can't say

14    with certainty, so I don't want to misstate something.

15              MR. CHAPPLE:  And who created the Justice League?

16    Was it Mr. Hoft?  Was it you and Mr. Hoft?  Was it Mr. Hoft

17    and his brother and you?  Who created it?

18              MR. BURNS:  It was myself on behalf of Mr. Hoft.

19              MR. CHAPPLE:  Mr. Hoft's decision to create the

20    Justice League?

21              MR. BURNS:  I'm sorry, was your question whether

22    was Mr. Hoft's decision to create the Justice League?

23              MR. CHAPPLE:  That's correct.

24              MR. BURNS:  Yes, it was.

25              MR. CHAPPLE:  And does the Justice League have any
```

Case 9:24-cv-80682-AHS Document 26-376 Entered filed 06/20/24 Docket 06/19/2025 Page 1042 of 1417

1    employees?

2              MR. BURNS:  It does not.

3              MR. CHAPPLE:  And does it have a board or

4    managers?

5              MR. BURNS:  Mr. Hoft is the sole member manager.

6              MR. CHAPPLE:  Okay.  You do not hold a position

7    with the Justice League and are you not an employee?

8              MR. BURNS:  I am not an employee, but I am the

9    general counsel and executive vice president.

10             MR. CHAPPLE:  Of the Justice League?

11             MR. BURNS:  Yes, sir.

12             MR. CHAPPLE:  And do you hold the same position

13   with the Debtor?

14             MR. BURNS:  I do.

15             MR. CHAPPLE:  Do you hold any position with any

16   other company or entity affiliated with Mr. Hoft?

17             MR. BURNS:  Formally, no, although I do advise Mr.

18   Hoft on a number of matters.

19             MR. CHAPPLE:  In his personal capacity?

20             MR. BURNS:  Yes.

21             MR. CHAPPLE:  Okay.  That's all I have for right

22   now.  Thank you.

23             MR. OCHS:  Okay, thank you.  The Sub V Trustee had

24   to step off.  I have a few questions that I'm going to ask

25   and then we'll be able to wrap this meeting up.

```
 1              So, I'd like to go back to the monthly operating
 2    report.  At the top of the monthly operating report on Page
 3    1, there are a series of questions.  Some are answered yes
 4    and some are answered no, but in particular question number
 5    one, "Did the Debtor -- did the business operate during the
 6    entire reporting period?" and the box no is checked.  What -
 7    - why does it say no that the Debtor did not operate during
 8    the entire period?  Did the Debtor cease operating for a
 9    period of time?
10              MR. BURNS:  Mr. Ochs, just a quick question.  I'm
11    sorry.  Could you direct me to the document number?
12              MR. OCHS:  Okay.  It is Document No. 51 on the
13    docket.  This is the one we spent a fair amount of time with
14    before because there's some confusion about the document
15    itself, but it's Document No. 51, Page 1, and then question
16    number one.  "Did the business operate during the entire
17    period?"
18              MR. HOUSTON:  This is Bart Houston.  To my
19    knowledge that has to be an error.
20              MR. OCHS:  Okay.
21              MR. BURNS:  Yeah, I would -- that's an error.  I
22    mean, the business has been operating.  It operates today
23    and it operated during this time period.
24              MR. OCHS:  Okay.  And then question number five,
25    "Have you deposited all of the receipts of your business
```

Case 9:24-cv-80022-AHS-MANT Document 26-37 Entered on FLSD Docket 06/09/2025 Page 1044 of 1417

```
 1    into the Debtor in Possession (DIP) accounts?"  Again,
 2    that's checked no.  Why is that?
 3              MR. BURNS:  I believe that that's because as of
 4    the date of the Court or the date of the filing, that was
 5    the correct -- that was the truthful answer.  However, as
 6    you know, as we sit here today, that is no longer the
 7    correct answer because all of the bank accounts have been
 8    closed and consolidated to the DIP account.
 9              MR. OCHS:  But the answer remains that the --
10    there were funds that were -- DIP funds deposited in non-DIP
11    accounts; is that correct?
12              MR. BURNS:  I'm sorry, you cut out there for a
13    second.  I apologize.
14              MR. OCHS:  The answer remains that there was --
15    that there were DIP funds that were not deposited into the
16    DIP account; is that true or false?
17              MR. BURNS:  As of the filing of the report?  Yes,
18    I believe that that's the case, because they had not yet
19    been consolidated.  Some of the -- some of them had not been
20    consolidated yet.
21              MR. OCHS:  Do you know what accounts they were
22    deposited into?
23              MR. BURNS:  They were only deposited into the
24    Debtor in Possession account.
25              MR. OCHS:  All right.  Mr. Hoft, you made
```

1    reference during this 341 meeting to say down there in

2    Florida.  Where are you sitting right this minute?  Where

3    are you?

4              MR. HOFT:  Who's that question for?

5              MR. OCHS:  Mr. Hoft.

6              MR. HOFT:  I'm currently sitting in Saint Louis.

7              MR. OCHS:  Okay.  When was the last time you were

8    in Florida?

9              MR. HOFT:  I spent the winter there and I came

10   back and then -- to Saint Louis, then I went to Florida, I

11   think for another month, then I came back, and then I went

12   down to Florida again for a few weeks for some events that

13   we had scheduled, and then I came back to Saint Louis.  So,

14   I've been here a little over a month right now.

15             MR. OCHS:  If the business is located in --

16             MR. HOFT:  But I'm returning because I have

17   another event next week, and I was going to come back last

18   week, but our event was canceled.  So, once I return to

19   Florida, then I'll be in Florida for quite -- you know,

20   quite some time.

21             MR. OCHS:  If the business is located in Florida,

22   why are you still spending time in Missouri?

23             MR. HOFT:  Sir, I spend most of my time in

24   Florida.

25             MR. OCHS:  That didn't answer my question.  Why

1   are you still spending time in Missouri?

2           MR. HOFT:  Well, I also have a residence in

3   Missouri, but I spend most of my time in Florida, sir.

4           MR. OCHS:  Okay.  Tell me about your educational

5   background.

6           MR. HOFT:  I -- sure.  I went to a Catholic

7   school, went to a Catholic college, took some courses after

8   college.  So, I went to a Catholic college in Iowa.

9           MR. OCHS:  Do you have a degree of any sort?

10          MR. HOFT:  Yes, I have a degree.

11          MR. OCHS:  What degree do you --

12          MR. HOFT:  Bachelor of science.

13          MR. OCHS:  Okay.  And that's from the University

14  of Iowa, you said?

15          MR. HOFT:  That would have been from Loras

16  College, L-O-R-A-S.  It's a Catholic college in Iowa.

17          MR. OCHS:  Okay.  And do you have any postgraduate

18  degrees?

19          MR. HOFT:  No.

20          MR. OCHS:  Okay.

21          MR. HOFT:  I've taken courses.  I don't have a

22  postgraduate degree.

23          MR. OCHS:  What is your plan or the plan for TGP

24  to repay or to deal with and dispose of the defamation

25  claims that have apparently prompted this bankruptcy case?

```
 1            MR. HOFT:  Can you be more specific with that

 2    question, sir?

 3            MR. OCHS:  No.  I just want to know what the

 4    overall --

 5            MR. HOFT:  Okay, could you repeat that question?

 6            MR. OCHS:  Sure.  I want to know what the Debtor's

 7    overall plan is for dealing with the, what are, what appear

 8    to be sizable claims and the claims actually force the

 9    Debtor into bankruptcy, it appears, so what is the Debtor's

10    plan --

11            MR. HOFT:  Sir, I don't believe I was guilty of

12    any charges.  I don't believe I was guilty.  I know that the

13    Courts, you know, don't always come out in your favor, but

14    so, do I have a play on repaying some $150 million to

15    someone that's not something I've spoken about with my

16    attorney Jon Burns at this point.

17            MR. OCHS:  So, you don't know.  You don't know how

18    you're going to know how you're going to emerge from

19    bankruptcy yet or -- withdrawn.  You don't know how TGP is

20    going to emerge from bankruptcy yet; is that correct?

21            MR. HOFT:  Sir, I'm currently, of course, in the

22    middle of this bankruptcy or at the beginning, and so I will

23    certainly take the advice of my attorneys and make a plan.

24    I -- do I have a concrete plan at this point?  I have to

25    speak with my attorneys.
```

```
 1              MR. OCHS:  when do you know you'll have a concrete
 2    plan?
 3              MR. HOFT:  Again, I need to speak with my
 4    attorneys.  I don't know the process.  It's the first time
 5    I've done something like this.  So, I'm not sure.  I have to
 6    get some advice and speak to, you know, some people I trust
 7    and -- including my attorneys and set up a plan.
 8              MR. OCHS:  So, is it safe to say that you filed
 9    the bankruptcy case on behalf of TGP without any real plan
10    or goal for getting through the Subchapter V bankruptcy case
11    that was filed?
12              MR. HOFT:  Sir, we -- I thought we discussed that.
13              MR. OCHS:  I'm asking you a question now.  It
14    doesn't matter whether we discussed it.  Just answer the
15    question.  It's much easier that way.
16              MR. HOFT:  Well, for one, I'm going --
17              MR. HOUSTON:  Mr. Hoft -- Mr. Hoft.
18              MR. HOFT:  Yeah.
19              MR. HOUSTON:  Yeah, Mr. Hoft, if you're going to
20    use the advice you've gotten from me answering that
21    question, then I would caution you not to.  If you can
22    answer from a business standpoint, then you're free to
23    answer.
24              MR. HOFT:  Okay.  Yeah, I haven't spoken with Bart
25    about that, so I won't answer at this point.
```

Case 9:24-cv-80022-AHS Document 236-76 Entered on FLSD Docket 06/09/2025 Page 1049 of 1417

```
 1              MR. OCHS:  No, he said the exact opposite to you.
 2    What is -- so what -- he does not want you to repeat, reveal
 3    an attorney-client confidence.  Okay?  So, the question
 4    becomes --
 5              MR. HOFT:  Okay.
 6              MR. OCHS:  -- what do you intend to do to get this
 7    case out of bankruptcy?
 8              MR. HOFT:  Again, I will talk to my attorney and
 9    get their advice and set up a plan.  I can -- I'm sure we
10    could get you that plan in the next few days.
11              MR. OCHS:  You're about a month into the
12    bankruptcy case and you have no objective or goal for how
13    you're going to emerge from bankruptcy?
14              MR. HOFT:  Well, the objective, sir, I think we've
15    explained, and again, I'll talk to my attorneys and get you
16    a -- I'm sure we can -- we can get you some something in the
17    next few days.
18              MR. OCHS:  But as we sit here right now, you have
19    no real course or plan of action in the bankruptcy case?
20              MR. HOFT:  Well, sir --
21              MR. OCHS:  It's a very simple question.
22              MR. HOFT:  We filed this because of the
23    (indiscernible).
24              MR. HOUSTON:  Excuse me a second, Jim.  Mr. Ochs -
25    --
```

1          MR. HOFT:  Yeah.

2          MR. HOUSTON:  -- you're bullying this individual

3     and I told you multiple times and I will say again, most all

4     of my business and legal discussions have been with Mr.

5     Burns, as he has a better general overall picture --

6          MR. OCHS:  I --

7          MR. HOUSTON:  -- the Debtor's finances, so --

8          MR. OCHS:  He is the --

9          MR. HOUSTON:  I understand what your question is

10    and why you're asking, but you're really pushing too hard on

11    the wrong guy.  He just doesn't know.

12         MR. OCHS:  All right.  Let's try this way.  Mr.

13    Burns, what's the plan for getting this case out of

14    bankruptcy?

15         MR. BURNS:  Yeah, and I'm not going to answer that

16    question because that's going to go into attorney-client

17    privilege matters.

18         MR. OCHS:  Does the Debtor have a plan for getting

19    out of bankruptcy?

20         MR. HOUSTON:  (indiscernible) creditors and emerge

21    reorganized.

22         MR. OCHS:  How does the Debtor intend to repay its

23    creditors?

24         MR. HOUSTON:  With its disposable income going

25    forward.

1            MR. OCHS:  Is that you answering, Mr. Houston?

2            MR. HOUSTON:  It is.

3            MR. OCHS:  Well, no.  Do you want me to put you

4     under oath or do you want Mr. Burns to answer the question?

5     You're the one who directed me back to Mr. Burns.

6            MR. HOUSTON:  I understand that.  Now, I've had my

7     -- Mr. Ochs, we will be filing a plan within the time

8     restraints of the Bankruptcy Code.

9            MR. OCHS:  And I'm asking where --

10           MR. HOUSTON:  -- plan is to pay creditors with

11    disposable income before the requisite period.

12           MR. OCHS:  Creditors are entitled to understand

13    what the Debtor's objectives and goals are in this

14    bankruptcy case.  And the Debtor ought to know that having

15    filed the bankruptcy one month ago, that should be something

16    that should be readily at hand, either Mr. Hoft's hands or

17    Mr. Burns' hands.

18           MR. HOUSTON:  It's in a state of continual

19    discussion and analysis.

20           MR. OCHS:  In other words, the Debtor has -- Mr.

21    Burns, does the Debtor have some formulation of a plan at

22    hand right now?

23           MR. BURNS:  That's -- it's going -- we are putting

24    together a plan.  It's my understanding, the plan isn't due

25    until July.

1          MR. OCHS:  Right.  Today's June 18th.

2          MR. BURNS:  Right.  We will put -- we are putting

3    together a plan and we will have a plan on deadline.

4          MR. OCHS:  Okay.  Don't be surprised if the United

5    States Trustee makes a motion to either convert, dismiss, or

6    appoint a Chapter 11 Trustee in this case.  There's a lot

7    that's cone on here.

8          MR. HOUSTON:  Is that a question?

9          MR. OCHS:  There's a lot that's gone on in here

10   that has not been addressed.  So, that that's something to

11   keep in mind.  The United States Trustee has no further

12   questions at this point in time.  Do any other creditors

13   have any other questions today?  Let the record reflect that

14   there are none.  Ms. Leali, did you return to the call?  Let

15   the record reflect that --

16          MS. LEALI:  I did, and -- I did return.  I don't

17   have any further questions.

18          MR. OCHS:  Okay.  It is now -- the United States

19   Trustee is going to conclude this meeting of creditors.  I

20   expect to get the documents that were asked for.  It is now

21   June 18th, 2024 at 11:08 a.m. and this meeting of Creditors

22   is concluded.  Thank you, everybody.

23          (Whereupon these proceedings were concluded at

24   11:08 a.m.)

25

Page 81

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7    *1215*, Signature*

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 24, 2024

| & | | | |
|---|---|---|---|
| **&** 3:8,15 4:2,8 4:9 7:3 34:21 | | | |

**1**

**1** 13:11,18,19 14:7,15 71:3 71:15
**1.2** 53:2
**1.3** 53:3
**10** 44:6 52:7 67:21
**100,000** 53:4
**10019** 4:11
**1064** 3:17
**11** 9:12 35:4,10 35:12,12 44:5 80:6
**11501** 81:23
**11:08** 80:21,24
**12** 25:10 36:24 46:12
**12151** 81:7
**13** 27:15 51:14 51:23 67:20
**15** 23:4 28:19
**150** 75:14
**150,000** 42:11 69:7,9
**1515** 1:14
**1526** 23:10
**17** 29:13 45:20 53:17 54:1
**17,000** 49:21
**18** 1:17
**18th** 5:5 9:6 80:1,21

**19** 13:11 14:15 25:11 27:15 28:19 29:14,24
**1st** 20:20

**2**

**2** 52:21 59:22 67:21
**201** 3:10
**2013** 56:19
**2016** 45:20
**2020** 66:13,23
**2021** 35:20 47:5 62:25 64:11,21
**2023** 42:8,9 66:3,8
**2024** 1:17 5:5 5:15 9:6 56:22 57:7,10,15 65:20 80:21 81:25
**20th** 9:7 34:14
**2200** 3:10
**2255** 3:3
**2360** 45:17
**24** 8:20 23:24 81:25
**24-13938** 1:3 5:10
**24th** 5:15
**2525** 2:17
**28** 48:8,8

**3**

**3** 54:3 55:14,17 55:18

**30** 35:4,10 44:6
**300** 2:17 81:22
**300,000** 58:17
**30303** 2:5
**30th** 28:22
**31st** 54:5
**33,000** 48:18 49:9
**330** 81:21
**33130** 4:4
**33134** 2:18
**33301** 2:11 3:11
**33401** 1:15
**33431** 3:4
**34** 35:4,8 41:18 42:12 44:5 47:5 48:7
**341** 1:20 5:9 8:11,17 18:9 18:24 23:23 32:2 45:7 63:12 73:1
**362** 2:4

**4**

**4/22** 19:21
**4/24** 19:20,21
**4/30** 19:11,20
**400** 4:3
**401** 44:16,20 44:24,25
**419a** 3:3
**4627** 44:16

**5**

**50,000** 53:4

**500** 2:10
**51** 9:11 10:1,3 12:18 14:3,15 16:24 27:16 71:12,15
**54** 12:14

**6**

**6** 47:6 54:3 55:14,17,18
**6/5/24** 14:17
**633** 2:10
**66** 4:3
**691,000** 54:14 56:12

**7**

**70,000** 47:17
**700,000** 58:13
**75** 2:4
**787** 4:10
**799,860** 35:18 37:2

**8**

**801** 1:14
**81201** 3:18
**815** 25:13,16
**82** 45:11
**8256** 45:12

**9**

**9,000** 50:4
**90** 48:10 69:8
**95,000** 50:9
**9:02** 1:18 5:6

**a**

**a.m.** 5:6 80:21 80:24

| | | | |
|---|---|---|---|
| **ability** 8:25 | **accurate** 81:4 | **alterable** 16:12 | **apparently** |
| 45:25 61:11 | **acquire** 49:16 | **altered** 17:25 | 34:9 74:25 |
| **able** 10:6 32:15 | 61:18 | **alternate** 15:22 | **appeal** 59:4 |
| 32:24 39:14 | **acquired** 47:7 | **amended** 69:5 | **appear** 21:21 |
| 40:2 59:12 | 47:11 | **amendment** | 21:24 75:7 |
| 70:25 | **action** 77:19 | 39:1 | **appearance** |
| **absent** 46:23 | **activity** 58:18 | **american** | 6:10,14 7:9,13 |
| **absolutely** | **actually** 36:18 | 38:21 | 7:14,18,22 |
| 30:16 | 41:21 44:5 | **amount** 19:3 | **appearances** |
| **account** 11:17 | 53:17 59:13 | 35:18 37:2,2,9 | 6:19 |
| 22:7,8,15,17 | 61:17,20 66:1 | 39:11 49:14 | **appearing** 7:11 |
| 22:20,24 25:19 | 75:8 | 50:7 52:25 | **appears** 13:17 |
| 26:9 27:19,22 | **addition** 18:22 | 58:18 67:2 | 18:1 20:24 |
| 27:25 28:4,5,7 | **additional** 68:4 | 69:6 71:13 | 25:5 27:16 |
| 28:8 30:10,15 | 68:16 | **analysis** 79:19 | 29:14 75:9 |
| 30:19,19 31:1 | **addressed** | **andrews** 2:10 | **applicable** |
| 36:17,20 40:13 | 80:10 | **answer** 21:13 | 67:22 |
| 44:7,11,13,16 | **administer** 9:1 | 21:14 38:18 | **application** |
| 44:16,21 45:11 | **administered** | 40:2,16,17,19 | 26:4,6 27:6,11 |
| 45:11,13,17,18 | 9:2 | 43:25 46:11 | 56:22 57:14 |
| 46:8 49:25 | **admit** 18:3 | 50:24 54:20,23 | **applied** 52:17 |
| 55:25 72:8,16 | **advice** 64:4 | 55:4,6 59:12 | **appoint** 80:6 |
| 72:24 | 75:23 76:6,20 | 68:8 72:5,7,9 | **appointed** |
| **accountant** | 77:9 | 72:14 73:25 | 10:12 |
| 25:21,22,23,25 | **advise** 70:17 | 76:14,22,23,25 | **appreciate** |
| 26:2 39:25 | **affiliated** 22:23 | 78:15 79:4 | 30:2 61:4 |
| 54:17,24 56:10 | 70:16 | **answered** 71:3 | **approval** 60:12 |
| 56:15 | **affirm** 12:9 | 71:4 | **approved** |
| **accountants** | **ago** 8:21 45:5 | **answering** | 22:16 27:24 |
| 64:5 | 47:8 51:10 | 76:20 79:1 | **approximately** |
| **accounting** | 79:15 | **anybody** 7:17 | 53:2,4 65:18 |
| 26:16 40:4 | **agreement** | 7:21 13:2 | **april** 5:15 |
| **accounts** 30:5 | 36:5,8,12 | **ap** 26:15 | 20:20 28:22 |
| 30:9,18 44:8 | 39:24 40:5,7 | **apologize** | 56:21 57:6,7 |
| 46:1,6,9 49:4 | 43:6 | 34:22,24 53:3 | 57:10,15 |
| 72:1,7,11,21 | **ahead** 7:14 | 63:14 72:13 | **area** 65:2 |
| | 63:4 | | |

| | | | |
|---|---|---|---|
| **arguing** 17:5 18:17 | **attorneys** 3:2,9 3:16 4:2,9 63:6 64:5,6 75:23 75:25 76:4,7 77:15 | **backwards** 31:2 | **barcoded** 18:7 |
| **arizona** 39:15 | | **balance** 37:1 54:4 | **bart** 2:13 5:17 26:13,17 31:4 32:22 46:19 71:18 76:24 |
| **arrangements** 8:8 | | **ballpark** 47:14 52:24 | |
| **arshaye** 4:2,9 | **audio** 15:2 60:10 | **bank** 11:17 19:5,24 20:5,7 20:8,19,20,23 21:4,21,25 22:7,7,15,16 22:24 23:20 24:5 25:5 27:17,22,25 28:4 30:8,10 72:7 | **based** 27:12 58:25 60:20 61:12 |
| **ascertain** 43:25 | **august** 35:21 | | |
| **aside** 58:24 61:6 | **authorization** 56:23 | | **basically** 51:4 |
| **asked** 10:25 11:8 23:15,17 31:5 32:3 33:22 80:20 | **automatic** 25:19 | | **basis** 9:1 30:15 |
| | **automobile** 33:22 | | **beach** 1:2,15 |
| | | | **bear** 15:21 16:2 23:25 |
| **asking** 13:7 21:17 23:12 30:23 33:18 76:13 78:10 79:9 | **available** 8:20 18:24 | **bankruptcy** 1:1,12 5:10,11 9:17 11:19 16:15,20 26:3 30:15 31:13 33:4,16,23 57:21 58:3,10 58:15,23 60:7 60:10,12,15,18 69:8 74:25 75:9,19,20,22 76:9,10 77:7 77:12,13,19 78:14,19 79:8 79:14,15 | **bears** 23:22 |
| | **avenue** 2:10 4:10 | | **beginning** 18:4 75:22 |
| | **aware** 40:11 41:11 45:12 55:24 56:7,9 67:15,22 | | **begins** 25:7 |
| **assets** 44:12 | | | **begun** 30:14 |
| **assigned** 5:11 | | | **behalf** 5:17 7:3 13:3 55:8 64:18 66:11 69:18 76:9 |
| **assist** 10:22 12:22 25:10 | | | |
| **assistant** 24:8 | **b** | | |
| **assists** 24:21 | **b** 1:23 | | **belief** 5:25 12:11 |
| **assume** 20:13 29:19 | **bachelor** 74:12 | | |
| | **back** 14:7 36:17 39:10,20 40:12,22 41:2 41:5,7 42:20 44:2 45:10,20 59:3 61:17 66:2 69:4 71:1 73:10,11,13,17 79:5 | **bar** 15:10,12 15:13 16:21 21:5 | **believe** 9:22 13:4 20:6 25:7 29:18 31:7 35:21,24 37:13 40:10,21,25 41:23 42:1,3,3 44:24 45:1,5 45:20 46:7 47:17 49:23,23 51:17,21 52:10 53:2 55:2,6 56:2 57:2 58:16 62:9,25 |
| **atlanta** 2:5 | | | |
| **attached** 24:5 25:4 | | | |
| **attending** 39:16 | | | |
| **attorney** 5:4 11:13 23:5,13 28:19 38:14 63:4 75:16 77:3,8 78:16 | | **barcode** 18:1 21:2,6 | |
| | **background** 5:7 74:5 | | |

62:25 65:24
66:12 68:17,18
68:22 72:3,18
75:11,12
**beneficiaries**
44:12,17 45:12
45:17
**beneficiary**
44:20
**benefit** 68:19
**best** 5:24 12:10
58:22
**better** 59:11
78:5
**bit** 22:3 25:6
37:4 38:17
39:8 51:13
61:20
**blank** 20:11
**blansky** 4:6 7:6
7:8,10,11
**blvd** 2:17 3:10
**board** 70:3
**boca** 3:4
**boom** 13:14
**borrowed** 37:7
**bottom** 54:7
55:19
**bought** 62:3,5
**bowen** 3:8
**box** 3:17 71:6
**brad** 6:24 7:15
**bradley** 3:20
**brother** 31:7
31:14 43:12,13
63:21 65:2
69:17

**brunage** 34:17
**building** 1:13
**bullet** 52:4
**bullying** 78:2
**burbage** 4:13
6:23 7:2,2,7
34:19,19,20,21
34:23 35:1,8
35:10,13,15,18
35:22,25 36:3
36:7,13,16,19
36:23 37:1,6
37:10,14,20,23
38:2,5,9,12,16
39:6,9,13,22
40:3,8,11,15
40:19 41:1,6,9
41:12,16 42:5
42:9,14,16,20
42:25 43:5,10
43:14,17,19,23
44:4,10,15,20
44:23,25 45:2
45:6,10,16,24
46:3,5,10,14
46:20 47:4,10
47:14,18,22,25
48:4,7,14,16
48:20,23 49:5
49:9,12,18,21
50:1,3,8,11,13
50:18,23 51:3
51:7,12,23
52:1,5,8,12,21
53:1,5,11,15
53:25 54:3,7
54:14,22,25

55:7,10,14,18
55:21,24 56:7
56:11,16,21
57:3,6,9,13,20
57:23 58:1,6
58:12,24 59:8
59:17 60:5,11
60:13,19 61:4
61:10,14,25
62:7,12,14,17
62:22 63:1,13
63:23 67:21
**burn** 61:2
**burns** 4:18 6:8
6:9,11,11
10:12 11:13,25
12:5,6,7,12,19
12:21,24 13:1
13:4,14 14:1,9
14:14,17 19:7
19:11,14,19
20:1,3,21
21:20,23 22:2
22:9,14,19
26:4,6 32:18
32:19,23,25
34:7,7 40:16
40:17,19,21
41:3,8,11,15
41:21,23 42:7
50:23 51:1,6,8
51:21,24 52:3
52:7,10,15,23
53:2,8,14,24
54:2,6,13,16
55:3 59:15,24
60:6,12,17

61:1,9,13
62:11,13,16,19
62:24 63:7,9
64:7 65:9,15
65:20,22 66:6
66:10,14,19,25
67:8,12,18,25
68:5,7,17 69:3
69:12,18,21,24
70:2,5,8,11,14
70:17,20 71:10
71:21 72:3,12
72:17,23 75:16
78:5,13,15
79:4,5,17,21
79:23 80:2
**business** 9:12
22:6,21 24:18
24:23 26:1
29:14 39:10
47:21 56:6,24
57:14 60:23
61:12 64:14,24
71:5,16,22,25
73:15,21 76:22
78:4

| c |
|---|

**c** 2:1 3:6 5:1
81:1,1
**cain** 3:15
**call** 7:18 58:13
80:14
**canceled** 73:18
**capacity** 70:19
**captive** 53:6,8
53:9

| | | | |
|---|---|---|---|
| **car** 47:20,22 47:24 | **change** 15:8 | **city** 30:10 | 21:7,11,11,18 |
| **carrier** 66:16 66:17 | **changed** 16:6 | **claim** 39:18 | 21:23 22:21 |
| **case** 1:3 5:9,10 | **chapple** 3:13 6:20,20 63:5,6 | **claimants** 67:15 | 29:16 36:10 40:12 43:15 |
| 5:11,14 8:6 9:1 | 63:11,25 64:6 | **claims** 67:15 | 54:4 55:1 |
| 9:2,17 15:3 | 64:8,14,18,25 | 74:25 75:8,8 | 56:17 57:21 |
| 22:11 26:3 | 65:3,5,8,19,21 | **clarifying** 61:16 | 59:9 |
| 33:18 39:4,7 | 66:4,7,12,15 | **clarity's** 63:12 | **company** 22:6 |
| 39:14,15,20 | 66:21 67:4,10 | **clear** 14:20 | 26:15 27:20,21 |
| 42:3 48:11 | 67:13,19 68:1 | 16:13 29:23 | 28:3 47:22 |
| 52:17,18,19 | 68:6,14,25 | 33:19 59:18 | 56:8,23 58:25 |
| 59:24,25 68:11 | 69:4,15,19,23 | 67:5 | 60:22 66:11 |
| 68:11,12 69:2 | 69:25 70:3,6 | **clearly** 8:2 | 68:10,18 70:16 |
| 72:18 74:25 | 70:10,12,15,19 | **client** 10:10 | **compensation** 49:6 |
| 76:9,10 77:7 | 70:21 | 67:6 77:3 | **compiled** 13:15 |
| 77:12,19 78:13 | **chapter** 9:12 | 78:16 | **compiling** 8:16 |
| 79:14 80:6 | 80:6 | **closed** 16:1 | **complete** 17:24 |
| **cases** 39:2 | **charge** 16:17 | 22:20 28:9 | **completed** |
| **cash** 48:3 | **charged** 51:5 | 29:17 72:8 | 16:10 17:2 |
| **catholic** 74:6,7 | **charges** 75:12 | **closing** 32:10 | **completely** |
| 74:8,16 | **charles** 30:18 | 32:13,14,23 | 19:5,6 |
| **causes** 50:16 | 30:19 31:1 | 61:21,22 | **component** |
| **caution** 76:21 | 44:7,15 45:11 | **closure** 8:6 | 51:9 |
| **cayenne** 47:6 | 45:11,16 | **code** 79:8 | **concern** 61:1,1 |
| **cease** 71:8 | **check** 24:14 | **coding** 15:10 | **conclude** 80:19 |
| **certain** 48:9 | 25:4,8,17 | 15:12,13 16:22 | **concluded** |
| **certainly** 11:17 | 61:14 62:19 | **cohen** 3:1 | 80:22,23 |
| 17:18 45:21 | **checked** 71:6 | **college** 74:7,8,8 | **conclusion** |
| 52:19 57:25 | 72:2 | 74:16,16 | 58:2,13 |
| 58:20 60:19 | **checks** 24:4,13 | **come** 73:17 | **concrete** 75:24 |
| 61:22 68:10 | 24:18 | 75:13 | 76:1 |
| 75:23 | **choosing** 18:11 | **communicati...** | **condo** 37:3 |
| **certainty** 67:2 | **chopping** | 66:15,17 | 61:19,19 62:1 |
| 69:14 | 58:19 | **communicati...** | 62:8 63:20 |
| **certified** 81:3 | **christ** 20:16,19 | 1:7 5:10 20:9 | **condominium** |
| | **circling** 69:4 | 20:12,14,25 | 61:24 64:3,16 |

64:21
**conducted**
66:1
**cone** 80:7
**confidence**
77:3
**conflict** 26:21
**confusing** 22:3
**confusion**
23:23 71:14
**connection**
11:3 49:22
**connotation**
22:4
**conscious**
28:17
**consolidated**
72:8,19,20
**contact** 12:1
**contemplating**
57:24
**context** 38:18
**continual**
79:18
**continued** 5:9
**contract** 65:4
69:1
**contractors**
45:22 68:20,21
68:25
**contributions**
46:6,12 54:10
55:21
**control** 64:20
**conversation**
32:6

**convert** 80:5
**coomer** 6:21
7:16 51:19
52:14,16 59:3
59:20 60:3,4
63:7 65:11
66:12 67:5,7
67:14 68:11
**coomer's** 52:17
52:18 53:20
63:4
**coomers** 3:9,16
**copy** 8:7 34:10
42:25 46:16,24
46:25 62:5
63:15
**coral** 2:18
**corporate**
47:19
**corporation**
26:23 32:4
**corporation's**
25:22,24
**correct** 5:24
6:3 7:6,7 12:10
14:3 26:10,11
31:7,8 36:2
37:19,24 43:16
48:21,22 50:12
51:18,19 53:14
53:24 59:14
61:9 65:6,7
66:25 67:6,10
67:11 69:23
72:5,7,11
75:20

**correspond**
37:3
**cost** 53:20
59:21 61:23
**costs** 52:13
53:12,23 59:19
61:21
**counsel** 5:15
7:15 13:4
41:13 63:13
70:9
**count** 29:17
**country** 81:21
**county** 39:16
39:18 41:25
**couple** 57:12
57:18,22 58:17
59:4
**course** 41:2,3
56:4 60:23
61:11 75:21
77:19
**courses** 74:7
74:21
**court** 1:1,12
11:19 16:15,20
29:5 30:25
39:3,7 42:24
67:9 72:4
**courtlink**
15:21 16:15,16
**courts** 75:13
**cover** 60:4,8
61:21
**coverage** 52:18
65:11,25 67:16
68:20

**covered** 58:7
59:19 60:3
68:10,12,13,23
**covering** 52:13
53:20,23
**crazy** 16:23
**create** 69:19,22
**created** 69:15
69:17
**creditors** 1:20
17:4 18:15
22:11 34:17
48:10 60:22,23
61:7 78:20,23
79:10,12 80:12
80:19,21
**criminal** 66:18
**crystal** 33:20
**currently** 5:6
30:13 36:1
45:9 58:5 62:8
65:5 73:6
75:21
**cut** 24:14,18
51:22 72:12

### d

**d** 5:1
**damages** 39:19
**data** 15:8
17:25
**date** 19:19
37:12 41:10
42:10,18 43:20
47:9 65:14,16
72:4,4 81:25
**dates** 19:14

**david** 4:6 7:5
7:10
**day** 32:1 39:3
**days** 48:10
69:8 77:10,17
**dba** 20:9,11,14
20:25 21:7,12
21:19,25
**de** 2:17
**deadline** 80:3
**deal** 74:24
**dealership**
47:13
**dealing** 75:7
**dealt** 32:24
**debtor** 1:9 5:14
5:18,20 6:6,12
13:3 18:25
26:16 30:4,5
30:14 31:6,14
33:5 35:2,6,19
36:9,17 37:16
37:25 39:10,23
41:19 42:17,21
44:12 45:13
46:5 47:7
49:14,16 55:25
56:22 57:9,14
60:19,23 61:7
61:18 63:13
64:2,15,18
65:6,9,21
66:16,17 67:16
67:23 68:14
70:13 71:5,7,8
72:1,24 75:9
78:18,22 79:14

79:20,21
**debtor's** 5:15
51:13 61:6
75:6,9 78:7
79:13
**debtors** 48:25
61:10
**debts** 60:22
**dec** 68:9
**december**
66:13,23
**decide** 57:21
**decided** 39:2
58:10
**decision** 64:1
64:19 69:19,22
**declare** 58:22
**declaring**
59:13
**defamation**
74:24
**defending**
52:22
**defer** 54:24
**definitely**
49:17
**degree** 74:9,10
74:11,22
**degrees** 74:18
**delays** 9:3
**delivering**
24:22
**denver** 67:8
**depends** 49:7
**deposited**
71:25 72:10,15
72:22,23

**difference** 37:7
61:21
**different** 14:24
22:2 25:1
27:19 36:20
50:19 53:16
61:3,5
**differently**
37:24
**dip** 72:1,8,10
72:10,15,16
**direct** 71:11
**directed** 22:24
79:5
**disclosures**
60:21
**discussed**
63:23 64:11
67:21 69:1,6,9
76:12,14
**discussing** 64:9
67:17
**discussion**
79:19
**discussions**
78:4
**disinterested**
27:4,12
**dismiss** 80:5
**disposable**
78:24 79:11
**dispose** 74:24
**dispute** 53:22
53:22
**district** 1:2
67:8

**dividends** 56:8
**doc** 14:15 15:4
**docket** 9:11,11
9:25 10:1
13:10,21,22
14:19,20 15:6
16:1,11,20,24
16:24 18:3,4,5
35:4,8 41:17
41:18 51:14
53:17,25 67:20
71:13
**document** 9:10
9:13 10:3,16
10:19 11:4,7
11:18,23 12:13
12:23 13:16,20
14:2,3,6,8,8,13
14:18,21,21,25
15:9,13,25
16:2,6,10,14
16:19,21 17:13
17:25 18:2,5
25:11 27:16
35:7,11 36:12
37:15 41:18
42:12 43:1,8
43:24 44:5
47:5,6 48:7,8
51:21,23 52:6
53:16 62:2
63:15,17 71:11
71:12,14,15
**documented**
40:5
**documents**
8:13,14 9:3,5,7

9:16,18,20,23
10:7 11:16
23:24 31:6,9
31:10 32:3,9,9
32:10,11,13,15
33:4,14,18
34:13 38:21
44:3,18 46:15
46:22 47:2
63:19 80:20
**doing**  24:21
26:19 33:2
**double**  62:19
**dr**  3:9,16 6:21
7:16 52:14,15
52:17,18 53:20
63:3,6 66:12
67:6
**draws**  54:10,15
55:22 56:12
**drive**  1:14 2:4
**due**  37:16,18
48:5 79:24
**dunn**  4:1
**dwindling**  58:9

**e**

**e**  1:23,23 2:1,1
3:13 5:1,1 81:1
**earlier**  65:11
67:21
**earns**  49:8
**easier**  33:11
76:15
**east**  3:10
**easy**  34:15
**ecf**  16:1,5,14

ecf.flsb.usco...
16:20
**editable**  15:18
17:13
**educational**
74:4
**effect**  24:7
**ein**  22:25
**either**  64:19
68:15,22 79:16
80:5
**electronic**
13:25 15:17
**electronically**
7:24 34:16
**email**  8:9 10:13
46:22 63:15
**emails**  44:3
**emerge**  75:18
75:20 77:13
78:20
**employee**
44:21 45:3,9
45:15,21 65:4
65:6 70:7,8
**employees**  45:7
70:1
**ended**  39:19
**ends**  25:7
**enormous**
58:18
**enormously**
59:6
**entire**  71:6,8
71:16
**entirely**  19:10
19:13 40:23

68:9
**entirety**  14:7
29:10
**entitled**  33:15
79:12
**entity**  62:8
64:10,20 70:16
**entries**  19:17
**equity**  54:8,9
55:1,19,21
56:1
**eric**  3:9,16 6:21
7:16 59:20
63:7
**error**  71:19,21
**essentially**
8:21 53:10
**estimated**
54:10,11 55:11
55:12
**event**  73:17,18
**events**  73:12
**everybody**
15:2 80:22
**exact**  47:9 77:1
**exactly**  21:16
48:24
**examine**  18:25
**excess**  67:24
**exclusively**
32:25
**excuse**  53:15
53:17 66:4
77:24
**executive**  70:9
**exist**  60:14

**expect**  8:23
31:10 46:3
80:20
**expense**  53:12
**expenses**  38:14
38:15 39:5,7
39:21 58:5,6
59:12
**expensive**
38:23
**explain**  38:16
48:24 53:6
54:14
**explained**
50:16 54:18
68:18 77:15
**extended**  37:25
38:3 61:20
**extension**
39:22
**extent**  46:14
**extra**  61:23

**f**

**f**  1:23 81:1
**face**  35:18
**facebook**  49:2
**facing**  58:5
**factors**  58:2
**fair**  41:2 59:18
59:18 61:12
71:13
**falls**  68:8
**false**  72:16
**familiar**  9:12
10:15,17,18
12:13,21 15:13
20:7 51:15

far 28:5
farr 4:8 7:3
  34:21
fashion 9:3
favor 75:13
february 65:18
federal 55:11
fifty 12:14,16
  12:18
figure 42:17
  52:24 54:15
  56:12,12
file 27:5 57:14
  57:21 58:2,14
  60:14
filed 5:14 9:10
  9:17,21,23
  11:18,23 13:9
  14:17 39:18
  56:22 57:5,6
  66:13,23 76:8
  76:11 77:22
  79:15
filing 28:20
  48:10 56:24
  72:4,17 79:7
fill 11:9
fillable 14:22
  15:25
finances 78:7
financial 26:20
  27:7 60:21
financials 27:1
find 10:6 17:18
  29:18 32:24
fine 46:17

firm 5:23
first 11:24 13:8
  13:10 17:2,7
  23:23 26:14
  39:1 51:15
  58:17 63:11
  76:4
five 71:24
fl 1:15 2:11,18
  3:4,11 4:4
flagler 1:13,14
  4:3
flattens 17:24
florida 1:2 5:5
  8:9 32:5 35:24
  47:23,24 56:20
  56:24 57:10,11
  57:15,18 62:20
  64:22 73:2,8
  73:10,12,19,19
  73:21,24 74:3
focus 63:20,22
folks 61:8,11
following
  46:10
force 75:8
foregoing 81:3
foreign 56:23
  57:1
forgot 42:4
form 17:24
  57:1
formal 36:8,11
  36:12 40:6
  43:8 46:23
formally 40:5
  70:17

formulation
  79:21
fort 3:11
forth 14:7
forward 5:2
  78:25
four 54:10
frankly 65:25
free 39:3,15
  76:22
freeman 4:2,9
  7:3,11 52:20
  67:11,14 68:11
  68:12
frequently
  16:16 36:16
front 9:14 10:1
  13:23 42:23
  43:3,21 62:2,4
  68:9
ft 2:11
full 62:22
funds 16:18
  39:22 42:1
  44:6 45:25
  72:10,10,15
furr 3:1,6 7:19
  7:19 16:3,3,5,5
  17:7,9 30:25
further 49:18
  65:25 80:11,17

**g**

g 5:1
ga 2:5
gables 2:18
gallagher 4:8
  7:3 34:21

gathering
  39:17
gathers 12:2
general 70:9
  78:5
generating
  60:24
getter 49:3
getting 9:3,20
  9:23 17:4
  76:10 78:13,18
give 5:24 12:9
  14:19 38:17
  46:21 52:23
given 60:7
glad 20:1 46:22
glades 3:3
glitch 15:2
  60:10
go 7:2,14 17:4
  44:5,10 48:8
  53:16 54:3
  63:4 71:1
  78:16
goal 76:10
  77:12
goals 79:13
goes 24:23 46:8
  49:25 50:15
going 14:20
  16:1,1 23:19
  27:10,13 28:4
  29:19,24 34:16
  39:2 42:20,22
  43:8 44:2
  52:23 61:17
  66:23 70:24

73:17 75:18,18
75:20 76:16,19
77:13 78:15,16
78:24 79:23
80:19
**good**  5:3 6:20
6:23,24 7:10
16:17 30:23
34:12,19 58:11
63:5
**gotten**  31:9
76:20
**governing**
46:15
**government**
16:17 22:16
27:24 28:5
**government's**
16:18
**grade**  17:15
**guess**  24:23
58:12 60:8
61:2,5 66:10
**guilty**  75:11,12
**gulag**  38:22
**guy**  78:11

**h**

**h**  4:13
**half**  17:3 18:16
**hand**  5:22 8:3
12:8 79:16,22
**hands**  79:16,17
**hang**  23:7
**happen**  23:25
**happy**  34:15
**hard**  25:7
27:13 78:10

**head**  8:3 63:14
**heads**  63:17
**hear**  20:17
34:3,23 63:7
63:25
**heard**  28:19
**hearings**  69:2
**help**  38:20
39:20 66:8
**helped**  11:9
38:20
**helper**  25:3
**helpful**  43:1
**helps**  39:5
**hey**  46:19
**hi**  6:15
**historically**
38:3
**hoft**  3:2 4:17
5:19,21,21,22
6:1,4 7:19 8:19
9:9,14,18,22
10:3,5,6,7,13
10:17,20,23,25
11:5,8,11,13
11:16,21 12:2
20:6,13,17
21:1,4,8,13,14
21:15 22:24,25
23:2,4,6,8,10
23:15,18 24:2
24:3,8,11,13
24:16,21 25:3
25:8,9,12,16
25:18,24 26:8
26:22,24 27:15
27:19,23 28:2

28:13,15,24
29:3,8,17 30:4
30:7,10,13,16
30:20,22 31:5
31:7,8,11,14
31:15,19,22,24
32:1,7,12,18
32:24 33:1,6,8
33:14 34:5,8
35:3,7,9,12,14
35:17,20,23
36:2,6,9,11,15
36:18,22,25
37:4,8,13,18
37:21 38:1,4,7
38:11,14,19
39:8,12,14,25
40:6,10,14,17
41:17,19,20
42:13,15,19,20
42:21,22 43:3
43:7,12,16,18
43:21 44:2,9
44:14,18,22,24
45:1,4,9,14,19
46:2,4,7,13,17
47:8,12,16,20
47:24 48:2,6
48:12,15,19,22
49:1,7,11,17
49:19,20,23
50:2,5,10,12
50:15,21,25
51:9,17 54:22
54:24 55:2,5,9
55:13,15,20,23
56:2,9,14,19

57:1,4,8,11,16
57:22,25 58:4
58:8,16 59:2
59:11,16 60:16
61:22 62:2,9
63:7,10,25
64:4,7,13,17
64:23 65:1,4,7
68:3,3,13,14
68:15 69:16,16
69:16,18 70:5
70:16,18 72:25
73:4,5,6,9,16
73:23 74:2,6
74:10,12,15,19
74:21 75:1,5
75:11,21 76:3
76:12,16,17,17
76:18,19,24
77:5,8,14,20
77:22 78:1
**hoft's**  27:12
63:21 69:19,22
79:16
**hold**  52:5 59:8
61:15 70:6,12
70:15
**home**  25:1 32:5
32:11,13 64:24
**hood**  44:7,11
**hopefully**
34:14
**hour**  17:3
18:16 30:22
**hours**  8:20
23:24

house  24:25
houston  2:9,13
  5:17,17 6:5,8
  8:11,15,23 9:8
  10:9,11 11:22
  11:24 12:16
  13:5,7,12,18
  13:23 14:20,24
  15:2,6,11,15
  15:20 17:1,11
  17:15,18,20
  18:8,12,15,20
  23:19,21 24:2
  26:11,13,13,17
  26:17,19,24
  27:5 29:7,9,12
  29:21,23 30:3
  30:24 31:4,4
  32:20,22,22
  33:7,10,12,20
  33:25 34:1,3,9
  34:10 46:19,19
  46:21 47:3
  71:18,18 76:17
  76:19 77:24
  78:2,7,9,20,24
  79:1,2,6,10,18
  80:8
how's  18:19
hyde  81:3,8

i

idea  64:12
  69:11
immediately
  57:17
impeding  8:25
  9:4

important  8:2
  33:17
included  28:12
including  76:7
income  78:24
  79:11
incomplete
  14:21
incorporated
  56:18,19 62:18
  62:20
increasing
  58:21
incurring
  60:22
indiscernible
  10:12 15:7,11
  15:20 18:20
  19:15 21:16
  23:8 26:4 30:3
  33:10 38:15,20
  48:17 50:2
  54:11 55:24
  66:4,18 68:3
  77:23 78:20
individual
  25:25 27:22
  36:9 55:8 56:1
  78:2
individually
  7:20 24:15,20
  25:22 26:22
  56:4 64:10,20
information
  5:25 12:2,11
  13:14 27:7
  38:4,8,10

42:23 43:3,7
  43:22 62:4
  65:10 69:13
initial  64:8
initially  65:23
  66:12
initiate  66:22
initiated  52:14
  67:6
instagram  49:3
insurance
  51:13,15 52:2
  52:9,12 53:6,9
  53:9,18,19,23
  58:7,8,14,19
  59:10,19,23
  63:22 65:9
  66:11 68:10,18
  68:19
insured  67:23
  68:4
insureds  68:15
  68:16
intend  77:6
  78:22
interest  22:11
  36:13 40:8
  43:11,13
interferes  5:7
interject  41:22
internet  48:24
inures  68:19
invested  37:22
investigation
  33:1,17
investments
  46:16

involved  28:11
iowa  74:8,14
  74:16
irrelevant  22:8
  22:9,10,12,13
issue  66:9
issues  63:22
  65:10
it'll  29:25
item  37:15
  41:17 48:16
items  28:23
  54:8 55:11

j

j  25:7
james  4:13
  5:19,21
january  9:5
jesus  20:16,18
jez  49:14,17
jezreel  49:1
jim  3:2 4:17
  7:2,19 33:7,8
  34:19 36:9
  46:19 49:19
  61:18 62:15
  68:3,14 77:24
joe  31:6,14
  32:23 33:7
  41:17,19 42:20
  42:21 65:2
  68:13,14
join  63:15
joined  7:5
jon  6:11 11:11
  11:12,13 21:13
  32:18 34:7,7

| | | | |
|---|---|---|---|
| 40:15,17,19 | 12:3 13:2 | 58:5,7,25 | **likely** 27:9 |
| 41:23 50:23 | 15:24 16:7 | 59:10 60:18 | 63:19 |
| 51:1,18,20 | 17:14 19:9,12 | 61:3,6 | **likewise** 16:11 |
| 59:11,12,14 | 20:18 22:4,5 | **lawyer** 22:12 | **limitations** |
| 60:16 62:10 | 22:12,22,22 | **league** 37:16 | 45:24 46:15 |
| 75:16 | 25:18 27:7,24 | 37:19,22,25 | **limited** 22:6 |
| **jonathan** 4:18 | 28:2,3 32:25 | 38:13,17,19,22 | 56:23 |
| 6:8 | 33:1 36:22,25 | 38:25 39:6,9 | **linda** 2:15,20 |
| **judge** 5:11 | 38:23 39:2,15 | 39:23 40:12 | 6:15 |
| **july** 79:25 | 39:25 40:16,17 | 41:25 42:11 | **line** 6:7 7:21 |
| **june** 1:17 5:5 | 40:19 43:8,10 | 50:9,16,20 | 20:24 37:15 |
| 9:6,7 34:14 | 43:19 47:9 | 51:5,11 63:21 | 41:17 48:16 |
| 80:1,21 81:25 | 48:11 50:23 | 68:6 69:5,8,15 | 52:3 54:8,9 |
| **justice** 37:16 | 52:4 54:20,21 | 69:20,22,25 | 55:11,16 |
| 37:18,22,25 | 54:22 55:3,4,5 | 70:7,10 | **lines** 49:18 |
| 38:13,17,19,22 | 55:10 56:5,10 | **leali** 2:15,20 | 54:10 |
| 38:25 39:6,9 | 56:11,15 58:8 | 6:15,15 15:16 | **link** 16:16 |
| 39:23 40:12 | 59:6 60:2,7,8,9 | 17:6,10,12 | **liquidating** |
| 41:25 42:11 | 62:7 64:13 | 80:14,16 | 46:15 |
| 50:9,16,19 | 66:1 68:19 | **lease** 48:5 | **list** 8:16 48:9 |
| 51:4,11 63:21 | 69:5,7,9 72:6 | **leave** 53:18 | 52:8 |
| 68:6 69:4,8,15 | 72:21 73:19 | **led** 58:2 | **listed** 33:23 |
| 69:20,22,25 | 75:3,6,12,13 | **ledanski** 81:3,8 | 63:20 67:20 |
| 70:7,10 | 75:17,17,18,19 | **legal** 38:21,21 | 68:3 69:6 |
| **k** | 76:1,4,6 78:11 | 39:5,7 50:16 | **lists** 44:6 |
| | 79:14 | 51:4 62:7 78:4 | **litigation** 52:13 |
| **k** 44:16,20,24 | **knowledge** | 81:20 | 53:20 59:19,20 |
| 44:25 | 5:24 12:10 | **leon** 2:17 | 59:21,21 65:12 |
| **keep** 80:11 | 71:19 | **lesser** 16:16 | 66:18,22 67:5 |
| **keeping** 8:3 | **l** | **letter** 46:22 | 67:6,11,14,14 |
| **kept** 8:5 28:7 | | **level** 11:2 | 67:15 |
| **kloewer** 3:20 | **l** 74:16 | **lexis** 16:15 | **litigations** |
| 6:24,24 7:15 | **las** 3:10 | **liability** 22:6 | 53:12 59:22 |
| 7:15 | **lauderdale** | 51:15 52:2 | 60:13 |
| **knew** 23:17 | 2:11 3:11 | 53:19 56:23 | **little** 22:3 36:4 |
| **know** 8:15,18 | **law** 4:1 38:20 | 67:20 68:2 | 38:17 48:17 |
| 8:21 9:22 10:4 | **lawsuits** 51:19 | | 49:19 51:13 |
| 11:20,21,22 | 52:13,22 58:4 | | |

61:20 73:14
**live** 36:1
**lives** 65:2
**llc** 1:7 5:10
20:9,14 21:7
21:11,11,16,19
21:20,23,25
22:21 29:16
36:10 56:18
62:13,14,17,23
62:25 64:11,21
**llp** 3:8 4:8
**loan** 32:4,10,13
32:24 33:5,18
35:3,5,6,15,19
35:22,23 36:5
36:5,6,14,17
36:21 37:1,9
37:11,12,17,24
38:12,12 39:24
40:9,13,23
41:2,7,9,13,16
41:19 42:3,11
42:20,21 43:2
43:5,5,11,13
43:14,20 50:19
51:2 61:17,20
63:20,20,21
64:2,8,9,9,15
64:19 69:6,9
**loans** 33:9,13
35:2 38:2
63:20
**located** 73:15
73:21
**location** 65:1

**long** 31:17
**longer** 8:18
72:6
**look** 9:15,24,25
13:22,22 25:14
28:21 29:20
31:15,19 35:9
38:11 40:14
42:22 43:22,23
44:2 47:8,16
50:22 61:6
**looked** 16:13
58:10
**looking** 10:7
13:9,19 14:5,6
14:9,14,21,23
14:24 15:8,15
15:16 16:11,22
18:2 19:14
24:3 27:15
28:18,18 29:13
37:19 48:9
53:15
**looks** 10:17,20
18:16 22:19
50:5
**loras** 74:15
**lost** 59:4
**lot** 10:25 28:16
80:6,9
**louis** 47:13,21
73:6,10,13

**m**

**made** 8:8,15
24:5 31:6,12
31:13 32:4
33:5 35:2

36:20,23 37:11
40:12,22 42:2
42:6 46:5,12
55:25 60:21
61:18 64:1,9
64:10 69:7,11
72:25
**main** 35:23
62:9,9,12,25
64:11,21
**maintained**
16:14,15
**make** 9:10 14:1
27:11 33:11,19
34:10 36:4,16
50:7 53:21
64:15,19 75:23
**makes** 10:18
61:12 80:5
**making** 8:1
43:15
**mam** 1:3
**man** 20:16
48:13 63:24
**manager** 70:5
**managers** 70:4
**mancuso** 24:6
24:8
**marathon** 17:5
**march** 54:4
65:17,18
**maria** 24:6,8
**maricopa**
39:16,18 41:25
**marie** 2:20
**market** 49:16

**martin** 1:24
2:7 5:3 46:25
46:25
**marty** 15:16
17:12
**matter** 1:5
19:17 60:3,4
76:14
**matters** 12:1
38:21 70:18
78:17
**maturity** 37:12
41:9 43:20
**mean** 11:24
14:5 15:19
16:23 17:1
19:21 22:12
25:22 41:3,3
42:10 51:8,8,9
53:8 60:6,17
68:7,17 71:22
**means** 15:25
17:16
**media** 49:1
51:15 52:1
53:19 67:19
68:2
**meeting** 1:20
5:9 7:23 8:5,11
12:14 18:9,24
23:24 32:3
45:7 63:12
70:25 73:1
80:19,21
**meetings** 39:17
**member** 70:5

**memorialized**
36:8
**mentioned**
51:10 60:1
**miami**  4:4 5:5
8:9
**microphone**
5:7,12,13 8:2
34:17
**middle**  28:21
75:22
**million**  52:22
53:3 59:22
75:14
**mind**  8:3 80:11
**mine**  15:3,5,7
24:8
**mineola**  81:23
**minute**  73:2
**minutes**  51:10
**mispronounc...**
34:24
**missing**  14:6
50:4,6
**missouri**  56:19
73:22 74:1,3
**misstate**  69:14
**mistake**  67:2
**mistaken**  19:1
**misters**  33:14
**mo**  54:11 55:12
**moment**  14:19
51:24,24 58:25
**money**  24:15
37:21 39:11,20
41:24 46:8
50:15 51:1

59:5,9 60:24
61:23 64:2,19
**month**  24:13
24:18 25:20
49:7,14 58:18
59:9 73:11,14
77:11 79:15
**month's**  49:10
**monthly**  9:11
9:25 18:23,23
29:14 49:24,25
60:20 71:1,2
**months**  36:24
46:12 49:11,13
50:4,5 57:22
57:24
**mor**  17:23
**mora**  5:11
**morning**  5:3
6:20,23,24
7:10 34:19
63:5
**moss**  4:2,9 7:4
7:11 52:20
**motion**  80:5
**move**  18:22
19:1 37:14
57:9
**moving**  41:16
**multifaceted**
22:5
**multiple**  78:3
**mute**  5:6,13
**mutual**  44:6
45:25

**n**

**n**  2:1 5:1 81:1
**name**  5:3 7:25
13:25 14:10
20:13,24 21:1
21:9,21,24
22:16,20 24:6
25:5 27:16,22
27:24 28:5,10
29:15,19 33:24
34:25 62:23
63:6,14
**named**  67:23
68:15,22
**names**  6:19
**narrow**  66:22
**national**  30:11
**necessities**
61:24
**need**  24:24
27:2 29:5
30:25 33:7
76:3
**negotiated**
41:14
**never**  16:7
59:6
**new**  4:11 64:10
**nods**  8:3
**noise**  5:7
**non**  72:10
**noon**  9:7 34:14
**north**  1:14
**note**  6:9,14,18
7:8,13,14,22
7:25

**noted**  7:18,22
**notes**  37:15,23
53:16 61:14
**notices**  56:21
**number**  8:12
15:3,4 22:23
22:23,25 23:6
23:16,17 44:16
45:5 51:21
52:4,7 54:8
70:18 71:4,11
71:16,24
**ny**  4:11 81:23

**o**

**o**  1:23 5:1
74:16 81:1
**oath**  6:3 79:4
**object**  27:6,10
**objective**  77:12
77:14
**objectives**
79:13
**obligations**  6:2
**obtain**  8:7
**obviously**  15:9
49:2
**occurred**  19:21
**ochs**  1:24 2:7
5:2,3,19,22 6:2
6:5,9,13,17,22
7:1,5,8,10,12
7:17,21 8:18
8:25 9:9,16,19
9:24 10:4,6,9
10:15,18,22,24
11:2,6,10,12
11:14,18,22

12:5,8,13,18
12:20,22,25
13:2,5,9,16,18
13:19 14:1,4
14:12,16,18
15:1,5,7,12,19
15:21 16:4,9
17:1,17,19,22
18:14,18,22
19:9,12,16,23
20:2,4,14,18
20:21,23 21:3
21:5,10,14,18
21:20,21,24
22:9,14,18,22
23:1,3,5,7,9,11
23:17,19,22
24:3,9,12,14
24:19 25:2,4
25:10,15,17,21
26:2,5,9,12,15
26:18,21 27:3
27:9,21 28:1
28:11,14,18
29:1,4,7,11,13
29:21 30:1,4,8
30:12,14,17,21
30:23 31:5,9
31:12,17,21,23
31:25 32:2,8
32:17,19 33:3
33:8,11,13,21
34:2,5,12,20
34:22,24 46:24
46:25,25 63:3
70:23 71:10,12
71:20,24 72:9

72:14,21,25
73:5,7,15,21
73:25 74:4,9
74:11,13,17,20
74:23 75:3,6
75:17 76:1,8
76:13 77:1,6
77:11,18,21,24
78:6,8,12,18
78:22 79:1,3,7
79:9,12,20
80:1,4,9,18
**october** 35:21
**offhand** 25:13
56:15 62:21
64:13
**office** 2:3 5:4
8:9 17:21
**official** 18:3,4
18:5
**officials** 39:17
39:18
**oh** 23:18 25:18
49:17
**okay** 5:19 6:9
6:17 7:2,17,21
8:18,25 9:19
10:3,4,5,14,15
12:8 13:5 20:2
20:9,23 21:8
21:15 22:7
23:5,15,18
25:2,12 26:2
26:18 27:19,21
29:3,11 30:8
30:14,17,21,23
31:5,17,21

32:8,12,19
33:6,14,21
34:5,12,14
35:9,12,13,22
35:25 36:3,13
36:19 37:1,6
37:10,14,21,23
38:9,16 39:9
39:22 40:8,11
41:1,12,16
42:9,14,16
43:19,23 44:4
44:15 45:2,6
45:10,10,16,24
46:5,14 47:10
47:14,18,22,25
48:4,7,12,16
48:23 49:5,9
49:12,18 50:1
50:8,10,18,23
51:3,7,12,24
52:12,21 53:1
53:5,11,15,25
54:3,22,25
55:5,7,10,15
55:15,20,23
56:7,11,16,16
57:6,9,13,20
57:23 58:1,24
59:16,17 60:5
60:11,19 61:14
61:16 62:7,17
62:22 63:1,1,3
63:3,8,11 64:8
64:25 65:3
67:4 69:4 70:6
70:21,23 71:12

71:20,24 73:7
74:4,13,17,20
75:5 76:24
77:3,5 80:4,18
**olas** 3:10
**old** 81:21
**once** 35:10
73:18
**ones** 28:21
**open** 5:12
14:22 22:15
**opened** 30:4
**operate** 71:5,7
71:16
**operated** 22:6
71:23
**operates** 71:22
**operating** 9:11
9:25 18:23,23
19:1,2,4,4,5
21:10,18 24:4
60:20 71:1,2,8
71:22
**operations**
39:10 59:1
61:7
**opportunity**
18:25
**opposite** 77:1
**option** 58:11
58:22
**order** 29:6
30:25 61:18
**ordinary** 60:23
61:11
**organizes** 25:1

[original - please]

| | | | |
|---|---|---|---|
| **original** 13:12 | 35:10,12,12 | **payable** 24:5 | 70:19 |
| 13:24 14:11 | 44:5,5,6 47:6 | **paying** 39:6,19 | **personally** |
| 29:19 66:20 | 48:8,8 54:3,7 | 41:2 49:14 | 21:12 24:17 |
| **originally** | 55:13,14,16,16 | 53:12 56:5 | 43:15 |
| 38:25 41:18 | 55:18 67:21 | 59:9,13 | **perspective** |
| 65:24 | 68:9 71:2,15 | **payment** 25:14 | 63:19 |
| **ought** 79:14 | **pages** 29:24 | 25:20 42:2,5 | **petition** 19:8 |
| **outright** 48:1 | **paid** 41:5 48:2 | 48:20,23 49:19 | 19:19 28:20 |
| **outside** 59:9 | 55:7 59:22 | 49:21,24 50:9 | 30:5 31:13 |
| **outstanding** | **palm** 1:2,15 | 50:13 51:4 | 33:5,16,23 |
| 37:1 42:11 | **papers** 5:12 | 69:10 | 42:10,17 |
| 48:4 50:19 | **paralegal** 8:15 | **payments** 31:6 | **phone** 6:18 |
| **overall** 75:4,7 | 17:21 | 31:11,12 36:16 | 12:3 |
| 78:5 | **pardon** 12:18 | 36:20,23 37:11 | **picked** 8:3 |
| **owed** 42:17 | 12:18 | 40:11,21,22 | **picking** 24:22 |
| **owes** 50:20 | **part** 51:9 63:17 | 41:7,8 48:5,9 | 59:3 |
| **own** 24:15 56:3 | **participate** | 55:25 69:7,10 | **picks** 58:19 |
| 64:20 | 11:6 | **pays** 24:12 | **picture** 78:5 |
| **owned** 47:25 | **participation** | **pdf** 14:22 | **piece** 17:23 |
| 62:14 | 11:2 | 15:25 18:19 | **pieces** 67:13 |
| **owner** 56:1 | **particular** 71:4 | **pending** 60:12 | **place** 64:23 |
| **owner's** 54:9 | **parties** 6:18 | 67:8 | **plaintiffs** 39:4 |
| 55:21 | 22:11 41:12 | **people** 76:6 | **plan** 26:15,20 |
| **owns** 62:8 | **partner** 48:21 | **perform** 24:19 | 27:1,8 39:12 |
| **p** | **party** 7:12 8:10 | 50:17 | 39:12 74:23,23 |
| | 13:13,24 14:10 | **performs** | 75:7,10,23,24 |
| **p** 1:24 2:1,1,7 | 14:11 24:7 | 24:16,17 | 76:2,7,9 77:9 |
| 5:1 | **pass** 34:17 | **period** 8:6 | 77:10,19 78:13 |
| **p.a.** 2:15 4:1 | **past** 26:21 | 26:25 31:2 | 78:18 79:7,10 |
| **p.o.** 3:17 | 27:13 36:24 | 67:16 69:11 | 79:21,24,24 |
| **pacer** 15:22 | 38:5 46:6,12 | 71:6,8,9,17,23 | 80:3,3 |
| **packages** 24:22 | 56:20 57:22 | 79:11 | **planning** 26:12 |
| **page** 13:8,10 | **pay** 17:15 | **person** 6:7 | **play** 75:14 |
| 13:11,18,19 | 39:10,20 41:7 | 11:15 | **please** 5:6,13 |
| 14:7,15 17:8 | 56:3,4 60:24 | **personal** 26:1 | 5:23 6:9,14,18 |
| 25:10 27:15 | 61:11,22 79:10 | 27:16 44:24,25 | 7:1,8,22,25 |
| 28:18,19,22 | | 49:25 50:6 | 11:5 12:8 30:9 |
| 29:13,24 35:4 | | | |

34:6,18 46:24
46:25 63:4
**pllc** 2:9 3:15
**point** 5:2 8:22
12:1 30:5
54:18 61:4,5
75:16,24 76:25
80:12
**pointing** 13:5
**policies** 51:13
52:9 53:18
58:8 59:3,3
67:22
**policy** 51:15,16
51:17,20 52:2
52:13,17,22
53:6,9,9,11,19
53:20,23 58:7
58:14,20 59:10
59:23 60:1,2,3
67:16,20,24
68:1,2,12,16
**ponce** 2:17
**porsche** 33:22
34:6 47:5,7,11
47:12,15,19,25
48:5
**position** 64:14
70:6,12,15
**possession**
6:12 30:5 72:1
72:24
**post** 19:8,19
30:5,15
**postgraduate**
74:17,22

**potentially**
67:22
**precise** 52:24
**preparation**
10:22 11:3,7
12:22
**preparing** 27:1
**prepetition**
19:7,17
**present** 4:15
5:15,20
**presently**
59:24
**president** 70:9
**press** 66:7
**pressed** 66:2,8
**pressing** 66:9
**presumably**
15:2
**pretty** 10:11
**preventing**
39:16
**price** 37:3,4,7
37:9 47:15
61:19
**primary** 67:24
**prior** 28:20
57:15 69:8
**privilege** 78:17
**probably** 41:4
41:4
**problem** 18:7
**proceed** 7:25
34:18
**proceedings**
80:23 81:4

**process** 9:4
76:4
**produce** 19:24
29:4,22,24
30:24 31:3
**produced** 8:13
**production**
8:14
**professional**
67:19 68:2
**professionals**
53:19
**profitable**
58:25 59:5,7
**promote** 39:1
**prompted**
74:25
**proper** 8:10
**properly** 16:10
**property** 35:24
35:25
**provide** 11:3
35:19 42:21,25
46:18 65:13
**provided** 9:16
9:18 26:6 35:6
36:21 37:17
41:19 48:25
**providing**
11:17
**public** 39:17
39:17
**pull** 13:21 16:2
25:12 44:18
53:25
**pulling** 52:6

**purchase** 32:5
37:3,4,7,9
47:15 61:19
64:2,15,21
**purchases**
61:24
**purpose** 47:19
**purposely**
17:20
**pushing** 78:10
**put** 27:24 28:5
43:13 79:3
80:2
**putting** 58:24
61:5 79:23
80:2

**q**

**quarter** 65:16
65:17
**question** 11:5
20:4,5,17 22:1
22:3 35:3,14
36:7 40:4,15
40:20 52:16
54:20,23 55:4
55:6 60:2
65:23,23 69:21
71:4,10,15,24
73:4,25 75:2,5
76:13,15,21
77:3,21 78:9
78:16 79:4
80:8
**question's** 40:3
**questioning**
17:3,5

**questions**
10:25 11:8
44:1 47:5
56:17 61:16
63:2 65:8
70:24 71:3
80:12,13,17
**quick** 9:1
41:22 71:10
**quicker** 9:3
58:20
**quite** 38:23
39:8 46:10
65:25 73:19,20

**r**

**r** 1:23 2:1 5:1
74:16 81:1
**radar** 57:17
**raise** 5:22 12:8
**rapidity** 61:2
**rate** 36:13 40:8
43:11,13 61:2
**rather** 14:19
28:12
**raton** 3:4
**reach** 58:12
**read** 24:6 25:7
**readily** 79:16
**ready** 8:24
17:4
**real** 41:22 76:9
77:19
**really** 18:13
21:25 24:25
27:2 33:1
78:10

**realtor** 62:5
**reason** 11:21
17:13 57:13
58:9 60:14,17
**recall** 31:21,25
32:2,6 35:5
37:11,16 41:19
43:2,4 47:7,10
47:14 50:13
54:19 62:20,22
66:19 69:13
**recalled** 41:22
41:23
**receipts** 71:25
**receivable** 35:3
35:5,16 37:15
41:16
**receivables**
37:24
**receive** 32:9
34:15 46:16
**received** 32:8
32:22
**recent** 27:12
52:19
**recently** 52:15
65:12
**record** 7:23
20:19 22:20
23:12 29:23
63:12 80:13,15
81:4
**recorded** 7:23
**recording** 5:3
5:8 7:24 8:4,5
8:7,8,10

**recouped**
41:24
**redact** 19:16
**redacted** 19:5
19:6,13 20:8
20:10 21:6
28:21 29:2,16
29:25
**redaction** 19:3
19:18 20:24
21:5 22:13
28:23 29:15
**reference** 9:10
52:1 53:6 73:1
**referenced**
33:16 41:18
47:6 51:14
**referencing**
12:14
**referred** 35:4
**referring** 15:14
55:11 56:13,25
67:5
**reflect** 80:13
80:15
**reflected** 31:13
36:5 39:23
43:5
**reflecting**
43:24
**reflective**
49:15
**regard** 66:17
**registration**
57:1
**regular** 41:2,3
41:6 49:22

**regulated** 28:4
**related** 24:18
**relating** 28:23
31:6 65:9
**relative** 32:3
33:13,14 52:18
**relevant** 19:21
**reload** 14:16
14:18
**remaining** 53:3
**remains** 14:22
15:24 72:9,14
**remember**
66:19
**remitted** 42:1
**reorganized**
78:21
**repay** 74:24
78:22
**repaying** 75:14
**repeat** 64:17
75:5 77:2
**repeating**
23:22 24:1
**rephrase** 11:5
**report** 8:16
9:11,25 13:15
18:23,24 19:1
19:2,4,4,6,8,20
19:22 24:4
29:24 71:2,2
72:17
**reporting** 71:6
**reports** 60:20
**represent** 6:21
**representative**
5:20 6:6,11

**represented**
  41:13
**representing**
  26:22
**represents**
  54:15
**request** 46:23
  47:1 63:15,18
**requested** 8:12
  8:19
**require** 61:25
**requisite** 79:11
**researching**
  32:23
**residence** 74:2
**resident** 57:11
  57:18
**resolved** 53:22
**respect** 35:3
  56:12
**responsible**
  13:13,24 14:10
  14:11
**restraints** 79:8
**retain** 26:15
**retained** 26:2
  26:10
**return** 73:18
  80:14,16
**returned** 32:14
**returning**
  73:16
**reveal** 77:2
**revenue** 61:12
**review** 65:25
  66:2

**reviewed** 13:14
**revolut** 29:14
  29:17,22
**riders** 69:1
**right** 5:22 6:5
  6:13 7:1,12,22
  9:9 10:8,13,18
  11:18 12:5,8
  13:2,19 14:14
  15:1 16:4,24
  18:3,14,20
  23:3 24:3 27:9
  28:18 29:13,21
  33:3 34:16
  36:7 39:13
  40:24 41:6
  42:13 43:14,17
  52:7,8 53:23
  60:6,9,13,25
  62:24 63:14
  64:23 70:21
  72:25 73:2,14
  77:18 78:12
  79:22 80:1,2
**road** 3:3 81:21
**robert** 3:6 7:19
  16:3,5
**robin** 44:7,11
**roderman** 2:9
**role** 11:7
**royal** 66:10
**ruby** 4:2,9 7:3
  51:19 52:14,15
  59:21
**rules** 27:24
  28:3

**run** 38:21
**runs** 49:1,3
**rush** 18:9
**ryan** 3:13 6:20
  63:6

**s**

**s** 2:1,10 5:1
  74:16
**safe** 76:8
**saint** 73:6,10
  73:13
**sake** 63:12
**salary** 49:22,25
**salida** 3:18
**saved** 44:3
**saying** 13:10
  14:5 20:18
  21:2 22:14,15
  22:18
**says** 13:24
  14:10,11 20:8
  20:9 21:6,8
  25:6,6 35:15
  44:16 48:9,17
  48:23 54:9,10
  55:19
**schedule** 41:7
  41:8
**scheduled**
  73:13
**schedules** 69:5
**school** 74:7
**schwab** 30:18
  30:19 31:1
  44:7,15 45:11
  45:11,16 46:7

**science** 74:12
**scrolling** 14:6
**sealed** 16:21
  18:6
**seals** 17:25
**search** 43:9
**seat** 18:10,11
**second** 23:21
  25:4 48:16
  52:5 61:15
  72:13 77:24
**seconds** 23:4
**section** 67:21
**security** 22:23
**see** 7:24 14:4,7
  14:8,12,19
  15:17 17:6,7
  21:1,8 25:9,14
  28:24 29:2
  31:19 35:15
  44:3,8,19
  48:11,18 54:11
  55:15,16 58:21
**seems** 17:4
  60:21 61:10
**seen** 10:20 16:7
  60:20
**sees** 18:17
**selected** 65:1
**self** 53:9
**sell** 45:25
**selling** 28:6
**send** 8:10 10:9
  18:18,19 20:1
  20:21 23:5
  29:9

[sense - states]

| | | | |
|---|---|---|---|
| **sense** 49:13 | **shuffling** 5:12 | **slightly** 36:19 | **speech** 39:3,15 |
| **sent** 10:11 | **shutts** 3:8 | 40:3 61:5 | **spend** 73:23 |
| 32:18 | **sign** 12:25 | **small** 9:12 | 74:3 |
| **separate** 28:7,7 | **signature** | **smore** 59:5 | **spending** 58:18 |
| 38:22 41:13 | 13:12,17,17,20 | **snot** 51:2 | 59:2,5 73:22 |
| 47:24 | 13:24,25 14:4 | **social** 22:23 | 74:1 |
| **series** 71:3 | 14:8,11 15:17 | 49:1,2 | **spent** 52:22 |
| **serious** 58:9 | 15:23 17:7,7 | **software** 17:24 | 58:13,16 61:23 |
| **services** 48:24 | 81:7 | **sole** 70:5 | 71:13 73:9 |
| 48:25 49:15,16 | **signatures** | **solutions** 81:20 | **spoke** 26:13,14 |
| 51:4 | 17:6 18:17 | **somebody** 8:7 | **spoken** 75:15 |
| **set** 27:23 28:3 | **signed** 12:4 | 18:18 20:18 | 76:24 |
| 28:8 30:13 | 13:3,4,6,6,10 | **somewhat** 22:8 | **spread** 23:12 |
| 38:19,24 45:4 | 16:11,22,24 | **sonya** 81:3,8 | **st** 47:13,21 |
| 45:20,23 56:17 | 18:6 | **soon** 32:16 | **stamp** 15:3 |
| 76:7 77:9 | **similar** 49:15 | **sorry** 5:15 9:5 | **standpoint** |
| **seventh** 4:10 | **simple** 22:1 | 34:2,20,22 | 76:22 |
| **several** 37:8 | 77:21 | 42:4 46:10 | **started** 45:4,20 |
| 57:24 | **sir** 7:14 9:22 | 51:22 52:3 | 61:17 65:14 |
| **shareholder** | 10:16 11:1 | 65:20,20 66:5 | **state** 39:17 |
| 35:5,16 | 22:24 23:16 | 66:10 69:21 | 56:17 67:1,1 |
| **shaye** 7:3 | 25:19 28:15 | 71:11 72:12 | 79:18 |
| 51:19 52:14,15 | 32:17 35:7 | **sort** 36:8 43:25 | **statement** 12:9 |
| 59:21 | 54:6 63:9 | 65:13,13 74:9 | 20:8,19,20,23 |
| **sheet** 54:4 | 67:12,25 69:3 | **sounds** 41:1 | 21:4,22,25 |
| **shifting** 45:10 | 70:11 73:23 | 53:18,21 | 24:5 25:5 |
| **shirts** 28:6 | 74:3 75:2,11 | **southern** 1:2 | 27:17 29:14 |
| **shopify** 28:24 | 75:21 76:12 | **speak** 7:25 8:2 | 32:23 69:5 |
| **shopping** | 77:14,20 | 75:25 76:3,6 | **statements** |
| 24:23 | **sit** 40:24 54:18 | **speaking** 5:6 | 5:23 8:1 19:5 |
| **short** 46:21 | 69:12 72:6 | 26:14,17 29:9 | 19:24 20:6,7 |
| 68:8 | 77:18 | 32:22 | 23:20 29:22 |
| **shortly** 34:11 | **sitting** 73:2,6 | **specific** 37:2 | 30:19 31:1 |
| **show** 13:6,16 | **situation** 58:10 | 59:20 67:1 | **states** 1:1,12 |
| 60:4 | **sizable** 75:8 | 75:1 | 5:4 8:12 19:24 |
| **showing** 15:23 | **skarnulis** 3:15 | **specifically** | 22:10 27:10 |
| 15:24 27:11 | | 32:10 | 32:21 33:15,17 |

| | | | |
|---|---|---|---|
| 33:21 34:13 | 4:3 81:22 | **tasks** 24:16,17 | 57:21 58:2 |
| 47:1 63:16 | **suits** 38:20 | 24:19,25 50:17 | 59:8,13 60:14 |
| 80:5,11,18 | 68:22 | **tax** 22:23 26:16 | 66:11 74:23 |
| **status** 8:14,17 | **summer** 42:8,9 | 55:16,25 | 75:19 76:9 |
| **stay** 35:1 44:4 | **supply** 23:3,13 | **taxes** 25:25 | **th3e** 28:21 |
| **staying** 47:4 | 23:13,19,24 | 26:1,24 54:11 | **thank** 5:8,13 |
| 48:7 | **supreme** 39:3 | 54:11 55:7,11 | 6:22 7:5,17 9:9 |
| **step** 70:24 | 39:7 | 55:12 56:3,5 | 25:12 26:8 |
| **stepped** 7:13 | **sure** 10:11,23 | **technically** | 30:1 42:19 |
| **steward** 16:17 | 14:1 21:15,16 | 60:8 | 47:2 63:2,3,5 |
| **stocks** 45:25 | 34:10 36:4,18 | **ted** 2:4 | 70:22,23 80:22 |
| **stop** 23:7,9,9,9 | 40:23,25 44:9 | **telegram** 49:3 | **thing** 34:15 |
| 23:11,11 | 46:2,4 50:21 | **telephone** | **things** 8:19 |
| **store** 27:20,22 | 53:21 54:17 | 48:24 | 23:22 24:22 |
| **strange** 15:18 | 68:9 74:6 75:6 | **tell** 11:24 27:17 | 25:1 51:10 |
| **street** 4:3 | 76:5 77:9,16 | 29:1 30:24 | **think** 9:19,20 |
| 35:23 62:10,12 | **surprised** 80:4 | 74:4 | 17:12 18:25 |
| 62:25 64:11,21 | **swear** 5:23 | **tender** 65:21 | 19:1,7,9,12,14 |
| **strike** 66:16 | 12:9 | **terms** 68:20 | 22:3 24:2 27:3 |
| **structure** 65:9 | | **testified** 20:6 | 27:4,5,9,13 |
| **structured** | **t** | **testify** 12:6 | 29:18 31:18,22 |
| 54:19 | **t** 28:6 81:1,1 | **testimony** | 32:25 36:11 |
| **styled** 22:8 | **take** 8:19 31:17 | 27:13 29:4 | 40:1,6,17 42:2 |
| **sub** 6:13 70:23 | 37:10 75:23 | 36:3 65:11,13 | 46:11,17,17 |
| **subchapter** | **taken** 55:1 | 65:15 | 51:3 52:7 |
| 6:16 9:2 76:10 | 56:8 74:21 | **tgp** 1:7 5:9 | 59:11,12 61:1 |
| **subject** 19:18 | **takes** 46:7 | 20:9,11,14,25 | 61:15 62:4,24 |
| 60:7 | **talk** 51:12 | 21:7,10,11,18 | 63:1 73:11 |
| **substantial** | 56:15 66:5 | 22:21 24:10,11 | 77:14 |
| 42:2 | 77:8,15 | 25:17 29:15 | **third** 41:17 |
| **suggesting** | **talked** 30:18 | 36:9 38:13 | **thought** 34:8,8 |
| 12:4 | **talking** 12:16 | 40:12 42:1 | 58:21 76:12 |
| **suggests** 33:5 | 14:2,2 22:25 | 43:14 44:14,17 | **thousand** 37:8 |
| **suit** 41:24 | 28:25 35:1 | 44:23 45:3,7 | **three** 44:7 |
| 66:13 68:22 | 53:13 65:19 | 45:15,18 50:20 | 49:11,12 63:20 |
| **suite** 1:14 2:4 | 68:1 69:1 | 51:5 54:4 55:1 | **threshold** |
| 2:10,17 3:10 | **tammy** 56:15 | 55:7 56:17 | 27:14 |

**thursday** 9:7
  34:14
**tied** 60:9,10
**time** 6:17 7:1
  17:2 23:21,23
  24:25 26:14,25
  30:6,17 39:8
  45:22 49:6
  58:14 65:4
  69:10,11 71:9
  71:13,23 73:7
  73:20,22,23
  74:1,3 76:4
  79:7 80:12
**times** 78:3
**title** 33:22,24
  33:25 34:5
**today** 5:5,16
  5:20 9:5 12:6
  27:13 31:2
  38:24 64:9
  67:17 69:6,10
  71:22 72:6
  80:13
**today's** 80:1
**together** 79:24
  80:3
**told** 11:25 78:3
**tomorrow** 8:24
**took** 66:1,3
  74:7
**top** 20:7,8 21:2
  27:17 39:4
  71:2
**topic** 53:18
**total** 35:18

**towards** 54:7
  55:18 66:2
**transact** 56:24
  57:14
**transaction** 19:20 28:22
**transactions** 19:8 28:7,20
  28:24
**transcript** 8:8
  81:4
**transfer** 48:17
**transfers** 48:10
**tremendous** 19:3
**trial** 5:4
**true** 5:24 12:10
  49:2 59:15
  72:16 81:4
**trust** 76:6
**trustee** 1:25
  2:3,16 6:13,16
  8:12 19:25
  22:10 27:10
  32:21 33:15,22
  34:13 47:1
  63:16 70:23
  80:5,6,11,19
**trustee's** 5:4
  33:17
**truthful** 72:5
**try** 16:17 19:23
  78:12
**trying** 7:13
  16:23 42:16
**tuesday** 5:5 9:5
  9:6

**turn** 33:3
**turned** 18:15
  32:12,14,17,19
  32:20 34:8,9
  34:13
**turner** 2:4
**turning** 17:3
**twin** 28:15
  31:7 43:12
  65:2
**twitter** 49:2
**two** 8:6,21
  16:13 24:4,13
  24:18 28:23
  33:8 51:14
  52:22 53:12
  55:11 61:16
  65:17 67:13
**typically** 9:2

**u**

**u.s.** 2:3 11:17
  20:5
**ultimately** 42:1
  57:20 58:1
**umbrella** 67:24
**un** 15:23
**uncalled** 18:12
  18:13
**unclear** 33:23
  33:24 36:4
  45:6
**uncomfortable** 18:10
**under** 6:3 9:12
  14:9 17:19
  20:24 21:1,3,5
  21:5 68:12,16

  79:4
**underneath** 50:11 54:9
  55:19
**understand** 6:2,6 8:23
  17:16 18:8
  23:14 66:8,14
  78:9 79:6,12
**understanding** 25:6 68:24
  79:24
**understood** 9:8
  33:12
**unfinished** 11:19,20,23
**unfortunately** 54:17
**united** 1:1,12
  5:4 8:12 19:24
  22:10 27:10
  32:20 33:15,17
  33:21 34:13
  46:24,25 63:16
  80:4,11,18
**university** 74:13
**unredacted** 19:24 23:20
  29:5,12,22,25
**unsigned** 11:19
  11:20,23 15:24
**urge** 13:21
**use** 16:16
  28:14,15 64:23
  76:20

**used** 32:5
  47:20
**using** 30:14
  51:18

### v

**v** 6:13,16 9:2
  70:23 76:10
**various** 69:2
**veritext** 81:20
**versions** 16:13
  29:5
**vice** 70:9
**voluntarily**
  31:3

### w

**wait** 26:5
**wandrea'** 4:2,9
**want** 9:10 10:9
  14:1 21:13,14
  23:11 31:1
  33:4,11,13,14
  36:4 44:4
  46:22 53:21
  65:17 67:2
  69:14 75:3,6
  77:2 79:3,4
**wanted** 32:10
  63:16
**wants** 27:6
  63:4
**waterview**
  1:13
**waves** 8:3
**way** 17:15
  19:23 27:7
  36:20 51:3

54:25 76:15
  78:12
**we've** 33:1
  56:21 59:6
  60:20 63:2
  64:9 77:14
**website** 15:22
  16:14 38:23
**week** 26:14
  73:17,18
**weeks** 8:21
  73:12
**went** 13:13
  73:10,11 74:6
  74:7,8
**west** 1:2,15 4:3
**wholly** 62:14
**willkie** 4:8 7:3
  34:21
**winter** 73:9
**wish** 54:16
  66:25
**withdrawals**
  55:1
**withdrawn**
  75:19
**won** 39:14
**word** 28:14,15
**words** 79:20
**work** 24:9,9
  26:20 49:10
  64:24
**worked** 39:25
  62:5
**working** 45:22
  66:11

**works** 24:11,11
  25:25
**worries** 35:1
**worth** 49:10
**wrap** 70:25
**writers** 61:8
**wrong** 17:22
  17:23 78:11

### x

**x** 1:4,10

### y

**yea** 17:10
**yeah** 15:19
  16:9 23:2 25:3
  25:13,18 28:9
  32:12 35:17
  37:21 38:19
  42:13,15,16,25
  43:18 46:20
  47:4 48:2
  49:17 50:6,25
  51:1 52:1,8
  55:5,18 56:2,3
  57:3,25 65:22
  66:6,6 71:21
  76:18,19,24
  78:1,15
**year** 31:2,2
  38:6 46:6,9
  56:5,20 65:19
  65:20 66:22
**years** 8:6 45:5
  47:8 57:12,18
  58:17 59:4
**york** 4:11

# Exhibit 21

DATE FILED: December 22, 2020 2:05 PM
FILING ID: C3AD4DD04446A
CASE NUMBER: 2020CV34319

DISTRICT COURT, DENVER COUNTY, COLORADO
1437 Bannock Street
Denver, CO 80202

ERIC COOMER, Ph.D.,
Plaintiff

vs.

DONALD J. TRUMP FOR PRESIDENT, INC., SIDNEY POWELL, SIDNEY POWELL, P.C., RUDOLPH GIULIANI, JOSEPH OLTMANN, FEC UNITED, SHUFFLING MADNESS MEDIA, INC. dba CONSERVATIVE DAILY, JAMES HOFT, TGP COMMUNICATIONS LLC dba THE GATEWAY PUNDIT, MICHELLE MALKIN, ERIC METAXAS, CHANEL RION, HERRING NETWORKS, INC. dba ONE AMERICA NEWS NETWORK, and NEWSMAX MEDIA, INC.,
Defendants

▲ COURT USE ONLY ▲

**Attorneys for Plaintiff**
Charles J. Cain (Attorney No. 51020)
Steve Skarnulis*
**Cain & Skarnulis PLLC**
P. O. Box 1064
Salida, Colorado 81201
719-530-3011     Telephone
512-477-5011     Facsimile
Email:          ccain@cstrial.com
Email:          skarnulis@cstrial.com

*Application for *pro hac vice* forthcoming

Case Number:_____

Division Number:_____

Courtroom:_____

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), by and through undersigned counsel, brings this action against Defendants Donald J. Trump for President, Inc., Sidney Powell, Sidney Powell, P.C., Rudolph Giuliani, Joseph Oltmann, FEC United, Shuffling Madness Media, Inc. dba Conservative Daily, James Hoft, TGP Communications LLC dba The Gateway Pundit, Michelle Malkin, Eric Metaxas, Chanel Rion, Herring Networks, Inc. dba One America News Network, and Newsmax Media, Inc. (collectively, Defendants herein) in response to relentless defamation and ongoing threats.

## I.    INTRODUCTION

1.      Spreading false conspiracy theories about American election workers can have devastating consequences.  This is such a case.  Specifically, this case is based on Defendants' false and baseless assertions that Dr. Coomer, an employee of Dominion Voting Systems, Inc. (Dominion), sits at the center of a national conspiracy to fraudulently elect the President of the United States.  Defendants, by their actions, have elevated Dr. Coomer into the national spotlight, invaded his privacy, threatened his security, and fundamentally defamed his reputation across this country.

2.      On November 3, 2020, the presidential election was held across the United States.  Votes were counted throughout the week, and on Saturday, November 7, 2020, the Associated Press formally called the election for former Vice President Joe Biden.  President-Elect Biden decisively won the election with a total of 306 electoral votes, winning the popular vote by more than seven million votes.  State election officials have verified and certified the election results.  Electors have cast their ballots.

3. As the vote count proceeded and it became apparent that President Trump was likely to lose the election, the President, his campaign, his agents, and many of his supporters began alleging widespread voter fraud and perpetuating baseless conspiracies about why President Trump lost.

4. Defendants were integral to this effort. To support their unsubstantiated allegations, they manufactured and spread a false narrative that Dominion—a business that had partnered with more than 1,300 jurisdictions in the United States to provide various election support services—conspired to rig its equipment and the election in favor of President-Elect Biden.[1] Defendants made Dr. Coomer, the Director of Product Strategy and Security for Dominion, the face of their false claims.

5. Defendants relied heavily upon false allegations made by Joseph Oltmann, a politically-motivated individual, business owner, and podcast host, to support their conspiracy theory.

6. Oltmann has founded a nonprofit and media business for the alleged purpose of building a political movement to preserve freedoms he perceived as threatened in the United States. This allegedly included efforts to uncover and reveal Antifa activists conspiring against Oltmann. Oltmann claimed to have infiltrated a conference call with such Antifa activists. Oltmann claimed on this call he purportedly heard someone identified as "Eric from Dominion," and that this "Eric" stated he would ensure the election went to President-Elect Biden. Oltmann provided no explanation for how he

---

[1] Apparently, this conspiracy only affected the presidential votes, as Democrats in the same election lost ground in down-ballot races. *See* Trip Gabriel, *How Democrats Suffered Crushing Down-Ballot Losses Across America*, N.Y. TIMES, Nov. 28, 2020, https://www.nytimes.com/2020/11/28/us/politics/democrats-republicans-state-legislatures.html.

learned of this purported call or gained access to it. Oltmann acknowledged he has no recording of it and indicated he had no knowledge of the participants he referenced within it. Rather, Oltmann's dubious claims are premised on one unverified speaker referring to another. With no legitimate attempt to confirm the identity of these alleged speakers, Oltmann attributed their alleged statements to Dr. Coomer. With no additional evidence, Oltmann then used these statements to falsely assert that Dr. Coomer subverted the results of the election. Defendants seized on and perpetuated these false allegations to further their own interests.

7.     To be clear, Dr. Coomer has no knowledge of an alleged "Antifa Conference Call;" Dr. Coomer did not participate in such an alleged call; Dr. Coomer did not make the comments Defendants falsely attribute to him; and Dr. Coomer did not take actions to subvert the presidential election as Defendants falsely allege.

8.     Despite the inherent unreliability of these claims, Defendants widely disseminated this false narrative. As intended, Defendants' fabrication quickly spread throughout various media sources. Within days, the hashtags #EricCoomer, #ExposeEricCoomer, and #ArrestEricCoomer were trending on social media. The President began publishing numerous false statements to his millions of followers alleging Dominion interfered with the election; the President's son and campaign surrogate, Eric Trump, tweeted a photo of Dr. Coomer alongside this false claim; and the President's Campaign lawyers identified Dr. Coomer in a nationally televised press conference where they described him as a "vicious, vicious man" who "is close to Antifa" and falsely claimed that Dr. Coomer "specifically says that they're going to fix this

election" and that he "had the election rigged for Mr. Biden." With such attention, Defendants have escalated denigrations of Dr. Coomer, furthered dissemination of these false statements, and encouraged threats and violence against Dr. Coomer.

9. Defendants knowingly circulated and amplified a baseless conspiracy theory to challenge the integrity of the presidential election. While this theory has been thoroughly rejected, its immediate and life-threatening effects remain very real. The deluge of misinformation has caused immense injury to Dr. Coomer's reputation, professional standing, safety, and privacy. Once an esteemed private election technology expert, Dr. Coomer has been vilified and subjected to an onslaught of offensive messages and harassment. In response to multiple credible death threats, Dr. Coomer has been forced to leave his home in fear for his safety. Without concern for the truth or the consequences of their reckless conduct, Defendants branded Dr. Coomer a traitor to the United States, a terrorist, and a criminal of the highest order.

## II.   PARTIES

10. Plaintiff Eric Coomer, Ph.D. is an individual and resident of Colorado who may be contacted c/o Cain & Skarnulis PLLC, P. O. Box 1064, Salida, Colorado 81201. Dr. Coomer is the Director of Product Strategy and Security for Dominion.

11. Defendant Donald J. Trump for President Inc. (the Trump Campaign or the President's Campaign)[2] is a corporation organized and existing under the laws of Virginia,

---

[2] As of this filing, Rudolph Giuliani is a representative of the Trump Campaign. His actions relevant to this case were as a representative of the Trump Campaign and within the scope and furtherance of his work for the Trump Campaign. He had actual or apparent authority as an agent of the Trump Campaign. The Trump Campaign is vicariously liable for Giuliani's tortious conduct described herein. Sidney Powell was a representative of the Trump Campaign. For a period of time relevant to this case, Powell's actions were as

and may be served through its registered agent for service CT Corporation System at 4701 Cox Road, Suite 284, Glen Allen, Virginia 23060-6808.

12.     Defendant Sidney Powell (Powell) is an individual and resident of Texas. Powell is a practicing attorney that has brought several lawsuits seeking to overturn the results of the election.  On November 14, 2020, President Trump identified Powell as part of the legal team representing his campaign and its efforts to overturn the results of the election.  On November 22, 2020, the campaign subsequently removed Powell from its legal team.  Powell may be served at 3831 Turtle Creek Boulevard, Unit 5B, Dallas, Texas 75219.

13.     Defendant Sidney Powell, P.C. (Powell, P.C.)[3] is a professional corporation organized and existing under the laws of Texas, and may be served with process through its registered agent Sidney Powell at 3831 Turtle Creek Boulevard, Unit 5B, Dallas, Texas 75219.

14.     Defendant Rudolph Giuliani (Giuliani) is an individual and resident of New York.  Giuliani is a practicing attorney that serves as President Trump's personal counsel, as well as counsel for President Trump's campaign, Donald J. Trump for President Inc.  Giuliani may be served with process at 445 Park Avenue, Floor 18, New York, New York 10022.

---

a representative of the Trump Campaign and within the scope and furtherance of her work for the Trump Campaign.  She had actual or apparent authority as an agent of the Trump Campaign during that period of time.  The Trump Campaign is vicariously liable for Powell's tortious conduct during the period of time described herein.

[3] Powell is a representative of Powell, P.C.  Her actions relevant to this case were as a representative of Powell, P.C. and within the scope and furtherance of her work for Powell, P.C.  She had actual or apparent authority as an agent of Powell, P.C.  Powell, P.C. is vicariously liable for Powell's tortious conduct described herein.

15.     Defendant Joseph Oltmann (Oltmann) is an individual and resident of Colorado.  Oltmann is an activist; a supporter of President Trump; an owner of Shuffling Madness Media, Inc. dba Conservative Daily; a co-host of the Conservative Daily podcast; and founder of the nonprofit FEC United.  Oltmann may be served with process at 8245 Keith Court, Castle Rock, Colorado 80108.

16.     Defendant FEC United[4] is a nonprofit corporation organized and existing under the laws of Colorado with its principal place of business located in Denver, Colorado, and may be served with process through its registered agent Pacific Registered Agents, Inc. at 44 Cook Street, Suite 100, Denver, Colorado 80206.

17.     Defendant Shuffling Madness Media, Inc. dba Conservative Daily (Conservative Daily)[5] is a corporation organized and existing under the laws of Delaware with its principal place of business located in Colorado, and may be served with process through its registered agent Joe Oltmann at 10750 S. Pine Drive, Parker, Colorado 80138.

18.     Defendant James Hoft (Hoft) is an individual and resident of Missouri.  Hoft is the owner of TGP Communications LLC and author and editor of the political website and blog, The Gateway Pundit.  Hoft may be served with process at 12 Godwin Lane, St. Louis, Missouri 63124.

---

[4] Oltmann is a representative of FEC United.  His actions relevant to this case were as a representative of FEC United and within the scope and furtherance of his work for FEC United.  He had actual or apparent authority as an agent of FEC United.  FEC United is vicariously liable for Oltmann's tortious conduct described herein.

[5] Oltmann is also a representative of Conservative Daily.  His actions relevant to this case were as a representative of Conservative Daily and within the scope and furtherance of his work for Conservative Daily.  He had actual or apparent authority as an agent of Conservative Daily.  Conservative Daily is vicariously liable for Oltmann's tortious conduct described herein.

19.     Defendant TGP Communications LLC dba The Gateway Pundit (Gateway Pundit)[6] is a limited liability company organized and existing under the laws of Missouri, and may be served with process through its registered agent Gregory J. Hickel at 12300 Old Tesson Road, Suite 400-G, St. Louis, Missouri 63128.

20.     Defendant Michelle Malkin (Malkin) is an individual and resident of Colorado. Malkin is a political blogger, commentator, and author. Malkin may be served with process at 171 Larkspur Lane, Avon, Colorado 81620.

21.     Defendant Eric Metaxas (Metaxas) is an individual and resident of New York. Metaxas is an author, speaker, and host of The Eric Metaxas Radio Show. Metaxas may be served with process at 35 East 84th Street, Apt. 5A, New York, New York 10028.

22.     Defendant Chanel Rion (Rion) is an individual and resident of New York. Rion is the Chief White House Correspondent for One America News Network (OANN). Rion may be served with process at 622 Acorn Hill Road, Olivesbridge, New York 12461.

23.     Defendant Herring Networks, Inc.,[7] is a corporation organized and existing under the laws of California, which owns and operates One America News Network (OANN). OANN may be served through its agent for service Seth B. Bobroff at 6256 Greenwich Drive, Suite 500, San Diego, California 92117.

---

[6] Hoft is a representative of Gateway Pundit. His actions relevant to this case were as a representative of Gateway Pundit and within the scope and furtherance of his work for Gateway Pundit. He had actual or apparent authority as an agent of Gateway Pundit. Gateway Pundit is vicariously liable for Hoft's tortious conduct described herein.

[7] Rion is a representative of Herring Networks, Inc. (referred to herein as OANN). Rion's actions relevant to this case were as a representative of OANN and within the scope and furtherance of her work for OANN. She had actual or apparent authority as an agent of OANN. OANN is vicariously liable for Rion's tortious conduct described herein.

24.     Defendant Newsmax Media, Inc. (Newsmax) is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Florida. Newsmax may be served through its registered agent Cogency Global Inc. at 115 North Calhoun Street, Suite 4, Tallahassee, Florida 32301.

### III.     JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to Article VI, section 9 of the Colorado Constitution and C.R.S. section 13-1-124.

26.     This Court may exercise personal jurisdiction over the Trump Campaign as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. The Trump Campaign had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776-81 (1984). The Trump Campaign derived its defamatory statements from Coloradan sources.[8] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[9] *See Calder v. Jones*, 465 U.S. 783, 788-89 (1984); *see also Keeton,* 465 U.S. at 780 (recognizing a plaintiff's residence may be relevant to the jurisdictional inquiry as it "may be the focus of the activities of the defendant out of which the suit arises."). The

---

[8] The Trump Campaign knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 59–65, 68.

[9] The Trump Campaign knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 50–65, 68.

Trump Campaign purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[10] *See Keeton,* 465 U.S. at 776-81 (finding "libel is generally held to occur wherever the offending material is circulated" and a defendant continuously and deliberately exploiting a market "must reasonably anticipate being haled into court there in a libel action").

27.     This Court may exercise personal jurisdiction over Powell as she committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  Powell had the knowledge and intent that: the effects of her actions would be felt in the state of Colorado; the injury would occur in Colorado; and that her defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Powell derived her defamatory statements from Coloradan sources.[11]  The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for her defamatory statements.[12]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Powell purposefully utilized national broadcasts and media platforms with regular circulation in

---

[10] The Trump Campaign knowingly published its statements using national platforms and broadcasts that purposefully direct their statements into the state of Colorado and to Coloradan audiences.  The Trump Campaign intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans.  *See infra* ¶¶ 59–65, 68.

[11] Powell knowingly relied on Oltmann as her source for her false statements; specifically identified Oltmann as a Denver, Colorado businessman within her statements; and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 61–68.

[12] Powell knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of her false statements.  *See infra* ¶¶ 61–68.

Colorado and to Coloradan audiences to make her statements.[13] *See Keeton,* 465 U.S. at 776-81.

28.     This Court may exercise personal jurisdiction over Powell, P.C. as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Powell, P.C. had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Powell, P.C. derived its defamatory statements from Coloradan sources.[14] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[15] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Powell, P.C. purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[16] *See Keeton,* 465 U.S. at 776-81.

---

[13] Powell knowingly published her statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences. Powell intended to reach every citizen in the United States, purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 61–68.

[14] Powell P.C. knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 61–68.

[15] Powell P.C. knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 61–68.

[16] Powell P.C. knowingly published its statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences. Powell P.C. intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 61–68.

29.     This Court may exercise personal jurisdiction over Giuliani as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  Giuliani had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Giuliani derived his defamatory statements from Coloradan sources.[17]  The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for his defamatory statements.[18]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Giuliani purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make his statements.[19]  *See Keeton,* 465 U.S. at 776-81.

30.     This Court may exercise personal jurisdiction over Oltmann as he is a resident and domiciliary of Colorado and he committed tortious actions giving rise to this cause of action within Colorado.

---

[17] Giuliani knowingly relied on Oltmann, a Colorado businessman, as his source for his false statements and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 61-62, 68.

[18] Giuliani knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements.  *See infra* ¶¶ 61–62, 68.

[19] Giuliani knowingly published his statements using national platforms and broadcasts that purposefully direct their statements into the state of Colorado and to Coloradan audiences.  Giuliani intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans.  *See infra* ¶¶ 61–62, 68.

31. This Court may exercise personal jurisdiction over FEC United as it is formed within and existing under the laws of Colorado and it committed tortious actions giving rise to this cause of action within Colorado.

32. This Court may exercise personal jurisdiction over Conservative Daily as it has its principal place of business within Colorado and it committed tortious actions giving rise to this cause of action within Colorado.

33. This Court may exercise personal jurisdiction over Hoft as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Hoft had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Hoft derived his defamatory statements from Coloradan sources.[20] The subject of those statements concerned a Colorado resident and that resident's work and employment within a business based in Colorado, making Colorado an integral focal point for his defamatory statements.[21] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Further, Hoft has purposefully sought a national audience and regularly directs his publications to Colorado and Coloradan audiences for circulation.[22] *See Keeton,* 465 U.S. at 776-81.

---

[20] Hoft knowingly relied on Oltmann as his source for his false statements, specifically identified Oltmann as a Denver, Colorado businessman within his statements, and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 55, 58, 68.

[21] Hoft knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements. *See infra* ¶¶ 55, 58, 68.

[22] Hoft, as founder, editor, and author of Gateway Pundit, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets, with articles naming Colorado, identifying events in Colorado, and referencing Coloradans. *See infra* ¶¶ 55, 58, 68, n.25.

34. This Court may exercise personal jurisdiction over Gateway Pundit as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Gateway Pundit had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Gateway Pundit derived its defamatory statements from Coloradan sources.[23] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[24] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Further, Gateway Pundit has purposefully sought a national audience and regularly directs its publications to Colorado and Coloradan audiences for circulation.[25] *See Keeton,* 465 U.S. at 776-81.

---

[23] Gateway Pundit knowingly relied on Oltmann as its source for false statements it published, specifically identified Oltmann as a Denver, Colorado businessman within its statements, and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 55, 58, 68.

[24] Gateway Pundit knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 55, 58, 68

[25] Gateway Pundit regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets, with articles naming Colorado, identifying events in Colorado, and referencing Coloradans. *See e.g.*, Cristina Laila, *BREAKING! SHOCK VIDEO: Colorado Democrat Executive Says "2020 is a Political Revolution"; "Guillotines Motherf\*cker, Killing Random Nazis in the Street"*, THE GATEWAY PUNDIT, October 13, 2020; Joe Hoft, *WEIRD: Early Reports Claimed Killer of Trump Supporter in Denver Is a Security Guard But He's Not Registered In Colorado's Security Guard Database*, THE GATEWAY PUNDIT, October 11, 2020; Cristina Laila, *Democrat Colorado Secretary of State Mails Postcards to Illegals and Dead People Urging Them to Vote*, THE GATEWAY PUNDIT, September 27, 2020; Jim Hoft, *Let's Make Her Famous! Violent, Foul-Mouthed Leftist Caught on Video Ripping Down Trump Sign in Castle Rock, Colorado*, THE GATEWAY PUNDIT, September 22, 2020; Cristina Laila, *Colorado Woman Repeatedly Punches 12-Year-Old Boy in the Back of the Head Over Trump Yard Sign*, THE GATEWAY PUNDIT, September 2, 2020.

35.     This Court may exercise personal jurisdiction over Malkin as she is a resident and domiciliary of Colorado and she committed tortious actions giving rise to this cause of action within Colorado.

36.     This Court may exercise personal jurisdiction over Metaxas as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As the host of a nationally syndicated radio show and podcast, Metaxas had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado.  *See Keeton*, 465 U.S. at 776-81.  Metaxas also derived his defamatory statements from Coloradan sources.[26]  The subject of those statements concerned a Colorado resident and that resident's work and employment within a business based in Colorado, making Colorado an integral focal point for his defamatory statements.[27]  *See Calder*, 465 U.S. at 788-89; *see also Keeton*, 465 U.S. at 780.  Further, Metaxas has purposefully sought a national audience and regularly directs his publications to Colorado and Coloradan audiences for circulation.[28]  *See Keeton*, 465 U.S. at 776-81.

---

[26] Metaxas knowingly relied on Oltmann as his source for his false statements, specifically identified Oltmann as a Denver, Colorado businessman within his statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 57, 68.

[27] Metaxas knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements.  *See infra* ¶¶ 57, 68.

[28] Metaxas, as the host of a nationally syndicated radio show and podcast, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets.  *See infra* ¶¶ 57, 68.

37.     This Court may exercise personal jurisdiction over Rion as she committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As a correspondent for a national news network that specifically broadcasts to Colorado and Coloradan audiences, Rion had the knowledge and intent that: the effects of her actions would be felt in the state of Colorado; the injury would occur in Colorado; and that her defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Rion also derived her defamatory statements from Coloradan sources.[29]  The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for her defamatory statements.[30]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Through OANN, Rion has purposefully sought a national audience and regularly directs her reporting to Colorado and Coloradan audiences for circulation.[31] *See Keeton,* 465 U.S. at 776-81.

38.     This Court may exercise personal jurisdiction over OANN as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As a national news network that specifically broadcasts to Colorado and Coloradan audiences, OANN had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its

---

[29] Rion knowingly relied on Oltmann as her source for her false statements, specifically identified Oltmann as a Denver, Colorado businessman within her statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 59, 68.

[30] Rion knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of her false statements.  *See infra* ¶ 59, 68.

[31] Rion, as a correspondent for OANN, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets.  *See infra* ¶¶ 59, 68, n.34.

defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. OANN also derived its defamatory statements from Coloradan sources.[32] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[33] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. OANN has purposefully sought a national audience and regularly directs its reporting to Colorado and Coloradan audiences for circulation.[34] *See Keeton,* 465 U.S. at 776-81.

39.    This Court may exercise personal jurisdiction over Newsmax as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As a national news network that specifically broadcasts to Colorado and Coloradan audiences, Newsmax had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at

---

[32] OANN knowingly relied on Oltmann as its source for false statements it published, specifically identified Oltmann as a Denver, Colorado businessman within its statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 59, 68.

[33] OANN knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements.  *See infra* ¶¶ 59, 68.

[34] On its website, OANN identifies: (1) national cable providers, including AT&T U-verse, CenturyLink PRISM, DirecTV, GCI, and Verizon FiOS; (2) local providers in all 50 states; and (3) for Colorado, OANN specifically states "You can find OAN in Colorado on one of the many national cable providers above.  Need another option?  Stream OAN and many other TV channels LIVE on KlowdTV without a contract, offering flexibility and affordability.    Sign up for a free-trial!"  *See OANN, Where to Watch,* https://www.oann.com/wheretowatch/ (last visited Dec. 22, 2020).

776-81. Newsmax further derived its defamatory statements from Coloradan sources.[35] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[36] *See Calder*, 465 U.S. at 788-89; *see also Keeton*, 465 U.S. at 780. Newsmax has purposefully sought a national audience and regularly directs its reporting to Colorado and Coloradan audiences for circulation.[37] *See Keeton*, 465 U.S. at 776-81.

40. Venue is proper in this Court pursuant to Colorado Rule of Civil Procedure 98 because a substantial part of the events and omissions giving rise to the claims occurred in Denver County, Colorado and Defendant FEC United's principal place of business is in Denver County, Colorado.

## IV. FACTS

41. Plaintiff Dr. Eric Coomer is the Director of Product Strategy and Security for Dominion.

---

[35] Newsmax knowingly relied on Oltmann, a Colorado based businessman, as the source of the false statements that it published and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 63, 68.

[36] Newsmax knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 63, 68.

[37] Newsmax purposefully directs its broadcasts into the state of Colorado and to Coloradan audiences. On its website, Newsmax identifies broadcast areas for Coloradan zip codes and identifies national cable providers and channels specifically for Colorado. For example, in the zip code of this Court, Newsmax identifies "Newsmax TV is available in your local area in the following services" including: CenturyLink HD Ch. 1209 (SD Ch. 209); DIRECTV HD Ch. 349; DISH Network HD Ch. 216; fuboTV; Sling TV; and Xfinity/Comcast HD Ch. 1115. *See* Newsmax TV, *You Can Watch Newsmax TV!*", https://www.newsmaxtv.com/findus (last visited Dec. 22, 2020).

42.     Dominion is based in Denver, Colorado, and provides election support services across the United States, including from initial project implementation through election set-up, ballot layout, multiple language audio, machine set-up and system testing.

43.     Dominion provided election related services to at least thirty different states during the 2020 presidential election.

## A.     *The 2020 presidential election was a free and fair election.*

44.     The 2020 presidential election results have been verified by numerous independent entities, including government officials and agencies.   State elections officials tasked with verifying the election and vote counts have certified the election results across all 50 states and the District of Columbia.[38]   Electors have met and formerly cast their ballots with President-Elect Joe Biden securing 306 electoral votes and winning the popular vote by more than seven million votes.[39]

45.     The Cybersecurity & Infrastructure Security Agency (CISA), a standalone United States federal agency under the Department of Homeland Security, has issued a Joint Statement from the Elections Infrastructure Government Coordinating Council and the Elections Infrastructure Sector Coordinating Executive Committees stating:

> The November 3rd election was the most secure in American history.  Right now, across the country, election officials are reviewing and double checking the entire election process prior to finalizing the result.

---

[38] *See* Maggie Astor, et al., *Biden Secures Enough Electors to Be President*, N.Y. TIMES, Dec. 9, 2020, https://www.nytimes.com/interactive/2020/11/20/us/politics/2020-election-certification-tracker.html ("Election results have now been certified in all 50 states and Washington, D.C.").

[39] *See* Nick Corasaniti, et. al., *Electoral College Vote Officially Affirms Biden's Victory*, N.Y. TIMES, Dec. 14, 2020, https://www.nytimes.com/2020/12/14/us/politics/biden-electoral-college.html.

When states have close elections, many will recount ballots. All of the states with close results in the 2020 presidential race have paper records of each vote, allowing the ability to go back and count each ballot if necessary. This is an added benefit for security and resilience. This process allows for the identification and correction of any mistakes or errors. **There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.**

Other security measures like pre-election testing, state certification of voting equipment, and the U.S. Election Assistance Commission's (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020.

While we know there are many unfounded claims and opportunities for misinformation about the process of our elections, we can assure you we have the utmost confidence in the security and integrity of our elections, and you should too. When you have questions, turn to elections officials as trusted voices as they administer elections."[40]

46. Former Director of CISA, Chris Krebs, after his dismissal by President Trump, acknowledged that states had transitioned to auditable voting systems with paper-based ballots that could be recounted, independent of any allegedly hacked software or hardware.[41] Krebs explained that these paper ballots, when paired with state post-election checks, ensured the accuracy of the voting counts. Such post-election checks were utilized with recounts in Georgia and Wisconsin, which affirmed the election results.[42]

---

[40] CISA, *Joint Statement from Elections Infrastructure Gov't Coordinating Council & the Election Infrastructure Sector Coordinating Exec. Comms.*, Nov. 12, 2020, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (emphasis in original).

[41] Chris Krebs, *Trump fired me for saying this, but I'll say it again: The Election wasn't rigged*, WASH. POST, Dec. 1, 2020, https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html.

[42] Scott Bauer, *Wisconsin certifies Joe Biden as winner following recount*, AP, Nov. 30, 2020, https://apnews.com/article/election-2020-joe-biden-donald-trump-wisconsin-lawsuits-2e9cf60550f519537d31b6b71aa32c3c; Kate Brumback, *Georgia again certifies election results showing*

47.     The U.S. Attorney General William Barr confirmed "to date, we have not

seen fraud on a scale that could have effected a different outcome in the election."[43]

48.     Over 50 separate lawsuits brought by President Trump's campaign and its

supporters across the country attempting to challenge the legitimacy of the election

results have failed.[44]  With these, courts have rejected baseless allegations of widespread

voter fraud raised to overcome the election results.[45]  Notably in one case, Judge Brann

in the United States District Court for the Middle District of Pennsylvania rendered an

opinion stating:

> One might expect that when seeking [to disenfranchise almost seven million
> voters], a plaintiff would come formidably armed with compelling legal
> arguments and factual proof of rampant corruption, such that this Court
> would have no option but to regrettably grant the proposed injunctive relief
> despite the impact it would have on such a large group of citizens.
>
> That has not happened.  Instead, this Court has been presented with
> strained legal arguments without merit and speculative accusations, unpled
> in the operative complaint and unsupported by evidence.

*Donald J. Trump for President, Inc., et al. v. Boockvar, et al.*, No. 4:20-cv-02078-

MWB, at Dkt. No. 202, p.2 (M.D. PA. Nov. 21, 2020).  In review of this opinion, Judge

---

*Biden won*, AP, Dec. 7, 2020, https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a.

[43] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, AP, Dec. 1, 2020, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d. As of this filing, U.S. Attorney General Barr has tendered his resignation.

[44] Rosalind S. Helderman, et al., *'The last wall': How dozens of judges across the political spectrum rejected Trump's efforts to overturn the election*, WASH. POST, Dec. 12, 2020, https://www.washingtonpost.com/politics/judges-trump-election-lawsuits/2020/12/12/e3a57224-3a72-11eb-98c4-25dc9f4987e8_story.html.

[45] *See e.g., Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 84, p.28 (concluding "[n]ot only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them.  Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court.").

Bibas, writing the Third Circuit's unanimous opinion on November 27, 2020, summarized the Court's ruling as follows:

> Free, fair elections are the lifeblood of our democracy. Charges of unfairness are serious. But calling an election unfair does not make it so. Charges require specific allegations and then proof. We have neither here.

*Donald J. Trump for President, Inc., et. al. v. Sec'y Commonwealth of Pennsylvania, et. al.*, No. 20-3371, * 2 (3rd Cir. Nov. 27, 2020).

### B. Oltmann fabricated a conspiracy.

49. Joseph Oltmann is a political activist and supporter of President Trump with ambitions of creating a political movement.[46] Oltmann formed a nonprofit organization, FEC United, allegedly to restore and secure constitutional protections he perceived as under attack, which includes a paramilitary civilian defense group.[47] FEC United has hosted rallies for armed civilians to gather, as well as political events on behalf of the Colorado Republican Party and the Trump Campaign.[48] By way of example, FEC

---

[46] *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 2, 2020) (In response to lawsuits brought by President Trump, "[w]e do this without the weak ass Republican traitors."); (Dec. 4, 2020) ("It's time we turn out the corrupt government and weaponized media and tech companies. This is our country . . . #reckoning #ericcoomerisatraitor #dominionvotingsystems); (Dec. 6, 2020) ("I will love my neighbors after I beat their ass and stop this evil indoctrination and cancer on our community . . . I punched one of these asshats in the face and defended our country"); (Dec. 7, 2020) ("I am angry we are where we are and we allowed the loony left to even get their claws of deceit and despair into the fiber of our country. I am disappointed we let the evil left remove God from our schools and communities without a bigger fight . . . Pray for our country. Pray for our President. Pray for our leaders that they can have courage. Pray for the warriors of our nation that will stand up for you. God bless you all. We will not surrender and we will never retreat."); (Dec. 10, 2020) ("Pray for our country and that our Supreme Court has the courage to reject the evil we face."); (Dec. 12, 2020) ("Now we got to war as the people . . . the deep state runs deep. Evil at work . . .").

[47] *See* FEC United, *Defend the American Way of Life,* https://fecunited.com (last visited Dec. 22, 2020); United American Defense Fund, *Defend and Protect What Is Ours,* https://fecunited.com/uadf/ (last visited Dec. 22, 2020).

[48] *See* Erik Maulbetsch, *Conservative Group Behind the Deadly "Patriot Muster" Rally Working Closely With Colorado GOP,* COLO. TIMES RECORDER, Oct. 12, 2020, https://coloradotimesrecorder.com/2020/10/conservative-group-behind-deadly-patriot-muster-rally-working-closely-with-colorado-gop/31445/.

United reportedly solicited its members to sign up for the "Army for Trump" poll watcher program before the election, claiming that "Democrats have been actively stacking the poll-watching positions with their own people, and this will only contribute to the fraud . . . Join Our Election Day Team!"[49] Upon information and belief, Oltmann also owns a business, Shuffling Madness Media, Inc., which operates under the name Conservative Daily. Oltmann serves as a co-host of the Conservative Daily Podcast under the name Joe Otto with videos also posted on Conservative Daily's YouTube channel.

50. After the results of the election were called for President-Elect Joe Biden, Oltmann co-hosted a Conservative Daily Podcast.[50] On that podcast, he alleged to have learned almost two months earlier of a conspiracy to elect the president of the United States. Oltmann claimed he gained this information after infiltrating Antifa. Despite his interest in the election and prolific podcasting schedule, Oltmann apparently took no action at that time to report this alleged threat to democracy.[51] Waiting until November 9, 2020, Oltmann began this podcast, saying:

> Let's not sugar coat this, we're going to expose someone inside of Dominion Voting Systems specifically related to Antifa and related to someone that is so far left and is controlling the elections, and his fingerprints are in every state. So I want you guys to understand that what we're about to show you, you have to share . . . The conversation will be about a man named Eric Coomer. C-O-O-M-E-R.

---

[49] *See id.*

[50] Joseph Oltmann, et al., *Ep. 196—Dominion Voting Systems*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020).

[51] The Conservative Daily Podcast posted fifty podcasts from September 1, 2020 to November 9, 2020. *See id.*; *see also* Joseph Oltmann, et al., *Ep. 146—Someone Stole My Trump Sign (And I'm Pissed)*, CONSERVATIVE DAILY PODCAST (Sept. 1, 2020).

Oltmann then posted a photo of Dr. Coomer's face. Oltmann explained he had allegedly "infiltrated an Antifa conference call" sometime in late September with unknown and unverified participants. Oltmann claimed while on this purported call one of these unknown participants was referred to as "Eric" and another allegedly explained "Eric is the Dominion guy." Oltmann claimed when another unknown participant asked, "What are we gonna do if f-ing Trump wins?" the unknown "Eric" responded, which Oltmann paraphrased as, "Don't worry about the election, Trump is not gonna win. I made f-ing sure of that. Hahahaha." Afterwards, Oltmann's alleged efforts to identify the unknown speakers of this purported call were limited to googling "Eric," "Dominion," and "Denver, Colorado."[52] With this, Oltmann claimed he identified Dr. Coomer and Dominion Voting Systems, Inc.[53] At no point has Oltmann contacted Dr. Coomer to confirm his involvement in this purported call.

51. Only after President Trump had lost the presidential election did Oltmann allegedly remember Dr. Coomer and take steps to target him. Oltmann had conceived a storyline about the election—that its results were fraudulent—and consciously set out to establish that Dr. Coomer perpetuated this fraud.[54] This included accessing Dr. Coomer's

---

[52] In a subsequent interview, Oltmann explained, "So it was really simple. This is what I did, right. I put in 'Eric,' into google search, 'Eric,' 'Dominion,' 'Denver, Colorado.' Not very clever, right?" *See* Michelle Malkin, *#MalkinLive: U.S. Elections*, YOUTUBE (Nov. 13, 2020).

[53] Oltmann provides no explanation for how he understood "Dominion" to mean "Dominion Voting Systems, Inc." and not any of the number of other Dominion-named businesses and locations in Colorado, including, but not limited to: Old Dominion Freight Line; Dominion Life Church; Dominion Realty Group; Dominion Water & Sanitation District; either of the two Dominion Towers constituting Dominion Plaza; Dominion Mortgage; and Dominion Carpet Cleaning Inc.

[54] Oltmann has a history of advancing varying allegations of voter fraud to support his political beliefs and his preferred candidates as well as to promote himself and his businesses interests. *See e.g.*, Erik Maulbetsch, *Conservative Group Behind the Deadly "Patriot Muster Rally Working Closely With Colorado GOP*, COLO. TIMES RECORDER, Oct. 12, 2020 (FEC United alleging election fraud); Joseph Oltmann, et al.,

private Facebook profile. Finding no credible evidence of Dr. Coomer's involvement in the purported "Antifa Conference Call," Oltmann, instead, used posts on Dr. Coomer's Facebook profile that were critical of President Trump to allege he was the anonymous "Eric." Having no credible evidence of voter fraud, Oltmann used Dr. Coomer's position and employment with Dominion to allege Dr. Coomer was a key figure in a high-level conspiracy to rig the election against President Trump. These statements are baseless and unequivocally false. Dr. Coomer has no knowledge of this alleged "Antifa Conference Call;" Dr. Coomer did not participate in such an alleged call; Dr. Coomer did not make the comments Oltmann alleged were made; and Dr. Coomer did not take steps to subvert the results of the presidential election.

52.     In reality, Dr. Coomer, like many, had a private Facebook page that he shared with approximately 300 friends. He shared political views and was critical of President Trump. He shared satire, that Oltmann intentionally disregarded and held out as true. None of it was public. It is unclear how Oltmann came into possession of it.

53.     More importantly, Dr. Coomer's professional life was separate from his personal political opinion. Dr. Coomer did not participate in political groups and did not donate to campaigns. Dr. Coomer worked with elections officials—Republican, Democratic, and independent—across the country to make sure the process was safe,

---

*Ep. 151–Voter Fraud is Real*, CONSERVATIVE DAILY PODCAST, (Sept. 9, 2020) (separate allegations of election fraud); *Ep. 126–GOP Caving to Pelosi's Cheat-By-Mail Demands,* CONSERVATIVE DAILY PODCAST (Aug. 5, 2020) (separate allegations of election fraud). Oltmann utilized these false allegations for personal gain. On November 5, 2020, the Conservative Daily podcast informed its viewers it was the "#119 most popular political podcast in America," on November 6, 2020 it informed them it was then the "#108 most popular political podcast," on November 9, 2020 it was "#66," on November 10, 2020 it was "#62," November 14, 2020 it was "#53," on November 19, 2020 it was "#28," on December 2, 2020 it was "#8."

secure, and fair. The ability to have a political opinion in this country is a protected right. It remains a protected right, even if critical of a sitting president. That criticism does not denote conspiracy or fraud.

### C. Defendants spread the conspiracy.

54.     Oltmann began spreading his baseless allegations.[55]  Defendants seized on Oltmann's statements to promote a conspiracy of election fraud.  At the same time Defendants began to use Oltmann as a source for their reporting, Twitter suspended his account.  This suspension was related to Oltmann's attempts to spread false allegations and threats about Dr. Coomer.[56]

55.     On November 13, 2020, Gateway Pundit published an article by James "Jim" Hoft to its website with the headline: "Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote."[57]  In this article, Hoft and Gateway Pundit developed Oltmann's story by adding photo and video, additional context, and links to ostensibly related content. They rely on Oltmann as a source of information to report on Dr. Coomer and Dominion, asserting:

> Joe Oltmann did a deep dive on Dr. Eric Coomer who is responsible for the strategy and Security of Dominion Voting Systems.  Oltmann posted a Facebook post by Coomer from June. Dr. Coomer retweeted the "Antifa" manifesto letter to President Trump.  Needless to say Dr. Coomer is NOT a Trump supporter!

---

[55] On December 6, 2020 alone, Oltmann claimed he had "been busy doing 15 interviews in the last 2 days." *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020).

[56] Oltmann explained after sharing an alleged photograph of Dr. Coomer's house, "I have been kicked off of Twitter for exposing Eric Coomer." *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020).

[57] Jim Hoft, THE GATEWAY PUNDIT, Nov. 13, 2020.

56.     Also on November 13, 2020, Michelle Malkin[58] hosted an interview with Oltmann, who was identified as a representative of FEC United, on her personal YouTube channel, #MalkinLive, which has approximately 100,000 subscribers.[59]   During the MalkinLive interview, Oltmann again falsely alleged that Dr. Coomer was an anonymous Antifa activist on a purported call Oltmann claimed to have infiltrated well before the election.[60]  Yet only after the election did Oltmann allegedly determine from this call that Dr. Coomer subverted the presidential election to elect Joe Biden.[61]   Malkin published these false statements despite their inherent improbability, the unreliability of her source, and the lack of credible evidence in support of these allegations.  Malkin had no credible evidence that an "Antifa conference call" actually happened; that Dr. Coomer was present on the call; that the comments attributed to Dr. Coomer were actually spoken; and that the alleged election fraud actually occurred.  Malkin took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary.  At one point in the interview, Oltmann rhetorically directed his commentary to Dr. Coomer, and said:

---

[58] Notably, Malkin joined Newsmax in May 2020 as a political contributor and host of a Newsmax television show, Michelle Malkin Sovereign Nation.  *See* Bill Hoffmann, *Acclaimed Journalist Michelle Malkin Joins Newsmax TV*, May 21, 2020; *see also* Newsmax TV, Hosts, https://www.newsmaxtv.com/host-bios (last visited Dec. 22, 2020).

[59] Michelle Malkin, *#MalkinLive: U.S. Elections*, YOUTUBE (Nov. 13, 2020).  In this interview, Malkin identified Oltmann as Colorado businessman and founder of FEC United.  Oltmann explained why he formed FEC United, spoke on behalf of FEC United during the interview, and promoted FEC United with a large banner across the screen reading, "For more info: FECUnited.com."

[60] Oltmann admitted in this interview his efforts to infiltrate Antifa stemmed from his belief they were conspiring against him, saying "So these journalists started attacking me. . . I wanted to know why . . . So I set out to uncover Antifa within the journalist community." *See id.*

[61] Oltmann explained to Malkin that his investigation of this purported call was premised on a google search and premised on unknown and unverified speakers, stating "somebody named Eric came on . . . someone says who's Eric . . . and someone answers." *See id.*

> You're either the one who is responsible for it, which is what it looks like, or you have other people that need to take the fall with you, and that might lessen the opportunity for you to get the death penalty, because frankly, I think the treason is punishable by death.

Following this interview, Malkin began publishing additional false statements in tweets, promoting her interview of Oltmann and the allegations of fraud to her followers.[62] Like Oltmann, Malkin conceived a story that the results of the election were fraudulent and consciously set out to establish that Dr. Coomer perpetuated this fraud.[63]

57. Similarly, Eric Metaxas hosted an interview with Oltmann, who was again identified as a representative of FEC United, on his radio talk show and podcast on November 24, 2020.[64] This interview was also published on Metaxas's YouTube channel, The Eric Metaxas Radio Show, which has approximately 185,000 subscribers.[65] During

---

[62] Michelle Malkin (@michellemalkin), TWITTER (Nov. 13, 2020, 12:43 PM) ("Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop hatred-inciting rants of #EricCoomer, VP of strategy/security of Dominion Voting Systems. 'What if I told you he is a major shareholder' in Dominion & 'owns patents associated with other voting systems?' #MalkinLive."); (Nov. 13, 2020, 12:46 PM) ("Full interview with #joeoltmann on #ericcoomer #dominion here ==>"); (Nov. 13, 2020, 2:31 PM), ("What are they trying to hide? #DominionVotingSystems."); (Nov. 15, 2020, 12:09 PM) ("ICYMI – Dominion, Antifa & #EricCoomer exposed by Joe Oltmann on #MalkinLive last week. Joe was suspended by Twitter but you can find him on @parler."); (Nov. 16, 2020, 12:29 PM) ("ICYMI: #ExposeDominion #WhoIsEricCoomer #JoeOltmann Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath -- His Internet Profile is Being Deleted and Erased (AUDIO)."); (Nov. 16, 2020, 12:29 PM) (commenting with the hashtags "#ExposeDominion" and "#WhoIsEricCoomer."); (Nov. 19, 2020, 12:19 PM) ("In case you missed it: My interview with #JoeOltmann from six days ago exposing #EricCoomer #Antifa #ExposeDominion.").

[63] Malkin also has a history of advancing varying allegations of voter fraud to support her political beliefs and her preferred candidates as well as to promote herself and her businesses interests. *See e.g.*, Michelle Malkin, *Who's Behind Shady Ballot Harvesting Schemes*, RASMUSSEN REPORTS, Sept. 30, 2020 (separate allegations of voter fraud); *Out of the Shadows . . . and Into the Voting Booth*, RASMUSSEN REPORTS, Dec. 18, 2019 (separate allegations of voter fraud). Malkin is also an admitted supporter of President Trump. *See, e.g.*, Michelle Malkin, *No Time for Phony Healing*, RASMUSSEN REPORTS, Nov. 11, 2020 ("We, the 71 million Americans who voted to reelect Donald J. Trump, do not surrender.").

[64] Eric Metaxas, Joe Oltmann, THE ERIC METAXAS SHOW PODCAST (Nov. 24, 2020).

[65] The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020). In this interview, Oltmann was identified as a Colorado businessman and founder of FEC United. Oltmann explained why he formed FEC United and spoke on behalf of FEC United during the interview.

the Metaxas interview, Oltmann again falsely alleged that Dr. Coomer was an anonymous Antifa activist on a purported call Oltmann claimed to have infiltrated well before the election.[66] And again allegedly determined from this call that Dr. Coomer subverted the presidential election.[67] Metaxas also published these false statements despite their inherent improbability, the unreliability of his source, and the lack of credible evidence in support of these allegations. Metaxas also had no credible evidence that an "Antifa conference call" actually happened; that Dr. Coomer was present on the call; that the comments attributed to Dr. Coomer were actually spoken; and that the alleged election fraud actually occurred. Metaxas also took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary. Following this interview, Metaxas, like Malkin, published additional false statements in tweets, promoting his interview of Oltmann and the allegations of fraud to his followers.[68] Like Oltmann, Metaxas conceived of a story that

---

[66] Oltmann admitted in this interview his efforts to infiltrate Antifa stemmed from his belief that Antifa journalists were conspiring against both him and FEC United following his efforts to reopen small businesses in Colorado last September.

[67] Oltmann explained to Metaxas that his investigation of this purported call was premised on a google search and premised on unknown and unverified speakers in the purported call, stating "This guy named Eric started talking, and then somebody asked who Eric was. And they said, 'Eric's a Dominion guy.'" Despite this, Metaxas took no actions or efforts to corroborate or verify the baseless allegations before publishing them.

[68] Eric Metaxas (@ericmetaxas), TWITTER (Nov. 24, 2020, 5:26 PM) ("Today Joe Oltmann explained how after infiltrating Antifa he bumped into someone working w/them named Eric Koomer [sic] – who was the head of Security and Safety at #Dominion – and who PROMISED the Antifa folks that 'effing' Trump WOULD NOT WIN! Please RT.").

the results of the election were fraudulent and consciously set out to establish that

Dr. Coomer perpetuated this fraud.[69]

58.     On November 14, 2020, Gateway Pundit began publishing successive

articles written by Hoft based and built upon Oltmann's false allegations.  Gateway Pundit

and Hoft asserted, "Oltmann said that as the conversation continued, someone asked,

'What are we gonna do if F*cking Trump wins?'  Oltmann paraphrased how Eric (the

Dominion guy) responded, 'Don't worry about the election, Trump's not gonna win. I

made f*cking sure of that!'"[70]  Gateway Pundit repeatedly identified Oltmann, a "Denver

business owner" and "founder of FEC (Faith Education Commerce) United," as the source

of its articles about Dr. Coomer and Dominion, stating:

> The Gateway Pundit's Jim Hoft interviewed Denver business owner Joe
> Oltmann on Sunday.  Oltmann, the founder of FEC (Faith Education
> Commerce) United, revealed how he infiltrated Antifa and how during a
> conversation with Antifa members, he discovered "Eric from Dominion"
> was allegedly part of a chat during the week of September 27, 2020.

Similarly, Gateway Pundit and Hoft took no efforts to verify or corroborate these false

allegations.  Gateway Pundit and Hoft equally had no credible evidence of any "Antifa

conference call;" that Dr. Coomer was part of this purported call; or that Dr. Coomer

---

[69]  Metaxas has advanced varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote his businesses interests.  *See e.g.*, The Eric Metaxas Radio Show, *Attorney Jenna Ellis—On Democrats Changing Election Laws for the 2020 Election*, YOUTUBE (May 11, 2020); Eric Metaxas (@ericmetaxas), TWITTER (Nov. 7, 2020, 4:35 PM) (in response to President Trump's allegations of voter fraud due to allegations related to observers and mail-in-ballots, "If an election bears signs of fraud—so that the will of the people was thwarted—it is not an official election. STAY TUNED. And pray.  This is absolutely not over, despite what some seem to think.  The American people will not roll over.").

[70]  *See* Jim Hoft, *Report: Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online*, THE GATEWAY PUNDIT, Nov. 14, 2020; *Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile Is Being Deleted and Erased (AUDIO)*, THE GATEWAY PUNDIT, Nov. 16, 2020 ("Oltmann told The Gateway Pundit he believes Eric Coomer is mentally ill and a sociopath.").

committed election fraud. Gateway Pundit and Hoft also took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary. Oltmann has admitted there is no recording of this call.[71] Gateway Pundit and Hoft knowingly and recklessly published these false statements despite their inherent improbability, the unreliability of the source, and the lack of credible evidence. Gateway Pundit and Hoft made these false statements to support their preconceived conspiracy that the election was fraudulent.[72]

59. On November 17, 2020, OANN Chief White House Correspondent Chanel Rion published false statements regarding Dr. Coomer, tweeting "Dominion Director of Strategy and Security, #EricCoomer: 'Trump won't win. I made F***ing sure of that.'"[73] As a representative of OANN and national broadcast reporter, Rion has a Twitter following of roughly 588,000 people with followers across the United States, including those in Colorado. Rion's November 17 tweet referencing Dr. Coomer garnered more than 40,000 likes. OANN and Rion went on to broadcast false allegations of the statements and actions Oltmann attributed to Dr. Coomer of election fraud, including a

---

[71] *See* Joseph Oltmann, et al., *Ep. 196–Dominion Voting Machines*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) (In response to the statement "but we don't have a recording," Oltmann stated "[i]t doesn't matter if I don't have it recorded.").

[72] Gateway Pundit and Hoft have a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests. *See* Joe Hoft, *ROGER STONE EXCLUSIVE: How the Democrats Plan to Steal the 2020 Election*, THE GATEWAY PUNDIT, October 31, 2020; Joe Hoft, *2020 Election Prediction: Despite Massive Headwinds and Democrat Attempts to Steal Election, President Trump Will Win in Larger Landslide than 2016*, THE GATEWAY PUNDIT, October 23, 2020; Cassandra Fairbanks, *4Chan Users Claim To Have Found Way To Easily Change People's Voter Registration and Cancel Ballots Online in Washington and Oregon*, THE GATEWAY PUNDIT, October 18, 2020; Joe Hoft, *ELECTION FRAUD: Pennsylvania Rejects 334,000 Duplicate Ballots Already; Kentucky Reports Bins of Ballots Discarded*, THE GATEWAY PUNDIT, October 17, 2020.

[73] Chanel Rion OAN (@ChanelRion), TWITTER (Nov. 17, 2020, 8:35 AM).

three-part report focusing on Dominion and Dr. Coomer, which President Trump retweeted to his followers.[74] Given OANN and Rion's coverage of President Trump and the Trump Campaign, the President has increasingly promoted their reporting.[75] President Trump has a national audience of over 88,000,000 followers on Twitter, including a substantial number of Colorado residents. Similarly, OANN and Rion took no efforts to verify or corroborate these false allegations before publishing them and disregarded reliable sources establishing the contrary. They had no credible evidence of any "Antifa conference call;" that Dr. Coomer was part of this purported call; or that Dr. Coomer committed election fraud. Instead, like other Defendants, OANN and Rion knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[76]

---

[74] *See* Chanel Rion, *Dominion-izing the Vote*, Nov. 21, 2020, YOUTUBE (saying "In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters. What does he mean when he says 'Trump won't win. I made f-ing sure of that.' Nothing?"); *Top Dominion Exec: Trump Is Not Going to Win. I Made F\*\*ing Sure of That*, Nov. 29, 2020, YOUTUBE (publishing Oltmann saying "Eric Coomer was this, you know, he's not just Antifa, he was responsible for putting his finger on the scales of our election" and adding "If Coomer is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason. Unfortunately, the question is, will the FBI step up to investigate?"); *see also* Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 18, 2020, 11:41 PM), (Nov. 21, 2020, 10:30 PM), (Nov. 21, 2020, 10:31 PM), and (Nov. 21, 2020, 10:32 PM).

[75] Margaret Sullivan, *When Fox News disappoints, Trump has a backup: the conspiracy theory-peddling OANN*, WASH. POST, June 10, 2020, https://www.washingtonpost.com/lifestyle/media/when-fox-news-disappoints-trump-has-a-backup-the-conspiracy-peddling-oann/2020/06/10/c2a6ec8e-ab1f-11ea-9063-e69bd6520940_story.html; Jason Wilson, *OANN: what is the alternative far-right media outlet Trump is pushing?*, GUARDIAN, Nov. 16, 2020, https://www.theguardian.com/us-news/2020/nov/16/oann-what-is-tv-network-trump-is-pushing.

[76] OANN has a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests. *See* OANN Newsroom, *Several States Investigating Accounts of Mail-In Voter Fraud*, OANN, Sept. 27, 2020; OANN Newsroom, *President Trump Slams Mail-In Voting As A 'Scam,' Says It Will Be 'A Disaster,'* OANN, Sep. 19, 2020; OANN Newsroom, *AG Barr: Mail-In Ballots Enable Fraud, Voter Coercion*, OANN, Sept. 3, 2020.

60.    On November 17, 2020, Eric Trump, a representative and surrogate of President Trump's campaign, tweeted the following:[77]



With his relationship to the President and the Trump Campaign, Eric Trump has a Twitter following of roughly 4.5 million people, including a significant number of Colorado

---

[77] Eric Trump (@EricTrump), TWITTER (Nov. 17, 2020, 2:49 PM).

residents.[78]  Eric Trump's November 17 tweet falsely attributed the quote "Don't worry

about the election, Trump's not gonna win.  I made f*cking sure of that!" to Dr. Coomer

and linked a Gateway Pundit article identifying "Denver Business Owner" Oltmann as its

source for allegations against Dr. Coomer and Dominion.  This false statement garnered

more than 38,000 likes.  While Eric Trump's published tweet was intended to reach a

national audience to cast doubt on the integrity of an election for the benefit of the Trump

Campaign, it directly identified and targeted Colorado and Coloradan audiences.

As intended, followers in Colorado received Eric Trump's message and responded.[79]

Despite the lack of evidence, unreliability of the source, and improbability of the

allegations, Eric Trump, as a representative of the Trump Campaign, promoted a

preconceived conspiracy of election fraud in support of the Trump campaign.[80]  Similarly,

---

[78] Eric Trump has campaigned on behalf of the Trump Campaign in Colorado and specifically in relation to FEC United.  *See* Erik Maulbetsch, *FEC United Founder Threatens Journalists at GOP Campaign Event*, COLO. TIMES RECORDER, Oct. 16, 2020, https://coloradotimesrecorder.com/2020/10/fec-united-founder-threatens-journalists-at-gop-candidate-event/31689/ (reporting a political event held by FEC United and Oltmann in Colorado featured video message from Eric Trump before the presidential election).

[79] *See e.g.*, Liesl Bryan (@LieslBryan), TWITTER (Nov. 17, 2020, 3:43 PM) ("We need a revote in Colorado then!"); Optimistforever – blacklisted by commies (@99Cornelia6), TWITTER (Nov. 17, 2020, 2:53 PM) ("Maybe Colorado is blue for the same reason!!"); Bink's MamaBear (@Binks_MamaBear), TWITTER (Nov. 17, 2020, 3:09 PM) ("Yet, no one is investigating Colorado's results. Why?!?! @JenaGriswold insisted our elections were perfect.  I'm certain if they were audited Gardner & House would've won.  There's an active campaign to recall polis.  @pnjaban @SidneyPowell1 @RonColeman @LLinWood."); D W Jenkins(@DWJenkins1), TWITTER (Nov. 17, 2020, 2:51 PM) ("Denver and all the front range need to be scrutinized").

[80] Eric Trump and the Trump Campaign have a history of advancing varying allegations of voter fraud to support and promote their political advancement.  *See* Donald J. Trump (@realDonaldTrump), TWITTER (Jun. 22, 2020, 6:10 AM) (separate allegations of fraud); *see also* Tiffany Hsu, *Conservative News Sites Fuel Voter Fraud Misinformation*, N.Y. TIMES, Oct. 25, 2020, https://www.nytimes.com/2020/10/25/business/media/voter-fraud-misinformation.html; Pat Beall et. al., *We analyzed a conservative foundation's catalog of absentee ballot fraud: It's not a 2020 election threat*, USA TODAY, Oct. 20, 2020, https://www.usatoday.com/in-depth/news/investigations/2020/10/20/trumps-absentee-ballot-fraud-claims-not-supported-evidence/5969447002/; Arielle Mitropoulos, *Trump's ballot fraud allegations embellished and not widespread: Experts*, ABC, Oct. 20, 2020, https://abcnews.go.com/Politics/trumps-ballot-fraud-allegations-embellished-widespread-experts/story?id=73701060.

Eric Trump took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary.

61.     Furthering the false allegations, on November 19, 2020, the Trump Campaign provided an update on its legal challenges to the election from the Republican National Committee in Washington D.C.[81]  Among those who spoke at the press conference were personal attorneys for President Trump, as well as the Trump Campaign, including (at that time) Sidney Powell, Rudolph Giuliani, and Jenna Ellis.[82]  During the press conference, Powell falsely stated:

> Speaking of Smartmatic's leadership, one of the Smartmatic patent holders, Eric Coomer I believe his name is, is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden, nothing to worry about here, and he was going to, they were going to f— Trump.  His social media is filled with hatred for the President, and for the United States of America as a whole, as are the social media accounts of many other Smartmatic people.

Giuliani furthered these unfounded attacks on Dr. Coomer, stating:

> By the way, the Coomer character, who is close to Antifa, took off all of his social media, haha, but we kept it.  We've got it.  The man is a vicious, vicious man.  He wrote horrible things about the president.  He is completely – he is completely biased.  He is completely warped.  And, he specifically says, that they are going to fix this election.  I don't know what you need to wake up, to do your job, and inform the American people, whether you like it or not, of the things they need to know.

> This is real.  It is not made up.  It is not - there is nobody here that engages in fantasies.  I've tried a hundred cases.  I've prosecuted some of the most

---

[81] This event was broadcast on C-SPAN.  It has also been substantially reported across various media outlets, including CNN, Fox, The New York Times as well as Defendants OANN and Newsmax.  President Trump also tweeted this news conference.  *See* Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 19, 2020, 6:59 AM) ("Important News Conference today by lawyers on a very clear and viable path to victory.  Pieces are very nicely falling into place.  RNC at 12:00 P.M.")

[82] *See* Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 14, 2020, 9:11 PM) ("Rudy, Giuliani, Joseph diGenova, Victoria Toensing, Sidney Powell, and Jenna Ellis, a truly great team, added to our wonderful lawyers and representatives!").

dangerous criminals in the world.  I know crimes.  I can smell them.  You
don't have to smell this one.  I can prove it to you eighteen different ways.  I
can prove to you that he won Pennsylvania by 300,000 votes.  I can prove
to you that he won Michigan by probably 50,000 votes.

When I went to bed on election night, he was ahead in all of those states,
every single one of those states.  How is it they all turned around?  Every
single one of them turned around.  Or is it more consistent that there was a
plan to turn them around?  And since there are witnesses who say there was
a plan to turn them around, and it kind of begs credulity to say that it all
happened in every single state, my goodness this is how you win cases in a
courtroom."

These statements are false.  Dr. Coomer is not part of Smartmatic, which is a competitor

of Dominion.  He never had a conversation with anyone claiming to be Antifa, he never

uttered words suggesting he would rig the election, and he never took actions to rig the

election.  As noted above, Dr. Coomer's social media was private and, of course, under the

First Amendment to the Constitution, he is entitled to his political opinion.

62.      The Trump Campaign and its representatives knowingly and recklessly

made these statements despite the lack of credible evidence, the unreliability of their

sources, and the improbability of the allegations.  They similarly took no actions or efforts

to corroborate or verify the baseless allegations before publishing them and disregarded

reliable sources establishing the contrary.  They continued to promote a preconceived

conspiracy of election fraud in support of their political ends.[83]  In response to inquiries

from members of the press in attendance at the news conference, Jenna Ellis, baldly

informed them, "Your question is fundamentally flawed when you're asking, 'Where is the

---

[83] Notably, the legal challenges raised by the Trump Campaign after the election failed to allege or support
the false allegations raised to the public.  *See* Alanna Durkin Richer, et. al., *EXPLAINER: A look at Trump's
long-shot legal challenges,* AP, Nov. 18, 2020, https://apnews.com/article/donald-trump-legal-
challenges-explained-075b2ef6f75e9dd3026d54fc38b81920.

evidence?'" Following the press conference, various news publications ran headlines questioning the reliability of the Trump Campaign's allegations.[84] Despite concerns raised by news outlets, a significant portion of the public trusts President Trump, his campaign, and his campaign representatives and took these false allegations against Dr. Coomer seriously.[85]

63. On November 20, 2020, Defendant Newsmax interviewed Powell on "The Howie Carr Show" and identified her as an attorney for the President's Campaign. In this interview, Carr asked Powell to confirm that there was alleged evidence of widespread voter fraud, that votes cast had been changed through voting machines, that millions of votes had been removed from President Trump and given to President-Elect Joe Biden, and that Dr. Coomer through Dominion was part of this conspiracy to subvert the presidential election. Carr then asked Powell whether Dr. Coomer actually stated "Don't worry about President Trump, I already made sure that he's going to lose the election." Powell falsely attributed these statements to Dr. Coomer, stating "Yes, it's true. We have an affidavit to that effect and I think we have a copy of the call."[86] She further alleged

---

[84] See e.g., Jane C. Timm, *Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference*, NBC, Nov. 19, 2020, https://www.nbcnews.com/politics/donald-trump/rudy-giuliani-baselessly-alleges-centralized-voter-fraud-free-wheeling-news-n1248273; Tara Subramaniam, et al., *Fact checking Giuliani and the Trump legal team's wild, fact-free press conference,* CNN, Nov. 20, 2020, https://www.cnn.com/2020/11/19/politics/giuliani-trump-legal-team-press-briefing-fact-check/index.html; Andrew Solender, *More Republicans Break with Trump On Election After Giuliani Press Conference*, FORBES, Nov. 20, 2020, https://www.forbes.com/sites/andrewsolender/2020/11/20/more-republicans-break-with-trump-on-election-after-giuliani-press-conference/?sh=6d9007cb6013.

[85] See Anthony Salvanto et. al., *CBS News Poll: Most feel election is "settled" but Trump voters disagree*, CBS, Dec. 13, 2020.; *see also infra* § IV(D).

[86] Howie Carr, *The Howie Carr Show*, NEWSMAX, Nov. 20, 2020. The affidavit Powell referenced was made by Oltmann. *See e.g.*, *Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 1, ¶¶ 94-101. Oltmann, in an interview on the Peter Boyles Show on November 17, 2020 also confirmed he had been "in constant contact with the Trump lawyers."

Dr. Coomer had disappeared, and Dominion had closed its offices in Denver and Toronto. Powell had no "copy of the call" or recording.[87]  Dr. Coomer had not "disappeared."  And Dominion had not closed its offices.  These allegations were capable of verification.  Yet, neither Newsmax nor Powell made any legitimate effort to verify them before publishing. They had no credible evidence or reliable source.  They again disregarded reliable sources establishing the contrary.  Like other Defendants, Newsmax and Powell knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[88]

64.     On this same day, Powell appeared in another interview with Maria Bartiromo and again alleged she had a tape of Dr. Coomer saying he was going to rig the election for Biden.[89]  Again, she had no tape.  However, Powell apparently did not have time to appear on Fox News that same day with Tucker Carlson.  That evening, Carlson published an opinion piece wherein he stated, "We asked the Trump campaign attorney

---

[87] Oltmann has admitted he has no recording of the alleged "Antifa Conference Call" he infiltrated. *See* Joseph Oltmann, et al., *Ep. 196—Dominion Voting Machines,* CONSERVATIVE DAILY PODCAST (Nov. 9, 2020).

[88] Newsmax has a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests.  *See* John Gizzi, *Pennsylvania Conservatives Echo Trump on Possible Voter Fraud,* NEWSMAX, Sept. 28, 2020 (separate allegations of voter fraud); Michael Dorstewitz, *On Elections Trump Is Right: Protect Integrity, Beware of Fraud,* NEWSMAX, Sep. 30, 2020 (separate allegations of voter fraud).  Powell also has a history of advancing unsupported theories and allegations of fraud to support specific political beliefs and specific political candidates as well as to promote her businesses interests.  *See, e.g.*, Lou Dobbs, *Sidney Powell: Trump has to fight for election integrity,* FOX, Nov. 6, 2020 (alleging that an Obama-era supercomputer known as THE HAMMER had flipped thousands of votes from Trump to Biden); Sidney Powell, *Licensed to Lie* (2nd ed. 2018) (alleging deep state corruption in the Justice Department); Jeremy W. Peters, et al., *What We Know About Sidney Powell, the Lawyer Behind Wild Voting Conspiracy Theories*, Dec. 8, 2020, https://www.nytimes.com/article/who-is-sidney-powell.html.

[89] *See* Maria Bartiromo, *Mornings with Maria*, FOX, Nov. 20, 2020 (Powell falsely stating "We've got Eric Coomer admitting on tape that he rigged the election for Biden and hated Trump . . . We have pictures of him in other countries helping people rig elections.  So he's got a long history of accomplishing the result that they want accomplished, and I'm sure that it's for money.").

for proof of her bombshell claims.  She gave us nothing."[90]  Carlson went on to explain that:

> [W]e invited Sidney Powell on the show.  We would have given her the whole hour.  We would have given her the entire week, actually, and listened quietly the whole time at rapt attention.
>
> But she never sent us any evidence, despite a lot of polite requests.  When we kept pressing, she got angry and told us to stop contacting her.  When we checked with others around the Trump campaign, people in positions of authority, they also told us Powell had never given them evidence to prove anything she claimed at the press conference.

65.    On November 22, 2020, the Trump Campaign purportedly removed Powell from its legal team.  "Sidney Powell is practicing law on her own," Trump's personal and campaign lawyers said in the statement.[91]  "She is not a member of the Trump Legal Team.  She is also not a lawyer for the President in his personal capacity."  That did not stop Powell's false statements against Dr. Coomer.

66.    After being removed from the Trump Campaign's legal team, Powell formed her own "Defending the Republic" legal defense fund, a 501(c)(4) nonprofit located in Dallas.  On information and belief, she has raised millions of dollars to fund her own attacks on the election.

67.    Powell filed highly publicized lawsuits in Arizona, Georgia, Wisconsin, and Michigan, in which Dr. Coomer is a central figure.  Powell promised the press she would "release the Kraken" with extensive evidence, but the lawsuits that followed were filled with conspiracy theories, speculation, and typographical errors.  Without evidence, she

---

[90] Tucker Carlson, *Tucker Carlson: Time for Sidney Powell to show us her evidence*, FOX, Nov. 19, 2020.

[91] *See* Kyle Cheney, *Trump Campaign cuts Sidney Powell from president's legal team*, POLITICO, Nov. 22, 2020, https://www.politico.com/news/2020/11/22/trump-campaign-sidney-powell-legal-439357.

alleged a massive criminal conspiracy under Dr. Coomer's direction and accused

Dr. Coomer of anti-American and criminal conduct:

- In the United States District Court for the Northern District of Georgia, Powell quotes Oltmann's interview with Michelle Malkin and recounts Oltmann's story about "Eric from Dominion" saying he fixed the election on an Antifa call.[92]   Judge Timothy Batten dismissed the suit less than two weeks after it was filed.[93]

- In the United States District Court for the Eastern District of Michigan, Powell again references the Malkin interview with Oltmann.[94]  In a scathing order, Judge Linda V. Parker dismissed the case, noting "Plaintiffs are far from likely to succeed in this matter."[95]

- In the United States District Court of Arizona, Powell alleged Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA, a domestic terrorist organization where he recorded Eric Coomer representing, "Don't worry about the election. Trump is not going to win . . ."[96] Judge Diane J. Humetewa dismissed this matter, stating "Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court."[97]

- In the United States District Court for the Eastern District of Wisconsin, Powell again relies on Oltmann to falsely allege that Dr. Coomer was present at an Antifa meeting, made allegations to subvert the election, and suggests he did in fact subvert the election.[98] Judge Pamela Pepper dismissed this matter, stating "Federal judges do not appoint the president in this country.  One

---

[92] *Pearson v. Kemp, et al.*, No. 1:20-cv-04809-TCB (N.D. Ga.) at Dkt. No. 1, ¶ 120.

[93] *Id.* at Dkt. No. 74.

[94] *King, et al., v. Whitmer, et al.*, No. 2:20-cv-13134-LVP-RSW (E. Mich.) at Dkt. No. 1, ¶ 153.

[95] *Id.* at Dkt. No. 62, p. 35 (the Court goes on to say "In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government.").

[96] *Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 1, ¶ 100.

[97] *Id.* at Dkt. No. 84, p. 28–29.

[98] *Feehan, et al., v. Wis. Elections Comm'n, et al.*, No. 2:20-cv-01771-PP (E.D. Wisc.) at Dkt. No. 1, ¶¶ 99-100.

wonders why plaintiffs came to federal court and asked a federal judge to do so."[99]

68.     All of the Defendants relied on false statements made by one another to advance a narrative that had no basis in fact.  Together, Defendants conceived of a story that the results of the election were fraudulent and consciously set out to establish that Dr. Coomer perpetuated this fraud so as to further their own ends.  To do this, Defendants disregarded credible evidence and relied on inherently unreliable sources all to form their inherently improbable accusations.  Defendants' conduct has resulted in direct harm to Dr. Coomer through their encouragement of violence and threats.

**D.     *The harm Defendants caused Dr. Coomer.***

69.     Social media exploded with threats and attacks as the lies spread.  For example, on November 21, 2020, anonymous Reddit user "Pher001" posted an article to the subreddit /r/donaldtrump titled "Eric Coomer needs to be arrested before he tries to run/fly away."  The post contained the following image:

---

[99] *Id.* at Dkt. No. 83, p. 2, 45.



Some of the responses among the hundreds written to this one post include:

"Fking maggot";

"Most wanted, live, to testify.  Report if you know his were abouts. Report any sight-seeing of him.  But I think he is going to hide in Venezuela!";

"If this man disenfranchised people of their votes he deserves worse than life in prison";

"He disenfranchised millions of people's voting rights.  Wars are fought over that. He deserves everything he gets";

"His fucken face makes me so fucken mad.  FUCK HIM!! TRUMP WON!";

"A good mug for USA's Top 10 Terrorist list.  Wanted DEAD or ALIVE";

"This man will be dead within 2 weeks."

70.     Given the flood of negative publicity, including death threats, Dominion was

forced to alter its website and attempted to correct the numerous falsehoods Defendants

and others had spread about it and its employees.[100]  Dominion posted on its website that "Dominion is not shuttering its offices.  Employees have been encouraged to work remotely and protect their social media profiles due to persistent harassment and threats against their personal safety.  Dominion employees are being forced to retreat from their lives due to personal safety concerns, not only for our employees themselves, but also for their extended families."[101]

71.    Dr. Coomer is the Dominion employee who has taken the brunt of these attacks.[102]  He was forced to flee his home in response to the credible threats he has been receiving and continues to receive.[103]  He has had to sever ties with friends and family members in order to stay in seclusion.[104]

---

[100] Dominion Voting Systems, *Election 2020: Disinformation is Dangerous and Threatens Democracy*, https://www.dominionvoting.com ("Get the Facts About Dominion and Its Voting Systems") (last visited Dec. 22, 2020); John Poulos, *Fake Claims About Dominion Voting System Do Real Damage*, WSJ, Nov. 30, 2020, https://www.wsj.com/articles/fake-claims-about-dominion-voting-systems-do-real-damage-11606755399.

[101] *See* Dominion Voting Systems, *Setting the Record Straight: Facts & Rumors*, https://www.dominionvoting.com (previous webpage on Nov. 30, 2020).

[102] Oltmann has published statements across media platforms referring to Dr. Coomer as mentally ill, an unhinged sociopath, a creep, a fraud, a cheat, a scumbag, a lynchman, a terrorist, a traitor, evil, and even suggesting it is unsafe to receive medical treatment for fear of Antifa activists and Dr. Coomer compromising his care.

[103] Oltmann has threatened Dr. Coomer.  *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020) ("Blow this shit up.  Share, put his name everywhere.  No rest for this shitbag.  Eric Coomer, Eric Coomer, Eric Coomer . . . Eric we are watching you . . .").

[104] Oltmann has allegedly revealed personally identifying information about Dr. Coomer.  *See* Joseph Oltmann, et al., *Ep. 217–Shameful Dems Attacking Election Witnesses*, CONSERVATIVE DAILY PODCAST (Dec. 3, 2020), (Oltmann stating "I want everybody to put out on their social media account, 'Where is Eric Coomer?' I found him.  Just want you to know I found him . . . I have pictures of him coming out of hiding . . . I know he drives a truck.  I know his truck is parked at his house.").  These actions are especially dangerous given Oltmann's involvement with an armed paramilitary civilian group with ties to FEC United.  *See* United American Defense Fund, *Defend and Protect What Is Ours*, https://fecunited.com/uadf/ (last visited Dec. 22, 2020).

72.     Calls for Dr. Coomer's capture and arrest have spread rapidly across the internet and on social media.  For example,



73.     Threats grew more intense and specific.  For example, on November 25, 2020, Twitter user @AngLindva stated the following:



74.     Dr. Coomer began to receive threatening text messages from unknown out-of-state numbers sent directly to his cell phone in Colorado.  Some of these messages included:

"[W]e are already watching you.  Come clean and you will live."

"What is the penalty for TREASON?"

"FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA. Does that chant sound familiar. PB have you and there is nowhere you can run."

"RUN."

75.     Oltmann's efforts to incite violence against Dr. Coomer are still escalating with Oltmann recently posting:

> They certify this election and we go to war . . . Now it's time we fight. And when I mean fight I don't mean yelling it's not fair. I mean we fight these communist, marxist lying shitbags. That means Eric Coomer never has peace and we smash each and every voting machine in every state that uses them. We will not be silenced by a bunch of BLM and Antifa communist asshats. It's time we take back our America by any and all means necessary . . .
>
> . . . Eric Coomer, you are a traitor. We are coming for you and your shitbag company. We are coming for Antifa and we are coming for your politician friends. Share this . . . share Eric's name . . . If they certify the electors today after this audit, we have an obligation to forcibly remove them all. This is not a drill, our country is not their evil playground. God is at the wheel, but we are the warriors that must do the work of men to repel evil. These people are evil, and they are liars, cheats and thieves out to take what they did not earn or deserve. Where will you stand?[105]

76.     The onslaught of threats Dr. Coomer has experienced and the necessary measures he has been forced to take to protect himself are the direct result of Defendants' defamatory conduct. Dr. Coomer has and will continue to experience serious and severe emotional and physical distress as a result. The harm Defendants have caused to Dr. Coomer's reputation, privacy, safety, and earnings, and other pecuniary loss is immense.

---

[105] Joseph Oltmann (@Joeoltmann), Parler (Dec. 14, 2020).

### V.    CAUSES OF ACTION

### A.    *Defamation Against All Defendants*

77.    Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

78.    Dr. Coomer is neither a public official nor a public figure.  He is a private individual that Defendants, by their own conduct and for their own ends, targeted and elevated into the public sphere.  Defendants intentionally caused the publication of false and unprivileged oral and written statements about Dr. Coomer.  Their false statements have been seen, read, or heard by millions of individuals across the United States, across Colorado, and specifically within Denver County, Colorado.

79.    The defamatory meaning of Defendants' false statements is apparent from the face of their publication, refer to Dr. Coomer, and are understood to be about him. These statements are defamatory per se as they inherently injure Dr. Coomer's reputation; impute a crime; and disparage his business practices.  On their face, they falsely assert Dr. Coomer has perpetrated a conspiracy that undermined the integrity of the election; disenfranchised millions of voters; and fraudulently elected the president of the United States.  Defendants falsely allege Dr. Coomer accomplished this through fraudulent business practices as an employee of Dominion.  Defendants falsely allege Dr. Coomer is a traitor.  Defendants' false statements have subjected Dr. Coomer to scorn, outrage, and threats from his community.   Their false statements have harmed Dr. Coomer's reputation by lowering him in the estimation of at least a substantial and respectable minority of the community.

80.     Defendants published their false statements negligently.     Defendants
published these statements with actual malice.  Defendants knew or had reason to know
that these statements were false and published their statements with knowledge or
reckless disregard of their falsity.  Defendants failed to contact and question obvious
available sources for corroboration; disregarded reliable sources refuting their claims;
had no credible bases for the false allegations made; fabricated specific allegations;
treated speculation and innuendo as evidence; and published their allegations in a
manner calculated to create a false inference.  Their allegations were inherently
improbable, derived from unreliable sources, and unsupported by evidence.  Defendants
preconceived a conspiracy and then set out to establish that conspiracy to further their
own ends.

81.     As a direct and proximate result of Defendants' conduct, Dr. Coomer has
suffered significant actual and special damages including, without limitation, harm to his
reputation, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.

**B.**     ***Intentional Infliction of Emotional Distress Against All Defendants***

82.     Plaintiff fully incorporates the foregoing paragraphs, as well as the
Introduction of this Complaint.

83.     Defendants engaged in extreme and outrageous conduct.  Their conduct was
calculated to cause Dr. Coomer severe emotional distress.  Defendants falsely alleged
Dr. Coomer perpetrated a criminal conspiracy against every American citizen to overturn
the results of the presidential election.  They branded Dr. Coomer a traitor and made him
a pariah.  They encouraged the dissemination of these false claims.  They exploited public

fear and directed vitriol and threats against Dr. Coomer. Oltmann has directly made terroristic threats against Dr. Coomer, calling on people to harm Dr. Coomer and placing Dr. Coomer in fear of imminent injury and death. Defendants have knowingly elevated Oltmann's statements and adopted his false allegations and threats. These actions have had their intended effect. Dr. Coomer has had an onslaught of harassment and credible death threats issued against him; he is at risk in his home or in going to work; his presence puts his family, friends, colleagues, and his community in danger. All aspects of his life have been altered in response to Defendants' conduct, including things as basic as where to live, how to go out in public, and when to see family and friends. The results of Defendants' ongoing conduct are foreseeable and obscene. This conduct is so outrageous in character and extreme in degree as to go beyond all possible bounds of decency. It should be regarded as atrocious and determined intolerable in a civilized community.

84.    As a direct and proximate result of Defendants' conduct, Dr. Coomer has suffered significant actual and special damages including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

## C.    *Civil Conspiracy Against All Defendants*

85.    Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

86.    Defendants engaged in a conspiracy to defame and inflict emotional distress upon Plaintiff.

87.    Defendants' collective objective was to promote the reelection bid of President Trump for their own financial and political gain. To do that, Defendants agreed,

both expressly and implicitly, to create a false narrative that in the event President Trump lost his reelection bid it could have only occurred because of fraudulent election activities. Defendants began spreading this false narrative before the election began.

88.     After the election, Defendants fed their narrative by falsely accusing Plaintiff of both having the ability and intent to rig the presidential election and actually subverting the election results so as to disenfranchise millions of voters.  Defendants fabricated their false narrative by using Plaintiff's alleged (and false) affiliation with "Antifa," speculation as to his access to election hardware and software, and his personal political beliefs.  In order to further their objective, Defendants agreed, by their words and conduct, to publish and republish defamatory statements about Plaintiff and threats towards Plaintiff.

89.     As a result of Defendants' coordinated conduct, Plaintiff has become the target of death threats and harassment and suffered significant actual and special damages proximately caused by their conduct, including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

**D.     *Preliminary and Permanent Injunction***

90.     Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

91.     Defendant Oltmann's escalating violent threats directed at Dr. Coomer demonstrate the need for the Court to enjoin such conduct.  The Court should order that Oltmann, FEC United, Conservative Daily, and their officers, agents, servants, employees, and attorneys be enjoined from threatening or encouraging acts of violence, intimidation,

or coercion against Dr. Coomer, including but not limited to encouraging others to confront, threaten, or endanger Dr. Coomer's physical safety, and further order these Defendants to remove any publication of threats, intimidation, personal information, or coercion made against Dr. Coomer. Such an order is essential to avoid impending danger and preserve the status quo at the time the controversy arose. Plaintiff is prepared to post the necessary bond.

92.     From the facts in this Complaint, Plaintiff has demonstrated the existence of a wrongful act, a clear likelihood of success on the merits, the existence of imminent, irreparable harm for which no adequate remedy at law exists, and that the damage to Plaintiff if the injunction does not issue will exceed the damage to Defendants Oltmann, FEC United, and Conservative Daily if the injunction does issue.

93.     Plaintiff further seeks permanent injunctive relief to remove all Defendants' defamatory statements upon final adjudication of the claims at issue.

## VI.   DEMAND FOR RETRACTION

94.     Plaintiff demands Defendants immediately and publicly retract all defamatory statements regarding Plaintiff and threats Defendants made to Plaintiff.

## VII.   RIGHT TO AMEND

95.     Plaintiff reserves the right to amend his pleadings in accordance with the Colorado Rules of Civil Procedure. Plaintiff anticipates amending his pleadings as more information becomes available, including the full scope of defamatory statements Defendants have made.

## VIII.  JURY DEMAND

96.     Pursuant to Colorado Rule of Civil Procedure 38, Plaintiff requests a jury to decide all issues of fact.

### PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer, and that the Court enter judgment against Defendants, including, but not limited to:

- Preliminary and permanent injunctive relief enjoining Defendants Oltmann, FEC United, Conservative Daily, and their officers, agents, servants, employees, and attorneys from threatening or encouraging acts of violence, intimidation, or coercion against Dr. Coomer and further ordering these Defendants to remove any publication of threats, intimidation, or coercion made against Dr. Coomer;

- Permanent injunctive relief requiring Defendants and their officers, agents, servants, employees, and attorneys to remove any and all defamatory publications made about Dr. Coomer;

- Actual and special damages against Defendants in an amount to be proven at trial;

- Leave to amend this Complaint and allege exemplary damages in an amount to be proven at trial after the exchange of initial disclosures pursuant to Colorado Rules of Civil Procedure and Plaintiff establishes prima facie proof of triable issues pursuant to C.R.S. § 13-21-102.

- Attorney's fees and costs;

- Prejudgment and post-judgment interest; and

- Such other and further relief, both general and special, to which Plaintiff may be justly entitled to receive.

Respectfully submitted this 22nd day of December 2020.[106]

Respectfully submitted,

_____*/s/ Charles J. Cain*_____
Charles J. Cain, #51020
Steve Skarnulis*
*Application for *pro hac vice* forthcoming

---

[106] Spacing pursuant to C.R.C.P. 10(d)(3)(II) due to the complexity and technical nature of this matter.

Exhibit 22

# EXHIBIT A

DATE FILED: February 4, 2021 4:07 PM
FILING ID: 5D2B3A08F794E
CASE NUMBER: 2020CV34319

DISTRICT COURT, DENVER COUNTY, COLORADO
1437 Bannock Street
Denver, CO 80202

ERIC COOMER, Ph.D.,
Plaintiff

vs.

DONALD J. TRUMP FOR PRESIDENT, INC., et al.,
Defendants

▲ COURT USE ONLY ▲

**Attorneys for Plaintiff**
Charles J. Cain, No. 51020
ccain@cstrial.com
Steve Skarnulis, No. 21PHV6401
skarnulis@cstrial.com
**CAIN & SKARNULIS PLLC**
P. O. Box 1064
Salida, Colorado 81201
719-530-3011          Telephone
512-477-5011          Facsimile

Thomas J. Rogers III, No. 28809
trey@rklawpc.com
Mark Grueskin, No. 14621
mark@rklawpc.com
Andrew E. Ho, No. 40381
andrew@rklawpc.com
RechtKornfeld PC
1600 Stout Street, Suite 1400
Denver, Colorado 80202
303-573-1900          Telephone
303-446-9400          Facsimile

Case Number:          2020cv034319

Division Courtroom:          409

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), by and through undersigned counsel, brings this action against Defendants Donald J. Trump for President, Inc., Sidney Powell, Sidney Powell, P.C., Defending the Republic, Inc., Rudolph Giuliani, Joseph Oltmann, FEC United, Shuffling Madness Media, Inc. dba Conservative Daily, James Hoft, TGP Communications LLC dba The Gateway Pundit, Michelle Malkin, Eric Metaxas, Chanel Rion, Herring Networks, Inc. dba One America News Network, and Newsmax Media, Inc. (collectively, Defendants herein) in response to relentless defamation and ongoing threats.

## I.   INTRODUCTION

1.    Spreading false conspiracy theories about the American election and its workers can have devastating consequences.  This is such a case.  Specifically, this case is based on Defendants' false and baseless assertions that Dr. Coomer, an employee of Dominion Voting Systems, Inc. (Dominion), sits at the center of a national conspiracy to fraudulently elect the President of the United States.  Defendants, by their actions, have elevated Dr. Coomer into the national spotlight, invaded his privacy, threatened his security, and fundamentally defamed his reputation across this country.

2.    On November 3, 2020, the presidential election was held across the United States.  Votes were counted throughout the week, and on Saturday, November 7, 2020, the Associated Press formally called the election for former Vice President Joseph Biden.  President Biden decisively won the election with a total of 306 electoral votes, winning the popular vote by more than seven million votes.  State election officials have verified

and certified the election results.  Electors have cast their ballots.  Electoral votes have been counted.  Joseph Biden is now President.

3.      But as the vote count proceeded and it became apparent that President Trump was likely to lose the election, the former President, his campaign, his agents, and many of his supporters began alleging widespread voter fraud and perpetuating baseless conspiracies about why President Trump lost.

4.      Defendants were integral to this effort.  To support their unsubstantiated allegations, they manufactured and spread a false narrative that Dominion—a business that had partnered with more than 1,300 jurisdictions in the United States to provide various election support services—conspired to rig its equipment and the election in favor of President Biden.[1]  Defendants made Dr. Coomer, the Director of Product Strategy and Security for Dominion, the face of their false claims.

5.      Defendants relied heavily upon false allegations made by Joseph Oltmann, a politically-motivated individual, business owner, and podcast host, to support their conspiracy theory.

6.      Oltmann has founded a nonprofit and media business for the alleged purpose of building a political movement to preserve freedoms he perceives as threatened in the United States.  This allegedly included efforts to uncover and reveal Antifa activists conspiring against Oltmann.  Oltmann claimed to have infiltrated a conference call with

---

[1] Apparently, this conspiracy only affected the presidential votes, as Democrats in the same election lost ground in down-ballot races.  *See* Trip Gabriel, *How Democrats Suffered Crushing Down-Ballot Losses Across America*, N.Y. TIMES, Nov. 28, 2020, https://www.nytimes.com/2020/11/28/us/politics/democrats-republicans-state-legislatures.html  (last visited Feb. 4, 2021).

such Antifa activists.  Oltmann claimed on this call he purportedly heard someone identified as "Eric from Dominion," and that this "Eric" stated he would ensure the election went to President Biden.  Oltmann provided no explanation for how he learned of this purported call or gained access to it.  Oltmann acknowledged he has no recording of it and indicated he had no knowledge of the participants he referenced within it.  Rather, Oltmann's dubious claims are premised on one unverified speaker referring to another.  With no legitimate attempt to confirm the identity of these alleged speakers, Oltmann attributed their alleged statements to Dr. Coomer.  With no additional evidence, Oltmann then used these statements to falsely assert that Dr. Coomer subverted the results of the election.  Defendants seized on and perpetuated these false allegations to further their own interests.

7.     To be clear, Dr. Coomer has no knowledge of an alleged "Antifa Conference Call;" Dr. Coomer did not participate in such an alleged call; Dr. Coomer did not make the comments Defendants falsely attribute to him; and Dr. Coomer did not take actions to subvert the presidential election as Defendants falsely allege.

8.     Despite the inherent unreliability of these claims, Defendants widely disseminated this false narrative.  As intended, Defendants' fabrication quickly spread throughout various media sources.   Within days, the hashtags #EricCoomer, #ExposeEricCoomer, and #ArrestEricCoomer were trending on social media.  President Trump began publishing numerous false statements to his millions of followers alleging Dominion interfered with the election; President Trump's son and campaign surrogate, Eric Trump, tweeted a photo of Dr. Coomer alongside this false claim; and the Trump

Campaign lawyers identified Dr. Coomer in a nationally televised press conference where they described him as a "vicious, vicious man" who "is close to Antifa" and falsely claimed that Dr. Coomer "specifically says that they're going to fix this election" and that he "had the election rigged for Mr. Biden." With such attention, Defendants have escalated denigrations of Dr. Coomer, furthered dissemination of these false statements, and encouraged threats and violence against Dr. Coomer.

9.     Defendants knowingly circulated and amplified a baseless conspiracy theory to challenge the integrity of the presidential election. While this theory has been thoroughly rejected, its immediate and life-threatening effects remain very real. The deluge of misinformation has caused immense injury to Dr. Coomer's reputation, professional standing, safety, and privacy. Once an esteemed private election technology expert, Dr. Coomer has been vilified and subjected to an onslaught of offensive messages and harassment. In response to multiple credible death threats, Dr. Coomer has been forced to leave his home in fear for his safety. Without concern for the truth or the consequences of their reckless conduct, Defendants branded Dr. Coomer a traitor to the United States, a terrorist, and a criminal of the highest order.

## II.     PARTIES

10.     Plaintiff Eric Coomer, Ph.D. is an individual and resident of Colorado who may be contacted c/o Cain & Skarnulis PLLC, P. O. Box 1064, Salida, Colorado 81201. Dr. Coomer is the Director of Product Strategy and Security for Dominion.

11.     Defendant Donald J. Trump for President Inc. (the Trump Campaign)[2] is a corporation organized and existing under the laws of Virginia, and may be served through its registered agent for service CT Corporation System at 4701 Cox Road, Suite 284, Glen Allen, Virginia 23060-6808.

12.     Defendant Sidney Powell (Powell) is an individual and resident of Texas. Powell is a practicing attorney that has brought several lawsuits seeking to overturn the results of the election.  On November 14, 2020, President Trump identified Powell as part of the legal team representing his campaign and its efforts to overturn the results of the election.  On November 22, 2020, the campaign subsequently removed Powell from its legal team.  Powell may be served at 3831 Turtle Creek Boulevard, Unit 5B, Dallas, Texas 75219.

13.     Defendant Sidney Powell, P.C. (Powell, P.C.)[3] is a professional corporation organized and existing under the laws of Texas, and may be served with process through its registered agent Sidney Powell at 3831 Turtle Creek Boulevard, Unit 5B, Dallas, Texas 75219.

---

[2] As of this filing, Rudolph Giuliani is a representative of the Trump Campaign.  His actions relevant to this case were as a representative of the Trump Campaign and within the scope and furtherance of his work for the Trump Campaign.  He had actual or apparent authority as an agent of the Trump Campaign.  The Trump Campaign is vicariously liable for Giuliani's tortious conduct described herein.  Sidney Powell was a representative of the Trump Campaign.  For a period of time relevant to this case, Powell's actions were as a representative of the Trump Campaign and within the scope and furtherance of her work for the Trump Campaign.  She had actual or apparent authority as an agent of the Trump Campaign during that period of time.  The Trump Campaign is vicariously liable for Powell's tortious conduct during the period of time described herein.

[3] Powell is a representative of Powell, P.C.  Her actions relevant to this case were as a representative of Powell, P.C. and within the scope and furtherance of her work for Powell, P.C.  She had actual or apparent authority as an agent of Powell, P.C.  Powell, P.C. is vicariously liable for Powell's tortious conduct described herein.

6

14.     Defendant Defending the Republic, Inc.⁴ (Defending the Republic) is a nonprofit corporation organized and existing under the laws of Texas, and may be served with process through its registered agent Capitol Corporate Services, Inc. at 206 E. 9th Street, Suite 1300, Austin, Texas 78701.

15.     Defendant Rudolph Giuliani (Giuliani) is an individual and resident of New York.  Giuliani is a practicing attorney that serves as President Trump's personal counsel, as well as counsel for President Trump's campaign, Donald J. Trump for President Inc.  Giuliani may be served with process at 445 Park Avenue, Floor 18, New York, New York 10022.

16.     Defendant Joseph Oltmann (Oltmann) is an individual and resident of Colorado.  Oltmann is an activist; a supporter of President Trump; an owner of Shuffling Madness Media, Inc. dba Conservative Daily; a co-host of the Conservative Daily podcast; and founder of the nonprofit FEC United.  Oltmann may be served with process at 8245 Keith Court, Castle Rock, Colorado 80108.

17.     Defendant FEC United⁵ is a nonprofit corporation organized and existing under the laws of Colorado with its principal place of business located in Denver, Colorado, and may be served with process through its registered agent Pacific Registered Agents, Inc. at 44 Cook Street, Suite 100, Denver, Colorado 80206.

---

4 Powell is a director and representative of Defending the Republic.  Her actions relevant to this case were as a representative of Defending the Republic and within the scope and furtherance of her work for Defending the Republic.  She had actual or apparent authority as an agent of Defending the Republic. Defending the Republic is vicariously liable for Powell's tortious conduct described herein.

5 Oltmann is a representative of FEC United.  His actions relevant to this case were as a representative of FEC United and within the scope and furtherance of his work for FEC United.  He had actual or apparent authority as an agent of FEC United.  FEC United is vicariously liable for Oltmann's tortious conduct described herein.

18.     Defendant Shuffling Madness Media, Inc. with registered trade name Conservative Daily (Conservative Daily)[6] is a corporation organized and existing under the laws of Delaware with its principal place of business located in Colorado, and may be served with process through its registered agent Joe Oltmann at 10750 S. Pine Drive, Parker, Colorado 80138.

19.     Defendant James Hoft (Hoft) is an individual and resident of Missouri. Hoft is the owner of TGP Communications LLC and author and editor of the political website and blog, The Gateway Pundit.  Hoft may be served with process at 12 Godwin Lane, St. Louis, Missouri 63124.

20.     Defendant TGP Communications LLC dba The Gateway Pundit (Gateway Pundit)[7] is a limited liability company organized and existing under the laws of Missouri, and may be served with process through its registered agent Gregory J. Hickel at 12300 Old Tesson Road, Suite 400-G, St. Louis, Missouri 63128.

21.     Defendant Michelle Malkin (Malkin) is an individual and resident of Colorado.  Malkin is a political blogger, commentator, and author.  Malkin may be served with process at 171 Larkspur Lane, Avon, Colorado 81620.

22.     Defendant Eric Metaxas (Metaxas) is an individual and resident of New York.  Metaxas is an author, speaker, and host of The Eric Metaxas Radio Show.

---

[6] Oltmann is also a representative of Conservative Daily.  His actions relevant to this case were as a representative of Conservative Daily and within the scope and furtherance of his work for Conservative Daily.  He had actual or apparent authority as an agent of Conservative Daily.  Conservative Daily is vicariously liable for Oltmann's tortious conduct described herein.

[7] Hoft is a representative of Gateway Pundit.  His actions relevant to this case were as a representative of Gateway Pundit and within the scope and furtherance of his work for Gateway Pundit.  He had actual or apparent authority as an agent of Gateway Pundit.  Gateway Pundit is vicariously liable for Hoft's tortious conduct described herein.

Metaxas may be served with process at 35 East 84th Street, Apt. 5A, New York, New York 10028.

23.     Defendant Chanel Rion (Rion) is an individual and resident of New York. Rion is the Chief White House Correspondent for One America News Network (OANN). Rion may be served with process at 622 Acorn Hill Road, Olivesbridge, New York 12461.

24.     Defendant Herring Networks, Inc.,[8] is a corporation organized and existing under the laws of California, which owns and operates One America News Network (OANN).   OANN may be served through its agent for service Seth B. Bobroff at 6256 Greenwich Drive, Suite 500, San Diego, California 92117.

25.     Defendant Newsmax Media, Inc. (Newsmax) is a corporation organized and existing under the laws of Delaware, with its principal place of business located in Florida. Newsmax may be served through its registered agent Cogency Global Inc. at 115 North Calhoun Street, Suite 4, Tallahassee, Florida 32301.

### III.    JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to Article VI, section 9 of the Colorado Constitution and C.R.S. section 13-1-124.

27.     This Court may exercise personal jurisdiction over the Trump Campaign as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  The Trump Campaign had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and

---

[8] Rion is a representative of Herring Networks, Inc. (referred to herein as OANN).  Rion's actions relevant to this case were as a representative of OANN and within the scope and furtherance of her work for OANN. She had actual or apparent authority as an agent of OANN.  OANN is vicariously liable for Rion's tortious conduct described herein.

that its defamatory messages would be directed at Colorado. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776-81 (1984). The Trump Campaign derived its defamatory statements from Coloradan sources.[9] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[10] *See Calder v. Jones*, 465 U.S. 783, 788-89 (1984); *see also Keeton,* 465 U.S. at 780 (recognizing a plaintiff's residence may be relevant to the jurisdictional inquiry as it "may be the focus of the activities of the defendant out of which the suit arises."). The Trump Campaign purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[11] *See Keeton,* 465 U.S. at 776-81 (finding "libel is generally held to occur wherever the offending material is circulated" and a defendant continuously and deliberately exploiting a market "must reasonably anticipate being haled into court there in a libel action"). Colorado has a substantial interest in this cause of action.

28.     This Court may exercise personal jurisdiction over Powell as she committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Powell had the knowledge and intent that: the effects of her actions would be felt

---

[9] The Trump Campaign knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 61–68, 71.

[10] The Trump Campaign knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 52–68, 71.

[11] The Trump Campaign knowingly published its statements using national platforms and broadcasts that purposefully direct their statements into the state of Colorado and to Coloradan audiences. The Trump Campaign intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 61–68, 71.

in the state of Colorado; the injury would occur in Colorado; and that her defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Powell derived her defamatory statements from Coloradan sources.[12] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for her defamatory statements.[13] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Powell purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make her statements.[14] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

29. This Court may exercise personal jurisdiction over Powell, P.C. as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Powell, P.C. had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Powell, P.C. derived its defamatory statements from Coloradan sources.[15] The subject of

---

[12] Powell knowingly relied on Oltmann as her source for her false statements; specifically identified Oltmann as a Denver, Colorado businessman within her statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 64–71.

[13] Powell knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of her false statements. *See infra* ¶¶ 64–71.

[14] Powell knowingly published her statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences. Powell intended to reach every citizen in the United States, purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 64–71.

[15] Powell P.C. knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 64–71.

those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[16] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Powell, P.C. purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[17] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

30.     This Court may exercise personal jurisdiction over Defending the Republic as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Defending the Republic had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 77681. Defending the Republic derived its defamatory statements from Coloradan sources.[18] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[19] *See Calder*, 465 U.S. at 788-89;

---

[16] Powell P.C. knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 64–71.

[17] Powell P.C. knowingly published its statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences. Powell P.C. intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 64–71.

[18] Defending the Republic knowingly relied on Oltmann as its source for its false statements; specifically identified Oltmann as a Denver, Colorado businessman within its statements; and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 64–71.

[19] Defending the Republic knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 64–71.

*see also Keeton,* 465 U.S. at 780. Defending the Republic purposefully utilized national broadcasts and media platforms with regular circulation in Colorado and to Coloradan audiences to make its statements.[20] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

31.     This Court may exercise personal jurisdiction over Giuliani as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Giuliani had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Giuliani derived his defamatory statements from Coloradan sources.[21] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for his defamatory statements.[22] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Giuliani purposefully utilized national broadcasts and media platforms with regular circulation in

---

[20] Defending the Republic knowingly published its statements using national platforms and broadcasts that purposefully direct their broadcasts into the state of Colorado and to Coloradan audiences. Defending the Republic intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans. *See infra* ¶¶ 64–71.

[21] Giuliani knowingly relied on Oltmann, a Colorado businessman, as his source for his false statements and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 64–65, 71.

[22] Giuliani knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements. *See infra* ¶¶ 64–65, 71.

Colorado and to Coloradan audiences to make his statements.[23]  *See Keeton,* 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

32.     This Court may exercise personal jurisdiction over Oltmann as he is a resident and domiciliary of Colorado and he committed tortious actions giving rise to this cause of action within Colorado.

33.     This Court may exercise personal jurisdiction over FEC United as it is formed within and existing under the laws of Colorado and it committed tortious actions giving rise to this cause of action within Colorado.

34.     This Court may exercise personal jurisdiction over Conservative Daily as it has its principal place of business within Colorado and it committed tortious actions giving rise to this cause of action within Colorado.

35.     This Court may exercise personal jurisdiction over Hoft as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  Hoft had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Hoft derived his defamatory statements from Coloradan sources.[24]  The subject of those statements concerned a Colorado resident and that resident's work and employment within a

---

[23] Giuliani knowingly published his statements using national platforms and broadcasts that purposefully direct their statements into the state of Colorado and to Coloradan audiences.  Giuliani intended to reach every citizen in the United States and purposefully sought this national audience, which included Colorado and Coloradans.  *See infra* ¶¶ 64–65, 71.

[24] Hoft knowingly relied on Oltmann as his source for his false statements, specifically identified Oltmann as a Denver, Colorado businessman within his statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 57, 60, 71.

business based in Colorado, making Colorado an integral focal point for his defamatory statements.[25] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Further, Hoft has purposefully sought a national audience and regularly directs his publications to Colorado and Coloradan audiences for circulation.[26] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

36. This Court may exercise personal jurisdiction over Gateway Pundit as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. Gateway Pundit had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Gateway Pundit derived its defamatory statements from Coloradan sources.[27] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[28] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Further, Gateway Pundit has purposefully sought a national audience and regularly directs its publications to Colorado and Coloradan audiences for

[25] Hoft knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements. *See infra* ¶¶ 57, 60, 71.

[26] Hoft, as founder, editor, and author of Gateway Pundit, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets, with articles naming Colorado, identifying events in Colorado, and referencing Coloradans. *See infra* ¶¶ 57, 60, 71, n.29.

[27] Gateway Pundit knowingly relied on Oltmann as its source for false statements it published, specifically identified Oltmann as a Denver, Colorado businessman within its statements, and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 57, 60, 71.

[28] Gateway Pundit knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 57, 60, 71.

circulation.[29]  *See Keeton,* 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

37.     This Court may exercise personal jurisdiction over Malkin as she is a resident and domiciliary of Colorado and she committed tortious actions giving rise to this cause of action within Colorado.

38.     This Court may exercise personal jurisdiction over Metaxas as he committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As the host of a nationally syndicated radio show and podcast, Metaxas had the knowledge and intent that: the effects of his actions would be felt in the state of Colorado; the injury would occur in Colorado; and that his defamatory messages would be directed at Colorado.  *See Keeton*, 465 U.S. at 776-81.  Metaxas also derived his defamatory statements from Coloradan sources.[30]  The subject of those statements concerned a Colorado resident and that resident's work and employment within a business based in Colorado, making Colorado an integral focal point for his defamatory

---

[29] Gateway Pundit regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets, with articles naming Colorado, identifying events in Colorado, and referencing Coloradans.  *See e.g.*, Cristina Laila, *BREAKING! SHOCK VIDEO: Colorado Democrat Executive Says "2020 is a Political Revolution"; "Guillotines Motherf*cker, Killing Random Nazis in the Street"*, THE GATEWAY PUNDIT, Oct. 13, 2020; Joe Hoft, *WEIRD: Early Reports Claimed Killer of Trump Supporter in Denver Is a Security Guard But He's Not Registered In Colorado's Security Guard Database*, THE GATEWAY PUNDIT, Oct. 11, 2020; Cristina Laila, *Democrat Colorado Secretary of State Mails Postcards to Illegals and Dead People Urging Them to Vote*, THE GATEWAY PUNDIT, Sept. 27, 2020; Jim Hoft, *Let's Make Her Famous! Violent, Foul-Mouthed Leftist Caught on Video Ripping Down Trump Sign in Castle Rock, Colorado*, THE GATEWAY PUNDIT, Sept. 22, 2020; Cristina Laila, *Colorado Woman Repeatedly Punches 12-Year-Old Boy in the Back of the Head Over Trump Yard Sign*, THE GATEWAY PUNDIT, Sept. 2, 2020.

[30] Metaxas knowingly relied on Oltmann as his source for his false statements, specifically identified Oltmann as a Denver, Colorado businessman within his statements, and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 59, 71.

16

statements.[31]  *See Calder*, 465 U.S. at 788-89; *see also Keeton*, 465 U.S. at 780.  Further, Metaxas has purposefully sought a national audience and regularly directs his publications to Colorado and Coloradan audiences for circulation.[32]  *See Keeton*, 465 U.S. at 776-81.  Colorado has a substantial interest in this cause of action.

39.     This Court may exercise personal jurisdiction over Rion as she committed tortious actions against a resident of the state of Colorado giving rise to this cause of action.  As a correspondent for a national news network that specifically broadcasts to Colorado and Coloradan audiences, Rion had the knowledge and intent that: the effects of her actions would be felt in the state of Colorado; the injury would occur in Colorado; and that her defamatory messages would be directed at Colorado.  *See Keeton,* 465 U.S. at 776-81.  Rion also derived her defamatory statements from Coloradan sources.[33]  The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for her defamatory statements.[34]  *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780.  Through OANN, Rion has purposefully sought a national audience and

---

[31] Metaxas knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of his false statements.  *See infra* ¶¶ 59, 71.

[32] Metaxas, as the host of a nationally syndicated radio show and podcast, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets.  *See infra* ¶¶ 59, 71.

[33] Rion knowingly relied on Oltmann as her source for her false statements, specifically identified Oltmann as a Denver, Colorado businessman within her statements, and derived those statements from information Oltmann allegedly gained while in Colorado.  *See infra* ¶¶ 61, 71.

[34] Rion knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of her false statements.  *See infra* ¶¶ 61, 71.

regularly directs her reporting to Colorado and Coloradan audiences for circulation.[35] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

40.     This Court may exercise personal jurisdiction over OANN as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. As a national news network that specifically broadcasts to Colorado and Coloradan audiences, OANN had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. OANN also derived its defamatory statements from Coloradan sources.[36] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[37] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. OANN has purposefully sought a national audience and regularly directs its reporting to Colorado and Coloradan audiences for circulation.[38] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

---

[35] Rion, as a correspondent for OANN, regularly directs publications to a national audience, specifically including and exploiting Colorado and Coloradan markets. *See infra* ¶¶ 61, 71, n.38.

[36] OANN knowingly relied on Oltmann as its source for false statements it published, specifically identified Oltmann as a Denver, Colorado businessman within its statements, and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 61, 71.

[37] OANN knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 61, 71.

[38] On its website, OANN identifies: (1) national cable providers, including AT&T U-verse, CenturyLink PRISM, DirecTV, GCI, and Verizon FiOS; (2) local providers in all 50 states; and (3) for Colorado, OANN specifically states "You can find OAN in Colorado on one of the many national cable providers above. Need another option? Stream OAN and many other TV channels LIVE on KlowdTV without a contract, offering flexibility and affordability. Sign up for a free-trial!" *See OANN, Where to Watch,* https://www.oann.com/wheretowatch/ (last visited Feb. 4, 2021).

41. This Court may exercise personal jurisdiction over Newsmax as it committed tortious actions against a resident of the state of Colorado giving rise to this cause of action. As a national news network that specifically broadcasts to Colorado and Coloradan audiences, Newsmax had the knowledge and intent that: the effects of its actions would be felt in the state of Colorado; the injury would occur in Colorado; and that its defamatory messages would be directed at Colorado. *See Keeton,* 465 U.S. at 776-81. Newsmax further derived its defamatory statements from Coloradan sources.[39] The subject of those statements concerned a Colorado resident and that resident's work and employment for a business based in Colorado, making Colorado an integral focal point for its defamatory statements.[40] *See Calder*, 465 U.S. at 788-89; *see also Keeton,* 465 U.S. at 780. Newsmax has purposefully sought a national audience and regularly directs its reporting to Colorado and Coloradan audiences for circulation.[41] *See Keeton,* 465 U.S. at 776-81. Colorado has a substantial interest in this cause of action.

42. Jurisdiction in Colorado provides for the efficient resolution of the claims herein. Venue is proper in this Court pursuant to Colorado Rule of Civil Procedure 98

---

[39] Newsmax knowingly relied on Oltmann, a Colorado based businessman, as the source of the false statements that it published and derived those statements from information Oltmann allegedly gained while in Colorado. *See infra* ¶¶ 66, 71.

[40] Newsmax knowingly relied on Dr. Coomer, a Colorado resident, and Dominion, a business based in Colorado, and alleged actions and events taken in Colorado as the subject of its false statements. *See infra* ¶¶ 66, 71.

[41] Newsmax purposefully directs its broadcasts into the state of Colorado and to Coloradan audiences. On its website, Newsmax identifies broadcast areas for Coloradan zip codes and identifies national cable providers and channels specifically for Colorado. For example, in the zip code of this Court, Newsmax identifies "Newsmax TV is available in your local area in the following services" including: CenturyLink HD Ch. 1209 (SD Ch. 209); DIRECTV HD Ch. 349; DISH Network HD Ch. 216; fuboTV; Sling TV; and Xfinity/Comcast HD Ch. 1115. *See* Newsmax TV, *You Can Watch Newsmax TV!*", https://www.newsmaxtv.com/findus (last visited Feb. 4, 2021).

because a substantial part of the events and omissions giving rise to the claims occurred in Denver County, Colorado and Defendant FEC United's principal place of business is in Denver County, Colorado.

## IV. FACTS

43.     Plaintiff Dr. Eric Coomer is the Director of Product Strategy and Security for Dominion.

44.     Dominion is based in Denver, Colorado, and provides election support services across the United States, including from initial project implementation through election set-up, ballot layout, multiple language audio, machine set-up and system testing.

45.     Dominion provided election related services to at least thirty different states during the 2020 presidential election.

### A. *The 2020 presidential election was a free and fair election.*

46.     The 2020 presidential election results have been verified by numerous independent entities, including government officials and agencies.   State elections officials tasked with verifying the election and vote counts certified the election results across all 50 states and the District of Columbia.[42]   Electors met and formerly cast their ballots with President Joe Biden securing 306 electoral votes and winning the popular vote by more than seven million votes.[43]   Despite incited violence, Congress formally

---

[42] *See* Maggie Astor, et al., *Biden Secures Enough Electors to Be President*, N.Y. TIMES, Dec. 9, 2020, https://www.nytimes.com/interactive/2020/11/20/us/politics/2020-election-certification-tracker.html (last visited Feb. 4, 2021).  ("Election results have now been certified in all 50 states and Washington, D.C.").

[43] *See* Nick Corasaniti, et. al., *Electoral College Vote Officially Affirms Biden's Victory*, N.Y. TIMES, Dec. 14, 2020, https://www.nytimes.com/2020/12/14/us/politics/biden-electoral-college.html (last visited Feb. 4, 2021).

counted the electoral votes, and Vice President Mike Pence declared Joe Biden the winner

of the presidential election.[44]

47.     The Cybersecurity & Infrastructure Security Agency (CISA), a standalone

United States federal agency under the Department of Homeland Security, issued a Joint

Statement from the Elections Infrastructure Government Coordinating Council and the

Elections Infrastructure Sector Coordinating Executive Committees stating:

> The November 3rd election was the most secure in American history. Right
> now, across the country, election officials are reviewing and double
> checking the entire election process prior to finalizing the result.
>
> When states have close elections, many will recount ballots. All of the states
> with close results in the 2020 presidential race have paper records of each
> vote, allowing the ability to go back and count each ballot if necessary. This
> is an added benefit for security and resilience. This process allows for the
> identification and correction of any mistakes or errors. **There is no
> evidence that any voting system deleted or lost votes, changed
> votes, or was in any way compromised.**
>
> Other security measures like pre-election testing, state certification of
> voting equipment, and the U.S. Election Assistance Commission's (EAC)
> certification of voting equipment help to build additional confidence in the
> voting systems used in 2020.
>
> While we know there are many unfounded claims and opportunities for
> misinformation about the process of our elections, we can assure you we
> have the utmost confidence in the security and integrity of our elections,
> and you should too. When you have questions, turn to elections officials as
> trusted voices as they administer elections."[45]

---

[44] *See* John Wagner, et al., *Pence declares Biden winner of presidential election after Congress finally counts electoral votes*, WASH. POST, Jan. 07, 2021, https://www.washingtonpost.com/politics/2021/01/06/congress-electoral-college-vote-live-updates/ (last visited Feb. 4, 2021).

[45] CISA, *Joint Statement from Elections Infrastructure Gov't Coordinating Council & the Election Infrastructure Sector Coordinative Exec. Comms.*, Nov. 12, 2020, https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election (last visited Feb. 4, 2021) (emphasis in original).

48.     Former Director of CISA, Chris Krebs, after his dismissal by President Trump, acknowledged that states had transitioned to auditable voting systems with paper-based ballots that could be recounted, independent of any allegedly hacked software or hardware.[46]  Krebs explained that these paper ballots, when paired with state post-election checks, ensured the accuracy of the voting counts.  Such post-election checks were utilized with recounts in Georgia and Wisconsin, which affirmed the election results.[47]

49.     Then U.S. Attorney General William Barr confirmed "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."[48]

50.     Over 60 separate lawsuits brought by President Trump's campaign and its supporters across the country attempting to challenge the legitimacy of the election results have failed.[49]  With these, courts have rejected baseless allegations of widespread

---

[46] Chris Krebs, *Trump fired me for saying this, but I'll say it again: The Election wasn't rigged*, WASH. POST, Dec. 1, 2020, https://www.washingtonpost.com/opinions/christopher-krebs-trump-election-wasnt-hacked/2020/12/01/88da94a0-340f-11eb-8d38-6aea1adb3839_story.html (last visited Feb. 4, 2021).

[47] Scott Bauer, *Wisconsin certifies Joe Biden as winner following recount*, AP, Nov. 30, 2020, https://apnews.com/article/election-2020-joe-biden-donald-trump-wisconsin-lawsuits-2e9cf60550f519537d31b6b71aa32c3c (last visited Feb. 4, 2021); Kate Brumback, *Georgia again certifies election results showing Biden won*, AP, Dec. 7, 2020, https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a (last visited Feb. 4, 2021).

[48] Michael Balsamo, *Disputing Trump, Barr says no widespread election fraud*, AP, Dec. 1, 2020, https://apnews.com/article/barr-no-widespread-election-fraud-b1f1488796c9a98c4b1a9061a6c7f49d (last visited Feb. 4, 2021).  As of this filing, U.S. Attorney General Barr has tendered his resignation.

[49] Rosalind S. Helderman, et al., *'The last wall': How dozens of judges across the political spectrum rejected Trump's efforts to overturn the election*, WASH. POST, Dec. 12, 2020, https://www.washingtonpost.com/politics/judges-trump-election-lawsuits/2020/12/12/e3a57224-3a72-11eb-98c4-25dc9f4987e8_story.html (last visited Feb. 4, 2021); William Cummings, et al., By the numbers: President Donald Trump's failed efforts to overturn the election, USA TODAY, Jan. 6, 2021, https://www.usatoday.com/in-depth/news/elections/2021/01/06/trumps-failed-efforts-overturn-election-numbers/4130307001/ (last visited Feb. 4, 2021) ("Out of the 62 lawsuits filed challenging the presidential election, 61 have failed").

voter fraud raised to overcome the election results.[50]  Notably in one case, Judge Brann in the United States District Court for the Middle District of Pennsylvania rendered an opinion stating:

> One might expect that when seeking [to disenfranchise almost seven million voters], a plaintiff would come formidably armed with compelling legal arguments and factual proof of rampant corruption, such that this Court would have no option but to regrettably grant the proposed injunctive relief despite the impact it would have on such a large group of citizens.
>
> That has not happened.  Instead, this Court has been presented with strained legal arguments without merit and speculative accusations, unpled in the operative complaint and unsupported by evidence.

*Donald J. Trump for President, Inc., et al. v. Boockvar, et al.*, No. 4:20-cv-02078-MWB, at Dkt. No. 202, p.2 (M.D. PA. Nov. 21, 2020).  In review of this opinion, Judge Bibas, writing the Third Circuit's unanimous opinion on November 27, 2020, summarized the Court's ruling as follows:

> Free, fair elections are the lifeblood of our democracy.  Charges of unfairness are serious.  But calling an election unfair does not make it so.  Charges require specific allegations and then proof.  We have neither here.

*Donald J. Trump for President, Inc., et. al. v. Sec'y Commonwealth of Pennsylvania, et. al.*, No. 20-3371, * 2 (3rd Cir. Nov. 27, 2020).

---

[50] *See e.g., Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 84, p.28 (concluding "[n]ot only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them.  Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court.").

**B. *Oltmann fabricated a conspiracy.***

51.     Joseph Oltmann is a political activist and supporter of President Trump with ambitions of creating a political movement.[51]  Oltmann formed a nonprofit organization, FEC United, allegedly to restore and secure constitutional protections he perceived as under attack, which includes a paramilitary civilian defense group.[52] FEC United has hosted rallies for armed civilians to gather, as well as political events on behalf of the Colorado Republican Party and the Trump Campaign.[53]  By way of example, FEC United reportedly solicited its members to sign up for the "Army for Trump" poll watcher program before the election, claiming that "Democrats have been actively stacking the poll-watching positions with their own people, and this will only contribute to the fraud . . . Join Our Election Day Team!"[54]  Upon information and belief, Oltmann also owns a business, Shuffling Madness Media, Inc., which registered the trade name

---

[51] *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 2, 2020) (In response to lawsuits brought by President Trump, "[w]e do this without the weak ass Republican traitors."); (Dec. 4, 2020) ("It's time we turn out the corrupt government and weaponized media and tech companies.  This is our country . . . #reckoning #ericcoomerisatraitor #dominionvotingsystems); (Dec. 6, 2020) ("I will love my neighbors after I beat their ass and stop this evil indoctrination and cancer on our community . . . I punched one of these asshats in the face and defended our country"); (Dec. 7, 2020) ("I am angry we are where we are and we allowed the loony left to even get their claws of deceit and despair into the fiber of our country. I am disappointed we let the evil left remove God from our schools and communities without a bigger fight . . . Pray for our country.  Pray for our President.  Pray for our leaders that they can have courage.  Pray for the warriors of our nation that will stand up for you.  God bless you all.  We will not surrender and we will never retreat."); (Dec. 10, 2020) ("Pray for our country and that our Supreme Court has the courage to reject the evil we face."); (Dec. 12, 2020) ("Now we got to war as the people . . . the deep state runs deep. Evil at work . . .").

[52] *See* FEC United, *Defend the American Way of Life*, https://fecunited.com (last visited Feb. 4, 2021); United American Defense Fund, *Defend and Protect What Is Ours*, https://fecunited.com/uadf/ (last visited Feb. 4, 2021).

[53] *See* Erik Maulbetsch, *Conservative Group Behind the Deadly "Patriot Muster" Rally Working Closely With Colorado GOP*, COLO. TIMES RECORDER, Oct. 12, 2020, https://coloradotimesrecorder.com/2020/10/conservative-group-behind-deadly-patriot-muster-rally-working-closely-with-colorado-gop/31445/ (last visited Feb. 4, 2021).

[54] *See id.*

and upon information and belief operates under the Conservative Daily. Oltmann serves

as a co-host of the Conservative Daily Podcast under the name Joe Otto with videos also

posted on Conservative Daily's YouTube channel.

52.     After the results of the election were called for President Joe Biden,

Oltmann co-hosted a Conservative Daily Podcast.[55]  On that podcast, he alleged to have

learned almost two months earlier of a conspiracy to elect the president of the United

States.  Oltmann claimed he gained this information after infiltrating Antifa.  Despite his

interest in the election and prolific podcasting schedule, Oltmann apparently took no

action at that time to report this alleged threat to democracy.[56]  Waiting until November 9,

2020, Oltmann began this podcast, saying:

> Let's not sugar coat this, we're going to expose someone inside of Dominion
> Voting Systems specifically related to Antifa and related to someone that is
> so far left and is controlling the elections, and his fingerprints are in every
> state.  So I want you guys to understand that what we're about to show you,
> you have to share . . . The conversation will be about a man named Eric
> Coomer.  C-O-O-M-E-R.

Oltmann then posted a photo of Dr. Coomer's face.  Oltmann explained he had allegedly

"infiltrated an Antifa conference call" sometime in late September with unknown and

unverified participants.  Oltmann claimed while on this purported call one of these

unknown participants was referred to as "Eric" and another allegedly explained "Eric is

the Dominion guy."  Oltmann claimed when another unknown participant asked, "What

---

[55] Joseph Oltmann, et al., *Ep. 196—Dominion Voting Systems*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020).

[56] The Conservative Daily Podcast posted fifty podcasts from September 1, 2020 to November 9, 2020. *See id.*; *see also* Joseph Oltmann, et al., *Ep. 146—Someone Stole My Trump Sign (And I'm Pissed)*, CONSERVATIVE DAILY PODCAST (Sept. 1, 2020).

are we gonna do if f-ing Trump wins?" the unknown "Eric" responded, which Oltmann paraphrased as, "Don't worry about the election, Trump is not gonna win. I made f-ing sure of that. Hahahaha." Afterwards, Oltmann's alleged efforts to identify the unknown speakers of this purported call were limited to googling "Eric," "Dominion," and "Denver, Colorado."[57] With this, Oltmann claimed he identified Dr. Coomer and Dominion Voting Systems, Inc.[58] At no point has Oltmann contacted Dr. Coomer to confirm his involvement in this purported call.

53. Only after President Trump had lost the presidential election did Oltmann allegedly remember Dr. Coomer and take steps to target him. Oltmann had conceived a storyline about the election—that its results were fraudulent—and consciously set out to establish that Dr. Coomer perpetuated this fraud.[59] This included accessing Dr. Coomer's

---

[57] In a subsequent interview, Oltmann explained, "So it was really simple. This is what I did, right. I put in 'Eric,' into google search, 'Eric,' 'Dominion,' 'Denver, Colorado.' Not very clever, right?" *See* Michelle Malkin, *#MalkinLive: U.S. Elections*, YOUTUBE (Nov. 13, 2020).

[58] Oltmann provides no explanation for how he understood "Dominion" to mean "Dominion Voting Systems, Inc." and not any of the number of other Dominion-named businesses and locations in Colorado, including, but not limited to: Old Dominion Freight Line; Dominion Life Church; Dominion Realty Group; Dominion Water & Sanitation District; either of the two Dominion Towers constituting Dominion Plaza; Dominion Mortgage; and Dominion Carpet Cleaning Inc.

[59] Oltmann has a history of advancing varying allegations of voter fraud to support his political beliefs and his preferred candidates as well as to promote himself and his businesses interests. *See e.g.*, Erik Maulbetsch, *Conservative Group Behind the Deadly "Patriot Muster Rally Working Closely With Colorado GOP*, COLO. TIMES RECORDER, Oct. 12, 2020 (FEC United alleging election fraud); Joseph Oltmann, et al., *Ep. 151–Voter Fraud is Real*, CONSERVATIVE DAILY PODCAST (Sept. 9, 2020) (separate allegations of election fraud); *Ep. 126–GOP Caving to Pelosi's Cheat-By-Mail Demands*, CONSERVATIVE DAILY PODCAST (Aug. 5, 2020) (separate allegations of election fraud). Shortly after the election, Oltmann's baseless allegations of fraud continued to evolve across various theories until coalescing into his false statements against Dr. Coomer. *Compare* Joseph Oltmann, et al., *Ep. 193–Democrats Just Got Caught*, CONSERVATIVE DAILY PODCAST (Nov. 5, 2020) (separate allegations of election fraud), *Ep. 194–How Democrats Stole It* CONSERVATIVE DAILY PODCAST (Nov. 6, 2020) (separate allegations of election fraud), and *Ep. 194–How Democrats Stole It (Part 2)*, CONSERVATIVE DAILY PODCAST (Nov. 6, 2020) (separate allegations of election fraud), *with Ep.196–Dominion Voting Systems*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) ("we're doing a deep dive on Dominion Voting Systems, all the stuff we're seeing with Scorecard, with Hammer, big tech as a whole."). Oltmann ultimately utilized these false allegations for personal gain. On November 5, 2020, the Conservative Daily podcast informed its viewers it was the "#119 most popular political podcast in

private Facebook profile. Finding no credible evidence of Dr. Coomer's involvement in the purported "Antifa Conference Call," Oltmann, instead, used posts on Dr. Coomer's Facebook profile that were critical of President Trump to allege he was the anonymous "Eric." Having no credible evidence of voter fraud, Oltmann used Dr. Coomer's position and employment with Dominion to allege Dr. Coomer was a key figure in a high-level conspiracy to rig the election against President Trump.[60] These statements are baseless and unequivocally false. Dr. Coomer has no knowledge of this alleged "Antifa Conference Call;" Dr. Coomer did not participate in such an alleged call; Dr. Coomer did not make the comments Oltmann alleged were made; and Dr. Coomer did not take steps to subvert the results of the presidential election.

54.     In reality, Dr. Coomer, like many, had a private Facebook page that he shared with approximately 300 friends. He shared political views and was critical of President Trump. He shared satire, that Oltmann intentionally disregarded and held out as true. None of it was public. It is unclear how Oltmann came into possession of it.

---

America," on November 6, 2020 it informed them it was then the "#108 most popular political podcast," on November 9, 2020 it was "#66," on November 10, 2020 it was "#62," November 14, 2020 it was "#53," on November 19, 2020 it was "#28," on December 2, 2020 it was "#8."

[60] *See* Joseph Oltmann, et al., *Ep. 196—Dominion Voting Systems*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) ("It's not admitting it's vulnerable, it's actually creating the vulnerability so that it can actually be manipulated, and that's what's happened here, Max. That's what's happened here. You have a guy that literally is a fanatic. He's on calls, he's taking time in the middle of an election season to get on a call. Three weeks before an election. Three weeks before the election! He's getting on the phone and he's saying very clearly that 'I have it handled.' And he runs product strategy and security. We're not talking about someone that is at a low level, that has an opportunity to just - He's in everywhere you look!"); Wake Up with Randy Corporon, Nov. 14, 2020, 710 KNUS (Corporon: "Joe, what you have done and exposed may save the republic, or at least save the possibility of having an honest outcome to this election. People's heads roll up and they say, okay, maybe there were a few machines that made a mistake or whatever. You have exposed the Antifa basis to the man who has the knowledge and the influence on this company that has these machines and this software in battleground states around the country." Oltmann, in agreement: "Everywhere across the country, Eric Coomer is in every state. He is the one actually presenting that. He is the cog to the wheel."); *see also infra* § IV(C).

55.     More importantly, Dr. Coomer's professional life was separate from his

personal political opinion.  Dr. Coomer did not participate in political groups and did not

donate to campaigns.    Dr. Coomer worked with elections officials—Republican,

Democratic, and independent—across the country to make sure the process was safe,

secure, and fair.  The ability to have a political opinion in this country is a protected right.

It remains a protected right, even if critical of a sitting president.  That criticism does not

denote conspiracy or fraud.

### C.     *Defendants spread the conspiracy.*

56.     Oltmann began spreading his baseless allegations.[61]  Defendants seized on

Oltmann's statements to promote a conspiracy of election fraud.  At the same time

Defendants began to use Oltmann as a source for their reporting, Twitter suspended his

account.  This suspension was related to Oltmann's attempts to spread false allegations

and threats about Dr. Coomer.[62]

57.     On November 13, 2020, Gateway Pundit published an article by James

"Jim" Hoft to its website with the headline: "Dominion Voting Systems Officer of Strategy

and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have

Access to Manipulate the Vote."[63]   In this article, Hoft and Gateway Pundit developed

Oltmann's story by adding photo and video, additional context, and links to ostensibly

---

[61] On December 6, 2020 alone, Oltmann claimed he had "been busy doing 15 interviews in the last 2 days."
*See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020).

[62] Oltmann explained after sharing an alleged photograph of Dr. Coomer's house, "I have been kicked off of
Twitter for exposing Eric Coomer."  *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020).

[63] Jim Hoft, THE GATEWAY PUNDIT, Nov. 13, 2020.

related content.  They rely on Oltmann as a source of information to report on Dr. Coomer

and Dominion, asserting:

> Joe Oltmann did a deep dive on Dr. Eric Coomer who is responsible for the strategy and Security of Dominion Voting Systems.  Oltmann posted a Facebook post by Coomer from June. Dr. Coomer retweeted the "Antifa" manifesto letter to President Trump.  Needless to say Dr. Coomer is NOT a Trump supporter!

58.    Also on November 13, 2020, Michelle Malkin[64] hosted an interview with

Oltmann, who was identified as a representative of FEC United, on her personal YouTube

channel, #MalkinLive, which has approximately 100,000 subscribers.[65]  During the

MalkinLive interview, Oltmann again falsely alleged that Dr. Coomer was an anonymous

Antifa activist on a purported call Oltmann claimed to have infiltrated well before the

election.[66]  Yet only after the presidential election did Oltmann allegedly determine from

this call that Dr. Coomer subverted the election to elect Joe Biden.[67]  Malkin published

these false statements despite their inherent improbability, the unreliability of her source,

and the lack of credible evidence in support of these allegations.  Malkin had no credible

evidence that an "Antifa conference call" actually happened; that Dr. Coomer was present

---

[64] Notably, Malkin joined Newsmax in May 2020 as a political contributor and host of a Newsmax television show, Michelle Malkin Sovereign Nation.  *See* Bill Hoffmann, *Acclaimed Journalist Michelle Malkin Joins Newsmax TV*, May 21, 2020; *see also* Newsmax TV, Hosts, https://www.newsmaxtv.com/host-bios (last visited Feb. 4, 2021).

[65] Michelle Malkin, *#MalkinLive: U.S. Elections*, YOUTUBE (Nov. 13, 2020).  In this interview, Malkin identified Oltmann as Colorado businessman and founder of FEC United.  Oltmann explained why he formed FEC United, spoke on behalf of FEC United during the interview, and promoted FEC United with a large banner across the screen reading, "For more info: FECUnited.com."

[66] Oltmann admitted in this interview his efforts to infiltrate Antifa stemmed from his belief they were conspiring against him, saying "So these journalists started attacking me. . . I wanted to know why . . . So I set out to uncover Antifa within the journalist community."  *See id.*

[67] Oltmann explained to Malkin that his investigation of this purported call was premised on a Google search and premised on unknown and unverified speakers, stating "somebody named Eric came on . . . someone says who's Eric . . . and someone answers."  *Id.*

on the call; that the comments attributed to Dr. Coomer were actually spoken; and that the alleged election fraud actually occurred. Malkin took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary.[68] At one point in the interview, Oltmann rhetorically directed his commentary to Dr. Coomer, and said:

> You're either the one who is responsible for it, which is what it looks like, or you have other people that need to take the fall with you, and that might lessen the opportunity for you to get the death penalty, because frankly, I think the treason is punishable by death.

Following this interview, Malkin began publishing additional false statements in tweets, promoting her interview of Oltmann and the allegations of fraud to her followers[69] as well as additional broadcasts with Oltmann.[70] Like Oltmann, Malkin conceived a story that

---

[68] Malkin also has a history of advancing varying allegations of voter fraud to support her political beliefs and her preferred candidates as well as to promote herself and her businesses interests. *See e.g.*, Michelle Malkin, *Who's Funding Shady Ballot Harvesting Schemes*, RASMUSSEN REPORTS, Sept. 30, 2020 (separate allegations of voter fraud); *Out of the Shadows . . . and Into the Voting Booth*, RASMUSSEN REPORTS, Dec. 18, 2019 (separate allegations of voter fraud). Malkin is also an admitted supporter of President Trump. *See, e.g.*, Michelle Malkin, *No Time for Phony Healing*, RASMUSSEN REPORTS, NOV. 11, 2020 ("We, the 71 million Americans who voted to reelect Donald J. Trump, do not surrender.").

[69] Michelle Malkin (@michellemalkin), TWITTER (Nov. 13, 2020, 12:43 PM) ("Joe Oltmann (now banned on Twitter) exposes pro-Antifa, cop hatred-inciting rants of #EricCoomer, VP of strategy/security of Dominion Voting Systems. 'What if I told you he is a major shareholder' in Dominion & 'owns patents associated with other voting systems?' #MalkinLive."); (Nov. 13, 2020, 12:46 PM) ("Full interview with #joeoltmann on #ericcoomer #dominion here ==>"); (Nov. 13, 2020, 2:31 PM), ("What are they trying to hide? #DominionVotingSystems."); (Nov. 15, 2020, 12:09 PM) ("ICYMI – Dominion, Antifa & #EricCoomer exposed by Joe Oltmann on #MalkinLive last week. Joe was suspended by Twitter but you can find him on @parler."); (Nov. 16, 2020, 12:29 PM) ("ICYMI: #ExposeDominion #WhoIsEricCoomer #JoeOltmann Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath -- His Internet Profile is Being Deleted and Erased (AUDIO)."); (Nov. 16, 2020, 12:29 PM) (commenting with the hashtags "#ExposeDominion" and "#WhoIsEricCoomer."); (Nov. 19, 2020, 12:19 PM) ("In case you missed it: My interview with #JoeOltmann from six days ago exposing #EricCoomer #Antifa #ExposeDominion.").

[70] In a broadcast of Sovereign Nation on Newsmax, Malkin conducted another interview with Oltmann on November 28, 2020. Malkin's broadcast compared allegations of voter fraud in the Philippines allegedly using Smartmatic with allegations of voter fraud in the United States allegedly with Dr. Coomer and Dominion:

the results of the election were fraudulent and consciously set out to establish that

Dr. Coomer did in fact subvert the election and perpetuate this fraud.

    59.    Similarly, Eric Metaxas hosted an interview with Oltmann, who was again

identified as a representative of FEC United, on his radio talk show and podcast on

November 24, 2020.[71] This interview was also published on Metaxas's YouTube channel,

---

    Malkin: Well, evading scrutiny seems to be part of the vote hacking playbook. Last week, Dominion officials bailed out of a state legislative hearing in battleground Pennsylvania . . . Who has control over our elections? Who has *dominion* over our votes? Is it we the people, or is it the electronic voting oligarchs? Without full election transparency, there can be no election peace. Next up, Denver businessman Joe Oltmann joins me to discuss his shocking discoveries about Dominion Vice President of Strategy and Security Eric Coomer, plus much more. Stay tuned . . . I want you to tell our audience at Sovereign Nation who exactly Eric Coomer is, and why it matters in these ongoing battles against election fraud across the country . . .

    Oltmann: Eric Coomer is the Director of Strategy and Security for Dominion Voting Systems. He is also affiliated with or a part of the Antifa movement. Frankly, he has the ability, he has a doctorate in nuclear physics, and has the ability to put his finger on the scale and has, I believe, put his finger on the scale of our election across the country . . .

    Malkin: In the course of the work you do, political activism and research, back in October, you happened to be on a phone call of local Denver area Antifa organizers, and that's where you heard the name Eric Coomer. Tell us what you heard on that phone call.

After Oltmann alleged to have heard an unidentified third party refer to another unidentified third party only as "Eric" and from this falsely allege that Dr. Coomer was part of an Antifa conspiracy to fraudulently elect the President of the United States:

    Malkin: The reason why this is so alarming, and it's obvious, but it should be spelled out, is that this is one of the highest-ranking officials at Dominion Voting Systems, which has penetrated our election system across the country and of course, around the world . . .

    Oltmann: He truly is the mastermind . . .

    Malkin: As a reward for the whistleblowing and the recording that you've done, you were banned on Twitter, or suspended. Tell us about that . . .

    Oltmann: I decided I was going to come forward, put all of the information forward, call out Eric Coomer specifically. As soon as I did that, you caught wind of the story, you posted it, people started following me on Twitter, I started releasing even more information that I had, and Twitter came back and said that I had multiple Twitter accounts that I was using to harm others.

*See* Sovereign Nation with Michelle Malkin, *Hacking the Vote*, NEWSMAX, Nov. 28, 2020.

[71] Eric Metaxas, *Joe Oltmann*, THE ERIC METAXAS SHOW PODCAST (Nov. 24, 2020).

The Eric Metaxas Radio Show, which has approximately 185,000 subscribers.[72]  During

the Metaxas interview, Oltmann again falsely alleged that Dr. Coomer was an anonymous

Antifa activist on a purported call Oltmann claimed to have infiltrated well before the

election.[73]  And again allegedly determined from this call that Dr. Coomer subverted the

presidential election.[74]  Metaxas also published these false statements despite their

---

[72] The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YOUTUBE (Nov. 24, 2020).  In this interview, Oltmann was identified as a Colorado businessman and founder of FEC United.  Oltmann explained why he formed FEC United and spoke on behalf of FEC United during the interview.

[73] Oltmann admitted in this interview his efforts to infiltrate Antifa stemmed from his belief that Antifa journalists were conspiring against both him and FEC United following his efforts to reopen small businesses in Colorado last September.

[74] Oltmann explained to Metaxas in this interview that his investigation of this purported call was premised on a google search and premised on unknown and unverified speakers in the purported call, stating "This guy named Eric started talking, and then somebody asked who Eric was.  And they said, 'Eric's a Dominion guy.'"  Despite this, Metaxas took no actions or efforts to corroborate or verify the baseless allegations before publishing them.  Instead, Metaxas perpetuated these false allegations of voter fraud:

> Metaxas: He's a PhD in nuclear physics, so this is a super brilliant guy, Director of Strategy and Security.  Now, when you're talking about Dominion Voting Systems, there is no higher level of security necessary, it's like the guy who we had on this program recently who created the anti-fraud system for eBay.  I mean, this is top, top, top level coding and that stuff.  So this guy, Eric Coomer, this genius, you discover was the guy who said on this Antifa call "don't worry about Trump, there's no way he's going to win."

> Oltmann: Yeah.  And I've also tied him to Our Revolution, the movement . . .  We were dealing with a person that could put his finger firmly on the American voice, and tip scale of the election very easily, and frankly that he was doing it.

> Metaxas: When you're smart enough to get a Ph.D. in nuclear physics, it reminds me of the Unabomber.  There are some people that uh, their learning, or rather their brains will flirt with insanity and violence.  It sounds like you're dealing with somebody who at least begins to fall into that category.  We know that Antifa is evil, that they are anti-American, that they are effectively Marxist shock troops at this point.  But to have a man with this kind of power, the Director of Strategy and Security at Dominion, *huge*, powerful, international company.  This is big news . . . I mean, this is globalist stuff.  This is everybody's worst nightmare of deep state, George Soros.  The idea that a man of this level, at a place like Dominion, which is operating all around the globe in elections, which got started in Venezuela, that somebody like that who despises America.  You know, if you despise America, by definition, you become allied with these globalist forces, which are effectively fascist, Marxist, you know.  That this guy has this kind of power, I mean, it's scary, even just having this conversation with you and thinking about this . . . The idea, the *idea*, that anyone would *dare* to try to mess with our elections, many patriots have died, suffered and died, so that we can have what we have.  I cannot think of anything more despicable and more worthy

32

inherent improbability, the unreliability of his source, and the lack of credible evidence in support of these allegations. Metaxas also had no credible evidence that an "Antifa conference call" actually happened; that Dr. Coomer was present on the call; that the comments attributed to Dr. Coomer were actually spoken; or that the alleged election fraud actually occurred. Metaxas also took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary. Following this interview, Metaxas, like Malkin, published additional false statements in tweets, promoting his interview of Oltmann[75] and additional interviews perpetuating these allegations of fraud to his followers.[76] Like

---

of our doing everything we can, including give our lives if necessary, to fight for this, and so that's why I'm so glad to be speaking with you and getting this information out. . . Eric Coomer, has he gone into hiding? What is he thinking? Does he know that he's going to go to prison for the rest of his life?

Oltmann: This isn't all made up, this isn't hyperbole that we're just throwing out there. This is absolute fact.

Metaxas responded: Well there's levels of stupidity and evil, and we know that not everybody is on the same level. There are some people that just hate Trump, but then there are other nefarious actors, like Mr. Coomer and others. It's hard to know what to say other than there's wickedness, there's evil here. Because nothing that they're doing, even if you hate Trump, I have many friends who hate Trump, but they would never do what we're talking about. What we're talking about is evil. In fact, Let's just say this, it's extremely criminal, and these folks know they're going to go to jail for the rest of their lives. It doesn't matter how rich or smart they are. They are in the process of being caught, thanks to God, because you just stumbled across this, God chose you to stumble across this to get this information out. I'm very encouraged by your mere existence, Joe Oltmann.

*See* The Eric Metaxas Radio Show, *Joe Oltmann Discusses How A Security Genius at Dominion Voting Promised Antifa Members a Trump Loss*, YouTube (Nov. 24, 2020).

[75] Eric Metaxas (@ericmetaxas), Twitter (Nov. 24, 2020, 5:26 PM) ("Today Joe Oltmann explained how after infiltrating Antifa he bumped into someone working w/them named Eric Koomer [sic] – who was the head of Security and Safety at #Dominion – and who PROMISED the Antifa folks that 'effing' Trump WOULD NOT WIN! Please RT.").

[76] Eric Metaxas (@ericmetaxas), Instagram (Nov. 16, 2020) ("Sidney Powell talks to Lou Dobbs about the Dominion Voting Systems on Fox. Release the Kraken!"); The Eric Metaxas Radio Show, *John Zmirak Shares His Personal Knowledge of the "Authenticity" of Sidney Powell's Investigation*, YouTube (Nov. 20, 2020); The Eric Metaxas Radio Show, *Eric Examines Sidney Powell Investigation*, YouTube (Nov. 23, 2020); Eric Metaxas, *Joe Oltmann*, The Eric Metaxas Show Podcast (Nov. 24, 2020); Eric Metaxas, *Joe*

Oltmann, Metaxas conceived of a story that the results of the election were fraudulent and consciously set out to establish that Dr. Coomer perpetuated this fraud.[77]

60.    On November 14, 2020, Gateway Pundit began publishing successive articles written or edited by Hoft based and built upon Oltmann's false allegations. Gateway Pundit and Hoft asserted, "Oltmann said that as the conversation continued, someone asked, 'What are we gonna do if F*cking Trump wins?'  Oltmann paraphrased how Eric (the Dominion guy) responded, 'Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!'"[78]    Gateway Pundit repeatedly identified

_Oltmann_, THE ERIC METAXAS SHOW PODCAST (Nov. 25, 2020); The Eric Metaxas Radio Show, _Kevin McCullough Has Late-breaking News About the Ownership Of Dominion Voting Machines (It's China)_, YOUTUBE (Dec. 3, 2020); The Eric Metaxas Radio Show, _Charlie Kirk Asks Eric Where We Stand As a Nation Right Now & Eric Shares A Christmas Miracle Story_, YOUTUBE (Dec. 9, 2020);  The Eric Metaxas Radio Show, _Eric Presents Steve Bannon From Sunday Night's "Prayer Call" | Steve Shares Trump's Path to Victory_, YOUTUBE (Dec. 21, 2020);  Eric Metaxas (@ericmetaxas), TWITTER (Jan. 4, 2021, 2:22 PM) ("WATCH! Here's @SidneyPowell1 talking about the election fraud from last night's prayer meeting . . ."); Eric Metaxas, _Mike Lindell_, THE ERIC METAXAS SHOW PODCAST (Jan. 18, 2021).

[77] Metaxas has advanced varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote his businesses interests. _See e.g._., The Eric Metaxas Radio Show, _Attorney Jenna Ellis—On Democrats Changing Election Laws for the 2020 Election_, YOUTUBE (May 11, 2020); Eric Metaxas (@ericmetaxas), TWITTER (Nov. 7, 2020, 4:35 PM) (in response to President Trump's allegations of voter fraud to observers and mail-in-ballots, "If an election bears signs of fraud—so that the will of the people was thwarted—it is not an official election.  STAY TUNED.  And pray.  This is absolutely not over, despite what some seem to think.  The American people will not roll over.").

[78] _See_ Jim Hoft, _Report: Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online_, THE GATEWAY PUNDIT, Nov. 14, 2020; _Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile Is Being Deleted and Erased (AUDIO)_, THE GATEWAY PUNDIT, Nov. 16, 2020 ("Oltmann told The Gateway Pundit he believes Eric Coomer is mentally ill and a sociopath."); Jim Hoft, _WAKE UP AMERICA! Bold Billionaire Offers $1 Million Bounty for Dominion, Eric Coomer's Comeuppance_, THE GATEWAY PUNDIT, Dec. 28, 2020 (After referencing a reward posted on another website by Greek billionaire Alki David for proof that Dominion and Dr. Coomer produced fraudulent votes in the 2020 election, stating "We know that Dominion is one of the companies accused of massive fraud in numerous lawsuits around the country stemming from the 2020 election. But who is Eric Coomer? . . . Eric Coomer is an alleged PhD who allegedly worked for Dominion . . . As an employee of Dominion, he seemed to be fairly integral.  In fact, he seems to have designed several voting machine patents beginning in 2011, at least some of which belonged to dominion but now belong to China's HSBC as of last year . . . An affidavit from Trump Lawsuit highlighting Coomer's Dominion Patent, now alleged to belong to China . . .  He also can be seen in training videos explaining to users 'adjudication' functions on the vote machine that could allegedly be used to alter votes, singularly or in bulk, if a nefarious user chose to do so.  It is also alleged that he or Dominion performed

Oltmann, a "Denver business owner" and "founder of FEC (Faith Education Commerce)

United," as the source of its articles about Dr. Coomer and Dominion, stating:

> The Gateway Pundit's Jim Hoft interviewed Denver business owner Joe Oltmann on Sunday. Oltmann, the founder of FEC (Faith Education Commerce) United, revealed how he infiltrated Antifa and how during a conversation with Antifa members, he discovered "Eric from Dominion" was allegedly part of a chat during the week of September 27, 2020.

After indelibly linking Dr. Coomer and Dominion to false allegations of voter fraud,

Gateway Pundit and Hoft proceeded to release additional articles alleging the means with

which such fraud occurred.[79] Similarly, Gateway Pundit and Hoft took no efforts to verify

or corroborate these false allegations. Gateway Pundit and Hoft equally had no credible

evidence of any "Antifa conference call;" that Dr. Coomer was part of this purported call;

or that Dr. Coomer committed election fraud. Gateway Pundit and Hoft also took no

actions or efforts to corroborate or verify the baseless allegations before publishing them

---

illegal un-certified updates to possibly 1000s of Georgia election machines just days before the election . . . Coomer and Dominion Voting Systems are also allegedly threatening hefty lawsuits against all websites and news agencies who dare to speak out against their alleged massive national (and possibly international) scheme to allegedly rig our alleged elections. That is why we all must be very careful about what we say about Dominion and The Great and Powerful Eric Coomer.").

[79] *See* Jim Hoft, *IT WAS SYSTEMIC-PURPOSEFUL FRAUD: Clark County Nevada Dominion Machines ALSO Kicked out "About 70% of Ballots" – It Was in the Settings!*, THE GATEWAY PUNDIT, Dec. 15, 2020 ("The Dominion machines were set up to dispute 68.05 percent of all ballots. These ballots were then sent off to 'another location' where people in other locations could change the votes. This election is a fraud."); Jim Hoft, *New Video Shows Dominion's Eric Coomer Admitting Their Voting Machine Systems Are Wireless and Support All Networks*, THE GATEWAY PUNDIT, Jan. 3, 2021; Joe Hoft, *Report: Georgia Secretary of State Brad Raffensperger Neglected to Protect Georgians By Allowing Dominion Voting Machines in Elections – He Didn't Prevent Fraud – He Provided for It*, THE GATEWAY PUNDIT, Jan. 4, 2021; Joe Hoft, *New Detailed Inventory on Election Fraud in the 2020 Election by Deroy Murdock Provides Strong Evidence on President Trump's Performance in All the Swing States and Overall Race*, THE GATEWAY PUNDIT, Jan. 9, 2021 ("Everyone knows the results of the 2020 election are invalid. Even the corrupt politicians who ignored the fraud."); Joe Hoft, *Accurate List of 2020 Election Fraud Cases Shows 81 Cases Total, 30 Still Active – And NOT ONE SINGLE COURT Has Allowed Evidence to be Argued*, THE GATEWAY PUNDIT, Jan. 24, 2021 ("The 2020 election will go down as arguably the greatest fraud in world history. The tremendously popular incumbent candidate, President Trump, was easily winning the race on election night *in a landslide* and then suddenly multiple states took a break, quit counting, and by the end of the week the election was flipped to Joe Biden.").

and disregarded reliable sources establishing the contrary.  Oltmann has admitted there is no recording of this call.[80]   Gateway Pundit and Hoft knowingly and recklessly published these false statements despite their inherent improbability, the unreliability of the source, and the lack of credible evidence.  Gateway Pundit and Hoft made these false statements to support their preconceived conspiracy that the election was fraudulent.[81]

61.   On November 17, 2020, OANN Chief White House Correspondent Chanel Rion published false statements regarding Dr. Coomer, tweeting "Dominion Director of Strategy and Security, #EricCoomer: 'Trump won't win. I made F***ing sure of that.'"[82] As a representative of OANN and national broadcast reporter, Rion has a Twitter following of roughly 588,000 people with followers across the United States, including those in Colorado.  Rion's November 17 tweet referencing Dr. Coomer garnered more than 40,000 likes.  OANN and Rion went on to broadcast false allegations of the statements and actions Oltmann attributed to Dr. Coomer of election fraud, including a three-part report focusing on Dominion and Dr. Coomer, which President Trump

---

[80] *See* Joseph Oltmann, et al., *Ep. 196–Dominion Voting Machines*, CONSERVATIVE DAILY PODCAST (Nov. 9, 2020) (In response to the statement "but we don't have a recording," Oltmann stated "[i]t doesn't matter if I don't have it recorded.").

[81] Gateway Pundit and Hoft have a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests.  *See* Joe Hoft, *ROGER STONE EXCLUSIVE: How the Democrats Plan to Steal the 2020 Election*, THE GATEWAY PUNDIT, October 31, 2020; Joe Hoft, *2020 Election Prediction: Despite Massive Headwinds and Democrat Attempts to Steal Election, President Trump Will Win in Larger Landslide than 2016*, THE GATEWAY PUNDIT, October 23, 2020; Cassandra Fairbanks, *4Chan Users Claim To Have Found Way To Easily Change People's Voter Registration and Cancel Ballots Online in Washington and Oregon*, THE GATEWAY PUNDIT, October 18, 2020; Joe Hoft, *ELECTION FRAUD: Pennsylvania Rejects 334,000 Duplicate Ballots Already; Kentucky Reports Bins of Ballots Discarded*, THE GATEWAY PUNDIT, October 17, 2020.

[82] Chanel Rion OAN (@ChanelRion), TWITTER (Nov. 17, 2020, 8:35 AM).

retweeted to his followers.[83]  Given OANN and Rion's coverage of President Trump and

the Trump Campaign, the President had increasingly promoted their reporting.[84]

President Trump at that time had a national audience of over 88,000,000 followers on

Twitter, including upon information and belief a substantial number of Colorado

residents.  After linking Dr. Coomer and Dominion to false allegations of voter fraud,

OANN continued to perpetuate allegations of systemic voter fraud.[85]  Similarly, OANN

and Rion took no efforts to verify or corroborate these false allegations before publishing

them and disregarded reliable sources establishing the contrary.  They had no credible

evidence of any "Antifa conference call;" that Dr. Coomer was part of this purported call;

---

[83] *See* Chanel Rion, *Dominion-izing the Vote*, YOUTUBE (Nov. 21, 2021) (saying "In Coomer's case, he was in a position of power to actually act on his rage against Trump and Trump voters.  What does he mean when he says 'Trump won't win.  I made f-ing sure of that.'  Nothing?"); *Top Dominion Exec: Trump Is Not Going to Win.  I Made F\*\*ing Sure of That*, Nov. 29, 2020, YOUTUBE (publishing Oltmann saying "Eric Coomer was this, you know, he's not just Antifa, he was responsible for putting his finger on the scales of our election" and adding "If Coomer is investigated and found to have indeed tampered with a presidential election, such an action could be tried for treason.  Unfortunately, the question is, will the FBI step up to investigate?"); *see also* Donald J. Trump (@realDonaldTrump), TWITTER (NOV. 18, 2020, 11:41 PM), (Nov. 21, 2020, 10:30 PM), (Nov. 21, 2020, 10:31 PM), and (Nov. 21, 2020, 10:32 PM).

[84] Margaret Sullivan, *When Fox News disappoints, Trump has a backup: the conspiracy theory-peddling OANN*, WASH. POST, June 10, 2020, https://www.washingtonpost.com/lifestyle/media/when-fox-news-disappoints-trump-has-a-backup-the-conspiracy-peddling-oann/2020/06/10/c2a6ec8e-ab1f-11ea-9063-e69bd6520940_story.html (last visited Feb. 4, 2021); Jason Wilson, *OANN: what is the alternative far-right media outlet Trump is pushing?*, GUARDIAN, Nov. 16, 2020, https://www.theguardian.com/us-news/2020/nov/16/oann-what-is-tv-network-trump-is-pushing (last visited Feb. 4, 2021).

[85] Upon information and belief, OANN published several false statements of voter fraud relating to Dominion, which OANN had directly linked to Dr. Coomer, across various segments, including but not limited to: In Focus, *Former U.S. Attorney, Joe DiGenova, On the Growing Evidence of Voter Fraud*, OANN, Nov. 20, 2020 (Identifying Joe DiGenova as counsel for the Trump Campaign, publishing false allegations of voter fraud involving Dominion, including bulletins stating "Trump Campaign Building on 9 Key Points All Pointing to Election Fraud"); OAN News 8 AM, *Voting Fraud: Trump Legal Team Presents 'Clear and Viable' Path to Victory*, OANN, Nov. 20, 2020 (publishing false allegations that Sidney Powell was "making the case" for voter fraud, that Dominion and Smartmatic software was linked, and that real time data showed irregularities with Dominion voting machines); *Syndey* [sic] *Powell Launches Election Lawsuits in Michigan, Georgia*, OANN, Nov. 28, 2020 (publishing false allegations of voter fraud using Dominion's software programs); *President Trump's Path to Re-Election*, OANN, Dec. 21, 2020 (publishing allegations in support of false statements regarding voter fraud); *George Soros-Linked Election Software Company Denies Ties with Dominion*, Dec. 21, 2020 (publishing allegations in support of false statements regarding voter fraud so as to link Dominion, Smartmatic, and George Soros).

or that Dr. Coomer committed election fraud. Instead, like other Defendants, OANN and Rion knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[86]

62. Newsmax also began publishing false statements regarding Dr. Coomer. On November 17, 2020, Newsmax aired an episode of "American Agenda" that identified Dr. Coomer by name in relation to allegations of voter fraud with election equipment for Dominion and Smartmatic, a competitor of Dominion, alongside alleged conspiratoral connections with the 90-year-old Hungarian philanthropist George Soros.[87] Newsmax suggested nefarious intent when noting that Dominion had "scrubbed [Dr. Coomer] from their website." In reality, Dr. Coomer had not been on Dominion's website for years and Dominion employees' identities were removed from third party marketing sites as an essential safety precaution given the numerous death threats already targeting them. On

---

[86] OANN has a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests. *See* OANN Newsroom, *Several States Investigating Accounts of Mail-In Voter Fraud*, OANN, Sept. 27, 2020; OANN Newsroom, *President Trump Slams Mail-In Voting As A 'Scam,' Says It Will Be 'A Disaster,'* OANN, Sep. 19, 2020; OANN Newsroom, *AG Barr: Mail-In Ballots Enable Fraud, Voter Coercion*, OANN, Sept. 3, 2020.

[87] American Agenda, *Who is behind Dominion Voting System*, NEWSMAX, Nov. 17, 2020 (Childers: ". . . we're talking about Dominion Voting, everyone has heard of it by now. It is one of the major systems used to case election ballots all across the nation. It is used in fact in 28 states. It has come under fire as allegations of voter fraud . . . in which votes for the President were switched to Joe Biden . . .and joining us now to talk a little more about it, what was in fact uncovered, is national security and foreign policy advisory board Trump for President 2016 Kenneth Timmerman . . . you are also the author of Election Heist." Timmerman: "Dominion is certainly backpedaling very quickly . . . their relationship with Smartmatic . . . chairman of the board of Smartmatic until recently . . . was an investment partner of George Soros . . . Smartmatic changed their website and scrubbed him from the website and Dominion scrubbed about half of their employees . . . their profiles . . . including a gentleman named Eric Coomer, who is best known for having reposted the Antifa manifesto and sent it to President Trump." With the bulletin "Is the President Right About Faulty Dominion Machines," Sellers: "It seems Ken like they've never heard of each other . . . as you know, they have. They've worked together in some cases." Timmerman stating that not all systems have paper backups, following with allegations of Dominion software was faulty: "You don't certify the software four days before the election, it could very well be hacked . . . the hacking doesn't have to come by Dominion by the way, it can come from someone impersonating Dominion.").

November 20, 2020, Newsmax host Howie Carr invited Powell onto "The Howie Carr Show" to elaborate on her baseless allegations of voter fraud. Carr sought confirmation from Powell regarding the false allegations she had made against Dr. Coomer, asking her if it was true that Dr. Coomer was on a conference call with Antifa and had allegedly claimed he rigged the election.[88] Carr did not ask for any proof when Powell affirmed those allegations, when she stated that she had a recording of the call (she does not), or when she went on to make further baseless allegations of connections between George Soros and Dominion. Just a week later Newsmax aired an episode of Michelle Malkin's "Sovereign Nation" wherein she focused an entire segment on Dr. Coomer.[89] Malkin invited Oltmann on the show for a lengthy interview where Oltmann again promoted his false allegations against Dr. Coomer. Malkin falsely claimed that Oltmann "heard the name Eric Coomer" on the call (he did not), and Oltmann noted that she was an early vector for facilitating the spread of the story.[90] On December 5, 2020, Newsmax host Greg Kelly invited Ken Timmerman on his show, Greg Kelly Reports, to discuss his book "The Election Heist."[91] Timmerman concluded the segment by repeating the question that had driven Dr. Coomer into hiding and that had resulted in countless death threats:

---

[88] *See* Howie Carr, THE HOWIE CARR RADIO NETWORK PODCAST, (Nov. 20, 2020) (Carr asking, "Let me ask you about this guy Eric Coomer. He's—I think—he works for Dominion. He's [a] Berkley, California—University of California grad. He's the one who was allegedly . . . on a conference call or something—a Zoom—with Antifa. And he said supposedly, 'Don't worry about Trump. I've already made sure he's going to lose the election.' Is that true, for starters?" Powell responded, "Yes . . . We have an affidavit to that effect and we have the—I think we have a copy of the call." Carr continued, "Where is Eric Coomer now?" Powell responded, "He's disappeared. And also Dominion has shuttered up both of their offices in Canada where they shared an office floor with George Soros entities and they have moved their office in Denver and of course, I'm sure there was a lot of document shredding and thing quote lost end quote in that process.").

[89] *See* Sovereign Nation with Michelle Malkin, *Hacking the Vote*, NEWSMAX, Nov. 28, 2020.

[90] *See supra* at n.70.

[91] Greg Kelly Reports, NEWSMAX, Dec. 5, 2020.

"Where is Eric Coomer?  Where is Eric Coomer, the Dominion guy who is behind all of this?" Kelly responded, "Good question.  Good question indeed.  We'll see you later, okay?  Eric Coomer, yeah, that's certainly not a household name yet.  Could be soon.  We'll be right back."[92]  After linking Dr. Coomer and Dominion to allegations of voter fraud, on December 15, 2020, Newsmax aired another episode of "American Agenda" linking Dominion with Smartmatic, alleging Smartmatic was Venezuelan-owned, and falsely alleging there was systemic fraud.[93]  Newsmax repeatedly promoted these false allegations of voter fraud.[94]  Newsmax took no efforts to verify or corroborate the false allegations against Dr. Coomer and Dominion before publishing them and disregarded reliable sources establishing the contrary.[95]  It had no credible evidence of any "Antifa

---

[92] Upon information and belief, a similar segment was aired by Newsmax on December 4, 2020 and December 5, 2020, on its daytime program "Spicer and Co," which also asked "Where is Eric Coomer? . . . the guy who's behind it all . . . that's certainly not a household name yet but could be soon."

[93] American Agenda, NEWSMAX, Dec. 15, 2020 ( Morris: "Dominion software was licensed from Smartmatic, which is a Venezuelan owned and controlled company.  So, we're dealing with here the most incredible, systemic fraud.  This is the exact same system they're using in Georgia on January 5th."  Childers: "Regardless of whether it was caused by human error rate of 68 percent versus what the FEC says is acceptable of .0008 percent.  Dramatically different").

[94] Upon information and belief, Newsmax published several false statements of voter fraud relating Dominion, which Newsmax had directly linked to Dr. Coomer, across various segments, including but not limited to: Stinchfield, NEWSMAX, Nov. 17, 2020 (publishing statements that election fraud may well have originated in the Dominion software); John Bachman Now, NEWSMAX, Nov. 19, 2020 (publishing statements of a wide-ranging conspiracy involving George Soros, deceased Venezuelan president Hugo Chavez, and Dr. Coomer); American Agenda, NEWSMAX, Dec. 15, 2020 (publishing statements that Dominion software is licensed from Smartmatic); Greg Kelly Reports, NEWSMAX, Dec. 17, 2020 (publishing statements that Smartmatic election software was used by various foreign governments to destroy the election system); American Agenda, *Who is behind Dominion Voting System*, NEWSMAX, Dec. 18, 2020 (publishing statements that actual intervention in the vote count with Dominion software has been "proven"); The Chris Salcedo Show, NEWSMAX, Dec. 18, 2020 (publishing statements that Smartmatic election software only used to easily change votes).

[95] Since then, Newsmax has issued a sweeping retraction for such statements, stating:

Since election day, various guests, attorneys and elected officials have appeared on Newsmax and offered opinions and claims about Smartmatic and Dominion Systems, both companies that offer voting software in the U.S. Newsmax would like to clarify its news

conference call;" that Dr. Coomer was part of this purported call; or that Dr. Coomer

committed election fraud or subverted the results of the election. Instead, like other

---

coverage and note that it has not reported as true certain claims made about these companies. There are several facts our viewers and readers should be aware of.

Newsmax has found no evidence that either Dominion or Smartmatic owns the other, or has any business association with each other. We have no evidence that Dominion uses Smartmatic software, or vice versa. No evidence has been offered that Dominion or Smartmatic used software or reprogrammed software that manipulated votes in the 2020 election. Smartmatic has stated that its software was only used in the 2020 election in Los Angeles. It was not used in any battleground state contested by the Trump Campaign. Newsmax has no evidence to the contrary.

Dominion has stated the company has no ownership relationship with the Pelosi family, the Feinstein family, the Clinton family, Hugo Chavez, or the government of Venezuela. Neither Dominion nor Smartmatic has any relationship with George Soros. Smartmatic is a U.S. company, and not owned by the Venezuelan government, Hugo Chavez, or any foreign official or entity. Smartmatic states that it has no operations in Venezuela. While the company did election projects in Venezuela from 2004-2017, it states that it was never founded by Hugo Chavez, nor did it have a corrupt relationship with him, or the Venezuelan government.

*See Jeremy Barr, Newsmax issues sweeping 'clarification' debunking its own coverage of election information,* WASH. POST, Dec 21, 2020, *https://www.washingtonpost.com/media/2020/12/21/newsmax-clarification-smartmatic/* (last visited Feb. 4, 2021). Other entities have similarly issued retractions, including the American Thinker Magazine:

American Thinker and contributors Andrea Widburg, R.D. Wedge, Brian Tomlinson, and Peggy Ryan have published pieces on www.AmericanThinker.com that falsely accuse US Dominion Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively "Dominion") of conspiring to steal the November 2020 election from Donald Trump. These pieces rely on discredited sources who have peddled debunked theories about Dominion's supposed ties to Venezuela, fraud on Dominion's machines that resulted in massive vote switching or weighted votes, and other claims falsely stating that there is credible evidence that Dominion acted fraudulently.

These statements are completely false and have no basis in fact. Industry experts and public officials alike have confirmed that Dominion conducted itself appropriately and that there is simply no evidence to support these claims.

It was wrong for us to publish these false statements. We apologize to Dominion for all of the harm this caused them and their employees. We also apologize to our readers for abandoning journalistic principles and misrepresenting Dominion's track record and its limited role in tabulating votes for the November 2020 election. We regret this grave error.

Thomas Lifson, *Statement*, AM. THINKER, Jan. 15, 2021, https://www.americanthinker.com/blog/2021/01/statement.html (last visited Feb. 4, 2021).

Defendants, Newsmax knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[96]

63. The Trump Campaign fomented these conspiracies of election fraud. Beginning as early as 2016, President Trump and the Trump Campaign began to promote baseless allegations of voter fraud as a justification for then losing the popular vote.[97] In the months leading to the 2020 election, the Trump Campaign revived these allegations in the event of a loss and repeatedly refused to agree to accept the results of the election.[98] After election night, as President Trump's early lead dwindled, the Trump Campaign refused to accept the results and instead turned to allegations of fraud.[99] This included

---

[96] Newsmax has a history of advancing varying allegations of voter fraud to support specific political beliefs and specific political candidates as well as to promote their businesses interests. *See* John Gizzi, *Pennsylvania Conservatives Echo Trump on Possible Voter Fraud*, NEWSMAX, Sept. 28, 2020 (separate allegations of voter fraud); Michael Dorstewitz, *On Elections Trump Is Right: Protect Integrity, Beware of Fraud*, NEWSMAX, Sept. 30, 2020 (separate allegations of voter fraud).

[97] *See* Jim Rutenberg, et al., *77 Days: Trump's Campaign to Subvert the Election*, N.Y. TIMES, Jan. 31, 2021, https://www.nytimes.com/2021/01/31/us/trump-election-lie.html (last visited Feb. 4, 2021).

[98] As the Trial Memorandum of the U.S. House of Representatives stated:

> Before a single voter cast a ballot in the 2020 presidential election President Trump made it clear that he had no intention of abiding by the verdict of the American people. In a July 2020 interview, he pointedly refused to agree that he would accept the election results. Pressed in September 2020 on whether he would "commit to making sure that there is a peaceful transferal [sic] of power after the election," he responded: "We're going to have to see what happens." Throughout this period, he insisted at rallies and through social media that if he appeared to lose the election, the only possible explanation was a conspiracy to defraud him and those who supported him. On August 17, for instance, he asserted that "the only way we're going to lose this election is if this election is rigged." One week later, he declared that "[t]he only way they can take this election away from us is if this is a rigged election." He echoed these points at every opportunity, laying the groundwork for a refusal to accept any outcome other than his own continued grip on power.

*See In re Impeachment of Donald J. Trump*, Tr. Memo., In the Senate of the United States Sitting as a Court of Impeachment, Feb. 2, 2021 (internal citations omitted).

[99] *See* Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 4, 2020, 12:49 A.M.) ("We are up BIG, but they are trying to STEAL the Election. We will never let them do it."); Donald J. Trump (@realDonaldTrump), TWITTER (Nov. 8, 2020, 9:17 A.M.) ("this was a stolen election").

Oltmann's baseless allegations against Dr. Coomer.[100]   On November 17, 2020, Eric Trump, a representative and surrogate of President Trump's campaign, tweeted the following:[101]



With his relationship to the President and the Trump Campaign, Eric Trump has a Twitter following of roughly 4.5 million people, including a significant number of Colorado

---

[100] *See* Wake Up with Randy Corporon, 710 KNUS, Nov. 14, 2020 (Corporon assisted Oltmann in preparing an affidavit for the Trump Campaign regarding Oltmann's false statements of voter fraud, stating "Joe is part of that evidence now, because yesterday we polished up an affidavit and sent it directly to Jenna Ellis, Donald Trump's, actually she sent it to me, because she put it together after conversations with him, and I reviewed it and cleaned it up . . . When I say we, I am a minor wheel in the cog of the Trump team lawyers, just doing whatever I can, whenever I am told, any time I am told it, to try to move this thing along.").

[101] Eric Trump (@EricTrump), TWITTER (Nov. 17, 2020, 2:49 PM).

residents.[102]  Eric Trump's November 17 tweet falsely attributed the quote "Don't worry
about the election, Trump's not gonna win.  I made f*cking sure of that!" to Dr. Coomer
and linked a Gateway Pundit article identifying "Denver Business Owner" Oltmann as its
source for allegations against Dr. Coomer and Dominion.  This false statement garnered
more than 38,000 likes.  While Eric Trump's published tweet was intended to reach a
national audience to cast doubt on the integrity of an election for the benefit of the Trump
Campaign, it directly identified and targeted Colorado and Coloradan audiences.
As intended, followers in Colorado received Eric Trump's message and responded.[103]
Despite the lack of evidence, unreliability of the source, and improbability of the
allegations, Eric Trump, as a representative of the Trump Campaign, promoted a
preconceived conspiracy of election fraud in support of the Trump campaign.[104]

---

[102] Eric Trump has campaigned on behalf of the Trump Campaign in Colorado and specifically in relation
to FEC United.  *See* Erik Maulbetsch, *FEC United Founder Threatens Journalists at GOP Campaign Event*,
COLO. TIMES RECORDER, Oct. 16, 2020, https://coloradotimesrecorder.com/2020/10/fec-united-founder-
threatens-journalists-at-gop-candidate-event/31689/ (last visited Feb. 4, 2021) (reporting a political event
held by FEC United and Oltmann in Colorado featured video message from Eric Trump before the
presidential election).

[103] *See e.g.*, Liesl Bryan (@LieslBryan), TWITTER (Nov. 17, 2020, 3:43 PM) ("We need a revote in Colorado
then!"); Optimistforever – blacklisted by commies (@99Cornelia6), TWITTER (Nov. 17, 2020, 2:53 PM)
("Maybe Colorado is blue for the same reason!!"); Bink's MamaBear (@Binks_MamaBear), TWITTER
(Nov. 17, 2020, 3:09 PM) ("Yet, no one is investigating Colorado's results. Why?!?! @JenaGriswold insisted
our elections were perfect.  I'm certain if they were audited Gardner & House would've won.  There's an
active campaign to recall polis.  @pnjaban @SidneyPowell1 @RonColeman @LLinWood."); D W
Jenkins(@DWJenkins1), TWITTER (Nov. 17, 2020, 2:51 PM) ("Denver and all the front range need to be
scrutinized").

[104] Eric Trump and the Trump Campaign have a history of advancing varying allegations of voter fraud to
support and promote their political advancement.  *See* Donald J. Trump (@realDonaldTrump), TWITTER
(Jun. 22, 2020, 6:10 AM) (separate allegations of fraud); *see also* Tiffany Hsu, *Conservative News Sites
Fuel      Voter     Fraud      Misinformation*,      N.Y.      TIMES,      Oct. 25,      2020,
https://www.nytimes.com/2020/10/25/business/media/voter-fraud-misinformation.html (last   visited
Feb. 4, 2021); Pat Beall et. al., *We analyzed a conservative foundation's catalog of absentee ballot fraud:
It's    not    a    2020    election    threat*, USA TODAY, Oct. 20, 2020, https://www.usatoday.com/in-
depth/news/investigations/2020/10/20/trumps-absentee-ballot-fraud-claims-not-supported-
evidence/5969447002/ (last visited Feb. 4, 2021); Arielle Mitropoulos, *Trump's ballot fraud allegations*

Similarly, Eric Trump took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary.

64. Furthering the false allegations, on November 19, 2020, the Trump Campaign provided an update on its legal challenges to the election from the Republican National Committee in Washington D.C.[105] Among those who spoke at the press conference were personal attorneys for President Trump, as well as the Trump Campaign, including (at that time) Sidney Powell, Rudolph Giuliani, and Jenna Ellis.[106] During the press conference, Powell falsely stated:

> Speaking of Smartmatic's leadership, one of the Smartmatic patent holders, Eric Coomer I believe his name is, is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden, nothing to worry about here, and he was going to, they were going to f— Trump. His social media is filled with hatred for the President, and for the United States of America as a whole, as are the social media accounts of many other Smartmatic people.

Giuliani furthered these unfounded attacks on Dr. Coomer, stating:

> By the way, the Coomer character, who is close to Antifa, took off all of his social media, haha, but we kept it. We've got it. The man is a vicious, vicious man. He wrote horrible things about the president. He is completely – he is completely biased. He is completely warped. And, he specifically says, that they are going to fix this election. I don't know what you need to wake

---

*embellished and not widespread: Experts*, ABC, Oct. 20, 2020, https://abcnews.go.com/Politics/trumps-ballot-fraud-allegations-embellished-widespread-experts/story?id=73701060 (last visited Feb. 4, 2021).

[105] This event was broadcast on C-SPAN. It has also been substantially reported across various media outlets, including CNN, Fox, The New York Times as well as Defendants OANN and Newsmax. President Trump also tweeted this news conference. *See* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 19, 2020, 6:59 AM) ("Important News Conference today by lawyers on a very clear and viable path to victory. Pieces are very nicely falling into place. RNC at 12:00 P.M.")

[106] *See* Donald J. Trump (@realDonaldTrump), Twitter (Nov. 14, 2020, 9:11 PM) ("Rudy, Giuliani, Joseph diGenova, Victoria Toensing, Sidney Powell, and Jenna Ellis, a truly great team, added to our wonderful lawyers and representatives!").

up, to do your job, and inform the American people, whether you like it or not, of the things they need to know.

This is real. It is not made up. It is not - there is nobody here that engages in fantasies. I've tried a hundred cases. I've prosecuted some of the most dangerous criminals in the world. I know crimes. I can smell them. You don't have to smell this one. I can prove it to you eighteen different ways. I can prove to you that he won Pennsylvania by 300,000 votes. I can prove to you that he won Michigan by probably 50,000 votes.

When I went to bed on election night, he was ahead in all of those states, every single one of those states. How is it they all turned around? Every single one of them turned around. Or is it more consistent that there was a plan to turn them around? And since there are witnesses who say there was a plan to turn them around, and it kind of begs credulity to say that it all happened in every single state, my goodness this is how you win cases in a courtroom.

Giuliani's statement echoed several previous statements he made about Dr. Coomer.[107]

These statements are false. Dr. Coomer is not part of Smartmatic. He never had a conversation with anyone claiming to be Antifa, he never uttered words suggesting he would rig the election, and he never took actions to rig the election. As noted above, Dr. Coomer's social media was private and, of course, under the First Amendment to the Constitution, he is entitled to his political opinion. Notably, Ronna McDaniel, the chairwoman of the Republic National Committee, has since expressed regret over letting

---

[107] On November 12, 2020, in a nationally televised interview on Lou Dobbs Tonight, Giuliani falsely claimed that Dominion was owned by Smartmatic and that Smartmatic was formed to "fix the elections" by Venezuelans and that Smartmatic was being run by individuals in George Soros's organization. *Lou Dobbs Tonight*, FOX BUSINESS, Nov. 12, 2020. On November 13, 2020, Giuliani again said that "Dominion software . . . really is Venezuelan . . . it's called Smartmatic." *Chat with the Mayor: Major Challenges*, 77WABC, Nov. 13, 2020. On November 14, 2020, Giuliani tweeted that Dominion "was a front for Smartmatic." Rudy W. Giuliani (@RudyGiuliani), TWITTER (Nov. 14, 2020). On November 15, 2020, during his radio show and a televised interview on Fox News, Giuliani claimed that Dominion uses Venezuelans software "that's been used to steal elections in other countries" and that Dominion "notifies" election officials as to when they can add fake ballots. *Uncovering the Truth with Rudy Giuliani & Dr. Maria Ryan: Voter Fraud*, 77WABC, Nov. 15, 2020; *Giuliani: Trump is contesting the election 'vigorously' in the courts*, FOX NEWS., Nov. 15, 2020.

Powell and Giuliani hold this press conference, stating "When I saw some of the things Sidney was saying, without proof, I certainly was concerned it was happening in my building."[108]

65. The Trump Campaign and its representatives knowingly and recklessly made these statements despite the lack of credible evidence, the unreliability of their sources, and the improbability of the allegations.[109] They similarly took no actions or efforts to corroborate or verify the baseless allegations before publishing them and disregarded reliable sources establishing the contrary.[110] They continued to promote a

---

[108] *See* Annie Karni, et al., *An Emboldened Extremist Wing Flexes Its Power in a Leaderless G.O.P*, N.Y. TIMES, Feb. 1, 2021, https://www.nytimes.com/2021/02/01/us/politics/republicans-trump-ronna-mcdaniel.html (last visited Feb. 4, 2021).

[109] Counsel for the Trump Campaign had declined to make allegations of systemic voter fraud in court under penalty of perjury. One attorney for the campaign recently filed a motion for leave to withdraw as counsel for the Trump Campaign, stating it had used his "services to perpetuate a crime" and "insist[ed] upon taking action that the lawyer considers repugnant and with which the lawyer has a fundamental disagreement." *See Trump for President, Inc. v. Phila. Cnty. Bd. of Elections*, No. 2:20-cv-05533-PD (E.D. Pa.) at Dkt. No. 9. There are reports indicating President Trump and the Trump Campaign were advised these allegations were baseless. *See* Jonathan Swan, et al.*, Bonus Episode, Inside the craziest meeting of the Trump presidency*, Axios, Feb. 2, 2021, https://www.axios.com/trump-oval-office-meeting-sidney-powell-a8e1e466-2e42-42d0-9cf1-26eb267f8723.html.

[110] Several Trump Campaign attorneys are now being investigated for failures of professional obligations for peddling such claims. Michigan's Attorney General, Secretary of State, and Governor filed complaints with the State Bar of Texas requesting that Powell be disbarred for violating her ethical and professional obligations by "fil[ing] a complaint based on falsehoods, us[ing] her law license in an attempt to disenfranchise Michigan voters and undermine the faith of the public in the legitimacy of the recent presidential election, and len[ding] credence to untruths that led to violence and unrest." *See* Press Release, State of Michigan, AG Nessel, Gov. Whitmer, Secretary Benson Seek Disbarment of Attorneys for Pushing Election Fraud Narrative, Feb. 1, 2021, https://www.michigan.gov/som/0,4669,7-192-26847-551080--,00.html (last visited Feb. 4, 2021)**.** The New York State Bar Association (NYSBA) received hundreds of similar complaints about Giuliani and "his baseless efforts on behalf of President Trump to cast doubt on the veracity of the 2020 presidential election and after the votes were cast, to overturn its legitimate results" and announced its formal investigation into Giuliani and his efforts, which "included the commencement and prosecution of court actions in multiple states without any evidentiary basis whatsoever." *See* Susan DeSantis, *New York State Bar Association Launches Historic Inquiry into Removing Trump Attorney Rudy Giuliani From Its Membership*, N.Y. STATE BAR ASSOC., Jan. 11, 2021, https://nysba.org/new-york-state-bar-association-launches-historic-inquiry-into-removing-trump-attorney-rudy-giuliani-from-its-membership/ (last visited Feb. 4, 2021).

preconceived conspiracy of election fraud in support of their political ends.[111]  In response to inquiries from members of the press in attendance at the news conference, Jenna Ellis, baldly informed them, "Your question is fundamentally flawed when you're asking, 'Where is the evidence?'"  Following the press conference, various news publications ran headlines questioning the reliability of the Trump Campaign's allegations.[112]  Despite concerns raised by news outlets, a significant portion of the public trusts President Trump, his campaign, and his campaign representatives and took these false allegations against Dr. Coomer seriously.[113]  This led to an anticipated violent conclusion.

66.    In November 2020, Sidney Powell, the Trump Campaign's then-attorney, began making appearances on nationally broadcasted platforms to further disseminate false statements about election fraud and Dr. Coomer.  On November 20, 2020, Newsmax host Howie Carr interviewed Powell on "The Howie Carr Show" and asked her to confirm that there was alleged evidence of widespread voter fraud, that votes cast had been changed through voting machines, that millions of votes had been removed from

---

[111] Notably, the legal challenges raised by the Trump Campaign after the election failed to allege or support the false allegations raised to the public.  *See* Alanna Durkin Richer, et. al., *EXPLAINER: A look at Trump's long-shot legal challenges,* AP, Nov. 18, 2020, https://apnews.com/article/donald-trump-legal-challenges-explained-075b2ef6f75e9dd3026d54fc38b81920 (last visited Feb. 4, 2021).

[112] *See e.g.*, Jane C. Timm, *Rudy Giuliani baselessly alleges 'centralized' voter fraud at free-wheeling news conference*, NBC, Nov. 19, 2020, https://www.nbcnews.com/politics/donald-trump/rudy-giuliani-baselessly-alleges-centralized-voter-fraud-free-wheeling-news-n1248273 (last visited Feb. 4, 2021); Tara Subramaniam, et al., *Fact checking Giuliani and the Trump legal team's wild, fact-free press conference,* CNN, Nov. 20, 2020, https://www.cnn.com/2020/11/19/politics/giuliani-trump-legal-team-press-briefing-fact-check/index.html (last visited Feb. 4, 2021); Andrew Solender, *More Republicans Break with Trump On Election After Giuliani Press Conference*, FORBES, Nov. 20, 2020, https://www.forbes.com/sites/andrewsolender/2020/11/20/more-republicans-break-with-trump-on-election-after-giuliani-press-conference/?sh=6d9007cb6013 (last visited Feb. 4, 2021).

[113] *See* Anthony Salvanto et. al., *CBS News Poll: Most feel election is "settled" but Trump voters disagree*, CBS, Dec. 13, 2020.; *see also infra* § IV(D).

President Trump and given to President Joe Biden, and that Dr. Coomer through Dominion was part of this conspiracy to subvert the presidential election. Carr then asked Powell whether Dr. Coomer actually stated "Don't worry about President Trump, I already made sure that he's going to lose the election." Powell falsely attributed these statements to Dr. Coomer, stating "Yes, it's true. We have an affidavit to that effect and I think we have a copy of the call."[114] She further alleged Dr. Coomer had disappeared, and Dominion had closed its offices in Denver and Toronto. Powell had no "copy of the call" or recording.[115] Dr. Coomer had not "disappeared." And Dominion had not closed its offices. These allegations were capable of verification. Yet, neither Newsmax nor Powell made any legitimate effort to verify them before publishing. They had no credible evidence or reliable source. They again disregarded reliable sources establishing the contrary. Like other Defendants, Newsmax and Powell knowingly and recklessly published false statements about Dr. Coomer to support a preconceived conspiracy that the election was fraudulent.[116]

---

[114] Howie Carr, *The Howie Carr Show*, NEWSMAX, Nov. 20, 2020. The affidavit Powell referenced was made by Oltmann. *See e.g.*, *Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 1, ¶¶ 94-101. Oltmann, in an interview on the Peter Boyles Show on November 17, 2020 also confirmed he had been "in constant contact with the Trump lawyers."

[115] Oltmann has admitted he has no recording of the alleged "Antifa Conference Call" he infiltrated. *See* Joseph Oltmann, et al., *Ep. 196–Dominion Voting Machines,* CONSERVATIVE DAILY PODCAST (Nov. 9, 2020).

[116] Powell also has a history of advancing unsupported theories and allegations of fraud to support specific political beliefs and specific political candidates as well as to promote her businesses interests. *See, e.g.*, Lou Dobbs, *Sidney Powell: Trump has to fight for election integrity,* FOX BUSINESS, Nov. 7, 2020 (alleging that an Obama-era supercomputer known as The Hammer had flipped thousands of votes from Trump to Biden); Sidney Powell, *Licensed to Lie* (2nd ed. 2018) (alleging deep state corruption in the Justice Department); Jeremy W. Peters, et al., *What We Know About Sidney Powell, the Lawyer Behind Wild Voting Conspiracy Theories,* Dec. 8, 2020, https://www.nytimes.com/article/who-is-sidney-powell.html (last visited Feb. 4, 2021). For example, in her November 7, 2020 interview on The Lou Dobbs Show, Powell

67. On this same day, Powell appeared in another interview with Maria Bartiromo and again alleged she had a tape of Dr. Coomer saying he was going to rig the election for Biden.[117] Again, she had no tape. However, Powell apparently did not have time to appear on Fox News that same day with Tucker Carlson. That evening, Carlson published an opinion piece wherein he stated, "We asked the Trump campaign attorney for proof of her bombshell claims. She gave us nothing."[118] Carlson went on to explain that:

> [W]e invited Sidney Powell on the show. We would have given her the whole hour. We would have given her the entire week, actually, and listened quietly the whole time at rapt attention.
>
> But she never sent us any evidence, despite a lot of polite requests. When we kept pressing, she got angry and told us to stop contacting her. When we checked with others around the Trump Campaign, people in positions of

---

turned to far-right conspiracy theories circulated prior to the election regarding programs called The Hammer and Scorecard stating:

> I think there are a number of things [the Department of Justice] need[s] to investigate, including the likelihood that 3% of the vote total was changed in the pre-election voting ballots that were collected digitally by using the Hammer program and the software program called Scorecard. That would have amounted to a massive change in the vote that would have gone across the country and explains a lot of what we're seeing. In addition, they ran an algorithm to calculate votes they might need to come up with for Mr. Biden in specific areas . . . I think they were very broadly used, but not by the vote counters. They were used by the forces in the Democratic operatives that had access to these programs through the government access points that they have and used it illegally to change votes in this country. It's got to be investigated probably by the president's most trusted military intelligence officials who can get into the system and see what was done, but we do have some evidence that was exactly what happened. And they've used it against other entities in other countries, it's just been turned recently against our own citizens here to change election results.

Lou Dobbs Tonight, *Sidney Powell: Trump has to fight for election integrity*, Fox Business, Nov. 7, 2020. These conspiracies were created well before the 2020 election.

[117] *See* Maria Bartiromo, *Mornings with Maria*, Fox, Nov. 20, 2020 (Powell falsely stating "We've got Eric Coomer admitting on tape that he rigged the election for Biden . . . We have pictures of him in other countries helping people rig elections. So he's got a long history of accomplishing the result that they want accomplished, and I'm sure that it's for money.").

[118] Tucker Carlson, *Tucker Carlson: Time for Sidney Powell to show us her evidence*, Fox, Nov. 19, 2020.

authority, they also told us Powell had never given them evidence to prove anything she claimed at the press conference.

68.     On November 22, 2020, the Trump Campaign purportedly removed Powell from its legal team.  "Sidney Powell is practicing law on her own," Trump's personal and campaign lawyers said in the statement.[119]  "She is not a member of the Trump Legal Team.  She is also not a lawyer for the President in his personal capacity."  That did not stop Powell's false statements against Dr. Coomer.

69.     Throughout Powell's various media appearances, she solicited millions of dollars in donations on behalf of her legal defense fund, Defending the Republic.  Powell and Defending the Republic then used the donations to fund her attacks on the election and Dr. Coomer.

70.     Using these donations, Powell filed highly publicized lawsuits in Arizona, Georgia, Wisconsin, and Michigan, in which Dr. Coomer is a central figure.  Powell promised the press she would "release the Kraken" with extensive evidence, but the lawsuits that followed were filled with conspiracy theories, speculation, and typographical errors.  Without evidence, she alleged a massive criminal conspiracy under Dr. Coomer's direction and accused Dr. Coomer of anti-American and criminal conduct:

- In the United States District Court for the Northern District of Georgia, Powell quotes Oltmann's interview with Michelle Malkin and recounts Oltmann's story about "Eric from Dominion" saying he fixed the election on an Antifa call.[120]  Judge Timothy Batten dismissed the suit less than two weeks after it was filed.[121]  After

---

[119] *See* Kyle Cheney, *Trump Campaign cuts Sidney Powell from president's legal team*, POLITICO, Nov. 22, 2020, https://www.politico.com/news/2020/11/22/trump-campaign-sidney-powell-legal-439357 (last visited Feb. 4, 2021).

[120] *Pearson, et al., v. Kemp, et al.*, No. 1:20-cv-04809-TCB (N.D. Ga.) at Dkt. No. 1, ¶ 120.

[121] *Id.* at Dkt. No. 74.

appealing to the U.S. Supreme Court, Powell voluntarily dismissed the lawsuit on January 19, 2021.[122]

- In the United States District Court for the Eastern District of Michigan, Powell again references the Malkin interview with Oltmann.[123] In a scathing order, Judge Linda V. Parker dismissed the case, noting "Plaintiffs are far from likely to succeed in this matter."[124]

- In the United States District Court of Arizona, Powell alleged Colorado resident Joe Oltmann disclosed that as a reporter he infiltrated ANTIFA, a domestic terrorist organization where he recorded Eric Coomer representing, "Don't worry about the election. Trump is not going to win . . ."[125] Judge Diane J. Humetewa dismissed this matter, stating "Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court."[126]

   In the United States District Court for the Eastern District of Wisconsin, Powell again relies on Oltmann to falsely allege that Dr. Coomer was present at an Antifa meeting, made allegations to subvert the election, and suggests he did in fact subvert the election.[127] Judge Pamela Pepper dismissed this matter, stating "Federal judges do not appoint the president in this country. One wonders why plaintiffs came to federal court and asked a federal judge to do so."[128]

71. All of the Defendants relied on false statements made by one another to advance a narrative that had no basis in fact. Together, Defendants conceived of a story

---

[122] *Pearson, et al., v. Kemp, et al.*, No. 20-816 (U.S.) at Joint Stipulation to Dismiss Appeal.

[123] *King, et al., v. Whitmer, et al.*, No. 2:20-cv-13134-LVP-RSW (E. Mich.) at Dkt. No. 1, ¶ 153.

[124] *Id.* at Dkt. No. 62, p. 35 (the Court goes on to say, "In fact, this lawsuit seems to be less about achieving the relief Plaintiffs seek—as much of that relief is beyond the power of this Court—and more about the impact of their allegations on People's faith in the democratic process and their trust in our government.").

[125] *Bowyer, et al., v. Ducey, et al.*, No. 2:20-cv-02321-DJH (D. Ariz.) at Dkt. No. 1, ¶ 100.

[126] *Id.* at Dkt. No. 84, p. 28–29.

[127] *Feehan, et al., v. Wis. Elections Comm'n, et al.*, No. 2:20-cv-01771-PP (E.D. Wisc.) at Dkt. No. 1, ¶¶ 99-100.

[128] *Id.* at Dkt. No. 83, p. 2, 45.

that the results of the election were fraudulent and consciously set out to establish that Dr. Coomer perpetuated this fraud so as to further their own ends. To do this, Defendants disregarded credible evidence and relied on inherently unreliable sources all to form their inherently improbable accusations. Defendants' conduct has resulted in direct harm to Dr. Coomer through their encouragement of violence and threats. This harm is not hypothetical. A direct manifestation of the harm caused by Defendants' conduct is the armed insurrection on the U.S. Capitol on January 6, 2021. Lies about election fraud, including lies about Dr. Coomer, incited the insurrection. The open use of force by the militants further confirms the seriousness of the threats being made against Dr. Coomer.

### D.   *The harm Defendants caused Dr. Coomer.*

72.    Social media exploded with threats and attacks as the lies spread. For example, on November 21, 2020, anonymous Reddit user "Pher001" posted an article to the subreddit /r/donaldtrump titled "Eric Coomer needs to be arrested before he tries to run/or fly away." The post contained the following image:



53

Some of the responses among the hundreds written to this one post include:

"Fking maggot";

"Most wanted, live, to testify.  Report if you know his were abouts. Report any sight-seeing of him.  But I think he is going to hide in Venezuela!";

"If this man disenfranchised people of their votes he deserves worse than life in prison";

"He disenfranchised millions of people's voting rights.  Wars are fought over that. He deserves everything he gets";

"His fucken face makes me so fucken mad.  FUCK HIM!! TRUMP WON!";

"A good mug for USA's Top 10 Terrorist list.  Wanted DEAD or ALIVE";

"This man will be dead within 2 weeks."

73.     Given the flood of negative publicity, including death threats, Dominion was forced to alter its website and attempted to correct the numerous falsehoods Defendants and others had spread about it and its employees.[129]  Dominion posted on its website that "Dominion is not shuttering its offices.  Employees have been encouraged to work remotely and protect their social media profiles due to persistent harassment and threats against their personal safety.  Dominion employees are being forced to retreat from their lives due to personal safety concerns, not only for our employees themselves, but also for their extended families."[130]

---

[129] Dominion Voting Systems, *Election 2020: Disinformation is Dangerous and Threatens Democracy*, https://www.dominionvoting.com ("Get the Facts About Dominion and Its Voting Systems") (last visited Feb. 4, 2021); John Poulos, *Fake Claims About Dominion Voting System Do Real Damage*, WSJ, Nov. 30, 2020, https://www.wsj.com/articles/fake-claims-about-dominion-voting-systems-do-real-damage-11606755399 (last visited Feb. 4, 2021).

[130] *See* Dominion Voting Systems, *Setting the Record Straight: Facts & Rumors*, https://www.dominionvoting.com (previous webpage on Nov. 30, 2020).

74.     Dr. Coomer is the Dominion employee who has taken the brunt of these attacks.[131]  He was forced to flee his home in response to the credible threats he has been receiving and continues to receive.[132]  He has had to sever ties with friends and family members in order to stay in seclusion.[133]

75.     Calls for Dr. Coomer's capture and arrest have spread rapidly across the internet and on social media.  For example,



76.     Threats grew more intense and specific.  For example, on November 25, 2020, Twitter user @AngLindva stated the following:

---

[131] Oltmann has published statements across media platforms referring to Dr. Coomer as mentally ill, an unhinged sociopath, a creep, a fraud, a cheat, a scumbag, a lynchman, a terrorist, a traitor, evil, and even suggesting it is unsafe to receive medical treatment for fear of Antifa activists and Dr. Coomer compromising his care.

[132] Oltmann has threatened Dr. Coomer.  *See* Joseph Oltmann (@Joeoltmann), PARLER (Dec. 6, 2020) ("Blow this shit up.  Share, put his name everywhere.  No rest for this shitbag.  Eric Coomer, Eric Coomer, Eric Coomer . . . Eric we are watching you . . .").

[133] Oltmann has allegedly revealed personally identifying information about Dr. Coomer.  *See* Joseph Oltmann, et al., *Ep. 217–Shameful Dems Attacking Election Witnesses*, CONSERVATIVE DAILY PODCAST (Dec. 3, 2020), (Oltmann stating "I want everybody to put out on their social media account, 'Where is Eric Coomer?' I found him.  Just want you to know I found him . . . I have pictures of him coming out of hiding . . . I know he drives a truck.  I know his truck is parked at his house.").  These actions are especially dangerous given Oltmann's involvement with an armed paramilitary civilian group with ties to FEC United. *See* United American Defense Fund, *Defend and Protect What Is Ours*, https://fecunited.com/uadf/ (last visited Feb. 4, 2021).



77.     Dr. Coomer began to receive threatening text messages from unknown out-of-state numbers sent directly to his cell phone in Colorado.  Some of these messages included:

> "[W]e are already watching you.  Come clean and you will live."

> "What is the penalty for TREASON?"

> "FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA, FUCK ANTIFA.  Does that chant sound familiar. PB have you and there is nowhere you can run."

> "RUN."

78.     Oltmann's efforts to incite violence against Dr. Coomer are escalating with Oltmann posting:

> They certify this election and we go to war . . . Now it's time we fight.  And when I mean fight I don't mean yelling it's not fair.  I mean we fight these communist, marxist lying shitbags.  That means Eric Coomer never has peace and we smash each and every voting machine in every state that uses them.  We will not be silenced by a bunch of BLM and Antifa communist asshats.  It's time we take back our America by any and all means necessary . . .

> . . . Eric Coomer, you are a traitor.  We are coming for you and your shitbag company.  We are coming for Antifa and we are coming for your politician

56

friends.  Share this . . . share Eric's name . . . If they certify the electors today
after this audit, we have an obligation to forcibly remove them all.  This is
not a drill, our country is not their evil playground.  God is at the wheel, but
we are the warriors that must do the work of men to repel evil.  These people
are evil, and they are liars, cheats and thieves out to take what they did not
earn or deserve.  Where will you stand?[134]

79.    Upon information and belief, in early January, Defendant Oltmann traveled
to Washington D.C. to spread his unfounded theories about Dr. Coomer and to partake in
various other efforts to undermine the legitimacy of the presidential election.  On January
5, 2021, Oltmann was apparently the keynote speaker at the #StopTheSteal rally on
Freedom Plaza.[135]  The day before crowds would go on to breach the Capitol and assault
more than 130 police officer, Oltmann was introduced as "The guy who found and
fingered Eric Coomer."  After the applause died down, Oltmann stated, "By the way, Eric
Coomer is suing me. It's really fun. I'm going to crush him in discovery."  Oltmann then
went on to perpetuate his baseless theories of voter fraud, alleging Dominion machines
had manipulated the vote counts to subvert results of the presidential election.

80.    On January 26, 2021, Oltmann posted from his Facebook account:

. . . Eric Coomer. I'm never going to stop. You have no idea what information
I have or how your loose lips and arrogance is your ultimate weakness. By the
time I am done ... and I will never talk about the "krakken" that is stupid.
What I will talk about is truth. See you later, and your unhinged lawyers . . .
see those shitbags too. Good night.. God is at the wheel and blood is in the
water.[136]

---

[134] Joseph Oltmann (@Joeoltmann), PARLER (Dec. 14, 2020).

[135] *See* RSBN Network (@RSBNetwork*)* TWITTER, (Jan. 5, 2021, 1:45 p.m.), Other speakers included
InfoWars host Alex Jones, Roger Stone, and rally organizer, Ali Alexander.

[136] *See* Joe Oltmann, FACEBOOK (Jan. 26, 2021).

81.     The onslaught of threats Dr. Coomer has experienced and the necessary measures he has been forced to take to protect himself are the direct result of Defendants' defamatory conduct.  Dr. Coomer has and will continue to experience serious and severe emotional and physical distress as a result.  The harm Defendants have caused to Dr. Coomer's reputation,[137] privacy, safety, and earnings, and other pecuniary loss is immense.

## V.     CAUSES OF ACTION

### A.     *Defamation Against All Defendants*

82.     Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

83.     Dr. Coomer is neither a public official nor a public figure.  He is a private individual that Defendants, by their own conduct and for their own ends, targeted and elevated into the public sphere.  Defendants intentionally caused the publication of false and unprivileged oral and written statements about Dr. Coomer.  Their false statements have been seen, read, or heard by millions of individuals across the United States, across Colorado, and specifically within Denver County, Colorado.

84.     The defamatory meaning of Defendants' false statements is apparent from the face of their publication, refer to Dr. Coomer, and are understood to be about him.

---

[137] These false statements have damaged Dr. Coomer's professional reputation, which depended on working relationships with state and county officials, and compromised his continued involvement and employment in relation to  and support of elections.  *See* Saja Hindi, *GOP demand for probe of Colorado's Dominion voting system part of "debunked conspiracy theories." House speaker says*, DENVER POST, Dec. 7, 2020, https://www.denverpost.com/2020/12/07/colorado-republicans-dominion-investigation/ (last visited Feb. 4, 2021).

These statements are defamatory per se as they inherently injure Dr. Coomer's reputation; impute a crime; and disparage his business practices.  On their face, they falsely assert Dr. Coomer has perpetrated a conspiracy that undermined the integrity of the election; disenfranchised millions of voters; and fraudulently elected the president of the United States.  Defendants falsely allege Dr. Coomer accomplished this through fraudulent business practices as an employee of Dominion.  Defendants falsely allege Dr. Coomer is a traitor.  Defendants' false statements have subjected Dr. Coomer to scorn, outrage, and threats from his community.  Their false statements have harmed Dr. Coomer's reputation by lowering him in the estimation of at least a substantial and respectable minority of the community.

85.     Defendants published their false statements negligently.  Defendants published these statements with actual malice.  Defendants knew or had reason to know that these statements were false and published their statements with knowledge or reckless disregard of their falsity.  Defendants failed to contact and question obvious available sources for corroboration; disregarded reliable sources refuting their claims; had no credible bases for the false allegations made; fabricated specific allegations; treated speculation and innuendo as evidence; and published their allegations in a manner calculated to create a false inference.  Their allegations were inherently improbable, derived from unreliable sources, and unsupported by evidence.  Defendants preconceived a conspiracy and then set out to establish that conspiracy to further their own ends.

86.     As a direct and proximate result of Defendants' conduct, Dr. Coomer has suffered significant actual and special damages including, without limitation, harm to his reputation, emotional distress, stress, anxiety, lost earnings, and other pecuniary loss.

**B.    *Intentional Infliction of Emotional Distress Against All Defendants***

87.     Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

88.     Defendants engaged in extreme and outrageous conduct. Their conduct was calculated to cause Dr. Coomer severe emotional distress. Defendants falsely alleged Dr. Coomer perpetrated a criminal conspiracy against every American citizen to overturn the results of the presidential election. They branded Dr. Coomer a traitor and made him a pariah. They encouraged the dissemination of these false claims. They exploited public fear and directed vitriol and threats against Dr. Coomer. Oltmann has directly made terroristic threats against Dr. Coomer, calling on people to harm Dr. Coomer and placing Dr. Coomer in fear of imminent injury and death. Defendants have knowingly elevated Oltmann's statements and adopted his false allegations and threats. These actions have had their intended effect. Dr. Coomer has had an onslaught of harassment and credible death threats issued against him; he is at risk in his home or in going to work; his presence puts his family, friends, colleagues, and his community in danger. All aspects of his life have been altered in response to Defendants' conduct, including things as basic as where to live, how to go out in public, and when to see family and friends. The results of Defendants' ongoing conduct are foreseeable and obscene. This conduct is so outrageous

in character and extreme in degree as to go beyond all possible bounds of decency. It should be regarded as atrocious and determined intolerable in a civilized community.

89.     As a direct and proximate result of Defendants' conduct, Dr. Coomer has suffered significant actual and special damages including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

## C.     Civil Conspiracy Against All Defendants

90.     Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

91.     Defendants engaged in a conspiracy to defame and inflict emotional distress upon Plaintiff.

92.     Defendants' collective objective was to promote the reelection bid of President Trump for their own financial and political gain. To do that, Defendants agreed, both expressly and implicitly, to create a false narrative that in the event President Trump lost his reelection bid it could have only occurred because of fraudulent election activities. Defendants began spreading this false narrative before the election began.

93.     After the election, Defendants fed their narrative by falsely accusing Plaintiff of both having the ability and intent to rig the presidential election and actually subverting the election results so as to disenfranchise millions of voters. Defendants fabricated their false narrative by using Plaintiff's alleged (and false) affiliation with "Antifa," speculation as to his access to election hardware and software, and his personal political beliefs. In order to further their objective, Defendants agreed, by their words and

conduct, to publish and republish defamatory statements about Plaintiff and threats towards Plaintiff.

94.     As a result of Defendants' coordinated conduct, Plaintiff has become the target of death threats and harassment and suffered significant actual and special damages proximately caused by their conduct, including, without limitation, emotional distress, overwhelming stress and anxiety, lost earnings, and other pecuniary loss.

**D.     *Preliminary and Permanent Injunction***

95.     Plaintiff fully incorporates the foregoing paragraphs, as well as the Introduction of this Complaint.

96.     Defendant Oltmann's escalating violent threats directed at Dr. Coomer demonstrate the need for the Court to enjoin such conduct. The Court should order that Oltmann, FEC United, Conservative Daily, and their officers, agents, servants, employees, and attorneys be enjoined from threatening or encouraging acts of violence, intimidation, or coercion against Dr. Coomer, including but not limited to encouraging others to confront, threaten, or endanger Dr. Coomer's physical safety, and further order these Defendants to remove any publication of threats, intimidation, personal information, or coercion made against Dr. Coomer. Such an order is essential to avoid impending danger and preserve the status quo at the time the controversy arose. Plaintiff is prepared to post the necessary bond.

97.     From the facts in this Complaint, Plaintiff has demonstrated the existence of a wrongful act, a clear likelihood of success on the merits, the existence of imminent, irreparable harm for which no adequate remedy at law exists, and that the damage to

Plaintiff if the injunction does not issue will exceed the damage to Defendants Oltmann, FEC United, and Conservative Daily if the injunction does issue.

98.    Plaintiff further seeks permanent injunctive relief to remove all Defendants' defamatory statements upon final adjudication of the claims at issue.

## VI.    DEMAND FOR RETRACTION

99.    Plaintiff demands Defendants immediately and publicly retract all defamatory statements regarding Plaintiff and threats Defendants made to Plaintiff.

## VII.    RIGHT TO AMEND

100.    Plaintiff reserves the right to amend his pleadings in accordance with the Colorado Rules of Civil Procedure. Plaintiff anticipates amending his pleadings as more information becomes available, including the full scope of defamatory statements Defendants have made.

## VIII.    JURY DEMAND

101.    Pursuant to Colorado Rule of Civil Procedure 38, Plaintiff requests a jury to decide all issues of fact.

## PRAYER FOR RELIEF

For these reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer, and that the Court enter judgment against Defendants, including, but not limited to:

- Preliminary and permanent injunctive relief enjoining Defendants Oltmann, FEC United, Conservative Daily, and their officers, agents, servants, employees, and attorneys from threatening or encouraging acts of violence, intimidation, or coercion against Dr. Coomer and further ordering these Defendants to remove any publication of threats, intimidation, or coercion made against Dr. Coomer;

- Permanent injunctive relief requiring Defendants and their officers, agents, servants, employees, and attorneys to remove any and all defamatory publications made about Dr. Coomer;

- Actual and special damages against Defendants in an amount to be proven at trial;

- Leave to amend this Complaint and allege exemplary damages in an amount to be proven at trial after the exchange of initial disclosures pursuant to Colorado Rules of Civil Procedure and Plaintiff establishes prima facie proof of triable issues pursuant to C.R.S. § 13-21-102.

- Attorney's fees and costs;

- Prejudgment and post-judgment interest; and

- Such other and further relief, both general and special, to which Plaintiff may be justly entitled to receive.

Respectfully submitted this 4th day of February 2021.[138]

Respectfully submitted,

_____ /s/ Charles J. Cain _____
Charles J. Cain, No. 51020
Steve Skarnulis, No. 21PHV6401
Thomas J. Rogers III, No. 28809
Mark Grueskin, No. 14621
Andrew Ho, No. 40381

---

[138] Spacing pursuant to C.R.C.P. 10(d)(3)(II) due to the complexity and technical nature of this matter.

**CERTIFICATE OF SERVICE**

I certify that on February 4, 2021, a true and accurate copy of the foregoing

Plaintiff's First Amended Complaint has been e-served via ICCES on all counsel of record.

_____/s/ Charles J. Cain_____

Charles J. Cain, No. 51020

**Subject:** FW: Coomer Amended Complaint

**Date:** Friday, February 5, 2021 at 3:50:21 PM Central Standard Time

**From:** Summer Knox on behalf of Notifications

**Attachments:** P 1st Amd Complaint (20210204).pdf

---

**From:** CO E-Filing Courtesy Notices <DoNotReply@judicial.state.co.us>
**Date:** Friday, February 5, 2021 at 3:25 PM
**To:** Scotti Beam <sbeam@cstrial.com>
**Subject:** Accepted Filing: 2020CV034319 - Coomer, Eric v. Donald J Trump For President Inc et al

Court: Denver County - District
Case Caption: Coomer, Eric v. Donald J Trump For President Inc et al
Case Number: 2020CV034319
Division: Division 409
Filing ID: 5D2B3A08F794E
Date Filed: February 4, 2021
Date Accepted: February 5, 2021

Document ID: F3406FAEB0234 Plaintiff's First Amended Complaint has been accepted by the court.
Clerk Name: Corrin O

View details online at
https://www.jbits.courts.state.co.us/efiling/web/filingInformation/filingInfo.htm#/filingInfo?
fid=5D2B3A08F794E.

For questions about this case, please contact the court.

If you need additional assistance, you may contact us at efilingsupport@judicial.state.co.us or 1-855-264-2237.

*This e-mail was sent from an automated service. Please do not reply to this e-mail directly.*

Exhibit 23

The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

DATE FILED: April 11, 2024
CASE NUMBER: 2022CA843

SUMMARY
April 11, 2024

## 2024COA35

**No. 22CA0843, *Coomer v. Donald J. Trump for President, Inc.*
— Courts and Court Procedure — Regulation of Actions and
Proceedings — Action Involving Exercise of Constitutional
Rights — Anti-SLAPP; Torts — Civil Conspiracy — Defamation
— Intentional Infliction of Emotional Distress**

Applying the anti-SLAPP statute, § 13-20-1101, C.R.S. 2023, a

division of the court of appeals concludes that the plaintiff has

established a reasonable likelihood of success on his claims for

defamation and intentional infliction of emotional distress arising

out of statements by various defendants that the plaintiff

(1) asserted on a conference call in September 2020 that he had

"made sure" then-President Trump was not going to win the 2020

presidential election and (2) took steps to interfere with the election

results.  The division concludes that, accepting the plaintiff's

evidence as true, the plaintiff has shown a reasonable likelihood

that each defendant made these statements, that the statements were false, and that the defendants made them with actual malice.

The division concludes that the plaintiff has not established a reasonable likelihood of success on his conspiracy claim because the plaintiff presented no evidence of an agreement to defame him.

The division affirms the district court's denial of the special motions to dismiss the plaintiff's claims for defamation and intentional infliction of emotional distress.  It reverses the denial of the special motions to dismiss the plaintiff's conspiracy claim as to certain defendants (those who challenge that ruling on appeal).

COLORADO COURT OF APPEALS                                    **2024COA35**

---

Court of Appeals Nos. 22CA0843 & 22CA0879
City and County of Denver District Court No. 20CV34319
Honorable Marie Avery Moses, Judge

---

Eric Coomer, Ph.D.,

Plaintiff-Appellee,

v.

Donald J. Trump for President, Inc.; Sidney Powell; Sidney Powell, P.C.; Joseph
Oltmann; FEC United; Shuffling Madness Media, Inc., d/b/a Conservative
Daily; James Hoft; TGP Communications, LLC, d/b/a The Gateway Pundit;
Michelle Malkin; Eric Metaxas; and Defending the Republic, Inc.,

Defendants-Appellants.

---

ORDER AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE SCHOCK
Navarro and Kuhn, JJ., concur

Announced April 11, 2024

---

Cain & Skarnulis PLLC, Charles J. Cain, Zachary Bowman, Bradley A. Kloewer,
Salida, Colorado; RechtKornfeld PC, Thomas M. Rogers III, Mark Grueskin,
Andrew E. Ho, Denver, Colorado, for Plaintiff-Appellee

Campbell Killin Brittan & Ray, LLC, John S. Zakhem, Andrew C. Nickel,
Denver, Colorado, for Defendant-Appellant Donald J. Trump for President, Inc.

Arrington Law Firm, Barry K. Arrington, Denver, Colorado; Kennedys CMK LLP,
Marc S. Casarino, Wilmington, Delaware, for Defendants-Appellants Sidney
Powell and Sidney Powell, P.C.

Harris, Karstaedt, Jamison & Powers, P.C., Jamey W. Jamison, Mark A. Sares,
Dino G. Moncecchi, Englewood, Colorado, for Defendants-Appellants Joseph

Oltmann, FEC United, and Shuffling Madness Media, Inc., d/b/a Conservative Daily

Law Offices of Randy B. Corporon, Randy B. Corporon, Aurora, Colorado; Burns Law Firm, Jonathon Burns, St. Louis, Missouri, for Defendants-Appellants James Hoft and TGP Communications, LLC, d/b/a The Gateway Pundit

Patterson Ripplinger, P.C., Franklin D. Patterson, Gordon A. Queenan, Greenwood Village, Colorado, for Defendant-Appellant Michelle Malkin

Gordon & Rees LLP, John R. Mann, Thomas B. Quinn, Margaret L. Boehmer, Denver, Colorado, for Defendant-Appellant Eric Metaxas

Dymond Reagor, PLLC, Michael W. Reagor, Christopher P. Seerveld, Greenwood Village, Colorado, for Defendant-Appellant Defending the Republic, Inc.

¶ 1 In the wake of the 2020 presidential election, certain members of the media and political figures began circulating claims of election irregularities. One strand of those claims centered on the plaintiff, Eric Coomer, who was then an employee of Dominion Voting Systems, Inc. (Dominion), a company that provided election technology and support services throughout the country. The core of the allegations was that, on a supposed "Antifa" conference call in late September 2020, a person purported to be Coomer said he had "made sure" then-President Donald J. Trump was "not going to win" the election. Coomer denies ever being on such a call or making such a statement, and there is no evidence that he (or anyone else) took any action to undermine the election results.

¶ 2 Coomer sued several individuals and entities who shared reports of his alleged statement on the internet and in other media, asserting claims for defamation, intentional infliction of emotional distress, and civil conspiracy. Those claims come before us in a preliminary posture under Colorado's anti-SLAPP[1] statute, section 13-20-1101, C.R.S. 2023. Under that statute, we do not decide

---

[1] "SLAPP" stands for "strategic lawsuit against public participation." *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 1 n.1.

whether Coomer will prevail on his claims. Nor do we determine who is telling the truth about what occurred. Instead, the sole question we must answer is whether Coomer has done enough to pursue his claims further. To do so, he must establish a reasonable likelihood — not a certainty — that he will prevail on each of those claims. The district court concluded that Coomer had met this burden with respect to all claims against all defendants.

¶ 3      We conclude that Coomer has met his burden with respect to his claims for defamation and intentional infliction of emotional distress. Considering each defendant's statements separately, we conclude that each defendant made statements that could reasonably be understood to communicate that (1) Coomer asserted on a conference call that he had made sure President Trump was not going to win the election, and (2) Coomer in fact took steps to interfere with the election. We further conclude that Coomer has presented sufficient evidence at this preliminary stage to establish a reasonable likelihood of showing that those statements were false and that defendants made them with actual malice — that is, with knowledge they were false or with reckless disregard for their truth.

¶ 4     We reach a different conclusion as to Coomer's civil conspiracy claim — at least with respect to the defendants who challenge that claim on appeal.  Because Coomer has presented no evidence of an agreement to defame him or inflict emotional distress upon him, he has not shown a reasonable likelihood of prevailing on this claim.

¶ 5     We also conclude that the district court erred by addressing Coomer's likelihood of prevailing on his request for an injunction in its order denying defendants' special motions to dismiss because an injunction is a *remedy*, not an independent cause of action that is subject to dismissal under the anti-SLAPP statute.  But because a request for injunctive relief is not the proper subject of an anti-SLAPP motion to dismiss, the district court's denial of the special motions to dismiss that relief was correct on other grounds.

¶ 6     We therefore affirm the denial of the special motions to dismiss the defamation claim, with the exception of two tweets that we conclude are protected under the Communications Decency Act (CDA), 47 U.S.C. § 230.  We also affirm the denial of the motions to dismiss the claim for intentional infliction of emotional distress and the request for injunctive relief.  We reverse the denial of the motion to dismiss the conspiracy claim as to the defendants who challenge

that ruling on appeal (as detailed below).  We remand for the district

court to consider certain defendants' requests for attorney fees and

costs, and for further proceedings consistent with this opinion.[2]

## I.    Background

¶ 7       Coomer is the former Director of Product Security and Strategy

at Dominion.  Dominion provided voting technology and support

services to at least thirty different states in connection with the

2020 presidential election.  Defendants are podcasters, talk show

hosts, political commentators, bloggers, attorneys, and associated

entities who generally questioned the validity of the 2020

presidential election results.  More specifically, defendants are:

- Joseph Oltmann, the co-host of the Conservative Daily

  podcast, along with a nonprofit corporation Oltmann

  founded, FEC United, and a media corporation he owns,

  Shuffling Madness Media, Inc., d/b/a Conservative Daily

  (collectively, the Oltmann Defendants);

---

[2] This action has been stayed as to defendant Rudolph Giuliani
because he filed for bankruptcy while the appeal was pending.  *See*
11 U.S.C. § 362(a).  This opinion, including the disposition, is thus
limited to the appeals of the other defendants.

4

- Michelle Malkin, the host of #MalkinLive, a program previously broadcast on YouTube, and Sovereign Nation, a television program that previously ran on Newsmax;

- James Hoft, the founder, editor-in-chief, and contributing author of The Gateway Pundit website, along with the company that operates the website, TGP Communications, LLC (collectively, the Hoft Defendants);

- Eric Metaxas, the host of The Eric Metaxas Radio Show, a radio program and podcast that is broadcast on various platforms and published on YouTube;

- Sidney Powell, an attorney who became associated with President Trump's reelection campaign in the weeks following the 2020 election, along with Powell's law firm, Sidney Powell, P.C. (collectively, the Powell Defendants), and a nonprofit corporation Powell founded, Defending the Republic, Inc. (DTR); and

- Donald J. Trump for President, Inc. (the Trump Campaign or the Campaign), an organization supporting the reelection efforts of President Trump.

A.    Oltmann's Account

¶ 8    The statements underlying Coomer's claims all stem from an

account first shared by Oltmann on the Conservative Daily podcast

days after Joseph Biden, Jr., was declared the winner of the 2020

presidential election.  On November 9, 2020, Oltmann asserted that

"the election was rigged" and called Dominion "a fraudulent

company that is out to destroy our republic."  He then recounted an

alleged conference call he claimed to have infiltrated weeks earlier.

¶ 9    Oltmann introduced the show by stating,

> We're going to expose someone inside of
> Dominion Voting Systems specifically related
> to Antifa and related to someone that is so far
> left and is controlling elections, and his
> fingerprints are in every state.
>
> . . . .
>
> The conversation will be about a man named
> Eric Coomer.  C-O-O-M-E-R.

¶ 10    After describing Coomer's role with Dominion, Oltmann

relayed that, weeks before the election, he had been able to listen in

on an Antifa conference call.  As told by Oltmann, "a person who

called himself Eric was on the call."  As "Eric" was speaking,

> [s]omebody interrupts, "Who's Eric?"  Someone
> else enters, "Eric is the Dominion guy, right?"
> . . . and everyone's like, "Oh, oh, he's a

> Dominion guy, okay." So, "Go ahead," came from somebody else.
>
> So . . . somebody actually interrupts. First he says, "What are we going to do if effing Trump wins, right?" As in somebody's frustrated and they're . . . talking on this call. And ["Eric"] responds, and I'm paraphrasing this, right, "Don't worry about the election. Trump is not going to win. I made effing sure of that, ha-ha-ha-ha." And everyone's like, "Yeah." And then somebody else responds, "Effing right," right?

¶ 11    Oltmann went on to explain how he came to believe that the "Eric" on the call was Coomer, based primarily on Coomer's social media posts, which included anti-Trump messages and a so-called "Antifa manifesto." He also said that he thought "Eric's" voice was a "match" to Coomer's voice in other videos he had heard, but he "[couldn't] be sure." In the end, Oltmann encapsulated his account:

> Let me put this all together for you guys. So, you have a guy that is actually going to an Antifa meeting that tells somebody else that, [supposedly] . . . he's got the election in hand.
>
> . . . .
>
> It's not admitting [Dominion is] vulnerable, it's actually creating the vulnerability so that it can actually be manipulated. And that's what happened here . . . . You have a guy that literally is a fanatic. . . . Three weeks before the election he's getting on the phone and he's saying very clearly that, I have it handled. And he runs product strategy and security.

¶ 12    Oltmann then went further and explicitly accused Coomer of

interfering with the election:

> [Coomer] has to answer for this stuff that he is
> interfering with the American vote. He's
> interfering with the election.
>
> . . . .
>
> [T]here's somebody that says none of this is a
> smoking gun. . . . You're wrong. You're
> absolutely wrong. . . . I'm going to say this
> very clearly. There's more to be had.
>
> . . . .
>
> [I]t's not the one event that it is a smoking
> gun, it's the fact that this is the guy
> responsible for most of the elections across the
> United States.

¶ 13    Oltmann repeated these accusations against Coomer on his

podcast over the next three days, reiterating his account of the

conference call and describing Coomer as "dangerous":

> [T]he guy that knows nuclear physics, and that
> actually is coding, is probably one of the most
> dangerous people in the world. That's why I
> know, if you look at everything, that Eric is
> involved. I'm not guessing that he's involved, I
> know he's involved in this. And that's why as
> he starts talking about things, as we start
> hearing about Eric Coomer in the media, he's
> hiding right now. . . . He is literally scared for
> his life, because what we're talking about
> people, is sedition. . . . We are talking about
> people going to prison for the rest of their lives,

and, or being sentenced to death.  When you
interfere with the country's election, when you
put your finger on the scale of the voting of the
people, the American voice, you are subject to
being put to death.

B.    CISA Joint Statement

¶ 14    On November 12, 2020, the Cybersecurity & Infrastructure

Security Agency (CISA) released a joint statement from the executive

committees of the Election Infrastructure Government Coordinating

Council and the Election Infrastructure Sector Coordinating

Council, which addressed the "many unfounded claims and

opportunities for misinformation about the process of [United

States] elections."  That joint statement concluded as follows:

> The November 3rd election was the most
> secure in American history.  Right now, across
> the country, election officials are reviewing and
> double checking the entire election process
> prior to finalizing the result.
>
> . . . *There is no evidence that any voting
> system deleted or lost votes, changed votes, or
> was in any way compromised.*
>
> Other security measures like pre-election
> testing, state certification of voting equipment,
> and the U.S. Election Assistance Commission's
> (EAC) certification of voting equipment help to
> build additional confidence in the voting
> systems used in 2020.

### C.    Publication of Oltmann's Account in Other Media

¶ 15    Notwithstanding the CISA statement, Oltmann's account of
the alleged conference call — now pinpointed to the week of
September 27, 2020 — began to pick up steam with other media.

¶ 16    On November 13, 2020, Oltmann appeared on Malkin's
YouTube program, #MalkinLive.  Malkin introduced her program by
announcing that she would be "bringing [the audience] information
that is so vital to understanding the systemic stealing of our
election."  She invited Oltmann to explain "what [he had] discovered
about Dominion, and one figure, very key figure in particular."

¶ 17    Oltmann proceeded to describe the alleged conference call
similarly to how he had described it on his own show.  He also
explained how he had found Coomer by Googling "Eric, Dominion,
Denver, Colorado," and how, six weeks later in the wake of the
election, he had concluded that the "Eric" on the conference call
was Coomer, based in large part on Coomer's social media posts.

¶ 18    After Oltmann had completed his account, Malkin responded
to "underscore that . . . the market share of Dominion is why this
reaches from conspiracy theory to conspiracy truth."  Oltmann
agreed, declaring, "It is truth, a hundred percent truth.  I mean, I'm

betting everything on it." Malkin closed the interview by urging her audience to follow Oltmann on social media "for all the latest on Eric Coomer" and Dominion, stating, "[T]he truth will get out there. The truth just wants to be free, just like American citizens."

¶ 19    After the show, Malkin posted several links to the interview on social media, describing it as Oltmann "speak[ing] out" about Dominion and "Antifa radical Eric Coomer." In the posts, Malkin noted that Coomer was "VP of strategy/security" and a "major shareholder" of Dominion, and she asked, "What are they trying to hide?" Malkin continued to share the Oltmann interview on social media in multiple tweets over the next week, each of which tagged Coomer and stated that he had been "exposed" by Oltmann.

¶ 20    The same day of the Malkin interview, Oltmann's account was picked up by Hoft and The Gateway Pundit. That day, The Gateway Pundit published an article by Hoft with the headline, "Dominion Voting Systems Officer of Strategy and Security Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote." That article cited alleged election-related computer glitches and wrote that Oltmann had done a "deep dive

on Eric Coomer[,] who is responsible for the strategy and security of
Dominion," and discovered anti-Trump social media posts.

¶ 21     The next day, Hoft wrote another Gateway Pundit article,
which reported that Coomer was "participating in Antifa calls."  In
that article, Hoft cited Oltmann's interview with Malkin and relayed
Oltmann's account of the alleged September 2020 conference call.
The article repeated Oltmann's statement that "Eric (the Dominion
guy)" said, "Don't worry about the election, Trump's not gonna win.
I made f*cking sure of that!"  It went on to explain that Oltmann's
investigation after the call caused him to "c[o]me upon" Coomer.

¶ 22     On November 16, 2020, Hoft interviewed Oltmann about the
call.  He introduced the interview by stating that Oltmann "was on
an Antifa line where they were speaking with Eric Coomer."  Later
in the interview, after Oltmann had given his account of the call,
including the statement he attributed to Coomer, Hoft said, "You
have information that's truthful that should be released . . . you're
exposing absolute fraud."  Hoft published the audio of this interview
on The Gateway Pundit, along with an article about the interview.

¶ 23     On November 24, 2020, Metaxas invited Oltmann to share his
story on the Eric Metaxas Radio Show.  Oltmann repeated his now-

familiar account of the alleged September conference call — his infiltration of the call; the statement by "Eric, the Dominion guy" of "Don't worry about the election. Trump's not going to win. I've made effing sure of that"; and Oltmann's internet research that led him to believe "Eric" was Eric Coomer — before concluding with his assertion that there had been "massive" fraud in the 2020 election.

¶ 24    At one point during the interview, Metaxas asked Oltmann to confirm that the person who made the statement was in fact Coomer: "So this guy, Eric Coomer, this genius you discover was the guy who said on this Antifa call, 'Don't worry about Trump, there's no way he's going to win'?" Oltmann said that it was. Metaxas said he was "exercised" by "the idea that anyone would dare try to mess with our elections," and that is why he was "glad to be speaking with [Oltmann] and getting this information out."

¶ 25    Metaxas asked Oltmann, "Eric Coomer, has he gone into hiding? . . . Does he know he's going to go to prison for the rest of his life?" Oltmann said Coomer had "disappeared" and continued: "Why if there is no fraud against the American people has Eric Coomer disappeared? . . . So this isn't all made up. This isn't hyperbole that we're just throwing out there. This is absolute fact."

¶ 26    Metaxas then closed the show by calling Coomer's conduct

"extremely criminal":

> [T]here's levels of stupidity and evil and we
> know that not everybody is on the same level,
> that there are some people that they just hate
> Trump but then there are other nefarious
> actors like Mr. Coomer . . . .  What we're
> talking about is evil.  In fact, let's just say this.
> It's extremely criminal and these folks know
> they're going to go to jail for the rest of their
> lives.  Doesn't matter how rich or smart they
> are, that they are in the process of being
> caught thanks to God because you were just —
> you just stumbled across this.

¶ 27    After the interview, Metaxas posted a link to the interview on

his social media page, along with the message, "Today Joe Oltmann

explained how after infiltrating Antifa he bumped into someone

working w/them named Eric [C]oomer — who was the head of

Security and Safety at #Dominion — and who PROMISED the Antifa

folks that 'effing' Trump WOULD NOT WIN!  Please [retweet]."

¶ 28    Malkin interviewed Oltmann again on November 28, 2020, this

time on her Sovereign Nation show on Newsmax, in a segment she

said was focused on "hacking the vote."  After introducing the show

by asking "who has control over our elections," Malkin asked

Oltmann to tell her audience "who exactly Eric Coomer is and why

it matters in these ongoing battles against election fraud." Oltmann responded that Coomer "has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country." From there, the interview followed the same pattern as the other interviews, with Oltmann sharing his account.

¶ 29     Malkin then expounded, "[T]he reason why this is so alarming — and it's obvious, but it should be spelled out — is that this is one of the highest ranking officials at Dominion Voting Systems, which has penetrated our election system across the country." Malkin acknowledged that "at this point, at least publicly, there's no evidence that Eric Coomer made good on his threat." But she asserted that Coomer's patents and experience "certainly suggest[] that he has the ability to carry out on his threat or this braggadocio that [Oltmann] heard directly on this Antifa phone call."

¶ 30     Over the next month, and continuing after this lawsuit was filed, Oltmann continued to discuss Coomer, the alleged conference call, and Oltmann's contention that Coomer had interfered with the election on his Conservative Daily podcast and other media platforms. The Gateway Pundit also published a few additional articles discussing Coomer and alleged election irregularities.

15

D.     The Trump Campaign and the Powell Defendants

¶ 31     Meanwhile, Oltmann's account of the alleged September call made its way to those in President Trump's orbit.  Oltmann explained in his interview with Metaxas that he had been in touch with the Trump Campaign and "in constant contact with the Trump attorneys," including Powell.  He also said that he had signed an affidavit attesting to "all of the information" he was describing.

¶ 32     On November 14, 2020, the Trump Campaign circulated an internal memorandum addressing the "internet rumor that [Coomer] has ties to Antifa."  The memo concluded that "there is no evidence that Eric Coomer is a supporter of Antifa in any way."

¶ 33     On November 17, 2020, Eric Trump, President Trump's son and someone the Campaign called a "surrogate speaker," shared on social media a Gateway Pundit article that quoted Coomer's alleged statement on the September call, along with the message, "Eric Coomer — Dominion Vice President of U.S. Engineering — 'Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that!'"  A few days later, President Trump himself tweeted a link to a segment on One America News Network called

16

"Dominion-izing the Vote." That segment included an interview with Oltmann in which Oltmann repeated his claims about Coomer.

¶ 34    On November 19, 2020, the Trump Campaign held a press conference to provide an update on its legal challenges to the election results. Rudolph Giuliani spoke first, introducing himself and Sidney Powell as two of the "senior lawyers" representing President Trump and the Trump Campaign.[3] After running through a litany of allegations of election fraud, Giuliani asked Powell to describe what he called "another totally outrageous situation."

¶ 35    Powell spoke about Dominion and Smartmatic, another company she said was responsible for the software used in computerized voting systems. She then turned to Coomer:

> [O]ne of the Smartmatic patent holders, Eric Coomer I believe his name is, is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden. Nothing to worry about here. And he was going to — they were going to "F" Trump. His social media is filled with hatred for the President, and for the United States of America as a whole . . . .

---

[3] As noted above, we do not consider Coomer's claims against Giuliani because this action is stayed as to Giuliani. But Giuliani's statements are nevertheless relevant to the extent Coomer asserts that Giuliani was speaking as an agent of the Trump Campaign.

¶ 36     Later in the press conference, Giuliani returned to the topic of

Coomer:

> [B]y the way, the Coomer character, who is
> close to Antifa, took off all of his social media.
> Ah-ah, but we kept it, we've got it.  The man is
> a vicious, vicious man . . . and he specifically
> says that they're going to fix this election. . . .
>
> This is real.  It is not made up.  [T]here's
> nobody here that engages in fantasies.  I've
> tried a hundred cases.  I've prosecuted some of
> the most dangerous criminals in the world.  I
> know crimes.  I can smell them.  You don't
> have to smell this one.  I can prove it to you
> eighteen different ways. . . .

¶ 37     The day after the press conference, Powell addressed the

accusations against Coomer in two separate interviews, one on

Newsmax and one on Fox News.  In the first, Powell engaged in the

following exchange with the interviewer, Howie Carr:

> Carr: Let me ask you about this guy Eric
> Coomer.  He works for Dominion . . . .  He's
> the one who was allegedly . . . on a conference
> call or something, a Zoom with Antifa.  And he
> said, supposedly, don't worry about Trump,
> I've already made sure he's going to lose the
> election.  Is that true, for starters?
>
> Powell: Yes.
>
> Carr: It's true.  You have that?
>
> Powell: It's true.  We have an affidavit to that
> effect and I think we have a copy of the call.

18

¶ 38    In the second interview that day, Powell announced, "We've got Eric Coomer . . . admitting on tape that he rigged the election for Biden and hated Trump.  We've got their social media posts.  We've got all kinds of evidence that is mathematically irrefutable."

¶ 39    Before the November 19 press conference, the Trump Campaign had filed lawsuits in Pennsylvania and Michigan challenging the election results in those states.  In the days and weeks after the press conference, Powell filed four more lawsuits — in Michigan, Georgia, Wisconsin, and Arizona — on behalf of other individual plaintiffs.  Neither of the Trump Campaign's lawsuits referred to Coomer.  Powell's complaints, however, referred to Coomer and cited his alleged statement on the September call, as told by Oltmann.  None of the lawsuits was successful.

¶ 40    On December 14, 2020, the Electoral College voted and officially confirmed the result of the election, with now-President Biden receiving 306 electoral votes and President Trump receiving 232.  On January 7, 2021, the electoral votes were certified, and Biden was confirmed as the President-elect of the United States.

### E.    Coomer's Complaint

¶ 41    On December 22, 2020, Coomer filed this lawsuit, asserting

claims against defendants for defamation, intentional infliction of

emotional distress, and civil conspiracy, and seeking damages and

injunctive relief.  (Coomer later amended his complaint to add DTR

as a defendant.)  The claims centered on Oltmann's account of the

September 2020 conference call and the other defendants'

dissemination of that narrative, as detailed above.  Coomer alleged

that, through their statements, defendants had made Coomer the

"face" of a false "national conspiracy to fraudulently elect the

President of the United States," thus causing "immense injury" to

his reputation, professional standing, safety, and privacy.

¶ 42    More specifically, Coomer alleged that Oltmann and the other

defendants made false defamatory statements by asserting that

Coomer (1) was on the alleged conference call; (2) said on that call

that he "made sure" President Trump would not win reelection; and

(3) in fact took action to subvert the 2020 presidential election.  He

alleged that "the dissemination of these false claims" constituted

extreme and outrageous conduct that had caused him severe

emotional distress by, among other things, subjecting him to an

"onslaught of harassment and credible death threats." And he alleged that defendants had conspired to engage in such conduct.

¶ 43    In the complaint, Coomer denied (1) having any knowledge of the alleged Antifa conference call; (2) participating in such a call; (3) making the statements Oltmann claimed he made; or (4) taking any action to subvert the results of the presidential election.

### F.    Defendants' Special Motions to Dismiss

¶ 44    All defendants filed special motions to dismiss under the anti-SLAPP statute. *See* § 13-20-1101(3)(a). The precise arguments made by each defendant differed somewhat, but all argued that Coomer could not show actual malice because defendants did not know their statements were false or entertain serious doubts as to their truth. Several defendants asserted that their statements were protected statements of opinion. And others claimed that their statements were protected by the litigation privilege or the CDA.

¶ 45    Defendants also argued that Coomer had not shown a reasonable likelihood of success on his non-defamation claims for many of the same reasons and a few others. They argued that Coomer could not show extreme or outrageous conduct, as

necessary for his intentional infliction of emotional distress claim,

or a meeting of the minds, as necessary for his conspiracy claim.

¶ 46     In support, the Powell Defendants and the Trump Campaign

each submitted an affidavit signed by Oltmann on November 13,

2020, in which Oltmann gave his account of an "Antifa meeting"

that was consistent with his public statements.  He stated that "[o]n

or about the week of September 27, 2020, [he] was able to attend

an Antifa meeting" where the following conversation occurred:

> Someone identified as "Eric" began to speak.
> Someone asked who Eric was, and someone
> else replied "he is the Dominion guy"
> [paraphrased].
>
> Eric then began to speak after being told to
> continue, but was interrupted and asked by
> someone, "What are we going to do if Trump
> wins this fucking election?"
>
> Eric responded, "Don't worry about the
> election.  Trump is not going to win.  I made
> fucking sure of that.  Hahaha[.]"

¶ 47     The affidavit then described how Oltmann determined that the

"Eric on the conference call" was Coomer, based on a "simple

[G]oogle search: [k]eywords: 'Eric,' 'Dominion,' 'Denver Colorado,'"

and a review of Coomer's social media posts reflecting "Anti-Trump

rhetoric."  Oltmann also explained that he did not initially believe

the person on the call was Coomer until he learned days after the election that Coomer was a "spokesperson" for Dominion.

¶ 48    Malkin, Hoft, and Powell also submitted their own affidavits attesting that they had no reason to disbelieve Oltmann's account.

### G.    Coomer's Response and Opposing Declarations

¶ 49    Over defendants' objections, the district court allowed Coomer to conduct specified discovery, including a three-hour deposition of each defendant and limited requests for production.

¶ 50    After conducting that discovery, Coomer filed an omnibus response to all defendants' special motions to dismiss, arguing that (1) the anti-SLAPP statute did not apply; and (2) even if it did, he had established a reasonable likelihood of success on his claims.

¶ 51    Coomer attached his own declaration in support. In that affidavit, Coomer attested that he was not on the alleged conference call in September 2020, did not make the statement defendants had attributed to him, and did not seek to interfere with the outcome of the presidential election. More specifically, he declared:

> [The] statements made by Oltmann about me are false. I did not take any action to subvert the 2020 Presidential election. I did not participate in a scheme to change votes from one candidate to another and am aware of no

such election-rigging activity. I did not participate in an Antifa conference call or boast about my supposed ability to rig the election. . . .

. . . .

In my position with Dominion Voting Systems, I did not have the capacity to manipulate or alter in any way either the Dominion voting machines used during the 2020 Presidential election or the Dominion source code that those machines employed. Numerous layers of review, security, encryption, and other checks and balances exist between individual Dominion employees, like myself, and the products that Dominion provides to its clients. As a result of the numerous safety protocols in place, many of which are required by statute, I did not have the ability to alter the results of the 2020 Presidential election in any way.

. . . .

I have never stated that I had the ability or the desire to affect the outcome of an election. In fact, I have often made the exact opposite statement publicly, and privately during routine conversations. I have never even joked about the ability to affect the outcomes of free and fair elections.

¶ 52     Coomer also attached a declaration from Heidi Beedle,

someone Oltmann had identified in his affidavit as a potential

participant in the alleged conference call. Beedle stated in her

24

declaration that she was not aware of any "Antifa call" that occurred in mid to late September 2020. Nor did she know Coomer.

¶ 53 And Coomer submitted a declaration from Auontai Anderson, someone who *did* participate in a Zoom conference call in late September 2020 with other "Denver activists," albeit not one he associated with Antifa. Anderson explained that "[d]uring that call, no one mentioned 'Eric from Dominion,' and [he is] not familiar with anyone who would meet that description." He further attested that he did not know Coomer and had never before heard his name.

### H. Order Denying Defendants' Special Motions to Dismiss

¶ 54 The district court held a two-day hearing on defendants' motions, at which the parties presented argument and summaries of the evidence in support of their respective claims and defenses.

¶ 55 After the hearing, the district court issued a written order denying defendants' special motions to dismiss in their entirety. The court agreed with defendants that the anti-SLAPP statute applied because defendants' statements about Coomer involved matters of public concern. But it concluded that Coomer had established a reasonable likelihood of prevailing on his claims.

## II.    Scope of Appeal

¶ 56    We begin by clarifying that this appeal is limited to the district court order denying defendants' special motions to dismiss.

¶ 57    In their original opening brief, the Oltmann Defendants (and another defendant who is no longer a party to this appeal) challenged various discovery orders in addition to the order denying the special motions to dismiss.  A motions division of this court ruled that "[t]he appeal is limited to the district court order on the special motion to dismiss" because "the other issues appellants have raised in the briefs are not final, appealable orders."  The motions division therefore struck the Oltmann Defendants' opening brief and ordered them to file an amended opening brief "limited to the district court order on the special motion to dismiss."[4]

---

[4] Coomer filed a motion requesting an award of attorney fees and costs against the Oltmann Defendants as a sanction for challenging these other interlocutory orders in their original opening brief. (Coomer also requested sanctions against the defendant who is no longer a party to this appeal.  That portion of the motion is moot.) We deny Coomer's motion.  Although we do not approve of the Oltmann Defendants' attempt to raise issues beyond the scope of this appeal, we cannot conclude that their doing so was so frivolous as to warrant sanctions under C.A.R. 38(b).  *See Glover v. Serratoga Falls LLC*, 2021 CO 77, ¶ 70 (noting that the purpose of an award of attorney fees under C.A.R. 38(b) is to deter egregious conduct).

¶ 58    The Oltmann Defendants filed an amended opening brief but continue to argue that the district court erred by (1) allowing Coomer to conduct discovery before ruling on the special motions to dismiss and (2) ordering Oltmann to disclose the identity of the person who allegedly assisted him in gaining access to the "Antifa call." The Hoft Defendants also assert that the district court erred by granting Coomer discovery and denying them reciprocal discovery. We agree with the motions division that these interlocutory orders are not properly before us in this appeal.

¶ 59    As a general rule, our jurisdiction is limited to "appeals from final judgments." § 13-4-102(1), C.R.S. 2023; *see also Wilson v. Kennedy*, 2020 COA 122, ¶¶ 5-7; C.A.R. 1(a)(1). The anti-SLAPP statute provides an exception for "an order granting or denying a special motion to dismiss." § 13-20-1101(7); *see also* § 13-4-102.2, C.R.S. 2023. But nothing in that statute extends that exception to other interlocutory orders. And we cannot expand the scope of our jurisdiction beyond that specified by the legislature. *Wilson*, ¶ 6. We therefore lack jurisdiction in this appeal to review any order other than the order denying the special motions to dismiss.

### III.    Anti-SLAPP Legal Principles

¶ 60    The purpose of Colorado's anti-SLAPP statute is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government," and, at the same time, to preserve the right to "file meritorious lawsuits for demonstrable injury." § 13-20-1101(1)(b); *see also Gonzales v. Hushen*, 2023 COA 87, ¶ 19.  The statute seeks to balance these often competing interests by creating a mechanism to "weed[] out, at an early stage, nonmeritorious lawsuits brought in response to a defendant's petitioning or speech activity." *Tender Care Veterinary Ctr., Inc. v. Lind-Barnett*, 2023 COA 114, ¶ 12.

¶ 61    That mechanism — a special motion to dismiss — allows for the early dismissal of any claim arising from an act "in furtherance of" a person's constitutional right of petition or free speech "in connection with a public issue," unless the plaintiff establishes "a reasonable likelihood" of prevailing on the claim.  § 13-20-1101(3)(a); *see also L.S.S. v. S.A.P.*, 2022 COA 123, ¶ 18.

¶ 62    The resolution of such a motion requires a two-step analysis. *Anderson v. Senthilnathan*, 2023 COA 88, ¶ 10.  First, the court must determine whether the defendant has made a threshold

showing that the anti-SLAPP statute applies — "that is, whether the claims arise from the defendant's exercise of free speech or right to petition in connection with a public issue." *Id.*; *see also* § 13-20-1101(2)(a), (3)(a). Second, if the defendant meets that threshold, the burden shifts to the plaintiff to establish a reasonable likelihood of prevailing on the claim. *See Anderson*, ¶ 10; § 13-20-1101(3)(a).

¶ 63    At the second step, the court must consider the pleadings and supporting and opposing affidavits to determine "whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *L.S.S.*, ¶ 23 (citation omitted); *see also* § 13-20-1101(3)(b). In making this determination, the court may not weigh the evidence or resolve factual conflicts. *Rosenblum v. Budd*, 2023 COA 72, ¶ 24. Instead, it must assess whether the facts in the affidavits submitted by the plaintiff, "if true, establish a reasonable likelihood of proving each claim under the applicable burden of proof." *Id.* If the plaintiff meets this burden, the court must deny the motion to dismiss. *Id.* at ¶ 25. Otherwise, the claim must be dismissed. *Anderson*, ¶ 10.

¶ 64    We review an order granting or denying a special motion to dismiss de novo, applying the same two-step analysis as the district court.  *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 21.

¶ 65    When the district court issued its order in this case, there was not yet any published case in Colorado applying the anti-SLAPP statute, which had become law less than three years earlier.  *See id.* (first published Colorado anti-SLAPP case issued in September 2022).  But our case law has developed substantially since then — including since the parties filed their appellate briefs.[5]  Perhaps unsurprisingly then, the parties dispute various legal principles, and several defendants raise arguments concerning the *manner* in which the district court resolved their motions.  Thus, before we address the substance of Coomer's claims, we pause to highlight a few foundational legal principles governing anti-SLAPP review.

---

[5] In addition, because California has a substantially similar anti-SLAPP statute, "we look to California case law for guidance in construing and applying section 13-20-1101," C.R.S. 2023.  *Tender Care Veterinary Ctr., Inc. v. Lind-Barnett*, 2023 COA 114, ¶ 16.

A.    Plaintiff's Evidence Accepted as True

¶ 66    First, in determining whether a plaintiff has met their burden at the second step of the anti-SLAPP analysis, we must accept the plaintiff's evidence as true. *See L.S.S.*, ¶ 23; *Gonzales*, ¶¶ 21, 80.

¶ 67    Several defendants cite *Salazar* for the proposition that we do not "accept the truth of [plaintiff's] *allegations*." *Salazar*, ¶ 21 (emphasis added). And Coomer asserts that *Salazar* is inconsistent with *L.S.S.* But we do not view these principles as inconsistent.

¶ 68    Unlike a C.R.C.P. 12(b)(5) motion, we do not "accept the factual allegations in the complaint as true." *Salazar*, ¶ 15. Instead, to defeat an anti-SLAPP motion, the plaintiff generally must go further and present *evidence* establishing a reasonable likelihood of success. *See L.S.S.*, ¶ 23 (describing this step as "a summary judgment-like procedure in which the court reviews the pleadings and the evidence"). That evidence can — and typically will — come in the form of an affidavit. § 13-20-1101(3)(b). But once affirmed in an affidavit, the plaintiff's assertions are no longer mere allegations; they are evidence. And that evidence must be accepted as true. *L.S.S.*, ¶ 23; *see also Collins v. Waters*, 308 Cal. Rptr. 3d 326, 334 (Ct. App. 2023) (noting that court "must accept the plaintiff's

31

evidence fully," despite the defendant's argument that the plaintiff "is so disreputable that she could not believe anything he said").

¶ 69    In other words, while we do not necessarily accept the plaintiff's *allegations* as true, we do accept as true the plaintiff's *evidence*. *See Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 715 (Cal. 2019) (noting that the court must accept as true the evidence favorable to the plaintiff, but "we have never insisted that the complaint's allegations be given similar credence").[6]

### B.    No Factfinding

¶ 70    Relatedly, in resolving a special motion to dismiss, "the district court does not make factual findings." *Salazar*, ¶ 19.  Nor does it "weigh the evidence or resolve factual conflicts." *Rosenblum*, ¶ 24.

¶ 71    Thus, although the district court labeled a portion of its order "findings of fact," we reject Coomer's suggestion that we should review those so-called factual findings for clear error.  *See Salazar*, ¶ 19.  To the extent certain defendants argue that the district court

---

[6] In *Rosenblum v. Budd*, 2023 COA 72, ¶ 24, the division stated that a court must assume the truth of the plaintiff's "factual assertions." We read this to mean the factual assertions in the plaintiff's affidavit, not the allegations in the complaint — particularly given the division's citation to *Salazar* for this point.  *See Salazar*, ¶ 21 (noting that we do not "simply accept the truth of the allegations").

*did* make improper factual findings, any such error is harmless because our review is de novo. *Id.* at ¶ 21; *see also* C.A.R. 35(c). In conducting that review, we will disregard any such factual findings.

¶ 72    Some defendants contend that our obligation to consider "opposing affidavits" means that we *should* weigh the evidence. *See* § 13-20-1101(3)(b). But as set forth above, when there is a factual conflict, we accept the plaintiff's evidence as true. *L.S.S.*, ¶ 24. We assess the defendant's evidence "only to determine if it defeats the plaintiff's claim as a matter of law." *Id.* at ¶ 23 (citation omitted).

### C.    No Credibility Determinations

¶ 73    Just as a court may not make factual findings in resolving an anti-SLAPP motion, it may not make credibility determinations. *L.S.S.*, ¶ 48. Indeed, the principles noted above — that we accept the plaintiff's evidence as true and do not weigh the evidence — leave the court with no credibility determinations to make. *See id.*

¶ 74    Several defendants assert that the district court made improper credibility findings. And to the extent it made findings as to the credibility of the evidence submitted in connection with the parties' anti-SLAPP briefing, we agree. We will disregard any such credibility findings and refrain from making any of our own. *See*

C.A.R. 35(c); *cf. L.S.S.*, ¶ 46 (concluding that district court's application of an erroneous burden of proof did not lead to an erroneous result where correct burden was applied on appeal).

¶ 75    But evidence bearing on the reliability of a defendant's source of information, known to the defendant *at the time of the statement*, may be relevant to actual malice — that is, whether the defendant knew the statement was false or entertained serious doubts as to its truth. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157-58 (1967) (holding that evidence was sufficient to support a finding of actual malice where there were reasons to question the source's reliability); *Creekside Endodontics, LLC v. Sullivan*, 2022 COA 145, ¶¶ 37-38, 44 (holding that the plaintiff could not show actual malice where the defendant's statements were based on the professional opinions of three dentists). Thus, to the extent the district court made determinations as to the reliability of Oltmann's account *at the time of defendants' statements*, based upon the evidence presented by the parties, those were not credibility findings. They were a part of the substantive legal analysis as to whether Coomer had established a reasonable likelihood of prevailing on his claims.

## D. Prima Facie Showing

¶ 76    A plaintiff does not need to prove their case at the anti-SLAPP stage. Nor do we (or the district court) decide whether the plaintiff will ultimately prevail — much less *has* prevailed — on their claims. *See Salazar*, ¶ 46. Rather, a plaintiff's burden is to make "a prima facie showing" of evidence that — if later presented at trial — is reasonably likely to sustain a favorable judgment. *L.S.S.*, ¶ 42. And our role is limited to determining whether the plaintiff has met this threshold burden. *Id.* at ¶ 23. If the plaintiff overcomes this initial hurdle, the case proceeds as normal and this "early screening determination" has no further effect on the case. *Salazar*, ¶ 46.

¶ 77    Although we stated this point above, we reiterate it here because several defendants argue that Coomer failed to present clear and convincing evidence to support his claims. That is not the standard. Instead, at this preliminary stage, a plaintiff must show only a reasonable likelihood that they *will* be able to meet their burden of proof at trial. *Rosenblum*, ¶ 24. Where, as here, a plaintiff is "pursuing a defamation claim that will ultimately require proof of actual malice by clear and convincing evidence, . . . the plaintiff must establish a *probability* that they *will* be able to

produce clear and convincing evidence of actual malice at trial."
*L.S.S.*, ¶ 42 (emphasis added). If the plaintiff meets this burden,
the ultimate determination must be made by a jury. *Id.* at ¶ 44.

### E. Evidence That May Be Considered

¶ 78    In resolving an anti-SLAPP special motion to dismiss, the
court "shall consider the pleadings and supporting and opposing
affidavits." § 13-20-1101(3)(b). The evidence in those affidavits
may be considered if "it is reasonably possible the proffered
evidence . . . will be admissible at trial." *Sweetwater Union High
Sch. Dist. v. Gilbane Bldg. Co.*, 434 P.3d 1152, 1163 (Cal. 2019); *cf.
USA Leasing, Inc. v. Montelongo*, 25 P.3d 1277, 1278 (Colo. App.
2001) (noting that a supporting affidavit "must contain evidentiary
material that would be admissible as part of the affiant's testimony
if the affiant was in court and testifying on the witness stand").

¶ 79    No party argues that the court may *only* consider affidavits,
and we decline to impose such a limitation in this case. *See, e.g.*,
*Creekside Endodontics*, ¶ 41 (considering patient notes and email
communication); *L.S.S.*, ¶ 47 (identifying various categories of
evidence presented). *But see Salazar*, ¶ 40 ("A challenge under the
anti-SLAPP statute . . . only allows the court to consider the

36

pleadings and supporting and opposing affidavits . . . .").  Indeed, both Coomer *and* several defendants presented evidence beyond affidavits.  At a minimum, when a court allows specified discovery, *see* § 13-20-1101(6), such an order necessarily implies that the parties may present evidence obtained through that discovery.

¶ 80    But several defendants assert, with varying degrees of development, that the district court improperly relied on inadmissible evidence.  The most developed of these assertions — advanced by the Oltmann Defendants — concerns three expert declarations, which the Oltmann Defendants contend contained legal conclusions, went beyond the declarants' areas of expertise, and relied on undisclosed facts.  We need not decide the admissibility of these declarations because we do not rely on them.

¶ 81    The Oltmann Defendants also challenge the admissibility of the lay declarations submitted by Coomer, on the ground that they had no notice of or opportunity to cross-examine the declarants.  But nothing in the anti-SLAPP statute requires such notice or cross-examination as part of the anti-SLAPP proceedings.  *See* § 13-20-1101(6) (providing that discovery is generally stayed pending a

ruling on the motion). Rather, if the motion is denied, cross-examination can occur later — in a deposition or at trial.

¶ 82    The Oltmann Defendants' challenge to more than thirty exhibits identified only by exhibit number is undeveloped, as is the Hoft Defendants' challenge to the district court's purported reliance on extensive, but unspecified, "inadmissible evidence."[7]  We thus do not consider these arguments.  *See Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56.

### IV.    Reasonable Likelihood of Prevailing

¶ 83    Coomer does not dispute the district court's conclusion that defendants' statements satisfy the first step of the anti-SLAPP analysis — more specifically, that they were made "in connection with a public issue" and in furtherance of defendants' constitutional right of petition or free speech.  § 13-20-1101(3)(a).  We therefore do not address that first step and move directly to the second —

---

[7] The Hoft Defendants assert that they "adopt and incorporate" arguments in the brief of another appellant (who is no longer a party to this appeal) on this issue and others.  Because "a party may not both file a separate brief and incorporate by reference the brief of another party," C.A.R. 28(h), we will only consider arguments developed by the Hoft Defendants in their own briefs.

whether Coomer established a reasonable likelihood of prevailing on his claims.  *See Gonzales*, ¶ 22; *Creekside Endodontics*, ¶ 29.

### A.    Defamation

¶ 84    The thrust of Coomer's defamation claim is that each defendant made statements perpetuating the false claim that Coomer (1) said on the September 2020 conference call that he intended to subvert the presidential election and (2) did in fact subvert the presidential election.[8]  Defendants' arguments overlap and diverge in various respects, but in general, they assert that Coomer did not show a reasonable likelihood of proving, by clear and convincing evidence, that (1) their statements were defamatory; (2) their statements were false; or (3) they acted with actual malice.

### 1.    Legal Principles

¶ 85    Defamation is "a communication that holds an individual up to contempt or ridicule thereby causing [that individual] injury or damage." *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994).  To prevail on a claim of defamation, a plaintiff generally must prove

---

[8] Coomer also repeatedly cites defendants' alleged statements that he "participated in an Antifa call."  But as we understand Coomer's claims, those claims are not based on his mere participation in the call but rather what defendants claimed he said on that call.

four elements: (1) a defamatory statement concerning the plaintiff; (2) publication; (3) fault amounting to at least negligence; and (4) either actionability of the statement irrespective of special damages or the existence of special damages. *Rosenblum*, ¶ 38.

¶ 86    But when, as here, the statement involves a matter of public concern, three heightened standards apply. *L.S.S.*, ¶ 36. First, the plaintiff must prove the falsity of the statement by clear and convincing evidence, rather than by a mere preponderance. *Id.* Second, the plaintiff must prove by clear and convincing evidence that the speaker acted with actual malice. *Id.* Third, the plaintiff must prove actual damages, even if the statement is defamatory per se. *Id.* Because Coomer does not challenge the district court's conclusion that the statements in this case involve a matter of public concern, he must satisfy these heightened burdens.[9] *See id.* at ¶ 38 (assuming statements involved matters of public concern

---

[9] The Hoft Defendants assert that the district court erred by concluding that Coomer was not a public figure. But the same heightened standards apply to cases involving public figures and matters of public concern. *See Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1106 (Colo. 1982). Because there is no dispute that the statements in this case involve matters of public concern, we need not decide whether Coomer is a public figure.

where plaintiff did not dispute that they did); *Lawson v. Stow*, 2014 COA 26, ¶ 18 (explaining that a matter is generally of public concern when it "embraces an issue about which information is needed or is appropriate" or when "the public may reasonably be expected to have a legitimate interest" in it) (citation omitted).

¶ 87    Clear and convincing evidence is "evidence that is highly probable and free from serious or substantial doubt." *Destination Maternity v. Burren*, 2020 CO 41, ¶ 10 (citation omitted). But again, that is the burden a plaintiff must ultimately meet at trial. At this early stage, Coomer need only show "a reasonable probability that he *will* be able" to prove falsity and actual malice by clear and convincing evidence at trial. *Rosenblum*, ¶ 40 (emphasis added).[10]

### 2.    Defamatory Statements

¶ 88    There is no dispute about *what* defendants said in this case. Those statements were all either recorded or written, and the record contains transcripts of most of the recorded statements and copies

---

[10] The anti-SLAPP statute uses the phrase "reasonable likelihood," § 13-20-1101(3)(a), while our case law sometimes uses the phrase "reasonable probability," *e.g.*, *Rosenblum*, ¶ 40. Except when quoting prior cases, we will adhere to the language of the statute. But the two phrases are synonymous in this context. *Salazar*, ¶ 23.

of the written ones. But defendants dispute the district court's characterization of those statements and their defamatory nature.

### a. Statements in Question

¶ 89    The district court concluded that Coomer had sufficiently shown that each defendant stated, in substance, that (1) Coomer participated in an Antifa conference call;[11] (2) Coomer said on the call that he intended to subvert the presidential election; and (3) Coomer did subvert the results of the election. Defendants argue that the court erred by lumping all defendants together and making generalizations about the "substance" of their statements rather than analyzing what each defendant actually said.

¶ 90    We agree with defendants that it is important to consider each defendant's statements independently and avoid generalizing them for the sake of expediency. But we are not limited to viewing discrete sentences or words in isolation. Instead, we must consider each defendant's statements in context to determine how a reasonable person would have understood them. *See Anderson,*

---

[11] As noted above, *supra* n.8, we do not consider the statements that Coomer participated in an Antifa conference call as an independent basis of Coomer's claims, separate from defendants' statements about what Coomer supposedly said on that call.

¶¶ 39, 47; *Rosenblum*, ¶ 43.  Statements may, alone or in combination, "reasonably be interpreted to communicate an idea" that they do not spell out expressly.  *Rosenblum*, ¶ 43; *see also Keohane*, 882 P.2d at 1302-03 (explaining that a factual assertion may be implied); *Billauer v. Escobar-Eck*, 305 Cal. Rptr. 3d 273, 286 (Ct. App. 2023) ("[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory," but "whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance.") (citation omitted).

¶ 91    We therefore begin by separately considering each defendant's statements.  Although the wording of those statements varies, we conclude that each defendant made statements that could reasonably be interpreted as asserting that Coomer said on a conference call that he had made sure President Trump was not going to win the election.  *See Rosenblum*, ¶¶ 43-44.  We further conclude that each defendant made statements, either express or implied, that Coomer took steps to undermine the election results.[12]

---

[12] By identifying specific statements made by each defendant, we do not intend to suggest that Coomer's claim is limited to those statements.  We simply conclude that those statements are sufficient to establish a reasonable likelihood that Coomer will

### i. Oltmann Defendants

¶ 92    The Oltmann Defendants do not dispute that Oltmann made the statements Coomer claims he did or that his statements can be attributed to the other Oltmann Defendants.  As just a small sampling, Oltmann said on his November 9, 2020, Conservative Daily podcast that (1) he was "going to expose someone," later identified as Coomer, who "is controlling elections"; (2) a person identified as "Eric, the Dominion guy" said on the conference call, "Don't worry about the election.  Trump is not going to win.  I made effing sure of that"; (3) Oltmann determined the "Eric" on the call was Coomer; and (4) Coomer was "interfering with the election."

¶ 93    Over the next month (and beyond), Oltmann repeated these and similar statements, underscoring them with expressions of certainty that Coomer — not just someone named "Eric" — had

---

prevail on his claims.  Absent a specific challenge, we need not separately parse each statement by each defendant.  *See Park v. Nazari*, 311 Cal. Rptr. 3d 557, 564 n.5 (Ct. App. 2023) (holding that when an anti-SLAPP motion seeks to strike the entire complaint, "the court can properly deny the motion . . . so long as the court concludes the complaint presents at least one claim that does not arise from anti-SLAPP protected activity").  We express no opinion as to any additional statements we do not address below.

made the alleged statement on the conference call and had in fact interfered with the election.  These statements included:

- "I'm not guessing that [Coomer is] involved, I know he's involved in this. . . .  When you interfere with the country's election, when you put your finger on the scale of the voting of the people, the American voice, you are subject to being put to death."

- "It is truth, a hundred percent truth."

- "[T]his isn't all made up.  This isn't hyperbole that we're just throwing out there.  This is absolute fact."

- "[Coomer] has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country."

- "[Coomer] could put his finger firmly on the American voice and tip the scale of the election very easily.  And frankly . . . he was doing it."

ii.    Malkin

¶ 94    On her November 13, 2020, broadcast of #MalkinLive, Malkin asked Oltmann to give his account of the September conference call, which she characterized as "information that is so vital to

understanding the systemic stealing of our election." After Oltmann had finished that account, she said that "the market share of Dominion is why this reaches from conspiracy theory to conspiracy truth." She also said that Coomer was "cheerleading calls for Antifa types" and that Oltmann "got to hear the unhinged rantings of this lunatic in charge of security at Dominion Voting Systems." Then, after the show, Malkin posted several links to the interview along with messages indicating, among other things, that Coomer had been "exposed" by Oltmann. These statements "could reasonably be interpreted to communicate" that Coomer had made the statement Oltmann had just described. *Rosenblum*, ¶ 43.

¶ 95     Malkin contends that she did not say Coomer in fact subverted the election, pointing to her disclaimer in her second interview that "there's no evidence that Eric Coomer made good on his threat" — a disclaimer she qualified with the two-part caveat, "at this point, at least publicly." But in that same interview, Malkin tied Coomer to a segment focused on "hacking the vote," said that Coomer "matters in these ongoing battles against election fraud," and immediately followed the disclaimer with the assertion that Coomer "ha[d] the ability to carry out on this threat . . . that [Oltmann] heard directly."

¶ 96    Given this context, Malkin's disclaimer is not dispositive.  *See* Restatement (Second) of Torts § 563 cmt. c (Am. L. Inst. 1977) ("A conditional or alternative statement may be defamatory if, notwithstanding its conditional or alternative form it is reasonably understood in a defamatory sense."); *Damon v. Moore*, 520 F.3d 98, 107 n.5 (1st Cir. 2008) ("While disclaimers are not a bad practice, the non-defamatory character of a statement will rarely depend solely on the presence or absence of one.").  Notwithstanding that disclaimer, a jury could reasonably interpret Malkin's statements, in combination, to imply that Coomer had taken steps to undermine the election results.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (holding that a reasonable fact finder could conclude that nine passages in a newspaper column "impl[ied] an assertion that [the plaintiff] perjured himself").  Moreover, the disclaimer expressly reasserted that Coomer had *threatened* to influence the election.

iii.    Hoft Defendants

¶ 97    The Hoft Defendants published articles that included the following statements, among others: (1) "Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls"; (2) Oltmann "infiltrated Antifa" and heard "Eric (the Dominion guy)"

say "Don't worry about the election, Trump's not gonna win. I made f*cking sure of that"; (3) Oltman investigated "Eric from Dominion" and "came upon Eric Coomer"; and (4) Coomer and Dominion had allegedly threatened lawsuits against media "who dare to speak out against their alleged massive national (and possibly international) scheme to allegedly rig our alleged elections." They also published several articles discussing Coomer in the context of claims about vulnerabilities in Dominion software and alleged "vote switching."

¶ 98     The Hoft Defendants also published the audio of Hoft's interview with Oltmann, in which Hoft said explicitly that Coomer was on the call Oltmann described, that Oltmann's information was "truthful," and that Oltmann was "exposing absolute fraud."

¶ 99     Contrary to the Hoft Defendants' argument that Coomer did not plead the allegedly defamatory statements with sufficient specificity, the operative complaint quotes several of these statements directly and identifies others by citation to the articles in which they appear. Although a defamation claim "requires a certain degree of specificity," *Corporon v. Safeway Stores, Inc.*, 708 P.2d 1385, 1390 (Colo. App. 1985), the plaintiff is not required to quote each defamatory statement verbatim in its entirety.

¶ 100    The Hoft Defendants assert that they never said Coomer

"rigged the election" but only that someone identified as Coomer

said, "Trump is not gonna win.  I made f-ing sure of that."  Notably,

the Hoft Defendants do not dispute that they asserted that Coomer

*said* he made sure President Trump was not going to win, even

though they were repeating Oltmann's account.  *See Anderson*,

¶¶ 38-47 (suggesting that a report of allegations may be an

assertion of the allegations themselves where context indicates the

speaker endorses their truth); *Dixon v. Newsweek, Inc.,* 562 F.2d

626, 631 (10th Cir. 1977) ("[T]he republication of false defamatory

statements is as much a tort as the original publication.").

¶ 101    As to whether the Hoft Defendants said Coomer subverted the

election, we agree they did not do so explicitly.  And their repeated

use of the word "alleged" when referring to Coomer's "scheme" to

"rig" our elections arguably cuts against such an assertion.  *See*

*Anderson*, ¶ 44.  On the other hand, in context, the repeated use of

the word "alleged" — including in reference to "our alleged elections"

— could be seen as tongue in cheek.  Moreover, that statement

followed several other Gateway Pundit articles discussing Coomer

in the context of alleged election fraud, as well as Hoft's statement that

49

Oltmann was "exposing absolute fraud."  Given this context, we cannot foreclose a reasonable likelihood that a jury could interpret these statements as assertions that Coomer had in fact engaged in a "scheme" to "rig" the election.  *See Milkovich*, 497 U.S. at 21.

### iv.  Metaxas

¶ 102   Like Malkin, Metaxas gave Oltmann a platform to share his account of the September 2020 call.  Metaxas then confirmed that account: "So this guy, Eric Coomer, this genius you discover was the guy who said on this Antifa call, 'Don't worry about Trump, there's no way he's going to win'?"  Although framed as a question, this statement — viewed in the context of the entire interview — could reasonably be interpreted as an assertion that Coomer had made the claimed statement, particularly when Metaxas knew Oltmann would confirm it.  *See Keohane*, 882 P.2d at 1302 ("A question . . . though not phrased in the form of a declaration of fact, may imply the existence of a false and defamatory fact.").

¶ 103   Metaxas then went further, suggesting that Coomer had in fact improperly influenced the election results:

- "Eric Coomer is the director of strategy and security for Dominion Voting Systems. . . .  [T]hat guy is all in for

Antifa, wants to do anything he can with his
tremendously powerful position to make sure Donald
Trump is not elected. He effectively succeeds . . . ."

- "[T]he idea that anyone would dare try to mess with our
elections . . . I cannot think of anything more despicable
. . . so that's why I'm so glad to be speaking with you and
getting this information out."

- "Does [Coomer] know he's going to go to prison for the
rest of his life?"

- "[T]here are other nefarious actors like Mr. Coomer . . . .
What we're talking about is evil. . . . It's extremely
criminal and these folks know they're going to go to jail
for the rest of their lives."

¶ 104    Metaxas later posted a link to the interview with a message
stating, this time explicitly, that "Eric [C]oomer . . . PROMISED the
Antifa folks that 'effing' Trump WOULD NOT WIN!"

### v. Powell Defendants

¶ 105    Powell[13] said explicitly at the November 19 press conference
that "Eric Coomer . . . is on the web as being recorded in a
conversation with Antifa members, saying that he had the election
rigged for Mr. Biden.  Nothing to worry about here.  And he was
going to — they were going to 'F' Trump."  In an interview the next
day, she repeated that accusation: "We've got Eric Coomer . . .
admitting on tape that he rigged the election for Biden . . . ."  And in
another interview, she confirmed the interviewer's question that
Coomer "was allegedly . . . on a conference call . . . with Antifa" and
"said, supposedly, don't worry about Trump, I've already made sure
he's going to lose the election," responding, "It's true.  We have an
affidavit to that effect and I think we have a copy of the call."

¶ 106    The Powell Defendants contend that Powell was merely stating
that there were reports that Coomer had made the statements, not
that he had actually made them.  But this characterization is belied
by Powell's statements themselves, as well as their context.  Powell

---

[13] Sidney Powell, P.C. does not make any arguments distinct from
Powell, nor does it dispute that the relevant statements by Powell
may be imputed to it.  We therefore assume that they can.

did not simply say others had said it; she said she had a recording of Coomer's statements. And when the interviewer used the words "allegedly" and "supposedly," Powell did not. She said the allegations were "true" and then reinforced that assertion by citing the affidavit and again suggesting there was a recording. Notably, Oltmann acknowledged from the outset that there is no recording of the call, and the record contains no evidence of any such recording.

¶ 107    We also think that Powell's statements — made in the context of her claims that the election had been "rigged" — could reasonably be understood as assertions that Coomer interfered with the election results. She did not just say Coomer made the comment attributed to him; she said he "admitt[ed] on tape that he rigged the election." She then immediately followed that statement by claiming to have "all kinds of evidence that is mathematically irrefutable" — thus indicating not only that Coomer had "admitted" to "rigging" the election, but that she could prove he had done so.

vi.    Trump Campaign

¶ 108    The Trump Campaign does not dispute that Giuliani's statements at the November 19, 2020, press conference may be imputed to it. Giuliani introduced himself at that press conference

53

as part of the legal team representing President Trump and the Trump Campaign. *See* Restatement (Second) of Agency § 254 (Am. L. Inst. 1958) ("A principal is subject to liability for a defamatory statement by . . . [an] agent if the agent was authorized, or . . . apparently authorized to make it."); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("[I]f an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the defamatory statement.").

¶ 109    Giuliani explained that the purpose of the press conference was to present evidence of alleged election irregularities. One of those pieces of "evidence" was Oltmann's account of Coomer's statements. After Powell relayed that account, Giuliani reiterated that Coomer "specifically says that they're going to fix the election." He followed that statement by asserting that there had been a "crime" and that he could "prove" President Trump won the election. These statements — indisputably attributable to the Campaign — can reasonably be understood to assert that Coomer (1) said he was "going to fix the election" and (2) actually took steps to do so.

¶ 110    The Trump Campaign contends that Powell's statements cannot be imputed to it because Powell was not acting as its agent

when she made the statements.  We conclude that there is a reasonable likelihood a jury could find otherwise.  Five days before the press conference, President Trump posted on social media:

> I look forward to Mayor Giuliani spearheading the legal effort to defend OUR RIGHT to FREE and FAIR ELECTIONS!  Rudy Giuliani, Joseph diGenova, Victoria Toensing, *Sidney Powell*, and Jenna Ellis, a truly great team . . . .

(Emphasis added.)  Then, at the beginning of the press conference, Giuliani introduced Powell as one of the "senior lawyers" representing President Trump *and* the Trump Campaign.

¶ 111    The Trump Campaign argues that Giuliani's and President Trump's statements cannot establish agency because they were not "principals" of the Campaign.  In support, it cites century-old case law for the proposition that a putative agent's *own* declarations are not admissible to prove agency in the absence of other evidence. *See Modoc Gold Mining Co. v. Skiles*, 13 Colo. App. 293, 294, 57 P. 190, 190 (1899); *Am. Nat'l Bank of Sapulpa v. Bartlett*, 40 F.2d 21, 23 (10th Cir. 1930).  *But see Zambruk v. Perlmutter 3rd Generation Builders, Inc.*, 32 Colo. App. 276, 279, 510 P.2d 472, 474 (1973) ("Although it is true that an agency relationship cannot be established *solely* from the assertion of authority by an alleged

55

agent, . . . [a]gency may be established by the conduct of the principal *and* the alleged agent.") (emphasis added).

¶ 112    This confuses the issue.  The principal is the Trump Campaign.  *See* Restatement (Second) of Agency § 1 ("The one for whom action is to be taken is the principal.").  As agents of the Trump Campaign, Giuliani and President Trump could speak and act on its behalf.  *See Dworkin, Chambers & Williams, P.C. v. Provo*, 81 P.3d 1053, 1058 (Colo. 2003) ("By definition, an agent is one with authority to 'act on behalf of . . . and bind' a principal.") (citation omitted).  So Giuliani's and President Trump's statements that Powell was an attorney for the Campaign *were* statements of the principal.  *See Dall. Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997) ("[A] corporation can only act through its agents, and their acts within the scope of their authority are the acts of the corporation.") (citation omitted).  Coomer does not rely solely, if at all, on the putative agent's (Powell's) own declarations of agency.

¶ 113    Indeed, it is the Trump Campaign that relies on Powell's own declarations, citing her deposition testimony that she did not appear at the press conference on behalf of the Trump Campaign, and that, although she and Giuliani were "essentially aligned," she

was "pursuing [her] own path." The Campaign also cites its own deposition testimony, and that of Giuliani, denying that Powell had been an attorney for the Campaign. These post hoc denials may create a factual dispute. But that is a dispute we cannot resolve at this stage. *See Rosenblum*, ¶ 24. In light of the statements above, Coomer has made a "prima facie showing" that, at the time of the November 19 press conference and her interviews the next day, Powell was acting as an agent of the Trump Campaign. *L.S.S.*, ¶ 42.

¶ 114    Finally, the Trump Campaign asserts that, even if Powell was its agent at some point, that agency terminated on November 22, 2020, when Giuliani and another lawyer for the Campaign, Jenna Ellis, publicly stated that Powell "is not a member of the Trump legal team." *See* Restatement (Second) of Agency § 118 ("Authority terminates if the principal . . . manifests to the other dissent to its continuance."). We need not decide this issue because Coomer does not seek to impute to the Trump Campaign any statements made by Powell on or after November 22, 2020.

### vii.    DTR

¶ 115    DTR makes a different argument than the other defendants. Its sole argument is that it cannot be liable for Powell's statements

— the only alleged basis for liability — because it was formed after those statements were made. While Powell's statements were made on November 19 and 20, 2020, DTR presented evidence that it was not incorporated until December 1, 2020. Thus, DTR contends that it cannot be deemed to have made the statements attributed to it.

¶ 116 This argument has substantial force on the merits. *See Coopers & Lybrand v. Fox*, 758 P.2d 683, 685 (Colo. App. 1988) ("One cannot act as the agent of a nonexistent principal."); *Miser Gold Mining & Milling Co. v. Moody*, 37 Colo. 310, 315, 86 P. 335, 337 (1906) (holding that corporation could not be bound by acts occurring when it was "not yet in existence"). But there are two problems with us considering the argument in this appeal.

¶ 117 First, we question whether DTR's argument may even be raised in an anti-SLAPP motion. Consistent with the anti-SLAPP statute's purpose of encouraging and safeguarding constitutional rights, the statute applies only when the defendant makes a prima facie showing that the cause of action arises from an "act of *that person* in furtherance of the person's right of petition or free speech." § 13-20-1101(3)(a) (emphasis added); *see also Salazar*,

¶ 21.  It is not clear, then, that a defendant may invoke the special procedures of that statute when it denies engaging in any such act.

¶ 118    Second, even if DTR could have made this argument in its anti-SLAPP motion, it did not.  To the contrary, that motion effectively assumed DTR's vicarious liability for Powell's statements and asserted that those statements were not actionable.  It was not until DTR's reply that it first asserted that the statements were made before it existed or that it presented evidence to that effect.  We ordinarily will not consider issues raised for the first time in a reply brief before the district court.  *See Grohn v. Sisters of Charity Health Servs. Colo.*, 960 P.2d 722, 727 (Colo. App. 1998).

¶ 119    DTR contends that it was not required to raise the issue in its motion because it was Coomer's burden to show a reasonable likelihood of prevailing on his claim, which he could do only if he first showed DTR existed when the statements were made.  But a plaintiff's burden does not require the plaintiff to anticipate and respond to arguments a defendant does not make — particularly where, as here, the special motion to dismiss appears to concede the issue.  *See Salazar*, ¶ 34 (holding that the defendant did not preserve an argument that the plaintiff had to show actual malice).

59

¶ 120    We decline to exercise our discretion to consider this
unpreserved argument.  *See Farmer v. Colo. Parks & Wildlife
Comm'n*, 2016 COA 120, ¶ 19.  Coomer did not have an opportunity
to brief the merits of the argument in the district court and,
contrary to DTR's contention that it involves a pure issue of law,
Coomer's response on appeal presents arguable factual disputes as
to whether DTR ratified or otherwise adopted Powell's earlier
statements after it was incorporated.  *See Knox v. First Sec. Bank of
Utah*, 196 F.2d 112, 116 (10th Cir. 1952).  Under these
circumstances, we do not think it would be appropriate to address
this argument for the first time on appeal.  *See Salazar*, ¶ 35.

¶ 121    Because DTR does not challenge the district court's denial of
its anti-SLAPP motion to dismiss on any other grounds, the order is
affirmed as to DTR.  This does not, however, preclude DTR from
asserting this argument in an appropriate motion on remand.

b.    Defamatory Nature

¶ 122    We have concluded that each defendant made statements that
could reasonably be understood to communicate that (1) Coomer
said on a September 2020 conference call that he made sure
President Trump would not win the election, and (2) Coomer took

60

steps to undermine the election results.  We next conclude that there is a reasonable likelihood a jury could find these statements were defamatory, in that they "tend[ed] to so harm [Coomer's] reputation . . . as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Arrington v. Palmer*, 971 P.2d 669, 671 (Colo. App. 1998).  A statement is defamatory if it "prejudice[s] the plaintiff in the eyes of a substantial and respectable minority of the community."  *Id.*

¶ 123    No defendant disputes that a statement that Coomer in fact interfered with the election would be defamatory.  To the extent such a statement imputes a criminal offense, as several defendants' statements did expressly, it is defamatory per se.  *Id.*; *see also Keohane*, 882 P.2d at 1304 ("[A]ccusations of criminal activity, 'even in the form of opinion, are not constitutionally protected.'") (citation omitted).  Even if it did not, such an accusation could undoubtedly harm Coomer's reputation, prejudice him in the eyes of the community, and hold him up to contempt or ridicule, as evidenced by the death threats and harassment Coomer says he experienced.  *See Keohane*, 882 P.2d at 1297; *Arrington*, 971 P.2d at 671.

¶ 124     Several defendants contend that a statement that Coomer said

he "made sure" President Trump was not going to win the election is

not defamatory because it could mean something innocuous like

donating to the Biden campaign or encouraging people not to vote

for President Trump.  But this argument ignores the context of the

statements.  Defendants were not discussing this story in the

context of political activism; they were discussing it in the context of

claims of election fraud.  In that context, a statement that Coomer

had "made sure" President Trump was not going to win could mean

only that he had taken steps to subvert the election results.

¶ 125     Some defendants — for example, the Powell Defendants and

the Oltmann Defendants — connected these dots explicitly by

paraphrasing Coomer's alleged quote accordingly.  Others left the

meaning of Coomer's reported statement implicit.  Either way, there

is a reasonable likelihood that a jury could conclude that, even if

Coomer did not follow through on his supposed guarantee, the

claim that he had *made* such a statement was itself defamatory.

¶ 126     Several defendants also dispute the defamatory nature of

statements that Coomer participated in an Antifa conference call,

particularly when Coomer himself had posted a self-styled "public

statement from 'Antifa'" on his social media page.  We agree that it is a closer call whether merely stating that Coomer had participated in an Antifa call would alone be defamatory under these circumstances.  But we need not decide that point because the central focus of defendants' statements was not simply that Coomer had been on an Antifa call, but what he had said on that call.

¶ 127   The same is true of the Powell Defendants' argument that their statement that the call was recorded was not defamatory.  In a vacuum, the existence (or not) of a recording might not be defamatory, and we do not understand Coomer to argue otherwise.  But Powell used the claimed recording to fortify her claim that Coomer made the statement.  A jury could reasonably conclude that Powell's reference to a recording, while perhaps not defamatory on its own, increased the defamatory impact of her other statements.

### c.   Opinion

¶ 128   The Hoft Defendants and Metaxas each contend that their statements were protected opinion and hyperbole.  They assert that, as a political opinion blog and talk radio host, respectively, no one would understand their statements as anything other than

intentionally provocative commentary.  With respect to statements expressing the factual assertions we identify above, we disagree.

¶ 129   A statement may be actionable as defamation if it is "sufficiently factual to be susceptible of being proved true or false." *Anderson*, ¶ 34 (citation omitted).  Statements of pure opinion that do not "contain a provably false factual connotation" or that "cannot 'reasonably [be] interpreted as stating actual facts' about an individual" are constitutionally protected and nonactionable. *Keohane*, 882 P.2d at 1299 (citation omitted); *see Lawson*, ¶ 30.

¶ 130   But there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'"  *Milkovich*, 497 U.S. at 18.  To the contrary, expressions of opinion "often imply an assertion of objective fact."  *Id.*  And "[s]imply couching [a factual assertion] in terms of opinion" — for example, by prefacing the statement with a qualification like "I think" or "I believe" — does not itself insulate the speaker from liability.  *Id.* at 19; *see also Anderson*, ¶ 35.

¶ 131   To distinguish between an actionable assertion of fact and a nonactionable statement of pure opinion, we apply a two-part test. *Keohane*, 882 P.2d at 1299.  First, we ask whether the statement is "sufficiently factual to be susceptible of being proved true or false."

*Id.* (citation omitted). This step is satisfied if "the statement contains *or implies* a verifiable fact." *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 10 (Colo. 1994) (emphasis added). Second, we ask "whether reasonable people would conclude that the assertion is one of fact." *Keohane*, 882 P.2d at 1299. In answering this second question, we may consider how the statement is phrased, the context, and the surrounding circumstances, including the medium through which the statement is disseminated and the audience to whom it is directed. *Id.*

¶ 132    The assertions we identify above — that Coomer said he made sure that President Trump was not going to win the election, and that he took steps to undermine the election results — are "sufficiently factual to be susceptible of being proved true or false." *Id.* (citation omitted). Either Coomer made the statement on the conference call or he did not. Either he took steps to undermine the election results or he did not. Those are factual assertions.

¶ 133    Moreover, we conclude that a reasonable person would understand these portions of the Hoft Defendants' and Metaxas's statements as assertions of fact. We recognize that the statements were made on platforms commonly used to express opinions. And

some of what these defendants said in their articles and radio show undoubtedly *would* qualify as protected opinion or hyperbole — for example, that Coomer was "unhinged," a "lunatic," or "evil."

¶ 134   But assertions of fact can be made on an opinion platform. And as to the statements in question, defendants did not hedge. They did not even couch the statements with qualifying language like "I think," "I believe," or "in my opinion."  Rather, they reported Oltmann's account in declarative terms and then connected it to claimed election irregularities — Metaxas directly, saying Coomer had "effectively succeed[ed]," and the Hoft Defendants only slightly less so. *See Milkovich*, 497 U.S. at 18 (noting that factual assertion may be implied).  Further, those statements came in the context of broader claims of election improprieties nationwide, including by the Trump Campaign itself, making it more likely that defendants' audiences would take the statements as fact. *See Keohane*, 882 P.2d at 1303-04 (holding that other claims of official misconduct indicated that a reasonable person would understand an accusation of similar misconduct as a statement of fact); *cf. Rosenblum*, ¶ 44 (rejecting argument that no reasonable internet user could have believed statements because internet is "inherently unreliable").

¶ 135   We also reject defendants' suggestion that their statements are

protected because they identified the bases for those statements,

including Oltmann's interview, internet videos of Coomer, and

Coomer's social media posts.  Such disclosure of the underlying

facts is not an automatic safe harbor.  *Milkovich*, 497 U.S. at 18-19.

The statement may still imply a false assertion of fact if those facts

are incorrect or incomplete, or if the speaker's assessment of them

is provably false.  *Id.*  That is the essence of Coomer's claim.

¶ 136   That is how this case differs from *Herring Networks, Inc. v.

Maddow*, 8 F.4th 1148 (9th Cir. 2021), and *McDougal v. Fox News

Network, LLC*, 489 F. Supp. 3d 174, 182 (S.D.N.Y. 2020).  In both

*Herring Networks* and *McDougal*, the plaintiffs did not dispute any

of the underlying verifiable facts but only the defendants' subjective

characterization of those facts.  *See Herring Networks*, 8 F.4th at

1159 (distinguishing between the defendant's "commentary and the

actual news she is reporting"); *McDougal*, 489 F. Supp. 3d at 178,

182 (noting that the plaintiff alleged in the complaint that she

received the payment but disputed "the accusation of 'extortion,'

coupled with the description of [her] alleged actions").  In contrast,

Coomer's claims concern the truth of the reported facts.

### 3. Falsity

¶ 137    We next conclude that, accepting Coomer's evidence as true, he has shown a reasonable likelihood of proving by clear and convincing evidence that defendants' statements were false.

¶ 138    In his declaration, Coomer attested that (1) he never participated in any Antifa conference call or any other call related to protest activity; (2) he never stated he had the ability or desire to affect the outcome of an election; (3) he did not boast about his supposed ability to rig the 2020 presidential election; (4) he did not take any action to subvert the election; and (5) he did not have the ability to alter the results of the election in any way.  Coomer also generally accounted for his daily schedule on September 25, 2020, and each day during the week of September 27, 2020 — no part of which included anything like the call Oltmann described.

¶ 139    This declaration, if true, could provide clear and convincing evidence that defendants' statements about what Coomer had said and done were false.  *See Anderson*, ¶ 68 (relying on the plaintiff's affidavit attesting that he had never sexually assaulted anyone or "engaged in conduct that could reasonably be interpreted as sexual assault" to conclude that a reasonable juror could find by clear and

convincing evidence that the sexual assault allegation was false).

Despite defendants' exhortations, we cannot at this stage reject (or

discount) Coomer's declaration as incredible.  *See id.* at ¶ 70.

¶ 140    Coomer presented other evidence as well.  For example,

several defendants suggest that a September 25, 2020, conference

call described in Anderson's declaration might have been the

conference call in question.  But if that is the case, Anderson's

declaration corroborates Coomer's denial.  Anderson attested that,

on that call, "no one mentioned 'Eric from Dominion.'"  He also

stated that, although he was "generally familiar with all of the call

participants," he did not know, had never met, and had never heard

of Eric Coomer.  Another person Oltmann suggested might have

been on the call, Heidi Beedle, attested that she was not aware of

an Antifa call in late September 2020 and had never met Coomer.

¶ 141    Coomer also points to apparent inconsistencies or weaknesses

in Oltmann's account of the call, including that (1) the screenshot

of Oltmann's alleged Google search is dated September 26, 2020,

while Oltmann's affidavit states that the call occurred on or about

the week of September 27, 2020; (2) Oltmann originally said it was

a phone call but later said it was a Zoom call; and (3) there was no

recording of the call despite a later claim by some defendants that there was. Though not alone sufficient, these factors would provide further grounds for a jury to find that Oltmann's account was false.

¶ 142   Defendants cite a litany of evidence that they contend could support a contrary finding. They do not point to any direct evidence that *Coomer* made the statement. Nor does any defendant even assert on appeal, much less cite evidence, that Coomer in fact took steps to undermine the election results. But defendants point to the following evidence that could support a jury finding that the call occurred as Oltmann described and that Coomer was the speaker:

- Oltmann attested to his account of the call in a sworn affidavit and in his deposition testimony.

- Oltmann presented contemporaneous notes of the call.

- Oltmann presented a screenshot of a Google search for "eric dominion denver Colorado," dated the day after the conference call described in Anderson's declaration.

- Oltmann allegedly described the call to two other people before discussing it on his podcast.

- Coomer made social media posts that were "anti-Trump" and supportive of Antifa.

- There was a Zoom call among Denver activists around the time of the alleged call Oltmann described.

¶ 143    Several defendants argue that a reasonable jury could find from this evidence that Coomer cannot prove by clear and convincing evidence that Oltmann's account of the call was false. And that may be true. But it answers the wrong question. The question is not whether a reasonable jury could find in defendants' favor. The question is whether, accepting Coomer's evidence as true, there is a reasonable likelihood that a jury could find in *Coomer's* favor. If there is a reasonable likelihood of *either* finding — a verdict in favor of defendants *or* a verdict in favor of Coomer — Coomer has necessarily overcome the anti-SLAPP threshold.

¶ 144    To be clear, we do not make any determination as to which evidence — Coomer's or defendants' — is more credible. When, as here, there is competing evidence, we may not weigh the evidence at all. *Rosenblum*, ¶ 24. We conclude only that Coomer has presented evidence establishing a reasonable likelihood that he will be able to prove the falsity of defendants' statements at trial. The question of which version of events to believe is one for the jury. *L.S.S.*, ¶ 44.

¶ 145    Some defendants highlight certain statements that they

contend are substantially true, including that Dominion had

"penetrated our election system" (Malkin), that *a* call occurred

involving the parties and topics Oltmann claimed (the Hoft

Defendants), that there were *reports* of Coomer having made the

statement (the Powell Defendants), and that Coomer was "anti-

Trump" (the Powell Defendants).  *See SG Ints. I, Ltd. v.

Kolbenschlag*, 2019 COA 115, ¶ 21 ("Substantial truth is a complete

defense to defamation.").  To the extent these arguments are

premised on the existence of a call in which Coomer participated,

we reject them for the reasons above: Coomer presented an affidavit

denying that he participated in any such call.  To the extent they

assert the substantial truth of statements other than those that

Coomer made the comment attributed to him and took steps to

undermine the 2020 presidential election, they are beside the point.

Coomer's claims are not based on defendants' statements that he

disapproved of President Trump, or even on defendants' assertions

about Dominion more generally.  They are based on defendants'

statements about what Coomer said and did with regard to the

election.  And as discussed above, each defendant went further than simply reporting that *others* had made those statements.

### 4.  Actual Malice

¶ 146   As noted above, because defendants' statements involve a matter of public concern, Coomer must "establish a reasonable probability that he will be able to produce clear and convincing evidence of actual malice at trial." *Rosenblum*, ¶ 40.  Defendants each contend that Coomer has not met this burden.  We disagree.

### a.  Legal Standard

¶ 147   Actual malice means that the speaker made the statement "with actual knowledge that it was false or with reckless disregard for whether it was true." *L.S.S.*, ¶ 40.  A speaker acts with reckless disregard if the speaker "entertain[s] serious doubts as to the truth of the statement or act[s] with a high degree of awareness of its probable falsity." *Creekside Endodontics*, ¶ 38 (citation omitted).

¶ 148   This is a subjective standard.  *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also In re Green*, 11 P.3d 1078, 1086 n.7 (Colo. 2000).  The question is not "whether a reasonably prudent [person] would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731.  Instead, the evidence

must "permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication," *id.*, or was highly aware of its probable falsity, *Creekside Endodontics*, ¶ 38.

¶ 149   But that does not mean that a defendant can defeat a defamation claim simply by "testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 732. Nor does it mean that what a reasonable person would have known or believed is irrelevant. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("[I]t cannot be said that evidence concerning . . . care never bears any relation to the actual malice inquiry."). Actual malice can, and often must, be proved by circumstantial evidence. *Id.*; *see also Creekside Endodontics*, ¶ 37 ("[I]t is rare for there to be evidence that the speaker *knew* their statement was false yet published it anyway."). And one way of showing a defendant in fact entertained serious doubts as to the truth of a statement is to show that any reasonable person would have entertained such doubts. *See Harte-Hanks Commc'ns*, 491 U.S. at 667-68 (holding that departure from accepted standards of reporting supported finding of reckless disregard); *Reader's Digest Ass'n v. Superior Ct.*, 690 P.2d 610, 618 (Cal. 1984) ("[E]vidence of

74

negligence . . . may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or . . . knowledge of falsity.") (citation omitted).

¶ 150    Thus, while inadequate investigation by a layperson is generally not alone sufficient to show actual malice, grossly inadequate investigation might be. *Creekside Endodontics*, ¶ 38. Similarly, while the failure to corroborate information received from an otherwise reliable source does not establish actual malice, *id.*, "a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation" may do so, *Kuhn v. Tribune-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981). Other circumstantial evidence of actual malice may include (1) the speaker's hostility toward the plaintiff; (2) inconsistencies in the source's account; (3) reasons to doubt the veracity or reliability of the source; (4) the inherent improbability of the claim; and (5) other credible information contradicting the information. *See St. Amant*, 390 U.S. at 732; *L.S.S.*, ¶ 40; *Gonzales,* ¶ 81; *Anderson*, ¶¶ 64-67.

¶ 151    Contrary to defendants' assertions, such considerations do not convert the actual malice standard into an objective one. The question remains the defendant's subjective state of mind — in

other words, what the defendant actually knew or believed.[14]  But rarely will a plaintiff have direct evidence of a defendant's mental state.  *See, e.g.*, *Nixon v. City & Cnty. of Denver*, 2014 COA 172, ¶ 29.  And in the absence of such evidence, a plaintiff can prove that element by presenting evidence that would permit the *inference* that the defendant acted with actual malice based on all the circumstances.  *See Kuhn*, 637 P.2d at 318; *L.S.S.*, ¶ 46.

### b.    Oltmann Defendants

¶ 152    Accepting Coomer's evidence as true allows for one of two conclusions: either (1) Oltmann fabricated his account of the September 2020 conference call; or (2) there *was* a conference call

---

[14] The Oltmann Defendants assert that the district court erred by referring to a negligence standard in one paragraph of its order. But the court did not apply a negligence standard.  Rather, it first concluded that Coomer had shown *at least* negligence (i.e., the third element of an ordinary defamation claim), *see Rosenblum*, ¶ 38, before applying the heightened standard of actual malice in the very next paragraph.  Thus, while the court's conclusion as to negligence was unnecessary, the court ultimately applied the correct standard. *Cf. Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667-68 (1989) ("[W]hen the [lower court's] opinion is read as a whole, it is clear that the conclusion concerning the newspaper's departure from accepted standards . . . [is] merely supportive of the court's ultimate conclusion" that the record demonstrated actual malice.).

and *someone* on that call said they "made sure" President Trump was "not going to win," but that person was not Coomer.

¶ 153    The first alternative, by definition, would show actual malice on the part of the Oltmann Defendants because it would mean Oltmann knew his account was false. *See St. Amant*, 390 U.S. at 732 ("Professions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant [or] is the product of his imagination . . . ."). We cannot say whether or not that is the case because it turns on credibility assessments we cannot make. But based on the parties' conflicting evidence and Coomer's denial, a jury could reasonably so find. *See L.S.S.*, ¶ 52 (noting that when faced with "competing narratives," courts "have routinely held that a plaintiff's allegations that the defendant made false accusations are sufficient to create a factual issue as to actual malice").

¶ 154    Even if a jury were to accept the second alternative, however, Oltmann's account itself creates a reasonable likelihood that a jury could find by clear and convincing evidence that he entertained serious doubts as to whether the speaker was Coomer. As told by Oltmann, his sole bases for concluding that the speaker was Coomer were that (1) an anonymous person said — and in the

77

original telling, *asked if* — "Eric is the Dominion guy"; (2) Coomer's first name is Eric and he worked at Dominion Voting Systems; (3) Coomer had responsibilities related to voting technology; and (4) Coomer was highly critical of President Trump on social media.[15] No one on the call identified the speaker as Coomer. Nor did the speaker identify himself as someone associated with Dominion.

¶ 155    From that information, Oltmann jumped first to the explosive claim that Coomer — not an anonymous "Eric," but Coomer — had made the statement, and then to the even more explosive claim that Coomer had interfered with the election. All without attempting to contact the "most obvious source of corroboration or refutation": Coomer himself. *Rosenblum*, ¶ 46. Given the gravity of the allegations and the size of the inferential leap they required, there is a reasonable likelihood that a jury could find that Oltmann acted with reckless disregard for the truth in making those accusations. *See Creekside Endodontics*, ¶ 38 (noting that grossly inadequate

---

[15] Oltmann testified in his deposition that the voice of the speaker on the call was the same as Coomer's voice on videos that Oltmann found on the internet. But in Oltmann's initial account on his podcast, he said that he "can't be sure" if the voice was a "match" to those videos. And Oltmann did not mention the voice similarities in his interviews with the other defendants or in his affidavit.

investigation may show actual malice); *Samsel v. Desoto Cnty. Sch. Dist.*, 242 F. Supp. 3d 496, 533-34 (N.D. Miss. 2017) ("[G]iven the magnitude of the step [the defendant] was taking in [making the statement], it was incumbent on him to exercise great care . . . .").

¶ 156    Indeed, Oltmann himself acknowledged that, at least initially, he *did* doubt the speaker was Coomer. The only new pieces of information he says persuaded him otherwise were the claims of election irregularities, Coomer's involvement in election technology, and Coomer's social media posts. Whether this information in fact sufficed to satisfy Oltmann of a connection he had previously rejected — or whether the claims of election irregularities by others emboldened him to trumpet a theory he still questioned — is a factual question we cannot answer. *See Rosenblum*, ¶ 24. But there is a reasonable likelihood that a jury could find that Oltmann continued to harbor the doubts he admittedly did at first.

¶ 157    The Oltmann Defendants dispute the district court's conclusion that Oltmann relied on an anonymous source, asserting that *he* was the source of his own report. This argument conflates what Oltmann says he heard on the call with who said it. Oltmann may have had firsthand knowledge that *someone* said, "Trump is

not going to win.  I made effing sure of that," and that someone else *said* that person was "Eric, the Dominion guy."  But the source of the claim that the speaker *was* "Eric from Dominion" — the sole basis for attributing that statement to Coomer — was the anonymous person on the call.  *See St. Amant*, 390 U.S. at 732 (noting that a finding of good faith is unlikely where a story is "based wholly on an unverified anonymous telephone call").

¶ 158     Moreover, as to Oltmann's statements that Coomer interfered with the election, those claims were substantially undermined by the November 12, 2020, CISA statement, which concluded that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."  Although this report did not specifically refer to Coomer, its conclusion that the 2020 presidential election "was the most secure in American history" and that "there is no evidence" to the contrary was fundamentally inconsistent with Oltmann's claim that Coomer "put his finger on the scale" of the election.  And although Oltmann's initial statements came before the CISA statement was issued, he continued making his accusations for several weeks thereafter.

¶ 159    It is possible that a jury could find that Oltmann was undeterred by the CISA statement because he genuinely disbelieved it, or perhaps because he was unaware of it.  But it is also reasonably likely that a jury could find that, as to Oltmann's post-November 12 statements, the CISA statement made Oltmann aware of the probable falsity of his claims, yet he persisted in making those claims nonetheless.  *Cf. Gonzales*, ¶ 87 (concluding that a judicial finding that there was no independent corroboration for defendants' claims could support a finding of actual malice).

### c.    Other Defendants

¶ 160    The other defendants' arguments as to actual malice overlap substantially, as does the evidence.  Thus, while we consider the evidence of actual malice as to each defendant individually, we discuss these defendants collectively, addressing specific arguments made by particular defendants as appropriate.  With respect to each defendant, we conclude that Coomer has met his burden of establishing a reasonable likelihood that he will be able to prove actual malice by clear and convincing evidence.  *See L.S.S.*, ¶ 41.

### i.    Reliability of Source and Account

¶ 161    In ruling that Coomer had established a reasonable likelihood of proving actual malice, the district court relied in part on its conclusion that Oltmann was not a credible or reliable source. Several defendants take issue with this conclusion, characterizing it as an improper credibility finding, and an unsupported one at that.

¶ 162    As we discuss above, a court may properly consider evidence relevant to a source's credibility at the time the allegedly defamatory statements are made.  *See Curtis Publ'g Co.*, 388 U.S. at 157-58. Such evidence may bear on whether the defendant acted with reckless disregard in publishing the statements.  *Id.*  But for the reasons above, we need not reach any conclusions concerning Oltmann's reliability as a general matter.  Even if defendants genuinely believed Oltmann's account of the call, that account itself could reasonably support a finding that defendants entertained serious doubts about the two points in question: (1) that Coomer was the one on the call who made the comment, and (2) that Coomer then took steps to undermine the election results.

¶ 163    First, Oltmann admittedly had no direct personal knowledge that Coomer made the statement, or even that an "Eric from

Dominion" made the statement. Instead, that claim was indisputably based entirely on an anonymous person identifying another anonymous person as "Eric, the Dominion guy." That is the sole factual basis for the claim: Oltmann's report about what he heard an anonymous person say. In other words, Oltmann was the source for what was said, but the source of the underlying information was unknown. *See St. Amant*, 390 U.S. at 732.

¶ 164    Then, assuming the person who made the statement *was* "Eric, the Dominion guy," defendants needed to make another leap to conclude that person was Coomer. That leap was based entirely on (1) the fact that Coomer was a person named "Eric" who worked at Dominion Voting Systems, and (2) Coomer's social media posts in opposition to President Trump. This might be enough to raise suspicion that it was Coomer who made the statement, and perhaps even enough for a jury to find defendants sincerely believed it was him. But given the limited substantiation, there is a reasonable likelihood that a jury could find that defendants were touting the theory as fact — whether for entertainment purposes or to bolster their claims of election irregularities more generally — without being convinced beyond serious doubt of its truth.

¶ 165    Second, neither Oltmann nor any other defendant claimed to

have firsthand knowledge that Coomer actually interfered with the

election.  That assertion appears to have been based solely on

defendants' skepticism about the election results and Coomer's role

in election technology.  As noted above, it was contradicted by the

official statement of CISA, the government agency responsible for

election security, which rejected any claim that the election had

been compromised *by anyone*.  Other than Coomer's role with

Dominion, defendants offered no information as to *how* they

believed Coomer had personally manipulated the election results.

Nor do they even attempt to defend such a belief on appeal.  There

is a reasonable likelihood that a jury could find that defendants

recklessly disregarded the truth by asserting such an explosive and

improbable claim without any evidence to support it.

¶ 166    Thus, defendants' efforts to distinguish *Curtis Publishing*

based on the reliability of their source (Oltmann) and his account

are beside the point.  In *Curtis Publishing*, the defendant's source

had indisputably overheard a conversation involving the plaintiff,

and the only issue was what the plaintiff had said on that call.  388

U.S. at 137.  Because the source necessarily had personal

knowledge of what he did or did not hear, the entire story turned on

the source's reliability.  If he was telling the truth, the story was

true; if he was not, it was not.  *Id.* at 157-58.  In contrast, even if

the alleged conference call happened exactly as Oltmann described,

that account could not itself establish the truth of the inferences

defendants drew from it — namely, that the speaker on the call was

Coomer and that Coomer took steps to subvert the election results.

ii.    Adequacy of Investigation by Media Defendants

¶ 167    The media defendants — Malkin, the Hoft Defendants, and

Metaxas — argue that the district court held them to too high of a

standard in concluding that they did not adequately investigate

Oltmann's claims.  They assert that they are not journalists but

opinion commentators and, thus, should not be held to the same

standard as reporters.  They further contend that no investigation

was necessary because Oltmann was offering a firsthand account.

¶ 168    Whether or not these defendants should be held to the same

standards as news reporters, we conclude that a jury could

reasonably find that their investigation was grossly inadequate.  *See*

*Creekside Endodontics*, ¶ 38.  Notwithstanding the gravity of

Oltmann's accusations, none of the defendants even attempted to

contact Coomer — the "most obvious source of corroboration or refutation" — before publishing those accusations. *Rosenblum,* ¶ 46. Indeed, it does not appear they attempted to contact *anyone* other than Oltmann. Nor do they identify anything else they did to attempt to verify Oltmann's claims. While it may be true that a talk radio host or podcaster need not investigate every topic discussed on the show, the wholesale failure to look into an account reported as fact — particularly one as explosive as the one in this case — could bear on whether the host actually believes the account (or is simply using it to spur discussion without regard to its truth).

¶ 169    Metaxas asserts that the nature of his show prevents him from "do[ing] anything other than cursorily vet[ting] the guest before the show." And he correctly points out that talk show hosts cannot be expected to know everything their guests will say on their show. But Metaxas *did* know what Oltmann was going to say, at least in material part, as indicated by Metaxas's introduction to the show, which made clear that Oltmann was there to discuss his allegations about Coomer. Then, after the show, Metaxas posted a link to the interview on social media, obviously knowing at that point (and highlighting in the post) the substance of Oltmann's claim.

¶ 170   None of this is to suggest that media members may only make statements "whose validity [is] beyond question." *N.Y. Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir. 1966).  And reliance on a single source does not, by itself, prove actual malice.  *Id.*  But as noted above, the single source in this case had no personal knowledge of material portions of the claim that was being reported.  Under these circumstances, a jury could reasonably find that the media defendants acted with actual malice in publishing those claims.

iii.   Affidavit and Vetting of Oltmann's Claims by Powell Defendants and Trump Campaign

¶ 171   The Powell Defendants and the Trump Campaign also challenge the district court's conclusion that their investigation was inadequate.  Beyond the arguments made by the other defendants, they highlight that they had an affidavit from Oltmann attesting to his account.  That affidavit, they contend, gave them a sufficient basis for repeating Oltmann's claims without further investigation.

¶ 172   We agree that the affidavit is one factor that could weigh against a finding of actual malice — at least as to Oltmann's account about what was said on the call.  But again, that account leaves all the same gaps we describe above.  The affidavit does

nothing to bridge the gap between the anonymous caller's reference to "Eric from Dominion" and Coomer. Nor does it provide any basis for Powell's assertion that Coomer "rigged" the election.

¶ 173 The Powell Defendants contend that the district court "flipped the burden of proof" by requiring them to produce evidence to support Powell's assertions. We do not read the district court order as having done so. Instead, the court concluded that Coomer had met *his burden* of presenting prima facie evidence of falsity because he "unequivocally declared" Powell's statements were false. The court noted that Coomer's declaration was *also* uncontroverted because the Powell Defendants had "not put forward any evidence" to support their allegations. But that statement, which was consistent with the court's consideration of supporting *and* opposing affidavits, did not supplant Coomer's prima facie burden.

### iv.    Subjective Knowledge

¶ 174 Several defendants argue that, regardless of whether a reasonable person in their position would have entertained serious doubts about the statements they made, they sincerely believed them. The Hoft Defendants, in particular, assert that they still do. Among other things, defendants point to the nature of Coomer's

social media posts, his patents in voting technology, and defendants' personal assessments of Oltmann as a credible source.

¶ 175  All of this is evidence defendants may present at trial. And if a jury ultimately believes them, they may prevail. *See St. Amant*, 390 U.S. at 731; *L.S.S.*, ¶ 40. But a defendant cannot defeat a defamation claim at this early stage simply by saying they believed their statements were true. *See L.S.S.*, ¶ 49 (holding that plaintiff made a prima facie showing of actual malice despite defendant's argument that she had no reason to doubt the statements). If a plaintiff presents evidence that is reasonably likely to support the contrary finding, the question is one for the jury. *Id.* at ¶ 44.

v.  Other Credible Sources

¶ 176  Defendants also take issue with the district court's conclusion that their statements were contradicted by other credible sources, including the CISA statement and a December 1, 2020, statement by then-United States Attorney General William Barr to the Associated Press that "to date, we have not seen fraud on a scale that could have effected a different outcome in the election."

¶ 177  As to Attorney General Barr's statement, defendants argue that the district court erred by relying on that statement because it

came after most of defendants' statements.  We agree.  What

Attorney General Barr said on December 1, 2020, could have no

bearing on what defendants knew or believed before that date.

Thus, we do not consider Attorney General Barr's statement with

respect to any statements made before December 1, 2020.

¶ 178    As to the CISA statement, defendants argue that it cannot

support a finding of actual malice because (1) it sheds no light on

Oltmann's account about what Coomer *said* on the conference call,

and (2) it does not conclusively foreclose any claims of election

fraud.  Defendants are correct that the CISA statement does not

directly contradict Oltmann's account of what occurred on the

conference call.  But as discussed above, it does contradict

defendants' claims that Coomer subverted the election.  And

although we recognize that certain defendants question the veracity

of the CISA statement, it is one piece of evidence that could support

a finding of actual malice.  *See Anderson*, ¶¶ 65-67.  The actual

impact of that statement on defendants' subjective state of mind is

a factual question that we cannot resolve.  *See Rosenblum*, ¶ 24.

¶ 179    Relatedly, we acknowledge the Trump Campaign's argument

that the focus of the inquiry must be on defendants' state of mind

at the time the statements were made and not what has happened since. We also acknowledge that, in November 2020, claims of election irregularities were ubiquitous among certain media outlets and political circles. But what defendants (or others) thought at the time about the election results more generally is not the question in this case. The question is whether defendants acted with reckless disregard in asserting that *Coomer* took steps to undermine the election. And at this stage, the even more limited question is whether there is a reasonable likelihood that a jury could so find.

vi.    Other Factors Cited by the District Court

¶ 180    Defendants dispute several other factors the district court cited in support of its conclusion that Coomer had met his prima facie burden of proving actual malice. Most significantly, several defendants assert that the record does not support the district court's conclusion that they had political and financial incentives to defame Coomer or that they did so to advance a "preconceived storyline." Others challenge the district court's reliance on the Trump Campaign memorandum finding no connection between Coomer and Antifa and the inherent improbability of defendants' claims. Because we do not rely on these factors (or any other we do

not address above) in concluding that Coomer has met his prima facie burden, we need not decide whether the record supports them.

### 5.    Damages

¶ 181    The Hoft Defendants contend that the district court erred by concluding that Coomer had made a sufficient showing of actual damages to sustain his claim.  *See L.S.S.*, ¶ 36.  We disagree.

¶ 182    Actual damages may be established by "proving harm to reputation, personal humiliation, mental anguish, or physical suffering."  *Keohane*, 882 P.2d at 1304.  A plaintiff's own testimony regarding the emotional distress the statements caused them is alone sufficient to support a finding of actual damages.  *Id.* at 1305; *Anderson*, ¶ 88.  Thus, a plaintiff's affidavit attesting to mental anguish and reputational harm resulting from the statements is sufficient to defeat an anti-SLAPP motion.  *Anderson*, ¶ 88.

¶ 183    In his declaration, Coomer attested that he had suffered "severe emotional distress, pecuniary loss, and other damages" as a result of the defamatory statements.  He explained that those damages included (1) anxiety and depression, for which he has sought medical treatment; (2) the tarnishing of his reputation; (3) the end of his employment and the "effective" end of his career in

election services; and (4) his receipt of "almost daily threats." Although the Hoft Defendants characterize these statements as conclusory and unsupported, they are sufficient to satisfy Coomer's burden at this stage of the case. *See Anderson*, ¶ 88.

¶ 184    Citing the incremental harm doctrine, the Hoft Defendants further assert that Coomer failed to show that his injuries were caused by the defamatory statements and not by his own acts, including his social media posts and public statements. *See Tonnessen v. Denver Publ'g Co.*, 5 P.3d 959, 965 (Colo. App. 2000) ("[W]hen unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, may not be actionable because it causes no harm beyond the harm caused by the remainder of the publication."). Resolution of this question requires weighing the evidence, which we cannot do. *Rosenblum*, ¶ 24. At this stage, we conclude only that a jury could reasonably find that accusing Coomer of having said he "made sure" President Trump was not going to win, and then implying he had participated in a scheme to "rig" the election, caused Coomer emotional, reputational, and career harm beyond that which would have resulted from his social media posts being made public.

### 6. Litigation Privilege

¶ 185    The Trump Campaign next asserts that the statements made by Giuliani and Powell at the November 19 press conference were protected by the litigation privilege.  We disagree.

¶ 186    The litigation privilege is an absolute privilege that permits an attorney to "publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which [the attorney] participates as counsel, if it has some relation to the proceeding."  *Killmer, Lane & Newman, LLP v. BKP, Inc.*, 2023 CO 47, ¶ 21 (quoting Restatement (Second) of Torts § 586).  As an absolute privilege, it provides "absolute immunity" to the speaker, even if the statements are false, defamatory, and made with actual malice.[16]  *Gonzales*, ¶ 24.

¶ 187    Two, and sometimes three, conditions must be satisfied for the privilege to apply: (1) the statement must have some relation to the subject matter of the litigation; (2) the statement must be made in

---

[16] We agree with the Trump Campaign that the district court was incorrect in suggesting that the litigation privilege "can be lost by a finding of actual malice."  But because we conclude the litigation privilege does not apply, that error is harmless.  *See* C.A.R. 35(c).

furtherance of the objective of the litigation; and (3) in the case of prelitigation statements, the proceedings must actually be contemplated in good faith. *Killmer, Lane & Newman*, ¶ 24.

¶ 188   The applicability of the litigation privilege is a question of law that we review de novo. *Id.* at ¶ 18. In doing so, we resolve all doubts about whether a statement is privileged "in favor of [the statement's] relevancy or pertinency." *Id.* at ¶ 25 (citation omitted).

¶ 189   The Trump Campaign's assertion of the litigation privilege is premised on (1) a Michigan lawsuit the Campaign filed eight days before the November 19 press conference and (2) Giuliani's reference to anticipated litigation in other states. The Michigan complaint did not reference Coomer and mentioned Dominion in only three paragraphs. Those paragraphs alleged that Dominion's voting machines caused a "massive miscount" in one Michigan county and were not sufficiently tested in another. Giuliani was not shown as an attorney of record on the complaint, and neither he nor the Campaign filed any subsequent lawsuits. But beginning six days after the press conference, and three days after the Campaign publicly stated that Powell was "not a member of the Trump legal team," Powell filed four additional lawsuits challenging the election

results on behalf of individual plaintiffs.  The complaints in those lawsuits did refer to Coomer and his alleged conference call remark.

¶ 190   Resolving all doubts in favor of relevancy, we conclude that the statements about Coomer at the November 19 press conference had "some relation to the subject matter" of the Michigan lawsuit — even though those statements went well beyond the allegations of the complaint.  *Id.* at ¶ 40; *see also id.* at ¶ 47 (expressing no opinion as to "whether defamatory press statements that go beyond the allegations of the complaint are actionable").  We further assume that Giuliani and Powell contemplated additional related litigation in good faith — even though neither Giuliani nor the Trump Campaign ever filed any, and Powell did so only after the Campaign declared her not to be a member of its legal team.

¶ 191   But we cannot conclude that the statements were made in furtherance of the objective of the litigation.  *Id.* at ¶ 24.  Unlike a class action, in which publication may serve to notify potential class members, *see id.* at ¶ 41, no such notice was needed here; the litigants had already been identified, certainly for the Michigan lawsuit and presumably for any other litigation anticipated to be filed shortly.  Nor does the context of the statements support the

Trump Campaign's suggestion that their purpose was to solicit additional plaintiffs or witnesses. The Campaign has offered no persuasive explanation as to how arguing its claims to the public could have advanced its existing or contemplated litigation. Cases are decided in courts of law, not in the court of public opinion.

¶ 192    Moreover, even if there were a litigation-related purpose for publicizing the allegations of the Michigan complaint, Giuliani and Powell did not "merely repeat[], summarize[], or paraphrase[]" those allegations. *Id.* at ¶ 42. Indeed, the statement in question — that Coomer "specifically says that they're going to fix this election" — does not appear in the Michigan complaint at all. Even the limited allegations about Dominion that do appear in the complaint do not allege that Dominion "fixed" the election but only that there were "mechanical malfunction[s]." The litigation privilege does not give an attorney cover to make defamatory statements to the public that, for whatever reason, they were unwilling to advance in court, simply because they bear some relation to the subject of ongoing litigation. *Cf. id.* at ¶ 24 (noting that an attorney cannot cloak a defamatory statement in privilege by filing a bad faith and meritless claim).

¶ 193    Finally, with respect to Giuliani's statements, the Trump Campaign's litigation privilege claim runs into another roadblock. The privilege extends only to statements made in connection with a proceeding in which the attorney making the statement participates as counsel. *Id.* at ¶ 21. It does not appear from the record that Giuliani participated as counsel in the Michigan lawsuit or in any of the other lawsuits that were filed after the press conference.

¶ 194    We acknowledge that the district court, relying on a federal case, stated that the litigation privilege does not apply to statements made to the media. *See Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1314-15 (D. Colo. 1998). Our supreme court has since rejected this categorical rule. *Killmer, Lane & Newman*, ¶ 48. But that does not mean anything an attorney says at a press conference goes. Instead, such statements, like any others, are protected only when they are made in furtherance of the objective of the litigation.

¶ 195    Because we conclude the statements at issue were not made to further the litigation, the litigation privilege does not apply.

### 7.    Communications Decency Act

¶ 196    The Trump Campaign asserts that Eric Trump's tweet of the Gateway Pundit article and President Trump's tweet of the One

America News Network segment are immune from liability under the CDA. Because Coomer has established a reasonable likelihood of prevailing against the Campaign without these two tweets, this issue does not affect whether Coomer's claim can proceed. But because the Campaign specifically challenges these two alleged publications, we will address the issue. *See Balla v. Hall*, 273 Cal. Rptr. 3d 695, 672 (Ct. App. 2021). We agree with the Campaign that these two tweets may not form the basis for liability.[17]

¶ 197    The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1); *see also* 47 U.S.C. § 230(e)(3) (precluding any state law cause of action or liability that is "inconsistent with this section"). This law protects users of interactive websites from

---

[17] The Trump Campaign asserted in its special motion to dismiss that the CDA provided immunity for the tweet by Eric Trump, but it did not extend that argument to the tweet by President Trump until its reply. Nevertheless, because the same analysis applies to both tweets and the district court ruled on the merits of the argument with respect to both tweets, we will consider both tweets as well. *See Rinker v. Colina-Lee*, 2019 COA 45, ¶ 26 (noting that we may consider an unpreserved issue when the district court rules on it); *Farmer v. Colo. Parks & Wildlife Comm'n*, 2016 COA 120, ¶ 19.

"defamation claims based on information provided by another information content provider." *Rosenblum*, ¶ 48. The district court concluded that the tweets were not protected by the CDA because (1) Eric Trump's tweet did not merely republish the Gateway Pundit article but included his own defamatory statement, and (2) the CDA does not apply when the user knows or has reason to know the information is defamatory. We disagree on both counts.

¶ 198     First, neither Eric Trump's nor President Trump's tweet included any statement beyond the information in the article and video they shared. *See id.* (indicating that "[h]ad [the defendant] just posted the link," the post might be protected under the CDA). Eric Trump's tweet stated simply, "Eric Coomer — Dominions Vice President of U.S. Engineering — 'Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!'" That quote (as well as Coomer's name and title) was pulled verbatim from the article, which unmistakably attributed the quote to Coomer. The tweet therefore conveyed only "information provided by another information content provider." 47 U.S.C. § 230(c)(1). President Trump's tweet said even less, merely quoting the segment's title, "Dominion-izing the Vote," and making no mention of Coomer at all.

¶ 199 Second, the district court's conclusion that the CDA does not apply to information that a user "knew or had reason to know was defamatory" finds no support in the text of the CDA or case law applying it.[18] Indeed, case law from other jurisdictions is uniformly to the contrary. *See In re Facebook, Inc.*, 625 S.W.3d 80, 89-93 (Tex. 2021) (noting "national consensus" and "overwhelming weight of authority" rejecting distinction between liability as a speaker or publisher and liability as a distributor) (citations omitted); *Barrett v. Rosenthal*, 146 P.3d 510, 517-20, 518 n.9 (Cal. 2006) (citing cases); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331-33 (4th Cir. 1997).

¶ 200 The district court relied exclusively on Justice Thomas's statement respecting the denial of certiorari in *Malwarebytes, Inc. v. Enigma Software Group*, 592 U.S. ___, ___, 141 S. Ct. 13, 15-16 (2020) (published order). That statement — the statement of a

---

[18] The Trump Campaign at first appears to adopt this exception, including it in its recitation of the applicable law and confusingly citing *Barrett v. Rosenthal*, 146 P.3d 510, 513, 525 (Cal. 2006), which stands for the opposite proposition. But it goes on to cite *Barrett*'s pronouncement that "Congress has comprehensively immunized republication by individual [i]nternet users." *Id.* at 529. And it argues that retweets of information previously published by others are categorically protected by the CDA. Thus, despite the Campaign's contradictory statements of the law, we construe its argument as contesting both grounds for the district court's ruling.

single Justice, not a decision of the Court — is contrary to the position taken by "every existing judicial decision" of which we are aware. *In re Facebook*, 625 S.W.3d at 91. But even that statement would only support a "know or reason to know" exception for *distributors* — a term that traditionally encompassed actors like newspaper vendors and booksellers who distribute the publications of others. *See Malwarebytes*, 592 U.S. at ___, 141 S. Ct. at 15-16; *Barrett*, 146 P.3d at 513. Whether or not that term might include "[i]nternet platforms" that do no more than host content published by third parties, not even Justice Thomas's statement extends so-called "distributor liability" to the individual users who post that content. *See Malwarebytes*, 592 U.S. at ___, 141 S. Ct. at 14-15 (questioning "sweeping protection to [i]nternet platforms").

¶ 201    Thus, because the two tweets by Eric Trump and President Trump consisted solely of "information provided by another information content provider," 47 U.S.C. § 230(c)(1), Coomer's claim against the Trump Campaign may not be based on those tweets.

### B.    Intentional Infliction of Emotional Distress

¶ 202    Malkin, the Hoft Defendants, Metaxas, and the Trump Campaign assert that the district court erred by not dismissing

Coomer's claim for intentional infliction of emotional distress. But

apart from the Hoft Defendants, their sole argument is that Coomer

did not establish a reasonable likelihood of proving actual malice.

*See Hustler Mag., Inc v. Falwell*, 485 U.S. 46, 56 (1988) (holding

that "actual malice" requirement applies to claims for intentional

infliction of emotional distress premised on publications that are

subject to heightened constitutional protections); *Lewis v. McGraw-*

*Hill Broad. Co.*, 832 P.2d 1118, 1124-25 (Colo. App. 1992). Because

we have concluded that Coomer has satisfied his burden with

respect to actual malice, we reject this argument. *See L.S.S.*, ¶ 53.

¶ 203    The Hoft Defendants also argue that Coomer failed to show

"extreme and outrageous conduct," as required to sustain his claim.

*See Mackall v. JPMorgan Chase Bank, N.A.*, 2014 COA 120, ¶ 49

(listing elements). To satisfy this standard, the conduct must be "so

outrageous in character, and so extreme in degree, as to go beyond

all possible bounds of decency, and to be regarded as atrocious,

and utterly intolerable in a civilized community." *Coors Brewing Co.*

*v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (citation omitted). Whether

a defendant's conduct rises to this level is generally a question of

fact for the jury. *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877,

883 (Colo. 1994).  Our role is limited to determining "whether reasonable persons could differ on the question" — or, in the anti-SLAPP context, whether there is a reasonable likelihood that a jury could find the defendant's conduct sufficiently outrageous.  *Id.*

¶ 204   We agree with the Hoft Defendants that there is no evidence that they incited violence against Coomer.  But we do not agree that their conduct can be deemed not extreme and outrageous as a matter of law.  As we explain above, Coomer presented evidence that would support a finding that the Hoft Defendants falsely accused him — someone who made his career in election technology — of saying he "made sure" President Trump would not win reelection and implied, with no evidence, that he had rigged the presidential election.  *Cf. Tonnessen*, 5 P.3d at 967 (holding that article could not constitute outrageous conduct because it was not defamatory).  The Hoft Defendants then repeated those claims several times to a nationwide audience, going so far as to publish an article about a $1 million "bounty" for Coomer's "comeuppance."

¶ 205   These statements went beyond mere insults, annoyances, or trivialities.  See *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003).  They struck at the core of American democracy and made

Coomer a personification of claims that the presidential election

had been stolen.  Given the magnitude of those accusations, and

the minimal evidence to support them, there is a reasonable

likelihood that a jury could find the dissemination of those claims

"atrocious," "utterly intolerable," and "beyond all possible bounds of

decency."  *Coors Brewing Co.*, 978 P.2d at 666 (citation omitted).

¶ 206    The Hoft Defendants also assert that Coomer has not met his

burden of showing the required element of severe emotional

distress.  *See Mackall*, ¶ 49.  But as discussed above, Coomer's

declaration attesting that he has "suffered severe emotional

distress," including anxiety and depression, as a result of the

statements made by the Hoft Defendants and others suffices to

meet his burden at this stage of the case.  *See Anderson*, ¶ 88.

## C.    Conspiracy

¶ 207    All defendants except the Oltmann Defendants[19] and DTR[20]

assert that the district court erred by denying their special motions

to dismiss the conspiracy claim.  They argue that Coomer did not

establish a reasonable likelihood of success on this claim because

he failed to present any evidence of an agreement.[21]  We agree.

¶ 208    A claim for civil conspiracy has five elements: (1) two or more

persons; (2) an object to be accomplished; (3) a meeting of the

minds on the object or course of action; (4) an unlawful overt act;

---

[19] Because the Oltmann Defendants do not challenge the district court's ruling on the conspiracy claim, apart from their more general challenges above, we do not consider this claim with respect to them.  *See, e.g.*, *People v. Perez-Hernandez*, 2013 COA 160, ¶ 9 (explaining that arguments not raised on appeal are abandoned).

[20] As noted above, DTR's sole argument in its opening brief was that it was formed after the statements at issue.  In its reply brief, DTR specifically challenges the conspiracy claim, but it does so only on the ground that DTR did not exist at the time of the alleged conspiracy.  Because we have rejected this argument, we do not further consider Coomer's conspiracy claim against DTR.

[21] Several defendants also argue that, as a derivative cause of action, the conspiracy claim must be dismissed if the other claims are dismissed.  *See Colo. Cmty. Bank v. Hoffman*, 2013 COA 146, ¶ 43 ("[I]f the acts alleged to constitute the underlying wrong provide no cause of action, then no cause of action arises for the conspiracy alone.") (citation omitted).  Because we have concluded that the other claims may proceed, this argument necessarily fails.

and (5) resulting damages. *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995). Because Coomer alleges a conspiracy to defame him and inflict emotional distress upon him, he must show an agreement as to that objective or the course of action to achieve it. *Rosenblum*, ¶ 54. He need not show a single collective agreement among *all* defendants, but he must show a meeting of the minds between each defendant and at least one other person. *Id.* at ¶ 55.

¶ 209    A civil conspiracy may be "implied by a course of conduct and other circumstantial evidence." *Id.* at ¶ 52 (citation omitted). But we will not "infer the agreement." *Nelson*, 908 P.2d at 106. Rather, a plaintiff must present "evidence of such an agreement," whether direct or circumstantial. *Id.* Such evidence may not consist solely of a "shared political ideology" or "close political ties." *Rosenblum*, ¶¶ 53, 55. Nor is it enough to show "concerted efforts" to advance a political message. *Id.* at ¶ 55. The plaintiff must present some indicia that the defendant actually *agreed* with at least one other person to make the defamatory statements. *Id.* at ¶¶ 52, 56.

¶ 210    Despite the district court order permitting Coomer to conduct discovery on this point, he has failed to present any such evidence. Instead, his argument is premised almost entirely on Oltmann

having served as the other defendants' source of information and coordinating with them to present his account on their shows. We cannot conclude that such ordinary sharing of information and coordination between the media and their sources gives rise to a conspiracy. *See Dowd v. Calabrese*, 589 F. Supp. 1206, 1213-14 (D.D.C. 1984) (noting that allowing "the traditionally-recognized relationships between sources and reporters [to] become actionable as conspiracies on a substantial scale" would result in "the 'chilling' of such relationships and collaborations"). "[W]hat is required in this sensitive First Amendment area is . . . proof not merely of a joint purpose to publish, but specific evidence of a joint purpose to defame." *Id.* at 1214 (footnote omitted); *see also Rosenblum*, ¶ 56.

¶ 211    For similar reasons, the Powell Defendants and the Trump Campaign's coordination with a reporter from One America News Network concerning a story about claimed election fraud cannot alone prove a conspiracy. *See Dowd*, 589 F. Supp. at 1213-14 ("[P]roof of cooperation between two individuals who have a common purpose to produce a news story does not represent a sufficient basis for an actionable conspiracy," even when the story gives rise to separate defamation claims against each individual.). Nor do

their efforts to verify Oltmann's story by requesting an affidavit.
*See Rosenblum*, ¶ 56 (concluding that defendant's attempt to verify
the accuracy of the source's account undermined conspiracy claim).

¶ 212   The district court concluded that defendants "cooperated and
fed off one another to spread dangerous and inflammatory political
disinformation designed to undermine the legitimacy of the 2020
presidential election."  Coomer similarly cites an alleged public
"agreement to delegitimize the results of the [e]lection."  But even if
there were an agreement among defendants — as opposed to
parallel efforts stemming from a shared political ideology — to
undermine the legitimacy of the election, Coomer cannot prevail by
showing an agreement to undermine the legitimacy of the election
generally.  He must show an agreement to defame or inflict
emotional distress *upon him*.  And we see no evidence that
defendants agreed to advance their ostensible overarching shared
purpose by defaming Coomer.  Different media outlets reporting on
the same story — even a false one — does not prove a conspiracy.

¶ 213   We also reject any implication that coordination among the
Trump Campaign, Giuliani, and the Powell Defendants could
support a claim for conspiracy at a time when Coomer contends

Powell was acting as an agent of the Campaign. A corporation and its agents acting on its behalf "do not constitute the 'two or more persons' required for a civil conspiracy." *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1390 (Colo. App. 1986); *see also Semler v. Hellerstein*, 2016 COA 143, ¶¶ 30-33 (holding that attorney acting within the scope of representation cannot conspire with a client, absent a claim of fraud or an allegation that the attorney acted for personal gain), *rev'd on other grounds sub nom. Bewley v. Semler*, 2018 CO 79. This principle likewise precludes any conspiracy between the individual defendants and their related entities.

¶ 214    Thus, we conclude that Coomer has failed to meet his burden of establishing a reasonable likelihood of prevailing on his conspiracy claim with respect to all defendants other than the Oltmann Defendants and DTR (which claims we do not address). The conspiracy claim against these defendants must be dismissed.

### D.    Injunction

¶ 215    In their special motions to dismiss, the Oltmann Defendants and Metaxas moved to dismiss Coomer's "claim" for injunctive relief. In addressing that argument, the district court analyzed each element of a permanent injunction as to all defendants and

concluded that, "[s]ubject to the adjudication of his claims, Coomer has established a prima facie basis for injunctive relief."

¶ 216    On appeal, the Hoft Defendants and the Trump Campaign contend that the district court erred by addressing Coomer's request for injunctive relief because an injunction is not a substantive claim that is subject to an anti-SLAPP motion. Coomer agrees that review of this request was premature, and so do we.

¶ 217    Section 13-20-1101(3)(a) provides that "[a] *cause of action . . .* is subject to a special motion to dismiss unless . . . there is a reasonable likelihood that the plaintiff will prevail on the *claim.*" (Emphasis added.)  But an injunction, even if pleaded as a claim for relief, is a remedy, not an independent cause of action. *Wibby v. Boulder Cnty. Bd. of Cnty. Comm'rs*, 2016 COA 104, ¶ 4 n.2.

¶ 218    That remedy is not itself subject to an anti-SLAPP motion to dismiss. Its fate flows from the substantive claim to which it is attached. If the substantive claim is dismissed, the ancillary request for injunctive relief goes with it. Otherwise, resolution of that request must await resolution of the claim on the merits. *Cf. Winston v. Polis*, 2021 COA 90, ¶ 21 ("Speculation about a possible remedy is premature because no . . . violation has been found.").

111

¶ 219    We therefore agree with the Hoft Defendants and the Trump Campaign that the district court erred by addressing the merits of Coomer's request for injunctive relief.  We nevertheless affirm the denial of the special motions to dismiss this request because that request could not be dismissed under the anti-SLAPP statute.[22]

## V.    Attorney Fees

¶ 220    Malkin, the Hoft Defendants, DTR, and the Trump Campaign request their attorney fees and costs under section 13-20-1101(4)(a).  That subsection provides that "in any action subject to [the anti-SLAPP statute], a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney fees and costs."  *Id.*  The statute entitles a defendant who prevails on appeal to recover their appellate attorney fees and costs.  *Rosenblum*, ¶ 61.

¶ 221    A partially prevailing defendant "must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any practical benefit

---

[22] Because we conclude that a request for injunctive relief is not subject to an anti-SLAPP motion to dismiss, we do not address the Trump Campaign and Hoft Defendants' argument that injunctive relief is not feasible or Metaxas's argument that injunctive relief would constitute an unconstitutional prior restraint on speech.

from bringing the motion." *Id.* at ¶ 63 (citation omitted). But the fees awarded to such a defendant must be "commensurate with the extent to which the motion changed the nature and character of the lawsuit in a practical way." *Mann v. Quality Old Time Serv., Inc.*, 42 Cal. Rptr. 3d 607, 619 (Ct. App. 2006). "Whether a party prevailed on an anti-SLAPP motion — and to what extent the partial success warrants an apportionment of fees — is a determination that lies within the broad discretion of a district court." *Rosenblum*, ¶ 63.

¶ 222     Because we have rejected DTR's sole argument on appeal and affirmed the district court's denial of its special motion to dismiss, we deny its request for attorney fees and costs. *See Salazar*, ¶ 66.

¶ 223     Resolution of the other defendants' fee requests is less clear cut. For the most part, we have affirmed the district court order as to these defendants, concluding that Coomer's claims for defamation and intentional infliction of emotional distress may proceed. The survival of the defamation claim in particular — which was the primary focus of defendants' briefing — substantially limits the degree of defendants' success. *See Mann*, 42 Cal. Rptr. 3d at 618-19 (considering, among other things, "whether the same factual allegations remain to be litigated"); *Gonzales*, ¶ 104 (denying

attorney fees because court "denied virtually all of [defendants'] requested relief, and the effect of [the] disposition is that . . . the only communications whose merits were at issue on appeal . . . survive defendants' anti-SLAPP motion"). And although we have slightly narrowed Coomer's claim against the Trump Campaign by concluding that two tweets are protected by the CDA, that does not make the Campaign a partially prevailing defendant because the defamation claim as a whole survives. *See Salazar*, ¶ 66.

¶ 224    Nevertheless, given our reversal of the district court's ruling on the conspiracy claim, we cannot say that these defendants received *no* practical benefit from this appeal. *Rosenblum*, ¶ 63. We thus exercise our discretion under C.A.R. 39.1 to remand to the district court to determine whether Malkin, the Hoft Defendants, and the Trump Campaign are partially prevailing defendants; the extent to which their partial appellate success, if any, warrants an award of appellate fees; and the reasonableness of those fees. *Id.* at ¶ 64.

## VI.    Disposition

¶ 225    We reverse the district court's denial of the special motions to dismiss the conspiracy claim as to Malkin, the Hoft Defendants, Metaxas, the Powell Defendants, and the Trump Campaign. We

reverse the ruling that the tweets by Eric Trump and President
Trump are not protected by the CDA, and we hold that the Trump
Campaign may not be liable for those tweets. We affirm the district
court order in all other respects (except as to Giuliani). We remand
to the district court for determination of the requests for attorney
fees and costs by Malkin, the Hoft Defendants, and the Trump
Campaign, and for further proceedings consistent with this opinion.

JUDGE NAVARRO and JUDGE KUHN concur.

# Court of Appeals

**STATE OF COLORADO**

2 East 14th Avenue

Denver, CO 80203

(720) 625-5150

**PAULINE BROCK**

**CLERK OF THE COURT**

## NOTICE CONCERNING ISSUANCE OF THE MANDATE

Pursuant to C.A.R. 41(b), the mandate of the Court of Appeals may issue forty-three days after entry of the judgment.  In worker's compensation and unemployment insurance cases, the mandate of the Court of Appeals may issue thirty-one days after entry of the judgment.  Pursuant to C.A.R. 3.4(m), the mandate of the Court of Appeals may issue twenty-nine days after the entry of the judgment in appeals from proceedings in dependency or neglect.

Filing of a Petition for Rehearing, within the time permitted by C.A.R. 40, will stay the mandate until the court has ruled on the petition.  Filing a Petition for Writ of Certiorari with the Supreme Court, within the time permitted by C.A.R. 52(b), will also stay the mandate until the Supreme Court has ruled on the Petition.

BY THE COURT:    Gilbert M. Román,

Chief Judge

DATED:  January 6, 2022

***Notice to self-represented parties***:  *You may be able to obtain help for your civil appeal from a volunteer lawyer through the Colorado Bar Association's (CBA) pro bono programs.  If you are interested in learning more about the CBA's pro bono programs, please visit the CBA's website at* *https://www.cobar.org/Appellate*

# Exhibit 24

| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: May 31, 2024<br>CASE NUMBER: 2024SC317 |
|---|---|
| Certiorari to the Court of Appeals, 2022CA843<br>District Court, Denver County, 2020CV34319 | |
| **Petitioners:**<br><br>Michelle Malkin and Eric Metaxas,<br><br>**v.**<br><br>**Respondent:**<br><br>Eric Coomer, Ph.D. | Supreme Court Case No:<br>2024SC317 |
| ORDER OF COURT | |

Upon consideration of Respondent's Motion for extension of time to file Opposition brief to Petitions for Writ of Certiorari and/or Cross-Petition for Writ of Certiorari filed in the above cause, and now being sufficiently advised in the premises,

IT IS ORDERED that said Motion shall be, and the same hereby is, GRANTED TO AND INCLUDING JULY 11, 2024.

BY THE COURT, MAY 31, 2024.

Exhibit 25

# STATE OF MISSOURI

## CERTIFICATE OF TITLE

TITLE NUMBER
UTA33994

01751AB472    ORIGINAL

| VEHICLE IDENTIFICATION NUMBER | YEAR | MAKE | | BODY STYLE |
|---|---|---|---|---|
| WP1AA2AY4MDA01232 | 2021 | PORS | | STAW |

| HP | PREVIOUS STATE | MILEAGE AT TIME OF TRANSFER | TAX | PURCHASE DATE | DATE ISSUED |
|---|---|---|---|---|---|
| 33 | | 10452* | PAID | 08/07/2021 | 10/01/2021 |

OWNER  TGP COMMUNICATONS LLC
5105 LINDELL BLVD
SAINT LOUIS          MO 63108

MAIL TO  0001-000

TGP COMMUNICATONS LLC
5105 LINDELL BLVD
SAINT LOUIS MO  63108-1221

VEHICLE SUBJECT TO FOLLOWING LIEN(S)

FIRST LIEN                              LIEN DATE

**Lien release** - To release any lien shown on the face of this title, the lienholder must complete a **notarized** Lien Release (DOR-4809) to be attached to this title before the purchaser applies for a Certificate of Title.

SECOND LIEN                             LIEN DATE

Any person who knowingly and intentionally submits a separate document releasing a lien of another without authority to do so shall be guilty of a class C felony. (301.640 RSMo)

**BUYER ON REVERSE SIDE MUST TITLE IN 30 DAYS TO AVOID PENALTY**

MILEAGE STATEMENT

*ACTUAL MILEAGE.
ANNUAL ODOMETER UPDATES MAY BE AVAILABLE FROM THE
DEPARTMENT OF REVENUE.
EFFECTIVE 1/1/06 YOU MUST SUBMIT A NOTICE OF SALE
TO THE DEPARTMENT OF REVENUE WITHIN 30 DAYS OF
SELLING THIS VEHICLE.

31183865

*Ken Zellers*

DIRECTOR OF REVENUE DOR-387 (04/2017)

**ANY ALTERATION OR ERASURE VOIDS THIS TITLE**

---

MUST BE COMPLETED AT TIME OF SALE    **NOTICE OF SALE OR TRANSFER**    SEE INSTRUCTIONS ON REVERSE

| PURCHASER NAME - LAST, FIRST (REQUIRED) (PRINTED) | PURCHASER SIGNATURE (REQUIRED) | |
|---|---|---|
| ADDRESS (REQUIRED) | DRIVER LICENSE NUMBER OF PURCHASER | DATE OF BIRTH OF PURCHASER __/__/____ |
| CITY (REQUIRED) | SALE DATE (REQUIRED) __/__/____ | |
| STATE (REQ.)  ZIP CODE (REQUIRED)  COUNTY | NET PRICE (REQUIRED) $ | |

| KOV | YEAR | MAKE | VEHICLE IDENTIFICATION NUMBER | TITLE NUMBER |
|---|---|---|---|---|
| P | 2021 | PORS | WP1AA2AY4MDA01232 | UTA33994 |

| SELLER NAME AND SIGNATURE (REQUIRED) | DEALER NUMBER |
|---|---|

SELLER MUST SUBMIT TO DEPARTMENT OF REVENUE. SEE REVERSE SIDE.    DOR-5049A (08/2015)



**ORDERED in the Southern District of Florida on June 24, 2024.**

Mindy A. Mora, Judge
United States Bankruptcy Court

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### www.flsb.uscourts.gov

In re:                                                            Chapter 11

**TGP COMMUNICATIONS, LLC**                        Case No.  24-13938-MAM

     Debtor.

_____/


**ORDER DEFERRING RULING ON DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS; DIRECTING THE DEBTOR TO FILE SWORN DECLARATIONS; AND SETTING CONTINUED HEARING**

This matter came before the Court on June 4, 2024 at 1:30 PM upon the Debtor's Motion for Entry of an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors [ECF No. 26] (the "**Motion**").  In opposition to the relief sought in the Motion, the United States Trustee filed its Objection to the Motion [ECF No. 35], as joined by Dr. Eric Coomer [ECF No. 45] and Ruby Freeman and Wandrea' ArShaye Moss [ECF No. 46] (collectively, the "**Written Objections**"). The Court has considered the Motion and the Written Objections, heard

arguments of counsel as reflected in the record and finds good cause to consider additional evidence to be submitted by the Debtor as well as any further opposition from creditors.  Accordingly, it is

**ORDERED**, the Debtor shall submit sworn declarations of any number of the Contract Writers as evidentiary support of the relief requested in the Motion.  The declarations shall be filed and served on or before June 18, 2024; it is further

**ORDERED**, any party in interest may file objections to the Motion and the declarations, but must do so by June 25, 2024; it is further

**ORDERED**, the Court shall conduct a further hearing on the Motion and any timely filed objection on **June 27, 2024 at 1:00 PM** at The Flagler Waterview Building, 1515 North Flagler Drive, Room 801, Courtroom "A" West Palm Beach, Florida. All participating attorneys, parties, and other representatives must attend the hearing in person. Counsel for the United States Trustee may appear via Zoom.

###

**Submitted by:**
Bart A. Houston, Esq.
Houston Roderman, PLLC
633 South Andrews Ave
Suite 500
Fort Lauderdale, FL 33301
bhouston@houstonroderman.com


**Copy furnished to:**
Bart A. Houston, Esq. (Attorney Houston shall serve a copy of the signed order on all parties listed below and file with the court a certificate of service conforming with Local Rule 2002-1(F).

Debtor
U.S. Trustee
Twenty Largest Creditors
All appearances

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 11 |
| | : | |
| TGP COMMUNICATIONS, LLC, | : | CASE NO. 24-13938 (MAM) |
| | : | |
| DEBTOR. | : | |

---

**AGREED EX-PARTE MOTION TO CONTINUE HEARING ON DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS**

MARY IDA TOWNSON, the United States Trustee for Region 21, with the agreement of Debtor's counsel, hereby requests that the Court continue the June 27, 2024, hearing on the Debtor's *Motion for an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors* (ECF No. 26) and extend the deadlines related to the June 27, 2024, hearing date.

In support, the United States Trustee states:

1.      On May 21, 2024, the Debtor filed its *Motion for an Order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors* (the "Motion to Suppress") (ECF No. 26).

2.      On May 30, 2024, the United States Trustee filed her opposition to the Motion to Suppress  (ECF No. 35).

3.      An initial hearing was held on June 4, 2024, during which the Court heard arguments on the Motion to Suppress.

4.      On June 24, 2024, the Court entered an order scheduling a further hearing on the Motion to Suppress for June 27, 2024, at 1:00 p.m. (the "June 24th Order").

5.     The June 24th Order required the Debtor to serve and file written declarations from the contract writers on or before June 18, 2024 (ECF No 77).

6.     The June 24th Order also required parties to file objections to the declarations on or before June 25, 2024.

7.     On June 20, 2024, the Debtor filed a Notice of Filing of Redated Declarations (the "Declarations") (ECF No. 72) which contained approximately twenty-three redacted declarations from the contract writers.

8.     The Court has scheduled an evidentiary hearing regarding the *Motion of Ruby Freeman and Wandrea' ArShaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation* (ECF No. 39), for June 27, 2024, 1:00 p.m. (the "Motion to Dismiss").

9.     The Motion to Dismiss is a dispositive motion , the outcome of which may render the Debtor's Motion to Suppress moot.

10.    Accordingly, the United States Trustee requests that the Court continue the hearing on the Motion to Suppress to a date that is two weeks after the Court issues a ruling on the Motion to Dismiss.  The United States Trustee further requests that the Court extend the deadline for the United States Trustee to file objections to the Declarations to a date that is one week prior to the continued hearing on the Motion to Suppress.

11.    The undersigned has conferred with counsel for the Debtor and can represent that the Debtor has no objection to the relief requested herein.

WHEREFORE, the United States Trustee respectfully requests that the Court enter an order continuing the June 27, 2024, hearing on the Debtor's Motion to Suppress to a date that is two weeks after the Court issues a ruling on the Motion to Dismiss, and extend the deadline for the United States Trustee to file objections to the Declarations to a date that is one week prior to the continued hearing on the Motion.

Dated: June 25, 2024

MARY IDA TOWNSON
UNITED STATES TRUSTEE
REGION 21

By:_____/s/_____
Martin P. Ochs*
Georgia Bar No. 091608
United States Department of Justice
Office of the United States Trustee
362 Richard Russell Building
75 Ted Turner Drive SW
Atlanta, Georgia 30303
(404) 331-4509
martin.p.ochs@usdoj.gov

* I hereby certify that I am admitted to the Bars of the States of Georgia and New York and that I am excepted from additional qualifications to practice in this Court pursuant to Local Rule 9011-4 pertaining to attorneys representing the United States government.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the **AGREED EX-PARTE MOTION TO CONTINUE HEARING ON DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO SUPPRESS PERSONALLY IDENTIFIABLE INFORMATION FOR CERTAIN INDIVIDUAL CREDITORS** was electronically filed with the Court using the CM/ECF system, which sent notification to all parties of interest participating in the CM/ECF system and via U.S. Mail to the following:

Bart Houston:   bhouston@houstonroderman.com
Robert Furr:   ltitus@furrcohen.com
Linda Leali:   trustee@lealilaw.com


        \* I hereby certify that I am admitted to the Bars of the States of Georgia and New York and that I am excepted from additional qualifications to practice in this Court pursuant to Local Rule 9011-4 pertaining to attorneys representing the United States government.

        This the 25th day of June, 2024.


                            /s/
                    MARTIN P. OCHS
                    Trial Attorney

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re: | Chapter 11 |
| TGP Communications, LLC. | Case No. 24-13938 (MAM) |
| Debtor. | |

### REPLY IN SUPPORT OF THE
### MOTION OF RUBY FREEMAN AND WANDREA' ARSHAYE MOSS FOR
### AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE UNDER SECTIONS
### 1112(b) AND 305(a) OF THE BANKRUPTCY CODE OR, IN THE ALTERNATIVE,
### <u>MODIFYING THE AUTOMATIC STAY TO CONTINUE PREPETITION LITIGATION</u>

The Freeman Plaintiffs (together, with Dr. Eric Coomer, the "Prepetition Litigation Claimants"), as creditors of TGP Communications, LLC (the "Debtor" or "The Gateway Pundit"), by and through their undersigned counsel, respectfully file this reply (the "Reply") in support of the Motion and in response to the Debtor's response thereto [Docket No. 71] (the "Response").[1]

## **REPLY**

1. The Debtor's actions the past month underscore how the Debtor is abusing the judicial process and why dismissal is justified. Just last week, the Debtor and Jim Hoft used their sizable platform to undermine the integrity of this proceeding and the entire bankruptcy system by accusing the U.S. Trustee of partisan motivation in an article. It then used these baseless accusations as a way to raise money. This episode is just one of many examples. Curiously, despite being given a full opportunity to submit declarations and testify in support of its filing, the Debtor has decided not to. Instead, the Response makes several conclusory and unsupported arguments about why the case has a valid bankruptcy purpose. For the reasons set forth herein, the Court should reject those arguments and dismiss The Gateway Pundit's chapter 11 case.

### A. The Debtor's Conduct Over the Past Month Justifies Dismissal

2. Jim Hoft, the Debtor's sole employee and owner, skipped the first section 341 meeting of creditors on May 28 (the "341 Meeting"). When the 341 Meeting resumed on June 6, Mr. Hoft testified that he had *not* signed the Debtor's statement of financial affairs and schedules despite his electronic signature appearing on the document.[2] This troubling testimony is more indicative of evasiveness and a strategic diffusion of responsibility rather than genuine confusion. The record supports this conclusion. A mere five minutes before that 341 Meeting began, the

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

[2]  *See* June 6, 2024 341 Meeting Tr., 11: 4-15.

Debtor filed a pleading signed by Jonathan Burns.[3]  In that pleading, Mr. Burns (who is not an authorized representative of the debtor) certifies to the contents of the statement and schedules, and suggests that Jim Hoft was not involved in their preparation.  Taken together, Mr. Hoft's testimony and the Certification either demonstrates Mr. Hoft's incompetence or is an improper attempt to frustrate the efforts of creditors to exercise their basic informational rights.[4]

3.       When the 341 Meeting resumed on June 18, the Debtor testified to a number of facts further supporting dismissal.  *First*, the Debtor testified that it has the ability to satisfy its obligations to non-litigation creditors as they come due.[5]  *Second*, the Debtor confirmed that three prepetition loans totaling nearly $1 million given to related parties were all interest-free, without documentation, repayment schedules, or stated maturity dates.[6]  *Third*, Mr. Hoft's testimony shows a number of corporate formalities not being respected, including (a) the Debtor extending Mr. Hoft one of those interest-and payment-free "loans" to acquire a condominium, (b) a second loan made by the Debtor to Mr. Hoft's brother for purposes Mr. Hoft allegedly does not recall, and (c) the Debtor owning a Porsche for Mr. Hoft's use.[7]

---

[3]  *See Additional Certification of Information Contained Within Schedules and Statements of Financial Affairs* [Docket No. 52] (the "Certification").  Jonathan Burns is not an employee of the Debtor but (confusingly) has the title "General Counsel and Executive Vice President" of TGP Communications, LLC.

[4]  As demonstrated in the non-exhaustive list of potential examples of "cause" under Bankruptcy Code Section 1112(b), post-petition actions are relevant to the inquiry of whether dismissal is justified. *In re Asanda Air II LLC*, 600 B.R. 714, 722 (Bankr. N.D. Ga. 2019) (granting motion to dismiss where debtor made misrepresentations and failed to disclose critical leases and prepetition transfers in its filings and noting "easiest way to fail the good faith test ... is for a debtor to misrepresent, lie, or otherwise mislead the court") (internal citations omitted).

[5]  *See* June 18, 2024 341 Meeting Tr., 61:4-13.  The Debtor also confirmed that the only reason it filed for bankruptcy was the Prepetition Litigations, and that the defense costs of those litigations are being paid from the Debtor's media professional insurance policy (the "Policy"). *See id.* 52: 15-20; 60: 13-18.  In other words, the Prepetition Litigations are not impairing the Debtor's ability to pay creditors in the ordinary course of business now would they for the foreseeable future.

[6]  *See generally id.*, 35-43. Prior to the Petition Date, the Debtor provided loans to (a) Jim Hoft ($799,860), (b) Joe Hoft ($21,000) and (c) the Justice League ($150,000).

[7]  *See id.,* 47:18-24.

2

4.       At the conclusion of that 341 Meeting, an attorney for the United States Trustee told the Debtor that it should not be surprised if its office files a motion to dismiss of its own.[8]  But the Court need not await such a filing: it is already abundantly clear that this case is an abuse of the bankruptcy system.  It is therefore highly ironic—in addition to being deeply problematic—that following the 341 Meeting, Jim Hoft published an article on The Gateway Pundit questioning the integrity of United States Trustee's office, in an attempt to cast doubt on this case and the bankruptcy system itself.[9]  The Debtor then encouraged readers to give money to the Justice League, which is a non-debtor affiliate owned by Jim Hoft.  To be clear, it is The Gateway Pundit that is undermining the integrity of the bankruptcy system, not the other parties in interest who, unlike The Gateway Pundit, did not choose to be here.[10]

## B.  The Response Does Not Demonstrate that the Debtor's Chapter 11 Filing has a Valid Bankruptcy Purpose

5.       The Debtor barely tried to establish this chapter 11 petition as a good faith filing. Rather than address this shortcoming, the Debtor's Response spills significant ink asserting that

---

[8] *See id.*, 80:4-7.

[9] *See "The Department of Justice is Targeting The Gateway Pundit in Their Hopes to Ruin Us—Secretly Injected Itself in Chapter 11 Case—Why?"* (https://www.thegatewaypundit.com/2024/06/department-justice-is-targeting-gateway-pundit-their-hopes/).  The article accuses Mr. Ochs of the United States Trustee's office of being influenced by the "Biden DOJ" to prevent The Gateway Pundit from proceeding with its chapter 11 case.  The article concludes by asking readers to "[P]lease help us in the historic battle for the Gateway Pundit by donating to our GiveSendGo account here."  Somehow, the Debtor then represents to this Court that it does not accept politically-driven donations. *See* Response at p. 6.  When the Court is evaluating the Motion, it should do so through the lens of the Debtor's extreme comfort with misrepresenting the truth. *See e.g.,* Docket Nos. 30, 34 (answering "No" to whether the Debtor provided compensation to insiders in the one year prior to the Petition Date).

[10] In addition to abusing the bankruptcy system, the Debtor also misrepresents the Freeman Plaintiffs' claims against it. First, it is incorrect to categorize the blatantly false statements of fact the Debtor made about the Freeman Plaintiffs as "opinion and editorial content." *See* Objection at ¶ 4. Second, the Response suggests that the Debtor's statements about the Freeman Plaintiffs "were derived from and restated by Former President Donald Trump, and New York Mayor Rudy Giuliani.*" See* Response at ¶ 4.  However, the Debtor was the first to name the Freeman Plaintiffs as Fulton County election workers involved in voter fraud and has historically bragged about being the first outlet to "break" the story. *See, e.g., WTH? John F. Kennedy Library Foundation Lumps President Zelensky In With Pack of Election Crooks, Cowards and Liars In Latest "Profile in Courage" Awards*, Gateway Pundit (Apr. 22, 2022, 11:05 AM), https://www.thegatewaypundit.com/2022/04/wth-john-f-kennedy-library-foundation-lumps-president-zelensky-pack-election-crooks-cowards-liars-latest-profile-courage-awards/.  Moreover, the Debtor, unlike most other outlets, continued to repeat the false claims against the Freeman Plaintiffs long after they were established to be untrue.

the *Piccadilly* factors do not apply here because this is not a single-asset real estate case.  But the *Piccadilly* factors have been applied to a wider context of cases and no case cited in the Response suggests otherwise.[11]   By spending so much time on this analysis, the Response does not meaningfully address the heart of the issue: under the totality of the circumstances, has the Debtor demonstrated a valid bankruptcy purpose?  The answer is no.

6.      The Response argues that the purpose of the Debtor's chapter 11 filing is to "maximize property available to satisfy creditors."  However, this case is not serving the interests of any creditors.  The Debtor's creditors fall into two buckets: the Prepetition Litigation Claimants, and all other creditors.  The Debtor testified that if the Prepetition Litigation Claimants are set aside, the Debtor can pay its creditors in the ordinary course of business.[12]  If the chapter 11 case is allowed to go forward, these non-litigation creditors will wait years to get a fractional recovery on their claims.  Alternatively, if the case is dismissed, the Debtor can pay these creditors in full immediately.  Thus, the chapter 11 filing is not maximizing property available to satisfy these creditors—it's accomplishing the exact opposite and denying them timely payments in full.

7.      At bottom, the Debtor's claim to be maximizing the value of estate property comes down to the remaining $1.3 million available under the Insurance Policy.  Tellingly, the only parties who have an economic interest in those funds—the Prepetition Litigation Parties—both want this case dismissed.  Indeed, there are strong reasons to doubt that the Debtor suddenly became a responsible fiduciary for the Prepetition Litigation Claimants in April 2024 (especially after burning through $700,000 of coverage implementing various delay tactics).  Most notably, the timing of this about-face occurred on the same date the Hoft brothers were served with deposition

---

[11] *In re Boughton*, 243 B.R. 830, 834 (Bankr. M.D. Fla. 2000) (noting the Court continues to employ the *Phoenix Piccadilly* factors in multiple asset cases).

[12] *See* June 18, 2024 341 Meeting Transcript, 61:4-13.

notices in the Missouri Litigation.  Moreover, the Debtor's failure to initiate any meaningful settlement discussions with the Prepetition Litigation Parties prior to the Petition Date undermines any notion that the Debtor has the Prepetition Litigation Parties' interests at heart.[13]  In addition, the Debtor has continued to publish defamatory statements about the Freeman Plaintiffs during the pendency of the bankruptcy,[14] thereby creating administrative claims that will only continue to erode distributable value for creditors.  All of this suggests that the true purpose of filing the petition is to avoid discovery in the Prepetition Litigation and not maximizing value for creditors.

8.     If anything, this case appears to be part of a larger effort by Jim Hoft to minimize his personal liability.  Jim Hoft is a defendant in both the Missouri Litigation and Colorado Litigation, but has not filed for personal bankruptcy.  As the Debtor's only employee, owner, and principal publisher, editor and philosophical leader, the line between where Jim Hoft ends and The Gateway Pundit starts is blurry to non-existent. Accordingly, settling with *only* Jim Hoft or *only* the Debtor is all but impossible—a fact the Freeman Plaintiffs know better than anyone.  Mr. Hoft appears to see the subchapter V plan process as a means to advance his own personal interests, perhaps by increasing the pressure on the Prepetition Litigation Parties to reach a global settlement.

9.     Put simply, this case is a sham filing.  The Court should not stand by as the Debtor undermines the bankruptcy process, makes numerous misrepresentations in court filings, and frustrates the rights of creditors without a legitimate reason for being in bankruptcy.  Accordingly, the Motion should be granted and The Gateway Pundit's chapter 11 case should be dismissed.

---

[13] These conversations have also not occurred after the Petition Date.  In yet another example of the Debtor misrepresenting facts to the Court, the Debtor previously stated that "Efforts have been made to discuss the confirmation of a consensual plan with the largest creditor constituents."  *See* Docket No. 27 at ¶ 6.  However, no such conversations have ever taken place with the Freeman Plaintiffs.

[14] *See e.g.*, *This Video Right Here is Why The Gateway Pundit is Under Constant Assault and Lawfare Attacks by the Tyrannical Left…*, The Gateway Pundit (May 29, 2024, 8:15 AM), https://www.thegatewaypundit.com/2024/05/this-video-right-here-is-why-gateway-pundit/.

Dated: June 25, 2024

By: _/s/ David A. Blansky_____

David A. Blansky
Florida Bar No. 1033002
Michael P. Dunn
Florida Bar No. 100705
DUNN LAW, P.A.
66 West Flagler Street, Suite 400
Miami, FL 33130
Telephone: (786) 433-3866
Facsimile: (786) 260-0269
dblansky@dunnlawpa.com
michael.dunn@dunnlawpa.com

-and-

Rachel Goodman (admitted _pro hac vice_)
Brittany Williams (admitted _pro hac vice_)
UNITED TO PROTECT DEMOCRACY
82 Nassau Street, #601
New York, NY 10038
Telephone: (202) 579-4582
rachel.goodman@protectdemocracy.org
brittany.williams@protectdemocracy.org

Rachel C. Strickland (admitted _pro hac vice_)
Aaron E. Nathan (admitted _pro hac vice_)
James H. Burbage (admitted _pro hac vice_)
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
rstrickland@willkie.com
anathan@willkie.com
jburbage@willkie.com

-and-

Michael J. Gottlieb (admitted _pro hac vice_)
Meryl C. Governski (admitted _pro hac vice_)
WILLKIE FARR & GALLAGHER LLP
1875 K Street NW
Washington, DC 20006
mgottlieb@willkie.com
mgovernski@willkie.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF), on this 25th day of June, 2024 upon counsel for the Debtor and registered users in this case.

By: _/s/David A. Blansky_____
David A. Blansky, Esq.
Florida Bar No. 1033002

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re: | Chapter 11 |
| TGP Communications, LLC, | Case No. 24-13938 (MAM) |
| Debtor. |  |

### JOINT STIPULATION OF UNCONTESTED FACTS

Ruby Freeman and Wandrea' ArShaye "Shaye" Moss (together, the "Freeman Plaintiffs"), Dr. Eric Coomer ("Dr. Coomer"), and TGP Communications, LLC (the "Debtor" or "The Gateway Pundit"), by and through their undersigned counsel, hereby stipulate to the following facts in connection with the *Motion of Ruby Freeman and Wandrea' ArShaye Moss for an Order Dismissing the Debtor's Chapter 11 Case under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation* [Docket No. 39] (the "Motion"), the Joinder by Dr. Coomer [Docket No. 45] and the Debtor's Response in Opposition to Motion of Ruby Freeman and Wandrea' Arshaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(B) and 305(A) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation [Docket No. 71] (the "Response"):

1. On April 24, 2024 (the "Petition Date"), the Debtor filed a chapter 11 petition in the Bankruptcy Court for the Southern District of Florida.

2. The Debtor is a limited liability company organized under the laws of the state of Missouri on November 21, 2013.

3.      The Debtor's sole member and owner is James ("Jim") Hoft.  Jim Hoft owns 100% of the Debtor's membership interests.  No other party holds any equity interest in the Debtor.

4.      The Debtor operates a website ("The Gateway Pundit") that reports on current events from a conservative perspective.  Jim Hoft founded the Gateway Pundit in 2004.  Prior to 2013, Jim Hoft operated the Gateway Pundit as an unincorporated individual.

5.      Both before and after the Petition Date, the Debtor's only employee has been Jim Hoft.

6.      On April 18, 2024, the Debtor filed an Application by a Foreign Limited Liability Company for Authorization to Transact Business in Florida (the "Application").  The Application lists Jim Hoft as a Member of the Debtor and John C. Burns as an Authorized Person and the Contact Person for the Debtor.

7.      The Debtor's address in Florida is 1820 NE Jensen Beach Blvd., Unit 1120, Jensen Beach, Florida 45957.  This address is a mailbox.

8.      James Hoft is married to Jez Morano. James Hoft and Jez Morano have maintained a residence in Jensen Beach, Florida since October 2021.  Jez Morano is listed as the Debtor's second largest unsecured creditor in its schedule of the twenty largest unsecured claims.  *See* Docket No. 2.

9.      Joseph ("Joe") Hoft is Jim Hoft's twin brother.  Joe Hoft is a contract writer for the Debtor.

10.      The Debtor listed its assets as of the Petition Date in its *Summary of Assets and Liabilities for Non-Individuals* [Docket No. 34].  As listed therein, as of the Petition Date, the Debtors' assets included: (a) three bank accounts; (b) four investment accounts (including one cryptocurrency account); (c) three loan receivables (discussed below); (d) intangibles and

2

intellectual property (including domain names, trademark rights, articles, and social media posts); and (e) 2021 Porsche Cayenne.

11.    The Debtor's listed assets include a $799,860.00 receivable, listed as a "loan receivable" owed by Jim Hoft (the "Member Loan").

12.    The Debtor loaned those funds to Jim Hoft in order for him to purchase a Florida condominium located at 8750 South Ocean Drive, Unit 833, Jensen Beach, Florida 34957 (the "Florida Condominium").

13.    On October 4, 2021, using funds from the Member Loan, Jim Hoft purchased the Florida Condominium for $740,000 through 2021 Main Street LLC, a limited liability company organized under the laws of Missouri. 2021 Main Street LLC was formed on August 20, 2021. James Hoft is the sole owner and member of 2021 Main Street LLC. John Burns is the registered agent for 2021 Main Street LLC.

14.    Jim Hoft resides in the Florida Condominium as a personal residence with Jez Morano.

15.    There is no written loan agreement between the Debtor and Jim Hoft memorializing the Member Loan.

16.    There is no interest rate, repayment schedule, or maturity date with respect to the Member Loan.

17.    As of June 18, 2024, Jim Hoft had not made any payments in connection with the Member Loan.

18.    The Debtor's listed assets include a "loan receivable" from an entity Justice League of America LLC (the "Justice League") in the amount of $150,000.00 (the "Justice League Loan").

19.     Jim Hoft is the sole owner and member of Justice League.

20.     Justice League of America LLC is a limited liability company organized under the laws of Missouri and formed on August 11, 2020. John Burns is the registered agent for Justice League of America LLC.

21.     There is no written loan agreement between the Debtor and Justice League memorializing the Justice League Loan.

22.     There is no interest rate, repayment schedule, or maturity date with respect to the Justice League Loan.

23.     The Debtor's listed assets include a "loan receivable" from Jim Hoft's twin brother Joe Hoft in the amount of $21,000.00 (the "Joe Hoft Loan").

24.     The Debtor provided the Joe Hoft Loan in May or June 2023.

25.     There is no written loan agreement executed between the Debtor and Joe Hoft with respect to the Joe Hoft Loan.

26.     There is no interest rate, repayment schedule, or maturity date with respect to the Joe Hoft Loan.

27.     As of June 18, 2024, Joe Hoft had not made any payments in connection with the Joe Hoft Loan.

28.     The Debtor's listed assets include a 2021 Porsche Cayenne.

29.     The Debtor acquired the 2021 Porsche Cayenne in 2022 in cash for an amount no less than $70,000.

30.     The 2021 Porsche Cayenne is garaged at Jim Hoft's residence in Missouri.

31.     On December 2, 2021, the Freeman Plaintiffs filed a civil action against the Debtor, Jim Hoft, and Joe Hoft in the Circuit Court of the City of Saint Louis, Missouri (the "Missouri

Litigation"). In the Missouri Litigation, the Freeman Plaintiffs seek damages for alleged defamation and the intentional infliction of emotional distress in connection with statements made by the Debtor about the Freeman Plaintiffs in connection with the 2020 presidential election.

32. Fact discovery in the Missouri Litigation was scheduled to be completed by May 31, 2024. Plaintiffs served their first discovery requests on June 10, 2022. Defendants did not serve discovery requests until November 16, 2023. Defendants moved the court for the issuance of letters rogatory on February 28, 2024. Plaintiffs opposed that motion on March 7, 2024. The court granted Defendants' motion on March 15, 2024. Defendants filed their petition for the letters rogatory on April 12, 2024.

33. Jim Hoft was scheduled to be deposed in the Missouri Litigation on May 28, 2024. This deposition was noticed on April 24, 2024, the same day the Debtor filed its chapter 11 petition.

34. Joe Hoft was scheduled to be deposed in the Missouri Litigation on May 29, 2024. This deposition was noticed on April 24, 2024, the same day the Debtor filed its chapter 11 petition.

35. As of the Petition Date, Defendants in the Missouri Litigation had not noticed or taken a single deposition.

36. Trial in the Missouri Litigation was scheduled for March 10, 2025.

37. On December 22, 2020, Dr. Eric Coomer filed a civil action against the Debtor, Jim Hoft, and various other defendants in District Court, Denver County, Colorado (the "Colorado Litigation," and together with the Missouri Litigation, the "Prepetition Litigations").

38. In the Colorado Litigation, Dr. Coomer seeks damages for alleged defamation, intentional infliction of emotional distress, and civil conspiracy, along with a preliminary and permanent injunction, and a demand for retraction in connection with statements made by the Debtor about Dr. Coomer in connection with the 2020 presidential election.

39.     On May 13, 2022, a Colorado District Court denied the Debtor's and Jim Hoft's motion to dismiss the case.  On April 11, 2024, the Colorado Court of Appeals affirmed the district court's ruling following an appeal by the Debtor and Jim Hoft.  The deadline to appeal that ruling to the Colorado Supreme Court is June 24, 2024.

40.     There is currently no trial date scheduled in the Colorado Litigation. Fact and expert discovery have not yet commenced in the Colorado Litigation.

41.     The Debtor is insured by a media liability insurance policy with an aggregate limit of $2,000,000 (the "Media Liability Insurance Policy").

42.     Prior to the Petition Date, proceeds of the Media Liability Insurance Policy were used to pay the defense costs with respect to the Prepetition Litigations.

43.     The Debtor is not a defendant in any litigations except for the Prepetition Litigations.

44.     As of the Petition Date, approximately $700,000 of the Media Liability Insurance Policy had been exhausted as a result of defending the Prepetition Litigations. The Debtor does not believe it is liable under the Prepetition Litigations.  The Debtor did not list the Freeman Plaintiffs or Dr. Coomer on its schedule of the twenty largest unsecured claims.  *See* Docket No. 2.

45.     Other than potential liability arising from the Prepetition Litigations, the Debtor has approximately $102,596.61 in liquidated unsecured debts as of the Petition Date (the "Non-Litigation Debts").

46.     As of the Petition Date, and continuing through the present time, the Debtor has sufficient assets to satisfy the Non-Litigation Debts in the ordinary course of business.

47.     But for the Prepetition Litigations, the Debtor would not have filed its bankruptcy petition.

48.     A section 341 meeting (the "341 Meeting") of creditors was originally scheduled for May 30, 2024 (the "341 Meeting").  The First 341 Meeting was continued to June 6, 2024.

49.     The 341 Meeting resumed on June 6, 2024 at 3:00 PM .  After two hours of questioning Jim Hoft, the U.S. Trustee adjourned the 341 Meeting.  A copy of the transcript of the June 6 meeting is has been filed as Exhibit 19 to the Motion to Dismiss, Docket No. 76-19.

50.     The 341 Meeting resumed on June 18, 2024 at 3:30 PM and concluded at 5 p.m.  A copy of the transcript for the June 18 meeting has been filed as Exhibit 20 to the Motion to Dismiss, Docket No. 76-20.

## JOINT STIPULATION REGARDING EXHIBITS

The Freeman Plaintiffs, Dr. Coomer, and the Debtor stipulate and agree to the admissibility of Exhibits 1–25, filed at Docket No. 76.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 25, 2024

By: */s/ David A. Blansky*

    David A. Blansky
    Florida Bar No. 1033002
    Michael P. Dunn
    Florida Bar No. 100705
    DUNN LAW, P.A.
    66 West Flager Street, Suite 400
    Miami, FL 33130
    Telephone: (786) 433-3866
    Facsimile: (786) 260-0269
    dblansky@dunnlawpa.com
    michael.dunn@dunnlawpa.com

    Rachel C. Strickland (admitted *pro hac vice*)
    Aaron E. Nathan (admitted *pro hac vice*)
    James H. Burbage (admitted *pro hac vice*)
    WILLKIE FARR & GALLAGHER LLP
    787 Seventh Avenue
    New York, NY 10019
    Telephone: (212) 728-8000
    Facsimile: (212) 728-8111
    rstrickland@willkie.com
    anathan@willkie.com
    jburbage@willkie.com

    *Counsel for Ruby Freeman*
    *and Wandrea' ArShaye Moss*

By: /s/ Vincent F. Alexander
    Vincent F. Alexander
    Florida Bar No. 68114
    SHUTTS & BOWEN LLP
    201 East Las Olas Blvd., Suite 2200
    Fort Lauderdale, Florida 33301
    Telephone: 954-524-5505
    Facsimile: 954-524-5506
    valexander@shutts.com

    Charles J. Cain (*pro hac vice* pending)
    Ryan E. Chapple (*pro hac vice* pending)
    Bradley A. Kloewer (*pro hac vice* pending)
    CAIN & SKARNULIS PLLC

303 Colorado Street, Suite 2850
Austin, Texas 78701
Telephone: 512-477-5000
Facsimile: 512-477-5011
ccain@cstrial.com
rchapple@cstrial.com
bkloewer@cstrial.com

*Counsel for Dr. Eric Coomer*

By: */s/ Bart A. Houston*___
    Bart A. Houston
    Florida Bar No. 623636
    HOUSTON RODERMAN
    633 S. Andrews Ave Suite 500
    Ft. Lauderdale, FL 33301
    Telephone: (954) 900-2615
    Facsimile: (954) 839-9068
    bhouston@thehoustonfirm.com

*Counsel for the Debtor*

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via Notice of Electronic Filing (CM/ECF), on this 25th day of June, 2024 upon those parties registered to receive such notice in this case.

        By: */s/ David A. Blansky*
           David A. Blansky, Esq.
           Florida Bar No. 1033002

9

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | § | Chapter 11 (Subchapter V) |
| | § | |
| TGP COMMUNICATIONS, LLC, | § | Case No. 24-13938 (MAM) |
| | § | |
| Debtor. | § | |

**DR. ERIC COOMER'S JOINDER TO THE REPLY IN SUPPORT OF THE**
**MOTION OF RUBY FREEMAN AND WANDREA' ARSHAYE MOSS FOR**
**AN ORDER DISMISSING THE DEBTOR'S CHAPTER 11 CASE UNDER**
**SECTIONS 1112(b) AND 305(a) OF THE BANKRUPTCY CODE OR, IN THE**
**ALTERNATIVE, MODIFYING THE AUTOMATIC STAY TO CONTINUE**
**PREPETITION LITIGATION**

Dr. Eric Coomer ("Dr. Coomer"), by and through undersigned counsel, respectfully joins and adopts the Reply in Support of the Motion of Ruby Freeman And Wandrea' Arshaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(B) and 305(A) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation (the "Reply") [ECF No. 79], and states:

**PROCEDURAL POSTURE OF THE COLORADO LITIGATION**

Dr. Coomer joins and adopts the arguments and supporting authority cited in the Reply, but briefly draws the Court's attention to aspects of the Colorado Litigation that lend further support to arguments raised in the Reply.

The procedural posture of the Colorado Litigation lends further support to Freeman and Moss' arguments regarding Debtor's lack of a valid bankruptcy purpose. Specifically, the Reply raises the suspect timing of Debtor's bankruptcy filing, noting that it "just so happened to occur on the same date the Hoft brothers were served with deposition notices in the Missouri Litigation."  Reply, p. 4.  The April 25 Suggestion of Bankruptcy similarly came very shortly after the Colorado Court of Appeals denied

1

Debtor's appeal of the Denver District Court's order denying Debtor's anti-SLAPP Motion
to Dismiss on April 11, 2024.  As a result, Debtor's obligation to participate in discovery
upon remand was just about to commence.

These facts support a determination that Debtor filed this bankruptcy not for a
valid purpose, but rather as a ploy to escape its obligations in the Colorado Litigation.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Dr. Eric Coomer joins the Reply in
Support of the Motion and respectfully requests that the Court enter an order granting
the Motion and dismissing this chapter 11 case.  In the alternative, Dr. Eric Coomer
requests an order granting him relief from the automatic stay to continue the Colorado
Litigation to judgment.

Dr. Coomer further reserves the right to raise any arguments in connection with
the Reply at the next scheduled hearing.

Dated: June 25 2024

/s/ Vincent F. Alexander
Vincent F. Alexander
valexander@shutts.com
Florida Bar No. 68114
**SHUTTS & BOWEN LLP**
201 East Las Olas Blvd., Suite 2200
Fort Lauderdale, Florida 33301
954-524-5505
954-524-5506—Facsimile

-AND-

/s/ Ryan E. Chapple
Charles J. Cain - *Pro Hac Vice*
ccain@cstrial.com
Ryan E. Chapple - *Pro Hac Vice*
rchapple@cstrial.com
Bradley A. Kloewer - *Pro Hac Vice*
bkloewer@cstrial.com

**CAIN & SKARNULIS PLLC**
303 Colorado Street, Suite 2850
Austin, Texas 78701
512-477-5000
512-477-5011—Facsimile

**ATTORNEYS FOR DR. ERIC COOMER**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or *pro se* parties who are authorized to receive electronically Notice of Electronic Filing in this bankruptcy case.

*/s/ Vincent F. Alexander*
Vincent F. Alexander

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

TGP COMMUNICATIONS, LLC,                    Case No. 24-13938-MAM
                                            Chapter 11

     Debtor.

_____/

## **SUPPLEMENT TO EXHIBIT REGISTER[1]**

Exhibits submitted on behalf of: Ruby Freeman and Wandrea' ArShaye Moss (Movants) and Dr. Eric Coomer (Joining Party)

Matter set for hearing/trial: *Motion of Ruby Freeman and Wandrea' ArShaye Moss for an Order Dismissing the Debtor's Chapter 11 Case Under Sections 1112(b) and 305(a) of the Bankruptcy Code or, in the Alternative, Modifying the Automatic Stay to Continue Prepetition Litigation* (ECF No. 39).

Date of hearing/trial: June 27, 2024

By: */s/ David A. Blansky*              By: */s/ Vincent F. Alexander*

    David A. Blansky                   Vincent F. Alexander
    Florida Bar No. 1033002            Florida Bar No. 68114
    Michael P. Dunn                   SHUTTS & BOWEN LLP
    Florida Bar No. 100705            201 East Las Olas Blvd., Suite 2200
    DUNN LAW, P.A.                  Fort Lauderdale, Florida 33301
    66 West Flager Street, Suite 400     Telephone: 954-524-5505
    Miami, FL 33130                 Facsimile: 954-524-5506
    Telephone: (786) 433-3866        valexander@shutts.com
    Facsimile: (786) 260-0269         *Attorneys for Joining Party*
    dblansky@dunnlawpa.com        *Dr. Eric Coomer*
    michael.dunn@dunnlawpa.com
    *Attorneys for Movants Ruby Freeman and*
    *Wandrea' ArShaye Moss*

---

[1] Exhibit 26 is added.

| Exhibit Number | Description | Admitted | Refused | Not Offered Into Evidence |
|---|---|---|---|---|
| 1. | Missouri Litigation: Second Amended Petition (Case No. 2122-CC09815-01) | | | |
| 2. | Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida | | | |
| 3. | Missouri Litigation: Opinion, Memorandum and Order Remanding Case | | | |
| 4. | Missouri Litigation: Order on Defendants' Protective Order | | | |
| 5. | Missouri Litigation: Order and Judgment Dismissing Defendants' Counterclaim and Striking Defendants' anti-SLAPP Motion | | | |
| 6. | Missouri Litigation: Order – Petition for Writ of Prohibition | | | |
| 7. | Missouri Litigation: Order Granting Motion to Dismiss | | | |
| 8. | Missouri Litigation: Order Appointing Special Master | | | |
| 9. | Missouri Litigation: Court Order Adopting Third Report and Recommendation of the Special Master in its Entirety | | | |
| 10. | Voluntary Petition for Non-Individuals Filing for Bankruptcy [ECF No. 1] | | | |
| 11. | Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders [ECF No. 2] | | | |
| 12. | Chapter 11 Case Management Summary [ECF No. 13] | | | |
| 13. | Notice of Filing Documents for Small Business as Required by 11 USC § 1116(1) [ECF No. 17] | | | |
| 14. | Debtor's Pre-Status Conference Report Pursuant to 11 U.S.C. § 1188(c) [ECF No. 27] | | | |
| 15. | Summary of Assets and Liability for Non-Individuals and Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy [ECF No. 30] | | | |

| 16. | Amended Summary of Assets and Liability for Non-Individuals and Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy [ECF No. 34] | | | |
| 17. | Amended Monthly Operating Report for Small Business Under Chapter 11 [ECF No. 51] | | | |
| 18. | Additional Certification of Information Contained Within Schedules and Statement of Financial Affairs [ECF No. 52] | | | |
| 19. | 341 Meeting of Creditors Transcript [June 6, 2024] | | | |
| 20. | 341 Meeting of Creditors Transcript [June 18, 2024] | | | |
| 21. | Colorado Litigation: Plaintiff's Original Complaint (Case No. 2020-cv-034319) | | | |
| 22. | Colorado Litigation: Plaintiff's First Amended Complaint | | | |
| 23. | Colorado Litigation: Court of Appeals' Anti-SLAPP Opinion | | | |
| 24. | Colorado Litigation: Order of Court Granting Motion for Extension of Time to File Opposition Brief to Petitions for Writ of Certiorari | | | |
| 25. | Title of 2021 Porsche Cayenne | | | |
| 26. | TGP Suggestion of Bankruptcy Filed in Colorado Supreme Court [June 24, 2024] | | | |

| | |
|---|---|
| COLORADO SUPREME COURT<br>Ralph L. Carr Colorado Judicial Center<br>2 E. 14th Avenue<br>Denver, Colorado 80203<br><br>_____<br><br>On appeal from the Colorado Court of Appeals<br>Case No. 2022 CA 0843<br><br>Denver District Court<br>Case No. 2020 CV 034319<br><br>_____<br><br>Petitioner(s): DONALD J. TRUMP FOR PRESIDENT, INC.; SIDNEY POWELL; SIDNEY POWELL, P.C.; JOSEPH OLTMANN; FEC UNITED; SHUFFLING MADNESS MEDIA, INC., D/B/A CONSERVATIVE DAILY; JAMES HOFT; TGP COMMUNICATIONS, LLC, D/B/A THE GATEWAY PUNDIT; MICHELLE MALKIN; AND ERIC METAXAS<br><br>v.<br><br>Respondent(s): ERIC COOMER, Ph.D. | ▲ COURT USE ONLY ▲<br><br>Case Number: 2024SC317 |
| _____ | |
| **Attorneys for Defendant-Appellants James Hoft and TGP Communications, LLC:**<br>Law Offices of Randy B. Corporon<br>Randy B. Corporon, Reg. No. 29861<br>S. Parker Road, Suite 555<br>Aurora, Colorado 80014<br>Telephone: 303-749-0062<br>E-Mail: rbc@corporonlaw.com<br><br>Jonathon Burns, #21PHV6433<br>Burns Law Firm<br>P.O. Box 191250<br>St. Louis, MO 63119<br>Telephone: 314-329-5040<br>Email: TBLF@pm.me | |

1

---

## SUGGESTION OF BANKRUPTCY

---

**TGP COMMUNICATIONS, LLC**, (the "**Debtor**") hereby files this suggestion of bankruptcy to inform the Court and all parties that the captioned matter is stayed pursuant to 11 U.S.C. § 362, by virtue of the pendency of proceedings styled as *In re TGP COMMUNICATIONS, LLC*, Case No. 24-13938-MAM, which was filed on the 24th of April, 2024, in the United States Bankruptcy Court for the Southern District of Florida. Although this action was filed by the Debtor, it is an ancillary proceeding connected to the case of Donald J. Trump for President, Inc.; Sidney Powell, P.C.; Joseph Oltmann; FEC United; Shuffling Madness Media, Inc., D/B/A Conservative Daily; James Hoft; TGP Communications, LLC, D/B/A The Gateway Pundit; Michelle Malkin; and Eric Metaxas v. Eric Coomer*, Case No. 2024SC317, pending in the Colorado Supreme Court, and Eric Coomer v. Donald J. Trump for President, Inc., et al, Case No. 2020 CV 034319, pending in Denver District Court, State of Colorado, each of which have been stayed under the Bankruptcy Code.

This Suggestion of Bankruptcy does not constitute a general appearance for the Debtor or the assertion of affirmative relief in this case by undersigned counsel.

2

**Dated:  June 24, 2024**

**HOUSTON RODERMAN PLLC**
*Counsel for Debtor*
633 S. Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 900-2615
Primary Email: bhouston@thehoustonfirm.com
Secondary Email: dschena@thehoustonfirm.com

By:      /s/ Bart A. Houston_____
**Bart A. Houston, Fla. Bar No. 623636**
Primary Email: bhouston@thehoustonfirm.com
Secondary Email: dschena@thehoustonfirm.com
**Alexander G. Lewitt, Fla. Bar No. 1048121**
Primary Email: alewitt@thehoustonfirm.com
Secondary Email: dschena@thehoustonfirm.com


/s/ Randy B. Corporon_____
Randy B. Corporon, Esq.
Law Office of Randy B. Corporon, P.C.
2821 S. Parker Road, Suite 555
Aurora, Colorado 80014
Telephone: 303-749-0062
E-Mail: rbc@corporonlaw.com


Jonathon Burns, #21PHV6433
Burns Law Firm
P.O. Box 191250
St. Louis, MO 63119
Telephone: 314-329-5040
Email: TBLF@pm.me
*(Attorneys for Appellants Hoft and TGP
Communications LLC dba The Gateway Pundit)*

3

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of June, 2024, a true and correct copy of the above and foregoing was served upon the following via Colorado Courts E-Filing:

Barry K. Arrington, Esq.
Arrington Law Firm
3801 E. Florida Avenue, Suite 830
Denver, Colorado 80210
*(Attorneys for Petitioners Sidney Powell and Sidney Powell, P.C.)*

John R. Mann, Esq.
Margaret L. Boehmer, Esq.
Thomas B. Quinn, Esq.
Gordon & Rees LLP
555 Seventeenth Street, Suite 3400
Denver, Colorado 80202
*(Attorneys for Petitioner Metaxas)*

Charles J. Cain, Esq.
Bradley A. Kloewer, Esq.
Zachary H. Bowman, Esq.
Cain & Skarnulis PLLC
P.O. Box 1064
Salida, Colorado 81201
*(Attorneys for Respondent)*

Thomas M. Rogers, III, Esq.
Mark G. Grueskin, Esq.
Andrew E. Ho, Esq.
Recht Kornfeld, P.C.
1600 Stout Street, Suite 1400
Denver, Colorado 80202
*(Attorneys for Respondent)*

Franklin D. Patterson, No. 12058
Patterson Ripplinger, P.C.
5613 DTC Parkway, Suite 400
Greenwood Village, Colorado 80111
Telephone:  303/741-4539
Facsimile:   303/741-5043
E-mail:
        fpatterson@prpclegal.com
(*Attorneys for Petitioner Malkin*)

CAMPBELL KILLIN BRITTAN & RAY, LLC
John S. Zakhem
Andrew C. Nickel

270 Saint Paul Street, Ste. 200
Denver, CO 80206
303-322-3400
*Attorney for Petitioner Donald J. Trump*
*For President, Inc*

KENNEDYS CMK LLP
Marc S. Casarino
222 Delaware Avenue, Ste. 710
Wilmington, DE 19801
302-308-6647
*Attorneys for Petitioners Sidney Powell*
*and Sidney Powell, P.C.*


HARRIS, KARSTAEDT, JAMISON & POWERS, P.C.
Jamey W. Jamison
Dino G. Moncecchi
Mark A. Sares
10333 E. Dry Creek Road, Ste. 300
Englewood, Colorado 80112
(720) 875-9140
*Attorney for Petitioners Oltmann, FEC*
*United, and Shuffling Madness Media, Inc.*
*dba Conservative Daily*

<u>*s/ Randy B. Corporon, Esq.*</u>
Randy B. Corporon

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
**www.flsb.uscourts.gov**

| | | |
|---|---|---|
| In re: | § | Chapter 11 (Subchapter V) |
| | § | |
| TGP COMMUNICATIONS, LLC, | § | Case No. 24-13938 (MAM) |
| | § | |
| Debtor. | § | |

**NOTICE OF FILING**

Dr. Eric Coomer ("Coomer") hereby files a copy of the *Order of Court on Respondent, Dr. Coomer's Motion to Sever* which was issued in Case No. 2024SC000317 in the Colorado Supreme Court, styled as *Donald J. Trump for President, Inc., et al. v. Eric Coomer, Ph.D.*, a copy of which is attached as Exhibit "A".

Dated: July 10, 2024

                            _____/s/ Vincent F. Alexander_____
                            Vincent F. Alexander
                            valexander@shutts.com
                            Florida Bar No. 68114
                            SHUTTS & BOWEN LLP
                            201 East Las Olas Blvd., Suite 2200
                            Fort Lauderdale, Florida 33301
                            954-524-5505
                            954-524-5506—Facsimile

                            and

                            _____/s/ Ryan E. Chapple_____
                            Charles J. Cain – admitted *Pro Hac Vice*
                            ccain@cstrial.com
                            Ryan E. Chapple – admitted *Pro Hac Vice*
                            rchapple@cstrial.com
                            Bradley A. Kloewer – admitted *Pro Hac Vice*
                            bkloewer@cstrial.com
                            CAIN & SKARNULIS PLLC
                            303 Colorado Street, Suite 2850
                            Austin, Texas 78701
                            512-477-5000
                            512-477-5011—Facsimile
                            **ATTORNEYS FOR DR. ERIC COOMER**

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record or *pro se* parties who are authorized to receive electronically Notice of Electronic Filing in this bankruptcy case.


_____*/s/ Vincent F. Alexander*_____
Vincent F. Alexander

# EXHIBIT A

| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: July 8, 2024<br>CASE NUMBER: 2024SC317 |
|---|---|
| Certiorari to the Court of Appeals, 2022CA843<br>District Court, Denver County, 2020CV34319 | |
| **Petitioners:**<br><br>Michelle Malkin; Eric Metaxas; Donald J. Trump for President, Inc.; Joseph Oltmann; FEC United; Shuffling Madness Media, Inc. d/b/a Conservative Daily; James Hoft; and TGP Communications LLC, d/b/a The Gateway Pundit;<br><br>**v.**<br><br>**Respondent:**<br><br>Eric Coomer, Ph.D. | Supreme Court Case No:<br>2024SC317 |
| **ORDER OF COURT** | |

The Court, having considered the "Suggestion of Bankruptcy" filed by Petitioner, TGP Communications, LLC, and Respondent, Dr. Coomer's "Emergency Motion to Sever," and having received no response to the Emergency Motion to Sever, ORDERS the following:

The Emergency Motion to Sever is DENIED. All further proceedings in the above-captioned matter are STAYED as to TGP Communications, LLC only pursuant to the automatic stay provisions in 11 U.S.C. § 362(a) pending further orders of the bankruptcy court. The above-captioned matter will proceed as to all other parties.

The Court FUTHER ORDERS that petitioner, TGP Communications LLC, must notify the Court in writing of the status of the bankruptcy proceedings on or before August 8, 2024, and every month thereafter until the stay is discharged.

BY THE COURT, JULY 8, 2024.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

In re:                                                   Chapter 11

**TGP COMMUNICATIONS, LLC**                              Case No.  24-13938-MAM

    **Debtor.**
_____/

# CHAPTER 11 SUBCHAPTER V
# <u>PLAN OF REORGANIZATION</u>

**HOUSTON RODERMAN**
633 S. Andrews Avenue, Suite 500
Ft. Lauderdale, FL 33301
Phone: (954) 900-2615
Facsimile: (954) 839-9068
bhouston@houstonroderman.com
dschena@houstonroderman.com
*Attorney for Debtor and*
*Debtor in Possession*

Dated: July 23, 2024

---

**IMPORTANT**

THIS PLAN OF REORGANIZATION CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS (AS DEFINED BELOW) ARE ENCOURAGED TO READ THE PLAN CAREFULLY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS PLAN OF REORGANIZATION AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVISE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

---

# TABLE OF CONTENTS

**ARTICLE I.  INTRODUCTION** ....................................................................... 1

    **A.**   **PURPOSE.** ......................................................................... 1
    **B.**   **DISCLAIMER.** .................................................................... 1
    **C.**   **OVERVIEW OF THE PLAN.** ............................................... 1

**ARTICLE II.  DEFINITIONS AND INTERPRETATION** .......................... 2

    **A.**   **DEFINITIONS.** .................................................................. 2
    **B.**   **INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.** ... 7
    **C.**   **REFERENCE TO MONETARY FIGURES.** ........................... 7

**ARTICLE III.  BACKGROUND** ....................................................................... 7

    **3.1**   **CORPORATE OVERVIEW.** ............................................... 8
    **3.2**   **DEBTOR'S BUSINESS OPERATIONS.** ............................ 8
    **3.3**   **THE DEBTOR'S CAPITAL STRUCTURE.** ...................... 8
        **A.**   **Secured Debt.** ........................................................... 8
        **B.**   **Unsecured Debt.** ...................................................... 8
        **C.**   **Equity.** ....................................................................... 8
    **3.4**   **EVENTS LEADING TO CHAPTER 11 CASE.** .................. 8
    **3.5**   **OVERVIEW OF CHAPTER 11 CASE.** ............................. 9
    **3.7**   **CLAIMS RECONCILIATION PROCESS.** ....................... 10

**ARTICLE IV.  ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS** .................... 10

    **4.1**   **ADMINISTRATIVE EXPENSE CLAIMS.** ..................... 10
    **4.2**   **PRIORITY TAX CLAIMS.** ............................................. 11

**ARTICLE V.  CLASSIFICATION OF CLAIMS** ....................................... 11

    **5.1**   **CLASSIFICATION IN GENERAL.** ................................. 11
    **5.2**   **SUMMARY OF CLASSIFICATION.** ............................... 11
    **5.3**   **SPECIAL PROVISION GOVERNING UNIMPAIRED CLAIMS.** ...................... 12
        **5.4**   **CONFIRMATION PURSUANT TO SECTIONS 1129(A)(10) AND 1129(B) OF THE BANKRUPTCY CODE.** ............................... 12

**ARTICLE VI.  TREATMENT OF CLAIMS** ............................................. 12

    **6.1**   **PREPFORT SECURED CLAIMS (CLASS 1)** ................. 12
    **6.2**   **GENERAL UNSECURED CLAIMS (CLASS 2)** ............ **ERROR! BOOKMARK NOT DEFINED.**
    **6.3**   **EQUITY INTERESTS (CLASS 3)** .................................. 12

**ARTICLE VII.  MEANS FOR IMPLEMENTATION** ............................... 13

**TABLE OF CONTENTS**
**(CONTINUED)**

| | | |
|---|---|---|
| 7.1 | SOURCES OF CONSIDERATION FOR PLAN DISBURSEMENTS. | 13 |
| 7.2 | PRESERVATION OF CAUSES OF ACTION. | 13 |
| 7.3 | CORPORATE GOVERNANCE; DISSOLUTION. | 13 |

**ARTICLES IX. DISBURSEMENTS** ..... 14

| | | |
|---|---|---|
| 9.4 | DISBURSEMENTS. | 14 |

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN** ..... 15

| | | |
|---|---|---|
| 10.1 | CONDITIONS PRECEDENT TO EFFECTIVE DATE. | 15 |
| 10.2 | WAIVER OF CONDITION PRECEDENT. | 15 |
| 10.3 | EFFECT OF FAILURE OF A CONDITION. | 15 |

**ARTICLE XI. EFFECT OF CONFIRMATION OF PLAN** ..... 15

| | | |
|---|---|---|
| 11.1 | VESTING OF PROPERTY OF THE ESTATE. | 15 |
| 11.2 | SUBORDINATED CLAIMS. | 16 |
| 11.3 | BINDING EFFECT. | 16 |
| 11.4 | CLOSING OF CHAPTER 11 CASE. | 16 |
| 11.5 | NOTICE OF EFFECTIVE DATE. | 16 |
| 11.6 | TERM OF INJUNCTIONS OR STAYS. | 16 |
| 11.7 | INJUNCTIONS AND STAYS. | 17 |
| 11.9 | DISCHARGE OF DEBTOR. | ERROR! BOOKMARK NOT DEFINED. |
| 11.10 | SOLICITATION OF PLAN. | 17 |

**ARTICLE XII. RETENTION OF JURISDICTION** ..... 18

| | | |
|---|---|---|
| 12.1 | RETENTION OF JURISDICTION. | 18 |
| 12.2 | COURTS OF COMPETENT JURISDICTION. | 19 |

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** ..... 19

## TABLE OF CONTENTS
## (CONTINUED)

13.1 SUBSTANTIAL CONSUMMATION OF THE PLAN. ................................ 19

13.2 PLAN MODIFICATIONS. ................................................................ 19

13.3 GOVERNING LAW. .................................................................... 19

13.4 TIME. ..................................................................................... 20

13.5 DATES OF ACTIONS TO IMPLEMENT THE PLAN. ............................ 20

13.6 IMMEDIATE BINDING EFFECT. .................................................... 20

13.7 DEEMED ACTS. ....................................................................... 20

13.8 FILING OF FINAL REPORT. ......................................................... 20

13.9 NOTICES. ............................................................................... 20

# ARTICLE I.  INTRODUCTION

### A.    **Purpose.**

This is the plan of reorganization (the "**Plan**") of TGP Communications, LLC ("**Debtor**"), as debtor and debtor-in-possession in the above captioned Chapter 11, Subchapter V case (the "**Chapter 11 Case**") pending in the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**").

The purpose of the Plan in the Chapter 11 Case is to provide Holders of Claims with adequate information regarding the (i) Debtor's history and the Chapter 11 Case; (ii) rights of interested parties; and (iii) other information necessary to enable creditors entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan.

### B.    **Disclaimer.**

The information contained in this Plan including any attachments thereto concerning the financial condition of the Debtor is based upon financial and other information as of the date of the filing of this Plan.  The information contained in this Plan was obtained from the Debtor, the Debtor's books and records, and pleadings and other filings with the Bankruptcy Court.  The Debtor's books and records have not been audited.  As such, the Debtor cannot verify the complete accuracy of the information.  The Debtor, however, is not aware of any material misrepresentations or omissions in this Plan.

No representations concerning the financial condition of the Debtor or any aspect of the Plan are authorized by the Debtor except as set forth in this Plan.  If and to the extent that any such representations have been made to any creditor or party-in-interest, then such representations should be reported to counsel to the Debtor or to the Office of the United States Trustee (the "**U.S. Trustee**").  Any such representations or inducements made to secure your acceptance or rejection of the Plan which is other than as set forth in this document should not be relied upon by you in deciding whether to accept or reject the Plan.  You should read this Plan in its entirety before voting to accept or reject the Plan.

### C.    **Overview of the Plan.**

The Plan provides for the reorganization of the Debtor's business in this Chapter 11 Case with all disposable income from the Debtor's business assets to be distributed to the Debtor's creditors.  Except as otherwise ordered by the United States Bankruptcy Court for the Southern District of Florida (the "**Bankruptcy Court**"), treatment and satisfaction of all Allowed Claims (as defined below) will occur over 3-5 years after the Plan is confirmed.  The Plan also includes a description of the Debtor's business operations along with a brief history of the events leading up to the Debtor's bankruptcy filing and a liquidation analysis as required by Section 1190 of the Bankruptcy Code.

The Projection of Disposable Income for the following 3 year period is attached to this Plan as ***Exhibit "A"***.  The Liquidation Analysis is attached as ***Exhibit "B"***.

## ARTICLE II. DEFINITIONS AND INTERPRETATION

A.    **Definitions.** The following terms shall have the respective meanings specified below:

2.1    **"*Administrative Expense Claim*"** shall mean a Claim against the Estate of the Debtor allowed by order of the Bankruptcy Court pursuant to Section 503(b) and entitled to priority under Section 507(a)(1) or 507(b) of the Bankruptcy Code, including, without limitation: (i) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Debtor's Estate and of operating the business of the Debtor; (ii) any payment to be made under this Plan to cure a default on an executory contract or unexpired lease that is assumed pursuant to Section 365 of the Bankruptcy Code, (iii) any post-Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of business, (iv) compensation or reimbursement of expenses of Professionals to the extent allowed by the Bankruptcy Court under Section 330(a) or Section 331 of the Bankruptcy Code, (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court, including under Section 546(c)(2)(A) of the Bankruptcy Code, and (vi) all fees and charges assessed against the Debtor's Estate pursuant to 28 U.S.C. §1930(a).

2.2    **"*Allowed*"** when used as an adjective preceding the words "Claim" shall mean any Claim against the Debtor, proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of claim, or, if no proof of claim is filed, which has been or hereafter is listed by the Debtor in his Schedules as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objection to the allowance thereof has been interposed with the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, Local Rules, or as to which any objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. Unless otherwise specified in the Plan, "Allowed Claim" shall not, for purposes of computation of disbursements under the Plan, include interest on the amount of such Claim from and after the Petition Date.

2.3    **"*Allowed Administrative Claim*"** shall mean all or that portion of an Administrative Claim, including those administrative claims for Professionals, which has been allowed by a Final Order of the Bankruptcy Court.

2.4    **"*Allowed Claim*"** shall mean a Claim: (a) (i) proof of which was timely and properly filed on or before the Bar Date, (ii) proof of which was deemed filed pursuant to Section 1111(a) of the Bankruptcy Code, or (iii) if no such proof was filed or deemed filed, such Claim has been or hereafter is listed by the Debtor on their Schedules as liquidated in amount and not disputed or contingent and, in any case, as to which (A) no objection to the allowance thereof has been or is interposed, or (B) if an objection is made, any such objection has been settled, withdrawn or determined by a Final Order; (b) based on an application of a Professional under Section 330, Section 331, or Section 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Chapter 11 Case, to the extent such application is approved by a Final Order; or (c) expressly allowed under this Plan or the Confirmation Order. Unless otherwise specified herein or by order of the Bankruptcy Court, an Allowed Claim shall not include interest on such Claim for the period from and after the Petition Date.

2.5 **"*Allowed Priority Claim*"** shall mean a Priority Claim which is not a Disputed Claim; or, if disputed has been Allowed by a Final Order of the Bankruptcy Court.

2.6 **"*Allowed Unsecured Claim*"** shall mean an Unsecured Claim which is not a Disputed Claim; or, if disputed has been allowed by a Final Order of the Bankruptcy Court.

2.7 **"*Assets*"** shall mean the Debtor's Assets.

2.8 **"*Bankruptcy Code*"** shall mean Title 11 of the United States Code, 11 U.S.C.§ 101, *et. seq.*, in effect as of the Petition Date, together with all amendments and modifications thereto to the extent applicable to this Chapter 11 Case.

2.9 **"*Bankruptcy Court*"** shall mean the United States Bankruptcy Court for the Southern District of Florida.

2.10 **"*Bankruptcy Rules*"** shall mean (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under Section 2075 of title 28 of the United States Code; (ii) the Federal Rules of Civil Procedure, as amended and promulgated under Section 2072 of title 28 of the United States Code; (iii) the Local Rules of the United States Bankruptcy Court for the Southern District of Florida; and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto to the extent applicable to this Chapter 11 Case or proceedings herein, as the case may be.

2.11 **"*Bar Date*"** shall mean July 3, 2024, the last date for Creditors to file proofs of Claims in this Chapter 11 Case, provided however that with respect to Government Units, the Bar Date is October 21, 2024.

2.12 *"Business Day"* means any day other than a Saturday, a Sunday, or any other day on which banking institutions are required or authorized to close by law or executive order.

2.13 **"*Cash*"** shall mean cash on hand on the Effective Date from the liquidation of Assets or any other source.

2.14 **"*Causes of Action*"** shall mean any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any claim pursuant to Section 362 or Chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in Section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

2.15 **"*Chapter 11 Case*"** shall mean the proceedings under Chapter 11 of the Bankruptcy Code for the liquidation of the Debtor.

2.16 **"*Claim*"** shall mean any claim, as that term is defined in Section 101(5) of the Bankruptcy Code, including, without limitation, any claim of right to payment, liquidated, unliquidated, contingent, matured, unmatured, disputed or undisputed, legal, equitable, secured or unsecured.

2.17 **"*Claim Objection Deadline*"** shall mean the date set by order of the Bankruptcy Court for objecting to Claims against the Estate as may be extended from time to time.

2.18 **"*Class*"** or **"*Classes*"** shall mean each class or classes of Creditors classified under the Plan pursuant to Section 1122 of the Bankruptcy Code.

2.19 **"*Confirmation*"** shall mean the entry of an order of the Bankruptcy Court confirming the Plan in accordance with Section 1129 of the Bankruptcy Code.

2.20 **"*Confirmation Date*"** shall mean the date on which the Confirmation Order is entered on the computerized docket maintained by the Clerk of the Bankruptcy Court.

2.21 **"*Confirmation Hearing*"** shall mean the hearing conducted by the Bankruptcy Court under Section 1128 of the Bankruptcy Code wherein the Bankruptcy Court shall consider confirmation of this Plan, in accordance with Section 1129 of the Bankruptcy Code, as the same may be continued from time to time.

2.22 **"*Confirmation Order*"** shall mean the order of the Bankruptcy Court confirming this Plan pursuant to Section 1129 of the Bankruptcy Code.

2.23 **"*Creditor*"** shall mean any Person which has a Claim against the Debtor that arose on or before the Petition Date or a Claim against the Debtor's estate of any kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code. This includes all persons, corporations, partnerships, or business entities holding claims against the Debtor.

2.24 **"*Debtor*"** or **"*Debtor in Possession*"** shall mean TGP Communications, LLC.

2.25 **"*Debtor's Principal*"** shall mean James Hoft, the Debtor's Chief Executive Officer and sole member holding all of the equity in the Debtor.

2.26 **"*Disbursements*"** shall mean payment of all Allowed Administrative Expense Claims, including Administrative Claims for Professionals, all Allowed Priority Claims, and the corresponding fees of the Office of the United States Trustee incurred by the Debtor with respect to such disbursements as of the Effective Date, and all Allowed Unsecured Claims.

2.27 **"*Disputed Claim*"** shall mean all Claims: (a) which are listed in the Schedules as disputed, contingent or unliquidated, or (b) as to which (i) a proof of Claim has been filed; (ii) an objection, or request for estimation, has been timely filed (and not withdrawn) by any party in interest; and (iii) no Final Order has been entered thereon. In the event that any part of a Claim is disputed, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of

disbursement under this Plan unless a Final Order has been entered allowing such Claim. Without limiting any of the above, a Claim that is the subject of a pending objection, motion, complaint, counterclaim, setoff, avoidance action, litigation claim or other defense, or any other proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed to constitute a Disputed Claim.

2.28    "*Disbursement Date*" shall mean the 30th day following the Effective Date every successive 30th day after that date.

2.29    "*Effective Date*" shall mean the date which is fifteen (15) days after the date the Confirmation Order is entered on the Bankruptcy Court's computerized docket by the clerk of the Bankruptcy Court.

2.30    "*Entity*" means an individual, corporation, partnership, limited partnership, limited liability company, association, joint stock company, joint venture, estate, trust, indenture trustee, unincorporated organization, governmental unit (as defined in Section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in Section 101(41) of the Bankruptcy Code) or other entity.

2.31    "*Estate*" shall mean the estate of the Debtor created pursuant to Section 541 of the Bankruptcy Code on the Petition Date.

2.32    "*Final Order*" shall mean an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and: (i) as to which the time to appeal or seek reconsideration or rehearing thereof has expired and no appeal or motion for rehearing and/or reconsideration has been filed; (ii) in the event of a motion for reconsideration or rehearing is filed, such motion has been denied by an order or judgment of the Bankruptcy Court; or (iii) in the event of an appeal is filed and pending, a stay pending appeal has not been entered; provided however, that with respect to an order or judgment of the Bankruptcy Court allowing or disallowing a Claim, such order or judgment shall have become final and non-appealable. Provided further that the possibility that a motion under Rule 59 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

2.33    "*Final Decree*" means the final decree entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

2.34    "*General Unsecured Claim*" means any Claim against the Debtor, that is not (a) an Administrative Expense Claim, (b) a Priority Tax Claim, (c) a Non-Priority Tax Claim, and (d) a Secured Claim.

2.35    "*Government Unit*" shall have the meaning as such term is defined in section 101(27) of the Bankruptcy Code.

2.36    "*Impairment*" or "*Impaired*" shall have the meaning under Section 1124 of the Bankruptcy Code.

2.37    "*Interests*" means any membership interest of the Debtor.

2.38    *"Lien"* shall mean any valid and undisputed mortgage, lien, charge, security interest, encumbrance or other security device of any kind affecting any Asset of the Debtor or the Debtor's Estate.

2.39    *"Objection"* shall mean any objection, application, motion, complaint or any other legal proceeding, including, with respect to the terms of this Plan, seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, subordinate or estimate any Claim (including the resolution of any request for payment of any Administrative Claim) other than an Allowed Claim.

2.40    *"Petition Date"* shall mean April 24, 2024, the date of the commencement of this Chapter 11 Case.

2.41    *"Plan"* shall mean this Plan in its entirety, together with all addenda, exhibits, and schedules in its present form or as it may be modified, amended, or supplemented from time to time.

2.42    *"Preserved Causes of Actions"* means any Causes of Action that are preserved and not released, vested, settled or sold to a third party under the Plan or any other order of the Bankruptcy Court, including the Specified Causes of Action.  For the avoidance of doubt, the Debtor will retain all rights to commence and pursue all Preserved Causes of Actions.

2.43    *"Priority Claim"* shall mean a Claim entitled to priority under Section 507(a)(1)–(10) of the Bankruptcy Code.

2.44    *"Priority Non-Tax Claim"* means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in Section 507(a) of the Bankruptcy Code.

2.45    *"Priority Tax Claim"* shall mean a Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

2.46    *"Proof of Claim"*  means a proof of Claim filed against any of the Debtor in the Chapter 11 Case.

2.47    *"Professionals"* shall mean a person employed in the Chapter 11 Case pursuant to a Final Order in accordance with Sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code, for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b)(4) of the Bankruptcy Code.

2.48    *"Debtor's Assets"* shall mean the assets of the Debtor which shall consist of all property of the Estate as defined in 11 U.S.C. § 541 of the Bankruptcy Code, including without limitation, the following: (i) all legal or equitable interests of the Debtor in any and all real or personal property of any nature, together with any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses acquired by the Debtor pre-petition, materials, supplies, furniture, fixtures equipment, and any general tangibles and intangibles, and the proceeds, product, offspring, rents or profits thereof; and (ii) any and all litigation claims,

Causes of Action, demands, suits, actions at law or equity and other legal, beneficial and equitable rights, claims or interests that the Debtor or Reorganized Debtor has or may have against any Entity.

2.49 "***Schedules***" shall mean the Schedules and Statement of Financial Affairs filed by the Debtor pursuant to Sections 521(1) and 1106(a)(2) of the Bankruptcy Code, as amended and supplemented.

2.50 "***Houston Roderman***" shall mean Houston Roderman, PLLC., the Debtor's present court-approved general bankruptcy counsel.

2.51 "*Unimpaired*" means, with respect to a Claim or Class of Claims, not "Impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

2.52 "***Unsecured Claim***" shall mean any Claim against the Debtor's Estate that is not an Administrative Claim, a Post-Confirmation Administrative Claim, a Priority Claim, a Secured Claim or a Priority Tax Claim.

B. **Interpretation; Application of Definitions and Rules of Construction.**

Any term used but not defined herein shall have the meaning given to it by the Bankruptcy Code or the Bankruptcy Rules, if used therein. The words "herein", "hereof", "hereunder" and other words of similar import refer to this Plan as a whole, not to a particular section, subsection, paragraph, subparagraph or clause, unless the context requires otherwise. Whenever it appears appropriate from the context, each term stated in the singular or the plural includes the singular and the plural, and each pronoun stated in the masculine, feminine or neuter includes the masculine, feminine and the neuter. All captions and headings to articles and paragraphs of the Plan are inserted for convenience and reference only and are not intended to be a part or to affect the interpretation of the Plan. Any rules of construction set forth in Section 102 of the Bankruptcy Code shall apply, unless superseded herein or in the Confirmation Order. In computing any period of time prescribed or allowed by this Plan, unless otherwise expressly provided, the provisions of the Bankruptcy Rule 9006(a) shall apply.

C. **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

## ARTICLE III.  BACKGROUND

This section provides a brief overview and history of the Debtor's business operations and summarizes the events leading up to the filing of the Chapter 11 Case and certain key events in the Chapter 11 Case.  Creditors and other parties-in-interest may disagree with statements contained in this section.  This section is for informational purposes only and shall not be deemed accurate or have preclusive effect in any future proceeding.

3.1    **Business/Corporate Overview.**

Founded in 2004, The Gateway Pundit (TGP) is an online news publication consisting of news, commentary and analysis.  Originally founded in 2004 as TheGatewayPundit/blogspot.com by Jim Hoft who is the Editor of TGP. At the time the site primarily wrote brief introductions and linked to other content producers serving as a hub for important current events in the political and media sphere. The site was established for readers tired of limited options and a politicized establishment media.  The first readers included Joe, Jim's twin brother, Midwest Engineer and Jim's mother … and it grew from there. In 2011, the website moved to its current location as www.thegatewaypundit.com.  TGP's audience grew rapidly and added additional writers to the staff. Today over 2.5 million unique readers every day visit TGP.  Editorially, The Gateway Pundit espouses politically conservative world view that support conservative positions on most issues, including abortion, national defense, small government, second amendment rights, tax policy, individual freedom and Constitutional values.

In November 2013, the business became owned by TGP Communications, LLC and from that date forward continued its Business under this corporate ownership.

3.2    **The Debtor's Capital Structure.**

A.    **Secured Debt.**  The Debtor does not have any secured creditors.

B.    **Unsecured Debt.**  As of the Petition Date, the Debtor disclosed $102,596.00 in aggregate liquidated unsecured debts.  An additional amount of $250.00 was claimed in timely proof of claims. Several claims were filed after the Bar Date totaling $ 172,527.00. The late filed claims may be duplicative of the Schedule

As of the Bar Date, three (3) claims for unliquidated unsecured debt claims have been filed in the total amount of "unknown".

C.    **Equity.**  All of the equity, otherwise known as the membership interest, in the Debtor is owned by James Hoft.

3.3    **Events Leading to Chapter 11 Case.**

Shortly after the 2020 National Election, the Debtor published and proclaimed opinion and information concerning voter fraud and other acts of election interference resulting in the election of Joe Biden as the 46th President.

Among the information published in opinion and editorial content, was the allegations concerning Eric Coomer, the Director of Security for Dominion Voting Systems. On December 22, 2020, Eric Coomer filed a civil action against the Debtor, Jim Hoft, and various other defendants in District Court, Denver County, Colorado (the "Colorado Litigation"). In the Colorado Litigation, Eric Coomer seeks damages for alleged defamation, intentional infliction of emotional distress, and civil conspiracy, along with a preliminary and permanent injunction, and

a demand for retraction in connection with statements made by the Debtor about Eric. Coomer in connection with the 2020 election.

In addition, the Debtor published and echoed allegations made concerning two (2) election workers Ruby Freeman and Wandrea Arshaye Moss in Georgia and asserted that these two individuals were involved in voter fraud. These allegations were echoed throughout the right-wing conservative outlets and echoed by former President, Donald Trump and former New York Mayor, Rudy Giuliani. On December 2, 2021, Ruby Freeman and Wandrea Arshaye Moss (the "Freeman Plaintiffs") initiated litigation against the Debtor in the St. Louis Missouri Circuit Court (the "Missouri Litigation"). In the Missouri Litigation, the Freeman Plaintiffs seek damages for alleged defamation and the intentional infliction of emotional distress in connection with statements made by the Debtor about the Freeman Plaintiffs in connection with the 2020 presidential election.

The Colorado Litigation and the Missouri Litigation (collectively, the "Pre-Petition Litigations") are covered under the Debtor's Media Liability insurance policy (the "Policy") with a limit of two ($2,000,000) million dollars. The Policy is a wasting policy as the limit of coverage includes defense costs that are incurred during the course of defensing the Debtor on the Pre-Petition Litigations. There remains approximately $1.3 million of coverage under the Policy as of the Petition Date.

The combined cost (diminution of policy limits) of the Pre-Petition Litigations together with the distractions  cause by multi district litigations have contributed to the Debtor's decision to file this Chapter 11 bankruptcy case.

### 3.4 Overview of Chapter 11 Case.

On April 24, 2024, the Debtor filed its Voluntary Petition under Chapter 11, Subchapter of the Bankruptcy Code.  The Debtor believed that the Chapter 11 process would allow the liquidation of its unliquidated unsecured debt and allow those debts to be treated in such a manner as to allow the continuation and reorganization of its Business.

On April 25, 2024, the Office of the United States Trustee (UST) appointed Linda Leali, Esq. of Linda Leali P.A, as subchapter V trustee in the Debtor's Chapter 11 Case. [ECF No. 6]. The Debtor continues to manage its assets as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

On May 30, 2024,  the UST commenced the meeting of creditors as mandated by Section 341 of the United States Bankruptcy Code (the "Bankruptcy Code").  The creditors meeting was continued and re-commenced on June 6, 2024 and June 18, 2024.  The Creditors meeting was concluded on June 18, 2024.

On April 30, 2024, the Debtor filed its Application for Authorization to Employ and Retain Houston Roderman, PLLC as Bankruptcy Counsel for Debtor-In-Possession. [ECF No. 14].  On _____, the Bankruptcy Court entered its Order approving the retention. [ECF No. __ ]

On May 21, 2024, the Debtor filed its Motion for entry of an order Authorizing the Debtor to Suppress Personally Identifiable Information for Certain Individual Creditors. [ECF No. 26]. On June 24, 2024, the Bankruptcy Court entered its Order deferring ruling on the Motion the for further argument on June 27, 2024. [ECF No. 77] Prior to the June 27th hearing, the UST filed its Motion seeking to continue the hearing was granted by Order dated July 3, 2024 [ECF No. 85].

On May 31, 2024, the Freeman Plaintiffs filed their Motion For An Order Dismissing The Debtor's Chapter 11 Case Under Sections 1112(B) And 305(A) Of The Bankruptcy Code Or, In The Alternative, Modifying The Automatic Stay To Continue Prepetition Litigation (the "Motion to Dismiss Bankruptcy Case"). [ECF No. 39]. On June 8, 2024, Eric Coomer filed his Joinder to the Motion to Dismiss Bankruptcy Case. [ECF No. 57]. Thereafter, the Debtor filed its Response [ECF No. 71] and the moving parties filed their Replies [ECF No. 79, 81]. On June 27, 2024, the Court heard oral arguments on the Motion to Dismiss the Bankruptcy Case and considered the arguments by the Pre-petition Litigation creditors in support and the Debtor's response in opposition to the Motion. The Court took the matter under advisement and scheduled another hearing for August 2, 2024.

### 3.8 Claims Reconciliation Process.

The Bankruptcy Court has established the Claims Bar Date deadline as July 3, 2024 requiring any person or entities holding or asserting a pre-petition claim against the Debtor to file a written proof of claim with the Bankruptcy Court. The Debtor has assessed the Claims filed as of Claims Bar Date and is expected to file objections to claims prior to the Confirmation Hearing. Any person or entity (other than governmental unit and professionals retained in the Chapter 11 Case) that failed to timely file a proof of claim may be forever barred, estopped and enjoined from voting on, or receiving disbursement under the Plan and may be forever barred, estopped and enjoined from asserting a claim against the Debtor.

## ARTICLE IV.  ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

### 4.1    *Administrative Expense Claims.*

Administrative Expense Claims include any right to payment constituting a cost or expense of administration of the Chapter 11 Case of a kind specified under Section 503(b) of the Bankruptcy Code and entitled to priority under Sections 507(a)(1), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtor's Estate, any indebtedness or obligations incurred or assumed by the Debtor in connection with the conduct of its business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, all compensation and reimbursement of expenses to the extent awarded by the Bankruptcy Court under Sections 330, 331, or 503 of the Bankruptcy Code, and any fees or charges assessed against the Debtor under 1930 of Chapter 123 of Title 28 of the United States Code.

Each holder of an Allowed Administrative Expense Claims against the Estate shall be paid one hundred percent (100%) of their Allowed Administrative Expense Claims in Cash from the

Debtor, unless otherwise ordered by the Bankruptcy Court, on the later of: (i) the Effective Date or the date of a Final Order allowing such Administrative Claim becomes an Allowed Expense Administrative Claim; or (ii) for liabilities incurred by the Debtor in the ordinary course during this Chapter 11 Case, the date on which each such Claim becomes due in the ordinary course and in accordance with the terms and conditions of any agreement relating thereto; or (iii) upon such other dates and terms as may be agreed upon by the holder of any such Allowed Administrative Expense Claim and the Debtor.

The Debtor's Counsel received a fee retainer in the amount of $50,000.00 and cost retainer of $7,500.00. Much of the fee retainer was consumed prior to the Petition Date for pre-filing matters. At this point, and presuming moderately aggressive resistance to the conformation of the Plan by the Pre-petition Litigation Creditors, additional fees due at confirmation are estimated to be less than $100,000.00

### 4.2 *Priority Tax Claims.*

Upon the later of the Effective Date or the date upon which such Priority Tax Claim is Allowed, each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim or (ii) such other treatment as to which the Debtor and such Holder have agreed upon.

The Internal Revenue Service has filed a timely proof of claim for unpaid employment taxes totaling $16,303.02.

### ARTICLE V. CLASSIFICATION OF CLAIMS

### 5.1 *Classification in General.*

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims. A Claim is placed in a particular Class only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled or paid prior to the Effective Date. In accordance with Sections 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in Sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code have not been classified, are deemed not to be Impaired and are treated as set forth in Article II above.

### 5.2 *Summary of Classification.*

The following table designates the Classes of Claims against the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with Section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | General Unsecured Claims | Impaired | Yes |
| 2 | Equity Interests | Unimpaired | No |

### 5.3 *Special Provision Governing Unimpaired Claims.*

Nothing under the Plan shall affect the rights of the Debtor, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 5.4 *Confirmation Pursuant to Sections 1191(b) of the Bankruptcy Code.*

The Debtor reserves the right to modify the Plan to the extent, if any, that Confirmation pursuant to Section 1191(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims.

## ARTICLE VI.  TREATMENT OF CLAIMS

### 6.1 *General Unsecured Claims (Class 1)*

*Classification*: Class 1 consists of holders of Allowed General Unsecured Claims

*Treatment:* Each holder of a Class 1 Allowed Claim shall receive pro rata payment from the Debtor's Projected Net Income from the Debtor's Business for a period of three (3) years. The first disbursement from the Debtor's Projected Net Income shall be made on the First Disbursement Date and on each Subsequent Disbursement Date thereafter.

*Voting:* Class 1 is Impaired, and holders of Allowed Unsecured Claims are entitled to vote to accept or reject the Plan pursuant to Section 1126(f) of the Bankruptcy Code.  Holders of Class 1 Claims are not expected to be paid in full; however, holders of Class 1 Claims are expected to receive a recovery under the Plan that exceeds the Debtor's liquidation value. Therefore, holders of Allowed Unsecured Claims are entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited.

### 6.2 *Equity Interests (Class 2)*

*Classification*: Class 2 consists of Existing Equity Interests by James Hoft.

*Treatment*: Class 2 consists of the holder of Existing Equity Interests against the Debtor. James Hoft is the sole member.  The Existing Equity Interest shall continue to be owned by James Hoft after Confirmation and is not impaired.

12

*Voting:* Class 2 is Unimpaired. Holders of Existing Equity Interests are conclusively deemed to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, holders of Existing Equity Interest are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Existing Equity Interests.

## ARTICLE VII. MEANS FOR IMPLEMENTATION

7.1 *Sources of Consideration for Plan Disbursements.*

The Plan shall fund disbursements and satisfy applicable Administrative Expense Claims, and Allowed Claims under the Plan using: (a) Cash on hand (Effective Date Payments); and (b) Cash from Projected Net Income (subject to the limitations set forth in the Plan).

The Debtor expects to utilize its cash on hand for payment of the Administrative Expense Claims or any other Effective Date payments.

The Debtor shall commit and disburse its Projected Disposable Income for the Three Year period of the Plan for payment of Allowed Unsecured Claims.

7.2 **Preservation of Causes of Action.**

**Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by order of the Bankruptcy Court, the Debtor reserves any and all Preserved Causes of Action.** No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action against them as any indication that the Debtor will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Date or Consummation. Prior to the Effective Date, the Debtor, and after the Effective Date, the Debtor shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except a provided in Section 9.7(g) of the Plan.

7.3 **Corporate Governance; Dissolution.**

On the Effective Date, all Estate Assets shall revest in the Debtor and the Debtor shall continue its business be dissolved without the necessity for any other or further actions to be taken by the Debtor or its member or any payments to be made in connection therewith. All managers of the Debtor shall remain vested with the same authority as existed prior to the Petition Date.

# ARTICLES VIII.  INTENTIONALLY OMITTED

# ARTICLES IX.  DISBURSEMENTS

7.4  *Disbursements.*

(a)  *Delivery of Disbursements*: Disbursements under the Plan shall be made by the Debtor to the holders of Allowed Claims in all Classes at the addresses set forth in the Schedules, unless such addresses are superseded by proofs of claims or transfers of claims filed pursuant to Bankruptcy Rule 3001.

(b)  *Disbursements of Cash*: Any payment by the Debtor pursuant to the terms of the Plan shall be made by check or wire transfer.

(c)  *Date of Disbursements:* Except as otherwise provided in the Plan, any Disbursement and deliveries to be made under the Plan shall be made on the Disbursement Dates or as otherwise determined in accordance with the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

(d)  *Unclaimed Disbursements of Cash*: Any disbursement of cash under the Plan that is unclaimed ninety (90) days after it has been delivered (or attempted to be delivered) shall be deposited with the Clerk of the Bankruptcy Court when the Debtor files the Final Report.

(e)  *Objections to and Resolution of Claims*: Prior to and following the Effective Date, the Debtor shall have the exclusive right to make and to file objections to, or otherwise contest the allowance of all Claims listed and/or filed in this case. Unless an order of the Court specifically provides for a later date, any party filing a proof of claim after the Bar Date shall be not be entitled to treatment as a Creditor with respect to such Claim. Moreover, the Debtor shall have the sole and exclusive authority to file, settle, compromise, withdraw, arbitrate or litigate to judgment Objections to Claims pursuant to applicable procedures established by the Bankruptcy Code, the Bankruptcy Rules and this Plan. Except with respect to Administrative Claims, Objections to Claims must be filed by the Claim Objection Deadline, as may be extended by the Bankruptcy Court from time to time. The Debtor shall retain all rights under 11 U.S.C. §502(d) of the Bankruptcy Code until the Plan is confirmed. Upon confirmation of the Plan, all such rights and interests with respect to Objections to Claims under 11 U.S.C. §502(d) of the Bankruptcy Code shall revest in the Debtor for all purposes. Nothing herein shall adversely effect, divest, nor be deemed a waiver of any right, claim or interest of the Debtor to file and prosecute any objection to claims

14

and/or to seek the disallowance of any Claim filed by any Creditor against the Debtor or the estate, under 11 U.S.C. §502(d) of the Bankruptcy Code prior to and following the Effective Date of the Plan. The Debtor shall be responsible for payment of professional fees and costs associated with prosecuting the Objections to Claims following the Effective Date.

## ARTICLE X.   CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN

### 10.1   Conditions Precedent to Effective Date.

The following are conditions precedent to the occurrence of the Effective Date of the Plan:

   (a)   The Confirmation Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtor, be in full force and effect and not be subject to any stay or injunction; and

   (b)   All actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

### 10.2   Waiver of Condition Precedent.

Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

### 10.3   Effect of Failure of a Condition.

If the conditions listed in Section 10.1 of the Plan are not satisfied or waived in accordance with Section 10.2 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects.

## ARTICLE XI.   EFFECT OF CONFIRMATION OF PLAN

### 11.1   Vesting of Property of the Estate.

The Assets of the Debtor shall consist of all property of the Estate as defined in Section 541 of the Bankruptcy Code, including without limitation, the following: (i) all legal or equitable interests of the Debtor in any and all real or personal property of any nature, together with any real estate, buildings, structures, improvements, privileges, rights, easements, leases, subleases, licenses acquired by the Debtor pre-petition, materials, supplies, furniture, fixtures equipment, and any general tangibles and intangibles, and the proceeds, product, offspring, rents or profits thereof; and (ii) any and all litigation claims, Causes of Action, demands, suits, actions at law or equity and

other legal, beneficial and equitable rights, claims or interests that the Debtor has or may have against any Entity as of the Effective Date. On the Effective Date, all of the Debtor's Assets shall revest in, and be retained free and clear of all liens, claims, encumbrances and interests of any kind except as provided under the Plan.

### 11.2    Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and the respective interests in the Debtor's Assets and the respective Disbursements and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principals of equitable subordination, Section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to Section 510 of the Bankruptcy Code, the Debtor shall have the right to reclassify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.3    Binding Effect.

As of the Effective Date, the Plan shall bind all holders of Claims against and interest in the Debtor's Assets, notwithstanding whether any such holders were (i) Impaired or Unimpaired under the Plan; (ii) presumed to accept or deemed to reject the Plan; (iii) failed to vote to accept or reject the Plan; (iv) voted to reject the Plan; or (v) received any Disbursement under the Plan.

### 11.4    Closing of Chapter 11 Case.

After the Estate has been fully administered, the Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

### 11.5    Notice of Effective Date.

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtor shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 11.6    Term of Injunctions or Stays.

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under Section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

11.7    **Injunctions and Stays.**

(a)    **Upon entry of the Confirmation Order, all holders of Claims and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or interest in any or all of the Debtor's and/or Debtor's Assets (whether proof of such Claims or interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, with respect to such Claims and interests, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or any property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor or any property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor or any property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor or against any property or interest in property of the Debtor r; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(c)    **By accepting Disbursements pursuant to the Plan, each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented.**

11.8    **Solicitation of Plan.**

As of and subject to the occurrence of the Confirmation Date: (i) the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, Sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (ii) the Debtor and each of her professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan.

## ARTICLE XII.  RETENTION OF JURISDICTION

### 12.1    Retention of Jurisdiction.

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)     to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any administrative or priority Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b)     to hear and determine settlements and disputes with respect to any Assets, including the Causes of Action;

(c)     to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to professionals authorized pursuant to the Bankruptcy Code or the Plan;

(d)     to ensure that Disbursements to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan; enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan;

(e)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code) filed, or to be filed, with respect to tax returns of the Debtor for any and all taxable periods ending after the Petition Date through the Effective Date

(f)     to issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with consummation or enforcement of the Plan;

(g)     to determine any other matters that may arise in connection with or relate to the Plan, t the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan;

(h)     to enter an order or final decree concluding or closing the Chapter 11 Case;

(i)     to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(j) to determine requests for the payment of Claims entitled to priority pursuant to Section 507 of the Bankruptcy Code;

(k) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed or deemed executed in connection with the Plan;

(l) to hear and determine all disputes involving the existence, nature, scope or enforcement of any discharges, injunctions, and releases granted in the Plan;

(m) to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(n) to enforce all orders previously entered by the Bankruptcy Court; and

(o) to hear any other matter not inconsistent with the Bankruptcy Code.

### 12.2 Courts of Competent Jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIII. MISCELLANEOUS PROVISIONS

### 13.1 Substantial Consummation of the Plan.

On the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

### 13.2 Plan Modifications.

Subject to the limitations contained in the Plan the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy Section 1129(b) of the Bankruptcy Code; and after the entry of the Confirmation Order, the Debtor, as the case may be, may amend or modify the Plan, in accordance with Section 1126(b) of the Bankruptcy Code.

### 13.3 Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflict of laws thereof.

13.4 **Time**.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

13.5 **Dates of Actions to Implement the Plan.**

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

13.6 **Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganized Debtor, the holder of Claims, and each of their respective successors and assigns.

13.7 **Deemed Acts.**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

13.8 **Filing of Final Report.**

Notwithstanding anything to the contrary in the Bankruptcy Rules providing for earlier closure of the Chapter 11 Case, when all Disputed Claims against the Debtor have become Allowed Claims or have been disallowed by Final Order, and Assets have been liquidated and converted into Cash, and such Cash has been distributed in accordance with the Plan, the Debtor shall file a final accounting with the Bankruptcy Court, together with a final report, and shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

13.9 **Notices**.

All notices, requests, and demands to or upon the Debtor, to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received and telephonically confirmed, addressed as follows:

**Bart A. Houston, Esq.**
**Houston Roderman PLLC**
633 South Andrews Avenue
Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 900-2615
Facsimile: (954) 839-9068
bhouston@houstonroderman.com
dschena@houstonroderman.com

Dated: July 23, 2024

**Respectfully Submitted:**

| | |
|---|---|
| **Houston Roderman PLLC** | **TGP Communications, LLC** |
| Counsel for the Debtor | |
| 633 South Andrews Avenue | ___/s James Holt, Mgr.___ |
| Suite 500 | By: _James Holt_ |
| Fort Lauderdale, Florida 33301 | Its: _Manager_ |
| Telephone: (954) 900-2615 | |
| Facsimile: (954) 839-9068 | |
| bhouston@houstonroderman.com | |
| dschena@houstonroderman.com | |

# EXHIBIT "A"

Projection of Disposable Income
Three (3) Year Period

**TGP Communications, LLC**
**Projected Net Income**
For Three Year Period Beginning September 1, 2024

| | Eff. Date | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Jul-25 | Aug-25 | Year One Total | Year Two Total | Year Three Total | Total Unsecured Payments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Starting Cash: | 200,000.00 | | | | | | | | | | | | | | | | |
| **A. Revenue** | | | | | | | | | | | | | | | | | |
| Operating Revenue | | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 2,940,000.00 | 2,940,000.00 | 2,940,000.00 | |
| **Total Revenue:** | | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 245,000.00 | 2,940,000.00 | 2,940,000.00 | 2,940,000.00 | |
| **B. Expenses** | | | | | | | | | | | | | | | | | |
| Payroll & related expense | | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 82,500.00 | 990,000.00 | 990,000.00 | 990,000.00 | |
| Advertising | | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 137.00 | 1,644.00 | 1,644.00 | 1,644.00 | |
| Bank | | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 1,672.00 | 20,064.00 | 20,064.00 | 20,064.00 | |
| Contractors (Writers, etc) | | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 16,000.00 | 192,000.00 | 192,000.00 | 192,000.00 | |
| Insurance | | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 43,368.00 | 520,416.00 | 520,416.00 | 520,416.00 | |
| Information Technology | | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 5,600.00 | 67,200.00 | 67,200.00 | 67,200.00 | |
| Office | | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 550.00 | 6,600.00 | 6,600.00 | 6,600.00 | |
| Legal Fees & Expense | | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 25,000.00 | 300,000.00 | 300,000.00 | 300,000.00 | |
| Accounting Fees | | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 9,500.00 | 114,000.00 | 114,000.00 | 114,000.00 | |
| Travel Expense | | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 4,100.00 | 49,200.00 | 49,200.00 | 49,200.00 | |
| Telephone/Utilities | | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 3,000.00 | 3,000.00 | 3,000.00 | |
| Misc. Expenses | | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | |
| **Total expenses:** | | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 190,677.00 | 2,288,124.00 | 2,288,124.00 | 2,288,124.00 | |
| **C. Projected Disposable Income** | | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 54,323.00 | 651,876.00 | 651,876.00 | 651,876.00 | |
| **D. Plan Payments** | | | | | | | | | | | | | | | | | |
| General Unsecured Plan Payments | | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $54,323 | $651,876 | $651,876 | $651,876 | $1,955,628 |
| **E. Effective Date Payments** | | | | | | | | | | | | | | | | | |
| Administrative Expenses | 85,000.00 | | | | | | | | | | | | | | | | |
| Internal Revenue Service | 16,303.02 | | | | | | | | | | | | | | | | |
| | 101,303.02 | | | | | | | | | | | | | | | | |

# EXHIBIT "B"

**LIQUIDATION ANALYSIS**

**TGP Communications, LLC**
**Liquidation Analysis**
   as of July 2024

|  | Valuation | Adjustment | Liquidation Values |
|---|---|---|---|
| **ASSETS** |  |  |  |
| Cash | 84,000.00 |  | 84,000.00 |
| Investment Account (Schwab) | 270,000.00 |  | 270,000.00 |
|  |  |  |  |
| **Other Current Assets** |  |  |  |
| Loan Receivable - Jim Hoft | 799,860.00 |  | 799,860.00 |
| Loan Receivable - Joe Hoft | 21,000.00 | (21,000.00) [1] | - |
| Due from Justice League | 150,000.00 | (150,000.00) [2] | - |
| Misc Accounts | 40,000.00 |  | 40,000.00 |
| Intellectual Property | - |  | - |
| **Fixed Assets** |  |  |  |
| Vehicle (Porsche) | 88,000.00 | (52,000.00) [3] | 36,000.00 |
|  |  |  | - |
|  | 1,452,860.00 | (223,000.00) | **1,229,860.00** |
|  |  |  |  |
| **LIQUIDATION EXPENSE** |  |  |  |
| Chapter 7 Trustee | 36,895.80 |  |  |
| Admin Expenses | 100,000.00 |  |  |
|  | **136,895.80** |  |  |

**1,092,964.20**

[1]. Likley uncollectible. No source documents or other evidence of indebtedness or initial advance of funds.

[2]. Likely uncollectible.  Justice League is largely funded by TGP and advances other TGP causes and projects.
Liquidation of TGP would eliminate funding and donations would cease if there are no additional projects to pursue

[3]. Accumulated depreciation.



**ORDERED in the Southern District of Florida on July 24, 2024.**

**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                            Chapter 11

TGP Communications, LLC,                          Case No. 24-13938-MAM

      Debtor.

_____/

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION TO DISMISS CHAPTER 11 CASE**
**UNER SECTIONS 1112(b) AND 305(a) OF THE BANKRUPTCY CODE AND**
**CANCELLING HEARING**

Whether a bankruptcy case succeeds or fails depends on many factors, but two things must exist for the process to function as Congress intended: transparency and good faith.

Article I, Section 8, Clause 4 of the United States Constitution grants Congress power to enact uniform laws governing bankruptcies. Those laws, which have become the bedrock upon which bankruptcy courts grant relief, require unflinching disclosure

of identity, obligations, ownership, and other relevant facts in exchange for freedom from debt. Most debtors find that to be a fair trade.

In this unusual bankruptcy case, truth is at the center of all disputes. Lack of truthful disclosure, theories based upon half-truths, claims for which truth could provide a defense—all possibilities are on display. Litigation about truth pushed the debtor to file bankruptcy, but that unusual twist does not alter the Court's duty to remain focused on bankruptcy issues.

This Court's only task in this case is to determine whether the debtor, a business entity wholly owned and run by one person, has demonstrated a valid reorganizational purpose for chapter 11 bankruptcy motivated by good faith intent. The answer, in short, is no, it has not.

## BACKGROUND[1]

The debtor, TGP Communications, LLC ("<u>TGP</u>"), is a limited liability corporation owned by James Hoft ("<u>Hoft</u>"). Hoft formed TGP to run a website featuring politically charged articles. That website is named The Gateway Pundit.

### A. <u>The Gateway Pundit and TGP</u>

Hoft started The Gateway Pundit years ago, before the creation of TGP as a business entity. Originally, The Gateway Pundit was, as Hoft described it, a hobby. Over time, Hoft cultivated an audience of dedicated readers for The Gateway Pundit.

---

[1] In addition to their attendance at an evidentiary hearing on June 27, 2024, the parties submitted a Joint Stipulation of Facts (DE 80) that greatly aided the Court's understanding of material facts. The parties also supplied copies of the transcript for TGP's meeting of creditors pursuant to 11 U.S.C. § 341 (the "<u>341 Meeting</u>"). ECF Nos. 76-19 and 76-20. The United States Trustee conducted the 341 Meeting under oath, as is typical.

In 2012, Hoft decided to formalize his ownership of The Gateway Pundit through formation of TGP as a limited liability business entity.[2]

Hoft remains TGP's sole owner and only employee.[3] He originally formed TGP and registered it to do business in the state of Missouri, where he owns a home. Hoft still spends a fair amount of time in St. Louis but decided in 2021 that he preferred to spend at least part of the year in Florida. That decision led Hoft to buy, using TGP's funds, an oceanfront condo in Jensen Beach, Florida.[4] The condo is titled in the name of 2021 Main Street LLC, a Missouri limited liability company, which is solely owned by Hoft.

At some point after that, Hoft began conducting TGP's operations in Florida. According to TGP's Statement of Financial Affairs, TGP started doing business in Florida sometime in October 2021.[5] For reasons Hoft was unable to articulate, TGP did not register to do business in the state of Florida until one week before the filing of this bankruptcy case. Taking Hoft's sworn testimony at face value, TGP has been

---

[2] Hoft owns 100% of the equity of TGP. TGP's primary asset is the website known as The Gateway Pundit, along with title to a Porsche that Hoft drives and garages at his residence in St. Louis.

[3] Hoft's twin brother, Joe Hoft, has served as a contract employee and Hoft's husband, Jezreel Morano, provides digital marketing services in exchange for regular monthly income. Hoft testified that neither his brother nor his husband were regular employees.

[4] TGP disclosed, via Hoft's testimony, that Hoft used TGP's funds to purchase the condo pursuant to an undocumented, interest-free loan. There are no business terms to disclose because no loan documents exist. The majority of TGP's revenue seems to derive from ad revenue and reader donations, which are openly solicited on The Gateway Pundit website. See https://www.thegatewaypundit.com/ (lateral menu tab titled "How to Help", with dropdown tab labeled "Support TGP with a donation").

[5] ECF No. 34, pdf p. 19 (Official Form 207, Part 7, Previous Addresses). TGP's Application by Foreign Limited Liability Company for Authorization to Transact Business in Florida identifies the date as November 1, 2021. ECF No. 50, at pdf p. 127 (Exhibit B).

doing business in the state of Florida for approximately 3 years without a local business license.[6]

### B. <u>The Articles and Media Insurance Policy</u>

About a year before Hoft's purchase of the Jensen Beach condo, The Gateway Pundit published a series of articles (the "<u>Articles</u>") about the 2020 presidential election. Those Articles included titles like "BREAKING: CROOKED GEORGIA ELECTIONS SUPERVISOR Filmed Pulling Out Suitcases of Ballots from Beneath Table IS IDENTIFIED — IT'S RUBY'S DAUGHTER! (Video)" and "HUGE! Video Footage From Georgia Shows Suitcases Filled with Ballots Pulled From Under Table AFTER Supervisor Told GOP Poll Workers to Leave Tabulation Center".[7] The Articles include a series of stories published by TGP focusing on the former director of product strategy and security for Dominion Voting Systems. *See, e.g.,* "Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath – His Internet Profile is Being Deleted and Erased."[8]

Publication of the Articles ultimately led to state court complaints being filed in Missouri and Colorado against Hoft and TGP for defamation and other intentional torts.[9] Hoft admits that the defense of those lawsuits pushed TGP to seek bankruptcy

---

[6] It is possible that TGP owes back taxes due to its failure to timely disclose its status as a foreign entity conducting business within the state of. Florida.

[7] *See* https://www.thegatewaypundit.com/2020/12/breaking-crooked-elections-superviser-filmed-pulling-suitcases-ballots/ and https://www.thegatewaypundit.com/2020/12/video-footage-georgia-shows-suitcases-filled-ballots-pulled-table-supervisor-told-gop-poll-workers-leave-tabulation-center/.

[8] *See* https://www.thegatewaypundit.com/2020/11/denver-business-owner-dominions-eric-coomer-unhinged-sociopath-internet-profile-deleted-erased-audio/.

[9] The Dismissal Motion (ECF No. 39, defined later in this Opinion) refers to litigation in Georgia on pages 2 and 11-12. The defined term "Georgia Litigation" is described in footnote 5 of the Dismissal

relief and argues that rapid depletion of benefits payable under media insurance coverage to pay TGP's legal fees could eventually harm TGP and its creditors. That prospect is the stated motivation for bankruptcy relief, as TGP is currently able to pay its operating debts in the ordinary course of its business.

Creditors Ruby Freeman ("Freeman"), Wandrea' Arshaye Moss ("Moss"), and Dr. Eric Coomer ("Coomer") dismiss the availability of insurance funds as ancillary to their fight for justice. They contend that policy limits should not be the only issue considered, and urge the Court to look at the whole picture, assessing good faith from a broader perspective. Freeman, Moss, and Coomer believe that TGP's schedules, statements of financial affairs, and actions to date, including TGP's request to evade typical bankruptcy disclosure, reflect the use of bankruptcy as a pure litigation tactic.

No other creditor has voiced an opinion regarding the relative importance of the media insurance policy (the "Policy"), which is perhaps to be expected given the composition of the creditor body. Besides the IRS and a modest amount of trade claimants, other scheduled creditors with sizeable claims include Hoft's husband, Jezreel ("Jez") Morano, law firms hired to represent TGP's (and presumably Hoft's) interests, and various contract writers who produced articles about the 2020 election (all of whom wish to remain anonymous in this bankruptcy case).[10] Recently, five

---

Motion as an action brought by the defendants in the Missouri litigation seeking the issuance of third-party subpoenas from the Superior Court of Fulton County based on letters rogatory issued by the Missouri state court.

[10] ECF No. 26 (motion to approve concealing writers' names and identifying personal information from public view). TGP made this request despite having published personal identifiable information, including home addresses, of the State Court Plaintiffs.

other creditors filed proofs of claim alleging (without any supporting documentation) damages owed for copyright infringement.[11]

### C. TGP's Assets

TGP's assets are eye-catching. TGP purchased and holds title to a 2021 Porsche Cayenne that Hoft drives and garages at his home in St. Louis. Although TGP's schedules describe investment accounts holding over a million dollars in funds, Hoft testified that he considers those funds to be his personal retirement savings. Indeed, in TGP's recently filed Chapter 11 Subchapter V Plan of Reorganization (ECF No. 93) (the "Plan"), the Liquidation Analysis attached as Exhibit B indicates that TGP proposes to realize only $270,000 from the Schwab investment accounts to pay creditors.[12]

TGP has consolidated its existing revenue into one postpetition bank account with a sizeable balance. For a period of time, at least some (and potentially all) donations flowing from links posted on The Gateway Pundit website were directed to an account held by another entity that Hoft owns and controls, the Justice League of America ("Justice League").[13]

---

[11] Proofs of Claim Nos. 6-11. Sanders Law Group filed these claims. None of the claims contains information for the claimant beyond a name, nor do they include a final judgment or complaint.

[12] Although personal retirement accounts are generally exempt in a personal bankruptcy, this is a business entity case and the accounts are described on schedules and statements as assets of TGP's bankruptcy estate. ECF No. 34.

[13] When the Court began preparing this Opinion in early July 2024, The Gateway Pundit website directed reader donation funds to Justice League. Since that time, The Gateway Pundit website has been edited to indicate that donations may be sent to TGP at a post office box in Jensen Beach. That street address, 1820 NE Jensen Beach Blvd. "Unit" 1120, is for a "Mail Box Plus" location. See https://www.jensenbeachshipping.com/; see also ECF No. 79-19, pdf p. 8 (transcript p. 25 at lines 1-14).

TGP holds a small amount of cryptocurrency. TGP also has the ability to call almost $1,000,000 in loans to Hoft, his brother, and Justice League.[14] Intellectual property, including article rights, websites, and internet domain names, comprise the bulk of TGP's other assets.[15] And, of course, TGP may draw on the Policy as needed for legal fees, up to the coverage limits.

TGP's known, easily reachable assets are over 22 times greater than its liabilities. The total amount of TGP's scheduled liabilities are only 4% of the value of its assets.[16] These figures exclude the potential value of intellectual property rights, which TGP disputes have any value on the open market.[17]

TGP may have other bankruptcy assets as well in the form of preference payments. Within the 90 days prior to the petition date of its bankruptcy filing, TGP transferred $95,000 to Justice League (an entity wholly owned by Hoft), $27,000 to Orchid Grove Media, $17,714.64 to Conradson Rentals, $30,125.09 to O'Malley

---

Justice League continues to maintain a donation page at GiveSendGo to pay for unspecified legal fees. See https://www.givesendgo.com/G2HD4. That website contains the following copy: "The Justice League was created to defend The Gateway Pundit against First Amendment assaults on our business and free speech. Please consider donating to help with expenses incurred from the numerous legal battles we are constantly facing."

[14] ECF No. 34, at pdf p. 11. In the Liquidation Analysis attached to the Plan, TGP has projected that it could recover $799,860 from Hoft, but indicated that the obligations due from Joe Hoft and the Justice League are likely uncollectible. ECF No. 93, at p. 30. That statement directly contradicts the Amended Schedules, which were filed under penalty of perjury. *See* ECF No. 34, pdf p. 11, at question 71 (Continuation Sheet) (describing doubtful or uncollectible amount as "$0.00").

[15] The Liquidation Analysis attached to the Plan reflects that TGP's intellectual property has no liquidation value. ECF No. 93, at p. 30.

[16] ECF No. 34, at pdf p. 1. Scheduled assets are valued at $2,323,996.76, while scheduled claims are reflected as being in the amount of $102,596.61.

[17] TGP listed extensive intellectual property rights on its schedules with an "unknown" value. ECF No. 34.

McCulloch LLC, and $13,477.73 to Slightly Offensive Inc. These amounts do not include transfers to Hoft, his husband (Jezreel Morano), or various contract writers (all identified by "Doe" pseudonyms).[18]

It is unclear whether and to what extent TGP has any insider preference claims. TGP did not disclose any transfers to Hoft or Justice League in the one year prior to bankruptcy in the appropriate line for doing so on TGP's Statement of Financial Affairs (Part 2, Question 4).[19]

## DISMISSAL ARGUMENTS

Freeman and Moss sought dismissal of TGP's bankruptcy case pursuant to Bankruptcy Code §§ 1112(b) and 305(a) or, alternatively, relief from the automatic stay to continue litigation in Missouri and Georgia. ECF No. 39 (the "Dismissal Motion"). Coomer joined in the request for dismissal and likewise alternatively sought stay relief to continue litigation in Colorado. ECF No. 57 (the "Joinder").[20]

Freeman, Moss, and Coomer (all collectively, the "State Court Plaintiffs") have strong personal reasons for seeking dismissal to continue litigation (all state court cases combined, the "State Court Litigation"). The Dismissal Motion and Joinder describe terrifying attacks directed at the State Court Plaintiffs following The

---

[18] ECF No. 34, pdf. p. 28 (Continuation Sheet for Official Form 207).

[19] This statement conflicts with disclosure in the question immediately prior (Part 2, Question 3), as well as Hoft's sworn testimony. ECF No. 76-20, pdf p. 46 at lines 6-15) (Hoft is TGP's only employee).

[20] Because the Joinder adopts all arguments made in the Dismissal Motion, the Court will address all requests for relief in the same discussion.

Gateway Pundit's publication of the Articles, which accuse them of tampering with the 2020 presidential election results.

Several reputable sources debunk The Gateway Pundit's version of election events, but Hoft stands by their accuracy. In an evidentiary hearing before this Court on June 27, 2024 (the "Hearing"), TGP continued to assert that The Gateway Pundit "broke" the stories told in the Articles and it has been beleaguered ever since.

Even though the parties' positions regarding the Articles dominate the narrative about dismissal, the Court's task is not to evaluate the truthfulness of the Articles or the viability of the State Court Litigation. Instead, the Court considers the purpose of chapter 11 as part of the Bankruptcy Code and TGP's demonstration of good faith (or lack thereof) in seeking to use it.

## LEGAL STANDARDS

### A. Section 305(a)(1)

Section 305(a)(1) of the Bankruptcy Code is not a typical basis for dismissal of a chapter 11 case. It permits dismissal or suspension of all proceedings at any time if the best interests of the debtor and creditors would be better served by doing so. 11 U.S.C. § 305(a)(1). The authority granted under the statute is extraordinary, prompting courts to approach it with caution. *In re First Fin. Enters., Inc.,* 99 B.R. 751, 754 (Bankr. W.D. Tex. 1989) ("Since the decision to abstain under section 305(a) is not reviewable by appeal or otherwise, it is certainly an extraordinary power which should be exercised sparingly and only in unusual circumstances.") (internal

citations and quotation marks omitted).

Abstention or dismissal makes sense where a debtor attempts to circumvent the Bankruptcy Code "by doing indirectly what cannot be done directly," including filing bankruptcy purely as a litigation strategy. *Id.* It also makes sense when an entity that is otherwise ineligible for bankruptcy relief seeks to backdoor its way into bankruptcy protection. *Id.* at 755-56. Courts may likewise permit abstention or dismissal under § 305(a) when litigation is already well underway in another forum and that forum is available to determine the parties' interests. *Passavant Mem'l Homes v. Laurel Highlands Foundation, Inc. (In re Laurel Highlands Foundation, Inc.)*, 473 B.R. 641, 654 (Bankr. W.D. Pa. 2012).

### B. Section 1112(b)

Bankruptcy Code § 1112 provides that a court may dismiss a bankruptcy case for cause on request of a party in interest, and after notice and a hearing. 11 U.S.C. § 1112. Subsection 1112(b)(4) provides a list of sixteen factors that may constitute "cause":

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B) gross mismanagement of the estate;
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E) failure to comply with an order of the court;
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
> (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

10

(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K) failure to pay any fees or charges required under chapter 123 of title 28;

(L) revocation of an order of confirmation under section 1144;

(M) inability to effectuate substantial consummation of a confirmed plan;

(N) material default by the debtor with respect to a confirmed plan;

(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

The list is not exclusive and most courts agree that a case may also be dismissed if it was not filed in good faith. *In re Aearo Techs.* LLC, Case No. 22-02890-JJG-11, 2023 WL 3938436, at *9 (Bankr. S.D. Ind. June 9, 2023). As with all good faith or bad faith determinations, the protocol for analysis is difficult to pin down because, to put it simply, facts matter.

The leading case on dismissal of a chapter 11 case in this Circuit, *In re Phoenix Piccadilly, Ltd.*, describes the existence of the following factors as indicative of a bad faith chapter 11 filing:

(i) The debtor has only one asset, the property, in which it does not hold legal title;

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii) The debtor has few employees;

(iv) The property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The debtor's financial problems involve essentially a dispute between the debtor and its secured creditors which can be resolved in a pending state court action; and

11

(vi) The timing of the bankruptcy filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

849 F.2d 1393, 1394-95 (11th Cir. 1988).[21] *Phoenix Piccadilly* did not restrict the parameters of good faith to the above metrics and encouraged bankruptcy courts to consider any factors that evidence "an intent to abuse the judicial process and the purposes of the reorganization provisions." *Id.* (internal citation omitted).

That type of thought process has led some courts to adopt a multi-factor test to analyze whether a petition was filed in good faith. *Aearo Techs.*, 2023 WL 3938426, at *12-14. Other courts have elected to focus on whether a chapter 11 case serves a "valid reorganizational purpose". *Id.* at *14. The "purpose" line of inquiry requires an appreciation of what, precisely, constitutes a valid reorganizational purpose, which is yet another difficult-to-pin-down topic. *Id.* at 15.

The United States Supreme Court has offered some guidance on that point through description of valid bankruptcy goals. Two well-accepted objectives of the bankruptcy process are (i) preserving going concerns, and (ii) maximizing property available to satisfy creditors. *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 No. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999). Those goals are important touchstones, but the inquiry for good faith runs deeper.

Implicit in any good faith analysis is the question of whether the bankruptcy filing masks other, less savory, aims. In addition to advancing a valid bankruptcy purpose, courts consider whether the debtor filed a bankruptcy case merely to obtain

---

[21] The full case name is *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.).*

a tactical advantage. *LTL Mgmt. v. Official Comm. of Talc Claimants (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100-01 (3d Cir. 2023) (internal citations omitted). Another key inflection point is whether the debtor exhibits financial distress that is curable through the bankruptcy process. *Id.* at 101-04.

The synthesis of these divergent but complementary standards makes a complex question even more difficult. The Court issues this Opinion to pull together the threads of binding precedent in this Circuit while thoughtfully weighing all persuasive case law regardless of origin. At its core, the question of good faith is an equitable one, and facts will always make a difference.

## ANALYSIS

The Court begins its analysis with § 1112(b) and the factors listed in *Phoenix Piccadilly* because that case is binding precedent within our Circuit.

### A.    Application of Phoenix Piccadilly

*Phoenix Piccadilly* lists six factors for dismissal analysis under § 1112(b):

(i) The debtor has only one asset, the property, in which it does not hold legal title;

(ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

(iii) The debtor has few employees;

(iv) The property is the subject of a foreclosure action as a result of arrearages on the debt;

(v) The debtor's financial problems involve essentially a dispute between the debtor and its secured creditors which can be resolved in a pending state court action; and

(vi) The timing of the bankruptcy filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

*Phoenix Piccadilly,* at 1394-95.

Factual distinctions prevent meaningful application of the *Phoenix Piccadilly* factors to this bankruptcy case. Only two of the *Phoenix Piccadilly* factors are present, namely: few employees and potential use of bankruptcy as a litigation strategy.[22] The paucity of other factors does not mean, however, that good faith is present. None of the other *Phoenix Piccadilly* factors exist because the factual predicate for each one does not exist.

*Phoenix Piccadilly* involved a dispute between a debtor and its secured creditors over title to real property.[23] The circumstances are wildly different in this bankruptcy case. Plaintiffs' disputes arise from a series of politically charged articles that spawned multiple defamation claims.[24] We are not dealing with secured claims and real property, but rather tort claims and insurance policy benefits. The situation is markedly different from the factual scenario underlying *Phoenix Piccadilly*.

### B. Beyond *Phoenix Piccadilly*

The chasm between the *Phoenix Piccadilly* factors and the situation at hand requires analysis from a different vantage point. When does use of chapter 11 serve

---

[22] Even arriving at this conclusion requires the Court to extrapolate a bit as to factor (vi). The Court describes the mismatch between factors and facts in more detail below.

[23] The Eleventh Circuit Court of Appeals decided *Phoenix Piccadilly* in 1988. Congress later amended § 362 of the Bankruptcy Coded to include present-day § 362(d)(3) to address issues unique to single asset real estate cases. *See* Bankruptcy Reform Act of 1994, PL 103–394, October 22, 1994, 108 Stat 4106, § 218(b) (adding paragraph (3)).

[24] The evolution of technology provides another reason why the *Phoenix Piccadilly* factors do not provide a resilient platform for analysis in this bankruptcy case. Adoption of internet technology was not widespread in 1988, so bankruptcy cases from that era naturally do not address circumstances that could arise only in today's internet-soaked world.

a litigation tactic, rather than a valid reorganizational purpose? Does it matter if the debtor acknowledges that it plans to cap potential litigation claims by structuring a repayment plan that will limit the amount collectible, should the non-debtor party prevail in the litigation? How should a court assess good faith intent to reorganize when the claims at issue involve personal injury torts and remain unliquidated?

Whether a court applies a multi-factor test, a totality of the circumstances test, or evaluates the presence of "cause" under § 1112(b), the ultimate question is the same: does this particular use of chapter 11 comport with Congressional intent behind the Bankruptcy Code? Thoughtfully addressing this question requires the court to delve deeper and consider the full picture.

### C. <u>Valid Reorganizational Purpose</u>

As noted before, the concept of a valid reorganizational purpose is fuzzy at best. Every chapter 11 bankruptcy case brings different facts, history, and perspectives. Policy goals supporting chapter 11 bankruptcy relief include preservation of the economy and prevention of harm to innocent third parties, like employees and third party creditors. Congress envisioned bankruptcy as a public policy tool, not a corporate weapon. *See, e.g.* 11 U.S.C. § 1129(a) (listing factors supporting confirmation of a chapter 11 plan).

Several courts evaluating whether a chapter 11 bankruptcy case furthers a valid reorganizational purpose have focused on whether the debtor is in financial distress. *See, e.g., LTL Mgmt.*, 64 F.4th at 101 ("Our precedents show a debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition

serves a valid bankruptcy purpose supporting good faith."). That is an important part

of the analysis, but not the only step. Other factors also matter.

Consideration of additional factors is entirely consistent with *Phoenix

Piccadilly* because "there is no particular test for determining whether a debtor has

filed a petition in bad faith". 849 F.2d at 1394. Whenever the Court discerns an intent

to abuse the judicial process, undermine the purpose of the reorganization provisions,

or circumvent legitimate state court litigation, evaluation of other concerns is wholly

appropriate. *Id.*

### D. <u>Other Factors</u>

It would be impossible for this Court (or any bankruptcy court) to draft a

complete list of universal factors demonstrating good faith intent to reorganize, or

the flip side, bad faith intent to abuse the chapter 11 process. It's fair to say that a

certain sense of "you know it when you see it" perspective pervades any sort of

good/bad faith analysis, as each is necessarily fact intensive. *See, e.g., Piazza v.*

*Nueterra Healthcare Physical Therapy, LLC (In re Piazza)*, 719 F.3d 1253, 1271 (11th

Cir. 2013) ("Bad faith does not lend itself to a strict formula.") and *In re Letterese*,

397 B.R. 507, 512 (Bankr. S.D. Fla. 2008) (evaluating debtor's good faith in chapter

13 case under totality of the circumstances). The expansiveness of the inquiry

requires bankruptcy courts to be thorough yet detail-oriented in their analysis.

In the context of chapter 11 and, more specifically, subchapter V of the

Bankruptcy Code, some considerations jump out as uniquely important. Those factors

include the debtor's level of financial distress, ability to formulate and execute a

viable reorganization plan, and evidence of filing purely (or primarily) as a litigation tactic.

### 1. *Financial Distress*

From a balance sheet perspective, TGP is a healthy business with a modest number of liquidated obligations. TGP's schedules and statements of financial affairs (ECF No. 34) list assets of $2,323,996.76 and liabilities of $102,596.61. All of TGP's liquidated obligations are general unsecured debts.

Over half of TGP's liquid assets ($1,105,286,.25) rests in four investment accounts. Hoft views those investment accounts as his personal retirement savings, but inclusion of the funds as part of TGP's bankruptcy estate indicates that they are (or should be) available for distribution to creditors.

| General Description | Current Value |
|---|---|
| Robinhood acct #1307 | $ 8,588.24 |
| Charles Schwab (401k) acct #4627 | $ 497,511.37 |
| Charles Schwab acct #8256 | $ 107,617.10 |
| Charles Schwab acct #2360 | $ 491,569.54 |
| **Total** | $1,105,286,.25 |

TGP (through Hoft, as its sole principal) offloaded a sizeable chunk of its other liquid assets through unusual exports of cash. TGP made two undocumented interest-free loans, first, to an entity solely owned by Hoft, and second, to his twin brother, Joe.[25] Together, these loans total $820,860. TGP also purchased a Porsche for Hoft to

---

[25] Hoft used his loan to purchase the Jensen Beach condo in the name of 2021 Main Street LLC, another limited liability company owned solely by Hoft. *See* ECF No. 76-20, at p. 63.

drive while in St. Louis. That vehicle has a listed value of $53,339.[26]

Justice League, another entity wholly owned by Hoft, owes TGP $150,000.[27] The circumstances of this debt are unclear, as there is no documentation in the record (or anywhere, apparently) of the reason for the transfer, deal terms, or other standard formalities for a business loan from one entity to another.

Although TGP's balance sheet is healthy (excluding potential obligations owed to the State Court Plaintiffs), the future of TGP's cash flow is less clear. For a period of time, The Gateway Pundit directed reader donations to other entities owned by Hoft, including Justice League.[28] Justice League may provide a benefit to TGP in the form of litigation funding for the State Court Litigation. Then again, Justice League may choose to use reader donations for other purposes.[29] Hoft controls both entities, but they are legally separate entities, and the Court is unaware of a formal litigation support agreement between Justice League and TGP. To the extent that reader

---

[26] The Liquidation Analysis attached as an exhibit to the Plan projects the liquidation value of the Porsche as $36,000. *See* ECF No. 93, at p. 30.

[27] The Court observes that this sum matches the amount described on Justice League's GiveSendGo webpage as the target goal for reader-supported donations offered to help The Gateway Pundit. *See* https://www.givesendgo.com/G2HD4 (last visited July 19, 2024). As of July 19, 2024, Justice League had raised $105,346 of its $150,000 goal.

The Liquidation Analysis attached as an exhibit to the Plan projects this debt as uncollectible because "Justice League is largely funded by TGP and advances other TGP causes and projects. Liquidation of TGP would eliminate funding and donations would cease if there are no additional projects to pursue." *See* ECF No. 93, at p. 30. That statement directly contradicts the Amended Schedules, which were filed under penalty of perjury. *See* ECF No. 34, pdf p. 11, at question 71 (Continuation Sheet) (describing doubtful or uncollectible amount as "$0.00").

[28] *See* Background § C, above.

[29] See https://www.givesendgo.com/G2HD4 ("Any amount raised will be applied to legal fees and other expenses incurred by the Justice League of America and for our current and future investigations.").

donations might once again be directed to Justice League rather than TGP, that would presumably create a drop in future revenue for TGP.

For the moment, TGP remains able to pay its operating debts as they come due.[30] TGP's primary cash flow concern is the rapid depletion of the benefits payable under the Policy. Once the Policy limits are reached, TGP will have to look to other sources of revenue to pay its legal bills, and, potentially, judgments in the State Court Plaintiffs' favor. That possibility is the driving force behind TGP's bankruptcy filing, but it remains to be seen whether TGP will ever suffer cash flow insolvency.

TGP's present financial status weighs in favor of dismissal, as it does not exhibit financial distress or the need to reorganize. For the sake of full analysis, the Court will continue with the next consideration, which is TGP's reorganization plan. In that analysis, the Court will consider the assets available to fund a plan, along with TGP's anticipated use of those assets.

### 2. *Reorganization Plan*

Publication of sensational stories has generated healthy revenues for TGP. TGP reported gross revenue in 2022 of $2,860,691 and in 2023 of $3,097,988.38.[31] Gross revenue reported for 2024 appears on track to match those years.[32] Website

---

[30] TGP projections for the three years of distributions to creditors under its Plan indicate that it will realize disposable income each month of $54,323, or annually $651,876, after covering normal operating expenses. *See* ECF No. 93, at p. 28.

[31] ECF No. 30, at 27.

[32] *Id.*

visits generate ad revenue, and reader donations provide another income stream.

The viability of that strategy as a long-term business plan, however, is now in question. The State Court Litigation challenges The Gateway Pundit's brash (and allegedly not fact-checked) reporting style, which may in turn compromise its profitability. If a court determines that statements in the Articles are defamatory, then The Gateway Pundit might choose to adopt a more restrained editorial style. That choice could lead to fewer website views, which would likely soften revenue.

The Plan indicates that TGP's future business model would be substantially consistent with its current business strategy, as its projected annual income would be $2,940,000, which is in line with the gross income reported during the prior two years. TGP's existing business model has provided sufficient revenue for Hoft to (i) purchase a Florida oceanfront condo titled in the name of 2021 Main Street LLC for cash along with a Porsche that he drives while in Missouri, (ii) fund over $1,000,000 in investment accounts, and (iii) pay his husband a regular income in addition to Hoft's own distributions. Hoft, as TGP's principal and only employee, has several strong incentives to maintain TGP's status quo.

What is not contemplated by the Plan is the distribution to general unsecured creditors of anything more than TGP's disposable net income over three years. The Plan does not contemplate any recovery from Hoft for the loan it made to enable him to purchase the Jensen Beach condo, nor does it contemplate any benefits being funded from the Policy, nor does it provide for the distribution to general unsecured creditors of any of the funds held by TGP in its investment accounts.

While most chapter 11 debtors prominently describe alterations to existing business models to combat past weaknesses or market threats, this one is different. There is no stated plan to change anything except to fund disposable income over three years to buy peace with the State Court Plaintiffs. More simply stated, there is no discussion on the record about TGP's *need* to reorganize, only the desire to do so in a way that blunts the impact of pending litigation against Hoft and TGP.

TGP's desire to fend off and manage liability arising from litigation claims in bankruptcy is not, in and of itself, problematic. The underlying issues run deeper, beyond litigation management. TGP failed to show that it is insolvent or has a present business need to revamp its business model.

And, with the Plan TGP just filed, it has similarly failed to show that any proposed reorganization plan would have a reasonable prospect of being confirmed. TGP's strategy seems to be that it doesn't matter what claims are asserted by the State Court Plaintiffs or what judgments are entered in the State Court Litigation, because the payout to all general unsecured creditors will be capped at three years of disposable net income under TGP's Plan.

That viewpoint conflates TGP's liability with Hoft's and begs the question of how reorganization is supposed to benefit TGP, rather than Hoft. Although it is difficult to tell where TGP ends and Hoft begins, Hoft is a separate co-defendant in the State Court Litigation who possesses or controls significant assets accrued with TGP's funds. Those assets include the Jensen Beach condo (purchased for just under

$800,000)[33] and the investment accounts (with a balance of over $1,000,000). It is difficult to envision a consensual plan (much less post-confirmation tranquility) if those assets were effectively squirreled away without creditor consent, nor would the plan pass muster.[34]

TGP's explanations regarding the "good faith" nature of its filing color the facts an improbable hue. Because legal fees incurred in the State Court Litigation have already depleted $700,000 of the Policy's $2 million in gross benefits, TGP insists that it filed bankruptcy to benefit the State Court Plaintiffs and that a subchapter V reorganization plan preserving the remaining $1.3 million in policy benefits would facilitate a robust payout of all claims. That simply isn't true.

The Plan, as envisioned by TGP, which limits the amount required for distributions to TGP's projected net income over three years, would do three things: (i) restrict the total amount payable to the State Court Claimants to whatever TGP earns over the next few years, effectively capping whatever litigation damage exposure that TGP now faces to an amount that TGP finds palatable, (ii) require the State Court Plaintiffs to share the future revenue allocated to the Plan with all other general unsecured claimants, thereby further limiting the State Court Plaintiffs' potential recovery, and (iii) dilute the possible recovery for non-litigation general unsecured claimants by likewise requiring them to share the plan-allocated portion of TGP's future revenue with the State Court Plaintiffs.

---

[33] *See* ECF No. 76-20, at pp. 38 (lines 38:1-38:13), 62-63 (lines 62:16-63:25), pp. 98-99 (lines 98:8-99:7).

[34] *C.f. Harrington v. Purdue Pharma L.P.*, Case No. 23-124 (Slip Op. June 27, 2024) (denying validity of third party releases in chapter 11 absent consent).

TGP's proposed Plan that mostly seeks to limit litigation exposure to its sole principal—and only that—looks a lot like bad faith.[35] Chapter 11 may be used to manage litigation claims (particularly for some categories of claimants, like asbestos claims), but there are limits, as the Court will discuss below.

### 3. *Existing Litigation*

Even though TGP has many tools at the ready to defray litigation costs—i.e., assistance from the Justice League, repayment of the Hoft brothers' loans (which may necessitate sale of the Jensen Beach condo), selling intellectual rights to the Articles or website domains, and liquidation of the investment accounts—it has expressed little to no interest in pursuing those options.[36] Instead, TGP's preferred path is one of limitation: it proposes to restrict litigation costs, including damages payable to the State Court Plaintiffs, to a capped amount payable from TGP's disposable income over the next 3 years.

There are several problems with this scenario. The viability of TGP's current business model in the face of defamation lawsuits is questionable, as already discussed. That is the first obstacle. TGP's apparent unwillingness to call existing loans (like the one Hoft used to purchase the Jensen Beach condo) or seek regular payment from Hoft for use of corporate assets (like the 2021 Porsche Cayenne) creates the second hurdle, and is indicative of bad faith. Favoring equity holders over creditors is typically not allowed in bankruptcy. *Cryzewski v. Jevic Holding Corp.*,

---

[35] *See* ECF No. 93, at ¶11.7(b).

[36] *See* ECF No. 34, at pdf p. 8 (Part 11, Question 71) (describing the doubtful or uncollectible amount of $970,760 in loans as $0).

580 U.S. 451, 457 (2017). Public policy as expressed through the Bankruptcy Code provides the third, very large impediment.

Congress drafted the Bankruptcy Code and is responsible for revising it as needed. The plain statutory language and years of legislative history show that bankruptcy relief is intended to foster equitable goals, not provide a Monopoly-style "Get out of jail free" card for potential personal injury torts. That policy is reflected in the statutory limitation prohibiting bankruptcy courts from adjudicating personal injury tort claims, the elevation of certain personal injury claims in payment priority relative to other unsecured claims, and the ability of creditors to file actions under § 523 to obtain a judgment rendering some claims nondischargeable. 28 U.S.C. § 157(b)(5); 11 U.S.C. §§ 507(a)(10) and 523(a)(6).

Nothing in the text of subchapter V of chapter 11 indicates that Congress intended to (and did) create a new form of bankruptcy that encourages limiting a debtor's principal's personal exposure for corporate acts, absent consent. *C.f. Harrington v. Purdue Pharma L.P,* Case No. 23-124 (Slip Op. June 27, 2024) (denying validity of third party releases in chapter 11 absent consent). Perceived attempts to use subchapter V to "game the system" in a similar fashion have been met with disfavor in this Court. *In re Bensalz Prods., LLC,* 2022 WL 1617690, at *5-6 (Bankr. S.D. Fla. May 19, 2022) (describing potential factors indicating use of subchapter V bankruptcy as a litigation tactic).

### E. <u>The Policy Proceeds</u>

The most telling aspect of TGP's failure to demonstrate that its bankruptcy

filing is intended to preserve going concern value or maximize property available to satisfy creditors is its reliance upon depletion of the Policy as a justification for relief. *LaSalle St. P'ship*, 526 U.S. at 453. The Policy, like all insurance policies, is a contract allocating risk. Its use is restricted to its terms, which means that the proceeds of the Policy may only be used in accordance with the Policy terms. All of this logic is very basic, but it still merits discussion because TGP has acted as if maximizing use of the Policy benefits serves all creditors. It does not.

It is true that if Policy limits are met, and no further funds are made available by Hoft, Justice League, or another revenue source, TGP will be forced to tap as-yet unused assets to pay litigation costs or a potential judgment. It is also true that, at that time, all unsecured creditors' interests could be at stake.

But we are not there yet.

TGP remains both balance sheet and cash flow solvent. There is no present financial distress, no looming foreclosure sale, no prospect of a market crash. There is only the State Court Litigation in which TGP must defend itself. That's not a basis for bankruptcy relief; it's the justice system in operation. And the State Court Plaintiffs have made their positions clear: they want their day in court to present their state law claims, rather than the ability to file a proof of claim in a bankruptcy case and receive a payout capped at what TGP predicts its disposable income might

be over the next 3 years.[37]

## F. Section 305 and 1112

The only question left to determine is whether dismissal is appropriate under § 305(a), § 1112(b), or both.

The Court concludes that both options make sense. Although the bulk of this Opinion focuses upon factors relevant to § 1112(b), the unique facts of this bankruptcy case make it suitable for dismissal under § 305(a) as well. By filing for subchapter V relief, TGP attempts to accomplish indirectly what it cannot do directly. *First Fin.*, 99 B.R. at 754. Hoft's testimony at the section 341 Meeting and further statements by counsel demonstrate that TGP filed bankruptcy purely as a litigation strategy. *Id.* Litigation is already well underway in two other fora, both of which are far better available to determine the parties' interests. *Laurel Highlands*, 473 B.R. at 654. In lieu of a repetitious recitation of facts justifying relief under § 305(a), the Court will summarize its analysis this way: in this particular bankruptcy case, all the facts that support § 1112 dismissal also support § 305(a) dismissal.

The Court is mindful of the extreme nature of dismissal pursuant to § 305(a) and does not impose this remedy lightly. It is appropriate and correct in this limited instance. The record of this bankruptcy case, including the Schedules and Statements of Financial Affairs (ECF No. 34), transcripts of the 341 Meeting (ECF Nos. 76-20

---

[37] It is worthy to note that despite claims made by TGP at hearings before this Court that the reason for filing this case was to preserve Policy benefits for the benefit of the State Court Plaintiffs, the Plan funds distributions to general unsecured creditors solely from three years of disposable income. No mention is made in the Plan of using Policy benefits to fund a distribution to the State Court Plaintiffs.

and 76-21), Joint Stipulation (ECF No. 80), transcript of the June 27, 2024 Hearing, and the Plan (ECF No. 93), all strongly support this conclusion. The facts are what they are, and the Court accepts the sworn statements submitted by TGP as true and accurate. Despite facing a substantial burden of proof, the State Court Plaintiffs have shown that dismissal is in the best interests of TGP and all creditors. *In re C & C Dev't Group, LLC*, 2012 WL 1865422, at *3 (Bankr. S.D. Fla. May 22, 2012); *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.),* 517 B.R. 361, 371 (Bankr. M.D. Ga. 2014) (describing movant's evidentiary burden); *see also In re Jefferson Cnty., Ala.*, 474 B.R. 228, 277 (Bankr. N.D. Ala. 2012) ("Section 305 creates an exception to the rule that a federal court is required to exercise its bankruptcy jurisdiction.").

## CONCLUSION

This case features charged emotions and polarizing facts. None of that impacts this Court's sole duty, which is determining whether TGP demonstrated good faith intent in filing and pursuing this chapter 11 bankruptcy case. The answer is no. The Court will dismiss this bankruptcy case as a bad faith filing.

## ORDER

The Court **ORDERS** that:

1. The Dismissal Motion is **GRANTED**.

2.  The Bankruptcy Case is **DISMISSED**.

3. The hearing previously scheduled for August 2, 2024 at 9:30 a.m. (pursuant to ECF No. 85) is **CANCELLED**.

4. The Court retains jurisdiction over the implementation and interpretation of this Order.

### ###

Copy to:

David A. Blansky, Esq.
(*Attorney Blansky must serve this Order upon the service list below and all other interested parties in compliance with applicable rules*).

Martin Ochs, Office of the United States Trustee

Mark Hamilton, General Counsel
Florida Department of Revenue
P. O. Box 6668
Tallahassee, FL 32314-6668

Re: Case No. 2024SC317 (Malkin, et al. v. Coomer)
Colorado Supreme Court
2 East 14th Avenue
Denver, CO 80203

Re: Case No. 4:21CV1424 HEA (Freeman, et al. v. Hoft, et al.)
United States District Court
Eastern District of Missouri, Eastern Division
111 South 10th Street
St. Louis, MO 63102

Re: Case No. 2122-CC09815 (Freeman, et al. v. Hoft, et al.)
Missouri Circuit Court
Twenty-Second Judicial Circuit Court (City of St. Louis)
10 North Tucker Blvd.
St. Louis, MO 63101