1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2                WEST PALM BEACH DIVISION

3                        Case No.:  24-13938-MAM

4

5    IN RE:

6    TGP COMMUNICATIONS, LLC,

7         Debtor.
_____/

8

9

10

11

12                     ECF # 26, 39

13                     June 27, 2024

14

15

16         The above-entitled cause came on for a

17   Zoom hearing before the HONORABLE MINDY A. MORA, one

18   of the Judges of the UNITED STATES BANKRUPTCY COURT,

19   in and for the SOUTHERN DISTRICT OF FLORIDA, at 1515

20   North Flagler Drive, West Palm Beach, Florida, on

21   Thursday, June 27, 2024, commencing at or about 1:28

22   p.m., and the following proceedings were had:

23

          Transcribed from a digital recording by:
24            Helayne Wills, Court Reporter

25

```
 1   APPEARANCES:
 2        LINDA LEALI, Subchapter V Trustee
 3
          HOUSTON RODERMAN, PLLC, by
 4        BART A. HOUSTON, ESQ.,
          on behalf of the Debtor
 5
 6        WILKIE FARR & GALLAGHER, LLP, by
          RACHEL C. STRICKLAND, ESQ.,
 7        BRITTANY WILLIAMS, ESQ.,
          JAMES BURBAGE, ESQ.,
 8        and
          DUNN LAW, P.A., by
 9        DAVID A. BLANSKY, ESQ.,
          on behalf of Creditors Ruby Freeman and
10        Wandrea Arshay "Shaye" Moss
11
          SHUTTS & BOWEN, LLP, by
12        VINCENT F. ALEXANDER, ESQ.,
          and
13        CHARLES CAIN, ESQ.,
          on behalf of Creditor Eric Coomer
14
15        OFFICE OF THE UNITED STATES TRUSTEE, by
          MARTIN OCHS, ESQ., (via Zoom)
16        on behalf of the U.S. Trustee
17
          FURR AND COHEN, P.A., by
18        ROBERT C. FURR, ESQ.,
          on behalf of Jim Hoft
19
20        ALSO PRESENT:
          ECRO:  Electronic Court Reporting Operator
21        RUBY FREEMAN (Listen Only)
          SHAYE MOSS (Listen Only)
22        ERIC COOMER (Listen Only)
          JIM HOFT(Listen Only)
23        JONATHAN BURNS (Listen Only)
24   EXHIBITS                                    PAGE
25    No. 26                                     28
```

1         THE COURT:  Okay, great.  Then, having

2    gotten those matters out of the way, let's turn to

3    TGP Communications, LLC, and let's go through taking

4    appearances, please.

5         MR. HOUSTON:  Good afternoon, Judge.  I'm

6    Bart Houston.  I represent the debtor-in-possession.

7    At counsel's table with me is Jonathan Burns,

8    executive vice-president and general counsel of the

9    debtor, Mr. Hoft, who is the 100 percent shareholder

10   is also present in the courtroom, and has his own

11   counsel, Mr. Furr.  I'm sure he'll make his own

12   appearance.

13        I would just tell the Court one thing.  I,

14   about a month ago, had COVID, and have a congestion

15   in my ears, and my hearing is a little bit strained.

16   So I may request that Your Honor repeat things if I

17   don't hear them, so I'm sure I got it accurately,

18   but that would be why.

19        THE COURT:  Mr. Houston, I had the same

20   thing happen to me in April.  So I feel your pain on

21   that.  Feel free to ask me to repeat myself.

22        MR. HOUSTON:  Thank you.

23        MR. FURR:  Judge, Robert Furr for the

24   owner, Jim Hoft.

25        THE COURT:  Thank you.

```
 1              MS. STRICKLAND:  Good morning, Your Honor.
 2    Rachel Strickland, Wilkie Farr & Gallagher.  I'm
 3    joined by my co-counsel, Brittany Williams, David
 4    Blansky and James Burbage, and we are here on behalf
 5    of Ruby Freeman and Shaye Moss.
 6              THE COURT:  All right.  Thank you.
 7              Our audio system at counsel table isn't
 8    great, so in the future, if you would just come to
 9    the podium to address the Court.
10              MS. STRICKLAND:  Will do, Your Honor.
11              THE COURT:  Thank you.
12              MR. ALEXANDER:  Good afternoon, Your
13    Honor.  Vincent Alexander of Shutts & Bowen on
14    behalf of Dr. Eric Coomer.  I'm joined on the Zoom
15    with co-counsel, Charlie Cain.
16              THE COURT:  Great.  Thank you,
17    Mr. Alexander.
18              MR. ALEXANDER:  Mr. Cain is admitted pro
19    hac vice, although he won't be making argument
20    today.
21              THE COURT:  Okay.  Thank you.
22              Okay.  And on Zoom, Mr. Ochs.
23              MR. OCHS:  Thank you, Your Honor.  Martin
24    Ochs for the United States Trustee.
25              Your Honor, if I could just echo on
```

Page 5

1    something that Your Honor said.  If parties are

2    going to speak, if they would just stand at the

3    podium so that I can see them, as well, that would

4    be very helpful.  Thank you.

5              THE COURT:  Okay.  So, here's what I would

6    like to do.  We have set for hearing today two

7    matters.  We have a hearing on -- continued hearing

8    on the motion to approve omission, countered by

9    Mr. Ochs' motion to continue that hearing.  We also

10   have set for hearing the motion to dismiss filed by

11   litigation plaintiffs, or in the alternative, to

12   modify the automatic stay.

13             I'd like to first talk about and give you

14   the Court's preliminary ruling on the motion to

15   approve omission, and then we'll turn to the motion

16   to dismiss the case.

17             Okay.  As a reminder, at the last hearing

18   we talked about a structure that might work for the

19   concern expressed by Mr. Houston on behalf of the

20   creditors who were listed as Jane Doe, John Doe,

21   with a service address care of Mr. Burns.

22             I expressed concern about that, and noted

23   that in a decision by Judge Mark in the Aerotech

24   case, that I believe was cited in somebody's papers,

25   that we would consider a structure in which a claims

```
 1   agent was retained, and that the unredacted version

 2   of the schedules listing the creditors by name and

 3   address still needed to be filed under seal with the

 4   Clerk of the Court, and provided to the claims agent

 5   and the U.S. Trustee, as well.

 6              In order to get from here to there,

 7   however, there was a discussion about the need for

 8   evidence to demonstrate that this was really a

 9   viable concern, and what the -- what was filed with

10   the Court was a little problematic.  So, the

11   debtor's motion to approve, which was filed at ECF

12   26, resulted in a document filed, a notice of

13   filing, and I'd like to just talk about why I found

14   that document problematic.

15              Now, the U.S. Trustee has filed an agreed

16   ex parte motion to continue this afternoon's hearing

17   on the motion to approve, but I really do think it's

18   important to point out what our local rules require

19   governing the filing of redacted or confidential

20   information or exhibits, in connection with the

21   motion to approve.

22              The order I entered deferring ruling on

23   the motion to approve, which was entered as ECF 77,

24   on June 24, 2024, directed the debtor to submit

25   sworn declarations as evidentiary support of the
```

```
 1    relief requested in the motion to approve, in
 2    advance of today's hearing.
 3              On June 20th the debtor filed a notice of
 4    filing redacted declarations, which were docketed at
 5    ECF 72, which included a footnote indicating that
 6    unredacted declarations would be provided to the
 7    Court and Mr. Ochs, on behalf of the U.S. Trustee,
 8    and a claims agent, presumably, pending the Court's
 9    ruling on the motion.  But that notice failed to
10    comply with the procedures set forth in our local
11    rules.
12              Specifically, I'm talking about Local Rule
13    9070-1(a)(4), and 5005-1(a)(4), for the use of
14    confidential information in an evidentiary setting.
15    Local Rule 9070-1(a)(4), which governs electronic
16    submission of exhibits to the Court, mandates that
17    if a party determines that any confidential
18    information should be considered by the Court at
19    trial or evidentiary hearing, that party must
20    nevertheless submit redacted copies of its exhibits
21    in accordance with subsections (a)(2) of this local
22    rule, and seek authority to file the unredacted
23    documents under seal, as provided for in Local Rule
24    5005-1(a)(4).
25              That local rule, 5005-1(a)(4)(C) provides
```

```
 1   for the manner of submitting motions to seal and
 2   sealed documents to the Court.  In fact, CM/ECF has
 3   a specific mechanism for a sealed document to be
 4   uploaded after entry of an order by the Court, so
 5   that it doesn't appear on the docket.
 6           Mr. Houston, you didn't file an
 7   appropriate motion to seal, and the notice and
 8   redacted exhibits filed doesn't adequately comply
 9   with the procedures set forth in Local Rule
10   5005-1(a)(4)(C).  So therefore, I'm going to direct
11   you to promptly comply with our local rules,
12   9070-1(a)(4), and 5005-1(a)(4)(C).
13           You have to file a motion seeking
14   authority to file under seal unredacted copies of
15   the exhibits, attached to your notice of filing, in
16   accordance with Local Rule 5005-1, by July 3, 2024.
17           I'm going to grant the U.S. Trustee's
18   motion to continue the hearing on the motion to
19   approve, and we'll talk about what makes sense as a
20   continued date, but please understand that failure
21   to comply with the Court's directive in a timely
22   manner will result in the notice filed at ECF 72
23   being stricken from the record.
24           Okay.  So, Ms. Romaguera, my thought was
25   that we would set a hearing on the motion to approve
```

1   the omission of the creditor data somewhere three to

2   four weeks out. Because I think it's likely to take

3   that long to resolve the issues surrounding the

4   motion to dismiss or for stay relief.

5            ECRO: How long will it take, all day?

6            THE COURT: I think it will be all day,

7   because my hope is that that same day we -- let's

8   just say this. I'm not optimistic that we're going

9   to finish the evidentiary presentation today. Maybe

10   we will, maybe we won't. I don't know. And if we

11   don't, we may need to finish that up.

