| | |
|---|---|
| **COLORADO SUPREME COURT**<br>Colorado State Judicial Building<br>2 East 14th Avenue<br>Denver, Colorado 80203 | |
| **On Certiorari from the Colorado Court of Appeals**<br>Case No. 2022 CA 0843<br>Opinion of April 11, 2024 | |
| **Petitioners**: DONALD J. TRUMP FOR PRESIDENT, INC., JOSEPH OLTMANN, FEC UNITED, SHUFFLING MADNESS MEDIA, INC., dba CONSERVATIVE DAILY, TGP COMMUNICATIONS LLC D/B/A THE GATEWAY PUNDIT, and JAMES HOFT,<br><br>v.<br><br>**Respondent:** ERIC COOMER | **Δ COURT USE ONLY Δ** |
| **Attorneys for Petitioner Donald J. Trump for President, Inc**.<br>John S. Zakhem, #30089<br>Andrew C. Nickel, #45235<br>Campbell Killin Brittan & Ray, LLC<br>270 St. Paul Street, Suite 200<br>Denver, Colorado 80206<br>Phone: (303) 322-3400<br>Fax: (303) 322-5800<br>jzakhem@ckbrlaw.com<br>anickel@ckbrlaw.com<br><br>**Attorneys for Joseph Oltmann, FED United, Shuffling Madness Media, Inc.**<br>Jamey W. Jamison, #10953<br>Mark A. Sares, #19070<br>Dino G. Moncecchi, #45429<br>Harris, Karstaedt, Jamison & Powers, P.C.<br>10333 E. Dry Creek Road, Suite 300<br>Englewood, Colorado 80112<br>Phone:  720-875-9140<br>Fax:  720-875-9141<br>E-mail:  jjamison@hkjp.com<br>msares@hkjp.com<br>dmoncecchi@hkjp.com | **Case No:** 2024SC317 |

|  |  |
|---|---|
| **Attorneys for Petitioners Hoft and TGP Communications LLC dba The Gateway Pundit**<br>The Law Offices of Randy B. Corporon P.C.<br>Randy B. Corporon, # 29861<br>2821 S. Parker Rd., Ste. 555<br>Aurora, CO 80014<br>Phone: (303)749-0062<br>Email: rbc@corporonlaw.com |  |
| **JOINT PETITION FOR A WRIT OF CERTIORARI** ||

## CERTIFICATE OF COMPLIANCE PURSUANT TO C.A.R. 32(H)

I hereby certify that this brief complies with all requirements of C.R.A. 53(a) and C.A.R. 28, 32, and 53, including all formatting requirements set forth in those Rules. Specifically, the undersigned certifies that this document contains 3,184 words (including headings and footings but excluding the case caption, Certificate of Compliance, Table of Contents, Table of Authorities, signature blocks, Certificate of Service and the Appendix).

*/s/ Andrew C. Nickel*
Andrew C. Nickel, #45235
Campbell, Killin, Brittan, & Ray, LLC

# TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE PURSUANT TO C.A.R. 32(h) .................. i

TABLE OF CONTENTS ..................................................................... ii

APPENDIX ....................................................................................... iii

TABLE OF AUTHORITIES ............................................................... iv

ADVISORY LISTING OF ISSUES PRESENTED FOR REVIEW .................... 1

OPINION BELOW ............................................................................. 1

GROUNDS ON WHICH JURISDICTION IS INVOKED ................................ 2

OTHER CASES ................................................................................ 2

STATEMENT OF THE CASE ............................................................... 2

ARGUMENT .................................................................................... 3

I.    Certiorari Should be Granted Because the Court of Appeals Erroneously Applied the Standard of Review ....................................... 3

II.    Review Should Be Granted Because the Court of Appeals Erroneously Engaged in Credibility Determinations ................................................. 6

III.    Review Should be Granted Because the Court of Appeals Erroneously Applied the Actual Malice Standard ........................................................ 8

IV.    The Court of Appeals Erred When It Failed to Apply the Litigation Privilege to Statements Made by Campaign Attorneys at a Press Conference Held to Solicit Additional Facts, Witnesses, And Potential Litigants Related to Both Ongoing and Anticipated Litigation. ....................................... 13

CONCLUSION ................................................................................. 16

APPENDIX

Appendix A:   Court of Appeals Opinion dated April 11, 2024 ("Opinion")

Appendix B:   Opening Brief of Petitioner Donald J. Trump for President, Inc.

Appendix C:   Opening Brief of Petitioner Hoft and TGP Communications LLC dba The Gateway Pundit

Appendix D:   Opening Brief of Petitioners Joseph Oltmann, FEC United, Shuffling Madness Media, Inc. d/b/a Conservative Daily

# TABLE OF AUTHORITIES

Cases

*Begley v. Ireson* ........................................................................................14

*Coomer v. Donald J. Trump for President, et al* ........................................2

*Gannett Co. v. DePasquale* .......................................................................15

*In re Green* .................................................................................................9

*Killmer, Lane, & Newman LLP v. BKP, Inc* ............................................13

*L.S.S. v. SAP* .............................................................................................11

*Rosenblum v. Budd* .....................................................................................3

*Salazar* v. Pub. Tr. Inst. ...........................................................................3

*St. Amant v. Thompson* ..............................................................................8

*Wright v. TEGNA Inc.* ...............................................................................8

**Statutes**

C.R.S. § 13-20-1101 ...................................................................................2

## ADVISORY LISTING OF ISSUES PRESENTED FOR REVIEW

I.     The Court of Appeals erroneously applied the standard of review for a special motion to dismiss under the Anti-SLAPP Statute.

II.     The Court of Appeals erroneously engaged in credibility determinations, and deviated from its pronounced standard, when concluding plaintiff presented *prima facie* evidence to overcome the special motion to dismiss under the Anti-SLAPP Statute.

III.     The Court of Appeals erroneously applied the actual malice standard when evaluating the special motion to dismiss under the Anti-SLAPP Statute.

IV.     The Court of Appeals erroneously failed to apply the litigation privilege to statements made by Campaign attorneys, at a press conference that was held to solicit facts and witnesses related to both ongoing and anticipated litigation.

## OPINION BELOW

The Court of Appeals entered its opinion on April 11, 2024. ___ P.3d ___, 2024COA35 (Apr. 11, 2024). *See* Appendix A. On May 31, 2024, this Court extended the time to file this Petition to and including June 24, 2024.

## GROUNDS ON WHICH JURISDICTION IS INVOKED

This petition arises from the Court of Appeals' April 11, 2024, decision affirming in part and denying in part the judgment of the Denver District Court. No party sought rehearing. This Court has jurisdiction pursuant to C.A.R. 49(b)-(d), and C.R.S. § 13-4-108.

## OTHER CASES

Petitioners are not aware of any pending case in which this Court has granted certiorari review on the same legal issues on which review is sought.

## STATEMENT OF THE CASE

In 2019 the Colorado General Assembly enacted C.R.S. § 13-20-1101 (the "Anti-SLAPP Statute"). Respondent filed his complaint on December 22, 2020, and a first amended complaint on February 4, 2021. Petitioners filed special motions to dismiss the first amended complaint pursuant to the Anti-SLAPP Statute. The trial court denied the special motions to dismiss on May 13, 2022. Petitioners appealed, and the Court of Appeals issued its decision affirming in part and denying in part the trial court's rulings in *Coomer v. Donald J. Trump for President, et al.,* ___ P.3d ___, 2024COA35 (Apr. 11, 2024), and remanded the case to the trial court for further proceedings.

## ARGUMENT

### I.   Certiorari Should be Granted Because the Court of Appeals Erroneously Applied the Standard of Review

The Court of Appeals enumerated that where a plaintiff is "pursuing a defamation claim that will ultimately require proof of actual malice by clear and convincing evidence…the plaintiff must establish a probability that they will be able to produce clear and convincing evidence of actual malice at trial" to overcome a special motion to dismiss under the Anti-SLAPP Statute. Opinion, ¶77 (quoting *Rosenblum v. Budd*, 2023 COA 72). The Court of Appeals further explained that "[i]n resolving an anti-SLAPP special motion to dismiss, the court 'shall consider the pleadings and supporting and opposing affidavits." *Id.*, ¶78 (quoting C.R.S. § 13-20-1101(3)(b)). This standard mandates consideration of evidence, but not a party's allegations.

In *Salazar* v. *Pub. Tr. Inst.,* 522 P.3d 242 (Colo. App. 2022), the Court of Appeals correctly observed that "the review of a special motion to dismiss is similar to a review of the sufficiency of the evidence, in that a court reviewing such a motion is called on to determine whether the plaintiff's allegations and supporting affidavit, viewed in conjunction with any opposing affidavit, meet the legal threshold of establishing a reasonable likelihood of establishing success on the merits." *Salazar,*

at 248. *Salazar* found the plaintiff had provided evidence supporting his allegations and theory of the case through administrative body records and a sworn statement that provided extensive factual detail on each of the alleged defamatory statements. That case, moreover, did not involve uncontroverted evidence produced by the defendant.

In the instant matter, the Court of Appeals accepted plaintiff's affidavit as "evidence" wherein he merely denies the content of statements made about him. Plaintiff's affidavit is not evidence; rather, it is repetitive of plaintiff's allegations in the Complaint, and recitation of self-serving allegations that the statements regarding him are false. The plaintiff's affidavit lacks any factual detail that would constitute evidence in a court of law, and certainly omits the level of evidence submitted by *Salazar*. Accordingly, plaintiff's affidavit falls well short of the evidentiary standard enumerated in *Salazar*. In addition, the Court of Appeals did not properly defer to evidence produced by defendants that was uncontroverted. While a court should not weigh evidence, it also should not ignore evidence that is not in dispute.

Under the Court of Appeals' erroneous application of the standard in this matter, any plaintiff facing a special motion to dismiss under the Anti-SLAPP Statute can defeat the motion with nothing more than a self-serving affidavit denying

the statements stated about the plaintiff, and wholly ignore any evidence that a defendant produced that the plaintiff cannot deny. This cannot be the standard applicable to a special motion to dismiss under the Anti-SLAPP Statute, and this Court must accordingly clarify the standard and remand for further proceedings consistent with said corrected standard.

The Court of Appeals' affirmation of the district court's denial of the defendants' anti-SLAPP motions, is a determination that Coomer made a proper Anti-SLAPP stage showing of a *prima facie* case for actual [subjective] malice on the part of Oltmann and the other defendants.

The Court of Appeals' Opinion affirms that to prove defamation "when, as here, the statement involves a matter of public concern, three heightened standards apply" Opinion, ¶86. The heightening of each of the three standards is by virtue of the need for "clear and convincing evidence." *Id.* "[B]ecause defendants' statements involve a matter of public concern, Coomer must "establish a reasonable probability that he will be able to produce clear and convincing evidence of actual malice at trial." Opinion, ¶146, (citing *Rosenblum,* ¶ 40).

> Clear and convincing evidence is "evidence that is highly probable and free from serious or substantial doubt." *Destination Maternity v. Burren,* 2020 CO 41, ¶ 10 (citation omitted). But again, that is the burden a plaintiff must ultimately meet at trial. At this early stage, Coomer need only show "a reasonable probability that he *will* be able" to prove falsity and actual malice by clear and convincing evidence at

trial. *Rosenblum,* ¶ 40. (emphasis added).

Opinion, ¶87. However the Court of Appeals' opinion does not clearly identify the manner in which a *prima facie* showing, in this case, includes a showing by Coomer of a reasonable probability of supplying "clear and convincing" evidence of actual malice. The absence of a showing by Coomer that he has a reasonable probability of providing clear and convincing evidence at trial is justification for overturning the denial of the Anti-SLAPP motions.

In this case, the lack of clarity about how to apply "clear and convincing" as a standard of proof during the Anti-SLAPP stage is grounds for this Court to accept the Petition for Certiorari. This error on the part of the Court of Appeals requires this Court's intervention.

## II.    Review Should Be Granted Because the Court of Appeals Erroneously Engaged in Credibility Determinations

The Court of Appeals correctly noted that it cannot engage in credibility determinations when evaluating a special motion to dismiss under the Anti-SLAPP Statute. Opinion, ¶73. However, the Court of Appeals then proceeded to credit plaintiff's self-serving denials of having participated in the conduct attributed to him by news sources. But the Court of Appeals then simultaneously found the evidence presented by the defendants lacked credibility. The Court of Appeals disguised its

credibility comparisons as merely a consideration of whether the defendants' sources were "reliable;" but in truth, the Court of Appeals improperly compared its perspective of the relative "credibility" of the parties' competing statements. *See* Opinion, ¶75.

The Court of Appeals' Opinion acknowledges that only pleadings and affidavits that are based on facts that are "true," are to be assessed. *See* Opinion, ¶63 (citing *Rosenblum v. Budd*, 2023 COA 72, ¶24). Only if true facts indicate that Coomer has a reasonable likelihood of producing clear and convincing evidence to prove subjective/actual malice, should he be able to proceed on his defamation claim. *See Rosenblum v. Budd*, 2023 COA 72, ¶24. Otherwise, the claim must be dismissed. *See* Opinion, ¶63. The facts accepted by the Court of Appeals were solely those of Coomer.

Despite opposing factual affidavits from defendants, the Court of Appeals justifies ignoring such "facts" as improper "weighing" of evidence. The Court of Appeals says that no credibility determinations are allowed, because that would be permitting the "weighing" of evidence, which is not allowed in its de novo review. Opinion, ¶73. Yet, the Court of Appeals makes what are essentially "credibility" determinations by making a lack of "reliability" determination about Oltmann's account of what was heard on the Antifa call and what Oltmann learned by research

7

and investigation into "Eric from Dominion" and into Eric Coomer's background and employment. This reliability determination seems to be a work-around by the Court of Appeals used to weigh the evidence in Oltmann's affidavit as not credible and therefore not true. *See* Opinion, ¶75.

What evidence is to be considered and assessed by the Court of Appeals' *de novo* review of a trial court ruling on an Anti-Slapp motion remains a subject being addressed by the panels of the Court of Appeals and requires the attention of the Colorado Supreme Court. *See e.g., Wright v. TEGNA Inc*., 2024 COA 64, ¶¶40-41 (already comparing this Court of Appeals ruling to other Anti-SLAPP appeals and holding that it may consider allegations that are unsupported by admissible evidence).

## III.   Review Should be Granted Because the Court of Appeals Erroneously Applied the Actual Malice Standard

The Court of Appeals erred when holding there was *prima facie* evidence of a reasonable likelihood of Coomer's ability to prove *actual malice by clear and convincing evidence*.

Plaintiff's required showing of actual malice in defamation cases means "the evidence must 'permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication,' [*citing St. Amant v. Thompson,* 390 U.S.

727, 731 (1968)]*, or was highly aware of its probable falsity, *Creekside Endodontics,*

¶ 38." Opinion, ¶148. The Court of Appeals cites to *In re Green*, which states:

> We recognize that in disciplinary cases some jurisdictions have applied
> the second prong of the *New York Times* test--that the defendant knew
> the statement was false or spoke with reckless disregard as to its truth-
> -as an objective requirement, contrary to the subjective approach of the
> Supreme Court in defamation cases. *St. Amant*, 390 U.S. at 731. In *St.
> Amant*, the Court applied a subjective standard in defamation cases,
> holding that "reckless conduct is not measured by whether a reasonably
> prudent man would have published, or would have investigated before
> publishing. There must be sufficient evidence to permit the conclusion
> that the defendant in fact entertained serious doubts as to the truth of
> his publication." *Id.*

*In re Green*, 11 P.3d 1078, 1086 **n.7** (Colo. 2000).

Nevertheless, in the next paragraph, the Court of Appeals leans away from

requiring Plaintiff Coomer to meet that subjective burden of proof analysis by

quoting the case of *St. Amant v. Thompson*, 390 U.S. at 732, in a manner to suggest

that the focus somehow becomes the adequacy of the defendant's belief. Opinion,

¶149. The Court of Appeals' Opinion goes on to, in effect, make an

objective/reasonable person standard analysis for malice – contrary to the subjective

standard – and suggests it supports Coomer showing actual malice.

Yet, the Court of Appeals Opinion makes what appears to be a patent excuse

for Plaintiff having *no* evidence of defendant's subjective mental state. To make up

for Plaintiff having no (i.e., insufficient) evidence of defendant Oltmann *subjectively*

having a malicious state of mind, the Court of Appeals permits Plaintiff to argue for an "inference" of subjective malice by comparing/judging/weighing plaintiff's arguments to an objective standard for malice. *See* Opinion, ¶¶151-153 (the Court of Appeals recognized that its suggested "first alternative" for evidence of malice is clearly inadequate: "We cannot say whether or not that is the case because it turns on credibility assessments we cannot make." ¶153).

The Court of Appeals however *weighs* the evidence presented contrary to its recognition that weighing evidence, at the Anti-SLAPP motion stage, *is not appropriate*. The mechanism used by the Court of Appeals to, in effect, weigh the evidence, is to say a defendant's simple statement that he thought the published communication was true is insufficient. Opinion, ¶149. The Court of Appeals justifies weighing evidence of malice, by applying an altered standard of proof -- from a subjective standard to an objective standard -- and calling evidence "insufficient" that it deemed objectively not to be "reasonable" evidence. *See Id*.

The Court of Appeals justifies its weighing evidence of a lay person's investigation of information as either adequate or grossly inadequate by rejecting the subjective standard entirely and making determinations about what is a "reliable" source for corroborative information. *See* Opinion, ¶150 and ¶75. This work around by the Court of Appeals, hides the fact that it is improperly justifying weighing of

evidence. The Court of Appeals weighed the credibility of information gathered by Oltmann as "unreliable" internet sourced investigation. But even the Court of Appeals noted that *Rosenblum* rejected the argument that the internet is inherently unreliable such that a person cannot reasonably believe statements on it. Opinion, ¶134.

The Court of Appeals's citation to *L.S.S. v. SAP*, 2022 COA 123, ¶52, is inapt as support to accept Plaintiff Coomer's mere denial of the Antifa call as sufficient evidence of actual/subjective malice. Opinion, ¶153. The cases cited by the *L.S.S.* court, each reflect a plaintiff who is presenting more than the mere denial of the alleged defamatory statements as evidence of actual malice.  The cases cited by the court in *L.S.S.*, involved evidence of "competing narratives" that were presented as evidence beyond mere denials of the alleged defamatory communication.

Although the Court of Appeals confirmed early in its decision the importance of evaluating each speaker individually, Opinion, ¶90, when addressing actual malice, it erroneously discussed the speakers collectively – which obfuscates the actual malice evaluation for each speaker. Opinion, ¶¶160-179. The Court of Appeals' actual malice findings should be reversed and remanded for proper consideration of each speaker on an individual basis.

The Court of Appeals' actual malice analysis was further flawed because it presumed plaintiff's self-serving affidavit must be accepted at face value, while affidavits from certain defendants were disregarded altogether, even where the evidence in those defendants' affidavits was not disputed. The Court of Appeals disregarded the defendants' affidavits because "a defendant cannot defeat a defamation claim at this early stage simply by saying they believed their statements were true." Opinion, ¶175. Yet, the Court of Appeals accepted plaintiff's self-serving and bald denials of the veracity of statements as "evidence" when in fact they are merely plaintiff's allegations.

**IV.    The Court of Appeals Erred When It Failed to Apply the Litigation Privilege to Statements Made by Campaign Attorneys at a Press Conference Held to Solicit Additional Facts, Witnesses, And Potential Litigants Related to Both Ongoing and Anticipated Litigation.**

The application of the litigation privilege is a question of law that the Supreme Court of Colorado reviews de novo. *Killmer, Lane, & Newman LLP v. BKP, Inc.*, 535 P.3d 91, 95 (Colo. 2023).

The Opinion contrives an "attorney of record on the complaint" requirement for application of the litigation privilege. Under the division's invention, it is no longer sufficient that an attorney have "participated" in litigation, as this Court previously held in *Killmer, Lane, Newman, LLP v. BKP*, *supra*, the privilege now only protects attorneys who have participated as an "attorney of record on the complaint." Opinion, ¶189. The division's novel exception essentially strips the important protections of the litigation privilege from attorneys who participate in litigation but do not enter an appearance, as is common among government attorneys, general counsel and attorneys associated in law firms or contingency practice groups.

Moreover, by creating a new "attorney of record on the complaint" requirement, the division failed to take into account that the litigation privilege can attach to statements made before any complaint has been filed, such as the pre-

litigation statements at issue in *Killmer, Lane, & Newman LLP v. BKP, Inc.*, *supra*, and *Begley v. Ireson*, 490 P.3d 963 (Colo. App. 2020). Since it is not possible for an attorney to be the "attorney of record" on a complaint that has not yet been filed, the division's new requirement obliterates the pre-litigation privilege.

The Court of Appeals went out of its way to find that the statements at issue "were not made to further the litigation," and were, therefore, not protected by the litigation privilege. See Opinion, ¶195. The statements at issue were made to the American public, to solicit potential witnesses or plaintiffs in ongoing or anticipated litigation. As this Court previously held, "the statements must be made in furtherance of the objective of the litigation" in order for the litigation privilege to apply. *Killmer, Lane, & Newman*, 535 P.3d at 96.

By finding that the statements at issue in this case did not further the litigation, the division below is inconsistent with this Court's recent ruling in *Killmer, Lane, & Newman, LLP*, supra, which held that attorneys speaking at a press conference with the purpose of reaching additional potential plaintiffs in a class action suit, did, in fact, further the object of the litigation. 535 P.3d at 101.

By ignoring the underlying purpose for the press conference – to speak to potential litigants and solicit additional facts and witnesses – the division below has all but closed the door on the litigation privilege in Colorado by making the

"furtherance of the litigation" requirement an impossible burden to overcome. If by soliciting witnesses, facts, and additional litigants, attorneys are no longer considered to be furthering the objective of litigation, it is difficult to ascertain what that requirement now entails.

Certiorari is warranted because this court must unwind the division's narrowing of the litigation privilege and determine the proper scope and application of the privilege. Stripping away the protections of the litigation privilege will lead to a conflict between attorneys and clients. Without the protections of the litigation privilege, attorneys may begin to protect their own interests, even if those interests are at odds with the zealous representation of their clients.

The division's holding will also have the effect of chilling vital attorney speech concerning litigation and will adversely impact the public's ability to learn about matters of public concern. Without such knowledge, the quality of testimony will be diminished, less witnesses will come forward with relevant testimony, and the public will be deprived of opportunities to observe the judicial system. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979) (recognizing that publicity surrounding trials "may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to

perform their duties more conscientiously, and generally give the public an opportunity to observe the judicial system").

## CONCLUSION

For the reasons stated above, the Petitioners respectfully request that this Court grant this Petition for Writ of Certiorari.

Respectfully submitted this 24th day of June 2024.

CAMPBELL KILLIN BRITTAN & RAY, LLC
*s/Andrew C. Nickel*
John S. Zakhem
Andrew C. Nickel
*Attorneys for Petitioner Donald J. Trump for President, Inc.*

HARRIS, KARSTAEDT, JAMISON & POWERS
*s/ Mark A. Sares*
Jamey W. Jamison, Esq.
Mark A. Sares, Esq.
*Attorneys for Petitioners Joseph Oltmann, FEC United, Shuffling Madness Media, Inc. d/b/a Conservative Daily*

THE LAW OFFICES OF RANDY B. CORPORON PC
*s/ Randy B. Corporon*
Randy B. Corporon

*Attorneys for Petitioners Hoft and TGP Communications LLC dba The Gateway Pundit*

The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

DATE FILED: April 11, 2024
CASE NUMBER: 2022CA843

SUMMARY
April 11, 2024

## 2024COA35

**No. 22CA0843, *Coomer v. Donald J. Trump for President, Inc.*
— Courts and Court Procedure — Regulation of Actions and
Proceedings — Action Involving Exercise of Constitutional
Rights — Anti-SLAPP; Torts — Civil Conspiracy — Defamation
— Intentional Infliction of Emotional Distress**

Applying the anti-SLAPP statute, § 13-20-1101, C.R.S. 2023, a

division of the court of appeals concludes that the plaintiff has

established a reasonable likelihood of success on his claims for

defamation and intentional infliction of emotional distress arising

out of statements by various defendants that the plaintiff

(1) asserted on a conference call in September 2020 that he had

"made sure" then-President Trump was not going to win the 2020

presidential election and (2) took steps to interfere with the election

results.  The division concludes that, accepting the plaintiff's

evidence as true, the plaintiff has shown a reasonable likelihood

that each defendant made these statements, that the statements were false, and that the defendants made them with actual malice.

The division concludes that the plaintiff has not established a reasonable likelihood of success on his conspiracy claim because the plaintiff presented no evidence of an agreement to defame him.

The division affirms the district court's denial of the special motions to dismiss the plaintiff's claims for defamation and intentional infliction of emotional distress.  It reverses the denial of the special motions to dismiss the plaintiff's conspiracy claim as to certain defendants (those who challenge that ruling on appeal).

COLORADO COURT OF APPEALS       **2024COA35**

---

Court of Appeals Nos. 22CA0843 & 22CA0879
City and County of Denver District Court No. 20CV34319
Honorable Marie Avery Moses, Judge

---

Eric Coomer, Ph.D.,

Plaintiff-Appellee,

v.

Donald J. Trump for President, Inc.; Sidney Powell; Sidney Powell, P.C.; Joseph Oltmann; FEC United; Shuffling Madness Media, Inc., d/b/a Conservative Daily; James Hoft; TGP Communications, LLC, d/b/a The Gateway Pundit; Michelle Malkin; Eric Metaxas; and Defending the Republic, Inc.,

Defendants-Appellants.

---

ORDER AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE SCHOCK
Navarro and Kuhn, JJ., concur

Announced April 11, 2024

---

Cain & Skarnulis PLLC, Charles J. Cain, Zachary Bowman, Bradley A. Kloewer, Salida, Colorado; RechtKornfeld PC, Thomas M. Rogers III, Mark Grueskin, Andrew E. Ho, Denver, Colorado, for Plaintiff-Appellee

Campbell Killin Brittan & Ray, LLC, John S. Zakhem, Andrew C. Nickel, Denver, Colorado, for Defendant-Appellant Donald J. Trump for President, Inc.

Arrington Law Firm, Barry K. Arrington, Denver, Colorado; Kennedys CMK LLP, Marc S. Casarino, Wilmington, Delaware, for Defendants-Appellants Sidney Powell and Sidney Powell, P.C.

Harris, Karstaedt, Jamison & Powers, P.C., Jamey W. Jamison, Mark A. Sares, Dino G. Moncecchi, Englewood, Colorado, for Defendants-Appellants Joseph

Oltmann, FEC United, and Shuffling Madness Media, Inc., d/b/a Conservative Daily

Law Offices of Randy B. Corporon, Randy B. Corporon, Aurora, Colorado; Burns Law Firm, Jonathon Burns, St. Louis, Missouri, for Defendants-Appellants James Hoft and TGP Communications, LLC, d/b/a The Gateway Pundit

Patterson Ripplinger, P.C., Franklin D. Patterson, Gordon A. Queenan, Greenwood Village, Colorado, for Defendant-Appellant Michelle Malkin

Gordon & Rees LLP, John R. Mann, Thomas B. Quinn, Margaret L. Boehmer, Denver, Colorado, for Defendant-Appellant Eric Metaxas

Dymond Reagor, PLLC, Michael W. Reagor, Christopher P. Seerveld, Greenwood Village, Colorado, for Defendant-Appellant Defending the Republic, Inc.

¶ 1        In the wake of the 2020 presidential election, certain members

of the media and political figures began circulating claims of

election irregularities.  One strand of those claims centered on the

plaintiff, Eric Coomer, who was then an employee of Dominion

Voting Systems, Inc. (Dominion), a company that provided election

technology and support services throughout the country.  The core

of the allegations was that, on a supposed "Antifa" conference call

in late September 2020, a person purported to be Coomer said he

had "made sure" then-President Donald J. Trump was "not going to

win" the election.  Coomer denies ever being on such a call or

making such a statement, and there is no evidence that he (or

anyone else) took any action to undermine the election results.

¶ 2        Coomer sued several individuals and entities who shared

reports of his alleged statement on the internet and in other media,

asserting claims for defamation, intentional infliction of emotional

distress, and civil conspiracy.  Those claims come before us in a

preliminary posture under Colorado's anti-SLAPP[1] statute, section

13-20-1101, C.R.S. 2023.  Under that statute, we do not decide

---

[1] "SLAPP" stands for "strategic lawsuit against public participation."
*Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 1 n.1.

whether Coomer will prevail on his claims.  Nor do we determine

who is telling the truth about what occurred.  Instead, the sole

question we must answer is whether Coomer has done enough to

pursue his claims further.  To do so, he must establish a

reasonable likelihood — not a certainty — that he will prevail on

each of those claims.  The district court concluded that Coomer had

met this burden with respect to all claims against all defendants.

¶ 3      We conclude that Coomer has met his burden with respect to

his claims for defamation and intentional infliction of emotional

distress.  Considering each defendant's statements separately, we

conclude that each defendant made statements that could

reasonably be understood to communicate that (1) Coomer asserted

on a conference call that he had made sure President Trump was

not going to win the election, and (2) Coomer in fact took steps to

interfere with the election.  We further conclude that Coomer has

presented sufficient evidence at this preliminary stage to establish a

reasonable likelihood of showing that those statements were false

and that defendants made them with actual malice — that is, with

knowledge they were false or with reckless disregard for their truth.

¶ 4        We reach a different conclusion as to Coomer's civil conspiracy claim — at least with respect to the defendants who challenge that claim on appeal.  Because Coomer has presented no evidence of an agreement to defame him or inflict emotional distress upon him, he has not shown a reasonable likelihood of prevailing on this claim.

¶ 5        We also conclude that the district court erred by addressing Coomer's likelihood of prevailing on his request for an injunction in its order denying defendants' special motions to dismiss because an injunction is a *remedy*, not an independent cause of action that is subject to dismissal under the anti-SLAPP statute.  But because a request for injunctive relief is not the proper subject of an anti-SLAPP motion to dismiss, the district court's denial of the special motions to dismiss that relief was correct on other grounds.

¶ 6        We therefore affirm the denial of the special motions to dismiss the defamation claim, with the exception of two tweets that we conclude are protected under the Communications Decency Act (CDA), 47 U.S.C. § 230.  We also affirm the denial of the motions to dismiss the claim for intentional infliction of emotional distress and the request for injunctive relief.  We reverse the denial of the motion to dismiss the conspiracy claim as to the defendants who challenge

that ruling on appeal (as detailed below).  We remand for the district court to consider certain defendants' requests for attorney fees and costs, and for further proceedings consistent with this opinion.[2]

## I.  Background

¶ 7      Coomer is the former Director of Product Security and Strategy at Dominion.  Dominion provided voting technology and support services to at least thirty different states in connection with the 2020 presidential election.  Defendants are podcasters, talk show hosts, political commentators, bloggers, attorneys, and associated entities who generally questioned the validity of the 2020 presidential election results.  More specifically, defendants are:

- Joseph Oltmann, the co-host of the Conservative Daily podcast, along with a nonprofit corporation Oltmann founded, FEC United, and a media corporation he owns, Shuffling Madness Media, Inc., d/b/a Conservative Daily (collectively, the Oltmann Defendants);

---

[2] This action has been stayed as to defendant Rudolph Giuliani because he filed for bankruptcy while the appeal was pending.  *See* 11 U.S.C. § 362(a).  This opinion, including the disposition, is thus limited to the appeals of the other defendants.

- Michelle Malkin, the host of #MalkinLive, a program previously broadcast on YouTube, and Sovereign Nation, a television program that previously ran on Newsmax;

- James Hoft, the founder, editor-in-chief, and contributing author of The Gateway Pundit website, along with the company that operates the website, TGP Communications, LLC (collectively, the Hoft Defendants);

- Eric Metaxas, the host of The Eric Metaxas Radio Show, a radio program and podcast that is broadcast on various platforms and published on YouTube;

- Sidney Powell, an attorney who became associated with President Trump's reelection campaign in the weeks following the 2020 election, along with Powell's law firm, Sidney Powell, P.C. (collectively, the Powell Defendants), and a nonprofit corporation Powell founded, Defending the Republic, Inc. (DTR); and

- Donald J. Trump for President, Inc. (the Trump Campaign or the Campaign), an organization supporting the reelection efforts of President Trump.

### A.    Oltmann's Account

¶ 8    The statements underlying Coomer's claims all stem from an account first shared by Oltmann on the Conservative Daily podcast days after Joseph Biden, Jr., was declared the winner of the 2020 presidential election.  On November 9, 2020, Oltmann asserted that "the election was rigged" and called Dominion "a fraudulent company that is out to destroy our republic."  He then recounted an alleged conference call he claimed to have infiltrated weeks earlier.

¶ 9    Oltmann introduced the show by stating,

> We're going to expose someone inside of Dominion Voting Systems specifically related to Antifa and related to someone that is so far left and is controlling elections, and his fingerprints are in every state.
>
> . . . .
>
> The conversation will be about a man named Eric Coomer.  C-O-O-M-E-R.

¶ 10    After describing Coomer's role with Dominion, Oltmann relayed that, weeks before the election, he had been able to listen in on an Antifa conference call.  As told by Oltmann, "a person who called himself Eric was on the call."  As "Eric" was speaking,

> [s]omebody interrupts, "Who's Eric?"  Someone else enters, "Eric is the Dominion guy, right?" . . . and everyone's like, "Oh, oh, he's a

> Dominion guy, okay." So, "Go ahead," came from somebody else.
>
> So . . . somebody actually interrupts. First he says, "What are we going to do if effing Trump wins, right?" As in somebody's frustrated and they're . . . talking on this call. And ["Eric"] responds, and I'm paraphrasing this, right, "Don't worry about the election. Trump is not going to win. I made effing sure of that, ha-ha-ha-ha." And everyone's like, "Yeah." And then somebody else responds, "Effing right," right?

¶ 11    Oltmann went on to explain how he came to believe that the

"Eric" on the call was Coomer, based primarily on Coomer's social

media posts, which included anti-Trump messages and a so-called

"Antifa manifesto." He also said that he thought "Eric's" voice was a

"match" to Coomer's voice in other videos he had heard, but he

"[couldn't] be sure." In the end, Oltmann encapsulated his account:

> Let me put this all together for you guys. So, you have a guy that is actually going to an Antifa meeting that tells somebody else that, [supposedly] . . . he's got the election in hand.
>
> . . . .
>
> It's not admitting [Dominion is] vulnerable, it's actually creating the vulnerability so that it can actually be manipulated. And that's what happened here . . . . You have a guy that literally is a fanatic. . . . Three weeks before the election he's getting on the phone and he's saying very clearly that, I have it handled. And he runs product strategy and security.

7

¶ 12     Oltmann then went further and explicitly accused Coomer of

interfering with the election:

> [Coomer] has to answer for this stuff that he is
> interfering with the American vote.  He's
> interfering with the election.
>
> . . . .
>
> [T]here's somebody that says none of this is a
> smoking gun. . . .  You're wrong.  You're
> absolutely wrong. . . .  I'm going to say this
> very clearly.  There's more to be had.
>
> . . . .
>
> [I]t's not the one event that it is a smoking
> gun, it's the fact that this is the guy
> responsible for most of the elections across the
> United States.

¶ 13     Oltmann repeated these accusations against Coomer on his

podcast over the next three days, reiterating his account of the

conference call and describing Coomer as "dangerous":

> [T]he guy that knows nuclear physics, and that
> actually is coding, is probably one of the most
> dangerous people in the world.  That's why I
> know, if you look at everything, that Eric is
> involved.  I'm not guessing that he's involved, I
> know he's involved in this.  And that's why as
> he starts talking about things, as we start
> hearing about Eric Coomer in the media, he's
> hiding right now. . . .  He is literally scared for
> his life, because what we're talking about
> people, is sedition. . . .  We are talking about
> people going to prison for the rest of their lives,

8

and, or being sentenced to death.  When you interfere with the country's election, when you put your finger on the scale of the voting of the people, the American voice, you are subject to being put to death.

### B.   CISA Joint Statement

¶ 14    On November 12, 2020, the Cybersecurity & Infrastructure Security Agency (CISA) released a joint statement from the executive committees of the Election Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Council, which addressed the "many unfounded claims and opportunities for misinformation about the process of [United States] elections."  That joint statement concluded as follows:

> The November 3rd election was the most secure in American history.  Right now, across the country, election officials are reviewing and double checking the entire election process prior to finalizing the result.
>
> *. . . There is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised.*
>
> Other security measures like pre-election testing, state certification of voting equipment, and the U.S. Election Assistance Commission's (EAC) certification of voting equipment help to build additional confidence in the voting systems used in 2020.

C.     Publication of Oltmann's Account in Other Media

¶ 15     Notwithstanding the CISA statement, Oltmann's account of

the alleged conference call — now pinpointed to the week of

September 27, 2020 — began to pick up steam with other media.

¶ 16     On November 13, 2020, Oltmann appeared on Malkin's

YouTube program, #MalkinLive.  Malkin introduced her program by

announcing that she would be "bringing [the audience] information

that is so vital to understanding the systemic stealing of our

election."  She invited Oltmann to explain "what [he had] discovered

about Dominion, and one figure, very key figure in particular."

¶ 17     Oltmann proceeded to describe the alleged conference call

similarly to how he had described it on his own show.  He also

explained how he had found Coomer by Googling "Eric, Dominion,

Denver, Colorado," and how, six weeks later in the wake of the

election, he had concluded that the "Eric" on the conference call

was Coomer, based in large part on Coomer's social media posts.

¶ 18     After Oltmann had completed his account, Malkin responded

to "underscore that . . . the market share of Dominion is why this

reaches from conspiracy theory to conspiracy truth."  Oltmann

agreed, declaring, "It is truth, a hundred percent truth.  I mean, I'm

betting everything on it."  Malkin closed the interview by urging her audience to follow Oltmann on social media "for all the latest on Eric Coomer" and Dominion, stating, "[T]he truth will get out there. The truth just wants to be free, just like American citizens."

¶ 19     After the show, Malkin posted several links to the interview on social media, describing it as Oltmann "speak[ing] out" about Dominion and "Antifa radical Eric Coomer."  In the posts, Malkin noted that Coomer was "VP of strategy/security" and a "major shareholder" of Dominion, and she asked, "What are they trying to hide?"  Malkin continued to share the Oltmann interview on social media in multiple tweets over the next week, each of which tagged Coomer and stated that he had been "exposed" by Oltmann.

¶ 20     The same day of the Malkin interview, Oltmann's account was picked up by Hoft and The Gateway Pundit.  That day, The Gateway Pundit published an article by Hoft with the headline, "Dominion Voting Systems Officer of Strategy and Security Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote."  That article cited alleged election-related computer glitches and wrote that Oltmann had done a "deep dive

on Eric Coomer[,] who is responsible for the strategy and security of Dominion," and discovered anti-Trump social media posts.

¶ 21    The next day, Hoft wrote another Gateway Pundit article, which reported that Coomer was "participating in Antifa calls." In that article, Hoft cited Oltmann's interview with Malkin and relayed Oltmann's account of the alleged September 2020 conference call. The article repeated Oltmann's statement that "Eric (the Dominion guy)" said, "Don't worry about the election, Trump's not gonna win. I made f*cking sure of that!" It went on to explain that Oltmann's investigation after the call caused him to "c[o]me upon" Coomer.

¶ 22    On November 16, 2020, Hoft interviewed Oltmann about the call. He introduced the interview by stating that Oltmann "was on an Antifa line where they were speaking with Eric Coomer." Later in the interview, after Oltmann had given his account of the call, including the statement he attributed to Coomer, Hoft said, "You have information that's truthful that should be released . . . you're exposing absolute fraud." Hoft published the audio of this interview on The Gateway Pundit, along with an article about the interview.

¶ 23    On November 24, 2020, Metaxas invited Oltmann to share his story on the Eric Metaxas Radio Show. Oltmann repeated his now-

familiar account of the alleged September conference call — his infiltration of the call; the statement by "Eric, the Dominion guy" of "Don't worry about the election.  Trump's not going to win.  I've made effing sure of that"; and Oltmann's internet research that led him to believe "Eric" was Eric Coomer — before concluding with his assertion that there had been "massive" fraud in the 2020 election.

¶ 24     At one point during the interview, Metaxas asked Oltmann to confirm that the person who made the statement was in fact Coomer: "So this guy, Eric Coomer, this genius you discover was the guy who said on this Antifa call, 'Don't worry about Trump, there's no way he's going to win'?"  Oltmann said that it was. Metaxas said he was "exercised" by "the idea that anyone would dare try to mess with our elections," and that is why he was "glad to be speaking with [Oltmann] and getting this information out."

¶ 25     Metaxas asked Oltmann, "Eric Coomer, has he gone into hiding? . . .  Does he know he's going to go to prison for the rest of his life?"  Oltmann said Coomer had "disappeared" and continued: "Why if there is no fraud against the American people has Eric Coomer disappeared? . . .  So this isn't all made up.  This isn't hyperbole that we're just throwing out there.  This is absolute fact."

13

¶ 26    Metaxas then closed the show by calling Coomer's conduct

"extremely criminal":

> [T]here's levels of stupidity and evil and we
> know that not everybody is on the same level,
> that there are some people that they just hate
> Trump but then there are other nefarious
> actors like Mr. Coomer . . . . What we're
> talking about is evil.  In fact, let's just say this.
> It's extremely criminal and these folks know
> they're going to go to jail for the rest of their
> lives.  Doesn't matter how rich or smart they
> are, that they are in the process of being
> caught thanks to God because you were just —
> you just stumbled across this.

¶ 27    After the interview, Metaxas posted a link to the interview on

his social media page, along with the message, "Today Joe Oltmann

explained how after infiltrating Antifa he bumped into someone

working w/them named Eric [C]oomer — who was the head of

Security and Safety at #Dominion — and who PROMISED the Antifa

folks that 'effing' Trump WOULD NOT WIN!  Please [retweet]."

¶ 28    Malkin interviewed Oltmann again on November 28, 2020, this

time on her Sovereign Nation show on Newsmax, in a segment she

said was focused on "hacking the vote."  After introducing the show

by asking "who has control over our elections," Malkin asked

Oltmann to tell her audience "who exactly Eric Coomer is and why

it matters in these ongoing battles against election fraud."  Oltmann responded that Coomer "has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country."  From there, the interview followed the same pattern as the other interviews, with Oltmann sharing his account.

¶ 29    Malkin then expounded, "[T]he reason why this is so alarming — and it's obvious, but it should be spelled out — is that this is one of the highest ranking officials at Dominion Voting Systems, which has penetrated our election system across the country."  Malkin acknowledged that "at this point, at least publicly, there's no evidence that Eric Coomer made good on his threat."  But she asserted that Coomer's patents and experience "certainly suggest[] that he has the ability to carry out on his threat or this braggadocio that [Oltmann] heard directly on this Antifa phone call."

¶ 30    Over the next month, and continuing after this lawsuit was filed, Oltmann continued to discuss Coomer, the alleged conference call, and Oltmann's contention that Coomer had interfered with the election on his Conservative Daily podcast and other media platforms.  The Gateway Pundit also published a few additional articles discussing Coomer and alleged election irregularities.

15

### D.    The Trump Campaign and the Powell Defendants

¶ 31    Meanwhile, Oltmann's account of the alleged September call made its way to those in President Trump's orbit.  Oltmann explained in his interview with Metaxas that he had been in touch with the Trump Campaign and "in constant contact with the Trump attorneys," including Powell.  He also said that he had signed an affidavit attesting to "all of the information" he was describing.

¶ 32    On November 14, 2020, the Trump Campaign circulated an internal memorandum addressing the "internet rumor that [Coomer] has ties to Antifa."  The memo concluded that "there is no evidence that Eric Coomer is a supporter of Antifa in any way."

¶ 33    On November 17, 2020, Eric Trump, President Trump's son and someone the Campaign called a "surrogate speaker," shared on social media a Gateway Pundit article that quoted Coomer's alleged statement on the September call, along with the message, "Eric Coomer — Dominion Vice President of U.S. Engineering — 'Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that!'"  A few days later, President Trump himself tweeted a link to a segment on One America News Network called

"Dominion-izing the Vote."  That segment included an interview with Oltmann in which Oltmann repeated his claims about Coomer.

¶ 34    On November 19, 2020, the Trump Campaign held a press conference to provide an update on its legal challenges to the election results.  Rudolph Giuliani spoke first, introducing himself and Sidney Powell as two of the "senior lawyers" representing President Trump and the Trump Campaign.[3]  After running through a litany of allegations of election fraud, Giuliani asked Powell to describe what he called "another totally outrageous situation."

¶ 35    Powell spoke about Dominion and Smartmatic, another company she said was responsible for the software used in computerized voting systems.  She then turned to Coomer:

> [O]ne of the Smartmatic patent holders, Eric Coomer I believe his name is, is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden.  Nothing to worry about here.  And he was going to — they were going to "F" Trump.  His social media is filled with hatred for the President, and for the United States of America as a whole . . . .

---

[3] As noted above, we do not consider Coomer's claims against Giuliani because this action is stayed as to Giuliani.  But Giuliani's statements are nevertheless relevant to the extent Coomer asserts that Giuliani was speaking as an agent of the Trump Campaign.

¶ 36     Later in the press conference, Giuliani returned to the topic of

Coomer:

> [B]y the way, the Coomer character, who is
> close to Antifa, took off all of his social media.
> Ah-ah, but we kept it, we've got it.  The man is
> a vicious, vicious man . . . and he specifically
> says that they're going to fix this election. . . .
>
> This is real.  It is not made up.  [T]here's
> nobody here that engages in fantasies.  I've
> tried a hundred cases.  I've prosecuted some of
> the most dangerous criminals in the world.  I
> know crimes.  I can smell them.  You don't
> have to smell this one.  I can prove it to you
> eighteen different ways. . . .

¶ 37     The day after the press conference, Powell addressed the

accusations against Coomer in two separate interviews, one on

Newsmax and one on Fox News.  In the first, Powell engaged in the

following exchange with the interviewer, Howie Carr:

> Carr: Let me ask you about this guy Eric
> Coomer.  He works for Dominion . . . .  He's
> the one who was allegedly . . . on a conference
> call or something, a Zoom with Antifa.  And he
> said, supposedly, don't worry about Trump,
> I've already made sure he's going to lose the
> election.  Is that true, for starters?
>
> Powell: Yes.
>
> Carr: It's true.  You have that?
>
> Powell: It's true.  We have an affidavit to that
> effect and I think we have a copy of the call.

¶ 38    In the second interview that day, Powell announced, "We've got Eric Coomer . . . admitting on tape that he rigged the election for Biden and hated Trump.  We've got their social media posts.  We've got all kinds of evidence that is mathematically irrefutable."

¶ 39    Before the November 19 press conference, the Trump Campaign had filed lawsuits in Pennsylvania and Michigan challenging the election results in those states.  In the days and weeks after the press conference, Powell filed four more lawsuits — in Michigan, Georgia, Wisconsin, and Arizona — on behalf of other individual plaintiffs.  Neither of the Trump Campaign's lawsuits referred to Coomer.  Powell's complaints, however, referred to Coomer and cited his alleged statement on the September call, as told by Oltmann.  None of the lawsuits was successful.

¶ 40    On December 14, 2020, the Electoral College voted and officially confirmed the result of the election, with now-President Biden receiving 306 electoral votes and President Trump receiving 232.  On January 7, 2021, the electoral votes were certified, and Biden was confirmed as the President-elect of the United States.

E.    Coomer's Complaint

¶ 41     On December 22, 2020, Coomer filed this lawsuit, asserting claims against defendants for defamation, intentional infliction of emotional distress, and civil conspiracy, and seeking damages and injunctive relief.  (Coomer later amended his complaint to add DTR as a defendant.)  The claims centered on Oltmann's account of the September 2020 conference call and the other defendants' dissemination of that narrative, as detailed above.  Coomer alleged that, through their statements, defendants had made Coomer the "face" of a false "national conspiracy to fraudulently elect the President of the United States," thus causing "immense injury" to his reputation, professional standing, safety, and privacy.

¶ 42     More specifically, Coomer alleged that Oltmann and the other defendants made false defamatory statements by asserting that Coomer (1) was on the alleged conference call; (2) said on that call that he "made sure" President Trump would not win reelection; and (3) in fact took action to subvert the 2020 presidential election.  He alleged that "the dissemination of these false claims" constituted extreme and outrageous conduct that had caused him severe emotional distress by, among other things, subjecting him to an

20

"onslaught of harassment and credible death threats."  And he alleged that defendants had conspired to engage in such conduct.

¶ 43    In the complaint, Coomer denied (1) having any knowledge of the alleged Antifa conference call; (2) participating in such a call; (3) making the statements Oltmann claimed he made; or (4) taking any action to subvert the results of the presidential election.

F.    Defendants' Special Motions to Dismiss

¶ 44    All defendants filed special motions to dismiss under the anti-SLAPP statute.  *See* § 13-20-1101(3)(a).  The precise arguments made by each defendant differed somewhat, but all argued that Coomer could not show actual malice because defendants did not know their statements were false or entertain serious doubts as to their truth.  Several defendants asserted that their statements were protected statements of opinion.  And others claimed that their statements were protected by the litigation privilege or the CDA.

¶ 45    Defendants also argued that Coomer had not shown a reasonable likelihood of success on his non-defamation claims for many of the same reasons and a few others.  They argued that Coomer could not show extreme or outrageous conduct, as

necessary for his intentional infliction of emotional distress claim,

or a meeting of the minds, as necessary for his conspiracy claim.

¶ 46      In support, the Powell Defendants and the Trump Campaign

each submitted an affidavit signed by Oltmann on November 13,

2020, in which Oltmann gave his account of an "Antifa meeting"

that was consistent with his public statements.  He stated that "[o]n

or about the week of September 27, 2020, [he] was able to attend

an Antifa meeting" where the following conversation occurred:

> Someone identified as "Eric" began to speak.
> Someone asked who Eric was, and someone
> else replied "he is the Dominion guy"
> [paraphrased].
>
> Eric then began to speak after being told to
> continue, but was interrupted and asked by
> someone, "What are we going to do if Trump
> wins this fucking election?"
>
> Eric responded, "Don't worry about the
> election.  Trump is not going to win.  I made
> fucking sure of that.  Hahaha[.]"

¶ 47      The affidavit then described how Oltmann determined that the

"Eric on the conference call" was Coomer, based on a "simple

[G]oogle search: [k]eywords: 'Eric,' 'Dominion,' 'Denver Colorado,'"

and a review of Coomer's social media posts reflecting "Anti-Trump

rhetoric."  Oltmann also explained that he did not initially believe

the person on the call was Coomer until he learned days after the election that Coomer was a "spokesperson" for Dominion.

¶ 48    Malkin, Hoft, and Powell also submitted their own affidavits attesting that they had no reason to disbelieve Oltmann's account.

### G.    Coomer's Response and Opposing Declarations

¶ 49    Over defendants' objections, the district court allowed Coomer to conduct specified discovery, including a three-hour deposition of each defendant and limited requests for production.

¶ 50    After conducting that discovery, Coomer filed an omnibus response to all defendants' special motions to dismiss, arguing that (1) the anti-SLAPP statute did not apply; and (2) even if it did, he had established a reasonable likelihood of success on his claims.

¶ 51    Coomer attached his own declaration in support.  In that affidavit, Coomer attested that he was not on the alleged conference call in September 2020, did not make the statement defendants had attributed to him, and did not seek to interfere with the outcome of the presidential election.  More specifically, he declared:

> [The] statements made by Oltmann about me
> are false.  I did not take any action to subvert
> the 2020 Presidential election.  I did not
> participate in a scheme to change votes from
> one candidate to another and am aware of no

such election-rigging activity.  I did not participate in an Antifa conference call or boast about my supposed ability to rig the election. . . .

. . . .

In my position with Dominion Voting Systems, I did not have the capacity to manipulate or alter in any way either the Dominion voting machines used during the 2020 Presidential election or the Dominion source code that those machines employed.  Numerous layers of review, security, encryption, and other checks and balances exist between individual Dominion employees, like myself, and the products that Dominion provides to its clients.  As a result of the numerous safety protocols in place, many of which are required by statute, I did not have the ability to alter the results of the 2020 Presidential election in any way.

. . . .

I have never stated that I had the ability or the desire to affect the outcome of an election.  In fact, I have often made the exact opposite statement publicly, and privately during routine conversations.  I have never even joked about the ability to affect the outcomes of free and fair elections.

¶ 52    Coomer also attached a declaration from Heidi Beedle, someone Oltmann had identified in his affidavit as a potential participant in the alleged conference call.  Beedle stated in her

declaration that she was not aware of any "Antifa call" that occurred in mid to late September 2020.  Nor did she know Coomer.

¶ 53    And Coomer submitted a declaration from Auontai Anderson, someone who *did* participate in a Zoom conference call in late September 2020 with other "Denver activists," albeit not one he associated with Antifa.  Anderson explained that "[d]uring that call, no one mentioned 'Eric from Dominion,' and [he is] not familiar with anyone who would meet that description."  He further attested that he did not know Coomer and had never before heard his name.

H.    Order Denying Defendants' Special Motions to Dismiss

¶ 54    The district court held a two-day hearing on defendants' motions, at which the parties presented argument and summaries of the evidence in support of their respective claims and defenses.

¶ 55    After the hearing, the district court issued a written order denying defendants' special motions to dismiss in their entirety. The court agreed with defendants that the anti-SLAPP statute applied because defendants' statements about Coomer involved matters of public concern.  But it concluded that Coomer had established a reasonable likelihood of prevailing on his claims.

## II.     Scope of Appeal

¶ 56    We begin by clarifying that this appeal is limited to the district court order denying defendants' special motions to dismiss.

¶ 57    In their original opening brief, the Oltmann Defendants (and another defendant who is no longer a party to this appeal) challenged various discovery orders in addition to the order denying the special motions to dismiss.  A motions division of this court ruled that "[t]he appeal is limited to the district court order on the special motion to dismiss" because "the other issues appellants have raised in the briefs are not final, appealable orders."  The motions division therefore struck the Oltmann Defendants' opening brief and ordered them to file an amended opening brief "limited to the district court order on the special motion to dismiss."[4]

---

[4] Coomer filed a motion requesting an award of attorney fees and costs against the Oltmann Defendants as a sanction for challenging these other interlocutory orders in their original opening brief. (Coomer also requested sanctions against the defendant who is no longer a party to this appeal.  That portion of the motion is moot.) We deny Coomer's motion.  Although we do not approve of the Oltmann Defendants' attempt to raise issues beyond the scope of this appeal, we cannot conclude that their doing so was so frivolous as to warrant sanctions under C.A.R. 38(b).  *See Glover v. Serratoga Falls LLC*, 2021 CO 77, ¶ 70 (noting that the purpose of an award of attorney fees under C.A.R. 38(b) is to deter egregious conduct).

¶ 58    The Oltmann Defendants filed an amended opening brief but continue to argue that the district court erred by (1) allowing Coomer to conduct discovery before ruling on the special motions to dismiss and (2) ordering Oltmann to disclose the identity of the person who allegedly assisted him in gaining access to the "Antifa call."  The Hoft Defendants also assert that the district court erred by granting Coomer discovery and denying them reciprocal discovery.  We agree with the motions division that these interlocutory orders are not properly before us in this appeal.

¶ 59    As a general rule, our jurisdiction is limited to "appeals from final judgments."  § 13-4-102(1), C.R.S. 2023; *see also Wilson v. Kennedy*, 2020 COA 122, ¶¶ 5-7; C.A.R. 1(a)(1).  The anti-SLAPP statute provides an exception for "an order granting or denying a special motion to dismiss."  § 13-20-1101(7); *see also* § 13-4-102.2, C.R.S. 2023.  But nothing in that statute extends that exception to other interlocutory orders.  And we cannot expand the scope of our jurisdiction beyond that specified by the legislature.  *Wilson*, ¶ 6. We therefore lack jurisdiction in this appeal to review any order other than the order denying the special motions to dismiss.

### III.   Anti-SLAPP Legal Principles

¶ 60     The purpose of Colorado's anti-SLAPP statute is to "encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government," and, at the same time, to preserve the right to "file meritorious lawsuits for demonstrable injury." § 13-20-1101(1)(b); *see also Gonzales v. Hushen*, 2023 COA 87, ¶ 19.  The statute seeks to balance these often competing interests by creating a mechanism to "weed[] out, at an early stage, nonmeritorious lawsuits brought in response to a defendant's petitioning or speech activity." *Tender Care Veterinary Ctr., Inc. v. Lind-Barnett*, 2023 COA 114, ¶ 12.

¶ 61     That mechanism — a special motion to dismiss — allows for the early dismissal of any claim arising from an act "in furtherance of" a person's constitutional right of petition or free speech "in connection with a public issue," unless the plaintiff establishes "a reasonable likelihood" of prevailing on the claim.  § 13-20-1101(3)(a); *see also L.S.S. v. S.A.P.*, 2022 COA 123, ¶ 18.

¶ 62     The resolution of such a motion requires a two-step analysis. *Anderson v. Senthilnathan*, 2023 COA 88, ¶ 10.  First, the court must determine whether the defendant has made a threshold

showing that the anti-SLAPP statute applies — "that is, whether the claims arise from the defendant's exercise of free speech or right to petition in connection with a public issue." *Id.*; *see also* § 13-20-1101(2)(a), (3)(a).  Second, if the defendant meets that threshold, the burden shifts to the plaintiff to establish a reasonable likelihood of prevailing on the claim.  *See Anderson*, ¶ 10; § 13-20-1101(3)(a).

¶ 63    At the second step, the court must consider the pleadings and supporting and opposing affidavits to determine "whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *L.S.S.*, ¶ 23 (citation omitted); *see also* § 13-20-1101(3)(b).  In making this determination, the court may not weigh the evidence or resolve factual conflicts.  *Rosenblum v. Budd*, 2023 COA 72, ¶ 24.  Instead, it must assess whether the facts in the affidavits submitted by the plaintiff, "if true, establish a reasonable likelihood of proving each claim under the applicable burden of proof." *Id.*  If the plaintiff meets this burden, the court must deny the motion to dismiss.  *Id.* at ¶ 25.  Otherwise, the claim must be dismissed.  *Anderson*, ¶ 10.

¶ 64     We review an order granting or denying a special motion to dismiss de novo, applying the same two-step analysis as the district court.  *Salazar v. Pub. Tr. Inst.*, 2022 COA 109M, ¶ 21.

¶ 65     When the district court issued its order in this case, there was not yet any published case in Colorado applying the anti-SLAPP statute, which had become law less than three years earlier.  *See id.* (first published Colorado anti-SLAPP case issued in September 2022).  But our case law has developed substantially since then — including since the parties filed their appellate briefs.[5]  Perhaps unsurprisingly then, the parties dispute various legal principles, and several defendants raise arguments concerning the *manner* in which the district court resolved their motions.  Thus, before we address the substance of Coomer's claims, we pause to highlight a few foundational legal principles governing anti-SLAPP review.

---

[5] In addition, because California has a substantially similar anti-SLAPP statute, "we look to California case law for guidance in construing and applying section 13-20-1101," C.R.S. 2023.  *Tender Care Veterinary Ctr., Inc. v. Lind-Barnett*, 2023 COA 114, ¶ 16.

A.    Plaintiff's Evidence Accepted as True

¶ 66    First, in determining whether a plaintiff has met their burden at the second step of the anti-SLAPP analysis, we must accept the plaintiff's evidence as true.  *See L.S.S.*, ¶ 23; *Gonzales*, ¶¶ 21, 80.

¶ 67    Several defendants cite *Salazar* for the proposition that we do not "accept the truth of [plaintiff's] *allegations.*"  *Salazar*, ¶ 21 (emphasis added).  And Coomer asserts that *Salazar* is inconsistent with *L.S.S.*  But we do not view these principles as inconsistent.

¶ 68    Unlike a C.R.C.P. 12(b)(5) motion, we do not "accept the factual allegations in the complaint as true."  *Salazar*, ¶ 15. Instead, to defeat an anti-SLAPP motion, the plaintiff generally must go further and present *evidence* establishing a reasonable likelihood of success.  *See L.S.S.*, ¶ 23 (describing this step as "a summary judgment-like procedure in which the court reviews the pleadings and the evidence").  That evidence can — and typically will — come in the form of an affidavit.  § 13-20-1101(3)(b).  But once affirmed in an affidavit, the plaintiff's assertions are no longer mere allegations; they are evidence.  And that evidence must be accepted as true. *L.S.S.*, ¶ 23; *see also Collins v. Waters*, 308 Cal. Rptr. 3d 326, 334 (Ct. App. 2023) (noting that court "must accept the plaintiff's

31

evidence fully," despite the defendant's argument that the plaintiff "is so disreputable that she could not believe anything he said").

¶ 69      In other words, while we do not necessarily accept the plaintiff's *allegations* as true, we do accept as true the plaintiff's *evidence*. *See Wilson v. Cable News Network, Inc.*, 444 P.3d 706, 715 (Cal. 2019) (noting that the court must accept as true the evidence favorable to the plaintiff, but "we have never insisted that the complaint's allegations be given similar credence").[6]

### B.    No Factfinding

¶ 70      Relatedly, in resolving a special motion to dismiss, "the district court does not make factual findings." *Salazar*, ¶ 19.  Nor does it "weigh the evidence or resolve factual conflicts." *Rosenblum*, ¶ 24.

¶ 71      Thus, although the district court labeled a portion of its order "findings of fact," we reject Coomer's suggestion that we should review those so-called factual findings for clear error.  *See Salazar*, ¶ 19.  To the extent certain defendants argue that the district court

---

[6] In *Rosenblum v. Budd*, 2023 COA 72, ¶ 24, the division stated that a court must assume the truth of the plaintiff's "factual assertions." We read this to mean the factual assertions in the plaintiff's affidavit, not the allegations in the complaint — particularly given the division's citation to *Salazar* for this point.  *See Salazar*, ¶ 21 (noting that we do not "simply accept the truth of the allegations").

*did* make improper factual findings, any such error is harmless because our review is de novo.  *Id.* at ¶ 21; *see also* C.A.R. 35(c).  In conducting that review, we will disregard any such factual findings.

¶ 72   Some defendants contend that our obligation to consider "opposing affidavits" means that we *should* weigh the evidence.  *See* § 13-20-1101(3)(b).  But as set forth above, when there is a factual conflict, we accept the plaintiff's evidence as true.  *L.S.S.*, ¶ 24.  We assess the defendant's evidence "only to determine if it defeats the plaintiff's claim as a matter of law."  *Id.* at ¶ 23 (citation omitted).

## C.   No Credibility Determinations

¶ 73   Just as a court may not make factual findings in resolving an anti-SLAPP motion, it may not make credibility determinations.  *L.S.S.*, ¶ 48.  Indeed, the principles noted above — that we accept the plaintiff's evidence as true and do not weigh the evidence — leave the court with no credibility determinations to make.  *See id.*

¶ 74   Several defendants assert that the district court made improper credibility findings.  And to the extent it made findings as to the credibility of the evidence submitted in connection with the parties' anti-SLAPP briefing, we agree.  We will disregard any such credibility findings and refrain from making any of our own.  *See*

33

C.A.R. 35(c); *cf. L.S.S.*, ¶ 46 (concluding that district court's application of an erroneous burden of proof did not lead to an erroneous result where correct burden was applied on appeal).

¶ 75     But evidence bearing on the reliability of a defendant's source of information, known to the defendant *at the time of the statement*, may be relevant to actual malice — that is, whether the defendant knew the statement was false or entertained serious doubts as to its truth.  *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 157-58 (1967) (holding that evidence was sufficient to support a finding of actual malice where there were reasons to question the source's reliability); *Creekside Endodontics, LLC v. Sullivan*, 2022 COA 145, ¶¶ 37-38, 44 (holding that the plaintiff could not show actual malice where the defendant's statements were based on the professional opinions of three dentists).  Thus, to the extent the district court made determinations as to the reliability of Oltmann's account *at the time of defendants' statements*, based upon the evidence presented by the parties, those were not credibility findings.  They were a part of the substantive legal analysis as to whether Coomer had established a reasonable likelihood of prevailing on his claims.

### D.    Prima Facie Showing

¶ 76    A plaintiff does not need to prove their case at the anti-SLAPP

stage.  Nor do we (or the district court) decide whether the plaintiff

will ultimately prevail — much less *has* prevailed — on their claims.

*See Salazar*, ¶ 46.  Rather, a plaintiff's burden is to make "a prima

facie showing" of evidence that — if later presented at trial — is

reasonably likely to sustain a favorable judgment.  *L.S.S.*, ¶ 42.

And our role is limited to determining whether the plaintiff has met

this threshold burden.  *Id.* at ¶ 23.  If the plaintiff overcomes this

initial hurdle, the case proceeds as normal and this "early screening

determination" has no further effect on the case.  *Salazar*, ¶ 46.

¶ 77    Although we stated this point above, we reiterate it here

because several defendants argue that Coomer failed to present

clear and convincing evidence to support his claims.  That is not the

standard.  Instead, at this preliminary stage, a plaintiff must show

only a reasonable likelihood that they *will* be able to meet their

burden of proof at trial.  *Rosenblum*, ¶ 24.  Where, as here, a

plaintiff is "pursuing a defamation claim that will ultimately require

proof of actual malice by clear and convincing evidence, . . . the

plaintiff must establish a *probability* that they *will* be able to

35

produce clear and convincing evidence of actual malice at trial." *L.S.S.*, ¶ 42 (emphasis added).  If the plaintiff meets this burden, the ultimate determination must be made by a jury.  *Id.* at ¶ 44.

### E.     Evidence That May Be Considered

¶ 78     In resolving an anti-SLAPP special motion to dismiss, the court "shall consider the pleadings and supporting and opposing affidavits."  § 13-20-1101(3)(b).  The evidence in those affidavits may be considered if "it is reasonably possible the proffered evidence . . . will be admissible at trial."  *Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*, 434 P.3d 1152, 1163 (Cal. 2019); *cf. USA Leasing, Inc. v. Montelongo*, 25 P.3d 1277, 1278 (Colo. App. 2001) (noting that a supporting affidavit "must contain evidentiary material that would be admissible as part of the affiant's testimony if the affiant was in court and testifying on the witness stand").

¶ 79     No party argues that the court may *only* consider affidavits, and we decline to impose such a limitation in this case.  *See, e.g.*, *Creekside Endodontics*, ¶ 41 (considering patient notes and email communication); *L.S.S.*, ¶ 47 (identifying various categories of evidence presented).  *But see Salazar*, ¶ 40 ("A challenge under the anti-SLAPP statute . . . only allows the court to consider the

pleadings and supporting and opposing affidavits . . . .").  Indeed, both Coomer *and* several defendants presented evidence beyond affidavits.  At a minimum, when a court allows specified discovery, *see* § 13-20-1101(6), such an order necessarily implies that the parties may present evidence obtained through that discovery.

¶ 80     But several defendants assert, with varying degrees of development, that the district court improperly relied on inadmissible evidence.  The most developed of these assertions — advanced by the Oltmann Defendants — concerns three expert declarations, which the Oltmann Defendants contend contained legal conclusions, went beyond the declarants' areas of expertise, and relied on undisclosed facts.  We need not decide the admissibility of these declarations because we do not rely on them.

¶ 81     The Oltmann Defendants also challenge the admissibility of the lay declarations submitted by Coomer, on the ground that they had no notice of or opportunity to cross-examine the declarants. But nothing in the anti-SLAPP statute requires such notice or cross-examination as part of the anti-SLAPP proceedings.  *See* § 13-20-1101(6) (providing that discovery is generally stayed pending a

ruling on the motion).  Rather, if the motion is denied, cross-examination can occur later — in a deposition or at trial.

¶ 82   The Oltmann Defendants' challenge to more than thirty exhibits identified only by exhibit number is undeveloped, as is the Hoft Defendants' challenge to the district court's purported reliance on extensive, but unspecified, "inadmissible evidence."[7]  We thus do not consider these arguments.  *See Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12 ("We don't consider undeveloped and unsupported arguments."), *aff'd*, 2021 CO 56.

## IV.   Reasonable Likelihood of Prevailing

¶ 83   Coomer does not dispute the district court's conclusion that defendants' statements satisfy the first step of the anti-SLAPP analysis — more specifically, that they were made "in connection with a public issue" and in furtherance of defendants' constitutional right of petition or free speech.  § 13-20-1101(3)(a).  We therefore do not address that first step and move directly to the second —

---

[7] The Hoft Defendants assert that they "adopt and incorporate" arguments in the brief of another appellant (who is no longer a party to this appeal) on this issue and others.  Because "a party may not both file a separate brief and incorporate by reference the brief of another party," C.A.R. 28(h), we will only consider arguments developed by the Hoft Defendants in their own briefs.

whether Coomer established a reasonable likelihood of prevailing on his claims. *See Gonzales*, ¶ 22; *Creekside Endodontics*, ¶ 29.

## A.    Defamation

¶ 84    The thrust of Coomer's defamation claim is that each defendant made statements perpetuating the false claim that Coomer (1) said on the September 2020 conference call that he intended to subvert the presidential election and (2) did in fact subvert the presidential election.[8]  Defendants' arguments overlap and diverge in various respects, but in general, they assert that Coomer did not show a reasonable likelihood of proving, by clear and convincing evidence, that (1) their statements were defamatory; (2) their statements were false; or (3) they acted with actual malice.

### 1.    Legal Principles

¶ 85    Defamation is "a communication that holds an individual up to contempt or ridicule thereby causing [that individual] injury or damage." *Keohane v. Stewart*, 882 P.2d 1293, 1297 (Colo. 1994). To prevail on a claim of defamation, a plaintiff generally must prove

---

[8] Coomer also repeatedly cites defendants' alleged statements that he "participated in an Antifa call."  But as we understand Coomer's claims, those claims are not based on his mere participation in the call but rather what defendants claimed he said on that call.

four elements: (1) a defamatory statement concerning the plaintiff;

(2) publication; (3) fault amounting to at least negligence; and

(4) either actionability of the statement irrespective of special

damages or the existence of special damages. *Rosenblum*, ¶ 38.

¶ 86    But when, as here, the statement involves a matter of public

concern, three heightened standards apply. *L.S.S.*, ¶ 36.  First, the

plaintiff must prove the falsity of the statement by clear and

convincing evidence, rather than by a mere preponderance. *Id.*

Second, the plaintiff must prove by clear and convincing evidence

that the speaker acted with actual malice. *Id.*  Third, the plaintiff

must prove actual damages, even if the statement is defamatory per

se. *Id.*  Because Coomer does not challenge the district court's

conclusion that the statements in this case involve a matter of

public concern, he must satisfy these heightened burdens.[9]  *See id.*

at ¶ 38 (assuming statements involved matters of public concern

---

[9] The Hoft Defendants assert that the district court erred by
concluding that Coomer was not a public figure.  But the same
heightened standards apply to cases involving public figures and
matters of public concern.  *See Diversified Mgmt., Inc. v. Denver
Post, Inc.*, 653 P.2d 1103, 1106 (Colo. 1982).  Because there is no
dispute that the statements in this case involve matters of public
concern, we need not decide whether Coomer is a public figure.

where plaintiff did not dispute that they did); *Lawson v. Stow*, 2014 COA 26, ¶ 18 (explaining that a matter is generally of public concern when it "embraces an issue about which information is needed or is appropriate" or when "the public may reasonably be expected to have a legitimate interest" in it) (citation omitted).

¶ 87    Clear and convincing evidence is "evidence that is highly probable and free from serious or substantial doubt." *Destination Maternity v. Burren*, 2020 CO 41, ¶ 10 (citation omitted).  But again, that is the burden a plaintiff must ultimately meet at trial.  At this early stage, Coomer need only show "a reasonable probability that he *will* be able" to prove falsity and actual malice by clear and convincing evidence at trial.  *Rosenblum*, ¶ 40 (emphasis added).[10]

## 2.    Defamatory Statements

¶ 88    There is no dispute about *what* defendants said in this case.  Those statements were all either recorded or written, and the record contains transcripts of most of the recorded statements and copies

---

[10] The anti-SLAPP statute uses the phrase "reasonable likelihood," § 13-20-1101(3)(a), while our case law sometimes uses the phrase "reasonable probability," *e.g.*, *Rosenblum*, ¶ 40.  Except when quoting prior cases, we will adhere to the language of the statute. But the two phrases are synonymous in this context.  *Salazar*, ¶ 23.

of the written ones.  But defendants dispute the district court's characterization of those statements and their defamatory nature.

### a.      Statements in Question

¶ 89    The district court concluded that Coomer had sufficiently shown that each defendant stated, in substance, that (1) Coomer participated in an Antifa conference call;[11] (2) Coomer said on the call that he intended to subvert the presidential election; and (3) Coomer did subvert the results of the election.  Defendants argue that the court erred by lumping all defendants together and making generalizations about the "substance" of their statements rather than analyzing what each defendant actually said.

¶ 90    We agree with defendants that it is important to consider each defendant's statements independently and avoid generalizing them for the sake of expediency.  But we are not limited to viewing discrete sentences or words in isolation.  Instead, we must consider each defendant's statements in context to determine how a reasonable person would have understood them.  *See Anderson,*

---

[11] As noted above, *supra* n.8, we do not consider the statements that Coomer participated in an Antifa conference call as an independent basis of Coomer's claims, separate from defendants' statements about what Coomer supposedly said on that call.

¶¶ 39, 47; *Rosenblum*, ¶ 43.  Statements may, alone or in combination, "reasonably be interpreted to communicate an idea" that they do not spell out expressly.  *Rosenblum*, ¶ 43; *see also Keohane*, 882 P.2d at 1302-03 (explaining that a factual assertion may be implied); *Billauer v. Escobar-Eck*, 305 Cal. Rptr. 3d 273, 286 (Ct. App. 2023) ("[I]t is not the literal truth or falsity of each word or detail used in a statement which determines whether or not it is defamatory," but "whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance.") (citation omitted).

¶ 91   We therefore begin by separately considering each defendant's statements.  Although the wording of those statements varies, we conclude that each defendant made statements that could reasonably be interpreted as asserting that Coomer said on a conference call that he had made sure President Trump was not going to win the election.  *See Rosenblum*, ¶¶ 43-44.  We further conclude that each defendant made statements, either express or implied, that Coomer took steps to undermine the election results.[12]

_____

[12] By identifying specific statements made by each defendant, we do not intend to suggest that Coomer's claim is limited to those statements.  We simply conclude that those statements are sufficient to establish a reasonable likelihood that Coomer will

i.   Oltmann Defendants

¶ 92   The Oltmann Defendants do not dispute that Oltmann made the statements Coomer claims he did or that his statements can be attributed to the other Oltmann Defendants.  As just a small sampling, Oltmann said on his November 9, 2020, Conservative Daily podcast that (1) he was "going to expose someone," later identified as Coomer, who "is controlling elections"; (2) a person identified as "Eric, the Dominion guy" said on the conference call, "Don't worry about the election.  Trump is not going to win.  I made effing sure of that"; (3) Oltmann determined the "Eric" on the call was Coomer; and (4) Coomer was "interfering with the election."

¶ 93   Over the next month (and beyond), Oltmann repeated these and similar statements, underscoring them with expressions of certainty that Coomer — not just someone named "Eric" — had

---

prevail on his claims.  Absent a specific challenge, we need not separately parse each statement by each defendant.  *See Park v. Nazari*, 311 Cal. Rptr. 3d 557, 564 n.5 (Ct. App. 2023) (holding that when an anti-SLAPP motion seeks to strike the entire complaint, "the court can properly deny the motion . . . so long as the court concludes the complaint presents at least one claim that does not arise from anti-SLAPP protected activity").  We express no opinion as to any additional statements we do not address below.

44

made the alleged statement on the conference call and had in fact interfered with the election.  These statements included:

- "I'm not guessing that [Coomer is] involved, I know he's involved in this. . . .  When you interfere with the country's election, when you put your finger on the scale of the voting of the people, the American voice, you are subject to being put to death."

- "It is truth, a hundred percent truth."

- "[T]his isn't all made up.  This isn't hyperbole that we're just throwing out there.  This is absolute fact."

- "[Coomer] has the ability to put his finger on the scale and has, I believe, put his finger on the scale of the election across our country."

- "[Coomer] could put his finger firmly on the American voice and tip the scale of the election very easily.  And frankly . . . he was doing it."

ii.    Malkin

¶ 94    On her November 13, 2020, broadcast of #MalkinLive, Malkin asked Oltmann to give his account of the September conference call, which she characterized as "information that is so vital to

45

understanding the systemic stealing of our election."  After Oltmann had finished that account, she said that "the market share of Dominion is why this reaches from conspiracy theory to conspiracy truth."  She also said that Coomer was "cheerleading calls for Antifa types" and that Oltmann "got to hear the unhinged rantings of this lunatic in charge of security at Dominion Voting Systems."  Then, after the show, Malkin posted several links to the interview along with messages indicating, among other things, that Coomer had been "exposed" by Oltmann.  These statements "could reasonably be interpreted to communicate" that Coomer had made the statement Oltmann had just described.  *Rosenblum*, ¶ 43.

¶ 95    Malkin contends that she did not say Coomer in fact subverted the election, pointing to her disclaimer in her second interview that "there's no evidence that Eric Coomer made good on his threat" — a disclaimer she qualified with the two-part caveat, "at this point, at least publicly."  But in that same interview, Malkin tied Coomer to a segment focused on "hacking the vote," said that Coomer "matters in these ongoing battles against election fraud," and immediately followed the disclaimer with the assertion that Coomer "ha[d] the ability to carry out on this threat . . . that [Oltmann] heard directly."

¶ 96    Given this context, Malkin's disclaimer is not dispositive.  *See*
Restatement (Second) of Torts § 563 cmt. c (Am. L. Inst. 1977) ("A
conditional or alternative statement may be defamatory if,
notwithstanding its conditional or alternative form it is reasonably
understood in a defamatory sense."); *Damon v. Moore*, 520 F.3d 98,
107 n.5 (1st Cir. 2008) ("While disclaimers are not a bad practice,
the non-defamatory character of a statement will rarely depend
solely on the presence or absence of one.").  Notwithstanding that
disclaimer, a jury could reasonably interpret Malkin's statements,
in combination, to imply that Coomer had taken steps to undermine
the election results.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1,
21 (1990) (holding that a reasonable fact finder could conclude that
nine passages in a newspaper column "impl[ied] an assertion that
[the plaintiff] perjured himself").  Moreover, the disclaimer expressly
reasserted that Coomer had *threatened* to influence the election.

### iii.    Hoft Defendants

¶ 97    The Hoft Defendants published articles that included the
following statements, among others: (1) "Anti-Trump Dominion
Voting Systems Security Chief Was Participating in Antifa Calls";
(2) Oltmann "infiltrated Antifa" and heard "Eric (the Dominion guy)"

say "Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that"; (3) Oltman investigated "Eric from Dominion" and "came upon Eric Coomer"; and (4) Coomer and Dominion had allegedly threatened lawsuits against media "who dare to speak out against their alleged massive national (and possibly international) scheme to allegedly rig our alleged elections."  They also published several articles discussing Coomer in the context of claims about vulnerabilities in Dominion software and alleged "vote switching."

¶ 98    The Hoft Defendants also published the audio of Hoft's interview with Oltmann, in which Hoft said explicitly that Coomer was on the call Oltmann described, that Oltmann's information was "truthful," and that Oltmann was "exposing absolute fraud."

¶ 99    Contrary to the Hoft Defendants' argument that Coomer did not plead the allegedly defamatory statements with sufficient specificity, the operative complaint quotes several of these statements directly and identifies others by citation to the articles in which they appear.  Although a defamation claim "requires a certain degree of specificity," *Corporon v. Safeway Stores, Inc.*, 708 P.2d 1385, 1390 (Colo. App. 1985), the plaintiff is not required to quote each defamatory statement verbatim in its entirety.

¶ 100    The Hoft Defendants assert that they never said Coomer

"rigged the election" but only that someone identified as Coomer

said, "Trump is not gonna win.  I made f-ing sure of that."  Notably,

the Hoft Defendants do not dispute that they asserted that Coomer

*said* he made sure President Trump was not going to win, even

though they were repeating Oltmann's account.  *See Anderson*,

¶¶ 38-47 (suggesting that a report of allegations may be an

assertion of the allegations themselves where context indicates the

speaker endorses their truth); *Dixon v. Newsweek, Inc.,* 562 F.2d

626, 631 (10th Cir. 1977) ("[T]he republication of false defamatory

statements is as much a tort as the original publication.").

¶ 101    As to whether the Hoft Defendants said Coomer subverted the

election, we agree they did not do so explicitly.  And their repeated

use of the word "alleged" when referring to Coomer's "scheme" to

"rig" our elections arguably cuts against such an assertion.  *See*

*Anderson*, ¶ 44.  On the other hand, in context, the repeated use of

the word "alleged" — including in reference to "our alleged elections"

— could be seen as tongue in cheek.  Moreover, that statement

followed several other Gateway Pundit articles discussing Coomer in

the context of alleged election fraud, as well as Hoft's statement that

Oltmann was "exposing absolute fraud."  Given this context, we cannot foreclose a reasonable likelihood that a jury could interpret these statements as assertions that Coomer had in fact engaged in a "scheme" to "rig" the election.  *See Milkovich*, 497 U.S. at 21.

### iv.   Metaxas

¶ 102   Like Malkin, Metaxas gave Oltmann a platform to share his account of the September 2020 call.  Metaxas then confirmed that account: "So this guy, Eric Coomer, this genius you discover was the guy who said on this Antifa call, 'Don't worry about Trump, there's no way he's going to win'?"  Although framed as a question, this statement — viewed in the context of the entire interview — could reasonably be interpreted as an assertion that Coomer had made the claimed statement, particularly when Metaxas knew Oltmann would confirm it.  *See Keohane*, 882 P.2d at 1302 ("A question . . . though not phrased in the form of a declaration of fact, may imply the existence of a false and defamatory fact.").

¶ 103   Metaxas then went further, suggesting that Coomer had in fact improperly influenced the election results:

- "Eric Coomer is the director of strategy and security for Dominion Voting Systems. . . .  [T]hat guy is all in for

Antifa, wants to do anything he can with his tremendously powerful position to make sure Donald Trump is not elected.  He effectively succeeds . . . ."

- "[T]he idea that anyone would dare try to mess with our elections . . . I cannot think of anything more despicable . . . so that's why I'm so glad to be speaking with you and getting this information out."

- "Does [Coomer] know he's going to go to prison for the rest of his life?"

- "[T]here are other nefarious actors like Mr. Coomer . . . . What we're talking about is evil. . . .  It's extremely criminal and these folks know they're going to go to jail for the rest of their lives."

¶ 104    Metaxas later posted a link to the interview with a message stating, this time explicitly, that "Eric [C]oomer . . . PROMISED the Antifa folks that 'effing' Trump WOULD NOT WIN!"

### v.   Powell Defendants

¶ 105   Powell[13] said explicitly at the November 19 press conference that "Eric Coomer . . . is on the web as being recorded in a conversation with Antifa members, saying that he had the election rigged for Mr. Biden.  Nothing to worry about here.  And he was going to — they were going to 'F' Trump."  In an interview the next day, she repeated that accusation: "We've got Eric Coomer . . . admitting on tape that he rigged the election for Biden . . . ."  And in another interview, she confirmed the interviewer's question that Coomer "was allegedly . . . on a conference call . . . with Antifa" and "said, supposedly, don't worry about Trump, I've already made sure he's going to lose the election," responding, "It's true.  We have an affidavit to that effect and I think we have a copy of the call."

¶ 106   The Powell Defendants contend that Powell was merely stating that there were reports that Coomer had made the statements, not that he had actually made them.  But this characterization is belied by Powell's statements themselves, as well as their context.  Powell

---

[13] Sidney Powell, P.C. does not make any arguments distinct from Powell, nor does it dispute that the relevant statements by Powell may be imputed to it.  We therefore assume that they can.

did not simply say others had said it; she said she had a recording of Coomer's statements.  And when the interviewer used the words "allegedly" and "supposedly," Powell did not.  She said the allegations were "true" and then reinforced that assertion by citing the affidavit and again suggesting there was a recording.  Notably, Oltmann acknowledged from the outset that there is no recording of the call, and the record contains no evidence of any such recording.

¶ 107   We also think that Powell's statements — made in the context of her claims that the election had been "rigged" — could reasonably be understood as assertions that Coomer interfered with the election results.  She did not just say Coomer made the comment attributed to him; she said he "admitt[ed] on tape that he rigged the election."  She then immediately followed that statement by claiming to have "all kinds of evidence that is mathematically irrefutable" — thus indicating not only that Coomer had "admitted" to "rigging" the election, but that she could prove he had done so.

### vi.    Trump Campaign

¶ 108   The Trump Campaign does not dispute that Giuliani's statements at the November 19, 2020, press conference may be imputed to it.  Giuliani introduced himself at that press conference

as part of the legal team representing President Trump and the Trump Campaign.  *See* Restatement (Second) of Agency § 254 (Am. L. Inst. 1958) ("A principal is subject to liability for a defamatory statement by . . . [an] agent if the agent was authorized, or . . . apparently authorized to make it."); *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("[I]f an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the defamatory statement.").

¶ 109   Giuliani explained that the purpose of the press conference was to present evidence of alleged election irregularities.  One of those pieces of "evidence" was Oltmann's account of Coomer's statements.  After Powell relayed that account, Giuliani reiterated that Coomer "specifically says that they're going to fix the election." He followed that statement by asserting that there had been a "crime" and that he could "prove" President Trump won the election. These statements — indisputably attributable to the Campaign — can reasonably be understood to assert that Coomer (1) said he was "going to fix the election" and (2) actually took steps to do so.

¶ 110   The Trump Campaign contends that Powell's statements cannot be imputed to it because Powell was not acting as its agent

54

when she made the statements.  We conclude that there is a reasonable likelihood a jury could find otherwise.  Five days before the press conference, President Trump posted on social media:

> I look forward to Mayor Giuliani spearheading the legal effort to defend OUR RIGHT to FREE and FAIR ELECTIONS!  Rudy Giuliani, Joseph diGenova, Victoria Toensing, *Sidney Powell*, and Jenna Ellis, a truly great team . . . .

(Emphasis added.)  Then, at the beginning of the press conference, Giuliani introduced Powell as one of the "senior lawyers" representing President Trump *and* the Trump Campaign.

¶ 111   The Trump Campaign argues that Giuliani's and President Trump's statements cannot establish agency because they were not "principals" of the Campaign.  In support, it cites century-old case law for the proposition that a putative agent's *own* declarations are not admissible to prove agency in the absence of other evidence.  *See Modoc Gold Mining Co. v. Skiles*, 13 Colo. App. 293, 294, 57 P. 190, 190 (1899); *Am. Nat'l Bank of Sapulpa v. Bartlett*, 40 F.2d 21, 23 (10th Cir. 1930).  *But see Zambruk v. Perlmutter 3rd Generation Builders, Inc.*, 32 Colo. App. 276, 279, 510 P.2d 472, 474 (1973) ("Although it is true that an agency relationship cannot be established *solely* from the assertion of authority by an alleged

agent, . . . [a]gency may be established by the conduct of the principal *and* the alleged agent.") (emphasis added).

¶ 112   This confuses the issue.  The principal is the Trump Campaign.  *See* Restatement (Second) of Agency § 1 ("The one for whom action is to be taken is the principal.").  As agents of the Trump Campaign, Giuliani and President Trump could speak and act on its behalf.  *See Dworkin, Chambers & Williams, P.C. v. Provo*, 81 P.3d 1053, 1058 (Colo. 2003) ("By definition, an agent is one with authority to 'act on behalf of . . . and bind' a principal.") (citation omitted).  So Giuliani's and President Trump's statements that Powell was an attorney for the Campaign *were* statements of the principal.  *See Dall. Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997) ("[A] corporation can only act through its agents, and their acts within the scope of their authority are the acts of the corporation.") (citation omitted).  Coomer does not rely solely, if at all, on the putative agent's (Powell's) own declarations of agency.

¶ 113   Indeed, it is the Trump Campaign that relies on Powell's own declarations, citing her deposition testimony that she did not appear at the press conference on behalf of the Trump Campaign, and that, although she and Giuliani were "essentially aligned," she

56

was "pursuing [her] own path."  The Campaign also cites its own deposition testimony, and that of Giuliani, denying that Powell had been an attorney for the Campaign.  These post hoc denials may create a factual dispute.  But that is a dispute we cannot resolve at this stage.  *See Rosenblum*, ¶ 24.  In light of the statements above, Coomer has made a "prima facie showing" that, at the time of the November 19 press conference and her interviews the next day, Powell was acting as an agent of the Trump Campaign.  *L.S.S.*, ¶ 42.

¶ 114    Finally, the Trump Campaign asserts that, even if Powell was its agent at some point, that agency terminated on November 22, 2020, when Giuliani and another lawyer for the Campaign, Jenna Ellis, publicly stated that Powell "is not a member of the Trump legal team."  *See* Restatement (Second) of Agency § 118 ("Authority terminates if the principal . . . manifests to the other dissent to its continuance.").  We need not decide this issue because Coomer does not seek to impute to the Trump Campaign any statements made by Powell on or after November 22, 2020.

vii.    DTR

¶ 115    DTR makes a different argument than the other defendants. Its sole argument is that it cannot be liable for Powell's statements

57

— the only alleged basis for liability — because it was formed after those statements were made.  While Powell's statements were made on November 19 and 20, 2020, DTR presented evidence that it was not incorporated until December 1, 2020.  Thus, DTR contends that it cannot be deemed to have made the statements attributed to it.

¶ 116   This argument has substantial force on the merits.  *See Coopers & Lybrand v. Fox*, 758 P.2d 683, 685 (Colo. App. 1988) ("One cannot act as the agent of a nonexistent principal."); *Miser Gold Mining & Milling Co. v. Moody*, 37 Colo. 310, 315, 86 P. 335, 337 (1906) (holding that corporation could not be bound by acts occurring when it was "not yet in existence").  But there are two problems with us considering the argument in this appeal.

¶ 117   First, we question whether DTR's argument may even be raised in an anti-SLAPP motion.  Consistent with the anti-SLAPP statute's purpose of encouraging and safeguarding constitutional rights, the statute applies only when the defendant makes a prima facie showing that the cause of action arises from an "act of *that person* in furtherance of the person's right of petition or free speech."  § 13-20-1101(3)(a) (emphasis added); *see also Salazar*,

¶ 21.  It is not clear, then, that a defendant may invoke the special procedures of that statute when it denies engaging in any such act.

¶ 118    Second, even if DTR could have made this argument in its anti-SLAPP motion, it did not.  To the contrary, that motion effectively assumed DTR's vicarious liability for Powell's statements and asserted that those statements were not actionable.  It was not until DTR's reply that it first asserted that the statements were made before it existed or that it presented evidence to that effect.  We ordinarily will not consider issues raised for the first time in a reply brief before the district court.  *See Grohn v. Sisters of Charity Health Servs. Colo.*, 960 P.2d 722, 727 (Colo. App. 1998).

¶ 119    DTR contends that it was not required to raise the issue in its motion because it was Coomer's burden to show a reasonable likelihood of prevailing on his claim, which he could do only if he first showed DTR existed when the statements were made.  But a plaintiff's burden does not require the plaintiff to anticipate and respond to arguments a defendant does not make — particularly where, as here, the special motion to dismiss appears to concede the issue.  *See Salazar*, ¶ 34 (holding that the defendant did not preserve an argument that the plaintiff had to show actual malice).

¶ 120    We decline to exercise our discretion to consider this

unpreserved argument.  *See Farmer v. Colo. Parks & Wildlife

Comm'n*, 2016 COA 120, ¶ 19.  Coomer did not have an opportunity

to brief the merits of the argument in the district court and,

contrary to DTR's contention that it involves a pure issue of law,

Coomer's response on appeal presents arguable factual disputes as

to whether DTR ratified or otherwise adopted Powell's earlier

statements after it was incorporated.  *See Knox v. First Sec. Bank of

Utah*, 196 F.2d 112, 116 (10th Cir. 1952).  Under these

circumstances, we do not think it would be appropriate to address

this argument for the first time on appeal.  *See Salazar*, ¶ 35.

¶ 121    Because DTR does not challenge the district court's denial of

its anti-SLAPP motion to dismiss on any other grounds, the order is

affirmed as to DTR.  This does not, however, preclude DTR from

asserting this argument in an appropriate motion on remand.

### b.    Defamatory Nature

¶ 122    We have concluded that each defendant made statements that

could reasonably be understood to communicate that (1) Coomer

said on a September 2020 conference call that he made sure

President Trump would not win the election, and (2) Coomer took

steps to undermine the election results.  We next conclude that there is a reasonable likelihood a jury could find these statements were defamatory, in that they "tend[ed] to so harm [Coomer's] reputation . . . as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Arrington v. Palmer*, 971 P.2d 669, 671 (Colo. App. 1998).  A statement is defamatory if it "prejudice[s] the plaintiff in the eyes of a substantial and respectable minority of the community."  *Id.*

¶ 123    No defendant disputes that a statement that Coomer in fact interfered with the election would be defamatory.  To the extent such a statement imputes a criminal offense, as several defendants' statements did expressly, it is defamatory per se.  *Id.*; *see also Keohane*, 882 P.2d at 1304 ("[A]ccusations of criminal activity, 'even in the form of opinion, are not constitutionally protected.'") (citation omitted).  Even if it did not, such an accusation could undoubtedly harm Coomer's reputation, prejudice him in the eyes of the community, and hold him up to contempt or ridicule, as evidenced by the death threats and harassment Coomer says he experienced.  *See Keohane*, 882 P.2d at 1297; *Arrington*, 971 P.2d at 671.

¶ 124    Several defendants contend that a statement that Coomer said he "made sure" President Trump was not going to win the election is not defamatory because it could mean something innocuous like donating to the Biden campaign or encouraging people not to vote for President Trump.  But this argument ignores the context of the statements.  Defendants were not discussing this story in the context of political activism; they were discussing it in the context of claims of election fraud.  In that context, a statement that Coomer had "made sure" President Trump was not going to win could mean only that he had taken steps to subvert the election results.

¶ 125    Some defendants — for example, the Powell Defendants and the Oltmann Defendants — connected these dots explicitly by paraphrasing Coomer's alleged quote accordingly.  Others left the meaning of Coomer's reported statement implicit.  Either way, there is a reasonable likelihood that a jury could conclude that, even if Coomer did not follow through on his supposed guarantee, the claim that he had *made* such a statement was itself defamatory.

¶ 126    Several defendants also dispute the defamatory nature of statements that Coomer participated in an Antifa conference call, particularly when Coomer himself had posted a self-styled "public

statement from 'Antifa'" on his social media page.  We agree that it is a closer call whether merely stating that Coomer had participated in an Antifa call would alone be defamatory under these circumstances.  But we need not decide that point because the central focus of defendants' statements was not simply that Coomer had been on an Antifa call, but what he had said on that call.

¶ 127    The same is true of the Powell Defendants' argument that their statement that the call was recorded was not defamatory.  In a vacuum, the existence (or not) of a recording might not be defamatory, and we do not understand Coomer to argue otherwise.  But Powell used the claimed recording to fortify her claim that Coomer made the statement.  A jury could reasonably conclude that Powell's reference to a recording, while perhaps not defamatory on its own, increased the defamatory impact of her other statements.

c.    Opinion

¶ 128    The Hoft Defendants and Metaxas each contend that their statements were protected opinion and hyperbole.  They assert that, as a political opinion blog and talk radio host, respectively, no one would understand their statements as anything other than

intentionally provocative commentary.  With respect to statements expressing the factual assertions we identify above, we disagree.

¶ 129    A statement may be actionable as defamation if it is "sufficiently factual to be susceptible of being proved true or false." *Anderson*, ¶ 34 (citation omitted).  Statements of pure opinion that do not "contain a provably false factual connotation" or that "cannot 'reasonably [be] interpreted as stating actual facts' about an individual" are constitutionally protected and nonactionable. *Keohane*, 882 P.2d at 1299 (citation omitted); *see Lawson*, ¶ 30.

¶ 130    But there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'"  *Milkovich*, 497 U.S. at 18.  To the contrary, expressions of opinion "often imply an assertion of objective fact."  *Id.*  And "[s]imply couching [a factual assertion] in terms of opinion" — for example, by prefacing the statement with a qualification like "I think" or "I believe" — does not itself insulate the speaker from liability.  *Id.* at 19; *see also Anderson*, ¶ 35.

¶ 131    To distinguish between an actionable assertion of fact and a nonactionable statement of pure opinion, we apply a two-part test. *Keohane*, 882 P.2d at 1299.  First, we ask whether the statement is "sufficiently factual to be susceptible of being proved true or false."

*Id.* (citation omitted).  This step is satisfied if "the statement contains *or implies* a verifiable fact."  *NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 10 (Colo. 1994) (emphasis added).  Second, we ask "whether reasonable people would conclude that the assertion is one of fact."  *Keohane*, 882 P.2d at 1299.  In answering this second question, we may consider how the statement is phrased, the context, and the surrounding circumstances, including the medium through which the statement is disseminated and the audience to whom it is directed.  *Id.*

¶ 132    The assertions we identify above — that Coomer said he made sure that President Trump was not going to win the election, and that he took steps to undermine the election results — are "sufficiently factual to be susceptible of being proved true or false." *Id.* (citation omitted).  Either Coomer made the statement on the conference call or he did not.  Either he took steps to undermine the election results or he did not.  Those are factual assertions.

¶ 133    Moreover, we conclude that a reasonable person would understand these portions of the Hoft Defendants' and Metaxas's statements as assertions of fact.  We recognize that the statements were made on platforms commonly used to express opinions.  And

some of what these defendants said in their articles and radio show

undoubtedly *would* qualify as protected opinion or hyperbole — for

example, that Coomer was "unhinged," a "lunatic," or "evil."

¶ 134    But assertions of fact can be made on an opinion platform.

And as to the statements in question, defendants did not hedge.

They did not even couch the statements with qualifying language

like "I think," "I believe," or "in my opinion."  Rather, they reported

Oltmann's account in declarative terms and then connected it to

claimed election irregularities — Metaxas directly, saying Coomer

had "effectively succeed[ed]," and the Hoft Defendants only slightly

less so.  *See Milkovich*, 497 U.S. at 18 (noting that factual assertion

may be implied).  Further, those statements came in the context of

broader claims of election improprieties nationwide, including by

the Trump Campaign itself, making it more likely that defendants'

audiences would take the statements as fact.  *See Keohane*, 882

P.2d at 1303-04 (holding that other claims of official misconduct

indicated that a reasonable person would understand an accusation

of similar misconduct as a statement of fact); *cf. Rosenblum*, ¶ 44

(rejecting argument that no reasonable internet user could have

believed statements because internet is "inherently unreliable").

¶ 135    We also reject defendants' suggestion that their statements are

protected because they identified the bases for those statements,

including Oltmann's interview, internet videos of Coomer, and

Coomer's social media posts.  Such disclosure of the underlying

facts is not an automatic safe harbor.  *Milkovich*, 497 U.S. at 18-19.

The statement may still imply a false assertion of fact if those facts

are incorrect or incomplete, or if the speaker's assessment of them

is provably false.  *Id.*  That is the essence of Coomer's claim.

¶ 136    That is how this case differs from *Herring Networks, Inc. v.*

*Maddow*, 8 F.4th 1148 (9th Cir. 2021), and *McDougal v. Fox News*

*Network, LLC*, 489 F. Supp. 3d 174, 182 (S.D.N.Y. 2020).  In both

*Herring Networks* and *McDougal*, the plaintiffs did not dispute any

of the underlying verifiable facts but only the defendants' subjective

characterization of those facts.  *See Herring Networks*, 8 F.4th at

1159 (distinguishing between the defendant's "commentary and the

actual news she is reporting"); *McDougal*, 489 F. Supp. 3d at 178,

182 (noting that the plaintiff alleged in the complaint that she

received the payment but disputed "the accusation of 'extortion,'

coupled with the description of [her] alleged actions").  In contrast,

Coomer's claims concern the truth of the reported facts.

### 3.    Falsity

¶ 137    We next conclude that, accepting Coomer's evidence as true, he has shown a reasonable likelihood of proving by clear and convincing evidence that defendants' statements were false.

¶ 138    In his declaration, Coomer attested that (1) he never participated in any Antifa conference call or any other call related to protest activity; (2) he never stated he had the ability or desire to affect the outcome of an election; (3) he did not boast about his supposed ability to rig the 2020 presidential election; (4) he did not take any action to subvert the election; and (5) he did not have the ability to alter the results of the election in any way.  Coomer also generally accounted for his daily schedule on September 25, 2020, and each day during the week of September 27, 2020 — no part of which included anything like the call Oltmann described.

¶ 139    This declaration, if true, could provide clear and convincing evidence that defendants' statements about what Coomer had said and done were false.  *See Anderson*, ¶ 68 (relying on the plaintiff's affidavit attesting that he had never sexually assaulted anyone or "engaged in conduct that could reasonably be interpreted as sexual assault" to conclude that a reasonable juror could find by clear and

convincing evidence that the sexual assault allegation was false). Despite defendants' exhortations, we cannot at this stage reject (or discount) Coomer's declaration as incredible.  *See id.* at ¶ 70.

¶ 140    Coomer presented other evidence as well.  For example, several defendants suggest that a September 25, 2020, conference call described in Anderson's declaration might have been the conference call in question.  But if that is the case, Anderson's declaration corroborates Coomer's denial.  Anderson attested that, on that call, "no one mentioned 'Eric from Dominion.'"  He also stated that, although he was "generally familiar with all of the call participants," he did not know, had never met, and had never heard of Eric Coomer.  Another person Oltmann suggested might have been on the call, Heidi Beedle, attested that she was not aware of an Antifa call in late September 2020 and had never met Coomer.

¶ 141    Coomer also points to apparent inconsistencies or weaknesses in Oltmann's account of the call, including that (1) the screenshot of Oltmann's alleged Google search is dated September 26, 2020, while Oltmann's affidavit states that the call occurred on or about the week of September 27, 2020; (2) Oltmann originally said it was a phone call but later said it was a Zoom call; and (3) there was no

recording of the call despite a later claim by some defendants that there was.  Though not alone sufficient, these factors would provide further grounds for a jury to find that Oltmann's account was false.

¶ 142    Defendants cite a litany of evidence that they contend could support a contrary finding.  They do not point to any direct evidence that *Coomer* made the statement.  Nor does any defendant even assert on appeal, much less cite evidence, that Coomer in fact took steps to undermine the election results.  But defendants point to the following evidence that could support a jury finding that the call occurred as Oltmann described and that Coomer was the speaker:

- Oltmann attested to his account of the call in a sworn affidavit and in his deposition testimony.

- Oltmann presented contemporaneous notes of the call.

- Oltmann presented a screenshot of a Google search for "eric dominion denver Colorado," dated the day after the conference call described in Anderson's declaration.

- Oltmann allegedly described the call to two other people before discussing it on his podcast.

- Coomer made social media posts that were "anti-Trump" and supportive of Antifa.

70

- There was a Zoom call among Denver activists around the time of the alleged call Oltmann described.

¶ 143   Several defendants argue that a reasonable jury could find from this evidence that Coomer cannot prove by clear and convincing evidence that Oltmann's account of the call was false. And that may be true.  But it answers the wrong question.  The question is not whether a reasonable jury could find in defendants' favor.  The question is whether, accepting Coomer's evidence as true, there is a reasonable likelihood that a jury could find in *Coomer's* favor.  If there is a reasonable likelihood of *either* finding — a verdict in favor of defendants *or* a verdict in favor of Coomer — Coomer has necessarily overcome the anti-SLAPP threshold.

¶ 144   To be clear, we do not make any determination as to which evidence — Coomer's or defendants' — is more credible.  When, as here, there is competing evidence, we may not weigh the evidence at all.  *Rosenblum*, ¶ 24.  We conclude only that Coomer has presented evidence establishing a reasonable likelihood that he will be able to prove the falsity of defendants' statements at trial.  The question of which version of events to believe is one for the jury.  *L.S.S.*, ¶ 44.

¶ 145    Some defendants highlight certain statements that they

contend are substantially true, including that Dominion had

"penetrated our election system" (Malkin), that *a* call occurred

involving the parties and topics Oltmann claimed (the Hoft

Defendants), that there were *reports* of Coomer having made the

statement (the Powell Defendants), and that Coomer was "anti-

Trump" (the Powell Defendants).  *See SG Ints. I, Ltd. v.*

*Kolbenschlag*, 2019 COA 115, ¶ 21 ("Substantial truth is a complete

defense to defamation.").  To the extent these arguments are

premised on the existence of a call in which Coomer participated,

we reject them for the reasons above: Coomer presented an affidavit

denying that he participated in any such call.  To the extent they

assert the substantial truth of statements other than those that

Coomer made the comment attributed to him and took steps to

undermine the 2020 presidential election, they are beside the point.

Coomer's claims are not based on defendants' statements that he

disapproved of President Trump, or even on defendants' assertions

about Dominion more generally.  They are based on defendants'

statements about what Coomer said and did with regard to the

election.  And as discussed above, each defendant went further than simply reporting that *others* had made those statements.

### 4.    Actual Malice

¶ 146    As noted above, because defendants' statements involve a matter of public concern, Coomer must "establish a reasonable probability that he will be able to produce clear and convincing evidence of actual malice at trial." *Rosenblum*, ¶ 40.  Defendants each contend that Coomer has not met this burden.  We disagree.

### a.    Legal Standard

¶ 147    Actual malice means that the speaker made the statement "with actual knowledge that it was false or with reckless disregard for whether it was true." *L.S.S.*, ¶ 40.  A speaker acts with reckless disregard if the speaker "entertain[s] serious doubts as to the truth of the statement or act[s] with a high degree of awareness of its probable falsity." *Creekside Endodontics*, ¶ 38 (citation omitted).

¶ 148    This is a subjective standard.  *See St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see also In re Green*, 11 P.3d 1078, 1086 n.7 (Colo. 2000).  The question is not "whether a reasonably prudent [person] would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731.  Instead, the evidence

must "permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication," *id.*, or was highly aware of its probable falsity, *Creekside Endodontics*, ¶ 38.

¶ 149    But that does not mean that a defendant can defeat a defamation claim simply by "testifying that he published with a belief that the statements were true." *St. Amant*, 390 U.S. at 732. Nor does it mean that what a reasonable person would have known or believed is irrelevant. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989) ("[I]t cannot be said that evidence concerning . . . care never bears any relation to the actual malice inquiry."). Actual malice can, and often must, be proved by circumstantial evidence. *Id.*; *see also Creekside Endodontics*, ¶ 37 ("[I]t is rare for there to be evidence that the speaker *knew* their statement was false yet published it anyway."). And one way of showing a defendant in fact entertained serious doubts as to the truth of a statement is to show that any reasonable person would have entertained such doubts. *See Harte-Hanks Commc'ns*, 491 U.S. at 667-68 (holding that departure from accepted standards of reporting supported finding of reckless disregard); *Reader's Digest Ass'n v. Superior Ct.*, 690 P.2d 610, 618 (Cal. 1984) ("[E]vidence of

negligence . . . may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or . . . knowledge of falsity.") (citation omitted).

¶ 150    Thus, while inadequate investigation by a layperson is generally not alone sufficient to show actual malice, grossly inadequate investigation might be.  *Creekside Endodontics*, ¶ 38.  Similarly, while the failure to corroborate information received from an otherwise reliable source does not establish actual malice, *id.*, "a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation" may do so, *Kuhn v. Tribune-Republican Publ'g Co.*, 637 P.2d 315, 319 (Colo. 1981).  Other circumstantial evidence of actual malice may include (1) the speaker's hostility toward the plaintiff; (2) inconsistencies in the source's account; (3) reasons to doubt the veracity or reliability of the source; (4) the inherent improbability of the claim; and (5) other credible information contradicting the information.  *See St. Amant*, 390 U.S. at 732; *L.S.S.*, ¶ 40; *Gonzales,* ¶ 81; *Anderson*, ¶¶ 64-67.

¶ 151    Contrary to defendants' assertions, such considerations do not convert the actual malice standard into an objective one.  The question remains the defendant's subjective state of mind — in

other words, what the defendant actually knew or believed.[14]  But rarely will a plaintiff have direct evidence of a defendant's mental state.  *See, e.g.*, *Nixon v. City & Cnty. of Denver*, 2014 COA 172, ¶ 29.  And in the absence of such evidence, a plaintiff can prove that element by presenting evidence that would permit the *inference* that the defendant acted with actual malice based on all the circumstances.  *See Kuhn*, 637 P.2d at 318; *L.S.S.*, ¶ 46.

### b.   Oltmann Defendants

¶ 152    Accepting Coomer's evidence as true allows for one of two conclusions: either (1) Oltmann fabricated his account of the September 2020 conference call; or (2) there *was* a conference call

---

[14] The Oltmann Defendants assert that the district court erred by referring to a negligence standard in one paragraph of its order.  But the court did not apply a negligence standard.  Rather, it first concluded that Coomer had shown *at least* negligence (i.e., the third element of an ordinary defamation claim), *see Rosenblum*, ¶ 38, before applying the heightened standard of actual malice in the very next paragraph.  Thus, while the court's conclusion as to negligence was unnecessary, the court ultimately applied the correct standard.  *Cf. Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667-68 (1989) ("[W]hen the [lower court's] opinion is read as a whole, it is clear that the conclusion concerning the newspaper's departure from accepted standards . . . [is] merely supportive of the court's ultimate conclusion" that the record demonstrated actual malice.).

and *someone* on that call said they "made sure" President Trump was "not going to win," but that person was not Coomer.

¶ 153    The first alternative, by definition, would show actual malice on the part of the Oltmann Defendants because it would mean Oltmann knew his account was false.  *See St. Amant*, 390 U.S. at 732 ("Professions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant [or] is the product of his imagination . . . .").  We cannot say whether or not that is the case because it turns on credibility assessments we cannot make.  But based on the parties' conflicting evidence and Coomer's denial, a jury could reasonably so find.  *See L.S.S.*, ¶ 52 (noting that when faced with "competing narratives," courts "have routinely held that a plaintiff's allegations that the defendant made false accusations are sufficient to create a factual issue as to actual malice").

¶ 154    Even if a jury were to accept the second alternative, however, Oltmann's account itself creates a reasonable likelihood that a jury could find by clear and convincing evidence that he entertained serious doubts as to whether the speaker was Coomer.  As told by Oltmann, his sole bases for concluding that the speaker was Coomer were that (1) an anonymous person said — and in the

original telling, *asked if* — "Eric is the Dominion guy"; (2) Coomer's first name is Eric and he worked at Dominion Voting Systems; (3) Coomer had responsibilities related to voting technology; and (4) Coomer was highly critical of President Trump on social media.[15] No one on the call identified the speaker as Coomer.  Nor did the speaker identify himself as someone associated with Dominion.

¶ 155    From that information, Oltmann jumped first to the explosive claim that Coomer — not an anonymous "Eric," but Coomer — had made the statement, and then to the even more explosive claim that Coomer had interfered with the election.  All without attempting to contact the "most obvious source of corroboration or refutation": Coomer himself.  *Rosenblum*, ¶ 46.  Given the gravity of the allegations and the size of the inferential leap they required, there is a reasonable likelihood that a jury could find that Oltmann acted with reckless disregard for the truth in making those accusations. *See Creekside Endodontics*, ¶ 38 (noting that grossly inadequate

---

[15] Oltmann testified in his deposition that the voice of the speaker on the call was the same as Coomer's voice on videos that Oltmann found on the internet.  But in Oltmann's initial account on his podcast, he said that he "can't be sure" if the voice was a "match" to those videos.  And Oltmann did not mention the voice similarities in his interviews with the other defendants or in his affidavit.

investigation may show actual malice); *Samsel v. Desoto Cnty. Sch. Dist.*, 242 F. Supp. 3d 496, 533-34 (N.D. Miss. 2017) ("[G]iven the magnitude of the step [the defendant] was taking in [making the statement], it was incumbent on him to exercise great care . . . .").

¶ 156   Indeed, Oltmann himself acknowledged that, at least initially, he *did* doubt the speaker was Coomer.  The only new pieces of information he says persuaded him otherwise were the claims of election irregularities, Coomer's involvement in election technology, and Coomer's social media posts.  Whether this information in fact sufficed to satisfy Oltmann of a connection he had previously rejected — or whether the claims of election irregularities by others emboldened him to trumpet a theory he still questioned — is a factual question we cannot answer.  *See Rosenblum*, ¶ 24.  But there is a reasonable likelihood that a jury could find that Oltmann continued to harbor the doubts he admittedly did at first.

¶ 157   The Oltmann Defendants dispute the district court's conclusion that Oltmann relied on an anonymous source, asserting that *he* was the source of his own report.  This argument conflates what Oltmann says he heard on the call with who said it.  Oltmann may have had firsthand knowledge that *someone* said, "Trump is

not going to win.  I made effing sure of that," and that someone else *said* that person was "Eric, the Dominion guy."  But the source of the claim that the speaker *was* "Eric from Dominion" — the sole basis for attributing that statement to Coomer — was the anonymous person on the call.  *See St. Amant*, 390 U.S. at 732 (noting that a finding of good faith is unlikely where a story is "based wholly on an unverified anonymous telephone call").

¶ 158    Moreover, as to Oltmann's statements that Coomer interfered with the election, those claims were substantially undermined by the November 12, 2020, CISA statement, which concluded that "[t]here is no evidence that any voting system deleted or lost votes, changed votes, or was in any way compromised."  Although this report did not specifically refer to Coomer, its conclusion that the 2020 presidential election "was the most secure in American history" and that "there is no evidence" to the contrary was fundamentally inconsistent with Oltmann's claim that Coomer "put his finger on the scale" of the election.  And although Oltmann's initial statements came before the CISA statement was issued, he continued making his accusations for several weeks thereafter.

¶ 159    It is possible that a jury could find that Oltmann was undeterred by the CISA statement because he genuinely disbelieved it, or perhaps because he was unaware of it.  But it is also reasonably likely that a jury could find that, as to Oltmann's post-November 12 statements, the CISA statement made Oltmann aware of the probable falsity of his claims, yet he persisted in making those claims nonetheless.  *Cf. Gonzales*, ¶ 87 (concluding that a judicial finding that there was no independent corroboration for defendants' claims could support a finding of actual malice).

### c.    Other Defendants

¶ 160    The other defendants' arguments as to actual malice overlap substantially, as does the evidence.  Thus, while we consider the evidence of actual malice as to each defendant individually, we discuss these defendants collectively, addressing specific arguments made by particular defendants as appropriate.  With respect to each defendant, we conclude that Coomer has met his burden of establishing a reasonable likelihood that he will be able to prove actual malice by clear and convincing evidence.  *See L.S.S.*, ¶ 41.

i.    Reliability of Source and Account

¶ 161    In ruling that Coomer had established a reasonable likelihood
of proving actual malice, the district court relied in part on its
conclusion that Oltmann was not a credible or reliable source.
Several defendants take issue with this conclusion, characterizing it
as an improper credibility finding, and an unsupported one at that.

¶ 162    As we discuss above, a court may properly consider evidence
relevant to a source's credibility at the time the allegedly defamatory
statements are made.  *See Curtis Publ'g Co.*, 388 U.S. at 157-58.
Such evidence may bear on whether the defendant acted with
reckless disregard in publishing the statements.  *Id.*  But for the
reasons above, we need not reach any conclusions concerning
Oltmann's reliability as a general matter.  Even if defendants
genuinely believed Oltmann's account of the call, that account itself
could reasonably support a finding that defendants entertained
serious doubts about the two points in question: (1) that Coomer
was the one on the call who made the comment, and (2) that
Coomer then took steps to undermine the election results.

¶ 163    First, Oltmann admittedly had no direct personal knowledge
that Coomer made the statement, or even that an "Eric from

Dominion" made the statement.  Instead, that claim was indisputably based entirely on an anonymous person identifying another anonymous person as "Eric, the Dominion guy."  That is the sole factual basis for the claim: Oltmann's report about what he heard an anonymous person say.  In other words, Oltmann was the source for what was said, but the source of the underlying information was unknown.  *See St. Amant*, 390 U.S. at 732.

¶ 164    Then, assuming the person who made the statement *was* "Eric, the Dominion guy," defendants needed to make another leap to conclude that person was Coomer.  That leap was based entirely on (1) the fact that Coomer was a person named "Eric" who worked at Dominion Voting Systems, and (2) Coomer's social media posts in opposition to President Trump.  This might be enough to raise suspicion that it was Coomer who made the statement, and perhaps even enough for a jury to find defendants sincerely believed it was him.  But given the limited substantiation, there is a reasonable likelihood that a jury could find that defendants were touting the theory as fact — whether for entertainment purposes or to bolster their claims of election irregularities more generally — without being convinced beyond serious doubt of its truth.

¶ 165    Second, neither Oltmann nor any other defendant claimed to

have firsthand knowledge that Coomer actually interfered with the

election.  That assertion appears to have been based solely on

defendants' skepticism about the election results and Coomer's role

in election technology.  As noted above, it was contradicted by the

official statement of CISA, the government agency responsible for

election security, which rejected any claim that the election had

been compromised *by anyone*.  Other than Coomer's role with

Dominion, defendants offered no information as to *how* they

believed Coomer had personally manipulated the election results.

Nor do they even attempt to defend such a belief on appeal.  There

is a reasonable likelihood that a jury could find that defendants

recklessly disregarded the truth by asserting such an explosive and

improbable claim without any evidence to support it.

¶ 166    Thus, defendants' efforts to distinguish *Curtis Publishing*

based on the reliability of their source (Oltmann) and his account

are beside the point.  In *Curtis Publishing*, the defendant's source

had indisputably overheard a conversation involving the plaintiff,

and the only issue was what the plaintiff had said on that call.  388

U.S. at 137.  Because the source necessarily had personal

knowledge of what he did or did not hear, the entire story turned on the source's reliability.  If he was telling the truth, the story was true; if he was not, it was not.  *Id.* at 157-58.  In contrast, even if the alleged conference call happened exactly as Oltmann described, that account could not itself establish the truth of the inferences defendants drew from it — namely, that the speaker on the call was Coomer and that Coomer took steps to subvert the election results.

        ii.     Adequacy of Investigation by Media Defendants

¶ 167   The media defendants — Malkin, the Hoft Defendants, and Metaxas — argue that the district court held them to too high of a standard in concluding that they did not adequately investigate Oltmann's claims.  They assert that they are not journalists but opinion commentators and, thus, should not be held to the same standard as reporters.  They further contend that no investigation was necessary because Oltmann was offering a firsthand account.

¶ 168   Whether or not these defendants should be held to the same standards as news reporters, we conclude that a jury could reasonably find that their investigation was grossly inadequate.  *See Creekside Endodontics*, ¶ 38.  Notwithstanding the gravity of Oltmann's accusations, none of the defendants even attempted to

contact Coomer — the "most obvious source of corroboration or refutation" — before publishing those accusations.  *Rosenblum,* ¶ 46.  Indeed, it does not appear they attempted to contact *anyone* other than Oltmann.  Nor do they identify anything else they did to attempt to verify Oltmann's claims.  While it may be true that a talk radio host or podcaster need not investigate every topic discussed on the show, the wholesale failure to look into an account reported as fact — particularly one as explosive as the one in this case — could bear on whether the host actually believes the account (or is simply using it to spur discussion without regard to its truth).

¶ 169    Metaxas asserts that the nature of his show prevents him from "do[ing] anything other than cursorily vet[ting] the guest before the show."  And he correctly points out that talk show hosts cannot be expected to know everything their guests will say on their show.  But Metaxas *did* know what Oltmann was going to say, at least in material part, as indicated by Metaxas's introduction to the show, which made clear that Oltmann was there to discuss his allegations about Coomer.  Then, after the show, Metaxas posted a link to the interview on social media, obviously knowing at that point (and highlighting in the post) the substance of Oltmann's claim.

¶ 170    None of this is to suggest that media members may only make statements "whose validity [is] beyond question." *N.Y. Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir. 1966).  And reliance on a single source does not, by itself, prove actual malice.  *Id.*  But as noted above, the single source in this case had no personal knowledge of material portions of the claim that was being reported.  Under these circumstances, a jury could reasonably find that the media defendants acted with actual malice in publishing those claims.

### iii.    Affidavit and Vetting of Oltmann's Claims by Powell Defendants and Trump Campaign

¶ 171    The Powell Defendants and the Trump Campaign also challenge the district court's conclusion that their investigation was inadequate.  Beyond the arguments made by the other defendants, they highlight that they had an affidavit from Oltmann attesting to his account.  That affidavit, they contend, gave them a sufficient basis for repeating Oltmann's claims without further investigation.

¶ 172    We agree that the affidavit is one factor that could weigh against a finding of actual malice — at least as to Oltmann's account about what was said on the call.  But again, that account leaves all the same gaps we describe above.  The affidavit does

nothing to bridge the gap between the anonymous caller's reference to "Eric from Dominion" and Coomer. Nor does it provide any basis for Powell's assertion that Coomer "rigged" the election.

¶ 173    The Powell Defendants contend that the district court "flipped the burden of proof" by requiring them to produce evidence to support Powell's assertions. We do not read the district court order as having done so. Instead, the court concluded that Coomer had met *his burden* of presenting prima facie evidence of falsity because he "unequivocally declared" Powell's statements were false. The court noted that Coomer's declaration was *also* uncontroverted because the Powell Defendants had "not put forward any evidence" to support their allegations. But that statement, which was consistent with the court's consideration of supporting *and* opposing affidavits, did not supplant Coomer's prima facie burden.

### iv.    Subjective Knowledge

¶ 174    Several defendants argue that, regardless of whether a reasonable person in their position would have entertained serious doubts about the statements they made, they sincerely believed them. The Hoft Defendants, in particular, assert that they still do. Among other things, defendants point to the nature of Coomer's

social media posts, his patents in voting technology, and

defendants' personal assessments of Oltmann as a credible source.

¶ 175    All of this is evidence defendants may present at trial.  And if a

jury ultimately believes them, they may prevail.  *See St. Amant*, 390

U.S. at 731; *L.S.S.*, ¶ 40.  But a defendant cannot defeat a

defamation claim at this early stage simply by saying they believed

their statements were true.  *See L.S.S.*, ¶ 49 (holding that plaintiff

made a prima facie showing of actual malice despite defendant's

argument that she had no reason to doubt the statements).  If a

plaintiff presents evidence that is reasonably likely to support the

contrary finding, the question is one for the jury.  *Id.* at ¶ 44.

v.    Other Credible Sources

¶ 176    Defendants also take issue with the district court's conclusion

that their statements were contradicted by other credible sources,

including the CISA statement and a December 1, 2020, statement

by then-United States Attorney General William Barr to the

Associated Press that "to date, we have not seen fraud on a scale

that could have effected a different outcome in the election."

¶ 177    As to Attorney General Barr's statement, defendants argue

that the district court erred by relying on that statement because it

89

came after most of defendants' statements.  We agree.  What

Attorney General Barr said on December 1, 2020, could have no

bearing on what defendants knew or believed before that date.

Thus, we do not consider Attorney General Barr's statement with

respect to any statements made before December 1, 2020.

¶ 178    As to the CISA statement, defendants argue that it cannot

support a finding of actual malice because (1) it sheds no light on

Oltmann's account about what Coomer *said* on the conference call,

and (2) it does not conclusively foreclose any claims of election

fraud.  Defendants are correct that the CISA statement does not

directly contradict Oltmann's account of what occurred on the

conference call.  But as discussed above, it does contradict

defendants' claims that Coomer subverted the election.  And

although we recognize that certain defendants question the veracity

of the CISA statement, it is one piece of evidence that could support

a finding of actual malice.  *See Anderson*, ¶¶ 65-67.  The actual

impact of that statement on defendants' subjective state of mind is

a factual question that we cannot resolve.  *See Rosenblum*, ¶ 24.

¶ 179    Relatedly, we acknowledge the Trump Campaign's argument

that the focus of the inquiry must be on defendants' state of mind

at the time the statements were made and not what has happened

since.  We also acknowledge that, in November 2020, claims of

election irregularities were ubiquitous among certain media outlets

and political circles.  But what defendants (or others) thought at the

time about the election results more generally is not the question in

this case.  The question is whether defendants acted with reckless

disregard in asserting that *Coomer* took steps to undermine the

election.  And at this stage, the even more limited question is

whether there is a reasonable likelihood that a jury could so find.

> vi.   Other Factors Cited by the District Court

¶ 180   Defendants dispute several other factors the district court

cited in support of its conclusion that Coomer had met his prima

facie burden of proving actual malice.  Most significantly, several

defendants assert that the record does not support the district

court's conclusion that they had political and financial incentives to

defame Coomer or that they did so to advance a "preconceived

storyline."  Others challenge the district court's reliance on the

Trump Campaign memorandum finding no connection between

Coomer and Antifa and the inherent improbability of defendants'

claims.  Because we do not rely on these factors (or any other we do

not address above) in concluding that Coomer has met his prima

facie burden, we need not decide whether the record supports them.

### 5.    Damages

¶ 181    The Hoft Defendants contend that the district court erred by

concluding that Coomer had made a sufficient showing of actual

damages to sustain his claim.  *See L.S.S.*, ¶ 36.  We disagree.

¶ 182    Actual damages may be established by "proving harm to

reputation, personal humiliation, mental anguish, or physical

suffering."  *Keohane*, 882 P.2d at 1304.  A plaintiff's own testimony

regarding the emotional distress the statements caused them is

alone sufficient to support a finding of actual damages.  *Id.* at 1305;

*Anderson*, ¶ 88.  Thus, a plaintiff's affidavit attesting to mental

anguish and reputational harm resulting from the statements is

sufficient to defeat an anti-SLAPP motion.  *Anderson*, ¶ 88.

¶ 183    In his declaration, Coomer attested that he had suffered

"severe emotional distress, pecuniary loss, and other damages" as a

result of the defamatory statements.  He explained that those

damages included (1) anxiety and depression, for which he has

sought medical treatment; (2) the tarnishing of his reputation;

(3) the end of his employment and the "effective" end of his career in

92

election services; and (4) his receipt of "almost daily threats." Although the Hoft Defendants characterize these statements as conclusory and unsupported, they are sufficient to satisfy Coomer's burden at this stage of the case.  *See Anderson*, ¶ 88.

¶ 184    Citing the incremental harm doctrine, the Hoft Defendants further assert that Coomer failed to show that his injuries were caused by the defamatory statements and not by his own acts, including his social media posts and public statements.  *See Tonnessen v. Denver Publ'g Co.,* 5 P.3d 959, 965 (Colo. App. 2000) ("[W]hen unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, may not be actionable because it causes no harm beyond the harm caused by the remainder of the publication.").  Resolution of this question requires weighing the evidence, which we cannot do. *Rosenblum*, ¶ 24.  At this stage, we conclude only that a jury could reasonably find that accusing Coomer of having said he "made sure" President Trump was not going to win, and then implying he had participated in a scheme to "rig" the election, caused Coomer emotional, reputational, and career harm beyond that which would have resulted from his social media posts being made public.

### 6.   Litigation Privilege

¶ 185   The Trump Campaign next asserts that the statements made by Giuliani and Powell at the November 19 press conference were protected by the litigation privilege.  We disagree.

¶ 186   The litigation privilege is an absolute privilege that permits an attorney to "publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which [the attorney] participates as counsel, if it has some relation to the proceeding."  *Killmer, Lane & Newman, LLP v. BKP, Inc.*, 2023 CO 47, ¶ 21 (quoting Restatement (Second) of Torts § 586).  As an absolute privilege, it provides "absolute immunity" to the speaker, even if the statements are false, defamatory, and made with actual malice.[16]  *Gonzales*, ¶ 24.

¶ 187   Two, and sometimes three, conditions must be satisfied for the privilege to apply: (1) the statement must have some relation to the subject matter of the litigation; (2) the statement must be made in

---

[16] We agree with the Trump Campaign that the district court was incorrect in suggesting that the litigation privilege "can be lost by a finding of actual malice."  But because we conclude the litigation privilege does not apply, that error is harmless.  *See* C.A.R. 35(c).

furtherance of the objective of the litigation; and (3) in the case of prelitigation statements, the proceedings must actually be contemplated in good faith.  *Killmer, Lane & Newman*, ¶ 24.

¶ 188   The applicability of the litigation privilege is a question of law that we review de novo.  *Id.* at ¶ 18.  In doing so, we resolve all doubts about whether a statement is privileged "in favor of [the statement's] relevancy or pertinency."  *Id.* at ¶ 25 (citation omitted).

¶ 189   The Trump Campaign's assertion of the litigation privilege is premised on (1) a Michigan lawsuit the Campaign filed eight days before the November 19 press conference and (2) Giuliani's reference to anticipated litigation in other states.  The Michigan complaint did not reference Coomer and mentioned Dominion in only three paragraphs.  Those paragraphs alleged that Dominion's voting machines caused a "massive miscount" in one Michigan county and were not sufficiently tested in another.  Giuliani was not shown as an attorney of record on the complaint, and neither he nor the Campaign filed any subsequent lawsuits.  But beginning six days after the press conference, and three days after the Campaign publicly stated that Powell was "not a member of the Trump legal team," Powell filed four additional lawsuits challenging the election

results on behalf of individual plaintiffs.  The complaints in those lawsuits did refer to Coomer and his alleged conference call remark.

¶ 190    Resolving all doubts in favor of relevancy, we conclude that the statements about Coomer at the November 19 press conference had "some relation to the subject matter" of the Michigan lawsuit — even though those statements went well beyond the allegations of the complaint.  *Id.* at ¶ 40; *see also id.* at ¶ 47 (expressing no opinion as to "whether defamatory press statements that go beyond the allegations of the complaint are actionable").  We further assume that Giuliani and Powell contemplated additional related litigation in good faith — even though neither Giuliani nor the Trump Campaign ever filed any, and Powell did so only after the Campaign declared her not to be a member of its legal team.

¶ 191    But we cannot conclude that the statements were made in furtherance of the objective of the litigation.  *Id.* at ¶ 24.  Unlike a class action, in which publication may serve to notify potential class members, *see id.* at ¶ 41, no such notice was needed here; the litigants had already been identified, certainly for the Michigan lawsuit and presumably for any other litigation anticipated to be filed shortly.  Nor does the context of the statements support the

Trump Campaign's suggestion that their purpose was to solicit additional plaintiffs or witnesses. The Campaign has offered no persuasive explanation as to how arguing its claims to the public could have advanced its existing or contemplated litigation. Cases are decided in courts of law, not in the court of public opinion.

¶ 192    Moreover, even if there were a litigation-related purpose for publicizing the allegations of the Michigan complaint, Giuliani and Powell did not "merely repeat[], summarize[], or paraphrase[]" those allegations. *Id.* at ¶ 42. Indeed, the statement in question — that Coomer "specifically says that they're going to fix this election" — does not appear in the Michigan complaint at all. Even the limited allegations about Dominion that do appear in the complaint do not allege that Dominion "fixed" the election but only that there were "mechanical malfunction[s]." The litigation privilege does not give an attorney cover to make defamatory statements to the public that, for whatever reason, they were unwilling to advance in court, simply because they bear some relation to the subject of ongoing litigation. *Cf. id.* at ¶ 24 (noting that an attorney cannot cloak a defamatory statement in privilege by filing a bad faith and meritless claim).

¶ 193   Finally, with respect to Giuliani's statements, the Trump Campaign's litigation privilege claim runs into another roadblock. The privilege extends only to statements made in connection with a proceeding in which the attorney making the statement participates as counsel.  *Id.* at ¶ 21.  It does not appear from the record that Giuliani participated as counsel in the Michigan lawsuit or in any of the other lawsuits that were filed after the press conference.

¶ 194   We acknowledge that the district court, relying on a federal case, stated that the litigation privilege does not apply to statements made to the media.  *See Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1314-15 (D. Colo. 1998).  Our supreme court has since rejected this categorical rule.  *Killmer, Lane & Newman*, ¶ 48.  But that does not mean anything an attorney says at a press conference goes.  Instead, such statements, like any others, are protected only when they are made in furtherance of the objective of the litigation.

¶ 195   Because we conclude the statements at issue were not made to further the litigation, the litigation privilege does not apply.

### 7.    Communications Decency Act

¶ 196   The Trump Campaign asserts that Eric Trump's tweet of the Gateway Pundit article and President Trump's tweet of the One

America News Network segment are immune from liability under the CDA.  Because Coomer has established a reasonable likelihood of prevailing against the Campaign without these two tweets, this issue does not affect whether Coomer's claim can proceed.  But because the Campaign specifically challenges these two alleged publications, we will address the issue.  *See Balla v. Hall*, 273 Cal. Rptr. 3d 695, 672 (Ct. App. 2021).  We agree with the Campaign that these two tweets may not form the basis for liability.[17]

¶ 197   The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1); *see also* 47 U.S.C. § 230(e)(3) (precluding any state law cause of action or liability that is "inconsistent with this section").  This law protects users of interactive websites from

---

[17] The Trump Campaign asserted in its special motion to dismiss that the CDA provided immunity for the tweet by Eric Trump, but it did not extend that argument to the tweet by President Trump until its reply.  Nevertheless, because the same analysis applies to both tweets and the district court ruled on the merits of the argument with respect to both tweets, we will consider both tweets as well.  *See Rinker v. Colina-Lee*, 2019 COA 45, ¶ 26 (noting that we may consider an unpreserved issue when the district court rules on it); *Farmer v. Colo. Parks & Wildlife Comm'n*, 2016 COA 120, ¶ 19.

"defamation claims based on information provided by another information content provider." *Rosenblum*, ¶ 48.  The district court concluded that the tweets were not protected by the CDA because (1) Eric Trump's tweet did not merely republish the Gateway Pundit article but included his own defamatory statement, and (2) the CDA does not apply when the user knows or has reason to know the information is defamatory.  We disagree on both counts.

¶ 198    First, neither Eric Trump's nor President Trump's tweet included any statement beyond the information in the article and video they shared.  *See id.* (indicating that "[h]ad [the defendant] just posted the link," the post might be protected under the CDA).  Eric Trump's tweet stated simply, "Eric Coomer — Dominions Vice President of U.S. Engineering — 'Don't worry about the election, Trump's not gonna win.  I made f*cking sure of that!'"  That quote (as well as Coomer's name and title) was pulled verbatim from the article, which unmistakably attributed the quote to Coomer.  The tweet therefore conveyed only "information provided by another information content provider."  47 U.S.C. § 230(c)(1).  President Trump's tweet said even less, merely quoting the segment's title, "Dominion-izing the Vote," and making no mention of Coomer at all.

¶ 199    Second, the district court's conclusion that the CDA does not

apply to information that a user "knew or had reason to know was

defamatory" finds no support in the text of the CDA or case law

applying it.[18]   Indeed, case law from other jurisdictions is uniformly

to the contrary.   *See In re Facebook, Inc.*, 625 S.W.3d 80, 89-93

(Tex. 2021) (noting "national consensus" and "overwhelming weight

of authority" rejecting distinction between liability as a speaker or

publisher and liability as a distributor) (citations omitted); *Barrett v.

Rosenthal*, 146 P.3d 510, 517-20, 518 n.9 (Cal. 2006) (citing cases);

*Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331-33 (4th Cir. 1997).

¶ 200    The district court relied exclusively on Justice Thomas's

statement respecting the denial of certiorari in *Malwarebytes, Inc. v.

Enigma Software Group*, 592 U.S. ___, ___, 141 S. Ct. 13, 15-16

(2020) (published order).   That statement — the statement of a

---

[18] The Trump Campaign at first appears to adopt this exception,
including it in its recitation of the applicable law and confusingly
citing *Barrett v. Rosenthal*, 146 P.3d 510, 513, 525 (Cal. 2006),
which stands for the opposite proposition.   But it goes on to cite
*Barrett*'s pronouncement that "Congress has comprehensively
immunized republication by individual [i]nternet users."   *Id.* at 529.
And it argues that retweets of information previously published by
others are categorically protected by the CDA.   Thus, despite the
Campaign's contradictory statements of the law, we construe its
argument as contesting both grounds for the district court's ruling.

single Justice, not a decision of the Court — is contrary to the
position taken by "every existing judicial decision" of which we are
aware.  *In re Facebook*, 625 S.W.3d at 91.  But even that statement
would only support a "know or reason to know" exception for
*distributors* — a term that traditionally encompassed actors like
newspaper vendors and booksellers who distribute the publications
of others.  *See Malwarebytes*, 592 U.S. at ___, 141 S. Ct. at 15-16;
*Barrett*, 146 P.3d at 513.  Whether or not that term might include
"[i]nternet platforms" that do no more than host content published
by third parties, not even Justice Thomas's statement extends so-
called "distributor liability" to the individual users who post that
content.  *See Malwarebytes*, 592 U.S. at ___, 141 S. Ct. at 14-15
(questioning "sweeping protection to [i]nternet platforms").

¶ 201    Thus, because the two tweets by Eric Trump and President
Trump consisted solely of "information provided by another
information content provider," 47 U.S.C. § 230(c)(1), Coomer's claim
against the Trump Campaign may not be based on those tweets.

> **B.    Intentional Infliction of Emotional Distress**

¶ 202    Malkin, the Hoft Defendants, Metaxas, and the Trump
Campaign assert that the district court erred by not dismissing

Coomer's claim for intentional infliction of emotional distress.  But apart from the Hoft Defendants, their sole argument is that Coomer did not establish a reasonable likelihood of proving actual malice. *See Hustler Mag., Inc v. Falwell*, 485 U.S. 46, 56 (1988) (holding that "actual malice" requirement applies to claims for intentional infliction of emotional distress premised on publications that are subject to heightened constitutional protections); *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1124-25 (Colo. App. 1992).  Because we have concluded that Coomer has satisfied his burden with respect to actual malice, we reject this argument.  *See L.S.S.*, ¶ 53.

¶ 203    The Hoft Defendants also argue that Coomer failed to show "extreme and outrageous conduct," as required to sustain his claim. *See Mackall v. JPMorgan Chase Bank, N.A.*, 2014 COA 120, ¶ 49 (listing elements).  To satisfy this standard, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (citation omitted).  Whether a defendant's conduct rises to this level is generally a question of fact for the jury.  *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877,

883 (Colo. 1994).  Our role is limited to determining "whether reasonable persons could differ on the question" — or, in the anti-SLAPP context, whether there is a reasonable likelihood that a jury could find the defendant's conduct sufficiently outrageous.  *Id.*

¶ 204   We agree with the Hoft Defendants that there is no evidence that they incited violence against Coomer.  But we do not agree that their conduct can be deemed not extreme and outrageous as a matter of law.  As we explain above, Coomer presented evidence that would support a finding that the Hoft Defendants falsely accused him — someone who made his career in election technology — of saying he "made sure" President Trump would not win reelection and implied, with no evidence, that he had rigged the presidential election.  *Cf. Tonnessen*, 5 P.3d at 967 (holding that article could not constitute outrageous conduct because it was not defamatory).  The Hoft Defendants then repeated those claims several times to a nationwide audience, going so far as to publish an article about a $1 million "bounty" for Coomer's "comeuppance."

¶ 205   These statements went beyond mere insults, annoyances, or trivialities.  See *Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. App. 2003).  They struck at the core of American democracy and made

Coomer a personification of claims that the presidential election had been stolen.  Given the magnitude of those accusations, and the minimal evidence to support them, there is a reasonable likelihood that a jury could find the dissemination of those claims "atrocious," "utterly intolerable," and "beyond all possible bounds of decency."  *Coors Brewing Co.*, 978 P.2d at 666 (citation omitted).

¶ 206    The Hoft Defendants also assert that Coomer has not met his burden of showing the required element of severe emotional distress.  *See Mackall*, ¶ 49.  But as discussed above, Coomer's declaration attesting that he has "suffered severe emotional distress," including anxiety and depression, as a result of the statements made by the Hoft Defendants and others suffices to meet his burden at this stage of the case.  *See Anderson*, ¶ 88.

C.    Conspiracy

¶ 207   All defendants except the Oltmann Defendants[19] and DTR[20]

assert that the district court erred by denying their special motions

to dismiss the conspiracy claim.  They argue that Coomer did not

establish a reasonable likelihood of success on this claim because

he failed to present any evidence of an agreement.[21]  We agree.

¶ 208   A claim for civil conspiracy has five elements: (1) two or more

persons; (2) an object to be accomplished; (3) a meeting of the

minds on the object or course of action; (4) an unlawful overt act;

---

[19] Because the Oltmann Defendants do not challenge the district court's ruling on the conspiracy claim, apart from their more general challenges above, we do not consider this claim with respect to them.  *See, e.g.*, *People v. Perez-Hernandez*, 2013 COA 160, ¶ 9 (explaining that arguments not raised on appeal are abandoned).

[20] As noted above, DTR's sole argument in its opening brief was that it was formed after the statements at issue.  In its reply brief, DTR specifically challenges the conspiracy claim, but it does so only on the ground that DTR did not exist at the time of the alleged conspiracy.  Because we have rejected this argument, we do not further consider Coomer's conspiracy claim against DTR.

[21] Several defendants also argue that, as a derivative cause of action, the conspiracy claim must be dismissed if the other claims are dismissed.  *See Colo. Cmty. Bank v. Hoffman*, 2013 COA 146, ¶ 43 ("[I]f the acts alleged to constitute the underlying wrong provide no cause of action, then no cause of action arises for the conspiracy alone.") (citation omitted).  Because we have concluded that the other claims may proceed, this argument necessarily fails.

and (5) resulting damages.  *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995).  Because Coomer alleges a conspiracy to defame him and inflict emotional distress upon him, he must show an agreement as to that objective or the course of action to achieve it.  *Rosenblum*, ¶ 54.  He need not show a single collective agreement among *all* defendants, but he must show a meeting of the minds between each defendant and at least one other person.  *Id.* at ¶ 55.

¶ 209    A civil conspiracy may be "implied by a course of conduct and other circumstantial evidence."  *Id.* at ¶ 52 (citation omitted).  But we will not "infer the agreement."  *Nelson*, 908 P.2d at 106.  Rather, a plaintiff must present "evidence of such an agreement," whether direct or circumstantial.  *Id.*  Such evidence may not consist solely of a "shared political ideology" or "close political ties."  *Rosenblum*, ¶¶ 53, 55.  Nor is it enough to show "concerted efforts" to advance a political message.  *Id.* at ¶ 55.  The plaintiff must present some indicia that the defendant actually *agreed* with at least one other person to make the defamatory statements.  *Id.* at ¶¶ 52, 56.

¶ 210    Despite the district court order permitting Coomer to conduct discovery on this point, he has failed to present any such evidence.  Instead, his argument is premised almost entirely on Oltmann

having served as the other defendants' source of information and coordinating with them to present his account on their shows. We cannot conclude that such ordinary sharing of information and coordination between the media and their sources gives rise to a conspiracy. *See Dowd v. Calabrese*, 589 F. Supp. 1206, 1213-14 (D.D.C. 1984) (noting that allowing "the traditionally-recognized relationships between sources and reporters [to] become actionable as conspiracies on a substantial scale" would result in "the 'chilling' of such relationships and collaborations"). "[W]hat is required in this sensitive First Amendment area is . . . proof not merely of a joint purpose to publish, but specific evidence of a joint purpose to defame." *Id.* at 1214 (footnote omitted); *see also Rosenblum*, ¶ 56.

¶ 211   For similar reasons, the Powell Defendants and the Trump Campaign's coordination with a reporter from One America News Network concerning a story about claimed election fraud cannot alone prove a conspiracy. *See Dowd*, 589 F. Supp. at 1213-14 ("[P]roof of cooperation between two individuals who have a common purpose to produce a news story does not represent a sufficient basis for an actionable conspiracy," even when the story gives rise to separate defamation claims against each individual.). Nor do

108

their efforts to verify Oltmann's story by requesting an affidavit. *See Rosenblum*, ¶ 56 (concluding that defendant's attempt to verify the accuracy of the source's account undermined conspiracy claim).

¶ 212   The district court concluded that defendants "cooperated and fed off one another to spread dangerous and inflammatory political disinformation designed to undermine the legitimacy of the 2020 presidential election."  Coomer similarly cites an alleged public "agreement to delegitimize the results of the [e]lection."  But even if there were an agreement among defendants — as opposed to parallel efforts stemming from a shared political ideology — to undermine the legitimacy of the election, Coomer cannot prevail by showing an agreement to undermine the legitimacy of the election generally.  He must show an agreement to defame or inflict emotional distress *upon him*.  And we see no evidence that defendants agreed to advance their ostensible overarching shared purpose by defaming Coomer.  Different media outlets reporting on the same story — even a false one — does not prove a conspiracy.

¶ 213   We also reject any implication that coordination among the Trump Campaign, Giuliani, and the Powell Defendants could support a claim for conspiracy at a time when Coomer contends

109

Powell was acting as an agent of the Campaign. A corporation and its agents acting on its behalf "do not constitute the 'two or more persons' required for a civil conspiracy." *Pittman v. Larson Distrib. Co.*, 724 P.2d 1379, 1390 (Colo. App. 1986); *see also Semler v. Hellerstein*, 2016 COA 143, ¶¶ 30-33 (holding that attorney acting within the scope of representation cannot conspire with a client, absent a claim of fraud or an allegation that the attorney acted for personal gain), *rev'd on other grounds sub nom. Bewley v. Semler*, 2018 CO 79. This principle likewise precludes any conspiracy between the individual defendants and their related entities.

¶ 214    Thus, we conclude that Coomer has failed to meet his burden of establishing a reasonable likelihood of prevailing on his conspiracy claim with respect to all defendants other than the Oltmann Defendants and DTR (which claims we do not address). The conspiracy claim against these defendants must be dismissed.

## D.   Injunction

¶ 215    In their special motions to dismiss, the Oltmann Defendants and Metaxas moved to dismiss Coomer's "claim" for injunctive relief. In addressing that argument, the district court analyzed each element of a permanent injunction as to all defendants and

concluded that, "[s]ubject to the adjudication of his claims, Coomer has established a prima facie basis for injunctive relief."

¶ 216     On appeal, the Hoft Defendants and the Trump Campaign contend that the district court erred by addressing Coomer's request for injunctive relief because an injunction is not a substantive claim that is subject to an anti-SLAPP motion.  Coomer agrees that review of this request was premature, and so do we.

¶ 217     Section 13-20-1101(3)(a) provides that "[a] *cause of action . . .* is subject to a special motion to dismiss unless . . . there is a reasonable likelihood that the plaintiff will prevail on the *claim.*" (Emphasis added.)  But an injunction, even if pleaded as a claim for relief, is a remedy, not an independent cause of action.  *Wibby v. Boulder Cnty. Bd. of Cnty. Comm'rs*, 2016 COA 104, ¶ 4 n.2.

¶ 218     That remedy is not itself subject to an anti-SLAPP motion to dismiss.  Its fate flows from the substantive claim to which it is attached.  If the substantive claim is dismissed, the ancillary request for injunctive relief goes with it.  Otherwise, resolution of that request must await resolution of the claim on the merits.  *Cf. Winston v. Polis*, 2021 COA 90, ¶ 21 ("Speculation about a possible remedy is premature because no . . . violation has been found.").

¶ 219    We therefore agree with the Hoft Defendants and the Trump Campaign that the district court erred by addressing the merits of Coomer's request for injunctive relief.  We nevertheless affirm the denial of the special motions to dismiss this request because that request could not be dismissed under the anti-SLAPP statute.[22]

## V.    Attorney Fees

¶ 220    Malkin, the Hoft Defendants, DTR, and the Trump Campaign request their attorney fees and costs under section 13-20-1101(4)(a).  That subsection provides that "in any action subject to [the anti-SLAPP statute], a prevailing defendant on a special motion to dismiss is entitled to recover the defendant's attorney fees and costs."  *Id.*  The statute entitles a defendant who prevails on appeal to recover their appellate attorney fees and costs.  *Rosenblum*, ¶ 61.

¶ 221    A partially prevailing defendant "must generally be considered a prevailing party unless the results of the motion were so insignificant that the party did not achieve any practical benefit

---

[22] Because we conclude that a request for injunctive relief is not subject to an anti-SLAPP motion to dismiss, we do not address the Trump Campaign and Hoft Defendants' argument that injunctive relief is not feasible or Metaxas's argument that injunctive relief would constitute an unconstitutional prior restraint on speech.

from bringing the motion." *Id.* at ¶ 63 (citation omitted).  But the fees awarded to such a defendant must be "commensurate with the extent to which the motion changed the nature and character of the lawsuit in a practical way." *Mann v. Quality Old Time Serv., Inc.*, 42 Cal. Rptr. 3d 607, 619 (Ct. App. 2006).  "Whether a party prevailed on an anti-SLAPP motion — and to what extent the partial success warrants an apportionment of fees — is a determination that lies within the broad discretion of a district court." *Rosenblum*, ¶ 63.

¶ 222    Because we have rejected DTR's sole argument on appeal and affirmed the district court's denial of its special motion to dismiss, we deny its request for attorney fees and costs.  *See Salazar*, ¶ 66.

¶ 223    Resolution of the other defendants' fee requests is less clear cut.  For the most part, we have affirmed the district court order as to these defendants, concluding that Coomer's claims for defamation and intentional infliction of emotional distress may proceed.  The survival of the defamation claim in particular — which was the primary focus of defendants' briefing — substantially limits the degree of defendants' success.  *See Mann*, 42 Cal. Rptr. 3d at 618-19 (considering, among other things, "whether the same factual allegations remain to be litigated"); *Gonzales*, ¶ 104 (denying

113

attorney fees because court "denied virtually all of [defendants'] requested relief, and the effect of [the] disposition is that . . . the only communications whose merits were at issue on appeal . . . survive defendants' anti-SLAPP motion").  And although we have slightly narrowed Coomer's claim against the Trump Campaign by concluding that two tweets are protected by the CDA, that does not make the Campaign a partially prevailing defendant because the defamation claim as a whole survives.  *See Salazar*, ¶ 66.

¶ 224   Nevertheless, given our reversal of the district court's ruling on the conspiracy claim, we cannot say that these defendants received *no* practical benefit from this appeal.  *Rosenblum*, ¶ 63.  We thus exercise our discretion under C.A.R. 39.1 to remand to the district court to determine whether Malkin, the Hoft Defendants, and the Trump Campaign are partially prevailing defendants; the extent to which their partial appellate success, if any, warrants an award of appellate fees; and the reasonableness of those fees.  *Id.* at ¶ 64.

## VI.   Disposition

¶ 225   We reverse the district court's denial of the special motions to dismiss the conspiracy claim as to Malkin, the Hoft Defendants, Metaxas, the Powell Defendants, and the Trump Campaign.  We

reverse the ruling that the tweets by Eric Trump and President Trump are not protected by the CDA, and we hold that the Trump Campaign may not be liable for those tweets.  We affirm the district court order in all other respects (except as to Giuliani).  We remand to the district court for determination of the requests for attorney fees and costs by Malkin, the Hoft Defendants, and the Trump Campaign, and for further proceedings consistent with this opinion.

JUDGE NAVARRO and JUDGE KUHN concur.

# Court of Appeals

**STATE OF COLORADO**
**2 East 14th Avenue**
**Denver, CO 80203**
**(720) 625-5150**

**PAULINE BROCK**
**CLERK OF THE COURT**

## NOTICE CONCERNING ISSUANCE OF THE MANDATE

Pursuant to C.A.R. 41(b), the mandate of the Court of Appeals may issue forty-three days after entry of the judgment. In worker's compensation and unemployment insurance cases, the mandate of the Court of Appeals may issue thirty-one days after entry of the judgment. Pursuant to C.A.R. 3.4(m), the mandate of the Court of Appeals may issue twenty-nine days after the entry of the judgment in appeals from proceedings in dependency or neglect.

Filing of a Petition for Rehearing, within the time permitted by C.A.R. 40, will stay the mandate until the court has ruled on the petition. Filing a Petition for Writ of Certiorari with the Supreme Court, within the time permitted by C.A.R. 52(b), will also stay the mandate until the Supreme Court has ruled on the Petition.


BY THE COURT:    Gilbert M. Román,
Chief Judge


DATED: January 6, 2022

***Notice to self-represented parties****: You may be able to obtain help for your civil appeal from a volunteer lawyer through the Colorado Bar Association's (CBA) pro bono programs. If you are interested in learning more about the CBA's pro bono programs, please visit the CBA's website at https://www.cobar.org/Appellate*

DATE FILED: November 8, 2022 7:51 PM
FILING ID: 85A813C6831F2
CASE NUMBER: 2022CA843

| | |
|---|---|
| **Court of Appeals, State of Colorado**<br>2 East 14th Street<br>Denver, Colorado 80203<br><br>Appeal From Denver District Court<br>Case No. 2020CV34319<br>Honorable Marie Avery Moses, Judge | |
| **Plaintiff-Appellee:  ERIC COOMER, Ph.D.**<br><br>v.<br><br>**Defendants-Appellants:  DONALD J. TRUMP FOR PRESIDENT, INC., et al.** | |
| *Attorneys for Appellant Donald J. Trump for President, Inc.*<br>John S. Zakhem, #30089<br>Eric R. Holway, #49263<br>Andrew C. Nickel, #45235<br>Nicole B. Grimmesey, #55217<br>Jackson Kelly PLLC<br>1099 18th Street, Suite 2150<br>Denver, Colorado 80202<br>Telephone: 303.390.0003<br>Facsimile: 303.390.0177<br>jszakhem@jacksonkelly.com<br>eric.holway@jacksonkelly.com<br>andrew.nickel@jacksonkelly.com<br>nicole.grimmesey@jacksonkelly.com | Case Number: 2022CA843 |

## OPENING BRIEF OF DEFENDANT-APPELLANT DONALD J. TRUMP FOR PRESIDENT, INC.

## CERTIFICATION

The undersigned hereby certifies that this brief complies with all requirements of C.A.R. 28 and C.A.R. 32, including all formatting requirements.  Specifically, the undersigned certifies that:

**The brief *does not* comply with the applicable word limits set forth in C.A.R. 28(g).**  It contains 13,461 words.  However, the brief is accompanied by a motion to exceed the word limit.

**The brief complies with the standard of review requirements set forth in C.A.R. 28(a)(7)(A) and/or C.A.R. 28(b).**  For each issue raised by the appellant, the brief contains under a separate heading before the discussion of the issue, a concise statement: (1) of the applicable standard of appellate review with citation to authority; and (2) whether the issue was preserved and, if preserved, the precise location in the record where the issue was raised and where the court rules, not to an entire document.

**I acknowledge that my brief may be stricken if it fails to comply with any of the requirements of C.A.R. 28 or 28.1 and C.A.R. 32.**

/s/ *Andrew C. Nickel*
Andrew C. Nickel, Reg. No. 45235

ii

# TABLE OF CONTENTS

CERTIFICATION ..................................................................................... ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ....................................................................... v

ISSUES PRESENTED FOR REVIEW ...................................................... 1

STATEMENT OF THE CASE ..................................................................... 2

    I.      Statement of Facts, Nature of the Case, Course of Proceedings, and Disposition ................................................................................................ 2

        A.    Statement of Facts and Nature of the Case ................................. 2

        B.    Course of Proceedings/Disposition ........................................... 10

SUMMARY OF THE ARGUMENT ......................................................... 11

ARGUMENT ........................................................................................... 14

    I.      The Anti-SLAPP Statute Applies Because Coomer's Lawsuit Arises from a Protected Activity ........................................................................... 14

        A.    Appealability ............................................................................. 14

        B.    Standard of Review .................................................................... 14

        C.    Colorado's anti-SLAPP Statute ................................................. 15

        D.    The Campaign satisfied its burden under the anti-SLAPP statute ........... 17

    II.     The First Amendment Requires Clear and Convincing Evidence of Falsity and Actual Malice. ..................................................................... 19

        A.    Appealability and Standard of Review ...................................... 19

        B.    First Amendment Standard ........................................................ 20

        C.    The District Court Failed to Hold Coomer to the Exacting Standard Required by the First Amendment ................................................... 25

    III.    The Court Erred in its Application of the Communications Decency Act ("CDA") ......................................................................................... 36

        A.    Appealability ............................................................................. 36

        B.    Standard of Review .................................................................... 36

        C.    The Trump Tweets are Immune Under the CDA ...................... 37

IV.      The District Court Erred in Failing to Apply the Litigation Privilege .40

   A.    Appealability ................................................................................40

   B.    Standard of Review .....................................................................41

   C.    The Statements Are Absolutely Privileged ................................42

V.      The District Court Improperly Held the Campaign Liable for the
Statements Issued by Powell as an Agent of the Campaign ...............................50

   A.    Appealability ................................................................................50

   B.    Standard of Review .....................................................................50

   C.    Powell was not an Agent of the Campaign. ...............................51

   D.    Even assuming, *arguendo*, Powell was an agent of the Campaign, the
agency relationship lasted only from November 14, 2020, at the earliest, until
November 22, 2020. ..........................................................................55

VI.     The District Court Erred in Finding Coomer Was Likely to Prevail On
His Intentional Infliction of Emotional Distress ("IIED") Claim........................56

   A.    Appealability ................................................................................56

   B.    Standard of Review .....................................................................57

   C.    Coomer's IIED Claim is an Impermissible End-run Around the
Applicable Burden of Proof..................................................................57

VII.    The District Court Erred in Finding Coomer Was Likely to Prevail On
His Civil Conspiracy Claim .................................................................59

   A.    Appealability ................................................................................59

   B.    Standard of Review .....................................................................59

   C.    Civil Conspiracy is not Independently Actionable .................................59

VIII.   The District Court Erred in Finding Coomer Was Likely to Prevail on
His Claim for Injunctive Relief...............................................................62

   A.    Appealability ................................................................................62

   B.    Standard of Review .....................................................................62

   C.    Coomer is not Entitled to Injunctive Relief ..................................62

CONCLUSION .......................................................................................63

REQUEST FOR ATTORNEYS' FEES ...............................................................64

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*1-800- Contacts, Inc. v. Steinberg*,
   107 Cal.App.4th 568 (2003) .................................................................. 36

*11 Civ. 5436 (LGS)*,
   2017 WL 177652 (S.D.N.Y. Jan. 17, 2017) ....................................... 47

*Addison Insurance Company v. Michael Veverka*,
   2020 WL 6468542 (D. Colo. February 11, 2020)............................... 15

*Almeida v. Amazon.com, Inc.*,
   456 F.3d 1316 (11th Cir. 2006).......................................................... 38

*Am. Nat. Bank of Sapulpa, Okl. v. Bartlett*,
   40 F.2d 21 (10th Cir. 1930)........................................................... 51, 52

*American Freedom Defense Initiative v. Lynch*,
   217 F. Supp. 3d 100 (D.D.C. 2016) ................................................... 38

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983)........................................................................... 48

*Annette F. v. Sharon S.*,
   119 Cal.App.4th 1146 (2004) ............................................................ 20

*Barrett v. Rosenthal*,
   146 P.3d 510 (Cal. 2006) ................................................................... 37

*Bd. Of Cnty. Comm's v. Park Cnty. Sportsman Ranch, LLP*,
   271 P.3d 562 (Colo. App. 2013) ........................................................ 59

v

*Beckley Newspapers Corp. v. Hanks*,
  389 U.S. 81 (1967) ............................................................................. 23

*Begley v. Ireson*
  399 P.3d 777 (Colo. App. 2017) ....................................... 41, 45, 47, 48

*Belinda A. Begley & Robert K. Hirsch Revocable TCF v. Ireson*,
  490 P.3d 963 (Colo. App. 2020) ............................................. 12, 45, 46

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ........................................................................... 30

*Briggs v. Eden Council for Hope & Opportunity*,
  19 Cal.4th 1106 (1999) ...................................................................... 18

*Buckhannon v. US W. Communications, Inc.*,
  928 P.2d 1331 (Colo. App. 1996) ....................................................... 49

*Burke v. Greene*,
  963 P.2d 1119 (Colo. App. 1998) ....................................................... 44

*Club Valencia Homeowners Ass'n v. Valencia Assoc.*,
  712 P.2d 1024 (Colo. App. 1985) ..................................................Passim

*Colorado Community Bank v. Hoffman*,
  338 P.3d 390 (Colo. App. 2011) ......................................................... 59

*Curling v. Raffensperger*,
  493 F. Supp. 3d 1264 (N.D. Ga. 2020) ................................................. 3

*Dallman v. Rifter*,
  225 P.3d 619 (Colo. App. 2010) ......................................................... 62

*Dep't of Corr., Denver Reception & Diagnostic Ctr. v. Stiles*,
  477 P.3d 709 (Colo. 2020) ................................................................. 50

*Digerati Holdings v. Young Money*,
  194 Cal.App.4th 873 (2011) ............................................................... 17

vi

*DiLeo v. Koltnow*,
200 Colo. 119 (Colo. 1980) .......................................................................... 23, 26

*Dowling v. Zimmerman*,
85 Cal.App.4th 1400 (2001) .............................................................................. 19

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) .......................................................................................... 30

*DuPont Merck Pharm. Co. v. Superior Court*,
78 Cal. App. 4th 562 (Ct. App. 2000)............................................................... 17

*Edwards v. South Carolina*,
372 U.S. 229 (1963).......................................................................................... 20

*Equilon Enterprises v. Consumer Cause, Inc.*,
29 Cal.4th 53 (2002) .................................................................................... 17, 20

*Flatley v. Mauro*,
39 Cal.4th 299 (2006) .................................................................................. 14, 41

*Fry v. Lee*,
408 P.3d 843 (Colo. App. 2013) ....................................................................... 57

*Garrison v. La.*,
379 U.S. 64 (1964)............................................................................................ 30

*Gertz v. Welch*,
418 U.S. 323 (1974).................................................................................... 23, 24

*Glasson v. Bowen*,
267 P. 1066 (Colo. 1928) .................................................................................. 41

*Gordon v. Boyles*,
9 P.3d 1106 (Colo. 2000) ...................................................................... 21, 27, 31

4861-3517-4462.v2

*Green v. Qwest Servs., Corp.*,
   155 P.3d 383 (Colo. App. 2006) ........................................................................ 57

*Gresk for Estate of VanWinkle v. Demetris*,
   96 N.E.3d 564 (Ind. 2018) ............................................................................... 15

*Harte-Hanks Communs v. Connaughton*,
   491 U.S. 657 (1989) ......................................................................................... 29

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988) ........................................................................................... 58

*In re Estate of Owens*,
   2017 COA 53 ................................................................................................... 22

*In re Marriage of Newell*,
   192 P.3d 529 (Colo. App. 2008) ........................................................................ 18

*In re Winship*,
   397 U.S. 358 (1970) ......................................................................................... 24

*Johnson v. Arden*,
   614 F.3d 785 (8th Cir. 2010) ............................................................................ 38

*Keohane v. Stewart*,
   882 P.2d 1293 (Colo. 1994) .............................................................................. 23

*Kleier Advertising, Inc. v. Premier Pontiac, Inc.*,
   921 F.2d 1036 (10th Cir. 1990) ......................................................................... 49

*Korean New Life Methodist Church v. Korean Methodist Church of the Americas*,
   474 P.3d 143 (Colo. App. 2020) ........................................................................ 62

*L.S.S. v. S.A.P.*,
   2022 COA 123 ................................................................................................. 36

*La Liberte v. Reid*,
   966 F.3d 79 (2d Cir. 2020) ............................................................................... 40

4861-3517-4462.v2

*Lawson v. Stow*,
327 P.3d 340 (Colo. App. 2014) ......................................................................... 26

*Lewis v. McGraw-Hill Broadcasting Co.*,
832 P.2d 1118 (Colo. App. 1992) ....................................................................... 57

*Ludwig v. Superior Court*,
37 Cal.App.4th 8 (1995) ..................................................................................... 36

*McCutcheon v. Fed. Election Com'n*,
572 U.S. 185 (2014) ........................................................................................... 22

*McIntyre v. Jones*,
194 P.3d 519 (Colo. App. 2008) ................................................................... 19, 26

*Mcintyre v. Ohio Elections Com'n*,
514 U.S. 334 (1995) ........................................................................................... 22

*Merrick v. Burns Wall Smith & Mueller, P.C.*,
43 P.3d 712 (Colo. App. 2001) .................................................................... 41, 45

*Miles v. Ramsey*,
31 F. Supp. 2d 869 (D. Colo. 1998) ................................................................... 57

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ............................................................................................... 23

*Miller v. Warner Literary Grp., LLC*,
2013 WL 360012 (D. Colo. Jan. 30, 2013) ........................................................ 55

*Modoc Gold Mining Co. v. Skiles*,
13 Colo. App. 293 (1899) ............................................................................. 51, 52

*More v. Johnson*,
568 P.2d 437 (Colo. 1997) ................................................................................. 60

4861-3517-4462.v2

*Murray v. Bailey*,
    613 F. Supp. 1276 (N.D. Cal. 1985) ...................................................................... 34

*Nelson v. Elway*,
    908 P.2d 102 (Colo. 1995) .................................................................................. 60

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) .............................................................................. 11, 23, 29

*Newton v. NBC*,
    930 F.2d 662 (9th Cir. 1990)................................................................................ 29

*Norman v. Borison*,
    17 A.3d 697 (Md. App. 2011)............................................................................... 48

*Olsen v. Vail Assocs. Real Est., Inc.*,
    935 P.2d 975 (Colo. 1997) .................................................................................. 50

*Parisi v. Sinclar*,
    774 F. Supp. 2d 310 (D.D.C. 2011) ...................................................................... 37

*Robertson v. Rodriguez*,
    36 Cal.App.4th 347 (1995)...................................................................... 20, 25, 35

*Roca Labs, Inc. v. Consumer Op. Corp.*,
    140 F. Supp. 3d 1311 (M.D. Fla. 2015) ............................................................... 39

*Rosenbloom v. Metromedia, Inc.*,
    403 U.S. 29 (1971) .............................................................................. 11, 23, 24

*Salazar v. Pub. Tr. Inst.*,
    2022 WL 4241948 (Colo. App. 2022) ...................................................... 14, 17, 36

*Sall v. Barber*,
    782 P.2d 1216 (Colo. App. 1989) ........................................................................ 28

*Seidl v. Greentree Mortgage Co.*,
    30 F.Supp. 2d 1292 (D. Colo. 1998).......................................................... 41, 47, 48

x

*Seltzer v. Barnes*,
   182 Cal.App.4th 953 (2010) ........................................................................ 14

*Spacecon Specialty Contractors, LLC v. Bensinger*,
   713 F.3d 1028 (10th Cir. 2013).................................................................. 30

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ............................................................................ 30, 34

*Stevens v. Mulay*,
   2021 WL 1153059 (D. Colo. March 26, 2021)........................................... 15

*Stortroen v. Beneficial Fin. Co.*,
   736 P.2d 391 (Colo.1987) ......................................................................... 51

*Tacopina v. O'Keefe*,
   645 Fed.Appx. 7 (2d Cir. 2016) ................................................................ 48

*Tamkin v. CBS Broadcasting, Inc.*,
   193 Cal.App.4th 133 (2011) ..................................................................... 17

*Thornhill v. Alabama*,
   310 U.S. 88 (1940)................................................................................... 24

*US Dominion, Inc. v. MyPillow, Inc.*,
   2022 WL 1597420 (D.D.C. May 19, 2022)................................................ 61

*Vackar v. Package Mach. Co.*,
   841 F. Supp. 310 (N.D. Cal. 1993) ........................................................... 58

*Visto Corp. v. Sproqit Techs., Inc.*,
   360 F. Supp. 2d 1064 (N.D. Cal. 2005) ..................................................... 46

*Walker v. Colorado Springs Sun, Inc.*,
   188 Colo. 86 (1975) ...........................................................................Passim

4861-3517-4462.v2

*Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*,
    814 F. Supp.2d 1033 (S.D. Cal. 2011) .................................................... 47

*West Virginia Board of Education v. Barnette*,
    319 U.S. 624 (1943) ............................................................................... 63

*Westfield Dev. Co. v. Rifle Inv. Assocs.*,
    786 P.2d 1112 (Colo. 1990) ................................................................... 42

*Wibby v. Boulder Cty. Bd. Of Cty. Commissioners*,
    409 P.3d 516 (Colo. App. 2016) ............................................................ 62

*Zambruk v. Perlmutter 3rd Generation Builders, Inc.*,
    32 Colo. App. 276 (1973) ................................................................. 51, 52

## Statutes

47 U.S.C. § 230 ............................................................................................ 39

47 U.S.C. § 230(c)(1) ....................................................................... 37, 39, 40

47 U.S.C. § 230(e)(3) .................................................................................. 37

47 U.S.C. § 230(f)(2) ................................................................................... 37

C.R.S. § 13-90-119(3)(c) ............................................................................ 21

C.R.S. § 13-20-1101 ........................................................................... Passim

C.R.S. § 13-20-1101(7) ................................................................................ 14

C.R.S. § 13-20-1101(1) ................................................................................ 22

C.R.S. § 13-20-1101(4)(a) ........................................................................... 63

C.R.S. § 13-20-1101(4) ................................................................................ 63

Colo. Const., art. II, §10 .............................................................................. 20

Kan. Stat. Ann. § 60-5320(d) ................................................................... 21

Or. Rev. Stat. § 31.150(3) ........................................................................ 21

**Rules**

C.R.C.P. 12(b)(2) ............................................................................... Passim

C.R.C.P. 12(b)(5) ............................................................................... Passim

C.R.C.P. 30(b)(6) ..................................................................................... 54

C.R.C.P. 56(e) ......................................................................................... 25

**Other Authorities**

7 Ill. Prac., Business Organizations § 2:2 (2d ed.) .................................... 51

Restatement (Second) of Agency § 1(1) (1957) ...................................... 51

Restatement (Second) of Agency, §118 ................................................... 55

Section 230 and the Twitter Presidency,
   115 NW. U.L. REV. ONLINE 192 (2020) ........................................... 39

SLAPPs: Strategic Lawsuits Against Public Participation,
   7 Pace Envtl. L. Rev. 3, 5 (1989) ....................................................... 15

## ISSUES PRESENTED FOR REVIEW

I.      Did the District Court commit reversible error in denying the Campaign's Special Motion to Dismiss pursuant to C.R.S. § 13-20-1101, on the four counts asserted by the Plaintiff: (1) defamation; (2) intentional infliction of emotional distress; (3) conspiracy; and (4) injunctive relief?

4861-3517-4462.v2

**STATEMENT OF THE CASE**

**I.     Statement of Facts, Nature of the Case, Course of Proceedings, and Disposition**

    **A.     Statement of Facts and Nature of the Case**

    Donald J. Trump for President, Inc. ("Campaign") and its alleged agents cannot be punished for exercising their rights to petition and speak freely, and statements made by the Campaign's attorneys are protected by the litigation privilege.  The Campaign cannot be held liable for statements made by Sidney Powell ("Powell"), who did not represent the Campaign.  Plaintiff-Appellee Eric Coomer ("Coomer") failed to present a reasonable likelihood that he will prevail on his claims, which must be dismissed under Colorado's anti-SLAPP statute, C.R.S. § 13-20-1101 (the "anti-SLAPP statute").  The Trial Court erred in denying the Campaign's Special Motion to Dismiss ("Motion").

**1. Security Concerns Before the Election**

    During the 2020 Presidential Election (the "Election"), Dominion Voting Systems ("Dominion") provided election support services in over 1,300 jurisdictions (at least 30 states) throughout the United States, including from initial project implementation through election set-up, ballot layout, multiple language audio, machine set-up and system testing.  CF, pp. 5, ¶4; 21, ¶ 42.

2

Coomer is the former Director of Product Strategy and Security at Dominion Voting Systems ("Dominion"). CF, p. 757. Coomer is an expert in voting system technology and holds a number of patents in the field. *Id*.; 2555-2622.

Prior to the Election, widespread concerns arose regarding voting security, including specifically Dominion's machines and software. On December 6, 2019, Senators Elizabeth Warren, Amy Klobuchar, and Ron Wyden, and Congressman Mark Pocan, expressed public concerns regarding the vulnerability of elections, specifically referencing Dominion. CF, pp. 4102-4106.

On January 24, 2020, the Texas Secretary of State found that Dominion's voting system was insufficiently secure to be certified for use in Texas. CF, pp. 4102-4106; 19254-19256. On October 11, 2020, a federal judge in Georgia expressed deep reservations about Dominion's voting system and the security of the voting machines. *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1341 (N.D. Ga. 2020) (finding security risks and deficits in Dominion's systems were neither "hypothetical nor remote").

## 2. Oltmann's Allegations and Press Coverage

On or around September 25, 2020, Joe Oltmann ("Oltmann"), a Colorado businessman and host of the "Conservative Daily" podcast, gained access to a conference call comprised of political activists ("Conference Call"). CF, p. 5872.

3

Oltmann heard the activists discussing the possibility that President Trump may win re-election. CF, pp. 5872-5873.   Oltmann testified that, someone identified as "Eric,…the Dominion guy" spoke up and assured the participants: "Don't worry about the election, Trump is not gonna win.  I made f-ing sure of that.  Hahahaha." *Id*. at 5873.

The same day, Auon'tai "Tay" Anderson, a Black Lives Matter leader and a member of the Denver Public Schools Board, hosted a conference call to discuss the BLM response to harassment of attendees at recent protests.  Anderson does not deny that Coomer was on the call and does not deny that Oltmann was on the call.  Anderson's timeframe and general description of his call matches Oltmann's description of the Conference Call.  CF, pp. 10897-10900.

Oltmann researched "Eric…the Dominion guy" from the Conference Call, including a Google search for the keywords "Eric," "Dominion," and "Denver, Colorado."  He discovered Coomer's Dominion employee profile and some of Coomer's social media posts, which revealed intense anti-Trump sentiment and expressed support for extreme causes. CF, pp. 19934, 4566-4568, 8487 (85:19-22).

Election day was November 3, 2020.  The results in many states were very close.  On November 4th, it was announced that Mr. Biden had received enough votes

4

to win many crucial states. By November 7, 2020, most national media organizations declared Mr. Biden had won the election and was "President-elect."

After the Election, suspicions of voter fraud remained widespread and Oltmann began reporting on his podcast what he had heard on the Conference Call. CF, pp. 4569, 8785 (18:19-35:1). On November 13, 2020, Oltmann was interviewed by Michelle Malkin ("Malkin") and his story was published by multiple media sources across the country. CF, pp. 9288-9299, 9595-9605, 9824-9827. In the Malkin interview, Oltmann recounted what he heard on the Conference Call and discussed Coomer's anti-Trump and inflammatory social-media posts. *Id.*

That same day, Oltmann executed a sworn affidavit, attesting under penalty of perjury to what he heard on the Conference Call and the results of his research into Coomer. CF, pp. 5872-5877.

On November 13, 2020, Gateway Pundit reported on Oltmann's story and published articles about Coomer and Oltmann's allegations. CF, pp. 178, 184-186.

On November 17, 2020, Newsmax covered the Dominion story, including allegations regarding Coomer's role at Dominion and Oltmann's report of the Conference Call. CF, pp. 188-192.

On November 21, 2020, OAN broadcasted "Dominion-izing the Vote," where Oltmann was interviewed, recounting the Conference Call and describing Coomer's Facebook posts. CF, p. 9878.

### 3. Investigations and Resulting Litigation

Rudy Giuliani ("Giuliani") was retained by the Campaign just after the Election as the head of the Campaign's legal team.  CF, pp. 4910, 9988 (139:14-18). He was heavily involved on the Campaign's behalf in a lawsuit filed in Pennsylvania on November 9, 2020, which challenged the constitutionality of Pennsylvania's election practices.  See e.g., *Donald J. Trump for President, Inc. v. Boockvar*, Case No. 4:20-cv-02078-MWB, (M.D. Penn. 2020).

Giuliani investigated allegations of Election fraud throughout the nation, overseeing a team of investigators and attorneys. The team included Col. Phil Waldron and other professional investigators at Allied Security Operations Group. CF, pp. 9958 (19:25-20:14), 9969 (62:3-11), 9964 (44:23-45:2).

The legal team became aware of the media reports concerning Oltmann and the Conference Call and tasked investigators to look into Oltmann's claims.  Giuliani reviewed Coomer's anti-Trump Facebook posts, which revealed sympathy for groups such as Antifa.  CF, pp. 9964 (44:23-45:2), 9967 (54:20-55:8), 9969 (62:3-11).

Sidney Powell ("Powell") also investigated Dominion.  While Powell was aligned in some ways with the Campaign, she never represented the Campaign.  CF, p. 4659, ¶ 5.  Powell was concerned that what already seemed to be an unlikely come-from-behind victory for Biden was actually a statistical impossibility. CF, p. 4660, ¶ 7.  Powell believed there were serious questions about the integrity of the Election and worked to prepare lawsuits, which she began filing on November 25, 2020. *Id.*

### 4. Press Conference

On November 19, 2020, Giuliani and other allied attorneys (including Powell) who did not represent the Campaign, came together at a press conference in Washington D.C. ("Press Conference").  It was livestreamed by C-SPAN, and at least CNN, Fox News, and the New York Times "substantially reported" on it.  CF, pp. 195-197, ¶64, n. 105, 10077-10149.

By this time, the Campaign had already filed a lawsuit in Michigan, 1:20-cv-01083-JTN-PJG, *Donald J. Trump for President, Inc., et al. v. Jocelyn Benson, et al.,* specifically questioning Dominion machines and challenging Election certification in Antrim County, Michigan. CF, pp. 4888-89, 4897.  In the days leading up to the Press Conference, much of Giuliani's time was spent on the Michigan lawsuit.  CF, pp. 9963-9964 (41:21-42:7).

7

The Press Conference was presented as an "opening statement" to America, outlining the evidence that the Michigan lawsuit and future lawsuits would bear out. Giuliani's intention was to inform the American electorate, all of whom were potential plaintiffs in additional lawsuits, of the expectations regarding this evidence. CF, pp. 4911-12.

Giuliani stated that the Campaign intended to file more lawsuits - in Georgia, Arizona, New Mexico and Virginia, alleging, *inter alia*, that the results of the Election were tainted based on security issues with Dominion machines and/or software.  CF, p. 10099 (23:17-18-24:2-12).  Giuliani also offered opinions, based on his review of Coomer's social media posts, that Coomer was a "vicious man," "close to Antifa," and "biased" against President Trump. CF, p. 10125 (49:14-19).

Powell also spoke at the Press Conference.  Although Powell did not represent the Campaign, she initiated her own investigation into Election integrity.  Powell specifically referenced Otmann's allegations about the Conference Call, as verified by his sworn affidavit.  A copy of Oltmann's affidavit was made available to the press.  CF, pp. 4660, 10108 (32:4-13).

On November 22, 2020, Giuliani and Jenna Ellis ("Ellis") released a statement clarifying Powell's role: "Sidney Powell is practicing law on her own...she is not a member of the Trump Legal Team."  CF, p. 12993. Thereafter, Powell clarified she

8

was not the Campaign's attorney: "I agree with the statement today. I will represent #wethepeople and seek the truth." CF, p. 12994.

### 5. Lawsuits

On November 25, 2020, six days after the Press Conference, Powell filed lawsuits in Michigan (*King v. Whitmer*, case 2:20-cv-13134-LVP-RSW, U.S.D.C. Eastern District of Michigan; CF, p. 2893-2967) and Georgia (*See Pearson v. Kemp*, case 1:20-cv-04809-TCB, U.S.D.C., Northern District of Georgia; CF, p. 2242-2345), challenging the election results. She filed similar lawsuits in Wisconsin (*Feehan v. Wisconsin Elections Commission*, case 2:20-cv-01771-PP, filed December 1, 2020, U.S.D.C. Eastern District of Wisconsin; CF, pp. 3727-3778) and Arizona (*Bowyer v. Ducey*, case 2:20-cv-02321-DJH, filed December 2, 2020, U.S.D.C. District of Arizona; CF, pp. 4186-4238).  Every lawsuit alleged voting system manipulation by Dominion and included allegations regarding Oltmann's account of the Conference Call.  CF, pp. 201-201 (¶ 70).

### 6. Trump Tweets

About this time, President Trump and his son, Eric, communicated with the American electorate via Twitter to provide important updates regarding the investigation into Election fraud, including allegations that Dominion's machines were unsecure and/or unreliable (the "Trump Tweets").  It was widely reported by

9

the media at the time, and shared via Twitter, that Coomer made statements that he rigged the election against Trump. Eric Trump shared one such article, originally published by The Gateway Pundit on November 17, 2020. CF, p. 10576. On November 18, 2020, President Trump re-tweeted OAN's story, "Dominion-izing the Vote". CF, pp. 10577-10578.

**B.    Course of Proceedings/Disposition**

On December 22, 2020, amid ongoing investigations and pending lawsuits concerning Dominion and Election fraud across the country, Coomer filed this lawsuit. CF, pp. 3-54. The Amended Complaint alleges defamation, intentional infliction of emotional distress, and civil conspiracy against all Defendants. CF, pp. 151-215. By its timing and nature, Coomer's lawsuit seeks solely to punish the Campaign for exercising its First Amendment rights to petition and speak freely on matters involving the Election – a matter of great public interest.

As to the Campaign, Coomer's claims stem from statements made at the Press Conference and the Trump Tweets, all of which concern the investigation and litigation referenced above – a matter of public concern. Specifically, Coomer attributes the statements contained in Appendix A (the "Statements") to the Campaign.

10

On April 30, 2021, the Campaign filed the Motion.  On September 9, 2021, Coomer filed an "Omnibus Response" to the Motion.  In October 2021, the District Court held a two-day evidentiary hearing on Defendants' Special Motions to Dismiss.

On May 13, 2022, the District Court entered an omnibus order denying all Defendants' motions.  *See* attached Appendix B, hereafter the "Order."

## SUMMARY OF THE ARGUMENT

The Order correctly held that the anti-SLAPP statute applies because the Statements involved matters of public concern.  The District Court then held that Coomer met his burden of showing the requisite clear and convincing evidence that he would prevail on all of his claims.  Despite identifying the applicable burden to establish both falsity and actual malice by clear and convincing evidence, the District Court erred in finding Coomer presented sufficient admissible evidence to satisfy this burden.

First, Coomer failed to prove by clear and convincing evidence the falsity of the Statements, or that the Statements were made with actual malice, as required by the First Amendment.  *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 (1971); *Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 98 (1975).

Second, the District Court misapplied the Communications Decency Act and erred in finding that the Statements re-tweeted by President Trump and Eric Trump are not immune from liability.

Third, the District Court erred by disregarding the litigation privilege immunity with respect to Statements attributed to the Campaign through Giuliani and Powell, relating to ongoing litigation or litigation contemplated in good faith. Therefore, these statements cannot form the basis for a defamation claim against the Campaign. *See Club Valencia Homeowners Ass'n v. Valencia Assoc.*, 712 P.2d 1024 (Colo. App. 1985); *Belinda A. Begley & Robert K. Hirsch Revocable TCF v. Ireson*, 490 P.3d 963, 969-70 (Colo. App. 2020).

Fourth, the District Court erred in finding the Campaign is vicariously liable for Statements made by Powell, since there is insufficient evidence to support a finding that she was ever an attorney or agent of the Campaign.

Finally, the District Court incorrectly found that Coomer presented a prima facie case regarding his remaining claims against the Campaign for Intentional Infliction of Emotional Distress ("IIED"), Civil Conspiracy, and the "claim" for Permanent Injunction/Retraction. In doing so, the District Court failed to apply the clear and convincing standard required by the First Amendment.

Coomer presented nothing more than retrospective arguments and innuendo to illicit an emotional response regarding fallout from the Election.  In this respect, Coomer was successful.  The District Court adopted wholesale Coomer's irrelevant recitation of facts concerning events that transpired *after* the Election to support its Order, ignoring the salient inquiry:  the ***state of mind*** of the Campaign and its alleged agents on ***November 17-20*** - when the Statements were actually made.

What has happened since then is irrelevant:  the disposition of the Election fraud cases; the January 6 riot; the findings of CISA or former Attorney General Barr.  This is a defamation case.  It rests solely on the Statements and information forming the state of mind of the speakers at the time the Statements were made.

Coomer presented no admissible evidence, much less clear and convincing evidence, that the Campaign acted with actual malice, had knowledge of the probable falsity of the Statements, or that they were even false.  Coomer presented no alibi for the time of the Conference Call.  Coomer admitted that he participated in conference calls on September 25, 2020, but denied they were "antifa conference calls."  CF, p. 8421.  He did not deny being on a "Black Lives Matter" conference call.  This alone shows he failed to present clear and convincing evidence of the falsity of Oltmann's claims, and by extension, the Statements.

13

The District Court failed to view facts prospectively in order to assess whether Coomer met his burden, considering only prior or contemporaneous events to the time the Statements were made, including widespread concerns on both sides of the Election about its security. Therefore, the District Court erred in denying the Motion.

## ARGUMENT

### I. The Anti-SLAPP Statute Applies Because Coomer's Lawsuit Arises from a Protected Activity

#### A. Appealability

An order denying a special motion to dismiss is appealable pursuant to C.R.S. § 13-20-1101(7). The Campaign preserved this issue by filing its Motion on April 30, 2021. CF pp. 4738-4760.

#### B. Standard of Review

The Order is subject to *de novo* review. *Salazar v. Pub. Tr. Inst*., 2022 WL 4241948, *4 (Colo. App. 2022). *Flatley v. Mauro*, 39 Cal.4th 299, 325 (2006). "'Whether…the anti-SLAPP statute applies and whether the plaintiff has shown a probability of prevailing are both legal questions which [this court] review[s] independently on appeal.'" *Seltzer v. Barnes*, 182 Cal.App.4th 953, 961 (2010).

4861-3517-4462.v2

### C. Colorado's anti-SLAPP Statute

A SLAPP lawsuit is brought to send a message that there is a "price" to pay for civic engagement – that price being an expensive, meritless, retaliatory lawsuit meant to "chill participation in government." *Gresk for Estate of VanWinkle v. Demetris*, 96 N.E.3d 564, 568 (Ind. 2018) (citing SLAPPs: Strategic Lawsuits Against Public Participation, 7 Pace Envtl. L. Rev. 3, 5 (1989)).

Enacted in 2019, Colorado's anti-SLAPP law, C.R.S. § 13-20-1101, *et seq.* ("Statute"), adopts the language of California's anti-SLAPP statute nearly verbatim. Because the Statute is "relatively new and untested, and given that it tracks California's statute almost exactly, it is appropriate to draw from the more well-established body of authority interpreting California law." *Stevens v. Mulay*, Case No. 19-cv-01675-REB-KLM, 2021 WL 1153059 at *2 (D. Colo. March 26, 2021); *Addison Insurance Company v. Michael Veverka*, Case No. 1:19-CV-030080-RBJ, 2020 WL 6468542 (D. Colo. February 11, 2020).

The Statute's purpose is to:

> [E]ncourage and safeguard the constitutional rights of persons to petition, speak freely…and otherwise participate in government to the maximum extent permitted by law... [in order to further] the public interest to encourage continued participation in matters of public significance and that this participation should not be chilled through abuse of the judicial process.

Subsection (1).

Because imposition of civil liability for the exercise of constitutionally protected speech is forbidden by legal privileges conferred by the U.S. and Colorado Constitutions, and by the litigation privilege, the Statute provides an early protection mechanism for those privileges, authorizing a "special motion to dismiss" to dispose of claims based upon the defending party's exercise of constitutionally protected activity.

> A cause of action against a person arising from any *act of that person in furtherance of the person's right of petition or free speech under the United States constitution or the state constitution in connection with a public issue* is subject to a special motion to dismiss unless the court determines that the plaintiff has established that there is a reasonable likelihood that the plaintiff will prevail on the claim.

Subsection (3)(a) (emphasis added).

"Any act in furtherance of the person's right of petition or free speech under the United States constitution or the state constitution in connection with a public issue" includes, *inter alia*:

> Any written or oral statement or writing made in connection with an issue under consideration or review by a legislative executive, or *judicial body* or any other official proceeding…[a]ny written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest…[a]ny other conduct or communication in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Subsection (2)(a)(II)-(IV) (emphasis added).

16

Special Motions to Dismiss involve a two-step process. First, the defendant must make a prima facie showing that the lawsuit arises from an activity that is protected under the statute. Subsection (3)(a); *Salazar v. Pub. Tr. Inst.*, 2022 WL 4241948, *4 (Colo. App. 2022). The burden then shifts to the plaintiff to demonstrate a probability of prevailing on the claim. *See id.*; *Tamkin v. CBS Broadcasting, Inc.*, 193 Cal.App.4th 133, 142 (2011); *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (2002). If the plaintiff cannot meet this burden, the objectionable pleadings must be stricken. Subsection (3)(a); *Digerati Holdings v. Young Money Ent't*, 194 Cal.App.4th 873, 884 (2011).

Notably, the Statute does not limit the court's review to the four corners of the complaint and does not require acceptance of the plaintiff's allegations as true or in a light most favorable to the plaintiff. Subsection (3). Rather, the plaintiff must put forth "sufficient evidence" to substantiate his claims. *DuPont Merck Pharm. Co. v. Superior Court*, 78 Cal. App. 4th 562, 568 (Ct. App. 2000).

### D.  The Campaign satisfied its burden under the anti-SLAPP statute.

The Statements fall squarely within the definition of a protected activity and are subject to anti-SLAPP protections under Subsection (2)(a)(II) as they relate to "an issue under consideration or review by a…judicial body." Moreover, the Statements are protected under the U.S. Constitution and Colorado Constitution,

4861-3517-4462.v2

which affords even greater protection for free speech than does the First Amendment. *In re Marriage of Newell*, 192 P.3d 529, 535 (Colo. App. 2008).

At the time of the Statements, litigation had already been filed by the Campaign. The Michigan suit specifically contained allegations of misconduct by Coomer's employer, Dominion. The Statements pertained to Coomer in his capacity as an executive at Dominion and were made in connection with an issue under consideration before a judicial body. The Press Conference was an "opening statement" to address evidence the legal team expected to show at trial. CF, p. 10113 (57:13-24). Giuliani presented evidence gathered during investigation and intended for proof in court, and Powell discussed Dominion and the allegations regarding Coomer, which were circulating in the media. CF, pp. 10079-10103, 10103-10112. The Statements, therefore, certainly were "in connection with" the ongoing litigation in Michigan and, thus, fall under the protection of Subsection (2)(a)(II).

In addition, lawsuits in four additional jurisdictions were then contemplated and were ultimately filed no more than two weeks after the alleged statements were made. This, likewise, affords the Campaign anti-SLAPP protections which have been extended to include statements in connection with prospective litigation. *See i.e., Briggs v. Eden Council for Hope & Opportunity*, 19 Cal.4th 1106 (1999) (assisting tenant in pre-litigation investigation was protected as connected to a

judicial proceeding, regardless of whether it was a matter of public concern); *Dowling v. Zimmerman*, 85 Cal.App.4th 1400 (2001) (pre-litigation correspondence in preparation for litigation is protected statement regardless of whether it was a matter of public concern).

The Statements also fall under the protection of Subsection (2)(a)(III), because they were made in connection with an issue of public interest.  In Colorado, public interest is defined broadly, to include any matter of political, social, or other concern to the community.  *See McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008).

Finally, Subsection (2)(a)(IV) contains a catch-all provision, protecting "any other conduct or communication in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  Thus, even if the Statements were not deemed to have been made in a "public forum," they nevertheless fall under the protection of the Statute because they concerned the Election, a matter of public interest, and Coomer's lawsuit is a direct retaliation for the Campaign's exercise of free speech.

## II.   The First Amendment Requires Clear and Convincing Evidence of Falsity and Actual Malice.

### A.  Appealability and Standard of Review

First Amendment questions of constitutional fact compel an appellate court's *de novo* review, and that liability must be supported with convincing clarity." *Walker*, 188 Colo. at 101.  This issue was preserved in the Motion.  CF, pp. 4752-4758.  It was also preserved by arguing for the dismissal of Coomer's claims against the Campaign on the same grounds during the evidentiary hearing conducted on October 13, 2021, and October 14, 2021 ("Evidentiary Hearing").  TR 10/13/21, p. 159-184.

### B.  First Amendment Standard

Coomer's claims are subject to a heightened burden of proof under the First Amendment.  *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963)).  *See also*, Colo. Const., art. II, §10.  Because the Campaign demonstrated a protected activity, the burden shifted to Coomer to show there is a probability that he will prevail on his claims.  *Equilon*, 29 Cal.App.4th at 67.  Importantly, this prong of the anti-SLAPP analysis requires the reviewing court to consider the applicable burden of proof the plaintiff must carry to prevail on his claims at trial.  *Annette F. v. Sharon S.*, 119 Cal.App.4th 1146, 1166-67 (2004); *Robertson v. Rodriguez*, 36 Cal.App.4th 347, 358 (1995) (in determining whether the plaintiff has established actual malice, the court must "bear in mind the *higher clear and convincing standard of proof*") (emphasis added).

20

The District Court erred by failing to take this heightened burden into account. The Order improperly blends Coomer's heightened burden of proof with the concept of prima facie evidence, resulting in the application of an improper, lower burden of proof. The Statute is clear, requiring not merely a prima facie showing sufficient to satisfy the bare elements of a plaintiff's claims, but a "reasonable likelihood that the plaintiff will *prevail*." Subsection (3)(a) (emphasis added).[1]

This focus on the end result requires courts to consider the strength and character of a plaintiff's evidence, as well as any contradicting evidence submitted by the defendants. *See Gordon v. Boyles,* 9 P.3d 1106, 1120 (Colo. 2000) (holding that "the trial court must weigh the evidence presented at the pretrial hearing to determine whether the newsperson's statements were probably false..." as part of the balancing test required by C.R.S. §13-90-119(3)(c)). This gatekeeping role is consistent with the language in the Statute regarding evidence a court is to consider at this stage: "In making its determination, the court shall consider the pleadings and supporting *and opposing* affidavits stating the facts upon which the liability…is based." Subsection (3)(b) (emphasis added). If the court is only to consider whether a plaintiff has a prima facie case, there would be no need to consider opposing

---

[1] Statutes requiring plaintiffs to establish only a prima facie case make this lesser burden clear. *See i.e.* Kan. Stat. Ann. § 60-5320(d) (2020); Or. Rev. Stat. § 31.150(3) (2019); Tex. Civ. Practice & Remedies Code Ann. § 27.005(c) (West 2021).

affidavits at all.  Thus, the statutory language contemplates assessment of the merits of plaintiff's evidence weighed against the defendant's evidence.

Because the purpose of the Statute is "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government *to the maximum extent permitted by law*," (C.R.S. § 13-20-1101(1)), it burdens plaintiffs with establishing not only prima facie evidence, or that their claims are not frivolous, but that their claims are actually *meritorious.*[2]  Therefore, a plaintiff must prove likelihood of success on the merits. Otherwise, the legislature has determined that the resulting chill on constitutional rights is unjustified.

"The First Amendment safeguards an individual's right to participate in the public debate through political expression and political association."  *McCutcheon v. Fed. Election Com'n*, 572 U.S. 185, 203 (2014).  "Political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse." *Mcintyre v. Ohio Elections Com'n*, 514 U.S. 334, 357 (1995).

---

[2] There is a vast gap between merely non-frivolous claims and those that are meritorious.  Meritorious claims are "worthy of legal *victory*" or have "enough legal value to *prevail* in a dispute."  *Meritorious*, Black's Law Dictionary (abr. 10th ed. 2015) (emphasis added).  Many suits are neither meritorious nor frivolous.  *See In re Estate of Owens*, 2017 COA 53, ¶ 50.

22

Even "speculative commentary on matters of public concern is critical to the 'uninhibited, robust, and wide-open' public debate essential to a democratic society (*see New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)), because it constitutes 'a means of fueling a national discourse' and stimulates 'public pressure for answers from those who know more.'" *Keohane v. Stewart*, 882 P.2d 1293, 1300–01 (Colo. 1994) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 35 (1990), (Brennan, J., dissenting)).

*New York Times* provides four requirements in the context of political speech: (1) plaintiff must be a public official or running for public office; and he must prove (2) his case with clear and convincing evidence, (3) falsity of the statement, and (4) actual malice. A plaintiff bears the burden of proving falsity of the statement and actual malice with "convincing clarity." 376 U.S. at 285. The Supreme Court subsequently termed this standard as "clear and convincing evidence." *Gertz v. Welch*, 418 U.S. 323, 331-32 (1974); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 83 (1967); *See also, DiLeo v. Koltnow*, 200 Colo. 119, 125 (Colo. 1980).

In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 (1971), a plurality of the Supreme Court extended the *New York Times* rule to "all discussions and communication involving matters of public or general concern," regardless of whether the subject was a public figure. "Freedom of discussion, if it would fulfill

23

its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Id*. at 41 (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940)). *Rosenbloom* explains the justification for this exacting standard:

> In the normal civil suit where [the preponderance] standard is employed, 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan J., concurring). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement…but the possibility of such error, even beyond the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate.

403 U.S. at 50.[3]

In *Walker*, 188 Colo. at 92, the Colorado Supreme Court adopted the standard from *Rosenbloom*, thus confirming extension of the *New York Times* test beyond statements pertaining to public officials and to statements about matters of public concern.

---

[3] Later, in *Gertz v. Robert Welch, Inc*., a majority of the Supreme Court declined to adopt the *Rosenbloom* plurality standard but stated that "so long as they do not impose liability without fault, *the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual*." 418 U.S. 323, 347 (1974) (emphasis added).

4861-3517-4462.v2

Only admissible evidence may be presented to prove that Coomer has established clear and convincing evidence that he will prevail on his defamation claim.[4]  And, as noted above, the Statute requires the District Court to consider evidence from both Coomer and the Defendants.

*Walker* notes that "*New York Times* and *Rosenbloom* hold that First Amendment questions of constitutional fact compel an appellate court's *de novo* review, and *that liability must be supported with convincing clarity*."  *Id.* at 101 (emphasis added). This requires the reviewing court to "independently examine the statements in issue and the circumstances under which they are made against the backdrop of the entire record."  *Robertson*, 36 Cal.App.4th at 358.

### C. The District Court Failed to Hold Coomer to the Exacting Standard Required by the First Amendment

Coomer was required to present clear and convincing evidence (not merely prima facie evidence) that the Statements: (1) were false; and (2) made with "actual malice."  Clear and convincing evidence requires a finding that a fact or proposition is "highly probable," and the trier of fact has "no serious or substantial doubt." CJI-Civ. 3:2 (CLE ed. 2021).  Coomer failed to satisfy this burden.

---

[4] E.g., C.R.C.P. 56(e) requires affidavits must set forth *admissible* evidence.

### i. Coomer Failed to Present Clear and Convincing Evidence of the Falsity of the Statements.

While acknowledging Coomer's heightened burden of proof, the District Court failed to find that Coomer satisfied this burden of proof. It merely found Coomer presented a prima facie case; not that Coomer had shown with clear and convincing evidence that any of the Statements were false. The District Court accepted as "uncontroverted" that Coomer was not on an Antifa call (Order at ¶ 191) based solely on Coomer's affidavit, while largely ignoring the Defendants' evidence to the contrary.

The burden of proving falsity by clear and convincing evidence is on the plaintiff. *McIntyre v. Jones*, 194 P.3d 519, 528 (Colo. App. 2008); *Lawson v. Stow*, 327 P.3d 340, 348 (Colo. App. 2014). Clear and convincing evidence is "evidence which is stronger than a 'preponderance of the evidence' and which is unmistakable and free from serious or substantial doubt." *DiLeo v. Koltnow*, 613 P.2d 318, 323 (Colo. 1980).

The District Court erred in finding Coomer provided clear and convincing evidence that the Statements were false, ignoring evidence that Oltmann's

statements[5] were, in fact, true or, at the very least, could not be proven as false.  *Cf. Gordon,* 9 P.3d at 1120.  The Court simply accepted Coomer's evidence as true and held that the evidence was uncontroverted.  Order at ¶ 191.

What is uncontroverted is that a conference call with BLM activists occurred on September 25, 2020.  *See* CF, p. 10899.  Coomer did not deny taking part in a BLM call, and Anderson did not deny that Coomer was on that call.  Coomer only denied that he took part in an "Antifa call," objecting to Oltmann's characterization of the call as an "Antifa call," instead of a BLM call.  CF, p. 8421, ¶ 40.  Coomer offered no alibi for the time of the Conference Call, other than to state that he was "focused solely on investigating and mitigating a display issue discovered in Georgia."  CF, p. 8421.  Oltmann presented a screenshot from September 26, 2020, the day after the BLM call, in which he Googled the terms "Eric," "Dominion," and "Denver, Colorado."  He testified that the call occurred within a few days of that screenshot.  Oltmann Dep. 72:1-5.  Oltmann took contemporaneous notes of the call.  CF, pp. 8469 (13:21-24), 9589 (Oltmann's notes).

Coomer's Facebook posts, which he admitted are authentic, are consistent with someone who would participate in such a call and make the statements

---

[5] i.e., that there was a Conference Call on September 25, 2020; that someone on the call was identified as "Eric…the Dominion guy;" and that this person stated: "Trump's not gonna win…I made f'ing sure of that."

attributed to him.  See CF, pp. 8423-8425 (admission), 8036 (admission that "the Facebook posts were, in fact, authentic"), 4571-4584 (Facebook posts).   Thus, Coomer has not met his burden of proving by clear and convincing evidence that he was not on the Conference Call.

Other Statements that Coomer was a "vicious, vicious man" who is "warped," are mere opinions which are not defamatory in nature and are not capable of being disproven.  Pure opinion cannot be defamatory, regardless of whether the issue is of private or public concern.  *Sall v. Barber*, 782 P.2d 1216, 1218 (Colo. App. 1989).

To the extent the Campaign can be held liable for Statements made by Powell (which it cannot), there is no evidence that they are not true.  Contrary to the Order's findings, neither Giuliani nor Powell ever averred that Coomer actually stole the Election; only that he was overheard saying that he had made sure that Trump would not win.   The District Court pointed to numerous statements made by Powell regarding Dominion and its ballot-counting software (Order ¶ 80), but these are statements about Dominion, not Coomer, and are not actionable by Coomer.[6]

---

[6] The statements regarding Dominion are only actionable by Dominion, which has filed a lawsuit against Powell in the United States District Court for the District of Columbia.  *See US Dominion, Inc. et al v. Powell et al*, 1:21-cv-00040-CJN.  Thus, it is Dominion, not Coomer, who is the proper Plaintiff for the statements regarding Dominion.

Based on the Campaign's evidence, which the District Court disregarded, a reasonable jury could certainly conclude that the Conference Call occurred and that the statements attributed to Coomer by Oltmann were made on that call. Thus, Coomer has failed to meet his burden of showing falsity by clear and convincing evidence, and the Order must be overturned.

### ii. Coomer Failed to Present Clear and Convincing Evidence that the Campaign Acted with Actual Malice.

### 1. Actual Malice Standard

Actual malice is a deliberately demanding standard, requiring clear and convincing evidence of a false statement of fact, either with knowledge of its falsity or in reckless disregard thereof. *New York Times*, 376 U.S. at 280. *Walker* held that "when a defamatory statement has been published concerning a matter of public or general concern, the publisher of the statement will be liable only if he knew the statement to be false or made the statement with reckless disregard for whether it was true or not." 188 Colo. at 98.

Even "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting" will not suffice to establish actual malice. *Harte-Hanks Communs v. Connaughton*, 491 U.S. 657, 663-64 (1989); *see also Newton v. NBC*, 930 F.2d 662, 669 (9th Cir. 1990) (even "extreme departure from accepted professional standards…will not suffice to establish actual malice").

Evidence of bias alone is not enough to find of actual malice. *See Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1042-43 (10th Cir. 2013). Motive to cause harm to another is insufficient as well. *Id*. Ultimately, actual malice is an "almost impossible" standard for a plaintiff to meet. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 771 (1985) (White, J. concurring).

A defendant must be shown to have actually "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Actual malice requires subjective awareness of probable falsity; that there be proof that the defendant had serious doubts about the accuracy of the statements before making them. *Id*. at 731-733. This requires proof that the statements were made with "a high degree of awareness of their probable falsity." *Garrison v. La.*, 379 U.S. 64, 74 (1964).

Appellate courts are required to conduct an independent, *de novo* review to ensure that there is clear and convincing evidence acted with actual malice. "Appellate judges…must exercise independent judgment and determine whether the record established actual malice with convincing clarity." *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 514 (1984).

## 2.  There was no Actual Malice

Coomer failed to present clear and convincing evidence that the Campaign entertained serious doubts about the truth of the statements or had a high degree of awareness of their probable falsity.  In finding that the Campaign acted with actual malice, the District Court relied heavily on sources that allegedly debunked allegations of voter fraud.

This finding is logically flawed.  What is at issue is not what has transpired since the Election, but the state of mind of the Campaign and its alleged agents *at the time the statements were made.*  A "court should weigh the evidence known to the defendant…at the time that the defendant published the defamatory statement. That is, proving that a [statement] was false after publication does not establish that the defendant knew or should have known the information was false." *Gordon*, 9 P.3d at 1120 (citations omitted).  The District Court failed to take into account such information when it found Oltmann's allegations were "wholly incredible," "discredited," and "without substantial independent support" simply because Oltmann had previously questioned the Election results.  Order at ¶ 218.

At the time of the Statements, allegations of voter fraud were prevalent and under investigation.  Allegations of compromised election technology – Dominion's in particular – were circulating months, and even years, before the Press Conference.

CF, pp. 4102-4106; CF, pp. 19254-19256. Even Senator Elizabeth Warren highlighted concerns with Dominion prior to the Election in an open letter sent in 2019. CF, p.14103. Attorney General Barr's statements that there was, in his opinion, no evidence of widespread voter fraud (Order at ¶ 218) were not made until December 1, 2020 – nearly two weeks after the Press Conference.

The District Court also relied on a memorandum from the Campaign that the District Court characterized as "rejecting connection between Coomer and claims of voter fraud." *Id*. According to the District Court, the Campaign "disregarded its own research debunking the allegations against Coomer…." *Id*. This internal memorandum, however, does not support a finding of actual malice. Contrary to the District Court's findings, it did not "debunk" or "reject" any of those claims. Oltmann's account was that someone named "Eric," whom he concluded from subsequent research to be Coomer: (1) participated in a conference call; and (2) made a statement during that call that he made sure Donald Trump would not win the Election. The internal memorandum does not even mention, much less disprove, either of these assertions.

Instead, the focus of the Campaign's internal memorandum and supporting research is on "Dominion, Smartmatic, Sequoia and Venezuela." CF, p. 10546. The only discussion of Coomer in the internal memorandum was in the context of

32

addressing "internet rumors" that Coomer had ties to Antifa.  CF, p. 10573.  The memorandum and corresponding email string (CF, p. 10544) indicate that the research was done under time constraints ("let's cut this off at 10:30"), on or before 10:30 p.m. November 13, 2020, which is the same day Oltmann signed his sworn affidavit.  CF, pp. 4761-4766.  The memo also suggests that the Campaign had not yet received the approximately 80 pages of Coomer's Facebook posts, which provide ample evidence in support of Oltmann's report and directly contradict the memo's conclusion that Coomer had no ties to Antifa.  For instance, Coomer posted the "Antifa Manifesto" on his Facebook page.  CF, pp. 4571-4574.

Furthermore, the Campaign expressly rejected the memorandum's conclusion that Coomer had no ties to Antifa - a fact not even mentioned in the Order.  Campaign representative, Sean Dollman, testified: "I wouldn't say that the [C]ampaign knew that he didn't have ties to Antifa."  CF, p. 10494 (52:7-9).  "There's a lot of evidence within the Facebook; and I don't know if, like, they didn't see that information.  But there's a lot of things where I wouldn't say that Coomer is not a member of Antifa, and I wouldn't say that…."  *Id*. at 52:12-18.  "So, no, I don't think - - I don't think that there is no evidence that he is absolutely not tied to Antifa."  *Id*. at 53:1-43.

The Order also disregards evidence that the internal memorandum was not the only investigation performed by the Campaign prior to the time the Statements were

made.  The Campaign's legal team took additional steps to investigate Oltmann's allegations.  For example, prior to the Press Conference, Giuliani spoke directly with the team at Allied Security Operations Group, whom he tasked with investigating Oltmann's allegations.  CF, pp. 9963-9966, (40:14-43:19; 46:15-20; 48:10-49:21; 51:22-53:6).  Giuliani also reviewed Coomer's Facebook posts prior to the Press Conference.  CF, pp. 4911, 9966-9967 (52:13-19; 54:20-55:11).  Giuliani found no reason for the Campaign to conclude Oltmann was lying or disregard his affidavit.  CF, p. 4911, ¶ 6.

Moreover, allegations regarding Coomer did not originate with the Campaign and were not based on a wholly unverified or anonymous telephone call.  They were based on a reliable source – a sworn affidavit, signed under the penalty of perjury, from someone with first-hand knowledge.  Reliance on a sworn affidavit and/or a witness with first-hand knowledge of the accounts precludes a finding of actual malice.  *See e.g., St. Amant,* 390 U.S. at 730-31 (holding that televised reading of another's affidavit, containing allegedly defamatory statements, does not constitute actual malice even when the reader relies solely upon the affidavit and makes no attempt to verify the accusations.) ; *see also, Murray v. Bailey,* 613 F. Supp. 1276, 1280–81 (N.D. Cal. 1985) (publisher's failure to independently investigate the published accusations, and its full reliance on the person with first-hand knowledge,

was not done with "reckless disregard"; in fact, it was not even unreasonable). Reliance on reputable sources precludes, as a matter of law, a finding of actual malice.

In *Robertson*, 36 Cal.App.4th at 352, a councilman brought a libel action for a political mailer claiming he was "fined for running an illegal business out of his home." After the plaintiff filed a libel action, the defendant filed an anti-SLAPP motion to dismiss.

The defendant received his information from a city official along with a copy of the compromise agreement. The court granted the motion, finding that there could be no malice where the defendant relied upon the statements made by the city official. The court further held that the mere fact that the defendant had a copy of the compromise agreement, including the statement denying any wrongdoing, did not show actual malice. *Id.* at 348.

Similarly, the Campaign relied on reputable sources whom they believed they could trust. The affidavit was signed under penalty of perjury, and specifically recounted Oltmann's first-hand account of the Conference Call. CF, pp. 4565-4569. Giuliani relied on investigations performed by investigators, including Col. Phil Waldron and his team. CF, pp. 9963-65 (41:9-46:25; 48:14-49:22). Powell

reviewed and relied upon Oltmann's sworn affidavit to support the Statements made at the Press Conference.  CF, p. 4660.

Coomer failed to present clear and convincing evidence that, at the time of the Press Conference, the Campaign or its alleged agents entertained serious doubts about the truth of Oltmann's allegations.  The District Court, therefore, erred in denying the Campaign's Motion.

## III. The Court Erred in its Application of the Communications Decency Act ("CDA")

### A. Appealability

The Campaign preserved this issue by (i) filing the Motion pursuant to C.R.S. § 13-20-1101 asserting the protections of the CDA (CF, p. 4757); and (ii) by arguing for the dismissal of Coomer's claims against the Campaign on the same grounds during the evidentiary hearing conducted on October 13, 2021, and October 14, 2021 ("Evidentiary Hearing").  TR, 10/13/21 p. 169-171.

### B. Standard of Review

In reviewing *de novo* an anti-SLAPP Special Motion, the Court must consider affirmative defenses raised by the Defendant in the court below, such as immunity from liability afforded under the CDA.  *See L.S.S. v. S.A.P.,* 2022 COA 123, ¶ 19l *Salazar v. Pub. Tr. Inst.*, 2022 WL 4241948, *4 (Colo. App. 2022).  *See also 1-800-Contacts, Inc. v. Steinberg,* 107 Cal.App.4th 568, 583 (2003); *Ludwig v. Superior*

*Court*, 37 Cal.App.4ᵗʰ 8, 15-16 (1995).   The standard of review for this issue, therefore, is de novo.

### C.  The Trump Tweets are Immune Under the CDA

The District Court erred when it denied the Campaign the protections of the CDA.  Without explanation, the District Court held that "the application of Section 230 to Eric Trump's and former president Trump's tweets strains the reach of the CDA."  Order at ¶ 222.  The Court then held the CDA did not apply to Eric Trump's re-tweet on November 17 because Eric Trump "published his own defamatory statements to his Twitter followers."  *Id.* It gave no explanation for denying the protections of the CDA to President Trump's re-tweets.

### i.  The CDA

The CDA grants broad immunity to the user of an interactive computer service who posts or publishes material or information that originated from another source, unless the person "independently 'knew or had reason to know'" the statements were defamatory.  *Barrett v. Rosenthal*, 146 P.3d 510, 513, 525 (Cal. 2006); *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 315 (D.D.C. 2011) (discussing Congress's "legislative

judgment to effectively immunize providers [and users]...from civil liability in tort with respect to material...created by others.").

Under the CDA, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  An "interactive computer service" is defined as any system where multiple users can access a single server. 47 U.S.C. § 230(f)(2).

The CDA expressly preempts any state law to the contrary.  *Id.* at §230(e)(3). *See also Johnson v. Arden*, 614 F.3d 785, 792 (8th Cir. 2010) (CDA immunity preempts state-law defamation actions).

By enacting the CDA, "Congress has comprehensively immunized republication by individual Internet users."  *Id*. at 529.  Courts construe this statute broadly in favor of immunity "for information originating with a third-party user." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quotation omitted).

It is undisputed that Twitter is an interactive computer service provider. *See*, e.g., *American Freedom Defense Initiative v. Lynch*, 217 F. Supp. 3d 100, 104 (D.D.C. 2016).  It is undisputed that both Eric Trump and Donald Trump qualify as

38

users of Twitter.  Under the CDA's broad mantle of immunity, which offers "user" protection, the Trump Tweets are immune from liability.

### ii. Trump Tweets are protected under the CDA

Neither Donald Trump nor Eric Trump originated the allegedly defamatory content they re-tweeted.  The story re-tweeted by Eric Trump on November 17, 2020, was originally published by Gateway Pundit.  The story re-tweeted by Donald Trump on November 18, 2020, was originally published by OAN.

The District Court's holding is directly contrary to the unambiguous language of the CDA.  Eric Trump's preface on his re-tweet[7] does not change the binding nature and preemptive force of the CDA.  Contrary to the District Court's findings, this was not Eric Trump's "own comment."  Order at ¶ 222.  It is a verbatim, copy-and-paste, quote from an article previously published by Gateway Pundit.  Eric Trump did not originate the content; he merely repeated what had already been reported.  *See Roca Labs, Inc. v. Consumer Op. Corp.*, 140 F. Supp. 3d 1311, 1320 (M.D. Fla. 2015) ("reposting allegedly defamatory comments authored by third parties does not preclude Section 230 immunity"); Michael A. Cheah, <u>Section 230 and the Twitter Presidency</u>, 115 NW. U.L. REV. ONLINE 192, 202 (2020) ("While

---

[7] "Eric Coomer - Dominions [sic] Vice President of U.S. Engineering—'Don't worry about the election, Trump's not gonna win. I made f*cking sure of that." CF 10576.

Section 230(c)(1) certainly immunizes Twitter from liability for a user's defamatory tweet, it also protects the individuals who retweet it.").

The Trump Tweets shared previously published content of other individuals and news organizations. Re-tweeters are not the original publisher or speaker. Per the CDA, Coomer's claims, if any, are against the original publishers, not the re-tweeters. *See, e.g., La Liberte v. Reid*, 966 F.3d 79, 83 (2d Cir. 2020) (recognizing the force of the CDA but concluding that TV personality didn't have immunity because she originated defamatory content versus merely repeating previously published content).

The CDA provides no exception for "liking," "approving," or "copying and pasting" another's content. It plainly disallows "treat[ing]" a user as "the publisher or speaker of *any* information provided by another[.]"  47 U.S.C.§ 230(c)(1) (emphasis added). Coomer's claim, and the Order, simply attempt to hold the Campaign accountable for re-publication of an allegedly defamatory post by a third party. This is wholly inappropriate and in direct contravention of the CDA. The District Court erred in finding that CDA immunity did not apply to the Trump Tweets.

**IV.    The District Court Erred in Failing to Apply the Litigation Privilege**

**A. Appealability**

The Campaign preserved this issue by (i) filing the Motion pursuant to C.R.C.P. 12(b)(5) and C.R.C.P. 12(b)(2) (CF, pp. 1910-1913) based upon the absolute litigation privilege because Giuliani and Powell made the Statements while discussing ongoing and contemplated litigation; (ii) the Motion to Dismiss pursuant to C.R.S. § 13-20-1101 (CF, pp. 4748-4751); and (iii) arguing for the dismissal of Coomer's claims against the Campaign on the same grounds during the Evidentiary Hearing.  TR 10/13/21, pp. 159-184.

### B.  Standard of Review

Under anti-SLAPP's second prong, Coomer must show a probability of overcoming immunity pursuant to the litigation privilege.  *Flatley,* 39 Cal.4th at 323 (the litigation privilege is "relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing").  Whether the privilege applies is a question of law.  *Club Valencia.*, 712 P.2d at 1027.

It is well established that actions taken, and statements made in the course of litigation, which relate to the subject matter of the litigation, are absolutely immune from civil liability.  *See e.g., Glasson v. Bowen*, 267 P. 1066, 1067 (Colo. 1928); *Seidl v. Greentree Mortgage Co.*, 30 F.Supp. 2d 1292, 1313 (D. Colo. 1998).  This absolute immunity is commonly termed the "litigation privilege" and its

applicability is a question of law.  *See Club Valencia,* 712 P.2d at 1027; *Merrick v. Burns Wall Smith & Mueller, P.C.*, 43 P.3d 712, 713 (Colo. App. 2001).  This absolute privilege exists "to encourage and protect free access to the courts for litigants and their attorneys."  *Begley*, 399 P.3d at 780; *see also Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1117 (Colo. 1990).

In analyzing whether an extrajudicial statement is absolutely privileged because of its relation to a judicial proceeding, the court must consider:  (1) whether a judicial proceeding existed; (2) whether the statement was made during the course of a judicial proceeding; (3) whether the statement is *related or pertinent to* the judicial proceeding; and (4) whether the maker and recipient of the statement were closely connected with the proceedings.  *Club Valencia*, 712 P.2d at 1027 (emphasis added).  *See also*, Subsection 2(a)(II).  When analyzing the challenged communication, "[a]ll doubt should be resolved in favor of its relevancy or pertinency.  No strained or close construction will be indulged to exempt a case from the protection of privilege."  *Id*.

### C.  The Statements Are Absolutely Privileged

#### i.  Ongoing Judicial Proceedings

The District Court held that the litigation privilege did not apply to the Campaign because "the Trump Campaign was not involved in any election-related

42

lawsuits referencing Coomer." Order at ¶ 220. As noted above, however, the Campaign was a named party in a lawsuit in Michigan, which was filed many days before the Press Conference, which included specific allegations against Coomer's employer, Dominion Voting Systems. EX 908, pp. 786-789, 791-792, 814-815, 819-820, 822-823, 824-839.

The Statements at the Press Conference were certainly "made in reference to the subject matter" of that litigation. *Club Valencia*, 712 P.2d at 1027. There is no requirement that the Statements pertain solely to individuals or entities specifically referenced in the litigation. Whether or not Coomer was specifically mentioned in the lawsuits (both ongoing and contemplated) is not the standard for the litigation privilege to apply.

Nor does the fact that the Statements were made to the American people through the media remove the protections of the litigation privilege as the District Court wrongly held. *See* Order at ¶ 220. Under *Club Valencia,* for an extrajudicial statement to be protected by the litigation privilege, "the maker of the statement and the recipient must be involved in and closely connected with the proceeding." *Club Valencia*, 712 P.2d at 1027.

Here, the speakers were attorneys closely connected to ongoing litigation in Michigan and other contemplated litigation. The recipients of the Statements were

43

the American voters, all of whom had an interest in the integrity of the Election. The litigation privilege is not limited to statements made to parties connected to litigation; it includes communications to potential plaintiffs who might have an interest in or otherwise be connected to the litigation. *Aminokit Laboratories, Inc. v. Reinan*, 15CA0933 (Colo. App., August 4, 2016) (CF 14195-14207). The Statements, therefore, were *related or pertinent to* ongoing judicial proceedings and, thus, protected under the litigation privilege.

The District Court relied on *Burke v. Greene*, 963 P.2d 1119 (Colo. App. 1998) in support of the proposition that "even where the privilege applies in a defamation suit, it can be lost by a finding of actual malice." CF 21794, ¶ 210. However, *Burke* did not analyze the litigation privilege, but a qualified privilege for statements made to law enforcement officers. 963 P.2d at 1122.

Inapposite to the analysis in *Burke*, the litigation privilege is an absolute privilege, not a qualified one. "An absolute privilege is, in effect, a complete immunity," and it "protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth, or even his knowledge of its falsity." *Aminokit Laboratories,* 15CA0933 at *5-6. This is an overwhelming burden – one which Coomer did not overcome.

### ii.  Litigation Contemplated in Good Faith

There is also every indication that the Campaign was contemplating, in good faith, lawsuits in those states referenced by Giuliani at the Press Conference, and which would have specifically incorporated allegations concerning Coomer and Dominion.

Under *Club Valencia*, the absolute privilege "is not limited to statements during trial, but may extend to steps taken prior to trial, such as conferences and other communications preliminary to the proceeding." 712 P.2d at 1027. This has since been extended to "pre-litigation" statements where: (1) the statements are related to prospective litigation; and (2) the prospective litigation is contemplated in good faith. *Begley*, 399 P.3d at 781 (citing *Merrick,* 43 P.3d at 714). Pre-litigation privilege applies to any cause of action that is based on conduct protected by the litigation privilege. *Belinda A. Begley & Robert K. Hirsch Revocable TCF v. Ireson*, 490 P.3d 963, 969-70 (Colo. App. 2020) ("*Begley II*").

The "relatedness" criterion is construed broadly as follows:

> To be privileged, an attorney's allegedly tortious statement 'must have been made in reference to the subject matter of the proposed or pending litigation, although it need not be strictly relevant to any issue involved in it.' *Club Valencia*, 712 P.2d at 1027. 'The pertinency required is not technical legal relevancy, but rather a general frame of reference and relation to the subject matter of the litigation.' *Id*. The litigation privilege 'embraces anything that possibly may be relevant.' *Id*. And, '[a]ll doubt should be resolved in favor of its relevancy or pertinency. No strained or close construction will be indulged to exempt a case from the protection of privilege.' *Id*. at 1027-28.

45

*Begley II*, 490 P.3d at 972.

The "good faith" test is not determined by the merits of any such litigation or its success, but inquiries as to whether the intention to file the litigation is in good faith. *Visto Corp. v. Sproqit Techs., Inc.*, 360 F. Supp. 2d 1064, 1069 (N.D. Cal. 2005) ("It is the contemplation of litigation that must be in good faith, not the merits of the actual litigation itself that animates the litigation privilege."); *Begley II*, 480 P.3d at 975 ("there is a difference between bad faith and lack of success on a claim").

Good faith contemplation of litigation relating to the Statements is demonstrated by the Election-related lawsuits contemplated by the attorneys at the time of the Press Conference and ultimately filed in the days and weeks thereafter. Michigan and Georgia lawsuits were filed six days later (November 25, 2020) and specifically sought relief from alleged Election fraud involving Dominion software and hardware. Wisconsin and Arizona lawsuits were filed on December 1 and 2, 2020, respectively. Similar allegations against Dominion were alleged in these suits.

Regardless of whether the Campaign was a named party or otherwise involved in the subsequent litigation, there can be no dispute that additional lawsuits were being "considered in good faith" by Giuliani and Powell at the time the Statements were made. At the Press Conference, he announced his intention to file lawsuits in

46

Georgia, Arizona, Virginia, and potentially New Mexico on behalf of the Campaign. CF, p. 10099 (23:17-24:12).

Therefore, the Statements were protected by the pre-litigation privilege. *See Begley II*, 490 P.3d at 968 (holding declaration of attorney, coupled with corroborating evidence, timing of events, and fact that litigation was actually filed is sufficient evidence to establish the absolute litigation privilege). Whether or not the Campaign did, ultimately, file the lawsuits is immaterial to the pre-litigation privilege, which only requires that they were being contemplated in good faith.

The Order relies on *Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292 (D. Colo. 1998) for the proposition that the litigation privilege does not apply to statements made at a press conference. Order at ¶ 210. This federal case, however, is not binding on this court, and it is outdated. *Seidl* was decided prior to this Court's recognition of the pre-litigation privilege in *Begley*, 399 P.3d at 781 (no Colorado Court had previously analyzed the application of the litigation privilege to pre-litigation statements).

More recent cases immunize pre-litigation statements made by attorneys to the press, so long as the statements are calculated to reach those who might have an interest in the litigation. *See i.e., Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp.2d 1033, 1040-41 (S.D. Cal. 2011) (press

release sent to thousands of recipients protected by the privilege); *Tacopina v. O'Keefe*, 645 Fed.Appx. 7, 8 (2d Cir. 2016) (statement to press privileged); *Feist v. Paxfire, Inc.*, 11 Civ. 5436 (LGS), 2017 WL 177652, *5 (S.D.N.Y. Jan. 17, 2017) (same); *Norman v. Borison*, 17 A.3d 697, 711 (Md. App. 2011) (same).

Subsequent Colorado Courts have deliberately rejected the holding in *Seidl*, holding instead that publicizing proposed or pending litigation can serve an important purpose to alert those that may have an interest in, or otherwise be connected to, said litigation. *See Begley I*, 399 P.3d 777, 782 (Colo. App. 2017).

In the 32 years between *Club Valencia* and the *Begley* cases, litigation privilege immunity was expanded to include statements made not only to those closely connected to existing litigation, but also to anyone potentially interested in contemplated litigation. There is no longer a requirement that the communication be related to the subject matter of proposed or pending litigation or be made exclusively to the parties to the litigation.

Here, the audience of the Press Conference was not merely concerned observers, as in *Seidl*. Rather, they were concerned citizens and potential plaintiffs who might "have an interest in or otherwise be connected to the suits" filed. *Aminokit*, 15CA0933 at *10. Every voter in the nation had an interest in the integrity of the Election. *See Anderson v. Celebrezze*, 460 U.S. 780, 794-95 (1983) (in the

48

context of a presidential election, "state-imposed restrictions implicate a uniquely important national interest, because the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation, and the impact of the votes cast in each State affects the votes cast in other States."). Accordingly, the litigation privilege immunized the Campaign's pre-litigation Statements directed at the American voters.

Because the Statements were directed through the media toward recipients, public and private, who might be connected to past and future litigation, investigations or lawsuits regarding election fraud, they are protected under the litigation privilege. *See Buckhannon v. US W. Communications, Inc.*, 928 P.2d 1331 (Colo. App. 1996).

The Order also cites *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036 (10th Cir. 1990), for the proposition that "unnecessary publication to the news media may result in loss of the privilege as well as publication to those wholly unconnected with the judicial process."  Order at ¶ 207.  *Kleier* is a Tenth Circuit case arising out of Oklahoma and is inapposite to this matter.  The Court in *Kleier* analyzed the Oklahoma litigation privilege, not the Colorado litigation privilege. The dispute in *Kleier* was purely a private matter, between a businessman and his company.  The statements made by the defendant in that case to the news media

"were unrelated to any official judicial function" and to "an audience wholly unconnected to the judicial process." 921 F.2d at 1044. This case is very different. The Statements were related to both ongoing and contemplated judicial proceedings, and the audience (the American electorate) was inextricably connected to those cases. The District Court erred in relying on *Kleier* as grounds to deprive the Campaign of the protections afforded by the litigation privilege.

## V.   The District Court Improperly Held the Campaign Liable for the Statements Issued by Powell as an Agent of the Campaign

### A.  Appealability

The Campaign preserved this issue by filing the Motion pursuant to C.R.C.P. 12(b)(5) and C.R.C.P. 12(b)(2) (CF, pp. 1920-21, 6438-6439) based upon the lack of evidence that Powell was acting as an agent of the Campaign at the pertinent times in question and by arguing for the dismissal of Coomer's claims against the Campaign on the same grounds during the evidentiary hearing conducted on October 13, 2021, and October 14, 2021 ("Evidentiary Hearing"). TR, p. 10/13/21 159-184.

### B.  Standard of Review

Where there is no conflict in the facts which are alleged to have created the agency, the question of the existence of an agency relationship is a question of law. *Olsen v. Vail Assocs. Real Est., Inc.*, 935 P.2d 975, 980 (Colo. 1997). A question of

50

law is reviewed *de novo*.  *Dep't of Corr., Denver Reception & Diagnostic Ctr. v. Stiles*, 477 P.3d 709, 716 (Colo. 2020).

### C.  Powell was not an Agent of the Campaign.

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his [or her] behalf and subject to his [or her] control, and consent by the other so to act." *Stortroen v. Beneficial Fin. Co.*, 736 P.2d 391, 395 (Colo.1987) (quoting Restatement (Second) of Agency § 1(1) (1957)). The existence of an agency relationship must find its source in some act or word of the principal. 7 Ill. Prac., Business Organizations § 2:2 (2d ed.).  The underlying rule of agency law is that "the party dealing with the agent…must be able to trace the authority on which he relies back to some word or deed of the principal."  Mechem on Agency (2d Ed.) §§ 210, 750.

An agency relationship cannot be established solely from the assertion of authority by an alleged agent. *Zambruk v. Perlmutter 3rd Generation Builders, Inc.*, 32 Colo. App. 276, 279 (1973).  Declarations of the agent, not in the presence of the principal, as to the existence or extent of his authority, are not admissible.  *Am. Nat. Bank of Sapulpa, Okl. v. Bartlett*, 40 F.2d 21, 23 (10th Cir. 1930).  If the agency is shown by other proof, the declarations of the agent may then be admitted, but not otherwise. *Modoc Gold Mining Co. v. Skiles*, 13 Colo. App. 293, 294 (1899).

51

The Order's findings and conclusions lack a critical element of an agency relationship – those regarding the principal. The Order does not identify any principal of the Campaign, nor does it identify the actions taken by an alleged principal which manifested consent for Powell to act as an agent of the Campaign. In fact, the District Court did not even inquire into the identity of the principal of the Campaign. Further, there are no findings that Powell agreed to act subject to the control of the Campaign or that the Campaign had a right to control Powell's actions. There are no findings as to the dates the agency relationship began and ended. There are no findings as to the extent of Powell's alleged authority to act on behalf of the Campaign.

The sole factual findings supporting the conclusion that Powell was an agent of the Campaign are: (1) declarations by agents of the Campaign, Giuliani and President Trump; (2) declarations by alleged agent, Powell; and (3) a declaration by an unrelated third party, Fox News. However, the declarations of agents do not define the agency relationship. *Zambruk,* 32 Colo. App. at 279. In fact, the declarations the District Court relied upon cannot be considered admissible evidence because the alleged agency relationship was not demonstrated by any other evidence. *See Am. Nat. Bank*, 40 F.2d at 23; *Modoc Gold Mining Co. v. Skiles*, 13 Colo. App. at 294.

Neither Giuliani nor President Trump were the principals of the Campaign.[8] As such, their statements as agents could not have created a new agency relationship for the Campaign. Likewise, Powell's statements, and statements by any other third-party, cannot create an agency relationship for the Campaign because they are not the principal.

In addition to the inadmissibility of declarations by agents to establish an agency relationship, the District Court inserted new and different meaning to Powell's deposition testimony. Powell testified that she was working alongside Giuliani during the mid-November investigation into the Election. CF, p. 10032 (21:10-13). Powell did not state that she was working for the Campaign, but only that she was aligned with the Campaign "in trying to determine what went on with the election." *Id.* at 21:16-19. Powell also clarified that she was not working on behalf of Giuliani at that time but was instead pursuing her own path. *Id.* Thus, Powell even denied the existence of an agency relationship with the Campaign's

---

[8] Campaign representative Sean Dollman testified that President Trump was a "representative of the campaign," but did not have a role in deciding what the Campaign published. CF. p. 10486 (19:19-20:2; 21:15-22:1). He testified that the communications department and the leadership team ran the Campaign. CF pp. 10486-10487 (21:24-25:1). He testified that Campaign leadership could only give someone like Giuliani authorization to speak to the public and that Campaign leadership was the campaign manager, Bill Stepien. CF, p. 10626 (17:15-20).

agent, Giuliani.  The testimony cited in the Order does not support the conclusion that Powell was acting as an agent of the Campaign.

Importantly, the Order does not recognize the testimony under oath by Giuliani, Powell and/or the Campaign's C.R.C.P. 30(b)(6) witness, Sean Dollman, universally denying Powell was an agent of the Campaign.  When asked which individuals were counsel to the Campaign, Giuliani testified that "Sidney Powell had not been."  CF, p. 9959 (24:3-17).  In fact, Giuliani testified Powell operated independently from the Campaign. CF, p. 9970 (66:19-67:3).

During Powell's deposition, she was asked whether she attended the Press Conference on behalf of the Campaign. CF, p. 10042 (60:9-12).  Powell denied and testified that, rather, her attendance was requested by Jenna Ellis on behalf of Giuliani. CF, p. 10042 (59:21-60:1).

Critically, Mr. Dollman testified that Powell was not a lawyer for the Campaign.  CF, p. 10630 (31:18-25).  Further, when asked who would give authorization for someone to speak publicly on behalf of the Campaign, like Giuliani, Mr. Dollman responded "campaign leadership." CF, p. 10626 (17:15-17).  Mr. Dollman then specified that such authorizing person would be Bill Stepien.  CF, p. 10626 (17:17-20).

None of this testimony was acknowledged in the Order.

The conclusions drawn by the District Court lack legal support and ignore the evidence proving Powell was not an agent of the Campaign when she issued the Statements.  Therefore, the District Court's legal conclusion cannot stand.

### D. Even assuming, *arguendo*, Powell was an agent of the Campaign, the agency relationship lasted only from November 14, 2020, at the earliest, until November 22, 2020.

Assuming an agency relationship was created between Powell and the Campaign, the agency relationship only existed from either November 14, 2020, or November 19, 2020, through November 22, 2020.  As such, the Campaign is only liable for the actions of Powell during the existence of that agency relationship.

An agent's "[a]uthority terminates if the principal or agent manifests to the other dissent to its continuance."  Restatement (Second) of Agency, §118.  This Restatement has been adopted by the Colorado courts.  *Miller v. Warner Literary Grp., LLC*, No. 12-CV-2871-WJM-KLM, 2013 WL 360012, at *2 (D. Colo. Jan. 30, 2013).

Although the Order does not specify when Powell's alleged agency began, the earliest dates identified in the Order are November 14, and November 19, 2020. Assuming, *arguendo*, Powell became an agent of the Campaign following the Tweet, or Giuliani and Powell's statements at the November 19 Press Conference, Powell ceased being an agent of the Campaign on November 22, 2020, when Giuliani and

Ms. Ellis publicly stated that Powell "is not a member of the Trump legal team." CF, p. 12993.  Powell subsequently issued a statement that, "I agree with the statement today.  I will represent #wethepeople and seek the truth."  CF, p. 12994. Powell's public statement that she was not a representative of the Campaign terminated any agency relationship.  Accordingly, the Campaign is only *arguably* vicariously liable for Powell's conduct from November 14 or 19, 2020, as the Court may determine, through November 22, 2020, if at all.

To avoid doubt, to the extent any Powell Statements could arguably be attributed to the campaign (for the reasons above, they cannot), they would be limited to the following:

- Powell's statements at the November 19, 2020, press conference. CF, pp. 96-167.

- Powell's statements on the November 20, 2020, Howie Carr Show. CF, p. 10150.

- Powell's statements on the November 20, 2020, Fox News Morning show. CF, p. 10151.

Any statements made by Powell prior to or after the limited duration of the agency relationship cannot be attributed to the Campaign.

## VI.   The District Court Erred in Finding Coomer Was Likely to Prevail On His Intentional Infliction of Emotional Distress ("IIED") Claim

### A. Appealability

The Campaign preserved this issue by (i) filing the Motion pursuant to C.R.C.P. 12(b)(5) and C.R.C.P. 12(b)(2) based upon Plaintiff's failure to allege necessary elements for his IIED claim (CF, pp. 1916-1917); and (ii) filing its Special Motion to Dismiss pursuant C.R.S. § 13-20-1101 (CF, pp. 18-19).

### B.  Standard of Review

A *de novo* standard of review applies to an anti-SLAPP motion decision.  *See* Section III.B above.  Moreover, "whether reasonable persons could differ the outrageousness issue is a question of law and is subject to *de novo* review."  *See Green v. Qwest Servs., Corp.*, 155 P.3d 383, 385 (Colo. App. 2006).

### C.  Coomer's IIED Claim is an Impermissible End-run Around the Applicable Burden of Proof

The Order fails to take into account Coomer's heightened burden of proof by finding, "Plaintiff has put forth prima facie evidence the Trump Campaign engaged in extreme and outrageous conduct."  Order at ¶ 256.  While the actual malice standard is ordinarily discussed with respect to defamation actions, Colorado courts have held that alternative torts cannot be used to evade constitutional requirements for defamation actions.   *See e.g., Fry v. Lee*, 408 P.3d 843, 855 (Colo. App. 2013); *Lewis v. McGraw-Hill Broadcasting Co., 832 P.2d 1118*, 1124 (Colo. App. 1992) (affirming summary judgment dismissing negligence and infliction of emotional distress claims based on defamation claim's failure to show actual malice.); *see also*

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988) ("public figures...may not recover for the tort of intentional infliction of emotional distress by reason of publications...without showing in addition that the publication contains a false statement of fact which was made with 'actual malice'"); *Miles v. Ramsey*, 31 F. Supp. 2d 869, 880 (D. Colo. 1998) (dismissing the plaintiff's ancillary tort claims related to failed defamation claim).

"Plaintiff may not avoid the strictures of defamation law by artfully pleading their defamation claims to sound in other areas of tort law." *Vackar v. Package Mach. Co.*, 841 F. Supp. 310, 315 (N.D. Cal. 1993). First Amendment limitations on defamation claims "apply equally to ancillary tort claims which might arise from the publication of an allegedly defamatory statement." *Lewis*, 832 P.2d at 1124–25.

Regardless of how they are characterized, Coomer's ancillary claims are subject to the anti-SLAPP statute since they are predicated on the Statements. As set forth above, Coomer presented no evidence that the Campaign acted with actual malice (much less clear and convincing, admissible evidence). The District Court erred in denying the Motion based only on a finding that the Coomer presented prima facie evidence because it failed to account for Coomer's heightened burden of proof. The Campaign had evidence to support the Statements, including a first-hand witness affidavit. The Statements were investigated by professional investigators.

The Campaign reviewed Coomer's Facebook posts and Oltmann's allegations were nationally reported prior to the time of the Statements.

Because Coomer failed to present clear and convincing evidence establishing a reasonable likelihood (not merely prima facie evidence) that the Campaign acted with actual malice, his IIED claim likewise fails and must be dismissed pursuant to C.R.S. § 13-20-1101.

### VII. The District Court Erred in Finding Coomer Was Likely to Prevail On His Civil Conspiracy Claim

#### A. Appealability

The Campaign preserved this issue in its Motion pursuant to C.R.C.P. 12(b)(5) and C.R.C.P. 12(b)(2) based upon Coomer's failure to assert a legal claim for civil conspiracy (CF, pp. 1917-1919).

#### B. Standard of Review

The Standard of Review is the same as Section III.B above.

#### C. Civil Conspiracy is not Independently Actionable

Civil conspiracy is not an independently actionable cause of action. *Colorado Community Bank v. Hoffman*, 338 P.3d 390, 397 (Colo. App. 2011) (*citing Bd. Of Cnty. Comm's v. Park Cnty. Sportsman Ranch, LLP*, 271 P.3d 562, 572 (Colo. App. 2013)). Conspiracy claims are derivative of other actionable tort claims. *Id.* To prevail on a civil conspiracy claim, Coomer must prove the Campaign had a meeting

of the minds with other Defendants to engage in the allegedly tortious conduct. *See Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995).

Coomer failed to present any evidence of a conspiracy and failed to present a prima facie case on the other claims from which Coomer's conspiracy claim derives. The District Court's conspiracy finding as to the Campaign consists of a single paragraph, in which the Court combined all Defendants (other than Oltmann) and summarily found that they "cooperated and fed off one another." Order at ¶ 273. The District Court did not cite a single piece of evidence in support of this conclusion and pointed to no evidence of an agreement between the Campaign and any other party.

To establish a reasonable likelihood of prevailing on his conspiracy claim, Coomer must put forth evidence of *an agreement* on a course of conduct. The court cannot "infer the agreement necessary to form a conspiracy; evidence of such an agreement must be presented by the plaintiff." *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995); *see also More v. Johnson*, 568 P.2d 437, 440 (Colo. 1997). Simply making similar Statements on a matter of widespread public concern and contained in numerous contemporaneous press accounts is insufficient evidence of any agreement among the speakers.

Notably, in another case arising from the Election, the U.S. District Court for the District of Columbia dismissed a conspiracy claim where the counterclaimant "fail[ed] to adequately allege an agreement." *US Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420, *7 (D.D.C. May 19, 2022).

Even under the lower standard for a motion to dismiss for failure to state a claim pursuant C.R.C.P. 12(b)(5), Coomer must be able to point to some "events, conversations, or documents indicating an agreement or meeting of the minds among the alleged co-conspirators." *Id.* Coomer made no such allegations and the Order cited none. Indeed, no such events, conversations, or documents exist in the record.

The only evidence presented by Coomer to support a conspiracy claim is that of Defendants' shared ideology and an objective of challenging the Election. By this logic there are tens of thousands of co-conspirators across the nation targeting Coomer.

Coomer claims that republishing Oltmann's allegations might have been helpful toward that objective. These bare assertions are insufficient to prove a "meeting of the minds" and thus, Coomer's conspiracy claim fails as a matter of law. *See United States ex rel. PCA Integrity Assocs., LLC v. NCO Fin. Sys., Inc.*, No. 15-750 (RC), 2020WL686009, *30 (D.D.C. Feb. 11, 2020) (dismissing conspiracy

61

claim subject to heightened pleading standard where, like here, plaintiff only alleged a shared conspiratorial objective).

### VIII. The District Court Erred in Finding Coomer Was Likely to Prevail on His Claim for Injunctive Relief

#### A. Appealability

The Campaign preserved this issue in its Motion pursuant to C.R.C.P. 12(b)(5) and C.R.C.P. 12(b)(2) (CF, p. 1921, 1926).

#### B. Standard of Review

The Standard of Review is the same as Section III.B above.  Moreover, "review of a permanent injunction order presents a mixed question of law and fact…. We review questions of law *de novo*." *Korean New Life Methodist Church v. Korean Methodist Church of the Americas*, 474 P.3d 143, 149 (Colo. App. 2020) (internal citations omitted).

#### C. Coomer is not Entitled to Injunctive Relief

An injunction is not a claim for relief, but a remedy ancillary to a substantive claim upon which a litigant prevails on the merits or, in the case of a preliminary injunction, shows a likelihood of prevailing.  *See Dallman v. Rifter*, 225 P.3d 619, 621, n.11 (Colo. App. 2010); *Wibby v. Boulder Cty. Bd. Of Cty. Commissioners*, 409 P.3d 516, 519, n.2 (Colo. App. 2016).

4861-3517-4462.v2

Despite the facts that a request for injunctive relief is not a claim and Coomer has yet to file a motion for injunctive relief, the District Court held that Coomer is entitled to injunctive relief.  Order, ¶ 280.  The Campaign correctly argued that a claim for injunctive relief is not a separate claim for relief.  Even if it were, though, it is unclear what the relief would be.  No court may order the Campaign to issue a retraction. *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943). The Campaign cannot "remove" statements made at the Press Conference, and it has no ability to "remove" statements made on Twitter and in other publications over which it has no control.

The relief requested by the Coomer is simply impossible and, therefore, must be denied. At the very least, it was premature for the District Court to substantively analyze this "claim" for relief, since the Campaign had not yet been given an opportunity to present argument on why the harm resulting from the requested injunctive relief would outweigh any harm to Coomer.

## CONCLUSION

For the reasons above, this Court should reverse the District Court's Order and direct the District Court to enter a new order granting the Campaign's Motion in its entirety and awarding the Campaign its reasonable attorneys' fees and costs incurred below and for this appeal as allowed under C.R.S. § 13-20-1101(4)(a).

4861-3517-4462.v2

## REQUEST FOR ATTORNEYS' FEES

Pursuant to C.R.S. § 13-20-1101(4), the Campaign requests an award of attorney fees and costs incurred in this matter to be proven later.

Respectfully submitted this 8th day of November 2022.

JACKSON KELLY PLLC


/s/ John S. Zakhem
John S. Zakhem, #30089
Eric R. Holway, #49263
Andrew C. Nickel, #45235
Nicole B. Grimmesey, #55217
*Attorneys for Donald J. Trump for President, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of November, 2022, a true and correct copy of the foregoing was served via the Colorado Court's E-Filing system, on the following:

Charles J. Cain, Esq.
Bradley A. Kloewer, Esq.
Cain & Skarnulis, PLLC
P. O. Box 1064
Salida, Colorado 81201
ccain@cstrial.com
bkloewer@cstrial.com
*Attorneys for Plaintiff-Appellee*

Thomas M. Rogers III, Esq.
Mark Grueskin, Esq.
Andrew E. Ho, Esq.
Recht Kornfeld, PC
1600 Stout Street, Suite 1400
Denver, Colorado 80202
trey@rklawpc.com
mark@rklawpc.com
andrew@rklawpc.com
*Attorneys for Plaintiff-Appellee*

Barry K. Arrington, Esq.
Shaun Pearman, Esq.
Arrington Law Firm
3801 East Florida Ave., Suite 830
Denver, CO 80210
*Attorneys for Defendants-Appellants Sidney Powell and Sidney Powell, P.C.*

Michael W. Reagor, Esq.
Christopher P. Seerveld, Esq.
Dymond Reagor, PLLC
8400 E. Prentice Ave., Suite 1040
Greenwood Village, CO 80111
*Attorneys for Defendant-Appellant Defending the Republic, Inc.*

4861-3517-4462.v2

Richard A. Westfall, Esq.
Westfall Law, LLC
5842 W. Marquette Drive
Denver, Colorado 80235
rwestfall@westfall.law
*Attorneys for Defendant-Appellant*
*Herring Networks Inc. d/b/a One*
*America News Network*

Blaine C. Kimrey, Esq.
Jeanah Park, Esq.
Bryan K. Clark, Esq.
Julia L. Koechley, Esq.
Vedder Price P.C.
222 N. LaSalle Street, Suite 2600
Chicago, Illinois 60601
bkimrey@vedderprice.com
jpark@vedderprice.com
bclark@vedderprice.com
jkoechley@vedderprice.com
*Attorneys for Defendant-Appellant*
*Herring Networks Inc. d/b/a One*
*America News Network*

In addition, I hereby certify that a true and correct copy of the foregoing was served via U.S. Mail, on the following:

Steve Skarnulis, No. 21PHV6401
Zachary H. Bowman, No. 21PHV6676
Cain & Skarnulis, PLLC
P. O. Box 1064
Salida, Colorado 81201
skarnulis@cstrial.com
zbowman@cstrial.com
*Attorneys for Plaintiff-Appellee*

Clerk of the Court
District Court, City and County of
Denver, Colorado
1437 Bannock Street
Denver, CO 80202

*/s/ Andrew C. Nickel*
Andrew Nickel

| | |
|---|---|
| COLORADO COURT OF APPEALS<br>2 EAST 14TH AVENUE<br>DENVER, CO 80203<br><br>APPEAL | DATE FILED: January 10, 2023 9:35 PM<br>FILING ID: 23FF9AF3DBF53<br>CASE NUMBER: 2022CA843 |
| **Plaintiff-Appellee:**<br>ERIC COOMER,<br><br>vs.<br><br>**Defendants-Appellants:**<br><br>HERRING NETWORKS, INC., et al | ▲ **COURT USE ONLY** ▲ |
| *Attorneys for Defendant-Appellants James Hoft and TGP Communications, LLC:*<br>Law Offices of Randy B. Corporon<br>Randy B. Corporon, Reg. No. 29861<br>S. Parker Road, Suite 555<br>Aurora, Colorado 80014<br>Telephone: 303-749-0062<br>E-Mail: rbc@corporonlaw.com<br><br>Jonathon Burns, #21PHV6433<br>Burns Law Firm<br>P.O. Box 191250<br>St. Louis, MO 63119<br>Telephone: 314-329-5040<br>Email: TBLF@pm.me | Court of Appeals Case Numbers:<br>2022CA879 |

### OPENING BRIEF OF DEFENDANTS-APPELLANTS JAMES HOFT AND TGP COMMUNICATIONS, LLC, D/B/A THE GATEWAY PUNDIT

Defendants TGP Communications, LLC ("TGP") and James "Jim" Hoft ("Hoft") join and incorporate the amended briefs of defendants Herring Networks, Inc., d/b/a One America News Network ("OAN") and Chanel Rion ("Rion"), Eric Metaxas ("Metaxas") and Joseph Oltmann ("Oltmann") as though fully restated and set forth herein.

# I.     CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with all requirements of C.A.R. 28 or C.A.R. 28.1, and C.A.R. 32, including all formatting requirements set forth in these rules. Specifically, the undersigned certifies that:

**The brief complies with the applicable word limits set forth in C.A.R. 28(g) or C.A.R. 28.1(g).**

- It contains **10,436 words**, exclusive of caption, certificate of compliance, table of contents, signature block, and certificate of service.

**The brief complies with the standard of review requirements set forth in C.A.R. 28(a)(7)(A) and/or C.A.R. 28(b).**

- For each issue raised by the appellant, the brief contains under a separate heading before the discussion of the issue, a concise statement: (1) of the applicable standard of appellate review; and (2) whether the issue was preserved, and, if preserved, the precise location in the record where the issue was raised and where the court ruled, not to an entire document.

**I acknowledge that my brief may be stricken if it fails to comply with any of the requirements of C.A.R. 28 or 28.1, and C.A.R. 32.**

*/s/ John C. Burns*

# II.   TABLE OF CONTENTS

**Page**

I. CERTIFICATE OF COMPLIANCE ........................................................................ i

II. TABLE OF CONTENTS ................................................................................. ii

III. TABLE OF AUTHORITIES ........................................................................... vi

IV. STATEMENT OF ISSUES PRESENTED FOR REVIEW ............................... 1

V. STATEMENT OF THE CASE ......................................................................... 14

    A.    Coomer's lawsuit ....................................................................... 14

    B.    Coomer in the public spotlight ................................................. 15

    C.    The antifa call ........................................................................... 16

    D.    Coomer's Facebook posts ......................................................... 16

    E.    The statements made by TGP and/or Hoft ............................... 18

    F.    The District Court litigation ..................................................... 20

VI. SUMMARY OF ARGUMENT ........................................................................ 21

VII. ARGUMENT ................................................................................................. 24

    A.    The District Court reversibly erred in applying the wrong standard of proof ....................................................................... 24

        1.    The standard of review is *de novo* on this preserved issue ...... 24

        2.    The District Court should have applied the clear and convincing standard of proof but did not ............................... 24

    B.    The District Court reversibly erred by improperly substituting itself as fact finder and improperly judging credibility ...................... 25

        1.    The standard of review is *de novo* on this preserved issue ...... 25

        2.    The District Court viewed facts in Coomer's favor and judged credibility ................................................................. 25

    C.    The District Court reversibly erred in relying on inadmissible evidence .................................................................................... 29

        1.    The standard of review is *de novo* on this preserved issue ...... 30

        2.    The District Court relied on inadmissible evidence ................. 30

# TABLE OF CONTENTS
## (continued)

Page

D. The District Court reversibly erred in denying TGP and Hoft anti-SLAPP relief on Coomer's defamation claim (Cause of Action A) ........................................................................ 31

    1. The standard of review is *de novo* on these preserved issues ........................................................................ 32

    2. The District Court reversibly erred in failing to apply the *in haec verba* doctrine, in considering allegedly defamatory statements not asserted in the operative complaint, and in lumping all allegedly defamatory statements by all defendants-appellants into three generalized and inaccurate categories ..................................... 32

    3. The District Court reversibly erred in finding sufficient admissible evidence of actual malice...................................... 34

    4. The District Court reversibly erred in finding the statements at issue false............................................................ 37

    5. The District Court reversibly erred in failing to apply the substantial truth doctrine............................................................ 37

    6. The District Court reversibly erred in finding statements capable of defamatory meaning ................................................ 38

    7. The District Court reversibly erred in deeming Coomer a private figure, finding Coomer's claim not barred by the incremental harm doctrine, and finding sufficient evidence of actual damages ...................................................... 39

    8. The District Court reversibly erred in denying TGP and Hoft's special motion to dismiss as to Coomer's defamation claim (cause of action A) because TGP is a political opinion blog, Hoft is an opinion blogger, and their statements were obviously opinions……………….........45

E. The District Court reversibly erred in finding Coomer had pled or supported with admissible evidence sufficiently outrageous conduct for intentional infliction of emotional distress (Cause of Action B) ........................................................................ 51

    1. The standard of review is *de novo* on this preserved issue ...... 51

## TABLE OF CONTENTS
### (continued)

Page

2.    As a matter of law, the conduct of Hoft and Hoft was
      not outrageous, they did not act with actual malice, and
      Coomer has not demonstrated emotional distress .................... 52

F.    The District Court reversibly erred in finding Coomer had
      sufficiently pled or submitted sufficient admissible evidence of
      a conspiracy (Cause of Action C) ...................................................... 55

  1.    The standard of review is *de novo* on this preserved issue ...... 55

  2.    A conspiracy requires an agreement among alleged co-
        conspirators, and no admissible evidence showed such an
        agreement ................................................................................. 55

G.    The District Court reversibly erred in denying TGP and Hoft
      anti-SLAPP relief on Coomer's injunctive relief claim (Cause
      of Action D) .......................................................................................... 56

  1.    The standard of review is *de novo* on this preserved issue ...... 56

  2.    Injunctive relief is not a separate claim, and Coomer
        never moved for or otherwise justified an injunction ............. 57

H.    The District Court reversibly erred in granting discovery and
      then in granting it in a one-way, inequitable fashion ......................... 59

  1.    The standard of review is an abuse of discretion on this
        preserved issue ....................................................................... 59

  2.    The District Court erred in *sua sponte* reversing the prior
        judge's denial of discovery and then erred again in
        almost completely denying discovery to the defendants ......... 59

## TABLE OF CONTENTS
(continued)

**Page**

VIII. CONCLUSION .............................................................................................. 64

IX. FEE REQUEST ............................................................................................... 65

## III.   TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aspen Props. Co. v. Preble*,
   780 P.2d 57 (Colo. App. 1989) .......................................................................... 63

*Averill v. Superior Court*,
   42 Cal. App. 4th 1170 (1996)............................................................................. 45

*Barker v. Fox & Associates*,
   240 Cal. App. 4th 333 (2015)............................................................................. 45

*Colorado Community Bank v. Hoffman*,
   338 P. 3d 390 (Colo. App. 2013) ....................................................................... 56

*Corporon v. Safeway Stores, Inc.*,
   708 P.2d 1385 (Colo. App. 1985) .............................................................. 18, 33

*Curtis Publ'g Co. v. Butts*,
   388 U.S. 130 (1967)........................................................................... ………34

*Diversified Management, Inc. v. Denver Post, Inc.*,
   653 P.2d 1103 (Colo. 1982) ....................................................... …..25

*Ehrlich Feedlot, Inc. v. Oldenburg*,
   140 P.3d 265 (Colo. App. 2006) ....................................................................... 61

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)……………………………………………………40, 41, 44

*Green v. Qwest Servs. Corp.*,
   155 P.3d 383 (Colo. App. 2006) ....................................................................... 52

*Hussain v. Palmer Commc'ns Inc.*,
   60 F. App'x 747 (10th Cir. 2003)....................................................................... 53

*Hustler Magazine, Inc. v. Falwell,*
  485 U.S. 46 (1988) ................................................................. 54

*Int'l Acad. of Bus. & Fin. Mgmt., Ltd. v. Mentz,*
  2013 WL 212640 (D. Colo. Jan. 18, 2013) ....................................... 33

*Jones v. Scripps Media, Inc.,*
  2017 WL 1230481 (E.D. Mich. Apr. 4, 2017) .................................. 54

*Keading v. Keading,*
  60 Cal. App. 5th 1115 (2021) ................................................... 59

*Keohane v. Stewart,*
  882 P.2d 1293 (Colo. 1994) ..................................................... 44

*Korean New Life Methodist Church v. Korean Methodist Church of
  the Americas,* 474 P.3d 143 (Colo. App. 2020) ................................. 57

*Lawson v. Stow,*
  327 P.3d 340 (Colo. App. 2014) ............................................ …..32

*Lewis v. McGraw-Hill Broadcasting Co.,*
  832 P.2d 1118 (Colo. App. 1992) ............................................... 40

*L.S.S. v. S.A.P.,*
  2022 COA 123 .......................................................... ………24, 26

*People ex rel. Lockyer v. Brar,*
  115 Cal. App. 4th 1315 (2004) .................................................. 62

*Mackall v. JPMorgan Chase Bank, N.A.,*
356 P.3d 946 (Colo. App. 2014) ..................................................... …   51

*Metabolife Int'l, Inc. v. Wornick,*
  264 F.3d 832 (9th Cir. 2001) .................................................... 59

*NBC Subsidiary (KCNC-TV), Inc. v. Living Will Ctr.,*
  879 P.2d 6 (Colo. 1994) ........................................................ 31

*Nelson v. Elway*,
   908 P.2d 102 (Colo. 1995) ................................................................. 55

*Salazar v. Pub. Tr. Inst.*,
   2022 COA 109 ....................................................................... …..23, 25

*Sanders v. Superior Court*,
   34 Cal. App. 3d 270 (1973)............................................................... 62

*Seelig v. Infinity Broad. Corp.*,
   97 Cal. App. 4th 798 (2002).............................................................. 38

*Sumler v. Dist. Court*,
   889 P.2d 50 (Colo. 1995) .................................................................. 60

*Swartzman v. Superior Court In and For Los Angeles County*,
   231 Cal. App. 2d 195 (1964) .............................................. ………...58

*Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*,
   434 P.3d 1152 (Cal. 2019) ......................................................... …..29

*Tonnessen v. Denver Pub. Co.*,
   5 P.3d 959 (Colo. App. 2000) ..................................................... …..41

*US Dominion, Inc. v. MyPillow, Inc.*,
   2022 WL 1597420 (D.D.C. May 19, 2022) ...................................... 55

*Walters v. Linhof*,
   559 F. Supp. 1231 (D. Colo. 1983) ............................................ 17, 32

*Weinstein v. Bullick*,
   827 F. Supp. 1193 (E.D. Pa. 1993) ................................................... 53

*Wibby v. Boulder County Board of County Commissioners*,
   409 P.3d 516 (Colo. App. 2016) ....................................................... 57

*Zueger v. Goss*,
   2014 COA 61 ..................................................................................... 31

**Statutes**

C.R.S. § 13-17-101 .................................................................................. 62

C.R.S. § 13-20-1101 .................................................................. 23, 24, 60, 64

C.R.S. § 13-17-103 .................................................................................. 62

## IV.   STATEMENT OF ISSUES PRESENTED

1.    Whether the District Court reversibly erred in applying the wrong standard of proof in analyzing whether dismissal was appropriate under the Colorado anti-SLAPP statute.

2.    Whether the District Court reversibly erred by improperly substituting itself as fact finder and improperly judging credibility.

3.    Whether the District Court reversibly erred in relying on inadmissible evidence.

4.    Whether the District Court reversibly erred in denying anti-SLAPP relief on the defamation claim (Cause of Action A).

      a.    Whether the District Court reversibly erred in failing to apply the *in haec verba* doctrine.

      b.    Whether the District Court reversibly erred in failing to apply the "of and concerning" doctrine.

      c.    Whether the District Court reversibly erred in finding sufficient admissible evidence of actual malice.

      d.    Whether the District Court reversibly erred in finding sufficient evidence of falsity.

     e.     Whether the District Court reversibly erred in failing to apply the substantial truth doctrine.

     f.     Whether the District Court reversibly erred in finding certain statements capable of defamatory meaning.

     g.     Whether the District Court reversibly erred in finding Coomer a private figure.

     h.     Whether the District Court reversibly erred in finding Coomer's defamation claim not barred by the incremental harm doctrine.

     i.     Whether the District Court reversibly erred in finding that actual damages had been adequately pled or supported by sufficient evidence.

     j.     Whether the District Court reversibly erred in finding TGP/Hoft's statements to not be protected opinion and/or rhetorical hyperbole.

5.     Whether the District Court reversibly erred in finding Coomer had pled or supported with admissible evidence sufficiently outrageous conduct for the intentional infliction of emotional distress claim (Cause of Action B).

6.     Whether the District Court reversibly erred in finding Coomer had sufficiently pled or submitted sufficient admissible evidence of a conspiracy (Cause of Action C).

7.      Whether the District Court reversibly erred in denying anti-SLAPP relief on Coomer's injunctive relief count (Cause of Action D).

8.      Whether the District Court reversibly erred in granting discovery and then in granting it in a one-way, inequitable fashion.

## V.      STATEMENT OF THE CASE

### A.      Coomer's lawsuit

On December 23, 2020, plaintiff Eric Coomer sued 15 defendants, including TGP Communications, LLC, d/b/a The Gateway Pundit ("TGP"), and TGP publisher Jim Hoft ("Hoft"), claiming Coomer was defamed in news coverage, pleadings, podcasts, etc., that reported statements that someone claiming to be Coomer allegedly made on a conference call.  On February 4, 2021, Coomer filed his First Amended Complaint (CF p. 151, "Complaint" or "Compl."), asserting claims against TGP and Hoft for defamation (Cause of Action A), intentional infliction of emotional distress ("IIED") (Cause of Action B), conspiracy (Cause of Action C), and injunctive relief (Cause of Action D).

Coomer alleges he was defamed by statements by defendant-appellant Joseph Oltmann that in late September 2020, Oltmann heard someone who was identified as "Eric from Dominion" say during a conference call among antifa leaders that the other callers should not worry about "[w]hat are we gonna do if f-ing Trump wins?" the upcoming presidential election because "Trump is not gonna win. I made f-ing sure of that. Hahahaha." (Compl. ¶ 52).

Oltmann Google-searched for "Eric," "Dominion," and "Denver, Colorado" and discovered Coomer was the Director of Product Strategy and Security for Dominion Voting Systems. (Compl. ¶ 52). Dominion is one of the country's largest voting machine vendors; according to Coomer's lawsuit, "Dominion provided election related services to at least thirty different states during the 2020 presidential election." (Compl. ¶ 45).

Coomer alleges that among many media appearances, Oltmann appeared on TGP in a report hosted by Hoft in which Oltmann recounted the conference call and described his subsequent research into Coomer. (Compl. ¶ 60). Coomer also alleges that Hoft and TGP authored a number of articles based largely upon Oltmann's allegations.

**B.    Coomer in the public spotlight**

Defendant-Appellants Jim Hoft and TGP Communications, LLC, d/b/a The Gateway Pundit adopt and incorporate Sections V.B., V.C., V.F.,   from statement of the case as presented in Defendant-Appellants Herring Networks, Inc., d/b/a One America News Network, and Chanel Rion's Amended Opening Brief, as though fully restated and set-forth, herein.

**C.    The antifa call[1]**

**D.    Coomer's Facebook posts**

After the call in which Oltmann believes he heard someone identified as Coomer speak, Oltmann gained access to Coomer's Facebook page.  That Facebook page revealed numerous radical, profane, violent posts showing Coomer's deep loathing of Trump and sympathy for antifa. *See* Deposition of Eric Coomer (CF p. 14,478 ("Coomer Dep.")), Exh. P23.  The Facebook posts confirmed that Coomer held views consistent with the comment Oltmann claims to have heard on the call. *See* Deposition of James Hoft (Supplement to Court File ("Hoft Dep.")), 26:15-17; 37:17-18; 72:14-20; 97:16-21; 101: 9-17.  For instance, on July 21, 2016, Coomer published on Facebook to approximately 300 "friends" that "[o]nly an absolute FUCKING IDIOT could ever vote for that wind- bag fuck-tard FASCIST RACIST FUCK" and stated that his opinions were his own and "not necessarily the thoughts of my employer, though if not, I should probably find another job . . . Who wants to

---

[1] *See* section V.C., *supra.*

14

work for complete morons?"  Hoft Dep., 123:1-14 (discussing Ex. A); *see also* Hoft Dep., Exh. A, p. 210-231, esp. p. 218-19.

On December 8, 2020, Coomer authored a guest editorial in *The Denver Post*. Coomer Dep., CF p. 14,534 Exh. P. 19.  He wrote: "***[A]ny posts*** on social media channels purporting to be from me ***have also been fabricated***."  *Id.*  (Emphasis added).  Coomer reiterated in an *Ark Valley Voice* interview that "his Facebook account was dormant for about three and a half years, until the George Floyd murder. At that point he began posting here and there.  ***He was not the author of the wild posts being circulated***."  *See* Jan Wondra, Court Filing Reveals Trump's Voter Fraud Claim Was a Big Lie From The Beginning, ARK VALLEY VOICE, Sept. 23, 2021, available at https://arkvalleyvoice.com/court-filing-reveals-trumps-voter-fraud-claim-was-a-big-lie-from-the-beginning/ (last visited October 21, 2022) (emphasis added), cited at CF p. 12,165.

But on August 24, 2021, *New York Times Magazine* published a devastating admission from Coomer in a profile about him: "***the Facebook posts were, in fact, authentic***."  Coomer Dep., CF p. 14,522 Exh. P18.  (emphasis added).  Coomer told the *Times* that "he believed every word of what he said on Facebook, but when colleagues later asked him what he was thinking, he was frank: He ***had screwed up***." *Id.* (Emphasis added.)  This means not only that the Facebook posts providing factual background for the segments published by TGP and Hoft were accurate, but also that

15

Coomer had lied about them to curtail the fallout.

**E.      The statements made by TGP and/or Hoft**

Because Coomer failed to plead specifically alleged libelous statements of

TGP/Hoft *in haec verba*, TGP and Hoft filed a Motion for More Definite Statement.  In

his Response,[2] Coomer refused to plead *in haec verba*, but nevertheless clarified that

the sole statements at issue in The Complaint were the following articles by TGP and/or

Hoft:[3]

1.      *IT WAS SYSTEMIC-PURPOSEFUL FRAUD: Clark County Nevada*
*Dominion Machines ALSO Kicked out "About 70% of Ballots" – It Was in the*
*Settings!*, Jim Hoft, The Gateway Pundit, Dec. 15, 2020.  See TGP/Hoft Anti-SLAPP
Reply Exhibit 600 (CF p. 14382). **Notably, this article does not ever mention Eric**
**Coomer.**

2.      *New Detailed Inventory on Election Fraud in the 2020 Election by Deroy*
*Murdock Provides Strong Evidence on President Trump's Performance in All the*
*Swing States and Overall Race*, Joe Hoft, The Gateway Pundit, Jan. 9, 2021.  See

---

[2] CF p. 7169-170

[3] Coomer's Response, through the "Defamatory Statement Spreadsheet," attempts
to increase the number of allegedly defamatory statements at issue, but this is not
appropriate.  The content of the allegedly defamatory statement must be ***pled*** with
particularity in the complaint.  *See, e.g., Corporon v. Safeway Stores, Inc*., 708 P.2d
1385, 1390 (Colo. App. 1985); *Walters v. Linhof*, 559 F. Supp. 1231, 1234 (D. Colo.
1983).

TGP/Hoft Anti-SLAPP Reply Exhibit 600 (CF p. 14382).  **Notably, this article <u>does</u> <u>not</u> ever mention Eric Coomer.**

3.     *BREAKING EXCLUSIVE: Accurate List of 2020 Election Fraud Cases Shows 81 Cases Total, 30 Still Active – And NOT ONE SINGLE COURT Has Allowed Evidence to be Argued*, Joe Hoft, The Gateway Pundit, Jan. 24, 2021. See TGP/Hoft Anti-SLAPP Reply Exhibit 600 (CF p. 14382).  **Notably, this article <u>does not</u> ever mention Eric Coomer.**

4.     *Dominion Voting Systems Officer of Strategy and SECURITY Eric Coomer Admitted in 2016 Vendors and Election Officials Have Access to Manipulate the Vote*, Jim Hoft, The Gateway Pundit, Nov. 13, 2020. See TGP/Hoft Anti-SLAPP Reply Exhibit 601 (CF p. 14401).

5.     *Report: Anti-Trump Dominion Voting Systems Security Chief Was Participating in Antifa Calls, Posted Antifa Manifesto Letter to Trump Online*, Jim Hoft, Nov. 14, 2020.  See TGP/Hoft Anti-SLAPP Reply Exhibit 601 (CF p. 14401).

6.     *Denver Business Owner: Dominion's Eric Coomer Is an Unhinged Sociopath — His Internet Profile Is Being Deleted and Erased (AUDIO)*, Jim Hoft, The Gateway Pundit, Nov. 16, 2020.  See TGP/Hoft Anti-SLAPP Reply Exhibit 601 (CF p. 14401).

7.     *WAKE UP AMERICA! Bold Billionaire Offers $1 Million Bounty for Dominion's, Eric Coomer's Comeuppance*, Jim Hoft, The Gateway Pundit, Dec. 28,

2020. See TGP/Hoft Anti-SLAPP Reply Exhibit 601 (CF p. 14401).

8.    *New Video Shows Dominion's Eric Coomer Admitting Their Voting Machine Systems Are Wireless and Support All Networks*, Jim Hoft, The Gateway Pundit, Jan. 3, 2020.  See TGP/Hoft Anti-SLAPP Reply Exhibit 601 (CF p. 14401).

9.    *REPORT: Georgia Secretary of State Brad Raffensperger Neglected to Protect Georgians By Allowing Dominion Voting Machines in Elections – He Didn't Prevent Fraud – He Provided for It*, Joe Hoft, The Gateway Pundit, Jan. 4, 2020. See TGP/Hoft Anti-SLAPP Reply Exhibit 601 (CF p. 14401).

10.   **Coomer has not pled any statements *in haec verba***, but rather he has made generalized allegations that TGP and Hoft made or implied the following statements – that Dr. Coomer participated in an Antifa conference call and that Dr. Coomer stated on that call his intent to fraudulently elect the president of the United States. Response to Motion for More Definite Statement, CF p. 7169-170.

## F.    The District Court litigation[4]

### VI.    SUMMARY OF ARGUMENT

In denying TGP's and Hoft's anti-SLAPP motion, the District Court was consumed by preconceived narratives about events in the national spotlight in late 2020 and early 2021.  But none of that has ***any*** relevance to determining whether Coomer can present clear and convincing admissible evidence that TGP and Hoft

---

[4] *See* section V.B., *supra.*

defamed him.  The District Court, at Coomer's urging, apparently wanted to make this case about something more, attempting to draw tenuous connections to the events of January 6, 2021, and the so-called "Big Lie" while advancing an unsupported theme that the 15 defendants sued by Coomer worked in concert to carry out a conspiracy.  But as to TGP and Hoft, the reality is that this case comes down to just *a handful of statements or articles – three of which do not mention Eric Coomer at all, and cannot even be said to be referencing Coomer in any way – which either merely report on the witness account of Joe Oltmann, published undisputed evidence (such as videos of Coomer that readers can take or leave as they wish, or Coomer's own highly controversial and suggestive Facebook posts – which he originally lied about and said they were fabrications), or stated TGP/ Hoft's own opinions in the face of Oltmann's statements and other character evidence.*  As a matter of law, all of TGP's and Hoft's statements are, on their face, protected by the First Amendment, not the least because all of their statements have been protected **opinion**.  The District Court should have looked at those statements and evaluated whether Coomer had presented clear and convincing admissible evidence  that  he  could prevail on his claims.  Because the District Court did not do that, its Order should be overturned.

First, the District Court failed to apply the correct standard of proof under the anti-SLAPP statute, improperly accepting Coomer's allegations as true and usurping

the role of the jury *by opining on the credibility of witnesses and making findings of fact.* The District Court then magnified these failings by denying numerous objections to evidence by defendants OAN and Rion (*objections joined-in by TGP and Hoft*)[5] simply because they allegedly made "too many" objections and by relying on inadmissible evidence.

The District Court also repeatedly reversibly erred in analyzing Coomer's claims under the anti-SLAPP statute. First, the District Court made at least nine errors in denying anti-SLAPP relief on Coomer's defamation claim, failing to (1) apply the *in haec verba* doctrine, (2) apply the "of and concerning" doctrine, (3) recognize that Coomer could not present clear and convincing admissible evidence of actual malice, (4) recognize that Coomer could not present clear and convincing admissible evidence of falsity, (5) apply the substantial truth doctrine, (6) recognize that certain statements were not capable of defamatory meaning, (7) find that Coomer was a public figure, (8) apply the incremental harm doctrine, and (9) recognize that Coomer did not present sufficient evidence of actual damages.

The District Court also erred in denying anti-SLAPP relief on the IIED claim. The conduct at issue here is not outrageous as a matter of law, Coomer cannot establish actual malice, *and there is no meaningful evidence in the Record that*

---

[5] Transcript, Anti-SLAPP Hearing, October 13, 2021, page 199:1-24.

20

*Coomer suffered emotional distress*.  Thus, this count should have been dismissed.

With respect to the conspiracy claim, the District Court erred in denying anti-SLAPP relief **because the Record is entirely devoid of any evidence** (much less admissible evidence) of an agreement among any of the defendants.

And with respect to the injunctive relief claim, the District Court's astonishing finding that Coomer (who never moved for injunctive relief) is entitled to injunctive relief — despite the fact that the parties never briefed these issues — must be overturned.

The District Court's Order is not surprising because it is the culmination of a pattern of bias and unfair prejudice in favor of the plaintiff that began from the moment Judge Moses took over this case and *sua sponte* overturned the prior judge's decision denying anti-SLAPP discovery.  Judge Moses only magnified this error by largely denying defendants the opportunity to conduct discovery.  If the Court doesn't reverse, it should at minimum order on remand that the District Court allow TGP and Hoft to take reciprocal discovery.

Finally, the District Court erred in not granting a full case stay pending this appeal.

## VII.   ARGUMENT[67]

The District Court's May 13, 2022 Order (CF p. is riddled with errors of both

fact and law and should be reversed on any one of numerous grounds.

**A.   The District Court reversibly erred in applying the wrong standard of proof.**

**1.      The standard of review is *de novo* on this preserved issue.**

TGP and Hoft preserved this issue in their Motion at pp. 2, 11, 15, and 22,[8] and

in their Reply at pp. 3 and 12.[9]  The District Court addressed this issue throughout

the Order.

**2.      The District Court should have applied the clear and convincing standard of proof but did not.**

---

[6] Defendant-Appellants Jim Hoft and TGP Communications, LLC, d/b/a The Gateway Pundit adopt and incorporate **Sections VII.A.2**., **VII.C.2, VII.D.4**., **VII.D.5**.  from the Argument as presented in Defendant-Appellants Herring Networks, Inc., d/b/a One America News Network, and Chanel Rion's Amended Opening Brief, as though fully restated and set-forth, herein

[7] Because the TGP/ Hoft Defendants' reporting addressed a matter of public concern and Coomer is a public figure, Coomer must establish actual malice.  *Diversified Management, Inc. v. Denver Post, Inc*., 653 P.2d 1103, 1106 (Colo. 1982).  Although the District Court erroneously found Coomer to be a private figure, it found that the reporting involved a matter of public concern, thus the actual malice standard applies. (Order ¶ 147).

[8] TGP and Hoft's Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101  (CF p. 4950, "Motion").

[9] TGP's and Hoft's Reply in Support of Their Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 (CF p. 14,369, "Reply").

**B.** **The District Court reversibly erred by improperly substituting itself as fact finder and improperly judging credibility.**

    **1.** **The standard of review is *de novo* on this preserved issue.**

TGP and Hoft preserved this issue in their Motion at pp. 2, 11, 15, and 22,[10] and in their Reply at pp. 3 and 12.[11] The District Court addressed this issue throughout the Order.

    **2.** **The District Court viewed facts in Coomer's favor and judged credibility.**

Even if the District Court had applied the proper standard of proof (which it didn't), it reversibly erred by usurping the role of the jury, weighing disputed evidence, and making credibility determinations.  In *Salazar*, the court held that in ruling on an anti-SLAPP motion, a court should not "make an ultimate determination of [the] truth," but rather, "ever cognizant that we do not sit as a preliminary jury, we assess whether the allegations and defenses are such that it is reasonably likely that a jury would find for the plaintiff."  2022 COA 109, ¶ 22; *see also L.S.S.*, 2022 COA 123, ¶ 46 ("[I]t wasn't the court's role to weigh that evidence or evaluate the witnesses' credibility.").  Here, however, the District Court made nearly 60 pages of

---

[10] TGP and Hoft's Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101  (CF p. 4950, "Motion").

[11] TGP's and Hoft's Reply in Support of Their Special Motion to Dismiss Pursuant to C.R.S. § 13-20-1101 (CF p. 14,369, "Reply").

"Findings of Fact" despite having an incomplete factual record and one-sided discovery, after telling the parties that the District Court "will not be weighing the evidence presented by the parties or resolving conflicting factual claims." (Order, pp. 6-66; October 11, 2021 Order, p. 2).

Paragraph 54 of the Order is illustrative. The District Court assessed credibility, usurped the role of the jury, and disregarded the significance of the fact that Oltmann testified under oath that he was on the antifa call. (Order ¶ 54). Without support, the District Court found, as to TGP and Hoft that "[g]iven Oltmann's lack of personal knowledge, lack of expertise, obvious lack of credibility, and lack of evidence in support of his allegations against Coomer, Hoft-TGP had sufficient reason to know Oltmann was an unreliable witness." **The District Court ignored that one of Coomer's own witnesses verified significant details of the "Antifa" call**. *See* Response, Exh. U (CF p. 10,896). The District Court *decided* a fundamental element of the case without even considering evidence from TGP and Hoft, or allowing TGP and Hoft to conduct meaningful discovery. A reasonable juror could easily find Coomer lacks sufficient evidence to support his claims, but the District Court foreclosed that possibility.

Paragraph 55 is similarly problematic. Purportedly citing to the deposition of

Jim Hoft, the District Court, flagrantly mischaracterized Hoft's statements,[12] to enable it to allege that "Hoft-TGP conceived of a storyline regarding the results of the presidential election, which is reflected in their allegations of election fraud leading up to and after the election."[13]   The District Court's Order mischaracterizes Hoft's statements in order to make them appear nefarious (i.e., "conceived" as meaning "manufactured"), when in fact Hoft's statements on their very face simply state that he and TGP had election integrity concerns prior to (because of sudden mail-in-ballot rule changes) and during and after the election (suspicious happenings).   On the basis of this wholesale mischaracterization of Hoft's testimony created by the District Court alone, the court then enabled itself to conclude ***as part of its "Findings of Fact"*** that "Hoft-TGP consciously set out to conform their allegations against Coomer and consciously set out to conform their allegations against Coomer to that storyline, concealing their wholly unreasonable reliance on

---

[12] The Order specifically cites to the *Hoft dep., 62:18-64:11* (in which Hoft states he published articles voicing the prospect of voter fraud prior to the November 2020 election, including reporting on an election fraud report Hoft now believes to have been discredited, albeit unrelated to Coomer or Dominion) *and 66:19-69:21* (in which Hoft discusses eye-witness interviews TGP conducted with dozens of eye-witnesses in Detroit, FOIA-ing hundreds of hours of security camera footage from Detroit's TCF center, capturing highly suspicious ballot dumps at 3:30 a.m., and reporting on ballot counters in Atlanta illegally forcing ballot observers to leave, only to resume ballot counting once observers were booted).

[13] Compare the District Court's statement here to the Order at par. 72, against Defendants OAN and Rion (it's identical).

Oltmann, failure to investigate, and disregard of authoritative sources rejecting fraud allegations."[14]  Meanwhile, the District Court adopted Coomer's declaration in full, without even acknowledging incontrovertible evidence that he is a liar.  *See, e.g.,* Order n. 29-34, 51, 64, 87, 113, 116, 129, 196, 385-87 (adopting, without criticism, Coomer's factual allegations); *supra* pp. 8-9 discussing Coomer's public lies about his social media account.  The District Court found repeatedly that Oltmann was not credible (*see, e.g.,* Order ¶¶ 26, 28, 44, 54, 61, 71, etc.) — a conclusion the District Court reached before any evidence was presented (TR 7/2/21, 39:2-4) — but brushed aside concerns about Coomer's lack of credibility in a single sentence with no citations on page 97 of the Order.  *See* Order ¶ 191.  The District Court, which should have allowed Coomer's claims to survive dismissal only if supported by "clear and convincing evidence," substituted its own thoughts, opinions, and biases for evidence, stretching far beyond the factual record to make inappropriate credibility and factual determinations on disputed issues.

Indeed, rather than assessing the facts presented, the District Court constructed its own narrative unsupported by the Record. The District Court disregarded the defendants' evidence in favor of the District Court's ***own*** preconceived narrative and "feverish storyline" (Order ¶ 34), ultimately going so far

---

as to claim —with no citation or factual justification whatsoever — that "[i]t is impossible not to draw a straight line from Oltmann's threats of violence on his November 5th and 6th podcasts, to his statements regarding Coomer on November 9, 2020 and thereafter, to the violent attack on democracy that occurred in Washington, D.C. on January 6, 2021." (Order n. 54).  There are massive and obvious causation problems with such an astoundingly attenuated conclusion.  It's difficult to know where to begin.  Under such reasoning, anyone voicing a concern about election integrity is a de facto domestic terrorist.

Because the District Court improperly substituted its judgment for that of the jury and made "Findings of Fact" that were not based on the evidence in the record, the Order should be reversed.

## C.    The District Court reversibly erred in relying on inadmissible evidence.

### 1.    The standard of review is *de novo* on this preserved issue.

TGP and Hoft preserved this issue in their Motion to Strike and for Extension (CF p. 11,882),  Objections to Plaintiff's Alleged Evidence (CF p. 16,744)[15], and at the anti-SLAPP hearing (TR 10/13/21 198:3-199:10; 238:15-264:19; 267:7-

---

[15] TGP and Hoft joined OAN and Rion's objections as noted in Plaintiff's Motion for Expedited Relief from the OAN Defendants Evidentiary Objections, CF p. 16735.  The objections and joinders were, by order of the court, circulated privately amongst the parties and not filed with the court.  See the District Court's Order of Nov. 17, 2021 (CF p. 16726).

274:21; 277:12-24).[16]  The District Court addressed these issues in the November 21, 2021 Order (CF p. 18,090) and throughout the Order.

### 2.    The District Court relied on inadmissible evidence.

In his Response and at the anti-SLAPP hearing, Coomer relied on thousands of pages of deposition testimony, recordings, and other documents, as well as nine declarations of four purported experts and five fact witnesses that Coomer had never previously disclosed.  TGP and Hoft objected in pre-hearing motions and throughout the hearing.  *See* Motion to Strike and for Extension (CF p. 11,882), Motion for Evidentiary Hearing TR 10/13/21 198:3-199:10; 238:15- 264:19; 267:7-274:21; 277:12-24.[17]

Because the District Court relied extensively on inadmissible evidence without explaining the reasons for overruling TGP and Hoft's evidentiary objections, this Court should reverse the District Court's Order and grant TGP's and Hoft's anti-SLAPP motion.  If, however, the Court reverses and remands, it should do so with instructions that the District Court cannot consider any inadmissible evidence and that to the extent the District Court intends to rely on any evidence submitted by

---

[16] TGP and Hoft joined all objections of all Defendants at the Anti-SLAPP hearing by order of the court.  See TR 10/13/21 199:1-24).
[17] TGP and Hoft joined all objections of all Defendants at the Anti-SLAPP hearing by order of the court.  See TR 10/13/21 199:1-24).

Coomer, the District Court must allow TGP and Hoft to cross-examine any witnesses as applicable and must rule *specifically* on every objection lodged by OAN and Rion and by extension, TGP and Hoft, before ruling on their Motion.[18]

**D.    The District Court reversibly erred in denying TGP and Hoft anti-SLAPP relief on Coomer's defamation claim (Cause of Action A).**

**1.    The standard of review is *de novo* on these preserved issues.**

TGP and Hoft preserved arguments related to Coomer's defamation claim in their Motion at pp. 8-22 and in their Reply at pp. 3-12.  The District Court addressed these issues throughout the Order.

**2.    The District Court reversibly erred in failing to apply the *in haec verba* doctrine, in considering allegedly defamatory statements not asserted in the operative complaint, and in lumping all allegedly defamatory statements by all defendants-appellants into three generalized and inaccurate categories.**

To adequately state a claim for defamation, the plaintiff must satisfy the *in haec verba* doctrine, setting forth with specificity in the complaint the alleged defamatory language.  "Each publication of a defamatory statement must be pled as a separate claim.  In addition, alleged defamation requires a certain degree of specificity."  *Corporon*, 708 P.2d at 1390.  A defamation claim that fails to substantially set forth the words alleged to be defamatory and untrue "is vague and fails to state a claim."  *Walters*, 559 F. Supp. at 1234; *see also Int'l Acad. of Bus. &*

---

[18] Id.

*Fin. Mgmt., Ltd. v. Mentz*, 2013 WL 212640, at n. 4 (D. Colo. Jan. 18, 2013) (applying Colorado law, finding that defendant's failure to set forth the words that are allegedly defamatory warranted dismissal).

Here, Coomer alluded to nine (9) articles by TGP and Hoft, but without pleading the statements in haec verba. But the District Court allowed Coomer to vaguely allege for the first time in his Response additional alleged categories of purportedly defamatory statements — in fact, the District Court ultimately adopted Coomer's vague, inadequate categories of statements.

The District Court also embraced Coomer's claims that the statements alleged against ***all defendants*** in the Complaint (1) allege that Coomer was on an antifa call, (2) allege that Coomer threatened to undermine the integrity of the election, or (3) allege that Coomer actually did influence the election. The District Court's analysis is flawed because in the pursuit of its narrative, the District Court conflated all of the defendants, treating them as a monolith when in reality the facts are different for each party. In so doing, the District Court repeated the same three-part refrain for each defendant, without identifying the actual defamatory statements. *See, e.g.,* Order ¶¶ 55, 61, 69.

Because the District Court failed to apply the *in haec verba* doctrine and failed to identify and assess the specific statements allegedly made by TGP and Hoft, the Order should be overturned.

30

### 3.    The District Court reversibly erred in finding sufficient admissible evidence of actual malice.

The District Court found this case analogous to *Curtis Publ'g Co. v. Butts,* 388

U.S. 130, 157- 58 (1967) (see Order ¶ 170), but the case is clearly distinguishable:

| FACTS IN *CURTIS* SUPPORTING ACTUAL MALICE | FACTUAL DIFFERENCE IN RELATION TO TGP AND HOFT |
|---|---|
| The source for the story was on probation because of bad check charges.  388 U.S. at 157. | At the time of TGP/Hoft's reporting, Oltmann was not facing any criminal charges and was understood by TGP and Hoft to be an upstanding entrepreneur and business owner, and they found his investigation compelling and believed that Oltmann came forward into the public at great cost to his business and at great risk to the safety of himself and his family. TGP and Hoft also found Oltmann to be credible because he very openly and transparently acknowledged the limitations of his knowledge (acknowledging he had no smoking gun audio recording) and because he was able to produce Coomer's authentic and troubling Facebook posts  Hoft Dep. p. 35:8-18; p. 36:11-16; p. 70:2-9; p. 119-143.[19] |
| | |

---

[19] See CF. 9,190 for Hoft Deposition.

| | |
|---|---|
| The newspaper did not review the source's notes. *Id.* | TGP/ Hoft did not review Oltmann's handwritten notes before publication, but they were aware that he had taken them. Hoft Dep. 32:14-16. |
| The newspaper did not interview an individual who was with the source when the phone call at issue was overheard. *Id.* | TGP/Hoft were not aware of any other individuals by name (other than perhaps Coomer) on the antifa call when publication occurred, but **Anderson's** testimony has since confirmed key aspects of the call. And Hoft tried unsuccessfully to find Coomer but couldn't because he was in hiding. Hoft Dep. 90:6-16. |
| The newspaper did not review any background information related to the game in an effort to validate the allegations. *Id.* | Hoft reviewed Coomer's Facebook posts and determined that they showed "he was very active [in elections] in several states, and we also had that information from his Facebook page and from the call he made with the Antifa activists that [Coomer] was plotting against the Republican candidate." Hoft believed the posts "appeared completely biased and unhinged…anti-American…[t]hey were against President Trump." Hoft found the statements to be "shocking," and that he believed the Facebook posts were highly relevant "[b]ecause it really shows you what he's really thinking when he's posting something like this on a private Facebook page … it would really reveal what he was thinking about the current political climate and the current president and his supporters." Hoft Dep. 26:12-17; |

| | 37:17-18; 72:14-25; 128:13-23; 131:5-16. |
|---|---|
| The reporter handling the story lacked knowledge and expertise in football. *Id.* at 158. | Hoft is the publisher and editor of TGP, a widely known right-wing political blog that explicitly presented articles offering opinions on politics from a right-wing perspective.  At the time, Hoft and TGP were already reporting on possible voter fraud because it was a widespread concern leading up to the 2020 general election because of the sudden voting machine concerns about also because of widespread and sudden changes in mail-in-ballot rules, which cause chain of custody questions. reporting on Dominion Voting Systems when they became aware of Oltmann's allegations. Hoft Dep., 64-69. |

**4.     The District Court reversibly erred in finding the statements at issue false.**

**5.     The District Court reversibly erred in failing to apply the substantial truth doctrine.**

The District Court erred in refusing to apply the substantial truth doctrine to dismiss the claims against TGP and Hoft regarding whether the antifa call took place. There can be no doubt that Coomer has failed to present clear and convincing evidence that the statements about the occurrence of the antifa call are not *substantially* true. Even if the other participants on the call did not consider it to be an "antifa call," a reasonable juror could conclude that a call occurred on or around the time that Oltmann claimed, involving the parties Oltmann claimed, and discussing the topics Oltmann claimed. Thus, the District Court should have applied the substantial truth doctrine and dismissed the claims related to the antifa call on this additional basis.

Defendant-Appellants Jim Hoft and TGP Communications, LLC, d/b/a The Gateway Pundit adopt and incorporate **Section VII.D.6**. from the Argument as presented in Defendant-Appellants Herring Networks, Inc., d/b/a One America News Network, and Chanel Rion's Amended Opening Brief, as though fully restated and set-forth, herein.

**6.     The District Court reversibly erred in finding statements capable of defamatory meaning.**

Even if the evidentiary record presented clear and convincing admissible evidence of falsity (which it does not) or the absence of substantial truth (which it does not), the statements attributed to TGP and Hoft are not capable of defamatory meaning.  As set forth above*,* despite the District Court's conclusory three-part narrative, there is no evidence in the Record demonstrating that TGP or Hoft stated that they had independent knowledge that Coomer "rigged the election."  Thus, the defamation claims against TGP and Hoft can proceed only if allegations regarding the antifa call and/or allegations that someone identified as Coomer said "Trump is not gonna win.  I made f-ing sure of that" are defamatory.

Saying someone participated in an antifa call is not defamatory.  Most Americans — including Coomer — consider themselves "antifascist."  *See* Coomer Dep., 108:1-2 ("Q: Are you antifascist? Dr. Coomer: Absolutely.").  Moreover, Coomer maintains that antifa is not an organization to which someone could be a member.  *Id*. at 34:5-12.  And he testified in his deposition that he does not know what antifa is.  *Id.* at 111:7-8 ("I don't know what Antifa refers to.").  It is difficult to imagine how Coomer can credibly claim to have been defamed by a word he cannot define.  What is or is not an "antifa call" is inherently subjective and not capable of defamatory meaning.  *See, e.g., Seelig v. Infinity Broad. Corp*., 97 Cal. App. 4th 798, 810 (2002).  Similarly, what an individual could mean in saying "Trump is not gonna win. I made f-ing sure of that" is unclear.  The statement is too

vague to be proven true or false.

Importantly, this is not an argument based on "opinion," as the District Court found.  (Order ¶ 191).  The issue here is that the statements allegedly made by TGP and Hoft simply are not objective factual statements that can be proven true or false, thus they are not capable of defamatory meaning.  For that reason, the District Court's denial of the anti-SLAPP motion on defamation should be overturned.

**7.    The District Court reversibly erred in deeming Coomer a private figure, finding Coomer's claim not barred by the incremental harm doctrine, and finding sufficient evidence of actual damages.**

Dispatching with the argument in a single paragraph devoid of any citations, the District Court summarily concluded that Coomer was a private figure.  (Order ¶ 143).  This conclusion ignores significant evidence to the contrary and should be reversed.  "In determining whether a person is a public figure, a court must examine the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'"  *Diversified*, 653 P.2d at 1107.  Although being a public figure typically involves some amount of voluntariness, "the voluntariness requirement may be satisfied even though an individual does not intend to attract attention by his actions.  When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure."  *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir. 1985); *see also Lewis v. McGraw-*

36

*Hill Broadcasting Co.*, 832 P.2d 1118, 1122 (Colo. App. 1992). Moreover, courts have found that "a government contractor performing multimillion-dollar contracts for the United States . . . voluntarily exposed itself to increased risk of injury from defamatory falsehood and has effectively 'assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention.'" *Kuwait & Gulf Link Transp. Co. v. Doe*, 216 A.3d 1074, n. 3 (Pa. Super. Ct. 2019). At minimum, Coomer is a limited purpose public figure. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974) (defining a limited purpose public figure as one who "voluntarily injects himself or is drawn into a particular controversy and thereby becomes a public figure for a limited range of issues"); *Lewis*, 832 P.2d at 1122 ("Limited purpose public figure status focuses on two questions: the threshold question of whether the defamatory statement involves a matter of public concern and, more importantly, whether the level of plaintiff's participation in the controversy invites scrutiny.").

Here, Coomer is the former Director of Product Strategy and Security for Dominion. (Compl. ¶ 10). In connection with the public scrutiny of Dominion's systems, Coomer began appearing publicly as a representative of Dominion. And during the anti-SLAPP hearing, Defendants OAN and Rion played a clip from the HBO election insecurity documentary *Kill Chain* that showed Coomer in a Dominion promotional video. *See* TR 10/14/21 569:2-9.

37

A hallmark of a public figure is access to the press and ability to counteract false statements. *Gertz*, 418 U.S. at 344. The fact that Coomer was regularly quoted on issues related to election security before the allegedly defamatory statements weighs strongly in favor of finding that he was a public figure. *See Thompson v. Nat'l Catholic Reporter Pub. Co.*, 4 F. Supp. 2d 833, 838 (E.D. Wis. 1998) (executive who had access to media and was quoted on matters related to the controversy was limited purpose public figure). Coomer clearly has access to the media given the numerous profiles about him and articles written by him that have appeared in the media. *See supra* pp. 9-10.

On this record, it is mind-boggling that the District Court concluded — in summary fashion — that Coomer is not, at minimum, a limited purpose public figure. Accordingly, the Court should reverse the District Court's finding that Coomer is a private figure and find him to be a public figure or, at minimum, a limited-purpose public figure.

Second, the District Court erred in concluding that Coomer could proceed with a claim based on alleged harm to his reputation, despite the fact that Coomer has done immeasurable harm to his own reputation and credibility via his own public statements, interviews, Facebook posts, and actions. "[W]hen unchallenged or nonactionable parts of a particular publication are damaging, another statement, though maliciously false, may not be actionable because it causes no harm beyond the harm caused by the

remainder of the publication." *Tonnesen v. Denver Pub. Co*., 5 P.3d 959, 965 (Colo. App. 2000); *Crowe v. State Farm Mut. Auto. Ins. Co*., 2007

U.S. Dist. LEXIS 52982, *13 (D.C. Colo. July 23, 2007) (applying the incremental harm doctrine where allegedly defamatory statements in a letter terminating employment were not any more damaging than the rest of the non-defamatory statements in the termination letter). Citing no authority or supporting facts, the District Court simply concluded that being accused of rigging an election is worse than being found to have controversial Facebook posts and thus, the incremental harm doctrine cannot bar recovery here. (Order ¶ 197). But this conclusory statement ignores the incendiary, profane, and violent nature of the Facebook posts, Coomer's having lied (including in *The Denver Post*) about not having been the author of those posts, Coomer's later having admitted (including in *New York Times Magazine*) that the Facebook posts were in fact his, Coomer's having admitted that he "screwed up" in making the posts, and Coomer's penchant for lying generally, and it overstates what **TGP and Hoft** said about Coomer. There is no dispute in this case that TGP's and Hoft's publication of Coomer's inflammatory and disturbing Facebook posts was not actionable. Those posts alone would have raised numerous questions about Coomer's role at Dominion and placed his career in jeopardy (in fact, although we know Coomer is no longer employed by Dominion, we don't know why — this is one item TGP and Hoft would have delved into in discovery if the Court had not largely given only

Coomer the right to take discovery).  Given that TGP and Hoft did not actually allege that they had independent knowledge that Coomer rigged the election and given that Coomer has admitted to the bile he spewed on the Internet and his cozy relationship with dishonesty, the Court should find the Facebook posts and Coomer's behavior just as reputationally damaging as the allegations related to the antifa call and reverse the District Court's decision based on the incremental harm doctrine as discussed *above*, Coomer's admitted activities irretrievably ruined his reputation, and the alleged defamatory statements by TGP and Hoft during a 12-day period caused Coomer no harm (much less any harm beyond the harm Coomer caused himself).

Finally, the District Court erred in holding that Coomer adequately pled actual damages.  In a single paragraph, based on no meaningful evidence, the District Court summarily concluded that Coomer had been damaged.  (Order ¶ 117).  This holding was in error.  Because the case involves a matter of public concern, Coomer must prove ***actual*** damages.  *Diversified*, 653 P.2d at 1105-08; *see also Keohane v. Stewart*, 882 P.2d 1293, 1304 (Colo. 1994); *Tonnesen*, 5 P.3d at 963.  Actual injury includes "impairment of reputation" and "personal humiliation and mental anguish and suffering" in addition to "out-of-pocket loss." *Brokers Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, n. 32 (10th Cir. 2017) citing *Gertz*.  Failure to present evidence of damages is a valid basis to grant an anti-SLAPP motion. *See, e.g., Barker v. Fox & Associates*, 240 Cal. App. 4th 333, 345 (2015); *Averill v. Superior Court*, 42

Cal. App. 4th 1170, 1176 (1996).

The District Court relied on one paragraph of the Coomer Declaration (Paragraph 53) as the ***only*** evidence of recoverable damages.  (Order ¶ 117).  In that paragraph, Coomer made conclusory assertions that (1) he can no longer perform his prior duties for Dominion, (2) he has sought medical treatment for anxiety and depression, and (3) his career in election services is "effectively over," causing him to lose out on future earnings.  But these statements are entirely unsupported and speculative (**<u>and the Court barred discovery on them</u>**).  Coomer presented no evidence that the end of his career at Dominion and in election services has anything to do with the statements about the antifa call — in all likelihood, the revelation of Coomer's Facebook posts alone probably would have ended his career, given that it is difficult to imagine a reputable election machine and software company continuing to employ someone with such **public**, well-documented, and vitriolic political bias.  Coomer certainly has not presented clear and convincing evidence that these statements ended his career.  Similarly, with respect to the alleged medical treatment for depression and anxiety, Coomer has not provided any details, medical records, or receipts that would support a finding that he actually received medical treatment and that his alleged condition actually had any connection to the statements at issue here.

Because the evidence is lacking and Coomer bears the burden, the District Court's finding was in error and should be overturned.

41

8.    **The District Court reversibly erred in denying TGP and Hoft anti-SLAPP relief on Coomer's defamation claim (cause of action A) because TGP is a political opinion blog, and Hoft is an opinion blogger – period.**

The District Court committed reversible error in denying TGP and Hoft's anti-SLAPP motion because it failed to identify the statements at issue, and then, having failed at this, decided that the moving target statements were not opinion.

Coomer failed to plead the specific statements (*in haec verba*) TGP and Hoft allegedly made which were supposedly libelous.   As a result, TGP and Hoft filed a Motion for More Definite Statement (see CF p. 6868), demanding that Coomer plead the statements *in haec verba*.  This  motion was denied.  (See CF p. 8233).  However, in his Response (see CF 7166) to the motion, Coomer  argued that it was sufficient that he identified nine (9) separate articles, which variously, Coomer argued, accused Coomer of meddling with the 2020 election and being on an Antifa phone call.  Id., at 7169-170.

However, of those nine (9) articles, three (3) absolutely fail to reference Eric Coomer in any way.[20]  The six (6) "defamatory" articles that remain[21]  cannot be construed as defamatory because they are clearly opinion protected by the First Amendment.  TGP Defendants specifically directed the Court to *McDougal v. Fox*

---

[20] Collectively, these articles are contained in **Exhibit 600** (CF p. 14382).
[21] Collectively, the articles are contained in **Exhibit 601** (CF 14401).

*News Network*, 489 F. Supp. 3d 174 (S.D.N.Y Sept. 24, 2020) (hereafter, "*McDougal*")

and *Herring Networks, Inc. v. Rachel Maddow, et al*, 8 F.4th 1148 (9th Cir. 2021)

(hereafter "*Maddow*").   TGP Defendants are clearly a blog writer and blog,

respectively.  A blog, by its very nature, is an opinion website wherein pundits – such

as the "Gateway Pundit," offer their opinions and try to persuade their audience of

their position.  *See*  Ex. 606;[22]  C.f., *Maddow*, at 1157.  Considering the totality of the

circumstance attendant to each article as well as the platform on which they are

published, no one can reasonably and in good faith believe or argue the articles express

anything other than TGP Defendants' opinions.[23]

Founded by Jim Hoft in 2004, The Gateway Pundit it is now, and has always

been a Conservative Political Blog, that features Hoft's opinions on items of the

newsday.   Plaintiff's Exhibit E-1(CF 9190), p. 9-10; 113-114. This is widely

understood by his readers, fans, politicians, and detractors.  *Id*., passim. Not only this,

but The Gateway Pundit's own "About" page, plainly states that it's an opinion blog.

*Id*., at p. 113-114; see also Exhibit 606, CF 14621. Because of this, Hoft's readers

expect him to use rhetorical hyperbole, jokes, strongly worded opinions,

condemnations, and other devices to persuade the audience of his viewpoints.  None

---

[22] The Gateway Pundit's "About" page, explaining that it is a Conservative opinion
blog. *See* CF 14621.
[23] While one of the six (6) remaining articles was bylined by Defendant James (Jim)
Hoft's twin brother, Joe, Jim Hoft is the editor of the blog and edited the article.

of this is a mystery or a surprise.  In fact, many traditional "journalists" were outraged when The Gateway Pundit was granted access to White House briefings during the Trump Administration.[24]

Plaintiff spends a bit of time decrying Hoft's lack of professional journalism training.  This is an exercise in the obvious: Hoft is not a traditional journalist, and the **Gateway Pundit, on it's own "About" page admits this**.  See Ex. 606.  TGP Defendants are an opinion blogger and blog site, respectively.  Jim Hoft is a man who started an opinion blog – literally – in his basement, and that soapbox/bullhorn has simply grown.  See Ex. 606; Hoft Dep.[25]  In the America of the present interpretation of the US Constitution, this is absolutely protected by the First Amendment.

TGP Defendants learned about Joe Oltmann and Eric Coomer because Dominion and Oltmann were going "viral" online in the immediate aftermath of the 2020 Election.  Plaintiff's Exhibit E-1 (Hoft Depo), p. 119-120.[26]  TGP Defendants found Oltmann to be a credible whistleblower because of his status in the community as a successful businessman, a patriot, a man willing to put his person (and that of his family) and reputation at risk to report his experiences, because he produced the violent

---

[24] **Ex. 607 (CF p. 14629)**. *White House Grants Press Credentials to a Pro-Trump Blog*, Michael Grynbaum, The New York Times, February 13, 2017.
(https://www.nytimes.com/2017/02/13/business/the-gateway-pundit-trump.html ) (last accessed October 3, 2021).
[25] *See* CF p. 9190.
[26] *Id*.

and shocking Coomer Facebook Posts, and because Oltmann didn't hide any of the facts of his experiences: he acknowledged he had no smoking gun, and didn't have an audio recording of the Antifa conference call.  Id., at p. 119-143; see also Hoft Affidavit attached to Special Motion to Dismiss (Ex. 602).[27]

As to the six articles Plaintiff identifies as being defamatory, TGP Defendants' speech is absolutely protected as opinion commentary about a pre-existing controversy.  Plaintiff fails to explain how Jim Hoft and TGP Communications are any different from Tucker Carlson or Rachel Maddow.  If Maddow, accusing OAN of being actual paid Russian propaganda isn't defamation, and Carlson, calling McDougal an extortionist isn't defamation, then TGP Defendants, commenting on *Oltmann's allegations* and *Plaintiff's own emotionally unstable and violent public Facebook ramblings that raise a serious question as to his ability to fairly perform his job as a national presidential elections facilitator*, cannot legitimately be deemed defamation.

Even if Coomer sufficiently pled the contested statements *in haec verba* – he did not, and TGP and Hoft have been prejudiced by this moving target that even the District Court didn't definitively identify anywhere in its May 13, 2022 Order – TGP and Hoft stated their *opinions* in their articles *and didn't hide the ball*.  They identified

---

[27] CF p. 14470.

the bases upon which they founded their opinions, publishing the Oltmann interview,[28] various videos in which Coomer appears representing and discussing Dominion Voting Systems machines and technology,[29] and Coomer's own deranged and hateful Facebook posts expressing violent rage against half of the voting public.[30]

Further, the District Court's analysis – see for e.g., paragraph 178 to the District Court's Order – conflates the concepts of protected opinion and verifiably false statements. TGP and Hoft believed Oltmann's testimony at the time he gave his interview to Hoft, and they still continue to believe it. Hoft Affidavit attached to Special Motion to Dismiss (Ex. 602).[31] The fact that the District Court has unilaterally pontificated that Coomer's are the only credible statements in this case are irrelevant, and they absolutely do not change TGP or Hoft's opinion on Coomer. Further, the District Court failed to consider key evidence that militated in favor of Oltmann, TGP, Hoft, and every other defendant, such as the Facebook posts, Coomer's own witness affidavit[32] that confirms that the antifa conference call *actually took place*, and other

---

[28] *See, for e.g.*, **Exhibit 601 (CF p. 14382)**.

[29] These videos were of interest because Coomer's statements in the videos about the capabilities of the machines contradicted public statements of Dominion in the aftermath of the 2020 election (e.g., such as that the machines couldn't connect to wifi, when Coomer is on the video saying they can; or that elections administrators cannot alter the tally manually, when Coomer is on the video saying they could). *See, for e.g.*, **Exhibit 601**.

[30] *See, for e.g.*, **Exhibit 601**.

[31] CF p. 14470.

[32] Plaintiff's Response, Ex. U.  CF p. 10,896.

46

evidence discussed throughout this brief.

Similarly, in paragraph 179 to the Order, the District Court found that TGP/Hoft statements such as that Coomer is "mentally ill, and a sociopath," "an unhinged Trump hater and Antifa supporter," and a "lunatic," are each false statements of fact. The District Court is wrong as a matter of law. Not only has there been ZERO competent evidence to suggest that Coomer is not a "lunatic," but these highly charged words and phrases are the very essence of opinion expression and rhetorical hyperbole.  TGP and Hoft are absolutely within their rights to consider Coomer as a nut, and no court in the United States has the right to punish them for or prevent them from saying so under the protections of the First Amendment.

**E.     The District Court reversibly erred in finding Coomer had pled or supported with admissible evidence sufficiently outrageous conduct for intentional infliction of emotional distress (Cause of Action B).**

**1.     The standard of review is *de novo* on this preserved issue.**

TGP and Hoft and Rion preserved arguments related to the IIED claim in their Reply at p. 2, joining OAN and Rion's Reply at p. 20.  The District Court directly addressed this issue at p. 120 of the Order.

**2.     As a matter of law, the conduct of TGP and Hoft was not outrageous, they did not act with actual malice, and Coomer has not demonstrated emotional distress.**

With respect to outrageousness, "[l]iability for outrageous conduct can be found only if the conduct is so outrageous in character and so extreme in degree as

to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Tonnessen*, 5 P.3d at 967.  The District Court's decision on outrageousness is untethered to the actual claims in the case. The District Court held that TGP and Hoft engaged in "outrageous" conduct because they "without evidence, falsely accused Coomer of overturning the presidential election" and "incited threats of real violence against Coomer." (Order ¶ 236).  But TGP and Hoft did no such thing.  Nowhere in the Record is there any evidence that TGP and Hoft alleged independent knowledge of Coomer interfering with the election – they stated the bases of their opinions and showed their work.  The public was free to evaluate the open-sourced opinions.  Further, there is absolutely zero evidence that TGP or Hoft made any insinuation of violent threats.  This holding appears to be the result of the District Court's improper practice of treating the many defendants as a monolith, drawing an improper parallel between defendants and the riot on January 6, 2021, and attributing the same statements to all of the defendants, but whatever the reason, it is plainly wrong.

The actual statements at issue recount Oltmann's statements about the antifa call.  This conduct objectively is not "outrageous," and much more outrageous conduct has been found inadequate to assert an IIED claim.  *See, e.g., Hussain v. Palmer Commc'ns, Inc.,* 60 F. App'x 747, 754 (10th Cir. 2003) (broadcasting

plaintiff's photo and insinuating plaintiff was complicit in the Oklahoma City bombing was not outrageous); *Weinstein v. Bullick*, 827 F. Supp. 1193, 1195 (E.D. Pa. 1993) (police officer statements expressing skepticism over plaintiff's report of sexual assault were not outrageous); *Jones v. Scripps Media, Inc*., 2017 WL 1230481, at *14 (E.D. Mich. Apr. 4, 2017) (three reports suggesting that public employees received lucrative severance payments hidden from the public were not outrageous).  Accordingly, the District Court erred in finding clear and convincing evidence of outrageous conduct.

On the second prong, a public figure cannot recover IIED damages for defamatory statements unless the statements were made with actual malice.  *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50-53 (1988).  As set forth *above*, there is no evidence of actual malice (much less clear and convincing admissible evidence). TGP and Hoft had evidence to support their statements, in the form of a first-hand witness account, Facebook posts, and statements from high-ranking government officials.

Finally, in concluding that Coomer suffered emotional distress, the District Court did not cite *any* evidence.  (Order ¶ 238).  Based on citations elsewhere in the Order, the District Court's conclusion appears to be based on a single, unsupported paragraph in Coomer's declaration, which the parties were not allowed to address

when they deposed Coomer.  *See* Order ¶ 117.  This falls short of the clear and convincing standard and provides another basis to overturn the District Court's anti-SLAPP ruling as to the IIED claim.

**F.    The District Court reversibly erred in finding Coomer had sufficiently pled or submitted sufficient admissible evidence of a conspiracy (Cause of Action C).**

> **1.    The standard of review is *de novo* on this preserved issue.**

A *de novo* standard of review applies.  *See supra* Section VII.A.1.

TGP and Hoft preserved arguments related to the conspiracy claim in their Reply at p. 2 (joining OAN and Rion's Reply at p. 21), and p. 12.  The District Court directly addressed this issue at Paragraph 273 of the Order.

> **2.    A conspiracy requires an agreement among the alleged co-conspirators, and no admissible evidence showed such an agreement.**

The District Court's conspiracy finding as to TGP and Hoft is limited to a single paragraph, in which TGP and Hoft are combined with "All Other Defendants" as the District Court summarily found that the defendants "cooperated and fed off one another."  (Order ¶ 273).  The District Court did not cite a single piece of evidence in support of this conclusion — because there is none.  The most significant omission is any evidence of an agreement between TGP and/or Hoft and any other defendant.  To state a claim for civil conspiracy, Coomer must prove an agreement on the course of conduct, and the District Court cannot "infer the agreement

50

necessary to form a conspiracy; evidence of such an agreement must be presented by the plaintiff." *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995). Notably, in another case arising from the 2020 election, the U.S. District Court for the District of Columbia dismissed a conspiracy claim where the counterclaimant "fail[ed] to adequately allege an agreement." *US Dominion, Inc. v. MyPillow, Inc.*, 2022 WL 1597420, *7 (D.D.C. May 19, 2022). Critically, Plaintiff has not and cannot point to some 'events, conversations, or documents' indicating an 'agreement or a meeting of the minds' among the alleged co-conspirators." *Id.*

Moreover, conspiracy is not an independently actionable claim. *See Colorado Community Bank v. Hoffman*, 338 P. 3d 390, 397 (Colo. App. 2013). Conspiracy claims are derivative of other actionable claims. *Id*. Thus, in *Hoffman*, when the underlying claims were disposed of at summary judgment, the civil conspiracy claims were dismissed as derivative. *Id*. Because the defamation and IIED claims should be dismissed, the derivative conspiracy claim should be dismissed as well.

Accordingly, the denial of the anti-SLAPP relief as to the conspiracy claim should be reversed.

**G.   The District Court reversibly erred in denying TGP and Hoft anti-SLAPP relief on Coomer's injunctive relief claim (Cause of Action D).**

**1.   The standard of review is *de novo* on this preserved issue.**

51

TGP and Hoft preserved arguments related to the injunctive relief claim in their Reply at p. 2 (joining OAN and Rion's Reply at p. 21).  The District Court directly addressed this issue at p. 133 of the Order.

### 2.    Injunctive relief is not a separate claim, and Coomer never moved for or otherwise justified an injunction.

The District Court's injunctive relief finding demonstrates the biased judicial overreach carried out in this case.  Coomer has not moved for injunctive relief – presumably because there is no ongoing "harm."  TGP and Hoft have not been able to argue their position or explain why the harm resulting from the injunctive relief would outweigh any harm to Coomer.  Accordingly, it is premature to substantively analyze injunctive relief.  But the District Court nonetheless did a full injunctive relief analysis in the Order and ***found that Coomer is entitled to injunctive relief***. (Order ¶ 280).  Without even knowing what relief he is seeking or hearing how it would harm TGP and Hoft, the District Court concluded that there is irreparable harm and that it outweighs the harm to TGP and Hoft.  (Order ¶ 277).  The District Court also found that Coomer had established a likelihood of success in the case, going beyond the standards needed for an anti-SLAPP ruling and reaching conclusions of fact about the merits of the case.  (Order ¶ 275).

The question in the anti-SLAPP motion was not whether Coomer is entitled to injunctive relief — that issue was not briefed by the parties.

Moreover, even if it were appropriate to consider injunctive relief in

connection with this Motion, the relief that Coomer apparently seeks is not feasible. Although Coomer has not moved for injunctive relief, the Complaint "seeks permanent injunctive relief to remove all Defendants' defamatory statements upon final adjudication of the claims at issue." (Compl. ¶ 98). Coomer repeats this in his prayer for relief, in which he requests a "[p]ermanent injunctive relief requiring Defendants and their officers, agents, servants, employees, and attorneys to remove any and all defamatory publications made about Coomer." It's not clear what this even means, but TGP and Hoft do not have the ability to "remove" any and "all" statements in this digital age. That Coomer has requested an impossibility, and the District Court found he is entitled to it, is yet another reason this Order should be overturned and this count should be dismissed.

## H. The District Court reversibly erred in granting discovery and then in granting it in a one-way, inequitable fashion.

### 1. The standard of review is abuse of discretion on these preserved issues.

TGP and Hoft preserved arguments related to anti-SLAPP discovery and the one-way fashion in which it proceeded in their Response to Plaintiff's Motion for Reconsideration of Order Denying Plaintiff's Motion for Expedited Discovery (CF p. 6,651), Motion to Strike and for Extension of Reply Briefing Deadline and Hearing on Their Special Motion to Dismiss (CF p. 11,882). The District Court addressed these issues in its June 8, 2021 Order (CF p. 6,657), August 23, 2021 Order

(CF p. 7,618), September 7, 2021 Order (CF p. 8,113), September 22, 2021 Order (CF p. 11,301), and October 11, 2021 Order (CF p. 15,977).

**2.    The District Court erred in *sua sponte* reversing the prior judge's denial of discovery and then erred again in almost completely denying discovery to the defendants**

Judge Moses abused her discretion when she *sua sponte* reversed Judge Rappaport's denial of Coomer's request to lift the automatic discovery stay after the defendants filed their anti-SLAPP motions.  Judge Moses then doubled down on that error by largely refusing to allow discovery to the defendants, allowing anti-SLAPP discovery to proceed in a one-way, inequitable fashion.  Thus, if the Court is unwilling to grant TGP and Hoft anti-SLAPP relief on the current factual record, it should remand this case to the District Court with instructions to allow the defendants to engage in further discovery, including but not limited to depositions of the eight surprise declarants from Coomer's Response and a fulsome deposition of Coomer to discuss in greater detail, among other things, his status as a public figure, his activities in September 2020, the reasons for his departure from Dominion, and his reputation in the community generally.

## VIII.  CONCLUSION

The District Court's denial of TGP's and Hoft's Motion should be overturned, complete anti-SLAPP relief should be entered for TGP and Hoft (including an award of fees and costs), and the *sua sponte* sanction and fee award against TGP and Hoft

should be overturned.  If the case is remanded without entry of complete anti-SLAPP relief for TGP and Hoft, Judge Moses should be instructed to recuse and TGP and Hoft should be allowed reciprocal discovery before further briefing on anti-SLAPP relief on any counts that survive the order of this Court.

## IX.   FEE REQUEST

The Colorado anti-SLAPP statute provides for fees and costs to a prevailing defendant.  *See* C.R.S. § 13-20-1101(4)(a).  Because the District Court erred in denying TGP's and Hoft's Motion, the Order should be overturned, and TGP and Hoft should be awarded their fees and costs in defending against this lawsuit, including in connection with this appeal.

Respectfully submitted on January 10, 2023.

Respectfully submitted,
BURNS LAW FIRM

 *s/ John C. Burns* _____
JOHN C. BURNS
Burns Law Firm
P.O. Box 191250
Saint Louis, MO 63119
Telephone: 314-329-5040
Facsimile:  314-282-8136
E-mail:  tblf@pm.me

Randy B. Corporon, Esq.
Beth Chambers, Esq.
Law Offices of Randy B. Corporon, P.C.
2821 S. Parker Rd., Suite 555

Aurora, CO 80014

*Attorneys for Defendants*
*James (Jim) Hoft and*
*TGP Communications, LLC*
*d/b/a The Gateway Pundit*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of January 2023, a true and correct copy

of the foregoing was electronically served via the Integrated Colorado Courts E-

Filing System (ICCES) and has been e-served via ICCES on all counsel of record.

*/s/ John C. Burnes*

| | |
|---|---|
| In the Colorado Court of Appeals 2<br>East 14th Avenue<br>Denver, CO 80203 | <span>DATE FILED: November 1, 2022 5:05 PM<br>FILING ID: B25F1A15B9009<br>CASE NUMBER: 2022CA843</span> |
| Appeal from the District Court, County of Denver, District<br>Court Case No. 2020CV34319<br>Honorable Marie A. Moses – Division 409<br>Honorable Eric M. Johnson<br><br>**Plaintiff-Appellee:** Eric Coomer, Ph.D.<br><br>**v.**<br><br>**Defendants-Appellants:** Joseph Oltmann,<br>FEC United, Shuffling Madness Media, Inc. d/b/a<br>Conservative Daily | |
| **Attorney for Appellants:**<br>Ingrid J. DeFranco<br>LAW OFFICE OF INGRID J. DEFRANCO<br>PO Box 128<br>Brighton, CO 80601-0128<br>303-443-1749; fax: 303-558-4294<br>ingrid.defranco@gmail.com Reg. No. 31206 | Case Number: 22CA843 |

# OPENING BRIEF OF APPELLANTS JOSEPH OLTMANN, FEC UNITED, AND SHUFFLING MADNESS MEDIA, INC.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with all requirements of C.A.R. 28 and C.A.R. 32, including all formatting requirements set forth in those rules.  Specifically, the undersigned certifies that:

The brief does **not** comply with the applicable word limits set forth in C.A.R. 28(g).  It contains 10,923 words as calculated by MS Word 2022, and is accompanied by a Motion for Leave to Exceed the Word Limit.

The brief complies with the standard of review requirements set forth in C.A.R. 28(a)(7)(A).

For each issue raised by the appellant, the brief contains under a separate heading before the discussion of the issue, a concise statement: (1) of the applicable standard of appellate review with citation to authority; and (2) whether the issue was preserved, and, if preserved, the precise location in the record where the issue was raised and where the court ruled, not to an entire document.

I acknowledge that my brief may be stricken if it fails to comply with any of the requirements of C.A.R. 28 and C.A.R. 32.

/s/  Ingrid J. DeFranco

Ingrid J. DeFranco

i

# TABLE OF CONTENTS

CERTIFICATE OF COMPLIANCE   ……………………………………………..i

TABLE OF AUTHORITIES ................................................................iv

QUESTIONS PRESENTED ...................................................... 1

STATEMENT OF THE FACTS AND CASE.................................... 2

SUMMARY OF THE ARGUMENT ............................................ 7

ARGUMENT.......................................................................... 9

I.     The Discovery Order Was Improperly Reversed and Sanctions Were

       Improperly Imposed as a Consequence. ................................. 9

   A.    The Court Erroneously Reversed the Order and Granted

         Exceedingly Broad Discovery.............................................15

   B.    The Discovery Sanctions Were Improperly Imposed.....................17

II.    The Court Abused its Discretion by Finding that Mr. Oltmann's Statements

       Were Probably False, Holding that the Newsperson's Privilege Did Not

       Apply, and Ordering Disclosure of a Source. .......................22

III.   The Trial Court Erred Reversibly By Misapprehending the Standard for

       Determination of an Anti-Slapp Motion, Making Credibility Determinations,

       Misapprehending "Actual Malice" and Clear and Convincing Evidence, and

Relying on Incompetent Evidence to Find the Plaintiff Had Met

His Burdens. ...................................................................................... 27

A.    The Trial Court Grounded Its Denial of the Defendants' Motions In

Improper and Unwarranted Credibility Determinations ........................................ 29

B.    The Court's Analysis of Actual Malice Was Reversibly Erroneous. ............ 32

D.    The Court's Finding that the Plaintiff Met His Burdens Was Predicated on

Inadmissible and Incompetent Evidence .................................................. 35

E.    The Trial Court Erred By Denying a Complete Stay During the Pendency

of    this Appeal ............................................................................. 40

IV.    The Proceedings Below Were Infected By Judicial Bias .................................... 42

CONCLUSION ..................................................................................... 45

CERTIFICATE OF SERVICE .......................................................................... 45

APPENDICES:

Appendix 1: *Representative Trial Court Credibility Determinations*

Appendix 2: *Trial Court Action Post-Notice of Appeal*

# TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts v. Steinberg,* 132 Cal. Rptr. 2d 789, 809 (2003) .............................................. 16

*Alden v. Mid-Mesabi Assocs. Ltd P'ship*, No. 06-954 (JRT/RLE), 2008 WL 2828892,

at *18 (D. Minn. 2008) ........................................................................................................ 25

*Aspen Springs Metro. Dist. v. Keno,* 369 P.3d 716, 723 (Colo.App. 2015) ....................... 14

*Balla v. Hall,* 59 Cal. App. 5th 652, 692 (Cal.App. 2021 ...................................................... 16

*Byerly v. Bank of Colo.* 411 P.3d 732, 738 (Colo.App. 2013) ................................................ 43

*Chick-fil-A v. Exxonmobil Corp.*, No. 08-61422-CIV, 2009 WL 3763032, at *13

(S.D. Fla. Nov. 10, 2009) ..................................................................................................... 24

*City & Cnty. of Broomfield v. Farmers Reservoir & Irrigation Co.,* 239 P.3d

1270, 1275 (Colo.2010) ........................................................................................................ 22

*City of Las Cruces v. United States,* Civ. No. 17-809 JCH/GBW at *12

(D.N.M. Feb. 1, 2021) .......................................................................................................... 23

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) ................................................................. 32

*Commercial Industrial Const. v. Anderson*, 683 P.2d 378, 381 (Colo.App. 1984) ................ 44

*Costa v. County of Burlington,* 254 F.R.D. 187, 191 (D.N.J. 2008) ...................................... 23

*Craig v. Rider*, 651 P.2d 397, 401-402 (Colo. 1982) ............................................................. 14

*Dave Peterson Elec., Inc. v. Beach Mountain Builders, Inc.*, 167 P.3d 175, 176

(Colo.App. 2007) .................................................................................................... 21

*Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't,* 196 P.3d 892, 899 (Colo.2008) ... 22

*Freedom's Path at Dayton v. Dayton Metro. Hous. Auth.*, No. 3:16-cv-466 at *25

    (S.D. Ohio June 13, 2018) .................................................................................... 23

*Garrigan v. Bowen*, 243 P.3d 231, 235 (Colo.2010) .............................................. 14

*G.J.B. Assoc., Inc. v. Singleton,* 913 F.2d 824, 830 (10th Cir. 1990) ........................... 22, 26

*Gordon v. Boyles*, 9 P.3d 1106, 1109 (Colo. 2000) ................................................. 31

*In re Elinoff*, 22 P.3d 60, 63 (Colo. 2001) ............................................................. 31

*In re Murchison* 349 U.S. 133, 137(1955) ............................................................. 47

*In re Quiat*, 979 P.2d 1029, 1038 (Colo. 1999) ...................................................... 31

*In re T.E.R.,* 305 P.3d 414 (Colo.App. 2013 ........................................................... 14

*Int'l Ass'n of Machinists & Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479,

    487 (D. Md. 2005).............................................................................................. 25

*Klinck v. District Court*, 876 P.2d 1270, 1277 (Colo. 1994) .................................... 48

*L.S.S. v. S.A.P.,* 22COA123 ¶¶ 23, 20. ................................................................. 33

*Lawson v. Stow*, 2014 COA 26, ¶ 18 .................................................................... 33

*Lewis v. McGraw-Hill Broadcasting Co., Inc.,*   832 P.2d 1118, 1123 (Colo.App. 1992)..... 38

*Liteky v. United States,*  510 U.S. 540, 555 (1993) ................................................. 47

*Lykins v. CertainTeed Corp.,* 555 Fed. Appx. 791, 797 (10th Cir. 2014) ........................... 26

*Messenger v. Anderson* , 225 U.S. 436, 444 (1912) ................................................ 20

*Nesbit v. Industrial Commission*, 43 Colo.App. 398, 607 P.2d 1024 (1979) ...................... 43

*Oldham v. Pedrie,* 411 P.3d 933, 941 (Colo.App. 2015) ........................................................ 27

*Orsi v. Kirkwood,* 999 F.2d 86, 92 (4th Cir. 1993) ................................................................. 44

*People ex rel. Gallagher v. Dist. Court* , 666 P.2d 550, 553 (Colo. 1983) .............................. 20

*People in Interest of A.G.* , 262 P.3d 646, 651 (Colo. 2011) .................................................. 46

*People v. Allen,* 885 P.2d 207, 212 (Colo. 1994) ................................................................... 20

*People v. Dobler* , 369 P.3d 686, 688 (Colo.App. 2015) ......................................................... 45

*People v. Gibson,* 203 P.3d 571, 578 (Colo.App. 2008). ......................................................... 48

*People v. Hernandez and Associates,* 736 P.2d 1238, 1240 (Colo.App. 1986) ...................... 44

*People v. Huehn,* 53 P.3d 733, 736 (Colo.App. 2002) ............................................................ 44

*People v. James,* 40 P.3d 36, 45 (Colo.App. 2001) ................................................................ 48

*People v. James,* 694 P.2d 356 (Colo. 1984) ......................................................................... 43

*People v. Julien* , 47 P.3d 1194, 1197 (Colo. 2002) ................................................................ 45

*People v. Matheny,* 46 P.3d 453, (Colo. 2002 ....................................................................... 27

*People v. Rojas,* 181 P.3d 1216, 1218 (Colo.App. 2008) ........................................................ 45

*People v. Shifrin,* 342 P.3d 506, 517 (Colo.App. 2014) .......................................................... 43

*People v. Valera-Castillo,* 2021 COA 91, ¶ 25 ...................................................................... 42

*Pogue v. Nw. Mut. Life Ins. Co.,* No. 3:14-CV-598-CRS, 2017 WL 3044763,
at *8 (W.D. Ky. July 18, 2017) ......................................................................................... 23

*Pueblo of Jemez v. United States,* 366 F.Supp. 3d 1234, 1237 (10th Cir. 2018) .................. 45

*QBE Ins. Corp. v. Jorda Enterprises, Inc.,* 277 F.R.D. 676, 691 (S.D. Fla. 2012) ............... 23

*Quigley v. Rosenthal,* 327 F.3d 1044 (10th Cir. 2003) ....................................................... 37, 38

*Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1180 (D. Colo. 1999 .......................................... 37

*Rea v. Corrections Corp. of America*, 272 P.3d 1143, 1147 (Colo.App. 2012) .............. 46, 47

*Resolution Tr. Corp. v. Dabney*, 73 F.3d 262, 268 (10th Cir. 1995) ...................................... 26

*Salazar v. Pub. Tr. Inst.,* 22COA109 ¶ 21 ................................................................................ 32

*SG Ints. I, Ltd. v. Kolbenschlag*, 2019 COA 115, ¶ 19 ........................................................... 33

*Smith v. District Court* , 629 P.2d 1055, 1056 (Colo. 1981) ................................................... 45

*State v. Valdez,* 2006 UT 39, ¶ 44 140 P.3d 1219, 1233-34) .................................................. 42

*Sumler v. District Ct., City Cty*, 889 P.2d 50, 54 (Colo. 1995) .............................................. 21

*T.D. v. Patton*, 2149 F.Supp.3d 1297 *25 (D. Colo. 2014) ..................................................... 44

*Terrones v. Tapia*, 967 P.2d 216, 219 (Colo.App. 1998)( ....................................................... 45

*Wallbank v. Rothenberg*, 140 P.3d 177, 179 (Colo.App. 2006) .............................................. 14

*Warden v. Exempla, Inc.,* 291 P.3d 30, 34 (Colo. 2012) ......................................................... 22

*Watso v. Colo. Dep't of Soc. Servs.*, 841 P.2d 299, 311 (Colo. 1992) .................................... 14

*Weld County Kirby v. Industrial Commission*, 676 P.2d 1253, 1258 (Colo.App. 1983) ........ 43

*Williams v. Boyle*, 72 P.3d 392, 396 (Colo.App. 2003) ........................................................... 14

*Wilson v. Lakner*, 228 F.R.D. 524, 528 (D. Md. 2005) ........................................................... 23

## Statutes

§ 13-20-1101(5), C.R.S. (2021). ................................................................................................ 13

§ 13-20-1101(6), C.R.S.(2021) .................................................................................................. 15

§ 13-20-1101(6), C.R.S. (2021) ................................................................................................. 15

**Other Authorities**

Colo. C.J.C. 2.11, cmt. 2 ........................................................................................... 46

**Rules**

Colorado Rule of Civil Procedure 37(b)(2)(E) ..................................................... 25

Colorado Rule of Civil Procedure 56 ...................................................... 40, 43, 45

Colorado Rule of Civil Procedure 121 § 1-15(11) ......................................... 14, 17

# QUESTIONS PRESENTED

I.      Whether the trial court erred reversibly by soliciting and granting reconsideration of an order declining to lift the discovery stay which was not manifestly erroneous, granting broad discovery, and denying reciprocal discovery;

II.     Whether the trial court erred by imposing sanctions for imperfect testimony by corporate designees in unnoticed or precluded areas, and further erred by imposing sanctions on counsel without notice;

III.    Whether the trial court erred and abused its discretion by finding, without substantial record support, that Mr. Oltmann's report of what he witnessed on a conference call was "probably false", holding that the newsperson's privilege did not apply, and ordering disclosure of a source;

IV.     Whether the trial court erred reversibly by admitting incompetent evidence, making improper and unwarranted credibility determinations, and relying on the incompetent evidence and credibility determinations, by misapprehending the standard for adjudicating an Anti-SLAPP motion, and for determining "actual malice" and clear and convincing evidence, to deny the defendants' motions to dismiss;

V.      Whether the successor judge's hostility and bias toward the Oltmann Defendants required her recusal;

1

VI.     Whether the trial court erred by denying a complete stay during the pendency
        of this appeal.

## STATEMENT OF THE FACTS AND CASE

In the summer of 2020, Joseph Oltmann was conducting an FEC United (501(c)(4) organization) meeting when he was approached by a young man claiming to be a long-time ANTIFA member who wanted to distance himself from the organization. *CF,p.19853,42,ll.9-23.* At the time, Mr. Oltmann, suspicious that the man might be a provocateur, politely turned away. *CF,p.19853,42,l.9-43,l.8.* The man, "R.D.", proved persistent, and in September, attended another FEC meeting with a companion, and sought Oltmann out. He could provide access to an ANTIFA meeting, so that Oltmann could attempt to discover whether some of the local journalists who were targeting him were involved in the group and its operations. In September, R.D. and Oltmann infiltrated a conference call, using R.D.'s identity, and Oltmann listened in for about forty-five minutes. *CF,p.19857,59,l.21-p.19858,60,l.1.*

Oltmann believed he was able to identify a local journalist/activist who had targeted him, heard callers identify enemies and plans to harm them, in particular, a Joseph, "Joey" Camp, referred to as a "rat". *CF,p.19856,52,ll.9-18;p.19862, 76,l.7-77,l.10.* Someone asked what are we going to do if "Trump" wins. Another caller said, in effect, "Don't worry about the election. Trump is not going to win. I made fucking sure of that. Hahaha.". *CF,p.19884,167,ll.14-17;CF,pp.15917-19.* Someone asked who made the

2

comment, and another caller said, "Eric, the guy from Dominion". The callers continued to discuss recruiting, logistics, and planned upcoming events, and Oltmann left the call before the meeting concluded. *CF,p.19859,65,l.4– 19860,70,l.4;p.19865,72,l.1-p.19863,83,l.1.*

While the Plaintiff denies having been present on an "Antifa call", his witness, Tay Anderson, stated that a conference call for Black Lives Matter occurred on September 25, 2020. Oltmann's notes reflect that a "Tay" was present on the call, with a question mark followed by "This guy is Antifa??" *CF,p.19864,84,ll.12-13,p.19932; CF,pp.10897-901.*

Oltmann made notes during the call, and began attempting to identify and locate Mr. Camp, and to learn who the "Eric the Dominion guy" might be. Oltmann is a data expert, with more than a decade of experience in the area, beginning at Ernst & Williams, through the Ernst & Young merger, before leaving to start a company which has grown to be one of the largest first-party data aggregators in the nation and servicer for other companies. *CF,p.19845,8,ll.13-24,9,ll.12-21,11,l.24-p.19846,12,l.2.*

As Oltmann explained it, "[w]e can pretty much tell everything about you, including what kind of devices you use as far as cell phones, what's your IP addresses, how long you spend on certain sites…we take PII, which is personal identifiable information. We strip it away and we develop what are called unique identifiers of people, which makes it so that we don't put anybody at risk." *CF,p.19846,13,l.19-14,l.4.*

3

Investigating an electronic footprint is "very much in my wheelhouse." *CF,p.19570,14,ll.8-11.*

On September 26, the day after Anderson swears the call took place, Oltmann's Google search for "Eric Dominion Denver Colorado" lead to Eric Coomer, and Oltmann quickly found videos made by Coomer as a representative of Dominion Voting Systems. *CF,p.19874,ll.8-13.* From those videos he was able to compare the voice, cadence, and diction, learned that Eric Coomer was a Berkley-educated PhD. nuclear engineer, adjudged it incredible that such a person would have been on the September call or made the statement he heard, and suspended his investigation. *CF,p.19874,56,l.1-57,l.7.*

On Friday night, November 6, Oltmann received a troubling article about election irregularities in Georgia, and did some research. *CF,p.19873,121,ll.13-23,123, ll.11-16.* Digging down into Dominion and Eric Coomer, he discovered Eric Coomer's social media posts, patents, and contacts with election officials. *CF,p.19873,23,l.24– p.19874,127,l.5; CF,p.20253.*

On November 6 or 7, he received screenshots of Coomer's Facebook pages, verified that account, and determined the posts were consistent with an ANTIFA supporter, and inconsistent with Coomer's public image. *CF,p.19880,151,l.4- p.19881,155,l.14.* He also discovered Coomer's affidavit in the case against Dominion

in Georgia[1] and his bio submitted to the Colorado Secretary of State in 2015 by Dominion. He obtained "Draft notes" of Coomer's testimony to Arizona election officials. *CF,p.20174,l.20–p.20176,l.17; p.20178,ll.1–23.*

On November 9, 2020,. Oltmann reported the call and remarks he had witnessed in September, and the information he had amassed since then on his Conservative Daily podcast. He explained how he became focused on Antifa, *CF,p.20138,l.12-p.20140,l.18,* how he got on the September phone call, *CF,p.20140,l. 19-p.20141,l.7,* and what he heard there, *CF,p.20141,l.2–p.20142,l.7.*

Oltmann and co-host discussed the possibility that the speaker was "joking" or "bragging", *CF,p.20147,l.15-p.20148,l.14,* and did not foreclose that possibility. Oltmann commented, "even if he says that, some of the information he put on his page, no state in this entire country should use Dominion Voting Systems ever again once they hear this." *CF,p.20148,ll.16-20.* He showed screenshots of some of the Plaintiff's Facebook pages, particularly those involving profane anti-Trump diatribes, *CF,p.20149, l.17–p.20150,l.1;p.20153,l.25–p.20154,l.18,* support for Antifa, *CF,p.20157,l.6–p.20160,l.11,* anti-police posts including "fuck the police", *CF,p.20161,ll.17-22,* celebrating the killing of police officers, *CF,p.20166,l.24–p.20167,l.15,* "fuck the USA", *CF,p.20164,ll.1-4,* Coomer's his expert declaration in the Raffensperger case in U.S. District Court (N.D. Ga), *CF,p.20176,l.2-p.20177,l.9,* the bio included in Dominion's

---

[1] *Curling v. Raffensberger*, 1:17-CV-02989 (N.D.Ga.)

submission to the Colorado Secretary of State, *CF,p.20176,l.6– p.20179,l.22*, draft notes in Phoenix, AZ for his testimony before the election certification advisory committee, *CF,p.20180,ll.9-23*, his statements to Georgia election officials concerning a "glitch" in the 2020 pre-election testing, *CF,p.20182,l.14-p.20184,l.9*, his patents, *CF,p.20180,l.22– p.20187,l.7*, a post made during the 2016 election on November 8 in which he stated, "#2016results #widemargins #norecounts…from a professional standpoint, it's my one and only hope for tonight." *CF,p.20222,l.23–p.20224,l.21*. Oltmann concluded, "I don't think Eric Coomer should ever work in elections again…you can't have someone like that that has any sort of integrity in what they're doing" *CF,p.20234,ll.7-10*.

Within days, his life had been threatened, and he discovered that Coomer's internet presence was being scrubbed. *CF,p.19872,119,l.11-p.19873,120,l.19;p.19879, 144,ll.6-12; TR,07.07.21,p.16,l.1- p.19,l.1*. The threats continued and he was compelled to hire bodyguards as he was followed and invaded. *CF,p.19852,38,l.6– p.19853,39,l.18;CF,pp.15917-19*.

The Plaintiff filed his complaint on December 22, 2020, and the defendants were granted an extension of time to file their special motions to dismiss under Colorado's Anti-SLAPP statute. The district court judge initially assigned to the case was rotated out and replaced by an interim veteran district court judge.

The Plaintiff moved for discovery, and the veteran judge denied the request, finding that the Plaintiff had not made the required showing of "good cause" to subject any defendant to the expense and rigors of discovery. *CF,pp.6262-6264*. On May 27,

6

three days after taking the bench, a newly-appointed judge held a status conference and announced her intention to revisit the discovery order, inviting the Plaintiff to file a motion to reconsider the ruling. *TR,05.27.21,p.10,ll.8-14.* The defendants opposed reconsideration. *CF,pp.6609-14.* The court reversed the order and granted the Plaintiff extremely broad discovery, and set a hearing on the special motions to dismiss more than four months later, *CF, pp.6657-62,* over the defendants' objections, *CF,pp.6785-86.* The court denied reciprocal discovery. *CF,pp.7131-7134.*

The Plaintiff demanded that Oltmann reveal the source who introduced him to the Antifa call. He declined, citing Colorado's newsperson's privilege. *CF,pp.6800-04.* The court held a hearing on September 7, renewed a preliminary finding that his report was "probably false" and ordered him to disclose the source. *TR,07.09.21, p.90,l.6-p.91,l.7.*

On October 13 and 14, 2021, the district court held a hearing on the special motions to dismiss, granting the Plaintiff six and one-half hours, and requiring the fourteen defendants to split seven and one-half. *TR,10.13.21,p.17,ll.12-14.* The court instructed the parties to submit proposed findings of fact and conclusions of law, *TR,10.13.21,p.278,ll.17-20,* and denied all defendants' special motions to dismiss. *CF,pp.22772-907.* After the defendants filed their notices of appeal, the court denied their motion for a complete stay. *CF,p.23,895.*

**SUMMARY OF THE ARGUMENT**

7

The trial court found that the Plaintiff had not shown "good cause" to lift the discovery stay.  A successor judge improperly reconsidered the order and granted the Plaintiff extremely broad discovery, denied the defendants reciprocal discovery, permitted the Plaintiff to introduce declarations from nine individuals, including three putative experts, who had never been disclosed, and denied the defendants' motion to depose the declarants, who did not testify.  The court set a hearing on the motions, over defendants' objections, and to facilitate the Plaintiff's discovery, more than nine months after the complaint was filed, 140 days after the motions were served, far outside the twenty-eight-day statutory limit. § 13-20-1101(5), C.R.S. (2021).

the Plaintiff conducted 30(b)(6) depositions of the Oltmann Defendants, and sought sanctions, claiming that the designees constructively failed to appear.  The court improperly imposed sanctions on the Defendants for failing to answer questions which were not noticed or within the scope of discovery established by the discovery order, and imposed sanctions on counsel, without notice, for failure to designate appropriate representatives.

When Oltmann invoked privilege against disclosing a source, the court made a preliminary finding that Mr. Oltmann's statements were "probably false", based on four factors, held a hearing at which Mr. Oltmann and his security person testified, rebutting each of the four factors, and describing t extensive threats and invasions against the Oltmann Family.  The court disregarded the evidence and again found "probable falsity", ordering disclosure.

8

The court held a two-day evidentiary hearing, during which the Plaintiff was permitted to introduce unauthenticated and hearsay evidence, and undisclosed expert and lay declarations, which the defendants were denied any opportunity to test, then relied on that incompetent evidence to find that the Plaintiff had met his burden and deny the defendants' motions to dismiss.  After the notices of appeal were filed, the court erroneously denied the appellants' motion for a stay.

After the successor judge entered the case, the proceedings became a chronicle of unfair treatment of the defendants and their counsel, culminating in the May, 2022 order which intemperately and injudiciously traduced Oltmann.

## ARGUMENT

### I.  THE DISCOVERY ORDER WAS IMPROPERLY REVERSED AND SANCTIONS WERE IMPROPERLY IMPOSED AS A CONSEQUENCE.

**Preservation and Standard of Review:**

While "[g]ood cause" is generally held to be a matter left to the discretion of the trial court," *Craig v. Rider*, 651 P.2d 397, 401-402 (Colo. 1982) (good cause to reopen default judgment), *Williams v. Boyle*, 72 P.3d 392, 396 (Colo.App. 2003) (good cause for extension of time to file certificate of review), it has been held to require substantial supporting evidence (*In re T.E.R.*, 305 P.3d 414 (Colo.App. 2013)(ICWA transfer); *Watso v. Colo. Dep't of Soc. Servs.*, 841 P.2d 299, 311 (Colo. 1992); *Wallbank v. Rothenberg*,

140 P.3d 177, 179 (Colo.App. 2006) ("good cause" is a "substantial or legal justification, as opposed to an assumed or imaginary pretense").  However, a court's interpretation of a rule of civil procedure (here, Rule 121 1-15(11)) is reviewed *de novo*.  *Aspen Springs Metro. Dist. v. Keno,* 369 P.3d 716, 723 (Colo.App. 2015)(citing *Garrigan v. Bowen,* 243 P.3d 231, 235 (Colo.2010)).

The issues were preserved in the Defendants' Response in Opposition to Plaintiff's Motion for Limited Discovery, *CF,pp.6101-6110*, Response in Opposition to Plaintiff's Motion for Reconsideration and Request to Affirm the May 21, 2021 Order, *CF,pp.6609-6614,* and Motion to Reconsider June 8, 2021 Order Granting Limited Discovery, *CF,pp.6775-6786*.

**Particular Facts:**

The court found the Plaintiff had not shown "good cause" to lift the protective discovery stay established by § 13-20-1101(6), C.R.S. The successor judge, in her first action in the case, invited the Plaintiff to move for reconsideration of the discovery order, without identifying any manifest error of law or fact in, or manifest injustice resulting from, the order.

The May 21, 2021 order noted that "The automatic stay of discovery is a hallmark feature of the anti-SLAPP statute" *CF,p.6263(*citing Thomas R. Burke, F*iling Anti-SLAPP Motion Automatically Stays Discovery,* Anti-SLAPP Litigation 2:55 (2020). Colorado's statute, C.R.S. § 13-20-1101(6) provides that discovery may be granted only for "good cause shown", because the statute's primary purpose is to protect defendants

10

from the expense of defending against the suit, until such time as the court has determined it is meritorious and reasonably likely to succeed.

The court noted that "the plaintiff must show discovery is necessary to oppose the special motion to dismiss" (citing *Balla v. Hall,* 59 Cal. App. 5th 652, 692 (Cal.App. 2021), and held that the Plaintiff had failed to establish "good cause" as to any defendant.[2]

The new judge, reversing the earlier order, grounded her decision in the finding that, "[p]laintiff's pleadings, and indeed the pleadings of some of the Defendants, have established a prima facie case that the statements at issue contain "provably false factual assertions." *CF,p.6658*.  Noting that California courts require a plaintiff to give "some explanation of what additional facts [plaintiff expects to uncover…" (citing *1-800 Contacts v. Steinberg,* 132 Cal. Rptr. 2d 789, 809 (2003), the court held that the Plaintiff's request for discovery averred that he hoped to discover evidence *"with respect to the following elements addressed in his complaint"*:

> 1) Actual malice (which requires an inquiry into whether the Defendant(s) proceeded with reckless disregard as to whether their statements were false or not) related to Plaintiff's defamation claims; and
>
> 2) Coordination or discussions between Defendants related to Plaintiff's claims of civil conspiracy and relevant to the actual malice inquiry.

---

[2] The district court also addressed the litigation privilege raised by other defendants, and found that the requested discovery was unlikely to lead to admissible evidence relevant to that issue.

11

*CF,p.6659.* The court found "that Plaintiff has adequately described the specific additional facts he expects to uncover…" and granted exceedingly broad discovery. In fact, the Plaintiff identified no "facts" he expected to uncover, as the passage above demonstrates. The Oltmann Defendants timely moved for reconsideration, noting that neither the Plaintiff nor the court had identified a "manifest error of fact or law" as required by C.R.C.P. 121§ 1-15(11), that the court failed to give effect to the legislative intent of the automatic stay provision, or the defendants' concerns that the Plaintiff would attempt to secure virtually all the material discovery in the case, while ostensibly being granted only "limited" discovery" (which concerns fully materialized), that the order violated the "speedy resolution" provision of the Anti-SLAPP statute and Colorado's newsperson's privilege, permitted discovery on irrelevant claims, which are not, in fact, claims, and unconstitutionally chilled the defendants' First Amendment rights to gather news and investigate issues of significant public concern. *CF,pp.6775-6786.* The court denied reconsideration and the Oltmann Defendants moved for reciprocal discovery, on due process and equal protection grounds, and argued that without discovery, they would be unable to subject the Plaintiff's evidence to meaningful adversarial testing. *CF,pp.7131-7134.* Reciprocal discovery was denied. *CF,p.7618.*

After the New York Times published an interview in which the Plaintiff admitted he had lied in earlier interviews by claiming his Facebook pages were fabricated, ostensibly by Mr. Oltmann, and spoliated evidence, the defendants moved again for

12

limited discovery, *CF,pp.8046-8048,8109-8112,* and were permitted only a single two-hour deposition between them *CF,p.8116,* with Plaintiff's deposition to be sealed, while those of the defendants were not.

Mr. Oltmann was ordered to sit for a deposition at the courthouse, though the other defendants were permitted to be deposed remotely, or at their offices. His chief security person objected to his being required to appear at a public place at a prearranged time, because it was unsafe. As the court heard from a personal security person, under oath, the Oltmann Family had been repeatedly followed, shot at, had their home repeatedly invaded by armed persons and drones, had FBI investigation of unknown white powder mailed to their home and had been publicly and privately threatened. *TR,07.07.21,p.61,l.18-p.66,l.23.* He did not appear, and was sanctioned.

Depositions of the Oltmann Defendants were noticed for August 11, 2021. *CF, pp.7693-98;7687-92.* Attorneys for Mr. Oltmann, FEC United, Inc., and SMM notified Plaintiff's counsel that a representative for SMM would have no relevant information, because SMM had no interest in Conservative Daily and that it was owned and controlled by CD Solutions (not a named party), and asked who they actually wanted to depose. Plaintiff's counsel advised that they wanted to depose 'whatever entity is responsible for Conservative Daily, if it is not SMM, please." *CF,p.7701,¶24;7706 ¶22.* The 30(b)(6) designees for FEC United and CD Solutions appeared at the courthouse and were deposed. The Plaintiff moved for sanctions, claiming that the representatives

13

were inadequate, but offering no particulars as to what questions, on which properly-noticed topics, the representatives were unable to answer. *CF,pp.7257-7275*.

The Defendants responded, setting out for the court precisely which questions the representatives were unable to answer, and citing to the respective deposition transcripts. *CF,pp.7674-75*. The court set a hearing on the motion, and made a finding that the 30(b)(6) designees:

> …did not have sufficient knowledge to be able to respond in any meaningful way to the 30(b)(6) deposition notices…but repeatedly indicated, the person that has that information, and the information that was properly being sought, was in fact Mr. Oltmann. So the Court does find that the FEC United and Shuffling Madness, and to the extent that CD Solutions is involved, that those depositions were not sufficient, and the Court is going to impose sanctions under Rule 37 for those depositions.

*TR,08.27.21,p.27,ll.2-13*.   Mr. Oltmann's counsel explained that the designees were able to answer the appropriate questions, and deposing Oltmann would not change those answers, and that she advised Plaintiff's counsel prior to the deposition that neither FEC United nor Shuffling Madness Media would have relevant information, and gave them the opportunity to choose the designee. *TR, 08.27.21,p.28,ll.8-22;p.30,ll.1-20*. She objected to the Plaintiff's questioning outside the parameters of the court's limited discovery order. *TR, 08.27.21,p.2,ll. 9-13*.

The court designated Oltmann as the 30(b)(6) representative and ordered him to appear for CD Solutions, FEC United, and Shuffling Madness Media (which was not a named defendant in the case). *TR, 08.27.21,p.37,l.22-p.39,l.1*.

14

Mr. Oltmann shall be responsible for the reasonable and necessary fees and costs incurred by counsel for plaintiff preparing for and attending the deposition that day. Mr. Oltmann will be personally responsible for those reasonable fees and cost for all three depositions, Oltmann, FEC and CD Solutions.

Ms. Hall and Ms. DeFranco will be jointly responsible, with Mr. Oltmann, for the 30(b)(6) deposition reasonable fees and costs. So I do find that since they are the attorneys for FEC and Shuffling Madness Media that they did have an obligation to present witnesses that would be able to respond and they did not do. So that is why I'm entering the attorneys fees award with respect to Ms. Hall and Ms. DeFranco with respect to those 30(b)(6) depositions.

*TR, 08.27.21,p.44,ll.11-25.*

**Argument:**

### A. THE COURT ERRONEOUSLY REVERSED THE ORDER AND GRANTED EXCEEDINGLY BROAD DISCOVERY

The law of the case doctrine "expresses the practice of courts generally to refuse to reopen what has been decided" *People ex rel. Gallagher v. Dist. Court* , 666 P.2d 550, 553 (Colo. 1983) (quoting *Messenger v. Anderson* , 225 U.S. 436, 444 (1912)).  While the rule does not preclude a court from revisiting a decision which is erroneous, a ruling must be followed "unless the court determines that it is no longer sound because of changed conditions, factual errors in the previous ruling, intervening changes in the law, or manifest injustice resulting from the original ruling." *People v. Allen,* 885 P.2d 207, 212 (Colo. 1994)(citing *People ex rel. Gallagher, supra*).

A second district court judge may rule on a matter that was previously ruled upon by another judge of the same district if "[s]ufficient new facts [are] alleged in the second motion to allow the second judge to enter a different ruling than that of the first judge, in the same manner that judge

15

could have, had he been apprised of the new facts." *Jouflas v. Wyatt*, 646 P.2d 946, 947 (Colo.App. 1982); see *Moon v. Platte Valley Bank*[9], 634 P.2d 1036, 1037 (Colo.App. 1981). A successor judge may vacate a default judgment when the original judge would have had an adequate legal basis to do so. *Sunshine v. Robinson*, 168 Colo. 409, 414-15, 451 P.2d 757, 760 (1969).

[9] See also *State v. Lamper*, 779 P.2d 1125, 1129 (Utah 1989) ("The general rule is that one judge may not redetermine a previous ruling made by another judge in the same case. . . . However, if relevant circumstances change in the intervening period, the second judge may then reexamine the earlier ruling."); *Lemons v. Superior Court*, 687 P.2d 1257, 1259 (Ariz. 1984) ("The general rule . . . is that a trial court should not reconsider a motion already decided by another superior court judge unless new circumstances are demonstrated by the movant.").

*Sumler v. District Ct., City Cty*, 889 P.2d 50, 54 (Colo. 1995).  None of the conditions under which a successor judge may revisit a ruling is present here: there was no new evidence, and no changed conditions; there were no identified factual errors in the earlier ruling; there had been no changes in the law; and the Plaintiff made no claim that he had suffered a manifest injustice.

Rather, the successor judge invited the Plaintiff to submit a motion for reconsideration, and then reversed the order, without identifying any manifest error of fact or law in the earlier order.  Rule 121 §1-15(11) conditions relief upon this showing: "[s]uch a motion must allege a manifest error of fact or law that clearly mandates a different result or other circumstance resulting in manifest injustice." See *Dave Peterson Elec., Inc. v. Beach Mountain Builders, Inc.*, 167 P.3d 175, 176 (Colo.App. 2007) (motion for reconsideration properly denied where party did not establish harm or prejudice).

16

The trial court's invitation of a motion to reconsider was reversible error, because the mandatory conditions for a motion to reconsider were not present, and the law of the case doctrine precluded the court from revisiting an earlier ruling except under conditions not met.

## B. THE DISCOVERY SANCTIONS WERE IMPROPERLY IMPOSED

### Preservation and Standard of Review

A trial court's interpretation of a rule of civil procedure is reviewed *de novo* because it presents a question of law. *City & Cnty. of Broomfield v. Farmers Reservoir & Irrigation Co.,* 239 P.3d 1270, 1275 (Colo.2010). A misapplication of the law constitutes an abuse of discretion. *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't,* 196 P.3d 892, 899 (Colo.2008). A trial court's imposition of sanctions under Rule 37 is reviewed for an abuse of discretion, which occurs if its decision is manifestly arbitrary, unreasonable, or unfair. *Warden v. Exempla, Inc.,* 291 P.3d 30, 34 (Colo. 2012). A court also abuses its discretion by failing to provide a party with required due process. *G.J.B. Assoc., Inc. v. Singleton,* 913 F.2d 824, 830 (10th Cir. 1990).

Appellants preserved this issue in their Response in Opposition to Plaintiff's Motion for Sanctions, *CF,pp.7672-79,* and oral argument on August 27, 2021. *TR,08.27.2021,p.27,l.16-p.30,l.4;p.45,ll.12-14;p.43,ll.4-8.*

### Argument:

The court erred in its interpretation of Rule 30(b)(6) and by failing to afford counsel due process of law via notice and a meaningful opportunity to be heard before imposing sanctions.  It is not counsel's responsibility to designate a representative; it is the principal's.  The trial court cited to *DR Horton Inc. v. D&S Landscaping, LLC*, 215 P.3d 1163 (Colo. 2008) in imposing sanctions, but the language in *Horton* suggesting the designee must answer every question is dicta, and has not been repeated in the ensuing fourteen years.  The federal courts, addressing a substantially similar rule, have a more nuanced approach.

A Rule 30(b)(6) designee "is not expected to perform with absolute perfection". *Pogue v. Nw. Mut. Life Ins. Co.*, No. 3:14-CV-598-CRS, 2017 WL 3044763, at *8 (W.D. Ky. July 18, 2017) (unpublished) (citing *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 691 (S.D. Fla. 2012)); *see also, City of Las Cruces v. United States,* Civ. No. 17-809 JCH/GBW at *12 (D.N.M. Feb. 1, 2021)(same) *Freedom's Path at Dayton v. Dayton Metro. Hous. Auth.*, No. 3:16-cv-466 at *25 (S.D. Ohio June 13, 2018). "The mere fact that a designee could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with its obligation." *QBE Ins. Corp.*, F.R.D. at 691; *Costa v. County of Burlington,* 254 F.R.D. 187, 191 (D.N.J. 2008). Any expression of a lack of knowledge, however, "is itself an answer which will bind the corporation at trial." *Id.* at 690 (citations omitted).

A Rule 30(b)(6) deposition does not require "absolute perfection in preparation," but only "a good faith effort on the party of the designate to find out the relevant

facts." *Wilson v. Lakner*, 228 F.R.D. 524, 528 (D. Md. 2005). The mere fact that a designee could not answer every question on a certain topic does not necessarily mean that the corporation failed to comply with its obligation. *Costa v. County of Burlington*, 254 F.R.D. 187, 191 (D.N.J. 2008); *Chick-fil-A v. Exxonmobil Corp.*, No. 08-61422-CIV, 2009 WL 3763032, at *13 (S.D. Fla. Nov. 10, 2009) (explaining that a corporation need not produce witnesses who know every single fact-only those relevant and material to the incidents underlying the lawsuit).

Further, the representative for CD Solutions was unable to answer twenty questions, nineteen of which were either not specified in the notice, or were outside the parameters set by the court for limited discovery. Counsel would have no reason to prepare a designee to respond to "out of bounds" questions, nor would the principal. The sole question the CD Solutions representative should have been able to answer, but could not, was what journalistic standards CD Solutions (not a media company) operated under. The answer: "none".

FEC United's designee was unable to answer eight questions, none of which was both noticed and within the limited discovery parameters established by the court. Neither entity constructively failed to appear for the deposition, or was properly subject to sanctions.

Finally, the court, without affording counsel notice or a meaningful opportunity to be heard, imposed sanctions for their failure to designate appropriate representatives, which was not their duty. The court made no finding that they had failed to properly

prepare the representatives (they prepared the representatives to answer noticed questions within the permitted parameters) or directed any defendant to engage in misconduct or obstruction (they had not).

Colorado Rule of Civil Procedure 37(b)(2)(E) provides that a party or counsel advising the party may be sanctioned for failure to produce another for examination, except when it would be impossible, was substantially justified, or under other circumstances making an award unjust. The federal courts, construing a substantially-similar rule[3], generally permit sanctions only when the attorney has advised the client to disobey or actively impeded discovery. "Rule 37(b)(2)(E) permits a district court to sanction attorneys who advise their clients to disobey an order compelling discovery." *Magicsilk Corp. of New Jersey v. Vinson*, 924 F.2d 123, 125 (7th Cir. 1991). Rule 37 of the Federal Rules of Civil Procedure mandates that sanctions be issued when counsel has, without substantial justification, "advised" a disobedient party to oppose or fail to comply with discovery orders or otherwise delayed or impeded the use of specified discovery mechanisms. *Alden v. Mid-Mesabi Assocs. Ltd P'ship*, No. 06-954 (JRT/RLE), 2008 WL 2828892, at *18 (D. Minn. 2008) ("[I]t is far too facile to presume, in the absence of evidence to support a presumption, that simply because a client fails to responsibly allow discovery, her attorney should be blamed."). An attorney may also be sanctioned for failing to prepare a 30(b)(6) witness. *Int'l Ass'n of Machinists &*

---

[3] Federal rule includes somewhat differently-worded meet and confer and certification requirements.

*Aerospace Workers v. Werner-Masuda*, 390 F. Supp. 2d 479, 487 (D. Md. 2005); or for instructing a 30(b)(6) witness not to answer questions on the topics noticed when those instructions do not comply with the limitations in Rule 30(c)(2). *Lykins v. CertainTeed Corp.*, 555 Fed. Appx. 791, 797 (10th Cir. 2014).

The Tenth Circuit holds, under the substantially similar federal rule, that an attorney may not be sanctioned without notice of the court's intention:

> A party facing the possible assessment of costs, expenses or attorney fees has a due process right to notice that such sanctions are being considered by the court and a subsequent opportunity to respond. *Braley,* 832 F.2d 1514. An opportunity to be heard does not require an oral or evidentiary hearing on the issue; the opportunity to fully brief the issue is sufficient to satisfy due process requirements. *White v. General Motors Corp.,*908 F.2d 675, 686 (10th Cir. 1990), *cert. denied,*498 U.S. 1069 (1991).

> Day had no prior notice that sanctions were being considered against her and therefore, she had no ability to respond prior to the imposition of sanctions . Accordingly, the district court erred in imposing a sanction against Day without affording her due process. *See G.J.B. Assoc., Inc. v. Singleton,* 913 F.2d 824, 830 (10th Cir. 1990) (district court's error in failing to provide party with required due process constituted an abuse of discretion, requiring remand). On remand, the district court must afford Day with the requisite due process if the court intends to impose sanctions on Day.

*Resolution Tr. Corp. v. Dabney*, 73 F.3d 262, 268 (10th Cir. 1995).  The trial court improperly sanctioned Mr. Oltmann for the imperfect performance of his designees, and improperly sanctioned counsel, who engaged in no misconduct, without notice.

## II.   THE COURT ABUSED ITS DISCRETION BY FINDING THAT MR. OLTMANN'S STATEMENTS WERE PROBABLY FALSE, HOLDING THAT THE NEWSPERSON'S PRIVILEGE DID NOT APPLY, AND ORDERING DISCLOSURE OF A SOURCE.

**Preservation and Standard of Review:**

A trial court's factual findings are reviewed for clear error, under which a reviewing court defers to them unless they are unsupported by competent evidence in the record. *People v. Matheny,* 46 P.3d 453, (Colo. 2002)  The application of a privilege is a mixed question of law and fact, with the legal analysis subject to *de novo* review. *Oldham v. Pedrie,* 411 P.3d 933, 941 (Colo.App. 2015).

The issue was fully preserved in Defendants' Objections to Plaintiff's Discovery Requests, *CF,pp.6800-04,* and oral argument, *TR,07.07.21,p.84,l.11-p.88,l.13.*

**Particular Facts:**

After the court's June 21 order granting discovery, on June 25, 2021, the Oltmann Defendants filed objections to the Plaintiff's discovery requests for production concerning,  "[t]he person that assisted you in gaining access to the "Antifa call" as described by you on the David K. Clements "The Professor's Record" podcast dated April 20, 2021" and "[a]ll documents reflecting any investigation you made regarding the allegations about Dr. Coomer made by Joseph Oltmann" on the basis of the newsperson's privilege, C.R.S. § 13-90-119 (2021). *CF,pp.6802,6804.* Mr. Oltmann argued that the Plaintiff sought to discover information protected by § 13-90-119(2), the newsperson's privilege, and declined to identify the source.  On July 7, the court

22

held a hearing regarding defendants' objections, and addressed the newsperson's privilege, making a finding of "probable falsity" concerning Mr. Oltmann's statements. *TR,07.02.21,p.38,ll.3-6.*

> In support of that finding, I will tell you that I am relying on the following pieces of information that I have gleamed from the Court record to date: The first is that there was a two-month delay between Mr. Oltmann's intercept of the conference call and his revelation that the conference -- or that Eric from Dominion on the conference call was somehow related to election interference. That's factor number one for me.
>
> Factor number two is a lack of the recording of the conference call existing.
>
> Number three is the pervasive lack of specifics from Mr. Oltmann regarding how he intercepted the conference call. There is nothing in the record that indicates that he has conveyed to anyone how he did that and that makes his statements suspect.
>
> The fourth factor that the Court has looked at is Mr. Oltmann's own admission on his November 9th, 2020, Conservative Daily podcast that he was not sure that the individual on the phone was Dr. Eric Coomer.
>
> So with those four items from the record, at this very preliminary stage, the Court is making a finding of the probable falsity of the statements.
>
> *TR,07.02.212,p.38,l.7-p.39,l.4.*  The court set a hearing five days later.

Mr. Oltmann explained his eleven-year history as an investigative journalist, *TR,07.07.217,p.8,l.3–p.9,l.1,* and host of the Conservative Daily Podcast. *TR,07.07.21,p.9,ll.2-20.*  He chronicled how he came to be on the September phone call, *TR,07.07.21,p.9,l.13-p.13,l.7,* how he heard the statement he later reported, *TR, 07.07.21,p.13,ll.8-22*, and the investigation he conducted to determine who "Eric" was. *TR,07.07.21,p.13,l.20–p.15,l.25.*

23

Mr. Oltmann refused to disclose the identity of the individual who gave him access to the call, and refused to disclose the other individuals he knew on the call, because he understood that the individual could be determined by process of elimination, putting him in jeopardy. *TR,07.07.21,p.27,l.24-p.29,l.4;p.30,l.24-p.31,l.8.* He refused to provide the platform used for the call, because he believed it would be possible to identify the individual by knowing the precise platform, and thereby jeopardize his safety. *TR,07.07.21,p.32,l.1-p.34,l.16.* He also explained to the court why he had not been able to record the call, *TR,07.07.21,p.56,l.14-p.57,l.1,* and disclosed that he had made contemporaneous notes, and then investigated Eric Coomer, taking screenshots at the time of his investigation in September, 2021, and testified that, contrary to the court's earlier finding, he had first disclosed the call during a speech he gave on October 15 at Bandimere Speedway, which became the subject of a published story.     *TR,07.07.21,p.41,ll.5-14;p.42,l.20-p.44,l.3;p.45,l.8–p.46,l.2;p.50,ll.11-28;p.52,l.13-p.53,l.4.*

Mr. Oltmann argued that the identity of the individual who gave him access to the call was not directly relevant to an issue in the case, because that individual did not know or have any reason to suspect that Mr. Oltmann would hear about "Eric from Dominion", the election, or election security, and that Mr. Oltmann was the source of the report of the call.  *TR,07.07.21,p.81,l.18-p.82,l.15.* The court suggested that the Plaintiff had a right to call the individual and elicit his memory of what was said on the call, and Mr. Oltmann argued that the court had no basis to suggest that the individual

would contradict him.  *TR,07.07.21,p.82,l.24-p.83,l.19.*  Mr. Oltmann argued that the Plaintiff did not have a strong interest in discovering the individual's identity, because he could only speculate about what the individual might say, and that, balanced against Mr. Oltmann's First Amendment right to investigate, gather, and report news, and the public's right to receive that news, was woefully insufficient.  *TR,07.07.21,p.84,l.22-p.85,l.11.*

Finally, he argued that the Plaintiff's rationale that he was entitled to the identity in order to prove probable falsity was not grounds, because probable falsity mattered only to the analysis of the newsperson's privilege, and the Plaintiff's burden was to prove actual malice.  *TR,07.07.21,p.86,ll.2-15.*

The court renewed its finding that Mr. Oltmann's report of what he heard on the call was probably false, *TR,07.07.21,p.90,l.6-p.91,l.7,* held that the individual's identity was directly relevant to a substantial issue in the case as were the identities of others on the call:

> The information that those individuals are able to provide regarding the contents of that conference call are directly relevant to a substantial issue both with respect to the special motions to dismiss on the anti-slap, which is specifically what we are doing discovery on, but they are relevant to the anti-slap motions because of their broader relevance in the defamation case.

*TR,07.07.21,p.90,l.14-p.91,l.21,* and that a defamation plaintiff's interests outweigh the newsperson's privilege. *TR,07.07.21,p.92,ll.6-13.*

**Argument:**

25

The trial court's preliminary finding of "probable falsity" was contradicted at every point by Mr. Oltmann's evidence, and his concerns over the safety of the conduit were vindicated by the testimony of Mr. Papas.   The factual finding is entitled to deference only if it was supported by substantial evidence in the record, *In re Elinoff*, 22 P.3d 60, 63 (Colo. 2001)(citing *In re Quiat*, 979 P.2d 1029, 1038 (Colo. 1999)).

- Factor one: length of time – contradicted by evidence that Oltmann disclosed the call in October.

- Factor two: lack of recording – contradicted by contemporaneous notes naming witness who admitted the call occurred.

- Factor three: pervasive lack of specifics from Mr. Oltmann regarding how he intercepted the conference call – contradicted by detailed evidence of how he was given access and that disclosure of technical details could permit identification of the call, and the conduit.

- Factor four: Mr. Oltmann's own admission on his November 9th, 2020, Conservative Daily podcast that he was not sure that the individual on the phone was Dr. Eric Coomer – contradicted by evidence that Oltmann searched for "Eric, Dominion, Denver, Colorado", located Coomer, and identified him through videos on YouTube.

The trial court was required to find "probable falsity" to avoid the newsperson's privilege. *Gordon v. Boyles*, 9 P.3d 1106, 1109 (Colo. 2000), but in making that

determination, the court was not entitled to disregard unrebutted evidence contradicting each ground for the preliminary finding.

Because a journalist may be held liable for breaking a promise of confidentiality to a source, *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), and Oltmann had made that promise, the trial court's finding was manifestly erroneous, and unfair.  It placed both Oltmann and the source in jeopardy, and did so without regard to either.

III.   **THE TRIAL COURT ERRED REVERSIBLY BY MISAPPREHENDING THE STANDARD FOR DETERMINATION OF AN ANTI-SLAPP MOTION, MAKING CREDIBILITY DETERMINATIONS, MISAPPREHENDING "ACTUAL MALICE" AND CLEAR AND CONVINCING EVIDENCE, AND RELYING ON INCOMPETENT EVIDENCE TO FIND THE PLAINTIFF HAD MET HIS BURDENS.**

**Standard of Review and Preservation:**

A trial court's determination in an anti-SLAPP special motion to dismiss is subject to *de novo* review. *Salazar v. Pub. Tr. Inst.*, 22COA109 ¶ 21.

The issues were fully preserved in Defendants' Special Motion to Dismiss, *CF,pp.4990-5004,* Objections to Plaintiff's Discovery Requests, *CF,pp.6800-04,* Motion to Reconsider June 8, 2021 Order Granting Limited Discovery, *CF,pp.6775-86,* and Proposed Findings of Fact and Conclusions of Law, *CF,pp.19411-30.*

**Argument:**

27

Colorado's Anti-SLAPP statute, § 13-20-1101, C.R.S. (2022), is "substantively identical" to California's, which was enacted in 1992, and has generated a large body of case law.  A reviewing court may "look to California case law for guidance" *L.S.S. v. S.A.P.,* 22COA123 ¶¶ 23, 20.

A trial court considering a special motion to dismiss under the Anti-SLAPP statute uses:

> …a summary judgment-like procedure in which the court reviews the pleadings and the evidence to determine "whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *Baral*[4], 376 P.3d at 608; see also Cal. Civ. Proc. § 425.16(b)(1)-(2). In making that determination, "[t]he court does not weigh evidence or resolve conflicting factual claims" but simply "accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." *Baral*, 376 P.3d at 608.

*Id.* at ¶ 23.

The "likelihood of prevailing" standard imposes three disparate burdens on the plaintiff, when the statement concerns a matter of public concern.  *Id.* at ¶ 36.  The plaintiff must prove by clear and convincing evidence that the statement was false; the plaintiff must prove by clear and convincing evidence that the statement was published with actual malice; the plaintiff must establish actual damages.  *Id.,* (citing *SG Ints. I, Ltd. v. Kolbenschlag*, 2019 COA 115, ¶ 19; *Lawson v. Stow*, 2014 COA 26, ¶ 18).

---

[4] *Baral v. Schnitt,* 376 P.3d 604 (Cal. 2016)

The trial court must consider whether the plaintiff has demonstrated a probability of producing clear and convincing evidence of actual malice at trial. *Id.* at ¶ 42 (internal citations to California caselaw omitted).

## A. THE TRIAL COURT GROUNDED ITS DENIAL OF THE DEFENDANTS' MOTIONS IN IMPROPER AND UNWARRANTED CREDIBILITY DETERMINATIONS

In denying the defendants' motions to dismiss, the court noted that weighing of evidence and credibility determinations were not proper at this stage, *CF,p.22776,¶4,* but proceeded to do just that. The court's sustained attack on Mr. Oltmann's character was both manifestly improper and essential to its finding that the plaintiff had made a prima facie showing and was likely to prevail on the merits. A representative sampling is set forth verbatim at *Appendix 1.*

Mr. Oltmann testified that he made contemporaneous notes, and provided those notes to the parties. The court minimized the evidentiary value of the notes, utterly ignoring the fact that they identified, by name, Tay Anderson, a witness on the call who was not disclosed by the plaintiff until after discovery had closed. Mr. Anderson, stated under oath that that a conference call for Black Lives Matter occurred on September 25, 2020. Mr. Oltmann's notes reflect that a "Tay" was present on the call, with a question mark followed by "This guy is Antifa??" Mr. Anderson stated that he was the "administrator" of the call, and "generally familiar" with all of the call participants, but does not state that he was the "chair", (a Zoom meeting can continue when the host

leaves the call, unless the host is the "chair" and fails to designate another individual) or that he was present for the entirety of the call. Thus, while Mr. Oltmann characterizes the call as an "Antifa" call, his characterization of the call and statements of what he observed were not directly contradicted by either the Plaintiff's Declaration nor Mr. Anderson's and, indeed were confirmed, at least in part, by the Anderson Declaration, *CF, pp. 10897-10901*, and the documentary evidence that Mr. Oltmann conducted a Google search for Eric, Dominion, and Denver, the very next day. The court stated:

> Instead, Oltmann et al. have provided undated notes Oltmann alleges he took during the call (which differ in material ways from his summary of the notes which he provided to OAN on November 10, 2020).[105]
> [105] *Compare* Ex. F-2, *with* Ex. I-1, PX 35.

*CF, p.22791.* The court similarly ignored Mr. Oltmann's discussions of the call with numerous individuals prior to his initial report on November 9, two of whom provided sworn statements concerning when he discussed the call with them. *Declaration of Jonathan Tiegen, CF, pp.15917-19; Declaration of Gordon Beckstead, CF, p.20253.* The court ignored his production of more than 200 pages of records he compiled while investigating Mr. Coomer, his detailed affidavit provided to Ms. Powell before the complaint was filed, *CF, pp.14271-75*, and his detailed testimony about his search for "Eric…the Dominion guy" and the deeply disturbing evidence he uncovered concerning Mr. Coomer's identification as a skinhead, criminal history, mental illness, addiction, mendacity, repeated postings of kill the police memes, "Fuck the USA", Antifa Manifesto, and publication of a ghastly rape and torture fantasy regarding his

wife.*CF,p.13721,l.7-p.13727,l.9;p.13744,l.21-p.13746,l.7;p.13747,l.24-p.13751,l.9; CF,p.10968,103,l.3–p.19875,128,l.1.*

The Court ignored Mr. Coomer's sweeping spoliation of evidence immediately prior to filing his complaint, his admissions to the New York Times, during discovery, that his earlier statements to the press that the Facebook pages were not his, and had been fabricated, and that he did not have a Facebook account, were false. *CF,pp.8055-62.* The court had disclosed an *ex parte* communication on September 22, 2021, from an individual claiming to be Mr. Coomer's former girlfriend, who wished to provide highly-material inculpatory information concerning the Plaintiff. The Oltmann Defendants immediately moved for preservation and production of relevant information which could have enabled them to identify the individual and interview her, *CF,pp.11854-56.* The court ignored the motion and, to the best of the defendants' knowledge, took no action to preserve video evidence or evidence about how the document was received, as requested.

The court then used the multiple, unwarranted, and improper credibility determinations to draw an inference that the Plaintiff could, largely by use of circumstantial evidence, make a sufficient showing to withstand the motion to dismiss.

> Coomer has unequivocally declared that these statements are false. For purposes of the anti-SLAPP statute, Coomer's evidence is accepted as true. *See Baral v. Schnitt*, 376 P.3d 604, 608-09 (Cal. 2016). Further, Coomer's evidence is uncontroverted by credible evidence. Absent Oltmann's testimony, Oltmann et al. have put forward no evidence in support of their allegations against Coomer. ¶ 165

*CF,p.22695.* The court's reliance on its credibility determinations to find that the Plaintiff had demonstrated a likelihood of prevailing on the merits was legally erroneous and fundamentally unsound.

### B. THE COURT'S ANALYSIS OF ACTUAL MALICE WAS REVERSIBLY ERRONEOUS.

The court relied, and indeed, built, upon its improper credibility determinations to find that the Plaintiff made a sufficient showing of actual malice, by clear and convincing evidence. First, the court found that there was prima facie evidence of negligence, and then relied on a reversed case to hold that negligence may equate to actual malice.

> 168.   As to the third defamation element, there is prima facie evidence that, at a minimum, Oltmann et al. negligently published their defamatory statements.[393] Evidence that Oltmann et al. failed to investigate the allegations against Coomer, lacked corroborating evidence in support of their allegations, and based their allegations on speculation and conjecture are sufficient to support a finding of negligence. See *Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1180 (D. Colo. 1999) ("Failure to investigate obvious sources of refutation or corroboration of statements, especially when there is no time-pressure on their publication, may indicate not only negligence, but the higher standard of actual malice.").

*Quigley v. Rosenthal*, 43 F. Supp. 2d 1163, 1180 (D. Colo. 1999) was reversed by the 10th Circuit. *Quigley v. Rosenthal*, 327 F.3d 1044 (10th Cir. 2003).

> In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the Court refused to impose a federal constitutional standard with respect to allegedly defamatory statements made about private individuals. Instead, the Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate

standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Id. at 347.

Consistent with *Gertz*, the Colorado Supreme Court has extended the *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) "actual malice" standard of liability to cases where "a defamatory statement has been published concerning one who is not a public official or a public figure, but the matter involved is of public or general concern." *Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 538 P.2d 450, 457 (1975); see also *Diversified Mgmt., Inc. v. The Denver Post, Inc.*, 653 P.2d 1103, 1106 (Colo. 1982) (refining "actual malice" standard of liability by "adopting the same definition of 'reckless disregard' in cases involving public officials, public figures, and matter of public or general concern").

*Id.* at 1058. Failure to investigate, and negligence, are "constitutionally insufficient to show the recklessness that is required." *Sullivan, supra; Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81 (1967). Rather, the Plaintiff was required to demonstrate a reasonable likelihood of proving, by clear and convincing evidence, that Mr. Oltmann entertained serious doubts as to the truth of his statements. "That a reasonably prudent person would not have published the defamatory statements or would have investigated before publishing does not suffice." *Lewis v. McGraw-Hill Broadcasting Co., Inc.,* 832 P.2d 1118, 1123 (Colo.App. 1992). Negligence is certainly not clear and convincing evidence of actual malice, and the court's analysis was erroneous. The court then built upon its earlier improper credibility determinations to find sufficient evidence of actual malice.

169. There is prima facie evidence that Oltmann et al. acted with actual malice in publishing their statements. Actual malice "requires at a minimum that the statements were made with reckless disregard for the truth." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989); *Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d 1103, 1110-11. Circumstantial evidence of actual malice can include when a story is fabricated by a defendant or is the product of his imagination; when a

33

defendant relies on anonymous sources; when a defendant has reason to know that a source is unreliable; when the allegations made are inherently improbable that only a reckless person would publish them; when a defendant intentionally avoids the truth; when a defendant's allegations conform to a preconceived storyline; and when a defendant has an incentive or motive to make the defamatory statements. See, e.g., *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 157-58 (1967); *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). All of these bases are present here with respect to Oltmann et al.

There is no evidence that Mr. Oltmann fabricated the report of the call, and, indeed, the Plaintiff's own evidence corroborates his report, in material part. He relied on no source – anonymous or unreliable or otherwise. The unrebutted evidence in the record is that <u>he</u> was the source, so it would have been impossible for him to rely on an anonymous or unreliable source. He could not have recklessly published his own report; he either knew it was false or knew it was true. Neither did his allegations conform to a preconceived storyline, except in the court's uncritical acceptance of the Plaintiff's narrative. Indeed, substantial portions of the court's improper credibility determinations set forth above are taken verbatim from the Plaintiff's Opposition to the Special Motion to Dismiss. *CF,pp.8236-8399.*

In fact, the Plaintiff demanded and received reams of records from the Oltmann Defendants, deposed Mr. Oltmann four times, once in his personal capacity, and thrice as designee for CD Solutions, Shuffling Madness Media, and FEC United, yet produced no evidence that the report conformed to a preconceived storyline, or that Oltmann or his entities benefitted from it. The court filled the evidentiary gaps with credibility determinations, to find that the Plaintiff had adduced prima facie evidence of actual

34

malice, and had thus met his burdens.  He had not.  Prima facie evidence is not the required quantum.  Admissible evidence sufficient to establish a likelihood of prevailing on his claim, by clear and convincing evidence is required, and that burden was not met.

### D.   THE COURT'S FINDING THAT THE PLAINTIFF MET HIS BURDENS WAS PREDICATED ON INADMISSIBLE AND INCOMPETENT EVIDENCE

Ten days prior to the evidentiary hearing, the Plaintiff produced declarations – three from alleged experts, five from lay witnesses.  The Oltmann Defendants objected to the declarations, *CF,pp.10677-10901,* in their Reply in Support of the Special Motion to Dismiss *CF,pp.15059-84*, and Objections to Proposed Exhibits, *CF,pp.18357-59, 18545-47*, on grounds that the three undisclosed "expert" declarations violated C.R.C.P. 26, and prejudiced the defendants, were incompetent under C.R.C.P. 56, as conclusory and not based on personal knowledge, and disqualified under C.R.E. 702 and 703.

The Declarations of alleged experts Brown, Halderman, and Rothschild were replete with improper legal conclusions on ultimate questions the declarant was incompetent to make, contained opinions outside the declarant's area of expertise, reliant on undisclosed facts and unknown bases.  Halderman, an election security researcher, opined:

> Defendants' vote-rigging allegations were always implausible, consisting of wild speculation, readily debunked claims, and incoherent technical assertions, ¶7; Dr. Coomer was not a public figure prior to Defendants' conduct, ¶ 8; Defendants ignored these authorities and instead chose to promote incredible conspiracy theories, such as those advanced by Defendant Joseph Oltmann ¶ 21; Oltmann began to advance wildly speculative theories that Dr. Commer had personally engaged in a criminal

conspiracy, ¶ 22; It is implausible on its face that Dr. Coomer ever made such a statement, ¶ 25; It would have been the height of cartoonish buffoonery to claim to a large group that such a scheme was in the works, ¶ 25," etc.

*CF,pp.10736-59.*  Brown, a journalist, with no psychological or legal credentials opined:

> Oltmann's concern about antifa is, in my opinion at least, excessive to the point of obsession. ¶62, "I have said—somewhat reluctantly, because I do not pretend to know what motivates people—that Defendants have displayed "reckless disregard for the truth," an element of malice. ¶133, And, in my opinion, their failure to report on widely accepted, verifiable information that conflicts with their assumptions, may legitimately be characterized as a reckless disregard for the truth ¶ 134,", etc.

*CF,pp.10708,10731-32.*  Mike Rothschild, a thoroughly-debunked self-styled expert on conspiracies, (who previously reported that the CIA COINTELPRO operation was tied to the assassination of Malcom X) opined at virtually every paragraph without disclosing the basis for his opinion, or the evidence on which he relied. A partial sampling includes:

> In particular, the originator of the most dangerous claims against Dr. Eric Coomer was Joe Oltmann, who is deeply embedded in the QAnon movement., ¶ 9, One was Joe Oltmann, who may have already identified Dr. Coomer as what he thought was a perpetrator of the fraud through his position with Dominion, and worked backwards to tie him to it, using the supposed "antifa conference call." ¶ 12, The troll communities that birthed QAnon specialize in organized online harassment. ¶ 26, Colorado conspiracy theorist Joe Oltmann has multiple connections to QAnon, even though he is far from being its most visible promoter, ¶ 35", etc.

*CF,pp.10812-52.*  The defendants objected that each was without foundation, conclusory, unreliable, and inadmissible, and objected to the declarations of the

36

undisclosed   lay   witnesses   *CF,pp.10853-59(Beedle);10868-77(Golingan);10893-95 (Maulbetsch);10897-900(Anderson)* on grounds that they were were improper, prejudicial, unjustifiable, and should have been stricken.

The Plaintiff, knowing he would solicit these expert and lay declarations, deliberately failed to notify the defendants, and sandbagged them. "[S]andbagging is antithetical to notions of judicial economy and procedural fairness" *People v. Valera-Castillo*, 2021 COA 91, ¶ 25 (citing *State v. Valdez*, 2006 UT 39, ¶ 44 140 P.3d 1219, 1233-34).  The defendants moved for a hearing on the admissibility of the expert testimony, *CF,pp.16158,16164-68,* and for leave to depose the declarants, *CF,pp.12149-55,12183*. The court denied both, *CF, pp.15977-8,* thereby denying them an opportunity to delve into the accuracy and truthfulness of the witnesses, and crippling them in defending against dishonest, biased, and inaccurate witness testimony.

The Oltmann Defendants objected to thirty of the Plaintiff's unauthenticated and hearsay exhibits, *CF,p.15068,* but the court considered and relied on them. *CF,pp.18543-606.*   The court qualified the experts and accepted their declarations, *CF,pp.18570-85,* erroneously held that the Plaintiff had not sandbagged, because the individuals were known to the defendants, *CF,p.18546,* (they were not known to the Oltmann Defendants) and because both lay and expert declarants could be cross-examined at some future date. *CF,p.18571 et seq.*   The court relied heavily on this incompetent and inadmissible evidence to make its credibility determinations and to find that the Plaintiff had sustained his burdens.  *CF,pp.22772-22907.*

"Due process requires that the parties be apprised of all evidence to be submitted and considered, that they have the right of cross-examination, and that they be given the opportunity of rebuttal. *Nesbit v. Industrial Commission*, 43 Colo.App. 398, 607 P.2d 1024 (1979)." *Weld County Kirby v. Industrial Commission*, 676 P.2d 1253, 1258 (Colo.App. 1983)

> A civil litigant's right to due process of law includes the right to cross-examine witnesses and to have an opportunity for rebuttal." *Aspen Props. Co. v. Preble*,780 P.2d 57, 58 (Colo.App.1989). Hearsay is an out of court statement offered into evidence for the truth of the matter asserted. CRE 801. It is inadmissible unless an exception applies. CRE 802.

*People v. Shifrin*, 342 P.3d 506, 517 (Colo.App. 2014) (holding that the trial court abused its discretion by considering affidavits from non-testifying witnesses, because they were inadmissible despite defendant's opportunity to depose the witnesses).  None of the declarants testified, and the defendants objected, sought to depose the declarants, and sought to test the "expertise" of the putative experts, and were denied all opportunity. The court's use of untested evidence violated the defendants' due process rights, and resulted in unsound findings, unsupported by competent evidence.  Factual findings which are not supported by competent evidence are entitled to no deference, and are subject to being vacated by a reviewing court.  *Byerly v. Bank of Colo.* 411 P.3d 732, 738 (Colo.App. 2013).

The alleged "expert" declarations were similarly incompetent. C.R.C.P. 56 requires affidavits to be supported by "such facts as would be admissible in evidence." Conclusory affidavits are incompetent, and insufficient to raise a genuine issue of

38

material fact. *Raygor v. Board of County Comm'rs*, 21 P.3d 432, 437 (Colo.App. 2000)(citing

*People v. James*, 694 P.2d 356 (Colo. 1984)); an affidavit must be based on personal

knowledge for Rule 56 purposes, and a non-conforming affidavit may not be

considered on summary judgment. *Commercial Industrial Const. v. Anderson*, 683 P.2d 378,

381 (Colo.App. 1984). The Halderman, Brown, and Rothschild declarations are replete

with unsupported conclusions and hearsay, and statements the declarants have no

personal knowledge of.

> …affidavits based upon inadmissible hearsay are insufficient to support
> summary judgment. See CRE 802; *Harris v. Grizzle*, 625 P.2d 747 (Wyo.
> 1981); see also *People v. Hernandez*, 695 P.2d 308 (Colo.App. 1984) (hearsay
> affidavit cannot support motion for new trial). Moreover, an affidavit
> based not upon the affiant's personal knowledge but merely upon
> information and belief is speculation, and is insufficient to support
> summary judgment. See *Commercial Industrial Construction, Inc. v. Anderson*,
> 683 P.2d 378 (Colo.App. 1984); *National Surety Corp. v. Citizens State Bank*,
> 651 P.2d 460 (Colo.App. 1982).

> *People v. Hernandez and Associates*, 736 P.2d 1238, 1240 (Colo.App. 1986)

The Plaintiff's exhibits 78,79, 80, 84, 85, 92, 93, 104,105,106,107,109,111,113,

117,119,120,121,124,125,128,129,131,132,A,B-2PX104,B-12,C-2PX113,D-1PX92,

93,E-1PX78,79,80,85, and W-1 are unauthenticated hearsay, to which the defendants

objected. *CF,p.15068*.

It is "well established that unsworn, unauthenticated documents cannot be

considered on a motion for summary judgment." *T.D. v. Patton*, 2149 F.Supp.3d 1297

*25 (D. Colo. 2014)(quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)).

Authentication is a precondition to admissibility. CRE 901(a); *People v. Huehn*, 53 P.3d 733, 736 (Colo.App. 2002). The Plaintiff's unauthenticated evidence was inadmissible, and incompetent to support his burdens.

Similarly, hearsay is not admissible unless a rule or statute provides otherwise, and cannot support summary judgment. *Pueblo of Jemez v. United States,* 366 F.Supp. 3d 1234, 1237 (10th Cir. 2018); *People v. Rojas,* 181 P.3d 1216, 1218 (Colo.App. 2008)("Absent an exception, hearsay is not admissible.").

> See C.R.C.P. 56(e) (party opposing summary judgment must show by affidavit or otherwise, setting forth such specific facts as would be admissible in evidence, that there is genuine issue for trial); *People v. Hernandez Associates, Inc.*, 736 P.2d 1239 (Colo.App. 1986) (affidavits based on inadmissible hearsay are insufficient to support summary judgment).

*Terrones v. Tapia*, 967 P.2d 216, 219 (Colo.App. 1998)(deposition testimony based on hearsay does not create a genuine issue of material fact). The court improperly credited the Plaintiff's incompetent hearsay evidence to determine he sustained his burdens and to deny the defendants' motion to dismiss.

### E.   THE TRIAL COURT ERRED BY DENYING A COMPLETE STAY DURING THE PENDENCY OF THIS APPEAL

**Preservation and Standard of Review:**

Defendants OAN, Rion, and Powell moved for a complete stay, *CF,pp.22152-5;pp.22160-1,* and the court entered an order acknowledging that it lacked jurisdiction over matters and issues subject to the interlocutory appeal, but denied a complete stay. *CF,p.23895.*   On October 31,2011, the court overruled defendants' jurisdictional

objections, *Appendix 2,* and set a hearing on fees and costs arising from the sanctions at issue in this appeal.  *Appendix 2.*  Subject matter jurisdiction is not waivable and may be raised at any time.  *Paine, Webber, Jackson Curtis v. Adams*, 718 P.2d 508, 513 (Colo. 1986)

Jurisdictional issues are subject to *de novo* review. *People v. Sims*, 2019 COA 66, ¶ 13, 457 P.3d 719.

**Particular Facts:**

The trial court acknowledged that it lacked jurisdiction over issues raised on appeal, but denied a complete stay and ordered a hearing on attorney's fees arising from the sanctions imposed, at issue in this appeal. (IB, *supra*).

**Argument:**

California Courts hold that on an interlocutory appeal from the denial of an Anti-SLAPP motion, the appellate court has jurisdiction over both the merits and fee sanctions issues.  *Baharian-Mehr, v. Smith* 189 Cal.App.4th 265 (2010), because it "would be absurd to defer the issue of attorney fees until a future date, resulting in the probable waste of judicial resources."  *Id.* at 275.  No Colorado Appellate Court has yet decided the issue, but an El Paso County District Court has done so, determining that the case should be stayed during interlocutory appeal, to preserve resources.  *I.L.M. Properties LLC, et al. v. Tibbetts*, Case No. 2022CV30081. *CF,p.22,158.*

The trial court's Order denying the stay indicated it "likely retains jurisdiction to address collateral issues regarding attorney fees", *CF,p.23897,* was reversibly erroneous, and should be vacated.

## IV.    THE PROCEEDINGS BELOW WERE INFECTED BY JUDICIAL BIAS

**Preservation and Standard of Review:**

Whether a trial judge was disqualified to act is reviewed *de novo. People v. Julien* , 47 P.3d 1194, 1197 (Colo. 2002); *Smith v. District Court* , 629 P.2d 1055, 1056 (Colo. 1981); *People v. Dobler* , 369 P.3d 686, 688 (Colo.App. 2015).

The Oltmann Defendants did not move to disqualify the successor judge, but disqualification for actual bias is not waiveable and may be considered on appeal regardless of whether a motion was filed in the District Court. *People in Interest of A.G.* , 262 P.3d 646, 651 (Colo. 2011); *Rea v. Corrections Corp. of America*, 272 P.3d 1143, 1147 (Colo.App. 2012); Colo. C.J.C. 2.11, cmt. 2 ("A judge's obligation not to hear matters in which disqualification is required applies regardless of whether a motion to disqualify is filed.").

**Particular Facts:**

After two days on the bench, the newly-appointed judge announced her intention to grant the Plaintiff discovery, and did so, despite identifying no error.  The court then made a preliminary finding, before ever seeing Joseph Oltmann, that his statements were probably false.   After an evidentiary hearing, at which each basis for the

42

preliminary finding was rebutted, the court renewed its finding, and ordered Oltmann to disclose his source, with a troubling disregard for that individual's safety, given the unrebutted testimony about the grave danger into which the Oltmann Family had been thrust.

When counsel advised the court that Oltmann had not, as alleged, destroyed any evidence, but that Coomer had done so, the court threatened to mute her. *TR,07.15.21,p.49,l.24-p.51,l.1.* It ordered Oltmann to appear at the courthouse, at a date and time which were easily ascertainable, despite permitting depositions for every other defendant in a safe place. It denied the defendants reciprocal discovery until the Plaintiff's public admissions forced its hand, when it permitted only a two-hour, sealed, deposition, while the defendants' depositions were made public. Coomer was granted forty-two hours of depositions. The court refused to respond to the Oltmann Defendants' request to preserve evidence regarding the individual who made the *ex parte* communication with the court, which was very damaging to Coomer. It sanctioned Oltmann because his designees were unable to answer questions which were improperly posed, and then sanctioned his counsel for ethical misconduct by failing in a duty they did not owe.

Finally, the court made inappropriate and intemperate credibility findings concerning Oltmann and set them forth publicly, in an order, largely taken verbatim from the Plaintiff's submission.

43

**Argument:**

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 137(1955). Although fairness "requires an absence of actual bias in the trial of cases," it is "endeavored to prevent even the probability of unfairness." *Id.* at p. 136.   When judicial remarks "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible," recusal is required. *Liteky v. United States*,  510 U.S. 540, 555 (1993)

"To disqualify a judge for actual bias, a party must show that the judge has a frame (or bent) of mind that 'in all probability will prevent [him or her] from dealing fairly with a party.'" *Rea, supra,* 272 P.3d at 1147.  Judicial bias is "a leaning toward one side of a question involved, from other considerations than those belonging to it, or a bias in relation thereto which would in all probability interfere with fairness in judgment." *Klinck v. District Court*, 876 P.2d 1270, 1277 (Colo. 1994). Disqualification may be required where the judge's manifestation of hostility or ill will is apparent on the record and "indicates the absence of the impartiality required for a fair trial." *Id.* at 1277. "Numerous irregularities, each of which standing alone is insignificant, may, when taken together, so affect the substantial rights of a defendant as to require reversal." *People v. James*, 40 P.3d 36, 45 (Colo.App. 2001); *People v. Gibson*, 203 P.3d 571, 578 (Colo.App. 2008).

The successor judge's treatment of the Oltmann Defendants and their counsel demonstrated marked hostility and bias, to a degree mandating recusal.  In the event

44

that this matter is remanded for further proceedings, this Court should direct that it be heard by a different judge.

## CONCLUSION

Wherefore, the Appellants respectfully request that this Court vacate the Order denying their Special Motion to Dismiss, and the Order granting limited discovery, and remand the case to the trial court, with directions that further proceedings be heard by a different judge.

Respectfully Submitted this 1st day of November,

/s/  Ingrid J. DeFranco

Ingrid J. DeFranco
*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I have, this 1st day of November, filed the foregoing Opening Brief via JBits, which will serve a copy on all counsel of record in this case.

/s/ Ingrid J. DeFranco

45

# APPENDIX 1

*Representative Trial Court Credibility Determinations*

*Court File, pp. 22029-63*

The sheer implausibility of the claims made by Oltmann on the November 9, 2020 Conservative Daily podcast should have given any listener numerous serious reasons to question the veracity of his claims.  ¶ 19

Miraculously, in addition to Oltmann spontaneously remembering Coomer's involvement in the Antifa conference call, Oltmann also simultaneously obtained a trove of Coomer's anti-Trump Facebook posts. Oltmann acknowledged that he did not have any recording of the Antifa conference call. The entire story appears, on its face, to be manufactured around Coomer's Facebook posts, and deliberately crafted in a way to make it impossible to be verified by anyone attempting to investigate the veracity of Oltmann's outlandish claims of Coomer's involvement in the Antifa conference call. ¶ 19

Oltmann's claim that he only knew his conduit by the conduit's initials is completely incredible.[91] ¶ 26.

Throughout the initial Anti-SLAPP discovery period, Oltmann repeatedly refused to disclose relevant information. Specifically, at an evidentiary hearing on July 7, 2021, Oltmann refused to disclose information about how he accessed the alleged Antifa call. This Court found that his testimony was "evasive and not credible," and concluded that, for purposes of the Colorado Reporter's Privilege, C.R.S. § 13-90-119, Oltmann's "statements regarding that conference call are probably false."[108] This Court then ordered Oltmann to disclose the identity of his alleged conduit to the Antifa call.[109] Oltmann persisted in defying that order.[110] Oltmann has also refused to disclose the identity of the individual who allegedly gave him access to Coomer's Facebook profile, again in defiance of a Court order.[111] Given Oltmann et al.'s refusal to disclose evidence ordered by the Court, this Court ruled that it would not consider Oltmann et al.'s claims as to the source, timing, or manner in which Oltmann received the Facebook posts or permit Oltmann et al. to contest Coomer's evidence or claims regarding the source, timing, or manner of Oltmann's receipt of information regarding Coomer's Facebook posts.[112] ¶ 28.

Oltmann et al. had both political and financial motivations to delegitimize the results of the election by defaming Coomer. Oltmann is an ardent supporter of former president Trump and frequently advocates for conservative causes, often through FEC United and SMM.[125] Following Oltmann's publication of claims against Coomer, his Conservative Daily podcast gained new listeners and quickly climbed the podcast rankings.[126] Oltmann et al. have used this new exposure to promote FEC United to a wider audience.[127] Oltmann et al.'s obsession with increasing their podcast ratings through vocalizing increased outrage and increasingly provocative, inflammatory and violent statements is evident throughout the Conservative Daily podcasts that this Court has reviewed. ¶ 33

Oltmann et al. conceived of a feverish storyline regarding the results of the presidential election designed to delegitimize the election, which is reflected in their false allegations of elections fraud leading up to and after the election.[128] Oltmann et al. consciously set out to conform their implausible allegations against Coomer to their election fraud storyline and efforts to create a basis for their refusal to accept the outcome of the presidential election. In service of their goal to improve their podcast ratings, Oltmann et al. created and promoted a storyline that was based on Coomer's position at Dominion and Coomer's Facebook posts, but which involved no other investigation into Oltmann's claims regarding an Antifa conference call; failed to identify witnesses with personal knowledge of the allegations; deliberately refused to obtain corroborating evidence in support of the allegations; blindly proceeded without consulting with experts on election systems regarding the allegations; and avoided attempting to contact either Coomer or Dominion to confirm the allegations.[129] Instead, Oltmann et al. continued to publish the implausible allegations even after learning both Coomer and Dominion stated they were false.[130] Similarly, Oltmann et al. rejected reports from CISA and former Attorney General Barr regarding the legitimacy of the election.[131] Oltmann et al. advanced and exploited an wholly improbable[132] story for financial gain. ¶ 34

Given Oltmann's lack of personal knowledge, lack of expertise, and lack of evidence in support of his allegations against Coomer, Malkin had sufficient reason to know Oltmann was an unreliable source. ¶ 44

Given Oltmann's lack of personal knowledge, lack of expertise, obvious lack of credibility, and lack of evidence in support of his allegations against

Coomer, Hoft-TGP had sufficient reason to know Oltmann was an unreliable witness.  ¶ 54

Given Oltmann's lack of personal knowledge, partisanship and obvious lack of credibility as a first-hand fact witness, lack of expertise, and lack of evidence in support of his allegations against Coomer, Metaxas had sufficient reason to know Oltmann was an unreliable witness. ¶ 61

Given Oltmann's lack of personal knowledge, partisanship and obvious lack of credibility as a first-hand fact witness, the contradictions between Oltmann's own November 10th description of his notes of the Antifa call and handwritten notes ultimately produced by Oltmann, Oltmann's lack of expertise in election security matters, and his lack of evidence in support of his allegations against Coomer, OAN-Rion had sufficient reason to know Oltmann was an unreliable witness. ¶ 71

Powell had sufficient reason to know Oltmann was an unreliable witness. ¶ 83.

# APPENDIX 2

*Trial Court Action Post-Notice of Appeal*

| | |
|---|---|
| DISTRICT COURT, COUNTY OF DENVER, COLORADO<br>Court Address:<br>1437 Bannock Street<br>Denver, Colorado 80202<br><br>DATE FILED: October 20, 2022 1:17 PM<br>FILING ID: F1B71F1DF8160<br>CASE NUMBER: 2020CV34319 | |
| Plaintiff:<br><br>ERIC COOMER<br><br>Defendants:<br><br>DONALD J. TRUMP FOR PRESIDENT, INC., Et al. | ▲COURT USE ONLY▲<br><br>Case # 20-CV-34319<br><br>Div.  409 |
| **Attorney for Defendants Joseph Oltmann, FEC United, and Shuffling Madness Media, Inc. d/b/a Conservative Daily**<br>Andrea M. Hall<br>THE HALL LAW OFFICE, LLC<br>P.O. Box 2251<br>Loveland, CO 80539<br>(970) 419-8234<br>andrea@thehalllawoffice.com<br>Atty. Reg. #:  036410 | |

**DEFENDANTS JOSEPH OLTMANN/FEC UNITED, INC./SHUFFLING MADNESS MEDIA, INC. dba CONSERVATIVE DAILY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S SUBMISSION OF ATTORNEYS' FEES AND COSTS, OBJECTION TO FEE AWARD, AND REQUEST FOR HEARING**

Defendants Joseph Oltmann, FEC United, Inc., and Shuffling Madness Media, Inc., by and through their attorney, The Hall Law Office, hereby tender their response and objection to the Plaintiff's/Appellee's Submission of Attorneys' Fees and Costs, Objection to the requested fee award, and request for hearing.

**PRELIMINARY MATTER – SUBJECT MATTER JURISDICTION**

As a general rule, when subject matter jurisdiction is transferred to the Court of Appeals upon the filing of a Notice of Appeal, the trial court retains limited jurisdiction to resolve matters which can have no effect on the judgment being appealed. *Molitor v. Anderson,* 795 P.2d 266, 268 (Colo. 1990).

However, because a fee and cost award is separate from a judgment on the merits, it may be separately appealed, or reversed and vacated even if it is not appealed, if the underlying judgment is reversed on the merits. *Oster v. Baack,* 351 P.3d 546, 550 (Colo.App. 2015).  Should the Court of Appeals reverse this Court and hold either that the special motions to dismiss should have been granted, or that discovery was improperly granted prior to resolution of the motions, the sanctions order would be subject to reversal and vacation.  "[W]hen an underlying judgment is reversed, an award that is dependent on that judgment for its validity is also necessarily reversed and becomes a nullity." *Bainbridge, Inc. v. Douglas Cnty. Bd. of Comm'rs*, 55 P.3d 271, 273–74 (Colo. App. 2002); *Reyher v. State Farm Mut. Auto. Ins. Co.*, 2012 COA 58, ¶ 32, 280 P.3d 64 ("[B]ecause the judgment dismissing [plaintiff]'s claims was reversed in [a prior appeal], the costs and fees related to that dismissal must also be reversed."); *Nichols v. Burlington N. & Santa Fe Ry.*, 56 P.3d 106, 110 (Colo. App. 2002) (award of costs vacated when judgment supporting that award is reversed); *Nagy v. Landau*, 807 P.2d 1227, 1229 (Colo. App. 1990) (award of attorney fees is necessarily reversed where judgment upon which it relied was reversed).

A court must have subject matter jurisdiction to act, *Currier v. Sutherland*, 218 P.3d 709, 714 (Colo.2009), and once jurisdiction has been transferred to the Court of Appeals, the trial court does not recover jurisdiction until the mandate issues, when jurisdiction is automatically returned.  Because a judgment entered without jurisdiction is void, *Winslow v. Williams*, 749 P.2d 433, 436 (Colo. App. 1987), this Court should not act on the motion until jurisdiction has been returned from the Court of Appeals.

## LEGAL STANDARD GOVERNING A FEE AWARD

The Plaintiff/Appellee seeks an award of attorneys' fees of nearly twenty-eight thousand dollars for unwarranted, unnecessary, and unreasonable work done on an interlocutory appeal of the sanctions award entered by this Court.

2

The party seeking to recover attorney fees has the burden of proving the amount and reasonableness of the fees. *American Water Development, Inc. v. City of Alamosa*, 874 P.2d 352, 383 (Colo. 1994) ("The party requesting an award of attorney fees bears the burden of proving by a preponderance of the evidence its entitlement to such an award."). An award of attorneys' fees must be reasonable, and the determination of reasonableness is a question of fact for the trial court. *See Hartman v. Freedman,* 591 P.2d 1318, 1322 (Colo. 1979). "It remains counsel's burden to prove and establish the reasonableness of each dollar, each hour, above zero." *See Payan v. Nash Finch Co.,* 310 P.3d 212, 219 (Colo. App. 2012).

A "reasonable" fee should be determined in light of all the circumstances for the time and effort reasonably expended by the prevailing party's attorney. *Spensieri v. Farmers Alliance Mut. Ins. Co.,* 804 P.2d 268, 270 (Colo. App. 1990). If the court determines that some reduction in attorney fees is warranted, it may either identify the hours expended or, in the alternative, merely reduce the total fee by an appropriate amount. *Porter v. Castle Rock Ford Lincoln Mercury, Inc.,* 895 P.2d 1146, 1150 (Colo.App. 1995).

In determining reasonable attorneys' fees, once the lodestar calculation has been made, the trial court must consider the eight factors for determining the reasonableness of fees set forth in Rule 1.5 of the Colorado Rules of Professional Conduct and "other factors [which] may be appropriate to consider in a particular case." *City of Wheat Ridge v. Cerveny,* 913 P.2d 1110, 1115-1116 (Colo. 1996). The eight factors set forth in Rule 1.5 to be considered in determining the reasonableness of fees are:

1)   the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

2)   the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

3)   the fee customarily charged in the locality for similar legal services;

4)      the amount involved and the results obtained;

5)      the time limitations imposed by the client or by the circumstances;

6)      the nature and length of the professional relationship with the client;

7)      the experience, reputation, and ability of the lawyer or lawyers performing the services; and

8)      whether the fee is fixed or contingent.

These factors, particularly the first, do not support a finding that the fees requested are reasonable, or warranted, as there is no particular skill required to make a jurisdictional argument or to seek sanctions for an error concerning jurisdiction.

## ARGUMENT

The Plaintiff seeks nearly twenty-eight thousand dollars in fees which his counsel claim were properly and necessarily incurred in the interlocutory appeal, but which does not comport with the settled standard for reasonable attorneys' fees in Colorado.

On February 3, 2022, Mr. Coomer's counsel filed a Motion to Dismiss the Appeal, seeking sanctions and an extension of time to file an Answer Brief.  The motion consisted of three and one-half pages analyzing whether the Court of Appeals had jurisdiction over the interlocutory appeal, two and one-half pages of irrelevant case history, two paragraphs analyzing the appellee's entitlement to attorneys' fees and costs, and one paragraph requesting an extension.  *Attached as Exhibit A.*  Nothing else was filed in the Court of Appeals.

A reasonable fee award must necessarily exclude hours that are excessive or unwarranted, because the movant must establish the reasonableness of each hour.  To begin with, in submitting a fee application, a prevailing party is required to exercise "billing judgment" by making a good faith effort to exclude improper charges.  "Counsel for the prevailing party should make a good faith effort

4

to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983).

Plaintiffs' counsel have not attempted to exercise such judgment. Instead, it appears they simply summarized all of the hours and activities they undertook since the Notice of Appeal was filed, and left it for the Defendants and Court to sort out. This is not an ethical approach to submitting a fee application.  The initial considerations in reducing a fee award are whether the hours requested have been adequately documented; whether the request reflects overstaffing and duplication of effort by counsel; and whether hours have been expended on activities that were unproductive, unnecessary, or otherwise unreasonable  *Hensley*, 461 U.S. at 433-34.

The Court should also exclude as unproductive, unnecessary, and unreasonable numerous hours that had no direct bearing on the dismissal of the appeal.  For example, the bulk of the time for which the Plaintiff seeks fees was spent on an appellate brief which was never filed, and was unnecessary and unreasonable under the Plaintiff/Appellee's theory that the Court of Appeals lacked jurisdiction over the appeal.  Rather than filing the motion to dismiss and requesting that the Court of Appeals abate the briefing schedule pending a determination of its jurisdiction, counsel proceeded to "research", "consult on", "discuss", "draft" and "revise" an unwarranted, unnecessary, and worthless brief.  Under *Hensley,* these fees are improper, and may not be awarded.

Further, Plaintiff's counsel have "block billed" for their activities, in such a manner that the time spent on their motion to dismiss cannot be ascertained.  It is not possible to sift the block-billing to determine how much time was spent on the motion to dismiss.  For instance, on February 3, 2022, Mr. Kloewer's billing records show:

> Review of final draft of appeal response; various emails with
> Zach Bowman regarding ability to file appeal on order
> appealed; research on Rule 54 to determine validity of appeal;

discussions regarding potential sanctions for the appeal itself. Bkloewer

The *Payan* Court, drawing in *Hensley,* distinguished between block billing which allows a court to determine whether hours billed were reasonable, or all of a piece, and block billing which does not allow such a determination:

> Block billing is a form of time-keeping that involves stating the total daily time spent on a case, rather than separating out the time into individual entries describing specific activities." *Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 277 F. Supp. 2d 323, 325 n.3 (S.D.N.Y. 2003) (quoting *Rodriguez v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999)). C.R.C.P. 121, section 1-22 does not require counsel to use a particular type of billing format; nor does it prohibit block billing. See Colo. RPC 1.5 cmts.; *Crow v. Penrose-St. Francis Healthcare Sys.*, 262 P.3d 991, 1000 (Colo. App. 2011). However, a trial court retains discretion to reduce the hours billed based on block billing if the court is unable to determine whether the amount of time spent on various tasks was reasonable. See *Crow*, 262 P.3d at 1000; see also *Hensley*, 461 U.S. at 437 (holding that fee applicant should "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims"); *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) ("We do not quarrel with the district court's authority to reduce hours that are billed in block format. The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked.").

*Payan*, *supra*, 310 P.3d at 218.  The Court of Appeals, noting the trial court's determination that "across-the-board percentage cuts are routinely employed by courts to remedy such block billing" found "no reason to disagree with the trial court's conclusion".  *Id.*  The Court, in accord with *Hensley*, also held that "the district court should exclude from the initial lodestar calculation hours that were not 'reasonably expended'.  *Id.* (quoting *Hensley*, 461 U.S. at 434).  The party seeking a fee award "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley*, 461 U.S. at 437; see *Id.* at n.12 ("counsel's records must provide a proper basis for determining how much time was spent on particular claims").

The only entry in the billing records which concerns the motion alone is on February 3, 2022:

> draft and edit motion to dismiss appeal for lack of jurisdiction, motion for sanctions, and alternative motion for
> (4.5). zbowman

Finally, the Plaintiff's proposed lodestar rates are unreasonable and unsupported by any evidence but Mr. Cain's opinion, which does not suffice, particularly given that none of the listed attorneys practices in the Denver metropolitan area.  Mr. Cain, Bowman, Ms. Beam, and Mr. Romero are Texas-based, and Mr. Kloewer is based in Salida.  Mr. Cain offers no support for his opinion that the billing rates are in line with those prevailing in the community, and fails to recognize or sustain his burden, despite billing at $500 per hour.

Defendants also note that Mr. Cain's declaration, ¶ 11, avers, erroneously, that the fee award he seeks is "expressly authorized by C.R.C.P. 37…" because "the lawyers involved in the Oltmann depositions were unable to perform hourly fee services for other clients of the firm…"  However, the erroneous basis on which he claims an entitlement to fees does not alter the standard for reasonableness of the fee award sought.

> A "reasonable rate" is defined as the prevailing market rate in the relevant community for an attorney of similar experience. *Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1078 (10th Cir. 2002); *Malloy v. Monahan*, 73 F.3d 1012, 1018 (10th Cir. 1996). The party requesting fees bears "the burden of showing that the requested rates are in line with those prevailing in the community." *Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1203 (10th Cir. 1998). In order to satisfy his burden, plaintiff must produce "satisfactory evidence - in addition to the attorney's own affidavits - that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

> *Pirera v. Sullivan Kline Grp.*, Civil Action No. 18-cv-01477-PAB-KMT, at *9-10 (D. Colo. Sep.

5, 2019).  The Colorado and federal standards and procedures for determination of a reasonable fee are effectively interchangeable.  *Catlin v. Tormey Bewley Corp.,* 219 P.3d 407, 411 (Colo.App. 2009).

The Colorado Appellate Courts are clear: the party seeking fees bears the burden of demonstrating its entitlement to those fees, and the reasonableness of the fee award it requests. The Plaintiff has failed to provide the Court with a basis upon which it can make the mandatory findings

for a fee award, or to which the Defendants can adequately object, and have left the Court with no option but to deny the fee award, due to the Plaintiff's failure to demonstrate reasonableness or entitlement.

## CONCLUSION

Wherefore, the Plaintiff/Appellee's fee request is improper under *Hensley,* and fees may not be awarded for unproductive and unnecessary hours. The only billing entry attributed to the Appellee's Motion to Dismiss the Appeal is for four and one-half hours, on February 3, 2022. However, because the Plaintiff/Appellee has failed to establish a reasonable hourly rate in the relevant legal community, or the experience of the attorney who billed that time, the Court has no competent evidence from which to calculate an appropriate lodestar rate for the motion to dismiss.

The Defendants/Appellants do not dispute the fees submitted or object to an award of same.

The Defendants/Appellants respectfully request that the Court set a hearing on the propriety of fees sought.

Respectfully submitted this 20th day of October, 2022

/s/ Andrea M. Hall
Andrea M. Hall
Attorney for Defendants Oltmann/FEC
United/Shuffling Madness Media, Inc.

8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of October, 2022, I electronically filed

**DEFENDANTS JOE OLTMANN/FEC UNITED/SHUFFLING MADNESS MEDIA,**

**INC. dba CONSERVATIVE DAILY'S RESPONSE IN OPPOSITION TO PLAINTIFF'S**

**SUBMISSION OF ATTORNEYS' FEES AND COSTS AND OBJECTION TO AWARD**

with the Clerk of the Court using the ICCES electronic filing system, which will serve a copy of this

filing to all counsel of record.

<u>/s/</u>  Andrea M. Hall

9

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: October 27, 2022 7:16 PM<br>FILING ID: 947E24988C75B<br>CASE NUMBER: 2020CV34319 |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC., et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff**<br>Charles J. Cain, No. 51020<br>ccain@cstrial.com<br>Steve Skarnulis, No. 21PHV6401<br>skarnulis@cstrial.com<br>Bradley A. Kloewer, No. 50565<br>bkloewer@cstrial.com<br>Zachary H. Bowman, No. 21PHV6676<br>zbowman@cstrial.com<br>**CAIN & SKARNULIS PLLC**<br>P. O. Box 1064<br>Salida, Colorado 81201<br>719-530-3011/512-477-5011 (Fax)<br><br>Thomas M. Rogers III, No. 28809<br>trey@rklawpc.com<br>Mark Grueskin, No. 14621<br>mark@rklawpc.com<br>Andrew E. Ho, No. 40381<br>andrew@rklawpc.com<br>**RECHTKORNFELD PC**<br>1600 Stout Street, Suite 1400<br>Denver, Colorado 80202<br>303-573-1900 | Case Number:        2020cv034319<br><br>Division Courtroom:        409 |

**PLAINTIFF'S REPLY IN SUPPORT OF SUBMISSION OF ATTORNEY'S FEES AND COSTS PURSUANT TO ORDER OF THE COURT OF APPEALS**

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), through counsel, files this Reply in Support of his Notice of Submission of Attorney's Fees and Costs Pursuant to Order of the Court of Appeals and Response in Opposition thereto of Defendants Joseph Oltmann, FEC United, Inc., and Shuffling Madness Media, Inc. (the Oltmann Defendants), and shows the Court as follows.

1.      The Oltmann Defendants assert two arguments in their response: (a) that this Court lacks subject matter jurisdiction to award appellate fees and costs; and (b) that the fees requested are unreasonable.  These arguments should be rejected because the Court has jurisdiction to hear the motion and the fees and costs requested are reasonable.

2.      ***Subject Matter Jurisdiction.***  This case is currently on appeal from the denial of the Oltmann Defendants' anti-SLAPP motion.  No final judgment has been entered and the appeal is interlocutory.

3.      As the Court noted in its latest order, C.R.S. § 13-20-1101 is silent on the issue of a trial court's jurisdiction pending an appeal of a special motion to dismiss.[1] However, the Court followed *Nelson v. Elway,* 971 P.2d 245 (Colo. App. 1998) in its recent order, which stands for the proposition that the Court retains jurisdiction over the portions of the case not affected by a partial judgment certified as final for purposes of appeal under C.R.C.P. 54(b).[2]

---

[1] *See* Order Regarding Defendants Rudy Giuliani, Sydney Powell, Sydney Powell, P.C., and Donald J. Trump for President, Inc.'s Joint Motion for Stay, entered on August 18, 2022.

[2] It is well-established that absent certification under C.R.C.P. 54(b), "litigation involving multiple claims or multiple parties is treated as a single action which is not final and appealable until all of the issues in the litigation are adjudicated."  *Kempter v. Hurd,* 713 P.2d 1274, 1278 (Colo.1986).

4.      The pendency of the current appeal of the anti-SLAPP order is immaterial to the current award and enforcement of appellate fees and costs.  As noted in the Order of the Court entered on February 22, 2022, attached to Plaintiff's Notice of Submission as Exhibit C, the Court of Appeals awarded Dr. Coomer's request for attorney fees and costs following the Oltmann Defendants' failure to respond to Dr. Coomer's Motion to Dismiss. The default by the Oltmann Defendants leads to the reasonable conclusion that they themselves realized the frivolity of the appeal.  However, even if they had responded, it was clear that the Court of Appeals lacked jurisdiction under C.R.C.P. 54.  Conversely, here, the Oltmann Defendants are acting as if all issues in the litigation have been adjudicated when it is clear they have not.  Accordingly, under the reasoning in *Nelson*, this Court maintains subject matter jurisdiction because the award of appellate sanctions is not affected by the anti-SLAPP appeal (*i.e*, the fee award is unrelated to the Court's ruling on the special motion to dismiss).

5.      It is for this very reason that the cases cited by the Oltmann Defendants are unavailing.  Those cases involve circumstances where the award of fees and costs in the final judgment was reversed because the appellant prevailed on the appeal of the substantive merits of the underlying claim.  *See Oster v. Baack*, 351 P.3d 546 (Colo. App. 2015) (reversal of fee award based on prevailing party clause in employment contract); *Bainbridge, Inc. v. Douglas Cnty. Bd. Of Comm'rs*, 55 P.3d 271, 273-74 (Colo. App. 2002) (reversal of fee award based on prevailing party in construction case); *Reyhar v. State Farm Mut. Auto. Ins. Co.*, 280 P.3d 64 (Colo. App. 2012) (reversal of fee award based on prevailing party provision under C.R.C.P. 54(d)); *Nichols v. Burlington*

*Northern and Santa Fe Railway Co.*, 56 P.3d 106 (Colo. App. 2002) (reversal of FELA judgment and associated award of costs); and *Nagy v. Landau*, 807 P.2d 1227 (Colo. App. 1991) (reversal of fee award based on reversal of underlying promissory note action).

6.     Here, the Court of Appeals' award of fees and costs was not based on a final appealable judgment under C.R.C.P. 54, and thus its determination of the appeal on the anti-SLAPP motions to dismiss is ancillary to the fee award.  Accordingly, this Court has jurisdiction to award fees and costs and has, frankly, already recognized its continuing jurisdiction to do so in its prior orders.[3]

7.     ***The Requested Fees are Reasonable.***  Dr. Coomer agrees with the Oltmann Defendants that the amount of fees and costs are within the sound discretion of the Court.  Dr. Coomer is the only party to present actual evidence of the reasonableness of his appellate fees as is his burden.  By contrast, the Oltmann Defendants have presented no countermanding evidence that the requested fees are unreasonable.

8.     In effect, the Oltmann Defendants argue that their gambit before the Court of Appeals was so frivolous that it should have resulted in *less* fees then were actually incurred because their appeal did not warrant full briefing given that Dr. Coomer's motion

---

[3] As the Court stated in *Reyher*: "Contrary to State Farm's interpretation of C.R.C.P. 54(d), the focus of the prevailing party analysis is not on procedural victories during the course of the litigation, but on the final disposition of the substantive issues. *See In re Water Rights,* 891 P.2d at 984; *cf. Van Steenhouse v. Jacor Broad. of Colo., Inc.,* 958 P.2d 464, 468-69 (Colo.1998)(because the plaintiff voluntarily dismissed her wage claim, trial court never ruled on the merits of that claim, and neither party qualified as the winning party for purposes of attorney fees provision in wage recovery statute); *Brock v. Weidner,* 93 P.3d 576, 579 (Colo.App.2004) (the trial court's dismissal of the plaintiff's claims with prejudice, pursuant to a stipulation of the parties, operated as a final decision on the merits and entitled the defendants to attorney fees as prevailing parties)."

to dismiss was ultimately successful.  In other words, they contend that only a motion to dismiss their appeal gives rise to "reasonable" fees.

9.     To be clear, the contemporaneous time records demonstrate that Dr. Coomer's counsel treated the Oltmann Defendants' September 24, 2021 appeal as a legitimate appeal.  The record before the Court shows that a substantive brief was drafted in order to respond to the substantive issues that the Oltmann Defendants *themselves* raised.  It is fair to infer from the contemporaneous time records that a decision was ultimately made to file a motion to dismiss the appeal after a significant amount of substantive briefing was done.  In order for a fee to be considered *unreasonable*, the Oltmann Defendants would have to show that the billing was "excessive, redundant, or otherwise unnecessary."   *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). Endeavoring to draft a substantive response to a brief filed by the Oltmann Defendants can hardly be considered unnecessary.  The ultimate decision to file a motion to dismiss was within the discretion of Dr. Coomer's attorneys but can hardly vitiate work performed on the substantive appeal.

10.     Likewise, the argument that "block billing" occurred is misplaced.  Each billing entry is specific to the tasks at hand and were detailed as to each task.  Block billing indicates the failure to detail between tasks, which did not occur.

11.     Finally, the argument that "Texas-based" billing rates were applied is nonsense.  Both Mr. Cain and Mr. Kloewer are licensed Colorado attorneys and have their principal office in Salida, Colorado.  Moreover, Dr. Coomer's co-counsel, Trey Rogers,

also reviewed the billings for appropriateness.  And finally, Dr. Coomer's submissions of reasonable rates is consistent with this Court's prior award of sanctions.[4]

12.     In conclusion, the fees requested are reasonable and necessary.  Therefore, pursuant to the information contained in Dr. Coomer's original Submission, Dr. Coomer hereby requests an award of reasonable appellate fees in the amount of **$27,895.00** and costs of **$172.00**, for a total of **$28,067.00**.  Dr. Coomer further requests the Court order payment of these amounts within ten (10) days of this Court's order establishing the amount of the award.  Dr. Coomer does not agree that an in-person hearing is necessary but reserves the right to request additional fees if the Oltmann Defendants demand such a hearing.

Respectfully submitted this 27th day of October 2022.

_/s/ Charles J. Cain_
Charles J. Cain, No. 51020

## CERTIFICATE OF SERVICE

I certify that true and accurate copy of the foregoing Reply in Support of Submission Attorney Fee and Costs has been e-served via ICCES on all counsel of record on the 27th day of October 2022.

_/s/ Charles J. Cain_
Charles J. Cain, No. 51020

---

[4] Sanctions Order Against Defendant Oltmann and Counsel entered March 22, 2022, attached to Plaintiff's Notice of Submission as Exhibit B.

| DISTRICT COURT, DENVER COUNTY, COLORADO | |
|---|---|
| Court Address:<br>1437 BANNOCK STREET, RM 256, DENVER, CO, 80202 | DATE FILED: October 31, 2022 12:49 PM<br>CASE NUMBER: 2020CV34319 |
| **Plaintiff(s)** ERIC COOMER<br><br>v.<br><br>**Defendant(s)** DONALD J TRUMP FOR PRESIDENT INC et al. | |
| | ⚠ **COURT USE ONLY** ⚠ |
| | Case Number: 2020CV34319 |
| | Division: 409          Courtroom: |
| **Order:Plaintiff's Notice of Submission of Attorney's Fees and Costs Pursuant to Order of the Court of Appeals (with attach)** | |

The motion/proposed order attached hereto: SET FOR HEARING.

Counsel for Plaintiff shall contact Courtroom 409 (02Courtroom409@judicial.state.co.us) to obtain dates for a 2 hour hearing on attorneys fees and costs.

Issue Date: 10/31/2022

MARIE AVERY MOSES
District Court Judge

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| ERIC COOMER, Ph.D.,<br>Plaintiff<br><br>vs.<br><br>DONALD J. TRUMP FOR PRESIDENT, INC., et al.,<br>Defendants | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff**<br>Charles J. Cain, No. 51020<br>ccain@cstrial.com<br>Steve Skarnulis, No. 21PHV6401<br>skarnulis@cstrial.com<br>Bradley A. Kloewer, No. 50565<br>bkloewer@cstrial.com<br>Zachary H. Bowman, No. 21PHV6676<br>zbowman@cstrial.com<br>**CAIN & SKARNULIS PLLC**<br>P. O. Box 1064<br>Salida, Colorado 81201<br>719-530-3011/512-477-5011 (Fax)<br><br>Thomas M. Rogers III, No. 28809<br>trey@rklawpc.com<br>Mark Grueskin, No. 14621<br>mark@rklawpc.com<br>Andrew E. Ho, No. 40381<br>andrew@rklawpc.com<br>**RECHTKORNFELD PC**<br>1600 Stout Street, Suite 1400<br>Denver, Colorado 80202<br>303-573-1900 | Case Number:          2020cv034319<br><br>Division Courtroom:          409 |
| **PLAINTIFF'S NOTICE OF<br>SUBMISSION OF ATTORNEY'S FEES AND COSTS<br>PURSUANT TO ORDER OF THE COURT OF APPEALS** | |

TO THE HONORABLE JUDGE OF THIS COURT:

Plaintiff Eric Coomer, Ph.D. (Dr. Coomer), through counsel, submits the Declaration of Charles J. Cain, along with exhibits, attached as **Exhibit A**, pursuant to the Order of the Court of Appeals awarding Dr. Coomer his appellate fees and costs.

1.      On August 28, 2021, the Court entered a sanctions order against Defendants Oltmann, FEC United, and Shuffling Madness Media (collectively Appellants).

2.      On March 22, 2022, the Court issued an order on the amount of those sanctions. *See* **Exhibit B**. Among other things, the Court determined the reasonableness of certain hourly rates for Dr. Coomer's attorneys ($500 for partners, $275 for associates, and $137.50 for paralegals) as part of its analysis.

3.      On August 29, 2021, Appellants filed their notice of appeal in Court of Appeals Case Number 2021CA1481 for the purpose of contesting the March 22 Order.

4.      On February 22, 2022, after the matter was fully briefed, the Colorado Court of Appeals issued its order dismissing the Appellants' appeal. *See* **Exhibit C** (the COA Order).

5.      The COA Order granted Dr. Coomer's request for reasonable attorney fees and costs against Appellants in an amount "to be determined by the district court."

6.      On April 11, 2022, the Court of Appeals issued its mandate. *See* **Exhibit D**. Accordingly, Dr. Coomer's submission is now properly before this Court.

7.      Pursuant to the information contained in the attached Affidavit, Dr. Coomer hereby requests an award of reasonable appellate fees in the amount of **$27,895.00** and costs of **$172.00**, for a total of **$28,067.00**.  Dr. Coomer further requests the Court

order payment of these amounts within ten (10) days of this Court's order establishing the amount of the award.

Respectfully submitted this 6th day of October 2022.

_/s/ Charles J. Cain_
Charles J. Cain, No. 51020

## CERTIFICATE OF SERVICE

I certify that true and accurate copy of the foregoing Submission Attorney Fee and Costs has been e-served via ICCES on all counsel of record on the 6th day of October 2022.

_/s/ Charles J. Cain_
Charles J. Cain, No. 51020