12            My hope would be that at the conclusion of

13   that hearing, maybe after a brief recess, that the

14   Court might be able to issue an order on the motion

15   to dismiss or for stay relief, and it would be good

16   to have these two hearings scheduled on the same

17   date and time.

18            ECRO: Judge, I'm thinking maybe July 31.

19            THE COURT: I need everyone to look at

20   their calendars to see if that date will work.

21            That's a Wednesday, folks.

22            MR. HOUSTON: Judge, I have a trial in

23   front of Judge Robson in Orlando on that day

24   starting at 10:00 a.m., so that is a day that I

25   definitely wouldn't be able to attend.

```
 1              THE COURT:  What about Friday, the 26th of
 2   July?
 3              MR. OCHS:  Your Honor, if I may be heard.
 4   Martin Ochs for the United States Trustee.
 5              I will otherwise be engaged in another
 6   matter for that day, and so I will not be able to do
 7   this.  I think it makes the most sense if I
 8   participate in the hearing.  So I'd ask that the
 9   Court not use that date.
10              Thank you.
11              THE COURT:  August 2?
12              MR. HOUSTON:  Good for me, Judge.
13              MR. OCHS:  If I could just have one
14   moment, Your Honor.  Bear with me for one second.
15   I'm sorry.  I'm on a wrong date.  I apologize.
16              August 2nd would work well for the United
17   States Trustee.  Thank you.
18              THE COURT:  All right.  Other counsel,
19   yes?
20              MS. STRICKLAND:  Yes, Your Honor.
21              THE COURT:  All right.  Thank you.
22              MR. ALEXANDER:  August 2nd works for us,
23   as well, Your Honor.  Thank you.
24              THE COURT:  Okay.  Debtor's counsel, yes.
25   Mr. Furr.  Okay, great.  So our continued date then
```

1    would be August 2, 2024.

2              MR. HOUSTON:  If it helps the Court at

3    all, Mr. Burbage and I and other counsel have worked

4    pretty diligently to stipulate to as many facts as

5    were reasonably able to be stipulated to, and have

6    not submitted any declarations or witness lists.

7    I'm not sure that the Court thought that this will

8    extend beyond a day is entirely accurate.  I think

9    that we put enough together for the Court to review,

10   that perhaps it will be a little less onerous.

11             THE COURT:  Okay.  Well then, August 2

12   would then likely be a date by which either a

13   written opinion or an oral ruling would be presented

14   to the parties.  Okay.

15             Then, Mr. Ochs, what I need from you is an

16   order granting your motion to continue.

17             MR. OCHS:  I will draft that, Your Honor,

18   and submit it.  I believe I had submitted something,

19   so I just need to clean that up and resubmit it, and

20   I will do that quickly.

21             If I could, Your Honor, just for clarity

22   of the record and for the clarity of that order, if

23   I could ask the Court, the August 2nd date, what

24   time should we start?

25             THE COURT:  It's a Friday, so let's start

1    at 9:30, with the hopes that we finish earlier.

2                    MR. OCHS:  Very well.  Thank you, Your

3    Honor.

4                    THE COURT:  Ms. Romaguera is asking the

5    question whether that's going to be an in-person

6    hearing or via -- or a hybrid hearing.  I'm going to

7    say for the moment hybrid, I think would be

8    appropriate, particularly if the parties don't think

9    that there's going to be a rollover of any

10   evidentiary presentation to the Court.

11                   Okay.  All right.  So with that then, I

12   think what makes sense is for the motion to dismiss

13   or for stay relief to be presented to the Court,

14   response by the debtor, and any reply.

15                   All right, Ms. Strickland, whenever you're

16   ready.

17                   MS. STRICKLAND:  Thank you, Your Honor.

18   Good afternoon.  Rachel Strickland of Wilkie Farr &

19   Gallagher, on behalf of Ruby Freeman and Shaye Moss.

20                   I wanted to start with some housekeeping

21   things to make sure that your record stays clean,

22   the joint stipulation that Mr. Houston referred to

23   is the joint stipulation of facts.  That's at Docket

24   80, and the pre-agreed upon exhibits are at Docket

25   76.  All of those exhibits are ours, as the debtor

1   has submitted zero evidence.

2            Your Honor, I have two exempt bars of the

3   debtor's publications.  I've already provided a copy

4   to Mr. Houston.

5            Can I approach?

6            MR. HOUSTON:  These are not matters that

7   were in the exhibit register, and not provided to me

8   until about 20 minutes ago, Judge.  I don't believe

9   they have much probative value.

10           They're articles that were cited in their

11  reply, so certainly if Your Honor feels it's

12  appropriate, you can review them, but I never agreed

13  to them going into evidence.

14           MS. STRICKLAND:  Your Honor, I'm not

15  submitting them into evidence.  They're simply

16  demonstratives.  I printed them off of the Internet

17  this morning.  They're statements of the debtor.

18           THE COURT:  I think it would be better,

19  Ms. Strickland, if you just discuss them in your

20  argument.

21           MS. STRICKLAND:  No problem.  Very well,

22  Your Honor.

23           So the fundamental question before Your

24  Honor is whether the debtor filed this case with a

25  legitimate bankruptcy purpose, or whether the debtor

1    and its owner, Jim Hoft, are improperly using the

2    bankruptcy system and abusing the judicial process.

3    Considering the totality of the records before you,

4    dismissal of this bad case filing is warranted.

5             Let me give Your Honor a roadmap for my

6    argument today.  I'll start by providing some

7    background about my clients and their claims.  That

8    context is critical to understanding the debtor, and

9    why my clients feel so strongly about the motion to

10   dismiss.  The motion can be found at Docket Number

11   39.  Thereafter, I'll address the facts in the

12   record, and the legal argument raised in our motion.

13            So to begin, let's discuss my clients,

14   their claims, and how Jim Hoft and the Gateway

15   Pundit helped destroy their lives.  The facts I'm

16   about to discuss can be found in the second amended

17   petition in the Missouri litigation, which is Docket

18   76, Exhibit 1.

19            On election day 2020, Ms. Freeman and

20   Ms. Moss served as election workers in the State

21   Farm Arena in Fulton County, Georgia.  Their job was

22   to help process absentee ballots, and because of the

23   pandemic, there were quite a lot of them.

24            It was a busy day, but pretty uneventful,

25   and for the next few weeks life carried on for them

1    as it always had.  That changed on December 3, 2020.

2    On that day a team of lawyers from the Trump

3    campaign baselessly asserted that grainy security

4    footage showed an unidentified person counting

5    illegal ballots.  The Gateway Pundit, and its owner,

6    Jim Hoft, took these unsupported factual assertions

7    and immediately published them to tens of millions

8    of readers, attributing names and additional

9    accusations of criminal fraud against Ms. Freeman

10   and Ms. Moss.

11           Within 24 hours those claims went through

12   a detailed explanation of what misinterpreted videos

13   actually showed.  On December 4, the Gateway Pundit

14   published an article identifying the clients by

15   name, despite the fact that 24 hours before, all of

16   the allegations had been publicly and definitively

17   refuted by Georgia election workers.

18           So they knew on the day of the statements

19   that the statements were false.  Nonetheless, it

20   didn't stop them.  They published it.  It's

21   interesting, because in the reply, Docket 71,

22   Paragraph 4, the debtors say, "Oh, no, no, no, this

23   isn't really our doing.  These all derived with

24   somebody else."

25           But on the debtor's website, which is

 1    still available in several different locations, but

 2    including an April 22, 2022 post, the debtor wrote

 3    that the Gateway Pundit was the very first to

 4    identify the women, and on several different

 5    postings, attribute their own journalism to scooping

 6    the story.

 7              They continued to publish defamatory

 8    statements about my clients, and we've given an

 9    example of that in Footnote 9 of our reply, which is

10    on the docket.

11              Mr. Hoft has testified that the cases were

12    commenced solely because of this litigation.  That's

13    the reason we're here, according to the debtor.  Yet

14    inexplicably, these claims were not listed in the

15    list of creditors attached to the petition at Docket

16    2, at all.  In Paragraph 6 of the reply, Docket 71,

17    the debtor says, "All these statements are just

18    opinions."  So let's hear what some of the opinions

19    are.

20              They say that my clients kicked out

21    election observers for the purpose of counting

22    illegal ballots, hid illegal ballots in suitcases

23    under tables, so that they could count them, and

24    counted ballots multiple times.  Needless to say,

25    these are not opinions.  They are factual statements

1    that are entirely false.

2            As is the debtor's pattern, after

3    identifying my clients by name, they linked articles

4    to their personal information.  First came hundreds

5    of phone calls and e-mails and texts that

6    Ms. Freeman, Ms. Moss, Ms. Moss's 14 year old son,

7    all began receiving that day, December 4.  In the

8    days and weeks that followed, the campaign that the

9    Gateway Pundit had against Ms. Freeman and Ms. Moss,

10   they began facing unimaginable and devastating

11   effects on their lives.

12           The FBI asked Ms. Freeman to leave her

13   house for a number of months.  The FBI's suggestion

14   probably saved her life, because on January 5th,

15   after she fled her home, the day before the events

16   at the capitol, an angry mob gathered outside of

17   Mrs. Freeman's house.  People also showed up at

18   Ms. Freeman's 74 year old mother's house, and

19   demanded to make a citizens' arrest.  She had to

20   leave her job with Fulton County after eight years,

21   and she is still facing the effects of the damage

22   today.

23           On December 2, 2021, Ms. Freeman and

24   Ms. Moss filed a lawsuit in Missouri state court

25   against the debtor, Jim Hoft, his brother, Joe Hoft,

1    and they asserted claims of defamation, intentional

2    infliction of emotional distress.  The litigation,

3    which we refer to as the Missouri litigation, is

4    defined by the debtor's delay tactics, of which this

5    Chapter 11 is just the latest example.

6              In December of 2021, the defendants sought

7    to have the case removed to Federal Court.  That

8    failed, and it was remanded back.  In January of

9    '23, the defendants filed counterclaims for

10   defamation.  Those were dismissed.  In April of '23,

11   the defendants moved to dismiss the claims under

12   Georgia's anti-SLAPP statute.  That motion was

13   denied.  In August of '23, the defendants appealed.

14   Those appeals were denied.

15             So they ran out of procedural strategies

16   to delay the Missouri litigation, and then they just

17   started ignoring discovery deadlines.  After well

18   over a year of not engaging, the defendants finally

19   launched their own discovery request.  A Special

20   Master was appointed, and the Special Master made a

21   recommendation, and subsequently a Court entered an

22   order that all discovery had to be completed by

23   May 31st of 2024.

24             On April 24, the day the Freeman

25   plaintiffs noticed depositions of the Hoft brothers,

1    the debtors filed for bankruptcy, that exact day

2    that they were served with notices to appear for a

3    deposition.  That history is important for one

4    reason.  Your Honor has seen tons of debtors, I'm

5    sure, who file because they have perfectly healthy

6    businesses, but for bet-the-farm litigation.

7             I'm not here to suggest that those are not

8    appropriate filings, but this one is different.

9    This one is an exception, because of pre-petition

10   and post-petition conduct that all point to one

11   thing, and that's bad faith.

12            So in assessing whether dismissal is

13   warranted as a bad faith filing under Section 1112,

14   the central question is whether the debtor has filed

15   with a valid purpose, or whether the filing is an

16   effort to abuse the judicial process and the

17   purposes of the real litigation statute.  The

18   totality of the circumstances inquiry is what's

19   appropriate here, and it's a flexible approach,

20   which we and the debtors agree on.

21            So let's go through some of the facts in

22   this case that demonstrate how the debtor and Jim

23   Hoft, who I submit are one and the same, are abusing

24   the judicial process.  Let's start with the

25   petition.

1          The cases are filed solely to deal with

2     the litigation.  That's what the debtor testified

3     to.  And both our litigation, the Missouri

4     litigation, as well as Dr. Coomer, originate from

5     the debtor's coverage of the election.  Despite

6     this, you look at the petition, you look at the list

7     of creditors, Docket 2, nowhere to be found.

8          Next up we go to the 341 Meetings in the

9     case.  First meeting scheduled for May 30.  Has to

10    be continued.  Why?  Debtor no shows.  Jim Hoft, who

11    is the only legal representative of the debtor,

12    skipped it.

13         Then there's the second 341 Meeting on

14    June 6.  Jim Hoft testified that he didn't sign the

15    debtor's schedules and statements.  We've attached a

16    copy of the transcript at Docket 76.  Literally five

17    minutes before that 341 Meeting, the debtor filed a

18    pleading signed by Jonathan Burns, who is at

19    counsel's table today, which is located at Docket

20    52.

21         Mr. Burns is not an employee of the

22    debtor.  He has referred to himself as the general

23    counsel and executive vice-president, but his legal

24    tie to the debtor is murky at best.  But he files a

25    certification, it's at Docket 52, and says that Jim

1   Hoft was not involved in the preparation of the

2   debtor's statements and schedules.

3              In fact, if you look at Pages 32 and 33 of

4   Exhibit 20, the most recent 341 Meeting, debtor's

5   counsel informs the parties on the record that

6   Mr. Hoft doesn't know anything about the disclosures

7   being made in these cases.  The sole principal of

8   the debtors isn't involved.

9              They use this cover as a reason the debtor

10  doesn't know a bunch of important facts that are

11  then asked of him.  Why is Mr. Hoft's 401(k) linked

12  to a debtor account?  Why is the company store

13  linked to Mr. Hoft's bank account?  Why is this

14  Florida business paying Missouri taxes?  Why does

15  the balance sheets filed by the debtor show $691,000

16  in equity draws?  Is it a dividend?  The debtor

17  doesn't know.

18             Why are bank accounts of the debtors in

19  the name of Hoft, with a doing business as the

20  Gateway Pundit.  Big disclosure problem.

21             But Mr. Hoft is also improperly using the

22  debtor as his piggy bank.  He confirmed at his 341

23  Meeting that the debtor transferred large sums to

24  insiders.  He calls them loans.  This is generally

25  found at the 341 transcript, Pages 35 through 43,

1    Your Honor.

2            So the first of these so-called loans,

3    Mr. Hoft acquires the condo for himself and his

4    husband.  That's how their connection to Florida

5    comes.  It's money from the Gateway Pundit.

6            The second so-called loan is to the

7    Justice League.  That's a separate entity owned

8    entirely by Mr. Hoft, which files right wing

9    political actions and fund raises for Mr. Hoft.

10           And third, he has a loan to his twin

11   brother, Joe Hoft.  He has no idea what it was used

12   for, according to his 341 testimony.

13           All three of these transfers collectively

14   are about a million dollars.  All of these loans are

15   not documented in any way.  They're not written on a

16   piece of paper.  There's no interest.  They have no

17   repayment schedule, no stated maturity date.

18           When asked about it Mr. Hoft said at his

19   341 Meeting, "He's my twin brother.  I wouldn't put

20   an interest rate on a loan to my brother."

21           Well, Your Honor, Mr. Hoft isn't making

22   the loan.  This so-called business, the Gateway

23   Pundit, is making the loan.  So these are giveaways

24   to friends and family for no consideration.

25           Mr. Hoft confirmed that the debtor bought

1    a Porsche that he uses in Missouri.  That's a joint

2    stipulation, 29 and 30.  According to the 341

3    Meeting of Mr. Hoft, there's a personal assistant

4    that runs his household errands.  Also received

5    transfers post-petition from the debtor from a US

6    Bank account that is Mr. Hoft's account with a d/b/a

7    in the name of the debtor.

8            Now, the debtor has positioned himself or

9    itself, whichever you think, to say -- they sort of

10   put themselves forward like they're just

11   incompetent, not malicious, not bad faith, just

12   don't realize the rules, but that's not true.  So

13   let's go back to the debtor's tried and true method.

14           Two days after the 341 Meeting concluded

15   on June 18th, Jim Hoft publishes an article on the

16   Gateway Pundit questioning the integrity of the

17   United States Trustee's Office, identifies Mr. Ochs

18   by name, and states that he has been influenced by

19   the Biden DOJ to prevent the Gateway Pundit from

20   proceeding with its Chapter 11 case.

21           Now, when the debtor did this to our

22   clients they received death threats and needed

23   protection from the FBI.  So the debtor is using the

24   same playbook against the U.S. Trustee in this case.

25   This is beyond the pale.  It is undermining the

Page 24

1    integrity of this process, and by extension, the

2    professionals who dedicate their careers to it.  The

3    debtor is quite clearly abusing the judicial system.

4            Your Honor, this is one that I printed off

5    this morning.  I have it here.  I won't pass it up.

6    It's dated June 20, 2024.  It's on the Internet.

7    It's a statement of the debtor.

8            The title of the article is, "The

9    Department of Justice is targeting the Gateway

10   Pundit in their hopes to ruin us - Secretly injected

11   itself in Chapter 11 case.  Why?"

12           In this article they cite a source that

13   says, "The Department of Justice influenced the

14   Trustee assigned to our case and is pressuring this

15   man to make sure our Chapter 11 efforts fail."

16           They write that, "In most cases the 341

17   hearing ends after ten minutes or less," and that,

18   "Trial attorney Martin Ochs with the U.S. Department

19   of Justice presided over the hearing.  Mr. Ochs

20   harassed and abused the Gateway Pundit owner,

21   belittled, attacked and questioned Hoft nearly the

22   entire time," and reiterates that this process, the

23   341 Meeting, took hours, when it should have not,

24   normally listed for ten minutes.

25           According to this article, they learned

1    through an anonymous source that Mr. Ochs was

2    influenced by the Biden DOJ to prevent TGP

3    Communications from proceeding with the Chapter 11

4    bankrupcty, and he did his best to follow the orders

5    from above.

6              In this they do two other things.  They

7    continue to defame my clients, where close to the

8    end of the article it says, "Why did they not want

9    the truth of Ruby and Shaye's late night ballot drop

10   incident to make its way into the courtroom?"

11             And then at the very conclusion of the

12   article it asks followers to, "Please pray for Jim

13   Hoft, Joe Hoft, and the Gateway Pundit.  And please

14   help us in the historic battle for truth by donating

15   to support them at GiveSendGo," and they attach a

16   link so that followers can donate.

17             The link is not to the debtors.  The link

18   is to the Justice League, a non-debtor owned by Jim

19   Hoft.  That same non-debtor owned by Jim Hoft that

20   the debtor transferred -- they call it a loan, but

21   again, they didn't even bother to put an IOU on a

22   napkin -- $150,000, Mr. Hoft, the debtor, his

23   brother, Mr. Hoft's spouse, and his wholly owned

24   entities, all getting money.  It's like a

25   (unintelligible).

1          More bad faith on the amended schedules

2    and statements at Docket 34.  Jim Hoft answers no to

3    the question about whether within one year before

4    filing the case, did the debtor provide an insider

5    with value in any form, including salary,

6    compensation, draws, bonus, et cetera?"  He said no.

7          Same document, Mr. Hoft discloses payments

8    to himself, the Justice League, his husband.  So he

9    falsely answered this question under penalty of

10   perjury twice, another abuse of the judicial system.

11         I know Your Honor has spent a little bit

12   of time looking at the issue of the redactions, and

13   I won't go into it, because I know the matter has

14   been continued, but it's a huge red flag.  The April

15   MOR, which is at Docket 51, shows an unusual level

16   of evasiveness in contrast to the bankruptcy

17   system's belief in transparency, and demonstrates an

18   abuse of the judicial system.

19         Any one of these facts in isolation might

20   be tolerable, other than, I would submit, the

21   article about the U.S. Trustee, but they build a

22   mosaic of textbook bad faith.  So let's apply the

23   law to these facts.

24         Phoenix Piccadilly, in that case, just

25   like this one, there's multiple creditors.  The

```
1   timing of the debtor's filing evidenced intent to

2   delay and frustrate creditors.  Here, again, it's

3   the exact same day they get served with that

4   deposition notice, where the brothers are going to

5   have to sit for a depo.

6            Also in Piccadilly the Court notes that

7   the Chapter 11 filing was in the Middle District of

8   Florida in that case, when the business was in

9   Kentucky.  The 11th Circuit noted that even if the

10  filing was "technically proper," the choice to file

11  the petition so far away may be evidence of bad

12  faith.

13           Same is true here.  The business, and its

14  sole employee, seem by all accounts to be in

15  Missouri.  Remember, that's where that Porsche is

16  that Mr. Hoft drives, bought courtesy of the Gateway

17  Pundit.

18           The connections in Florida are a new

19  condo, again, paid for by the debtor, and a new

20  filing with Florida a week before the petition date,

21  and, of course, the paid mailbox that we've talked

22  about at prior hearings.  So those are the factual

23  similarities to the seminal case.

24           Let's go through the applicable factors

25  which cut in favor of dismissal.  Number one, number
```

```
 1   of assets.  It's a pretty simple business.  The
 2   debtor's assets are disclosed at Docket 34.  They've
 3   got bank accounts, most of them, by the way, in the
 4   name of Jim Hoft, d/b/a The Gateway Pundit,
 5   securities accounts, the Porsche in Missouri driven
 6   by Hoft, the non-documented IOUs from insider loans
 7   to the Hofts.  They've got some website domain
 8   names, and they've got the catalog of articles.
 9           That's all they have.  This is not a
10   complicated business.  And the assets don't require
11   the assistance of the bankruptcy.
12           Number of unsecured creditors.  So, the
13   number two creditor listed on that schedule that
14   doesn't list either my clients or Dr. Coomer, is the
15   debtor's husband.  So the total claims, unsecured
16   claims, listed, are about $102,000.  A lot of them
17   are writers, they're insiders, many of them.  Then
18   you contrast this $102,000 of general unsecured
19   claims with the $292,000 in cash the debtors have on
20   hand at the end of April, plus whatever they've made
21   in the last two months.
22           It doesn't say anything about the million
23   dollars in assets that holds in security accounts
24   that can easily be liquidated.  So the number of
25   unsecured creditors is few.  They appear
```

```
1   artificially inflated, since Mr. Hoft's husband is
2   one of them, as an example, his brother is one of
3   them.  They have pretty de minimis claims.
4            Then we go to factor three, the number of
5   employees.  It's Mr. Hoft.  He's the only one.
6            Factor six, intent to frustrate legitimate
7   efforts of creditors.  The petition was filed after
8   Hoft's rope-a-dope of creditors came to an end.  It
9   was the same day he was served with the deposition
10  notice.
11           Now, the debtors have said a bunch of
12  cases involving dismissal are with a secured
13  creditor.  That's true, but that's not dispositive
14  of anything.  You're not allowed to be a bad faith
15  filer no matter what the priority of your creditors
16  is.  Bad faith filings are not allowed, and 1112
17  doesn't say anything about being a secured creditor.
18  I think that's a red herring.
19           There's a lot of facts that demonstrate
20  abuse of the bankruptcy system in bad faith.  Both
21  my clients and Dr. Coomer, who joined in the motion
22  to dismiss, agree.  At the 341 Meeting, even the
23  U.S. Trustee put the debtor on notice that it might
24  file its own motion to dismiss.
25           So we've put in a lot of evidence.  There
```

Page 30

1    is a lot in the docket before you.  As I said at the

2    outset, the debtor has not filed a single

3    declaration in support of its objection, so none of

4    the evidence that we have put in has been

5    contradicted.

6         So what's the debtor going to say in the

7    face of that?  They're facing two lawsuits, that

8    reorganization in the face of litigation is often

9    found to be a bankruptcy purpose.  The cost of those

10   lawsuits is being paid for by insurance.  The debtor

11   testified at the 341 Meeting that originally they

12   weren't sure whether the litigation was going to

13   cover them both, partially because they didn't

14   notice their insurer properly.

15        But they have now, and the insurance is

16   paying for all the costs associated with the

17   litigation of both sets of litigation plaintiffs,

18   Missouri and Colorado.  Contrary to the debtor's

19   bald assertion, this case is not serving the

20   interest of any creditors.  There's only two

21   universe of creditors, litigation creditors, both

22   cases derive out of the exact same allegations of

23   voter fraud, and all the other creditors who have de

24   minimis claims that can easily be paid in the

25   ordinary course.

1           And that's not in dispute.  The debtors

2     stipulated that it has the ability to pay its

3     non-litigation creditors in the ordinary course.

4     That's in the joint stipulation, Paragraph 46,

5     Docket 80.

6           The second bucket of creditors, my clients

7     and Dr. Coomer, unanimously believe that this case

8     should be dismissed.  So while the debtor is going

9     to portray itself as a responsible party looking to

10    preserve something, they've got $1.3 million of

11    insurance coverage left.  They used a third of it on

12    their litigation delay-based tactics.

13          So the only parties that really have an

14    economic interest in those insurance proceeds both

15    want the case dismissed.  There's no creditor

16    interests being served here.

17          In addition to an argument about

18    maximizing property available to creditors, that's

19    also nonsense.  This is going to be fairly binary.

20    Number one, the more they defame our clients while

21    they're in Chapter 11, the more our clients have

22    administrative claims that go ahead of all other

23    general unsecured creditors.  That's not serving

24    anybody.

25          Moreover, the debtor says, "Oh, no, no,

```
 1    no.  Stuffing ballots in a suitcase, that's an

 2    opinion.  I'm going to win.  There's going to be a

 3    zero liability here."

 4              Well, if they're right, and I submit they

 5    can't possibly be, then they have nothing to worry

 6    about.  The bankruptcy doesn't help them one way or

 7    the other.  If they're wrong, the claims could be

 8    astronomical that they would have no business going

 9    forward in a Chapter V.  They would be completely

10    unable to do anything.  So we believe the dismissal

11    is warranted under 1112 as a bad faith filing.

12              As Your Honor knows, our paper also moved

13    for dismissal under Section 305(a), similar totality

14    of the circumstances analysis.  So I won't repackage

15    the factors that I just went through, unless Your

16    Honor wants me to.

17              But the one thing I would highlight about

18    305(a) is that the Court does not need to reach the

19    finding that the debtor filed in bad faith for that

20    one, although I think there is abundant evidence of

21    bad faith.  Under Section 305(a), all Your Honor

22    would have to conclude is that, if Your Honor thinks

23    the dismissal is in the best interest of creditors

24    and the debtor, that would be a basis.

25              So it's definitely in the best interest of
```

1   the creditors.  With respect to the debtor, it's

2   certainly in the best interest of the debtor, as

3   well, if they're going to continue to defame clients

4   and create new liabilities, to not have them be

5   instantaneously administrative claims with priority.

6           Again, it doesn't benefit the debtor, if

7   you believe their version of events, which is,

8   they've defamed no one, and they have no liability,

9   then the bankruptcy doesn't do anything for them

10  either.

11          Your Honor, do you want me to pause after

12  dismissal and address lift stay separately, do you

13  want me to keep going?  How would you like to handle

14  that?

15          THE COURT:  I'd like to hear your entire

16  argument.  Then we'll give Mr. Houston an

17  opportunity to respond.

18          MS. STRICKLAND:  Perfect.  Thank you, Your

19  Honor.

20          I think dismissal is clearly the right

21  action here, but if Your Honor disagrees, we would

22  submit you should lift the automatic stay and allow

23  the Missouri litigation to proceed.  Whether or not

24  the stay is lifted is basically a harm balancing

25  exercise, so lifting the stay doesn't harm the

```
 1   debtor.  The fact discovery in the Missouri
 2   litigation is five weeks from completion.
 3   Completing the discovery will take minimal time, and
 4   won't create significant additional erosion to the
 5   insurance policy.
 6             But again, it's not coming out of the
 7   business moneys that are coming in that can be used
 8   to pay other creditors in the ordinary course.  And
 9   again, if the debtor stops messing around, and
10   actually complies with things, rather than
11   rope-a-doping, it's certainly less expensive and
12   more efficient.
13             The cost of defending the Missouri
14   litigation, completely covered by insurance, no
15   depletion of estate assets.  Lifting the stay, we
16   think would benefit the debtor and its estate.
17             THE COURT:  Let me ask you a question
18   about what you just stated.
19             MS. STRICKLAND:  Sure.
20             THE COURT:  Does the insurance also
21   provide, if there was a judgment obtained, for your
22   clients to be able to recover against those
23   insurance proceeds?
24             MS. STRICKLAND:  I believe so, Your Honor.
25   It's media coverage.
```

1          THE COURT:  So there is a depletion of

2     those estate assets.  I mean, it is a estate asset,

3     if those funds are available to make distributions

4     to your clients and Mr. Alexander's clients?

5          MS. STRICKLAND:  Correct.  Although it's

6     media coverage insurance.  So it is for this exact

7     purpose.  It's not otherwise available to any other

8     general unsecured creditor.

9          So the person that delivers -- they don't

10    have an office, I was going to say delivers coffee

11    to the office, but there is none -- the server

12    system or whatever they use, can't avail themselves

13    of that asset.

14         THE COURT:  To the extent a claim your

15    client holds is liquidated and can be satisfied from

16    the proceeds of this insurance, it leaves other

17    assets of the debtor available to satisfy other

18    claims?

19         MS. STRICKLAND:  Absolutely.

20         THE COURT:  Okay.  I'm sorry.  Continue.

21         MS. STRICKLAND:  No, not at all.

22         So, you know, we think that lifting the

23    stay, per Your Honor's point, that positions the

24    debtors to liquidate the claim.  We also don't

25    think -- and this is in all of the case law -- that

```
 1    this is the place for these defamation actions.  We
 2    think they should go forward in Missouri and
 3    Colorado state court respectively.
 4            There's already been a fair amount of
 5    wrangling with respect to where they should be.
 6    It's been heavily litigated pre-petition, and
 7    because of the remand, they are in their proper
 8    home, we would submit.
 9            The harm faced by our clients is huge.
10    There's a huge link between the debtor and Jim Hoft,
11    and as a result of that, the whole thing is
12    effectively stayed.  A full or partial modification
13    of the stay would allow for the completion of
14    factual discovery, another factor the Courts look at
15    when looking to grant stay relief.
16            So we think this case should be dismissed
17    for bad faith; the debtor attacking the U.S.
18    Trustee's Office, undermining the integrity of the
19    bankruptcy process, fund raising off of these
20    attacks.  The debtor perjured itself in filings like
21    the schedules and statements.  They've shown a
22    complete lack of candor and competence, as
23    demonstrated in the 341 Meeting testimony, redacted
24    monthly operating reports to a ridiculous degree.
25            There are no shortage of reasons to
```

1   believe that the debtor and Jim Hoft do not have the

2   debtor's best interest in mind, from loans to

3   families and friends, the Porsche, the decision to

4   file for bankruptcy the day he was notified of a

5   deposition.  It's really implausible to conclude

6   that Mr. Hoft suddenly started caring about

7   maximizing value to creditors.

8             So we have more than met our burdens, I

9   would submit, for cause under the Piccadilly

10  factors, and the debtors have submitted no evidence

11  at all, let alone any that refutes our case.  So we

12  would ask that Your Honor not reward Mr. Hoft and

13  the debtor by allowing them to reap the benefits of

14  the bankruptcy process, given their conduct, and we

15  think the case should be dismissed.

16             THE COURT:  Thank you, Ms. Strickland.

17             MS. STRICKLAND:  Thank you.

18             THE COURT:  Mr. Alexander, if you'd like

19  to express your client's views, before I hear from

20  Mr. Houston.

21             MR. ALEXANDER:  Thank you, Your Honor.

22  Vincent Alexander.

23             I'll be brief, Your Honor.  I don't want

24  to rehash the arguments that were so eloquently made

25  by Ms. Strickland, but I do want to address a couple

```
 1   of points that kind of relate directly to
 2   Dr. Coomer.
 3              Before I do that I just -- there was a
 4   brief discussion earlier regarding the admission
 5   into evidence of Exhibits 1 through 25.  Earlier
 6   this morning we did file a supplement to the exhibit
 7   list.  That can be found at ECF Number 83.  I did
 8   speak with Mr. Houston.  There's one exhibit,
 9   Exhibit 26, and he has no objection to the admission
10   of that exhibit as part of the evidentiary record.
11              So we would move that in as part of the
12   other exhibits, 1 through 25.
13              THE COURT:  All right.  No objection,
14   Mr. Houston; is that correct?
15              MR. HOUSTON:  That's correct, Judge.  We
16   discussed it before the hearing.
17              THE COURT:  Thank you.
18              (Thereupon, Exhibit No. 26 was
19         admitted into evidence.)
20              MR. ALEXANDER:  Your Honor, I just thought
21   it would help to give a little background on who
22   Dr. Coomer is, and how he kind of relates to this
23   bankruptcy, and also to the request for dismissal
24   and also stay relief, which we've joined in.  We
25   certainly support all of the arguments that have
```

1    been made, but specifically, what's been referred to

2    as the Colorado litigation was commenced by

3    Dr. Coomer, who is the former director of product

4    strategy and security for the Dominion Voting

5    System.

6              He served in that role during the 2020

7    election -- presidential election.  And in the wake

8    of that election, there were various articles that

9    were published by the debtor about Dr. Coomer, which

10   contained what has been asserted by Dr. Coomer as

11   falsehoods.

12             Some exemplars of those -- and these are

13   some of the headlines.  This one is from

14   November 14, 2020.  "Report, Anti-Trump Dominion

15   Voting System security chief was participating in

16   Antifa calls, posted Antifa manifesto letters to

17   Trump online."

18             Then on November 16th, headline, "Denver

19   business owner, Dominion's Eric Coomer, is an

20   unhinged sociopath.  His Internet profile is being

21   deleted and erased."

22             From December 28, 2020, "Wake up, America.

23   Bold billionaire offers $1 million bounty for

24   Dominion, Eric Coomer's comeuppance."

25             These falsehoods had a serious impact on

 1    Dr. Coomer, and resulted in him fleeing his home,

 2    because of what he viewed as credible threats that

 3    were received.  He had to sever ties with his

 4    friends and family members to stay in seclusion

 5    during these threats that were being made upon him.

 6    He suffered damage to his reputation, privacy,

 7    safety, his ability to earn, among other losses.

 8            As a result of those articles, on

 9    December 22, 2020, Dr. Coomer filed what we've

10    referred to as the Colorado litigation, which that

11    exhibit is Exhibit Number 22 in the record.  That

12    includes claims, not only against the debtor, but

13    also the debtor's owner, Jim Hoft, among other

14    people.  There are many defendants who are in that

15    litigation.  It all relates to the claims that were

16    made as to Dr. Coomer allegedly rigging the 2020

17    election for his role at Dominion.

18            In terms of a little bit of a procedural

19    history with respect to that case, on April 30th,

20    there was a special motion to dismiss that was filed

21    by the debtor and Mr. Hoft, trying to dismiss the

22    claims under Colorado's anti-SLAPP statute.  And

23    subsequently the District Court denied that.  There

24    was an appeal of that.  That appeal affirmed the

25    decision, and currently that is with the Colorado

```
 1   Supreme Court.
 2              What's interesting is, on April 25th, the
 3   debtor filed a suggestion of bankruptcy in
 4   underlying Colorado litigation, which there's
 5   certainly no issue with that.  But then on May 10th,
 6   in the Appellate Court, the debtor filed a joint
 7   motion seeking an extension of time to file
 8   petitions for writs of certiorari for the Supreme
 9   Court, while this bankruptcy was pending.
10              Earlier this week, Exhibit 26, which I
11   previously referenced to Your Honor, was a
12   suggestion of bankruptcy, which was filed in the
13   Colorado Supreme Court.  And of relevance in that
14   particular filing -- and that was filed by --
15   Mr. Houston signed it -- is the reference that the
16   entire above captioned case is stayed as a result of
17   the debtor's bankruptcy filing.
18              THE COURT:  What date was that?
19              MR. ALEXANDER:  The date of that, June 24,
20   2024.
21              THE COURT:  Thank you.
22              MR. ALEXANDER:  Now, as I mentioned, the
23   debtor is not the only party to that appeal.  There
24   are multiple other parties to that appeal, including
25   Mr. Hoft.
```

1          And so in our view, what this

2     demonstrates, you have this timing issue, which

3     Ms. Strickland brought up, in terms of attempting to

4     use the bankruptcy and the benefits of the

5     bankruptcy, not for a restructuring purpose, but as

6     an improper litigation tactic.

7          An example of that is the suggestion of

8     bankruptcy.  At best it's just a mischaracterization

9     of the law under 362.  At worst, it's an attempt to

10    confuse the Court in the Colorado litigation that

11    this bankruptcy here in Florida has resulted in a

12    complete stay of that bankruptcy case.  We'll see

13    how all of that turns out with the Bankruptcy Court

14    there, but it's these types of filings where the

15    litigation is trying to be used to help non-debtors,

16    which demonstrates an improper purpose of the

17    bankruptcy itself.

18          As has been noted with respect to the

19    litigation, there are insurance policies that are

20    covering the defense costs.  So the fact that that

21    being a basis as to why the debtors filed to protect

22    and present those, it's not coming out of the

23    current revenue of the company.  It's being paid

24    under insurance policies.  That's not a negative

25    impact on the debtor's ability to operate this

```
 1   business, in terms of going forward.

 2              And so the use -- an improper use of the

 3   bankruptcy, the litigation tactics, we believe is a

 4   strong ground for dismissal of the bankruptcy case,

 5   And using the automatic stay to help non-debtor

 6   parties.  If they want the benefit of the automatic

 7   stay, then they can file their own bankruptcy cases,

 8   but they haven't, and without any orders from this

 9   Court, the automatic stay doesn't extend to any of

10   those non-debtor parties, and it's inappropriate for

11   the suggestion that it should.

12              We think very pertinent is the lack of

13   financial stress on the debtor at the time he filed.

14   We don't believe that there is necessarily a

15   requirement, but certainly that's a factor that's

16   looked at, in terms of whether the bankruptcy is

17   filed for a proper person.

18              The other point too, with respect to the

19   litigation, and this kind of leads more into stay

20   relief, Dr. Coomer is going to need to litigate --

21   or litigate and liquidate his claim.  There are

22   multiple defendants who are part of the Colorado

23   litigation, in terms of judicial economy, obviously,

24   getting consistent rulings, and having all the

25   relevant parties before one Court, is certainly
```

1    beneficial to happening.  Instead, everything is in

2    Colorado, and that's where it should remain.  There

3    was also a jury demand that was made with respect to

4    that litigation.

5            So we believe there are grounds for

6    dismissal of the case.  Alternatively, we believe

7    that it would be appropriate that the Court does not

8    dismiss the case, for stay relief to be granted and

9    provided to Dr. Coomer.  And again, we adopt and

10   incorporate all the arguments raised by (inaudible).

11           Thank you, Your Honor.

12           THE COURT:  All right.  Thank you,

13   Mr. Alexander.

14           Mr. Houston, I'm tempted to see whether

15   the U.S. Trustee has any comments first, and then

16   you can respond to every one at the same time.

17           MR. HOUSTON:  Understood, Judge.

18           THE COURT:  Mr. Ochs.

19           MR. OCHS:  Thank you, Your Honor.  Martin

20   Ochs for the United States Trustee.

21           The United States Trustee has not taken a

22   position yet on the motion to dismiss, and would ask

23   that you allow the others to continue, and then the

24   United States Trustee will take an appropriate step

25   when and if necessary.

Page 45

1          Thank you.

2          THE COURT:  Thank you.

3          All right.  Mr. Houston.

4          MR. HOUSTON:  Maybe I misspoke when I said

5    our arguments would be truncated, Judge, but --

6    first I'd like to point out, I think Ms. Strickland

7    has taken very, very liberal license with many of

8    the facts that she says are facts.  I'll get to my

9    argument, but I just need to point out a couple of

10   those things.

11          And that is, number one, Ms. Strickland

12   argues that Mr. Hoft skipped the first 341 Meeting,

13   and that's not exactly accurate.  I don't recall if

14   I adequately addressed this in the debtor's

15   response, but throughout the infancy of this

16   bankruptcy, and certainly well before in preparing

17   for it, my communications have been almost entirely,

18   96 percent, with Mr. Burns, who is general counsel,

19   executive vice-president, and has demonstrated to me

20   that he has a better command of the day-to-day

21   operations, the financial information, access to

22   accounting information and other things that we

23   normally concern ourselves with in bankruptcy

24   schedules and in bankruptcy cases as they move

25   forward.

1          So at the first 341 Meeting, having the

2    person from the debtor most knowledgeable, I

3    presented Mr. Burns.  Mr. Ochs demurred on me

4    presenting Mr. Burns, and said that he felt it was

5    necessary that it be Mr. Hoft that would appear,

6    although Mr. Hoft, as I described in the papers, is

7    the philosophical leader and, you know, for lack of

8    a better term, the Apex of this debtor, and has less

9    information on the day-to-day financial matters and

10   business matters, as opposed to the content and the

11   direction that the debtor takes in its conservative

12   viewpoint expressed on the website.

13          And, in fact, that bore truth when we had

14   the next two continued 341s, and I presented

15   Mr. Hoft, as requested by the U.S. Trustee, and many

16   of the questions he said, "I just don't know," and

17   that get seized on by the creditors as incompetence.

18   That is exactly what I tried to avoid initially, as

19   I knew from my many communications with Mr. Burns,

20   and probably less so with Mr. Hoft, that Mr. Burns

21   had a better handle on and more information and

22   better working knowledge with the information that

23   would be important for creditors and for the U.S.

24   Trustee.

25          So Mr. Hoft was not a no show.  Mr. Hoft

```
 1    was not presented.  Instead, Mr. Burns was
 2    presented, and I've explained how that progressed
 3    from there on, Judge.
 4              The 341 Meeting continued for a second
 5    session for approximately two hours, and Mr. Ochs
 6    concluded that at 5:00 p.m. on that particular date.
 7    Then it went for another two hours on a third
 8    session, and creditors were able to ask their
 9    questions to their satisfaction, and ultimately we
10    concluded the 341.
11              The other point I want to make before I
12    start my argument is that Ms. Strickland points out
13    that we have not presented any evidence of our good
14    faith.  I know the Court expects professionals in
15    this district, and I take it to heart, to work
16    together to try to work through stipulations of
17    fact, that is not necessary to call records
18    custodians and call someone to say that a particular
19    document was filed on a particular day in a
20    particular court.
21              And so I worked with counsel, opposing
22    counsel's firm, on at least three different sessions
23    through the stipulation of facts.  And, of course,
24    the Court is not considering, is not going to
25    consider, that being their evidence or my evidence.
```

```
 1    And as is usual in a lot of these cases, the facts
 2    are what they are, and it depends how the Court
 3    views those facts in the context of the case law and
 4    normal practice.  So to say that we presented no
 5    evidence is really a misnomer.
 6              Equally so, Judge, I reviewed very
 7    studiously the documents that opposing counsel
 8    proposed to go into an exhibit register, and the
 9    majority of them being court papers that, of course,
10    this Court can take judicial notice of.  And so
11    there was a very collaborative effort there, and
12    ultimately resulting in both sides saying, "Hey, we
13    don't really need to present written declarations
14    and then put people on the stand and elongate the
15    hearing."
16              So when it's stated that we didn't present
17    any evidence, we participated quite aggressively in
18    developing the evidence for the Court to use as its
19    backdrop for making this decision.
20              So, Judge, this motion reminds me of the
21    proverbial dog that chases cars, and the question
22    being asked, what does the dog do when it catches
23    the car?  In this instance, if the litigation
24    creditors are successful and this case is dismissed,
25    there will be two litigations heading for a trial,
```

1   with substantial discovery remaining to be done,

2   approximately 40 depositions in the State of Georgia

3   in the Freeman case, and less so, because that

4   discovery really hasn't commenced in the Coomer

5   case, and that's in our stipulation of fact.

6           But there is a substantial amount of work

7   to be done by insurance counsel.  The two lawsuits

8   will continue, the case is dismissed or stay relief

9   is granted.  The insurance policy is a wasting

10  policy, diminishing in its value on the liability

11  side as attorney's fees are incurred and paid.

12          And it's a fair guess, Judge, that that

13  $1.3 million will be eaten up between these two

14  litigations long before they reach trial.  At that

15  point the debtor has a decision, do we just fold up

16  and go away, or do we use our own resources to

17  continue defending these cases, because we think

18  that there's a laudatory purpose in defending our

19  opinions and what we've expressed in a conservative

20  viewpoint website.

21          And so what happens then is the debtor's

22  assets become depleted.  Which are not that large to

23  begin with.  And then you get down to the proverbial

24  race to the courthouse.  Who gets to trial first?

25  If there is anything left, it's going to go to the

```
 1    winner of that race.
 2              THE COURT:  Let me just stop you there and
 3    ask you a question, Mr. Houston.
 4              MR. HOUSTON:  Sure.
 5              THE COURT:  The question I have is this:
 6    The claims that the litigation plaintiffs -- and I'm
 7    talking about both the Missouri and Georgia
 8    action -- the Colorado and Missouri action -- those
 9    are tort claims.
10              MR. HOUSTON:  Yes.
11              THE COURT:  And those couldn't be
12    liquidated in this Court in any event.  So, they
13    have to be liquidated somewhere.
14              How would you envision that process
15    proceeding, by plaintiffs that I perceive -- the
16    Court perceives want their day in court, and not
17    necessarily just to reach a settlement, right?  They
18    want their day in court.  They want a jury and a
19    Judge to enter a judgment in their favor, not
20    because of anything that I've heard Ms. Strickland
21    or Mr. Alexander argue, my perception.
22              We can't liquidate those claims in this
23    Court, and that would be an essential part of a
24    restructuring effort by this debtor in a Chapter 11
25    case.  So how would you envision those claims
```

1    getting liquidated?

2              MR. HOUSTON:  I have three answers to that

3    question, Judge.  I thought about it myself, and

4    some other questions I assume the Court may ask me.

5              Number one, we have a very streamline

6    procedure in this Court for liquidating claims.  You

7    file a proof of claim.  And let's just assume that

8    proof of claim is an astronomical claim.  The

9    fortunate thing under Subchapter V is that those

10   claims, no matter what the amounts are, can be

11   treated in a plan, based upon the disposable

12   earnings of the debtor going forward for the three

13   or five-year period.

14             And so to the extent Mr. Coomer files a

15   big claim and Ms. Freeman files a smaller claim,

16   that just determines how the allocation of the pool

17   goes, and it may be that one creditor wants to

18   object to the claim of another creditor.  So the

19   proof of claim, I think, is the way it initially

20   gets liquidated traditionally.

21             The second way it happens is that there is

22   a proof of claim.  There potentially is an objection

23   to that proof of claim.  And to the extent there's

24   an objection, the debtor withdraws the reference and

25   it goes to the District Court for a jury trial.

1          And the third manner of dealing with
2     that -- and it's not really a manner of dealing with
3     it, but it's just sort of an unanswered question, is
4     defamation in Florida -- or Georgia law, because
5     Georgia law is governing their lawsuit, even though
6     they filed in Missouri -- is that a personal tort or
7     is it a general tort?
8          I would say to you in Florida there's a
9     lot of different cases going back and forth on
10    whether it's a general tort versus a personal tort.
11    And the definition being personal tort being an
12    injury to the body, a general tort being an injury
13    to some other intangible.  And then, of course,
14    there's the commercial torts, but that's not
15    involved here.
16          So I'm not sure that this Court can't
17    liquidate that, although I suspect this Court
18    wouldn't want to liquidate that.  And so therefore,
19    the reference is withdrawn and the District Court
20    that handles these matters all the time can deal
21    with it and give a jury trial.  But I think the true
22    answer is, to avoid wasting an asset, the insurance
23    policy, we would think that we would try to
24    negotiate with these creditors.
25          And I get that they may not want to

1    negotiate, but this is a Court that balances harm

2    and balances benefit.  And when you file a lawsuit

3    in our Courts, you're filing a lawsuit to obtain

4    compensation.  You're not necessarily filing a

5    lawsuit, although some do, to kill a company and put

6    it out of business.  And certainly that could be the

7    result here if this bankruptcy case is dismissed.

8              The result clearly --

9              THE COURT:  But that's not what I

10   perceive, just from what I've read.  What I

11   perceive, it's not even so much the dollar amount.

12   It's having a judgment saying that -- with

13   litigation plaintiffs, what I perceive they want is

14   a Court saying or a jury saying these were untruths,

15   these were falsehoods that were published, and they

16   caused harm.

17             But the first part of it, these were

18   falsehoods.  That's what it appears that they want,

19   and you can't get that through the traditional

20   bankruptcy claims objection process.  We just come

21   up with a dollar amount.  And that's what I am

22   struggling with, in the context of understanding the

23   bankruptcy dynamic here.

24             MR. HOUSTON:  As I said, Judge, number

25   one, in the state court complaint they've asked for

```
 1   money.  They've not asked for some sort of a
 2   proclamation of vindication.
 3               I'm being a little cheeky here when I say
 4   that, but that's what lawsuits are for, is to obtain
 5   compensation.  As a byproduct, maybe you're
 6   vindicating your position, or maybe the debtor is
 7   vindicating his position, but if they're asking for
 8   money, they won't get it litigating this case to
 9   death, or litigating this company to death.
10               The result will be, the company will have
11   zero assets, there will be zero left on the
12   insurance policy, and an ongoing business that, you
13   know, depending upon your view point, may or may not
14   serve a useful function in our highly charged
15   political environment, will be done, it will be
16   killed.
17               We filed this bankruptcy at this juncture
18   because there is about to become an onslaught of
19   discovery that is going to reduce the policy
20   proceeds substantially.  We have a million three in
21   added value by being in this Bankruptcy Court today,
22   and that million three would be coming from
23   insurance policy proceeds, because whether it goes
24   to lawyers or it goes to the first winner to the
25   courthouse, that policy will be wiped out.  There's
```

```
1    no question about that.  And then the debtor will
2    have to utilize its own resources and assets.  That
3    would be the result.
4              The result could be different in this
5    Court.  The $1.3 million could be used for payment
6    of creditor claims.  The debtor's assets could be
7    directed for payment of creditor claims.  The
8    debtor's generation of revenue going into the future
9    could be used to pay creditor claims.
10             THE COURT:  Is that an actual concession
11   that's been made by the insurance company?
12             MR. HOUSTON:  No.  It's an ongoing
13   discussion, Judge, but I would say the rhetoric that
14   I've had with the general counsel is that they
15   recognize that if this goes to litigation, they're
16   going to be out at some point.  So it would have to
17   be a negotiation.
18             And I would say, Judge, I approached one
19   of the litigation creditors' counsel about
20   discussing plan treatment and what assets could be
21   contributed.  He declined to have that discussion
22   until after this hearing was had.  And I understand
23   the litigation point of view.  I know Mr. Furr has
24   reached out to the litigation plaintiffs' counsel to
25   try to get a dialogue going, and of course, they
```

Page 56

```
 1   have politely declined.  And I'm sure Ms. Leali has
 2   been met or would be met with the same sort of
 3   result, that they want to see what their shot in
 4   litigation is first.
 5            So we would like to -- because we think
 6   Bankruptcy Court invites and encourages and condones
 7   negotiations, settlements and resolutions, rather
 8   than litigating again all the assets out of the
 9   estate.
10            So, Judge, we think that the bankruptcy
11   process, especially the Sub V process, lends itself
12   to accomplishing the goals that I've mentioned, and
13   we believe that the debtor -- there's no evidence
14   that the debtor filed this for any other function or
15   purpose, other than to try to resolve these things
16   with what assets it has, so it can survive.
17            And those are what the Supreme Court said
18   are the two balancing interests in a legitimate
19   bankruptcy filing, and that is, paying money to
20   creditors, and allowing ongoing businesses to
21   survive.
22            Addressing a couple of the comments from
23   Ms. Strickland, and perhaps Mr. Alexander, the fact
24   that the debtor presented Mr. Burns at the first 341
25   Meeting was not an indication of bad faith.  As I
```

Page 57

```
 1   said, it was my judgment call.  And we see this --
 2   actually, the Florida Rules of Procedures have just
 3   been amended to add the Apex doctrine, that it's not
 4   necessarily the head bottle washer that is going to
 5   be able to respond adequately to the question in a
 6   financial situation or operation situation.
 7            That's why I presented Mr. Burns for that.
 8   He's been my contact, and always been very
 9   responsive to me and responsible.  And so that was
10   on me, and not in any way the debtor skipping the
11   341, and Mr. Hoft taking this lightly in any
12   respect.
13            There's been an argument that the debtor
14   has been very strident in its defense of these
15   various things, and seeking appeals and seeking
16   counterclaims.  And of course, this is a business,
17   much like its compatriot websites and other news
18   outlets that generates a lot of litigation, no
19   different than Facebook or Amazon or other
20   businesses that are controversial in some respect.
21            Mr. Hoft has resided in, as it was said by
22   Ms. Stickland, his newly purchased condominium, that
23   was purchased three years ago in October of '21, and
24   ever since that period of time, has operated this
25   opinion website from that location.  Mr. Hoft is,
```

1   for lack of a better term, the nerve center.  Where

2   Mr. Hoft resides is where the business resides.

3           Ms. Strickland pointed out, there really

4   is no office to take coffee to, and that's because

5   it doesn't have a traditional sticks and bricks

6   identification.  It's a -- for lack of a better

7   term, a virtual business, you and it resides where

8   the guy that runs it or the guy that is the idea log

9   is located, and that's in Jensen Beach, Florida, and

10  that's why we filed here.

11          Judge, there is clearly a concern that in

12  six months or eight months or ten months, before

13  trial dates, that the insurance policy runs out, we

14  don't have that to deal with, debtor resources are

15  used and can be redirected in a different manner.

16          I now remember the last point I wanted to

17  address, Judge, and that was this Colorado

18  suggestion of bankruptcy.  It was very late in the

19  game that I was advised that there was an

20  application for the Colorado Supreme Court to take

21  certiorari review of the lower court.  I learned

22  that just happenstance speaking to Mr. Burns, and I

23  said, "Well, why didn't we report that on the

24  litigation schedule?"

25          And it's all part of the same litigation,

1   but we did not submit a suggestion of bankruptcy,

2   and Mr. Burns's concern was, "Well, we're really the

3   movant."

4           And of course, the case law, certainly in

5   this district, and many others, are, even if you're

6   the appellant, if the underlying litigation

7   potentially has adverse consequences against you,

8   that litigation is stayed too, and even the debtor

9   must seek relief from stay if it wants to proceed

10  forward in those kinds of things.

11          That's why it was submitted so belatedly,

12  Judge, and it was not for any sort of strategic

13  purpose to stop a proceeding.  It's just the law,

14  and it just came to my attention too late.

15          Judge, I don't need to belabor the point.

16  We'd like to stay in bankruptcy.  We think we can

17  stay in bankruptcy.  We'd ask the Court to deny the

18  motion.

19          Thank you.

20          THE COURT:  All right.  Thank you.

21          Ms. Leali.

22          MS. LEALI:  Your Honor, Linda Leali, as

23  the Chapter V Trustee.  I don't have anything to add

24  to the arguments that are being made today.

25          THE COURT:  Thank you.

```
1              Okay.  Ms. Strickland, I would invite you

2    to reply.  You did file a reply.  As you will come

3    to see, it is my custom to read everything that is

4    filed on the docket.  If you'd like to just offer a

5    couple of closing items, then the Court will

6    conclude and take this matter under advisement once

7    we just cover a few other housekeeping things.

8              MS. STRICKLAND:  Thank you, Your Honor.

9    For the record, Rachel Strickland, Wilkie Farr &

10   Gallagher.

11             I took no liberal licenses.  The fact is

12   that Mr. Hoft was not at the 341 Meeting when it was

13   originally scheduled.  He has been described by

14   counsel as the, A, head bottle washer.  I would

15   submit he is not the head bottle washer.  He's the

16   only one, and if you look at the joint stipulation

17   of facts, Paragraph 5, it says, before and after the

18   petition date the debtor's only employee has been

19   Jim Hoft.  So with that, it's very hard to imagine

20   how, as the nerve center, as Mr. Houston put it, he

21   would not be there.

22             Your Honor asked a question about what are

23   we supposed to do with these claims, and in terms of

24   liquidating them, the answer was, a jury trial.  And

25   yes, if you withdraw the reference and you have a
```

1    jury trial, I would submit that the insurance policy

2    befalls the same fate that debtor's counsel is

3    complaining about.

4              So rather than that artifice, which puts

5    them in District Court, which again, pre-petition,

6    the debtor has already tried to move it to District

7    Court and it was remanded back down, if it's going

8    to go to a jury trial, it might as well for its

9    efficiency stay where it is and continue.

10             There was also a reference to negotiation,

11   which I found fascinating, because when I read

12   Docket Number 27, which is the debtor's pre-status

13   conference report, there's a sentence in Paragraph 6

14   that says, "Efforts have been made to discuss the

15   confirmation of a consensual plan with the largest

16   creditor constituents," plural.

17             I can't imagine who that would be, but it

18   isn't Ruby Freeman and Shaye Moss.  We have received

19   zero outreach from the debtors.  Which again, it's

20   just rich that this would be filed in Your Honor's

21   Court, that it would be stated again today.  It

22   hasn't happened, so that's confusing.

23             Your Honor and Mr. Houston had a back and

24   forth about whether or not, when there's a lawsuit

25   filed, people want a decision that they are right.

Page 62

```
1    Well, defamation in particular, the key criteria
2    that must be found in a defamation suit is that the
3    statements are false.  So it is an important
4    element.
5              It doesn't mean we wouldn't take someone's
6    call if they bothered to call us, but the debtor
7    hasn't done that, and the reason they haven't done
8    that, when this was filed on May 21st of 2024,
9    certainly plenty of time to have phone calls, we
10   certainly have had lots of phone calls about the
11   joint stipulation, that's not what they're here for.
12   They're here for delay, and to frustrate my clients.
13             There was a statement made by counsel that
14   insurance might pay general creditors' claims.
15   That's not evidence.  That's not before you.  I've
16   never seen anything to that effect.  So it was a
17   nice throw away statement, but I'm not sure it's in
18   the record.
19             There also was a statement just made by
20   counsel that his client, or the head bottle washer,
21   Jim Hoft, moved to Florida in October of 2021, and
22   has lived here for three years.  That's pretty
23   interesting, because the business, The Gateway
24   Pundit, which is the debtor here, only filed in
25   Florida a week before the petition date.
```

1        So again, this goes to bad faith, this

2   goes to litigation tactics, and using the bankruptcy

3   process improperly.  If the nerve center is wherever

4   Mr. Hoft is, and Mr. Hoft has allegedly lived in

5   Florida for three years, I go back to the beginning.

6   Why are they paying Missouri taxes for this business

7   in the documents that they filed, and why did they

8   only file a business registration for The Gateway

9   Pundit one week before the petition date?  The nerve

10  center apparently has been living here for three

11  years.

12        So this isn't about proofs of claim, it's

13  not about all that other stuff.  This is about a bad

14  faith filing.  And when I go through the joint

15  stipulation of uncontested facts, not a single one

16  of them -- some of them are neutral.  Mr. Hoft is

17  the only employee.  A filing was made on such and

18  such a date.  But all of the actual evidence in here

19  is about loans to insiders that haven't been paid

20  back, that haven't been documented.

21        I assume that the evidence Mr. Houston was

22  pointing to in terms of their own submission isn't

23  about the Porsche, because there's nothing else in

24  here that would be supportive of the debtor's

25  position.

1           So with that Your Honor, unless you have
2    questions for me, we thank you for your
3    consideration.
4           THE COURT:  I do have a question.
5           MS. STRICKLAND:  Sure.
6           THE COURT:  And to play devil's advocate
7    with you, which is what I need to do in order to
8    come to a decision here, many of the facts that
9    you've alleged in your papers would suggest that
10   there is certain pre-petition misconduct that
11   depleted this debtor of assets.  And normally in a
12   bankruptcy case where that type of -- those types of
13   allegations are made, we would see either major
14   creditors or the U.S. Trustee's Office moving for
15   the appointment of a trustee, whether in Chapter 11,
16   or seeking to convert the business and appointing a
17   Chapter 7 Trustee, in order to recover those assets
18   for the benefit of the creditors of the estate.
19          It's somewhat striking to me in reviewing
20   the motions that were filed, that that was not
21   relief that your clients chose to seek.  That is,
22   you sought in the alternative to dismiss, stay
23   relief, but not a request that somebody go after
24   these assets that you claim were improperly stripped
25   from the debtor over the course of years.

```
 1            MS. STRICKLAND:  Certainly, Your Honor.
 2   So, one, I take you at your word that you're playing
 3   devil's advocate, but nonetheless, I just want to
 4   correct the record.
 5            They're not allegations, in terms of the
 6   strip.  These are in the debtor's own submissions
 7   that The Gateway Pundit bought a Porsche for
 8   Mr. Hoft.  That's not our allegation.  That is a
 9   stipulated fact.
10            The loan to Mr. Hoft to purchase the
11   Florida condominium in the amount of $799,860 is not
12   an allegation.  It's a fact.
13            I'm going T get to your question anyway,
14   because that's the more important part, but I just
15   wanted to start with the premise that the debtors
16   have stipulated that all of these dollars left the
17   house, that they lent the money.
18            THE COURT:  My understanding, just to
19   correct you, from the joint stipulation, is that the
20   car is titled in the debtor's name.
21            MS. STRICKLAND:  That's correct.
22            THE COURT:  It may be driven, as it would
23   have to be, by an individual, which happens to be
24   Mr. Hoft, but it is titled in the debtor's name.
25            MS. STRICKLAND:  Yes, in Missouri.
```

```
 1              THE COURT:  So that's the point that I'm
 2   getting at.
 3              MS. STRICKLAND:  Understood.  Correct,
 4   Your Honor.
 5              We didn't move for a Trustee and we didn't
 6   move for an examiner, because we don't believe this
 7   belongs here.  We don't believe there is a purpose
 8   of the Chapter 11, other than the automatic stay,
 9   and to use bankruptcy as a shield and a sword.  And
10   so, our starting premise was, where should these
11   thing be occurring, and we think they should be
12   occurring in Missouri state court.
13              And but for the fact that Mr. Hoft is
14   going to have to sit for a deposition, his brother,
15   the other Mr. Hoft is going to sit for a deposition,
16   we wouldn't be here at all.  So we just think it's
17   improper.
18              The other thing is, if we happen to be
19   here after Your Honor rules, I am almost certain
20   there will be follow up relief in the form that you
21   suggest, as we don't believe that there is actually
22   a steward of this estate.  The admissions in the
23   341, in terms of no one minding the store, a lot of
24   the questions about the economics, not only were
25   they not answered by Mr. Hoft, they also were not
```

1    answered by Mr. Burns, who's not an employee of the

2    debtor.

3              Instead, they referred to, "You'll have to

4    ask the accountant."  And this is in the 341

5    testimony under oath.  The accountant is someone who

6    is Mr. Hoft's personal accountant, also does work

7    for The Gateway Pundit, hasn't been retained in the

8    bankruptcy, and was referred to as the person who

9    knows stuff.  So I don't think there is a

10   responsible debtor-in-possession, if you will, here.

11             I think that if the case stands for

12   whatever reason, I'm sure we'll be moving for a

13   Trustee or an examiner.

14             THE COURT:  All right.  Thank you,

15   Ms. Strickland.

16             MR. HOUSTON:  May I respond to some of

17   those points, Judge?

18             THE COURT:  Sure.  We've got until --

19             MR. HOUSTON:  I'll be brief.

20             THE COURT:   -- 4:30.

21             MR. HOUSTON:  As far as the issue of

22   transfers, Judge, these are items that are on the

23   debtor's ballot sheet.  These are items that were

24   disclosed in the bankruptcy schedules.  These are

25   items that were discussed freely at the 341 Meeting,

1    one of the two long sessions.

2            This is a company that, for lack of being

3    in the forefront of political controversy, we would

4    call a mom and pop business.  It's not regulated by

5    the federal government or state government in any

6    substantial manner, or by bank covenants on lines of

7    credit or loans.  So, company owners sometimes do

8    borrow money from the company, and they either get

9    bonused out as compensation, distributions, if you

10   will, or they get repaid.

11           Mr. Hoft would absolutely have to be

12   addressed in a plan, to contribute to the payment of

13   the plan.  I can't ignore that.

14           The loan to Joe Hoft is $28,000.  That was

15   the question that someone couldn't answer, is what

16   was that loan for.  It was to Mr. Hoft's brother.

17           As for the deferral of questions to the

18   accountant, there was a very esoteric question asked

19   about owners equity on the balance sheet, and what

20   that owner equity represented.  I've gotten into

21   several intensive accounting cases where those are

22   capital accounts that vary, based upon so many

23   different factors.  It's not highly unusual for a

24   debtor's principal to understand he's making money

25   or he's not, versus, what is the owner's capital

1   account at any given time.

2           And the final point, Judge, is, I stated

3   to Mr. Ochs that I was going -- we were going to

4   retain the debtor's traditional accountant, because

5   she has the history of this debtor for a period of

6   time.  When Mr. Hoft testified at the 341 that she

7   also does his individual accounting, I've abandoned

8   that and told Mr. Ochs we won't be seeking to retain

9   her, because of disinterestedness issues, and

10  instead we retained Mr. Goffman (phonetic), that we

11  intend to present an application to the Court if we

12  get to that point, Judge.

13          Thank you.

14          THE COURT:  Thank you.

15          Mr. Alexander.

16          MR. ALEXANDER:  Your Honor, if I may make

17  two brief reply points to something that was raised

18  by Mr. Houston.  This is Vincent Alexander.

19          One of them is with respect to the

20  suggestion of bankruptcy that was filed, which is

21  Exhibit 26.  Obviously, we think the timing of it

22  was such that given that it was filed two days after

23  the petition for certiorari was due in the Colorado

24  Supreme Court.  But what we found more troubling was

25  the fact that it states that the entire captioned

1  matter is stayed, and that under no circumstances is
2  accurate.
3              And so we believe that that creates
4  confusion, because to the extent the stay applies,
5  it applies to the debtor, not non-debtor parties.
6  And so that was our point with respect to that
7  suggestion of bankruptcy.  So as on file now, it's
8  ambiguous and unclear at best, in terms of what the
9  debtor's intentions were with filing that document.
10             The second point I wanted to address was
11  with respect to what I consider blatant forum
12  shopping.  There was discussion about withdrawing
13  the reference of the claim, possibly to a District
14  Court.
15             The Colorado litigation, governed --
16  entitled to a jury trial, governed by Colorado law,
17  and the debtor didn't attempt to have that litigated
18  in Florida, non-Bankruptcy Court, District Court,
19  and have a Florida jury apply Colorado law, Florida
20  Judge apply Colorado law, on top of the fact that
21  there are multiple other defendants in another
22  litigation.  So that potentially could lead to
23  inconsistent rulings.
24             And again, in terms of judicial economy,
25  efficiency, appropriate forum, it's not here in

1    Florida.   It's elsewhere.

2              With that, Your Honor, I'd rest.

3              THE COURT:   Thank you, Mr. Alexander.

4              Okay, thank you.   All right.   So what I

5    then want to just verify I understand correctly, the

6    parties have agreed that in terms of the facts that

7    the Court should look at, it is what is in the joint

8    stipulation of uncontested facts, ECF 80, the

9    exhibit register submitted by what I'll refer to as

10   litigation plaintiffs, which the debtor doesn't

11   dispute, as well as the supplement to the exhibit

12   register that was just filed earlier today.

13             Those are the facts and exhibits that the

14   Court should be focused on, relying on, for purposes

15   of reaching its decision on this matter; is that

16   correct?

17             MR. HOUSTON:   Correct, Judge.

18             MS. STRICKLAND:   That's correct, Your

19   Honor, although I do believe that if Your Honor

20   wanted to look at the publicly available Internet

21   for a statement of the debtor about the Department

22   of Justice targeting The Gateway Pundit, this is on

23   the debtor's website as we speak, about the U.S.

24   Trustee and about these proceedings, and he thinks

25   that this is egregious and highly relevant, and that

1    Your Honor can take judicial notice of it.

2              THE COURT:  Thank you, Ms. Strickland.

3              All right.  The Court will then take this

4    matter under advisement, and will render its

5    decision prior to or on August 2nd.

6              All right.  Thank you all.

7              MS. STRICKLAND:  Thank you, Your Honor.

8              THE COURT:  I appreciate the

9    presentations.

10             MR. HOUSTON:  Thank you, Judge.

11             ECRO:  All rise.

12             (Thereupon, the hearing was concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 73

1                    CERTIFICATION

2

3    STATE OF FLORIDA:

4    COUNTY  OF  DADE:

5

6              I, HELAYNE F. WILLS, Shorthand

7    Reporter and Notary Public in and for the State of

8    Florida at Large, do hereby certify that the

9    foregoing proceedings were taken by electronic

10   recording at the date and place as stated in the

11   caption hereto on Page 1; that the foregoing

12   computer-aided transcription is a true record of my

13   stenographic notes taken from said electronic

14   recording.

15              WITNESS my hand this 23rd day of

16   July, 2024.

17

18

19   _____

                    HELAYNE F. WILLS

20           Court Reporter and Notary Public

            In and For the State of Florida at Large

21          Commission No:  HH157788 Expires 8/2/2025

22

23

24

25